KARLA KRAFT, State Bar No. 205530
kkraft@sycr.com
KATIE BEAUDIN, State Bar No. 306402
kbeaudin@sycr.com
STRADLING YOCCA CARLSON & RAUTH, P.C.
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660-6422
Telephone: (949) 725-4000
Facsimile: (949) 725-4100

KATHERINE B. FORREST (*pro hac vice*)
kforrest@cravath.com
MICHAEL T. REYNOLDS (*pro hac vice*)
mreynolds@cravath.com
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

Attorneys for Defendant
    BIOSENSE WEBSTER, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| INNOVATIVE HEALTH LLC,<br><br>Plaintiff,<br><br>v.<br><br>BIOSENSE WEBSTER, INC.,<br><br>Defendant. | CASE NO. 8:19-cv-01984-JVS-KES<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[*Filed concurrently with Proposed Order*]<br><br>Judge: Hon. James V. Selna<br>Date: March 2, 2020<br>Time: 1:30 p.m.<br><br>Complaint Filed: October 18, 2019 |

- 1 -

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on March 2, 2020 at 1:30 p.m., before the Honorable James V. Selna, at Courtroom 10C at the above-captioned Court, located at 411 West 4th Street, Santa Ana, California, 92701, defendant Biosense Webster, Inc. ("Biosense" or "Defendant") will move the Court for an order dismissing this action, without leave to amend, pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, and all pleadings, records and other documents on file with the Court in this action, and upon such oral argument as may be presented at, before and after the hearing of this Motion.

This Motion is made following conferences of counsel pursuant to Local Rule 7-3, which occurred on December 5, 2019, in relation to the original Complaint, and December 17, 2019, in relation to the operative First Amended Complaint.

DATED:  January 9, 2020

STRADLING YOCCA CARLSON & RAUTH,
A Professional Corporation

By:  */s/ Karla Kraft*
Karla Kraft
Katie Beaudin

And

Katherine B. Forrest *(Pro Hac Vice)*
Michael T. Reynolds *(Pro Hac Vice)*
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

Attorneys for Defendant
BIOSENSE WEBSTER, INC.

2

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 6

PRELIMINARY STATEMENT ........................................................ 6

STATEMENT OF FACTS ................................................................ 8

LEGAL STANDARD ..................................................................... 13

ARGUMENT .............................................................................. 14

    I.    PLAINTIFF FAILS TO ALLEGE PLAUSIBLE MARKETS ........ 14

        A.    Plaintiff Fails to Allege Plausible Catheter Product Markets ....................................................................... 15

        B.    Plaintiff Fails to Plausibly Allege a Market for CARTO 3 Training and Clinical Support ........................... 19

    II.    PLAINTIFF'S EXCLUSIVE DEALING CLAIM FAILS .............. 22

    III.    PLAINTIFF'S TYING CLAIMS ALSO FAIL .............................. 22

    IV.    PLAINTIFF FAILS TO PLAUSIBLY ALLEGE ATTEMPTED MONOPOLIZATION .................................................... 26

CONCLUSION .......................................................................... 28

i
TABLE OF CONTENTS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
  836 F.3d 1171 (9th Cir. 2016) ................................................. 22, 24, 25

*AFMS, LLC v. United Parcel Serv. Co.*,
  105 F. Supp. 3d 1061 (C.D. Cal. 2015), *aff'd* 696 F. App'x 293
  (9th Cir. 2017) ............................................................................. 20

*AFMS, LLC v. United Parcel Serv. Co.*,
  No. CV 10-05830 MMM, 2011 WL 13128436 (C.D. Cal. Nov. 23,
  2011) ............................................................................................ 17

*Allied Orthopedic v. Tyco Health Care Grp.*,
  592 F.3d 991 (9th Cir. 2010) ...................................................... 27

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal &
  Prof'l Publ'ns, Inc.*,
  108 F.3d 1147 (9th Cir. 1997) .................................................... 21

*Apple, Inc. v. Psystar Corp.*,
  586 F. Supp. 2d 1190 (N.D. Cal. 2008) ...................................... 18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................... 13

*Bendorf v. Ojai Basin Groundwater Mgmt. Agency*,
  No. CV 11-3877-DSF SP, 2012 WL 3867352 (C.D. Cal. July 16,
  2012), *R&R adopted*, No. CV 11-3877-DSF SP, 2012 WL
  3929891 (C.D. Cal. Sept. 4, 2012) .............................................. 27

*Blizzard Ent. Inc. v. Ceiling Fan Software LLC*,
  941 F. Supp. 2d 1227 (C.D. Cal. 2013) ................................. 18, 19

*Brantley v. NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012) .............................................. 14, 25, 26

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ..................................................................... 14

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992) ............................................................... 17, 23

iii

*Eastman v. Quest Diagnostics Inc.*,
   724 F. App'x 556 (9th Cir. 2018)................................................22, 23, 25

*Epicenter Recognition, Inc. v. Jostens, Inc.*,
   81 F. App'x 910 (9th Cir. 2003)................................................21

*Hirsh v. Martindale-Hubbell, Inc.*,
   674 F.2d 1343 (9th Cir. 1982)................................................23, 24

*In re ATM Fee Antitrust Litig.*,
   768 F. Supp. 2d 984 (N.D. Cal. 2009)................................................17

*In re Super Premium Ice Cream Distrib. Antitrust Litig.*,
   691 F.Supp. 1262 (N.D. Cal. 1988)................................................16

*Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*,
   No. CV07-00043MMMSSx, 2007 WL 4976364 (C.D. Cal. Oct.
   29, 2007), *aff'd*, 323 F. App'x 571 (9th Cir. 2009)................................................26

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) ................................................19

*LAI v. USB-Implementers Forum, Inc.*,
   No. CV 14-05301-RGK, 2014 WL 12600969 (C.D. Cal. Nov. 21,
   2014) ................................................14, 16, 21

*Lai v. USB-Implementers Forum, Inc.*,
   No. CV1405301RGKPJWX, 2015 WL 12746705 (C.D. Cal. Mar.
   11, 2015) ................................................28

*Petrochem Insulation, Inc. v. United Ass'n of Journeymen &*
   *Apprentices of the Plumbing & Pipe Fitting Indus., Local Union*
   *No. 38*,
   9 F.3d 29, 1993 WL 378807 (9th Cir. Sep. 24, 1993) ................................................27

*PNY Techs., Inc. v. SanDisk Corp.*,
   No. 11-CV-04689-WHO, 2014 WL 1677521 (N.D. Cal. Apr. 25,
   2014) ................................................21

*Power Analytics Corp. v. Operation Tech., Inc.*,
   No. SA CV16-01955JAK, 2017 WL 5479638 (C.D. Cal. May 10,
   2017) ................................................27

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ................................................21, 26

TABLE OF AUTHORITIES

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC,*
    532 F.3d 963 (9th Cir. 2008) .................................................................. 8, 24, 27

*Somers v. Apple, Inc.,*
    729 F.3d 953 (9th Cir. 2013) ...................................................................... 13, 14

*Streamcast Networks, Inc. v. Skype Techs., S.A.,*
    547 F. Supp. 2d 1086 (C.D. Cal. 2007) ............................................................ 17

*Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union,*
    No. CV14-05604-BRO (SSX), 2017 WL 5973279 (C.D. Cal. Mar.
    7, 2017), *aff'd*, 780 F. App'x 467 (9th Cir. 2019) ............................................. 25

*Tanaka v. Univ. of S. Cal.,*
    252 F.3d 1059 (9th Cir. 2001*)* ........................................................................ 14

*Ticketmaster L.L.C. v. RMG Techs., Inc.,*
    536 F. Supp. 2d 1191 (C.D. Cal. 2008) ............................................................ 14

*UGG Holdings, Inc. v. Severn,*
    No. CV 04-1137-JFW, 2004 WL 5458426 (C.D. Cal. Oct. 1, 2004) ............... 17

*United States v. Grinnell Corp.,*
    384 U.S. 563 (1966) ........................................................................................ 14

## MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

This is an action brought by one competitor against another.  Plaintiff Innovative Health LLC ("Innovative") reprocesses and sells diagnostic cardiac catheters originally designed and manufactured by defendant Biosense Webster, Inc. ("Biosense"), as well as those of other competing manufacturers.  Biosense also sells its own catheters.  While Biosense and Innovative compete for sales of reprocessed products, only Biosense has been authorized by FDA to sell its own newly-manufactured catheters.  Biosense also provides a free service to hospitals to train and provide clinical support to hospital personnel in the use of its cardiac mapping system.  Plaintiff Innovative does not.  A number of other competitors manufacture and reprocess competing catheters and provide their own training and clinical support on competing cardiac mapping systems.

These and other related facts, which demonstrate vibrant competitive conditions, are collected and recited by plaintiff in its First Amended Complaint (Docket No. 25, the "FAC") as evidence of anticompetitive conduct by defendant. Among the claims plaintiff asserts are monopolization, attempted monopolization, exclusive dealing and tying.  None can survive this motion.  While there are a number of issues with plaintiff's claims, we focus here on four arguments dispositive of the entirety of the FAC: plaintiff failed to plausibly allege (1) product markets necessary to support any antitrust claim, the elements necessary to support its (2) exclusive dealing and (3) tying claims, and (4) the requisite intent for attempted monopolization.

*First*, well-defined product markets are the *sine qua non* of any antitrust claim.  Without a well-defined market, it is impossible to calculate market share or determine whether any market participant in fact has or can exercise market power. The antitrust laws support dismissal of claims based on product markets defined without regard to common sense or economic reality.  Where the alleged market

definitions fail to include reasonable substitutes or improperly define a single-brand market, the allegations fail as a matter of law.  Here, plaintiff has set forth a goal-oriented market definition in which defendant's own products (various high-density and ultrasound catheters, some of which are used with its "CARTO 3" mapping system) constitute the outer bounds of the market.  So defined, it is no surprise that defendant is positioned as a *de facto* monopolist in its own products. In short, plaintiff's claims all rise or fall on whether the single-brand product market it has alleged is cognizable.

It is not.  Even within the four corners of the FAC, it is clear that there are a number of other competitors who manufacture competing mapping systems on which competing catheter brands, and even Biosense's own catheters, may be used; all of these competitors, catheters and mapping systems are carved out of plaintiff's market definitions.  Instead, plaintiff mistakenly posits product differentiation as equivalent to the boundaries of market definition.

Beyond this infirmity are dispositive allegations that eliminate the boundaries plaintiff alleged for a "training and support" market: plaintiff asserts that defendant has 100% share in the alleged market for such training and support, but concedes that hospitals can and do train and support their own personnel.  Once hospital personnel are included as part of the clinical support market, plaintiff's claims based on a far more limited market fail.

*Second*, the exclusive dealing claim fails for the simple reason that the FAC does not allege any exclusive term.  To the contrary, the FAC alleges that hospitals can and do purchase catheters from multiple suppliers and have no contractual requirement to purchase anything from defendant.

*Third*, plaintiff's tying claim fails because the factual allegations support neither the necessary two separate products, nor economic coercion. Rather, the alleged "tie" is better understood as plaintiff's dissatisfaction with having to compete against a manufacturer that utilizes expertise in its own product to provide

free training and support in its product to hospital personnel for the benefit of patients. According to plaintiff, such services create an unlawful "tie" of training and support with catheter purchases. Surely it would not benefit consumers for defendant to cease providing such services; and surely the law does not require that defendant be forced to support plaintiff's business by providing free services for its competing sales. The tying theory makes no sense. Plaintiff further concedes that hospitals purchase defendant's catheters separately from availing themselves of the training and clinical support, which defendant provides at will—thus eliminating any element of coercion. The state of our antitrust law has not reached the point of finding the enjoyment of free training and support provided by a manufacturer of a medical device to constitute a tie.

*Finally*, plaintiff fails to allege the specific intent necessary to support its attempted monopolization claim.[1]

These infirmities were raised in two meet and confers with plaintiff's counsel. As a result of the first meet and confer, plaintiff filed the instant FAC to attempt to remedy the deficiencies of the original complaint. Because the FAC still is deficient, dismissal should be granted without leave to further amend.

## STATEMENT OF FACTS

The following facts, drawn from the FAC and the exhibit attached thereto, are assumed true for purposes of this motion.

Defendant Biosense manufactures and sells diagnostic catheters as well as a cardiac mapping system with which they operate, the CARTO 3. Biosense is one of a number of manufacturers of cardiac mapping systems and diagnostic catheters. (*See, e.g.*, FAC ¶ 7 (asserting that only 50% of the mapping systems installed in the United States are Biosense systems); ¶¶ 8, 11, 12 (referring to "other cardiac

---

[1] The state law claims fail for the same reasons above. *See Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 976 n.5 (9th Cir. 2008).

MEMORANDUM OF POINTS AND AUTHORITIES

CASE NO. 8:19-cv-01984

mapping systems", including those from Abbott, Philips, General Electric and Siemens).)

Cardiac mapping systems assist medical providers with electrophysiology studies that test the electrical activity of the heart. (FAC ¶ 6.) Such studies diagnose abnormal heart rhythms and assist physicians with planning a course of care. (*Id.*) During the study, a physician inserts a series of electrically sensitive (diagnostic) catheters into a blood vessel that leads to the heart. (*Id.*) There are both "navigational" and "non-navigational" mapping catheters. (*See, e.g.*, FAC ¶ 11.) Ultrasound and high-density mapping catheters are two types of diagnostic catheters that can be used with a cardiac mapping system. (FAC ¶ 6.) Biosense sells the SOUNDSTAR and ACUNAV, two types of ultrasound diagnostic catheters. (FAC ¶ 7.) Abbott also sells an ultrasound diagnostic catheter, the ViewFlex, which works with an Abbott-manufactured ultrasound system or a Philips system. (FAC ¶ 12.) Biosense also manufactures two high-density mapping catheters, the PENTARAY and LASSO. (FAC ¶ 8.) Other manufacturers also make high-density mapping catheters; while plaintiff alleges that they are "generally" not compatible with the CARTO 3, it does not allege when they may be compatible and how that impacts sales or competition. (*See, e.g.*, FAC ¶¶ 8, 20.) Plaintiff Innovative sells reprocessed versions of catheters manufactured by other companies as well, such as Abbott's ViewFlex. (FAC ¶ 14; *see also id.* ¶ 20.)

The FDA regulates the sale of both new and reprocessed diagnostic catheters. (FAC ¶¶ 7, 9, 40, 43.) Biosense has been cleared by the FDA to sell both new and reprocessed SOUNDSTAR, ACUNAV, PENTARAY and LASSO catheters. (FAC ¶¶ 7, 10, 13.) These new and reprocessed catheters have the same indications for use. (FAC ¶¶ 9, 13.) Plaintiff is not authorized by the FDA to sell new Biosense catheters; it is only authorized to sell reprocessed versions. (FAC ¶¶ 1, 13, 14.)

MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 8:19-cv-01984

1   Plaintiff's factual allegations regarding relevant product markets are all

2   limited to diagnostic catheters *for use with the CARTO 3*.  (FAC ¶¶ 8, 11 (emphasis

3   added).)  Plaintiff alleges that defendant has "monopoly power in the nationwide

4   market or submarkets for the sale of high-density mapping catheters and ultrasound

5   catheters for use *with the CARTO 3* mapping system."  (FAC ¶ 32 (emphasis

6   added).)  Notably, the FAC does not allege factors differentiating the CARTO 3

7   from other cardiac mapping systems.

8   With regard to high-density mapping catheters "for use with the CARTO 3

9   system" (the PENTARAY and LASSO), plaintiff alleges that "[t]here are no

10   practical substitutes . . . to provide rapid high-resolution mapping of electrical

11   activity in the heart" and that "[o]ther diagnostic catheters are not comparable in

12   speed or accuracy for mapping an entire chamber of the heart."  (FAC ¶ 8.)  These

13   allegations appear to be limited to the concept of high-density mapping catheters

14   generally, and not defendant's particular ones.  Plaintiff does not allege that

15   Biosense's PENTARAY and LASSO are incompatible with all other mapping

16   systems but instead carefully alleges that they are "*generally*" not compatible and

17   cost up to a $1,000 per unit.  (FAC ¶ 8.)  Plaintiff does not include any factual

18   allegations regarding which other systems the PENTARAY and LASSO may be

19   used with.  Plaintiff alleges that many customers purchase both new and

20   reprocessed high-density mapping catheters for use with the CARTO 3 system.

21   (FAC ¶ 9.)  Plaintiff does not allege how demand or sales for new catheters differs

22   from reprocessed products, despite the fact that it is only authorized to sell

23   reprocessed versions.

24   In terms of ultrasound catheters, plaintiff alleges that there "are no practical

25   substitutes for ultrasound catheters to visualize cardiac structure and blood flow in

26   the heart without exposing the patient and medical staff to radiation."  (FAC ¶ 11.)

27   This allegation appears to be a general one regarding the role of ultrasound

28   catheters and is not limited to defendant's products.  Ultrasound catheters have "an

10

average sales price of more than $2,000." (*Id.*)  The SOUNDSTAR is compatible only with the CARTO 3.  (*Id.*)  But the ACUNAV is not compatible with the CARTO 3; it is "only compatible with ultrasound systems from General Electric or Siemens." (*Id.*)  Abbott makes the ViewFlex ultrasound diagnostic catheter for use with either an Abbott or Philips ultrasound system.  (FAC ¶ 12.)  Plaintiff does not include any factual allegations regarding consumer demand as between the SOUNDSTAR and ACUNAV products and others that work with the General Electric, Siemens, Abbott or Philips systems.  At most, plaintiff asserts that "[m]ost CARTO 3 users do not have an Abbott or Philips" system that would allow them to switch to the ViewFlex.  (FAC ¶ 12.)[2]  Plaintiff does not allege that it has performed a hospital survey or otherwise has market data supporting this broad statement.

Plaintiff alleges a separate market for training and what it calls "clinical support."  (FAC ¶ 15.)  It alleges that "cardiac mapping system software must be operated by a technician during a cardiac mapping procedure conducted by a physician" and that manufacturers of mapping systems do not provide training or clinical support for each other's machines.  (FAC ¶¶ 15, 16.)  With regard to the CARTO 3 system, plaintiff alleges that "clinical support requires specialized training and experience".  (FAC ¶ 16.)  Plaintiff acknowledges that a hospital's own clinical staff can provide such support and that "[h]*istorically*", "the system manufacturers" (whether it be defendant or another) "simply provided initial training for hospital staff".  (FAC ¶ 15.)  Plaintiff does not allege that the provision of initial training to hospital personnel was inadequate or would no longer be a feasible alternative.  Plaintiff alleges that defendant has a "100% share of the nationwide market or local markets for CARTO 3 clinical support", even though

---

[2] Plaintiff alleges that the geographic market for high-density mapping catheters and ultrasound catheters for use with the CARTO 3 system is "the United States."  (FAC ¶¶ 10, 14.)

MEMORANDUM OF POINTS AND AUTHORITIES

CASE NO. 8:19-cv-01984

Biosense is only alleged to provide clinical support "for more than 95% of the CARTO 3 systems installed in the United States."  (FAC ¶ 26.)

Plaintiff asserts that more than a decade ago, defendant Biosense began to provide clinical account specialists to hospitals free of charge. (FAC ¶ 15.) Plaintiff concedes that there are some hospitals that handle their own clinical support. (FAC ¶ 16.)[3]

Plaintiff concedes that defendant in fact sells catheters "of all kinds" without clinical support, and that "[h]ospitals purchase catheters of all kinds —ultrasound catheters, mapping catheters, diagnostic catheters and ablation catheters— separately from the clinical support."  (FAC ¶ 18.)  Plaintiff acknowledges that hospitals are under no contractual obligation to obtain catheters and clinical support together.  (*Id.*)  Plaintiff further alleges that "hospitals regularly purchase other diagnostic catheters (in contrast with the high-density mapping catheters) *from manufacturers and reprocessors other than Biosense Webster for use with the CARTO 3 system*."  (*Id.* (emphasis added).)  Plaintiff further concedes that "[Biosense] *voluntarily* provides the clinical account specialists *at will* to hospitals after the purchase of the CARTO 3 system."  (FAC ¶ 19 (emphasis added).) Plaintiff alleges that customers buy a mapping system separate from catheters and then bargain separately with catheter manufacturers and reprocessors for the best price.  (FAC ¶ 20.)  Plaintiff further alleges that hospitals that buy the CARTO 3 are not contractually obligated to purchase catheters compatible with the CARTO 3 from defendant.  (FAC ¶ 20.)  "For example, hospitals regularly purchase various brands of reprocessed non-navigational diagnostic catheters from Innovative Health or other reprocessors for use with the CARTO 3 system."  (*Id.*)  Plaintiff alleges that hospitals face costs in switching systems as they can cost up to $500,000 (FAC ¶ 25), but that "the physician has practical leverage with the

---

[3] With regard to the geographic market for clinical support, plaintiff alleges that it corresponds to "geographic pods".  (FAC ¶ 17.)

MEMORANDUM OF POINTS AND AUTHORITIES

CASE NO. 8:19-cv-01984

hospital in choosing a cardiac mapping system because he or she can move his or her patients to a competing hospital on short notice" (FAC ¶ 22).

Plaintiff further alleges that defendant has engaged in a variety of what it calls "predatory conduct" by:  (1) refusing to provide clinical support during procedures using catheters reprocessed by third parties, a policy it uses to "coerce and induce hospitals to deal exclusively with [it] for purchases of high-density mapping catheters and ultrasound catheters" and "foreclose[] its competitors from 98% to 99% of the nationwide markets for those catheters" (FAC ¶ 45); (2) "mak[ing] false and misleading statements to customers" that it has "no knowledge" of the "specifications" of reprocessed catheters (FAC ¶ 49); (3) adding a timestamp to catheters that must be decrypted after the first use (FAC ¶¶ 50-51); and (4) engaging in various practices at hospitals to collect used catheters that constrain Innovative from reprocessing them (FAC ¶ 52).

After the filing of its initial complaint, counsel for plaintiff and defendant had two meet and confers during which defendant's counsel highlighted the infirmities in the complaint discussed below.  Plaintiff filed the FAC after that meet and confer.  As discussed by the parties in the second meet and confer which occurred after the FAC was filed, the FAC fails to remedy the fundamental flaws of the original complaint.  This motion follows the parties' substantial meet and confer efforts.

## **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "As the Supreme Court has emphasized . . . insistence on specificity of facts is warranted before permitting a case to proceed into costly and protracted discovery in an antitrust case".  *Somers v. Apple, Inc.*, 729 F.3d 953, 966 (9th Cir. 2013).  "Plausibility requires pleading facts, as opposed to conclusory

allegations or the 'formulaic recitation of the elements of a cause of action'". *Id.* at 959. (quoting *Twombly*, 550 U.S. at 555). "'Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 960 (quoting *Iqbal*, 556 U.S. at 678). "Thus, a complaint's allegation of a practice that may or may not injure competition is insufficient". *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) (citation omitted).

## ARGUMENT

## I.    PLAINTIFF FAILS TO ALLEGE PLAUSIBLE MARKETS

The FAC fails to allege plausible product markets, requiring dismissal of all claims. *See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001*)* ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim."). A complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable.'" *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 536 F. Supp. 2d 1191, 1195 (C.D. Cal. 2008) (quoting *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)).

"Where a plaintiff fails to define [its] proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in his favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *LAI v. USB-Implementers Forum, Inc.*, No. CV 14-05301-RGK (PJWx), 2014 WL 12600969, at *5 (C.D. Cal. Nov. 21, 2014) (quoting *UGG Holdings, Inc. v. Severn*, No. CV 04-1137-JFW (FMOx), 2004 WL 5458426, at *3 (C.D. Cal. Oct. 1, 2004)); *see also United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) ("In case of a product it may be of such a character that substitute products must also be considered, as customers may turn to them if there is a slight increase in the price of the main product."); *Brown Shoe Co. v. United States*, 370 U.S. 294, 325

14

MEMORANDUM OF POINTS AND AUTHORITIES

CASE NO. 8:19-cv-01984

(1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.").

Here, plaintiff has alleged three separate markets, all of which are defined and limited by required usage "with the CARTO 3". Accordingly, if this Court views that limitation (which carves out all other competing mapping systems and competing catheters) as insufficiently supported, all claims must be dismissed. The product markets alleged are: (1) a market for high-density mapping catheters *for use with CARTO 3*, (2) a separate market for ultrasound catheters *for use with CARTO 3*, and (3) a third market for clinical training and support for *CARTO 3*. (*See* FAC ¶¶ 8-25.) The reason for the CARTO 3 limitation is clear: without it, defendant lacks the market power and competitive position to sustain any claim.

## A. Plaintiff Fails to Allege Plausible Catheter Product Markets.

Plaintiff purports to allege two separate catheter product markets, both of which are in turn defined in terms of usage with CARTO 3. Explicit allegations in the FAC undermine this limitation.

*First*, the FAC contains references to substitute cardiac mapping systems other than the CARTO 3. Indeed, the ACUNAV ultrasound catheter *is not even compatible with the CARTO 3*; it is "only compatible with ultrasound systems from General Electric or Siemens". (FAC ¶ 11.) It makes no sense that the ACUNAV would be part of a market for ultrasound catheters "for use with the CARTO 3" when the FAC alleges it cannot be used with the CARTO 3.

Plaintiff further alleges that the CARTO 3 accounts for just half of the cardiac mapping systems installed in the United States (FAC ¶ 7) and that there are "large lab[s]" and hospitals "with multiple brands of cardiac mapping systems" (FAC ¶ 24). Thus, there are other unaccounted for mapping systems that should be included in the market. Moreover, the FAC alleges that Biosense's PENTARAY

and LASSO high-density mapping catheters are "*generally* not compatible with other cardiac mapping systems", but the statement certainly implies that they are compatible with some.  (FAC ¶ 8 (emphasis added).)  The FAC also cites Abbott and Philips as manufacturers of competing cardiac mapping systems.  (FAC ¶¶ 12, 33, 53.)  In addition, doctors are alleged to have "practical leverage with the hospital in choosing a cardiac mapping system because [they] can move [their] patients to a competing hospital on short notice." (FAC ¶ 22.)  None of these competing mapping systems or catheters are included within plaintiff's asserted product market; nor does plaintiff adequately explain why they are excluded.

The FAC does include allegations suggesting certain differences between defendant's products and competing alternatives (*see, e.g.*, FAC ¶¶ 12, 33); but as pled, these differences are no more than product differentiation and cannot support the outer boundaries of an antitrust market.  *See In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F.Supp. 1262, 1268 (N.D. Cal. 1988) ("Courts have repeatedly rejected efforts to define markets by price variances or product quality variances.  Such distinctions are economically meaningless where the differences are actually a spectrum of price and quality differences.").

*Second*, the FAC alleges that there are substitute catheters for use with the CARTO 3, and these are improperly excluded from the proposed catheter markets. The four models of Biosense catheters which form the product markets in the FAC are not the only catheters compatible with the CARTO 3, as "hospitals regularly purchase various brands of reprocessed non-navigational diagnostic catheters from Innovative Health or other reprocessors for use with the CARTO 3 system" to such a degree that 20% of "CARTO 3 procedures involves one or more diagnostic catheters reprocessed by a third party."  (FAC ¶ 20.)  There are no allegations concerning the differences between these non-navigational catheters and navigational ones or that customers could not switch between them in response to a price increase.  *See, e.g.*, *LAI*, 2014 WL 12600969, at *5-6 (dismissing complaint

16

for failing to define relevant product market for "reversible USB connectors" separate from "one-way" connectors absent allegations regarding "the prices of these products" and "their qualities and uses"); *UGG Holdings*, 2004 WL 5458426, at *4 (dismissing with prejudice complaint that failed "to allege a lack of cross-elasticity of demand" between "sheepskin, fleece-lined" and other boots).  Again, these competing catheters are improperly excluded from the defined market.

In the face of the above specifically alleged market realities, the FAC alleges a single-brand market:  both catheter product markets are defined as limited to those "for use with the CARTO 3".  (*E.g.*, FAC ¶¶ 8-14.)  But the law is clear that single-brand markets are "extremely rare."  *AFMS, LLC v. United Parcel Serv. Co.*, No. CV 10-05830 MMM (AJWx), 2011 WL 13128436, at *20 (C.D. Cal. Nov. 23, 2011) (quoting *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008)); *see also Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086, 1094 (C.D. Cal. 2007) ("Courts have consistently refused to consider one brand to be a relevant market of its own when the brand competes with other potential substitutes." (quotation omitted)).  "Dismissal on the pleadings is appropriate" in cases involving "failed attempts to limit product markets to a single brand".  *AFMS*, 2011 WL 13128436, at *20 (quotation omitted).

Undoubtedly when alleging a single-brand product market, plaintiff had in mind the Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992) regarding derivative aftermarkets.  But "'[c]ourts have been extremely reluctant to embrace' *Kodak*'s single-brand market theory, 'much less to extend it to other types of goods.'"  *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 997 (N.D. Cal. 2009) (quoting *Streamcast Networks*, 547 F. Supp. 2d at 1094-95)).  In the Ninth Circuit, a single-brand aftermarket is plausibly pled considering "four relevant aspects of the complaint":  (1) the aftermarket "is wholly derivative from and dependent on the primary market"; (2) "the allegations of illegal anticompetitive acts relate[] only to the aftermarket

and not the initial market"; (3) the defendant's market power in the aftermarket "is derived from contractual *provisions* it obtained in the initial market . . . or through the contractual *relationship* it has with its consumers"; and (4) there are "market imperfections such as . . . high information costs and switching costs". *Blizzard Ent. Inc. v. Ceiling Fan Software LLC*, 941 F. Supp. 2d 1227, 1235-36 (C.D. Cal. 2013) (quoting *Newcal*, 513 F.3d at 1049-50).

Here, at least the first and fourth considerations undermine the plausibility of single-brand aftermarkets. The first element considers whether the aftermarkets would exist without the primary market. As detailed above, the PENTARAY and LASSO are compatible with at least some other cardiac mapping systems (FAC ¶ 8), and the ACUNAV is compatible *solely* with the Siemens and General Electric ultrasound systems (FAC ¶ 11). Thus, there would be a market for both categories of catheters even if the CARTO 3 did not exist. *See Blizzard*, 941 F. Supp. 2d at 1235 (summarizing precedent that there is no single-brand aftermarket for pizza ingredients derivative of a pizza franchise because there would be a market for ingredients "even without a market for pizza chain franchises").

The fourth consideration, market imperfections, likewise has not been plausibly pleaded. This element considers whether "[m]arket imperfections such as information costs and switching costs prevented customers from [evaluating costs of the aftermarket product] at the time of the original purchase or from imposing market discipline in the aftermarkets by switching among participants in the primary equipment market." *Apple*, 586 F. Supp. 2d at 1201. Here, hospitals can impose market discipline on the alleged catheter and service aftermarkets by switching between cardiac mapping systems. Although the FAC alleges that cardiac mapping systems "have an average sales price of roughly $400,000 to $500,000" (FAC ¶ 25), some hospitals and "large lab[s]" have "multiple brands of cardiac mapping systems" (FAC ¶ 24), and physicians "can move [their] patients to a competing hospital on short notice" (FAC ¶ 22). There is no allegation that there

18

are any costs in choosing among cardiac mapping systems that have already been purchased.  Even if hospitals were to purchase new equipment, switching costs may be relatively low.  Switching to the ViewFlex is alleged to cost around $50,000 (FAC ¶ 12); in light of the alleged price point of the ultrasound catheters of "more than $2,000" (FAC ¶ 11), such investment would not be unreachable in the event of a monopolistic price increase.  Hospitals thus are not "locked in" to the CARTO 3 as is required to allege plausible CARTO 3-branded catheter aftermarkets or market power therein.[4]

### B.   Plaintiff Fails to Plausibly Allege a Market for CARTO 3 Training and Clinical Support.

The alleged market for training and clinical support for the CARTO 3 is similarly flawed.  To support its tying claim, plaintiff must allege two separate products.  *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 (1984) ("[A] tying arrangement cannot exist unless two separate product markets have been linked.").  In order to meet this requirement, plaintiff sets up markets for catheters and a separate market for training and clinical support for the CARTO 3 machine.  That is, when hospitals invest in a CARTO 3 machine, defendant Biosense will provide training and support on the machine free of charge.  This is certainly a service that enhances consumer welfare. As alleged in the FAC, defendant's services are akin to a live instruction manual and customer support for use of an electronic device—the antitrust laws do not support viewing them as "products" defining the boundaries of an antitrust market.

Most critically, plaintiff failed to include the most apparent available substitute for defendant's clinical support: a hospital's own staff.  Inclusion of hospital personnel who can or do support catheter procedures using the CARTO 3

---

[4] Some cases discuss the aftermarkets exception "in the overall 'market definition' analysis", while this Court has before evaluated such claims under the "more specific 'market power' analysis."  *Blizzard Ent.*, 941 F. Supp. 2d at 1233 n.5.

MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 8:19-cv-01984

requires significant expansion of competing alternatives to defendant, and renders untenable plaintiff's allegations of market power.  As a matter of law, it need not even be the case that hospitals in fact provide such support on their own in order to include them in the market; it is enough if conditions exist that would allow them to provide such support.  *See AFMS, LLC v. United Parcel Serv. Co.*, 105 F. Supp. 3d 1061, 1073 (C.D. Cal. 2015), ("[M]arket definition must look at all relevant sources of supply, either actual rivals or eager potential entrants to the market." (quoting *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir. 1979))), *aff'd* 696 F. App'x 293 (9th Cir. 2017).

Plaintiff's acknowledgement that hospitals have, can and do provide their own clinical support is fatal to its market definition.[5]  Plaintiff alleges that there are hospitals that "handle their own case coverage" (FAC ¶ 16); that "historically", defendant and other system manufacturers provided "initial training for hospital staff to provide its own case coverage" (FAC ¶ 15); and that Biosense "regularly hires away clinical support personnel" from hospitals (FAC ¶ 30)—all of which substantiate that hospitals can provide such coverage themselves.  Most importantly, plaintiff ignores that it does not compete with defendant on the initial sale of catheters, as it has not been cleared by the FDA for the sale of new catheters, only reprocessed ones.  This means that all training and support of hospital personnel that occurs with <u>new</u> catheters is not in the same market as training and support of reprocessed catheters.  This has two impacts on plaintiff's market definition.  First, plaintiff must deduct from the market the amount of training and support provided in connection with new sales, as it is not alleging anticompetitive conduct in that segment of the market.  Second, the fact of initial training and support of new catheter sales means that hospital personnel are

---

[5] Plaintiff also alleges that other machine manufacturers also provide training/clinical support for their systems, making clear that defendant's alleged conduct in this regard is not unusual but sensible.  (FAC ¶¶ 16, 18.)

MEMORANDUM OF POINTS AND AUTHORITIES

CASE NO. 8:19-cv-01984

available at the time of reprocessed sales to support themselves, if they choose to do so.

In an attempt to avoid the historical reality that hospitals can and do have a ready supply of staff that are or can be trained in CARTO 3 support, plaintiff alleges the existence of "barriers to entry", including: (1) Biosense's brand reputation (FAC ¶ 27), which "does not constitute a sufficient entry barrier in this Circuit", *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997); *accord Epicenter Recognition, Inc. v. Jostens, Inc.*, 81 F. App'x 910, 911 (9th Cir. 2003); (2) economies of scale (FAC ¶¶ 28, 31); (3) "entrenched buying preferences" (FAC ¶ 29; *but see* FAC ¶ 22); and (4) Biosense's competition with hospitals for hiring clinical support personnel (FAC ¶ 30).[6] These "barriers" however, are nothing more than the cost of providing the clinical support itself—hiring, training and paying employees—which is not unique to entrants and which Innovative itself could undertake. *See PNY Techs., Inc. v. SanDisk Corp.*, No. 11-CV-04689-WHO, 2014 WL 1677521, at *10 (N.D. Cal. Apr. 25, 2014) (dismissing complaint without allegations that alleged entry costs "will not be incurred by incumbent providers" (quoting *E. Portland Imaging Ctr., P.C. v. Providence Health Sys.-Oregon*, 280 F. App'x 584, 586 (9th Cir. 2008))). Such costs are part of "natural market forces" in a competitive market, not "significant" barriers to entry. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995).

If plaintiff were to even try to allege a separate product market for training/clinical support, it must include all available substitutes for defendant's product. *See LAI*, 2014 WL 12600969, at *5. Because it does not, plaintiff's clinical support market definition fails.

---

[6] The alleged 18-month non-compete clauses (FAC ¶ 30) apply only to former *Biosense* employees, not technicians trained in hospitals. And the CARTO 3 was cleared by the FDA in 2009 (FAC ¶ 7); there are undoubtedly former Biosense technicians whose non-competes expired.

## II.   PLAINTIFF'S EXCLUSIVE DEALING CLAIM FAILS.

Plaintiff's Fourth and Tenth Causes of Action allege exclusive dealing. Both claims allege that defendant's practices "induce hospitals to deal exclusively with Biosense Webster" for the purchase of high-density mapping and ultrasound catheters.  (FAC ¶ 45; *see id.* ¶¶ 66, 84.)  These claims fail for the simple reason that no exclusive term is alleged.  "[A] prerequisite to any exclusive dealing claim is an agreement to deal exclusively."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1181 (9th Cir. 2016) (citation omitted).  A plaintiff "cannot sustain its burden by offering broad allegations and complaints that are unhinged from any specific agreement."  *Id.* at 1180.  Instead, courts "typically focus on whether there are requirements terms . . . volume or market share targets, or long-term contracts that prevent meaningful competition".  *Id.* at 1181 (internal citations omitted).

Here, there are no such allegations.  Instead, the FAC disclaims that there is any exclusive term:  "hospitals do not contractually agree to use high-density mapping catheters or ultrasound catheters purchased from Biosense Webster" in purchasing the CARTO 3.  (FAC ¶ 20.)  Indeed, the FAC alleges that customers are in fact able to and do purchase these catheters from others in "more than 20% of CARTO 3 procedures".  (FAC ¶ 18.)  No exclusive deal is alleged.

## III.   PLAINTIFF'S TYING CLAIMS ALSO FAIL.

In its Third and Ninth Causes of Action, plaintiff alleges that Biosense has unlawfully tied its sales of diagnostic catheters to its training and clinical support. That is, plaintiff positions defendant's free training and clinical support as the stronger "tying" product to which coercive catheter sales are allegedly "tied."  This makes no sense.

"Tying occurs when a 'seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product).'"  *Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 559 (9th Cir. 2018) (quoting *Rick-Mik Enters.*, 532 F.3d at 971).  A plaintiff must plead three elements to

plausibly allege a claim of tying *per se*: "(1) that there exist two distinct products or services in different markets whose sales are tied together; (2) that the seller possesses appreciable economic power in the tying product market sufficient to coerce acceptance of the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market." *Eastman*, 724 F. App'x at 560 (internal quotation marks and citation omitted). Plaintiff's tying claims fail for a number of reasons, only two of which are highlighted here: the FAC fails to plausibly allege two distinct products or coercive sales.

*First*, the FAC does not adequately allege that catheters and training/clinical support are in fact two distinct products. "For service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide services separately from parts." *Eastman Kodak*, 504 U.S. at 462 (citing *Jefferson Parish*, 466 U.S. at 21-22). If the "aggregation serves to facilitate competition by promoting product quality", the products more likely constitute "but a single product." *Hirsh v. Martindale-Hubbell, Inc.*, 674 F.2d 1343, 1347 (9th Cir. 1982).

Here, plaintiff alleged a tie in an odd way: it is clear that catheters (if not the cardiac mapping system itself) are the primary product necessary for cardiac electrophysiology studies. But in order to plead a tying claim, plaintiff must allege that it is the clinical support services that represent defendant's economic stronghold—clinical support services are positioned as the "tying" product, and the catheters the "tied" product. This is implausible. "Historically, the system manufacturers had simply provided initial training for hospital staff to provide its own case coverage" (FAC ¶ 15), meaning that there was no independent demand for clinical support. At present, the clinical services are provided "at will" (FAC ¶ 19), such that hospitals cannot make *any* catheter purchase guaranteeing they will actually receive such services. Indeed, "[n]one of the manufacturers offer clinical support, or training for clinical support, on each other's cardiac mapping systems."

23

(FAC ¶ 16.)  Thus, if manufacturers offer clinical support at all, they do so only in conjunction with their own products and not on a standalone basis.  This plausibly alleges a single product.  *See Rick-Mik Enters.*, 532 F.3d at 975 ("If competitive firms always bundle the tying and tied goods, then they are a single product." (citation omitted)).  Additionally, given that operating the CARTO 3 requires "specialized training and experience operating" the software (FAC ¶ 16), offering clinical support and catheters together "serves to improve the quality of the product offered by the seller", and as a result, "no tying arrangement is present."  *Hirsh*, 674 F.2d at 1348.

Plaintiff does allege that it would like to have defendant provide training and support services for its own customers, and posits a number of allegations as to why it is more efficient for defendant to do so.  But the law does not require defendant to support its competitor's business and product line, *see Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) ("Competitors are not required to engage in a lovefest; indeed, even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." (quotation omitted)), and allows defendant to deal or refuse to deal with customers of its own choosing, *see id.* ("As the Supreme Court has repeatedly emphasized, there is no duty to deal under the terms and conditions preferred by a competitor's rivals" (quotation omitted).).[7]

*Second*, and separately dispositive, is the absence of plausible factual allegations that any purchasers have been coerced into buying defendant's catheters in order to acquire training and support.  While "tying conditions need not be spelled out in express contractual terms", a plaintiff "waving its hands and

---

[7] For these reasons, plaintiff's claim that its supply of catheters has been impeded by defendant's in-hospital practices (FAC ¶ 52) similarly fails.  Biosense has every incentive to collect used catheters because Biosense "itself sells" reprocessed catheters (FAC ¶¶ 9, 13) and has no duty to make them available to its competitor.

saying that the gravamen of its complaint is a 'de facto' or 'implied' tie" does not

suffice where there is no "condition linked to a sale" of the tying product.  *Aerotec*,

836 F.3d at 1178-79.  There is none here.  In fact, plaintiff alleges that

"Biosense Webster will sell catheters of all kinds without clinical support" and the

"prices of catheters are set independently of the price for clinical support".  (FAC

¶ 18.)  And because the provision of clinical support is "at will" (FAC ¶ 19),

hospitals cannot be coerced by the need to purchase a product that they have no

guarantee of obtaining.  Moreover, there are no allegations suggesting a price

differential as between purchasing catheters and clinical support separately and

together.  *See Quest Diagnostics*, 724 F. App'x at 557 (dismissing tying claim that

failed to allege a price differential absent tie).  To the contrary, the FAC alleges

that hospitals can, at present, *save* money by switching to Innovative because

Innovative "offers savings on reprocessed catheters that is at least four to five

times the value of the clinical support from Biosense Webster."  (FAC ¶ 45.)  If

hospitals can already save money by forgoing clinical support services, there is no

economic coercion preventing them from switching catheter brands.  At bottom,

these allegations show that hospitals can "purchase parts and services in separate

transactions from whichever supplier they please", *Aerotec*, 836 F.3d at 1179,

exactly the sort of allegation that is insufficient to state a tying claim.

To the extent the FAC seeks to plead a tying claim under the rule of reason,

that requires pleading that the agreement "actually injures competition".  *Brantley*,

675 F.3d at 1197.  The FAC has not done so.  While Innovative claims that it "has

been unable to reach" a 1-2% market share in the alleged markets for high-density

mapping catheters and ultrasound catheters (FAC ¶ 37) and lost business in several

California hospitals (FAC ¶¶ 47-48), this is insufficient.  *See Surf City Steel, Inc. v.

Int'l Longshore & Warehouse Union*, No. CV14-05604-BRO (SSX), 2017 WL

5973279, at *9 (C.D. Cal. Mar. 7, 2017) ("The fact that one competitor took the

place of another competitor in the relevant market does not, on its own, constitute

harm to competition."), *aff'd*, 780 F. App'x 467 (9th Cir. 2019).  Innovative attempts to transform its own failure to expand into an allegation that Biosense "forecloses its competitors from 98% to 99% of the nationwide" catheter markets.  (FAC ¶ 45.)  But this is nothing more than subtraction, representing the share of the catheter markets that Innovative does not have; it does not follow that the market is foreclosed to all competitors.  In any case, Innovative alleges that it can "take significant amounts" of business from Biosense in these markets (FAC ¶¶ 9, 13), which defeats any allegation that Innovative individually (let alone competition generally) is harmed.  *See Rebel Oil*, 51 F.3d at 1440 (injury to competition likely where competitors *cannot* "take significant business away" from defendant).

Innovative also alleges that the prices for Biosense's high-density mapping and ultrasound catheters are "supracompetitive".  (FAC ¶¶ 33, 35, 37, 53.)  "There is no doubt that supra-competitive prices to consumers are a cognizable form of antitrust injury", but a plaintiff "must allege facts demonstrating that there is a causal connection between the alleged anti-competitive actions . . . and the alleged supra-competitive prices."  *Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*, No. CV07-00043MMMSSx, 2007 WL 4976364, at *14 (C.D. Cal. Oct. 29, 2007), *aff'd*, 323 F. App'x 571 (9th Cir. 2009).  The FAC does not do so; it concedes that reprocessed catheters "may or may not introduce price competition" relative to new catheters (FAC ¶ 23), which fails to allege a causal connection between any purported foreclosure of reprocessing firms and prices overall.  *See Brantley*, 675 F.3d at 1198 ("[A] complaint's allegation of a practice that may or may not injure competition is insufficient.").

## IV.   PLAINTIFF FAILS TO PLAUSIBLY ALLEGE ATTEMPTED MONOPOLIZATION

Plaintiff's Second and Eighth Causes of Action assert claims for attempted monopolization.  The "facts alleged" must be "[]adequate to show a specific intent

to destroy competition". *Bendorf v. Ojai Basin Groundwater Mgmt. Agency*, No. CV-11-3877-DSF SP, 2012 WL 3867352, at *14 (C.D. Cal. July 16, 2012), *R&R adopted*, No. CV-11-3877-DSF SP, 2012 WL 3929891 (C.D. Cal. Sept. 4, 2012). At most, the FAC alleges that "Biosense Webster has a specific intent to control prices, destroy competition, and build monopoly".  (FAC ¶¶ 60, 79.)  These conclusory allegations are insufficient as a matter of law.  *See Petrochem Insulation, Inc. v. United Ass'n of Journeymen & Apprentices of the Plumbing & Pipe Fitting Indus., Local Union No. 38*, 9 F.3d 29, 1993 WL 378807 (Table), at *1 (9th Cir. Sep. 24, 1993) ("[C]onclusory allegations are insufficient in the absence of anticompetitive conduct from which such specific intent may be inferred."); *Power Analytics Corp. v. Operation Tech., Inc.*, No. SA CV16-01955JAK (FFMx), 2017 WL 5479638, at *18 (C.D. Cal. May 10, 2017) (dismissing attempt claim alleging that defendant "engaged in the predatory conduct described above with a specific intent to monopolize").[8]

Plaintiff alleges other categories of "predatory conduct" that fail to state a monopolization claim.  (FAC ¶¶ 49-52.)  Because the arguments set forth above are dispositive, we are not burdening the Court with extensive argument on these. But, for instance, plaintiff's allegations that a design change that resulted in the inclusion of a timestamp fail.  "As a general rule, courts are properly very skeptical about claims that competition has been harmed by a dominant firm's product design changes." *Allied Orthopedic v. Tyco Health Care Grp.*, 592 F.3d 991, 998 (9th Cir. 2010).  Most importantly, plaintiff alleges such a timestamp can be decrypted and never alleges it has been unable to do so for the catheters at issue.

---

[8] Plaintiff's claims under the Cartwright Act mirror those asserted pursuant to the Sherman Act (Fifth, Sixth, Eleventh and Twelfth Causes of Action) and therefore fail for the same reasons. *See, e.g., Rick-Mik Enters.*, 532 F.3d at 976 n.5 (dismissing antitrust claims under California law because where "the federal claims fail, the state law claims fail").

MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 8:19-cv-01984

(FAC ¶¶ 50-51.)  To the contrary, the allegation that Innovative "has the ability to take significant amounts" of Biosense business (FAC ¶¶ 9-13) implies that it can.

* * *

Plaintiff had two bites at the apple.  The FAC did not remedy the defects of the original complaint, despite meet and confers regarding these failures.  Because the plaintiff "has failed to state a claim after guidance and an opportunity to amend[,] . . . further amendment would 'constitute an exercise in futility'", and dismissal with prejudice is proper.  *LAI*, 2015 WL 12746705, at *8 (quotation omitted).

## **CONCLUSION**

For the reasons stated above, the FAC should be dismissed with prejudice.


DATED:  January 9, 2020            STRADLING YOCCA CARLSON & RAUTH,
                                   A Professional Corporation

                                   By:  */s/ Karla Kraft*
                                        Karla Kraft
                                        Katie Beaudin

                                        And

                                        Katherine B. Forrest *(Pro Hac Vice)*
                                        Michael T. Reynolds *(Pro Hac Vice)*
                                        CRAVATH, SWAINE & MOORE LLP
                                        Worldwide Plaza
                                        825 Eighth Avenue
                                        New York, NY 10019-7475

                                        Attorneys for Defendant
                                        BIOSENSE WEBSTER, INC.