KARLA KRAFT, State Bar No. 205530
kkraft@stradlinglaw.com
VICTORIA MCLAUGHLIN, State Bar No. 321861
vmclaughlin@stradlinglaw.com
STRADLING YOCCA CARLSON & RAUTH, P.C.
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660-6422
Telephone: (949) 725-4000
Facsimile: (949) 725-4100

KATHERINE B. FORREST (*pro hac vice*)
kforrest@cravath.com
MICHAEL T. REYNOLDS (*pro hac vice*)
mreynolds@cravath.com
LAUREN A. MOSKOWITZ (*pro hac vice*)
lmoskowitz@cravath.com
LILLIAN S. GROSSBARD (*pro hac vice*)
lgrossbard@cravath.com
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019-7475
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
Attorneys for Defendant
BIOSENSE WEBSTER, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| INNOVATIVE HEALTH LLC,<br><br>Plaintiff,<br><br>vs.<br><br>BIOSENSE WEBSTER, INC.,<br><br>Defendant. | Case No.: 8:19-cv-1984 JVS (KESx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANT BIOSENSE WEBSTER, INC.** |

**MOTION FOR SUMMARY JUDGMENT BY DEFENDANT BIOSENSE WEBSTER, INC.**
Case No.: 8:19-cv-1984 JVS (KESx

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................ 1

FACTUAL BACKGROUND ...................................................................... 4

    A.    BWI ................................................................................................4

    B.    EP Landscape .................................................................................5

    C.    IH ....................................................................................................7

    D.    Reprocessing....................................................................................7

    E.    Clinical Support ...............................................................................8

    F.    Clinical Support Policy ..................................................................10

ARGUMENT............................................................................................. 10

I.    IH CANNOT SHOW THE EXISTENCE OF SINGLE-PRODUCT
    AFTERMARKETS.......................................................................... 11

    A.    Competition Occurs at the System Level .........................................14

    B.    Switching Costs Are Low or Nonexistent. ......................................15

    C.    System Information Costs Are Not High............................................16

    D.    BWI's Customers Were Not Locked Into a Policy Change. ..............17

II.    IH CANNOT SHOW THAT CLINICAL SUPPORT IS A DISTINCT
    PRODUCT IN A DIFFERENT MARKET FROM CATHETERS............ 19

III.    IH'S CLINICAL SUPPORT CLAIMS FAIL BECAUSE BWI'S
    CLINICAL SUPPORT POLICY IS JUSTIFIED. ..................................... 21

    A.    IH Is not Entitled to Free Ride on BWI's Clinical Support...............23

    B.    The Clinical Support Policy Is Justified by Quality and Safety
    Considerations. ..............................................................................27

i

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*

5

836 F.3d 1171 (9th Cir. 2016)..........................................................................11

6

*Anderson v. Liberty Lobby, Inc.,*

7

477 U.S. 242 (1986).........................................................................................11

8

*Apple, Inc. v. Psystar Corp.,*

9

586 F. Supp. 2d 1190 (N.D. Cal. 2008)...........................................................12

10

*Avaya Inc., RP v. Telecom Labs, Inc.,*

11

838 F.3d 354 (3d Cir. 2016).............................................................................18

12

*Brown Shoe Co. v. United States,*

13

370 U.S. 294 (1962).........................................................................................22

14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*

15

429 U.S. 477 (1977).........................................................................................22

16

*Cascade Health Sols. v. PeaceHealth,*

17

515 F.3d 883 (9th Cir. 2008)............................................................................22

18

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.,*

19

236 F.3d 1148 (9th Cir. 2001).....................................................................29, 30

20

*Collins v. Associated Pathologists, Ltd.,*

21

844 F.2d 473 (7th Cir. 1988)............................................................................21

22

*Colonial Med. Grp., Inc. v. Cath. Health Care W.,*

23

444 Fed. App'x 937 (9th Cir. 2011)...................................................................2

24

*Continental T.V., Inc. v. GTE Sylvania Inc.,*

25

433 U.S. 36 (1977)...........................................................................................23

26

*DSM Desotech, Inc. v. 3D Sys. Corp.,*

27

749 F.3d 1332 (Fed. Cir. 2014)........................................................................18

28

*Eastman Kodak Co. v. Image Technical Services, Inc.*,

    504 U.S. 451 (1992)................................................................................passim

*Eastman v. Quest Diagnostics Inc.*,

    724 F. App'x 556 (9th Cir. 2018).....................................................19

*Epic Games, Inc. v. Apple Inc.*,

    No. 4:20-CV-05640-YGR, 2021 WL 4128925 (N.D. Cal. Sept. 10,

    2021) ...........................................................................................11, 13, 14

*FTC v. Qualcomm Inc.*,

    969 F.3d 974 (9th Cir. 2020)......................................................23, 30

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*,

    723 F.3d 1019 (9th Cir. 2013)...........................................................24

*Green Country Food Market, Inc. v. Bottling Group*,

    371 F.3d 1275 (10th Cir. 2004).........................................................12

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,

    423 F.3d 374 (3d Cir. 2005).............................................................13

*HDC Medical, Inc. v. Minntech Corp.*,

    474 F.3d 543 (8th Cir. 2007).............................................................29

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,

    125 F.3d 1195 (9th Cir. 1997)...........................................................23

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,

    361 F. Supp. 3d 324 (E.D.N.Y. 2019).........................................12, 15

*In re ATM Fee Antitrust Litig.*,

    768 F. Supp. 2d 984 (N.D. Cal. 2009).............................................13

*Indep. Ent. Grp., Inc. v. Nat'l Basketball Ass'n*,

    853 F. Supp. 333 (C.D. Cal. 1994)..................................................24

*Ireland v. Bend Neurological Assoc. LLC*,

    2021 WL 1229937 (D. Or. March 31, 2021)....................................29

TABLE OF AUTHORITIES

*JBL Enters., Inc. v. Jhirmack Enters., Inc.*,
   698 F.2d 1011 (9th Cir. 1983)......................................................24

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984), *abrogated on other grounds by Ill. Tool Works
   Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) .....................................20

*Major League Baseball Props. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008)..........................................................23

*Mozart Co. v. Mercedes Benz of N. Am., Inc.*,
   833 F.2d 1342 (9th Cir. 1987)..................................................22, 30

*Newcal Indus., Inc. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008)........................................................11

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
   802 F.3d 1049 (9th Cir. 2015)..................................................22, 30

*O.S.C. Corp. v. Apple Comput., Inc.*,
   792 F.2d 1464 (9th Cir. 1986)........................................................25

*Oltz v. St. Peter's Cmty. Hosp.*,
   861 F.2d 1440 (9th Cir.1988)........................................................19

*Olympia Equip. Leasing Co. v. W. Union Telegraph Co.*,
   797 F.2d 370 (7th Cir. 1986)........................................................26

*Paul E. Volpp Tractor Parts Inc. v. Caterpillar, Inc.*,
   917 F. Supp. 1208 (W.D. Tenn. 1995) .............................................25

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
   104 F.3d 811 (6th Cir. 1997)....................................................13, 18

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997).........................................................15

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995)........................................................11

iv

TABLE OF AUTHORITIES

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC,*
 532 F.3d 963 (9th Cir. 2008)............................................................2, 19, 20, 21

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
 792 F.2d 210 (D.C. Cir. 1986) ......................................................................23

*Seagood Trading Corp. v. Jerrico, Inc.,*
 *924 F.2d 1555 (11th Cir. 1991)* ...........................................................25, 26, 27

*Serv. & Training, Inc. v. Data Gen. Corp.,*
 963 F.2d 680 (4th Cir. 1992)..........................................................................21

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.,*
 188 F.3d 11 (1st Cir. 1999) ................................................................13, 16, 19

*Streamcast Networks, Inc. v. Skype Techs., S.A.,*
 547 F. Supp. 2d 1086 (C.D. Cal. 2007) .........................................................14

*United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.,*
 89 F.3d 233 (5th Cir. 1996)............................................................................14

**Statutes & Rules**

California's Cartwright Act.................................................................................1, 2

Cartwright Act Section 16720.............................................................................11

Fed. R. Civ. P. 56(a) ..........................................................................................11

Food, Drug and Cosmetic Act Section 510(k)......................................................8

Sherman Act ..................................................................................................22, 26

Sherman Act § 1 .........................................................................................passim

Sherman Act § 2 .........................................................................................passim

v

TABLE OF AUTHORITIES

Defendant Biosense Webster, Inc. ("BWI") respectfully submits this
Memorandum of Points and Authorities in support of its Motion for Summary
Judgment as to all claims brought by Innovative Health LLC ("IH").

## INTRODUCTION

This lawsuit is IH's gamble that it can get this Court to give it a competitive
business advantage that it need not pay for. IH, a reprocessor of used
electrophysiology ("EP") devices, brings antitrust claims against BWI, the original
equipment manufacturer ("OEM") of the CARTO 3 cardiac mapping system and
catheters that can be used with that system to diagnose and treat abnormal heart
rhythms ("arrhythmias"). IH's claims concern three BWI catheters: the Lasso,
Pentaray and SoundStar. These catheters are referred to as "sensor-enabled"
because they contain a location sensor in their tip that is used to generate a very
precise three-dimensional ("3D") anatomical map of a patient's heart on the
CARTO 3 system. The physician relies on that map to identify the location of
arrhythmias.

In its Corrected Second Amended Complaint ("CSAC"), IH asserts eight
causes of action under Sections 1 and 2 of the Sherman Act and California's
Cartwright Act.[1] All claims share a common storyline: that by virtue of having
developed a sophisticated cardiac mapping system and catheters that can be used
with it, and by providing support on request to hospitals that want it, BWI has
engaged in monopoly maintenance and unlawful restraints of trade. Specifically,
IH's claims center on BWI's provision of free clinical support to hospitals for its
own cardiac mapping products. Unsurprisingly, BWI personnel are not supposed to
provide clinical support for any other manufacturer's sensor-enabled mapping
catheters used to create the 3D map on which physicians rely (the "clinical support

---

[1] The Court previously dismissed IH's exclusive dealing claims in its Fourth,
Sixth, Tenth and Twelfth Causes of Action. *See* Mot. to Dismiss Order, Dkt. 45.

1

policy"). According to IH, BWI should be required to provide its personnel to support CARTO 3 procedures using *IH's* reprocessed mapping catheters . . . for free. There has never been an antitrust case in which a court has required a competitor to provide a free service so that its rival can take away competing sales. Now, after more than a year of discovery that included dozens of depositions, hundreds of thousands of documents, and expert discovery, IH cannot raise a triable issue of fact to support its strained antitrust theories. The following arguments support entry of judgment in BWI's favor on all claims.

*First*, in order to succeed on any of its claims, IH must prove that competition is limited to three separate single-brand product markets, each for a single catheter used with CARTO 3—the Lasso, Pentaray and SoundStar catheters[2]—as well as a single-brand product market for CARTO 3 clinical support. Such single-brand product markets are the "unicorn" of antitrust claims, are almost never accepted by the courts, and IH cannot show them here. The documents and deposition testimony of IH's own executives, manufacturers of cardiac mapping systems and catheters, and hospital representatives deposed in this case, are all consistent: cardiac mapping systems compete with one another and the catheters at issue compete with a host of other catheters across systems. (Section I.)

*Second*, IH's four tying claims (Third, Fifth, Ninth and Eleventh Causes of Action), [3] are subject to dismissal because IH cannot show that clinical support (the

---

[2] IH previously alleged CARTO 3 markets for "high-density mapping catheters" (Lasso and Pentaray) and "ultrasound catheters" (AcuNav and SoundStar). CSAC, Dkt. 59, ¶¶ 14-15. IH now claims SoundStar, Lasso and Pentaray constitute separate markets and has dropped AcuNav from its claims. *See* Grossbard Decl., Ex. 122, Excerpted Forister Report ¶ 8(c), (f), (i).

[3] IH's tying claims under California's Cartwright Act (*see* CSAC, Dkt. 59, Fifth and Eleventh Causes of Action) fail for the same reasons its Section 1 tying claims fail, so are not addressed separately. *See, e.g.*, *Colonial Med. Grp., Inc. v. Cath. Health Care W.*, 444 F. App'x. 937, 939 (9th Cir. 2011); *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 976 n.5 (9th Cir. 2008).

2

alleged "tying" product) is a distinct product sold in a different market from the catheters supported (the alleged "tied" product), as required to prove a tie. No manufacturer has ever sold clinical support as a separate service dissociated from its own products; instead, support is a value-added service that is part of the product offering. Innovative has not elicited any contrary evidence. (Section II.)

*Third*, all of IH's claims based on BWI's clinical support policy must also be dismissed because two independent procompetitive rationales fully justify the challenged conduct. As an initial matter, the policy prevents free riding. Basic antitrust principles provide that a company need not allow a rival to free ride on its competitive investment and practices that prevent free riding are procompetitive. IH's desire to free ride is clearly demonstrated by its ability, but unwillingness, to make its own financial investment in clinical support. ███████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ SUF ¶ 166 (quoting Declaration of Lillian S. Grossbard in Support of Defendant Biosense Webster, Inc.'s Motion for Summary Judgment ("Grossbard Decl."), Ex. 95, at 234:3-14). (Section III.A.)

BWI's clinical support policy is also fully justified by BWI's need to ensure its representatives use devices that meet BWI's quality and safety standards. IH, not BWI, is the manufacturer of record for its reprocessed catheters, and BWI knows nothing about IH's reprocessing specifications or standards. BWI's commitment to support only procedures performed with catheters that have a known level of quality and safety simply does not violate the antitrust laws. (Section III.B.)

MEM. OF POINTS AND AUTHORITIES
Case No.: 8:19-cv-1984 JVS (KESx)

# FACTUAL BACKGROUND

## A.    BWI

BWI manufactures and sells the CARTO 3 cardiac mapping system and catheters used with that system to diagnose and treat cardiac arrhythmias.[4] SUF ¶¶ 1-2. Cardiac mapping systems create detailed, 3D anatomical maps of the heart and its electrical signals, which physicians use in EP studies to diagnose and treat arrhythmias. SUF ¶ 16. CARTO 3 connects to catheters moved through a patient's blood vessels into the heart, including "mapping" or "sensor-enabled" catheters that contain location sensors in their tip that provide the information used to generate the map of the patient's heart that is displayed on the cardiac mapping system. SUF ¶ 15. BWI manufactures two mapping catheters at issue in this litigation—the Lasso and Pentaray catheters. SUF ¶¶ 18-20.

Physicians often also use intracardiac electrocardiography ("ICE") ultrasound systems alongside cardiac mapping systems during EP procedures to visualize the structures and blood flow in the heart. SUF ¶ 17. Ultrasound catheters typically connect to ultrasound systems, not cardiac mapping systems. Grossbard Decl., Ex. 2, Thomas Decl. ¶ 8. BWI sells one ultrasound catheter at issue in this litigation: SoundStar. SUF ¶¶ 2, 21. BWI also has the exclusive rights to sell the AcuNav ultrasound catheter, manufactured by Siemens Medical Solutions ("Siemens"). SUF ¶ 3. BWI's SoundStar catheter is essentially an AcuNav ultrasound catheter that includes a BWI sensor. *See* SUF ¶ 21. The SoundStar connects both to an ultrasound system and the CARTO 3 cardiac mapping system. *Id.* While the ultrasound system generates ultrasound images, a physician can use

---

[4] For background information regarding EP and catheter functionality, *see* Declaration of Vincent Thomas ("Thomas Decl."), Grossbard Decl., Ex. 2; for additional information about BWI, its product offering and services, *see* Declaration of Michael Bodner ("Bodner Decl."), Grossbard Decl., Ex. 1.

4

the SoundStar to visualize a still image of the heart from the ultrasound system and build a CARTO 3 cardiac map on top of that image. SUF ¶¶ 18, 21.

BWI sells OEM Lasso, Pentaray and SoundStar catheters and reprocessed versions of the Lasso and SoundStar catheters through its affiliated reprocessor, SterilMed, a sister company of BWI in the Johnson & Johnson family of companies.[5] SUF ¶¶ 4-6. BWI sells sensor-enabled and ultrasound catheters reprocessed by SterilMed, including the Lasso and SoundStar catheters, under its "Certified Performance" program. SUF ¶ 6. Under this program, BWI differentiates its offering from other reprocessors by ensuring the catheters meet BWI's OEM specifications and testing criteria and providing clinical support for SterilMed's reprocessed catheters used with the CARTO 3. SUF ¶¶ 6-7, 175.

**B.    EP Landscape**

BWI is one of at least seven competitors currently manufacturing and selling cardiac mapping systems. SUF ¶¶ 44-46, 49, 52. BWI introduced the current version of its cardiac mapping system—the CARTO 3—to the U.S. market in 2009. SUF ¶ 14. Other early innovators in the cardiac mapping system space included Abbott Laboratories ("Abbott") and Boston Scientific Corporation ("Boston Scientific"). St. Jude Medical ("St. Jude"), which Abbott later acquired in 2017, launched its EnSite Velocity cardiac mapping system ("Ensite Velocity") in 2009. SUF ¶ 45. In 2017, Abbott introduced the next generation of this system, the Ensite Precision cardiac mapping system ("Ensite Precision"). SUF ¶ 46. In 2013, Boston Scientific released the Rhythmia cardiac mapping system ("Rhythmia"). SUF ¶ 49. More recent cardiac mapping entrants include Acutus Medical, Inc. ("Acutus"), Medtronic plc ("Medtronic"), Philips North America LLC ("Philips"), APN Health LLC ("APN") and CardioNXT, Inc. ("CardioNXT"). SUF ¶ 52. In

---

[5] SterilMed recently received clearance from the FDA to market a reprocessed Pentaray catheter, and BWI expects to begin selling reprocessed Pentaray catheters this month. Grossbard Decl., Ex. 1, Bodner Decl. ¶ 12.

5

2017, Acutus and Medtronic each received FDA clearance for their cardiac mapping systems, AcQMap and CardioInsight, respectively. *Id.* In 2018, APN released its Navik 3D cardiac mapping system and Philips received FDA clearance for its Kodex EPD cardiac mapping system. *Id.* Most recently, in 2021, the FDA cleared CardioNXT to market its iMap cardiac mapping system. *Id.* Like the CARTO 3, all of these systems can be used to build cardiac maps to aid physicians in EP procedures. *See* SUF ¶¶ 46, 49, 52, 92.

Hospitals considering the purchase of a cardiac mapping system typically solicit input from management, physicians and supply chain personnel, and often rely on committees referred to as a "Value Analysis Team" or "VAT" to evaluate prospective purchases. SUF ¶¶ 113-121. As part of this process, decisionmakers study and project the cost of the associated disposable products used with the systems, in part because the cost of the catheters far exceeds the cost of the cardiac mapping system. SUF ¶¶ 97, 113-121.

It is also common for hospitals to have multiple, competing cardiac mapping systems. ███████████ of BWI's hospital customers have not only a CARTO 3 system, but also at least one Abbott Ensite Precision and/or Boston Scientific Rhythmia on site. SUF ¶¶ 90, 94. Manufacturers, including BWI, Abbott, Boston Scientific and Acutus, also compete aggressively to get their systems into a hospital by offering multiple options for acquiring a cardiac mapping system with little or no capital outlay. SUF ¶¶ 98-104.

Most cardiac mapping system manufacturers also offer cardiac mapping catheters. These include Abbott's Advisor line of mapping catheters, Boston Scientific's Constellation, Orbiter and Orion mapping catheters, Medtronic's Achieve mapping catheter, as well as mapping catheters manufactured by new entrants, including Acutus (AcQMap 3D Imaging and Mapping Catheter), among others. SUF ¶¶ 47, 50, 53. Several of these manufacturers also sell ultrasound catheters used in EP procedures, such as Abbott's ViewFlex, Boston Scientific's

6

UltraICE, and Philip's VeriSight. SUF ¶¶ 48, 51, 54. The documents and testimony from IH, BWI, other competing manufacturers and hospitals demonstrate that BWI's Lasso and Pentaray catheters compete with Abbott's, Boston Scientific's, Medtronic's and Acutus's mapping catheters, among others, and that BWI's SoundStar catheter competes with Abbott's, Boston Scientific's and Philips's ultrasound catheters. SUF ¶¶ 59-60, 62-80, 82-83. BWI also faces competition from third party reprocessors such as IH and Stryker Sustainability Solutions ("Stryker"), the leading reprocessor of electrophysiology products in the U.S. SUF ¶¶ 55-56, 73.

### C.    IH

IH is a specialty reprocessor of EP catheters founded in 2015 by Innovative's current chief executive officer and others ███████████████ ███████████████████████ SUF ¶¶ 8-10; Grossbard Decl., Ex. 98, Ferreira Dep. 38:9-21. IH began selling reprocessed catheters in 2016. SUF ¶ 11. IH's reprocessed catheter products include reprocessed versions of the BWI Lasso, Pentaray and SoundStar catheters at issue in this litigation, as well as numerous other diagnostic, mapping and ultrasound catheters manufactured by BWI and its competitors. SUF ¶ 13. IH markets itself as a low cost provider, offering significant catheter cost savings that it claims can reduce the cost of EP procedures. SUF ¶ 12. Despite the fact that it only began selling reprocessed catheters in 2016, ██████████████████████████████████ ████████████████. Grossbard Decl., Ex. 96, Einwechter Dep. 40:20-43:6.

### D.    Reprocessing

Pursuant to FDA regulations, reprocessors are the legal manufacturers of their reprocessed products. *See* SUF ¶ 29. Although original equipment manufactured EP catheters are single-use devices ("SUD"), the FDA will clear a reprocessor to sterilize and market certain catheters for additional uses if the reprocessor can demonstrate that the catheter is "substantially equivalent" to the

7

OEM device under Section 510(k) of the Food, Drug and Cosmetic Act (a "510(k)" clearance). *See* SUF ¶¶ 25-27. To obtain FDA 510(k) clearance, a reprocessed catheter does not need to meet the same specifications as the OEM device, nor have the same testing criteria or standards as the OEM device. SUF ¶ 28; *see also id.* ¶¶ 30-37. In fact, because manufacturers—both OEMs and reprocessors—consider their medical devices' design specifications and testing criteria highly confidential and proprietary, 510(k) applications are not publicly available. *See* SUF ¶¶ 30-31. Thus, IH does not know the specifications and testing standards of BWI's OEM or SterilMed-reprocessed Lasso, Pentaray and SoundStar catheters, and BWI does not know the specifications and testing standards of IH's reprocessed Lasso, Pentaray and SoundStar catheters. SUF ¶ 31.

E.    **Clinical Support**

Physicians work with EP technicians during a mapping procedure. While the physician guides the catheters, a technician operates the mapping system software, providing "clinical support". SUF ¶ 130. BWI hires, trains and employs a team of Clinical Account Specialists ("CAS") to provide clinical support at no charge as a value-added service for its mapping products. SUF ¶¶ 135, 146; *see also id.* ¶¶ 139-43, 147. This is consistent with industry standards, as all cardiac mapping system manufacturers, including Abbott, Boston Scientific and Acutus, provide clinical support for their cardiac mapping products free of charge. SUF ¶¶ 131, 133. Clinical support is offered only in connection with these products; no manufacturer sells clinical support as a separate service. *See* SUF ¶ 131.

BWI has invested hundreds of millions of dollars to develop and grow its clinical support program over more than a decade. SUF ¶¶ 136-43. When BWI began selling the CARTO 3 system in 2009, it employed approximately 120 CAS. SUF ¶ 138. At that time, hospital staff operated the CARTO 3 software ("self-support") in approximately 50 percent of procedures, with CAS covering the remaining CARTO 3 cases. SUF ¶ 136. To satisfy a growing number of customer

8

requests for CAS support, BWI grew its support team almost tenfold—to approximately 900 CAS—by 2020. SUF ¶ 138. BWI incurs significant expenses in deploying these technicians; in 2015 BWI spent ███████ on CAS payroll expenses alone, and by 2020 this figure had grown to more than ████████. SUF ¶ 142. Indeed, BWI estimates that it spends approximately ████ to support a single CARTO 3 procedure. SUF ¶ 144. BWI made these investments in clinical support despite the fact that it has no contractual or other obligation to provide clinical support. SUF ¶ 145. Instead, BWI made the investment because it considers clinical support a cornerstone of its competitive value proposition. SUF ¶ 146.

Hospitals are not required—contractually or otherwise—to use BWI's clinical support; a hospital is entitled to obtain clinical support from anywhere it chooses. *See* SUF ¶ 169. While most hospitals do in fact take advantage of BWI's offering, a number of hospitals self-support using in-house personnel. SUF ¶ 148; *see also id.* ¶ 132. BWI provides free training on how to map on CARTO 3 to any hospital that wishes to develop the ability to self-support. SUF ¶ 149.

IH markets itself as offering clinical support for IH catheters and clinical support training for customers that want to purchase IH catheters and self-support. SUF ¶¶ 153-55, 158-62, 164; *see also id.* ¶¶ 150, 163. For example, IH distributed marketing literature stating, "[t]o be able to take advantage of reprocessing savings on sensor-enabled mapping catheters and ultrasound catheters, Innovative Health provides certified mapping support directly to the EP lab". SUF ¶ 99 (Grossbard Decl., Ex. 61, IH00348802 at 826). IH has provided a mapping technician to support procedures using its reprocessed SoundStar and Pentaray catheters on CARTO 3 for at least one of its customers. SUF ¶ 156. Despite this, IH has refused to invest the resources required to scale this effort and to provide clinical support more broadly. SUF ¶¶ 151-152, 166. IH's executives' rationale for why IH does not develop its own clinical support program is essentially that doing so would be costly and reduce its profits. *Id.*

MEM. OF POINTS AND AUTHORITIES
Case No.: 8:19-cv-1984 JVS (KESx)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## F.    Clinical Support Policy

BWI's clinical support policy prohibits its personnel from supporting CARTO 3 mapping procedures using another manufacturer's sensor-enabled catheters. SUF ¶ 167. As such, the policy applies to the Lasso, Pentaray and SoundStar sensor-enabled catheters used to map on CARTO 3. SUF ¶ 168. The clinical support policy does not prevent any third party from providing support on the CARTO 3 system; the limitations apply only to what BWI paid and trained personnel can and cannot do. SUF ¶ 169. BWI formally implemented its clinical support policy in written form in late 2014. SUF ¶ 171. Notably, customers have acquired a large number of CARTO 3 systems since this policy was widely publicly known. SUF ¶¶ 122-124.

BWI implemented its clinical support policy because third-party suppliers' products are not BWI catheters; a reprocessed catheter is considered, by the FDA, to be the product of the reprocessor—the OEM is no longer the manufacturer of record. SUF ¶ 29. BWI has no insight into a reprocessor's procedures, specifications or testing criteria. SUF ¶ 30. Moreover, evidence demonstrates that there are differences between BWI's and IH's specifications and guarantees for the reprocessed catheters at issue, including differences related to calibration, location accuracy and image quality. SUF ¶¶ 32-37, 42-43. ███████████ ████████████████████████████████████████████████████ ██████████████████████ SUF ¶¶ 38-39; *see also id.* ¶ 41. As such, BWI is unwilling to have its CAS generate 3D anatomical maps, which physicians rely on, using another manufacturer's sensor-enabled catheters. *See* SUF ¶¶ 171, 174 (Grossbard Decl., Ex. 27 (2014 clinical support position statement); Ex. 14 (2018 clinical support position statement)).

## ARGUMENT

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

10

matter of law." Fed. R. Civ. P. 56(a). A defendant moving for summary judgment need not disprove the plaintiff's case; if the moving party demonstrates a lack of evidence to support the plaintiff's claims, "the nonmoving party bears the burden of producing evidence sufficient to sustain a jury verdict on those issues for which it bears the burden at trial." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995). "[A] scintilla of evidence in support of the plaintiff's position will be insufficient" at the summary-judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Moreover, "anecdotal speculation and supposition are not a substitute for evidence, and that evidence decoupled from harm to competition—the bellwether of antitrust—is insufficient to defeat summary judgment." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1175 (9th Cir. 2016).

# I.    IH CANNOT SHOW THE EXISTENCE OF SINGLE-PRODUCT AFTERMARKETS.

All of IH's claims[6] hinge on the existence of four distinct single-brand product aftermarkets[7] for specific devices and support service "for the CARTO 3": (1) "navigational ultrasound catheters for the CARTO 3" (*i.e.*, SoundStar catheters), (2) "Fast Anatomical Mapping ('FAM')-capable circular mapping catheters for the CARTO 3" (*i.e.*, Lasso catheters), (3) "FAM-capable high-density mapping catheters for the CARTO 3" (*i.e.*, Pentaray catheters), and (4) "[c]linical

---

[6] IH's remaining claims are unlawful tying in violation of Section 1 of the Sherman Act and Section 16720 of the Cartwright Act and monopolization and attempted monopolization in violation of Section 2 of the Sherman Act. All Section 1 and Section 2 claims require defining a relevant antitrust product market. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 n.3 (9th Cir. 2008).

[7] "Aftermarkets" are dependent on a "foremarket", for instance, razors and razor blades. *See Epic Games, Inc. v. Apple Inc.*, No. 4:20-CV-05640-YGR, 2021 WL 4128925, at *29 n.244 (N.D. Cal. Sept. 10, 2021). Properly defined aftermarkets require evidence that foremarket competition does not "suffice to discipline anticompetitive practices in the aftermarket". *Newcal*, 513 F.3d at 1050.

MEM. OF POINTS AND AUTHORITIES
Case No.: 8:19-cv-1984 JVS (KESx)

support for the CARTO 3". Grossbard Decl., Ex. 122, Excerpted Forister Report ¶ 8(a), (c), (f), (i). The reason for the approach is obvious—a market comprised of competing mapping systems that perform the same mapping procedures (substitutes) would not result in BWI having market power in mapping systems. Similarly, competition in the foremarket disciplines competition in the aftermarkets for mapping and ultrasound catheters that perform the same functions (again, substitutes) across systems. IH's only hope to support any claim is to artificially limit the relevant market to BWI's own products. But IH has not elicited evidence sufficient to create a triable issue of fact to sustain these overwhelmingly disfavored single-brand product markets. *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) ("In general, a manufacturer's own products do not themselves comprise a relevant product market") (internal quotation marks omitted) (quoting *Green Country Food Market, Inc. v. Bottling Group*, 371 F.3d 1275, 1282 (10th Cir. 2004)).

The law is clear that "[s]ingle-brand markets are, at a minimum, extremely rare" and courts have rejected single-brand market definitions "[e]ven where brand loyalty is intense". *Apple*, 586 F. Supp. 2d at 1198; *see also In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 343 (E.D.N.Y. 2019) ("It is an understatement to say that single-brand markets are disfavored. From nearly the inception of modern antitrust law, the Supreme Court has expressed skepticism of single-brand markets . . . ."). The Supreme Court set forth a narrow exception to this rule in *Eastman Kodak Co. v. Image Technical Services, Inc*., in which the Court found that "one brand of a product can constitute a separate market" where plaintiff can prove that consumers are effectively "locked in" to their purchasing decision in the primary market such that they are unable to switch to a competing brand in response to an allegedly anticompetitive policy change with respect to aftermarket products used with the system. 504 U.S. 451, 482, 477 (1992). Specifically, the Court credited evidence that buyers had difficulty "engag[ing] in

12

MEM. OF POINTS AND AUTHORITIES
Case No.: 8:19-cv-1984 JVS (KESx)

accurate lifecycle pricing" (referred to as "information costs"), which involves "inform[ing] themselves of the total cost of the 'package'—equipment, service, and parts—at the time of purchase" of the photocopier, as well as evidence of difficulty in switching from Kodak photocopiers to other brands (referred to as "switching costs"). *Id.* at 457, 473, 477-78. The Court concluded that Kodak could exert market power over customers who were "locked in" to their foremarket equipment decision by information and switching costs to implement an alleged anticompetitive policy change of selling replacement parts only to buyers using Kodak service or who repaired their own machines. *Id.* at 477.

"[C]ourts have been extremely reluctant to embrace *Kodak*'s single-brand market theory." *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 997 (N.D. Cal. 2009) (alteration in original) (internal quotation marks omitted); *see also Epic Games, Inc. v. Apple Inc.*, No. 4:20-CV-05640-YGR, 2021 WL 4128925 at *87-*89 (N.D. Cal. Sept. 10, 2021) (describing limits on the application of *Kodak* imposed by Circuit Courts of Appeal). Following *Kodak*, courts have routinely rejected alleged single-brand aftermarkets where plaintiff fails to demonstrate that high information and switching costs lock in consumers to the primary market purchase. *See, e.g., Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 384-85 (3d Cir. 2005) (granting summary judgment for defendant where plaintiff failed to produce sufficient evidence of information costs that prevented knowledgeable customers from engaging in lifecycle pricing); *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 22-23 (1st Cir. 1999) (granting summary judgment for defendant in light of competition in the foremarkets and sophisticated decision making); *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820–21 (6th Cir. 1997) (granting summary judgment for defendant where defendant engaged in lengthy negotiations before the sale of equipment and provided estimates of services costs, which "reduce[d] the information costs faced by its consumers"); *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d

13

233, 237 (5th Cir. 1996) (affirming summary judgment against plaintiff given absence of significant information costs, and despite switching costs for some plaintiffs). Courts have also routinely declined to find a single-brand aftermarket even where there are information and/or switching costs if purchasers were not subject to a post-purchase policy change or were aware of the alleged anticompetitive policy when they made their primary market purchasing decision. *See Epic Games,* 2021 WL 4128925 at *88-*89 (collecting Circuit Court cases).

Here, IH has not raised a triable issue with respect to *any* of the requirements necessary to prove single-product aftermarkets under the limited exception set forth in *Kodak.* Instead, after more than a year of discovery, the evidence shows that: (1) competition occurs across systems; (2) system switching costs are low, if they exist at all; (3) hospitals are sophisticated consumers who consider the cost of disposables in their system purchasing decisions; and (4) there is no evidence that the clinical support policy constitutes a *Kodak*-style "policy change" that takes advantage of "locked in" customers. SUF at ¶¶ 57-129.

## A.    <u>Competition Occurs at the System Level</u>

As an initial matter, the only *direct* evidence—from IH, BWI, other manufacturers and hospital customers—is of robust competition among cardiac mapping systems, and competition for the catheters at issue occurring across these substitutable systems. SUF ¶¶ 57-88. *Streamcast Networks, Inc. v. Skype Techs., S.A.,* 547 F. Supp. 2d 1086, 1094 (C.D. Cal. 2007) ("Courts have consistently refused to consider one brand to be a relevant market of its own when the brand competes with other potential substitutes."). IH's own executives and sales team concede competition between mapping systems and catheters. SUF ¶¶ 59-68. Marketing materials and testimony of BWI, Boston Scientific and Abbott provide similarly. SUF ¶¶ 70-80. Finally, hospital representatives deposed in this matter consistently testified that system manufacturers compete for their business, including for mapping systems and catheters. SUF ¶¶ 82-88. IH did not develop

14

any contrary testimony, and its single-product aftermarkets should be rejected on this basis. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) (rejecting proposed single-brand market because of the availability of interchangeable products); *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d at 344 (E.D.N.Y. 2019) (noting that "[i]n most cases, [] the product at issue—even if distinguishable from other products due to its brand or certain features—will have possible substitutes such that a single-brand market definition is inappropriate").

### B.    Switching Costs Are Low or Nonexistent.

Even putting aside the direct evidence of cross-system competition, IH failed to raise a triable issue as to whether BWI's customers are "locked in" to the CARTO 3 system as required to prove single-product aftermarkets under *Kodak*. First, IH cannot demonstrate the kind of high switching costs the *Kodak* Court found critical, 504 U.S. at 477 (finding "evidence that the heavy initial outlay for Kodak equipment, combined with the required support material that works only with Kodak equipment, makes switching costs very high for existing Kodak customers"), because ███████████, of BWI's customers already have access to at least one competing cardiac mapping system in their electrophysiology labs, making their switching costs effectively zero, SUF ¶¶ 90, 93-96. Specifically, a data analysis of ████ unique cardiac mapping system customers of BWI, Abbott and/or Boston Scientific performed by Compass Lexecon, a third party neutral jointly retained by the Parties, found that ████ of hospitals that have a CARTO 3 system also have an Abbott or Boston Scientific cardiac mapping system. SUF ¶ 90. This finding is corroborated by BWI's internal intelligence, as well as market insight reports for the EP industry. SUF ¶¶ 93-94. Further, representatives of all six hospitals deposed testified that their respective hospitals have at least one other

MEM. OF POINTS AND AUTHORITIES
Case No.: 8:19-cv-1984 JVS (KESx)

cardiac mapping system aside from the CARTO 3, and evidence also corroborates that hospitals can and do switch between systems. SUF ¶¶ 95, 105-111.

Moreover, even if a hospital does not already have access to a competing cardiac mapping system, there is uncontroverted evidence that it can acquire one with little or no capital outlay—a fact that IH itself recognizes and represents to its customers. SUF ¶ 99 (IH marketing materials advising customers to "[a]cquire at least two different mapping systems (the acquisition cost can be very low when disposable quotas are assigned)"). Cardiac mapping system manufacturers typically offer several methods through which hospital customers can acquire their system with little or no up-front capital outlay, for example, through a system lease, a system rental, or a commitment to purchase a minimum number of catheters for use with the system over one or more years. SUF ¶¶ 100-104. The availability of these discounts and programs keeps switching costs low and hospitals are not "locked in" to a cardiac mapping system. *See SMS Sys. Maint. Servs., Inc*., 188 F.3d at 22-23 (affirming summary judgment in favor of defendant where, among other things, "both software vendors and hardware manufacturers offer migration support for new customers in the form of significant discounts on training, installation, and software conversion, thus internalizing much of the switching costs").

### C.    System Information Costs Are Not High.

IH also cannot demonstrate a triable issue that BWI's customers are "locked in" because high information costs prevent them from accurately assessing lifecycle pricing when making cardiac mapping system purchasing decisions. *See Kodak*, 504 U.S. at 473-74 (finding that consumers' failure to engage in accurate lifecycle pricing could limit the ability of competition in the foremarket to prevent an exercise of monopoly power in the aftermarket). The evidence, including from IH, proves that hospitals are sophisticated customers that research EP systems and disposables to make informed purchasing decisions. SUF ¶¶ 114-121. Hospital

16

witnesses consistently testified that their respective hospitals project the lifecycle cost of a cardiac mapping system, including the number of projected cases and the cost of disposables, when assessing whether to purchase a new system. SUF ¶¶ 116-119; *see also* ¶¶ 120-121 (reflecting use of a consultant to analyze purchasing decision). Many hospitals have special Value Analysis Teams ("VATs") that assess the prospective purchase based on a variety of factors, including price and clinical and operational considerations. SUF ¶ 114. Many hospitals also purchase their capital equipment (including cardiac mapping systems) through GPO agreements, which are negotiated by sophisticated group purchasing organizations on behalf of members to reduce prices. *See* SUF ¶ 115.

Moreover, the relationship between the primary product and aftermarket products here is entirely different than the relationship between the products at issue in *Kodak*. In concluding that significant information costs existed in *Kodak*, the Court relied upon evidence that the cost of the photocopying machine was high relative to the cost of the aftermarket replacement parts and repair services that any particular customer might later need, making it cost inefficient for consumers to consider these costs when making an equipment purchasing decision. 504 U.S. at 474-75. Here, however, the cost of the catheters—which hospitals know they will need to purchase because the mapping system serves no functional purpose without them—far exceeds the cost of the cardiac mapping system itself. SUF ¶ 97. Thus, IH cannot demonstrate that the kinds of "high information costs" necessary to prove a single-product aftermarket under *Kodak* exist here.

### D.    BWI's Customers Were Not Locked Into a Policy Change.

Even if there were evidence of high switching and information costs (there is not), IH still could not meet the *Kodak* requirements for single-product aftermarkets because IH did not elicit evidence that a single BWI customer was locked into a post-purchase policy change. Critical to the Court's finding in *Kodak* of consumer lock-in was that Kodak changed its policy of who could purchase

17

replacement parts *after* consumers had bought a machine. 504 U.S. at 458, 476-77. Numerous courts have refused to find single-product aftermarkets following *Kodak* where the allegedly restrictive policy was known at the time of a customer's initial purchasing decision. *See, e.g.*, *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 405 (3d Cir. 2016) (rejecting alleged single-brand aftermarket where "customers were put on clear notice that purchasing [defendant's product] precluded use of [third-party] maintenance"); *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997) ("[W]e thus hold that an antitrust plaintiff cannot succeed on a *Kodak*-type theory when the defendant has not changed its policy after locking-in some of its customers."). Here, of ██ CARTO 3 systems sold between October 2014 and March 2021, ██ were purchased after April 2016, when IH admits the clinical support policy was well known and enforced. SUF ¶ 123; Grossbard Decl., Ex. 122, Excerpted Forister Report ¶ 53; *see also* SUF ¶¶ 172-173.[8] That includes purchases by █████████████████████████ ██████████████████████████████—hospitals IH has identified as allegedly harmed by BWI's clinical support policy. SUF ¶¶ 125-129. Because all of these hospitals purchased systems with full knowledge of the policy, none were locked into a post-purchase policy change, and they cannot be included in IH's alleged single-product aftermarkets as a matter of law. *See DSM Desotech, Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1346 (Fed. Cir. 2014) ("[I]t is only the customers who learned about the [allegedly anticompetitive policy] *after* purchasing their equipment that are relevant to the 'locked-in' analysis.") (emphasis added).

In addition, even for BWI customers who exclusively purchased CARTO 3 systems before April 2016, the clinical support policy can only support a finding of

---

[8] BWI maintains that the clinical support policy was implemented and enforced well before this date, with an oral policy prior to a formal written policy implemented in late October 2014, *see* SUF ¶ 170, but will assume April 2016 as the implementation date for purposes of this Motion for Summary Judgment.

18

MEM. OF POINTS AND AUTHORITIES
Case No.: 8:19-cv-1984 JVS (KESx)

a single-product aftermarket if there is evidence that the customers would have made a different purchasing decision based on the policy. Absent this, the Court's concern in *Kodak*—that customers are "locked-in" because they are unable to foresee the cost of the policy change at the time of sale—evaporates. IH has not elicited any evidence to demonstrate that any customer would have made a different purchasing decision had they known about BWI's clinical support policy. To the contrary, BWI's CARTO 3 sales data demonstrates a consistent volume of system sales totaling approximately ▮▮▮ systems per year both before and after 2016. SUF ¶ 123. Thus, IH cannot demonstrate a relevant post-purchase policy change that impacted a substantial number of customers as necessary for a finding of single-product markets under *Kodak*. *See SMS Sys. Maint. Servs., Inc.*, 188 F.3d at 21 (noting under a *Kodak* analysis "unless a substantial number of preexisting customers are locked-in, defections from the manufacturer's installed base, coupled with losses in the foremarket . . . will sabotage any effort to exploit the aftermarket").

## II.   IH CANNOT SHOW THAT CLINICAL SUPPORT IS A DISTINCT PRODUCT IN A DIFFERENT MARKET FROM CATHETERS.

In addition to IH's failure to properly define and prove viable antitrust markets, its failure to raise a triable issue as to a separate market for clinical support also entitles BWI to summary judgment on IH's four tying claims.

Tying occurs when "the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Rick-Mik Enters. v. Equilon Enters.*, 532 F.3d 963, 971 (9th Cir. 2008) (internal quotation marks omitted). In order to prove a tying claim, a plaintiff must show, among other things, "that there exist two distinct products or services in different markets whose sales are tied together". *Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 560 (9th Cir. 2018) (reciting elements of a per se tying claim); *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1445 (9th Cir. 1988) (identifying requirements for tying

under rule of reason analysis).[9] It is well-settled that the test for determining whether there are two distinct products or services that compete in different markets is whether sufficient demand exists for firms to offer the products separately. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). To evaluate whether sufficient consumer demand exists to support a separate market, courts consider whether, when given a choice, consumers purchase the tying and tied goods together or separately, and whether "competitive firms always bundle the tying and tied goods". *Rick-Mik*, 532 F.3d at 975.

There is no evidence that BWI sells clinical support *at all*, much less as a separate product in a different market from its cardiac mapping products. The parties do not dispute that BWI provides clinical support for free and is not contractually required to provide the support. SUF ¶¶ 133, 145. It is also undisputed that free clinical support is an industry standard service offered by all cardiac mapping system manufacturers (and manufacturers of other medical devices) to support their products. SUF ¶ 131. Indeed, IH has not elicited *any* evidence that *any* manufacturer has *ever* provided clinical support for a procedure that does not use its products, much less that any manufacturer has ever sold support for another manufacturer's catheters as a separate service. Further, IH itself has never offered its direct clinical support or clinical support training other than in connection with its reprocessed catheter products.[10] *See* SUF ¶ 164. The record evidence is that firms provide support in conjunction with their cardiac mapping

---

[9] BWI maintains that the facts here do not warrant the application of the per se standard, but it is unnecessary for the Court to reach that to decide this issue.

[10] In fact, when IH provided clinical support to MedStar Health, it balked at the hospital's request that IH's mapper ("Aaron") use BWI OEM catheters to map his first cases, telling MedStar that it would "defeat[] the purpose of what we are trying to achieve. Aaron will be there for mapping support so that Hospital Center can use reprocessed catheters." SUF ¶ 157; *see also id.* ¶¶ 156, 165.

products; thus, IH cannot demonstrate that clinical support is a distinct product in a different market from the catheters supported. *Rick-Mik*, 532 F.3d at 975.

The fact that some number of hospitals have said that they would purchase IH's catheters if BWI would provide free clinical support for them does not change the analysis. The issue is whether there is evidence of sufficient demand from hospitals to actually *purchase* clinical support separately from catheters such that a firm can efficiently offer it as a separate service, not whether some number of hospitals might purchase IH's less expensive, reprocessed catheters if BWI would provide a free, high quality service for the catheters that IH does not offer. *See, e.g.*, *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 477 (7th Cir. 1988) ("no tying arrangement can exist unless there is a distinct demand *for the purchase of [the tying product]* by hospital patients separate from the demand for the [tied product]") (emphasis added); *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 684 (4th Cir. 1992) ("The purpose of the inquiry into consumer demand is to determine whether there are customers who would, absent an illegal agreement, *purchase* . . . the tying product without the tied product") (emphasis added). If the latter were the test, then any value-added service for any product would necessarily constitute a "distinct market" because some number of consumers would certainly opt to purchase a less expensive product if they could receive a free value-added service for the product from the product's more expensive competitor. As such, the evidence is meaningless, and there is no triable issue of fact to be decided.

III. **IH'S CLINICAL SUPPORT CLAIMS FAIL BECAUSE BWI'S CLINICAL SUPPORT POLICY IS JUSTIFIED.**

All of IH's tying claims and its monopolization and attempted monopolization claims that rely upon BWI's clinical support policy also fail because two legitimate, procompetitive rationales justify the policy: (1) it prevents BWI's competitors from free-riding on its valuable clinical support service, and (2) it protects the quality and safety of the clinical support BWI provides.

MEM. OF POINTS AND AUTHORITIES
Case No.: 8:19-cv-1984 JVS (KESx)

The Sherman Act protects "competition, not competitors". *Brown Shoe Co. v. United States*, 370 U.S. 294, 344 (1962); *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (emphasis in original) (finding that "[t]he damages respondents obtained are designed to provide them with the profits they would have realized had competition been reduced", which "is inimical to the purposes of these laws"); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 901 (9th Cir. 2008) (citing "[t]he Supreme Court's long and consistent adherence to the principle that the antitrust laws protect the process of competition"). Requiring BWI to provide clinical support for other manufacturers' reprocessed catheters would violate this foundational precept of antitrust law. While the clinical support policy may harm *IH* because *IH* finds it difficult to sell its reprocessed BWI mapping catheters when BWI will not provide free support for its products, and IH has chosen not to develop its own program, IH has raised no triable issue of fact that the policy injures *competition*. Instead, the clinical support policy *fosters* competition by preserving BWI's incentive and ability to offer a quality customer support service. The clinical support policy likewise enhances competition by preserving the quality and safety of BWI's support service. Requiring BWI to take on additional unknown risk to provide support for other manufacturers' sensor-enabled catheters—about which BWI knows nothing—would not.

Whether evaluating a Section 1 tying claim as a per se tie or under the rule of reason, it is well-settled that "a tie-in does not violate the antitrust laws if implemented for a legitimate purpose and if no less restrictive alternative is available". *Mozart Co. v. Mercedes Benz of N. Am., Inc.*, 833 F.2d 1342, 1349 (9th Cir. 1987) (quotation omitted) (per se tying claim); *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1074 (9th Cir. 2015) (rule of reason). In order to overcome a legitimate business justification, the less restrictive alternative "must be virtually as effective in serving the procompetitive purposes of the [challenged restraint], and without significantly increased cost". *O'Bannon*, 802 F.3d at 1074

22

(quotations omitted). An alleged anti-competitive restraint likewise does not violate Section 2 if there is a legitimate, procompetitive justification for the restraint. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020). The burden is on plaintiff to rebut a procompetitive justification "by demonstrating either that the justification does not legitimately promote competition or that the justification is pretextual". *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997). Failing that, "plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Qualcomm*, 969 F.3d at 991 (quotations omitted).

## A.    IH Is not Entitled to Free Ride on BWI's Clinical Support.

There is no triable issue of fact as to the question of procompetitive justifications for BWI's clinical support policy; IH's claims based on clinical support should be dismissed because they depend upon blatant free riding. IH seeks to free ride on BWI's investment in clinical support by manipulating the antitrust laws so that IH does not have to compete with BWI on the dimension of quality service. "Free-riding" occurs when a firm benefits from the investments of another without paying for them. *See Major League Baseball Props. v. Salvino, Inc.*, 542 F.3d 290, 305 (2d Cir. 2008) (describing the "'free-rider' problem" as "one entity's cashing in on the efforts of another"); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 212 (D.C. Cir. 1986) ( "A free ride occurs when one party to an arrangement reaps benefits for which another party pays."). Allowing rivals to free ride lessens or eliminates a firm's incentive to invest in high-value goods and services. *See, e.g.*, *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 55 (1977) ("The availability and quality of [] services affect a manufacturer's goodwill and the competitiveness of his product. Because of market imperfections such as the so-called 'free rider' effect, these services might not be provided by retailers in a purely competitive situation"). Restrictions that prevent free riding preserve these incentives and promote the development of

23

quality products that benefit consumers. *See, e.g.*, *JBL Enters., Inc. v. Jhirmack Enters., Inc.*, 698 F.2d 1011, 1015 (9th Cir. 1983) ("Dealers would be more likely to expend the effort necessary to promote or service a product if they did not have to worry about other dealers of the same product taking a 'free ride' on their efforts.") Based on these fundamental principles, courts have recognized that preventing free riding is a procompetitive justification warranting dismissal of claims on summary judgment under both Sections 1 and 2 of the Sherman Act. *See, e.g.*, *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1026 (9th Cir. 2013) (affirming summary judgment in favor of defendant on Section 1 claims when the challenged restraint prevented free riding because "free-riding could ultimately hurt consumers"); *Indep. Ent. Grp., Inc. v. Nat'l Basketball Ass'n*, 853 F. Supp. 333, 340 (C.D. Cal. 1994) (granting summary judgment in favor of defendant on Section 1 and Section 2 claims when "th[e] case, at bottom, [wa]s about plaintiffs' attempt to free-ride on the NBA's investment in its star players").

The high quality clinical support that BWI offers for its products is fundamental to BWI's value proposition. SUF ¶¶ 146-147. BWI has invested hundreds of millions of dollars in its clinical support program and spent more than a decade growing its team of CAS technicians by nearly a factor of ten. SUF ¶¶ 136-143. But while IH employs a trained CARTO 3 mapping technician that has provided clinical support for IH catheters and has held itself out as offering direct clinical support and training to teach customers to self-support, SUF ¶¶ 153-155, 158-162, 164, it has decided not to further develop its own clinical support program because it is a low-cost provider and, as such, it purportedly is not "practical" or "economically feasible" for it to do so, SUF ¶ 166 (quoting Grossbard Decl., Ex 119, IH Suppl. Interrog. Resp. at 4); *see also* SUF ¶¶ 151-152. Therefore, despite its admission that it can provide clinical support for its own products, IH seeks to use the antitrust laws to force BWI to provide its high quality

24

clinical support for IH's catheters so that IH can compete on price without
competing on service.

The numbers demonstrate what IH seeks. IH claims that absent the allegedly
anticompetitive clinical support policy, it would have sold an additional ███
catheters, earning IH ████████ in profits from 2016 to 2020. Grossbard Decl.,
Ex. 123, Excerpted Wu Report ¶ 97. In this "but-for" world, BWI would have
incurred ███ million to deploy its CAS to support those IH catheters, while
simultaneously losing millions in profits it otherwise would have generated from
those catheter sales. *Id.* In other words, IH contends BWI should have underwritten
███ million of IH's customer service costs so that IH could take millions in
profits from BWI. That makes no economic sense and is anathema to the basic
principles of the antitrust laws. Preventing IH from free riding on BWI's
services—by ensuring that BWI technicians only support BWI sensor-enabled
catheters—fully justifies BWI's clinical support policy. *See, e.g.*, O.*S.C. Corp. v.
Apple Comput., Inc.*, 792 F.2d 1464, 1468 (9th Cir. 1986) (affirming summary
judgment for defendant when the challenged conduct prevented free riding because
"such a concern is both legitimate and lawful"); *Paul E. Volpp Tractor Parts
Inc. v. Caterpillar, Inc.*, 917 F. Supp. 1208, 1233 (W.D. Tenn. 1995) (granting
summary judgment for defendant on tying claims because "[i]f [the defendant] did
not attempt to safeguard its investment in its own distribution system and its
warranty and return parts programs, it would be declining to aggressively
compete").

The fact that IH may find it difficult or expensive to develop a program the
size of BWI's is irrelevant. The antitrust laws do not entitle competitors to free ride
on their rivals' resources because it is difficult to develop their own. For example,
in *Seagood Trading Corp. v. Jerrico, Inc.*, the Eleventh Circuit affirmed summary
judgment against plaintiffs on their Section 1 claim alleging that defendant, a
fast-food distributor ("M-B") that serviced Long John Silver's ("LJS"), refused to

25

store and deliver the plaintiffs' cod. 924 F.2d 1555, 1558 (11th Cir. 1991). Plaintiffs argued that "[i]t was not economically feasible for LJS' competitors to emulate M-B's weekly delivery service, which was predicated on the high volume of scores of other products being sold by LJS". *Id.* at 1572. The court responded, "plaintiffs are seeking a 'free ride' — since they do not have a large enough operation to produce significant economies of scale and are unable, or unwilling, to finance the growth necessary to achieve these economies, they want to use, to their benefit, LJS' size and the capital outlays used to achieve it". *Id.* The court noted that this would destroy LJS' "competitive advantage over [plaintiffs]" and found that plaintiffs' claims failed because "[t]he antitrust laws are not intended to support artificially firms that cannot effectively compete on their own." *Id.* at 1572-73.

Like the plaintiffs in *Seagood*, IH asks that BWI hand over the competitive advantage that it has painstakingly developed when IH—for a price—could invest its time and resources to do the same. Just as the plaintiffs in *Seagood* complained "[i]t was not economically feasible" to develop a robust delivery network (*id.* at 1572), IH here complains, "[i]t is not practically or economically feasible for IH to provide its own nationwide clinical support program". SUF ¶ 166 (quoting Grossbard Decl., Ex 119, IH Suppl. Interrog. Resp. at 4). But as *Seagood* makes clear, the antitrust laws neither require BWI to assist IH, nor do they even encourage it. The antitrust laws simply do not require a firm to assist a rival unwilling to compete on its own. *Id.* at 1573 ("It is a harsh reality that when competition occurs, some win and some lose. Emerging victorious from competition, however, is not illegal under the Sherman Act. To hold otherwise would require us to interpret the Sherman Act as mandating cooperation among rivals. We will not do so.") (footnote omitted); *see also Olympia Equip. Leasing Co. v. W. Union Telegraph Co.*, 797 F.2d 370, 377, 379 (7th Cir. 1986) (concluding in the context of the essential-facilities doctrine that plaintiff "had no

MEM. OF POINTS AND AUTHORITIES
Case No.: 8:19-cv-1984 JVS (KESx)

right under antitrust law to take a free ride on its competitor's sales force" and defendant had no duty to assist "merely because [the plaintiff] was too weak to compete successfully").

Moreover, IH not only asks that BWI cease competing on service, but that BWI gratuitously finance IH's ability to take sales from it. That makes no economic sense. *See Seagood Trading Corp.*, 924 F.2d at 1573 n.44 ("Not only do the plaintiffs seek the benefits of [defendant's] capital outlays, they seek these benefits for free. The plaintiffs are not offering to pay [defendant] for its investment . . . . This would result in a windfall for the plaintiffs at [defendant's] expense—the plaintiffs would get all of the benefit without any of the cost."). Requiring BWI to expend its resources to assist its competitors would both disincentivize BWI from offering high-quality services and limit its ability to do so. SUF ¶¶ 176-177. IH does not explain how, as a practical matter, BWI would finance its CAS program if hospitals ceased purchasing BWI catheters. The parties do not dispute that BWI finances its clinical support program using the revenue it generates from its cardiac mapping products, including in particular its catheter sales. SUF ¶ 134. If BWI lost the revenue generated by those catheters and dedicated its CAS resources to supporting competitors' mapping catheters, BWI could not feasibly maintain and grow the kind of robust clinical support program it currently offers (nor would it have an incentive to do so). SUF ¶¶ 176-177. Compromising BWI's ability to offer this service that differentiates it competitively would ultimately hurt consumers. That is not a procompetitive outcome—it is an anticompetitive one.

**B.    The Clinical Support Policy Is Justified by Quality and Safety Considerations.**

BWI's clinical support policy is independently justified by the need to ensure that the sensor-enabled catheters its CAS support meet BWI's strict internal specifications and testing standards. CAS build the 3D anatomical maps on which

27

physicians rely to diagnose arrhythmias and determine where to ablate using these catheters, and BWI is well within bounds to want control over the quality and safety of the catheters used in this work. Requiring—as IH suggests this Court must—BWI employees to map using sensor-enabled catheters manufactured by third parties whose specifications and standards BWI does not know or control puts BWI's reputation at risk. It also presents a potential liability that BWI is justifiably unwilling to undertake. The antitrust laws do not require it to do so.

IH, not BWI, is the legal manufacturer of its reprocessed BWI catheters. SUF ¶ 29. The FDA's "substantial equivalence" standard for 510(k) clearance does not require that a reprocessor meet the OEM's product specifications or testing requirements. SUF ¶¶ 27-28. IH admits that it does not know BWI's specifications for its Lasso, Pentaray and SoundStar catheters, and IH does not make its specifications for those catheters available to BWI. SUF ¶¶ 30-31. As such, BWI does not know third-party reprocessors' specifications and standards and therefore cannot attest to the quality, safety or efficacy of those catheters.

IH also does not dispute that there are differences between BWI's and IH's specifications and testing standards, including, most importantly, differences between the companies' location accuracy standards. BWI calibrates its Lasso, Pentaray and SoundStar catheters and guarantees their location accuracy to within one millimeter, while IH not does not recalibrate or provide any specific location accuracy guarantee. SUF ¶¶ 23, 32-33; *see also id.* ¶¶ 22, 24. BWI also guarantees the image quality of its SterilMed reprocessed SoundStar catheter to have at least 94 percent of the OEM version's original fidelity, ███████████████ ███████, while IH does not provide a specific image quality guarantee and ███ ██████████████████████████████████. SUF ¶¶ 34-37. In addition, BWI's contemporaneous business records show that when BWI has tested third party reprocessed catheters, many did not meet its standards. SUF ¶¶ 38-39. To be clear, the actual quality of Innovative's catheters is not the point. The point is that the

competition laws do not render unlawful Biosense's commitment to a known level of quality and safety.

Thus, the alleged anticompetitive restraint—that BWI CAS can only provide clinical support in cases that use sensor-enabled catheters distributed by BWI—has the legitimate, procompetitive justification of ensuring that BWI can stand behind the quality and safety of the catheters its CAS use and also avoid potential liability associated with BWI employees creating maps using another manufacturer's products. Courts do not hesitate to dismiss tying claims on summary judgment where the relevant restraint is justified by similar quality and safety concerns. *See, e.g., Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159-60 (9th Cir. 2001) (affirming dismissal of tying claim where policy limiting C-section privileges to Board-certified obstetricians or physicians who completed obstetrics-gynecology residency had legitimate quality and safety objective of "optimizing patients' health"); *HDC Medical, Inc. v. Minntech Corp.*, 474 F.3d 543, 549–50 (8th Cir. 2007) (finding manufacturer's product modifications were justified by patient safety concerns); *Ireland v. Bend Neurological Assoc. LLC*, 2021 WL 1229937, at *4–5 (D. Or. March 31, 2021) (concluding that the hospital's conduct was justified to prevent harm to the quality of patient care).

There is also no less restrictive alternative available to ensure that the sensor-enabled catheters CAS use meet BWI's specifications and testing standards that would be virtually as effective and not entail significant costs. There is a real-world example of what the alternative would require—BWI's affiliated company, SterilMed. BWI certifies the performance of SterilMed's reprocessed sensor-enabled catheters by sharing its specifications and testing standards and providing access to BWI's calibration tools so that SterilMed can recalibrate to meet BWI's one millimeter accuracy guarantee. SUF ¶¶ 40, 42. To replicate this arrangement with its competitors would require BWI to disclose its proprietary specifications and testing methods, grant its competitor access to its proprietary equipment and

29

oversee its competitors' processes to ensure compliance with BWI's standards, the kind of expensive quality policing the Ninth Circuit has rejected (not to mention it would require BWI to share sensitive competitive information). *Mozart*, 833 F.2d at 1349 (finding that providing quality specifications to franchisees would require costly policing of the specifications); *Cnty. of Tuolumne*, 236 F.3d at 1159-60 (finding that independently evaluating a physician's operating skills would require hospital to incur substantial costs). Moreover, none of this would address the potential liability issue or the question of who would pay for the clinical support that BWI would provide for its competitors' now "approved" catheters.

In sum, BWI has established two legitimate, procompetitive justifications for the clinical support policy, and IH cannot point to any evidence that the policy is pretextual or that there is a less restrictive alternative to it under the law. Any alleged anticompetitive harm from BWI not supporting third-party reprocessed sensor-enabled catheters—catheters with unknown specifications and standards reprocessed by companies unwilling to develop clinical support programs themselves—is more than offset by the procompetitive benefits of (1) preventing free-riding and encouraging robust competition; and (2) allowing BWI to protect the quality of the catheters and the safety of patients in the procedures its CAS support. There is no triable issue of fact with respect to BWI's procompetitive justifications, and the Court therefore should dismiss IH's tying claim in its entirety and IH's Section 2 claims to the extent they are based on BWI's clinical support policy. *See Mozart Co. v. Mercedes Benz of N. Am., Inc.*, 833 F.2d at 1349; *O'Bannon*, 802 F.3d at 1074; *FTC v. Qualcomm Inc.*, 969 F.3d at 991.

## **CONCLUSION**

For the reasons set forth above, IH cannot raise a triable issue of fact as to critical aspects of its claims. All claims should be dismissed in their entirety.

MEM. OF POINTS AND AUTHORITIES
Case No.: 8:19-cv-1984 JVS (KESx)

1   Dated: December 13, 2021          STRADLING YOCCA CARLSON
2                                        & RAUTH

3                                 By:  /s/ Karla J. Kraft
4                                      Karla K. Kraft
5                                      Victoria McLaughlin
                                       *kkraft@stradlinglaw.com*
6                                      *vmclaughlin@stradlinglaw.com*
7
8                                      -and-
9
                                       CRAVATH, SWAINE & MOORE LLP
10                                     Katherine B. Forrest (*Pro Hac Vice*)
                                       Michael T. Reynolds (*Pro Hac Vice*)
11                                     Lauren A. Moskowitz (*Pro Hac Vice*)
12                                     Lillian S. Grossbard (*Pro Hac Vice*)
                                       *kforrest@cravath.com*
13                                     *mreynolds@cravath.com*
                                       *lmoskowitz@cravath.com*
14                                     *lgrossbard@cravath.com*
15
16                                     Attorneys *for Defendant*
17                                     *Biosense Webster, Inc.*
18
19
20
21
22
23
24
25
26
27
28

                                    31
                     MEM. OF POINTS AND AUTHORITIES
                                    Case No.: 8:19-cv-1984 JVS (KESx)