**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

# EXHIBIT 1

Page 1

1            UNITED STATES DISTRICT COURT

             CENTRAL DISTRICT OF CALIFORNIA

2                    SOUTHERN DIVISION

3

4    INNOVATIVE HEALTH LLC,

5         Plaintiff,                      CASE NO.

6    vs.                           8:19-cv-01984-JVS-KES

7    BIOSENSE WEBSTER, INC.,

8         Defendant.

9

10

11            VIDEOTAPE 30(B)(6) DEPOSITION

12             OF BIOSENSE WEBSTER, INC.

13          AND IN HIS INDIVIDUAL CAPACITY

14             WITNESS: MICHAEL BODNER

15              APPEARING REMOTE FROM

16               STATE OF CALIFORNIA

17

18               AUGUST 31, 2021

19                9:47 A.M. PST

20

21   Reported By:

22   Judith L. Leitz Moran

23   RPR, RSA, CCR-B-2312

24   APPEARING REMOTELY FROM ATLANTA, GEORGIA

25

30(b)(6) - Michael Bodner                    August 31, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 7

1        Q    Are you currently employed?

2        A    Yes.

3        Q    And you're employed with Johnson &

4    Johnson?

5        A    Yes.

6        Q    How long have you worked for Johnson &

7    Johnson?

8        A    Four years and a little over nine months.

9        Q    And you previously worked at Abbott?

10       A    Correct.

11       Q    And what was your last position at

12   Abbott?

13       A    I was the Divisional Vice President of

14   U.S. sales as well as Global Strategic Marketing.

15       Q    For any specific products?

16       A    For the endovascular and vessel closure

17   portfolio.

18       Q    And does endovascular include

19   electrophysiology products?

20       A    No, it does not.

21       Q    You are currently appearing remotely from

22   California for this deposition?

23       A    Correct.

24       Q    Okay.  And you have counsel representing

25   you here today?

Innovative Health, LLC v. Biosense Webster, Inc.

Page 8

1          A     Yes.

2          Q     Have you ever given a deposition?

3          A     No.

4          Q     Have you had an opportunity to consult

5    with your counsel regarding the ground rules for

6    today's deposition?

7          A     Yes.

8          Q     Do you believe that you understand the

9    ground rules for today's deposition?

10         A     Yes.

11         Q     And you understand that you're appearing

12   in part in your individual capacity?

13         A     Yes.

14         Q     And I'd like to start the deposition --

15   I'd like to take the deposition first in your

16   individual capacity.

17               And you are currently Vice President of

18   U.S. Sales, Marketing and Worldwide Service?

19         A     Yes.

20         Q     You manage Biosense's field sales in the

21   United States?

22         A     Yes.

23         Q     Including the clinical account

24   specialists?

25         A     Yes.

30(b)(6) of Michael Bodner                                    August 31, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 31



30(b)(6) of Michael Bodner                                      August 31, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 32



30(b)(6) of Michael Bodner                                August 31, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 33



30(b)(6) of Michael Bodner                              August 31, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 40



30(b)(6) of Michael Bodner                                    August 31, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 69



30(b)(6) Dep. Michael Bodner    August 31, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 70



30(b)(6) Dep. Michael Bodner                        August 31, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 71



30(b)(6) Dep. Michael Bodner                              August 31, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 72



30(b)(6) & Ind. - Michael Bodner                    August 31, 2021
Innovative Health, LLC v. Biosense Webster, Inc.



Case 8:19-cv-01984-JVS-KES    Document 131-2    Filed 01/17/22    Page 14 of 216
30(b)(6) of Michael Bodner                                August 31, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 89

1              C E R T I F I C A T E
2         Deposition of: MICHAEL BODNER
       Date of Deposition: AUGUST 31, 2021
3
4  STATE OF GEORGIA:
   COUNTY OF DEKALB:
5
6              I hereby certify that the foregoing
7  transcript was stenographically recorded by me
8  via Zoom as stated in the caption.  The deponent
9  was duly sworn to tell the truth, the whole truth,
10 and nothing but the truth.  And the colloquies,
11 statements, questions and answers thereto were
12 reduced to typewriting under my direction and
13 supervision and the deposition is a true and
14 correct record, to the best of my ability, of
15 the testimony/evidence given by the deponent.
16             I further certify that I am not a
17 relative or employee or attorney or counsel to
18 any of the parties in the case, nor am I a
19 relative or employee of such attorney or counsel,
20 nor am I financially interested in the action.
21             This  the 13th day of September 2021.
22
23
24        _____
          Judith L. Leitz Moran, CCR-B-2312
          Registered Professional Reporter
25

EXHIBIT 2

CONFIDENTIAL

Page 1

1            UNITED STATES DISTRICT COURT

             CENTRAL DISTRICT OF CALIFORNIA

2                  SOUTHERN DIVISION

3    _____

4    INNOVATIVE HEALTH LLC,

5         Plaintiff,                  CASE NO.

6    vs.                              8:19-cv-01984-JVS-KES

7    BIOSENSE WEBSTER, INC.,

8         Defendant.

9    _____

10                 ** CONFIDENTIAL **

11            VIDEOTAPE 30(B)(6) DEPOSITION

12             OF BIOSENSE WEBSTER, INC.

13           AND IN HIS INDIVIDUAL CAPACITY

14             WITNESS: DONALD COLDIRON

15               APPEARING REMOTE FROM

16                ROCHESTER, MINNESOTA

17

18                SEPTEMBER 3, 2021

19                  9:33 A.M CST

20

21   Reported By:

22   Judith L. Leitz Moran

23   RPR, RSA, CCR-B-2312

24   APPEARING REMOTELY FROM ATLANTA, GEORGIA

25

CONFIDENTIAL

                                              Page 9

1    with inside Mayo Clinic for -- to obtain answers

2    that I did not have knowledge of.

3         Q    And you are currently employed at Mayo?

4         A    Yes, I am.

5         Q    And you are principal category manager at

6    Mayo?

7         A    Yes.

8         Q    And you've had that position since

9    January 2020?

10        A    Yes.

11        Q    And generally what is the job of

12   principal category manager?

13        A    So I negotiate contracts on behalf of

14   Mayo stakeholders primarily in the cardiovascular

15   implant space for medical devices, and help train

16   team members on the medical device team, and sit on

17   a couple of supply chain committees within Mayo

18   Clinic.

19        Q    And your responsibilities include

20   electrophysiology products?

21        A    Yes.

22        Q    And are you also involved in an

23   organization called Captis?

24        A    Yes, I am.

25        Q    And is your involvement in Captis through

CONFIDENTIAL

Page 10

1    your position as principal category manager at

2    Mayo?

3          A    Yes.

4          Q    And what is Captis?

5          A    So Captis is an aggregation group of

6    hospitals, approximately 90 other healthcare

7    systems, including Mayo.  And Mayo has -- is the

8    service provider on the contracting arm of Captis

9    and negotiates contracts on behalf those Captis

10   members, including Mayo Clinic.

11         Q    And are you involved in negotiating those

12   contracts on behalf of Captis?

13         A    Yes, I am.  For the same categories.

14         Q    Including electrophysiology --

15         A    Yep.  Yes, sir.

16         Q    Okay.  So including electrophysiology

17   products?

18         A    Correct.

19         Q    And you consulted with other stakeholders

20   at Mayo prior to your deposition?

21         A    Yes.

22         Q    And who did you talk to?

23         A    Talked to Ms. Kim Hallum.  She's on our

24   performance consulting team.  And I talked to

25   Michelle Arnold, who is a contract coordinator for

CONFIDENTIAL

```
                                              Page 22

 1        A    Yes, sir.

 2        Q    The -- in your role at Captis, do you

 3   have substantial dealings with members of Captis?

 4        A    Yes, I do.

 5        Q    Are there regular meetings of the Captis

 6   members?

 7        A    Yes, regular monthly meetings.

 8        Q    And are those regular monthly meetings of

 9   the -- your fellow supply chain executives at the

10   other members of Captis?

11        A    That is correct.  It's -- it's usually

12   supply chain directors at that level.

13        Q    And are you familiar with the term

14   "physician preference item"?

15        A    Yes, I am.

16        Q    And what is your understanding of that

17   term?

18        A    They are items that are not commoditized

19   and I suppose they could be -- you know, some could

20   be commoditized, but they're primarily implants

21   that physicians who are implanting those products

22   prefer to utilize.

23        Q    Do all the physicians have strong

24   preferences for specific brands or type of medical

25   device in certain categories?
```

CONFIDENTIAL

Page 23

```
 1        A     That's a fair statement.
 2        Q     Based on your substantial dealings with
 3   members of Captis, do you believe that there's a
 4   strong physician preference on electrophysiology
 5   products?
 6        A     Yes, I do.
 7        Q     And that would include cardiac mapping
 8   systems?
 9        A     Yes.
10        Q     And electrophysiology catheters?
11        A     Yes.
12        Q     And is it true that there is a strong
13   physician preference on electrophysiology products
14   at Mayo Clinic as well?
15        A     Yes.
16        Q     Including cardiac mapping systems?
17        A     Yes.
18        Q     Including electrophysiology catheters?
19        A     Yes.
20        Q     Does the Mayo Clinic contract separately
21   for disposable for electrophysiology from its
22   contracting for capital equipment in
23   electrophysiology?
24        A     That is correct.
25        Q     And what is -- is there a typical
```

CONFIDENTIAL

                                                  Page 28

1    BY MR. BERHOLD:

2         Q    Does Biosense Webster have a policy of

3    refusing to support your cases on the CARTO 3 where

4    the physician uses ultrasound or mapping catheters

5    reprocessed by third parties?

6              MS. MOSKOWITZ:  Objection.

7         A    Yes.

8    BY MR. BERHOLD:

9         Q    Does Abbott St. Jude have a similar

10   policy?

11        A    No.

12        Q    Does Boston Scientific have a similar

13   policy?

14        A    No.

15        Q    Does Medtronic have a similar policy?

16        A    No, they do not have a policy where they

17   won't cover cases.

18        Q    Has Mayo taken any steps to avoid the

19   restrictions imposed by Biosense through the case

20   coverage policy?

21        A    Could you --

22             MR. KARPENKO:  Objection, vague.

23        A    Could you --

24             MS. MOSKOWITZ:  Objection.

25        A    -- please restate that?  I didn't

CONFIDENTIAL

Page 30

1          Q     Has the Mayo Clinic rejected some savings

2     on Biosense catheters reprocessed by Innovative

3     Health to keep its case coverage with Biosense on

4     the CARTO 3 mapping system?

5                MS. MOSKOWITZ:   Objection.

6          A     I'm sorry, can you -- can you restate

7     that question or rephrase it?

8     BY MR. BERHOLD:

9          Q     Oh, sure.

10               You testified earlier that the Mayo

11    Clinic prefers to maximize its savings on

12    reprocessed catheters through its purchases of

13    catheters reprocessed by Innovative Health?

14         A     Yes.

15         Q     Has -- and has the Mayo Clinic been able

16    to maximize its savings on reprocessed catheters

17    through its purchase of catheters reprocessed by

18    Innovative Health?

19         A     No.

20         Q     And has the Mayo Clinic been limited in

21    its savings on Biosense catheters reprocessed by

22    Innovative Health because of the case coverage

23    policy of Biosense?

24               MS. MOSKOWITZ:   Objection.

25         A     I would say that's the case.

CONFIDENTIAL

Page 31

1    BY MR. BERHOLD:

2        Q    And that continues today?

3            MS. MOSKOWITZ:  Objection.

4        A    Yes.

5            MR. BERHOLD:  Let's go off the record.

6            VIDEO TECHNICIAN:  The time is 10:18 and

7    we are going off the record.

8            (Recess taken.)

9            VIDEO TECHNICIAN:  The time is 10:25 and

10    we are back on the record.

11            MR. BERHOLD:  Welcome back, Mr. Coldiron.

12            I do not have any additional questions

13    for you in your individual capacity.

14            I may have some redirect examination on

15    that portion of the deposition and I may have

16    cross-examination for the portion of the deposition

17    in your role as corporate representative.

18            MS. MOSKOWITZ:  I think that's over to

19    me.

20                    EXAMINATION

21    BY MS. MOSKOWITZ:

22        Q    Good morning, Mr. Coldiron.  My name is

23    Lauren Moskowitz and I represent Biosense.  Thank

24    you for being here.

25        A    Good morning, ma'am.

CONFIDENTIAL

Page 76

1    physician preference for the systems might be?  You

2    gave me one example of perhaps age of the existing

3    system.  Are there other factors that you're aware

4    of that drive physician preference or choice for

5    certain mapping systems over others?

6        A    Sure, if it's something they were trained

7    on.  If there was -- you know, they're having good

8    clinical outcomes.  Technology.  Those are -- I

9    mean, those are probably the big ones.

10       Q    Is it fair to say then that some

11   physicians prefer to use the CARTO 3, for example,

12   over other systems?

13       A    I would say some physicians, yes.

14       Q    Have you personally heard feedback from

15   physicians who do prefer CARTO 3 over other

16   systems?

17       A    I -- I have not heard that within Mayo to

18   be honest.

19       Q    Have you heard it outside of Mayo?

20       A    I have.

21       Q    Is that in connection with Captis?

22       A    Yes.

23       Q    Can you share what you've heard in that

24   context?

25       A    Just that --

CONFIDENTIAL

Page 77

```
 1              MR. KARPENKO:  Objection, beyond the
 2      scope.
 3          A    Okay.  Just that, that they've had --
 4      they've been trained on it, they like it.  You
 5      know, they've had good outcomes and they prefer it.
 6      BY MS. MOSKOWITZ:
 7          Q    So with respect to within -- within Mayo,
 8      if a physician -- let's just say Rochester, for
 9      example, because you do have a number of different
10      systems available.  If a physician has a preference
11      for a certain system for their EP procedures, for
12      whatever reason --
13          A    Uh-huh.
14          Q    -- they might not use the other systems
15      even though they are within the same facility; is
16      that fair?
17          A    I don't know that to be a hundred percent
18      true, but, yeah, I mean, if they're -- if they're
19      primarily using CARTO, you know, and they're, you
20      know, one of the primary EP physicians, that's
21      likely what they're going to use.
22          Q    Similarly, if other physicians prefer
23      other systems, they may choose to use only those
24      systems?
25          A    Correct.
```

CONFIDENTIAL

Page 150

1          C E R T I F I C A T E

2          Deposition of: DONALD COLDIRON

        Date of Deposition: SEPTEMBER 3, 2021

3

4  STATE OF GEORGIA:

   COUNTY OF DEKALB:

5

6          I hereby certify that the foregoing

7  transcript was stenographically recorded by me

8  via Zoom as stated in the caption.  The deponent

9  was duly sworn to tell the truth, the whole truth,

10  and nothing but the truth.  And the colloquies,

11  statements, questions and answers thereto were

12  reduced to typewriting under my direction and

13  supervision and the deposition is a true and

14  correct record, to the best of my ability, of

15  the testimony/evidence given by the deponent.

16          I further certify that I am not a

17  relative or employee or attorney or counsel to

18  any of the parties in the case, nor am I a

19  relative or employee of such attorney or counsel,

20  nor am I financially interested in the action.

21          This, the 20th day of September 2021.

22

23

24  _____

        Judith L. Leitz Moran, CCR-B-2312

25      Registered Professional Reporter

EXHIBIT 3

Page 1

1              UNITED STATES DISTRICT COURT

               CENTRAL DISTRICT OF CALIFORNIA

2                   SOUTHERN DIVISION

3    _____

4    INNOVATIVE HEALTH LLC,

5         Plaintiff,                    CASE NO.

6    vs.                                8:19-cv-01984-JVS-KES

7    BIOSENSE WEBSTER, INC.,

8         Defendant.

9    _____

10

11             VIDEOTAPE 30(B)(6) DEPOSITION

12                 OF MEDLINE RENEWAL

13          AND IN HIS INDIVIDUAL CAPACITY

14             WITNESS: FRANK C. CZAJKA

15               APPEARING REMOTE FROM

16               LIBERTYVILLE, ILLINOIS

17

18               SEPTEMBER 13, 2021

19                  9:05 A.M CST

20

21   Reported By:

22   Judith L. Leitz Moran

23   RPR, RSA, CCR-B-2312

24   APPEARING REMOTELY FROM ATLANTA, GEORGIA

25

```
                                            Page 10

 1       Q    Okay.  And I'm just going to go through

 2   them quickly and make sure you understand and we

 3   have a common understanding of those comments and

 4   then we'll just start right in on the questioning.

 5            The first topic is Medline's relationship

 6   with Innovative --

 7            VIDEO TECHNICIAN:  I'm sorry,

 8   Ms. Forrest, I'm having a hard time hearing you.

 9            MS. FORREST:  I think that that's -- I

10   think it's Dan's background noise.

11            MR. MONICO:  That's me, I'm sorry, I'll

12   mute it.  I came off mute somehow.

13            MS. FORREST:  That's okay.  That's okay.

14   Probably shifting the baby from one shoulder to the

15   other.  That's all -- that's understandable.

16            All right, we'll start again.

17   BY MS. FORREST:

18       Q    Mr. Czajka, you understand that you are

19   designated to speak to Medline's business

20   relationship with Innovative with respect to the

21   sale or marketing of Innovative's reprocessed

22   catheters for use in electrophysiology studies or

23   procedures, including any formal or informal

24   business arrangements or agreements that Medline

25   may have with Innovative and the nature and terms
```

Page 11

1   of such arrangements or agreements?

2        A    Yes.

3        Q    Do you understand you've been -- all

4   right, terrific.

5             And do you understand that you've been

6   designated also for Medline's sales and marketing

7   of Innovative reprocessed electrophysiology

8   catheters, including, but not limited, to

9   reprocessed SOUNDSTAR, AcuNav, Lasso and Pentaray

10  catheters?

11       A    Yes.

12       Q    All right.  And do you understand that

13  you've also been designated to speak to the

14  identity of the prospective or actual customer to

15  whom you sold or attempted to sell Innovative's

16  reprocessed SOUNDSTAR, AcuNav, Lasso or Pentaray

17  catheters?

18       A    Yes.

19       Q    And do you understand that you've been

20  designated to speak to the reasons provided to

21  Medline by actual or prospective customers for

22  their decision not to purchase or not to enter into

23  or renew an agreement to purchase Medline

24  Innovative reprocessed diagnostic and mapping

25  catheters for use with CARTO 3, including, but not

Page 12

1    limited to, decisions not to purchase because of

2    inadequate supply, quality or reliability issues or

3    customer preference not to use reprocessed

4    products?

5           A    I do.

6           Q    Okay.  And do you understand that you've

7    also been designated to speak to the topic of

8    competition among entities that sell cardiac

9    mapping systems or ultrasound systems or diagnostic

10   and mapping catheters?

11          A    Yes.

12          Q    Okay.  And there's just two more.

13          Do you understand that you've been

14   designated to speak to discussions, negotiations,

15   arrangements or agreements Medline has or has had

16   with Innovative concerning Medline assisting

17   Innovative with respect to any efforts by

18   Innovative to provide clinical support or clinical

19   support training to assist physicians by creating

20   3D cardiac maps during electrophysiology studies

21   and procedures on the CARTO 3 cardiac mapping

22   system using Innovative's reprocessed catheters or

23   to train a hospital's nurses, technicians or others

24   employed or contracted by the hospital to do so?

25          A    Yes.

Page 13

1          Q    And the last topic is, that you've been

2    designated to speak to, is, Medline's efforts to

3    provide clinical support or clinical support

4    training to assist physicians by creating 3D

5    cardiac mapping during electrophysiology studies

6    and procedures on the CARTO 3 cardiac mapping

7    system using Innovative's reprocessed catheters or

8    to train a hospital's nurses, technicians or others

9    employed or contracted by the hospital to do so,

10   including the nature and scope of those efforts,

11   the number and identity of the customers who used

12   or currently use such clinical support or clinical

13   support training and the reasons provided by actual

14   or potential customers for choosing to use or not

15   use such clinical support or clinical support

16   training?

17         A    Yes.

18         Q    All right.  Thank you.

19              All right.  And you are represented by

20   counsel today?

21         A    I am.

22         Q    All right.  And I understand that counsel

23   may need to or will perhaps come in and out of the

24   deposition.  If at any point in time you need to

25   stop because your counsel has left the deposition

                                                            Page 14

1    and you believe you need to consult with your
2    counsel, please let us know, otherwise, we're just
3    going to proceed unless you tell us that we should
4    not; is that acceptable?
5         A    That is.
6         Q    Okay.  By whom are you currently
7    employed, Mr. Czajka?
8         A    Medline Industries.
9         Q    And what is your position at present with
10   Medline Industries?
11        A    Division president, Medline ReNewal.
12        Q    What are your duties and responsibilities
13   as the president of Medline ReNewal?
14        A    I manage our reprocessing business, the
15   P&L, and all functions.
16        Q    Now, is there a difference between
17   Medline and Medline ReNewal?  Is that the same
18   company or Medline ReNewal a subsidiary of Medline?
19        A    Medline ReNewal is a division of Medline
20   Industries LP.  We're broken into several different
21   divisions.
22        Q    All right.  And if I refer to for
23   purposes just of the deposition today as a
24   shorthand of Medline ReNewal as Medline, would that
25   be acceptable or is that going to cause confusion

```
                                               Page 65
 1        A     Yes.

 2               MR. BERHOLD:  Objection.

 3   BY MS. FORREST:

 4        Q     And does Medline increase the cost that's

 5   over on the right-hand side of that page, the net

 6   cost by approximately 30 percent when its selling

 7   those products to customers in order to obtain its

 8   margin?

 9        A     No, we actually share revenue and margin

10   with Innovative as part of the Medline Innovative

11   partnership.

12        Q     Okay.  And so the 30 percent margin that

13   you have mentioned as the Medline margin, is that

14   only the margin that Medline obtains?

15        A     Yes.

16        Q     What is the overall margin that is

17   obtained from the sales of these products that is

18   then shared with Innovative?

19        A     Roughly -- probably roughly 60 percent.

20        Q     All right.  So there's sort of a 50/50

21   sharing of the margin; is that right?

22        A     Yes.

23        Q     Okay.  And so is it the case that there's

24   a net cost of reprocessed products that we see on

25   Exhibit A and then there's approximately a 60
```

Page 157

1    for sure that it has.

2        Q    Based on your substantial dealings with

3    hospitals, do you believe that many of your

4    customers are rejecting the savings on Innovative

5    reprocessed catheters to keep their case coverage

6    from Biosense?

7            MS. FORREST:  Objection.

8            You can answer.

9        A    Yes.

10   BY MR. BERHOLD:

11       Q    Did you testify earlier about an Abbott

12   sensor-enabled catheter called the HD Grid?

13       A    I don't believe we talked about HD Grid.

14       Q    Are you familiar with the HD grid?

15       A    I know the brand, yeah, the item.

16       Q    And do you who manufactures the HD Grid?

17       A    I believe it's Abbott Healthcare.

18       Q    And it's used with the Abbott cardiac

19   mapping system?

20       A    I'm not that skilled to know which

21   mapping systems it would work with.

22       Q    What is your experience in selling the

23   Abbott HD Grid compared to selling the Biosense

24   Pentaray reprocessed by Innovative?

25       A    We have a substantially better chance to

Page 158

1   sell HD Grid.

2       Q    And do you believe based on your

3   financial dealings with hospitals that it's much

4   more difficult to sell the Biosense sensor-enabled

5   catheters because of the case coverage policy?

6       A    It's incredibly difficult to sell the

7   Biosense Webster products.

8       Q    Did any of your customers tell you that

9   they were, in fact, rejecting the savings from

10  Innovative to keep their case coverage from

11  Biosense?

12          MS. FORREST:  Can I have the court

13  reporter read the question back, please.

14          THE COURT REPORTER:  Sure, one second.

15          (Whereupon, the requested portion of

16          the record was read by the reporter.)

17          MS. FORREST:  Objection.

18      A    Yes.

19  BY MR. BERHOLD:

20      Q    From time to time does Medline ReNewal

21  offer a savings review to customers regarding the

22  opportunity for savings on reprocessed catheters?

23      A    Yes, we do.

24      Q    Have any customers told Medline ReNewal

25  that there is no point in even getting a savings

Page 164

1                    C E R T I F I C A T E

2              Deposition of: FRANK CZAJKA

3        Date of Deposition: SEPTEMBER 13, 2021

4    STATE OF GEORGIA:

     COUNTY OF DEKALB:

5

6              I hereby certify that the foregoing

7    transcript was stenographically recorded by me

8    via Zoom as stated in the caption.  The deponent

9    was duly sworn to tell the truth, the whole truth,

10   and nothing but the truth.  And the colloquies,

11   statements, questions and answers thereto were

12   reduced to typewriting under my direction and

13   supervision and the deposition is a true and

14   correct record, to the best of my ability, of

15   the testimony/evidence given by the deponent.

16             I further certify that I am not a

17   relative or employee or attorney or counsel to

18   any of the parties in the case, nor am I a

19   relative or employee of such attorney or counsel,

20   nor am I financially interested in the action.

21             This, the 26th day of September 2021.

22

23

     _____

24        Judith L. Leitz Moran, CCR-B-2312

          Registered Professional Reporter

25

**<span style="color:red">REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL</span>**

# EXHIBIT 4

Nick Demczuk                                      August 13, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 1

1            UNITED STATES DISTRICT COURT

             CENTRAL DISTRICT OF CALIFORNIA

2                   SOUTHERN DIVISION

3

4     INNOVATIVE HEALTH LLC,

5          Plaintiff,                    CASE NO.

6     vs.                        8:19-cv-01984-JVS-KES

7     BIOSENSE WEBSTER, INC.,

8          Defendant.

9

10

11              DEPOSITION NICK DEMCZUK

12               APPEARING REMOTE FROM

13               PLEASONTON, CALIFORNIA

14

15                AUGUST 13, 2021

16                 7:35 A.M. PST

17

18

19

20    Reported By:

21    Judith L. Leitz Moran

22    RPR, RSA, CCR-B-2312

23    APPEARING REMOTELY FROM ATLANTA, GEORGIA

24

25

Page 7

1                    EXAMINATION

2    BY MR. BERHOLD:

3         Q    Good morning, Mr. Demczuk.

4         A    Good morning.

5         Q    Do you have counsel representing you here

6    today?

7         A    Yes, I do.

8         Q    And who is your counsel?

9         A    Lillian Grossbard.

10        Q    And Ms. Grossbard also represents

11   Biosense Webster, to your knowledge?

12        A    Yes, they do.

13        Q    And you previously worked at Biosense

14   Webster?

15        A    As a contract employee at Biosense

16   Webster.

17        Q    And when did you work as a contract

18   employee for Biosense Webster?

19        A    February 2013 through November of 2015.

20   I don't know the exact dates, but that's...

21        Q    Without getting into any details of your

22   conversations with Ms. Grossbard or any other

23   counsel, what have you done to prepare for your

24   deposition today?

25        A    Primarily just speak with counsel.

Nick Demczuk                                         August 13, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

                                                    Page 9

1        A     Yes.

2        Q     What did you do at Biosense Webster?

3        A     I was hired on as a project manager in

4    the marketing -- initially in the commercial

5    marketing department.

6              Do you want -- that's about -- do you

7    want details or that's about...

8        Q     So what did you do as a project manager?

9        A     In 2013, primarily work on the Sound

10   Choice Program that introduced the reprocessed

11   catheter from Sterilmed into the Biosense

12   portfolio.

13       Q     Anything else initially as project

14   manager?

15       A     In 2013, no.

16       Q     At some point did your work

17   responsibilities change?

18       A     Yes.  In the beginning of 2014, I was

19   moved to the new product development team and

20   worked on a couple of projects in the new product

21   development.

22       Q     And what were those projects?

23       A     Well, one of them is Falcon, which I

24   think is what you guys are going to talk about.

25       Q     Anything else?

Nick Demchuk                                        August 13, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 10

1       A     Looking at potentially reprocessing Lasso

2    Nav eco for the Sterilmed team.

3       Q     And did you add any additional

4    responsibilities before you left Biosense in

5    November 2015?

6       A     Yeah.  At the beginning of 2015, I was

7    moved back to the commercial organization to help

8    with the launch of the SOUNDSTAR eco 8 French.

9       Q     So Biosense manufactures the CARTO 3

10   mapping system; is that right?

11      A     That's correct.

12      Q     And generally what is the CARTO 3 mapping

13   system?

14      A     It allows the EP physicians to generate a

15   map of the -- well, the entire heart really, the

16   left atrium, the right atrium, the ventricles left

17   and right.  And the map guides them to do their

18   ablation surgery with ablation catheters.  So

19   you're treating AFib essentially.

20      Q     And the CARTO 3 cardiac mapping system

21   itself has software?

22      A     Yeah, of course, it's a -- it's on a --

23   it runs on a computer.

24      Q     And there are a variety of disposables

25   that are used with the CARTO 3 cardiac mapping

Nick Demoulik                                                    August 13, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 26



Nick Demchuk                                                    August 13, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 31



Nick Demczuk                                    August 13, 2021
Page ID #:6911
Innovative Health, LLC v. Biosense Webster, Inc.

Page 32



Nick Demczuk                                    August 13, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 51



Nick Demarchuk                                         August 13, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 52



Nick Demczuk                                              August 13, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 53



Nick Demduk                                                    August 13, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 74



Nick Demchuk                                               August 13, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 75



Nick Demczuk                                                    August 13, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

                                                               Page 87

 1              C E R T I F I C A T E
 2           Deposition of: NICK DEMCZUK
        Date of Deposition: AUGUST 13, 2021
 3
 4   STATE OF GEORGIA:
     COUNTY OF DEKALB:
 5
 6           I hereby certify that the foregoing
 7   transcript was stenographically recorded by me
 8   via Zoom as stated in the caption.  The deponent
 9   was duly sworn to tell the truth, the whole truth,
10   and nothing but the truth.  And the colloquies,
11   statements, questions and answers thereto were
12   reduced to typewriting under my direction and
13   supervision and the deposition is a true and
14   correct record, to the best of my ability, of
15   the testimony/evidence given by the deponent.
16           I further certify that I am not a
17   relative or employee or attorney or counsel to
18   any of the parties in the case, nor am I a
19   relative or employee of such attorney or counsel,
20   nor am I financially interested in the action.
21           This, the 18th day of August 2021.
22
23
     _____
24   Judith L. Leitz Moran, CCR-B-2312
     Registered Professional Reporter
25

EXHIBIT 5

Page 1

1                   UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

3

4

5    INNOVATIVE HEALTH LLC,

6                   Plaintiff,

                                      No.

7           vs.                       8:19-CV-1984 JVS(KESx)

8    BIOSENSE WEBSTER, INC.,

9                   Defendant.
     _____/

10

11

12

13

14              VIDEOTAPED DEPOSITION OF AARON DETATE

15                   Remote Zoom Proceeding

16                     Atlanta, Georgia

17                   Friday, July 23, 2021

18

19

20

21

22

23   REPORTED BY:

24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25   Pages 1 - 283                    Job No. 4693858

Page 19

1    ever two or three months, I might do a couple days.

2        Q.  Okay.  You joined Innovative Health as senior

3    director of clinical integration of May -- in May of

4    2021; is that right?

5        A.  That is correct.  That sounds correct.          09:42:02

6        Q.  And can you describe your current role as senior

7    director of clinical integration at Innovative Health?

8        A.  Yeah, absolutely.

9            So my role is to support the sales staff and

10   administration, providing clinical guidance on the use of   09:42:16

11   the devices, going out to facilities, working with

12   administration on new product launches, new account

13   launches, as well as just routinely interfacing with

14   physicians.

15       Q.  To whom do you report at Innovative?            09:42:31

16       A.  My direct report is Rick Ferreira.

17       Q.  And Rick Ferreira is the CEO of Innovative?

18       A.  That's correct.

19       Q.  And do you have any direct reports?

20       A.  I do not.                                       09:42:44

21       Q.  How do you allocate your time with Innovative

22   with your other current jobs?

23       A.  So right now, I am working three days a week for

24   Innovative Health.  That's kind of my standing agreement.

25   If they need me more, then I try to make myself available   09:43:02

Page 21

```
 1    interpretations.  Procedure-related stuff like access,

 2    number of catheters, how an EG study is done.

 3         Q.  And does it involve training on now to map on a

 4    cardiac mapping system at all?

 5         A.  It does not.  There is no material currently on    09:44:39

 6    CHART for that.

 7         Q.  Okay.  And you're also a clinical

 8    electrophysiology specialist at Torrance Memorial

 9    Hospital; is that right?

10         A.  That is correct.                                   09:44:49

11         Q.  And you joined Torrance's staff in 2010?

12         A.  That's correct.

13         Q.  And what is your role at Torrance?

14         A.  My role at Torrance is kind of a lead role.  So

15    my responsibilities when I was hired was to come in and     09:45:03

16    kind of held rebuild an electrophysiology program at

17    Torrance.

18              So I do procedures.  I am very clinically

19    involved today.  I scrub in.  I run recording systems,

20    intracardiac pacing systems, mapping systems.              09:45:18

21              I also train the staff there.  I'm responsible

22    for helping to monitor and facilitate programs initiated

23    by the hospital.  So, for instance, contract compliance

24    and stuff like that, if the hospital feels like we're not

25    meeting our goals, I have to communicate that to the       09:45:38
```

Page 22

1    physicians as well, things like that.

2            And then the bridge between the physicians and

3    the facility.  So I'm also kind of their ear upward to

4    administration.  When they want new products or they feel

5    like they're not being heard or they want something, I'm      09:45:52

6    the one that communicates that to administration director

7    level, VP level, things like that.

8        Q.  Okay.  And have those responsibilities changed

9    over time?  You've been there quite a long time.

10       A.  I would say yes.  I'd say when I first started,      09:46:06

11   they had a vision of what they wanted to become but not

12   really clear steps, and over time that role has

13   definitely evolved into what it is today.

14       Q.  And what was the vision of what they wanted to

15   become?                                                        09:46:18

16       A.  They wanted me to help rebuild a program.  So

17   they had an EP program that was maybe doing one case a

18   month when I first started there.  The doctors were not

19   happy with the level of training.  Most of the staff was

20   registry staff.                                                09:46:28

21           The hospital's vision was they wanted a

22   comprehensive EP program, something they could be

23   considered as a center of excellence.  And they wanted me

24   to come in and help facilitate that.

25       Q.  And what is "registry staff"?                          09:46:42

Page 23

1       A.   Registry is usually per-diem staff that's hired

2    from outside the hospital, contract labor, not inhouse

3    people.  So they generally do -- it can be as short as a

4    daily booking or as long as a -- you know, a month or a

5    year.  But they are not hospital employees.  They're          09:46:55

6    contracted through a third-party staffing company.

7       Q.   Okay.  And has Torrance Memorial become a center

8    of excellence for electrophysiology?

9       A.   I -- that's kind of a subjective thing.  I mean,

10   would I consider it to be a center of excellence?            09:47:10

11   Absolutely.  I think the doctors would consider it to be

12   a center of excellence, but you'd have to ask them, so...

13      Q.   Okay.  And you mentioned per-diem employees.

14   Can per-diem employees map cases on cardiac mapping

15   systems?                                                     09:47:25

16      A.   Per diem as in the contract labor that I just

17   discussed?

18      Q.   Yes.

19      A.   No --

20           MR. BERHOLD:  Objection.                             09:47:32

21           THE WITNESS:  -- we actually --

22      Q.   BY MS. GROSSBARD:  You can finish your answer.

23      A.   So I would say we don't use contract labor

24   and -- or per diem.  We have per-diem classification

25   employees, but they're full-time hospital employees that    09:47:43

```
                                                      Page 62
 1    that, yes.

 2        Q.  Okay.  And how is fluoroscopy used in EP

 3    procedures?

 4        A.  To look at the catheter placement to see where

 5    the catheter location is.  We use it for tracking      10:36:47

 6    esophageal temperature probes.  We use it to verify that

 7    we're where we think we are with the catheters.

 8            So sometimes we use the fluoro system to make

 9    sure that -- that our maps are accurate, that the

10    catheter is where it should be in relationship to where  10:37:13

11    the 3D map is.

12        Q.  Okay.  Are you familiar with the term "clinical

13    support" as it relates to EP procedures being performed

14    using cardiac mapping systems?

15        A.  I am.                                           10:37:32

16        Q.  And what does that mean to you, "clinical

17    support"?

18        A.  My understanding is that clinical support

19    involves supporting the three-dimensional or the cardiac

20    mapping systems.                                        10:37:43

21        Q.  And does it involve specifically the ability to

22    generate a map on the mapping system?

23        A.  I think it's -- I mean, that's part of the

24    system's function.  My understanding is that it involves

25    supporting the entire system, so...                    10:37:56
```

Page 63

1          Q.  And supporting the entire system in what other

2    ways, other than helping create a map using the system?

3          A.  Troubleshooting error codes.  That's a big role

4    that they do in those systems as well.  So there's a lot

5    that goes into that system other than just creating the          10:38:19

6    maps.  So it's also looking at, you know, catheter

7    placement, like I said, error codes, the activation

8    through the heart, the map that we take that shows the

9    activation is part of that as well.

10           Sometimes it's the integration between the CT          10:38:39

11   that has been taken before the procedure and bringing it

12   into the map.

13         Q.  Are there portions of clinical support -- you

14   mentioned error codes, but are there portions of clinical

15   support that don't relate to the map that's being          10:39:02

16   generated?  Is catheter placement not relate to the map?

17         A.  I would say you can visualize it on the map, but

18   catheter placement is usually occurring regardless of --

19   well before the map is being generated.

20         Q.  And they're assisting with catheter placement          10:39:23

21   how before the map is being generated?

22         A.  I don't know that that's something they do.

23   Sometimes some of them do, some of them don't.  I guess

24   it depends on experience level.

25           So I'm not sure that I know the answer to that          10:39:36

Page 64

1    question.  I mean, some of them might help tell the

2    doctor, oh, I think the CS might be a little farther

3    back.  But generally, it's something that you would look

4    at X-ray to see or maybe even ultrasound images to see.

5    So I'm not sure.                                    10:39:57

6         Q.  I guess I'm trying to understand what kinds of

7    clinical support are being provided that aren't related

8    to that actual map that's being generated.

9         A.  Some of it's just the connection of the system.

10   I mean, the system has to be connected before the case,  10:40:10

11   and some of it is troubleshooting that, some of it's

12   troubleshooting how the system connects to the patient.

13   Some of it's troubleshooting the way the system boots up

14   because it's a computer.

15            There's a map -- I mean, there's a lot that goes  10:40:23

16   into the system and starting it before you get to the

17   mapping.  And so if you're supporting the system, you're

18   supporting all of that.

19        Q.  Okay.  Would it be fair to say that the primary

20   kind of clinical support this thing provided is the      10:40:37

21   mapping function or is it starting the system?

22        A.  I would say that the primary type of support

23   that's being done is supporting the entire system as a

24   whole.  So and everything that that involves, mapping is

25   a part of that, so...                                    10:40:55

Page 65

1          Q.   Okay.  And is clinical support synonymous with

2     case coverage and mapping support, which are other terms

3     that we see used?

4          A.   I think that's a very broad question.  Clinical

5     support, from my standpoint as somebody who works in the        10:41:14

6     EP lab, is the support that's given by clinical people

7     within a company on their product.

8              So we -- we get clinical support for all

9     different types of products.  Like a pacemaker rep comes

10    in and does the programming on that device.  That's their       10:41:32

11    clinical support.

12             So if we're specifically talking about EP

13    mapping systems, then I would say that clinical support

14    in this instance is synonymous with mapping support

15    because that's part of their role.                              10:41:48

16         Q.   Okay.  And is that also sometimes referred to as

17    case coverage for a cardiac mapping system?

18         A.   I guess so.  I mean, I think that's a very

19    general -- "case coverage" is a very general term.  But

20    sure, if that's how --                                          10:42:04

21         Q.   Okay.  Well, I can try not to use that term.

22         A.   Yeah, that's fine.  That's fine.  I mean, I just

23    think that that's a very general term; right?  So...

24         Q.   Okay.  Do Biosense's clinical account

25    specialists provide clinical support for CARTO 3?               10:42:17

Page 66

1          A.   Yeah, I believe that's their role.

2          Q.   How would you describe what clinical account

3     specialists do in a CARTO 3 procedure?

4          A.   I would describe their role as providing support

5     for the CARTO 3 system.                              10:42:38

6          Q.   How is the 3D map that's generated by a cardiac

7     mapping system, how is that used in an EP procedure?

8          A.   I believe it has a couple uses.  The first use

9     for a 3D map is to define the structures within the

10    heart; right?  So depending on which chamber you're in,    10:43:08

11    it could be the atrium, it could also include the

12    pulmonary veins, it could include valvular structures.

13          So it's basically the 3D map is generating

14    intracardiac geometry that defines the structures, the

15    intracardiac structures of the cardiac anatomy in          10:43:30

16    whatever chamber you happen to be working in.

17          Q.   And can it also show where catheters are located

18    within that map?

19          A.   Well, the 3D map itself isn't what provides that

20    tracking.  The tracking is provided by the system.  But    10:43:53

21    the 3D map itself is just a 3D map.

22          Q.   But the system is used to show catheters within

23    the 3D map; is that fair?

24          A.   Correct.  One of the functions the system does

25    is track those catheters within that space.               10:44:09

Page 282

1    STATE OF CALIFORNIA      ) ss:

2    COUNTY OF MARIN          )

3

4           I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

5    hereby certify:

6           That the foregoing deposition testimony was

7    taken before me at the time and place therein set forth

8    and at which time the witness was administered the oath;

9           That testimony of the witness and all objections

10   made by counsel at the time of the examination were

11   recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16          I further certify that I am neither counsel for

17   any party to said action, nor am I related to any party

18   to said action, nor am I in any way interested in the

19   outcome thereof.

20          IN WITNESS WHEREOF, I have subscribed my name

21   this 6th day of August, 2021.

22

23

24

25          LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

# EXHIBIT 6

```
                                                  Page 1

 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3                   SOUTHERN DIVISION
 4    ─────────────────────────────────────────────
 5    INNOVATIVE HEALTH, LLC,    |
                                 |
 6              Plaintiff,       |
                                 |
 7    vs.                        |         Case No.
                                 |   8:19-cv-1984 JVS-KES
 8    BIOSENSE WEBSTER, INC.,    |
                                 |
 9              Defendant.       |
                                 |
10    ─────────────────────────────────────────────
11         REMOTE VIDEOTAPED 30(b)(6) DEPOSITION OF
                   INNOVATIVE HEALTH, LLC
12
          by and through their corporate representative
13                      DAVID DISTEL
14         both in his personal and corporate capacity
15
16    DATE:       July 29, 2021
17    TIME:       8:28 a.m. (Central)
18    PLACE:      Veritext Virtual Videoconference
19
20
21
22
23
24    JOB NO.:       NY 4693878
      PAGES:         1 to 269
25    REPORTED BY:    Merilee Johnson, RDR, CRR, CRC, RSA
```

```
                                           Page 21

 1     sorry.  I got distracted by the interference.
 2             You were at Stryker from approximately 2006
 3     to 2012 to 2013; is that right?
 4         A.   Yes.
 5         Q.   Okay.  And what was your job after Stryker,
 6     if any?
 7         A.   I went to a small startup called Intralign,
 8     working with hospitals in the orthopedic space,
 9     looking at ways to create efficiencies within the
10     orthopedic service line.
11         Q.   And what was the job title that you held
12     when you were at Intralign?
13         A.   I think I was vice president of business
14     development.
15         Q.   And what year did you start and end at
16     Intralign?
17         A.   It would have been immediately after
18     departing the Cleveland Clinic.  And I would have
19     left there in April/May of 2016.
20         Q.   All right.  And in 2016, was your next job
21     with Innovative Health?
22         A.   Yes, it was.
23         Q.   All right.  And you're currently employed,
24     still, by Innovative Health; is that right?
25         A.   That is correct.
```

```
                                        Page 23

1      reporting to you today as the vice president of

2      business development?

3          A.   Four.

4          Q.   What are the job areas of those four

5      individuals?

6          A.   Amy Ferreira, who is the director of sales,

7      handles, again, meeting with clients and presenting

8      the value proposition from Innovative Health.  Ira

9      Joseph, who is our director of sales analytics,

10     provides the analytics from customers' data,

11     identifying the opportunities and savings

12     potentials.

13              Along with him is Tyler Andl, who also

14     operates Tableau for the visualization of all the

15     analytics, both for ourself and for our clients.

16     And Neha, who we just hired out of ASU, who will

17     also be assisting with analytics and database

18     development.

19         Q.   All right.  How big is the sales

20     organization of Innovative Health today?

21         A.   Approximately six of us.

22         Q.   And that would include yourself,

23     Ms. Ferreira, and four others?

24         A.    Myself, Amy Ferreira, Jay Farris, Rick

25     Ferreira, Michael Ferreira.  And that would really
```

```
                                                Page 32

 1     software packages.

 2         Q.    All right.  And are there other mapping

 3     systems other than the Carto 3?

 4         A.    There are.

 5         Q.    What are -- can you name them, please?

 6         A.    Abbott has both the EnSite and then they

 7     have the Precision.  And potentially launching a

 8     new system as we speak, the EnSite X.  And Boston

 9     Scientific has the Rhythmia.  And Acutus, as you

10     indicated, has their own system.

11         Q.    All right.  And does Innovative Health sell

12     catheters that work with the mapping system for the

13     Carto 3?

14         A.    We sell both the mapping catheters that

15     will work with the Carto 3 as well as an array of

16     diagnostic catheters that will work with it.

17         Q.    All right.  And is the same true for the

18     Abbott machines?

19         A.    We have the mapping catheters and the

20     diagnostic catheters for them, yes.

21         Q.    And is the same true -- let me just,

22     actually, ask the full question:  Does Innovative

23     Health sell mapping catheters as well as diagnostic

24     catheters that work with Boston Scientific's

25     Rhythmia machine?
```

Page 33

1          A.    We only offer the diagnostic catheters for

2     their machines at this time.  Until such time as

3     there is a business justification to go after their

4     mapping catheters, if their market share grows.

5          Q.    All right.  And we've talked about Acutus

6     already in terms of its AcQMap.  So does Innovative

7     Health sell any reprocessed mapping or diagnostic

8     catheters that support the Acutus machine?

9          A.    We do not do the AcQMap.

10         Q.    All right.  Let's go back for a moment to

11    your employment with Innovative Health generally.

12    And I'd like to ask you, in -- not in terms of

13    amounts at the moment, but in terms of the form of

14    your compensation.

15              Can you just give me the structure of the

16    form of your compensation.  Base?  Bonus?  Is it

17    tied to sales?  How would you describe it?

18         A.    I have a base that I'm paid, and then I'm

19    paid a commission on pieces of business that I

20    bring to the organization and manage.

21         Q.    All right.  And are there targets set for

22    your commission potential at various times during

23    the year?

24         A.    I'm not tied to targets.  I get paid a

25    percentage of the net sales.

                                          Page 134

1      directly as well as ultrasound catheters, correct?

2          A.   Yes.

3          Q.   All right.  And in terms of the sales

4      process for an EP lab, are your sales typically --

5      is there a typical contract duration that you enter

6      into with a facility?

7          A.   You know, the contract, if it's -- if it's

8      a GPO contract, it's obviously whatever the

9      remaining term is on the GPO contract.

10              If it's a direct contract, it would -- we

11     would generally put three years as a term on that.

12         Q.   And then for either contract, does

13     Innovative do any kind of estimating of the number

14     of catheters that that facility might use?

15         A.   So when we start with a client, we request

16     a data set of purchase history for the EP and the

17     cath lab.  And then we query that data for

18     reprocessable items to identify what items they

19     are, and then we look at the quantities that they

20     had consumed in the year prior.

21              So we use that as a way to also measure our

22     collection's efficiency, to make sure that -- if we

23     have a greatly disparate number higher or lower of

24     a product than what would have been expected, that

25     we are asking and that we're addressing that.

                                        Page 142

1      reprocessing business?

2          A.    I don't have a formal analysis to that

3      effect.

4          Q.    Okay.  Now, does Innovative Health have any

5      competitors?

6          A.    Stryker Sustainability competes in

7      electrophysiology, as does Sterilmed.

8          Q.    Are those the only competitors or the

9      primary competitors?

10         A.    They would be the competitors in the

11     reprocess marketplace.

12         Q.    Okay.  Now, does Innovative do anything to

13     differentiate itself from Sterilmed and Stryker?

14         A.    We differentiate ourself certainly on the

15     510(k)s that we pursue, the breadth of our

16     portfolio.  And I'm sure, just like them, we

17     present to customers our capabilities in managing

18     the entire program.  We do have the ability to use

19     the savings guarantee.

20         Q.    And when you say you also -- one of the

21     ways in which you differentiate yourself to

22     customers is your ability to manage the entire

23     program, would you consider that providing a

24     service to customers?  A management service?

25         A.    No.  I don't consider it a management

Page 267

1                    REPORTER'S CERTIFICATE
2
     STATE OF MINNESOTA    )
3                          ) ss.
     COUNTY OF HENNEPIN    )
4
          I hereby certify that I reported the remote
5    videotaped deposition of DAVID DISTEL, on
     July 29, 2021, via Veritext Virtual
6    Videoconference, and that the witness was by me
     first duly sworn to tell the whole truth;
7
          That the testimony was transcribed by me and
8    is a true record of the testimony of the witness;
9         That the cost of the original has been
     charged to the party who noticed the deposition,
10   and that all parties who ordered copies have been
     charged at the same rate for such copies;
11
          That I am not a relative or employee or
12   attorney or counsel of any of the parties, or a
     relative or employee of such attorney or counsel;
13
          That I am not financially interested in the
14   action and have no contract with the parties,
     attorneys, or persons with an interest in the
15   action that affects or has a substantial tendency
     to affect my impartiality;
16
          That the right to read and sign the
17   deposition by the witness was preserved.
18
          WITNESS MY HAND AND SEAL THIS 3rd day of
19   August, 2021
20
21
22
23
     _____
24        Merilee S. Johnson, RDR, CRR, CRC, RSA
          Notary Public, Hennepin County, Minnesota
25        My commission expires January 31, 2026

EXHIBIT 7

                                                    Page 1

1            UNITED STATES DISTRICT COURT

             CENTRAL DISTRICT OF CALIFORNIA

2                  SOUTHERN DIVISION

3    _____

4    INNOVATIVE HEALTH LLC,

5         Plaintiff,               CASE NO.

6    vs.                           8:19-cv-01984-JVS-KES

7    BIOSENSE WEBSTER, INC.,

8         Defendant.

9    _____

10

11          VIDEOTAPE 30(B)(6) DEPOSITION OF

12              INNOVATIVE HEALTH, LLC

13          AND IN HIS INDIVIDUAL CAPACITY

14           WITNESS:  RICK FERRIERA

15             APPEARING REMOTE FROM

16                 DALLAS, TEXAS

17

18             SEPTEMBER 22, 2021

19                8:40 A.M CST

20

21   Reported By:

22   Judith L. Leitz Moran

23   RPR, RSA, CCR-B-2312

24   APPEARING REMOTELY FROM ATLANTA, GEORGIA

25

Page 12

1      Q     All right.  Now, where do you live, sir?

2      A     Lighthouse Point, Florida.

3      Q     And where do you work at present?

4      A     At Innovative Health.

5      Q     What is your position at Innovative

6   Health?

7      A     I'm the chief executive officer.

8      Q     And are you currently working from home

9   or working from an office or some combination

10  thereof?

11     A     Today?  Today I'm --

12     Q     Generally -- generally speaking.

13     A     Between the office and on the -- I'm

14  either in the office in Scottsdale, in my office in

15  Florida or on the road seeing customers.

16     Q     All right.  So is it the case that at

17  Innovative Health, you have offices that you spend

18  time in in both Scottsdale and Florida, and that's

19  Scottsdale, Arizona, and Florida?

20     A     Yes, ma'am.

21     Q     And is the office in Florida in some

22  location other than your home, generally speaking?

23     A     No, it's in my home.

24     Q     Okay.  And is your home a place that

25  you've been working from since COVID or were you

```
                                            Page 13
 1   also working from your home prior to COVID?
 2        A    Well, I would work in both locations.
 3        Q    All right.  So is it the case that during
 4   the time that you have been with Innovative Health,
 5   you have worked from both your Florida office,
 6   which is located in your home, as well as the
 7   office in Scottsdale, Arizona?
 8        A    Yes.
 9        Q    All right.  And you said that you are
10   currently the CEO of Innovative Health; is that
11   right?
12        A    Yes.
13        Q    What are your duties and responsibilities
14   as the CEO of Innovative Health?
15        A    Well, I run the organization.  So I'm
16   responsible for -- for the entire operation, from
17   sales marketing, our manufacturing plant, all the
18   positions report into me.
19        Q    When did you -- when did Innovative
20   Health first begin marketing in the United States?
21        A    2017.
22        Q    Prior to 2017, did Innovative Health
23   market reprocessed products anywhere else in the
24   world?
25        A    No.
```

```
                                              Page 17

 1    other point in time?

 2         A    No.

 3         Q    Now, Innovative Health was started in

 4    2015; is that correct?

 5         A    Yes.

 6         Q    And what was your purpose in starting

 7    Innovative Health?

 8         A    What was my purpose?

 9         Q    Why -- why did you -- why did you start

10    Innovative Health?

11         A    As a business opportunity.

12         Q    So you saw a business opportunity and

13    established a company that you thought could meet

14    that business opportunity; is that right?

15         A    Yes.

16         Q    What was the business opportunity that

17    you perceived as existing at the time that you

18    started Innovative Health?

19         A    The reprocessing of electrophysiology

20    catheters.

21         Q    Prior to 2015, had you ever been involved

22    in the reprocessing of electrophysiology catheters?

23         A    Yes.

24         Q    And what company or companies had you

25    been so involved?
```

```
                                            Page 233

 1             C E R T I F I C A T E
 2          Deposition of: RICK FERRIERA
         Date of Deposition: SEPTEMBER 22, 2021
 3
 4   STATE OF GEORGIA:
     COUNTY OF DEKALB:
 5
 6            I hereby certify that the foregoing
 7   transcript was stenographically recorded by me
 8   via Zoom as stated in the caption.  The deponent
 9   was duly sworn to tell the truth, the whole truth,
10   and nothing but the truth.  And the colloquies,
11   statements, questions and answers thereto were
12   reduced to typewriting under my direction and
13   supervision and the deposition is a true and
14   correct record, to the best of my ability, of
15   the testimony/evidence given by the deponent.
16            I further certify that I am not a
17   relative or employee or attorney or counsel to
18   any of the parties in the case, nor am I a
19   relative or employee of such attorney or counsel,
20   nor am I financially interested in the action.
21            This, the 7th day of October 2021.
22
23
     _____
24        Judith L. Leitz Moran, CCR-B-2312
          Registered Professional Reporter
25
```

PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT 8

EXHIBIT 9

```
                                                        Page 1

 1                  UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

 3

     INNOVATIVE HEALTH, LLC,          ) Case No.
 4                                     ) 8:19-cv-1984 JVS
             Plaintiff,                ) (KESx)
 5                                     )
         vs.                           )
 6                                     )
     BIOSENSE WEBSTER, INC.,           )
 7                                     )
             Defendant.                )
 8   _____)

 9

10

11

         VIDEO-RECORDED VIRTUAL REMOTE 30(b)(6) and 30(b)(1)
12

                   DEPOSITION OF BLESSAN JOSEPH
13

14

15                       Atlanta, Georgia
                         July 27, 2021
16                       9:33 a.m. EST

17

18

19

20

21

22

23

         REPORTED BY:
24       Janice Gonzales, RPR, CRR
         AZ Certified Court
25       Reporter No. 50844
```

Page 12

1        front of you, can you just please let me know.        06:41

2              A.   Yes, I refreshed the page and I can see     06:41

3        Exhibit 102, Tab 55.                                   06:41

4              Q.   Okay.  And is this the document that you    06:41

5        reviewed with Mr. Berhold?                             06:41

6              A.   Yes.                                         06:41

7              Q.   Okay.  So turning to page 4 of the          06:41

8        document where the "Topics of Deposition" begin,       06:41

9        you've been designated by Innovative Health to         06:41

10       testify as a corporate representative with respects    06:42

11       to 1, 2, 3, 4, and 5 which starts on this page.  Do    06:42

12       you understand that?                                   06:42

13             A.   Yes.                                         06:42

14             Q.   And so if you turn the page specifically    06:42

15       with respect to No. 5, you've been designated to       06:42

16       testify as a corporate representative for Innovative   06:42

17       with respect to subtopics C and D; is that correct?    06:42

18             A.   Yes.                                         06:42

19             Q.   And then taking a look down at No. 6,        06:42

20       you've also been designated to testify as a corporate  06:42

21       representative of Innovative with respect to Topic 6   06:42

22       and specifically subsections B and D, correct?         06:42

23             A.   Yes.                                         06:42

24             Q.   Okay.  So I understand from Mr. Berhold      06:42

25       that he would also like to designate you for topic --  06:42

Page 15

```
 1      should have been.  We will try to take a look at them    06:55
 2      when we can and ask questions on them, but reserve       06:55
 3      all of our rights with respect to the failure to        06:55
 4      produce those documents in advance of the deposition.   06:55
 5             So let's begin with Topic No. 1 which is          06:55
 6      "Innovative's location accuracy specifications for       06:55
 7      its reprocessed Lasso, PentaRay, and SoundStar           06:55
 8      catheters including any testing Innovative performs       06:55
 9      related to location accuracy, Innovative's acceptance    06:55
10      criteria for location accuracy, how Innovative's         06:56
11      acceptance criteria for location accuracy are            06:56
12      derived, and how to interpret the data included in       06:56
13      the files produced by Innovative related to location     06:56
14      sensor testing."  Is that an accurate description of     06:56
15      the topic?                                               06:56
16             A.   Yeah.                                        06:56
17             Q.   And you're prepared, Mr. Joseph, to          06:56
18      testify on behalf of Innovative with respect to this    06:56
19      topic?                                                   06:56
20             A.   Yes.                                         06:56
21             Q.   The Lasso, PentaRay, and SoundStar           06:56
22      catheters all have a magnetic location sensor,           06:56
23      correct?                                                 06:56
24             THE COURT REPORTER:  I'm sorry, magnetic          06:56
25      what?                                                    06:56
```

```
                                                      Page 17

  1       location sensor versus where the catheter actually is   06:57

  2       located in -- in 3D space or in the patient.  Is that    06:57

  3       okay?                                                     06:57

  4            A.   Yes.                                            06:58

  5            Q.   Okay.  Does Innovative have a location          06:58

  6       accuracy specification for its reprocessed Lasso,         06:58

  7       PentaRay, and SoundStar catheters?                        06:58

  8            A.   Yes.                                            06:58

  9            Q.   And what is that specification?                 06:58

 10            A.   The specification was derived from new          06:58

 11       unused devices.  So we summarized that.  We               06:58

 12       calculated those values, averaged that and used that     06:58

 13       as the specification.                                     06:58

 14            Q.   Okay.  So you refer to that -- is that          06:58

 15       called the location sensor test?                          06:58

 16            A.   Correct.                                        06:58

 17            Q.   And the location sensor test compares           06:58

 18       some measure of the sensors in OEM catheters or the      06:58

 19       Biosense original equipment manufactured catheters,      06:59

 20       right, to Innovative's reprocessed catheters; is that    06:59

 21       right?                                                    06:59

 22            A.   Can you repeat the question?                    06:59

 23            Q.   So the location sensor test compares a          06:59

 24       measurement that you've taken of Biosense original       06:59

 25       equipment manufactured catheters and then compares       06:59
```

```
                                                      Page 18
 1        that to -- compares your reprocessed catheters to      06:59
 2        what you measured with respect to the original         06:59
 3        equipment manufactured catheters; is that right?       06:59
 4             A.   Can you rephrase that question?  It's the     06:59
 5        last part that is...                                    06:59
 6             Q.   Sure.  Why don't -- why don't you explain     06:59
 7        to me how the location sensor test works.               06:59
 8             A.   For each of the device category that we       06:59
 9        just mentioned, we use new devices from the original    06:59
10        manufacturer, take the baseline reading for each of     07:00
11        the frequencies that we test to and use that, and we    07:00
12        take multiple readings from multiple devices and use    07:00
13        that as our baseline.  So any reprocessed devices       07:00
14        tested post-reprocessing has to meet those exact        07:00
15        specifications, the upper and lower limit.              07:00
16             Q.   Is that location sensor test measuring        07:00
17        the accuracy of what Carto 3 identifies as a            07:00
18        catheter's location in 3D space based on the            07:00
19        information from the location sensor versus where the   07:00
20        catheter actually is in 3D space?                       07:00
21             A.   No.  It measures the performance of the       07:00
22        location sensors within the catheter.  So the testing   07:00
23        is intended to compare the performance of the           07:01
24        reprocessed catheter to a new device and does filter    07:01
25        out any devices that fall outside of that range.        07:01
```

```
                                              Page 171
 1      and take a break.                          12:17

 2                  THE VIDEOGRAPHER:  Going off the record.  12:17

 3      The time is 3:17.                          12:17

 4          (Recessed from 3:17 p.m. to 3:43 p.m.)  12:17

 5                  THE VIDEOGRAPHER:  Back on the record.  12:42

 6      This marks the beginning of Media Unit No. 3.  The  12:43

 7      time is 3:43.                              12:43

 8      BY MS. GROSSBARD:                          12:43

 9          Q.   So, Mr. Joseph, your counsel has told me  12:43

10      that you've looked at some e-mails and that now you  12:43

11      think that you can give the start and finish dates  12:43

12      for decryption for the catheters.  So what I would  12:43

13      like you to do for me is to -- for all the catheters  12:43

14      that you have the information, if you can go one by  12:43

15      one and give me the dates that you began the  12:43

16      decryption process and the dates where you concluded  12:43

17      the decryption process and then also the Bates  12:43

18      numbers of the e-mails you're referring to.  12:43

19          A.   Okay.  So for Lasso, SoundStar eco, and  12:43

20      SoundStar 3D, the reference Bates number is  12:44

21      IH00664422.                                12:44

22          Q.   And that's for all of Lasso?       12:44

23          A.   So the Lasso Nav eco, the SoundStar 3D,  12:44

24      and SoundStar eco.  The encryption -- the details  12:44

25      surrounding the encryption and the time stamp, we  12:44
```

```
                                                     Page 172
1        reached out to the -- the consultant Black Dog as    12:44

2        well as started getting him samples to do the        12:44

3        investigation.  Started October 6, 2014.             12:44

4             Q.   This is for all of Lasso, SoundStar 3D,     12:44

5        and SoundStar eco?                                    12:44

6             A.   That is correct.                            12:44

7             Q.   And what is the start date?                 12:44

8             A.   October 6, 2014.                            12:44

9             Q.   And who is the consultant?                  12:45

10            A.   Black Dog.                                  12:45

11            Q.   And who is the individual at Black Dog?     12:45

12            A.   Nathan Einwechter.                          12:45

13            Q.   Okay.                                       12:45

14            A.   And...                                      12:45

15            Q.   And when did you overcome each of the --    12:45

16       overcome the time stamp issue on each of those       12:45

17       catheters?                                            12:45

18            A.   So for Lasso, based on information, I'm     12:45

19       projecting April of 2000- -- April of 2015.          12:45

20            Q.   Okay.                                       12:46

21            A.   For SoundStar 3D, I'm projecting that to    12:46

22       be May or June 2017 -- no, May or June 2016.  My     12:46

23       mistake.                                              12:46

24            Q.   Okay.                                       12:46

25            A.   And then PentaRay was initiated June --     12:46
```

```
                                              Page 173
 1     June 8, 2017.                                12:46
 2             Q.   Okay.                            12:46
 3             A.    And the completion for PentaRay would   12:46
 4     have been September of 2018.  I can give you the     12:46
 5     Bates number for the PentaRay reference.  That one is 12:47
 6     IH00659454.                                   12:47
 7             Q.   IH00659454; is that correct?     12:47
 8             A.    Correct.                         12:47
 9             Q.    And the other one for all of the other  12:47
10     catheters was IH00664422; is that correct?    12:47
11             A.    Correct.                         12:47
12             Q.    And Innovative is then alleging that the 12:47
13     time of delay for Lasso was from October 6, 2014, to  12:47
14     April of 2015; is that correct?               12:48
15             A.    Yes.                             12:48
16             Q.    And for SoundStar 3D, the allegation is  12:48
17     the delay is from October 6, 2014, to May or June of  12:48
18     2016; is that correct?                        12:48
19             A.    Correct.                         12:48
20             Q.    And for the SoundStar eco it's the same  12:48
21     allegation.  That the delay is from October 6, 2014,  12:48
22     to May to June 2016?                          12:48
23             A.    No.  That one is April, May 2017 for the 12:48
24     first half because of the -- we were doing chip       12:48
25     replacement and then soon after we had the custom     12:49
```

```
                                                Page 174

1       chip issue and that was resolved end of              12:49

2       September/early part of -- end of September 2015 --   12:49

3       2000- -- oh, no, I'm looking at the wrong date.       12:49

4       September -- August of 2018 because that was the line 12:49

5       extension, yeah.                                      12:49

6              Q.   Okay.  So for SoundStar eco, just so I    12:49

7       have the dates of delay, it's October 6, 2014,        12:49

8       through April to May of 2017 and then again from      12:49

9       whenever the launch was to August of 2018; is that    12:50

10      correct?                                              12:50

11             A.   Correct.                                  12:50

12             Q.   Okay.  And you found -- have you -- you    12:50

13      have those e-mails -- you had them printed in front   12:50

14      of you?                                               12:50

15             A.   Yeah.  We did the search and we printed   12:50

16      it out just so I have a -- it's easier for me to look 12:50

17      at it and tell you the dates.                         12:50

18                  MS. GROSSBARD:  Okay.  Why don't we --    12:50

19      I'd like to take a break to be able to look at the    12:51

20      documents that you've now cited and not have that     12:51

21      count on my --                                        12:51

22                  MR. BERHOLD:  Okay.                       12:51

23                  MS. GROSSBARD:  -- on my 30(b)(6) time.   12:51

24      So let's go off the record.                           12:51

25                  THE VIDEOGRAPHER:  Going off the record.  12:51
```

                                                        Page 274

1          guarantee to your customers based on this?        03:42

2                A.   We state that the device performance is  03:42

3          substantially equivalent to the device or the      03:42

4          original device.                                    03:42

5                Q.   But you don't give anything in           03:42

6          millimeters or anything like that?  You just say it's  03:42

7          substantially equivalent; is that correct?          03:42

8                A.   We say it's -- you can expect the same   03:42

9          performance, same functionality.  It has the same  03:42

10         chip and the same calibration.                      03:42

11               Q.   So your answer is no; am I correct?      03:42

12               A.   That is correct.                          03:42

13               MS. GROSSBARD:  Why don't you just give        03:43

14         me just a couple of minutes to talk to my counsel and  03:43

15         then we may be finished here.  Why don't we go off   03:43

16         the record.                                          03:43

17               MR. BERHOLD:  Okay.                            03:43

18               THE VIDEOGRAPHER:  Going off the record.       03:43

19         The time is 6:43.                                    03:43

20               (Recessed from 6:43 p.m. to 6:45 p.m.)        03:43

21               THE VIDEOGRAPHER:  Back on the record.         03:45

22         The time is 6:45.                                    03:45

23               MS. GROSSBARD:  So I don't have any more       03:45

24         questions for you today, Mr. Joseph.  As I put on the  03:45

25         record before, I'm reserving rights with respect to  03:46

```
                                                    Page 276

 1                         CERTIFICATE

 2

 3                  I, JANICE E. GONZALES, Certified Reporter

 4        for the State of Arizona, certify:

 5                  That the foregoing proceeding was taken

 6        by me; that I am authorized to administer an oath;

 7        that the witness before testifying was duly sworn by

 8        me to testify to the whole truth; that the questions

 9        propounded by counsel and the answers of the witness

10        were taken down by me in shorthand and thereafter

11        transcribed by me or under my direction; that

12        deposition review and signature was requested; that

13        the foregoing pages are a full, true, and accurate

14        transcript of all proceedings and testimony had upon

15        the taking of said deposition, all done to the best

16        of my skill and ability.

17                  I FURTHER CERTIFY that I am in no way

18        related to any of the parties hereto, nor am I in any

19        way interested in the outcome hereof.

20                  DATED at Phoenix, Arizona this 11th day

21        of August, 2021.

22

23                      <%8176,Signature%>

                        Janice E. Gonzales, RPR, CRR

24                      Certified Reporter No. 50844

                        for the State of Arizona

25
```

EXHIBIT 10

Christine Bienvenue-Kauffman                    September 17, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

                                              Page 1

1            UNITED STATES DISTRICT COURT

            CENTRAL DISTRICT OF CALIFORNIA

2                 SOUTHERN DIVISION

3

4    INNOVATIVE HEALTH LLC,

5        Plaintiff,                    CASE NO.

6    vs.                      8:19-cv-01984-JVS-KES

7    BIOSENSE WEBSTER, INC.,

8        Defendant.

9

10

11           VIDEOTAPE DEPOSITION OF

12        CHRISTINE BIENVENUE-KAUFFMAN

13           APPEARING REMOTE FROM

14           JACKSONVILLE, FLORIDA

15

16           SEPTEMBER 17, 2021

17              9:29 A.M

18

19

20   Reported By:

21   Judith L. Leitz Moran

22   RPR, RSA, CCR-B-2312

23   APPEARING REMOTELY FROM ATLANTA, GEORGIA

24

25

```
                                                        Page 7

 1                CHRISTINE BIENVENUE-KAUFFMAN,

 2      being first duly sworn, was examined as follows:

 3                MS. KAUFFMAN:   I do.

 4                      EXAMINATION

 5      BY MR. BERHOLD:

 6          Q    Good morning, Ms. Kauffman.

 7          A    Good morning.

 8          Q    Are you appearing remotely today from

 9      Jacksonville, Florida?

10          A    Yes, I am.

11          Q    And are you at your workplace today at

12      Mayo Clinic Florida?

13          A    Yes, I am.

14          Q    Have you ever given a deposition?

15          A    No, sir, this is the first time.

16          Q    And do you have Mr. Karpenko representing

17      you here today?

18          A    Yes, that's correct.

19          Q    Have you had an opportunity to talk to

20      him about the ground rules for today's deposition?

21          A    Yes, I have.

22          Q    And do you believe that you understand

23      the ground rules for today's deposition?

24          A    Yes.

25          Q    Are you currently employed at Mayo Clinic
```

Innovative Health, LLC v. Biosense Webster, Inc.

Page 8

1    Florida?

2          A    Yes, I am.

3          Q    And where is Mayo Clinic Florida located?

4          A    In Jacksonville, Florida.

5          Q    And Mayo Clinic Florida is affiliated

6    with the Mayo Clinic in Rochester, Minnesota?

7          A    Yes, that's correct.

8          Q    What is your current position at Mayo

9    Clinic Florida?

10         A    I am the coordinator for cardiology.

11         Q    How long have you held that position?

12         A    For almost two years.

13         Q    What are your duties in that position?

14         A    Basically I oversee the day-to-day

15   operations as far as the equipment in the

16   procedural suites making sure that everything is up

17   and running to standard and functioning correctly.

18             I also oversee purchasing of service

19   contracts for our equipment.

20             And -- and I'm also responsible for

21   purchasing capital equipment.

22         Q    And do your responsibilities include

23   electrophysiology labs?

24         A    Yes.  Yes.

25         Q    And is there an electrophysiology lab at

                                                            Page 9

1    Mayo Clinic Florida?

2         A    Yes, we currently have two and a third

3    one is opening soon.

4         Q    And do you have other cardiovascular

5    responsibilities?

6         A    I assist in ordering supplies.  We have a

7    supply chain group that handles the contracts and

8    most of the ordering, but I do assist on -- with

9    that occasionally as a resource.

10        Q    And in -- in addition to the

11   electrophysiology labs, do you -- are you

12   responsible for other labs as well?

13        A    Yes, I am.  I cover electrophysiology and

14   cardiac cath.

15        Q    And do you have anyone assisting you in

16   managing the electrophysiology labs?

17        A    No, not from my standpoint.

18        Q    And is there -- how are the two

19   physiology -- electrophysiology labs managed?

20             Is there a manager assigned to each room

21   or is there a manager assigned to

22   electrophysiology?

23        A    We have a team lead that covers day to

24   day the workflow between both labs.

25        Q    And that's one person overseeing both of

Christine Dennison Kauffman                    September 17, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 19

1          Has Mayo Clinic Florida rejected savings

2    from Innovative Health on reprocessed catheters to

3    keep Mayo Clinic Florida's case coverage from

4    Biosense?

5              MS. MOSKOWITZ:  Objection.

6         A    Yes.

7    BY MR. BERHOLD:

8         Q    Have you -- has -- well, has anyone at

9    Mayo Clinic Florida talked to the physician about

10   switching procedures from the CARTO 3 in order to

11   get savings on reprocessed catheters from

12   Innovative Health on a different cardiac mapping

13   system?

14        A    No.

15        Q    Do you know why not?

16        A    This one physician that I work with that

17   uses the CARTO mapping system really likes how it

18   functions and likes that -- that mapping system

19   very much.  So he is -- he wants to stay with that

20   system.

21        Q    Has Mayo Clinic Florida looked at

22   training staff to cover its own cases on the CARTO

23   3?

24        A    It -- it is a wish, a desire for our lab

25   to do that, but right now we don't have the

Christine Dennison Kauffman                    September 17, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 20

1    bandwidth for training.

2        Q    Oh, and what do you mean by "bandwidth"?

3        A    We just don't have the number of staff

4    available to -- to be able to -- to train.

5        Q    Have you -- have you investigated the

6    possibility of training your staff if you did have

7    enough staff to do it?

8        A    If there was an interest, specific

9    interest there with our staff, we would be

10   supportive of that.

11       Q    And has Mayo Clinic Florida consulted

12   with the Mayo Clinic in Rochester about

13   possibilities for training staff?

14       A    No, we haven't opened that door yet.

15       Q    And is it -- is it true that Mayo Clinic

16   in Rochester has at least one or two employees that

17   map cases on the cardiac mapping procedures in

18   Rochester?

19       A    Yes, that is correct.

20       Q    And would it be the idea that those

21   mappers would train staff in Mayo Clinic Florida if

22   it was determined to be feasible?

23       A    I'm actually not sure of how that process

24   of training would -- how it would look like to be

25   honest with you.

Christine Derengoski Kauffman                September 17, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 21

1        Q    Or how long it would take?

2        A    I'm -- I'm not privy of that.

3        Q    And does Mayo Clinic Florida continue to

4   reject savings on reprocessed catheters from

5   Innovative Health to keep its case coverage from

6   Biosense today on the CARTO 3 cardiac mapping

7   system?

8             MS. MOSKOWITZ:  Objection.

9        A    Yes.

10            MR. BERHOLD:  Well, thank you for your

11  time, Ms. Kauffman.

12            I don't have any additional questions at

13  this time.  Biosense counsel may have some

14  questions of their own.

15            THE WITNESS:  Okay, thank you.

16                  EXAMINATION

17  BY MS. MOSKOWITZ:

18       Q    Good morning, Ms. Kauffman.  My name is

19  Lauren Moskowitz and I represent Biosense.  Thank

20  you for being here this morning.

21            I'm going to try not to re-cover, but

22  there might be a little bit of overlap, just to set

23  the table on the topics that we're going to be

24  discussing.

25            If at any point you don't understand my

Christine Bienvenue Kauffman                    September 17, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 65

1                C E R T I F I C A T E

2    Deposition of: CHRISTINE BIENVENUE-KAUFFMAN

        Date of Deposition: SEPTEMBER 17, 2021

3

4    STATE OF GEORGIA:

     COUNTY OF DEKALB:

5

6           I hereby certify that the foregoing

7    transcript was stenographically recorded by me

8    via Zoom as stated in the caption.  The deponent

9    was duly sworn to tell the truth, the whole truth,

10   and nothing but the truth.  And the colloquies,

11   statements, questions and answers thereto were

12   reduced to typewriting under my direction and

13   supervision and the deposition is a true and

14   correct record, to the best of my ability, of

15   the testimony/evidence given by the deponent.

16           I further certify that I am not a

17   relative or employee or attorney or counsel to

18   any of the parties in the case, nor am I a

19   relative or employee of such attorney or counsel,

20   nor am I financially interested in the action.

21           This. the 3rd dav of October 2021.

22

23

     _____

24   Judith L. Leitz Moran, CCR-B-2312

     Registered Professional Reporter

25

Veritext Legal Solutions
800.808.4958                                      770.343.9696

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

# EXHBIT 11

Innovative Health, LLC v. Biosense Webster, Inc.

Page 1

1          UNITED STATES DISTRICT COURT

           CENTRAL DISTRICT OF CALIFORNIA

2              SOUTHERN DIVISION

3

4    INNOVATIVE HEALTH LLC,

5       Plaintiff,                    CASE NO.

6    vs.                       8:19-cv-01984-JVS-KES

7    BIOSENSE WEBSTER, INC.,

8       Defendant.

9

10

11          DEPOSITION NOAH MARTIN

12          APPEARING REMOTE FROM

13            DENVER, COLORADO

14

15            AUGUST 6, 2021

16             9:45 A.M. MST

17

18

19

20   Reported By:

21   Judith L. Leitz Moran

22   RPR, RSA, CCR-B-2312

23   APPEARING REMOTELY FROM ATLANTA, GEORGIA

24

25

Noah Maggin                                    August 6, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 11

1    from around 2017 to 2021?

2          A    Yeah.

3          Q    And you had previously been contract

4    director working directly for Biosense Webster from

5    2012 to 2017?

6          A    No.  I was the contract director for

7    Biosense Webster starting in 2014.  And then I

8    believe the move to SCG may have been more like

9    2018.

10         Q    Okay.  So contract director for Biosense

11   Webster at Biosense Webster from 2014 to 2018 or

12   so?

13         A    Yeah.

14         Q    And continuing in that role as contract

15   director for Biosense Webster at J&J Strategic

16   Customer Group from 2018 to the present?

17         A    Yes.

18         Q    And prior to becoming contract director,

19   you had a previous role at Biosense Webster?

20         A    I did.

21         Q    What was your role prior to becoming

22   contract director?

23         A    I was a -- I was a specialist selling

24   capital equipment.  So our hardware, our software,

25   and then our equipment services line.

Innovative Health, LLC v. Biosense Webster, Inc.
Noah Marin
August 6, 2021

Page 72



Noah Martin                                        August 6, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 73



Page 74



Innovative Health, LLC v. Biosense Webster, Inc.
August 6, 2021

Page 75



Innovative Health, LLC v. Biosense Webster, Inc.
Noah Martin                                                        August 6, 2021



Noah Martin                                              August 6, 2021
Innovative Health, LLC v. Biosense Webster, Inc.



Noah Martin                                                    August 6, 2021
Innovative Health, LLC v. Biosense Webster, Inc.



Case 8:19-cv-01984-JVS-KES    Document 131-2    Filed 01/17/22    Page 111 of 216
Page 105

Noah Martin                                                        August 6, 2021
Innovative Health, LLC v. Biosense Webster, Inc.



Page 109

1            C E R T I F I C A T E
2         Deposition of: NOAH MARTIN
        Date of Deposition: AUGUST 6, 2021
3
4    STATE OF GEORGIA:
     COUNTY OF DEKALB:
5
6            I hereby certify that the foregoing
7    transcript was stenographically recorded by me
8    via Zoom as stated in the caption.  The deponent
9    was duly sworn to tell the truth, the whole truth,
10   and nothing but the truth.  And the colloquies,
11   statements, questions and answers thereto were
12   reduced to typewriting under my direction and
13   supervision and the deposition is a true and
14   correct record, to the best of my ability, of
15   the testimony/evidence given by the deponent.
16           I further certify that I am not a
17   relative or employee or attorney or counsel to
18   any of the parties in the case, nor am I a
19   relative or employee of such attorney or counsel,
20   nor am I financially interested in the action.
21           This, the 11th day of August 2021.
22
23
     _____
24   Judith L. Leitz Moran, CCR-B-2312
     Registered Professional Reporter
25

<span style="color:red">**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**</span>

# EXHBIT 12

```
                                                    Page 1

1               UNITED STATES DISTRICT COURT

                CENTRAL DISTRICT OF CALIFORNIA

2                     SOUTHERN DIVISION

3               Case No. 8:19-cv-1984 JVS-KES

4       _____

5   INNOVATIVE HEALTH, LLC,

6            Plaintiff,

7        vs.

8   BIOSENSE WEBSTER, INC.,

9            Defendant.

        _____

10

11

12

13

14          REMOTE VIDEOTAPED DEPOSITION OF

                    STEPHENIE ORSINI

15

16

17            Wednesday, August 25, 2021

18

19

20

21

22

23

24

25     Court Reporter:  Michelle M. Boudreaux-Phillips, RPR
```

Page 6

1        Q    And have you ever given a deposition?

2        A    I have.

3        Q    And have you also had an opportunity to

4    consult with your attorney regarding the ground rules

5    for today's deposition?

6        A    I have.

7        Q    And do you believe that you have an

8    understanding of the ground rules for today's

9    deposition?

10        A    Yes.

11        Q    And do you understand that you've been

12    designated as the corporate representative for

13    Biosense Webster regarding clinical support training

14    programs offered by Biosense Webster?

15        A    Yes.

16        Q    And are you currently employed by

17    Johnson & Johnson?

18        A    Yes.

19        Q    How long have you worked for

20    Johnson & Johnson?

21        A    Since December 2006.

22        Q    And you are currently senior director of

23    global education?

24        A    Correct.

25        Q    And your responsibilities include global

Page 7

1     education for the Biosense Webster operating company?

2          A    Correct.

3          Q    And you've had that responsibility for the

4     global education for Biosense Webster since January

5     2019?

6          A    Yes.

7          Q    Did you have a predecessor in that role?

8          A    No.

9          Q    So this was a new position?

10         A    Correct.

11         Q    Do you know why the position was created?

12         A    It was created to provide more consistency

13    globally in our education strategy.

14         Q    And Johnson & Johnson is a worldwide company;

15    is that right?

16         A    Correct.

17         Q    And Biosense Webster operates around the

18    world as well?

19         A    Yes.

20         Q    And so you mean worldwide when you say

21    "globally"?

22         A    Correct.

23         Q    And do you have a staff working under you for

24    handling the global education for Biosense Webster

25    specifically?

Stephen Corsini                                                    August 25, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 13



Stephen Cassini                                                    August 25, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 14



Stephen Corsini                                    August 25, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 15



Stephen Cassini                                                    August 25, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 16



Stephen Orsini                                                    August 25, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 17



Stephen Cosini    August 25, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 18



Stephenie Orsini                                    August 25, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

                                                    Page 37

1                    C E R T I F I C A T E

2

3    STATE OF GEORGIA

4    COUNTY OF COBB

5

6           I, MICHELLE M. BOUDREAUX-PHILLIPS, do hereby

7    certify that STEPHENIE ORSINI, the witness whose

8    deposition is hereinbefore set forth, was duly sworn by

9    me and that such deposition is a true record of the

10   testimony given by such witness.

11

12          I further certify that I am not related to

13   any of the parties to this action by blood or marriage

14   and that I am in no way interested in the outcome of

15   this matter.

16

17          IN WITNESS WHEREOF, I have hereunto set my

18   hand this 9th day of September 2021.

19

20   _____

           MICHELLE M. BOUDREAUX-PHILLIPS, RPR

21

22

23

24

25

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

# EXHIBIT 13

30(b)(6) Witness Conrad Ramos                        August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 1

1                UNITED STATES DISTRICT COURT

             CENTRAL DISTRICT OF CALIFORNIA

2                    SOUTHERN DIVISION

3

4    INNOVATIVE HEALTH LLC,

5         Plaintiff,                      CASE NO.

6    vs.                        8:19-cv-01984-JVS-KES

7    BIOSENSE WEBSTER, INC.,

8         Defendant.

9

10

11           VIDEOTAPE 30(B)(6) DEPOSITION

12             OF BIOSENSE WEBSTER, INC.

13          AND IN HIS INDIVIDUAL CAPACITY

14               WITNESS: CONRAD RAMOS

15               APPEARING REMOTE FROM

16                  ATLANTA, GEORGIA

17

18                 AUGUST 10, 2021

19                  9:33 A.M. EST

20

21

22   Reported By:

23   Judith L. Leitz Moran

24   RPR, RSA, CCR-B-2312

25   APPEARING REMOTELY FROM ATLANTA, GEORGIA

Page 13

1   you were regional business director?

2        A    My direct supervisor was Tom Lech.

3        Q    Was that true throughout the time from

4   April 2010 to June 2014?

5        A    No.  Actually, we had restructuring and a

6   realignment.  My first year I reported directly

7   into a gentleman named Jack Ayer.  And then we had

8   a restructuring where I did report in to Tom Lech

9   after that.  So my last three years in that role I

10  reported to Tom Lech.

11       Q    And then you were promoted from regional

12  business director to corporate account director?

13       A    That is correct, in July of 2017.

14       Q    Do you mean July of 2014?

15       A    Why do I keep saying 2017?  Yes, I do

16  mean July of 2014.

17       Q    And you were corporate account director

18  until March 2017?

19       A    Correct.

20       Q    And what did you do as a corporate

21  account director for Biosense?

22       A    Sure.  As a corporate account director, I

23  was the lead in most negotiations with the large

24  group purchasing organizations and the large

25  regional IDNs.  That stands for Integrated Delivery

Case 8:19-cv-01984-JVS-KES    Document 131-2    Filed 01/17/22    Page 127 of 216

30(b)(6) Sean Conrad Ramos                          August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 14

1   Networks.

2          I also had a role in working with

3   commercial operations in terms of pricing matrix

4   management and pricing matrix decisions.

5     Q    Did you share responsibilities or

6   territories with any other corporate account

7   directors?

8     A    I had one direct report at that time.

9   His name was Noah Martin.

10         We -- that role, Mr. Berhold, was really

11  a player/coach role.  So I had responsibilities for

12  geographies and certain IDNs while at the same time

13  splitting up some geography with Noah Martin.

14    Q    And what was your main geography

15  responsibility?

16    A    I would handle mostly the east and the

17  national -- the large national account IDNs.

18    Q    And who were your big accounts?

19    A    They would include Ascension, HealthTrust

20  Partners Group, HCA, which is an IDN within them.

21  CommonSpirit was covered sometimes by me, sometimes

22  by Noah.

23         The VA was also within my responsibility,

24  the VA medical centers.

25         Allegheny Health Network.  University of

Case 8:19-cv-01984-JVS-KES     Document 131-2     Filed 01/17/22     Page 128 of 216
30(b)(6) Sidney Conrad Ramos                                     August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 15

1    Pittsburgh Medical Center, Cleveland Clinic, Health

2    Foundation.  Everything mostly to the east.

3         Q    And would you and Noah sometimes assist

4    each other in working each others' accounts?

5         A    Yes.  Especially when the other one went

6    out on some type of leave, whether it was vacation

7    or paternity leave or something of that nature, we

8    would definitely cover for each other.

9         Q    Who was your direct supervisor during

10   your time as corporate account director?

11        A    My direct supervisor was Sandor Palfi.

12             Up until the last five months of my

13   tenure -- I'm sorry, I didn't mean to interrupt

14   you.

15        Q    Go ahead.

16        A    But up until the last five months of my

17   tenure, which would have been around the November

18   time frame of 2016, when Sandor moved into a new

19   role, and then Michael -- Michael Bodner was the

20   new VP of sales.  I reported into him until I left

21   the role in April of 2017.

22        Q    When you did report to Sandor Palfi, he

23   was the VP of sales?

24        A    That is correct.

25        Q    Now, your resume says you developed and

30(b)(6) Stuart Conrad Ramos                           August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 17



Page 106



30(b)(6) Stuart Conrad Ramos                    August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 107



30(b)(6) Kevin Conrad Ramos                    August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 108



30(b)(6) & Indiv. Conrad Ramos                                   August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 109



30(b)(6) Sidney Conrad Ramos                                      August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

                                                        Page 135

1         Q     Thank you.

2               Can you turn to Page 4.

3         A     Is that the page that starts with

4    "mapping, or other technical support"?

5         Q     Yes.

6         A     Okay, I am there now.

7         Q     I -- I understand that Biosense Webster

8    has designated you to testify regarding Topic 3,

9    which is "Biosense's policies on providing product

10   technical support or clinical support in cases that

11   use catheters reprocessed or distributed by third

12   parties, including the dates, scope, and reasons

13   and justifications for such policies."  Is that

14   your understanding as well?

15        A     That is correct, yes.

16              MR. REYNOLDS:  Yes, I just -- I would

17   just say on the record that this -- this topic was

18   then discussed in email exchanges, as you know,

19   Jeff, afterwards.

20              So as described in those emails,

21   including the one from June 28th from Lillian

22   Grossbard, we have designated him under this topic

23   as described therein.

24              MR. BERHOLD:  Okay.  Thank you, Mike --

25   Michael.

Page 150



25      Q      So the position statement goes to

Page 151

1    Ascension corporate in -- in or around November

2    3rd, 2014; is that right?

3        A    That's correct.

4        Q    Biosense takes more than 18 months,

5    though, to implement the policy around the country?

6            MR. REYNOLDS:  Objection.

7        A    Yes, it took us longer than we expected

8    to implement this completely across the country.

9    BY MR. BERHOLD:

10       Q    And even in March of 2016, Biosense is

11   still notifying Stryker customers about the

12   Biosense Webster case coverage policy; is that

13   right?

14           MR. REYNOLDS:  Objection, scope.

15       A    Are you referring to the -- the previous

16   email that we reviewed with **REDACTED**?

17   BY MR. BERHOLD:

18       Q    No, I'm asking generally.

19       A    Yes, we were -- we were still reinforcing

20   that message with customers even to that time

21   point.

22       Q    And isn't it true that Biosense Webster

23   was giving a first notification to some Stryker

24   customers about the Biosense Webster case coverage

25   policy in March 2016?

30(b)(6) - Sandra Conrad Ramos                                    August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 158



Case 8:19-cv-01984-JVS-KES    Document 131-2    Filed 01/17/22    Page 138 of 216
30(b)(6) of Conrad Ramos                                August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 191

```
 1            C E R T I F I C A T E
 2         Deposition of: CONRAD RAMOS
         Date of Deposition: AUGUST 10, 2021
 3
 4   STATE OF GEORGIA:
     COUNTY OF DEKALB:
 5
 6          I hereby certify that the foregoing
 7   transcript was stenographically recorded by me
 8   via Zoom as stated in the caption.  The deponent
 9   was duly sworn to tell the truth, the whole truth,
10   and nothing but the truth.  And the colloquies,
11   statements, questions and answers thereto were
12   reduced to typewriting under my direction and
13   supervision and the deposition is a true and
14   correct record, to the best of my ability, of
15   the testimony/evidence given by the deponent.
16          I further certify that I am not a
17   relative or employee or attorney or counsel to
18   any of the parties in the case, nor am I a
19   relative or employee of such attorney or counsel,
20   nor am I financially interested in the action.
21          This, the 13th day of August 2021.
22
23
24   _____
     Judith L. Leitz Moran, CCR-B-2312
     Registered Professional Reporter
25
```

EXHIBIT 14

```
                                             Page 1

 1

 2   ** H I G H L Y  C O N F I D E N T I A L **

 3   UNITED STATES DISTRICT COURT

 4   CENTRAL DISTRICT OF CALIFORNIA

 5   SOUTHERN DIVISION

 6   Case No. 8:19-cv-1984-JVS-KES

 7   ----------------------------------x

     INNOVATIVE HEALTH, LLC,

 8

               Plaintiff,

 9

10

         - against -

11

12

     BIOSENSE WEBSTER, INC.,

13

               Defendant.

14   ----------------------------------x

15                    September 23, 2021

16                    3:50 p.m.

17

18       Videotaped Deposition of KARA REYES,

19   taken by Defendant, pursuant to Subpoena,

20   held via Zoom videoconference, before Todd

21   DeSimone, a Registered Professional

22   Reporter and Notary Public of the State of

23   New York.

24

25
```

```
                                           Page 12
 1          REYES - HIGHLY CONFIDENTIAL
 2   lawyer or somebody working, a lawyer in a
 3   legal capacity at Premier, and Mr. Wilson,
 4   did you communicate with anyone else to
 5   prepare for your deposition?
 6        A.      No.
 7        Q.      Did you review any documents in
 8   preparation for your deposition to refresh
 9   your recollection?
10        A.      Yes.
11        Q.      What documents did you review?
12        A.      A few documents that were
13   produced.
14        Q.      Documents produced by whom?
15        A.      By S2S.
16        Q.      Do you recall what any of those
17   documents were?
18        A.      Sales and other contracts,
19   agreement.
20        Q.      What is your job position at
21   SVS?
22        A.      I'm the director of our
23   PremierPro reprocessing program.
24        Q.      How long have you held that
25   role?
```

```
                                           Page 13
 1         REYES - HIGHLY CONFIDENTIAL
 2       A.      Four years.
 3       Q.      What was your role prior to
 4   being the director of the PremierPro
 5   reprocessing program?
 6       A.      I was not at that company.
 7       Q.      When did you join S2S?
 8       A.      August 1st, 2017.
 9       Q.      Do you have direct reports in
10   your role as director of the PremierPro
11   reprocessing program?
12       A.      Yes.
13       Q.      How many?
14       A.      I have one direct report.
15       Q.      And who is that person?
16       A.      Jeb Hopper.
17       Q.      What are your job duties and
18   responsibilities as the director of the
19   PremierPro reprocessing program?
20       A.      I oversee this category within
21   S2S, this product category, basically all
22   aspects from inventory, purchasing, order,
23   to cash.
24       Q.      You referenced overseeing this
25   category within S2S.  What are you
```

```
                                        Page 14

 1          REYES - HIGHLY CONFIDENTIAL
 2   referencing when you say this category?
 3          A.     S2S sells other healthcare
 4   medical products and this reprocess
 5   services and products are just one of them.
 6          Q.     Do you oversee the function
 7   related to all reprocessed products or only
 8   certain types of reprocessed products?
 9          A.     All reprocessed products that
10   S2S sells.
11          Q.     And what are the reprocessed
12   products that S2S sells?
13          A.     Electrophysiology devices,
14   single-use electrophysiology devices.
15          Q.     And I take it that includes
16   cardiac catheters?
17                 MR. BERHOLD:  Objection.
18                 MS. KRAFT:  I'm sorry, I don't
19   know if I heard a noise or it was simply a
20   noise.
21                 MR. BERHOLD:  That was an
22   objection.  But, Ms. Reyes, you can answer
23   the question.
24          A.     Maybe I didn't hear the -- I
25   froze a little bit.  Can you ask --
```

```
                                          Page 15

 1          REYES - HIGHLY CONFIDENTIAL

 2       Q.      Perhaps that's why I heard a

 3   noise but it didn't sound like an

 4   objection.  Let me ask again.

 5               When you say all reprocessed

 6   products that S2S sells and you mentioned

 7   single-use, single-use products, does that

 8   include catheters?

 9               MR. BERHOLD:  Objection.

10       Q.      You may answer.

11       A.      With the objection?

12       Q.      Yes.

13       A.      Does that include catheters, is

14   the question?

15       Q.      Yes.

16       A.      Yes.

17       Q.      Cardiac catheters?

18       A.      Yes.

19       Q.      What type of cardiac catheters?

20       A.      Diagnostic, mapping,

21   ultrasound.

22       Q.      Do you have primary

23   responsibility for SVS's business

24   relationship with Innovative Health?

25       A.      Yes.
```

```
                                          Page 80

 1           REYES - HIGHLY CONFIDENTIAL
 2   provided?
 3         A.      Yes.
 4         Q.      What were the reasons that were
 5   provided to you?
 6         A.      Physicians are not on board
 7   with using reprocessed products.
 8         Q.      Physicians often prefer to use
 9   new devices exclusively?
10         A.      Yes.
11         Q.      Have you encountered a
12   situation where hospitals are not
13   interested in or have a policy against
14   using reprocessed electrophysiology
15   catheters?
16         A.      Yes, have a policy against --
17   yes.
18         Q.      Do some hospitals or their EP
19   labs already have a reprocessing partner
20   when you start talking to them?
21         A.      Yes, sometimes.
22         Q.      What is a typical duration of
23   those agreements, of a reprocessor
24   agreement with that hospital or an EP lab,
25   if you know?
```

```
                                        Page 81
 1           REYES - HIGHLY CONFIDENTIAL
 2      A.      I think three years.
 3      Q.      And during the three-year
 4  duration of that agreement, can that
 5  typically -- typically can that hospital or
 6  EP lab use an additional reprocessing
 7  partner or are those agreements typically
 8  exclusive?
 9      A.      From what I've seen, it's been
10  certain compliance thresholds that need to
11  be met, like, for example, I guess it is a
12  99 -- I'm sorry, a 90 percent compliance of
13  buying the reprocessed product from one
14  company, then I guess they could buy 10
15  percent from another.
16      Q.      So in your experience, in the
17  industry, in selling these, have you
18  encountered reprocessing agreements with
19  other reprocessors, that hospitals have
20  with other reprocessors that are exclusive,
21  that prevent you from selling to that
22  account for the duration of that contract?
23      A.      No.  I mean, to prevent me
24  from -- to prevent us from selling, I've
25  not seen that, no.
```

1          REYES - HIGHLY CONFIDENTIAL

2    don't want to take up too much time.

3               My name, again, is Jeff

4    Berhold, and I'm the attorney for

5    Innovative Health, LLC.

6               During your time with the

7    PremierPro reprocessing program, have you

8    had substantial dealings with customers

9    regarding the opportunity to obtain savings

10   through the purchase of reprocessed EP

11   catheters?

12        A.      Yes.

13        Q.      Based on those substantial

14   dealings, do you believe some of your

15   members rejected savings on Biosense

16   Webster sensor-enabled catheters

17   reprocessed by Innovative Health because of

18   the Biosense clinical support policy?

19        A.      Yes.

20        Q.      Do you recall any specifically?

21        A.      Current, I would have to get a

22   list, but the current -- all of the current

23   members that I'm working with today that

24   use CARTO 3 system will not buy those

25   related devices reprocessed.

```
                                           Page 134
 1           REYES - HIGHLY CONFIDENTIAL
 2       Q.       And do you believe based on
 3   your substantial dealings with your members
 4   that your current members that use the
 5   CARTO 3 system are not buying the Biosense
 6   Webster sensor-enabled catheters
 7   reprocessed by Innovative Health because of
 8   the Biosense clinical support policy?
 9               MS. KRAFT:   Objection.
10       A.       Yes.
11       Q.       Let me ask that same question a
12   little differently.
13               Based on your substantial
14   dealings, do you believe all of your
15   current PremierPro reprocessing program
16   customers that use the CARTO 3 are
17   rejecting savings on the Biosense Webster
18   sensor-enabled catheters reprocessed by
19   Innovative Health because of the Biosense
20   clinical support policy?
21               MS. KRAFT:   Objection.
22       A.       Yes.
```

Page 160

1

2                    **CERTIFICATION**

3

4      I,   TODD DeSIMONE, a Notary Public for

5    and within the State of New York, do hereby

6    certify:

7      That the witness whose testimony as

8    herein set forth, was duly sworn by me; and

9    that the within transcript is a true record

10   of the testimony given by said witness.

11     I further certify that I am not related

12   to any of the parties to this action by

13   blood or marriage, and that I am in no way

14   interested in the outcome of this matter.

15     IN WITNESS WHEREOF, I have hereunto set

16   my hand this 27th day of September, 2021.

17

18

19

20   _____

21         TODD DESIMONE

22

23

24

25

EXHIBIT 15

Mary Roberts                                                August 30, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 1

1                UNITED STATES DISTRICT COURT

                 CENTRAL DISTRICT OF CALIFORNIA

2                      SOUTHERN DIVISION

3                Case No. 8:19-cv-1984 JVS-KES

4      _____

5      INNOVATIVE HEALTH, LLC,

6              Plaintiff,

7          vs.

8      BIOSENSE WEBSTER, INC.,

9              Defendant.

       _____

10

11

12

13

14           REMOTE VIDEOTAPED DEPOSITION OF

                      MARY ROBERTS

15

16

17               Monday, August 30, 2021

18

19

20

21

22

23

24

25      Court Reporter:  Michelle M. Boudreaux-Phillips, RPR

Innovative Health, LLC v. Biosense Webster, Inc.

Page 8

1          Q    Are you currently employed?

2          A    I am.

3          Q    Where are you employed?

4          A    Providence Saint Joseph Health.

5          Q    And is Providence Saint Joe's a combination

6     of two health systems, Providence and Saint Joseph's,

7     that merged in 2016?

8          A    That is correct.

9          Q    And how many hospitals are part of the

10    Providence Saint Joe's system currently?

11         A    Fifty-three.

12         Q    And do some of those hospitals have

13    electrophysiology labs?

14         A    Yes.

15         Q    And do you have a sense of the number of

16    electrophysiology labs now being operated by Providence

17    Saint Joe's?

18         A    Nineteen.

19         Q    Are they located throughout the West Coast?

20         A    Yes.  Well --

21         Q    Does Providence Saint Joe's have any --

22         A    -- we have one in Texas.  We have one in

23    Texas.

24         Q    Does Providence Saint Joe's have a number of

25    electrophysiology labs in Southern California?

Innovative Health, LLC v. Biosense Webster, Inc.

Page 9

1          A     Yes.

2          Q     Where does Providence Saint Joe's have

3     electrophysiology labs in the Los Angeles area?

4          A     St. Jude Fullerton, Saint Joe's Orange --

5     Fullerton, Orange, Mission Viejo, Burbank.  Those are

6     the ones I recall.  I'd have to look at the list.

7          Q     Is Hoag currently part of Providence Saint

8     Joe?

9          A     No.  Can I go back?  Can you clarify that

10    question?  When you say is Hoag part of St. Joe's, are

11    you talking about their EP cath lab?

12         Q     Yeah, I was asking whether the Hoag

13    electro -- well, I was asking generally first whether

14    Hoag was part of the Providence Saint Joe's system

15    currently.

16         A     I honestly don't know how to answer that.

17         Q     Do you know one way or the other whether

18    Providence Saint Joe's has a relationship currently

19    with Hoag Memorial?

20         A     I think they're in the process of not -- of

21    not.

22         Q     And how long have you worked for Providence

23    Saint Joe's Health system?

24         A     Nineteen years.

25         Q     And that includes time with Saint Joseph's

Innovative Health, LLC v. Biosense Webster, Inc.

Page 10

```
 1    before the merger with Providence in 2016?

 2        A    That is -- that is correct.

 3        Q    And what is your current position with

 4    Providence Saint Joe's?

 5        A    I'm a director over clinical -- clinical

 6    resource integration department.

 7        Q    And how long have you had that position?

 8        A    Since the merger, about four years.

 9        Q    And what does the clinical resource

10    integration department do generally?

11        A    Basically value analysis and implementation.

12        Q    And are there particular products or services

13    that the CRI department is analyzing or implementing?

14        A    Yes.  I oversee anything nonclinical, lab,

15    and med-surg.

16        Q    So your responsibilities would include

17    electrophysiology and cath labs?

18        A    Yes.

19        Q    And what do you mean by value analysis and

20    implementation?

21        A    Implementation would be when a contract is

22    signed and we have to convert one product to another, I

23    would oversee that implementation at the ministries to

24    make sure that that conversion has taken place.

25        Q    And what is the value analysis?
```

Mary Roberts                                August 30, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

                                                        Page 11

 1          A    The value analysis portion of it is that

 2    we're the clinical arm of sourcing, just to make sure

 3    that the products are clinically acceptable for

 4    patients.

 5          Q    And do you have a role in the contracting for

 6    reprocessed medical devices?

 7          A    I do not.

 8          Q    Who handles the contracting for the

 9    reprocessed medical devices?

10          A    That would be the sourcing department.

11          Q    And does Providence Saint Joseph's have

12    currently a contract with any third party to

13    reprocess --

14          A    Yes.

15          Q    -- medical devices?  Who is that?

16          A    Medline.

17          Q    And Medline supplies a variety of reprocessed

18    devices to Providence Saint Joseph's?

19          A    Yes.

20          Q    And Innovative Health reprocesses the

21    electrophysiology products that are supplied by Medline

22    under the contract with Providence Saint Joseph's?

23          A    Yes.

24          Q    And so are you responsible for implementation

25    of the contract with Medline at your facility

August 30, 2021

Innovative Health, LLC v. Biosense Webster, Inc.

                                                            Page 12

1      throughout the Providence Saint Joe's system?

2           A     Yes.

3           Q     And do you prefer to maximize Providence

4      Saint Joseph's savings on reprocessed catheters through

5      the contract with Medline?

6           A     Yes.

7           Q     Does Biosense Webster have a policy of

8      refusing to support your cases on the CARTO 3 cardiac

9      mapping system --

10          A     Yes.

11          Q     -- where your physicians use -- where your

12     physicians use ultrasound or mapping catheters

13     reprocessed by third parties?

14          A     Yes.

15          Q     Do you know whether the other manufacturers

16     of cardiac mapping systems have a similar case coverage

17     policy?

18          A     No.

19          Q     So are you saying that you believe that the

20     other original equipment manufacturers do not have a

21     similar case coverage policy?

22          A     They do not, that I'm aware of.

23          Q     Have you tried to take any steps to avoid the

24     restrictions imposed by Biosense Webster through its

25     case coverage policy?

Innovative Health, LLC v. Biosense Webster, Inc.

                                                    Page 13

1            MR. JARRETT:  Objection, form.

2            MR. SILER:  Mary, you can go ahead and

3       answer.

4            THE WITNESS:  Yes.

5       Q    (By Mr. Berhold)  What sort of steps have you

6    taken?

7       A    I've tried to inquire to see if there was a

8    way that we could train our techs within the ministries

9    to make sure that they would be able to cover those

10   cases.

11      Q    And how did you go about investigating the

12   possibility of training your own staff?

13      A    I reached out to Innovative Health to see if

14   they had any programs available to be able to train our

15   techs at the hospitals.

16      Q    And what did they tell you?

17      A    They said they did.

18      Q    And have you explored that opportunity with

19   Innovative Health?

20      A    We have, yes.

21      Q    And what is the status?

22      A    Still working with the ministries to see if

23   this is an opportunity that they would like to take.

24      Q    And the ministries are the individual

25   hospitals in your system?

Innovative Health, LLC v. Biosense Webster, Inc.

Page 14

```
 1          A     Yes, they are.

 2          Q     And have you talked to any of the clinicians

 3     in the individual labs about the possibility of --

 4          A     Yes.

 5          Q     -- training your own...

 6                And have you gotten feedback?

 7          A     They are open to it, yes.

 8                MR. SILER:  Mary, just make sure to let

 9          Jeff finish his questions.

10                THE WITNESS:  Will do.

11          Q     (By Mr. Berhold)  Have -- has there been any

12     resistance from any of the doctors or nurses?

13          A     No.

14          Q     And have you investigated whether your labs

15     have the head count or employees to dedicate to the

16     training and then the support for the CARTO 3?

17          A     No.

18          Q     So are you still in the -- discussing the

19     concepts generally with your ministries?

20          A     Yes.

21          Q     Haven't gotten into detail as far as how it

22     would actually be done --

23                MR. JARRETT:  Objection, form.

24          Q     -- within the labs?

25                MR. JARRETT:  Objection, form.
```

Mary Roberts                                    August 30, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

                                                    Page 20

1        Q    Has Providence Saint Joseph's rejected some

2    savings on Biosense catheters reprocessed by Innovative

3    Health under the Medline contract to keep the case

4    coverage with Biosense on the CARTO 3 cardiac mapping

5    system?

6             MR. JARRETT:  Objection, form, compound

7        question, leading.

8             MR. SILER:  Objection, vague.

9             THE WITNESS:  Jeff, can you clarify the

10       question, please?

11            MR. BERHOLD:  Oh, sure.

12       Q    (By Mr. Berhold)  You testified earlier that

13   you would prefer to maximize the savings on reprocessed

14   catheters through the contract with Medline; is that

15   right?

16       A    That is correct.

17       Q    And have you been able to maximize the

18   savings on reprocessed catheters through the contract

19   with Medline?

20       A    No.

21       Q    And why not?

22       A    They're unable to use the sensor-enabled

23   catheters, the reprocessed sensor-enabled catheters for

24   the cases.

25       Q    And why are they not able to use the

Innovative Health, LLC v. Biosense Webster, Inc.

Page 21

1    reprocessed Biosense sensor-enabled catheters on cases?

2         A    Per a letter that was sent to Providence

3    saying that their techs would not cover those cases.

4         Q    And has that letter been in effect for some

5    time?

6         A    Yes.

7         Q    Has the letter been in effect during the

8    entirety of the contract with Medline?

9         A    Yes.

10        Q    So you do not maximize savings on Biosense

11   catheters reprocessed by Innovative Health under the

12   Medline contract in order to keep the case coverage

13   with Biosense on the cases?

14             MR. JARRETT:  Objection, form.

15             THE WITNESS:  Yes.

16        Q    (By Mr. Berhold)  And that continues to this

17   day?

18        A    Yes.

19             MR. BERHOLD:  I don't have any

20        additional questions for you at this time,

21        Ms. Roberts.  Mr. Jarrett may have some

22        questions, though.

23                         EXAMINATION

24   BY MR. JARRETT:

25        Q    Hi.  Good afternoon, Ms. Roberts.  My name is

Innovative Health, LLC v. Biosense Webster, Inc.

Page 84

1          A      Yes.

2          Q      And if a lab has more than one brand of

3    cardiac mapping system, who decides which cardiac

4    mapping system to use on a specific procedure?  Is it

5    the physician or the lab or the -- or the system as a

6    whole that decides --

7                 MR. JARRETT:  Objection, form.

8                 THE WITNESS:  I would say the physician

9          decides.

10                MR. BERHOLD:  That's my only question.

11         We can go off the record, then.

12                THE VIDEOGRAPHER:  The time is --

13                MR. BERHOLD:  Unless, Ross, you don't --

14         I assume Ross doesn't have any questions.

15                MR. SILER:  I have no questions.

16                THE VIDEOGRAPHER:  The time is 3:19 p.m.

17         [sic].  This concludes the videotaped

18         deposition.  We are off video record.

19                (Deposition concluded at 3:19 p.m. MST.)

20

21

22

23

24

25

Mary Roberts                                    August 30, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 87

1                    C E R T I F I C A T E

2

3      STATE OF GEORGIA

4      COUNTY OF COBB

5

6              I, MICHELLE M. BOUDREAUX-PHILLIPS, do hereby

7      certify that MARY ROBERTS, the witness whose deposition

8      is hereinbefore set forth, was duly sworn by me and

9      that such deposition is a true record of the testimony

10     given by such witness.

11

12             I further certify that I am not related to

13     any of the parties to this action by blood or marriage

14     and that I am in no way interested in the outcome of

15     this matter.

16

17             IN WITNESS WHEREOF, I have hereunto set my

18     hand this 13th day of September 2021.

19

20

                MICHELLE M. BOUDREAUX-PHILLIPS, RPR

21

22

23

24

25

EXHIBIT 16

Todd Senard                                            August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 1

1              UNITED STATES DISTRICT COURT

            CENTRAL DISTRICT OF CALIFORNIA

2                   SOUTHERN DIVISION

3

4    INNOVATIVE HEALTH LLC,

5         Plaintiff,                    CASE NO.

6    vs.                        8:19-cv-01984-JVS-KES

7    BIOSENSE WEBSTER, INC.,

8         Defendant.

9

10

11        VIDEOTAPE DEPOSITION OF TODD SENARD

12             APPEARING REMOTE FROM

13           PITTSBURGH, PENNSYLVANIA

14

15              AUGUST 23, 2021

16               1:30 P.M. EST

17

18

19   Reported By:

20   Judith L. Leitz Moran

21   RPR, RSA, CCR-B-2312

22   APPEARING REMOTELY FROM ATLANTA, GEORGIA

23

24

25

Todd Senard                                    August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

                                                       Page 9

 1                    EXAMINATION

 2    BY MR. BERHOLD:

 3        Q    Good afternoon, Mr. Senard.

 4        A    Good afternoon.

 5        Q    Have you ever given a deposition?

 6        A    No, sir.

 7        Q    Do you have a lawyer representing you

 8    here today?

 9        A    Mrs. Erica Curren.

10        Q    Okay.  Have you had an opportunity to

11    review the ground rules for a deposition with

12    Ms. Curren?

13        A    Yes, sir.

14        Q    And do you believe that you're familiar

15    generally with the ground rules for today's

16    deposition?

17        A    Yes, sir.

18        Q    And generally speaking, where are you

19    located today --

20        A    Pittsburgh, Pennsylvania.

21        Q    City and state?

22        A    Pittsburgh, Pennsylvania.

23        Q    And are you currently employed?

24        A    Yes.

25        Q    Where are you employed?

Todd Seguard                                          August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 10

1        A     Highmark Allegheny Health Network.

2        Q     And what is Highmark Allegheny Health

3   Network?

4        A     Highmark is the parent company, Allegheny

5   Health Network is the IDN health system owned by

6   Highmark.

7        Q     And what is an IDN?

8        A     It is -- it's a -- it's a health

9   system -- let me see the best way to explain it,

10  it's -- essentially it's a health system with its

11  own integrated network, so it's both provider and

12  payer.

13       Q     And how many hospitals are under the

14  Highmark umbrella?

15       A     Oh, let's see.  Off the top of my head,

16  10, with a handful of surgery centers and about

17  2,000 Allegheny clinics.

18       Q     And how many of those hospitals have

19  electrophysiology labs?

20       A     I cannot confirm that number, sir.  It's

21  because we are a corporate supply chain, so I am

22  not physically located in the hospitals themselves.

23       Q     Okay.  Are you aware that there are

24  electrophysiology labs at Allegheny General?

25       A     Yes, sir.  That's our -- that's our main

Todd Beard                                                    August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

                                                            Page 11

1    hospital.

2         Q    And do you know whether any of the other

3    hospitals in the network have electrophysiology

4    labs?

5         A    Yes, I can confirm, but I cannot confirm

6    who is still doing patient procedures.

7         Q    And how long have you been employed with

8    Highmark during this tenure?

9         A    Since May of 2017.

10        Q    What is your position there?

11        A    Manager of clinical contracting.

12        Q    And what are your duties as manager of

13   clinical contracting?

14        A    I oversee a team of five other

15   individuals.  They cover the service lines for

16   perioperative supplies, med surge supplies,

17   laboratory, pathology, and any other service line

18   essentially that touches patient care falls under

19   my team.

20             And we write the contract and the pricing

21   product contract for the various disposable

22   implants that are used within the Allegheny Health

23   System.

24        Q    And are you also responsible for the

25   capital contracting?

Todd Seward                                        August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 12

1      A     No, sir, I'm not.  That -- that is a
2   different division.
3      Q     And have your responsibilities changed
4   significantly since May 2017?
5      A     Yes.  I started with Allegheny Health
6   Network as an independent contributor, contract
7   manager, and now I oversee the clinical contracting
8   team, like I said, of five other individuals.
9      Q     And when did that change in
10   responsibilities take place?
11      A     June 2018.
12      Q     So you testified you're not involved in
13   the capital acquisitions; is that right?
14      A     Correct.  Our capital equipment and
15   purchase services is handled by a different
16   division within our supply chain.  My team only
17   works with disposables and implantables.
18      Q     Does your team work with the capital team
19   on --
20      A     Yes, we do -- we do work together on
21   projects, but my team is not responsible for the
22   acquisition of the capital.
23      Q     And does your team work with the capital
24   team on trying to project the costs of the
25   disposables over the life cycle of the capital

Todd Seward                                         August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 13

1    equipment that is under --

2         A     Yes, sir.

3         Q     -- consideration?

4         A     Yes, sir.

5         Q     And electrophysiology labs use cardiac

6    mapping systems?

7         A     Correct.

8         Q     Do you have a sense of which brand of

9    cardiac mapping system is most frequently used

10   within the Allegheny network?

11        A     We are majority market share with

12   Biosense Webster, but we do have all available

13   supplier systems per use within AHN.

14        Q     Do you have any sense of why the CARTO 3

15   mapping system gets the most usage within the

16   Allegheny network?

17        A     We are a physician-led organization, sir,

18   so it is up to the physicians to decide who they

19   choose to use, not supply chain.  My job is to just

20   secure the best pricing possible.

21        Q     On the disposables?

22        A     Correct.

23        Q     And do you have a sense of the average

24   life cycle of your cardiac mapping systems?

25        A     Can you please clarify your question?

Innovative Health, LLC v. Biosense Webster, Inc.

Page 36

1          Yeah, I guess.

2      Q    And is it still the case today that

3  Allegheny misses some savings on catheters

4  reprocessed by Innovative Health to keep the case

5  coverage from Biosense?

6      A    I cannot confirm if it's to keep case

7  coverage, but I can confirm that we are missing

8  savings from using reprocessed equipment.

9      Q    And why doesn't Allegheny just switch out

10 all of its cardiac mapping systems to get around

11 the whole case coverage policy?

12     A    Because we're a clinician-led

13 organization.  The clinicians decide and choose who

14 -- what suppliers they wish to use.

15     Q    And that includes the brand of cardiac

16 mapping system?

17     A    That includes all products used within

18 the system, sir.

19     Q    So that would include the types of

20 catheters, too?

21     A    Includes all products used in the system,

22 sir.

23          MR. BERHOLD:  So I'm going to suggest we

24 take a five-minute break.  I want to review my

25 notes to see if I have anymore questions and allow

Todd Senard                                August 23, 2021
Page 171 of 216
Innovative Health, LLC v. Biosense Webster, Inc.

Page 92

1              C E R T I F I C A T E
2           Deposition of: TODD SENARD
      Date of Deposition: AUGUST 23, 2021
3
4    STATE OF GEORGIA:
     COUNTY OF DEKALB:
5
6           I hereby certify that the foregoing
7    transcript was stenographically recorded by me
8    via Zoom as stated in the caption.  The deponent
9    was duly sworn to tell the truth, the whole truth,
10   and nothing but the truth.  And the colloquies,
11   statements, questions and answers thereto were
12   reduced to typewriting under my direction and
13   supervision and the deposition is a true and
14   correct record, to the best of my ability, of
15   the testimony/evidence given by the deponent.
16          I further certify that I am not a
17   relative or employee or attorney or counsel to
18   any of the parties in the case, nor am I a
19   relative or employee of such attorney or counsel,
20   nor am I financially interested in the action.
21          This, the 6th day of September 2021.
22
23
24          Judith L. Leitz Moran, CCR-B-2312
            Registered Professional Reporter
25

EXHIBIT 17

Portia Tranguch                                          August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

                                                              Page 1

1            UNITED STATES DISTRICT COURT

             CENTRAL DISTRICT OF CALIFORNIA

2                   SOUTHERN DIVISION

3

4    INNOVATIVE HEALTH LLC,

5         Plaintiff,                        CASE NO.

6    vs.                         8:19-cv-01984-JVS-KES

7    BIOSENSE WEBSTER, INC.,

8         Defendant.

9

10

11        VIDEOTAPE DEPOSITION OF PORTIA TRANGUCH

12              APPEARING REMOTE FROM

13           PITTSBURGH, PENNSYLVANIA

14

15                AUGUST 23, 2021

16                 9:30 A.M. EST

17

18

19   Reported By:

20   Judith L. Leitz Moran

21   RPR, RSA, CCR-B-2312

22   APPEARING REMOTELY FROM ATLANTA, GEORGIA

23

24

25

Portia Tranguch                                    August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 9

1       Q     All right.  Are you currently employed,
2   Mrs. Tranguch?
3       A     Yes.
4       Q     Where are you employed?
5       A     Allegheny General Hospital.
6       Q     How long have you been employed there?
7       A     17 years.
8       Q     What is your current position?
9       A     Director of cardiac services.
10       Q     And how long have you held that position?
11       A     About nine years.
12       Q     And what are your duties and
13   responsibilities in that job?
14       A     Day-to-day operations, financial
15   responsibility, staffing.  For the cardiac cath
16   lab, electrophysiology.  The cardiac lab unit,
17   cardiac MRI.
18           I know I'm missing some.
19           Heart station, nuclear cardiology,
20   neurodiagnostic, epilepsy monitoring unit and
21   radiology nursing.
22       Q     And how many electrophysiology labs are
23   under your oversight?
24       A     We have four.
25       Q     And those four labs are all part of your

Porter Trench                                    August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 10

1    responsibility?

2         A    Yes.

3         Q    And have your responsibilities changed

4    significantly over the last nine years as director?

5         A    Yes, we started out as director of the

6    cath lab and EP lab.  And then over the years I've

7    acquired several other departments.

8         Q    During that entire nine years, have you

9    been overseeing all four of the electrophysiology

10   labs?

11        A    Yeah.

12        Q    And are the four labs all located in the

13   same place or are they at different locations?

14        A    They're all in the fourth floor of the

15   hospital.

16        Q    Is there anyone that assists you in the

17   management of the electrophysiology labs?

18        A    We have a manager and a supervisor

19   currently.

20        Q    And what is the name of the manager?

21        A    Jennifer Thomas.

22             THE COURT REPORTER:  I'm sorry, Jennifer

23   what?

24             THE WITNESS:  Thomas, T-H-O-M-A-S.

25   BY MR. BERHOLD:

Porter Trauch                                    August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 34

1          A     I don't think it was all of them, but not
2     all of them do ablation, so it would be the
3     physicians that do those procedures.
4          Q     Let me ask it a little differently.
5                So do you recall -- so -- okay.
6                So you don't recall whether you were able
7     to persuade the physicians to switch specifically
8     to the new AcuNavs?
9          A     I don't remember that conversation, no.
10         Q     Okay.
11         A     With the physicians, no.
12         Q     And you don't recall specifically a
13    conversation with any of the physicians about
14    switching to reprocessed AcuNavs?
15         A     No, we have a lot of reprocessed AcuNavs
16    that we use for many procedures.
17         Q     Okay.  So Mr. Distel also suggests that
18    Allegheny shift to competitive systems such as the
19    EnSite Precision.  And you already testified
20    earlier about the preferences of your physicians.
21               Have you tried to shift procedures to
22    competitive systems like the EnSite Precision?
23         A     No, not specifically.  We -- purchasing
24    these mapping systems is a huge investment on a
25    hospital.  So when you have a system and the

Portia Tranguch                                    August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 35

1    physicians are happy with the system, we're not

2    going to change a system just to be able to use a

3    reprocessed item.  We're going to do what's best

4    for the patient and what our physicians are

5    comfortable with.  In this case, it was CARTO.

6              So looking at purchasing a brand new

7    system to be able to use a reprocessed catheter is

8    not financially responsible.

9        Q    And is that because you believe that the

10   physicians will continue to use the existing brand

11   of cardiac mapping system?

12       A    Yes.

13             MR. BERHOLD:  Jim, can we pull up 152664

14   as Exhibit 228?

15             CONCIERGE FARMER:  Okay.  The document's

16   available now.

17             (Deposition Exhibit 228 marked.)

18       A    (Witness reviews document.)

19   BY MR. BERHOLD:

20       Q    Other than the -- have you had an

21   opportunity to review Exhibit 228, Mrs. Tranguch?

22       A    I have.

23       Q    Other than the email at the very top from

24   Kara Reyes to Dave Distel, do you recognize Exhibit

25   228?

Porter Rauch                                    August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 39

1        Q      And you recall that her understanding was
2    based on a conversation with Biosense?
3        A      That's -- yes.  Yes.
4        Q      Does Boston Scientific have a case
5    coverage policy to your knowledge?
6        A      Boston Scientific?  Not that I'm aware
7    of.
8        Q      Does Boston Scientific provide free
9    clinical support for the Rhythmia cardiac mapping
10   system to Allegheny?
11       A      They train our staff when we purchase the
12   system, and then if we need them to come in to
13   support the staff, they'll come in, but they don't
14   just automatically send people in to be here with
15   their system.
16       Q      Does Allegheny prefer to maximize its
17   savings on reprocessed catheters through its
18   contract with Innovative Health?
19       A      Do we prefer to?  Yes.
20       Q      Yes.
21       A      If we can use reprocessed, it's a cost
22   savings for the hospital and allows us to provide
23   the same quality of care at a lower cost.
24       Q      And would that include savings on the
25   SOUNDSTAR?

Page 40

1      A    It includes savings on any catheter

2   that's able to be reprocessed.

3      Q    And that would include savings on the

4   Pentaray?

5      A    As long as that's able to be reprocessed.

6      Q    But Allegheny has had to reject savings

7   from Innovative Health on the SOUNDSTAR and the

8   Pentaray to keep their case coverage from Biosense?

9           MS. KOZIKOWSKI:  Objection.

10     A    That's correct.

11  BY MR. BERHOLD:

12     Q    And that continues to this day?

13     A    Yes.

14     Q    And Allegheny has asked Biosense if they

15  would train your staff so Allegheny could cover

16  cases and use Innovative?

17          MS. KOZIKOWSKI:  Objection.

18     A    Yes.

19  BY MR. BERHOLD:

20     Q    And -- and your physicians at Allegheny

21  are not going to switch cardiac mapping systems at

22  your direction?

23     A    At my direction?  No.

24          MR. BERHOLD:  Can we take a short break

25  of 10 minutes now?  It's been about an hour and 20

Porta Tetrauch                                    August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 77

1   do with whether we're willing to provide staff to

2   train.

3            If we were back to staffing the way that

4   we were prior to COVID, and Biosense Webster

5   offered to train our staff, we would take full

6   advantage of that.  That is not the case right now.

7        Q    Let's look at the second alternative that

8   Mr. Distel suggests.  He says:  Shifting a portion

9   of SOUNDSTAR eco ICE to AcuNav.  Mayo Clinic

10  shifted to 80 percent AcuNav and doubled their

11  savings.

12           Do you see that?

13       A    I do.

14       Q    And you testified that Allegheny did try

15  this, correct?

16       A    We've try -- we do use AcuNav, not -- we

17  use it in the cath lab, we use it in the EP lab.

18  The products are fine.  The physicians chose not to

19  use them, and for some of the products they did not

20  like them.  I'm not going to tell a physician what

21  he should or should not use for a case.

22       Q    And you testified earlier that some

23  physicians don't like the reprocessed AcuNav,

24  correct?

25       A    That's correct.

Portia Tranguch                                          August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 114

1              C E R T I F I C A T E
2           Deposition of: PORTIA TRANGUCH
         Date of Deposition: AUGUST 23, 2021
3
4      STATE OF GEORGIA:
       COUNTY OF DEKALB:
5
6              I hereby certify that the foregoing
7      transcript was stenographically recorded by me
8      via Zoom as stated in the caption.  The deponent
9      was duly sworn to tell the truth, the whole truth,
10     and nothing but the truth.  And the colloquies,
11     statements, questions and answers thereto were
12     reduced to typewriting under my direction and
13     supervision and the deposition is a true and
14     correct record, to the best of my ability, of
15     the testimony/evidence given by the deponent.
16             I further certify that I am not a
17     relative or employee or attorney or counsel to
18     any of the parties in the case, nor am I a
19     relative or employee of such attorney or counsel,
20     nor am I financially interested in the action.
21             This, the 6th day of September 2021.
22
23
24          Judith L. Leitz Moran, CCR-B-2312
            Registered Professional Reporter
25

Veritext Legal Solutions
800.808.4958                                          770.343.9696

EXHIBIT 18

Page 1

1                UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3                     SOUTHERN DIVISION

4

5     INNOVATIVE HEALTH, LLC,

6            Plaintiff,

7     vs.                              Case No.

8     BIOSENSE WEBSTER, INC.,        8:19-cv-1984 JVS-KES

9            Defendant.

10

11

12            VIDEO DEPOSITION OF TROY TUTTLE

13            Taken by Remote Videoconference

14                   August 4, 2021

15                      3:25 p.m.

16

17            Laura M. MacKay, RPR, CCR-B-1736

18

19

20

21

22

23

24

25

Innovative Health, LLC v. Biosense Webster, Inc.

Page 7

1      Q.   At some point did you work for Vizient?

2      A.   I did.

3      Q.   What is Vizient?

4      A.   Vizient is a group purchasing organization.

5      Q.   And does Vizient have members?

6      A.   They do.

7      Q.   And who are the members, generally

8  speaking?

9      A.   I think the easiest way to describe that

10 would be when UHC, VHA, and Novation came together

11 in 2015.  It's an aggregation of a lot of hospitals.

12     Q.   So Vizient has hospitals and IDNs as

13 members --

14     A.   Right.

15     Q.   -- (overspeaking) in the GPO?

16     A.   Correct.

17     Q.   Do you recall roughly how many?

18     A.   I would be guessing.  It's most of -- most

19 of the academic medical centers.  With a surety I

20 can say it's most of the academic medical centers.

21 But it's, you know, thousands of hospitals that

22 affiliate with Vizient.

23     Q.   And does Vizient have -- well, did Vizient

24 have members around the country?

25     A.   Correct.

Doe, John                                                    August 4, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 8

1        Q.   How long did you work at Vizient?

2        A.   Right around six years.

3        Q.   What did you do for Vizient?

4        A.   Three main roles.  The first one was in

5   sourcing, the second one was in implementation, and

6   the third one was strategic advisor and aptitude.

7        Q.   And did you focus on any product

8   categories?

9        A.   I did.  Cardiovascular was my background,

10  and those are the segments that I focused on.

11       Q.   You mentioned that you had three different

12  positions in your time at Vizient.  In a sentence,

13  what is -- were your responsibilities in sourcing?

14       A.   Sourcing was managing the cardiac rhythm

15  management, coronary products, and peripheral

16  vascular national GPO contracts.

17            THE WITNESS:  And implementation was --

18            MR. MERMAN:  Wait for a question.

19            THE WITNESS:  Oh, sorry.

20  BY MR. BERHOLD:

21       Q.   So in a sentence, what did you do in

22  implementation?

23       A.   Yes, sir.  Implementation is basically

24  going out to those members that were newly

25  onboarding with Vizient or were looking at new

Innovative Health, LLC v. Biosense Webster, Inc.

Page 9

1    categories and helping them implement the

2    cardiovascular division.

3         Q.   And in a sentence, what did you do in your

4    strategic role?

5         A.   With aptitude it was strategic supplier

6    relationships, so all of the cardiovascular

7    suppliers, engaging them, and their associated

8    dealings with our members in the cardiovascular

9    space.

10        Q.   As part of your work at Vizient, did you

11   try to identify cardiovascular savings for your

12   members?

13        A.   I did.

14        Q.   What are the -- are there different

15   categories of products within cardiovascular?

16        A.   Definitely.  I would say the key buckets

17   are cardiac rhythm management, coronary vascular,

18   and peripheral vascular.

19        Q.   What about electrophysiology products?

20        A.   Indeed.  Indeed.  Electrophysiology is

21   right there as well.

22        Q.   Were any of these product categories

23   considered physician preference at Vizient?

24        A.   Every category I listed, yes, it falls

25   under physician preference.

Innovative Health, LLC v. Biosense Webster, Inc.

Page 10

1       Q.   And what does that mean, "physician
2   preference"?
3       A.   It means the physician has the
4   decision-making power to select a device that is
5   going to bring out the best clinical outcome for the
6   specific patient case that they're dealing with.
7   They have that ability to choose that device.
8       Q.   And is that true of electrophysiology
9   products?
10      A.   It is.
11      Q.   And that would include cardiac mapping
12  systems?
13      A.   It would.
14      Q.   And it would include electrophysiology
15  catheters?
16      A.   Yes.
17      Q.   On a scale of 1 to 10, how would you rank
18  the strength of physician preference in cardiac
19  mapping systems?
20      A.   It's near the top.  If 1 being low, 10
21  being high, it's near the top.  It's near 10.
22      Q.   And how would you rank physician preference
23  in electrophysiology catheters between 1 to 10 with
24  1 being low and 10 being high?
25      A.   It would be the same.

August 4, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 11

1      Q.  Close to a 10?

2      A.  Yes, sir.

3      Q.  Do you recall the major manufacturers of

4   cardiac mapping systems?

5      A.  I do.  Biosense Webster; Abbott acquired

6   St. Jude, so Abbott; and then Boston Scientific were

7   the three key players that I would routinely work

8   with in the EP space.  Also Medtronic --

9      Q.  Who were the --

10     A.  I'm sorry.

11     Q.  Go ahead.

12     A.  Yeah, just the last one, Medtronic had a

13  cryocatheter that we would also encounter.  So those

14  four.

15     Q.  Okay.  Are you familiar with a company by

16  the name of Innovative Health?

17     A.  I am.

18     Q.  At some point did Innovative Health become

19  a strategic partner with Vizient?

20     A.  They did.

21     Q.  And Innovative Health reprocesses

22  electrophysiology products?

23     A.  They do.

24     Q.  And they collect the original manufacturer

25  single-use device and reprocess it?

Innovative Health, LLC v. Biosense Webster, Inc.

August 4, 2021

Page 15

1    members express concern that the Boston Scientific

2    clinical account specialist would not know how to

3    use a Boston Scientific catheter for a second use

4    after reprocessing?

5        A.   No.

6        Q.   Did you ever hear that Biosense had any

7    limits on its case coverage?

8        A.   Yes, I did.

9        Q.   And were you aware that Biosense objects to

10   providing a technician to run the Carto 3 mapping

11   system software if the physician uses a Biosense

12   sensor-enabled catheter for a second use after

13   reprocessing by a third party?

14       A.   Yes.

15           MS. YOUNG:   Object.

16   BY MR. BERHOLD:

17       Q.   As part of your duties at Vizient, did you

18   talk to your members about trying to find savings by

19   purchasing from Innovative Health?

20       A.   Yes.  This was an opportunity for savings

21   to use reprocessed catheters.

22       Q.   And were you able to identify any interest

23   from any of your members?

24       A.   Yes.

25       Q.   And what type of people do you deal with at

Page 16

1    your member hospitals?  Do you deal with

2    administration or supply chain or lab personnel or

3    physicians?  Can you walk me through the different

4    people that are part of your work?

5        A.   It would really be a combination of all of

6    the stakeholders you just mentioned, depending on

7    what stage of the RFP we are within.  So we do an

8    engagement, long-gauge supply chain, administration

9    and positions to ideally get congruence about how

10   they want to deliver that particular care to the

11   patient.

12       Q.   And it's true that sometimes your members

13   will provide purchasing history to you for

14   Innovative Health to calculate a savings model?

15       A.   That's exactly right.

16       Q.   In your experience was Innovative Health

17   ever able to identify significant savings for those

18   projections?

19       A.   Yes.

20       Q.   And would those savings projections

21   sometimes exceed one million dollars a year?

22       A.   Depending on the baseline spend, that is

23   definitely a possibility.

24       Q.   Is it fair to say you have had substantial

25   dealings at Vizient with your members about

Innovative Health, LLC v. Biosense Webster, Inc.                    August 4, 2021

Page 17

```
 1    purchasing electrophysiology products?

 2              MS. YOUNG:  Objection.

 3    BY MR. BERHOLD:

 4         Q.  You can answer, Mr. Tuttle.

 5         A.  Okay.

 6              Read the question one more time.  I'm

 7    sorry.

 8         Q.  Sure.

 9              Is it fair to say that you had substantial

10    dealings in your time at Vizient with your members

11    about purchasing electrophysiology products?

12         A.  Yes.

13         Q.  And is it fair to say you had substantial

14    dealings with your members at Vizient about

15    purchasing electrophysiology catheters from

16    Innovative Health?

17         A.  Yes.

18         Q.  Based on your dealings with your members --

19    well, based on your dealings with your members at

20    Vizient, did you believe that your members were

21    rejecting the savings from -- on Biosense

22    sensor-enabled catheters reprocessed by Innovative

23    to keep their case coverage from Biosense?

24         A.  Yes.  That was the prevailing atmosphere

25    when it came to that particular nuance of
```

August 4, 2021

Innovative Health, LLC v. Biosense Webster, Inc.

Page 18

```
 1    reprocessing.
 2         Q.  Did any of your members tell you that they
 3    were in fact rejecting the savings on Biosense
 4    sensor-enabled catheters reprocessed by Innovative
 5    to keep their case coverage from Biosense?
 6         A.  Yes.
 7         Q.  Do you recall the percentage?
 8         A.  Percentage of members that were rejecting
 9    savings based on the threat to remove case coverage?
10         Q.  Yes.
11         A.  I'm going to say most.  So greater than
12    80 percent.
13         Q.  And did any of your members say that they
14    were concerned about losing case coverage for other
15    procedures as well if they used Biosense
16    sensor-enabled catheters reprocessed by Innovative
17    Health on any of their procedures?
18              MS. YOUNG:  Object to form.
19         A.  I don't recall that specific nuance.
20    BY MR. BERHOLD:
21         Q.  Did some members even say that there was no
22    point in getting a savings model because of the case
23    coverage policy at Biosense?
24         A.  Yes, that happened quite frequently when we
25    would look at the category.  And it would just be a
```

Innovative Health, LLC v. Biosense Webster, Inc.

Page 20

1       A.   By Biosense.

2       Q.   How often did your members mention that

3   concern?

4       A.   Quite often.

5       Q.   And did some of your members say that their

6   physicians prefer to keep using their clinical

7   account specialists from Biosense rather than the

8   staff from the hospital?

9       A.   The workflow was in place.  So it made

10  sense to keep the Biosense rep and the relationship.

11      Q.   And is that something that some of your

12  members told you?

13      A.   Yes.

14      Q.   How frequently did that happen?

15      A.   Again, this was -- all of these points are

16  kind of part of the same narrative, part of the same

17  conversation.  So most of the time.

18      Q.   And did you ever encourage your members to

19  try to persuade the physicians to switch from the

20  Carto 3 cardiac mapping system to a different

21  cardiac mapping system to try to capture more

22  savings on reprocessed catheters?

23      A.   It was really probably not a tenable

24  approach given these doctors are trained on that

25  particular mapping system as they become attendings.

Troy Jenkins                                        August 4, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 21

1    So through their fellowship, they know these mapping
2    systems, they trust them, they're treating a
3    patient's heart.  They may be dual trained
4    sometimes, but a lot of them come up on one mapping
5    system and that's their go-to.
6         Q.  Did any of your members tell you that their
7    physicians were not going to switch from the Carto 3
8    cardiac mapping system?
9         A.  Yes.
10        Q.  How often?
11        A.  Most of the time.  The Carto mapping system
12   is a good system.
13        Q.  Would you say more than 50 percent of the
14   time?
15        A.  Yes.
16        Q.  More than 80 percent of the time?
17        A.  Yes.  Again, this really falls in the same
18   realm.  More than 80 percent.
19        Q.  Did any of your members tell you that they
20   were rejecting the savings on Biosense
21   sensor-enabled catheters from Innovative because
22   they were concerned that the Biosense clinical
23   account specialists did not have training on
24   Biosense catheters that had been reprocessed by
25   Innovative?

Innovative Health, LLC v. Biosense Webster, Inc.

Page 82

1                          CERTIFICATE
   STATE OF GEORGIA:
2  COUNTY OF FULTON:
                 I hereby certify that the foregoing
3  transcript was taken down, as stated in the caption,
   and the colloquies, questions and answers were
4  reduced to typewriting under my direction; that the
   transcript is a true and correct record of the
5  evidence given upon said proceeding.
                 I further certify that I am not a
6  relative or employee or attorney of any party, nor
   am I financially interested in the outcome of this
7  action.
                 I have no relationship of interest in
8  this matter which would disqualify me from
   maintaining my obligation of impartiality in
9  compliance with the Code of Professional Ethics.
                 I have no direct contract with any
10 party in this action and my compensation is based
   solely on the terms of my subcontractor agreement.
11               Nothing in the arrangements made for
   this proceeding impacts my absolute commitment to
12 serve all parties as an impartial officer of the
   court.
13               This the 9th day of August 2021.
14
15               *Laura M. Mackay*
16 _____
   LAURA M. MACKAY, CCR-B-1736
17
18
19
20
21
22
23
24
25

PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT 19

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

# EXHIBIT 20

Highly Confidential - Lawrence Wu                    December 1, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

                                                      Page 1

 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                  SOUTHERN DIVISION

 4

 5    INNOVATIVE HEALTH LLC,        )
                                    )
 6               Plaintiff,         )
                                    )
 7          vs.                     )   No. 8:19-cv-01984-
                                    )   JVS-KES
 8    BIOSENSE WEBSTER, INC.,       )
                                    )
 9               Defendant.         )
      ------------------------      )

10

11

12    * * * H I G H L Y   C O N F I D E N T I A L * * *

13

14

15                   December 1, 2021

16                   9:35 a.m. EST

17

18      Videoconferenced deposition of Dr. LAWRENCE

19    WU, held virtually with the witness located in

20    Los Altos, California, before Laurie A.

21    Collins, a Registered Professional Reporter

22    and Notary Public of the State of New York.

23

24

25

Lawrence Wu                    December 1, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 76

1    a barrier to entry?

2            MS. GROSSBARD:  Objection, vague with

3        respect to blocking technology.

4        A.    That's too general of a question for me

5    to answer that appropriately.

6        Q.    You can't answer one way or the other?

7        A.    The question is too vague for me to

8    answer.  You can give me a hypothetical or

9    another -- ask it a different way.  I don't

10   understand your question.

11       Q.    Okay.  Let me ask you a different

12   question.  Are you aware whether or not the

13   CARTO 3 cardiac mapping system is compatible with

14   sensor-enabled catheters manufactured by anyone

15   besides Biosense?

16       A.    My understanding is that Biosense

17   CARTO 3 mapping systems work with new or

18   reprocessed Biosense catheters and not catheters

19   made by a different OEM.

20       Q.    And another way of saying it is that

21   Biosense has a closed system with respect to the

22   sensor-enabled catheters?

23           MS. GROSSBARD:  Objection to the

24       characterization and foundation.

25       A.    I don't know that I would call it a

High CONF: Lawrence Wu                          December 1, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 180



High CONF. Lawrence Wu                    December 1, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 181



Highly Confidential - Lawrence Wu                    December 1, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 227

```
 1                    C E R T I F I C A T E

 2    STATE OF NEW YORK      )

 3                           : ss.

 4    COUNTY OF NEW YORK     )

 5

 6            I, LAURIE A. COLLINS, a Registered

 7       Professional Reporter and Notary Public

 8       within and for the State of New York, do

 9       hereby certify:

10            That LAWRENCE WU, the witness whose

11       deposition is hereinbefore set forth, was

12       duly sworn by me and that such deposition

13       is a true record of the testimony given by

14       the witness.

15            I further certify that I am not

16       related to any of the parties to this

17       action by blood or marriage and that I am

18       in no way interested in the outcome of this

19       matter.

20            IN WITNESS WHEREOF, I have hereunto

21       set my hand this 1st day of December 2021.

22

23

24            LAURIE A. COLLINS, RPR

25
```

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

# EXHIBIT 21

Page 1

1        UNITED STATES DISTRICT COURT

         CENTRAL DISTRICT OF CALIFORNIA

2             SOUTHERN DIVISION

3

4    INNOVATIVE HEALTH LLC,

5        Plaintiff,                    CASE NO.

6    vs.                      8:19-cv-01984-JVS-KES

7    BIOSENSE WEBSTER, INC.,

8        Defendant.

9

10

11            DEPOSITION FAIRY ZARE

12            APPEARING REMOTE FROM

13             IRVINE, CALIFORNIA

14

15             JULY 8, 2021

16           9:37 A.M. / 12:37 P.M

17

18

19

20   Reported By:

21   Judith L. Leitz Moran

22   RPR, RSA, CCR-B-2312

23   APPEARING REMOTELY FROM ATLANTA, GEORGIA

24

25

July 8, 2021

Innovative Health, LLC v. Biosense Webster, Inc.

Page 6

```
 1                  EXAMINATION
 2    BY MR. BERHOLD:
 3         Q    All right, good morning, Ms. Zare.
 4         A    Good morning.
 5         Q    Have you ever given a deposition?
 6         A    I have not.
 7         Q    Do you have a lawyer here on this Zoom
 8    deposition representing you?
 9         A    Yes, Ms. Grossbard.
10         Q    Have you had an opportunity to consult
11    with her regarding the deposition?
12         A    We have had conversation, yes.
13         Q    And do you believe you have a basic
14    understanding of the ground rules for today's
15    deposition?
16         A    I do.
17         Q    Ms. Zare, where are you physically
18    located right now?
19         A    I am in our headquarters building in
20    Irvine, California.
21         Q    Are you currently employed?
22         A    Yes.
23         Q    Where are you employed?
24         A    By Johnson & Johnson, Biosense Webster
25    specifically, the company.
```

Innovative Health, LLC v. Biosense Webster, Inc.                July 8, 2021

Page 7

1          Q     What is Biosense Webster's line of

2     business?

3          A     It's a -- it's in the cardiovascular

4     space.  Electrophysiology mapping and ablation,

5     specifically.

6          Q     What is your position with Biosense

7     Webster?

8          A     I lead the marketing in the U.S.

9          Q     What do you do day to day in that role?

10         A     I have a team and collectively we bring

11    products to the market, we partner with physicians

12    and institutions that will benefit from the -- from

13    these products and work flows, and conduct training

14    and -- and, you know, facilitate engagements to --

15    to just help people adopt these technologies to

16    treat patients better.

17         Q     What kind of products are part of your

18    responsibility?

19         A     So our full portfolio includes the CARTO

20    mapping system and its corresponding software

21    components as well as catheters that go along with

22    the -- this computer system, CARTO, that allow for

23    mapping and diagnosing the different arrhythmias,

24    the rhythm disorders that these physicians

25    identify, and then the therapeutic correspondence,

Innovative Health, LLC v. Biosense Webster, Inc.

July 8, 2021

Page 26

1        Q     What are the -- so is there a CARTO sound
2    module?

3        A     Yes.

4        Q     What is the CARTO sound module?

5        A     It's the capability to impose or pull the
6    image, the ultrasound image from the ultrasound
7    machine on to the CARTO map.  Allows integration of
8    the two different imaging modalities.

9        Q     Is there also a module called Confidense?

10       A     Yes.

11       Q     What's the purpose of the Confidense
12   module?

13       A     It's a diagnostic enhancement module to
14   just -- I think -- I'm not -- I'm not,
15   unfortunately, the clinical tech person, so don't
16   -- don't test my clinical knowledge here.  But it's
17   a -- it's a diagnostic module.  Some enhancements
18   to how you can map.

19       Q     And does Biosense launch new modules from
20   time to time?

21       A     Correct, yes.  Yeah.

22       Q     And modules can be added during the life
23   cycle of the mapping system at the hospital?

24       A     Yes, uh-huh.

25       Q     And sometimes Biosense charges an

Innovative Health, LLC v. Biosense Webster, Inc.                    July 8, 2021

Page 29

1          A     Uh-huh, yes.

2          Q     And that person can be someone from the

3     hospital or Biosense?

4          A     The person sitting behind the CARTO and

5     the workstation?

6          Q     Yes.

7          A     If there's a case going on, no.  I mean,

8     that's only the clinical -- for the most part only

9     a clinical person can map the case.

10         Q     So you're saying there has to be a

11    trained specialist on operating the CARTO --

12         A     Yes.

13         Q     -- at that workstation?

14               And that person can be supplied by the

15    hospital or Biosense as long as they have the

16    proper training?

17         A     Some of these clinicals that we hire come

18    from the hospital.  They are a lab tech and then

19    they join Biosense Webster.  So anybody can get

20    trained to do this if appropriate training is

21    conducted, yes.

22         Q     And do some hospitals employ their own

23    clinical person to run the CARTO 3?

24         A     I -- I don't believe there's that many of

25    them in the U.S.  I -- I know of Mayo Clinic being

July 8, 2021

Innovative Health, LLC v. Biosense Webster, Inc.

Page 33



Innovative Health, LLC v. Biosense Webster, Inc.

Page 34



July 8, 2021

Innovative Health, LLC v. Biosense Webster, Inc.



July 8, 2021

Innovative Health, LLC v. Biosense Webster, Inc.

Page 48



Innovative Health, LLC v. Biosense Webster, Inc.

                                                    Page 117

 1                C E R T I F I C A T E

 2           Deposition of: FAIRY ZARE

         Date of Deposition: JULY 8, 2021

 3

 4    STATE OF GEORGIA:

      COUNTY OF DEKALB:

 5

 6           I hereby certify that the foregoing

 7    transcript was stenographically recorded by me

 8    via Zoom as stated in the caption.  The deponent

 9    was duly sworn to tell the truth, the whole truth,

10    and nothing but the truth.  And the colloquies,

11    statements, questions and answers thereto were

12    reduced to typewriting under my direction and

13    supervision and the deposition is a true and

14    correct record, to the best of my ability, of

15    the testimony/evidence given by the deponent.

16           I further certify that I am not a

17    relative or employee or attorney or counsel to

18    any of the parties in the case, nor am I a

19    relative or employee of such attorney or counsel,

20    nor am I financially interested in the action.

21           This. the 12th day of July 2021.

22

23    _____

24    Judith L. Leitz Moran, CCR-B-2312

      Registered Professional Reporter

25

PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT 22

PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT 23

PROPOSED TO BE FILED UNDER SEAL

EXHIBIT 24