**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

KARLA KRAFT, State Bar No. 205530
kkraft@stradlinglaw.com
VICTORIA MCLAUGHLIN, State Bar No. 321861
vmclaughlin@stradlinglaw.com
STRADLING YOCCA CARLSON & RAUTH, P.C.
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660-6422
Telephone: (949) 725-4000
Facsimile: (949) 725-4100

KATHERINE B. FORREST (*pro hac vice*)
kforrest@cravath.com
LILLIAN S. GROSSBARD (*pro hac vice*)
lgrossbard@cravath.com
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019-7475
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
Attorneys for Defendant
BIOSENSE WEBSTER, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| INNOVATIVE HEALTH LLC,<br><br>      Plaintiff,<br><br>   vs.<br><br>BIOSENSE WEBSTER, INC.,<br><br>      Defendant. | Case No.: 8:19-cv-1984 JVS (KESx)<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANT BIOSENSE WEBSTER, INC.** |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES .................................................................................ii

Preliminary Statement ................................................................................. 1

I.     IH HAS NOT RAISED A TRIABLE ISSUE REGARDING ANY ANTITRUST MARKET ....................................................................... 7

       A.     IH Failed to Raise a Triable Issue with Regard to Any Catheter Market at Issue. ................................................................. 10

              i.     SoundStar .................................................................... 13

              ii.    Pentaray and Lasso ..................................................... 14

       B.     IH's Unsupported Claim of "Physician Preference" Lock-In Cannot Save its Market Definitions. ........................................ 15

II.    IH CANNOT SHOW THAT CLINICAL SUPPORT IS A DISTINCT PRODUCT IN A DIFFERENT MARKET FROM CATHETERS. .............. 17

III.   IH DOES NOT RAISE A GENUINE DISPUTE OF MATERIAL FACT WITH RESPECT TO BWI'S PROCOMPETITIVE JUSTIFICATIONS ........................................................................ 20

       A.     IH Did Not Raise A Genuine Dispute of Material Fact With Respect to BWI's Free Riding Justification. ............................. 21

       B.     IH Did Not Raise A Genuine Dispute of Material Fact With Respect to BWI's Quality and Safety Justification. ................... 22

       C.     IH Did Not Rebut BWI's Justifications With Evidence of Pretext to Sustain a Jury Verdict ............................................ 23

Conclusion .............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple, Inc. v. Psystar Corp.*,
   586 F. Supp. 2d 1190 (N.D. Cal. 2008) ............................................................... 5, 8

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ................................................................................................ 10

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ................................................................................... 4, 11, 18

*Chapman v. N.Y. State Div. for Youth*,
   546 F.3d 230 (2d Cir. 2008) .............................................................................. 12, 13

*Church & Dwight Co. v. Mayer Laboratories, Inc.*,
   868 F. Supp. 2d 876 (N.D. Cal. 2012) ........................................................... 13, 17

*Cnty. of Tuolomne v. Sonora Cmty. Hosp*,
   236 F.3d 1148 (9th Cir. 2001)............................................................................... 23

*Continental T.V, Inc. v. GTE Sylvania Inc.*,
   433 U.S. 36 (1977) ................................................................................................. 21

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
   504 U.S. 451 (1992) ........................................................................................passim

*Eastman v. Quest Diagnostics Inc.*,
   724 F. App'x 556 (9th Cir. 2018)......................................................................... 17

*FTC v. Advoc. Health Care Network*,
   841 F.3d 460 (7th Cir. 2016)................................................................................ 11

*Global Discount Travel Services, LLC v. Trans World Airlines, Inc.*,
   960 F. Supp. 701 (S.D.N.Y. 1997).................................................................... 16

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*,
   723 F.3d 1019 (9th Cir. 2013)............................................................................. 22

ii

*Green Country Food Market, Inc. v. Bottling Group*,

    371 F.3d 1275 (10th Cir. 2004)......................................................................15

*HDC Medical, Inc. v. Minntech Corp.*,

    474 F.3d 543 (8th Cir. 2007) ........................................................................23

*Hicks v. PGA Tour, Inc.*,

    897 F.3d 1109 (9th Cir. 2018)......................................................................12

*In re Air Passenger Comp. Res. Sys. Antitrust Lit.*,

    694 F. Supp. 1443 (C.D. Cal. 1988)...............................................................4

*In re Super Premium Ice Cream Distrib. Antitrust Litig.*,

    691 F. Supp. 1262 (N.D. Cal. 1988), *aff'd sub nom. Haagen-Dazs*

    *Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417

    (9th Cir. 1990) ...............................................................................................22

*Ireland v. Bend Neurological Assoc. LLC*,

    2021 WL 1229937 (D. Or. March 31, 2021) ...................................................23

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,

    466 U.S. 2 (1984) ..........................................................................................17

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,

    588 F.3d 908 (6th Cir. 2009) ........................................................................14

*Monsanto Co. v. Spray-Rite Serv. Corp.*,

    465 U.S. 752 (1984) ......................................................................................21

*Newcal Indus., Inc. v. Ikon Office Sol.*,

    513 F.3d 1038 (9th Cir. 2008)................................................................passim

*O.S.C. Corp. v. Apple Comput. Inc.*,

    792 F.2d 1464 (9th Cir. 1986) ......................................................................22

*Rebel Oil Co. v. Atl. Richfield Co.*,

    51 F.3d 1421 (9th Cir. 1995) ........................................................................10

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,

    778 F.3d 775 (9th Cir. 2015) ........................................................................16

TABLE OF AUTHORITIES

*Sidibe v. Sutter Health*,

   No. 12 cv-04854-LB, 2019 WL 2078788 (N.D. Cal. May 9, 2019)................11

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,

   188 F.3d 11 (1st Cir. 1999) .................................................................16

*Sumotext Corp. v. Zoove, Inc.*,

   No. 16-cv-01370-BLF, 2020 WL 6544410 (N.D. Cal. Nov. 6,

   2020), *aff'd*, 2021 WL 4988024 (9th Cir. Oct. 27, 2021)................................13

*Teradata Corp. v. SAP SE*,

   No. 18-cv-03670-WHO, 2021 WL 5178828 (N.D. Cal. Nov. 8,

   2021)...........................................................................................11

*Theme Promotions v. News Am. Mktg. FSI*,

   546 F.3d 991 (9th Cir. 2008)..............................................................11

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,

   676 F.2d 1291 (9th Cir. 1982)............................................................17

*United States v. Oracle Corp.*,

   331 F. Supp. 2d 1098 (N.D. Cal. 2004) .................................11, 15, 16

**Statutes & Rules**

Sherman Act .......................................................................................18

iv

TABLE OF AUTHORITIES

# **PRELIMINARY STATEMENT**

The antitrust laws are not intended to provide business advantages to competitors, nor is their enforcement intended to lead to increased prices for consumers, decreased quality or the elimination of a product offering. Yet, if IH's[1] theories set forth in its Opposition to Biosense's Motion for Summary Judgment (Dkt. 130-1) (the "Opposition") were to carry the day, that would be the outcome. No antitrust case has ever provided for the result IH seeks here.

The clarity of IH's positions in this regard is revealed in its basic theory of the case: IH believes that it suffers a competitive disadvantage because BWI provides a popular, free case coverage service to hospitals and IH does not want to incur costs that would increase its prices in order to compete with that level of service for its products. IH's theory must be viewed against the undisputed factual backdrop that its Opposition does not address:

- IH's CFO conceded IH has the financial resources to provide its own case coverage service (Response to Plaintiff Innovative Health LLC's Statement of Genuine Disputes in Support of Motion for Summary Judgment by Defendant Biosense Webster, Inc. ("RSUF") ¶ 163);

- Marketing materials IH provided to customers informed them that IH could provide case coverage (*id.* ¶¶ 153, 164);

- IH has a consultant on staff who can and does support CARTO 3 procedures and trains others to do the same (*id.* ¶¶ 149, 154, 156, 158); and

- Far from being foreclosed from market opportunities with regard to catheters, IH's business has grown over the past several years, consistent ███████████████████ (Declaration of Lillian S. Grossbard in Support of Defendant Biosense Webster, Inc.'s Motion for Summary Judgment (Dkt. 114-1) ("Grossbard

---

[1] The terms and abbreviations in this Reply have the same meaning as defined in the Memorandum in Support of Defendant's Motion for Summary Judgment (Dkt. 114) (the "Motion"), except where otherwise noted.

1

Decl."), Ex. 98, Ferreira Dep. 38:9-21; Grossbard Decl., Ex. 96,
Einwechter Dep. 40:20-43:6).

IH's claims are premised on the legally incorrect proposition that BWI's free
offering, that hospitals can take or not as they deem appropriate (and that the
undisputed evidence shows some do, and others do not, take), is anticompetitive.
Let there be no mistake about the remedy that IH wants this Court to impose:
increased prices and decreased offerings for hospitals. This is a world turned
upside down premised on a misreading of antitrust jurisprudence. A few examples
of IH's argument make its position plain:

- IH agrees that BWI incurs many millions of dollars in costs to provide
  clinical support, citing BWI's Statement of Undisputed Facts, then
  asserts as a fact in their favor that "Biosense provides CARTO 3 clinical
  support at will to hospitals for a nominal price of zero". Opp'n at 12.

- IH then asserts that hospitals paid for separate clinical support in the past
  and would be willing to do so again, if only "Biosense did not provide it
  for free." *Id.* at 26.

- IH asserts that it would be preferable for "Biosense to structure its prices
  for clinical support to reflect its investment costs in that area". *Id.* at 29.
  In other words, BWI should charge customers for something they
  currently receive for free; IH seeks a price increase to customers.

Why does IH want BWI to charge for that which it now provides for free? It
does so in the pursuit of an order from this Court that would judicially require BWI
to allow free riding on the service offering its personnel provide. The strange logic
is parsed as follows: once BWI charges for its service, a second judicial
requirement could be imposed that would require BWI to provide such services to
any purchaser of any of BWI's CARTO 3 machines, irrespective of which
*manufacturers' catheters* are being used in a procedure.[2] In other words, BWI

---

[2] It is undisputed that the FDA deems reprocessed catheters to be manufactured
by the reprocessor, rendering IH's catheters as *manufactured by IH*. RSUF ¶ 29.

2

would lose the ability to determine with whom and under what conditions it chooses to provide its own personnel to support a procedure. To be sure, IH would likely accept a court order that allows BWI to continue to provide the service for free, so long as it must provide it for free to IH customers. Either way, IH asks for a judicial requirement compelling BWI to hire, train and deploy BWI employees to support its competitors' sales. There is no antitrust case one could find supportive of such a proposition, and IH has proffered none, as it would contravene the foundational principle that the antitrust laws protect competition and not competitors. But the Opposition reveals a number of other points key to this Court's resolution of this motion.

As an initial matter, BWI moved for summary judgment on all claims. The Opposition is only directed at its tying claims: IH's Third, Fifth, Ninth and Eleventh Causes of Action.[3] Any argument raised by IH related to its monopolization and attempted monopolization claims occurs indirectly and only because certain points IH makes (with regard market definition, for instance) might be applicable to those claims as well. But any reading of the brief indicates that it is consumed with tying and tying alone. As such, IH does not contest dismissal of its remaining Section 2 claims.[4]

In order for IH to defeat summary judgment on any claim, it must persuade this Court its proposed single-brand markets exist. This requires IH to demonstrate a triable issue of fact with regard to whether any of the following proffered antitrust markets exist: (1) SoundStar catheters as a standalone market, (2) Pentaray catheters as a standalone market, (3) Lasso catheters as a standalone

---

[3] While IH never states this explicitly, from the first sentence of its Opposition to the last sentence, and virtually every lead paragraph in between, IH references only the tying claims.

[4] The remaining counts are IH's First, Second, Seventh and Eighth Causes of Action.

REPLY MEM. OF POINTS AND AUTHORITIES
Case No.: 8:19-cv-1984 JVS (KESx)

market and (4) CARTO 3 clinical support as a separate product. The Opposition confuses the appropriate standard for well-defined antitrust markets. As a general matter under the antitrust laws, product markets are defined with reference to *competing* products, *i.e.*, products that are interchangeable. *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962). This does not mean that the products cannot be differentiated in some way – and, indeed, product differentiation rests at the heart of the American competitive process. *See, e.g.*, *In re Air Passenger Comp. Res. Sys. Antitrust Lit.*, 694 F. Supp. 1443, 1457 (C.D. Cal. 1988) ("[P]roducers engage in product differentiation *because* they are involved in a highly competitive market and are merely attempting to compete with other brands. Product differentiation is a public good created by competitive markets").

In certain rare instances, outlined by the Supreme Court in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), or the Ninth Circuit in *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038 (9th Cir. 2008), an antitrust market may be limited to a manufacturer's single-brand. Mot. at 11-12. Here, that would be the CARTO 3 mapping system (the primary market or foremarket), or products defined solely with reference to it (the secondary market or aftermarkets). In other words, in a *Kodak*-type case, there is always some durable product with which other products are used. In *Kodak*, those products were the printer (the foremarket) and the parts and service for repairing the printer (two aftermarkets). While courts have recognized, in exceedingly rare circumstances in which the competitive conditions align, that a single-brand product market may exist, IH has not met this standard here: none of the factors present in *Kodak* (*i.e.*, switching costs, information costs and anticompetitive conduct taking advantage of lock-in)

REPLY MEM. OF POINTS AND AUTHORITIES

Case No.: 8:19-cv-1984 JVS (KESx)

are present here.[5] Among the evidence that IH ignored in its Opposition was the following:

- BWI is one of at least seven competitors currently manufacturing and selling cardiac mapping systems, all of which can be used to build cardiac maps to aid physicians in electrophysiology ("EP") procedures; these competitors include Abbott, Boston Scientific, Medtronic, Phillips, APN, CardioNXT and Acutus (Mot. at 5-6; RSUF ¶¶ 44-46, 49, 52; 92);

- All market participants believe that CARTO 3 competes with other cardiac mapping systems, and believe that the catheters at issue in this case compete with catheters made by other mapping system manufacturers (Mot. at 6-7; RSUF ¶¶ 57-88);

- IH admits that the catheters at issue here—the SoundStar, Lasso and Pentaray catheters—compete with catheters manufactured by Abbott, Boston Scientific and Acutus (Mot. at 7; SUF ¶¶ 58-68);

- ████████ of BWI's customers have more than one mapping system on site (Mot. at 6; RSUF ¶¶ 90, 93-96);

- IH's own witnesses testified that many hospitals have cardiac mapping systems from more than one manufacturer (RSUF ¶ 96);

- Manufacturers compete aggressively for system placement in hospitals, and customers can acquire cardiac mapping systems with little or no capital outlay (Mot. at 6; RSUF ¶¶ 100-104);

- IH admits that hospitals can acquire cardiac mapping systems at a very low cost (Mot. at 16; RSUF ¶ 99);

- Hospitals are sophisticated purchasers that consider and project the cost of disposable products used in EP procedures to inform system-purchase decisions (Mot. at 6; RSUF ¶¶ 114-121);

- IH commenced selling catheters *after* BWI had implemented its case coverage policy (Mot. at 7, 10; *compare* RSUF ¶ 11 *with* RSUF ¶¶ 171-173);

---

[5] The law is clear that "[s]ingle-brand markets are, at a minimum, extremely rare." *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008).

5

- IH has competed on the basis that it offers clinical support for the CARTO 3 and has in fact provided a mapping technician to support CARTO 3 procedures (Mot. at 9; RSUF ¶¶ 153-156, 158-162, 164); and

- Hospitals can provide their own clinical support if they choose to invest in training their own staff (Mot. at 9; RSUF ¶¶ 148, 158-160).

To avoid confronting the ample record evidence leaving no triable issue as to IH's market definition with respect to any of its alleged products (thus defeating all remaining antitrust claims)[6], IH refers repeatedly to its economic expert, Dr. Forister. Dr. Forister has notably never before testified in federal court on market definition, nor has he in such a case ever offered an opinion on a single-brand product market or performed the core test on which he relies to support his market definition (the "SSNIP test"). *See* Declaration of Lillian S. Grossbard in Support of Defendant Biosense Webster, Inc.'s Reply Memorandum in Support of its Motion for Summary Judgment ("Grossbard Reply Decl."), Ex. 1, Forister Dep. 19:7-19, 228:10-18. As set forth below, Dr. Forister's purported "SSNIP" test is not a true SSNIP test at all, and it does not address the right questions. Even apart from this, the law is clear that an expert's paid-for statements cannot defeat summary judgment in the face of significant contrary evidence.

IH also has not identified *any* evidence to demonstrate that clinical support—which all manufacturers offer at no charge, no third party has ever offered as a separate service, and for which there is no evidence hospitals want to purchase as a separate service—is a distinct product competing in a separate market from the products supported, as required to prove its tying claim.

Additionally, even if IH could raise a triable issue of fact as to market definition, it fails to raise a triable issue of fact as to the legitimacy of BWI's

---

[6] Each and every one of IH's antitrust claims requires that a product market be defined; each relies on a single-brand product market. Failing to raise a triable issue on market definition is therefore fatal to all claims. *See* Mot. at n.6.

REPLY MEM. OF POINTS AND AUTHORITIES

Case No.: 8:19-cv-1984 JVS (KESx)

procompetitive justifications for the clinical support policy. IH cites a handful of documents it claims demonstrate the clinical support policy is pretextual. But its arguments are incorrect. The record evidence as to which there is no triable issue is that the case coverage policy was designed for two plainly procompetitive reasons: to prevent free riding that is inimical to the competitive processes the antitrust laws are designed to protect, and quality and safety concerns where BWI personnel are creating cardiac maps for critical EP procedures.

But IH's true position, that it seeks the assistance of this Court to compel a self-serving competitive advantage, is evident from its discussion of less restrictive alternatives. IH goes so far as to suggest that a less restrictive alternative to avoid free riding is that BWI eliminate its "free" service, and instead impose a charge on hospitals for clinical support. This would raise costs to consumers, but even the playing field for IH which has chosen not to offer a similar service for free.

## ARGUMENT

## I.     <u>IH HAS NOT RAISED A TRIABLE ISSUE REGARDING ANY ANTITRUST MARKET.</u>

IH has alleged single-brand product markets at the aftermarket level. This is a classic *Kodak* and *Newcal* set up: under certain conditions, if a consumer purchases a durable product in the foremarket, the accessories or services in the aftermarket can constitute single-brand product markets associated with that foremarket. Mot. at 11-12, 11 n.7. These kinds of markets are exceedingly rare. *Id.* at 12. Competition at the foremarket level – here, the cardiac mapping system – goes a long way toward defeating a claim of a standalone catheter market. Assuming IH could raise a triable issue as to this first step, it nonetheless fails at the second: IH must raise a triable issue as to whether consumers (here, hospitals that purchase cardiac mapping systems), are locked into their foremarket purchase, and that competition in the foremarket cannot discipline competition in the

REPLY MEM. OF POINTS AND AUTHORITIES
Case No.: 8:19-cv-1984 JVS (KESx)

1   aftermarket.[7]

2       Thus, before this Court even needs to address the arguments of IH's

3   standalone catheter markets, it should first determine whether IH raised a triable

4   issue with regard to the required conditions in the foremarket. It has not. Having

5   failed to do so, IH's markets that are absolutely dependent on an acceptance of

6   foremarket lock-in and an accompanying lack of switching opportunity must fail.[8]

7       The evidence BWI proffered in the Motion demonstrates that there is

8   foremarket competition: BWI is one of at least seven competitors in mapping

9   systems, all market participants believe these mapping machines compete,

10  including IH's own executives; the mapping machines perform similar cardiac

11  procedures; █████████ of all hospitals have more than one mapping machine;

12  hospitals can and do switch between them; hospitals can acquire these systems

13  with little to no capital outlay. *See* RSUF ¶¶ 44-46, 49, 52, 57-88, 90, 92-96, 99,

14  100-111. IH ignored these facts. Thus, at the starting line, IH does not meet the

15  foremarket requirements to get to single brand aftermarkets. *See, e.g., Apple, Inc.*

16  *v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1197 (N.D. Cal. 2008) ("*Kodak* found that

17  single brand aftermarkets—markets for parts and service for Kodak equipment—

18  arose once customers have purchased and are 'locked in' to Kodak photocopiers or

19  equipment [the foremarket products]").

20

21

22  ───────────────

23      [7] IH incorrectly claims that *Kodak* failed to set forth standards that determine whether a plaintiff has proven single-product aftermarkets, Opp'n 23, ignoring the

24  numerous cases BWI cites. Mot. at 12-15. The law is clear that viable aftermarkets require evidence that foremarket competition does not "suffice to discipline

25  anticompetitive practices in the aftermarket". *Newcal*, 513 F.3d at 1050.
        [8] IH tries to walk back its reliance on single-brand product markets, stating it

26  has not alleged such markets at all because "Stryker[] and Innovative provide the catheters at issue" too. Opp'n at 22. This is an incorrect understanding of what a

27  single-brand product market *is*. CARTO 3 is the defining characteristic of what IH

28  has alleged creates the single product limitation cabining each of its markets.

REPLY MEM. OF POINTS AND AUTHORITIES
Case No.: 8:19-cv-1984 JVS (KESx)

The next question, as to which there is also a dispositive answer in the negative, is whether IH raised a triable issue as to whether consumers are locked-in once they have made a choice at the foremarket level. *Kodak* and *Newcal* also require that IH raise a triable issue as to this point. Mot. at 11-19. The answer is a resounding no. First, as stated above, IH has not contested the record evidence that ███████████ of all hospitals have competing machines on site, and that those that want another competing machine can and do acquire it with little to no capital outlay. RSUF ¶¶ 90, 94, 98-104. Both of these uncontested facts show a clear opportunity of hospitals to switch between machines in the foremarket, preventing lock-in. Second, methods of lock-in recognized in *Kodak* and *Newcal* also include a policy change that consumers were unaware of at the time of purchasing the durable good in the foremarket or lack of lifecycle information that prevents them from understanding the true cost implications of their purchase. The uncontradicted evidence is that neither is present here.

As stated in BWI's opening memorandum, the policy relating to case coverage was imposed before IH even began selling catheters; BWI continued to sell machines and others continued to sell machines since that policy was imposed; new entrants even entered since that time. *See* RSUF ¶¶ 11, 52, 123-124, 171-173. IH has not pointed to a single hospital that was misled into a purchase and then surprised with a policy change. IH and some hospitals may not like BWI's case coverage policy, but no one has been surprised by it. In terms of lifecycle costs, IH did not proffer a single fact that suggests that customers cannot predict what their costs will be when purchasing a CARTO 3. In its opening memorandum, BWI proffered a series of facts that demonstrate the opposite: hospitals are sophisticated purchasers that price out what they are getting into at the outset of a capital outlay. RSUF ¶¶ 114-121. The lack of foremarket lock-in defeats any claim of aftermarket single-brand product markets. Mot. at 14.

REPLY MEM. OF POINTS AND AUTHORITIES

Case No.: 8:19-cv-1984 JVS (KESx)

IH tries to reverse the appropriate legal inquiry to support its alleged antitrust markets by starting with the aftermarket products. In this regard, it proffers its expert Dr. Forister's SSNIP test and related opinions on physician preference. This order of analysis is incorrect and avoids the threshold question on the foremarket discussed above. But even if this Court were to proceed to analyze whether there is a triable issue with regard to standalone catheter aftermarkets, the answer is still "no". IH did not adduce facts that raise a triable issue. Instead, it proffered an expert whose opinions and theories contradict the evidentiary record. This is insufficient to raise a triable issue. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict. . . . Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them."); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435-36 (9th Cir. 1995) ("In the context of antitrust law, if there are undisputed facts about the structure of the market that render the inference economically unreasonable, the expert opinion is insufficient to support a jury verdict."). In addition, the analysis performed by IH's expert, Dr. Forister, is fatally flawed and could never form the basis for a triable issue, as explained *infra*.

### A.    IH Failed to Raise a Triable Issue with Regard to Any Catheter Market at Issue.

IH and its expert make the same mistake with regard to the three catheter product markets at issue. First, by ignoring foremarket competition, IH and its expert avoid confronting the market reality that if hospitals choose, they can switch. *See* RSUF ¶¶ 105-111. The primary argument IH raises against this is that "physician preference" precludes switching; this is a red herring that we discuss separately below. Second, for each of the three catheters, Dr. Forister purports to present a SSNIP test showing that prices have either increased or remained flat but

1  consumers have not switched. According to Dr. Forister, this raises a triable issue

2  as to whether the catheter being examined is a standalone market. Because the

3  SSNIP test is fatally flawed, it cannot raise a triable issue.

4      Under the antitrust laws, competition between products depends on product

5  substitutability. *Newcal*, 513 F.3d at 1045 (quoting *Brown Shoe v. United States*,

6  370 U.S. 294, 325 (1962)). The classic question in defining an antitrust product

7  market is whether when the price goes up for one product by a certain level,

8  consumers can switch to another product. If they can, then that is one way of

9  showing switching and therefore substitutability. The corollary of this is that a lack

10 of ability to switch may evidence a lack of consumer substitutability, suggesting

11 the outer bounds of a market. The term used for one kind of price-based

12 substitutability analysis is a "SSNIP test" – SSNIP stands for "small but significant

13 and non-transitory price increase." *Theme Promotions v. News Am. Mktg. FSI*, 546

14 F.3d 991, 1002 (9th Cir. 2008) (citing *United States v. Oracle Corp.*, 331 F. Supp.

15 2d 1098, 1112 (N.D. Cal. 2004)). A SSNIP test therefore involves "an iterative

16 analysis" in which one "proposes a candidate market, simulates a monopolization

17 of that market, then adjusts the candidate market and reruns the simulation as

18 necessary". *Sidibe v. Sutter Health*, No. 12 cv-04854-LB, 2019 WL 2078788, at

19 *27 n.204 (N.D. Cal. May 9, 2019) (quoting *FTC v. Advoc. Health Care Network*,

20 841 F.3d 460, 473 (7th Cir. 2016)). A similar economic analysis used to determine

21 the relevant market by gauging cross elasticity of demand "measures the

22 percentage change in quantity that consumers will demand of one product in

23 response to a percentage change in the price of another". *Theme Promotions*, 546

24 F.3d at 1002.

25     At a basic level, the so-called SSNIP test Dr. Forister proffers fails at the

26 starting gate. To ask the proper question (does x product compete with y product?),

27 there necessarily must be two products facing off against one another. That is the

28 iterative process described above. Dr. Forister does not do this. His SSNIP test

REPLY MEM. OF POINTS AND AUTHORITIES

Case No.: 8:19-cv-1984 JVS (KESx)

looks only at pricing of the same type of catheter (the Lasso, Pentaray or SoundStar). Dr. Forister's SSNIP test also does not examine consumer responses to any price increases. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████. No SSNIP test looks at pricing by multiple manufacturers – to do so defeats the SSNIP assumption that one is testing whether a monopolist can raise prices without offsetting substitutability. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████ This fails to satisfy the basic requirement that a SSNIP analysis consider customer response to an *increase in price*. But more than that, for accessory aftermarket products, it is only logical that the question be asked: does a price increase in the aftermarket cause a hospital to switch machines used – that is, the impact that the potential for foremarket switching can have as a result of aftermarket price increases. Dr. Forister never conducts such an analysis.[9]

Dr. Forister's analysis of price-elasticity also does not evaluate switching, but simply calculates BWI's own price-elasticity of demand based on BWI's profit margins without ever evaluating cross-price elasticity across catheters or what the price elasticities imply about substitutability. None of his analyses can support IH's market definitions. *See, e.g.*, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1123 (9th Cir. 2018) (affirming dismissal of antitrust claims because plaintiffs' alleged submarkets "omit many economic substitutes", were "not natural", "artificial" and "contorted to meet their litigation needs"); *Chapman v. N.Y. State Div. for Youth*,

---

[9] IH claims that Dr. Forister "considered the possibility of substitution to other products and providers in his analysis". Opp'n at 23. But none of the paragraphs of the expert report that IH cites—Forister Report ¶¶ 124, 125, 130, 135, 138 and Forister Rebuttal Report ¶¶ 75.a and 78.e—include any such analysis.

REPLY MEM. OF POINTS AND AUTHORITIES

546 F.3d 230, 238 (2d Cir. 2008) (explaining that a viable market definition analysis must consider cross elasticity of demand and concluding that "plaintiffs' proposed relevant market does not encompass all interchangeable substitute products"); *Teradata Corp. v. SAP SE*, No. 18-cv-03670-WHO, 2021 WL 5178828, at *18 (N.D. Cal. Nov. 8, 2021) (explaining that when the expert's chosen "data does not measure customer responses to changes in price", it "cannot measure the most fundamental principle in defining a market: cross-elasticity of demand"); *Church & Dwight Co. v. Mayer Laboratories, Inc.*, 868 F. Supp. 2d 876, 891, 895-96 (N.D. Cal. 2012) (describing SSNIP and cross elasticity of demand and rejecting expert's market definition analysis for failure to consider "whether manufacturers compete with each other across the[] [relevant] segments"); *Sumotext Corp. v. Zoove*, *Inc.*, No. 16-cv-01370-BLF, 2020 WL 6544410, at *7 (N.D. Cal. Nov. 6, 2020) ("Instead of a SSNIP test, [the expert] performed something he called a 'natural SSNIP test' by comparing, over time, prices of" various products, while excluding potential substitute products from the analysis), *aff'd*, 2021 WL 4988024 (9th Cir. Oct. 27, 2021).

Instead of performing an analysis consistent with accepted methods, Dr. Forister argues that "actual experience" demonstrates that BWI profitably imposed a SSNIP in the alleged markets. ████████████████████

████████████████████████████████████████████

████    Neither of these views take into consideration whether customers would switch to comparable catheters used with other cardiac mapping systems in reaction to a price increase.

### i.    SoundStar

Dr. Forister's opinion that there is a single-product aftermarket for the SoundStar catheter is based solely on his deficient SSNIP test. ████████████

████████████████████████████████████

████████████████████████████████████

REPLY MEM. OF POINTS AND AUTHORITIES

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 ████████████████████████████████████████████

7 ████████████████████████████████████████████████████

8 ████████████████████████████████████████████

9 ██████████████████████████████████████████

10 ████████████████████████████████████████████

11 ██████████████████████████████████████████████

12 ████████████████████████████████ *See Ky. Speedway, LLC v. Nat'l Ass'n*

13 *of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009) (affirming

14 summary judgment when district court concluded that expert "did not perform the

15 standard SSNIP test", but rather the expert's "own version" of the test).

16       **ii.    Pentaray and Lasso**

17       Dr. Forister's opinion that there are single-product aftermarkets for the

18 Pentaray and Lasso catheters is deficient for similar reasons. ████████████████

19 ████████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████. That is to say, Dr. Forister did not

22 evaluate any kind of price increase in either of these markets, much less perform

23 the type of price-increase analysis that would qualify as a SSNIP test. *See*

24 Grossbard Reply Decl., Ex. 1, Forister Dep. 226:7-227:10. Moreover, because he

25 asserts that Pentaray and Lasso stand alone as self-contained product markets

26 without examining any price increase, *see id.*, Dr. Forister does not even consider

27

28

14

whether consumers have switched or would switch to using other machines with which they could use potential substitutes in response to any price increase.

## B.    IH's Unsupported Claim of "Physician Preference" Lock-In Cannot Save its Market Definitions.

According to IH, the silver bullet that eliminates BWI's ability to point to competition in the foremarket (for mapping machines, and the ability to switch between machines) is physician choice. In other words, if physician preference for the CARTO 3 is strong, a physician in a hospital that has multiple machines may just refuse to switch to another. Put in antitrust terms, IH is asserting that physician preference creates lock-in that prevents real switching. There are numerous problems with this position. First and foremost, it misunderstands antitrust lock-in.

Antitrust lock-in that prevents or impedes switching is defined in the cases as an act *by the monopolist* that prevents consumers who have been lured into purchasing a good to switch. In *Kodak* and *Newcal*, examples of this occurred when (1) the alleged monopolist seller made a policy change that was implemented after purchase, locking the door behind consumers in an unexpected way, or (2) consumers were deprived of sufficient information by the alleged monopolist to predict the lifecycle costs of the product. *Kodak*, 504 U.S. at 458, 473-74, 476-77; *Newcal*, 513 F.3d at 1050. That a consumer may really, really like a product (for instance, he or she only drinks Tropicana orange juice) is not lock-in, it is consumer preference (based on personal choice of the consumer). Consumer preference is something that manufacturers strive for – it is not anticompetitive lock-in. The antitrust laws do not, as IH would suggest, penalize the manufacturer for brand loyalty. *See, e.g.*, *Green Country Food Market, Inc. v. Bottling Group*, 371 F.3d 1275, 1282 (10th Cir. 2004) ("Even where brand loyalty is intense, courts reject the argument that a single branded product constitutes a relevant market"); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1131 (N.D. Cal. 2004 ("[c]ustomer preferences towards one product over another do not negate

interchangeability"); *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 23 (1st Cir. 1999) (finding that there will always be customers whose preferences align them with one manufacturer, but "this kind of preference does not translate into the kind of economic power that antitrust law aims to mitigate"); *see also Global Discount Travel Services, LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (rejecting single-brand market allegations where customers were only "locked into" buying product because of consumer preference). When customer preference "for the functional features of [the] . . . products [i]s evident", "the issue is not what solutions the customers would *like* or *prefer* . . . the issue is what they *could* do in the event of an anticompetitive price increase". *Oracle Corp.*, 331 F. Supp. 2d at 1131.[10]

Finally, IH contends, citing *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775 (9th Cir. 2015), that hospitals do not switch because of a purported "principal-agent problem", Opp'n at 18, but *Saint Alphonsus* is inapposite. There, the Ninth Circuit explained that the two-stage model of competition for primary care physician ("PCP") providers involves PCPs first competing for inclusion in insurance plans, and then competing to attract patients enrolled in those plans. *Saint Alphonsus*, 778 F.3d at 784-85 & n.10. Because insurers in the first stage are the direct purchasers of most health care, and competition for patients in the second stage primarily takes place over non-price factors, the Ninth Circuit found that the district court properly focused on insurers' likely response to a price increase, *i.e.*, competition in the first stage where price competition exists. *Id.* Here, by contrast, EP product manufacturers sell to hospitals, and hospitals—not insurance plans or patients—are the direct payors; thus, the hospitals are the relevant consumers, "and it is their views as to the

---

[10] Moreover, by IH's logic, all EP manufacturers' products would constitute their own separate product markets because, according to IH, "[t]here is strong physician preference on electrophysiology products". Opp'n at 18.

16

substitutability and interchangeability of products that matter". *Church & Dwight Co. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 892 (N.D. Cal. 2012) (holding that "the relevant 'consumers' are the *retailers* who buy and stock the manufacturers' products"). As such, the analysis here properly focuses on hospitals' reactions to a hypothetical price increase, which hospitals would register as direct purchasers. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1297-1300 (9th Cir. 1982) (concluding that, for market definition purposes, the focus is on the level at which the parties compete).

## II. IH CANNOT SHOW THAT CLINICAL SUPPORT IS A DISTINCT PRODUCT IN A DIFFERENT MARKET FROM CATHETERS.

In order to prevail on its tying claim, IH must raise a triable issue that clinical support is a separate market. IH failed to do so.

First, IH misstates the relevant legal standard, asserting that the test is "whether there would be *separate markets for the tied products – i.e.*, the sensor enabled catheters – if they were not tied to the clinical support". Opp'n at 25 (emphasis added). That is confusing and wrong. The law requires that IH raise a triable issue as to whether "there exist two distinct products or services in different markets"—catheters and CARTO 3 clinical support—"whose sales are tied together". *Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 560 (9th Cir. 2018). The relevant test boils down to whether separate demand for each of the two alleged products exists. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). Thus the purported "evidence" of a separate market IH cites— that BWI and other manufacturers sell catheters to customers regardless of whether the customer takes advantage of their free clinical support service, Opp'n at 25— does not address the relevant test at all.

The evidentiary record is clear that clinical support is a value-added service that hospitals may or may not take, some do and some don't. There can be no

17

absolute tie when the record shows that the alleged tying product that is claimed to be so powerful is ignored by segments of the market. In addition, there is no contractual requirement that any purchaser of the tied product (the catheter) take the tying product; and there is not a price that the purchaser can pay to separately buy the product, or discount that they get if they do not. *See* Mot. at 20-21. IH has also not identified any evidence that BWI or any manufacturer has ever sold clinical support; nor has IH proffered evidence that hospitals have ever sought to purchase clinical support separately from BWI.[11] There is no doubt that IH wants clinical support to be required to be a separate product, offered for a price, but BWI need not make a product out of a service offering that it chooses to provide for free. Mandating that BWI separate clinical support from its catheter product offering, removing a point of competitive differentiation, and then charging customers for what they previously received for free, would be *anti*competitive and not a result supported by the antitrust laws. *See Brown Shoe*, 370 U.S. at 344 (explaining that the Sherman Act protects "competition, not competitors"). Likewise, IH's claim that "many customers would purchase the catheters at issue from other firms when given a choice by Biosense", Opp'n at 25, merely points to evidence that some customers would prefer to purchase lower-cost catheters from IH and still enjoy BWI's high-value clinical support for free. *See* Mot. at 21.

IH's other arguments regarding a separate clinical support market also fail. IH argues that BWI's investment of time and resources training a skilled team of CAS somehow renders clinical support a separate product. Opp'n at 24-25. But BWI's investment in a value-added service for its products and its employees' knowledge of CARTO 3 does not raise a triable issue with regard to the legal test for separateness. IH incorrectly claims that the Court "already held" that evidence

---

[11] As set forth in BWI's Motion, all manufacturers—including IH—offer clinical support only in combination with their own products. Mot. at 20-21.

18

of BWI's investments in clinical support and the purported industry recognition of clinical support as a specialty (a "fact" for which IH provides no citation to the record evidence), "demonstrates the existence of a market for CARTO 3 Clinical Support". Opp'n at 25 (citing Dkt. 73 at 10). However, the Court's decision with regard to tying was based on allegations IH added to its complaint that the evidentiary record now shows to be incorrect, and also clearly stated it was an assessment "at the pleading stage", explicitly leaving open the question of what would occur at summary judgment. Dkt. 73 at 10.

IH's reliance on *Kodak* as a purportedly analogous case, Opp'n at 25, is likewise misplaced. In *Kodak*, plaintiffs could point to evidence—absent here— that the defendant had actually sold, and continued to sell, the tying product. 504 U.S. at 462 (emphasizing that Kodak parts (the alleged tying product) had "been sold separately in the past and still [were] sold separately to self-service equipment owners"). Here, however, no manufacturer sells or has ever sold clinical support for EP procedures (the alleged tying product). The fact that BWI has sold and still sells *catheters* to self-supporting hospitals, Opp'n at 25, is likewise irrelevant to the question of demand to purchase *clinical support* separately. The Court in *Kodak* did not cite self-supporting customers as evidence of the existence of a separate service market as IH tries to do here, but instead cited "the development of the entire high-technology service industry" as evidence of that market. *Id.*

Indeed, IH's emphasis on self-supporting hospitals highlights the internal inconsistencies in IH's theory of liability. IH's claim that hospitals have, can and do self-support is entirely inconsistent with its argument that BWI has market power in the purported market for CARTO 3 clinical support, which IH must also prove to succeed on its tying claims. In finding IH adequately pled market power, the Court relied on IH's allegations that only BWI could feasibly provide clinical support, Dkt. 73 at 13-14; CSAC ¶ 8, but IH now claims in its opposition brief that hospitals "would *all be willing to pay for and provide their own clinical support . .*

1  . if Biosense did not provide it for free", Opp'n at 26 (emphasis added). Thus, the

2  issue it turns out is *not* that only BWI can provide support as IH originally alleged

3  but now disclaims, but that BWI provides support at no charge. [12] Additionally, IH

4  ignores the record evidence demonstrating that IH marketed itself as having

5  CARTO 3 case support, actually supported CARTO 3 cases, and its executives

6  acknowledge they could provide full clinical support but choose not to because

7  they do not want to incur the expense. RSUF ¶¶ 151-156, 158-164, 166. All of

8  these market realities are fatal to IH's tying claim.

9      Finally, Dr. Forister's purported "SSNIP" test to show a separate clinical

10  support market also fails. How he can perform a SSNIP test when there is no price

11  associated with clinical support, let alone any increase, is its own mystery. He

12  purports to address this by citing irrelevant facts: that "case support is necessary"

13  and that while BWI offers clinical support for free, it confers "benefits" on BWI.

14  Based on hospitals' appetite for case support provided by BWI, Dr. Forister

15  reaches the conclusion that a hypothetical monopolist could impose a price

16  increase – and that it therefore meets a SSNIP test's requirements for market

17  boundary. *See* Opp'n at 21-22. Dr. Forister simply has not performed a

18  recognizable SSNIP test or cross elasticity of demand analysis for case support –

19  and he ignored the market substitutes that the record demonstrates exist.

20  **III.  IH DOES NOT RAISE A GENUINE DISPUTE OF MATERIAL FACT
21        WITH RESPECT TO BWI'S PROCOMPETITIVE
       JUSTIFICATIONS.**

22

23      BWI raised two primary procompetitive justifications for its clinical support

24  policy: the prevention of free riding and ensuring its representatives use devices

25  _____

26  [12]



27

28

REPLY MEM. OF POINTS AND AUTHORITIES

Case No.: 8:19-cv-1984 JVS (KESx)

that meet BWI's quality and safety standards. Mot. at 21-30. IH argues that BWI's procompetitive justifications are not permitted as a matter of law, are pretextual or could be addressed with a less restrictive alternative. IH is wrong and failed to raise a triable issue of fact as to either justification.

### A.  IH Did Not Raise A Genuine Dispute of Material Fact With Respect to BWI's Free Riding Justification.

Despite IH's claims, prevention of free riding is plainly a cognizable procompetitive justification. Mot. at 23-26. IH misreads *Kodak* in asserting the opposite. Opp'n at 29. *Kodak* does not eviscerate the free riding doctrine, which is a standard procompetitive justification under the antitrust laws. When the Supreme Court concluded that Kodak's free-riding justification was insufficient in *that* case to support summary judgment, the Court did so based on whose investment was at issue. In *Kodak*, the third party service organizations had made an investment in servicing the machines. *Kodak*, 504 U.S. at 485 n.33. The Supreme Court further emphasized this point by distinguishing the facts there from those in *Continental T.V, Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977) and *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984). In both of those cases, the Court accepted the defendants' free riding prevention justifications because the challenged conduct incentivized "the kind of investment of capital and labor necessary to distribute the product". *Kodak*, 504 U.S. at 485 n.33. Here, as even IH concedes, it is BWI that made the substantial investment in providing clinical support. IH's executives conceded they have the financial resources to provide a clinical support program, but choose not to do so. *See* RSUF ¶ 163.

In addition, IH claims that free riding is not cognizable since providing service would mean that it would be required to "enter two markets simultaneously", Opp'n at 29, and that *Kodak* exempts them from this. There is no

reading of the *Kodak* case that provides what IH says.[13] According to IH's logic, free riding is allowed for an entrant that wants to provide reprocessed goods but not service them. This is more than an odd reading of the law. In fact, support of one's competitors is not required by the antitrust laws. *See* Mot. at 25; *see also Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025-26 (9th Cir. 2013); *O.S.C. Corp. v. Apple Comput. Inc.*, 792 F.2d 1464, 1468 (9th Cir. 1986); *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1270 (N.D. Cal. 1988), *aff'd sub nom. Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990).

As a final response to BWI's free-riding justification, IH proposes a "less restrictive alternative": BWI should charge for clinical support, resulting in an increase in price. Opp'n at 29. This is an astounding statement. While this might be a "less restrictive" alternative from IH's perspective, a price increase imposed on consumers to artificially support a single competitor unable or unwilling to compete on its own would plainly be *anti*competitive.

**B.    IH Did Not Raise A Genuine Dispute of Material Fact With Respect to BWI's Quality and Safety Justification.**

IH attempts to rebut BWI's quality and safety justification for the clinical support policy by arguing that "there is no safety defense in antitrust law". Opp'n at 30. This is a misreading of the law. IH cites *National Society of Professional Engineers v. United States*, but there, the Court only deemed as overbroad a public safety defense to a prohibition on engineers bidding competitively on projects, which amounted to an argument that competition was bad and effective price fixing should be allowed. 435 U.S. 679, 692-95 (1978). There is no " safety exemption" to what can constitute a procompetitive justification.

---

[13] Indeed, according to IH, it need not enter the purported CARTO 3 clinical support market because it claims hospitals "would all be willing to pay and provide for their own clinical support apart from the catheters". Opp'n at 26.

REPLY MEM. OF POINTS AND AUTHORITIES
Case No.: 8:19-cv-1984 JVS (KESx)

Additionally, IH does not respond to the caselaw cited in BWI's opening memorandum supporting quality and safety-related justifications to challenged restraints. *See* Mot. at 29-30. There is no antitrust principle that requires one manufacturer to service another's products generally, and certainly none when safety is at issue. *See, e.g., HDC Medical, Inc. v. Minntech Corp.*, 474 F.3d 543, 549–50 (8th Cir. 2007) (manufacturer's product modifications justified by patient safety concerns); *Ireland v. Bend Neurological Assoc. LLC*, 2021 WL 1229937, at *4–5 (D. Or. March 31, 2021) (hospital's conduct justified to prevent harm to the quality of patient care). IH suggests that BWI could employ "contractual quality specifications" or seek "a liability waiver or indemnification clause from hospitals or reprocessors" in lieu of the clinical support policy. Opp'n at 32. But IH has not raised a triable issue that this alternative is "substantially less restrictive", "virtually as effective in serving the legitimate objective" and "without significantly increased cost". *Cnty. of Tuolomne v. Sonora Cmty. Hosp*, 236 F.3d 1148, 1159 (9th Cir. 2001); *see* Mot. at 29-30.

**C.    IH Did Not Rebut BWI's Justifications With Evidence of Pretext to Sustain a Jury Verdict.**

IH also tries to avoid the procompetitive justifications for BWI's clinical support policy by claiming there is evidence of "pretext". That is, that BWI's clinical support policy was adopted not for the procompetitive reasons set forth above, but for some other more nefarious one. IH fails to raise a triable issue as to this argument. First, IH cites no evidence supporting pretext at the time of adoption. IH offers no evidence suggesting that BWI implemented the policy to block competition.[14] The only purported evidence of pretext IH cites that even

---

[14] ████████████████████████████████████████████

23

references the clinical support policy is an email from 2019—five years after Biosense drafted the written clinical support policy statement and three years after Innovative concedes the policy was fully implemented—authored by BWI's head of R&D in Israel who was entirely uninvolved with the policy's creation or its implementation, that asks only about the effect of the policy on Stryker sales, not the reasons for the policy's adoption. *See* Berhold Decl., Ex. 84. Additionally, evidence that Innovative cites proves that Biosense did not implement the policy to prevent third-party reprocessors from securing sales, belying IH's claim of pretext;

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████

      Finally, IH attacks BWI's procompetitive justifications as pretextual because they are allegedly inconsistent with other BWI practices. All of this evidence fails for want of IH demonstrating how it is relevant to BWI's clinical support policy, and in many cases IH's characterization of the evidence is simply wrong: IH claims the policy is "inconsistent" because it does not apply to "the CRISTACATH, HALO, and ISMUS mapping catheters". Opp'n at 32. As the record makes clear, these catheters *do not map on CARTO 3*; they map only on impedance-based mapping systems like Abbott's and Boston Scientific's. *See* RSUF ¶ 15. ████████████████████████████████████████████

████████████████████████████████████████

_____

████████████████████████████████████████████████

REPLY MEM. OF POINTS AND AUTHORITIES
Case No.: 8:19-cv-1984 JVS (KESx)



1

2

3

4

5

6 ███████ IH's remaining arguments regarding map shift,

7 ███████, system display settings and off-label procedures in no way

8 suggest pretext in BWI's implementation of the policy. IH makes no attempt to

9 explain what these are or how they are relevant to the policy, nor do BWI's

10 practices with respect to them help assess the legitimacy of BWI's justifications for

11 the policy. Instead of examining the significant amount of contemporaneous

12 evidence related to the policy's adoption—or even policy overview and training

13 materials following its implementation (*e.g.*, Grossbard Decl., Ex. 17)—to glean

14 BWI's true reasons for the policy, IH points to wholly unrelated issues, for

15 instance, when CARTO 3's algorithm triggers an error message on the CARTO 3

16 system. This does not suffice to raise a triable issue of genuine fact.

17    IH is correct that "customers can make their own informed decisions by

18 observing product quality for themselves", Opp'n at 33; BWI's policy in no way

19 prevents physicians from using third-party reprocessed catheters—they are free to

20 do so, but BWI is not required to provide its own technicians to service the device.

21                **CONCLUSION**

22    IH failed to raise a triable issue of fact as to any remaining claim. BWI

23 respectfully submits that the Court should enter judgment in favor of BWI on all

24 claims.

25 _____

26  15 ███████████████████████████████

27 ███████████████████████████████

28 ███████████████████████████████

1

2    Dated: January 31, 2022          STRADLING YOCCA CARLSON & RAUTH

3

4                                     By: /s/ Karla J. Kraft

5                                          Karla K. Kraft
                                           Victoria McLaughlin
6                                          *kkraft@stradlinglaw.com*
                                           *vmclaughlin@stradlinglaw.com*
7

8                                          CRAVATH, SWAINE & MOORE LLP
                                           Katherine B. Forrest (*Pro Hac Vice*)
9                                          Lillian S. Grossbard (*Pro Hac Vice*)
                                           *kforrest@cravath.com*
10                                         *lgrossbard@cravath.com*
11

12                                         Attorneys *for Defendant*
                                           *Biosense Webster, Inc.*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY MEM. OF POINTS AND AUTHORITIES
Case No.: 8:19-cv-1984 JVS (KESx)