CERTIFIED
COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING


INNOVATIVE HEALTH, LLC,        ) CERTIFIED TRANSCRIPT
                    Plaintiff,  )
        vs.                     )
                               )        SACV-19-01984-JVS
BIOSENSE WEBSTER, INC.,         )
                    Defendant.  )
----------------------------)



REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

February 28, 2022



SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

2

```
1   APPEARANCES OF COUNSEL:

2   For the Plaintiff:

3   JEFFREY L. BERHOLD
    JEFFREY L. BERHOLD, PC
4   1230 Peachtree Street, Suite 1050
    Atlanta, GA  30309
5   (404) 872-3800

6   PANTEHA ABDOLLAHI
    THEORDORA ORINGHER, PC
7   535 Anton Boulevard, Ninth Floor
    Costa Mesa, CA  92626
8   (714) 549-6200

9   For the Defendant:

10  KARLA J. KRAFT
    KAITLYN BEAUDIN
11  STRADLING YOCCA CARLSON & RAUTH, PC
    660 Newport Center Drive, Suite 1600
12  Newport Beach, CA  92660
    (949) 725-4000
13
    KATHERINE D. FORREST
14  CRAVATH SWAINE & MOORE, LLP
    Worldwide Plaza
15  825 Eighth Avenue
    New York, NY  10019
16  (212) 474-1155

17

18

19

20

21

22

23

24

25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

|    |    |                                                                    |
|----|----|--------------------------------------------------------------------|
|          | 1  | SANTA ANA, CALIFORNIA; MONDAY, FEBRUARY 28, 2022; 1:40 P.M.         |
|          | 2  | (The following proceedings were under seal:)                       |
| 01:40    | 3  | THE CLERK:  Calling Item No. 6, SACV-19-01984-JVS,                  |
| 01:40    | 4  | Innovative Health, LLC, versus Biosense Webster, Inc.              |
| 01:41    | 5  | Appearance on behalf of the plaintiff, please.                     |
| 01:41    | 6  | MR. BERHOLD:  Good afternoon, Your Honor.  Jeff                    |
| 01:41    | 7  | Berhold and Panteha Abdollahi for plaintiff Innovative             |
| 01:41    | 8  | Health, LLC.                                                       |
| 01:41    | 9  | MS. ABDOLLAHI:  Good afternoon, Your Honor.                        |
| 01:41    | 10 | THE COURT:  Good afternoon.                                        |
| 01:41    | 11 | THE CLERK:  On behalf of defendants, please.                      |
| 01:41    | 12 | MS. FORREST:  Good afternoon, Your Honor.                         |
| 01:41    | 13 | Katherine Forrest on behalf of the defendant Biosense             |
| 01:41    | 14 | Webster.                                                           |
| 01:41    | 15 | MS. BEAUDIN:  Good afternoon, Your Honor.  Kaitlyn                 |
| 01:41    | 16 | Beaudin on behalf of Biosense Webster.                            |
| 01:41    | 17 | MS. KRAFT:  Good afternoon.  Karla Kraft on behalf                |
| 01:41    | 18 | of Biosense Webster.                                               |
| 01:41    | 19 | THE COURT:  Good afternoon to you all.                            |
| 01:41    | 20 | The Court follows the CDC guidelines, and                         |
| 01:41    | 21 | presently Orange County is in the medium transmissible zone,       |
| 01:41    | 22 | which means that masks are not required if you're fully            |
| 01:41    | 23 | vaccinated.  The reason I'm not wearing a mask is I'm fully        |
| 01:41    | 24 | vaccinated, and I've had my booster.  Notwithstanding that,        |
| 0    2   | 25 | if anyone is fully vaccinated and nevertheless feels more         |

4

| | | |
|---|---|---|
| 01:42 | 1 | comfortable wearing a mask, please do.  I just wanted to put |
| 01:42 | 2 | that on the record as to why I'm not wearing a mask. |
| 01:42 | 3 | Okay, I think I'd like to hear from the plaintiffs |
| 01:42 | 4 | first, please. |
| 01:42 | 5 | MR. BERHOLD:  Thank you, Your Honor. |
| 01:42 | 6 | First of all, we thank you for the opportunity to |
| 01:42 | 7 | be heard in person.  This is an important case, a $3 billion |
| 01:42 | 8 | a year cardiac ablation industry.  I mean the ultimate |
| 01:42 | 9 | question is whether Biosense stepped over the line in being |
| 01:42 | 10 | the one manufacturer to use its leverage in clinical support |
| 01:42 | 11 | for its system to lock competition in catheters. |
| 01:43 | 12 | As far as the tentative ruling at issue here |
| 01:43 | 13 | today, first is market definition.  At the end of page 8, |
| 01:43 | 14 | the tentative ruling talks about economic substitute issues |
| 01:43 | 15 | and the ability to deprive each other of significant levels |
| 01:43 | 16 | of business, which begs the question what is the test?  The |
| 01:43 | 17 | lodestar is cross elasticity of demand and SSNIP.  How would |
| 01:43 | 18 | customers respond or how do they respond to a small but |
| 01:43 | 19 | significant non-transitory increase in price in a closed |
| 01:43 | 20 | market?  Would enough customers switch to the peak in |
| 01:43 | 21 | profitability of such increase, typically five to |
| 01:43 | 22 | ten percent? |
| 01:43 | 23 | This sits at the core of the Ninth Circuit |
| 01:43 | 24 | precedent and the ABA Civil Jury Instructions, not to |
| 0    4 | 25 | mention US and EU competition agency guidelines. |

01:44  1    I want to turn to page 17 of the composition

01:44  2  brief.  Innovative quotes the Court from its Motion to

01:44  3  Dismiss in its brief at page 17:  "A properly defined

01:44  4  product market includes a pool of goods or services that

01:44  5  enjoy reasonable interchangeability of use, a cross

01:44  6  elasticity of demand."

01:44  7    The brief goes on to quote Ninth Circuit

01:44  8  precedent:  "Cross elasticity of demand measures the

01:44  9  percentage change in quantity that consumers will demand of

01:44  10  one product in response to a percentage change in the price

01:45  11  of another.  A SSNIP analysis asks whether a monopolist in

01:45  12  the proposed market could properly impose a small,

01:45  13  significant, and non-transitory price increase."

01:45  14    Let me also quote the ABA Model Civil Jury

01:45  15  Instruction on relevant product market.

01:45  16    THE COURT:  Well, it's based on the law.

01:45  17    MR. BERHOLD:  Thank you, Your Honor.

01:45  18    It is not a question of whether customers could

01:45  19  shift their purchases to another product.  It is a question

01:45  20  of whether they would do so in significant enough numbers to

01:45  21  deter a price increase.

01:45  22    To be clear, Innovative is not talking about a

01:45  23  submarket of customers without another cardiac mapping

01:45  24  system or a submarket of customers that have already bought

0  5  25  a CARTO 3.  This is not Newcal for the boundaries of the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

6

| | | |
|---|---|---|
| 01:45 | 1 | market to depend on a contractually created group of |
| 01:46 | 2 | consumers.  Innovative is talking about hospitals with or |
| 01:46 | 3 | without other systems.  That's discussed at the brief at |
| 01:46 | 4 | pages 23 and 24.  A SSNIP test looks at all prospective |
| 01:46 | 5 | customers.  Do enough customers switch their catheter |
| 01:46 | 6 | purchases?  The tentative ruling omits that test at this |
| 01:46 | 7 | juncture. |
| 01:46 | 8 | The tentative ruling doesn't just follow the |
| 01:46 | 9 | anecdotal evidence over empirical evidence, but it omits any |
| 01:46 | 10 | discussion of evidence that customers as a whole did not |
| 01:46 | 11 | shift significant purchases of the catheters at issue in |
| 01:46 | 12 | response to the increase in the market prices for the |
| 01:46 | 13 | catheters as a result of the case coverage policy. |
| 01:46 | 14 | That discussion starts at page 19 of the brief, |
| 01:46 | 15 | and it refers back to the chart on page 17 of the brief |
| 01:46 | 16 | showing how prices increase after imposition of the case |
| 01:47 | 17 | coverage policy, average prices in the market.  Yet the |
| 01:47 | 18 | customers do not switch away from these catheters, and they |
| 01:47 | 19 | do not switch away from the CARTO 3 mapping system, even |
| 01:47 | 20 | though profit margins were already high on catheters and the |
| 01:47 | 21 | mapping system. |
| 01:47 | 22 | Could they switch in the abstract while coming |
| 01:47 | 23 | from Atlanta to Santa Ana by plane versus bus?  That's not |
| 01:47 | 24 | the question.  Customers could switch from plane to bus or a |
| 0  7 | 25 | nonstop to a one-way flight.  They both get you to the same |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:47  1    place.  But how do they collectively respond -- customers --

01:47  2    to a five percent or ten percent increase in nonstop fares?

01:47  3    My parents might switch in response to an increase of $50 in

01:48  4    those fares.  But again, that is not the question.

01:48  5            The question is would enough customers switch

01:48  6    their purchases in response to a SSNIP to eliminate the

01:48  7    profitability of such an increase?  Airlines, for example,

01:48  8    typically the Justice Department finds that there would not

01:48  9    be sufficient switching.  It concludes that the nonstop

01:48  10   route is the relevant product market.  It does not matter

01:48  11   that Delta, or United, or American may be the only carrier

01:48  12   on that route.  Customers typically prefer to fly nonstop on

01:48  13   a route if it is available.  As a whole, customers prefer

01:48  14   and they're willing to incur a price change to do it.

01:48  15           The test does not change for a single brand

01:48  16   market.  The tentative ruling refers to Apple v. Psystar,

01:49  17   and I would refer the Court to page 1198 of Apple v.

01:49  18   Psystar.  Quote:  "The responsiveness of one product to the

01:49  19   price of another is at the heart of the market definition

01:49  20   analysis."  This is a decision where -- the Court said this

01:49  21   expressly:  "I am looking at whether there is a single brand

01:49  22   product market."  However, it is not unusual to see single

01:49  23   brand markets in healthcare.  Courts have found relevant

01:49  24   markets for brands of pharmaceuticals, even though there are

0   9   25   other drugs to treat the same condition, that the SSNIP test

8

01:49   1   points to that conclusion.  Ciprofloxacin is just one

01:49   2   example.

01:49   3           The test is the same for asking whether

01:49   4   competition in a foremarket would prevent market power in an

01:50   5   aftermarket.  Biosense has argued that many customers

01:50   6   already have another mapping system where they can buy one.

01:50   7   The question is still the extent to which one market

01:50   8   prevents the exploitation of another market.  And it depends

01:50   9   on the extent to which customers will change their

01:50   10  consumption of one product in response to a price change in

01:50   11  another.  That's from Kodak at page 468, a Supreme Court

01:50   12  decision.  Red Lion Medical Safety, which is also in the

01:50   13  tentative ruling, says the same thing.

01:50   14          And there are good reasons here why physicians

01:50   15  would not switch away from the catheter specifically and the

01:50   16  CARTO 3 mapping system generally.  The opposition brief,

01:50   17  page 7, talks about the unique characteristics of the CARTO

01:51   18  3 cardiac mapping system and the catheters it can be used

01:51   19  on, for example, the SoundStar catheter combined with the

01:51   20  CARTO sound module and the CARTO 3 mapping system.  It's the

01:51   21  only catheter in the system that allows you to see the

01:51   22  ultrasound image -- it's generated by an ultrasound catheter

01:51   23  machine -- to be integrated with the cardiac map, the 3D

01:51   24  cardiac map on the cardiac mapping system.  And the Director

01:51   25  of Marketing, has testified how customers believe that's

01:52  1    very valuable to them.  That's just one example.

01:52  2              So when a physician walks in the room or schedules

01:52  3    a procedure, they're deciding what's going to work best for

01:52  4    the physician, for the type of the procedure, and the type

01:52  5    of patient.  If I want to have the ultrasound image right in

01:52  6    the CARTO map for speed, safety, or efficiency, I'm going to

01:52  7    use SoundStar.  If I'm going to use the SoundStar, I'm going

01:52  8    to use the CARTO, and I'm going to use its mapping

01:52  9    catheters, too.  And it's discussed again at page 10 of the

01:52  10   brief.

01:52  11             Again, SoundStars are the only navigational

01:52  12   ultrasound catheters for use with any cardiac mapping system

01:53  13   and are only usable with the CARTO 3 and the CARTO Sound

01:53  14   software module.  Zare, who leads marketing for Biosense in

01:53  15   the United States, explained that physicians tell us that's

01:53  16   really important for them.  The tentative ruling omits that

01:53  17   factual background.  In any event, we can see empirically

01:53  18   that customers as a whole did not switch catheters or

01:53  19   systems in response to the higher catheter prices resulting

01:53  20   from the face coverage policy.  That is the lodestar of the

01:53  21   market definition analysis.

01:53  22             Second, separate products, the tentative ruling

01:53  23   sets out the correct standard.  Is there sufficient demand

01:53  24   for the tying product -- the tie product -- for producers to

0   4   25   provide each product separately?  We know that there is

01:54   1   sufficient demand for catheters for manufacturers and

01:54   2   reprocessors to provide the catheters separately from the

01:54   3   support.  Not only have the manufacturers been willing to

01:54   4   buy the catheters without the support, but the manufacturers

01:54   5   mostly provided their own catheters without support until

01:54   6   recently.  Stryker and Innovative were willing to provide

01:54   7   the catheters separately as well, and we know that it is a

01:54   8   lucrative business.

01:54   9           Your Honor, can I mention some confidential

01:54   10   information?

01:54   11           MS. FORREST:  Your Honor, we have no issue with

01:54   12   counsel stating confidential information since the

01:54   13   individuals in this courtroom, as I understand it, are

01:54   14   either associated with court personnel or with the parties

01:54   15   and are otherwise entitled to see that information.

01:55   16           THE COURT:  The transcript won't be filed before

01:55   17   you have an opportunity to review it and suggest redactions.

01:55   18           MR. BERHOLD:  Thank you, Your Honor.

01:55   19           We know catheters are a lucrative business.

01:55   20   Manufacturers -- Biosense in particular had profit margins

01:55   21   exceeding ■ percent.  We know they're going to provide the

01:55   22   catheters.  We know there's a market for catheters, a very

01:55   23   big market for catheters.

01:55   24           Is there a sufficient demand for clinical support

01:55   25   for firms to provide support separately from the catheters?

| | |
|---|---|
| 01:55 | 1 |
| 01:55 | 2 |
| 01:55 | 3 |
| 01:55 | 4 |
| 01:55 | 5 |
| 01:56 | 6 |
| 01:56 | 7 |
| 01:56 | 8 |
| 01:56 | 9 |
| 01:56 | 10 |
| 01:56 | 11 |
| 01:56 | 12 |
| 01:56 | 13 |
| 01:56 | 14 |
| 01:56 | 15 |
| 01:56 | 16 |
| 01:56 | 17 |
| 01:56 | 18 |
| 01:56 | 19 |
| 01:56 | 20 |
| 01:57 | 21 |
| 01:57 | 22 |
| 01:57 | 23 |
| 01:57 | 24 |
| 0  7 | 25 |

1  Hospitals were providing their own support.  Moreover, this

2  is a lucrative procedure for hospitals.  There's no -- that

3  reasonably hospitals would not continue their own support,

4  nor that third parties, individuals, or companies, would

5  offer it on a contract basis if the manufacturers did not

6  decide to offer it for free to get into the room to upsell

7  their customers.

8       The manufacturers do not provide support because

9  no one else will provide it.  In fact, hospitals like

10  Torrance Memorial and Mayo Clinic still provide their own

11  support, and hospitals like Allegheny General and Hackensack

12  Regional asked Biosense for training to provide their own

13  support, even though they can get it without charge from the

14  manufacturers.

15       The manufacturers provide clinical support and

16  provide it without charge to get into the room to upsell the

17  customers.  Biosense -- and it's in the brief in the

18  record -- Biosense increases its revenue per case by more

19  than ███ percent with its own clinical account specialist in

20  the room.  It's Exhibit 94 at page 4, the Forester rebuttal

21  report at paragraph 34B.  It's also in the brief.  Biosense

22  spends $███ for the clinical account specialist to make an

23  additional $███ in revenue.

24       So this is not a case of filling an unmet need.

25  The cases will get covered if the manufacturers did not

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:57  1   cover them.  The tentative ruling talks about the value of

01:57  2   getting free support rather than providing it yourself.

01:57  3   That's not the question.  It is merely a question of whether

01:57  4   there is a sufficient demand for support for firms to

01:57  5   provide it separately.

01:57  6        Would hospitals pay fair market value, that is,

01:57  7   the actual cost for the clinical support if they had to do

01:57  8   so?  The answer is yes.  There is huge demand for support.

01:58  9   Hospitals would pay staff or independent contractors or

01:58  10  third parties for it if necessary.  In fact, they have done

01:58  11  so.  That's the record in this case, and that was the basis

01:58  12  for going forward in this case in the original ruling on the

01:58  13  Motion to Dismiss, and it's right out of Kodak.

01:58  14        Now, let me close on the final point in the

01:58  15  tentative ruling, that the free clinical support was a

01:58  16  competitive differentiation that benefited consumers.  That

01:58  17  does not change the fact that there was already sufficient

01:58  18  demand for support for firms to provide it separately.  But

01:58  19  it does highlight that the only differentiation now is

01:58  20  anti-competitive.

01:58  21        Every manufacturer, including Biosense, developed

01:58  22  programs to provide clinical support for their system to any

01:58  23  customer that requested it.  Now, Biosense is the only one

01:59  24  to take advantage of that leverage with its customers to

0   9   25  implement a case coverage policy that blocks competition on

| | |
|---|---|
| 01:59 | 1 |
| 01:59 | 2 |
| 01:59 | 3 |
| 01:59 | 4 |

1    the catheters.  The hospitals pay higher catheter prices.

2    Medicare and Blue Cross, all of us, pay more for our

3    procedures, and that is not pro-competitive.  It's clearly

4    anti-competitive.

5            Thank you, Your Honor.

6            THE COURT:  Thank you.

7            MS. FORREST:  Good afternoon, Your Honor.

8            THE COURT:  Good afternoon.

9            MS. FORREST:  Katherine Forrest.  May I proceed?

10           THE COURT:  Please.

11           MS. FORREST:  Your Honor, Biosense Webster

12   believes that the tentative ruling is correct in all

13   respects.  Indeed, the law that Your Honor cites is exactly

14   the right law.  It's stated in exactly the right way.  It

15   goes to exactly the right tests.

16           Counsel today has described a single brand product

17   market that has not followed the test that Your Honor had

18   laid out.  In fact, they are defined by the Supreme Court in

19   the Kodak case and the Ninth Circuit in the Newcal case.

20   There is a preliminary question which counsel has not

21   addressed, which is the ultimate fourth Newcal factor, which

22   Your Honor so correctly pointed out in your decision, which

23   is whether or not the competition in the foremarket

24   disciplines the competition in the aftermarket.

25           Here, the fourth factor for the Newcal test has

| | | |
|---|---|---|
| 02:00 | 1 | not been met, and the SSNIP test does not meet that test and |
| 02:00 | 2 | can't begin to meet it because as Dr. Forester, the expert |
| 02:00 | 3 | who presented the SSNIP test concedes, he never performed a |
| 02:00 | 4 | test or looked at the foremarket.  Indeed, Dr. Forester |
| 02:01 | 5 | himself says that he never -- and it's in our reply brief -- |
| 02:01 | 6 | that he never offered an opinion on the single brand product |
| 02:01 | 7 | market.  So a SSNIP test offered only through Dr. Forester |
| 02:01 | 8 | cannot support a single brand product market. |
| 02:01 | 9 | Your Honor, I would suggest that the SSNIP test |
| 02:01 | 10 | must be ignored to the extent that it is relyed upon Dr. |
| 02:01 | 11 | Forester, which is the only support for it.  But I'll also |
| 02:01 | 12 | go into the SSNIP test itself in a moment to explain to Your |
| 02:01 | 13 | Honor why even if you were to think about the SSNIP test and |
| 02:01 | 14 | look at the SSNIP test it still is inadequate. |
| 02:01 | 15 | Counsel is correct that the test for a |
| 02:01 | 16 | well-defined antitrust product market is reasonable |
| 02:01 | 17 | interchangeability of use, and Your Honor also states that |
| 02:01 | 18 | test correctly in your decision.  But as Innovative's |
| 02:01 | 19 | witnesses have stated, and as is undisputed in the |
| 02:02 | 20 | responsive statement of undisputed facts at Fact No. 92, |
| 02:02 | 21 | there is no debate between the parties that all of the |
| 02:02 | 22 | cardiac mapping systems that are in the foremarket have a |
| 02:02 | 23 | reasonable interchangeability of use. |
| 02:02 | 24 | The real question, Your Honor, is whether or not |
| 0   2 | 25 | the foremarket, which has robust competition, which Your |

02:02  1  Honor acknowledges and correctly cites to the undisputed

02:02  2  facts in the record -- whether that robust competition can

02:02  3  discipline the competition in the aftermarket.

02:02  4        If it can, then it doesn't matter that the

02:02  5  aftermarket has catheters that work only with the CARTO 3,

02:02  6  because the CARTO 3 is only one of a number of competing

02:02  7  machines.  And if the vast number -- we've got seven

02:02  8  competing machines, many of which are new entrants, as Your

02:02  9  Honor points out, coming out after 2017.  If those new

02:03  10  machines and the existing cardiac mapping machines can take

02:03  11  away business because of their own catheters, then there is

02:03  12  discipline.  As Your Honor points out in the tentative

02:03  13  ruling, there's in fact actual evidence of actual switching.

02:03  14  That evidence is uncontradicted in the record.

02:03  15        Also, counsel cited the Apple versus Psystar case.

02:03  16  In that case, a single brand product market case, the Court

02:03  17  acknowledged that the Newcal test, which is governing in the

02:03  18  Ninth Circuit, requires some form of market imperfection in

02:03  19  order for customers in the aftermarket to be locked into the

02:03  20  product, the durable good which they have acquired in the

02:03  21  foremarket.  There is no evidence here of such market

02:04  22  imperfections.

02:04  23        As Your Honor has so correctly stated in your

02:04  24  tentative ruling, there is not a lack of information.  There

0    4  25  was a policy change that was put in place in 2014 and was

02:04  1  fully implemented by 2016 and by 2017 when Innovative began

02:04  2  selling its catheters.  That policy was fully in place.

02:04  3       But more than that Your Honor, there's not a

02:04  4  single customer -- not a single one -- that has said that

02:04  5  they were surprised by the policy and that they felt

02:04  6  trapped.  As Your Honor acknowledged in the tentative

02:04  7  ruling, the customers in fact have the ability to switch if

02:04  8  they want to.  If they had in fact felt that they had been

02:04  9  misled in some way, first of all, there would be evidence of

02:04  10  it.  There is no such evidence.

02:04  11       But second of all, as Your Honor acknowledges in

02:05  12  your decision, there are a number of ways that customers are

02:05  13  able to acquire other competing machines.  They have and

02:05  14  they do.  Since 2016, as Your Honor acknowledged in your

02:05  15  decision, there have been a number of machines for the CARTO

02:05  16  3 sold each and every year since.  There is no market

02:05  17  imperfection in terms of the policy change.

02:05  18       There also is no market imperfection in terms of

02:05  19  the ability to estimate life cycle costs.  Your Honor has

02:05  20  cited that information.  I don't think I need to go through

02:05  21  it.  Counsel hasn't raised it here.

02:05  22       My point, Your Honor, is that there is not a

02:05  23  market imperfection.  As a result, we don't have here the

02:05  24  fourth Newcal factor.  What plaintiff has failed to do is to

0  5  25  make out a single brand product market.

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
| 02:05 | 1  | What they have done is they've raised with Your                      |
| 02:06 | 2  | Honor product differentiation.  Your Honor, there are a              |
| 02:06 | 3  | number of cases which indicate that product differentiation          |
| 02:06 | 4  | is not a basis upon which to find that products are not in           |
| 02:06 | 5  | the same market.  Warlick Distribution is such a case.               |
| 02:06 | 6  | Green Country Food Market is such a case.  DSM Desotech is            |
| 02:06 | 7  | such a case.                                                         |
| 02:06 | 8  | Indeed, in the DSM Desotech case, there the Court                    |
| 02:06 | 9  | said there are a number of dimensions upon which products            |
| 02:06 | 10 | may be differentiated.  They can be differentiated based            |
| 02:06 | 11 | upon customer service, on performance, on price, on cost,            |
| 02:06 | 12 | and that those are not bases to separate the products into a         |
| 02:06 | 13 | different market.  That's the law.                                   |
| 02:06 | 14 | Product differentiation is a statement of success                    |
| 02:06 | 15 | of the American competition system.  It's a statement of             |
| 02:07 | 16 | robust, interbrand competition.  What we don't want is for           |
| 02:07 | 17 | every product to be the same.  What we do want is for                |
| 02:07 | 18 | manufacturers to compete hard to make their products the             |
| 02:07 | 19 | best products, to be different from the other products, to           |
| 02:07 | 20 | be able to compete in ways that other products don't.  That          |
| 02:07 | 21 | doesn't mean the product is in its own market.  What it              |
| 02:07 | 22 | means is that somebody has built a better mouse trap.  And           |
| 02:07 | 23 | that, Your Honor, is what has happened here.                         |
| 02:07 | 24 | Your Honor, I also would just very briefly mention                   |
| 0   7 | 25 | that counsel has suggested that cross elasticity of demand           |

02:07  1  is a test, and we agree that cross elasticities of demand

02:07  2  can be a test for product markets.  That's, however, not the

02:07  3  test that was done by Dr. Forester in his analysis.  He did

02:07  4  no cross elasticity of demand.

02:08  5  　　　　Why?  Because Dr. Forester's analysis depended

02:08  6  entirely upon his market being the original manufacturer's

02:08  7  catheter, the LASSO, for instance, and the reprocessed

02:08  8  version of that catheter.  That's the competition he was

02:08  9  looking at.  He wasn't looking at the cross elasticities of

02:08  10  demand or in fact demand of any sort between what Boston

02:08  11  Scientific has as its catheters, or Abbott has as its

02:08  12  catheters, or Acutus has as its catheters.

02:08  13  　　　　Your Honor, as you acknowledge in the tentative

02:08  14  ruling, the Innovative executives themselves along with the

02:08  15  marketing literature acknowledge that these catheters from

02:08  16  other manufacturers compete against one another.  Why?

02:08  17  Because of the foremarket competition.

02:09  18  　　　　So, Your Honor, I can go through more on the

02:09  19  single brand product market or the SSNIP test if Your Honor

02:09  20  would like me to, but I don't want to overstep your patience

02:09  21  for that to get into the nuances of the SSNIP test.

02:09  22  　　　　THE COURT:  Well, does the SSNIP test produce a

02:09  23  result that favors your side?

02:09  24  　　　　MS. FORREST:  Your Honor, the SSNIP test is an

0  9  25  irrelevant test.

| | | |
|---|---|---|
| 02:09 | 1 | THE COURT:  I understand. |
| 02:09 | 2 | MS. FORREST:  What I would say is that it produces |
| 02:09 | 3 | a result favorable to our side because it does not do |
| 02:09 | 4 | anything to indicate in the way it was done that there are |
| 02:09 | 5 | in fact separate products.  The SSNIP test in the way that |
| 02:09 | 6 | it was done here is in fact entirely irrelevant.  It doesn't |
| 02:09 | 7 | show that there -- what a SSNIP test is supposed to do is |
| 02:09 | 8 | take a basket of products from different manufacturers, |
| 02:09 | 9 | interbrand, and it is supposed to then have a test where you |
| 02:09 | 10 | put together different baskets of products and say if there |
| 02:10 | 11 | was a price rise, would the other catheters sort of go away, |
| 02:10 | 12 | and is that monopolist able then to hold on to that price |
| 02:10 | 13 | rise, or are these catheters in fact able to take business |
| 02:10 | 14 | away from that manufacturer?  That's not the test that was |
| 02:10 | 15 | run here. |
| 02:10 | 16 | The test that was run here with the SoundStar, |
| 02:10 | 17 | with the Lasso, and the PentaRay, looked at, number one, |
| 02:10 | 18 | only the manufacturers and the reprocessed version of the |
| 02:10 | 19 | same brand.  That is not a SSNIP test that's looking at a |
| 02:10 | 20 | basket of catheters from different manufacturers.  That's |
| 02:10 | 21 | the number one problem. |
| 02:10 | 22 | The number two problem is it looks at average |
| 02:10 | 23 | prices.  There is no SSNIP test known to the history of |
| 02:10 | 24 | mankind that looks at average prices, because -- when I say |
| 0    0 | 25 | average prices, what the expert did who I deposed is he |

02:10   1   looked at price -- his SSNIP test looked at prices of both

02:11   2   the OEM and the reprocessed, and put those prices together,

02:11   3   and looked at whether or not there had been a price increase

02:11   4   for the SoundStar over time, found that there had, but could

02:11   5   not tell me who was responsible for the price increase.  And

02:11   6   I asked -- and this is in our reply brief -- "Do you know

02:11   7   whether or not the SoundStar ever raised the price in terms

02:11   8   of what we sold new?"  And he said, "I don't know.  I didn't

02:11   9   look at that."

02:11   10          For PentaRay and for Lasso, again, average prices,

02:11   11  the reprocessed plus what Biosense Webster had manufactured,

02:11   12  he put those together and said those average prices did not

02:11   13  change when there was entry.  But he only looked at entry of

02:11   14  one catheter of one manufacturer.  First of all, average

02:11   15  prices and the fact that average prices destroys the SSNIP

02:11   16  test to begin with, but second of all, he didn't look at a

02:11   17  basket of catheters that included Boston Scientific's

02:12   18  Acutus, et cetera, et cetera.  But in addition to that, the

02:12   19  conditions of entry are very specific conditions.

02:12   20          So the SSNIP test, Your Honor, I would say only

02:12   21  helps us not because it's right, but because it's just

02:12   22  absolutely wrong.  If I were to cross-examine the expert on

02:12   23  that SSNIP test, it could never hold up.  And, indeed, we've

02:12   24  made a Daubert motion on that very basis.

0    2   25          Your Honor, it's very important to go back to the

02:12  1  law as Your Honor had suggested, which is that when an

02:12  2  expert is coming into court to present an opinion, the

02:12  3  Brooke Group case tells us that the expert is to help us

02:12  4  explain facts, not come up with new facts.  Expert opinions

02:12  5  that contradict the factual record are not expert opinions

02:12  6  that can create a triable issue.  They are expert opinions

02:13  7  that are being used to try to manufacture something that

02:13  8  doesn't otherwise exist.

02:13  9       My last point, Your Honor, would be simply on the

02:13  10  separate product markets, which was the last portion of Your

02:13  11  Honor's opinion -- or separate products for the tying claim.

02:13  12  First, for clinical support, if there is no single brand

02:13  13  product market, then there is no single brand product market

02:13  14  for that market as well as the three catheter markets.

02:13  15       But putting that aside, as Your Honor correctly

02:13  16  noted in your tentative decision, the law is a demand test.

02:13  17  That is Jefferson Parish.  That is Rick-Mik.  In both of

02:13  18  those cases, the Court says you look at whether or not there

02:13  19  is a demand for the separate product.  In the Rick-Mik case,

02:13  20  there had been an aggregation of products for a very long

02:13  21  time, and the Court said if these cases are never unbundled,

02:13  22  then there isn't separate demand.

02:14  23       What we have here, Your Honor, is a situation in

02:14  24  which the OEMs have provided this clinical support for free.

0  4  25  The customers have an expectation of it being provided for

| | | |
|---|---|---|
| 02:14 | 1 | free.  It's never been charged for, and there's no evidence |
| 02:14 | 2 | in the record that a single hospital wants to pay Biosense |
| 02:14 | 3 | Webster a charge for what it's now providing for free. |
| 02:14 | 4 | So the demand is for the value added service |
| 02:14 | 5 | that's bundled in with a product that we already provide. |
| 02:14 | 6 | The result of the situation here, if Innovative were to |
| 02:14 | 7 | prevail, would be that prices would go up, because customers |
| 02:14 | 8 | would now be charged for something for which they today get |
| 02:14 | 9 | free.  And, Your Honor, that is not the law. |
| 02:14 | 10 | Unless Your Honor has any further questions, I |
| 02:14 | 11 | will sit down. |
| 02:14 | 12 | THE COURT:  No.  Thank you. |
| 02:14 | 13 | Mr. Berhold. |
| 02:15 | 14 | MR. BERHOLD:  Thank you, Your Honor.  Let me |
| 02:15 | 15 | address -- |
| 02:15 | 16 | THE COURT:  Well, let me ask you one thing.  Do |
| 02:15 | 17 | you agree with the proposition that unless there is an |
| 02:15 | 18 | irregularity in the forward market, you don't consider |
| 02:15 | 19 | yourselves about the aftermarket? |
| 02:15 | 20 | MR. BERHOLD:  No, Your Honor.  I would approach it |
| 02:15 | 21 | somewhat differently.  Kodak -- |
| 02:15 | 22 | THE COURT:  Well, first, is there an imperfection |
| 02:15 | 23 | in the forward market in this case? |
| 02:15 | 24 | MR. BERHOLD:  There are actually.  The biggest |
| 0   5 | 25 | market imperfection by far is that we've got a third-party |

02:15 1    payer problem that's talked about extensively in the

02:15 2    Forester report.  It's talked about in the Ninth Circuit

02:15 3    case law, and it's talked about in the opposition brief.

02:15 4              Hospitals pay for the system.  Hospitals pay for

02:15 5    the catheters.  The physicians are the ones indisputably who

02:16 6    pick which system to use on every procedure and the

02:16 7    catheters to use on every procedure.  That's by order of the

02:16 8    FDA, and that's what every hospital testified in this case.

02:16 9    The physicians choose, not the hospital administration.

02:16 10   They choose which system to buy, and then they decide when

02:16 11   they schedule a procedure which room they're going to use,

02:16 12   which system they're going to use, and then they instruct

02:16 13   their assistant which catheters they're going to use.  They

02:16 14   make the decisions, not the hospital.  So it's a very big

02:16 15   market imperfection.

02:16 16             But the question --

02:16 17             THE COURT:  Well, is it an imperfection or just a

02:16 18   manifestation that the competition occurs really in the

02:16 19   position level given the structure of things rather than at

02:16 20   the hospital purchaser level?

02:17 21             MR. BERHOLD:  It's an imperfection in the sense

02:17 22   that someone else is paying for those customers' choices.

02:17 23   You're not going to see prices as an effective discipline on

02:17 24   customer choices by the physician.  It's the physician's

0  7  25   choice, but the hospital pays for it.

24

| | | |
|---|---|---|
| 02:17 | 1 | THE COURT:  But doesn't the customer always get |
| 02:17 | 2 | the choice in the marketplace?  For a practical matter, the |
| 02:17 | 3 | doctor is a servant for the hospital, and the doctor makes |
| 02:17 | 4 | the product choice.  So what's wrong with that as long as |
| 02:17 | 5 | there's freedom of choice at some point in the open |
| 02:17 | 6 | decision-making process in the forward market? |
| 02:17 | 7 | MR. BERHOLD:  There's nothing wrong with it in and |
| 02:17 | 8 | of itself.  It just creates an imperfection in the market |
| 02:18 | 9 | because -- |
| 02:18 | 10 | THE COURT:  Imperfection or different |
| 02:18 | 11 | manifestation? |
| 02:18 | 12 | MR. BERHOLD:  Imperfection. |
| 02:18 | 13 | THE COURT:  Okay. |
| 02:18 | 14 | MR. BERHOLD:  It's third-party payer problem. |
| 02:18 | 15 | The analogy I think of is when you give your child your |
| 02:18 | 16 | credit card.  It's your credit card, and you'll pay the |
| 02:18 | 17 | bills.  But the question is, is there going to be discipline |
| 02:18 | 18 | in that market?  No.  The hospitals have testified again and |
| 02:18 | 19 | again we defer to the physicians.  They call the shots. |
| 02:18 | 20 | THE COURT:  Is there anything constraining the |
| 02:18 | 21 | physicians? |
| 02:18 | 22 | MR. BERHOLD:  I mean, they make the choice largely |
| 02:18 | 23 | on other reasons besides price, their preference in terms of |
| 02:18 | 24 | quality of care, in terms of the speed of the procedure, and |
| 0   8 | 25 | that's why -- |

| | | |
|---|---|---|
| 02:18 | 1 | THE COURT:  But isn't that true with all |
| 02:19 | 2 | customers?  Not all customers make the ultimate decision on |
| 02:19 | 3 | price.  I may want a car with airbags front and back.  Two |
| 02:19 | 4 | cars, they're both functioning as cars, but, you know, one |
| 02:19 | 5 | has this extra safety item that I want.  Is there not |
| 02:19 | 6 | competition there? |
| 02:19 | 7 | MR. BERHOLD:  I think the Ninth Circuit law and |
| 02:19 | 8 | economic practice would tell you that the third-party payer |
| 02:19 | 9 | problem does affect competition.  It is a market |
| 02:19 | 10 | imperfection.  If someone else is paying for your car, you'd |
| 02:19 | 11 | say I'll take the airbags.  They may be only worth $500 |
| 02:20 | 12 | extra, but I'll have -- |
| 02:20 | 13 | THE COURT:  But somebody may say, you know, this |
| 02:20 | 14 | manufacturer uses this brand, and their airbags are |
| 02:20 | 15 | notoriously unreliable.  So even though other features may |
| 02:20 | 16 | be offered and the hospital is effectively not the ultimate |
| 02:20 | 17 | decision-maker, doesn't the physician have the opportunity |
| 02:20 | 18 | to consider things other than dollars that may affect the |
| 02:20 | 19 | decision?  I don't think that's anti-competitive. |
| 02:20 | 20 | MR. BERHOLD:  It's not that it's anti-competitive. |
| 02:20 | 21 | It's a market imperfection.  A third-party payer problem |
| 02:20 | 22 | alone, that's not against the law.  It's a fact in certain |
| 02:20 | 23 | situations. |
| 02:20 | 24 | THE COURT:  Right. |
| 0   0 | 25 | MR. BERHOLD:  That's all I'm saying. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 02:20 | 1 | THE COURT:  Okay. |
| 02:20 | 2 | MR. BERHOLD:  So the test in Kodak is whether |
| 02:20 | 3 | competition -- so let's take for granted that there is |
| 02:21 | 4 | competition in a foremarket -- copiers, mapping systems. |
| 02:21 | 5 | The question is whether that -- I'll just quote from |
| 02:21 | 6 | page 469 of Kodak:  "The extent to which one market prevents |
| 02:21 | 7 | exploitation of another market depends on the extent to |
| 02:21 | 8 | which consumers will change their consumption of one product |
| 02:21 | 9 | in response to price change in another." |
| 02:21 | 10 | And the brief at page 23:  "Innovative was offered |
| 02:21 | 11 | evidence that did not shift away from CARTO 3 in response to |
| 02:21 | 12 | higher prices associated with the case coverage policy. |
| 02:21 | 13 | CARTO procedure share has been flat." |
| 02:21 | 14 | It cites to the Forester report, paragraph 176, |
| 02:22 | 15 | which states:  "Biosense's ability to increase average |
| 02:22 | 16 | prices was not constrained by a decline in CARTO 3 system |
| 02:22 | 17 | usage." |
| 02:22 | 18 | This isn't just any -- there's absolutely nothing |
| 02:22 | 19 | anti-competitive about the fact that Biosense makes the best |
| 02:22 | 20 | mapping system on the market, so ▮ percent of the mapping |
| 02:22 | 21 | systems but they have ▮ percent procedure share.  There's |
| 02:22 | 22 | nothing wrong with that.  The problem is that there's a case |
| 02:22 | 23 | coverage policy, and competition in the foremarket is not a |
| 02:22 | 24 | discipline.  How do we know it?  It's not based on theories. |
| 0   2 | 25 | It's based on what we see with the SSNIP test. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:22    1       To be clear, the whole point of a SSNIP test is to

02:23    2   look at the proposed product market.  Here, customers buy a

02:23    3   mix of new and reprocessed SoundStar catheters.  That's the

02:23    4   proposition.  That's the proposed market.  The question is,

02:23    5   if the average market price goes up, I say I'm not going to

02:23    6   buy SoundStar's anymore.  I'm going to buy AcuNav's, or

02:23    7   ViewFlex's, or I'm going to use a different mapping system.

02:23    8       The answer is no to both.  SoundStar volume has

02:23    9   gone up, up, up throughout the period of the case coverage

02:23   10   policy, and the CARTO 3 procedure volume has remained flat.

02:23   11   As a whole, customers are not moving away in response to the

02:23   12   case coverage policy.

02:23   13       I did want to address one more thing.  In Newcal,

02:24   14   there was a Motion to Dismiss on the sufficiency of a

02:24   15   Complaint, and Newcal goes into the four factors with

02:24   16   respect to that particular Complaint why factually it's

02:24   17   plausible.  It's still the same ultimate question as Kodak.

02:24   18   Does competition -- this is at page -- towards the end of

02:24   19   page 1050 of Newcal:  "Competition in the initial market

02:24   20   does not necessarily suffice to discipline anti-competitive

02:25   21   practices in the aftermarket."

02:25   22       Here, we don't have to guess anymore.  We're not

02:25   23   at the Complaint stage.  We've had discovery.  We've seen

02:25   24   what happens.  They're not moving.  But they have taken it,

0   5   25   and they're not switching.  That tells you that, one, these

02:25  1    are appropriate catheter markets; and, two, that competition

02:25  2    in the foremarket is not disciplining the competition in the

02:25  3    aftermarket.

02:25  4          I lost my thought.  I should have written a note

02:25  5    about the last point from Biosense about separate markets.

02:26  6    Do you mind if I confer with counsel?

02:26  7          THE COURT:  Sure.  Look at the last page of the

02:26  8    tentative.

02:26  9          MR. BERHOLD:  Let me take your suggestion and look

02:26  10   at the last line of the tentative if I can find it in my

02:26  11   stack of --

02:26  12          (Pause in proceedings)

02:26  13          MR. BERHOLD:  I don't think I have anything to add

02:27  14   on separate market.  I don't recall my point, but the

02:27  15   question is whether there's sufficient demand, that people

02:27  16   would provide it if wasn't free and tied to the catheters in

02:27  17   the system.  The answer is clearly yes.  It's been done

02:27  18   historically that way, and it would be done again.  There's

02:27  19   no doubt.  These are very lucrative procedures for the

02:27  20   hospitals.

02:27  21          Thank you, Your Honor.

02:27  22          THE COURT:  Thank you.

02:27  23          I have a stip to continue filing dates for certain

02:27  24   of the pretrial filings.  I'll sign that.

0   8  25          MR. BERHOLD:  Can I mention that the stipulation

02:28   1   and proposed order was limited to certain filings?

02:28   2            THE COURT:  Right.

02:28   3            MR. BERHOLD:  We neglected to include oppositions

02:28   4   to motions in-limine that are due today.  I would ask that

02:28   5   be added to the order as well.

02:28   6            THE COURT:  Any objection?

02:28   7            MS. FORREST:  No objection, Your Honor.

02:28   8            THE COURT:  Will do.

02:28   9            MR. BERHOLD:  Thank you, Your Honor.  That will

02:28  10   make everyone's life a little easier as well.

02:28  11            THE COURT:  You know, practice of law is tough

02:28  12   enough as it is.

02:28  13            Okay, anything else for today?

02:28  14            MS. FORREST:  Your Honor, unless you have any

02:28  15   questions for me, then nothing from Biosense.

02:28  16            THE COURT:  Okay.  Thank you very much.  It's been

02:28  17   helpful.

02:28  18            (Whereupon, the proceedings were concluded.)

02:28  19                       *    *    *

02:28  20

02:28  21

02:28  22

02:28  23

02:28  24

0    8  25

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

30

**CERTIFICATE**

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:   June 11, 2022

/s/   Sharon A. Seffens  6/11/22

SHARON A. SEFFENS, U.S. COURT REPORTER

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER