**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



FILED

JAN 5 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| INNOVATIVE HEALTH, LLC, | No. 22-55413 |
| Plaintiff-Appellant, | D.C. No. 8:19-cv-01984-JVS-KES |
| v. | |
| BIOSENSE WEBSTER, INC., | MEMORANDUM[*] |
| Defendant-Appellee, | |
| ABBOTT LABORATORIES, | |
| Intervenor. | |

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted June 5, 2023
San Francisco, California

Before: MILLER and KOH, Circuit Judges, and MOLLOY,[**] District Judge.
Dissent by Judge MILLER.

Innovative Health, LLC ("Innovative") appeals the district court's grant of

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**] The Honorable Donald W. Molloy, United States District Judge for the District of Montana, sitting by designation.

summary judgment to Biosense Webster, Inc. ("Biosense") on its suit alleging violations of federal and state antitrust laws. We have jurisdiction under 28 U.S.C. § 1291. Taking a fresh look at the evidence in the light most favorable to the non-moving party, *Wilk v. Neven*, 956 F.3d 1143, 1147 (9th Cir. 2020), we reverse and remand for further proceedings.

Biosense manufactures and sells the CARTO 3, a cardiac mapping system. It also manufactures and sells three types of specialized catheters that connect to the CARTO 3 and provides free clinical support for its users. Innovative reprocesses and sells used catheters, including those produced by Biosense and compatible with the CARTO 3. Innovative does not offer clinical support services.

Beginning sporadically in 2014 and as an official policy since April 2016, Biosense has provided clinical support services only to those hospitals that purchase a catheter sold in the first instance by Biosense. As a result, hospitals that purchase Innovative's reprocessed catheters cannot receive free clinical support services from Biosense and must seek them from third parties. Innovative alleges that this new policy is an unlawful tie, in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and California's Cartwright Act, Cal. Bus. & Prof. Code § 16720.[1]

---

[1] "Because the analysis under the Cartwright Act mirrors the analysis under the Sherman Act," and "because the legal tests used for sections 1 and 2 of the Sherman Act are similar," we review the claims "simultaneously." *Flaa v.*

1. The district court erred in concluding that Innovative failed to raise a genuine dispute of material fact about the existence of a tie. To "defeat a motion for summary judgment on [a] claim of a tying arrangement, a reasonable trier of fact must be able to find" (1) that the tied and tying product are "two distinct products," and (2) that the defendant "has tied the sale of the two products." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992). There is no dispute that Biosense has tied its clinical support services to its sale of catheters. The district court, however, concluded that Innovative had failed to show that clinical support services are a separate product from catheters.

"[T]o be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide" the products separately. *Id.* This "consumer-demand test" requires "(1) that it is possible to separate the products, and (2) that it is efficient to do so, as inferred from circumstantial evidence." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 995 (9th Cir. 2023). Still, this test "does not require a full-blown economic analysis." *Id.* Evidence that the two products "have been sold separately in the past and still are sold separately" will satisfy this inquiry. *Kodak*, 504 U.S. at 462.

Innovative produced sufficient evidence both that clinical support services

---

*Hollywood Foreign Press Ass'n*, 55 F.4th 680, 688 (9th Cir. 2022) (citation omitted).

3

and catheters have been sold separately in the past and that they still are sold separately. Before Biosense enacted its tying policy, hospitals purchased roughly one in every four catheters used with the CARTO 3 (sales of which Biosense bundled with its clinical support services) from a catheter manufacturer other than Biosense. Biosense's competitors in the cardiac mapping system market, meanwhile, continue to provide clinical support services for their own systems while allowing hospitals to purchase catheters from other manufacturers. Moreover, roughly five percent of hospitals that use the CARTO 3 provide their own clinical support services and buy catheters separately, in effect buying the products separately.

Biosense relatedly contends that, because Biosense bundles its clinical support services with sales of the CARTO 3 for no additional charge, Innovative cannot show sufficient demand for the *purchase* of both products separately. This argument "flouts the Supreme Court's instruction that courts should conduct market-definition inquiries based not on 'formalistic distinctions' but on 'actual market realities.'" *Epic Games*, 67 F.4th at 978 (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018)). To the contrary, there is no "categorical rule that an antitrust market can *never* relate to a product that is not licensed or sold." *Id.* (emphasis in original). Innovative has produced sufficient evidence for a rational trier of fact to conclude that clinical support services and catheters are distinct

4

products.

2.  The district court also incorrectly concluded that Innovative failed to demonstrate a genuine dispute of material fact about the existence of a single brand aftermarket.  The existence of a tying arrangement does not alone make it unlawful: the defendant must also have "appreciable economic power in the tying market."  *Kodak*, 504 U.S. at 464.  In other words, "the relevant market for antitrust purposes can be an *aftermarket*—where demand for a good is entirely dependent on the prior purchase of a durable good in a *foremarket*."  *Epic Games*, 67 F.4th at 976 (emphasis in original).  To establish such a single brand aftermarket, a plaintiff must show that "(1) the challenged aftermarket restrictions are not generally known when consumers make their foremarket purchase; (2) significant information costs prevent accurate life-cycle pricing; (3) significant monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market."  *Id.* at 977 (cleaned up).

The district court correctly concluded that customers who purchased the CARTO 3 after Biosense's tying policy formally took effect in April 2016 cannot serve as evidence of Biosense's market power.  Sophisticated customers like hospitals assuredly were aware of the policy and yet chose to purchase the CARTO 3 anyway.  Market power arising "solely from contractual rights that consumers

5

knowingly and voluntarily gave to the defendant" does not offend the antitrust laws. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008).

The district court went astray, however, in concluding that because new customers purchased the CARTO 3 post-tie, customers who purchased the CARTO 3 *pre*-tie could not serve as proof of a single brand aftermarket. In *Kodak*, the Supreme Court explained that customers who had already purchased copiers (the foremarket) would tolerate some level of supracompetitive service prices (the aftermarket) because "the switching costs were high relative to the increase in service prices, and the number of locked-in customers were high relative to the number of new purchasers." 504 U.S. at 476.

A rational trier of fact could conclude that hospitals who purchased the CARTO 3 *before* the tying policy was adopted nationwide in April 2016 would not have known, at the time of purchase, about the aftermarket restriction (i.e., that they would only be able to use Biosense's more expensive catheters). As a result, these hospitals, at the time of purchase, would have been unable to accurately predict the life-cycle costs of cardiac mapping. *See Epic Games*, 67 F.4th at 979 ("Such life-cycle pricing would be impossible if those consumers were unaware that they would be restricted to certain vendors in the aftermarket."). A rational trier of fact likewise could conclude that these hospitals would face significant potential switching costs, because cardiac mapping systems are expensive and

because physicians develop familiarity with an existing system. Innovative has therefore produced sufficient evidence of the first three factors to defeat summary judgment.

The parties primarily dispute *Epic Games*'s fourth factor, which asks whether competition in the foremarket is insufficient to discipline anticompetitive behavior in the aftermarket. See 67 F.4th at 976–77 (explaining analysis in *Kodak*). One way for a plaintiff to disprove any disciplining effect is by demonstrating lock-in: that "the number of locked-in customers [is] high relative to the number of new purchasers." *Kodak*, 504 U.S. at 476.

Innovative has produced evidence that, of 609 CARTO 3 devices sold between November 2014 and April 2021, 142 were sold before the tying policy officially went into effect, or roughly twenty three percent. Although the Ninth Circuit has not adopted a specific metric for what constitutes a "high" number of locked-in customers, by any metric this number is significant. It is also much higher than those found insufficient by the out-of-circuit decisions cited by our dissenting colleague. *See, e.g.*, *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1347 (Fed. Cir. 2014) (seven out of 268 customers locked in was "not substantial" enough to defeat summary judgment); *SMS Sys. Maint. Servs. v. Digital Equip. Corp.*, 188 F.3d 11, 21–22 (1st Cir. 1999) (testimony from two individuals employed by defendant's customers, neither of whom provided data,

was not "a substantial number" for purposes of summary judgment). A rational trier of fact could conclude that a sizable portion of Biosense's customers were locked in, and thus that there was a viable single brand aftermarket.

To be sure, that Innovative has produced sufficient evidence to defeat summary judgment does not mean that it will triumph at trial. We are mindful that proof of lock-in, like other antitrust contentions, must be resolved "on a case-by-case basis, focusing on the particular facts disclosed by the record." *Epic Games*, 67 F.4th at 977 (cleaned up) (quoting *Kodak*, 504 U.S. at 467). It may be notable, for example, that Innovative failed to produce any evidence about sales of the CARTO 3 before 2014. A trier of fact might well conclude that the clinical support services market "does discipline the aftermarket[]" so that both are "priced competitively overall . . . . But we cannot reach these conclusions as a matter of law." *Kodak*, 504 U.S. at 486. The district court should not have granted summary judgment.

3.  Biosense's proffered alternative ground for affirmance fails. A tying policy may nonetheless be lawful if the defendant can show that its "procompetitive effects" conclusively "outweigh the anticompetitive effects." *Kodak*, 504 U.S. at 479. Such procompetitive justifications are generally insufficient to warrant summary judgment, however, unless the policy is one that "appears always or almost always to enhance competition." *Id.* Biosense offers

8

two such justifications, both of which went unaddressed by the district court: (1) that its tie prevents competitors from free riding, and (2) that its tie is needed to ensure the quality and safety of the catheters used with the CARTO 3. Neither justification warrants summary judgment.

A procompetitive justification is one that acknowledges that Biosense is charging a supracompetitive price but contends that this price allows it to compete more efficiently. *See id.* at 472, 478. Biosense therefore must not only point to an alleged free-rider problem but prove that this problem justifies *supracompetitive pricing*. It has failed to do so, and so it cannot prevail on summary judgment. Biosense is free to press this contention at trial, bearing in mind that Innovative's failure to enter the clinical support services market alone cannot justify "the creation of entry barriers to potential competitors." *Id.* at 485.

Finally, although Biosense argues that Innovative's reprocessed catheters do not meet Biosense's safety standards, it fails to offer any data in support of this contention. Instead, it relies on tests of a different company's reprocessed catheters. Moreover, on this record there is no significant difference in the rates of complaints submitted by hospitals between reprocessed catheters and Biosense's catheters. At most, Biosense has simply shown a genuine dispute of material fact about a procompetitive justification rooted in safety and quality considerations.

4. Because we conclude that Innovative has produced evidence of a

9

single brand aftermarket and so raised a triable issue regarding market definition, we do not address its argument that it produced sufficient direct evidence of Biosense's market power such that it need not define a market.

**REVERSED and REMANDED for further proceedings.**

FILED

JAN 5 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Innovative Health, LLC v. Biosense Webster, Inc.*, No. 22-55413

MILLER, Circuit Judge, dissenting:

Innovative Health reprocesses and resells catheters that are used with the CARTO 3, a cardiac-mapping system sold by Biosense Webster. Biosense provides free clinical support to hospitals that use the CARTO 3, but only if they purchase catheters from it, not from a reseller like Innovative. According to Innovative, this policy is an unlawful tying arrangement. I agree with the district court that Innovative has not presented sufficient evidence to create a genuine issue of material fact on the lawfulness of the Biosense policy.

A claim of unlawful tying requires a plaintiff to establish "(1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 971 (9th Cir. 2008) (quoting *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008)). According to Innovative, the two distinct products and services at issue here are support services for the CARTO 3 (the tying product) and catheters for the CARTO 3 (the tied product). To establish that Biosense has market power in the tying market, Innovative must show that "support services for the CARTO 3" constitutes

1

a well-defined market. *See Ohio v. American Express Co.*, 138 S. Ct. 2274, 2285 (2018) ("[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market."); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) ("A threshold step in any antitrust case is to accurately define the relevant market.").

Significantly, the tying market that Innovative has proposed is *not* the market for support services for cardiac-mapping systems generally: Biosense clearly lacks power in that market because it faces competition from many other providers of cardiac-mapping systems. Rather, Innovative proposes that support services for the CARTO 3 cardiac-mapping system should be viewed as a distinct market. This is known as a "single-brand aftermarket"—that is, the market for services that are ancillary to a product sold by a single manufacturer.

As one court has observed, "[i]t is an understatement to say that single-brand markets are disfavored. From nearly the inception of modern antitrust law, the Supreme Court has expressed skepticism of single-brand markets." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 343 (E.D.N.Y. 2019); *see Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1283 (10th Cir. 2004) (noting that "products of a single manufacturer may . . . constitute a relevant product market" only "in rare circumstances"). The Supreme Court held in *Eastman Kodak Co. v. Image Technical Services, Inc.*, that "one

brand of a product can constitute a separate market," but only if customers are "locked in" by their purchasing decision in the primary market so that they lack the ability to switch to a competing brand in response to an allegedly anticompetitive policy change affecting aftermarket products. 504 U.S. 451, 482, 477 (1992). But "[c]ourts have been extremely reluctant" to recognize single-brand aftermarkets. *In re ATM Antitrust Litig.*, 768 F. Supp. 2d 984, 997 (N.D. Cal. 2009) (internal quotation marks omitted).

      We have held that an antitrust plaintiff seeking to establish a single-brand aftermarket must show that the "(1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023). Innovative cannot satisfy that test.

      As the court correctly recognizes, the hospitals that purchase cardiac-mapping systems are sophisticated consumers with purchasing departments that are capable of evaluating the lifecycle costs of the systems (that is, the cost of the systems themselves plus the cost of catheters and support services). Hospitals are therefore unlike the consumers in *Eastman Kodak*, who struggled to price the

lifecycle cost of copiers and replacement parts. 504 U.S. at 473–75. Although hospitals that buy a CARTO 3 may be "locked in" to dealing with Biosense, that lock-in arises from the "functional equivalent of a contractual commitment," and "the law prohibits antitrust claimants from resting on market power that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1048–49 (9th Cir. 2008).

Instead, as the court explains, "the parties primarily dispute *Epic Games*'s fourth factor, which asks whether competition in the foremarket is insufficient to discipline anticompetitive behavior in the aftermarket." To have any chance of success in establishing that factor on a lock-in theory, Innovative must rely on those hospitals that purchased the CARTO 3 before April 2016, when Biosense adopted its current policy of providing free support services only to hospitals that purchase its catheters. Because those hospitals did not know about the policy when they made their purchases, Innovative says that they are "locked in" and lacked the ability to assess lifecycle prices.

As an initial matter, it is not clear that Innovative has raised a genuine issue of fact as to whether even pre-2016 customers are truly locked in. *See SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 21 (1st Cir. 1999) ("A lock-in phenomenon must be shown, not assumed."). If the lock-in effect is real,

then presumably at least some customers who purchased a CARTO 3 before the policy change would have chosen not to purchase the system had they known of Biosense's policy. But Innovative presents no evidence of any such customers. On the other hand, Biosense has shown that its sales were not negatively affected by the new policy: Its CARTO 3 system sales volume was the same before and after the policy was announced. Biosense has also presented anecdotal evidence suggesting that hospitals can and do switch between brands of cardiac-mapping systems.

Even setting aside that problem, establishing a lock-in based on pre-2016 customers would require Innovative to show that "the number of locked-in customers [is] high relative to the number of new purchasers," *Eastman Kodak*, 504 U.S. at 476, or at least that "a *substantial* number of customers were locked in . . . before they learned of [the] restriction on [the] aftermarket." *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1346 (Fed. Cir. 2014) (emphasis added). Only then would competition in the primary market for cardiac-mapping systems be insufficient to discipline potential anticompetitive behavior in the aftermarket for support services.

Innovative has not shown that the number of locked-in customers is substantial, let alone that it is "high relative to the number of new purchasers." *Eastman Kodak*, 504 U.S. at 476. In fact, Innovative has not said anything about

5

the percentage of Biosense's customers that it believes to be locked in. *See Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) ("[I]t is not our task, or that of the district court, to scour the record in search of a genuine issue of triable fact." (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). Nevertheless, because the court relies on its own calculations of the relevant percentages, I address them here.

Innovative alleges that 609 CARTO 3s were sold between 2014 and 2021, with 142 sales coming before April 2016. It has not provided data on sales before 2014, but even if we confine our focus to the 2014–21 period, Innovative has not met its burden. The 142 CARTO 3 sales occurring before April 2016 represent only 23 percent of actual Biosense sales during the period. Even drawing all inferences in Innovative's favor, the locked-in fraction of the market is therefore too small to permit Biosense to "exploit the aftermarket." *DSM Desotech Inc.*, 749 F.3d at 1345 (citation omitted). If Biosense were to raise catheter prices to supracompetitive levels, "defections from the manufacturer's installed base, coupled with losses in the foremarket, in all probability [would] sabotage any effort to exploit the aftermarket." *SMS Sys. Maint. Servs.*, 188 F.3d at 21. In other words, Innovative would risk losing a large share of its non-locked-in customers—as well as forgoing the opportunity to sell to new customers—in return for gains among a much smaller set of allegedly locked-in customers. Because, as a matter

of law, Innovative has not established that a substantial number of its customers were locked in, the district court correctly concluded that Innovative had not created a genuine issue of material fact with respect to the existence of a single-brand aftermarket.

Perhaps recognizing the weakness of its evidence of market definition, Innovative emphasizes a different theory on appeal, arguing that it does not need to establish a well-defined market because it has presented direct evidence of market power. The court today does not rely on that theory, and with good reason. The Supreme Court has cautioned that valid inferences about market power can be challenging in the absence of proper market definition. *American Express*, 138 S. Ct. at 2285. That is especially true when the challenged conduct may "pose no risk to competition." *Id.* at 2285 n.7. And "[l]ike other vertical restraints, tying arrangements may promote rather than injure competition." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1200 (9th Cir. 2012). So even if it is possible to establish market power without satisfying the test for single-brand markets, Innovative would have to put forward a particularly strong showing of market power and anticompetitive effects in order to do so. It has not done so here. Innovative mainly points to the coincidence of rising prices of catheters and increasing demand for catheters. But "[w]here . . . output is expanding at the same time prices are increasing, rising prices are equally consistent with growing

product demand." *American Express*, 138 S. Ct. at 2288–89 (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.* 509 U.S. 209, 237 (1993)).

The district court correctly granted summary judgment to Biosense, and I would affirm its well-reasoned decision.