1               UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
2               SOUTHERN DIVISION - SANTA ANA

3

4    INNOVATIVE HEALTH LLC,        )  Case No. SACV 19-1984-JVS(KESx)
                                   )
5          Plaintiff,             )  Santa Ana, California
                                   )  Monday, November 4, 2024
6               v.                 )  1:30 P.M. to 2:27 P.M.
                                   )
7    BIOSENSE WEBSTER, INC.,       )
                                   )
8          Defendant.             )
     _____)
9

10

11

12               TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE KAREN E. SCOTT
13             UNITED STATES MAGISTRATE JUDGE

14

15   Appearances:              See Page 2

16   Deputy Clerk:             Jazmin Dorado

17   Court Reporter:           Recorded; CourtSmart

18   Transcription Service:    JAMS Certified Transcription
                               16000 Ventura Boulevard #1010
19                             Encino, California  91436
                               (661) 609-4528
20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

```
 1   APPEARANCES:

 2

 3   For the Plaintiff:      Kellogg, Hansen, Todd, Figel and
                             Frederick, P.L.L.C.
 4                           By:  MATTHEW D. READE
                             1615 M Street NW, Suite 400
 5                           Washington, D.C.  20036
                             (202) 326-7913
 6                           mreade@kellogghansen.com

 7                           Jeffrey L. Berhold, PC
                             By:  JEFFREY L. BERHOLD
 8                           1230 Peachtree Street, Suite 1050
                             Atlanta, Georgia  30309
 9                           (404) 872-3800
                             jeff@berhold.com
10
                             Theodora Oringher PC
11                           By:  PANTEHA ABDOLLAHI
                             535 Anton Boulevard, Ninth Floor
12                           Costa Mesa, California  92626
                             (714) 549-6200
13                           pabdollahi@tocounsel.com

14
     For the Defendant:      Stradling Yocca Carlson and Rauth LLP
15                           By:  KARLA J. KRAFT
                                  SEAN T. LOBB
16                                LISA M. NORTHRUP
                             660 Newport Center Drive, Suite 1600
17                           Newport Beach, California  92660
                             (949) 725-4000
18                           kkraft@stradlinglaw.com
                             slobb@stradlinglaw.com
19                           lnorthrup@stradlinglaw.com

20                           Patterson Belknap Webb and Tyler LLP
                             By:  WILLIAM F. CAVANAUGH, JR.
21                                ADEEL A. MANGI
                             1133 Avenue of the Americas
22                           New York, New York  10036
                             (212) 336-2000
23
                             KATHRYN MEISEL
24                           In-House Counsel
                             Johnson and Johnson
25
```

1    SANTA ANA, CALIFORNIA, MONDAY, NOVEMBER 4, 2024, 1:30 P.M.

2        (Call to Order of the Court.)

3            THE CLERK:  Calling case No. 8:19-cv-1984-JVS-KES,

4    *Innovative Health LLC v. Biosense Webster, Incorporated*.

5            Counsel, your appearances, please.

6            MATTHEW D. READE:  Matthew Reade for Innovative

7    Health.

8            JEFFREY L. BERHOLD:  Good afternoon, Your Honor.

9    Jeff Berhold for Plaintiff Innovative Health.

10           PANTEHA ABDOLLAHI:  Good afternoon, Your Honor.

11   Panteha Abdollahi on behalf of Innovative.

12           KARLA J. KRAFT:  Good afternoon, Your Honor.

13   Karla Kraft on behalf of Defendant Biosense.

14           SEAN T. LOBB:  Good afternoon, Your Honor.

15   Sean Lobb on behalf of Defendant Biosense Webster as well.

16           LISA M. NORTHROP:  Good afternoon, Your Honor.

17   Lisa Northrop also on behalf of Defendant Biosense Webster,

18   Inc.

19           THE COURT:  And I believe we have some counsel on

20   the phone.  Can you state your appearances as well, please.

21           WILLIAM F. CAVANAUGH, JR.:  Bill Cavanaugh from

22   Patterson Belknap, Your Honor, on behalf of defendant.

23           ADEEL A. MANGI:  Adeel Mangi from Patterson Belknap

24   also for the defendant.

25           KATHRYN MEISEL:  And Kathryn Meisel, in-house with

1    Johnson and Johnson, defendant.

2           THE COURT:  All right.  We are here to address a

3    discovery dispute.  The motion before the Court, I believe,

4    is at Docket 267, with the opposition at 273, and the reply

5    at 277.  The Court did go back and look at the history of the

6    case, and there's a lot that has gone on before the

7    magistrate judge was involved in any discovery disputes here,

8    and so I wanted to start by just confirming the scope of the

9    current discovery dispute to make sure that everyone is on

10    the same page.

11           While I know from the prior motions that there were

12    was some disputes about the scope of what sort of discovery

13    should happen after the Ninth Circuit remand about the dates

14    that were relevant and so forth, my understanding is that

15    presently the only issue that is remaining in dispute is

16    whether the Defendant Biosense needs to update sales

17    transaction data, which I understand to be identifying

18    essentially the number of sales, the customers, the dates,

19    maybe some pricing -- that kind of thing -- whether they need

20    to update that sales transaction data for two new models of

21    catheters that were introduced after the Ninth Circuit

22    appeal, the Octaray and the Optrell.  Is that what is at

23    issue here today?

24           MR. READE:  Your Honor, that's largely correct.  I

25    would just say the one other thing is that to the extent

1    there are any other catheters that were responsive to the

2    original discovery request -- so diagnostic or ultrasound

3    catheters -- that they haven't disclosed to us, we'd ask that

4    your order include those as well.  But the Octaray and the

5    Optrell are the two catheters that we highlighted in our

6    motion because those were the ones that we had focused on.

7              THE COURT:  All right.  So the parties' arguments

8    kind of fall into two groups.  There's arguments about was

9    this something that Judge Selna already ordered.  Looking

10   back at Judge Selna's order on the docket at No. 246 -- I can

11   tell the parties right from the start here that I've gone

12   back and read Judge Selna's order.  There's language that you

13   can look at to support both sides' interpretations.  So I

14   don't think either side has a slam-dunk argument based solely

15   on looking at Judge Selna's prior language without any

16   further inquiry.  So you're welcome to make arguments about

17   that, but my sense from when I read it was that he wasn't

18   really focused on the Octaray and the Optrell when he wrote

19   that language and that he didn't expressly address that, and

20   so you can look at certain things that he said to support

21   both sides' arguments.

22           The other large group of arguments that are being

23   made are arguments about relevancy because ultimately, if

24   data isn't relevant, then it's not within the scope of

25   discovery.  And there are a number of different arguments

1   about relevancy that are being made, arguments about whether

2   it's relevant to injunctive relief, whether it's relevant to

3   expert opinions, whether it's relevant to market conditions,

4   and typically in a discovery dispute if someone can show that

5   data is relevant for one purpose, that's enough.  So whether

6   the data may or may not be relevant for other purposes may

7   not be something that this Court needs to decide if the Court

8   finds that the data is relevant for at least one purpose that

9   is an issue that is in the lawsuit -- something that is put

10  at issue by the claims and defenses in the lawsuit pursuant

11  to Rule 26.

12          So with that set up, let me turn to plaintiff since

13  it's your motion as the moving party, and I think you can

14  hear from that that what I'm hoping that you can address is

15  some of the relevancy arguments that are being made here, and

16  maybe tell me what you think your best relevancy argument is,

17  but you're not limited to arguing that.  You can tell me all

18  the different ways you think this is relevant.

19          MR. READE:  Sure.  Thank you, Your Honor.

20          So I'd just start -- would you prefer that I stand

21  or is --

22          THE COURT:  You can sit or stand.  What I will say

23  is that we use a audio-recording system instead of a

24  traditional court reporter in this department.  So, as long

25  as you're close to a microphone, that's what's important to

1   make sure we get a clear record.

2           MR. READE:  Okay.  I will hang out here then.

3           THE COURT:  And you can feel free to pull the

4   microphone closer to you if you need to, however you're

5   comfortable.

6           MR. READE:  Okay.  Thank you, Your Honor.

7           So this data, we think, is clearly relevant given

8   the contours of this case.  So, as we explained in our

9   papers, we alleged three relevant catheter markets, and one

10  of them is a market for high-density mapping catheters, and

11  in this dispute there's actually no dispute between the

12  parties as to whether the Octaray and the Optrell are high-

13  density mapping catheters.  Biosense did not put in any

14  evidence suggesting that they are not high-density mapping

15  catheters, and our expert set forth a product market for

16  high-density mapping catheters, and as Biosense explained to

17  the Ninth Circuit in its en banc petition, one of our product

18  markets was high-density mapping catheters for use with the

19  Carto 3.  So there's no real question, I think, that the

20  Octaray and the Optrell belong to a candidate market in this

21  case.

22          THE COURT:  And let me just stop you there for a

23  moment and make sure that I understand the practical

24  ramifications of that argument.  I understand that, for

25  example, in the Complaint one of the catheters that is at

1    issue is the Pentaray.  If you were looking at sales data for

2    the Pentaray, would it be affected by sales of the Octaray or

3    Octarell [sic]?

4            MR. READE:  Well, certainly because they're

5    substitute products --

6            THE COURT:  Okay.

7            MR. READE:  -- and as -- you know, the Octaray and

8    the Pentaray -- the Octaray has three additional splines to

9    do the same function of mapping the inside of your heart for

10   purposes of the atrial fibrillation procedure, and so, you

11   know, if we don't have the full picture, it's really a

12   question of whether our expert in the supplemental report

13   that's due this December 2nd will have the benefit of the

14   hard data about total sales in the market and about the

15   degree of -- you know, to which customers have, you know,

16   moved to the Optrell or the Octaray, and measuring the total

17   extent of lost opportunities from our client's inability to

18   reprocess high-density mapping catheters in that market or

19   whether we'll have to estimate.  But the fact is that's going

20   to be something we're going to need to answer if we're trying

21   to understand what current market conditions are.

22           And so the other piece of this that's important is

23   that it's also not disputed that each of these catheters is

24   subject to the principal anticompetitive policy alleged in

25   this case, which is the case coverage policy.  And so in that

1  respect, these two catheters are exactly the same --

2  similarly situated as the Pentaray, and so it's, of course,

3  very relevant to not only damages, because the Pentaray

4  reprocessed version that our client sells is -- you know, our

5  theory of lost profits is that we are unable to sell high-

6  density -- reprocessed high-density mapping catheters because

7  of the case coverage policy, and that's true, you know,

8  whether or not it's only the Pentaray or is also the Octaray

9  and the Optrell because we have a product in the market that

10 is a substitute for each of those products that are in the

11 market.

12        THE COURT:  So your argument is even though you

13 don't currently reprocess the Octaray or the Optrell that

14 someone who is looking at buying a catheter for their Carto 3

15 system might opt to buy one of those newer models rather than

16 a reprocessed Pentaray because of the support that is tied

17 with the purchase of that new product?

18        MR. READE:  That's correct.  And I'd point to page

19 7, note 2, of our opening brief.  You know, Biosense

20 Webster's own press release markets the Optrell as a high-

21 density diagnostic catheter, and the Octaray is, you know,

22 expressly styled as sort of the next version of the Pentaray,

23 sort of a -- you know, with slightly more electrodes and --

24 but serving a similar function, and indeed the benchmarking

25 that was performed expressly compares those two products.  So

1    that's what I would say with respect to damages.

2           And then of course on injunctive relief, complete

3    sales and pricing data will help the Court assess the extent

4    to which the case coverage policy harms competition in the

5    overall market for high-density mapping catheters, and one

6    way this is so is that it will show the extent and effect of

7    higher catheter prices on consumers.  So just to make this a

8    little more concrete, one of the things our expert analyzed

9    is whether the pricing in the catheter market -- in --

10   reflects sort of super-competitive pricing, and he answered

11   that question "yes" and of -- it would of course be relevant

12   to understanding whether that is still true today and to what

13   extent to understand what the pricing has been for these new

14   entries -- these sort of latest and greatest products that

15   Biosense Webster has introduced in the market.  And then --

16          THE COURT:  Am I understanding you correctly that

17   the injunctive relief that you are seeking in this case is a

18   court order that either defendant not provide any free

19   support or if they're going to provide free support that they

20   do it for new and reprocessed catheters?

21          MR. READE:  So obviously subject to the record that

22   develops at trial, I would say that, you know, one of the

23   provisions that was instituted in the *Kodak* case, for

24   example, is an antidiscrimination provision.  So, if you're

25   going to provide support for the product, you need to provide

1   support for the product whether it is a new catheter or a

2   reprocessed catheter.  So, yes, that would be my answer

3   there.

4           And then just quickly on market power, this is

5   another respect in which this catheter data is relevant

6   because, you know, market power is the ability to restrict

7   price and output, and so having complete sales data will give

8   us a sense of how these two new entries in the market have

9   affected sales and pricing in the high-density mapping

10  catheter market.

11          So I think those are sort of our key points on the

12  relevance of this data, and I'm also happy to discuss, you

13  know, why we think Judge Selna's prior order clearly embraces

14  this information, but I'll pause there if you have any more

15  questions or want to direct me elsewhere.

16          THE COURT:  Let me ask you about one of the

17  arguments that was raised by defendant in their brief where

18  they said, "If we have to provide sales data about these new

19  models that it will be difficult or impossible for experts to

20  draw any conclusions about those unless there is additional

21  discovery about the new models, what their features are,

22  whether they are subject to being reprocessed, whether anyone

23  has considered reprocessing them or applied" -- "or started

24  the application process with regard to them and so forth."

25  If we understand that Judge Selna wasn't authorizing brand

1  new factual discovery about that kind of thing, is the sales

2  data still useful without that kind of supplemental

3  discovery?

4          MR. READE:  I think it is.  And I'd just preface my

5  comments by saying that of course we're not seeking that

6  discovery, right.  All we're seeking is complete catheter

7  sales data through mid-2024, which is how we understand

8  Judge Selna's order.

9          But -- so -- I lost my train of thought,

10  Your Honor.  Could you just run back the question again?

11          THE COURT:  Right.  It was their argument that "If

12  we start producing sales data about these catheters that no

13  one can really analyze its effect on market share or market

14  power or market conditions if you don't know other facts

15  about them, like what their features are and why a customer

16  might choose them instead of something else."

17          MR. READE:  So my response to that would be that

18  our lost profits -- so, first of all, there is agreement

19  already that these are high-density mapping catheters that

20  perform that -- you know, the function that high-density

21  mapping catheters perform.  I mean, these are high -- if it

22  walks like a duck and quacks like a duck, it's a duck, and

23  that's true of high-density mapping catheters in this case.

24  They've put in no evidence on this motion that these

25  catheters are so different from the Pentaray that they are

 1   not even, you know, remotely similar substitutes such that

 2   this data would be informative of an analysis of market power

 3   or damages or of understanding the scope of injunctive relief

 4   that would need to be ordered.

 5           And just to kind of make this point more concrete,

 6   you could imagine a case where, you know, this Court orders

 7   injunctive relief with respect -- like, let's imagine a world

 8   where there's no Octaray, there's no Optrell, it's just the

 9   Pentaray, and this Court orders an injunction and says, you

10   know, "You can no longer discriminate against reprocessed

11   Pentarays," and then they come out with sort of the

12   Pentaray plus," and it's got a yellow handle instead of a

13   black handle, but it's -- it's, you know, largely the same

14   product, and they advertise it to perform the same function.

15   There's -- it doesn't -- it would seem odd if we said that

16   that was beyond the power of the Court to address because

17   that seems like clearly an evasion of the injunction and

18   makes it impossible to enforce the antitrust laws.

19           If indeed the case coverage policy is illegal

20   because it is a tie -- an unlawful tie, then it must be true

21   that all the products that belong to that constituent market

22   should be subject to that same relief that remediates the

23   harm to competition that has taken place.

24           And so in a nutshell, I don't think there really is

25   a dispute that these are -- you know, belong to the same

1    candidate market.  They say there is, but they agree that

2    they are high-density mapping catheters.  So unless they have

3    some explanation as to how a high-density mapping catheter

4    cannot be a high-density mapping catheter, then I think it's

5    quite clear that this information would be relevant and

6    important to understanding the contours of the market.

7         THE COURT:  All right.  I think that is all the

8    questions I have right now for plaintiff.  So I'll be happy

9    to hear from defendant.

10        MR. READE:  Thank you, Your Honor.

11        MS. KRAFT:  Thank you, Your Honor.

12        Antitrust cases turn on market definitions.  What

13   we are in dispute on appears to be the market definitions

14   that have been litigated for the last five years that

15   plaintiff has chosen to use in the case and that are at issue

16   still currently today.

17        Plaintiff is now characterizing their market

18   definitions as "high-density mapping catheters" or

19   "ultrasound catheters."  That has not been how the case has

20   been litigated at any point in time.  This has been a case

21   about three single product markets, and it has been that way,

22   really, from the inception.  The Complaint certainly

23   discusses markets broadly for high-density mapping catheters

24   and markets broadly for ultrasound catheters, but what it

25   actually focuses on are four specific catheters, three of

 1  which are still at issue in three separate single-product

 2  markets and one that plaintiffs have abandoned as discovery

 3  has gone on.

 4         So, if we look at the history of this, we can look

 5  at the motion for summary judgment and the order granting

 6  defendant's motion for summary judgment.  In that order,

 7  Judge Selna specifically found that Innovative's argument

 8  that it didn't have single-product markets here -- or

 9  actually that -- was simply incorrect, specifically on page 9

10  of Judge Selna's summary judgment order, and I quote,

11  "Innovative argues that the markets it defines are not

12  single-brand markets."  That is not the case.  This is

13  precisely the definition of a "single-brand market."

14         In the Ninth Circuit -- in the Ninth Circuit's

15  order, the entire order is discussing whether or not

16  plaintiff can take to trial single-brand product markets, if

17  they have offered enough evidence to have a sustainable

18  single-brand product market to take the case back forward

19  toward trial, and specifically, in remanding the case on

20  pages 9 through 10 of the Ninth Circuit order, "Innovative"

21  -- the court holds "Innovative has produced evidence of a

22  single brand" product market, and then it goes on to say

23  sufficient to take the case to trial.

24         THE COURT:  And it's your understanding that in

25  saying that the Ninth Circuit was saying, "And that's the

1    only theory they can go to trial on"?

2    MS. KRAFT:  That's the theory -- yes, that's the

3    theory that the Ninth Circuit was saying that they were going

4    to go to trial on, and that's what Judge Selna emphasized in

5    the June 10 hearing.  So in the June 10 hearing -- the

6    transcript is before the Court -- Judge Selna specifically

7    said there are going to be no new theories.  The record is

8    the record.

9    The reason I'm talking about these markets is the

10   plaintiffs are talking about how new catheters that Biosense

11   has put on the market are high-density mapping catheters, but

12   that's not the market that they're using, and that is why it

13   is not relevant.  They have three single-brand product

14   markets:  for the Soundstar, which is an ultrasound catheter;

15   for the Pentaray, which is a high-density mapping catheters;

16   and then they've created -- or defined a third market for

17   circular mapping catheters, which is the Lasso.  Those are

18   the catheters that were the subject of these orders, also

19   that were the subject of their expert report and the single-

20   product markets analyzed in their expert report.

21   THE COURT:  Well, can you respond to counsel's

22   hypothetical where he says, "Okay.  We defined the Pentaray

23   as its own market because it's a high-density mapping

24   catheter, but then defendant comes out with something that

25   is, for all intents and purposes, incredibly similar to the

1    Pentaray but for a cosmetic change or a slight variation."

2    Are you saying that, because that's what their complaint

3    says, they're locked in and they can't point that there's

4    something new that is in fact relevant to the sales of the

5    Pentaray?

6         MS. KRAFT:  In part yes, and in part it's a

7    completely different issue.  The "in part yes" is they chose

8    to define their market as they defined it.  The plaintiff is

9    the master of their complaint, the master of their case.

10   They've litigated a single-product market throughout the

11   case, including in their expert's report, which I

12   specifically want to address on relevance in just a moment.

13        But the short answer is, yes, in part that's true

14   because of how they defined their markets.  However, what is

15   really notable about that is Biosense has other high-density

16   mapping catheters that have been on the market during the

17   case that plaintiffs have evidence on that they did not use

18   in their expert report and that they have not included in

19   their now alleged high-density mapping catheter market

20   analysis.  They've only analyzed the Pentaray as a high-

21   density mapping catheter.  There is another catheter called

22   the "Decanav" that has existed throughout the litigation that

23   Biosense sells -- makes and sells that has -- that is still

24   sold to this day.  They have data on it.  Their expert did

25   not argue about it.  They did not include it in any of their

1    -- in any of their analyses.

2              THE COURT:  Is that something that's used with the

3    Carto 3?

4              MS. KRAFT:  Yes.

5              THE COURT:  Okay.

6              MS. KRAFT:  It is.

7              And so plaintiffs have decided not to include other

8    high-density mapping catheters that Biosense has had on the

9    market in their market grouped with their single product,

10   which is the Pentaray.

11             How we get into relevance and the limitation of

12   their market definitions can really be seen in their expert

13   report.  In their expert's report, Dr. Forister analyzes

14   three single-product markets, and in doing so, he analyzes

15   market share and market power, which he needs to do and what

16   they're talking about as one of the issues now.  He relied,

17   when he did that, exclusively on the sales of the three

18   at-issue catheters in three single-product markets.  He

19   didn't use the "Decaray," he didn't use -- sorry -- Decanav,

20   and he didn't use any other Biosense catheters.  Biosense

21   makes dozens of catheters.  Innovative reprocesses 12 types

22   of them.  They didn't use any other Biosense catheters.  For

23   a lost-profit calculation, Dr. Forister relied on two

24   unrelated catheters.

25             So if, now, plaintiff wants discovery, the question

1  in part that is really teed up here is how do plaintiffs plan

2  on using this discovery?  There are only two ways that they

3  can do so.  One -- and they've never clarified which of these

4  they want to do.  We posed the question in our opposition.

5  It was not answered in the reply.  Either they want to

6  affirmatively seek damages for the sale of the Octaray and

7  the sales of the Optrell.  If they want to do that, that

8  fundamentally changes the current single-product markets that

9  they have.  It changes the entire damages analysis.  So the

10  discovery that was done on third-party usage of, for example,

11  in the high -- as a high-density mapping catheter in the

12  Pentaray, we would need to take discovery of third parties to

13  understand how they're using that and their purchase of that

14  and so forth.  We would --

15           THE COURT:  If they were trying to update their

16  lost-profit damages' calculations just for the reprocessed

17  Pentarays, would they need to take into account the fact that

18  now, when a consumer in 2024 is thinking about what catheter

19  to buy, it's not just a new Pentaray or a reprocessed

20  Pentaray, that another choice on the market is the fancy,

21  up-to-date Optrell and that a consumer might pick that for

22  other reasons that might not be related to the tying that's

23  alleged?  Wouldn't that be something an expert would want to

24  know, if lots of consumers picked that, and then that might

25  be a reason to say, "Well, we haven't been selling as many

1   reprocessed Pentarays," but there's an alternate explanation

2   that's not really anticompetitive?

3            MS. KRAFT:  No for three reasons.

4            THE COURT:  Okay.

5            MS. KRAFT:  One, Dr. Forister, when he created his

6   original lost-profits calculation, did not use other

7   potentially competitive catheters, like the Decanav, right.

8   He used two unrelated catheters to create his lost-profits

9   calculation.  So how Dr. Forister approached it originally,

10  if you were to now include alleged, you know, replacement

11  catheters or very similar catheters, he's fundamentally

12  changing how he is approaching his lost-profits calculation

13  theory.  That's a new theory.  That's something Judge Selna

14  said, "No, you don't get to do at this point in the case."

15           Two, right now Biosense admittedly does not

16  reprocess and does not have FDA approval to reprocess the

17  Octaray or the Optrell at all.  So that is something where it

18  is entirely speculative what, if any, damages they could

19  have.  It's entirely speculative if they ever will reprocess

20  those or if anybody is reprocessing those or ever will

21  reprocess those.  It is speculative damages.  It's

22  speculation entirely with regard to any remedy.

23           And third, it is not workable in an antitrust case

24  to have a continually evolving market definition.  When you

25  have a market definition, that is what your experts are

1    analyzing.  That is what you are considering and defending

2    against.  Consider a situation that they are essentially

3    proposing here, which is "Well, these two catheters now and

4    any new catheters in the future" -- and that's what they're

5    saying, and in fact during a meet-and-confer recently, they

6    said, "Well, what about other new catheters?  Are you putting

7    these on the market?"  That isn't how this works.  Companies

8    are always putting forth new products.  Whether or not they

9    are part of a single-product market clearly is a no, but it

10   isn't a situation where you get to speculatively say, "This

11   order is going to apply to something that might come out in

12   the future, we might process in the future."  That's' not

13   appropriate in a damages award.

14          THE COURT:  There was a cutoff date, as I

15   understand it, in Judge Selna's prior orders of June 30,

16   2024.  So I did not believe that anybody was relitigating the

17   cutoff date for relevant sales data here.

18          And I see counsel on plaintiff's side nodding.

19          MS. KRAFT:  That's right.

20          THE COURT:  Okay.  With regard to the undisclosed

21   catheters, I understood them to be -- when they made that

22   statement at the beginning of the hearing to essentially be

23   saying, well, they're aware of the "Octarell" and the

24   Optrell, but if there were additional catheters that were

25   sold before June 30, 2024, that would be high-density mapping

1   catheters that's what they want to know about, not just

2   anything but that specific thing.

3          MS. KRAFT:  During a meet-and-confer on a

4   completely unrelated issue where they had a question about a

5   spreadsheet -- and updated spreadsheet that was produced,

6   plaintiff's counsel asked about three new catheters that they

7   wondered if they were currently on the market and said that

8   they believed, as they did here today, that they would get

9   data on all catheters, and that is not appropriate.

10          I also want to mention something about

11   Judge Selna's order and the meet-and-confer process that led

12   up to that.  At no point during the meet-and-confer process

13   on supplemental discovery, which started shortly after

14   remand, so in March or April of this year -- at no point

15   during that process were new catheters -- for example, the

16   Octaray -- ever addressed.  They were not discussed with

17   Judge Selna.  That was not part of the discussion that

18   Judge Selna had when doing this -- when granting the limited

19   scope of additional discovery that was allowed.

20          THE COURT:  It was -- I sort of -- counsel can jump

21   in here, if they think I'm wrong, but I think in -- I had a

22   notation here that Document 236, which is one of the motions

23   that plaintiffs brought, specifically mentions the Octarell

24   and the Optrell on, like, page 17, and that was a motion that

25   was granted.

1          MS. KRAFT:  There's one mention in their document.
2     That's correct.

3              THE COURT:  Okay.

4          MS. KRAFT:  It was not addressed as a point in
5     their document.  It was not addressed in oral argument.  It
6     was not addressed in meet-and-confers.  There's one line, one
7     mention of that name but no actual discussion of it
8     whatsoever.

9          And I think what is relevant here is this is a
10    unique situation that we have in this particular case where
11    this isn't an -- sort of standard discovery, right.  A
12    standard relevant standard that might be very broad in
13    general discovery before discovery closes isn't really what's
14    going to apply here because discovery between the parties
15    closed three years ago, in September of 2021.  It hasn't
16    reopened.

17         What Judge Selna did in his order is he ordered
18    production of limited supplemental data for the sole purpose
19    of bringing certain spreadsheets -- certain data on certain
20    spreadsheets current to the present time.  Okay.  So there
21    was -- and in doing so, he rejected the broad scope that
22    plaintiffs were asking for in their motion and in their
23    proposed order and instead narrowly required, quote,
24    "Biosense's supplemental production shall [sic] include data
25    from the prior disclosure end date through June 30, 2024.

1    However, the production is limited to the same categories of

2    data already produced."

3              One of the reasons for doing so is -- I can't

4    speculate, but one of the reasons, I believe, that that would

5    certainly make sense here is we are post-remand, we have a

6    scope of the case that was before the Court of Appeal that is

7    now sent back to trial, and one of the key issues in that is

8    that there are three single-product markets.  What they're

9    talking about now is not appropriate to include in those

10   single-product markets.

11             So, if they were to bring in data and say, "We get

12   damages on this," one, that's utterly speculative because

13   they are not actually reprocessing any of these catheters or

14   teed up to reprocess any of these catheters, and; two, it

15   would fundamentally change the product markets at issue.

16   They would either be creating new product markets or changing

17   fundamentally one of the existing product markets such that

18   we need to essentially reconstitute what the experts are

19   doing, take additional discovery on that to understand the

20   scope of what's now happening in this new market.

21             THE COURT:  So, if I'm understanding your argument

22   here, you're saying that their -- during the allowed period

23   for expert discovery, their expert produced a report that

24   defined three single-product markets.  In that analysis they

25   did not look at whether alternative high-density mapping

1   catheters were affecting the sales of those three different

2   types of catheters that were in those single market -- or

3   single-product markets and that, if they were try to do so

4   now, they could not do so because it would be a new theory

5   that is prohibited by Judge Selna.

6          MS. KRAFT:  That's close.  I want to do one --

7          THE COURT:  Okay.

8          MS. KRAFT:  -- one tweak on the first part of that.

9          So their expert did two things.  One is he analyzed

10  the market share and market power in each of the three

11  single-product markets.  So he looked at sales of the three

12  at-issue catheters, and he looked at the sales by Biosense,

13  the Biosense OEM, you know, market -- manufactured catheters,

14  as well as reprocessed versions of those catheters, right, in

15  that single-product market.  So that's what he did when he

16  analyzed market share and market power in each of the three

17  single-product markets.  When he looked at lost profits, he

18  did a different calculation and relied as a benchmark on two

19  other unrelated catheters.

20         So that is how he chose to structure his analysis.

21  He did not, for example, say that there was a high-density

22  mapping catheter market because, if he did, that would have

23  included at the time, at a minimum, the Pentaray and the

24  Decanav, which they had data on, but instead he was analyzing

25  those exact three catheters and their reprocessed versions in

1  each of these three markets.  So, if we now add data for

2  other catheters, it fundamentally changes those three markets

3  in the market share, market power theory and structure that

4  he was doing in his report.  And on the lost-profit

5  calculation, he wasn't using other catheters, like the

6  Decanav or something else, to begin with.  So it, again,

7  fundamentally changed that theory.

8          So if he were looking -- if plaintiff were looking

9  at adding this in as damages, we've got a problem on both

10 speculative damages -- they don't have standing on it -- and

11 the fact that it fundamentally changes this.  If they're

12 instead making this sort of general, you know, market power,

13 you know, kind of broad-based argument, that goes back to,

14 well, it's fundamentally different than what they've done

15 before.  There's no relevancy there.  So that's the lack of

16 relevance in sum.

17         THE COURT:  Let me go back to something we were

18 talking about just a moment before.  Are there any new high-

19 density mapping catheters that have been introduced by

20 Biosense before June 30, 2024, other than the Octaray and the

21 Optrell?

22         MS. KRAFT:  I don't know the answer to that,

23 Your Honor.

24         THE COURT:  And if the Court were to direct that

25 the Octaray and Optrell be added to the spreadsheet so that

1  the same kind of data that was produced before for the

2  Pentaray now be produced for these new catheters, can you

3  give me an understanding of what that would entail?  Is that

4  data that would take weeks to compile?  Is that something

5  that could be run via some sort of automated report?

6          MS. KRAFT:  Unfortunately it's not the latter.  It

7  is working with multiple people in multiple departments to

8  get different pieces of data to populate the same type of

9  spreadsheet that was produced on other things, and

10 unfortunately that's not where it would stop, right.  If that

11 data is now out there and subject to use for experts and

12 others in the case, one, you know, depending on how they use

13 it -- again, they haven't disclosed a purpose for it, and I

14 think that is important to what may or may not, you know, be

15 relevant.  I don't think there is a proper or relevant

16 purpose, but right now it's not clear what the purpose is.

17         But depending on how they are trying to use that,

18 in either direction there would be additional discovery that

19 would be needed to understand the impact on either the new

20 single-product market that they are trying to forward or the

21 impact of change on the market that currently is a single-

22 product market for the Pentaray, which they are now

23 broadening to talk about as all high-density mapping

24 catheters on the Carto 3 and so there -- that fundamentally

25 would require additional discovery that at this late stage in

1    the case is, in our opinion, not appropriate because they had

2    a chance to choose their market definition, they did, and in

3    general, you can't have a continually evolving definition.

4    Every time a company releases a new product the case is going

5    to extend.  So essentially under their theory, the case would

6    never go to trial because at some point there's going to be a

7    new product of some type here -- a catheter -- but in any

8    antitrust case, assuming a company is evolving and

9    innovating, they're going to have new products.  It's a

10   never-ending cycle.

11          THE COURT:  You've given me a general description

12   of what would be required to collect that information,

13   talking with various people in various departments and so

14   forth.  Do you have an estimate of how long that would take?

15          MS. KRAFT:  Updating data on existing catheters and

16   so forth took quite some time.  I'm trying to recall exactly

17   how long but certainly weeks, potentially longer than that,

18   potentially a month, month and a half -- something in that

19   range -- because of -- I forget how many departments,

20   candidly.  It was multiple departments.  So, you know, you

21   have to -- people are on vacation.  People have changed

22   positions.  You go back and find somebody who worked on a

23   certain product or a certain thing.  So it takes some time.

24          THE COURT:  All right.  Then let me turn back to

25   plaintiff.  I'd like you to address counsel's argument that

1  it's not just about what's relevant, but it's about what's

2  relevant and permissible, and I understand them to be saying

3  that it's simply not permissible for your expert to come up

4  with new theories at this point and without a new theory that

5  this data isn't relevant.

6          MR. READE:  So I appreciate the argument, but it

7  seems like an argument that would better be made once our

8  expert actually prepares his supplemental report because

9  right now we're just talking about whether we are able to

10  have access to this data, and, you know, what we do with that

11  data is something that, I'm sure, my friend on the other side

12  will closely scrutinize, and we'll, you know, be back here

13  again if they disagree with what's been done with the data,

14  but as I see it, that issue is not actually what we're here

15  to talk about.

16          What we're here to talk about is whether the data

17  is -- has any -- has relevance to the case, and it's only

18  when our expert actually uses the data that we need to have a

19  discussion about whether the use of that data is permissible.

20  I think the burden on them would need to be to show that

21  there is no use of the data that is relevant or permissible

22  in the case, and I think given that it's already conceded

23  that these are high-density mapping catheters and, you know,

24  they are substitutes for the Pentaray that -- and they are

25  subject to the same anticompetitive policy that's alleged in

1  our Complaint there's relevance, and that's something that

2  our expert should be able to look at.

3         So that would be my answer there.

4         THE COURT:  Is there anything else in counsel's

5  remarks that you'd like to address?

6         MR. READE:  Yes.  Just a couple points.

7         So the first -- when we say "single-brand product

8  markets," we mean something very specific in antitrust law,

9  which is we're talking about something like the *Eastman Kodak*

10 case, where the relevant markets all derive from sort of a

11 single manufacturer or a single brand, right.  And so in this

12 case, the markets that we're discussing -- so the

13 navigational ultrasound catheter market and the high-density

14 mapping catheter market and the circular mapping catheter

15 market -- those are all single-brand markets but not because

16 they each only contain one product but because they are all

17 associated with the Carto 3 brand, right.  They are all

18 catheters that are compatible with the Carto 3.  It's just as

19 in the *Kodak* case, where, you know, the servicing for their

20 copiers was -- you know, it was a Kodak copier and a Kodak

21 service, and that's the issue -- that's what's meant by

22 "single brand."

23         And we know this is the case because Biosense

24 itself in its en banc petition characterized these markets

25 exactly as we characterize them now.  This is at page 5, note

1  4 of their en banc petition before the Ninth Circuit, and I

2  quote, (reading) Innovative based its claims on the following

3  four single-brand product markets: one, navigational

4  ultrasound catheters for use with the Carto 3; two, high-

5  density mapping catheters for use with the Carto 3 -- and I

6  can go on to the rest, but I think you get the idea.

7           The second point I'd like to address is the notion

8  that discovery into all catheters is somehow inappropriate.

9  Just to be clear about the scope of the original discovery

10  request, which is what is being supplemented here, the

11  original discovery request sought all -- sales for all

12  customers for each diagnostic and ultrasound catheter that

13  Biosense sells, and Biosense did not object to the scope of

14  that discovery request at the time, and as Your Honor pointed

15  out, there was no objection to our requesting that

16  information in the context of our prior motion before

17  Judge Selna, which was granted.  And so in that context, it

18  seems -- it would seem odd if -- having not objected to

19  producing information for all catheters before and not

20  objecting in the context of the prior motion then now we can,

21  you know, carve out this set of catheters which seem to have

22  clear relevance to the case.

23           The third -- and then just two more points, if I

24  may.

25           The first, on burden, there was no assertion of

1  burden in their responsive motion in the papers here, and

2  there certainly was no evidence put in as to the burden that

3  would be imposed, and then that's -- and just to put a finer

4  point on that, if I were an executive at Johnson and Johnson,

5  and I said, "I want to see the Octaray and Optrell sales and

6  customers tomorrow," I'm pretty sure they'd be able to figure

7  out a way to make that happen, and so I think, you know, a

8  district court of the United States can make that same

9  request of Biosense and have it be done timely.

10        And then the last point I'd like to make: The

11  discussion of an evolving market definition is a little

12  mysterious to me because we all seem to agree that these are

13  high-density mapping catheters, and so, if they have

14  critiques of our expert not including the Decanav, which I

15  don't believe is a high-density mapping catheter but, again,

16  that's another issue that was not addressed in their

17  responsive papers.

18        But even putting that aside, if they have

19  challenges with our expert report and think there are

20  substantive problems with the way that he has characterized

21  the markets, that's something they'll have an opportunity to

22  address in their response to our expert's report, and as

23  they've said, that information about the Decanav, for

24  example, is in the record, but here, there's no dispute that

25  these are high-density mapping catheters.  So it's unclear to

1   me how -- what additional discovery would be necessary or

2   even useful on the question given that this is something that

3   we apparently agree on.

4           And those are the points I had unless you have

5   other questions.

6           THE COURT:  No, I don't think that I do at this

7   point.

8           MS. KRAFT:  Your Honor, may I address just a couple

9   of things that were said?

10          THE COURT:  You may.

11          MS. KRAFT:  Okay.  First of all, Innovative's

12  current argument that the markets we're discussing are

13  single-brand product markets because we're talking about

14  high-density mapping catheters on the Carto 3, that is never

15  how this has been analyzed.  This has been analyzed very

16  specifically as a single-brand product market which is the

17  Pentaray, a single brand product market which is the Lasso,

18  and which is the Soundstar.  That is how this has been

19  analyzed.

20          In the summary judgment motion, for example, is one

21  example, but that was -- you know, the summary judgment was

22  decided three weeks before trial, so certainly very far

23  advanced in the case.  Judge Selna in his order granting

24  summary judgment noted how Innovative was arguing in that

25  point that the markets really weren't single-brand markets.

1   Innovative's argument was they weren't single-brand markets

2   because Biosense isn't the only provider.  Biosense, Stryker,

3   which is another reprocesser, and Innovative provide the

4   catheters at issue.  That was their argument as to single-

5   brand product markets.  That's what they were talking about

6   then, which is very different than saying, "Well, you know,

7   we all agree they're high-density mapping catheters."  What

8   we're talking about, yes, they are high-density mapping

9   catheters, but they aren't part of the market definition.

10          So, when counsel talks about, if we have

11   substantive problems with the expert, that's for a later

12   challenge, we do have problems with their expert report, but

13   that has nothing to do with the motion at hand.  The issue in

14   the motion at hand is their expert chose to analyze three

15   single-brand product markets.  By choosing that case theory,

16   as they have done throughout the case, they are choosing how

17   they proceed.  That is why other catheters aren't relevant.

18   They defined their markets as "single-brand product markets,"

19   and therefore these other things are not relevant because if

20   -- to add them in, you have to add either new markets or

21   fundamentally change an existing market.

22          Finally, Your Honor, I'd like to note -- I guess

23   two things -- almost finally.

24          One, plaintiff's counsel is talking about the

25   original request that is being supplemented.  They keep

1  saying we didn't object to that.  Biosense objected to the

2  request on a number of bases, which are in the record, in

3  relation to the motions.  It was served four years ago.

4  Subsequently, discovery was significantly narrowed, both in

5  written discovery, which started to focus on the four

6  catheters then at issue and then ultimately the three at

7  issue -- depositions focused on the three at issue; and then

8  by the time we had Judge Selna's order this summer allowing

9  very limited supplemental data, that is after the close of

10 discovery, and that circumscribes what is now allowed.

11        So this is not a relevant standard on four years

12 ago we're asking for everything; let's put it out there and

13 see what happens.  This is we're post-remand, ready to go to

14 trial.  There's a very narrow supplement that's happening on

15 existing data in the case.  Existing data in the case is

16 what's relevant because that's how the product markets are

17 defined.  And so to open this up now, it is a never-ending

18 process where, yes, there is additional discovery that we

19 would need.  We will lose the trial date.  We've already been

20 out here five years.  We need to move forward on the markets

21 they picked and get this done.

22        THE COURT:   And what is your current trial date?

23        MS. KRAFT:  It is April 29, Your Honor.

24        THE COURT:  Anything further from plaintiffs?

25        MR. READE:  I don't think so, Your Honor.  Thank

 1   you.

 2          THE COURT:  All right.  The Court thanks counsel

 3   for their well-prepared arguments.  The Court has listened to

 4   those carefully and has reviewed the briefing that was

 5   submitted as well.

 6          The Court here is going to grant plaintiff's

 7   motion.  In doing so, I want to be clear what I am finding

 8   and what I am not finding.

 9          The Court is not basing that on the waiver

10   argument.  The Court does agree that, when these written

11   discovery requests were served years ago, it was long before

12   the Octaray and the Optrell were even marketed, and so

13   expecting someone to advance a relevancy objection based on

14   those new products wouldn't be reasonable.  With regard to

15   the briefing, again, I think that there were many issues that

16   were being litigated there, and clearly relevancy and the

17   scope of appropriate supplemental discovery was being heavily

18   litigated; so I do not find a waiver.

19          The issue, as the Court sees it, is this issue of

20   is there a permissible relevant use for this data, and there

21   only needs to be one, and I do think that the Court is

22   persuaded based on some of Judge Selna's statements about the

23   importance of knowing current market conditions, that the

24   plaintiffs may not be locked into something that, you know,

25   may be better characterized as a "change of fact" rather than

1   a "change of theory."

2          If there are simply new high-density mapping

3   catheters being sold that weren't being sold before, it

4   certainly makes logical sense to the Court that if one is

5   trying to understand why people are or are not buying

6   Pentarays in 2024, why they are willing to pay a certain

7   price or not, why they are considering or not considering

8   reprocessed Pentarays that one of the facts that someone

9   could look at is whether there are newer, better, different,

10  perhaps less expensive -- I don't know -- products that are

11  being introduced that could be used as a substitute instead

12  of the Pentaray, and I think that is enough to, at least,

13  require the sales transaction data for the Octaray and the

14  Optrell up through June 30, 2024.

15          To the extent there are any other high-density

16  mapping catheters that are being used with the Carto 3 and

17  that were being sold -- not just in research and development

18  but actually had customer sales before June 30, 2024, then on

19  the same rationale, those would be part of the supplement.

20  The fact that the names might not have been disclosed earlier

21  wouldn't make a difference to the Court's rationale in that

22  regard.

23          With regard to damages' calculations for lost

24  profits or other kinds of damages, the Court isn't making any

25  determination about how this data could or couldn't be used

1  for that.  That seems like something that would need to be

2  addressed as a challenge to the expert, perhaps in a motion

3  in limine or some other motion to the trial judge.

4        Similarly, the Court's not making any decisions

5  about if the ramification of this decision would mean that

6  defendants would like to request additional discovery.  They

7  would need to address that request to Judge Selna and

8  persuade him of their reasons for needing that and

9  demonstrate to him the timing that would be involved in

10 completing that discovery and see how that works with the

11 trial schedule that he has set.

12        With regard to the production of the data that this

13 Court is ordering, the Court will direct that defendants do

14 that within three weeks of today.  Today is November 4th.  So

15 the deadline would be November 25th.

16        In an effort not to leave the parties confused

17 about the Court's rulings, since that seems to have been an

18 issue here before, if counsel have questions that they think

19 the Court can clarify about what's being ordered and what's

20 required, I'm happy to try and give a better explanation.

21        On plaintiff's side, any questions?

22        MR. READE:  Thank you, Your Honor.  Just one.

23        I -- our -- because our supplemental expert report

24 is due December 2nd, we think that that timing is a little

25 tight for us, and so we'd appreciate if we could shoot for,

1   perhaps, two weeks or so for the production.

2          THE COURT:  You know, given my understanding of how

3   big companies work and the -- I know that you've made an

4   argument that the CEO could get this data in a day.  In my

5   experience as a civil litigator working for large companies,

6   that was not the case, and so, if you have a problem with

7   that date, I think that, since Judge Selna set that date, the

8   better course at this point would be to ask him to extend it.

9          MR. READE:  Fair enough.

10          MS. KRAFT:  Your Honor, I just want to clarify.

11          There are three spreadsheets that were placed at

12   issue.  I'll read them into the record just so that we have

13   those.  It's BWI-INN00510476, BWI-INN00706180, and

14   BWI-INN00710526.  The Court's order is to create a

15   spreadsheet that reflects this -- the data that is on these

16   three spreadsheets for the Octaray and the Optrell.  Is --

17          THE COURT:  And any other high-density mapping

18   catheter that was introduced for sale before June 30, 2024,

19   that works with the Carto 3.

20          MS. KRAFT:  Thank you.

21          THE COURT:  And I just want to confirm.  That's my

22   understanding from the moving papers.  The plaintiff have any

23   issue that those are the relevant spreadsheets?

24          MR. READE:  Well, Your Honor, that sounds right to

25   me.  I would just say with the caveat that I think whatever

1  they produce should, you know, be the same catheter sales

2  data that was produced with respect to the other catheters,

3  but I take counsel's representation.

4         THE COURT:  Okay.  We haven't memorized the Bates

5  numbers, but it all sounds right.

6         MR. READE:  That's right.

7         THE COURT:  Okay.  Any other clarifying questions

8  that the Court can answer before we adjourn?

9         MS. KRAFT:  No, Your Honor.

10         THE COURT:  All right.

11         MR. READE:  Nothing for me.

12         THE COURT:  Okay.

13         THE CLERK:  This court is now adjourned.

14     (Proceedings adjourned at 2:27 p.m.)

15  ///

16  ///

17

18

19

20

21

22

23

24

25

1

2                               CERTIFICATE

3           I certify that the foregoing is a correct transcript

4    from the electronic sound recording of the proceedings in the

5    above-entitled matter.

6

7    /s/ Julie Messa                    November 20, 2024
     Julie Messa, CET**D-403             Date
8    Transcriber

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25