Panteha Abdollahi, Esq.
State Bar No. 230002
pabdollahi@tocounsel.com
THEODORA ORINGHER PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, California 92626-7109
Telephone: (714) 549-6200
Facsimile: (714) 549-6201

Jeffrey L. Berhold, Esq.
Admitted *Pro Hac Vice*
jeff@berhold.com
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, Georgia 30309
Telephone: (404) 872-3800
Facsimile: (678) 868-2021

Joshua P. Davis, Esq.
State Bar No. 193254
jdavis@bm.net
BERGER MONTAGUE PC
505 Montgomery St., Suite 625
San Francisco, California 94111
Telephone:  (415) 906-0684

Derek T. Ho, Esq.*
Andrew E. Goldsmith, Esq.*
Matthew D. Reade, Esq.*
Kelley C. Schiffman, Esq.
State Bar No. 325023
Rachel T. Anderson, Esq.*
Annamaria M. Morales-Kimball, Esq.*
Sean P. Quirk, Esq.*
*Admitted *Pro Hac Vice*
dho@kellogghansen.com
agoldsmith@kellogghansen.com
mreade@kellogghansen.com
kschiffman@kellogghansen.com
randerson@kellogghansen.com
amoraleskimball@kellogghansen.com
squirk@kellogghansen.com
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK. P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
Telephone: (202) 367-7900
Facsimile: (202) 326-7999

Attorneys for Plaintiff
INNOVATIVE HEALTH LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| INNOVATIVE HEALTH LLC,<br><br>Plaintiff,<br><br>vs.<br><br>BIOSENSE WEBSTER, INC.,<br><br>Defendant. | Case No. 8:19-cv-1984 JVS (KES)<br>Assigned for all purposes to:<br>Honorable James V. Selna<br>**DECLARATION OF ANDREW E. GOLDSMITH IN SUPPORT OF PLAINTIFF INNOVATIVE HEALTH LLC'S MOTION *IN LIMINE* NO. 2 TO EXCLUDE DEFENDANT'S ADVICE-OF-COUNSEL EVIDENCE**<br><br>Date:    April 14, 2025<br>Time:    11:00 a.m.<br>Crtrm:   10C<br>Action Filed:  October 18, 2019<br>Trial Date:  April 29, 2025 |

1

I, Andrew E. Goldsmith, declare as follows:

1.     I am an attorney admitted to the bars of the State of New York and the District of Columbia.  I am admitted *pro hac vice* to practice before this Court.  I practice law at Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., and represent the plaintiff, Innovative Health LLC, in this matter.

2.     I make this declaration in support of Plaintiff Innovative Health LLC's Motion *in Limine* No. 2 To Exclude Defendant's Advice-of-Counsel Evidence.

3.     The facts I state here are true and correct.  They are based on my own personal knowledge or knowledge I gleaned from reviewing files pertinent to this matter.  If called as a witness to testify, I could and would competently testify to these facts.

4.     **Exhibit 1** is a true and correct copy of a letter from counsel for Biosense to counsel for Innovative, dated January 10, 2025.

5.     **Exhibit 2** is a true and correct copy of a letter from counsel for Innovative to counsel for Biosense, dated December 12, 2024.

6.     **Exhibit 3** is a true and correct copy of a letter from counsel for Biosense to counsel for Innovative, dated December 23, 2024.

7.     **Exhibit 4** is a true and correct copy of a letter from counsel for Innovative to counsel for Biosense, dated December 31, 2024.

8.     **Exhibit 5** is a true and correct copy of excerpts of the final transcript of the August 10, 2021 deposition of Conrad Ramos and errata thereto.

9.     **Exhibit 6** is a true and correct copy of a document bearing Bates numbers BWI-INN00496729 to BWI-INN00496731, which was produced by Biosense in this litigation.

10.     **Exhibit 7** is a true and correct copy of a document bearing Bates numbers BWI-INN00709004 to BWI-INN00709006, which was produced by Biosense in this litigation.

*DECLARATION OF ANDREW E. GOLDSMITH*

11.     **Exhibit 8** is a true and correct copy of a document bearing Bates numbers BWI-INN00412690 to BWI-INN00412691, which was produced by Biosense in this litigation.

12.     **Exhibit 9** is a true and correct copy of a document bearing Bates numbers BWI-INN00401987 to BWI-INN00401991, which was produced by Biosense in this litigation.

13.     **Exhibit 10** is a true and correct copy of a document bearing Bates numbers BWI-INN00416215 to BWI-INN00416219, which was produced by Biosense in this litigation.

14.     **Exhibit 11** is a true and correct copy of a document bearing Bates numbers BWI-INN00418144 to BWI-INN00418145, which was produced by Biosense in this litigation.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 17th day of March, 2025, at Washington, DC.


*/s/ Andrew E. Goldsmith*
Andrew E. Goldsmith

*DECLARATION OF ANDREW E. GOLDSMITH*

# EXHIBIT 1



www.pbwt.com

January 10, 2025

Alejandro H. Cruz
Partner
(212) 336-7613
acruz@pbwt.com

***By Electronic Mail***

Matthew D. Reade, Esq.
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
Sumner Square
1615 M Street NW, Suite 400
Washington, DC 20036
*mreade@kellogghansen.com*

> Re:  ***Innovative Health LLC v. Biosense Webster, Inc.,***
> ***No. 8:19-cv-01984-JVS-KES (C.D. Cal.)***

Dear Matthew:

We write in response to your letter of December 31, 2024, relating to Biosense Webster, Inc.'s ("BWI") document productions in this case, as well as to follow-up on our conferral of January 3, 2025.

As an initial matter, Innovative Health, LLC ("IH") has failed to respond with respect to IH's waiver of the issues in its December 12, 2024 letter. As detailed in BWI's letter of December 23, 2024, IH's concerns regarding BWI's assertions of privilege and various redactions have been stale for over three years, and IH concedes as much by its silence. Moreover, in its December 31 letter, as well as during our subsequent conferral, IH appears to confuse the redactions applied by the parties based on responsiveness and discoverability, as contemplated by the ESI Protocol, and documents that may require sealing from public view. The redactions at issue here are redactions applied by BWI based on assertions of privilege, as well as those based on proprietary information that was "not responsive to any agreed requests for production" pursuant to the ESI Protocol. There is no question of public access to judicial records at issue, and framing IH's concerns with respect to "sealing" at the upcoming trial does not change that.

## I.    BWI HAS SATISFIED ITS OBLIGATION UNDER THE ESI PROTOCOL TO PROVIDE ADDITIONAL INFORMATION REGARDING ITS REDACTIONS

IH asserts that BWI failed to provide additional information regarding the redactions identified by IH pursuant to the ESI Protocol and requests that BWI reproduce unredacted version of certain documents. BWI disagrees for at least two reasons.

*First*, despite IH's belated request, BWI has already provided additional information regarding the basis of its redactions and thus satisfied its obligation under the ESI

Matthew D. Reade, Esq.
January 10, 2025
Page 2

Protocol. Specifically, with respect to its privilege redactions, BWI confirmed that the redactions reflect "transmission of otherwise privileged information between non-attorney corporate representatives" as well as "legal advice" from counsel. *See* Cruz Ltr. (Dec. 23, 2024), at 2. Similarly, with respect to its non-privilege redactions, BWI confirmed that the redactions marked "Redaction: Other" are "proprietary and commercially sensitive information that was not responsive to any agreed production requests." *Id.* The ESI Protocol requires the parties to provide "additional information regarding the *basis* for redactions on specific documents," not the *substance* of such redactions. Disclosure of the latter—which, based on your letter and our discussion, appears to be what IH is looking for—would dilute BWI's attorney-client privilege, as well as the parties' agreement that otherwise non-responsive commercially sensitive information would not be disclosed in this action.

*Second*, IH's requests relating to redactions of information concerning Octaray and Optrell catheters has no basis in the court's decisions and is unduly burdensome, especially this late in the day. Contrary to IH's allegations, the court has never found that all information relating to the Octaray and Optrell catheters is relevant to this case. Indeed, the hearing held on November 4, 2024, was limited to the parties' dispute regarding the ***sales transaction data*** for Octaray and Optrell. *See* Tr. 4:11-5:6 ("the only issue that is remaining in dispute is whether the Defendant Biosense needs to update sales transaction data . . . for two new models of catheters that were introduced after the Ninth Circuit appeal, the Octaray and the Optrell."). The court has made clear, and IH concedes, that the parties are not to pursue any new theories of the case or re-open discovery at this point in time, less than four months before trial. *See* Tr. 11:16-12:8 (IH's counsel confirming that "Judge Selna wasn't authorizing brand new factual discovery" and representing to the court that "[a]ll we're seeking is complete catheter sales data through mid-2024.") BWI supplemented such data pursuant to the court's order and without prejudice to the fact that discovery is and remains closed. To the extent IH demands that BWI undertake a review and revision of all redactions it appropriately applied years ago across its production of 102,747 documents (totaling 724,109 pages), BWI will not agree to such a request.

Nonetheless, in an effort to reach a compromise, BWI will agree to two things:

***Privilege Redactions***. BWI will provide a privilege log with respect to the privilege redactions reflected in the documents identified in IH's letter of December 12, 2024 in the coming week. For the sake of efficiency, BWI does not believe it is necessary to identify privilege redactions on the parties' exhibit list since such redactions are marked as "Redaction: Privilege" on the face of the documents.

***Non-Privilege Redactions.*** As you suggested during our January 3 discussion, BWI proposes that the parties specifically identify any proposed trial exhibit containing such redactions on the parties' exhibit list, and to the extent either party has questions or concerns regarding specific redactions, the parties should meet-and-confer to address them on a document-by-document basis for potential trial exhibits only, obviating the necessity of BWI retroactively reviewing its entire production. To be clear, for the reasons detailed above, BWI does not

Matthew D. Reade, Esq.
January 10, 2025
Page 3

believe it is necessary or appropriate for the parties to exchange unredacted exhibits to implement this process in the first instance, and BWI will not do so.[1]

## II. BWI DID NOT WAIVE PRIVILEGE AND IH'S PROPOSED STIPULATION IS BOTH PREMATURE AND INAPPROPRIATE

As detailed in BWI's letter of December 23, 2024, BWI has not waived its attorney-client privilege in this case by putting any legal advice at issue. BWI has not relied on any privileged information or communications with counsel to defend itself or otherwise negate any aspect of IH's claims in this action. Tellingly, IH has no substantive response, merely claiming with no legal or factual basis that it remains "unconvinced." Instead, IH proposes a stipulation that is not only overbroad in its scope, but unnecessary.

It is neither necessary nor efficient for the parties to engage in a lengthy negotiation of a stipulation when BWI has never defended itself on the basis of any legal advice in this action. IH's proposed stipulation, moreover, would likely hinder BWI's ability to defend itself as a practical matter, even in the absence of any defense based on legal advice. IH's proposed language for the stipulation—which goes well beyond the scope of advice of counsel—substantiates BWI's concern since it limits BWI's ability to discuss the clinical support policy and its justifications *at all*, the core issues in this case. IH's proposed language for the stipulation would also prevent BWI from discussing the history of the clinical support policy, which will provide important context for the jury to understand the policy's purpose and effect. Finally, all of these issues, to the extent IH chooses to press them, will be properly addressed through objections at trial, or, if IH prefers to address it in advance of trial, through a motion *in limine*.

BWI reserves all rights and waives none.

Very truly yours,

Alejandro H. Cruz

Cc: All Counsel of Record

---

[1] Our positions with respect to exhibit lists are detailed in our letter of yesterday, January 9, 2025.

# EXHIBIT 2

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
————
(202) 326-7900
FACSIMILE:
(202) 326-7999

December 12, 2024

~~Highly Confidential~~

*By Email*

Karla Kraft, Esq.
Stradling Yocca Carlson & Rauth LLP
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660
kkraft@stradlinglaw.com

Re:    *Innovative Health LLC v. Biosense Webster, Inc.*, No. 8:19-cv-01984-JVS-KES
         (C.D. Cal.)

Counsel:

I write to raise three concerns about Biosense's document productions in this case.

*First*, Biosense has improperly redacted relevant, nonprivileged material from its document productions.  Biosense should produce unredacted versions of the documents listed in the appendix to this letter by **December 23, 2024**.  Innovative Health reserves the right to challenge other redactions in the future, but for the time being has focused on documents that it currently expects may be trial exhibits.  Also, to the extent that Biosense redacted any documents based on its theory that the Octaray and Optrell mapping catheters were irrelevant to this case, Biosense should produce unredacted versions of those documents.  The Court has rejected Biosense's position that those catheters are irrelevant.  *See* Hr'g Tr. at 37:2-22 (Nov. 4, 2024).  Biosense should produce these unredacted documents by December 23, 2024 as well, or confirm that no such redactions exist.

*Second*, Biosense has waived the attorney-client privilege over its communications about the case coverage policy by relying affirmatively on its attorneys' advice to justify that illegal tie.  Please produce all such documents without redactions by December 23, 2024, identifying, as applicable, the privilege log entries to which each corresponds.

*Third*, Biosense has designated nearly all documents it produced in this matter as Confidential or Highly Confidential.  For example, 74 percent of Biosense's documents are designated as Highly Confidential, and nearly all those documents are more than five years old.  We doubt that many, if any, of the documents you have designated as Confidential or Highly Confidential are sensitive enough to overcome the "strong presumption of access" that courts

Kᴇʟʟᴏɢɢ, Hᴀɴsᴇɴ, Tᴏᴅᴅ, Fɪɢᴇʟ & Fʀᴇᴅᴇʀɪᴄᴋ, ᴘ.ʟ.ʟ.ᴄ.

~~Highly Confidential~~
Karla Kraft, Esq.
December 12, 2024
Page 2

apply. *Pintos v. Pacific Creditors Ass'n*, 605 F.3d 665, 679 (9th Cir. 2010). Trial will be far more efficient if both sides minimize the sealing of exhibits and testimony. Thus, we propose that each party note in its exhibit list whether it objects to the confidentiality designations applied by other parties or non-parties and whether it will withdraw its own confidentiality designations. After exchanging responses, the parties would confer in good faith to resolve disputes and minimize the need for sealing at trial.

Please let us know if Biosense agrees with these requests and, if not, when you are available to meet and confer so that we may promptly raise any disputes with the Court.

\*　　\*　　\*

Biosense has redacted relevant, nonprivileged material from several potential trial exhibits. As the party that redacted that material, Biosense "has the burden of proving" that those redactions are proper at trial. *In re Grand Jury Investigation*, 974 F.2d 1068, 1070 (9th Cir. 1992).[1]

We have identified four categories of improper redactions and withholdings:

(1) Relevant communications that Biosense concedes are nonprivileged;

(2) Assertions of attorney-client privilege over material that includes no attorneys;

(3) Assertions of attorney-client privilege over material that does not seek legal advice; and

(4) Assertions of attorney-client privilege over communications about the case coverage policy, over which Biosense has waived any privilege.

**1.** Biosense has redacted relevant material that, by its own admission, is not privileged, without providing any reason for those redactions as the Court's ESI Order requires. *See* Dkt. 64 at 10-11. Those redactions are improper: "The Court does not welcome unilateral editing of documents by the producing party," which "frequently gives rise to suspicion that

---

[1] *See also*, *e.g.*, *Perez v. Rash Curtis & Assocs.*, 2019 U.S. Dist. LEXIS 76332, at \*2-3 (N.D. Cal.) (overruling claim of attorney-client privilege over three trial exhibits); *Burton v. R.J. Reynolds Tobacco Co.*, 200 F.R.D. 661, 669 (D. Kan. 2001) (similar); *Slocum v. International Paper Co.*, 549 F. Supp. 3d 519, 525-26 (E.D. La. 2021) (overruling privilege claim over potential trial exhibit and requiring production of 35 additional documents "for *in camera* review in anticipation of the upcoming bench trial"); *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1136-38 (9th Cir. 2003) (requiring party to articulate "compelling reasons" to maintain redactions even after entry of final judgment).

Kᴇʟʟᴏɢɢ, Hᴀɴsᴇɴ, Tᴏᴅᴅ, Fɪɢᴇʟ & Fʀᴇᴅᴇʀɪᴄᴋ, ᴘ.ʟ.ʟ.ᴄ.

~~Highly Confidential~~
Karla Kraft, Esq.
December 12, 2024
Page 3

relevant material harmful to the producing party has been obscured." *In re Medeva Sec. Litig.*, 1995 WL 943468, at *3 (C.D. Cal.). Biosense's redactions illustrate the problem.

For example, in one email thread discussing competitive intelligence on Innovative's efforts to reprocess Biosense's Pentaray and Decanav mapping catheters, Biosense redacted part of its employees' discussion of the impact of its unlawful tie on Innovative's ability to compete:

> Both Stryker and Innovative Health have applied for a 510K for PentaRay, but neither one have it yet. However, Innovative Health did get 510K approval for decanav.
>
> Two things:
>
> To Jose's point, the PentaRay will 100% fall into our coverage policy just as Lasso Nav and SoundStar. I bet the company is going to be very strict about this one. The decanav will also fall into the coverage policy in terms of mapping.
>
> **[Redaction: Other]**[2]

Biosense applied similar redactions to another email discussing Biosense's "defence[s]" against third-party reprocessing of the Pentaray catheter:

> I don't see BW being successful selling [reprocessed Pentaray] unless they have to defend against a Stryker product which we haven't as yet seen . . . .
>
> And with the case coverage policy we have protection. So whilst it would be easy to say spend a few million $ and put it on the shelf ready – I think that's not a good way to spend our money.
>
> Plus hopefully we will get **[Redaction: Other]** at same time as Pentaray RPO so we have another defence.[3]

    **2.**    Biosense has asserted attorney-client privilege over communications that include no attorneys. But the "attorney-client privilege protects confidential communications *between attorneys and clients*, which are made for the purpose of giving legal advice." *In re Grand Jury*,

---

[2] BWI-INN00119210 at 211-12.

[3] BWI-INN00569983 at 983.

Kellogg, Hansen, Todd, Figel & Frederick, p.l.l.c.

23 F.4th 1088, 1091 (9th Cir. 2022) (emphasis added).  Biosense has offered no basis for treating non-attorney communications about core issues in the case as privileged.[4]

For example, BWI-INN00646198 is a February 2014 email thread between Ronen Krupnik, Nick Demczuk, and Marina Guevrekian.  None is an attorney.  Mr. Demczuk asks Ms. Guevrekian to "complete a regulatory assessment" of anti-reprocessing technology to be added to the Soundstar.

Ms. Guevrekian replies:

> Before completing any Regulatory assessment, I would like to let you know, that a while back, before Sterilmed acquisition, BWI wanted to make some changes to the EEPROM to prevent Sterilmed to reprocess our Ultrasound catheters.
>
> **[Redaction: Privilege]**
>
> Also, To [sic] be able to implement this change and my determination, I would need to have a reason for change (more elaborated than below) which could be the "Documented Reason" that I'll use in my assessment.  (That reason cannot be for blocking the competitors).

After Ms. Guevrekian provides her non-legal analysis, Mr. Krupnik adds:  "Since the 8fr is a new product I don't see an issue."  Then, Mr. Krupnik apparently offers his views—though Biosense asserts that they, too, are privileged—and asks Mr. Demczuk what he thinks.  The start of Mr. Demczuk's reply is redacted, but Mr. Demczuk goes on: "We have positioned this as Catheter Identification.  It allows BWI to control product so no cloning of the device can occur."  The first sentence of this statement suggests that the redactions obscure a *genuine* reason why Biosense added anti-reprocessing technology to its catheters.  That information bears directly on one of the principal anticompetitive tactics alleged here.

**3.**     Biosense also has asserted attorney-client privilege over communications with or including counsel that appear just to seek business advice, rather than legal advice, or that focus on business or strategic concerns.  But an attorney-client communication is not privileged unless "the primary purpose of the communication is to give or receive legal advice."  *Grand Jury*, 23

---

[4] *See* Fed. R. Civ. P. 26(b)(5)(A)(ii) (requiring Biosense to describe "the nature of the documents, communications, or tangible things not produced or disclosed" sufficiently to "enable other parties to assess the claim").

Kellogg, Hansen, Todd, Figel & Frederick, p.l.l.c.

~~Highly Confidential~~
Karla Kraft, Esq.
December 12, 2024
Page 5

F.4th at 1091.[5]  And because "a dual-purpose communication can only have a single 'primary' purpose," communications made for "a non-legal purpose," such as "tax compliance" or business strategy, are not privileged.  *Grand Jury*, 23 F.4th at 1091.

Nonetheless, Biosense asserts attorney-client privilege, for example, over bullet points summarizing a "strategy discussion" during a meeting about anti-reprocessing technology,[6] and over a non-attorney's musings to executives and counsel about the scope of the illegal clinical-support tie.[7]  Biosense has also redacted as privileged internal discussions of customer questions about "the original release date of the [case coverage policy] position statement letter," Sterilmed's "market share," the availability of "training . . . so [hospital] staff can support cases on their own," and other business topics.[8]  There is no basis for redacting such plainly relevant, nonprivileged materials from the record, especially given the likelihood that the redacted material contradicts the arguments that Biosense intends to make at trial.

4.     Biosense has waived any privilege that could apply to its communications, even with attorneys, about the case coverage policy.  "The privilege which protects attorney-client communications may not be used both as a sword and a shield."  *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992).  "Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived."  *Id.*; *see also*, *e.g.*, *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 145 (D.C. Cir. 2015) ("[A] party asserting attorney-client privilege cannot be allowed, after disclosing as much as he pleases, to withhold the remainder.").  Because Biosense relies on its attorneys' advice regarding liability as a justification for its illegal tie, Innovative is entitled to rebut that justification by inquiring into the views that Biosense's attorneys expressed about the tie's merits and risks.

Biosense sought summary judgment on the basis that "[r]equiring . . . BWI employees to map using sensor-enabled catheters manufactured by third parties . . . presents a potential liability that BWI is justifiably unwilling to undertake."[9]  And without objection from company counsel, Conrad Ramos—Biosense's corporate witness on the tie's "justifications"[10]—explained

---

[5] *See also Fisher v. United States*, 425 U.S. 391, 403 (1976) (the attorney-client privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege").

[6] *See* BWI-INN00230869; *see also* BWI-INN00694743 (a later version of the same thread with an additional, unfounded privilege redaction).

[7] *See*, *e.g.*, BWI-INN00418458.

[8] *See* BWI-INN00332651 at 652-53.

[9] Dkt. 139 at 28; *see also id.* at 29.

[10] Ramos Dep. Tr. 135:9-15.

Kᴇʟʟᴏɢɢ, Hᴀɴsᴇɴ, Tᴏᴅᴅ, Fɪɢᴇʟ & Fʀᴇᴅᴇʀɪᴄᴋ, ᴘ.ʟ.ʟ.ᴄ.

~~Highly Confidential~~
Karla Kraft, Esq.
December 12, 2024
Page 6

the "guidance that [he] received" from counsel after proposing the tie: "[I]f something went wrong in a procedure and we were using a third-party sensor-enabled catheter and there was a lawsuit that ensued, it could potentially create problems for us as Johnson & Johnson because it could be interpreted as us attesting to the efficacy of another party's sensor-enabled catheter."[11] Mr. Ramos further testified that he trained Biosense's field sales team to invoke reliance on counsel's advice when justifying the tie to customers:

> I'm not an attorney. . . . But when this came up to review with our attorneys, their primary concern was to say to us that providing clinical and technical support to another company's product, whether it's a reprocessed product or even a first time use OEM product would be indirectly attesting to the safety and efficacy of that product. And that's something that we simply can't provide.[12]

In taking those positions, Biosense has waived the attorney-client privilege over its communications about the case coverage policy.

Sincerely,

*/s/ Matthew D. Reade*

Matthew D. Reade
Counsel for Innovative Health

---

[11] *Id.* at 88:25-89:22.

[12] *Id.* at 85:22-86:9.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

~~Highly Confidential~~
Karla Kraft, Esq.
December 12, 2024
Page 7

**Appendix**

| | |
|---|---|
| BWI-INN00077653 | BWI-INN00348598 |
| BWI-INN00109692 | BWI-INN00385524 |
| BWI-INN00118590 | BWI-INN00385647 |
| BWI-INN00119210 | BWI-INN00385658 |
| BWI-INN00121340 | BWI-INN00395133 |
| BWI-INN00123105 | BWI-INN00401200 |
| BWI-INN00127095 | BWI-INN00401304 |
| BWI-INN00172076 | BWI-INN00401403 |
| BWI-INN00172734 | BWI-INN00401441 |
| BWI-INN00189073 | BWI-INN00418445 |
| BWI-INN00202622 | BWI-INN00418458 |
| BWI-INN00229700 | BWI-INN00474626 |
| BWI-INN00230859 | BWI-INN00526800 |
| BWI-INN00230869 | BWI-INN00569983 |
| BWI-INN00246134 | BWI-INN00569985 |
| BWI-INN00248425 | BWI-INN00618574 |
| BWI-INN00256674 | BWI-INN00634502 |
| BWI-INN00332651 | BWI-INN00646198 |
| BWI-INN00334676 | BWI-INN00694743 |
| BWI-INN00348211 | BWI-INN00709244 |

# EXHIBIT 3



December 23, 2024

**By Electronic Mail**

Alejandro H. Cruz
Partner
(212) 336-7613
acruz@pbwt.com

Matthew D. Reade, Esq.
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
Sumner Square
1615 M Street NW, Suite 400
Washington, DC 20036
*mreade@kellogghansen.com*

Re:    ***Innovative Health LLC v. Biosense Webster, Inc.,***
    **No. 8:19-cv-01984-JVS-KES (C.D. Cal.)**

Dear Matthew:

We represent Defendant Biosense Webster, Inc. ("BWI") in the above-captioned action brought by Innovative Health, LLC ("IH"). We write in response to your letter of December 12, 2024, relating to BWI's document productions in this case.

## I.    IH WAIVED ITS OBJECTIONS

As an initial matter, the objections detailed in your letter are untimely, and IH waived them long ago. Pursuant to Judge Selna's standing Jury Trial Order, motions "respecting the inadequacy of responses to discovery must be filed and served not later than ten (10) days after the discovery cut-off date." Fact discovery in this case closed on September 21, 2021. That was over three years ago.[1] And BWI produced all of the documents referenced in your letter prior to that date, on or before July 21, 2021. BWI also produced its privilege log on August 27, 2021. IH, nonetheless, sat on its hands, waiting until now—four months prior to trial and over three years after the fact discovery cutoff—to raise purported concerns related to BWI's privilege assertions and confidentiality designations, all of which could have and should have been raised years ago. IH waived its objections to any of these issues by its own choice (for strategic reasons or otherwise) to remain silent until now. *See In re BofI Holding, Inc. Sec. Litig.,* 2022 WL 141101, at *2-3 (S.D. Cal. Jan. 14, 2022) (denying plaintiff's motion to compel production of unredacted documents as "untimely" where plaintiff delayed for months beyond the deadline set forth in the court's rules). BWI will not tolerate eleventh-hour attempts to derail its preparation for the upcoming trial.

---

[1] The court's recent order granting IH's limited motion to re-open discovery was solely for the purpose of issuing subpoenas to third-parties Stryker Sustainability Solutions, Inc. and Abbott Laboratories. *See* ECF 246.

Matthew D. Reade, Esq.
December 23, 2024
Page 2

## II.  BWI'S REDACTIONS ARE APPROPRIATE AND CONSISTENT WITH THE ESI PROTOCOL IN THIS CASE

IH asserts that BWI redacted certain production documents based on erroneous claims of privilege.  IH complains that BWI improperly redacted "communications that include no attorneys."  This complaint is misplaced.  The redacted documents identified by IH reflect the transmission of otherwise privileged information between non-attorney corporate representatives.  Communications between non-attorneys that include content "that is for the purpose of legal advice, or which reflect the attorney's mental impressions" remain protected by attorney-client privilege, despite the communications not involving an attorney directly. *Robinson v. Cnty. of San Joaquin*, 2014 WL 5473049, at *7 (E.D. Cal. Oct. 28, 2014); *see also U.S. v. Chevron Texaco Corp.*, 241 F.Supp.2d 1065, 1077 (N.D. Cal. 2002).  BWI's privilege redactions are appropriate and consistent with the law in this jurisdiction.[2]  IH's assertion that BWI redacted communications "that appear just to seek business advice, rather than legal advice" is similarly incorrect.  BWI has reviewed the identified redactions and confirmed that they reflect legal advice.

Separate from redactions to preserve BWI's attorney-client privilege, IH also asserts that BWI improperly redacted certain documents for reasons other than a claim of privilege.  This position fares no better.  The parties agreed in the ESI Protocol that they "may also redact information that is proprietary, or personally or commercially sensitive so long as that information is not responsive to any agreed requests for production."  *See* ECF 64 (ESI Protocol), § 6.7; ECF 68 (Order regarding the same).  BWI properly redacted proprietary and commercially sensitive information that was not responsive to any agreed production requests pursuant to the parties' ESI Protocol and marked such redactions "[Redaction: Other]."  And with respect to the Octaray and Optrell catheters, as you know, neither product was on the market in 2021 so they could not have been responsive to discovery requests at the time, and BWI recently produced sales data relating to the Octaray and Optrell catheters pursuant to the court's order.  *See* ECF 288; BWI-INN00722125.  IH is not entitled to, nor does it need, any further information regarding those two catheters.  If IH believed such information were necessary and relevant to the upcoming trial, it no doubt would have sought such materials along with BWI's updated sales data; it did not.

---

[2] Additionally, BWI is "not required to log redacted Documents" pursuant to the parties' Stipulated Protocol Governing Electronically Stored Information and Hard-Copy Document (the "ESI Protocol"). *See* ECF 64, § 7.4.

Matthew D. Reade, Esq.
December 23, 2024
Page 3

## III.    BWI DID NOT WAIVE THE ATTORNEY-CLIENT PRIVILEGE

IH also claims that because BWI "relies on its attorneys' advice regarding liability as a justification for its illegal tie," BWI "has waived any privilege" to communications about the case coverage policy.  This is meritless.  Since this litigation began, BWI has not relied on any privileged information or communications with counsel to defend itself or otherwise negate any aspect of IH's claims.  IH fails to identify any evidence to the contrary.

Subject matter waivers are rare, and courts are reluctant to strip a client's legal communications of the protection granted by the privilege.  *See Akamai Techs., Inc. v. Digital Island, Inc*., 2002 WL 1285126, at *9 (N.D. Cal. May 30, 2002).  As relevant here, a party may effect a waiver of the attorney-client privilege only under circumstances where the "party ***relies on the advice of counsel to defend itself or negate an element of a claim*.**"  *Oakley, Inc. v. Bugaboos Eyewear Corp.,* 2010 WL 4117223, at *4 (S.D. Cal. Oct. 15, 2010) (emphasis added)*; see also Phase II Chin*, 2010 WL 11636216, at *6; *Kaiser Found. Health Plan v. Abbott Lab'ys*., 552 F.3d 1033, 1043 (9th Cir. 2009).

IH's reliance on one sentence from BWI's summary judgment brief and two excerpts from Mr. Ramos' deposition referring to "liability" and discussions with the legal department reflect nothing more than the undisputed (and unsurprising) reality that BWI's case coverage policy underwent a legal review.  *See Oakley,* 2010 WL 4117223, at *4 (holding that a party's admission that "it relied on the advice of counsel to prepare its warranty cards" did "not waive any privilege").[3]  BWI, however, is not relying on the substance of that review, related legal opinions, or any underlying legal advice, instructions, or directives as a defense to IH's claims in this case.[4]  There has been no waiver here.

## IV.    BWI WILL CONFER WITH IH REGARDING A REVIEW OF THE PARTIES' CONFIDENTIALTIY DESIGNATIONS

With respect to BWI's confidentiality designations, IH claims that documents "more than five years old" cannot be "sensitive enough to overcome the strong presumption of access that courts apply" for sealing documents.  BWI disagrees.  Public disclosure of

---

[3] Contrary to your assertion that Mr. Ramos testified regarding the content of legal advice in the absence of an objection from BWI's counsel, *see* Letter at 5-6, the record is clear that counsel explicitly instructed Mr. Ramos not to divulge any communications with counsel or otherwise privileged information.  Ramos Tr. 80:19-21 ("I just wanted to caution the witness not to reveal any communications with counsel that are privileged.")

[4] Innovative Health's reliance on *Chevron Corp. v. Pennzoil Co.,*974 F.2d 1156 (9th Cir. 1992) is misplaced.  *Chevron* "dealt with the situation in which a party affirmatively places the advice of his attorney in issue *by relying on it to support the party's claim or defense*," *Phase II Chin, LLC v. F. Shops, LLC,* 2010 WL 11636216, at *6 (D. Nev. Mar. 2, 2010), and thereby uses the privilege communication "both as a sword and a shield."  *Chevron* 974 F.2d at 1162.

Matthew D. Reade, Esq.
December 23, 2024
Page 4

commercially sensitive information such as long-term business strategies or information of existing customers, regardless of age, could cause irreparable harm to BWI's current business.

We agree, however, that reducing the number of trial exhibits designated as Confidential or Highly Confidential, to the extent practicable, would facilitate a more efficient trial. Accordingly, BWI is amenable to IH's proposal that each party note in its exhibit list whether it objects to the confidentiality designations applied by other parties or non-parties, and whether it will modify or withdraw its own confidentiality designations. The parties can then confer to resolve disputes about confidentiality designations to the extent necessary.

BWI is available to confer on all of the issues detailed herein. BWI reserves all rights and waives none.

Very truly yours,

Alejandro H. Cruz

Cc: All Counsel of Record

# EXHIBIT 4

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
———
(202) 326-7900
FACSIMILE:
(202) 326-7999

December 31, 2024

*By Email*

Alejandro H. Cruz, Esq.
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
acruz@pbwt.com

> Re:    *Innovative Health LLC v. Biosense Webster, Inc.*, No. 8:19-cv-01984-JVS-KES (C.D. Cal.)

Alejandro:

Thank you for your response letter dated December 23, 2024.  I write in reply.

**I.    <u>Confidentiality Designations</u>.**  Innovative appreciates Biosense's agreement to its proposal regarding the confidentiality designations applied to the parties' exhibits.  Each party will note in its exhibit list, during the pretrial exchanges between the parties, whether it objects to the confidentiality designations applied by other parties or non-parties and whether it will modify or withdraw its own confidentiality designations.  Then, after exchanging responses, the parties will confer in good faith to resolve disputes and minimize the need for sealing at trial.

**II.    <u>Redactions of Non-Privileged Information</u>.**  Biosense asserts that its redactions "are appropriate and consistent with the ESI Protocol in this case."  Letter from A. Cruz to M. Reade at 2 (Dec. 23, 2024).  This general assurance of propriety does not address any of the specific redactions that Innovative identified as obscuring relevant and responsive information.  Instead, Biosense appears to view the ESI Order as a blanket authorization to redact any Biosense documents that the parties use at trial.  Biosense also suggests (at 1) that asking it to substantiate any redactions to anticipated trial exhibits amounts to "eleventh-hour attempts to derail [Biosense's] preparation for the upcoming trial."  Innovative disagrees for at least two reasons.

*First*, the ESI Order *requires* Biosense to provide "additional information regarding the basis for redactions on specific documents" upon request.  Dkt. 64 at 11.  Innovative has made that request and reiterates it here.  Should Biosense refuse to provide any information about the basis for its redactions to the specific documents that Innovative's December 12 letter identified,

Kᴇʟʟᴏɢɢ, Hᴀɴsᴇɴ, Tᴏᴅᴅ, Fɪɢᴇʟ & Fʀᴇᴅᴇʀɪᴄᴋ, ᴘ.ʟ.ʟ.ᴄ.

Alejandro H. Cruz, Esq.
December 31, 2024
Page 2

Biosense will breach the ESI Order and waive any basis for asserting the challenged redactions and, in turn, other redactions regarding the same subject matter.

- Please produce unredacted versions of the potential trial exhibits identified in Innovative's December 12 letter by **January 9, 2025**. Otherwise, please explain the basis for each redaction you have applied by **January 9, 2025**.

Innovative also asked Biosense to confirm whether it redacted information about its Octaray and Optrell catheters from its productions. Innovative asked this question because, as should be evident, Innovative cannot see behind the redactions that Biosense applied.

Biosense's response ignores Innovative's question, instead reiterating the position that the Octaray and Optrell catheters are irrelevant. But the Court rejected that position. *See* Hr'g Tr. at 37:2-22 (Nov. 4, 2024). After the Court's ruling, Biosense should have disclosed whether it unilaterally redacted information about those relevant products from its productions. After all, if Biosense *did* redact that information, it knows that its prior disclosures were incomplete. *See* Fed. R. Civ. P. 26(e).

- So Innovative asks again: Did Biosense redact references to the Octaray and Optrell catheters from responsive documents that it produced in this case? And if so, how many documents did Biosense redact on that ground, and when will Biosense provide them without redactions?

*Second*, both the law and this Court's local rules require the parties to substantiate every redaction to the materials that they plan to use at trial. No matter the stage of a case, a "party seeking to seal a judicial record," such as a trial exhibit, "must present 'compelling reasons' to keep the records secret." *Natural-Immunogenics Corp. v. Newport Trial Grp.*, 2019 WL 11742967, at *2 (C.D. Cal.) (Selna, J.) (quoting *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)). And under this circuit's law, a "blanket" court order that permits sealing certain materials produced in discovery, like the ESI Order here, "does *not* justify sealing court records" and "is *not* a compelling reason that rebuts the presumption of access" to those records. *Kamakana*, 447 F.3d at 1183 (citations omitted) (emphasis added).

Likewise, this Court's local rules require that any party seeking to keep information under seal must, for all such information:

1. explain "why the strong presumption of public access in civil cases should be overcome, with citations to the applicable legal standard";

2. "list[ ] in table form each document or portion thereof to be filed under seal";

3. highlight "any proposed redactions" in its under-seal filings; and

Kᴇʟʟᴏɢɢ, Hᴀɴsᴇɴ, Tᴏᴅᴅ, Fɪɢᴇʟ & Fʀᴇᴅᴇʀɪᴄᴋ, ᴘ.ʟ.ʟ.ᴄ.

Alejandro H. Cruz, Esq.
December 31, 2024
Page 3

4. "inform[] the Court whether anyone opposes" sealing all or part of the identified information, among other requirements. C.D. Cal. L.R. 79-5.2.2(a); *see also id.* (requiring a "declaration" to substantiate each request for under-seal filing).

Given relevant precedent and the local rules, Innovative seeks to resolve disputes over redactions to trial exhibits early, so far as possible, to streamline the parties' trial preparations—through discrete requests about specific trial exhibits (like those discussed above) and through the parties' preliminary exhibit list exchange. Here is how Innovative proposes to address any trial exhibits with remaining redactions when the parties exchange their preliminary exhibit lists:

1. ***Identify redacted exhibits.*** The parties' preliminary exhibit lists shall identify any proposed exhibit that contains redactions, no matter who produced the exhibit, as well as the type of redactions included. For example, if Innovative lists a Biosense document that contains privilege redactions, Innovative will add "Y" to the redaction column for that exhibit, then state "Privilege" as the redaction type. Likewise, if Innovative lists an *Innovative* redacted document, Innovative will note whether that document contains redactions and what kind of redactions it includes.

2. ***Unredacted, highlighted versions of exhibits with non-privilege redactions.*** The redacting party shall provide an unredacted, highlighted version of each exhibit that the redacting party produced with non-privilege redactions during discovery.

   a. *Privilege redactions excepted.* At this stage, the parties need only unredact material they have not claimed as privileged.

   b. *Highlighting color.* Any desired non-privilege redactions to the public version of those documents should be highlighted in teal. Unredacted, unhighlighted versions of each exhibit will be used with the jury.

   c. *Timing.* The redacting party will provide the unredacted, highlighted versions of any documents that it produced and included on its own exhibit list when the parties exchange preliminary exhibit lists on the date(s) agreed by the parties or ordered by the Court for pretrial exchanges of exhibits and objections. Within 2 days of that exchange, the redacting party shall provide unredacted, unhighlighted versions of any documents that the redacting party produced but that the non-redacting party listed as exhibits.

3. ***Responding to proposed redactions.*** When responding to the other party's exhibit list on the date(s) agreed by the parties or ordered by the Court for pretrial exchanges of exhibits and objections, each party shall provide unredacted versions of each document that it produced but that is listed on the other party's exhibit list. Unlike the prior exchange of unredacted documents, these versions should include teal highlighting showing the redacting party's proposed non-privilege redactions (if any)

Kellogg, Hansen, Todd, Figel & Frederick, p.l.l.c.

Alejandro H. Cruz, Esq.
December 31, 2024
Page 4

to those documents.  The parties should then meet and confer regarding the scope of redactions to be applied to the public exhibits.

- Please let us know whether Biosense agrees to the procedure outlined above for addressing sealing disputes through the parties' exhibit list exchange.  If so, Innovative will prepare a template for the parties to use.

**III.    Privilege Waiver.**  Biosense also argues that it has not waived attorney-client privilege over its communications about the case coverage policy.  We are unconvinced.  But given Biosense's representation that it "is not relying on the substance" of its attorneys' advice or "any underlying legal advice, instructions, or directives as a defense" here, Innovative is willing to discuss a stipulation to exclude evidence and argument based on advice of counsel.  This stipulation would need to bar, at minimum:

1.  Any evidence of communications with counsel, and any argument that such evidence is a defense to Innovative's claims;

2.  Any evidence that Biosense believed that its conduct was legal, and any argument that such evidence is a defense to Innovative's claims;

3.  Any evidence that Biosense believed that its conduct was required by law, and any argument that such evidence is a defense to Innovative's claims;

4.  Any evidence that Biosense took any action based in whole or in part on advice of counsel, and any argument that such evidence is a defense to Innovative's claims;

5.  Any evidence that counsel created the case coverage policy, approved the policy, or reviewed or cleared any communication about the policy, and any argument that such evidence is a defense to Innovative's claims;

6.  Any evidence that continuing case coverage for third parties' catheters would violate the law, hospital policies, or any other rules or regulations, and any argument that such evidence is a defense to Innovative's claims;

7.  Any evidence that continuing case coverage for third parties' catheters would exceed the terms and conditions of Biosense's liability insurance, and any argument that such evidence is a defense to Innovative's claims;

8.  Any evidence that Biosense believed that the case coverage policy or position statement was necessary based in whole or in part on advice of counsel, and any argument that such evidence is a defense to Innovative's claims;

Kᴇʟʟᴏɢɢ, Hᴀɴsᴇɴ, Tᴏᴅᴅ, Fɪɢᴇʟ & Fʀᴇᴅᴇʀɪᴄᴋ, ᴘ.ʟ.ʟ.ᴄ.

Alejandro H. Cruz, Esq.
December 31, 2024
Page 5

9.  Any evidence that Biosense believed that the case coverage policy would reduce the
risk of liability to Biosense based in whole or in part on advice of counsel, and any
argument that such evidence is a defense to Innovative's claims; and

10. Any evidence that continuing case coverage would result in additional risk of liability
to Biosense from attesting to the safety and efficacy of third parties' catheters, and
any argument that such evidence is a defense to Innovative's claims.

• Please let us know whether Biosense is amenable to resolving this issue through joint
stipulation rather than motion practice. If so, the parties can discuss a timetable for
preparing their joint stipulation at the forthcoming meet-and-confer.

Otherwise, we look forward to discussing a schedule for timely briefing any or all of
these open issues when we meet and confer.

Sincerely,

*/s/ Matthew D. Reade*

Matthew D. Reade
Counsel for Innovative Health

cc: All counsel of record

# EXHIBIT 5

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Page 1

1                  UNITED STATES DISTRICT COURT

                CENTRAL DISTRICT OF CALIFORNIA

2                      SOUTHERN DIVISION

3

4    INNOVATIVE HEALTH LLC,

5         Plaintiff,                        CASE NO.

6    vs.                        8:19-cv-01984-JVS-KES

7    BIOSENSE WEBSTER, INC.,

8         Defendant.

9

10

11              VIDEOTAPE 30(B)(6) DEPOSITION

12               OF BIOSENSE WEBSTER, INC.

13            AND IN HIS INDIVIDUAL CAPACITY

14                WITNESS: CONRAD RAMOS

15                 APPEARING REMOTE FROM

16                   ATLANTA, GEORGIA

17

18                  AUGUST 10, 2021

19                   9:33 A.M. EST

20

21

22   Reported By:

23   Judith L. Leitz Moran

24   RPR, RSA, CCR-B-2312

25   APPEARING REMOTELY FROM ATLANTA, GEORGIA

30(b)(6) & Ind. Conrad Ramos          August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 61

1    BY MR. BERHOLD:

2          Q     Oh, sure.

3                Do you recognize Exhibit 169?

4          A     Yes, I do.

5          Q     And that's an email from you on

6    February 19th, 2016?

7          A     Correct.

8          Q     What was the purpose of your email?

9          A     So we wanted to -- at that time we didn't

10   have a Sharepoint site to house all the documents

11   and support -- supporting materials around --

12   either for corporate accounts or for anything

13   related specifically to this policy statement.

14               So I wanted to engage Justin and ask for

15   his assistance with creating a Sharepoint site that

16   I could then forward on the link to anyone who

17   requested support and training on the materials

18   that we had put out.

19         Q     And would these materials be available to

20   anyone in the field sales of Biosense Webster?

21         A     Anyone who had access to that Sharepoint

22   site.  So in order to have access to that they'd

23   have to be properly credentialed to access that

24   Sharepoint site.

25         Q     And who is credentialed to access the

30(b)(6) - Conrad Ramos                                    August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 62

1    Sharepoint site?

2        A    Generally speaking, the field team.  So

3    it would be the field team and marketing, and then

4    my own corporate accounts, a team of two.

5        Q    And who is the field team?

6        A    Oh, that would be clinical account

7    specialists, territory managers, regional business

8    directors, area business directors.

9        Q    And do you recall whether these materials

10   were uploaded?

11       A    I do believe they were uploaded.  I -- I

12   -- let me think here for a second, Mr. Berhold.  I

13   recall them being uploaded.

14       Q    Can you turn to 402015?

15       A    I am not seeing the -- oh, there we go.

16   402105.  Yes, I'm there now.

17       Q    Oh, thank you.

18            Do you see the reference towards the top

19   of the page to a webinar --

20       A    Uh-huh.

21       Q    -- archive of the 4th training session?

22       A    Uh-huh, yes, I do.

23       Q    Is that a video file, an audio file, a

24   multimedia file?

25       A    No, it would have been a video conference

Innovative Health, LLC v. Biosense Webster, Inc.

Page 63

 1    like this and where I would have gone through these

 2    materials.

 3              We did not -- to the best of my

 4    knowledge, we did not record the actual webinar

 5    training -- wait a minute, right there.  We did

 6    record one session.

 7              "Webinar Archive of the 4th training

 8    sessions conducted on February 26th."

 9              So there was one session which we did

10    record.

11        Q    And do you happen to know where that

12    recording is today?

13        A    I do not.

14        Q    And do you see a few paragraphs lower

15    that there's a reference to Simulation Training

16    Video links?

17        A    Yes.

18        Q    And there are links to Simulation 1 and

19    Simulation 2?

20        A    Correct.

21        Q    And were those uploaded?

22        A    Yes, they were to those sites right

23    there.

24        Q    And when was -- and are they still

25    available today?

30(b)(6) - Jim Conrad Ramos                    August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 72

1     A    Yes, specific to this -- to this policy
2   statement.
3     Q    And you understand that field sales used
4   the talk tracks from the simulation training videos
5   in interacting with their customers?
6     A    It was my understanding that the field
7   looked at the videos.  As to whether or not they
8   used the talking points from them, I -- I was -- I
9   could only attest to the times when I was present
10   with them and a customer.
11          So, yes, there were times when I was in
12   the field after the posting of these resources
13   where I did see clinical account specialists and
14   territory managers use the points from those --
15   those training materials, but I can't attest to
16   anything that I didn't have personal visibility to.
17          MR. BERHOLD:  Okay, Jim, can we pull up
18   Exhibit 170.
19          (Deposition Exhibit 170 marked.)
20   BY MR. BERHOLD:
21     Q    Mr. Ramos, Exhibit 170 is a -- is a video
22   file which appears to be the Simulation 1 for
23   Uninformed Lab Director.
24          And Mr. -- the -- the concierge is going
25   to forward control of the video file to me and

Page 73

1    we're going to run through it.

2              MR. BERHOLD:  And Judi, can you

3    transcribe the dialogue in the video file?

4              THE COURT REPORTER:  Yes, I can.

5              MR. BERHOLD:  Okay.  Great.

6              CONCIERGE FARMER:  Mr. Berhold, you

7    should have control of my screen here.

8              MR. BERHOLD:  Okay.  I think I do.  I'm

9    just thinking about how I want to go about playing

10    it right now.

11              CONCIERGE FARMER:  Okay.

12              MR. BERHOLD:  Thank you.

13              (WHEREUPON, VIDEO PLAYED, AS FOLLOWS:)

14

15

16

17        A    Can I hold you up?  I can't see the

18    video.

19

20              (VIDEO STOPPED.)

21        A    Let me see.  Oh, you know what, I'm still

22    in the Veritext file.  Now I can see the video.

23    Sorry about that.

24    BY MR. BERHOLD:

25        Q    Oh, no.  We'll start it over.  Thanks for

30(b)(6) of Conrad Ramos                                    August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 74

1    saying something.

2         A    Sure.

3              (WHEREUPON, VIDEO RESTARTED.)



Innovative Health, LLC v. Biosense Webster, Inc.

Page 75

1
2
3
4           (VIDEO STOPPED.)

5    BY MR. BERHOLD:

6         Q    So, Mr. Ramos, do you recognize

7    Exhibit 170 so far?

8         A    Yes, I do.  Yes, I do.

9         Q    All right.  Who is the good-looking guy

10   on the right?

11        A    It's a guy who's six years younger,

12   that's who that guy is.  It's a guy who doesn't

13   need glasses to see.

14        Q    But it's -- that's you on the right?

15        A    That is correct.

16        Q    And who is the gentleman on the left?

17        A    Rob -- oh, what is his name?  Rob.  I

18   can't remember Rob's name.  I know his first name

19   is Rob.  I think it -- I can't remember, I'm sorry.

20   I should be able to remember him.  Rob something

21   with an L.  I'm sorry, I can't remember his last

22   name.  But his first name is Rob.

23        Q    Do you recall -- okay.  Is he a -- was he

24   a Biosense Webster employee?

25        A    Yes, he was.  He was part of the -- the

30(b)(6) - Inez Conrad Ramos                    August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 76

1   commercial excellence team.  And that was the team

2   that was responsible for providing training to the

3   field.  Training to the commercial team part of the

4   field.

5            So things on how to manage contracts, how

6   to build business plans, how to run pod meetings,

7   things of that nature was what his group was

8   responsible for.

9            Schuler, Rob Schuler, that was his last

10  name.

11       Q    Did he assist in preparing the talk

12  track?

13       A    No.  He just was my counterpart for this

14  video.  That's all.  His -- his assistant was in

15  playing the role that he would imagine a customer

16  to play and respond the way he would imagine a

17  customer to play.

18           But the -- the points that needed to be

19  made that I was trying to train the sales team on

20  were all things that I had developed.

21       Q    Okay.  And had you prepared a written

22  script?

23       A    I can't recall if we had a written

24  script, no, because I think one of the things that

25  I remember is we had done this in one take, maybe

Page 77

1    two takes tops.  And the person who was videoing us

2    said "I can't I believe you guys did that within

3    two takes."

4            So we just went extemporaneous for this.

5    But eventually we had to produce a transcript so

6    that it could go through the copy review process.

7            (WHEREUPON, VIDEO RESTARTED.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

30(b)(6) & Intt. Conrad Ramos                    August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 78



21          (VIDEO STOPPED.)

22    BY MR. BERHOLD:

23          Q    Now, were you instructing field sales to

24    tell customers that the position statement had been

25    created by your legal department?

Page 79

1       A    Not that it had been created by the legal

2    department, it had been reviewed by the legal

3    department and approved by the legal department.

4       Q    But the position statement was not being

5    conveyed as a legal position, was it?

6            MR. REYNOLDS:  Objection, form.

7       A    Can you restate the question one more

8    time, Mr. Berhold, please?

9    BY MR. BERHOLD:

10      Q    Oh, sure.

11           Were you -- was the position statement

12   being conveyed to customers as a -- a legal

13   position?

14      A    So the statement -- the statement was

15   designed to address three things.

16           Our commitment to quality and the service

17   and the products that we had.

18           The fact that we had to ensure that our

19   products -- that our people were properly trained

20   to support the products in a way that was

21   consistent with their training.

22           And then third to address the

23   misconception that we were still the manufacturer

24   of record even though it had been reprocessed by

25   Stryker.

Page 80

1          So those are the three objectives of that

2    letter.

3          Now, this video was done in 2015, which

4    is some time after that letter was originally

5    approved and sent out to our customers, you know.

6          And as we -- as I had more discussions

7    with legal, they were the ones who said, you know,

8    this Certificate of Liability attesting to the

9    safety of someone else's sensor-enabled catheter is

10   not something we can support.  So --

11          MR. REYNOLDS:  Yeah, I just want -- go

12   ahead.  Are you finished, Conrad?

13      A    I was going to say, so to answer your

14   question, the original letter was designed to

15   address three other points, but -- as we learned

16   about what was important to highlight.  And so, by

17   stating that it's not our product, there are things

18   that are implied with that.

19          MR. REYNOLDS:  I just wanted to caution

20   the witness not to reveal any communications with

21   counsel that are privileged.

22          THE WITNESS:  Thank you, Michael.  Thanks

23   for the reminder.

24          MR. BERHOLD:  Yeah, thanks, Michael.

25   BY MR. BERHOLD:

30(b)(6) & Indiv. Conrad Ramos                    August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 81

1      Q    Without getting into any conversations

2    with counsel, why would you be referring at all to

3    lawyers in talking to customers about the position

4    statement?

5           MR. REYNOLDS:  Objection to form, but you

6    can answer.

7      A    Well, it's important for us to note that

8    we were also talking about the Certificate of

9    Liability and things that we are covered to do by

10    our company.

11           And so as part of clarifying that these

12    products were no longer manufactured by Johnson &

13    Johnson, we thought that announcing or alerting the

14    customer to any type of legal implications

15    associated with us providing coverage to a case in

16    a way that was not consistent with our training or

17    not to a product that we were properly trained to

18    do would be -- would create, you know, legal

19    considerations for us.

20    BY MR. BERHOLD:

21      Q    And so, field sales would refer to the

22    Biosense Webster lawyers in talking to the

23    customers about the case coverage policy?

24           MR. REYNOLDS:  Objection.

25      A    When you say "refer," meaning we would

Innovative Health, LLC v. Biosense Webster, Inc.

Page 82

1    say that our statement was approved by our legal

2    team and by our healthcare compliance team, that --

3    that's what we would state.

4    BY MR. BERHOLD:

5        Q    And would you say that legal counsel

6    provided a position statement to you, like you say

7    in this video?

8        A    I don't remember saying that.  You can

9    replay the video, but if I said that, then it was

10   inaccurate.  It should have been that legal and

11   healthcare compliance reviewed and approved this

12   statement before it was introduced to our

13   customers.

14            Again, I'd highlight this was an

15   extemporaneous performance, if you will.  We didn't

16   script it out.  We did it within two takes.

17       Q    So you weren't saying that the case

18   coverage policy was developed because Biosense

19   Webster believed that it was illegal for it to be

20   providing clinical support for Biosense Webster

21   catheters reprocessed by third parties, right?

22       A    No.

23            MR. REYNOLDS:  Objection.

24       A    We were not saying that.  We were saying

25   that we developed the policy to ensure that our

30(b)(6) - Inv. Conrad Ramos                        August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 83

1   people were supporting the products in a way that

2   they were properly trained to do so.  And we were

3   clarifying that these products were no longer

4   Johnson & Johnson products once they were

5   sterilized -- once they were reprocessed by

6   Stryker.

7                 (WHEREUPON, VIDEO RESTARTED.)

8

9

10

11

12

13

14

15

16                 (VIDEO STOPPED.)

17  BY MR. BERHOLD:

18       Q    Okay.  All right.  Well, in that

19  statement aren't you implying to the customer that

20  there is some question of legality of providing

21  clinical support for Biosense Webster catheters

22  reprocessed by third parties?

23       A    So now that you --

24            MR. REYNOLDS:  Objection.

25       A    So now that you replay the video, yes, I

30(b)(6) of Conrad Ramos                    August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

1  made that statement and I see it now.

2              But a more accurate statement would have

3  been, our legal department reviewed this and

4  support us communicating this to our customers.

5              (WHEREUPON, VIDEO RESTARTED.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

30(b)(6) & Indiv. Conrad Ramos                                    August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 85



30(b)(6) of Conrad Ramos                    August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 86

13          (VIDEO STOPPED.)

14  BY MR. BERHOLD:

15      Q     So, Mr. Ramos, what was the purpose for

16  referring again to conversations with the Biosense

17  Webster lawyers?

18          MR. REYNOLDS:   Objection.

19      A     The purpose is to walk the customer

20  through how we came about putting this policy

21  together and noting that we go through a checks and

22  balances process before we publish anything to our

23  customers.

24  BY MR. BERHOLD:

25      Q     But you've testified there was no legal

Page 87

1  reason why Biosense Webster developed the case

2  coverage policy, right?

3          MR. REYNOLDS:  Objection.

4      A    Well, as I stated in the video -- what I

5  stated is, as you mentioned before, yes, I said

6  that it came from legal, but then here I made the,

7  more augusting, where legal approved this is the

8  statement that I made in the video.

9          So I'm highlighting to the customer in

10  this simulation that our legal team has approved

11  this and deemed it appropriate for us to not

12  support these catheters by third parties.

13  BY MR. BERHOLD:

14      Q    And why was it relevant that Biosense

15  Webster's legal team had approved the letter?

16          MR. REYNOLDS:  Objection.

17      A    Well, I think it's relevant because we

18  often tell our customers that when we publish

19  something, if we make an official statement, that

20  it's appropriately reviewed to make sure that it's

21  consistent with the laws and the regulations that

22  we have to abide by.

23  BY MR. BERHOLD:

24      Q    But you didn't believe that it was

25  illegal for Biosense to provide clinical support on

30(b)(6) - Juan Conrad Ramos        August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 88

```
 1   cases where the physician uses Biosense Webster

 2   catheters reprocessed by third parties, right?

 3           MR. REYNOLDS:  Objection.

 4      A    No, I was not making that statement.

 5   BY MR. BERHOLD:

 6      Q    Okay.  And you did not intend to imply

 7   it?

 8           MR. REYNOLDS:  Objection.

 9      A    No, I did not intend to imply it.

10           MR. BERHOLD:  Sorry, it's hard to control

11   this.  All right.

12           (WHEREUPON, VIDEO RESTARTED.)

13

14

15

16

17

18

19

20

21

22

23           (VIDEO STOPPED.)

24   BY MR. BERHOLD:

25      Q    So what did you mean here by the legal
```

Page 89

1    limitations that you have?

2        A    So in this video I've revealed components

3    of a discussion that I had with our legal team

4    which is privileged and confidential, but it's part

5    of this exhibit here.

6            And so we weren't saying that -- I was

7    not saying that it would be illegal for us to

8    provide the support.

9            What -- the guidance that I received --

10   or I should say what I was saying is that if

11   something went wrong in a procedure and we were

12   using a third-party sensor-enabled catheter and

13   there was a lawsuit that ensued, it could

14   potentially create problems for us as Johnson &

15   Johnson because it could be interpreted as us

16   attesting to the efficacy of another party's

17   sensor-enabled catheter.

18           So I was not making any statement about

19   this being illegal, I was making a statement about

20   legal considerations that we, as Johnson & Johnson,

21   wanted to take to avoid future problems if such a

22   scenario arose.

23       Q    And you believe that Biosense Webster

24   could have some sort of liability for allegedly

25   attesting to the quality of the Biosense Webster

30(b)(6) - Ingmar Conrad Ramos                    August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 90

1    catheter that had been reprocessed by a third party

2    if it did not function properly?

3            A    The reason for that --

4                 MR. REYNOLDS:  Objection.

5            A    The reason for that belief is due to

6    information I received through a privileged and

7    confidential conversation with my legal resource.

8    BY MR. BERHOLD:

9            Q    And just to wrap up this exhibit.  It

10   says, in the bottom right corner, that it's

11   internal -- internal only for no further

12   distribution.

13               And so this was only accessible to the

14   Biosense Webster field sales; is that right?

15           A    That is correct.  When it has that

16   designation in the bottom right-hand corner, that

17   means explicitly this is not to be shared with

18   customers or anyone external to the corporation.

19               MR. BERHOLD:  Jim, you can take down the

20   video now.

21   BY MR. BERHOLD:

22           Q    So there was also a Simulation 2 video;

23   is that right?

24           A    That is correct.

25           Q    And I'll -- I'll confer with Michael at

30(b)(6) & Individual Conrad Ramos                    August 10, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 135

1        Q    Thank you.

2             Can you turn to Page 4.

3        A    Is that the page that starts with

4    "mapping, or other technical support"?

5        Q    Yes.

6        A    Okay, I am there now.

7        Q    I -- I understand that Biosense Webster

8    has designated you to testify regarding Topic 3,

9    which is "Biosense's policies on providing product

10   technical support or clinical support in cases that

11   use catheters reprocessed or distributed by third

12   parties, including the dates, scope, and reasons

13   and justifications for such policies."  Is that

14   your understanding as well?

15       A    That is correct, yes.

16            MR. REYNOLDS:  Yes, I just -- I would

17   just say on the record that this -- this topic was

18   then discussed in email exchanges, as you know,

19   Jeff, afterwards.

20            So as described in those emails,

21   including the one from June 28th from Lillian

22   Grossbard, we have designated him under this topic

23   as described therein.

24            MR. BERHOLD:  Okay.  Thank you, Mike --

25   Michael.

2

***ERRATA SHEET***

NAME OF CASE:    *Innovative Health LLC v. Biosense Webster, Inc.  8:19-cv-01984*

DATE OF DEPOSITION: 08/10/2021
NAME OF DEPONENT: Conrad Ramos

| | | | | |
|---|---|---|---|---|
| 87 | 7 | "augusting" | "accurate statement" | Transcription Error |
| 108 | 7 | "while that" | "that while that" | Transcription Error |
| 110 | 15 | "copy, reviewed" | "copy reviewed" | Grammar Error |
| 118 | 5 | "could it" | "could do it" | Transcription Error |
| 126 | 25 | "million" | "million dollars" | Transcription Error |
| 127 | 19 | "can - - so" | "can compete, so" | Transcription Error |
| 138 | 15 | "privilege" | "privileged" | Spelling Error |
| 172 | 17 | "impedence-based" | "impedance-based" | Spelling Error |
| 176 | 16 | "CONCIERGE FARMER" | "A" | Incorrect Speaker Identified |
| 176 | 20 | "CONCIERGE FARMER" | "A" | Incorrect Speaker Identified |
| 186 | 19 | "We've" | "Well we've" | Transcription Error |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*Conrad [signature]*

Conrad Ramos

Executed on

*13th* day of *September* , 2021.

# EXHIBIT 6

## REDACTED IN FULL DOCUMENT PROPOSED TO BE FILED UNDER SEAL IN ITS ENTIRETY

# EXHIBIT 7

## REDACTED IN FULL DOCUMENT PROPOSED TO BE FILED UNDER SEAL IN ITS ENTIRETY

# EXHIBIT 8

## REDACTED IN FULL DOCUMENT PROPOSED TO BE FILED UNDER SEAL IN ITS ENTIRETY

# EXHIBIT 9

| | |
|---|---|
| **From:** | Ramos, Conrado [BWIUS] </O=JNJ/OU=CRDUSBA/CN=RECIPIENTS/CN=CRAMOS12> |
| **To:** | Ayer, Jack [BWIUS]; Randall Marker |
| **CC:** | Jeffrey Neichin; Palfi, Sandor [BWIUS] |
| **BCC:** | Zare, Fairy [BWIUS]; Ramos, Conrado [BWIUS] |
| **Sent:** | 3/7/2016 9:09:01 PM |
| **Subject:** | RE: BWI Redraft of Policy statement-v1 |
| **Attachments:** | BWI SoundChoice Expansion and Clinical Support |

Jack,

The challenge with your request is that we have worked very hard over the last year to emphasize the issues of patient safety as related to vendor product competency, legal liability as related to our vendor certificate of liability, and on label promotion as related to our FDA approved instructions for use over the business issues at hand. Even with that focused effort, we still have customers that believe this position statement is only about positioning the Sound Choice Program and our Sterilmed partnership.  As an example, please see the attached message that I had to send to HPG when they flared up on Randy over the expansion of the Sound Choice program to include the BWI CS catheters.  We deliberately did not mention Sterilmed or the Sound Choice program in the original draft to not make it seem like a "hurt and rescue" tactic.  While the letter does not specifically mention Sterilmed and Sterilmed RPO products, everyone knows that we are joined at the hip and we have been consistent in our verbal communications with the customers about our partnership.  I think it would be a step in the wrong direction to divert attention away from the 3 core issues currently outlined in the letter by introducing a paragraph specific to Sterilmed and the Sound Choice program.  My concern is that such a departure from the original approach would be exploited by Stryker to work against Sterilmed and BWI.  The legitimacy of our position depends on us referencing objective, 3rd party standards, rules and regulations.


**Conrad Ramos**
Corporate Account Director
M. 404-808-1726
F. 877-817-8086
E. cramos12@its.jnj.com

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
3333 S. Diamond Canyon Road
Diamond Bar, CA 91765, USA
www.biosensewebster.com
T. 1-909-839-8500
T. 1-800-729-9010
F. 1-909-595-0187



**Confidentiality Notice:** This document is J&J Proprietary. You may forward this document within J&J on a need to know basis. You may not forward this onto the Internet without the author's permission. This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited.  If you have received this e-mail transmission in error, please reply to the sender, so that J&J can arrange for proper delivery, and then please delete the message from your inbox.

**From:** Ayer, Jack [BWIUS]
**Sent:** Monday, March 07, 2016 9:22 AM
**To:** Randall Marker; Ramos, Conrado [BWIUS]
**Cc:** Jeffrey Neichin

**Subject:** Re: BWI Redraft of Policy statement-v1

Conrad

The letter looks good. I would add a paragraph about Sterilmed and that BWI will support cases with RPO product.

The paragraph should state the following points:
- Sterilmed is  a JNJ company and RPO products for BWI using BWI design files and engineering support
- Sterilmed has disclosed it's manufacturing process to BWI
- BWI will train its CAS on RPO product from Sterilmed

Thoughts?

Sent from my iPhone

On Mar 4, 2016, at 6:58 AM, Randall Marker <rmarker@sterilmed.com> wrote:

Jack and Jeff,

Attached please find a draft letter from BWI pertaining to clinical support.

Conrad is open to suggestions for improvement.

**Randy Marker**
Director of Corporate Sales
<image002.jpg>
5010 Cheshire Parkway
Suite 2
Plymouth, MN  55446
P 513.325.3145
F 763.488.4552
rmarker@sterilmed.com
www.sterilmed.com

CONFIDENTIALITY NOTE: This e-mail message, including any attachments, may contain information that is confidential, proprietary or legally privileged. If you are not an intended recipient of this message or an authorized assistant to an intended recipient, please notify the sender by replying to this message and then delete it from your system. Use, dissemination, distribution, or reproduction of this message and/or its attachments (if any) by unintended recipients is not authorized and may be unlawful.

**From:** Ramos, Conrado [BWIUS] [mailto:CRamos12@ITS.JNJ.COM]
**Sent:** Friday, March 04, 2016 9:11 AM
**To:** Marker, Randy
**Subject:** Redraft of Policy statement-v1

**Conrad Ramos**
Corporate Account Director
M. 404-808-1726
F.  877-817-8086
E.  cramos12@its.jnj.com

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
3333 S. Diamond Canyon Road
Diamond Bar, CA 91765, USA
www.biosensewebster.com
T. 1-909-839-8500
T. 1-800-729-9010
F. 1-909-595-0187

                                                    BWI-INN00401988

**Confidentiality Notice:** This document is J&J Proprietary. You may forward this document within J&J on a need to know basis. You may not forward this onto the Internet without the author's permission. This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited.  If you have received this e-mail transmission in error, please reply to the sender, so that J&J can arrange for proper delivery, and then please delete the message from your inbox.

\<BWI Customer Letter on Reporcessed Catheter Support-2016 Update-v1.docx\>

| From: | Ramos, Conrado [BWIUS] </O=JNJ/OU=CRDUSBA/CN=RECIPIENTS/CN=CRAMOS12> |
|---|---|
| To: | Rebecca.Holt@Healthtrustpg.com |
| Sent: | 2/26/2016 1:13:15 PM |
| Subject: | BWI SoundChoice Expansion and Clinical Support |
| Attachments: | C3_IFU_v3.2.2-StndrdDXCatheters.pdf |

Becka,

As I mentioned in our conversation yesterday,  BWI's expansion of the Sound Choice Program to include BWI CS catheters will not result in BWI's clinical personnel not being able to utilize other CS catheters with the Carto 3 system.  CS Catheters that do not have magnetic sensor based navigational elements in them fall under the category of "Standard Diagnostic Catheters".  The Carto 3 System was designed with the intent and is approved by the FDA to be utilized with Standard Diagnostic Catheters from other manufacturers.  These types of catheters do not provide navigational (X/Y/Z coordinate) data to the Carto 3 system.  I have attached a PDF copy of the page from the Carto 3 System Instructions-For-Use which describes the system's ability to accommodate Standard Diagnostic Catheters from other manufacturers for your reference.

As a reminder, the BWI policy statement on Clinical Account Specialist (CAS) Case Support of Reprocessed SUD Catheters is not about "strong arming" our customers into participating in the Sound Choice Program.  The Sound Choice Program has proven to be very successful on its own without the need of such tactics.  The positive reception of the Sound Choice Program by our customers is a large part of why we are expanding the offering to include BWI CS Catheters as well as other BWI catheters in the near future.  Our goal in providing this policy statement is to address some common misconceptions regarding our clinical support capabilities.  By doing so, we want all stakeholders to have a clearer and more accurate understanding of the rules by which BWI has to operate under.  In the end, BWI personnel need to ensure their activities are inside the scope of their vendor product competency letter and vendor liability certificate.  We also need to ensure that our support of our products is consistent with our Instructions-For-Use as approved by the FDA.

I hope this message helps to alleviate your concerns about the Sound Choice Program expansion.

**Conrad Ramos**
Corporate Account Director
M. 404-808-1726
F.  877-817-8086
E.  **cramos12@its.jnj.com**

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
3333 S. Diamond Canyon Road
Diamond Bar, CA 91765, USA
www.biosensewebster.com
T. 1-909-839-8500
T. 1-800-729-9010
F. 1-909-595-0187



**Confidentiality Notice:** This document is J&J Proprietary. You may forward this document within J&J on a need to know basis. You may not forward this onto the Internet without the author's permission. This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited.  If you have received this e-mail transmission in error, please reply to the sender, so that J&J can arrange for proper delivery, and then please delete the message from your inbox.

                                                              BWI-INN00401990

When a NAVISTAR® Catheter is connected, the system might prompt the user to select the specific type of catheter that is connected. If an incorrect catheter is selected, visualization might be compromised.

 NOTE | When operating the system with the NIOBE magnets unstowed, standard NAVISTAR® Catheters are not supported. Other non-RMT sensor-based catheters have limited functionality.

## Biosense Webster Diagnostic Catheters with Auto ID

All Biosense Webster diagnostic catheters are suitable for use with the CARTO® 3 System. Biosense Webster Catheters which incorporate Biosense Webster's Auto ID technology are automatically identified and appear in the **Catheter Setup** Screen when the catheter is connected to the PIU.

See also:

- "Catheter Setup"

## Standard Diagnostic Catheters

Biosense Webster catheters without the Auto ID technology or diagnostic catheters from other manufacturers can also be used with the CARTO® 3 System, but will not be automatically recognized by the system. If the catheter you connect to the system does not appear in the **Catheter Setup** Screen after connecting, right-click the image of the appropriate socket and select the catheter from the Catheter List.

 WARNING | **If the catheter you select is not identical to the catheter connected to the PIU, visualization might be compromised**

If the catheter you have connected does not appear in this menu, you can use the Catheter Definition Tool to add it to the list.

 NOTES |
- The catheter connected to the MAP socket cannot be user-selected.

- Non-Biosense Webster diagnostic catheters must be connected to the PIU via the Catheter-PIU Pin Adapter (CPPA) using a PIN TO PIN connection.
  The CPPA can be connected to REF/DECA, 20 POLE A, or 20 POLE B sockets.

CONFIDENTIAL                                                                   BWI-INN00401991

# EXHIBIT 10

## REDACTED IN FULL DOCUMENT PROPOSED TO BE FILED UNDER SEAL IN ITS ENTIRETY

# EXHIBIT 11

## REDACTED IN FULL DOCUMENT PROPOSED TO BE FILED UNDER SEAL IN ITS ENTIRETY