Panteha Abdollahi, Esq.
State Bar No. 230002
pabdollahi@tocounsel.com
THEODORA ORINGHER PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, California 92626-7109
Telephone: (714) 549-6200
Facsimile: (714) 549-6201

Jeffrey L. Berhold, Esq.
Admitted *Pro Hac Vice*
jeff@berhold.com
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, Georgia 30309
Telephone: (404) 872-3800
Facsimile: (678) 868-2021

Joshua P. Davis, Esq.
State Bar No. 193254
jdavis@bm.net
BERGER MONTAGUE PC
505 Montgomery St., Suite 625
San Francisco, California 94111
Telephone:  (415) 906-0684

Derek T. Ho, Esq.*
Andrew E. Goldsmith, Esq.*
Matthew D. Reade, Esq.*
Kelley C. Schiffman, Esq.
State Bar No. 325023
Rachel T. Anderson, Esq.*
Annamaria M. Morales-Kimball, Esq.*
Sean P. Quirk, Esq.*
*Admitted *Pro Hac Vice*
dho@kellogghansen.com
agoldsmith@kellogghansen.com
mreade@kellogghansen.com
kschiffman@kellogghansen.com
randerson@kellogghansen.com
amoraleskimball@kellogghansen.com
squirk@kellogghansen.com
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK. P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
Telephone: (202) 367-7900
Facsimile: (202) 326-7999

Attorneys for Plaintiff
INNOVATIVE HEALTH LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| INNOVATIVE HEALTH LLC,<br><br>Plaintiff,<br><br>vs.<br><br>BIOSENSE WEBSTER, INC.,<br><br>Defendant. | Case No. 8:19-cv-1984 JVS (KES)<br>Assigned for all purposes to:<br>Honorable James V. Selna<br><br>**DECLARATION OF ANDREW E. GOLDSMITH IN SUPPORT OF PLAINTIFF INNOVATIVE HEALTH LLC'S MOTION *IN LIMINE* NO. 4 TO EXCLUDE EVIDENCE OF PERSONAL WEALTH AND ATTEMPTED SALES OF INNOVATIVE HEALTH**<br><br>Date:    April 14, 2025<br>Time:    11:00 a.m.<br>Crtrm:   10C<br>Action Filed:  October 18, 2019<br>Trial Date:  April 29, 2025 |

1

I, Andrew E. Goldsmith, declare as follows:

1.      I am an attorney admitted to the bars of the State of New York and the District of Columbia.  I am admitted *pro hac vice* to practice before this Court.  I practice law at Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., and represent the plaintiff, Innovative Health LLC, in this matter.

2.      I make this declaration in support of Plaintiff Innovative Health LLC's Motion *in Limine* No. 4 To Exclude Evidence Of Personal Wealth And Attempted Sales Of Innovative Health.

3.      The facts I state here are true and correct.  They are based on my own personal knowledge or knowledge I gleaned from reviewing files pertinent to this matter.  If called as a witness to testify, I could and would competently testify to these facts.

4.      **Exhibit 1** is a true and correct copy of an excerpt of the final transcript of the September 22, 2021 deposition of Rick Ferreira.

5.      **Exhibit 2** is a true and correct copy of an excerpt of the final transcript of the September 16, 2021 deposition of Timothy D. Einwechter.

6.      **Exhibit 3** is a true and correct copy of an email from A. Kirschenbaum to S. Quirk with the subject line "[EXTERNAL] RE: Innovative Health v. Biosense Webster – Stipulation re Personal Wealth" dated March 14, 2025, and earlier emails in the same chain.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day of March, 2025, at Washington, D.C.

/s/ *Andrew E. Goldsmith*
Andrew E. Goldsmith

# EXHIBIT 1

                                                    Page 1

1              UNITED STATES DISTRICT COURT

             CENTRAL DISTRICT OF CALIFORNIA

2                   SOUTHERN DIVISION

3    _____

4    INNOVATIVE HEALTH LLC,

5         Plaintiff,              CASE NO.

6    vs.                         8:19-cv-01984-JVS-KES

7    BIOSENSE WEBSTER, INC.,

8         Defendant.

9    _____

10

11          VIDEOTAPE 30(B)(6) DEPOSITION OF

12              INNOVATIVE HEALTH, LLC

13          AND IN HIS INDIVIDUAL CAPACITY

14            WITNESS:  RICK FERRIERA

15              APPEARING REMOTE FROM

16                  DALLAS, TEXAS

17

18              SEPTEMBER 22, 2021

19                  8:40 A.M CST

20

21   Reported By:

22   Judith L. Leitz Moran

23   RPR, RSA, CCR-B-2312

24   APPEARING REMOTELY FROM ATLANTA, GEORGIA

25

```
                                        Page 17
 1   other point in time?
 2        A    No.
 3        Q    Now, Innovative Health was started in
 4   2015; is that correct?
 5        A    Yes.
 6        Q    And what was your purpose in starting
 7   Innovative Health?
 8        A    What was my purpose?
 9        Q    Why -- why did you -- why did you start
10   Innovative Health?
11        A    As a business opportunity.
12        Q    So you saw a business opportunity and
13   established a company that you thought could meet
14   that business opportunity; is that right?
15        A    Yes.
16        Q    What was the business opportunity that
17   you perceived as existing at the time that you
18   started Innovative Health?
19        A    The reprocessing of electrophysiology
20   catheters.
21        Q    Prior to 2015, had you ever been involved
22   in the reprocessing of electrophysiology catheters?
23        A    Yes.
24        Q    And what company or companies had you
25   been so involved?
```

```
                                        Page 38
 1   have apart from Innovative?

 2        A    We've probably done 15 or 16 different

 3   investments.  They're all listed -- they're all

 4   listed on the website.  I mean, we -- it's

 5   healthcare, growth equity.

 6             So we've got a lot of different

 7   investments in the fund.  Some -- some we've

 8   already exited and some we're still investing in.

 9        Q    Am I correct that at the time that you

10   and Mr. Einwechter started Innovative, you were

11   interested in building up this company for eventual

12   sale?

13        A    Yes.

14        Q    And your goal was to start the company,

15   build it into a company that would be appetizing to

16   potential acquirers and then sell it, correct?

17        A    Yes.

18        Q    It was not a long-term investment in the

19   sense that you weren't thinking of holding on to it

20   forever, correct?

21        A    Correct.

22        Q    What was your original horizon for

23   potential sale that you considered at the time that

24   you started the company Innovative?

25        A    I don't know.  I think any time we look
```

```
                                            Page 39

 1   at an investment, we look at it in kind of a five-
 2   to seven-year horizon, but I mean, we were in
 3   Ascent for 13 years, so.
 4        Q    And when you say a five- to seven-year
 5   horizon, is that five to seven years from date of
 6   first marketing of product or date from founding
 7   the company, starting the company?
 8        A    When we're actually in the market
 9   generating revenue.
10        Q    So the five to seven years would then be
11   dated from 2017 approximately?
12        A    Sure, yeah.
13        Q    And five years would put us at 2021,
14   correct?
15        A    Yeah, so we missed that one.
16        Q    All right.  Well, you still got a couple
17   of months.
18             And 20 -- and seven years would be 2023,
19   correct?
20        A    Correct.
21        Q    All right.  Now, at the time that you
22   started Innovative in 2015 -- strike that.
23             At the time that you went to market with
24   your first product in 2017, you understood, didn't
25   you, that Biosense Webster had already disseminated
```

Page 89

1    yourself as a copiee dated April 14th, 2021.

2              And states "Innovative FS - March 2021,

3    March Financials."  And it bears the Bates numbers

4    at the bottom IH00694684 through 49 -- sorry, 697.

5         A    I have it up.

6         Q    All right.  And do you recall receiving

7    this on or about April 14th, 2021?

8         A    I mean, I don't recall receiving it, but

9    I obviously received it, so, I mean.

10        Q    Okay.  You have no doubt that you

11   received it, correct?

12        A    Yes, yes.

13        Q    Okay.  All right.  Now, in the beginning

14   of this -- on the first page, it says, "The March

15   financials show our improving financial

16   performance."

17             Is that consistent with your

18   understanding of the financial performance for

19   Innovative in April of 2021?

20        A    Yes.

21        Q    Now, Innovative is, as we talked about

22   before, planning to sell itself, correct?

23             MR. BERHOLD:  Objection.

24        A    At some point, yes.

25   BY MS. FORREST:

```
                                                    Page 90
```

1       Q    Who are the entities with whom Innovative

2    has had discussions for a potential sale?

3              THE COURT REPORTER:  Jeff, we can't hear

4    you.

5              THE WITNESS:  I haven't started to answer

6    yet.

7              MS. FORREST:  Was Jeff Berhold trying to

8    say something?

9              He wasn't, okay.

10      A    So -- well, we've had discussion with a

11   number of people, right?  So we've had discussions

12   with Cardinal.  We've had discussions with -- our

13   bankers had discussions with Abbott.  We've had

14   discussions with Cordis.  We've had discussions

15   with Acutus.  A couple of private equity shops.

16   People -- people have reached out to us.  We have

17   not run a sale process.

18   BY MS. FORREST:

19      Q    All right.  And you haven't hired -- oh,

20   strike that.

21              Have you hired a banker to --

22      A    No.

23      Q    -- represent you?

24      A    No.  We have a banker that -- we have a

25   banker that's worked with us for over 20 years, but

Page 91

1    nobody's been retained to sell IH.

2        Q    And what's that banker's name?

3        A    Mike Robinson at Jefferies.

4        Q    All right.  And are there any discussions

5    for the sale of Innovative that are -- that you

6    would consider to be currently live --

7        A    No.

8        Q    -- as we sit here today?

9        A    No.

10        Q    What is your view as the CEO of

11    Innovative of the value of Innovative?

12        A    What I consider to be the value or what I

13    would consider to sell it for?

14        Q    Well, let's just -- since they're

15    different, it sounds like, let's just take them

16    separately.

17            What do you consider to be the value?

18        A    Well, I think if you look at Medtech

19    multiples where they are today, the business is

20    probably worth, if we -- if we sold it off of a

21    multiple, 107 -- maybe $175 million.  Between 150

22    and 175.

23        Q    And that would be a multiple of -- of

24    what?

25        A    If you did a multiple of revenue, it

Page 92

 1    would be about a 4X on revenue and a high teen to

 2    20 on EBITDA.

 3         Q    And what --

 4         A    It sounds -- what sounds like a lot, but

 5    we sold our last business to Stryker at almost a 19

 6    times multiple of EBITDA.  So it's not out of the

 7    ballpark.

 8         Q    And what -- you said that that's the

 9    value that Medtech multiples might give you.

10         A    Yes.

11         Q    What is your view as to the value of

12    Innovative?

13         A    I wouldn't sell the business for less

14    than $200 million today.

15         Q    And why do you believe Innovative is

16    worth $200 million?

17         A    Because I think we are the leader in this

18    niche space.  And I think saving hospitals money

19    coming out of this next round of Covid is going to

20    be even more important.

21              As they said on one of those commercials,

22    the best is yet to come.

23         Q    Is there a particular profit margin that

24    is being targeted by you or Mr. Einwechter that

25    you're aware of?

Page 93

```
 1       A     No.  I think we'd like to get our -- we'd
 2   like to get our EBITDA in the low 20s, anywhere
 3   between 22 to 25 percent.
 4            And for a business that is a service
 5   business that gets viewed because of 510(k)s as a
 6   Medtech business, that's going to yield you a high
 7   multiple.  Like I said, somewhere in the high teens
 8   to 20s.
 9       Q     Have you had any discussions with
10   Biosense Webster about the sale of Innovative?
11       A     I have not.
12       Q     Have you had -- when you said you had had
13   some discussions with private equity, who were the
14   private equity shops that you've had discussions
15   with?
16       A     I can get you the names on a break but, I
17   mean, we've had -- just had a large group out of
18   Tucson about four months ago came by to see us.
19            My problem with selling to a private
20   equity is, I believe, I'm going to get a bigger
21   multiple off of a strategic buying the business
22   than private equity.
23       Q     And when you say "strategic," you're
24   referring to an entity that's actually in the -- in
25   the at least medical device area?
```

```
                                      Page 94
 1      A    Yeah, like a Cordis or an Abbott or a
 2  Boston Scientific.
 3      Q    Now, there was a point in time when there
 4  had been a Letter of Intent signed with a company
 5  called Ajax, correct?
 6      A    Yes.
 7      Q    And that Letter of Intent was a
 8  non-binding Letter of Intent, correct?
 9      A    Correct.
10      Q    And a part of the money was going to be
11  up front but part of it was going to be through a
12  workout, right?
13      A    Correct.
14      Q    All right.  And you decided not to
15  proceed with it, correct?
16      A    We decided not to proceed with it, but a
17  little bit more behind the story on that.  Ajax was
18  trying to build a platform.
19           They're the guys now behind the Cordis
20  acquisition --
21      Q    Uh-huh.
22      A    -- with the other private equity firm
23  Hellman & Friedman.  H & F is the actual owner of
24  that business now.
25           They were trying to -- they had a
```

Page 95

1    platform.  They were trying to add profit -- add

2    people to it.  We were going to be the service arm

3    of it.

4                They ended up selling that business and I

5    think they sold it to Boston Scientific.  And so

6    the workout -- the earnout wasn't going to work for

7    us long term.

8                MS. FORREST:  Okay.  Let's mark at the

9    next exhibit in order a document that I don't

10   believe has been marked before, but check me on

11   that, Rachel.  It's Tab 95.  And that would then be

12   Exhibit 370.

13               Right?  Am I right about that?  Yeah.

14   Okay.

15               (Deposition Exhibit 370 marked.)

16   BY MS. FORREST:

17      Q    Exhibit 370 would be for Mr. Ferriera,

18   Ferriera, sorry, dated December 28th, 2018, to

19   Bogdan Muzychka from Benson Capital.

20               And it bears the Bates number IH00616812

21   running through 820.

22               MR. BERHOLD:  Katherine, can we take a

23   break at the next change of topic?

24               MS. FORREST:  Yeah, yeah.

25      A    What was that -- what was that -- is

Page 96

1    that --

2              MR. BERHOLD:  It's not in order, Rick.

3    It's just above the --

4         A    So what's -- what is the exhibit again,

5    sorry?

6    BY MS. FORREST:

7         Q    It's going to be Exhibit 370 or tab --

8         A    I've got it.  I have it, yes, ma'am.

9    Uh-huh.  Okay.

10        Q    All right.  And do you recognize this

11   document that's been marked as Exhibit 370?

12        A    Yes.

13        Q    All right.  And you wrote this, didn't

14   you?

15        A    Yeah.

16        Q    All right.  And you state:  Here's the

17   outline of the KKR deal - enterprise value of

18   120 million with potential upside on the stock

19   (60 million cash/60 million stock).  We decided to

20   hold off here until early Q2 as revenue has grown

21   substantially over the last year - $600,000 per

22   month in February to 1.8 million in the month of

23   December.

24              Do you see that?

25        A    Yes.

1      Q      And that information was correct?

2      A      Yes.

3      Q      And so was it the case that Innovative

4   had decided to hold off on proceeding with the Ajax

5   deal in part because you believed that the value of

6   Innovative had exceeded what had been agreed to

7   with Ajax?

8      A      Correct.

9           MS. FORREST:  Let's do the -- Rachel,

10  let's do the -- what I'm going to call the side

11  document 1, the one that wasn't in the book, and

12  it's the Ajax Offering Memorandum, OM, 10/2/2018.

13           I think it's already been marked at

14  Mr. -- at a different deposition.

15           MS. PELTZER:  That Ajax document hasn't

16  been marked, so it will be Exhibit 371.

17           MS. FORREST:  Okay.

18           (Deposition Exhibit 371 marked.)

19  BY MS. FORREST:

20      Q      All right.  So we're going to mark as

21  Exhibit No. 371, Mr. Ferriera.

22           You know, this is a terrible problem I

23  had when I -- with names.  So I have a name

24  sometimes, a pronunciation in my head, and I just

25  -- if I have it wrong in my head, it just never

```
                                          Page 98
 1    leaves.  So, you know -- so is it Ferriera or

 2    Ferriera (pronunciation)?  It's Ferriera, right?

 3         A    Ferriera (pronunciation).

 4         Q    Ferriera (pronunciation), okay.

 5    Ferriera.  I'll just think of it as an E.  It is an

 6    E.

 7         A    Yeah, it is an E.  Yeah.

 8         Q    All right.  All right.  So Mr. Ferriera,

 9    I apologize.  The document that's been marked as

10    Exhibit 371 bears the Bates number at the bottom

11    IH00070398 and it runs all the way to 422.

12         A    It hasn't hit my screen yet.  Exhibit No.

13    3?  What's the exhibit number again, sorry 3?

14         Q    371.

15         A    It is on here.  Okay, good.  I got it.

16         Q    Okay.

17         A    Okay.

18         Q    All right.  And you were -- do you

19    recognize Exhibit 371?

20         A    I'm just looking at it now.  I know Nick

21    Lewin.

22              Okay.

23         Q    Do you recognize it?

24         A    I -- yes, I do.

25         Q    All right.  Who is Nick -- Mr. Nick
```

Page 99

1    Lewin?

2        A    And it's been -- I haven't seen it for a

3    long time.

4              Nick is a business partner of mine in

5    another deal that we were in.  And he's become a

6    friend.  And I don't know why I sent this to him,

7    but I think he might have known Ali Satvat from

8    KKR.  So that's maybe why I sent it to him.

9        Q    All right.  And who is Scott Cohen?

10       A    Scott Cohen is the -- I believe he was

11   the chairman of -- oh, I don't know who Scott --

12   Scott Cohen is one of Nick's partners.

13       Q    Okay.  And you attached the Ajax OM which

14   refers to offering memorandum, correct?

15       A    Yes.

16       Q    And it was -- you sent it to them

17   expecting that the information contained in it was

18   correct, right?

19       A    Yes.

20       Q    All right.  And if you turn to Bates

21   numbered page 4-0 -- ending in 403.

22       A    403.  Yes, okay, I have it.

23       Q    All right.  Now, here it says Epix

24   Therapeutics for Atrial Fibrillation?

25       A    Uh-huh.

# EXHIBIT 2

Page 1

1              UNITED STATES DISTRICT COURT

              CENTRAL DISTRICT OF CALIFORNIA

2                  SOUTHERN DIVISION

3      _____

4      INNOVATIVE HEALTH LLC,

5           Plaintiff,              CASE NO.

6      vs.                          8:19-cv-01984-JVS-KES

7      BIOSENSE WEBSTER, INC.,

8           Defendant.

9      _____

10

11              VIDEOTAPE DEPOSITION OF

12              TIMOTHY D. EINWECHTER

13               APPEARING REMOTE FROM

14                ATLANTA, GEORGIA

15

16               SEPTEMBER 16, 2021

17                  9:31 A.M

18

19

20     Reported By:

21     Judith L. Leitz Moran

22     RPR, RSA, CCR-B-2312

23     APPEARING REMOTELY FROM ATLANTA, GEORGIA

24

25

```
                                             Page 12
 1    sorry.   Innovative Health came into being -- and
 2    really more operational in -- you know, in that
 3    latter part of '15, yes.
 4         Q    All right.   Now, do you have any
 5    ownership interest in Innovative Health?
 6         A    Yes.
 7         Q    What is your ownership interest in terms
 8    of percentage and then we'll go to dollar value?
 9         A    Approximately 10 percent.
10         Q    When did you acquire your ownership
11    interest in Innovative Health, your first ownership
12    interest?
13         A    At the time of -- would have been in that
14    September -- no, we raised our first funding in
15    Innovative in late '15, so it would have been at
16    that time.
17         Q    All right.   So in 2015, more or less
18    approximate to the time that you became the CFO,
19    you acquired a 10 percent ownership interest in the
20    company; is that right?
21         A    At that time it was higher.
22         Q    Okay.   What was the -- I guess it was
23    before it was diluted by some equity --
24         A    Yes.
25         Q    -- infusions?
```

1       A    Yes.

2       Q    What was the original amount of your

3   ownership interest?

4       A    I think it was north of 25 percent, I

5   believe.

6       Q    And as there were equity infusions in

7   Innovative Health over the coming years, is it the

8   case that your ownership interest was diluted from

9   time to time?

10      A    Yes.

11      Q    Do you have an approximate personal view

12  as to the value of your 10 percent interest in

13  Innovative Health?

14      A    That's a wide range.

15      Q    I understand.  I understand it can be a

16  wide range from sort of a low end to a high end.

17          But what's your personal view as you sit

18  here today as to your ownership -- the value of

19  your ownership interest in Innovative?

20      A    It's -- that's speculation.  I -- it's --

21  you know, I'd say 10 to 12 million roughly.

22      Q    And are you also associated with an

23  entity that is known by the name of Alliance

24  Healthcare Partners?

25      A    Yes.

```
                                        Page 16

 1        A    Yes.

 2        Q    What is 1315 Capital, LLC?

 3        A    It's a healthcare venture capital or

 4   company.

 5        Q    And are you a -- were you a founder of

 6   1315 Capital, LLC?

 7        A    No.

 8        Q    When did you first become associated with

 9   1315 Capital, LLC?

10        A    I don't recall the exact year.

11        Q    Were you associated at some point in time

12   with a company known by the name of Ascent?

13        A    Yes.

14        Q    And were you associated with Ascent at

15   the time of its acquisition by Stryker?

16        A    Yes.

17        Q    And you're aware that Ascent was sold to

18   Stryker for something in the amount of

19   approximately $500 million; is that right?

20        A    Yes.

21        Q    And you had an ownership interest in

22   Ascent, did you not?

23        A    Very small, yes.

24        Q    But you acquired some personal advantage

25   as a result of the sale of Ascent to Stryker,
```

```
                                          Page 17
 1   correct?
 2        A    Yes.  Yep.
 3        Q    Approximately how much did you acquire as
 4   a result of the sale of Ascent to Stryker?
 5        A    Approximately $3 million after tax.
 6        Q    So let's go back to 1315 Capital, LLC.
 7   What is your association with 1315 Capital, LLC?
 8        A    Operating partner.
 9        Q    And how many operating partners are
10   there?
11        A    Eight.
12        Q    Is Mr. Ferreira one of the other
13   operating partners of 1315 Capital, LLC?
14        A    Yes.
15        Q    Are there any other individuals
16   associated with -- strike that.
17             Are there any individuals employed by
18   Innovative Health who are operating partners of
19   1315 Capital, LLC, apart from --
20        A    No.
21        Q    -- yourself and Mr. Ferreira?
22        A    No.
23        Q    And do you have a -- an ownership
24   interest in 1315 Capital, LLC?
25        A    I have a carry interest in their
```

```
                                         Page 25
```

1          A     Not always.

2          Q     Do you tend as a regular practice,

3    generally speaking, to review the board minutes?

4          A     No.

5          Q     When do you -- on what occasions do you

6    read the board minutes versus when you don't?

7          A     I spend very little time reading board

8    minutes, so very sporadic.  The minutes are a

9    minimum format, so they really say nothing.

10         Q     Why is that?

11         A     That's what the -- our legal firm advised

12   way back even prior to our Ascent sale.  And that

13   was advised to us by DLA Piper and Kirkland Ellis.

14   So two well-respected law firms and I just follow

15   their instructions.

16         Q     All right.  So there are activities that

17   occur at the board that are not reflected -- at the

18   board meetings that are not reflected in the

19   minutes; is that right?

20         A     Discussions, yes.

21         Q     In terms of the -- your role as CFO, do

22   you bear some responsibility for talking to

23   potential investors and acquirers of Innovative

24   Health?

25         A     Yes.

```
                                                Page 26

 1        Q    Are you the person who has primary

 2   responsibility for interaction and communication

 3   with potential acquirers of Innovative Health?

 4        A    No.

 5        Q    Does Mr. Ferreira have that role?

 6        A    Yes.

 7        Q    Do you along with Mr. Ferreira play the

 8   primary roles of communicating with potential

 9   acquirers of Innovative Health?

10        A    Yes.

11        Q    And is it the case that you also, along

12   with Mr. Ferreira, speak with potential equity

13   investors in Innovative Health?

14        A    Yes.

15        Q    In connection with your role as a

16   communicator with potential acquirers of Innovative

17   Health, have you provided them with information

18   about the business of Innovative Health from time

19   to time?

20        A    Yes.

21        Q    And have you provided them with

22   information relating to the financials of

23   Innovative Health from time to time?

24        A    Yes.

25        Q    And have you provided potential acquirers
```

```
                                          Page 27
 1    with information relating to the competitive

 2    landscape in which Innovative Health does business

 3    from time to time?

 4         A    Yes.

 5         Q    And in your provision of information to

 6    potential acquirers, have you attempted to be

 7    truthful and accurate?

 8         A    Yes.

 9         Q    Do you work with 1315 Capital in

10    connection with the discussions for potential

11    acquisition of Innovative Health?

12         A    They were a -- they were a participant in

13    discussions years ago, yes.

14         Q    Is 1315 Capital currently involved in any

15    discussions for the acquisition of Innovative

16    Health?

17         A    Not that I'm aware of.

18         Q    Have you hired any bankers or financial

19    advisors to assist Innovative Health with the

20    potential sale of the company?

21         A    No.

22         Q    In connection with the sale of Ascent,

23    had there been a banker or financial advisor who

24    had assisted Innovative Health with the sale of the

25    company?
```

                                                        Page 28

 1          A     Not a banker, no.

 2          Q     Was there an individual who acted as a

 3     consultant in terms of advising in some capacity on

 4     the sale of Ascent?

 5          A     One of our major investors, Roundtable

 6     Partners out of Lake Forest, Illinois, they had an

 7     individual on staff who had a close working

 8     relationship with Stryker, and so he acted as a

 9     conduit between Roundtable, Ascent and Stryker.

10          Q     All right.  Am I correct that Innovative

11     Health has explored a number of opportunities for

12     the sale of the business?

13          A     Yes.

14          Q     And is there any particular reason why

15     Innovative Health has not hired a banker or

16     financial advisor to assist it with the potential

17     sale of business?

18          A     We didn't feel it was necessary.

19          Q     So are the materials that are provided to

20     potential acquirers materials that are then

21     gathered by and provided by Innovative Health

22     directly --

23          A     Yes.

24          Q     -- to potential acquirers?

25          A     Yep.

```
                                           Page 29
 1        Q     And has Innovative Health done
 2   presentations to potential acquirers from time to
 3   time?
 4        A     Yes.
 5        Q     And has Innovative Health provided
 6   potential acquirers with information relating to
 7   the valuation of the company, Innovative Health?
 8              Strike that.  Let me rephrase that.
 9              Has Innovative Health provided potential
10   acquirers with an estimated value of the company as
11   a going concern?
12        A     In discussions.
13        Q     Meaning, that those estimated values have
14   not been provided in writing?
15        A     Not that I'm aware of.
16        Q     And has there been an EBITDA associated
17   with cash flows that has been used by you or by
18   others at Innovative Health to come up with such a
19   valuation?
20        A     No.
21        Q     What has the valuation that you have
22   discussed -- strike that.
23              Have you discussed estimated valuations
24   with potential acquirers or been present during
25   such discussions?
```

```
                                          Page 30
 1        A    Yes.
 2        Q    And what did you use or what was used for
 3   the valuations that were discussed in terms of
 4   assumptions?
 5        A    Forward looking numbers.
 6        Q    When you say "forward looking numbers,"
 7   are you referring to forward looking revenue
 8   numbers?
 9        A    Yes.
10        Q    And are you looking -- are you also
11   referring to forward looking cash flows?
12        A    Yes.
13        Q    And are you looking forward to -- when
14   you say "forward looking numbers," are you also
15   looking at margins, profit margins?
16        A    Yes.
17        Q    And the valuations -- on -- on how many
18   occasions have you provided valuations to potential
19   acquirers relating to Innovative Health's business?
20        A    I don't believe I've ever provided a
21   valuation.  I provided documentation and it's up to
22   the acquirer to determine their valuation.
23        Q    All right.  In prior answers you
24   indicated that there had been discussions of an
25   estimated value of Innovative Health --
```

```
                                              Page 31

  1        A    Yep.

  2        Q    -- that had been discussed with potential

  3   acquirers, correct?

  4        A    Correct.

  5        Q    All right.  And on how many occasions

  6   have there been such discussions of estimated

  7   values of Innovative Health?

  8        A    Perhaps three.

  9        Q    When was the first such occasion?

 10        A    I believe it was early '19 -- or early

 11   '18, sorry, I believe.

 12        Q    All right.  And with what entity was that

 13   discussion relating to an estimated value of

 14   Innovative Health had?

 15        A    Acutus.

 16        Q    And when was the second instance in which

 17   there was a discussion of an estimated valuation of

 18   Innovative Health?

 19        A    I can't recall the exact time, so, you

 20   know, occasionally we'll have bankers call up and

 21   we just tell them that if they can't get to a

 22   valuation, you know, don't even bother coming back.

 23             So I can't -- it would probably be post

 24   that time frame.

 25        Q    All right.  Was there a particular entity
```

```
                                              Page 32
 1   when we talk about -- let me go back to the
 2   question.
 3             So I'm focused on instances in which you
 4   discussed an estimated valuation of Innovative
 5   Health, and you had said that there were
 6   approximately three occasions.
 7             Acutus was one in early 2018.  Was the
 8   second one some conversation you recall with a
 9   banker?
10       A    We have a relationship with a banker from
11   Jefferies that we keep in contact with on a regular
12   basis.
13       Q    And is the case that you had a
14   conversation, an oral conversation, with this
15   banker from Jefferies relating to a valuation of
16   Innovative?
17       A    Yeah, we look at a value down the road
18   what we'd look at in order to have it sold.
19       Q    All right.  And what's the name of that
20   individual from Jefferies?
21       A    Mike Robinson.
22       Q    And what's the individual's name from
23   Acutus with whom you had the discussion in early
24   2018 relating to a estimated valuation of
25   Innovative?
```

```
                                             Page 33
 1        A    I'd have to go back in my notes and look
 2   at the exact name, but Acutus now is a public
 3   company.
 4        Q    Acutus filed an S-1 in approximately the
 5   summer of 2020, correct?
 6        A    Correct.
 7        Q    And it actually then went through with an
 8   IPO subsequent to that time, correct?
 9        A    Correct.
10        Q    And you've read the -- you read the S-1
11   at a high level?
12        A    No.
13        Q    You never --
14        A    No.
15        Q    -- looked at the S1?
16        A    Never did.
17        Q    Really?  Sort of interesting.
18        A    No.
19        Q    Sort of interesting.  Okay.
20        A    It's like an old girlfriend, once she
21   leaves, do I follow her on Instagram?  No.  So I
22   had no desire to follow Acutus S-1, so.
23        Q    All right.  All right.
24        A    That's just my nature.  That's just...
25        Q    Okay.  All right.  Do you own a -- do you
```

Page 34

1    own any shares in Acutus?

2        A    No.

3        Q    Does any entity with which you are

4    associated, meaning any family trust or trust for

5    your children or any other entity --

6        A    No.

7        Q    -- that you're aware of in which you have

8    any financial interest, or your family has a

9    financial interest, own any shares in Acutus?

10       A    Thank god, no.

11       Q    All right.  Now, we're back to the

12   estimated valuation discussions for Innovative that

13   you've had.

14            We've identified one in early 2018 with

15   Acutus.

16            We've identified a second with a banker,

17   Mr. Robinson, from Jefferies.  And the time --

18       A    Robinson.

19       Q    Robinson.

20       A    Okay.

21       Q    That was after the Acutus discussion,

22   correct?

23       A    Correct.

24       Q    All right.  And you don't recall as you

25   sit here today whether that was in 2018, 2019, or

Page 35

1   subsequent to that?

2       A    It could have been around the same time

3   as Acutus, so, you know, it's...

4       Q    All right.  And what was the third

5   instance on which there was a discussion of an

6   estimated valuation of Innovative?

7       A    Would have been early this year with

8   Cardinal Health.

9       Q    And is Cardinal Health the same entity

10  that engaged in the recent settlement in the opioid

11  matter?

12      A    That, I'm not aware of.

13      Q    Okay.  So Cardinal Health, that was in

14  2021?

15      A    Yeah, could have been late '20 that

16  spilled into '21.

17      Q    All right.

18      A    Roughly.

19      Q    All right.  So let's go through each of

20  the discussions of the estimated valuations that

21  you've had.

22           With regard to the discussion that you

23  had with Acutus in early 2018, what was the

24  approximate valuation that was attributed to

25  Innovative Health at that time?

```
                                              Page 36

 1        A    They were looking at a value of roughly

 2   150, 150 million, but --

 3        Q    And did you -- go ahead.

 4        A    -- some of that would have been in

 5   shares.

 6        Q    And that would have been in shares of

 7   Acutus?

 8        A    Yes.

 9        Q    And in terms of the number, the $150

10   million valuation, did you feel that that was a

11   number that was appropriate, high or low?

12        A    At the time appropriate.

13        Q    Do you believe that the valuation of

14   Innovative is higher than that today?

15        A    Discussions with Cardinal would indicate

16   no.

17        Q    In terms of your personal view of the

18   value of Innovative's business, do you believe that

19   the valuation of Innovative should be higher than

20   $150 million?

21        A    It should be.

22        Q    And in terms of your discussions with

23   Acutus, do you -- did you respond to Acutus in

24   terms of that valuation of $150 million?

25        A    Yes.
```

Page 37

1        Q     And what was your response?

2        A     We accepted their LOI.

3        Q     And was that through an entity called

4    Ajax, A-J-A-X?

5        A     Okay.  Sorry, then.  Yeah, that's another

6    one.  Ajax was prior to that.  Sorry about that.  I

7    forgot about that.  That goes back so far.  The

8    deal -- the deal, you know, it was discussions and

9    nothing ever happened.

10       Q     All right.

11       A     That would have probably been '17 with

12   Ajax.  And Ajax was -- one of the big investors at

13   Ajax was KKR.

14       Q     And so you do recall there was a time

15   when Innovative Health had discussions with Ajax

16   and KKR about a sale of Innovative Health to Ajax,

17   correct?

18       A     Yes.

19       Q     And that was going to be through a

20   combination of equity at closing and then also

21   workout money, correct?

22       A     Correct.

23       Q     And that deal never -- was never

24   consummated, correct?

25       A     No.  The reason why I laugh is the

Page 38

1    individual that is behind Ajax, he's like a ghost.

2    He's there and then he's gone, there and he's gone.

3    So like, that's why I kind of put it out of my

4    mind, it was a bad part of the history.

5         Q    All right.  And in fact, Innovative

6    Health signed an LOI with Ajax, correct?

7         A    Correct.

8         Q    Do you recall the valuation that was

9    given to Innovative Health at the time that the LOI

10    was signed?

11        A    I don't recall the exact valuation, no.

12        Q    And do you recall that it was lower than

13    that to which -- that which Acutus gave Innovative

14    Health in 2018?

15        A    I believe it was.

16        Q    And do you recall the reason ultimately

17    why the Ajax/KKR deal was terminated?

18        A    My understanding is that Ajax and KKR

19    were going to do a cardiology roll-up.  They had

20    bought a company that had significant legal

21    challenges.

22             And they also owned some software,

23    cardiology software device, whatever, I'm not sure

24    exactly what it was, called Epic.

25             And we realized the deal was off when we

Page 39

 1    saw in the Wall Street Journal that Ajax sold Epic.

 2    So without Epic, the cardiology roll-up was over,

 3    so, you know, they never followed through on their

 4    cardiology roll-up.

 5         Q    And the LOI did not require them to do

 6    so, correct?

 7         A    Correct.

 8         Q    All right.  Now, we're back to the

 9    discussions that occurred in 2018 with Acutus.  And

10    Acutus gave a -- an approximately $150 million

11    valuation.

12              Do you have any understanding as to the

13    assumptions that you used to evaluate the adequacy

14    of that valuation, at least in your own mind?

15         A    Yeah, we just looked at what we perceived

16    -- viewed the value of the company to be with the

17    number of 510(k)s we had cleared, the forward --

18    forward looking revenue.  And we looked at that

19    being an acceptable level.

20              But keep in mind that, you know, a lot of

21    that or a portion of that was going to be equity in

22    Acutus.

23              And as we all know, Acutus went public in

24    '19 and is now trading, I believe last time I

25    looked, a week or two ago, $11, so.

```
                                              Page 40
 1        Q     Now, the -- was there a multiple times
 2   EBITDA that you use in your own mind or you do use
 3   in your own mind in coming up with a potential
 4   valuation for --
 5        A     No.
 6        Q     -- Innovative Health?
 7        A     No.
 8        Q     You don't use multiples of EBITDA in
 9   terms of valuations for Innovative at all?
10        A     You would in a company that was mature,
11   but here's -- Innovative is just developing.  Not
12   -- not mature company.  We're losing money back at
13   that time.  So it just -- the multiples meant
14   nothing.  If I used a multiple, it meant I paid --
15   I would pay them to take it off my hands.
16        Q     And that's because the revenues projected
17   out versus the actual cash flows that had been
18   received are higher, correct?
19        A     Yes, for sure.
20        Q     And there was a third conversation which
21   you had -- or actually, we're up to the one with
22   Jefferies, with your contact at Jefferies.
23              What was the potential valuation that you
24   discussed with your contact at Jefferies?
25        A     I believe it was the same time as Acutus
```

Page 41

1   or around that same time, so it would have been in

2   that range of 150 to 200 range.

3       Q    And was there -- did Jefferies -- was

4   Jefferies acting as a -- a contact who was

5   assisting Innovative or was he acting on behalf of

6   another entity or neither?

7       A    He wasn't acting on behalf of us.  You

8   know, it was -- it was discussions.

9       Q    And when you say "it was discussions,"

10  was it discussions about the potential that he

11  could assist you with an acqui- -- a sale of the

12  company?

13      A    There was an opportunity there, yes.

14      Q    Did it ever come to pass?

15           Did Mr. Robinson ever, in fact, assist or

16  take on a role with Innovative to assist it with

17  the sale of the company?

18      A    No.

19      Q    And do you have any understanding as to

20  what assumptions underlay the 150 to 200

21  million dollar valuation that was discussed with

22  Mr. Robinson?

23      A    No.

24      Q    But that was also a valuation which you

25  deemed approximately appropriate in that time

Page 42

1    frame; is that right?

2         A    Yeah, it was a gut feel number.

3         Q    Okay.  Now, there also was a more recent

4    discussion with Cardinal Health in 2021.

5              Are the discussions with Cardinal Health

6    about the acquisition of Innovative ongoing?

7         A    No.

8         Q    What was the potential valuation that was

9    discussed with Innovative Health?

10        A    They -- they didn't discuss a number.

11        Q    Did you have a number in your own mind as

12   to what the value of the company was as of 2021?

13        A    Would have been consistent with our

14   previous numbers.

15        Q    So that's between 150 and 200 million

16   dollars; is that right?

17        A    Correct.

18        Q    As you sit here today, what is your view,

19   as the CFO of Innovative Health, as to the value of

20   Innovative Health in terms of a potential sale?

21        A    A sale today or in two year's time?

22        Q    Well, let's take a sale today and then

23   let's talk about two year's time.

24        A    I think today -- you know, it's clear

25   Cardinal didn't even give me a number, so, if I was

Page 43

1    forced to go to market today and sell to the

2    highest bidder, it might be a hundred million.  You

3    know, if it was a fire sale, right?

4             And down the road, we continue to grow

5    our revenue, I might get 150, I might get in that

6    range we're looking at.

7        Q    And to what extent do you believe that

8    COVID has impacted the valuation of Innovative

9    Health, if at all?

10       A    What COVID did is it delayed my revenue

11   by a year.  So in effect my -- you know, I -- and a

12   lot of people in healthcare look at '20 as a lost

13   year.

14       Q    So is it the case that Innovative Health

15   is looking for -- looking at a potential sale of

16   the company even today?

17       A    Not actively, no.

18       Q    Is Innovative Health hopeful that it will

19   be able to find an acquisition partner in the next

20   several years for the company?

21       A    Yes.

22       Q    And is Innovative Health hopeful that the

23   number it would be able to obtain for the

24   acquisition of the company in a couple of years

25   would be $200 million or north of that?

1          A     One can always hope.

2          Q     What do you think in a couple of years

3     time would be a realistic number for the sale of

4     Innovative Health?

5          A     I still think you're looking at that 150

6     to 200.  You know, north of 200 would be -- I think

7     that would be a real push.

8          Q     Does the outcome of the lawsuit with

9     Biosense Webster affect the enterprise valuation

10    that you would have for Innovative Health --

11         A     Yes.

12         Q     -- in two year's time?

13               And tell me in what way and what the

14    change would be.

15         A     It would allow our customers to buy

16    sensor-enabled catheters which would have a

17    positive impact on my revenue and a positive impact

18    on my value proposition to hospitals and allow them

19    to save more money.  So absolutely.

20         Q     Okay.  And what would be the approximate

21    additional value for the enterprise of Innovative

22    Health that you would expect that prevailing in

23    this lawsuit would have?

24         A     I have not looked at that.

25         Q     Have you done any calculation at all?

Page 45

1        A      No.

2        Q      Have you done any estimate, even if it's

3    not a formal calculation, at all of the value that

4    winning this lawsuit would have on the overall

5    enterprise of Innovative Health?

6        A      I have not, no.

7        Q      You're aware, aren't you, that Innovative

8    Health does sell sensor-enabled catheters today,

9    reprocessed?

10       A      Yes.

11       Q      And you're aware that it sells

12   sensor-enabled, reprocessed catheters made by --

13   originally made by companies other than Biosense

14   Webster, correct?

15       A      Correct.

16       Q      And you're aware that Biosense Webster

17   doesn't provide case coverage services for those

18   other companies, correct?

19       A      What other companies?  For?

20       Q      Let's -- let's -- let's talk about --

21   you're aware that St. Jude makes a sensor-enabled

22   catheter, correct?

23       A      Correct.

24       Q      And you're aware that Biosense Webster

25   doesn't support the St. Jude cases, correct?

```
                                        Page 52

 1        Q     Now, do you have any understanding as to

 2   what catheters compete with the Lasso catheter?

 3        A     No understanding.

 4        Q     And do you have any understanding as to

 5   what catheters compete with any particular

 6   catheter?

 7        A     No.

 8        Q     Is that because it's not your area of

 9   business?

10        A     Yes.

11        Q     Now, is it the case that part of the

12   business model for Innovative at this time is to

13   keep costs as low as possible and revenue as high

14   as possible?

15        A     No.

16        Q     Let me ask the question this way:  Is

17   maintaining a robust and healthy profit margin

18   important to Innovative in terms of the potential

19   sale of itself to another company?

20        A     That is balanced against putting out a

21   quality product.  So, you know, I can't keep the

22   cost as low as possible, there's no way I'm going

23   to jeopardize the quality regulatory aspect.

24              So there has to be that middle of the

25   road where you want to be known as a quality
```

```
                                        Page 53
 1   provider of products in the marketplace.  I'm not
 2   going to do anything that's going to jeopardize the
 3   company, so.
 4        Q    You're aware, aren't you, that you have
 5   presented information to potential investors,
 6   equity investors, and potential acquirers that have
 7   indicated that Innovative's profit margins exceed
 8   70 percent, correct?
 9        A    Correct.
10        Q    And in fact, you've provided information
11   that have indicated that there's a projection that
12   Innovative's profit margins are at or exceed over
13   80 percent, correct?
14        A    Correct.
15        Q    What today is your best estimate as to
16   Innovative's profit margin?
17        A    Approaching 70.
18        Q    And what is your expectation about the
19   profit margin that Innovative can achieve over the
20   next couple of years?
21        A    I would hope to get to 80, which would be
22   in line with an OEM, you know.  So what the OEM's
23   look at, I have a financial model that's very
24   similar, so.
25        Q    And are you -- what OEM are you aware of
```

Page 74

1    consistent effort.

2              MS. FORREST:  All right.  Now, let's put

3    up Tab 40.  Tab 40 which will be Exhibit 337.

4              MS. YOUNG:  That's right.

5    BY MS. FORREST:

6        Q    Okay.  Is a -- an email from

7    Mr. Einwechter to a number of individuals, Peter

8    Elia, Rick Ferreira, among others.  And it's

9    Innovative Health Data Request.

10             It bears the Bates numbers IH00689790

11   running all the way through 82 -- I'm sorry, yes,

12   running all the way through 828.

13             MS. YOUNG:  It should be available in the

14   platform now.

15             (Deposition Exhibit 337 marked.)

16       A    Okay.  There it is.

17   BY MS. FORREST:

18       Q    All right.  And Mr. Einwechter, do you

19   rec- -- do you understand this to be a document

20   that you sent on or about October 17th, 2019, to

21   the individuals indicated on the face of the

22   document?

23       A    It appears to be that way, yes, yep.

24       Q    Were any of these individuals individuals

25   who were either potential investors or acquirers of

Page 75

```
1    Innovative Health?
2         A    The primary people on the send to are --
3    are the Acutus people.
4         Q    And Mr. Peter Elia, E-L-I-A, he was one
5    of those Acutus people, correct?
6         A    Correct.
7         Q    And one of -- was part of the purpose of
8    sending this document to provide Acutus with
9    information relating to their potential acquisition
10   of Innovative?
11        A    I think at that time they were just
12   revisiting the Alliance -- not the Alliance.
13   Sorry, that goes way back.  The Innovative, you
14   know, acquisition that they had looked at in '18.
15   They were looking at how we progressed.
16             And I think they were leading up to their
17   IPO and they were assessing what they wanted to do.
18             So I don't believe at that time there was
19   any discussion -- hard discussions regarding a
20   sale.  I just -- you know, I look at this more like
21   bullshit.  So it is -- it is what it is.
22        Q    All right.  Did you -- when you say you
23   looked at it as bullshit, you don't look at the --
24   you didn't consider the information that you
25   provided to them to be bullshit, correct?
```

Page 99

```
 1       Q    Okay.
 2       A    I believe that's what this document
 3  related to, yes.  Yep.
 4       Q    All right.  Now, there was, as we've said
 5  before, a Letter of Intent signed with Ajax,
 6  correct?
 7       A    Correct.
 8       Q    All right.  And -- but the -- as we've
 9  also discussed, the Ajax transaction never was
10  consummated, correct?
11       A    Correct.
12       Q    All right.  Now, the model -- actually, I
13  don't need to do that.
14            If -- have you built in any assumptions
15  into any valuations of Innovative Health of any --
16  of the impact of any investigations for price
17  fixing by Innovative Health on its potential sale
18  price?
19       A    No.
20            MR. BERHOLD:  Objection.
21  BY MS. FORREST:
22       Q    Have you ever placed a value on the
23  Biosense Webster lawsuit?
24       A    No.
25       Q    Have you ever discussed with any
```

1    prospective investors or bankers any value for the

2    Biosense Webster lawsuit?

3         A    No.

4         Q    Have you ever discussed with Mr. Ferreira

5    any value of the Biosense Webster lawsuit?

6         A    No.

7         Q    Have you run any analysis -- analyses at

8    all as to potential damages as a result of the

9    Biosense Webster lawsuit?

10        A    I have not, no.

11        Q    Have you seen any analyses of damages of

12   the Biosense Webster lawsuit -- related to the

13   Biosense Webster lawsuit?

14        A    No.

15        Q    Now, two potential acquirers, in

16   connection with information to potential acquirers,

17   Innovative describes its competitors, correct?

18        A    If it's in the minutes -- is this --

19        Q    No.  No, it's not in any document you

20   received.  Again, I'm just building up a foundation

21   for something else.

22        A    Okay.  Oh.  We'll review our reprocessing

23   competitors, yes.

24        Q    And who in your -- to the best of your

25   understanding are Biosense -- are -- strike that.

# EXHIBIT 3

| | |
|---|---|
| **From:** | Kirschenbaum, Andrew (x2831) <akirschenbaum@pbwt.com> |
| **Sent:** | Friday, March 14, 2025 1:52 PM |
| **To:** | Quirk, Sean P. |
| **Cc:** | Matthew Summers; Jeffrey Berhold; Ho, Derek T.; Goldsmith, Andrew E.; Schiffman, Kelley C.; Harper, Christine (x2286); Anderson, Rachel T.; Morales-Kimball, Annamaria M.; Reade, Matthew D.; Joshua P. Davis; Kyla Gibboney; Julie A. Pollock; Panteha Abdollahi; Cavanaugh, William F. (x2793); Sean Lobb; Karla Kraft; Lisa Northrup; Cruz, Alejandro (x7613); ~muhammad.faridi@linklaters.com |
| **Subject:** | [EXTERNAL] RE: Innovative Health v. Biosense Webster - Stipulation re Personal Wealth |

Counsel:

Thank you for your proposal.  We have considered it and BWI will not agree to this stipulation, which goes well beyond the scope of "personal wealth."

Best,
Andy

---

**From:** Quirk, Sean P. <squirk@kelloghansen.com>
**Sent:** Thursday, March 13, 2025 10:01 AM
**To:** Harper, Christine (x2286) <charper@pbwt.com>; Cavanaugh, William F. (x2793) <wfcavanaugh@pbwt.com>; Kirschenbaum, Andrew (x2831) <akirschenbaum@pbwt.com>; Sean Lobb <stlobb@stradlinglaw.com>; Karla Kraft <KKraft@stradlinglaw.com>; Lisa Northrup <LNorthrup@stradlinglaw.com>; Cruz, Alejandro (x7613) <acruz@pbwt.com>; ~muhammad.faridi@linklaters.com <muhammad.faridi@linklaters.com>
**Cc:** Matthew Summers <msummers@bm.net>; Jeffrey Berhold <jeff@berhold.com>; Ho, Derek T. <dho@kelloghansen.com>; Goldsmith, Andrew E. <agoldsmith@kelloghansen.com>; Schiffman, Kelley C. <kschiffman@kelloghansen.com>; Anderson, Rachel T. <randerson@kelloghansen.com>; Morales-Kimball, Annamaria M. <amorales-kimball@kelloghansen.com>; Reade, Matthew D. <mreade@kelloghansen.com>; Joshua P. Davis <jdavis@bm.net>; Kyla Gibboney <kgibboney@bm.net>; Julie A. Pollock <jpollock@bm.net>; Panteha Abdollahi <pabdollahi@tocounsel.com>
**Subject:** Innovative Health v. Biosense Webster - Stipulation re Personal Wealth

**External: Think before you click.**

Counsel,

Following up on last Friday's meet and confer regarding motions *in limine*, please find attached a draft stipulation on personal wealth.  We are happy to arrange another call, to the extent Biosense would find further discussion useful.

Thanks,
Sean

**Sean P. Quirk**
**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**

Sumner Square | 1615 M Street, N.W. | Suite 400 | Washington, DC 20036
ph: 202-367-7815, fx: 202-326-7999

NOTICE:  This transmission is intended only for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify the sender immediately via reply e-mail, and then destroy all instances of this communication.  Thank you.

---

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to receiving email messages of this kind.

---