# Exhibit 1

**Volume 14**

**Pages 2429 - 2533**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín

```
SURGICAL INSTRUMENT SERVICE      )
COMPANY, INC., et al.,           )
                                 )
          Plaintiffs,            )
                                 )
  VS.                            )   NO. C 21-03496-AMO
                                 )
INTUITIVE SURGICAL, INC.,        )
                                 )
          Defendant.             )
_____ )
AND RELATED COUNTERCLAIMS.       )
_____ )
```

San Francisco, California
Monday, January 27, 2025

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiffs:

        MCCAULLEY LAW GROUP
        180 N. Wabash Avenue - Suite 601
        Chicago, Illinois 60601
    BY: **RICHARD McCAULLEY JR., ATTORNEY AT LAW**
        **ANTHONY E. DOWELL, ATTORNEY AT LAW**

        HALEY GUILIANO LLP
        111 Market Street - Suite 900
        San Jose, California 95113
    BY: **JOSHUA V. VAN HOVEN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
           Official Reporter, CSR No. 12219

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendant:
                                 PAUL, WEISS, RIFKIND, WHARTON
 3                               & GARRISON LLP
                                 2001 K Street NW
 4                               Washington, D.C. 20006
                         BY:   KENNETH A. GALLO, ATTORNEY AT LAW
 5                             PAUL D. BRACHMAN, ATTORNEY AT LAW

 6                               PAUL WEISS RIFKIND WHARTON
                                 & GARRISON LLP
 7                               1285 Avenue of the Americas
                                 New York, New York 10019
 8                       BY:   WILLIAM MICHAEL, ATTORNEY AT LAW
                               CRYSTAL L. PARKER, ATTORNEY AT LAW
 9
                                 PAUL, WEISS, RIFKIND, WHARTON
10                               & GARRISON LLP
                                 535 Mission Street - 24th Floor
11                               San Francisco, California 94105
                         BY:   JOSHUA HILL, JR., ATTORNEY AT LAW
12

13
     Also Present:        Bobby Cox
14                        Ryan Lee
                          Greg Posdal
15                        David Rosa

16

17

18

19

20

21

22

23

24

25
```

1          **I N D E X**

2     Monday, January 27, 2025 - Volume 14

3                                                    **PAGE**  **VOL.**

4     Defendant Rests                                    2440   14
      Charging Conference                                2455   14

5     **DEFENDANT'S WITNESSES**                          **PAGE**  **VOL.**

6
      **PLOMIN, PAUL**
7     By Videotape Deposition (not reported)             2439   14

8     **FRANCIS, JOHN**
      By Videotape Deposition (not reported)             2440   14

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Monday - January 27, 2025                          8:02 a.m.

 2                       P R O C E E D I N G S

 3                          ---o0o---

 4    (Proceedings were heard out of the presence of the jury.)

 5           THE CLERK:  All rise.  This court is now in session.

 6   The Honorable Araceli Martínez-Olguín presiding.

 7           THE COURT:  You may be seated.

 8           THE CLERK:  Calling Civil Matter 21-3496, Surgical

 9   Instrument Service Company Incorporated v. Intuitive Surgical

10   Incorporated.

11       Counsel, please state your appearances for the record,

12   starting with the plaintiff.

13           MR. McCAULLEY:  Good morning, Your Honor.  Rick

14   McCaulley on behalf of plaintiff SIS.  Along with me is my

15   partner Josh Van Hoven, and Greg Posdal from SIS.

16           THE COURT:  Good morning.

17           MR. GALLO:  Good morning, Your Honor.  Ken Gallo, for

18   defendant Intuitive, with Bill Michael, Paul Brachman, and our

19   corporate representative Dave Rosa.

20           THE COURT:  Good morning, all.

21       All right, folks.  I was going to speak with you all about

22   e-mail sent this weekend from Mr. Brachman.  But it sounds

23   like, before I get there, we should actually -- because it was

24   about when to expect objections to demonstratives in light of

25   waiting for you all to prepare your demonstratives until after
```

1    there was a rebuttal case.

2        But I understand there's been a development and that

3    Mr. Gallo has something he'd like to say about that.

4            **MR. GALLO:**  Yes, Your Honor.  Thank you very much.

5    Good morning.

6        We were informed -- excuse me -- over the weekend -- I

7    believe, Saturday -- that SIS had decided not to call Dr. Lamb

8    in its rebuttal case.  We were informed this morning at about

9    7:15 that it had decided not to call Mr. Posdal in its rebuttal

10   case.  So there will be no rebuttal case.

11       I only had two things that I wish to say about that.

12       One is I feel badly that we've now brought the jury back

13   for what will be a total of 25 minutes of deposition testimony,

14   and I raise with the Court whether the Court would like --

15   would be willing to tell the jury that we brought them back

16   today on the expectation that there would be a rebuttal case.

17       I mean, candidly, I'm a little concerned that somebody

18   that traveled an hour and a half or two hours to get here might

19   be a little angry with me for having to come back for only

20   25 minutes and they won't know it's because we thought there

21   was a rebuttal case coming.

22       So I wonder if the Court would think it appropriate to

23   tell the jury that we expected there to be a rebuttal case and

24   there's not one.

25       Secondly, if it meets with the Court's approval, we had

1    just -- we had agreed to exchange demonstratives for closing

2    after the rebuttal case -- I would probably amend that to say

3    after the charge conference, by noon or so today.  And I would

4    hope and expect that any objections could be raised with you by

5    late afternoon today, if that's acceptable.

6         **THE COURT:**  Can I hear from you, Mr. McCaulley?

7         **MR. McCAULLEY:**  Yes.  Thank you, Your Honor.

8    We did intend -- we were ready to put a rebuttal case on

9    on Friday.  Objections were raised to Dr. Lamb on Saturday.

10    I met with Dr. Lamb -- excuse me -- and we decided that

11    the juice wasn't worth the squeeze yesterday afternoon.

12    Objections were raised to Mr. Posdal.

13    We had a fire at our house.  We didn't have Internet or

14    electricity.  We got the materials this morning at about

15    5:00 a.m. from my team and decided, again, the juice wasn't

16    worth with the squeeze to fight over the objections.

17    I told the Court and opposing counsel that it would be a

18    very brief rebuttal with objections being raised.  I didn't

19    want to spend the morning fighting about it.

20    It's not a question of not intending to.  We intended to.

21    And I would have put them on on Friday.  They were here.  But

22    just over the weekend, it seemed like it -- having fights about

23    objections and scope didn't seem worth it for what we were

24    going to get out of it.

25         **THE COURT:**  Thoughts on exchanging demonstratives and

**PROCEEDINGS**

1  getting me objections to their demonstratives?  Go ahead.

2      MR. McCAULLEY:  We've got them.  I mean, we can send

3  them.  It's whenever -- and I don't know how long we're going

4  to be here this morning.

5      But, you know, if we have a couple of hours -- and based

6  on the conversations Mr. Gallo and I had, I don't anticipate

7  there will be a lot of objections.  But we can jump on it right

8  away.

9      THE COURT:  Okay.  So, you know, when push comes to

10 shove, I'm the one responsible for the jury's time.

11     MR. GALLO:  Okay.

12     THE COURT:  So, Mr. Gallo, there's a reason that I

13 didn't say anything to them -- to the jury on Friday about what

14 to expect today in terms of who would be doing what.  So I'm

15 not inclined to tell them.

16     They can -- believe you me, they will ultimately, I think,

17 ascribe all ire to me, as I'm the one who makes them come every

18 day.

19     So I'm not inclined to explain to them why I think that

20 they, in the end, may just be -- they, in the end, may just be

21 satisfied to know that it will pan out as told with -- at least

22 with regard to them being able to leave early today and coming

23 in tomorrow and just hitting the ground running in terms of

24 being charged, getting -- hearing argument from you all, and

25 then taking the case back themselves.

1      **MR. GALLO:**  Thank you, Your Honor.  Understood.

2      **THE COURT:**  Anything else, Counsel?

3      **MR. GALLO:**  Nothing from the defendant.

4      **MR. McCAULLEY:**  Nothing.  Thank you.

5      **THE COURT:**  All right.  Then -- oh, I'm sorry.  I do

6  have one more question for you, Mr. Gallo.

7      I think, back in my chambers, I have about seven boxes of

8  stuff with regard to the motions in limine and various other

9  things.  And we would very much like to give them back so we

10  can access our coffee maker again.

11                      (Laughter.)

12      So the two of us can be in the vicinity of the coffee

13  maker again.

14      I just wanted to ask, is it -- today or tomorrow, when

15  would you like us to bring them out to you?

16      **MR. GALLO:**  Oh, I think any time.  Whatever you like.

17  We could do it today.  And we'll come get them, if that's

18  easier.

19      **THE COURT:**  Oh, no.  We will bring them out to you.  I

20  did not want to -- it felt wrong to saddle you with seven boxes

21  without some notice.

22      **MR. GALLO:**  I don't think it's a problem.

23      **THE COURT:**  All right.  I thank you all.

24      See you all at 8:30 with the jury.

25      **MR. McCAULLEY:**  Thank you, Your Honor.

```
 1              (Recess taken at 8:09 a.m.)

 2              (Proceedings resumed at 8:30 a.m.)

 3      (Proceedings were heard out of the presence of the jury.)

 4          THE CLERK:  This court is back in session.

 5          THE COURT:  You may be seated.

 6       So I didn't bring the jury back in because I understand

 7  defendants want to send the deposition clips for these two

 8  depositions -- or, actually, why don't you tell me,

 9  Mr. Brachman or Mr. Gallo, whoever.

10          MR. GALLO:  It's pretty simple, and I'm not sure -- I

11  think we probably have an agreement, but I'm not sure.

12       We have noticed that the court reporter, appropriately,

13  has not been trying to type and transcribe the deposition clips

14  into the record.  So we raised with SIS this morning that it

15  probably makes sense for us to mark the clip reports for

16  identification, at least, Court Exhibit X, so that we have a

17  record of what was played in the courtroom because the videos

18  are not being transcribed.

19       So I think this is purely a mechanical issue of the

20  parties marking them and getting them identified for the

21  record.

22          THE COURT:  And can I ask?  You're proposing to do

23  that for all of them, not just the ones for today?

24          MR. GALLO:  Yes, going for all of them.

25          THE COURT:  Go ahead, Mr. McCaulley.
```

1          MR. McCAULLEY:  No objection from our perspective.

2      I don't think -- I mean, the transcripts won't be going

3  back to the jury, so I think we have a little bit of time; but

4  I agree that we could get them into the record that way.

5          MR. GALLO:  Right.  I just wanted to ensure they're in

6  the complete record before the case goes to the jury.  It seems

7  to me we should do that.

8          THE COURT:  That makes sense.  Thank you for

9  clarifying that.  Thank you for explaining that.  That should

10  be fine.

11      All right.  Then I understand.  All the jurors are here.

12      Folks, just so I'm clear -- I think I have this from

13  Friday.  Anyhow -- right? -- that I will come in.  There's --

14  you are -- they'll get the depo, watch the depo designations

15  from the morning, and that will be the end of it.

16          MR. GALLO:  Yes.

17          THE COURT:  All right.  Go ahead.

18                      (Pause in proceedings.)

19          THE CLERK:  All rise for the jury.

20                  (The jury enters the courtroom.)

21      (Proceedings were heard in the presence of the jury.)

22          THE COURT:  You may be seated.

23      Good morning, members of the jury.

24      I just want to give you a little heads-up about what to

25  expect at this point.

 1          As we talked about some on Friday, today is the last day

 2    of evidence.  To that end, defendants will continue their case.

 3    And after that, you all will be excused until tomorrow morning.

 4          As happens at trial, things change.  And so you will

 5    probably be let go earlier today than we talked about on

 6    Friday.  I think, if I have it right, in fact, you've got

 7    probably about 30 minutes of evidence left to go.

 8          All right.  So you see, we will -- then the case will be

 9    in your hands, and you'll tell us what sort of schedule we'll

10    be keeping.

11          Perfect.  All right.  Mr. Gallo, with that I hand it over

12    to you.

13          **MR. GALLO:**  Your Honor, Intuitive calls by videotape

14    deposition Paul Plomin.

15          Mr. Plomin was employed by hospital Franciscan Alliance,

16    and held the title of vice president of finance at the time of

17    his deposition.  The deposition was taken in November of 2022.

18                    (Video played but not reported.)

19          **MR. GALLO:**  Thank you, Your Honor.  Intuitive now

20    calls Dr. John Francis by video.

21          Dr. Francis was the chief of surgery at Franciscan

22    Alliance from 2010 to 2020.  He was a general surgeon at

23    Franciscan Alliance at the time of his deposition.  The

24    deposition was taken in November of 2022.

25    \\\

PROCEEDINGS

```
 1              (Video played but not reported.)

 2         MR. GALLO:  Thank you, Your Honor.

 3    That concludes the deposition testimony, and defendant

 4    Intuitive rests its case.

 5         THE COURT:  Thank you, Mr. Gallo.

 6    Anything further from you, Mr. McCaulley?

 7         MR. McCAULLEY:  No.  Thank you, Your Honor.

 8         THE COURT:  All right.  Members of the jury, you have

 9    heard all of the evidence in this case.

10    Tomorrow I will provide you with jury instructions, and

11    you will hear final arguments from counsel, and then you will

12    begin to deliberate.

13    In the meantime, I want to remind you of the instructions

14    that I've been providing you throughout the trial, which are to

15    not communicate with anyone in any way and not to let anyone

16    else communicate with you in any way about the merits of the

17    case or anything to do with it.

18    This includes discussing this case in person, in writing,

19    by phone, by electronic means, e-mail, texting, anything on the

20    Internet, those sorts of things.

21    Of course, this does mean anyone.  That includes your

22    fellow jurors, your family members, employers, friends,

23    relatives.

24    If you are asked or approached in any way about your jury

25    service or anything about this case, please respond that you've
```

1    been instructed not to discuss the matter.

2        Because you have received all the evidence that you need

3    and tomorrow you'll receive the legal instruction that you may

4    properly consider to return a verdict, please do not read,

5    watch, or listen to any news or media accounts or commentary

6    about the case or anything to do with it.

7        Do not do any research, such as consulting dictionaries,

8    searching the Internet, or using other reference materials.

9    And do not make any investigation in any way to try to learn

10   about the case on your own.

11       As we've discussed, the law requires these restrictions to

12   ensure the parties a fair trial based on the same evidence that

13   each party has had an opportunity to address.

14       Folks, with that, I thank you, as always, for being here.

15   And I will see you all tomorrow.

16       All rise for the jury.

17                (The jury leaves the courtroom.)

18    (Proceedings were heard out of the presence of the jury.)

19       **THE COURT:**  You may be seated.

20       Counsel, we need to take a small break to help our -- to

21   help get all our systems back up.  I will not belabor the

22   details, but I'll be back in -- well, whenever our court

23   reporter tells me that everything is back up and working.

24       So we're going to take a pause here.  See you in a few

25   minutes.

PROCEEDINGS

 1                 (Recess taken at 9:03 a.m.)

 2              (Proceedings resumed at 9:31 a.m.)

 3          THE CLERK:  All rise.  Court is back in session.

 4      (Proceedings were heard out of the presence of the jury.)

 5          THE COURT:  You may be seated.

 6      All right.  Folks, we're at the close of evidence.  So let

 7   me -- before we discuss jury charge, let's talk motions.

 8          MR. GALLO:  Thank you, Your Honor.

 9      Intuitive renews its motion under Rule 50 for judgment as

10   a matter of law.

11      SIS has failed to establish any of the elements of the

12   claims they bring in this case.  For example, they have not

13   established either of the two product markets that are an

14   element of all of their claims.

15      They've a failure of proof on both counts of product

16   market.  They have failed to prove that there's a market

17   limited to robotic surgery systems.

18      The evidence shows in the case that buyers consider open

19   and laparoscopic surgery as reasonable substitutes and

20   reasonably interchangeable with robotic systems.  And,

21   specifically, the da Vinci hospital witnesses, Intuitive

22   witnesses, and surgeons have all testified to that.

23      The fact that the da Vinci has some advantages over

24   other modalities of surgery does not establish that it's in a

25   different product market.

```
1         The law is clear that products need not be identical or

2    even precisely interchangeable so long as they are reasonable

3    substitutes for one another.

4         SIS also has failed to establish that there's an

5    aftermarket limited to EndoWrist repair and replacement.  They

6    have not established the Epic factors in the Ninth Circuit.

7    They have not established that hospitals do not know of -- did

8    not know of the challenged restrictions at the time they

9    entered the contracts with Intuitive.  The only evidence in the

10   record is to the contrary, that the hospitals did know.

11        They also have failed to establish that hospitals cannot

12   do accurate life cycle pricing of EndoWrist.  Again, the only

13   evidence in the record is to the contrary.  There's not a

14   single hospital or witness that has testified that life cycle

15   pricing is not possible to do.

16        So SIS has failed to carry its burden on those issues.

17        It has failed to carry its burden on the separate element

18   of whether Intuitive has engaged in tying or exclusive dealing.

19   Those are the only kinds of anticompetitive conduct that

20   support all four claims that SIS makes in this case.

21        To establish such conduct, it would have to prove that

22   hospitals were forced to enter into the contract terms and to

23   buy only from Intuitive.  Not a single hospital came here and

24   testified that they were forced to do anything.

25        Also, the undisputed evidence shows that there's a
```

PROCEEDINGS

 1   third-party approval clause in the Intuitive contract, not a --
 2   and that that clause is a realistic option for people to --
 3   third parties to be approved.  Not a single third party was --
 4   there's no evidence that a single third party ever applied and
 5   was rejected.
 6        SIS admits it did not seek approval.  The undisputed
 7   evidence is that dozens of third parties have been approved for
 8   sales of parts that are used with the da Vinci system.
 9        And Restore and Rebotix have been approved -- that's also
10   undisputed -- for sales of the EndoWrist with the da Vinci
11   system.
12        Respectfully, on this record, there's no way the jury
13   could conclude that the approval process is a sham or a
14   charade.
15        Third, SIS has failed to carry its burden of showing that
16   Intuitive engaged in conduct that caused competitive harm.
17        Intuitive's conduct promotes patient safety and product
18   quality.  That's why it has the clauses in the contract.  They
19   go all the way back to the beginning when they could not
20   possibly have been put in place as a function of monopoly
21   power.
22        Output of surgeries:  Da Vinci surgeries has increased
23   constantly over 25 years, more and more surgeries, what the
24   economists call "output."
25        Prices of da Vincis, it's undisputed, are flat or down.

 1    Dr. Lamb did not address the issue at all or contest what our

 2    economist Loren Smith said, that prices have gone down of both

 3    the da Vinci and the EndoWrist over time.

 4        All of this also shows that there's a good business

 5    justification for the conduct in which Intuitive has engaged.

 6        The law clearly says that price, product quality, and

 7    output are the three primary indicators of whether conduct is

 8    pro-competitive on the one hand or harms competition on the

 9    other hand.  All three of them indicate that the conduct is

10    pro-competitive and that there's been no harm to competition.

11        Next, SIS has not established that it was injured in its

12    business by anticompetitive conduct.  It has not established

13    antitrust injury.

14        The injury, if SIS has experienced any, does not flow from

15    Intuitive's conduct.  First, it flows from SIS never asking --

16    even asking to be approved under the policy.

17        And Mr. Posdal, on direct examination by his own lawyer,

18    said, if he had applied, he assumes he would have been

19    approved; but they never -- never applied.

20        The use limits that they complained about and that we

21    spent many, many hours in this courtroom talking about actually

22    benefit SIS.  They don't hurt SIS.

23        This came straight out of the mouth of Dr. Bero, their own

24    accounting expert and damages expert.  He said the fact that

25    you have a ten-use limit creates a business opportunity for SIS

1    to reset the device.

2        If the use limit was higher -- they've been arguing --

3    remember, they've been arguing all trial the use limit should

4    be higher.

5        If the use limit was higher, say 20, they would have less

6    of a business opportunity, not more of a business opportunity.

7        If the use limit was 30, they'd have even less.

8        If there were no use limit, they'd have no business

9    opportunity at all.

10       So use limit doesn't hurt their business.  It actually

11   helps their business.

12       SIS took no reasonable steps to invest in the business.

13   They basically spent two days with Rebotix and sent out

14   Mr. Johnson to try to make some sales.

15       The entire claim of injury flows from the assumption that

16   they had an agreement with Rebotix and that Rebotix would

17   supply them these devices.

18       They actually never had an agreement with Rebotix.  They

19   exchanged documents.  They never formed an agreement.

20       Rebotix then testified that some of the things that were

21   crucial to SIS, like the prices at which they would sell and

22   the exclusivity and the rights to the patent, the Rebotix

23   people testified they would have never agreed to those things.

24       So it's complete speculation that they had -- would have

25   an agreement with Rebotix.

PROCEEDINGS

1    Damages are unduly speculative.  They're based on the fact

2    that 70 percent of Vizient member hospitals would have bought

3    modified EndoWrists from SIS.

4    Not a single Vizient hospital ever bought a modified

5    EndoWrist.  They had a deal with Vizient for the entire rest of

6    their product line -- 2 percent of Vizient hospitals bought

7    from them for the entire rest of their product line.

8    It's complete speculation to suggest that they would have

9    had damages of the kind that Dr. Bero assumed.  And he assumed

10   it based on the testimony of Jean Sargent, who said she was an

11   employee of Vizient and that that formed her experience.

12   And she was not an employee of Vizient.  It's complete

13   speculation.

14   We incorporate by reference all of the prior grounds that

15   I've articulated.  I'll spare you that at least.

16   And thank you.  I appreciate it.

17       **THE COURT:**  Thank you, Mr. Gallo.

18   Mr. McCaulley?

19       **MR. McCAULLEY:**  Thank you, Your Honor.

20   I think there's ample evidence in the record to -- for a

21   reasonable jury to find in SIS's favor on all of the issues

22   that were identified by Mr. Gallo.

23   I apologize.  I can't take fast notes, and I can't go

24   through them one by one, but I stand on the record, and I stand

25   on the evidence in the case.

1    If there's no questions from the Court, we also have a

2    Rule 50 motion, Your Honor.

3         **THE COURT:**  Please proceed.

4         **MR. McCAULLEY:**  SIS moves pursuant to Rule 50 on

5    Intuitive's counterclaims.

6    Intuitive presented no evidence whatsoever of its alleged

7    lost profits damages in the context of its Lanham Act, unfair

8    competition, or tortious interference with Intuitive's

9    contractual relationships with its customers.

10   In the absence of such evidence, there's no legal remedy

11   for the jury to consider with respect to Intuitive's

12   counterclaims, and the Court should grant SIS's Rule 50 motion

13   for dismissal of all of Intuitive's counterclaims.

14   They didn't even try to make an argument that they had

15   lost profits, and they resisted any effort to -- even on

16   unrelated issues, to give evidence about what their

17   profitability was on the EndoWrist.

18   Intuitive extended no evidence whatsoever of SIS' alleged

19   profits earned from the repair and reset services provided by

20   SIS.  Therefore, we're entitled to relief, as a matter of law,

21   under their claims for disgorgement.  They presented no

22   evidence on that, Your Honor.

23   A reasonable jury would not have a basis on this record to

24   find that SIS made false or misleading statements in its

25   marketing materials or communications to potential and actual

1  customers.  In order to find for Intuitive, its

2  counterclaims --

3         (Reporter interrupts for clarification of the record.)

4         **MR. McCAULLEY:**  -- would not have a legally sufficient

5  evidentiary basis on this record to find that SIS made false or

6  misleading statements in its marketing materials or

7  communications.  And, therefore, there's no basis for liability

8  under Lanham Act.

9         That's all, Your Honor.  Thank you.

10         **MR. BRACHMAN:**  Thank you, Your Honor.

11         The motion should be denied because there is evidence from

12  which a reasonable jury could find --

13         **THE COURT:**  Mr. Brachman, would you pull that mic just

14  a little closer?

15         **MR. BRACHMAN:**  Of course.

16         **THE COURT:**  Thank you so much.

17         **MR. BRACHMAN:**  How's that, Your Honor?

18         **THE COURT:**  Perfect.

19         **MR. BRACHMAN:**  Excellent.

20         SIS's motion, respectfully, should be denied because there

21  is ample evidence in the record from which a jury could find

22  lost profit damages in favor of Intuitive on each of its

23  counterclaims.

24         I will go through the evidence in more detail, but at a

25  high level, the jury heard testimony, including admissions from

 1   Mr. Posdal, that SIS made false or misleading statements to

 2   customers.  The jury has heard testimony that SIS became aware

 3   of the terms of Intuitive's contracts.

 4        We received letters from -- that were sent to Marin

 5   General and, thereafter, continued to make sales of reset

 6   EndoWrists to Marin and also continued in its efforts to market

 7   reset EndoWrists, according to Mr. Johnson, for several months

 8   thereafter.

 9        The jury has heard testimony and seen evidence

10   establishing that SIS did, in fact, sell or give away 42 reset

11   EndoWrists.  And the jury has heard testimony from Mr. Rosa and

12   from Dr. Smith that the sale of reset EndoWrists diverts sales

13   away from Intuitive.

14        The jury has also heard testimony and seen evidence,

15   contrary to what Mr. McCaulley said, regarding Intuitive's

16   prices for its products and the margins that it earns on new

17   EndoWrists sales.

18        And so, based on all of that evidence, the jury can make a

19   straightforward computation of damages.  If it concludes that

20   some, all -- some or all of SIS' 42 reset EndoWrists sales

21   would have gone -- would have been purchased from Intuitive in

22   the absence of SIS' conduct, then they can calculate the prices

23   at which those new instruments would have been purchased from

24   Intuitive as well as Intuitive's contribution margin on those

25   sales.

```
 1        To the extent that SIS' motion is based on Dr. Smith not
 2   offering a precise formula or expert calculation of damages,
 3   that is not a basis to grant the motion.  The Ninth Circuit has
 4   been clear on this.  The law does not require expert testimony
 5   to establish damages.
 6        That's DSPT International against Nahum, 624 F.3d 1213
 7   from 2010.
 8        And for Lanham Act claims in particular, the Ninth Circuit
 9   has been clear on this point, Skydive Arizona, Incorporated
10   against Quattrochi, 673 F.3d 1105 from 2012, is a Lanham Act
11   case in which the plaintiff submitted evidence in the form of
12   ordinary business documents and testimony from lay witnesses to
13   establish harm to its goodwill.
14        The district court upheld the jury's verdict.  The verdict
15   was a damages verdict.  The verdict was appealed.  And the
16   Ninth Circuit affirmed, holding that neither empirical
17   quantification nor expert testimony is required to support a
18   monetary award of damages in a Lanham Act case.
19        And in a case from just a few years ago in the Central
20   District of California -- Allergan U.S.A., Incorporated against
21   Imprimis Pharmaceuticals, a very closely factually analogous
22   case to this one -- it's 2019 Westlaw 4546897.  The Court
23   denied a renewed Rule 50 motion where the Court had previously
24   granted partial summary judgment on Lanham Act and unfair
25   competition claims.
```

1      Damages were tried to a jury based exclusively on lay

2   evidence because the plaintiff's expert had been excluded by

3   the Court.  And the Court denied the Rule 50 motion and upheld

4   the jury's damages verdict because the Court held that there

5   was a sufficient basis in evidence to uphold the verdict.

6      And, specifically, the evidence that was in the verdict

7   was the fact that the defendant made statements to customers,

8   including statements that the plaintiff alleged were false;

9   that customers then made purchases of the plaintiff's product;

10   and that there was evidence sufficient to show that those

11   purchases otherwise would have or could have been made from the

12   plaintiff.

13      And so that's precisely the evidence that we have here.

14      The jury heard evidence of a number of false statements.

15   As I said earlier, SIS, for example, told hospitals it had a

16   patent.  Mr. Posdal admitted those statements were

17   misrepresentations, or not accurate.  He also admitted that

18   customers could have taken comfort from the belief that SIS had

19   a patent, that that could have influenced their purchasing

20   decisions.

21      We also saw evidence in the record, including

22   Trial Exhibit 489, that Marin General, in conversations with

23   Intuitive, stated that it believed it may have made a decision

24   to purchase from SIS based on "false information about

25   repairs."

 1         So there is a link between the false statements and

 2    diverted sales from Intuitive.

 3         And Mr. Rosa testified under cross-examination that there

 4    would be an impact to Intuitive's revenue as a result of SIS'

 5    activities or as a result of the sale of EndoWrists by third

 6    parties.

 7         Dr. Smith testified that sales by third parties siphoned

 8    sales away from Intuitive for a period of time.

 9         And the jury -- and I guess this is probably the most

10    important point, and I apologize for arriving at it after a few

11    minutes -- but the jury did, in fact, hear and see evidence

12    about Intuitive's prices and its margins.

13         So, for example, Mr. DeSantis, from Intuitive, testified

14    via deposition that Intuitive's contribution margin for new

15    EndoWrists is 89 percent.

16         Mr. McCaulley asked Mr. Rosa on cross-examination for a

17    representative price of an Intuitive EndoWrist.  He said 2,700

18    was a representative price.  The jury could multiply 2,700 by

19    SIS' 42 sales times an 89 percent contribution margin and come

20    up with a reliable damages estimate of approximately $100,000

21    in lost profits.

22         That's based on entirely on evidence in the record.  It's

23    not speculation, and it's not guesswork.

24         The jury also could make a reasonable estimate based on

25    Mr. Bero's testimony.  Mr. Bero testified that SIS' weighted

 1   selling price for reset EndoWrists in 2020 was $1,437.  He also

 2   testified that SIS was offering those reset EndoWrists at a

 3   40 percent discount.

 4       So if the jury finds the representative figure of 2,700

 5   not sufficiently precise, it can take Mr. Bero's weighted

 6   average price; increase that by 40 percent to account for the

 7   discount to arrive at Intuitive's weighted average price for

 8   new EndoWrists; multiply that by 42 sales, or some portion of

 9   42 sales; and then multiply that figure by 89 percent

10   contribution margin; and that would yield lost profit damages

11   of approximately $75,000.

12       Again, not speculation.  All soundly based in the record

13   evidence.

14       So we submit the facts and, frankly, the math here are no

15   more complicated than they were in the *Allergan* case or the

16   *Skydive* case.  And so we believe a reasonable jury could find

17   that Intuitive has proved damages on its counterclaims as well

18   as all of other elements of their counterclaims.  And they

19   should go to the jury, and the Rule 50 motion should be denied.

20       **THE COURT:**  It's your motion.  If you would like the

21   last word, you can have it.

22       **MR. McCAULLEY:**  I don't need the last word,

23   Your Honor.  Thank you.

24       There is one point that I should have brought up, and I

25   think it previews what we'll hear about during the jury --

1   argument over the jury charge.

2       The *Epic* factors, the lock-in factors that Mr. Gallo

3   referred to in his renewed Rule 50 motion, don't apply in this

4   case.  And so I don't think there needs to be any proof on

5   those four lock-in points.

6       Your Honor has included it in an instruction.  We have

7   case law that indicates that that's not applicable in this

8   case.  But Mr. Van Hoven will hear it.  I don't want to steal

9   his thunder.

10      **THE COURT:**  All right.  So let me deal with the

11  Rule 50 motions, and we'll get further into the jury charge.

12      So with regard to both Rule 50 motions, yours is a

13  renewed -- Intuitive's is a renewed motion.

14      But with regard to both of them, viewing the evidence

15  presented so far and without making credibility determinations

16  or weighing the evidence, I find there's substantial evidence

17  to support a finding by reasonable jurors on each of your

18  claims.  So I'm going to deny both of the Rule 50 motions -- or

19  the renewed Rule 50 motion.  So all of the claims will go to

20  the jury.

21      With that, I'm going to lead us off -- thank you,

22  Mr. Brachman.

23      **THE COURT:**  I want to take up the issue of the jury

24  charge.

25      So this was posted to the docket about noon on Saturday

 1   for you all.  I want to highlight just a couple of quick

 2   things.

 3        The first is there's a table of contents, which I wasn't

 4   necessarily thinking would go to the jury.  We had used it, and

 5   so I left it in in case it made life easier for you all as

 6   well.

 7        Because it does make the charge -- how's this?  I found it

 8   to help orient me through the charge.  So I'm not opposed to

 9   keeping it in for the jury, but I also know it isn't common to

10   do such a thing in jury instructions.

11        So I would also appreciate hearing from you all your

12   thoughts on that.

13        One other matter before I sort of hand the floor over to

14   you all.

15        And I will say, Mr. Van Hoven, I will probably ask you to

16   speak first just since the bulk of the instructions are for

17   plaintiffs' case.

18        My sense is that there were a large number of these

19   instructions that -- once -- once -- how to describe the two

20   markets -- right? -- the language about that.

21        Once that is settled on, your instructions were nearly

22   identical.  So I guess I just want to lead us off by saying my

23   sense is that the bulk of these actually are sort of not

24   contested.  You all generally agreed based on your submissions.

25        So if that is wrong, please also preview that for me.

1    And with that, Mr. Van Hoven, I think I'll ask you to

2  start it because I would rather you highlight for me places

3  where you want to talk rather than me trying to walk us through

4  these one by one.

5        **MR. VAN HOVEN:**  Sure, Your Honor.

6    Let's -- we have two main things that we want to discuss,

7  both of which are critical issues and that we think would

8  result in reversible error if these instructions were in the

9  case.

10   The first is the one that Mr. McCaulley highlighted, the

11 single-brand aftermarket.

12   And I'll just kind of walk through some of the history.

13 We'll talk about the *Apple-Epic* case.  This is the

14 Ninth Circuit recently explaining why they're even talking

15 about these factors.

16   And they say (as read):

17       "In *Kodak*, the Supreme Court considered the

18       question of whether a lack of -- a lack of market

19       power in the foremarket categorically precludes a

20       finding of market power in the aftermarket."

21   So that's -- the whole reason they're exploring these four

22 factors is because there's not market power in the foremarket.

23   And here, our allegations, we aren't trying to go down to

24 these factors.

25   Our allegations are they have market power in the

1  foremarket.  And, thus, we just look at the normal test, is

2  there a separate demand?

3      Again, this entire inquiry only comes in if there's a lack

4  of market power in the foremarket.  That's not in this case,

5  not at all not.

6      Let's go to what the Supreme Court said in *Kodak*

7  (as read):

8          "*Kodak* contends there is no need to examine the

9      facts when the issue is market power in the

10     aftermarkets."

11     They say (as read):

12         "A legal presumption against the finding of

13     market power is warranted because, absent market

14     power in the foremarket, it simply makes no economic

15     sense to consider an aftermarket."

16     So, again, that's the whole reason the Supreme Court

17  started out setting out those factors that are in Instruction

18  Number 7.

19     So both the Ninth Circuit and the Supreme Court have

20  recognized that this only comes into play when there is -- when

21  it's not an issue of market power in the foremarket.  Again,

22  that's not in this case.

23     That's -- so we'll go to -- and we have a very, very good

24  articulation of this issue by Judge Thompson in the *Lambrix*

25  case.  It's now published, 737 Federal Supp 3d. 822, relevant

1  cite, pages 840 to 841.

2      And Judge Thompson explains it much better than I did

3  (as read):

4          "From a practical perspective, the relevance of

5      information costs, switching costs, and general

6      knowledge of restrictions is reduced where a

7      defendant has market power in the foremarket."

8      So Judge Thompson decided this exact issue -- faced this

9  exact issue, nowhere near the market power that we have here.

10  But there was an allegation of market power and so it

11  essentially said, "Hey, we're not looking at these *Kodak*

12  factors that are in this Instruction Number 7."

13      To, you know, show kind of what -- you know, the harm this

14  does to the case and it why it doesn't make sense, let's look

15  at the proposed verdict form, Question Number 1 and Question

16  Number 2.

17      Question Number 1 is about market power in the foremarket.

18  (as read):

19          "Did SIS prove by a preponderance of the

20      evidence that there was a relevant market limited to

21      surgical robots used in minimally invasive soft

22      tissue surgery in the United States?"

23      That's Number 1.

24      Number 2 (as read):

25          "Did SIS prove by a preponderance of the

1    evidence that there is a relevant aftermarket limited

2    to EndoWrist repair and replacement in the United

3    States?"

4    So that's the aftermarket.

5    And then the instructions -- and we don't -- actually, we

6  don't disagree with this part of it.  (as read):

7    "If you answer no to either Question 1 or 2,

8    then SIS has not proved its claims."

9    Okay.  So that -- the only way we should ever get to these

10  *Kodak* factors if we -- is if the answer of the jury was "no" to

11  Question 1, if there wasn't -- if we didn't prove market power

12  in the foremarket.

13    But we should never arrive at that.  So this instruction

14  not only is against the Supreme Court, Ninth Circuit law, and

15  contrary to the recent, I think, well-discussed decision of

16  Judge Thompson, it is internally inconsistent with the verdict

17  form.

18        **THE COURT:**  Go ahead, Mr. Michael.

19      **MR. MICHAEL:**  Thank you, Your Honor.

20    I'll start out by saying this issue, as the Court knows,

21  has been briefed to a fare-thee-well.

22    Your Honor has been hearing about it for the past six or

23  eight months.  And the argument that you just heard from

24  Mr. Van Hoven really adds nothing to what the Court has already

25  heard.

 1          So we believe the instruction that the Court has proposed

 2     is correct, and it comes verbatim from the Ninth Circuit's

 3     decision in *Epic*.  So there cannot possibly be legal error in

 4     instructing the jury exactly what the Ninth Circuit has held

 5     that a plaintiff must show to establish this kind of claim.

 6          SIS, by contrast, has no controlling authority that they

 7     have cited to the Court holding to the contrary or that would

 8     justify deviating from the Ninth Circuit's clear holding as to

 9     what is required to establish a single-brand aftermarket.

10          They have made an argument that is not supported by

11     Ninth Circuit or Supreme Court law that you can automatically

12     define single-brand aftermarkets when there is market power in

13     the foremarket.  That goes against all of the case law from the

14     Ninth Circuit on this issue that says that single-brand

15     aftermarkets are the exception and not rule.

16          And it would make no sense for the Court to decline to

17     give an instruction that comes straight from the Ninth Circuit

18     where the Ninth Circuit did not qualify it by saying these four

19     factors only apply when there is not market power in the

20     foremarket.

21          And to do that on the basis of a single district court

22     decision, the *Lambrix* decision, which, of course, is not

23     binding on this Court -- *Epic* is binding on the Court; *Lambrix*

24     is not.

25          I would point out that if we're talking about district

1   court decisions, there actually is an even more recent

2   in-circuit district court decision from the Western District of

3   Washington called *Subspace Omega versus Amazon Web Services*,

4   2024 Westlaw 5202517 -- that's Western District of Washington,

5   December 23rd, 2024 -- where the Court dismissed a single-brand

6   aftermarket claim for failure to plead all four of the *Epic*

7   factors even though Amazon, the defendant in that case, had

8   been alleged to have at least 60 percent share in the

9   foremarket, which would give it market power under SIS'

10  definition.

11      But the real point I want to stress, Your Honor, is that

12  you don't need to decide whether the *Lambrix* court was correct

13  or this *Subspace Omega* court was correct on a motion to dismiss

14  decision because you have the Ninth Circuit decision in *Epic*,

15  and that's what should guide the jury instructions.

16      We do respectfully submit that the Court in *Lambrix* got it

17  wrong and that SIS is essentially asking this Court to make the

18  same legal error but with far more significant consequences

19  given that we're not talking about a motion to dismiss here

20  we're talking about jury instructions.

21      And what they're proposing to do is to give an instruction

22  that is not found in *Epic* and to give an instruction on an

23  issue where the jury has not yet made a finding.

24      The jury has made no finding that there was market power

25  in the foremarket, and we can't just presume that they will

 1  make that -- that finding.  So there's no precedent to say that

 2  that's what the issue of defining a single-brand market should

 3  turn on.

 4      Beyond that, I'll just point out that *Epic* itself --

 5  again, in addition to not making the distinction that SIS is

 6  making -- did involve a case where there was market power in

 7  the foremarket.

 8      *Epic* alleged a foremarket for smartphone operating

 9  systems.  That's at page 970 of the Ninth Circuit's decision.

10  And the plaintiff in that case had alleged that the foremarket

11  was "nearly 100 percent controlled by Apple and Google."

12      SIS has proposed -- and this is in the Court's tentative

13  jury charge -- that the threshold for market power in a tying

14  case is 30 percent.

15      So by definition, *Epic* was a case in which Apple, the

16  defendant, was alleged to have market power under SIS' own

17  definition in the foremarket.  And the district court actually

18  pointed out that Apple -- that Epic had deliberately chosen to

19  define the foremarket the way they did because it was a market

20  in which Apple had higher market share than if they had defined

21  it to include all smartphones.

22      So Epic deliberately pled a foremarket where they could

23  allege that Apple had market power.  And the Ninth Circuit,

24  nevertheless, went on to require the four factors that were

25  laid out in *Epic* in order to define a single-brand aftermarket.

1    So we respectfully submit that's the right approach here

2  and that the Court's instruction accurately reflects

3  Ninth Circuit law.

4    **THE COURT:**  Let me ask you each questions that will be

5  unhelpful, at least, in that they will point you in two

6  different directions.

7    Mr. Michael, because you like the instruction -- and,

8  Mr. Van Hoven, you should answer this as well -- you'll notice

9  that in the proposed -- that in the tentative jury charge that

10 was posted to the docket in Instruction 7, there's some

11 language stricken out -- right? -- that wasn't a mistake.  That

12 was so you all could see it because I wanted to you to see

13 this; right?

14   This Instruction Number 7 is a proposal from Intuitive.

15 The language is all yours.  The strikeout is mine because I

16 just found it hard to read and hard to understand.

17   But I also don't pretend to -- I want you to tell me if

18 I've done violence to this in terms of the economic principles

19 by striking out what I have or if you -- when you say that

20 you're fine with what's in Number 7, that this is a proper

21 statement of Ninth Circuit authority, if that includes my

22 strikeouts.

23   **MR. MICHAEL:**  I think it does, Your Honor.  I think

24 the strikeouts are fine, and they make sense in light of the

25 general market definition instruction that precedes this that

1    the Court is giving.

2        I think that, you know, that does not go into as much

3    detail about cross-elasticity of demand or talk about it

4    specifically in those terms.  And so I think it could be

5    confusing to refer to general market principles.

6        But I think this captures the essence of what the *Epic*

7    court was getting at with this factor where this they said even

8    if the plaintiff can prove the first three factors, you still

9    need to go on to consider this more general market definition

10   and principle of cross-elasticity of demand.

11       So I think this is the appropriate way to instruct.

12       **THE COURT:**  All right.  Assume for the moment that I'm

13   going this way, Mr. Van Hoven, do you take issue with my

14   strikeouts?

15       **MR. VAN HOVEN:**  No.  Our issue was with having an

16   instruction.

17       **THE COURT:**  No.  Exactly.  So let's go back one

18   moment.

19       So here is part of what I hear you saying, Mr. Van Hoven.

20       I hear you saying that Instruction 7 is something the jury

21   should consider only if it answers -- you just stated this very

22   well, and I'm having trouble recalling it.

23       Go ahead.

24       **MR. VAN HOVEN:**  If is it answers "no" to Question 1.

25       **THE COURT:**  And if it answers "yes," to your mind, it

1   skips over all this and goes on to Question 2?

2          MR. VAN HOVEN:  Yes, as well as the Ninth Circuit and

3   Supreme Court and Judge Thompson.

4          THE COURT:  I'll agree with Mr. Michael that I have

5   looked at this enough, that I did not look at it again more

6   carefully this weekend.  And I feel like, at some point, I read

7   *Lambrix*, and at this point cannot tell you -- let me say this

8   to both of you.

9      I'm going to look at *Lambrix* one more time, and come back.

10  But that's why I want to understand.  Because as I grasp it, if

11  I end up agreeing with Mr. Van Hoven, then what I'm doing is

12  putting in the instruction, but it becomes -- as the verdict

13  form is, it becomes a choose-your-own adventure of you only

14  answer this question or you only consider this if you answer

15  "yes" -- or I'm sorry -- "no" to Question Number 1.

16      That's your position?

17          MR. VAN HOVEN:  Yes.  And we aren't asserting a claim.

18  We aren't saying that we win this case if anyone answers "no"

19  to Question Number 1.  We're not even bringing that issue into

20  the case.

21          MR. MICHAEL:  So, Your Honor, respectfully, I don't

22  think that proposal makes sense.

23      If the jury answers "no" to Question Number 1, they're

24  done deliberating, so -- you know, I think Mr. Van Hoven just

25  said he agrees with that.

1    So if the answer to Question Number 1, whether there is

2    a -- whether SIS has proven that there's a relevant market

3    limited to surgical robots used in minimally invasive soft

4    tissue surgeries is "no," then the case is over, and SIS cannot

5    prevail on any of their claims.

6        In the jury answers "yes" to that question, then they

7    still need to go on to answer the question of whether SIS has

8    proven a single-brand aftermarket.  And the only way to do

9    that, consistent with the Ninth Circuit's holding in *Epic*, is

10   to find whether SIS has satisfied the four factors that the

11   Ninth Circuit laid out.

12       So that's where the second question comes in, and that's

13   where the Court's instruction is proper.

14       If I could add just one point on *Lambrix*, which is that

15   the *Lambrix* court, in addition to its decision not being

16   consistent with *Epic* itself, failed to consider or cite the

17   Ninth Circuit's more recent decision from 2023 in *Coronavirus*

18   *Reporter*, where the Ninth Circuit affirmed dismissal of a

19   complaint for failure to allege the *Epic* factors even though,

20   in that case, the defendant, again Apple, was alleged to have a

21   near total monopoly in the foremarket.  And we've laid that out

22   in our briefing.

23       So that's, you know, yet another Ninth Circuit decision

24   that we think controls this issue and is consistent with the

25   more recent district court decision that I also referred

1    the Court to.

2        **THE COURT:**  Mr. Michael, I think you've just reminded

3    what it was about *Lambrix*.  I thought that it was that it only

4    hadn't cited *Epic*.  I remember there being some additional

5    Ninth Circuit authority that you've cited to me in the past

6    that it did not address.

7        All right.  So I appreciate hearing from both of you on

8    it.  I'm going to leave in Instruction Number 7.

9        Mr. Van Hoven, what else would you like to take up?  You

10   identified at least a couple more things, I think.

11       **MR. VAN HOVEN:**  Yes.  The next is the business

12   justification question in the jury charge and instructions in

13   the jury instructions.

14       The business justification defense, I guess, first of all,

15   is an affirmative defense and it's -- it was never pleaded by

16   defendants.  I have their -- their claims, their affirmative

17   defenses, if the Court wants to see it.

18       But they've never pleaded this as an affirmative defense.

19   They can't bring it into the case now.

20       Second --

21       **THE COURT:**  Stay there.  Thank you.  Let's do them one

22   at a time.

23       Go ahead, Mr. Michael.  What say you?

24       **MR. MICHAEL:**  So, Your Honor, I think what

25   Mr. Van Hoven is referring to is that there may not be an

 1  affirmative defense in the answer labeled as such that says

 2  "business justification."

 3      I think that from the beginning in this case, including in

 4  Intuitive's answer, including in all the motion practice, and I

 5  think there could be no doubt for anyone that has been sitting

 6  through this trial that Intuitive has put on a case that it has

 7  a valid business justification for this conduct.

 8      And the facts underlying that overlap substantially -- if

 9  not entirely, but at least substantially -- with the evidence

10  that Intuitive has put on of competitive benefits under the

11  rule of reason.

12      These are very closely related; but in tying law, there is

13  this separate defense and the model instructions provide an

14  instruction on it.  It is separate and in addition to the rule

15  of reason instructions.

16      Intuitive bears the burden on it.  That's made clear, and

17  that's why it's broken out.  And so the model instruction that

18  the Court has included is entirely proper in this case.

19      **THE COURT:**  Mr. Michael, tell me why it didn't need to

20  be included in your answer.

21      **MR. MICHAEL:**  I don't think it needed to be included

22  in the answer, Your Honor, because of this sort of quirk of

23  antitrust cases where that evidence is going to be put on under

24  the rule of reason framework in any event, and so it didn't

25  need to be pled as a separate defense there.

```
 1        But, again, even if it did, I don't see how SIS could

 2   conceivably claim any prejudice or surprise from that.  Again,

 3   this has been in the case and clear from the beginning.

 4        THE COURT:  Would you address that last part,

 5   Mr. Van Hoven.

 6        MR. VAN HOVEN:  Yeah.  I mean, just to be clear what

 7   the language is of the first defense on page 39 of their answer

 8   affirmative defense -- singular -- and counterclaims is the

 9   doctrine of unclean hands as to SIS.  So we prepared our entire

10   case -- for four years, almost -- three and a half years based

11   on the understanding that this was the only affirmative defense

12   that they were bringing.

13        THE COURT:  If you could address prejudice -- because

14   I will share with you all that in looking at this instruction,

15   much of what Mr. Michael is saying rang true for me in that the

16   evidence that I've seen certainly seems to go to rule of reason

17   and to Intuitive putting that evidence forward.

18        I guess I'm trying to understand, if you could say more

19   for me, Mr. Van Hoven, about the fact that the evidence doesn't

20   seem to be different.

21        MR. VAN HOVEN:  And that's why it gets to why this

22   shouldn't be a separate -- it's only on the verdict form

23   because it's an affirmative defense.  Okay?

24        It shouldn't be a separate line in the verdict form, and

25   there shouldn't be a separate instruction for that exact
```

 1   reason, that pro-competitive benefits, all that stuff, is

 2   covered under your rule of reason instructions.

 3        So let's step back for a second and understand where this

 4   defense comes from.

 5        As we noted in our memo on the jury instructions, this is

 6   something that most courts don't even consider kind of a proper

 7   thing.  And one of reasons for that is, historically, it was a

 8   defense to per se tying claims.  Okay?

 9        So it's -- in per se tying claims, you don't get to put on

10   that rule of reason evidence.  And so this was something that a

11   defendant could bring in as an affirmative defense that they

12   have the burden on to per se tying claims.

13        So now we're in the Ninth Circuit where per se tying

14   claims still exist despite the fact that there's a lot of

15   academic dispute and disputes between circuits and things like

16   that.  We didn't want to get into the morass, so we decided not

17   to include the per se in our final set of instructions and

18   claims.

19        So this business justification defense is kind of a

20   historical anachronism based on the fact that some circuits

21   still had per se tying claims, but putting it into the jury

22   instruction is kind of a separate thing.  It doesn't make sense

23   if this is isn't an affirmative defense.

24        Having independent jury instructions that are different

25   perhaps in some ways from rule of reason or that kind of pile

 1   on that rule of reason analysis, that -- that's enormously

 2   prejudicial to us when those rule of reason instructions are

 3   already stated clearly.

 4        So all these things are already covered under the rule of

 5   reason.  There's no reason this business justification defense

 6   shouldn't in here because we don't have a per se claim.  So

 7   there's no reason to have an instruction and a line on the

 8   verdict form for it.

 9             **THE COURT:**  Mr. Michael?

10             **MR. MICHAEL:**  Thank you, Your Honor.  So a couple of

11   issues.

12        One, I don't think that Mr. Van Hoven did identify or can

13   identify any prejudice.  Again, the facts and the evidence that

14   we're relying on have been in this case from the beginning.

15        As to the argument that this only goes to a per se tying

16   claim, that's inconsistent with what is in the ABA model and we

17   believe it's inconsistent with the law as well, that this

18   defense can and should be considered as part of either a per se

19   or a rule of reason tying arrangement.  And that's how the ABA

20   model instructions have it.

21        And finally -- well, sorry.

22        As to the pleading issue, this was, you know, among other

23   things, clearly identified in the pretrial order and the

24   pretrial filings as a defense that Intuitive had legitimate

25   business reasons and pro-competitive justifications.  And for

 1  purposes of trial, that supersedes the initial pleadings.

 2      And, finally, with respect to the point that because the

 3  facts may be the same or similar to those that support other

 4  aspects of the instructions, that's true throughout these

 5  instructions.

 6      I mean, SIS has -- and we'll talk about this, probably, in

 7  a few minutes -- four different legal claims that all rely on

 8  the same factual premise.  That's not a reason not to give a

 9  jury instruction that's consistent with the law.

10          **MR. VAN HOVEN:**  Your Honor, quickly?

11          **THE COURT:**  Go ahead.

12          **MR. VAN HOVEN:**  So Mr. Michael cited to the -- talked

13  about the ABA model instruction.  Again, it says this is a

14  very -- not something the Courts are going with.

15      But the one case is cites for it, the main one, is the

16  Mozart case out of the Ninth Circuit, 833 F.2d 1342.  And the

17  pin cite here is 1348 through 1349.

18      And what did the Court address there?  (as read):

19          "We have recognized that antitrust defendants

20      may demonstrate a business justification for an

21      otherwise per se illegal trying arrangement."

22      So that's the circumstance under which kind of the only

23  supporting case of having this as a separate -- actually, in

24  this case, it wasn't a separate thing.  There was no rule of

25  reason analysis because it was a per se case.

1        THE COURT:  Folks, I'm going to leave it in.  Because

2   the ABA instructions are clear that the business justification

3   defense applies only if plaintiff has proven all of the

4   elements of a tying claim.

5       So it's clear that this instruction is to be given even in

6   a rule of reason case.  So I'm going to leave in

7   Instruction 31.

8        MR. VAN HOVEN:  Then, finally, we think there's a typo

9   in --

10        THE COURT:  Oh, please tell me.

11        MR. VAN HOVEN:  We think there's a typo in

12   Instruction 33, which has to do with exclusive dealing.  And it

13   refers to tying in the last sentence.

14        THE COURT:  Ah.  That should say "exclusive dealing";

15   is that right, Mr. Van Hoven?

16        MR. VAN HOVEN:  Correct.

17        THE COURT:  Do you agree, Mr. Michael?

18        MR. MICHAEL:  We do, Your Honor.  And that actually

19   dovetails with the first issue I'd like to raise.

20        THE COURT:  Okay.

21        MR. MICHAEL:  But we'll get to that when the Court is

22   ready.

23        THE WITNESS:  Okay.  Mr. Van Hoven, is there more?

24        MR. VAN HOVEN:  Yeah.  Nothing further from SI.

25   Nothing further.

 1          **THE COURT:**  Okay.  Go ahead, Mr. Michael.

 2          **MR. MICHAEL:**  So on that issue, Your Honor,

 3   Instruction Number 33 does relate to exclusive dealing.  We

 4   submit that the same instruction should be given with respect

 5   to the tying claim.

 6          The instruction correctly states the law based on the

 7   cases that we've cited to the Court, including the *Photovest*

 8   case from the Seventh Circuit, the *Betaseed* case from the

 9   Ninth Circuit, and the district court *Top Rank* case.

10          But those are all tying cases.  They all hold that where a

11   contract contains a third-party authorization or approved

12   source clause, the contract does not, as a matter of law,

13   constitute a tie because the essential element of forcing or

14   coercion is missing.

15          That is why this instruction applies in the exclusive

16   dealing context as well because, for the same reason that

17   forcing or coercion is missing, the plaintiff in this kind of

18   case cannot show exclusivity or coercion for purposes of an

19   exclusive dealing claim unless they satisfy their burden to

20   show illusoriness.

21          So it's correct and agreed, I think, to give it in the

22   exclusive dealing context, but the instruction should also be

23   given in tying.

24          We had proposed it as Instruction Number 20.  And, again,

25   we are fine with the way the Court has laid it out at

1  Instruction Number 33, which was slightly different from our

2  proposal.  But we had proposed that Instruction Number 33 also

3  be given in the tying context where Instruction 20 would go.

4       Alternatively, the Court could give a single instruction

5  and just make clear that it applies, really, to all four of

6  SIS' claims because the monopolization claims are based on the

7  same tying and exclusive dealing alleged conduct as well.

8       But either it should go in both places or it should be

9  given once and made clear that it applies to tying as well as

10  exclusive dealing.

11          **THE COURT:**  Mr. Van Hoven?

12          **MR. VAN HOVEN:**  Your Honor, I think -- we don't think

13  it should be in the tying claim.  The cases that they cite for

14  that all decided on other grounds.

15       It's simply not something that should be in a tying claim,

16  Your Honor.

17          **THE COURT:**  Well, I will share with you all that I

18  purposefully struck it -- I purposefully did not include

19  Instruction 20 because my sense of Intuitive's authority for

20  including it was nothing -- was with no binding authority to

21  include it.  And so I didn't include it for that reason.

22          **MR. MICHAEL:**  So, Your Honor, respectfully, we

23  disagree that there's no binding authority.

24       We think the *Betaseed* case from the Ninth Circuit, even

25  though ultimately it rejected the argument, it did use the same

 1  standard.  And all of the cases that this comes from, again,

 2  are tying cases, whether in the Ninth Circuit or outside the

 3  Ninth Circuit.

 4       And we're concerned that if you give the instruction only

 5  in the exclusive dealing context, it would create an

 6  unnecessary and serious risk of inconsistent verdicts where a

 7  jury could find tying contrary to all the cases that apply this

 8  rule about approved source clauses in the tying context.

 9       And I can recite the cases, in addition into the three

10  that I mentioned earlier, in just a moment, could find tying

11  without considering the issue of authorization but then reject

12  an exclusive dealing claim on that issue.

13       Again, the crux of the conduct is exactly the same for

14  both of those claims.  SIS is relying on the same contract

15  provisions for both claims.

16       Dr. Lamb, when he was here, described those contract

17  provisions as the very crux of the conduct that is being

18  complained about.

19       And so it would not make sense and, again, lead to a risk

20  of inconsistent verdicts to not give the instruction with

21  respect to both the tying and the exclusive dealing claim.

22            **THE COURT:**  Mr. Michael, what was the name of that

23  Ninth Circuit case you just mentioned?

24            **MR. MICHAEL:**  Yes, Your Honor, it's *Betaseed versus*

25  *U and I Inc.*  It's 681 F.2d 1203.

1        There's also the *Top Rank* case from the Central District

2    of California.  That's 2015 Westlaw 9948936.

3        We've cited the *Pullos* case from the Northern District of

4    Nevada, 2009 Westlaw 10708625.

5        *Mozart versus Mercedes Benz* from the Northern District of

6    California, 593 F. Supp. 1506.  Again, that was a tying case

7    where the Court found in that event that the plaintiff had

8    proved illusoriness, but the standard applied was the same.

9        And then the *Photovest* case from the Seventh Circuit,

10   606 F.2d 704.

11       All tying cases.

12           THE COURT:  Do you have anything, Mr. Van Hoven?

13           MR. VAN HOVEN:  No, Your Honor.  I've read those cases

14   the same way that, I think, Your Honor has.

15           THE COURT:  Mr. Michael, if I should decide that it

16   should be included and that it's only given once, am I just

17   adding "exclusive dealing" on page 40 there?

18           MR. MICHAEL:  Adding "tying," Your Honor.  Is that --

19           THE COURT:  I'm sorry.  That's right.  Sorry.

20       All right.  I'm at this point -- yes, go ahead.

21           MR. MICHAEL:  I think, essentially, that would be the

22   only change required to the substance.

23       But because this comes in the midst of the exclusive

24   dealing instructions, I think that may be unnecessarily

25   confusing.  And so I think it should go, we would propose, at

 1  the beginning, before getting into the substance of the --

 2  either the tying or the exclusive dealing instructions.  It

 3  could go at the end as well.

 4      But we would -- if the Court only wants to give it once, I

 5  think it should come out of either the tying section or the

 6  exclusive dealing section of the instructions and be given and

 7  made clear that it applies to both.

 8          THE COURT:  Mr. Van Hoven, if I end up agreeing with

 9  Mr. Michael, would you have me give it twice or move it

10  somewhere else and include both?

11          MR. VAN HOVEN:  If you were to add it, I don't think

12  we have a big preference.

13      Actually, Your Honor, I think we would prefer it to be in

14  the tying section.  So twice.

15          MR. MICHAEL:  So in that case, Your Honor, I think

16  probably the place to do it would be right after Instruction

17  Number 18, which is at page 33, and goes to conditioned sale.

18  That's really the element that the cases discuss this as going

19  to whether purchasers were, in fact, coerced.

20          THE COURT:  I'll take that note with me and take this

21  one under submission.

22      What else, Mr. Michael?

23          MR. MICHAEL:  So somewhat relatedly, Your Honor, at

24  page 20, the description of SIS' claims and the antitrust

25  statutes offered, and then this comes up again in the

1    monopolization instructions, there's a reference at page 20,

2    lines 13 and 17, to a variety of anticompetitive acts that SIS

3    has alleged in support of its Section 2 claims.

4         The only anticompetitive acts at this point that have been

5    alleged by SIS and put in front of the jury are alleged tying

6    and exclusive dealing.  There are no other alleged -- there's

7    no other alleged anticompetitive conduct in the case.

8         The one separate piece of conduct that SIS had previously

9    alleged, that the change in encryption technology from the S

10   and Si EndoWrist to the X and Xi EndoWrist was itself

11   anticompetitive, that was a claim that they had asserted

12   previously and that they have now dropped.  And so, given where

13   we've ended up with the same conduct, tying and exclusive

14   dealing being asserted in support of the Section 1 and

15   Section 2 claims, we believe that needs to be made clear to the

16   jury.

17        What we would suggest in the instruction at page 20 is to

18   replace "variety of anticompetitive acts" with the following

19   language (as read):

20             "The alleged tying and exclusive dealing conduct

21        I just described."

22        Which I think makes sense in context.

23        And then turning to Instruction Roman Numeral IV(a)(1),

24   which is Sherman Act Section 2 overview, we would propose an

25   addition there, which I can read to the Court and hand up in

 1    writing if Your Honor would like, to make clear that both of

 2    the Section 2 claims, the attempted monopolization and the

 3    monopolization claims, rest on the same allegedly

 4    anticompetitive contract provisions that are the basis for SIS'

 5    tying and exclusive dealing claims under Section 1.

 6        We believe that's what the evidence supports, and we

 7    believe that clarification is necessary to avoid, again, a risk

 8    of inconsistent verdicts if the jury is allowed to find no

 9    illegal tying or exclusive dealing under Section 1 but

10    nevertheless find monopolization based on the exact same

11    alleged obvious anticompetitive conduct under Section 2.

12        Those claims should be evaluated together.  And the

13    authority for that can be found in *ZF Meritor versus Eaton*,

14    696 F.3d 254, from the Third Circuit*; Dickson versus Microsoft*,

15    309 F.3d 193, from the Fourth Circuit -- as well as a number of

16    district court decisions.  I'll cite the Court to two from the

17    Southern District of New York*, Techreserves versus Delta

18    Controls*, 2014 Westlaw 1325914; and *In Re: Google Digital

19    Advertising*, 627 F. Supp. 3d 346, both tying cases, where

20    the Court looked at both Section 1 and Section 2 claims.

21        **MR. VAN HOVEN:**  Before I address that, I'd like to

22    just go back to the *Epic-Lambrix* issues for a moment.

23        I understand that the Court has seen briefing on that, but

24    they haven't seen -- but you haven't seen briefing from us.

25    That was all in the hospital cases.  It wasn't in our case.

CHARGING CONFERENCE

1      We'd like an opportunity to provide a short brief to

2  the Court, putting our positions in the record.

3           **MR. MICHAEL:**  Your Honor, if I may.

4      SIS had the opportunity to brief this issue in their trial

5  brief and in their jury instructions brief.  I believe they did

6  brief it in their jury instructions brief, so we see no reason

7  why there should be further briefing on the issue now.

8           **MR. VAN HOVEN:**  And I'll go on to -- I'll go on to the

9  issues raised by Mr. Michael.

10      There is -- there are certainly tying and exclusive

11  dealing claims here, but there is other anticompetitive

12  conduct: their internal business practices, their testing

13  practices, their pricing.

14      Evidence of this -- the way they enforced agreements,

15  their heavy-handed way of approaching hospitals and shutting

16  down their robot programs.

17      So there is other evidence of a variety of other

18  anticompetitive acts, and we think that's why there are

19  separate monopolization claims when a company is a monopolist,

20  such as Intuitive.  So we don't think that the instruction --

21  the changes to Instruction 3 or additional instruction in

22  monopolization would be proper.

23           **THE COURT:**  I'm going to disagree with you,

24  Mr. Van Hoven.

25      I don't -- I appreciate sort of what you're saying

 1    colloquially, but in terms of what's -- of the legal claims, as

 2    I read the addition Mr. Michael is proposing on page 20 and

 3    Instruction 3, it's just about being more specific about what

 4    the claims are here.

 5          But can -- I want to make sure that I'm understanding sort

 6    of what the proposal is.

 7          If I followed you -- right? -- Mr. Michael, I should be on

 8    page 47.

 9          **MR. MICHAEL:**  I believe that's correct, Your Honor,

10    Instruction Number 43.

11          And I did not, as I promised, read it into the record.  So

12    I can do that now.  And if Your Honor would like -- it's about

13    three sentences -- I do have a printed version I can hand up.

14          **THE COURT:**  Do you have a copy for Mr. Van Hoven?

15          **MR. MICHAEL:**  I do, and I sent one over the weekend as

16    well.

17          **THE COURT:**  Okay.  Great.  Let me see that.

18                      (Pause in proceedings.)

19          **MR. MICHAEL:**  So you can ignore the page Number 9 at

20    the bottom, Your Honor.  But, again, this would go in

21    Instruction Number 43, page 46 of the Court's proposal.

22          And we would propose to add the following paragraph before

23    the last sentence of what is in the Court's proposal.

24          And it would say (as read):

25              "Both of those claims rest on the same allegedly

1   anticompetitive contract provisions that are the

2   basis of SIS' tying and exclusive dealing claims

3   under Section 1 of the Sherman Act.

4    "If you have found that SIS did not establish

5   tying or exclusive dealing under Section 1 of the

6   Sherman Act, then you must find that SIS did not

7   establish monopolization or attempted monopolization

8   under Section 2 of the Sherman Act.

9    "If you have found that SIS did establish tying

10   or exclusive dealing in violation of Section 1 of the

11   Sherman Act, then you should consider whether SIS met

12   the requirements to establish a violation of

13   Section 2 of the Sherman Act."

14   And it would go on to say (as read):

15    "I will now instruct you on the elements of each

16   of these claims."

17    **THE COURT:**  Mr. Van Hoven?

18    **MR. VAN HOVEN:**  And, Your Honor, I think that, you

19 know, when you see the instruction, it puts in context what --

20 you know, what it is actually -- what they're actually doing

21 here, which is completely folding every monopolization

22 Section 2 claim or attempted monopolization claim into the

23 Section 1 claims.

24   And we've -- the Section 2 claim is also about the manner

25 in which they gained their monopoly, was that proper; the

1  manner in which they've attempted to monopolize, was that

2  proper?

3       And it's not just the exclusive dealing and the tying.

4       **MR. MICHAEL:**  If I may respond to that, Your Honor?

5       **THE COURT:**  Go ahead.

6       **MR. MICHAEL:**  So an element of the Section 2 claim is

7  anticompetitive conduct.  And, again, the only anticompetitive

8  conduct that SIS has alleged or put evidence in front of the

9  jury to show is the alleged tying and exclusive dealing.

10      Their expert, Dr. Lamb, talked about it as a singular

11 claim, the very crux of which -- and those were his words --

12 was the contracts.

13      What Mr. Van Hoven has pointed to today were three things.

14      The testing -- there is no claim in this case and never

15 has been that Intuitive's testing is anticompetitive.  And I'm

16 aware of no authority that testing could be anticompetitive

17 conduct to support a Section 2 claim.

18      He talked about pricing.  Pricing is not anticompetitive

19 conduct.

20      In *Verizon versus Trinko*, the Supreme Court made clear

21 that there is no antitrust violation when a firm has a monopoly

22 and charges a monopoly price.  That is what the competition

23 laws encourage.  There has to be an additional element of

24 anticompetitive conduct so the pricing is not anticompetitive.

25      And the last thing he pointed to was the enforcement.

1    And, well, enforcement of what?  The contract provisions.

2        The quote/unquote "enforcement" is not a different form of

3    conduct.  It's exactly the same as the alleged tying and

4    exclusive dealing.

5        There's no claim that Intuitive went beyond what its

6    contracts said.  In particular, there's no claim -- SIS dropped

7    this claim.  They stipulated to that -- that anything Intuitive

8    said to its customers was false or misleading.

9        What Intuitive did was told its customers the truth about

10   its contracts, and that's what SIS is complaining about under

11   its Section 1 claims as well as its Section 2 claims.

12        **THE COURT:**  Let me ask you, Mr. Van Hoven, the red

13   text that Mr. Michael is suggesting we add, is your position

14   that that's legally incorrect?

15        **MR. VAN HOVEN:**  Yes.

16        **THE COURT:**  Because?

17        **MR. VAN HOVEN:**  There are technical elements of tying

18   and exclusive dealing that are different than the elements of

19   monopolization.  So the same conduct can inform the

20   monopolization claim, which is what's it intended for?  It's

21   intended to capture the whole conduct of a monopolist.

22        **THE COURT:**  Is your point that you have put into the

23   record Intuitive conduct beyond what you're using to support

24   your tying and exclusive dealing claims?

25        **MR. VAN HOVEN:**  That's correct.  That -- that's

 1   another point.

 2        THE COURT:  I thought I was repeating what you --

 3   well, that's how I've been understanding your argument.

 4      Could you address that, Mr. Michael?  I think you have

 5   already, but...

 6        MR. MICHAEL:  I believe I have, Your Honor.

 7      There is no conduct that SIS has identified that could

 8   serve legally as anticompetitive conduct under Section 2 other

 9   than the alleged tying and exclusive dealing.

10        THE COURT:  Mr. Van Hoven, tell me what else you have

11   because I'm at a little bit of a loss here about what else is

12   in evidence that does not also go to your -- well, your point

13   is this may be similar to Intuitive's point earlier about the

14   business justification, right?  Or maybe the same evidence,

15   you're just saying, that it can be used --

16        MR. VAN HOVEN:  I mean, for example, their longtime

17   conduct of -- even separate from the contracts, their conduct

18   of testing a use counter to only 10 for 20 years when they knew

19   it could go longer.  They manipulated prices up and down, as

20   they wanted to, to pad their profits.

21      That's all in the record, and that's not part of either of

22   those claims.

23        MR. MICHAEL:  On the use counter, Your Honor, I'm glad

24   Mr. Van Hoven brings it up because it points in exactly the

25   opposite direction.

1    Again, what the Section 2 claim has to be based on is

2 anticompetitive conduct.  There is no claim in this case that

3 the use counter reduced competition.

4    As Mr. Gallo pointed out earlier -- we heard it from

5 Mr. Bero -- the use counter and the use limit is what created

6 the opportunity for the so-called competition that SIS wanted

7 to pursue.  If that wasn't there, that opportunity would not

8 exist.

9    So they can complain about the use counter, but it's not a

10 claim -- a complaint about anticompetitive conduct.  It's not a

11 complaint and it never has been, and there's no evidence to

12 suggest that it's a complaint that the use counter reduces

13 competition.

14    And the so-called manipulation of prices, first of all, I

15 don't think there's any evidence whatsoever in the record to

16 support that.  But that is very clearly not an antitrust claim.

17 That is not anticompetitive conduct under Section 2.

18         **MR. VAN HOVEN:**  May I address that very briefly?

19         **THE COURT:**  Mm-hmm.

20         **MR. VAN HOVEN:**  I think this -- that the use counter

21 increased competition is just pure semantics here.

22    Our client would be repairing these like they would have

23 any other instrument, like every other instrument can be done

24 with if it wasn't for the use counter in Intuitive's -- the way

25 they set that up.  So...

1        MR. MICHAEL:  And, Your Honor, if I may?

2        THE COURT:  Go ahead.  I'll give you one last -- a

3    couple more sentences here, Mr. Michael.

4        MR. MICHAEL:  It's just a contract.  I mean, the thing

5    that they're claiming stopped their client from providing the

6    service that they wanted to provide was not the use counter; it

7    was the contract.

8        THE COURT:  All right.  Let me ask -- and,

9    Mr. Van Hoven, I may be asking you the same question.  But,

10   again, I'm just trying to make sure I'm following your

11   argument.

12       Your position is that what's in red is legally incorrect?

13       MR. VAN HOVEN:  Yes.

14       THE COURT:  What's your best case for that?

15       MR. VAN HOVEN:  I don't have that with me at the

16   moment.

17       THE COURT:  Okay.  Mr. Michael, what's your best case

18   for what you want in red?

19       MR. MICHAEL:  It's, I believe, the ZF Meritor case and

20   the *Dickson versus Microsoft* case, both exclusive dealing

21   cases, both talking about how the Section 1 and Section -- when

22   the Section 1 allegations fail on that kind of claim, the

23   Section 2 allegations fail as well.

24       MR. VAN HOVEN:  And then just very briefly, my

25   recollection of those cases is that there is not additional

1    conduct as we're discussing here.

2         **THE COURT:**  All right.  Folks, I'll take this one with

3    me.

4        What else have you got, Mr. Michael?

5         **MR. MICHAEL:**  So, Your Honor, on just the pricing

6    point, I would refer the Court to *NYNEX versus Discon*, the

7    Supreme Court decision establishing that that's not

8    anticompetitive conduct.

9        So couple more issues which I believe we can deal with

10   briefly.

11       Page 26, Instruction Number 11, the rule of reason proof

12   of competitive harm.  The Court omitted from its instruction a

13   sentence that appears in the ABA model and -- as to which, I

14   believe, the parties were agreed.

15       The sentence is (as read):

16           "The ability to charge higher prices for better

17       products or services, however, is not market power."

18       Again, SIS did not dispute that that sentence should be in

19   the instructions.  It appeared in SIS' proposed Instruction

20   Number 28, which has fallen out for other reasons.  And it

21   appears in the ABA model, and we believe it should be restored.

22        **MR. VAN HOVEN:**  We don't have an issue with that, Your

23   Honor.

24        **THE COURT:**  Mr. Michael, you just said this, but which

25   instruction was it?

1          **MR. MICHAEL:**  It's Instruction Number 11 at --

2          **THE COURT:**  No, no.  It's fine.  It's 11.  I forget

3   that the numbers didn't actually change.

4          **MR. MICHAEL:**  Yes.  And page 26.

5          **THE COURT:**  All right.  And you told me already.  But,

6   again, to save me having to look at the screen.

7       Where should it be?  What line number should it -- where

8   should that sentence appear that way I can find it easier on

9   the other one?

10         **MR. MICHAEL:**  Yes, Your Honor.  Actually, I don't

11  believe I gave the Court that information.

12         **THE COURT:**  Oh, that's okay.

13         **MR. MICHAEL:**  No, no, no.  I will and I should.

14      Let me just -- it should go -- we think the Court

15  otherwise is tracking the ABA model instruction, and we would

16  propose that it go in the same place where it appears there.

17      So it should be -- yes, it's right after the sentence that

18  appears on page 27 at lines 2 to 3 that begins "a firm that

19  possesses," right after that sentence is where the ABA model

20  instruction gives the sentence that I read, beginning with "The

21  ability to charge higher prices."

22         **THE COURT:**  Great.  I'll get that in there.

23         **MR. MICHAEL:**  Next, Your Honor, page 28 of the Court's

24  charge Instruction Number 12, rule of reason, evidence of

25  competitive benefits.

1    This instruction as well as Instruction Number 29 at

2 page 37, which is substantively the same, did not include a

3 paragraph that the Court did properly, in our view, include in

4 Instruction Number 40 at page 45.

5    So if the Court looks at Instruction Number 40 at page 45,

6 there's a paragraph beginning "Antitrust law does not require."

7 That statements comes straight from the Supreme Court's

8 decision in *Alston versus NCAA* and the Ninth Circuit's decision

9 in *FTC versus Qualcomm*.  It's also quoted in this Court's

10 summary judgment decision.

11    That paragraph which appears in Instruction Number 40,

12 which, again, is otherwise the same as Instructions 12 and 29,

13 we believe, should be added to 12 and 29 as well.

14        **THE COURT:**  I think my goal was to not say it so many

15 times.  So I think that's -- truly, I think that's why I didn't

16 include it at 12 because I knew it would be coming in in other

17 places, and it made more sense to me there.

18    So let me -- well, let me hear from you, Mr. Van Hoven.

19        **MR. VAN HOVEN:**  And let me just get the context of 12

20 here.

21    And I think that what you're saying makes sense as far as

22 not having that in 12.  That's the section "Sherman Act claims

23 generally."  And it's adequately stated in the claims

24 themselves, so we'd prefer to keep it there.

25        **THE COURT:**  Mr. Michael, you pointed out that it is in

1    40.

2        You found it one other place?

3        **MR. MICHAEL:**  No, Your Honor.  I believe, that's the

4    only place it appears, and we do think it should be added to 12

5    and 29 to avoid any confusion or any misimpression by the jury

6    that they're being instructed on a different standard in those

7    contexts.

8        **THE COURT:**  On that note, I'm noting that -- right? --

9    rule -- excuse me -- Instruction 29 is called "Evidence of

10   Competitive Benefits," and, in fact, so is Number 40, but it's

11   under "Exclusive Dealing."

12       Again, my main purpose -- I think the paragraph is

13   generally fine.  I was trying to find a place for it instead of

14   needing to -- instead of needing to say it again and again.

15       But I hear you saying, Mr. Michael, that you think it

16   applies in all of those places.

17       **MR. MICHAEL:**  We do, Your Honor.

18       And, again, those instructions are otherwise substantively

19   the same, and so I think it does create a risk of confusion to

20   have a discrepancy between them in terms of this language being

21   included in one and not in the two others.

22       **THE COURT:**  Mr. Michael, does it put -- does it work

23   to put it just in 12?

24       **MR. MICHAEL:**  Respectfully, I don't think it does,

25   Your Honor, because, again, I would have the same concern that

 1   when we get to 29, the jury is hearing the same first

 2   paragraph, they're not hearing the second part of that; and

 3   they may erroneously believe that there's some difference

 4   there.

 5       29 is in the context of the tying claim specifically.

 6           **THE COURT:**  All right.  We'll put it in.  That was in

 7   9 -- no.  It's --

 8           **MR. MICHAEL:**  12, 29, and 40 are the three.

 9           **THE COURT:**  It's Number 29, but -- yeah, it's 9

10   with -- thank you, Mr. Michael.

11       All right.  What else you got?

12           **MR. MICHAEL:**  Thank you, Your Honor.

13       So one more what I'll call substantive one, and then if I

14   could run through some other issues quite briefly.

15       So the last substantive one I want to raise has to do with

16   this design change claim which SIS has now dropped from the

17   case that I mentioned earlier.

18       Despite the fact that they have dropped that as a legal

19   claim, they have continued to present argument and evidence to

20   the jury to suggest that the encryption on the X and Xi

21   EndoWrists was changed for anticompetitive reasons.

22       Mr. McCaulley, in his opening statement, transcript

23   page 232, said (as read):

24           "When the Xi and the X were introduced,

25       Intuitive changed the security and encryption and

 1          went with a wireless RFID chip to decrement the use

 2          counter -- the counter to go down from ten to zero.

 3          And that was more difficult to solve -- for third

 4          parties to solve the encryption.  It made it more

 5          difficult to crack the code."

 6          They then presented deposition testimony from Mr. Duque as

 7   well as Mr. Somayali on this issue and introduced TX670 and

 8   TX671 to show Intuitive's supposed motivations for making the

 9   design change.

10          And what we're concerned about is that a juror could

11   easily have the misimpression that this is part of the

12   anticompetitive conduct that's being alleged even though it is

13   not.

14          So we would suggest a new instruction.  And, again, I can

15   hand up a hard copy -- it's just two sentences -- to make clear

16   that the jury has heard evidence about the design of the X and

17   Xi model EndoWrists with a different encryption technology.

18          But there is no claim in this case that this redesign of

19   Intuitive's product was anticompetitive or illegal, and the

20   jury should not base any aspect of its verdict on this design

21   change.

22          **THE COURT:**  Mr. Van Hoven, you've seen it before right

23   now, I imagine?

24          **MR. VAN HOVEN:**  I have.

25          **THE COURT:**  Okay.  Thank you.

```
 1                    (Pause in proceedings.)

 2          THE COURT:  Thoughts on this, Mr. Van Hoven?

 3          MR. VAN HOVEN:  Yeah.  And I think that what you heard

 4   kind of speaks to there is no citation that we said that that

 5   was illegal, that that was wrong.  That's not come up anywhere

 6   in this trial.

 7          All that is is a juror's going to wonder, "Well, they did

 8   the Si.  Why couldn't they do the Xi?"

 9          The context is that the encryption was changed.  That made

10   it harder.

11          And so we've walked through that, but that's just part of

12   our -- showing our claim as to how -- A, why we needed to do Xi

13   differently, because it was different; and then understanding

14   the process, why it's taking a while, time, engineering

15   resources, et cetera.

16          This is directly relevant to that.  It hasn't been used to

17   try to state any kind of claim or make any argument that the

18   design change itself was illegal.  As he said, we dropped that

19   claim, but the key point is we dropped it before trial.  And so

20   it didn't come up.

21          THE COURT:  Could you crystalize -- so it sounds like

22   you don't want this included, but I'm not sure I'm clear why.

23          MR. VAN HOVEN:  That's -- I think it's kind of -- it's

24   going to be very misleading to the jury.

25          They're going to say well -- and look at how they say it.
```

 1   There is no claim in this case that this redesign of

 2   Intuitive's products was -- and they're going to -- I don't

 3   know how a juror's going to take that.  It's going to lead them

 4   astray as they're --

 5           **THE COURT:**  So, Mr. Van Hoven, here's what I hear

 6   Mr. Michael saying:  You all have put on some evidence about

 7   the X and the Xi.  I hear you explaining why you have.

 8       He wants to clarify for the jurors what the role of that

 9   is.  I'm not opposed to that.  I don't disagree with you that

10   if I were in your shoes, I might not want it like this.

11       So can you maybe propose something to me with regard to

12   the text?

13       Because I noticed you went right over the first sentence.

14   I think right -- that one is --

15           **MR. VAN HOVEN:**  Okay.

16           **THE COURT:**  -- controversial.

17       So talk to me about what you --

18           **MR. VAN HOVEN:**  Yeah.  It could just be this is --

19   this is -- this evidence has been provided to -- simply to

20   demonstrate the need for Xi decryption or Xi reverse

21   engineering.

22           **THE COURT:**  So, Mr. Michael, like Mr. Van Hoven, I

23   don't find objectionable your first sentence.  I have some

24   concerns about the second, and I'm trying to wordsmith it

25   myself as I sit here.

1    I may come back to you with proposals on it.

2         **MR. MICHAEL:**  One alternative proposal that I might

3    suggest to the Court is simply to end the second sentence after

4    the word "illegal."  Put a period there.

5         And I think then it is totally uncontroversial that there

6    is no claim in this case, that this redesign of Intuitive's

7    products was anticompetitive or illegal.

8         **THE COURT:**  Interesting you proposed that because I

9    was going to suggest the second half.  I say that for the

10    funny.

11        Mr. Van Hoven, what do you think?

12        **MR. VAN HOVEN:**  Of those two, the second half would be

13    preferable.  But we prefer to just couch it in the -- in

14    positive terms of -- that this is been provided to demonstrate

15    that Xi -- that additional work was required for Xi reverse

16    engineering.

17        **THE COURT:**  So the reason I'm picking between the two

18    is mostly because, while I appreciate your point, it doesn't

19    explain to the jury why we're saying anything to them about it;

20    right?  It should connect back up to the legal claims, which is

21    why I liked the second half, which is that this evidence has

22    been presented to them, but it's not part of their verdict.

23        Which did you say?  You said --

24        **MR. VAN HOVEN:**  Of those two, the second half would be

25    preferable.  And I just would strike "any aspect of."  Just say

 1   "You should not base your verdict on this design change."

 2        **THE COURT:**  Okay.

 3        **MR. MICHAEL:**  Your Honor, what I'm concerned about is

 4   that may leave the jury, you know, sort of wondering what

 5   they're supposed to do with it, if anything.

 6        And particularly, if we strike out any aspect, again, I

 7   think that the point that -- here is that there is no claim

 8   that this is illegal, and the jury should hear that so that

 9   they understand that that's not a claim that SIS is making.

10        Leaving that out, I think, only creates the risk of

11   confusion that we're concerned about in the first place.

12        **THE COURT:**  So you'll appreciate I -- here's what I'm

13   going to put in.  I just struck out the other language.

14        So -- because I think this is a nice middle path here

15   (as read):

16             "There is no claim in this case that this

17        redesign of Intuitive's products" --

18        No, no.  (as read):

19             "There is no claim in this case regarding this

20        resign of Intuitive's products, and you should not

21        base your verdict on this design change."

22        **MR. VAN HOVEN:**  The only thing I would suggest is "of

23   Intuitive's encryption technology" because, if you just leave

24   in "Intuitive's products" there, they could construe that as

25   saying, "Hey, we didn't think about anything about Xi."

1          **MR. MICHAEL:**  Your Honor, there's also no claim in

2    this case regarding the redesign of Xi.  And I think the fact

3    that Mr. Van Hoven, you know, wants to draw that distinction

4    raises another concern about confusion.

5          We would be fine with the Court's proposal the way Your

6    Honor read it.

7          **THE COURT:**  I appreciate your point that "products"

8    may be too broad, so I'm just going to take out -- here's

9    what's left in (as read):

10             "There is no claim in this case regarding this

11        redesign, and you should not base your verdict on

12        this design change."

13        **MR. MICHAEL:**  We're fine with that, Your Honor.

14        **MR. VAN HOVEN:**  Yes, Your Honor.

15        **THE COURT:**  All right.  And I appreciate, Mr. Michael,

16   that you're telling me where to insert this.  We will make it

17   so.

18        What else have you got?

19        **MR. MICHAEL:**  Okay.  So I'll run through the rest of

20   these.  Some of them truly are nits.  Some of them may be more

21   substantive, but I do believe they can all be dealt with fairly

22   quickly.

23        And I'll do this in order of the instructions, if that's

24   acceptable to the Court.

25        **THE COURT:**  By all means.

1    **MR. MICHAEL:**  So page 8, "What is Evidence?"

2    There's -- Item Number 4 there says (as read):

3         "Any facts that I may instruct you to accept as

4         proved."

5         And we would propose to add "that I have instructed you"

6    or "may instruct you," since the jury has received instructions

7    about facts from the Court.

8         **MR. VAN HOVEN:**  No issue from the plaintiff.

9         **THE COURT:**  And so it should I say "any facts that I

10   have and may"?

11        **MR. MICHAEL:**  Yes, Your Honor.

12        **THE COURT:**  Mm-hmm.

13        **MR. MICHAEL:**  Page 13, "Bench Conferences and Recess."

14   I believe there's just a typo at line 3.  It says "calling or

15   recess."  I think that should be "calling a recess" or "calling

16   for recess."

17        **THE COURT:**  Go on.

18        **MR. MICHAEL:**  Thank you, Your Honor.

19        Page 14, "Exhibit Redactions."  Here, to avoid -- I think

20   the issue that the Court is trying to avoid, which is the jury

21   speculating about what the redactions in documents may be

22   about, we would propose to replace the second sentence with the

23   following -- and, again, I think I can hand this out in hard

24   copy if it's helpful.

25        (As read):

1          "You should not draw any inferences or

2     conclusions from the fact that certain material is

3     redacted, and you should not speculate about what has

4     been redacted.  You should consider only those

5     portions of the exhibits that are not redacted and

6     ignore the redactions."

7          **THE COURT:**  Mr. Van Hoven?

8          **MR. VAN HOVEN:**  It's more words, but we have no

9     objections.

10         **THE COURT:**  Go ahead, Mr. Michael.

11         **MR. MICHAEL:**  "Stipulations of Fact," at page 15.

12    The Court previously read these stipulations to the jury at

13    pages 882 and 883 of the transcript.

14         The Court, at the same time, instructed the jury on facts

15    relating to the FDA that they were to accept as established and

16    true, and we believe those should be reiterated along with the

17    stipulated facts.

18         **MR. VAN HOVEN:**  Yes, Your Honor, that was given as a

19    curative instruction to be heard live, not to be inserted into

20    the jury instructions.

21         We'd object to that.

22         **THE COURT:**  I agree.  That's why I haven't included

23    them here; but I appreciate the point, Mr. Michael.

24         Keep on going, if you would.

25         **MR. VAN HOVEN:**  Thank you, Your Honor.

 1          Page 16, "On Depositions."  Just to note that the footnote

 2  should be updated to include Mr. John Francis -- or Dr. John

 3  Francis and Mr. Paul Plomin, and those depositions were played

 4  today.

 5          **THE COURT:**  Folks, thank you.

 6      I put in -- so I initially had all the witnesses listed

 7  and I -- truly, this was about not needing an extra cough drop

 8  as I read this entire thing to them.

 9          My question for you all is:  Do you want them all listed

10  or is it fine for you if I just put "the depositions of several

11  witnesses"?

12      I wasn't going to include the footnote.

13          **MR. MICHAEL:**  I see.

14          **THE COURT:**  I left it as a footnote just in case you

15  all told me you want them listed one by one so I could just put

16  them back in easily.

17          **MR. MICHAEL:**  We're fine omitting the footnote, Your

18  Honor.

19          **MR. VAN HOVEN:**  We're fine either way.

20          **THE COURT:**  Okay.  We will just take it out.

21      But thank you for pointing out the extra two.  This is why

22  I didn't want them listed.

23      Go ahead, Mr. Michael.

24          **MR. MICHAEL:**  Page 18, "Charts and Summaries Received

25  into Evidence."  I know this is from a model instruction, but

 1   we believe it is not correct, at least in this context.

 2        The model instruction comment does say that the

 3   instruction may be unnecessary if there is no dispute as to the

 4   accuracy of the chart or summary.

 5        And that is the case here with respect to the two

 6   Rule 1006 summary exhibits that were introduced into evidence,

 7   TX1641 and TX1642.  SIS and its witnesses did not dispute the

 8   accuracy of either of those exhibits.

 9        We also think the instruction is inconsistent with

10   Rule 1006 itself, which says that the underlying voluminous

11   writings that are summarized need not be offered into evidence,

12   and this instruction could create a misimpression to the

13   contrary.

14        **THE COURT:**  Mr. Van Hoven?

15        **MR. VAN HOVEN:**  Your Honor, it still, I think, is

16   necessary for the underlying -- the testimony that showed that

17   this was a proper -- to be proven and that this is still the

18   correct instruction.  Essentially, the jurors still make that

19   assessment.

20        **THE COURT:**  Mr. Van Hoven, do you -- do I hear you

21   disagree with Mr. Michael that if there's no dispute -- I hear

22   him saying this isn't necessary because there's no dispute from

23   you all about the charts.

24        **MR. VAN HOVEN:**  I don't -- I, frankly, don't remember

25   if those were -- if the evidence on those was disputed, as I

 1   stand here right now.

 2          THE COURT:  Do I remember, Mr. Michael, the two charts

 3   that I can think of -- and you read -- you made broader

 4   statements.

 5       But what I think they are is there's one about the amounts

 6   invested by Intuitive in research and development over time.  I

 7   don't remember what the other one is either.

 8          MR. MICHAEL:  That's correct.  That was TX1642, which

 9   was introduced on the direct examination of Mr. Rosa.

10       TX1641 was a summary of SIS' Vizient customers for its

11   other non-EndoWrist businesses.  That was introduced on the

12   cross-examination of Ms. Sargent.

13       And SIS did not put on evidence to contest the accuracy of

14   either one of those summary exhibits.

15          THE COURT:  My sense was, at least with the R&D, you

16   all didn't contest them because it was pulled from the

17   underlying documents.  And my sense is you also don't contest

18   the pieces from Ms. Sargent.

19       So I am inclined to --

20          MR. VAN HOVEN:  I'm not aware of us contesting that.

21          THE COURT:  I am inclined to remove this.

22       Go ahead, Mr. Michael.  What else?

23          MR. MICHAEL:  So one more addition that we would

24   propose, Your Honor, and that is to add back to the charge

25   Intuitive's Disputed Instruction Number 6 with respect to duty

1    to deal.

2        We believe that's a straightforward statement of the law,

3    as set out in *FTC versus Qualcomm* and *Verizon versus Trinko*.

4        I don't think there's any dispute that the statement is

5    legally correct.  We think it's necessary here to avoid juror

6    confusion and undue prejudice in light of what SIS has argued

7    about Intuitive's obligations.

8        Specifically, SIS' argument to the jury throughout the

9    trial has been that Intuitive has a duty to continue to warrant

10   and stand behind its products, including the da Vinci, and to

11   continue to provide services after SIS has made modifications

12   to the products.

13       That is the same thing in substance as saying that

14   Intuitive has a duty to deal with SIS or to facilitate its sale

15   of modified EndoWrists.

16       SIS has also suggested that Intuitive had an obligation to

17   go out and test third-party products.  And we believe, in light

18   of those arguments and the evidence that SIS has presented, the

19   jury should be informed that under the antitrust laws there is

20   no duty to deal with a competitor, so that it does not enter a

21   verdict on legally erroneous grounds.

22       And the fact that SIS has not styled its claim as a

23   unilateral refusal to deal really just underscores why we think

24   the instruction needs to be given.

25       It's not purporting to prove the legal elements it would

1    need to prove in order to establish a refusal to deal claim

2    under *Trinko*.  And so it should not be allowed to invite the

3    jury to find liability for tying or exclusive dealing on the

4    basis of a duty to deal that does not exist in the law.

5         And that was exactly the issue that the Supreme Court

6    addressed in *Pacific Bell versus linkLine*, where it held that

7    a plaintiff who fails to satisfy the strict requirement for a

8    unilateral refusal to deal claim cannot base another type of

9    claim -- in that case, it was a so-called price-squeeze

10   theory -- on the notion that the defendant, nevertheless, has a

11   duty to deal with the plaintiff.

12        **MR. VAN HOVEN:**  But that just misstates the theory of

13   our case and the claims that we brought.

14        We're not claiming they had a duty to deal.  But once you

15   become a monopolist, there's conduct that you can't engage in

16   connection with the tying and the exclusive dealing.

17        But it's not a duty to deal claim.

18        **THE COURT:**  I hear Mr. Michael saying that, to some

19   degree, you're looking to get around having actually pled it.

20        Can you just say a little bit more about that?

21        **MR. VAN HOVEN:**  Yeah.  I just -- that's not the

22   evidence and the theories that we brought, that it's a -- that

23   we're requiring them to deal.

24        It's that additional monopolistic conduct that they've

25   engaged in.  After we do what -- after we do -- we didn't say

1  we tried to deal with them.  That's in the record.  They've

2  argued that again and again.

3      **THE COURT:**  Mr. Michael, I think you've both noted

4  that there's a -- I am trying to hew closely to the model

5  instruction.

6      I'm curious if you all have anything to say about the fact

7  that there is no model instruction with regard to this.

8      **MR. MICHAEL:**  Your Honor, I think it's a somewhat --

9  it's a situation where -- again, I don't think there's any

10 dispute as to what the law provides on this issue.  I'm not

11 sure why the ABA has not proposed an instruction for duty to

12 deal claims.

13     But, again, I think it's appropriate in this context given

14 the evidence that SIS has put in front of the jury and the

15 arguments they put in front of the jury that would suggest that

16 Intuitive has an obligation to deal.

17     And we did cite some precedent for giving an instruction

18 like this in our jury instructions brief.

19     **THE COURT:**  I know I'm asking you all to tell me why

20 the ABA did or didn't do a thing.

21     **MR. VAN HOVEN:**  Yeah.  Probably because they thought

22 it wasn't appropriate to be in the jury instructions.

23     **MR. MICHAEL:**  And, Your Honor, again, there's a

24 Supreme Court case -- two Supreme Court cases, really, *Verizon*

25 *versus Trinko* and *Pacific Bell versus linkLine*, directly on

```
 1   point.

 2       So I think this is something that should be added to the

 3   model but, more pertinently, should be added to the

 4   instructions in this case.

 5           THE COURT:  Well, I'll let you lobby the ABA for it.

 6       I'll give it some thought.  But I'll tell you,

 7   Mr. Michael, I'm inclined to leave it out, which is why it's

 8   not in the proposed charge; but I appreciate you making your

 9   record for it.

10           MR. MICHAEL:  Just a couple of others, Your Honor.

11       Page -- and this is another proposed addition.  I'll be

12   very brief on it.

13       We had proposed a supply substitutability instruction.  It

14   was Instruction Number 28.  The Court did not include that.

15       That did come straight from the ABA model, and we believe

16   that it's appropriate because there is evidence in the record

17   that Intuitive faces competition or at least potential

18   competition from several major manufacturers of medical

19   devices, including Medtronic and Johnson & Johnson.

20       We contend those are current competitors of Intuitive.

21   But even if one were to accept that they are not, the jury

22   should be allowed to consider whether they, nonetheless,

23   constrain Intuitive's pricing because of their ability to shift

24   supply to offering products that compete with Intuitive.

25       And that is supported by evidence, including the 2021
```

1  Intuitive 10-K that was admitted during Mr. Rosa's testimony.

2  That's what the ABA model instruction speaks directly to.

3        THE COURT:  All right.  I think, Mr. Michael, you're

4  just speaking to the sentence -- the line numbers and page

5  numbers I have will mean nothing to you.  These are my notes,

6  which are not on the docket.

7        My sense is -- but we're looking at Instruction -- just to

8  make sure I'm on the -- literally on the same page.

9        We're looking at 28?

10       MR. MICHAEL:  No, Your Honor.  I'm sorry.  I may have

11  misspoken on that.

12       This is not in the Court's proposed charge.  It was

13  Disputed Instruction Number 8 --

14       THE COURT:  That's what I'm looking for.

15       MR. MICHAEL:  -- offered by Intuitive at page 25 of

16  Docket 266.

17       THE COURT:  Yup.

18       MR. MICHAEL:  And, again, that came straight from the

19  ABA model.

20       THE COURT:  So the question I had and the reason I

21  left out Disputed Instruction 8 -- and maybe you can just point

22  my attention to it, Mr. Michael.

23       I read the instruction, and I just have questions about

24  whether there was any evidence that had been presented to

25  warrant this instruction.

1    So I think you started here, and if you could just repeat

2  it for me because I was looking at the wrong instruction.

3        **MR. MICHAEL:**  Yes, Your Honor.  So the evidence that I

4  had pointed to was Intuitive's 2021 10-K filing with the SEC.

5  And I'm sorry, I actually don't have the exhibit number for

6  you.  I'm sure I could get it.  It was admitted during

7  Mr. Rosa's direct testimony.

8        And we believe it speaks to this issue at page 15 where it

9  says (as read):

10            "We face competition in the forms of existing

11        open surgery, conventional MIS, drug therapies,

12        radiation treatment, and emerging interventional

13        surgical approaches."

14        It goes on to say (as read):

15            "We also face competition from several companies

16        that have introduced or are developing new approaches

17        and products for the MIS market.  That includes

18        companies that have, quote, introduced products in

19        the field of robotic-assisted surgery or have made

20        explicit statements about their efforts to enter the

21        field.  And they include, but are not limited to,

22        Johnson & Johnson, Olympus Corporation, and Samsung

23        Group."

24        And then finally, it says (as read):

25            "Other companies with substantial experience in

 1          industrial robotics could potentially expand into the

 2          field of surgical robotics and become a competitor."

 3      And that speaks directly to what the ABA model talks about

 4  when it says that other manufacturers may have the ability to

 5  alter their production to manufacture products that can be

 6  reasonably substituted with Intuitive's even though they do not

 7  presently compete with Intuitive.

 8          THE COURT:  Mr. Van Hoven?

 9          MR. VAN HOVEN:  I think that statement essentially

10  says that every surgical procedure, drug manufacturer, or large

11  conglomerate is our competition.  It doesn't provide any

12  evidence that would comport to this instruction, and there

13  hasn't been any in this trial.

14          THE COURT:  I think the point -- so I -- we'll include

15  it.  I had excluded it because I didn't remember -- I didn't

16  see any evidence, and I think Mr. Michael has pointed me to

17  evidence in the record that calls -- that makes this

18  instruction relevant.

19          MR. MICHAEL:  And, Your Honor, just for the record and

20  for clarity, the document that I quoted from was TX1632.022-R.

21      I have just two more, Your Honor.

22          THE COURT:  Go ahead.

23          MR. MICHAEL:  So one is we had proposed an

24  instruction, Disputed Instruction Number 21, on voiding the

25  warranty not being coercion for purposes of a tying claim.

1    That instruction, we submit, accurately sets out the law

2    regarding whether contract provisions that exist at the time a

3    customer buys a product and provide that a manufacturer will

4    not honor a warranty if the customer uses unauthorized parts or

5    service cannot, as a matter of law, constitute coercion or

6    conditioning.  We cited cases to that effect.

7         Specifically about warranty provisions, in our jury

8    instruction brief, SIS did not dispute that's what the case law

9    shows.  They did not identify any contrary precedents.

10        Their argument is not that voiding a warranty is illegal.

11   It can't be, given Mr. Posdal's testimony, that that's what SIS

12   does.  And he has no problem when Intuitive does it.

13        Their argument is that SIS bases its claim on other

14   conduct.  But, again, that's exactly the point.

15        The warranty terms, on their own, are lawful.  And we

16   believe the jury should be instructed accordingly so they don't

17   base their verdict on lawful conduct.

18        If SIS can prove other contract provisions that are

19   unlawful, the jury can base the verdict on those contract

20   provisions.

21        **MR. VAN HOVEN:**  It's not that -- we're not claiming

22   that Intuitive's voiding the warranty on its EndoWrists is

23   anticompetitive conduct, but its conduct -- warranty conduct

24   related to the system, we claim, is.

25        And so giving this instruction would be -- essentially, it

```
 1    would confuse the jury as to whether that's potentially

 2    anticompetitive conduct.

 3          THE COURT:  I agree with Mr. Van Hoven.  So that will

 4    stay out.

 5        What else, Mr. Michael?

 6          MR. MICHAEL:  Last one has to do with the Court's

 7    proposed instruction, which is numbered 49.  It's at page 50,

 8    and it has to do with monopoly power direct evidence.

 9        So we had cited several Ninth Circuit and Northern

10    District of California precedents establishing that direct

11    evidence of monopoly power requires proof of both

12    supracompetitive prices and restricted output.

13        That is because, as the model instruction elsewhere

14    provides, higher prices alone are not sufficient to establish

15    monopoly power.  They are equally consistent with competition

16    based on innovation or quality.

17        Brooke Group versus Brown & Williamson from the Supreme

18    Court says the same thing.  FTC versus Qualcomm says the same

19    thing.

20        Now that the evidence is in, it is clear that SIS has not

21    submitted any proof of restricted output.  None of their

22    witnesses have testified that output of EndoWrists would be

23    higher but for the alleged conduct.  And to the contrary,

24    Mr. Bero's damages model assumes that output would be exactly

25    the same in his but-for world as it was in the real world.
```

1      As a result, we would submit that the direct evidence of

2    monopoly power instruction is not supported by the evidence in

3    this case and should not be given.

4      Alternatively, if the Court does decide to give it, it

5    should include at line 7, after the reference to prices above

6    competitive levels, the following language (as read):

7            "And to restrict output in that market."

8            **THE COURT:**  Is this Disputed Instruction 49, direct --

9    "Monopoly Power Direct Evidence"?

10           **MR. MICHAEL:**  Yes, Your Honor.

11           **THE COURT:**  Mr. Van Hoven?

12           **MR. VAN HOVEN:**  Yes.  First, as to the coercion point,

13   I think that's -- that doesn't kind of need to be in there.

14   It's already -- that point is already made elsewhere.

15     But as to what evidence has come in, there's been a

16   plethora of evidence that there would have been lower prices,

17   and that would have allowed hospitals to perform more

18   procedures for more patients.  So that is a change in output

19   that's been shown.

20           **MR. MICHAEL:**  May I respond to that, Your Honor?

21           **THE COURT:**  Yes.  But give me just one moment because

22   I -- I want to make sure I'm tracking the two parts here.

23     Go ahead, Mr. Michael.

24           **MR. MICHAEL:**  So there's zero evidence that hospitals

25   would perform more procedures.  And in any event, even if there

1    were, that would not respond to this point because that,

2    according to SIS, is a different market from the one in which

3    they're alleging a reduction of competition.

4        SIS is alleging harm to competition in one market and one

5    market only.  That is EndoWrist repair and replacement.  There

6    is zero evidence of reduced output in that market.

7        What the Supreme Court held in *Brooke Group* was, where

8    output is expanding at the same time, pricing are increasing.

9    Rising prices are equally consistent with growing product

10   demand.

11       And that's why the model instruction says that higher

12   prices alone are not sufficient to establish monopoly power.

13   They are consistent with competition based on innovation and

14   quality.

15           **THE COURT:**  Mr. Michael, tell -- Mr. Michael, I've

16   been thinking of the two additions as independent one -- and I

17   say "the two additions," meaning with Disputed Instruction 49,

18   you both started from the ABA model.  I understand Intuitive to

19   have essentially added these two sentences that I took out.

20       And I have been thinking of them as independent, one from

21   the other, i.e., including one or taking the other out doesn't

22   do -- works; is that right?  Or do you think both need to say

23   in?

24       Well, let me say that differently.

25       I know you want both of them in.

 1        I'm asking whether including one necessitates including

 2   the other.

 3            MR. MICHAEL:  I'm sorry, Your Honor.  On Instruction

 4   Number 49 -- so our proposal, to be clear, was that this

 5   instruction should not be given --

 6            THE COURT:  Oh.

 7            MR. MICHAEL:  -- because SI -- sorry.

 8            THE COURT:  No, no.  That's my fault.

 9            MR. MICHAEL:  This instruction on Direct Evidence of

10   Monopoly Power -- I think, earlier we were talking about a

11   different instruction on monopoly power.

12        So if there's some confusion there, I'm happy to help try

13   to clear that up.

14            THE COURT:  I'm sure the confusion is mine.

15        Point me again to where you are.  I thought we were -- I

16   thought we were on direct evidence, which was Disputed

17   Instruction 49.

18            MR. MICHAEL:  So I'm at page 50 of the Court's

19   proposed charge, Docket 437 --

20            THE COURT:  Yes.

21            MR. MICHAEL:  -- Monopoly Power Direct Evidence.

22        And we had proposed an instruction that referenced -- we

23   have proposed an addition that referenced output --

24            THE COURT:  Yes.

25            MR. MICHAEL:  -- to that which was not included here.

1        THE COURT:  Yes.  Okay.

2        MR. MICHAEL:  And so my point was that now that we

3   have the evidence, there is no evidence of reduced output.  And

4   so as a result, the instruction should not -- on direct

5   evidence should not be given because there is no direct

6   evidence of monopoly power.

7        THE COURT:  I see.

8        Okay.  Now that I more clearly understand Mr. Michael's

9   point, Mr. Van Hoven, could you make yours again, please?

10       Why do we need this instruction?

11       MR. VAN HOVEN:  Yes.  Because there is direct evidence

12   of reduced output.  Fewer surgeries performed because costs are

13   higher means fewer EndoWrists supplied to the market as a whole

14   through the combined replacement and new market.  That's

15   reduced output.

16       THE COURT:  And your point was that's not the right

17   market?

18       MR. MICHAEL:  Correct.  I think what he's talking

19   about is that there would be fewer procedures or there may be

20   more procedures if there were repaired EndoWrists in the

21   market.

22       Again, I don't think there's any evidence to support that.

23   Mr. Van Hoven has not cited any.

24       But, regardless, there's not a market that SIS has defined

25   for surgical procedures in this case.  They've defined a market

1    for repaired or replacement EndoWrists, and there's no evidence

2    of reduced output in that market.

3         **THE COURT:**  Go ahead.

4         **MR. VAN HOVEN:**  It's -- there's a lot of evidence in

5    the record that more procedures means more EndoWrists sold.

6    And so more -- we're not saying that there would be more

7    procedures as a market.

8         We're saying that because there is evidence that there

9    would be many more procedures because there would be lower

10   prices, that means that there would be more total EndoWrists

11   sold.

12        The problem Intuitive has is that those would be coming

13   from repair companies.  But that is reduced output of

14   EndoWrists, which is the exact market that we've defined.

15        **THE COURT:**  Thank you both, especially Mr. Michael,

16   for walking me through all the pieces of paper I have in front

17   of me.

18        I'm going to leave it in.

19        All right.  What else do you have for me, Mr. Michael?

20        **MR. MICHAEL:**  Your Honor, just on that one, then, we

21   would propose that the instruction include a reference to

22   reduced output.

23        In other words that, in line 7, which I think makes a

24   reference to prices -- yes, where it says "above competitive

25   levels."

 1          So the language that we're proposing to add after that is

 2     "and to restrict output in that market."

 3          And that's based on *FTC versus Qualcomm* and *Brooke Group*

 4     *versus Brown & Williamson*.

 5               THE COURT:  Mr. Van Hoven?

 6               MR. VAN HOVEN:  Yeah.  I think just because some cases

 7     put those two, prices and output, in the conjunctive doesn't

 8     mean that they always have to be together.  I'd stick with the

 9     model instruction and the cases that support that.

10               THE COURT:  And that's with regard to the first

11     addition.

12          Mr. Michael, do you also want to argue -- was there a

13     second addition that you wanted to that, or has that fallen

14     away?

15               MR. MICHAEL:  No, there's not a second addition on

16     this one, Your Honor.

17               THE COURT:  All right.  I am going to stick with the

18     model and leave it as is.

19          What else, Mr. Michael?

20               MR. MICHAEL:  Nothing else from Intuitive, Your Honor.

21               THE COURT:  Anything more, Mr. Van Hoven?

22               MR. VAN HOVEN:  Nothing else from SI.

23          Mr. McCaulley?

24               MR. McCAULLEY:  Your Honor, may I be briefly heard on

25     the lock-in factor issue?  I have a question for the Court.

2521

```
 1              THE COURT:  Are you talking about the single-branded
 2   market?
 3              MR. McCAULLEY:  Yes.
 4              THE COURT:  -- aftermarket?
 5         Yes.  Give me one second.
 6         Actually, can I tell you all, I just need to stretch.  So
 7   can I have five minutes, and I'll come right back to you.
 8         Thank you.
 9                   (Recess taken at 11:30 a.m.)
10                (Proceedings resumed at 11:38 a.m.)
11      (Proceedings were heard out of the presence of the jury.)
12              THE CLERK:  This Court is back in session.
13              THE COURT:  You may be seated.
14         Thank you all for the small break there.
15         All right.  Where were we?
16         You wanted to be heard on single-band aftermarkets.
17              MR. McCAULLEY:  Yes, please, Your Honor.
18         I just want to make sure I understand the intent of the
19   order.
20         Is the intent of the order, Your Honor, that if SIS proves
21   a relevant antitrust market and proves dominant market power in
22   that market, we still have to go through and prove the lock-in
23   factors?
24         Because I understood from -- I was reading Your Honor's
25   Docket Number 287, which was in the hospital plaintiffs' case,
```

1    but I think it's still on the same docket, and Your Honor was

2    discussing this issue and said that the Court did not find that

3    Intuitive holds market power in the foremarket.

4         The Court expressly denied summary judgment for plaintiffs

5    on market definition and power as to the surgical robot

6    foremarket, holding that disputed issues of fact remained for

7    the jury to decide.

8         Thus, if a single-brand aftermarket for EndoWrist

9    instruments can be established at this stage, it must be

10   accomplished through satisfaction of the *Epic Games* lock-in

11   factors.  The hospital plaintiffs cannot do so.

12        So what I understood from reading that was, at that point,

13   there had been no proof of a relevant antitrust market and that

14   there had been no proof of a market power or dominant market

15   power at that point.

16        And I just want to make sure I understand.  If the jury

17   finds -- if the jury agrees with SIS that the relevant

18   antitrust market is MIST surgical robots and if the jury agrees

19   with SIS that Intuitive had dominant market power in the

20   relevant antitrust market as defined, is it still -- it still

21   necessary to go under the lock-in factors?

22        Because, I think, if that's not the case, I think, if we

23   prove the relevant antitrust market is MIST surgical robots in

24   the United -- well, in the United States is stipulated to --

25   and we prove 99.5 percent market power in that market that

 1    *Kodak*, not *Epic*, *Kodak* says there's no need to go and look at

 2    the lock-in factors.

 3        I went back and looked at the case that they cited.  I

 4    would like to get some guidance from Your Honor on what the

 5    intention is and if it's -- I just want it to be very clear

 6    that if there's a relevant market proven and dominant market

 7    power in that market, it's still necessary to prove the lock-in

 8    factors.

 9             **THE COURT:**  So if I'm hearing you, Mr. McCaulley,

10    you -- I guess that is how I understand -- that is how I

11    understand the jury charge -- right? -- that ultimately --

12    right, that to establish a single-brand aftermarket, you need

13    to prove each of these -- each of these factors.

14        But I feel like there's an element of your question that

15    I'm missing.

16             **MR. McCAULLEY:**  No.  I'm -- well, I think Your Honor's

17    previous ruling was we were going to wait and see how the

18    evidence developed and that at the summary judgment point, that

19    the hospital plaintiffs had not proven a relevant antitrust

20    market or a dominant market power.

21        So at that stage, the *Epic Games* factors were the only way

22    to establish that.  I think it's contrary to the law, Your

23    Honor.  I think we have to go back and have a think.

24        I'd like to brief this issue because we have not

25    extensively briefed this issue.  It was extensively briefed by

```
 1    my friends, but we weren't involved.

 2         And I think that this is the most important issue that

 3    we'll talk about today, and I think it raises considerations

 4    for us and -- but I think that the proper instruction here --

 5    the proper verdict form would be if you -- and I understand

 6    it's Rube Goldberg; I understand that it's complicated.

 7         But if you find that MIST surgical robots is a relevant

 8    antitrust market and if you find that Intuitive has, at all

 9    times relevant to this case, had dominant market power in that

10    market, then you need not consider the lock-in factors.

11              THE COURT:  So I'm going to differ with you.

12         I agree with you that you all did not -- that SIS was not

13    party to the briefing that occurred in the hospital plaintiffs'

14    case at summary judgment.  And, certainly, you weren't party to

15    the reconsideration motion and everything that happened

16    thereafter, yes.

17         I will disagree with you that you haven't had an

18    opportunity to brief this or submit anything on it because this

19    has been in the proposed jury instructions and you had an

20    opportunity before the pretrial conference to submit your

21    counterproposal, your reason for your proposals.

22         So -- and those didn't -- believe you me, I know they

23    didn't have page limits.  So if you had more to say at that

24    point -- I have everything from you all.  You've argued about

25    this.  I have it.
```

 1    And you're -- so to that degree -- to that degree, I will
 2  disagree with you that you haven't had a chance to address
 3  this.
 4    For what it's worth, the part that you're reading to me
 5  from the motion for reconsideration, my -- I mean, I --
 6  actually, I don't want to walk through it because it's not part
 7  of this case.
 8    Ultimately, right, what happened in that case is that I
 9  had concluded -- I had concluded that there was not -- if I
10  remember, it's that there wasn't market power in the foremarket
11  but had concluded that there was power in the aftermarket.
12    And what was brought to my attention is that that runs
13  contrary to Ninth Circuit law and that I really should give
14  second thought to whether I wanted to leave that order in
15  place.
16    And to my own chagrin perhaps, because I have since gotten
17  more motions for reconsideration in all sorts of cases, I went
18  ahead and reconsidered.  So -- but that's a different posture
19  than where we are now.
20    So I think this is -- Mr. McCaulley, I'm not sure that
21  I've -- I'm not sure I'm answering your question.
22    But my best sense, then, of the law is you have to prove
23  the foremarket.  You need to prove -- you're going to have to
24  prove both markets.
25    And I think that's the point of those jury instructions.

1    I don't know, Mr. Michael, if you -- you don't need to say

2    that -- I don't know that -- you're welcome to add anything

3    that you'd like to.

4        But to the extent that Mr. McCaulley is asking me either

5    for a further opportunity to address this or maybe just for

6    guidance for me to explain sort of my thinking on it, that's

7    the best I have to offer.

8        MR. MICHAEL:  And, Your Honor, I would just add that

9    I believe the Court has correctly stated the law.  I believe

10   the Court's jury instruction correctly states the law in the

11   Ninth Circuit.  It's straight out of *Epic*.

12       And that Mr. McCaulley's argument misstates the law.  I

13   won't repeat the argument from earlier.  There is no binding

14   authority on this Court that says that if there is a showing of

15   market power or dominant market power, which is an entirely new

16   standard that Mr. McCaulley is proposing, then you don't have

17   to prove the *Epic* factors in order to establish a single-brand

18   aftermarket.

19       *Epic* itself, as well as *Coronavirus Reporter*, is to the

20   contrary.  And so the Court's instruction is correct.

21       MR. McCAULLEY:  Your Honor, my point is *Kodak* is

22   binding on everybody.  That's the Supreme Court from 1992.

23       And I wasn't arguing for a new standard for dominant.  I

24   was just pointing out that if we prove market power, it's based

25   on our assessment of 99.5 percent market share in that market.

 1          But I -- and I just -- I did want to be clear that

 2   Your Honor's ruling is that even in light of proof of market

 3   power in a relevant antitrust market, the lock-in factors must

 4   still be proven.

 5          **THE COURT:**  When you say "the lock-in factors," you

 6   mean the *Epic* factors about single-brand aftermarkets; is that

 7   right?

 8          **MR. McCAULLEY:**  Yes.

 9          **THE COURT:**  Then, yes.  I want to make sure we're

10   saying the same thing.

11       All right.  Mr. Michael, I think you were going to walk me

12   through -- you had one more -- no, you were done.  I'm sorry.

13       Mr. McCaulley, did you have something else?

14          **MR. McCAULLEY:**  That was my one more thing, Your

15   Honor.

16          **THE COURT:**  Okay.  Before you both step away, I have

17   my initial question which, rightly, I think, was ignored but

18   I'm going to put to both of you again.

19       Table of contents, in or out for the jury?

20          **MR. McCAULLEY:**  Plaintiffs are fine with it in, Your

21   Honor.

22          **MR. MICHAEL:**  We're fine with it staying in.

23          **THE COURT:**  All right.  Then we will leave it.

24       Okay.  I like tables of contents and roadmaps.

25       All right.  So let's talk verdict form.

PROCEEDINGS

1    I had flagged for you all -- well, I asked you all to come

2 prepared to discuss Intuitive's proposed jury verdict form

3 which should have telegraphed, and maybe I could have been more

4 explicit but -- I intend to use it, but had -- well, I want to

5 hear from you all about that.

6    I imagine Mr. Michael has little-to-nothing to say about

7 that, in part, because it's your proposal.  I do want to give

8 plaintiffs an opportunity to speak to -- to speak to this.

9    I do want to note a couple -- I think there was only one

10 edit -- there's a couple of edits that I will make to

11 Intuitive's proposal, including, on the final page -- on

12 page -- it's page 7 of -- and I'm looking at document ECF 429,

13 what's page 7 of the ECF but is page 6 from the document.

14    I think that's supposed to be Question 13 and not 14.

15         **MR. MICHAEL:**  That appears correct, Your Honor.

16         **THE COURT:**  And just so you're not surprised, instead

17 of saying "court security officer," I will edit that to say "my

18 courtroom deputy."

19    And one other thing.  For Question Number 9 -- I'm trying

20 to think if there's one more place -- yes, and so that would

21 also be for -- and for Number 13, I did like that SIS' verdict

22 form had the dollar sign for both Number 9, and then that would

23 also go at Number 13, just because -- I don't know; it feels

24 like it's just making it real clear what that is.

25    So those are the two things that I'm proposing to change.

PROCEEDINGS

1          The piece that -- I wanted to give plaintiffs an

2    opportunity to talk with me more about the verdict form and

3    also, where there are blanks, about which instructions to --

4    which instructions the verdict form should direct the jury.

5          I want you to tell me which instructions they are.

6          So lets start, Mr. Van Hoven, if you would, with just your

7    thoughts on this verdict form, please.

8              MR. VAN HOVEN:  So we'd be referencing -- we'll

9    reference the tentative jury instructions, knowing that these

10   numbers will move because there have been some changes.

11             THE COURT:  Oh.  Well, before you give me the numbers,

12   Mr. Van Hoven, is there any other -- are there any other

13   remarks you want to make about the verdict form itself?

14             MR. VAN HOVEN:  If we're going with this form, there's

15   not changes to be made further.

16             THE COURT:  Are there any other objections you want to

17   make about the form?

18             MR. VAN HOVEN:  No objections.

19             THE COURT:  Okay.  Then -- and, you know, I will --

20   let me ask this.

21         I'm realizing now that since there are insertions, the

22   numbers will change.  So instead of my asking you all to do

23   this on the fly or to give me the numbers that were --

24   actually, no.

25         I'm going to -- if you have them ready, Mr. Van Hoven,

PROCEEDINGS

 1    I'll take them, if you would.

 2            MR. VAN HOVEN:  I apologize.  I don't have those ready

 3    on the form at this moment.

 4            THE COURT:  That's okay.  Let me ask if Mr. Michael

 5    happens to have them.

 6            MR. MICHAEL:  We could do it by page number, Your

 7    Honor, in the Court's Docket 437, if that would be helpful.

 8            THE COURT:  Can I ask you, Mr. Michael, will that --

 9    let's do it that way now.  And then to the extent that we end

10    up, for example, including -- there's at least one or two of

11    your proposals that are now being included.  So that will

12    actually -- that should work.  And then as it shifts, I can

13    keep track of that.

14            MR. MICHAEL:  Okay.  Great.

15        So for Question 3, whether SIS has proven all the elements

16    of a tying argument, I think that would be pages 31 through 37

17    in Docket 437.

18            THE COURT:  Mr. Van Hoven, I'm going to ask

19    Mr. Michael to just go all way through.  And if you have

20    thoughts on his numbers, you'll speak up at the end.

21        Does that work?

22            MR. VAN HOVEN:  That works.

23            THE COURT:  Great.

24            MR. MICHAEL:  So, Your Honor -- sorry.  One -- well,

25    I'll come back to this.

 1          Okay.  So that's for the Tying Claim.

 2          For Question 5, the Exclusive Dealing, so the elements are

 3   at 39 through 45, pages 39 through 45.

 4          For Monopolization, it would be pages 46 through 56.  And

 5   that's Question 6.

 6          And then Question 7 would be pages 57 through 61.

 7          And I realized, Your Honor, that I skipped over

 8   Question 4.

 9              **THE COURT:**  For Business Justification?

10          **MR. MICHAEL:**  So -- yes.  That should be page 38.

11          And I think we're on to question Number 8 now.  And that

12   is Injury and Causation.  So those instructions would be at --

13   starting at page 62 and going to 64.

14          And then Damages for SIS' Claims, Question 9, that would

15   be 65 through 72.

16          And, again, I suppose this pagination could change and

17   we'll have to update this once the instructions get added.

18          So for the Lanham Act Counterclaim, Question Number 10,

19   that would be pages 74 through -- I believe it is 77.

20          And then Question 11, Unfair Competition, would be

21   page 78.

22          Question 12 on Tortious Interference would be page 79.

23          And the now correctly-numbered Question 13 would be

24   page 80.

25              **THE COURT:**  Any thoughts on that, Mr. Van Hoven?

1        **MR. VAN HOVEN:**  I don't see anything different there.

2        **THE COURT:**  Great.

3     Folks, I think that is everything -- go ahead.

4        **MR. MICHAEL:**  I apologize, Your Honor.

5     Mr. Gallo is reminding me that I had focused on the

6  substantive elements of each of the claims, but there are the

7  instructions that apply across the board, the relevant market

8  instructions, which we don't have reference to in Questions 1

9  and 2.  I think those should probably be added to the relevant

10 questions.

11       And then the General Rule of Reason instructions, I think,

12 should be incorporated into both the tying and the exclusive

13 dealing claims into those questions.  They could just be added

14 to the substantive elements.

15       And those Rule of Reason instructions are pages 25 through

16 28.

17       So just to be clear, we would be proposing to add 25

18 through 28 to Question 3 and to Question 5 in addition to the

19 ranges that I read earlier.  And then we would propose to

20 include a reference to the Relevant Market instructions,

21 pages 21 through 23 and Questions 1 and 2.

22       **THE COURT:**  And I imagine you would propose language

23 similar to what's in Question 3, which is, "according to the

24 elements" -- would it be -- yeah, well --

25       **MR. MICHAEL:**  "According to the instructions at..."

PROCEEDINGS

1            **THE COURT:**  "At pages 21 to 23"?

2           **MR. MICHAEL:**  Yes, Your Honor.

3           **MR. VAN HOVEN:**  Your Honor, briefly.

4       As to the Market Questions, that seems to make sense.

5       As to the Rule of Reason, those are already baked into the

6  claims.  That's what we were talking about with 12 and 29 and

7  40 before.  And so they're meant to get an introduction, but

8  they'll still have -- I think it would be confusing to be going

9  back up when you already have that in the claims baked in.

10         **THE COURT:**  And if I'm following you, Mr. Van Hoven,

11  you're suggesting that we don't need 25 to 28 put into

12  Question 3 and 5; is that right?

13         **MR. VAN HOVEN:**  That's right.

14         **THE COURT:**  That will be part of what I take with me.

15  Folks, we will work to get you a clean one and final one soon.

16  No promises on what that means.  But anything else, Counsel,

17  before I run away for real?

18         **MR. MICHAEL:**  Not from Intuitive.

19         **MR. VAN HOVEN:**  Nothing, Your Honor.

20         **THE COURT:**  All right.  Counsel, thank you.  See you

21  all tomorrow.

22         **MR. MICHAEL:**  Thank you, Your Honor.

23        (Proceedings adjourned at 11:58 a.m.)

24              ---o0o---

25

1

2                        **CERTIFICATE OF REPORTER**

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:    Monday, January 27, 2025

7

8

9

10   _____

11      Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
              Official Reporter, U.S. District Court

12

13

14

15

16

17

18

19

20

21

22

23

24

25