# Exhibit 3

1

1

2

3

4          UNITED STATES DISTRICT COURT

5          CENTRAL DISTRICT OF CALIFORNIA

6                SOUTHERN DIVISION

7                    - - -

8    THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

9

10   INNOVATIVE HEALTH, LLC,        ) CERTIFIED TRANSCRIPT
                    Plaintiff,  )
11        vs.                       )
                                    )   SACV-19-01984-JVS
12   BIOSENSE WEBSTER, INC.,        )
                    Defendant.  )
13   ---------------------------)

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16            Santa Ana, California

17             April 14, 2025

18

19                    SHARON A. SEFFENS, RPR
                      United States Courthouse
20                    411 West 4th Street, Suite 1-1053
                      Santa Ana, CA  92701
21                    (612) 804-8655

22

23

24

25

2

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiff:

 3    DEREK T. HO
      ANDREW E. GOLDSMITH
 4    MATTHEW D. READE
      KELLEY SCHIFFMAN
 5    KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, PLLC
      1615 M Street N.W., Suite 400
 6    Washington, D.C.  20036
      (202) 326-7900
 7
      JOSHUA PAUL DAVIS
 8    MATTHEW I. SUMMERS
      BERGER MONTAGUE, PC
 9    505 Montgomery Street, Suite 625
      San Francisco, CA  94111
10    (415) 906-0684

11    JEFFREY L. BERHOLD
      JEFFREY L. BERHOLD, PC
12    1230 Peachtree Street, Suite 1050
      Atlanta, GA  30309
13    (404) 872-3800

14    PANTEHA ABDOLLAHI
      THEODORA ORINGHER, PC
15    535 Anton Boulevard, Ninth Floor
      Costa Mesa, CA  92626-7109
16    (714) 549-6200

17    For the Defendant:

18    WILLIAM FRANCIS CAVANAUGH, JR.
      ALEJANDRO H. CRUZ
19    PATTERSON BELKNAP WEBB & TYLER, LLP
      1133 Avenue of the Americas
20    New York, NY  10036
      (212) 336-2000
21
      KARLA J. KRAFT
22    STRADLING YOCCA CARLSON & RAUTH, LLP
      660 Newport Center Drive, Suite 1600
23    Newport Beach, CA  92660-6422
      (949) 725-4000
24

25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

1   MUHAMMAD USMAN FARIDI
     LINKLATERS, LLP
2   1290 Avenue of the Americas
     New York, NY  10104
3   (212) 903-9314

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | SANTA ANA, CALIFORNIA; MONDAY, APRIL 14, 2025; 11:07 A.M. |
| 2 | THE CLERK:  Calling Item No. 2, SACV-19-01984-JVS, |
| 3 | Innovative Health, LLC, versus Biosense Webster, Inc. |
| 4 | Counsel, if you could please state your |
| 11:07 5 | appearances for the record. |
| 6 | MR. HO:  Good morning, Your Honor.  Derek Ho from |
| 7 | Kellogg Hansen for the plaintiff.  My colleagues will |
| 8 | introduce themselves with the Court's permission. |
| 9 | THE COURT:  Good morning. |
| 11:07 10 | MR. GOLDSMITH:  Good morning, Your Honor.  Andrew |
| 11 | Goldsmith also from Kellogg Hansen for the plaintiff. |
| 12 | THE COURT:  Good morning. |
| 13 | MR. READE:  Matthew Reade from Kellogg Hansen also |
| 14 | for the plaintiff. |
| 11:07 15 | THE COURT:  Good morning. |
| 16 | MR. DAVIS:  Good morning, Your Honor.  Josh Davis, |
| 17 | Berger Montague, also for the plaintiff. |
| 18 | THE COURT:  Good morning. |
| 19 | MR. BERHOLD:  Good morning, Your Honor.  Jeff |
| 11:07 20 | Berhold for plaintiff. |
| 21 | THE COURT:  Good morning. |
| 22 | MS. ABDOLLAHI:  Good morning, Your Honor.  Panteha |
| 23 | Abdollahi for the plaintiff. |
| 24 | THE COURT:  Good morning. |
| 11:07 25 | MR. SUMMERS:  Good morning, Your Honor.  Matt |

5

| | |
|---|---|
| 11:07 | 1 |
| | 2 |
| | 3 |
| | 4 |

```
11:07    1    Summers from Berger Montague on behalf of the plaintiff.

         2            THE COURT:  Good morning.

         3            MS. SCHIFFMAN:  Kelley Schiffman with Kellogg

         4    Hansen on behalf of the plaintiff.

11:08    5            THE COURT:  Good morning.

         6            MR. CAVANAUGH:  Good morning, Your Honor.  Bill

         7    Cavanaugh, Patterson Belknap, on behalf of the defendants.

         8            THE COURT:  Good morning.

         9            MS. KRAFT:  Good morning, Your Honor.  Karla Kraft

11:08   10    of Stradling on behalf of the defendant.

        11            THE COURT:  Good morning.

        12            MR. CRUZ:  Good morning, Your Honor.  Alejandro

        13    Cruz from Patterson Belknap on behalf of the defendant.

        14            THE COURT:  Good morning.

11:08   15            MR. FARIDI:  Good morning, Your Honor.  Muhammad

        16    Faridi, Linklaters, on behalf of the defendant.

        17            THE COURT:  Good morning.

        18            This matter is here for the pretrial conference.

        19    Let's take up first the motions in-limine.

11:08   20            Plaintiff's first dealing with the order of proof

        21    with regard to supercompetitive prices.

        22            Would you like to be heard on that?

        23            MR. HO:  Your Honor, we'll rest on the papers.

        24            THE COURT:  Okay.

11:08   25            The second motion relates to advice of counsel.
```

11:09    1          Would you like to be heard on that?

2          MR. HO:  We'll rest on the papers, but we will

3    respond in rebuttal if defendant wishes to argue.

4          THE COURT:  Okay.

11:09    5          Mr. Cavanaugh.

6          MR. CAVANAUGH:  Your Honor, we'll rest on the

7    tentative on supercompetitive prices, advice of counsel, as

8    well as personal wealth, but we would argue the late

9    disclosure issue.

11:09   10          THE COURT:  Okay.  Well, let's take that one up

11   next.

12          MR. FARIDI:  Good morning, Your Honor.

13          Your Honor, we have read your tentative ruling on

14   the issue very carefully, but given the significance of the

11:09   15   damages award that may be affected, $30 million or

16   $90 million if it's trebled, we felt compelled to argue this

17   morning.

18          I just want to highlight four things at the

19   beginning and then go through each of them one by one.  The

11:10   20   first is that there is absolutely no dispute here that the

21   error in the data that was provided to the plaintiff on

22   September 19, 2024 -- that that data was an inadvertent

23   error on our part.

24          THE COURT:  The first error, I don't have a

11:10   25   problem with it.  A little bit late, corrected, but not

11:10   1   beyond the bounds.

2           MR. FARIDI:  All right.  And there was certainly

3   no -- and I think the plaintiff is not contesting

4   this either.  There certainly was no bad faith or

11:10   5   gamesmanship on our part.

6           And I think the third point, which is really

7   critical, is there is absolutely no prejudice to them

8   whatsoever.  Why is there no prejudice?  Because we provided

9   the corrected data to them in January 2025.  Their expert,

11:11   10  Dr. Forister, baked the corrected data into the rebuttal

11  report that he provided in February of 2025.  So their

12  expert has already utilized that data in coming up with the

13  correct damages calculation on their part, and that damages

14  calculation as a result of the corrected data is $30 million

11:11   15  lower than the damages calculation would be if they were to

16  use the incorrect data that was provided to them in

17  September of 2024, so certainly no prejudice on their part.

18          What they do in the reply brief, Your Honor, is

19  they point out a few purported flaws in the data that we

11:11   20  provided to them in January of 2025.  Had they pointed out

21  those flaws in their opening papers, we would have responded

22  to them in our response brief.  Had they pointed out those

23  flaws anytime between January 2025 and when they filed their

24  motion in-limine on the issue, we would have responded to

11:11   25  them.  But we do have responses to the various flaws that

11:12    1    they are purportedly pointing out in their papers.

2            So, for instance -- I'll just give you a couple of

3    examples, Your Honor.  The first thing that they complain

4    about is that the new data that we gave to them in

11:12    5    January of 2025 changes the name for a few of the hospitals,

6    okay.  I'll give you an example.  One of the hospitals in

7    the old data that we gave them in September of 2024 -- the

8    name of that hospital in that data was PHI Good Samaritan.

9    The January 2025 data reflects the new name of that same

11:12    10    hospital, and the new name is Good Samaritan.  We omit the

11    PHI because the hospital went through a name change.

12            I'll give you another example.  They talk about

13    the list price in the data we disclosed to them in

14    September of 2024 is different than the list price in the

11:12    15    data that we provided to them in January 2025, but what they

16    failed to point out in their reply brief is that the list

17    price has no bearing whatsoever on their damages

18    calculation.  That's the list price that we list for the

19    catheters.  It's not the actual price that the hospital paid

11:13    20    to us.  The actual price did not change.  The list price

21    changed because they went up.  So that change has no impact

22    whatsoever on their damages calculation.

23            I'll give you a third example, and this is one

24    that they actually spent a full page on in their reply

11:13    25    brief.  They say the standard costs for the products, some

11:13   1    of the catheters, are different in the September 2024 data

2    relative to what they are in the January 2025 data, okay.

3    And -- but what they also failed to point out is that our

4    standard costs -- this is Biosense Webster's standard costs

11:13   5    -- have absolutely no impact whatsoever on their damages

6    calculation.  Their damages calculations are based on the

7    number of catheters, the number of widgets sold, and their

8    costs.  Our costs have no bearing on their damages analysis.

9         So they make mountains, Your Honor, out of little

11:14   10   molehills, if they are molehills at all, in arguing that the

11   new data that we gave them has flaws in it.

12        Now, we heard, Your Honor, the data was late

13   disclosed.  If Your Honor is inclined to --

14        THE COURT:  Well, there's no question about that.

11:14   15        MR. FARIDI:  Yes, absolutely.

16        THE COURT:  I mean, your argument rests on whether

17   there's harm.

18        MR. FARIDI:  There's no harm.  And, Your Honor, if

19   Your Honor is inclined to award some sort of measure to

11:14   20   address the late disclosure here, what would be appropriate

21   here is to award them a deposition.  We'll pay the costs and

22   the fees associated with a deposition.  And, you know, this

23   is the type of sanction that I think is awarded in Rule 37

24   motions that are considered within the Circuit, not the

11:14   25   ability to rely upon data that they know and we know is

11:15    1    wrong, and that erroneously inflates their damages by

2    $30 million, and if those damages -- if they're able to

3    establish liability, if those damages are trebled,

4    $90 million.  That is just fundamentally unfair, Your Honor.

11:15    5            And one last thing I'll say, Your Honor, and I'll

6    sit down, and I'm happy to address any questions that Your

7    Honor may have, is in your tentative ruling on our Daubert

8    motion challenging Dr. Forister's, their expert's,

9    eleventh-hour definition of the "foremarket," something

11:15    10   which is a core issue in this case, their expert never

11   addressed this issue in 2021, but late -- at the end of this

12   case, he snuck in a new definition.  Your Honor said, you

13   know, there's no prejudice to us because we had an

14   opportunity to respond to it.  Fine.  We accept that ruling.

11:15    15           The same principle should be applied to their

16   application here to prevent us from relying upon what both

17   sides know is correct data, and neither side should be

18   forced to use incorrect data at the upcoming trial that

19   would give them a windfall of $30 million or perhaps

11:16    20   $90 million if they're able to establish liability.

21           THE COURT:  Okay.  Thank you.

22           Mr. Ho, if your expert was able to absorb the

23   January disclosures in the January data and reflect those in

24   his report, where is the prejudice?

11:16    25           MR. HO:  The prejudice, Your Honor, is in the very

11:16  1   opening thing that counsel said, which is the assertion

2   without evidence to back it up and with explanations that

3   we're hearing for the first time that the data, the new

4   data, are the correct data.  That's a matter in dispute,

11:16  5   Your Honor.

6          THE COURT:  Well, was your expert able to absorb

7   the January data or not and reflect it in his report?

8          MR. HO:  Our expert could take the new data and

9   rerun the model on the assumption that the new data in the

11:17  10  new dataset were accurate, but he had no opportunity to --

11         THE COURT:  What would you need to test the

12  accuracy?

13         MR. HO:  Well, for example, the explanations that

14  you just heard, Your Honor, on the --

11:17  15         THE COURT:  No, what would you need to test the

16  accuracy?

17         MR. HO:  We would need depositions of a range of

18  the Biosense witnesses about how the data were pulled, why

19  there are the discrepancies that exist on a number of

11:17  20  dimensions.  Ninety percent of the data changed from the old

21  data to the new data.  Ninety percent of the values changed,

22  and we have no explanation as to why that was.  We're

23  getting explanations dribbled out over the course of the MIL

24  briefing, many explanations now for the first time on

11:17  25  April 14 at the final pretrial conference.  We don't have

11:17    1    time to explore all of this, and there is a lot to explore.

2    The idea that this is just a simple issue of 12,000 or some

3    number of duplicative rows in the data just is not accurate.

4    There are lots of discrepancies that call into question the

11:18    5    premise of the new data --

6             THE COURT:  Please don't bang the lectern.

7             MR. HO:  Oh, I'm sorry.

8             THE COURT:  Go ahead.

9             MR. HO:  There are many discrepancies that call

11:18    10    into question the premise of the entire argument being made

11    by Biosense, which is that the new data are obviously

12    correct.

13             THE COURT:  If you took a deposition or more than

14    one deposition, who would you depose?

11:18    15             MR. HO:  Well, we know of only one person who was

16    involved, and that's Mr. Dela Cruz.  We don't know who else

17    was involved.  We don't even have the SQL Script that was

18    used to pull the data, either the old data or the new data.

19    This would become a very significant exercise, and we would

11:18    20    need additional -- not only additional documents and data,

21    but also depositions of people whose identity we don't

22    really even know at this point.

23             THE COURT:  Okay.

24             MR. HO:  And all of this, again, is caused by the

11:19    25    undisputedly untimely production, and I would also say the

11:19    1    complete inability of Dr. Wu at his deposition several

    2    months after the production of the data to provide us with

    3    any explanation.  Dr. Wu himself I don't think knows the

    4    answers to a lot of these questions.  And so really what

11:19    5    this is, is backfilling Dr. Wu in addition to causing great

    6    prejudice to Innovative.

    7                THE COURT:  Okay.  Thank you.

    8                MR. HO:  Thank you.

    9                MR. FARIDI:  May I respond briefly, Your Honor?

11:19   10                THE COURT:  Please.

   11                If they wanted to test the data, who should they

   12    depose other than Mr. Dela Cruz?

   13                MR. FARIDI:  I think Mr. Dela Cruz is probably the

   14    only witness, Your Honor, who they can depose.  And if there

11:20   15    was another witness, I would confirm --

   16                THE COURT:  You say can depose.  Is there somebody

   17    else?

   18                MR. FARIDI:  I would need to check with our client

   19    on it, but I think he is the only one, and we can confirm

11:20   20    that, Your Honor.  We can let the other side know and Your

   21    Honor know as well.

   22                THE COURT:  Okay.

   23                MR. FARIDI:  I just want to say three things.  The

   24    first is this notion that Dr. Wu, our expert, wasn't able to

11:20   25    articulate the reasons why the code that was used to extract

11:20   1   the data in 2024 was incorrect.  Dr. Wu is an expert

  2   witness.  He didn't pull the data.  He relied upon the data

  3   that the company gave.  In fact, to his credit, when he saw

  4   the data when he was preparing his responsive report, he

11:20   5   identified the issue after his team, who are all quants and

  6   people with Ph.Ds, went through the spreadsheet and

  7   identified the error.  And we told them right away.  Within

  8   a week, they had the new data.  That was the first thing,

  9   Your Honor.

11:20   10   The second thing is we'll happily make Mr.

  11   Dela Cruz available for a deposition at their convenience as

  12   soon as the witness is available.

  13   THE COURT:  If I ordered it, it would be

  14   immediately, within seven days.

11:21   15   MR. FARIDI:  Absolutely, Your Honor.

  16   And the third thing, I'm just -- I was reluctant

  17   to pass this up before, Your Honor, but I think it is

  18   important for Your Honor to get a flavor of what went wrong

  19   here.  This is attached as Exhibit 1 to the Weingram

11:21   20   declaration, and with Your Honor's permission, if I can

  21   approach the bench.

  22   THE COURT:  Please.

  23   Sir, sir --

  24   MR. FARIDI:  I'm sorry.

11:21   25   THE COURT:  Old tradition.

11:21  1           (Document handed to the Court)

2           MR. FARIDI:  So this is what went wrong, and Your

3  Honor only needs to take a look at the first two rows, okay.

4  And you see here there is a catheter here that's titled

11:22  5  "Ultrasound."  It's the SOUNDSTAR Eco 8-French Catheter

6  that's in the second row.  And you see there, Your Honor,

7  there are four units sold in the first row if you look at

8  it, four units sold, and there's a total sales price here of

9  $9,416.

11:22  10          And this catheter is sold on April -- in April of

11  2021 to a hospital known as Advocate Sherman Hospital, okay.

12  That same row is duplicated.  There's two rows for the same

13  exact entry.  The first entry reflects a standard cost.

14  This is the third column from the right.  It's a fraction of

11:22  15  a penny.  It's a 30th of a penny, okay.  And the second row,

16  the row immediately below that, shows the standard cost of

17  that catheter sale as $914, okay.

18          That's what happened here.  The same sale was

19  duplicated.  The first sale is a fictitious sale that never

11:23  20  took place, and therefore, the cost associated with that

21  sale is listed as a fraction of a penny.  The second sale is

22  the sale that actually took place, and we know that because

23  the date of the sale is the same as the first one.

24          So this is something, you know, yes, Dr. Wu picked

11:23  25  up on.  This was in his spreadsheet, and frankly, Your

| | |
|---|---|
| 11:23 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:23 | 5 |

11:23  1   Honor, their expert could have picked up on it.  They were

2   asking us a lot of questions about the data when it went in.

3   We answered those questions when we gave them this data in

4   September of 2024.  Not a single question asked about it,

11:23  5   about this type of stuff.

6          So we hear Your Honor.  We'll make Mr. Dela Cruz

7   available as soon as Your Honor orders him, but I just

8   wanted Your Honor to get a flavor of what actually happened

9   here, what actually went wrong here.

11:23  10          THE COURT:  Okay.

11          MR. FARIDI:  Thank you, Your Honor.

12          THE COURT:  I'm going to deny the motion and order

13   the Dela Cruz deposition within seven days.  To the extent

14   it leads to other people, meet and confer.  If you can't

11:24  15   agree, come back ex parte promptly.  I want to get this data

16   out there.  If there's work to be done, I want to make sure

17   there's sufficient time, although under pressure, to get it

18   done.  So this motion will be denied.  I'll modify the

19   tentative.

11:24  20          The fourth one relates to personal wealth of the

21   co-founders.

22          Do you want to be heard on that one?

23          MR. READE:  We'll submit on the tentative, Your

24   Honor.

11:24  25          THE COURT:  Okay.  Thank you.

11:24  1          Let's turn to Biosense's motion with respect to

2    the MAUDE data.

3              MR. CAVANAUGH:  Your Honor, we would ask to

4    briefly argue that.

11:25  5              THE COURT:  Please.

6              MR. CRUZ:  Good morning, Your Honor.

7          We have reviewed Your Honor's tentative, and we

8    appreciated the opportunity to sort of get a preview of that

9    reasoning.  I don't want to belabor the point here and

11:25 10   rehash all of our briefing, but I want do want to hone in,

11   Your Honor, on two points from the tentative.

12             The first is the concern that Your Honor expressed

13   about the FDA's disclaimer given Innovative's potential use

14   of this data.  And just for a reminder, the FDA tells us

11:25 15   that the MAUDE data -- it is not intended to be used either

16   to evaluate rates of adverse events or to compare event

17   rates of adverse occurrences across devices.  And that makes

18   sense, right, because the MDRs in the MAUDE data are

19   passively collected.  They're not vetted by the FDA in any

11:26 20   meaningful way, and they contain known irregularities.  And

21   most importantly, Your Honor, it is data --

22             THE COURT:  Isn't that pretty good

23   cross-examination material?

24             MR. CRUZ:  Well, Your Honor, I think

11:26 25   cross-examination may cure some of this.  But what I'd offer

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:26    1    to the Court is that the irregularities, because of the

2    issues about correlation and causation that are going on

3    here -- and to be clear, Innovative leans right into the

4    fact that when it comes to what Dr. Forister or any other

11:26    5    witness is going to offer on this data, it's going to be a

6    causation opinion, because he has to assume causation to get

7    to the opinion that Innovative catheters based on the mod

8    data are safer and higher quality than the original

9    manufactured ones.  And I think this goes right to the

11:26    10    Court's --

11                THE COURT:  But why does that fall under

12    causation?

13                MR. CRUZ:  I'm sorry, Your Honor?

14                THE COURT:  Why does that fall under causation?

11:26    15                MR. CRUZ:  Well, Your Honor, I think it's

16    important to walk through how we get from the MAUDE data to

17    that opinion.  The MAUDE data reflects events that are

18    associated with particular medical devices, in this case,

19    the catheter's adverse events.  And what the FDA tells us is

11:27    20    that what we cannot tell from the MAUDE data and what it

21    cannot show us is whether those catheters actually caused

22    the event.  It's pure correlation.  But for purposes of an

23    opinion that actually goes to the point of safety, that

24    actually tells the jury Innovative catheters are safer.  I

11:27    25    think this is actually one step removed from pure causation,

11:27    1    but one step removed in a --

2          THE COURT:  But it's removed.

3          MR. CRUZ:  Well, I think it's --

4          THE COURT:  You characterize it as being removed

11:27    5    at a minimum, true?

6          MR. CRUZ:  I think it's removed, but in the worst

7    way, Your Honor, because it doesn't just -- it doesn't

8    analyze the question of causation.  What Dr. Forister is

9    going to do is assume causation.  He's going to assume the

11:27   10    underlying causation between catheter X and the adverse

11    event so that he can tell the jury that these products are

12    safer.

13          And that's what's especially dangerous about this

14    data, Your Honor, especially given some of the circumstances

11:28   15    that we know in this case.  For example, before 2020, there

16    was no distinction made in this FDA data between reprocessed

17    used catheters and originally manufactured catheters.  So

18    any event report would have been grouped under a Biosense

19    name, under a -- and there's actually an example of this.

11:28   20          THE COURT:  Does the data distinguish between new

21    and used?

22          MR. CRUZ:  The MAUDE data prior to 2020 did not

23    distinguish between new catheters and used catheters, but

24    the one caveat to that, Your Honor, is if you read down some

11:28   25    of the text, you're able to see -- for example, if the Court

| | |
|---|---|
| 11:28 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:29 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 11:29 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 11:29 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 11:29 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 11:30 | 25 |

is inclined to look at page -- I'm sorry, Exhibit 5 to the Weingram declaration, here the actual example that we put in, the label on it is a Biosense label because that's where the catheter started.  But if you read down in the text, as it turns out, it's actually a Stryker reprocessed catheter.  So I think that's one -- that's sort of one circumstance that's specific to this case that makes data that we know to be unreliable, that the FDA knows to be unreliable, that Innovative's EP witness knows to be unreliable, makes it even more unreliable in this case.

And going back to Your Honor's question about cross-examination, I think this is an instance where this data -- and I think Your Honor appreciates in the tentative and acknowledges that the causation opinion -- that courts acknowledge that causation is not appropriate here.

THE COURT:  Right.

MR. CRUZ:  And I think what's going on, because we're assuming causation, because this becomes more dangerous for the jury because of this underlying correlation that Dr. Forister is going to opine causation on -- I think we get to a point where once those opinions are out there based on this data, yes, there could be cross-examination.  But for the same reason those cases that looked at causation say that this is -- has the potential for unfair prejudice, the horse is kind of out of the barn

11:30    1    once these opinions get out there.  And based on data that

2    we know -- I don't think the FDA disagrees and I don't think

3    their EP physician disagrees that this is unreliable data.

4             So those are the two points I think are really

11:30    5    important for the Court to keep in mind.  And I would just

6    point once to the Court's tentative where, you know, the

7    case law favors exclusion, but the data are not being used

8    for that purpose.  And for the reasons I've explained, I

9    just want to push on that a little because I think the

11:30    10    causation issue for the reasons I've explained is exactly

11    what Innovative would be using it for.

12             THE COURT:  Okay.

13             MR. CRUZ:  Thank you, Your Honor.

14             THE COURT:  Thank you.

11:30    15             Who is going to address this?

16             MR. SUMMERS:  I will, Your Honor.

17             THE COURT:  And for the record?

18             MR. SUMMERS:  Matt Summers.  Thank you, Your

19    Honor.

11:31    20             From Dr. Forister's first report, he has commented

21    on the quality of Innovative catheters, which are equal to,

22    if not superior, to Biosense catheters, and he's relied on a

23    number of sources for that information, including complaint

24    data that's separate from MAUDE that comes from both parties

11:31    25    and other manufacturers.

11:31   1              That's backed up by academic research that shows

2       that reprocessed catheters are safe, and in the post-remand

3       reports, it's supplemented with MAUDE data, which he finds

4       is correlated with the complaint rate data in this case

11:31   5       showing that reprocessed catheters are equally safe, if not

6       more, than Biosense catheters.

7              So what we would submit, Your Honor, is that in

8       contrast to what we just heard, this is being used to

9       address the quality of Innovative catheters because Biosense

11:32   10      has throughout this litigation impugned the quality of

11      Innovative's catheters.  And if there were a challenge, if

12      there were a problem with the quality of Innovative's

13      catheters, an expert economist like Dr. Forister would

14      expect to see that appearing in some source of data.  So he

11:32   15      has reviewed numerous sources of data, one of which is the

16      MAUDE data, and found that there is not an observable

17      problem with the quality of Innovative's catheters.

18              This is not a products liability case where we're

19      trying to look at a particular patient's injury and

11:32   20      determine that there is causation between the catheter and

21      that injury based on the event that MAUDE -- the reported

22      MAUDE data.  This is looking at overall rates of adverse

23      events that happen with different types of catheters, which

24      are distinguished based on the manufacturer that they come

11:33   25      from, including whether it's from Biosense or from

11:33  1    Innovative.

2             THE COURT:  Is there an element of causation in

3    looking at a MAUDE report and inferring from that report

4    that there was a defect of some sort as reported by the

11:33  5    report?  Is there an element of causation in that?

6             MR. SUMMERS:  I don't think so, Your Honor,

7    because the question is whether or not overall if you look

8    at across many, many uses of the different catheters --

9    whether, you know, there is an elevated rate of adverse

11:33  10   events that's happening with Innovative catheters.  And not

11   finding that speaks to the general reliability of Innovative

12   catheters, but doesn't suggest in any way that the Biosense

13   catheter in any particular instance is causing an injury,

14   because it's true that there are other things that happen in

11:33  15   a procedure when the catheter is used.  But then when you

16   look at thousands of procedures that are used across

17   multiple years, you would expect to see some variation.  And

18   in fact, the variation that we do see is that Innovative's

19   catheters are associated with fewer adverse events than

11:34  20   Biosense's catheters.

21            THE COURT:  Okay.  Thank you.

22            MR. SUMMERS:  Thank you.

23            THE COURT:  Briefly.

24            MR. CRUZ:  Very briefly, Your Honor.  Your Honor,

11:34  25   three points very briefly.  The first I think in what

11:34  1    Mr. Summers said reflecting on the sort of aggregate nature

2    of this data and how it's consistent with a quality issue,

3    number one, I think the papers made clear that the testimony

4    here is also going to be about safety.  And whether it's

11:34  5    quality or safety, I think Mr. Summers in a large way

6    conceded the causation issue, because to make    that --

7              THE COURT:  No, he flatly denied it.

8              MR. CRUZ:  Well, Your Honor, what I think I'd say

9    is to make the jump from the aggregate data and consistency

11:35  10   that Mr. Summers is talking about to an issue of either

11   quality, or even worse, safety, you have to assume that that

12   correlation has meaning.  You have to assume that the

13   correlation in the MDR report itself means that the catheter

14   at issue in that report caused the adverse event, because if

11:35  15   you don't assume that, then the data just can't get them to

16   the conclusion they want.  So that's point one.

17             And then point two is, you know, Mr. Summers said

18   that Dr. Forister has long been commenting on quality.  And

19   I think one of the issues here to the extent he does rely on

11:35  20   multiple sources of data, I think that actually doesn't

21   really play in their favor, because I think that just brings

22   up the question why include an additional known unreliable

23   source of data that even their witnesses know is unreliable?

24             And number three is with respect to quality, I

11:35  25   think looking at Innovative's briefing, Your Honor, on

11:35    1   page 5, the -- you know, similarly, in analyzing Biosense's

         2   procompetitive justifications, Dr. Forister found that

         3   Biosense's tie does not promote quality or safety because of

         4   that complaint rate.

11:36    5          And so I think the focus on quality really has to

         6   be balanced with the fact that this has been and will be

         7   testimony regarding relative safety based on adverse event

         8   data that the FDA tells us can't be used for that purpose.

         9   Thank you, Your Honor.

11:36   10          THE COURT:  Okay.  Thank you.

        11          I am going to deny the motion.  It's a close

        12   question, but I think the data should come in, and I think

        13   the data can be adequately tested.

        14          Let's move to the last -- well, the last with

11:36   15   respect to catheter collections.

        16          MR. CAVANAUGH:  Your Honor, we will rest on the

        17   tentative on that.

        18          THE COURT:  Who is going to address this?

        19          MR. SUMMERS:  We'll also rest for plaintiff.

11:36   20          THE COURT:  Okay.  Then there's the final one with

        21   regard to new theories that I did not issue a tentative on.

        22          Okay, Mr. Cavanaugh.

        23          MR. CAVANAUGH:  Thank you, Your Honor.  I'm

        24   mindful of the time, so I'll keep it brief.

11:37   25          In their subsequent reports after this Court

11:37  1    issued an order that said no plugging of holes, no new
       2    expert theories, he posited the opinion that there is market
       3    power in the foremarket for cardiac mapping machines.  That
       4    opinion was never disclosed before.  And they now make the
11:37  5    argument that based on that opinion because of a District
       6    Court case, they can avoid the elements required to
       7    establish a single brand aftermarket.  Essentially, they can
       8    avoid satisfying the Kodak elements, which as this Court
       9    noted in one of its tentatives on Friday is necessary to
11:37 10    establish liability.  The Ninth Circuit in Newcal and Epic
      11    made clear that that is required.
      12         Now, what plaintiff rests on is that in his prior
      13    reports before this Court's order and before the Ninth
      14    Circuit decision that there were references to the fact that
11:38 15    more than half of the hospitals had cardiac mapping machines
      16    from Biosense, that competitive pressures will not
      17    materially constrain pricing in the aftermarket, all of
      18    which we dispute.  He put those facts out there, but at no
      19    time did he make the further step, which is a significant
11:38 20    step, to say all of this means that there's market power in
      21    the foremarket.
      22         And on summary judgment, Your Honor actually dealt
      23    with the fact that they hadn't sufficiently analyzed the
      24    foremarket conditions.  They skipped the analysis, and in
11:39 25    fact, you concluded that there was robust competition

11:39    1    because of a high degree of interchangeability, all of which
         2    we agree with.
         3             Now, dissatisfied with apparently the state of
         4    their opinions -- their expert's opinion subsequent to Your
11:39    5    Honor's permitting supplemental reports on updated sales for
         6    damages purposes, they have come in with a new theory.
         7             Now, to the extent Your Honor did note that if
         8    there was a change in controlling law they could address
         9    that controlling law, i.e., a Ninth Circuit decision
11:39   10    changing the rules of the game, that there was an exception
        11    to Kodak if you prove market power in the foremarket, Kodak
        12    never addressed that issue.  And what the Ninth Circuit said
        13    in both Epic and in Newcal, which has been the law for a
        14    long time, is that you must show the Kodak factors.  The
11:40   15    plaintiff must prove that in an aftermarket case.
        16             The only case they cite is a district court case
        17    in which the district court said that that was potentially a
        18    viable theory, that Kodak had not addressed it.  The Ninth
        19    Circuit has not said that and, in fact, has said the
11:40   20    opposite, that in an aftermarket case, the Kodak factors
        21    must be established.
        22             Thank you, Your Honor.
        23             THE COURT:  Thank you.
        24             Who is going to address this?
11:40   25             MR. HO:  Ms. Schiffman will.

11:40    **1**           THE COURT:  Okay.

         **2**           MS. SCHIFFMAN:  Your Honor, Kelley Schiffman for

         **3**    the plaintiff.

         **4**           Just to back up and set the context for this,

11:40    **5**    okay, roughly a year ago the Court ordered supplemental

         **6**    expert reports following remand.  The Court then clarified

         **7**    that the parties should be allowed to supplemental existing

         **8**    theories in particular to reflect new data, new

         **9**    developments, any changes in the law, and updated market

11:41   **10**    conditions.  That's exactly what Dr. Forister did in his

      **11**    expert reports, both with regard to the installed base data

      **12**    and with regard to market power in the foremarket.

      **13**           So to start with the installed base data, he does

      **14**    have an installed base analysis in his 2021 report.  We then

11:41   **15**    subsequently asked for updated installed base data.  The

      **16**    Court granted that request back in September of 2024.  At

      **17**    the time, Biosense did not raise any of the objections it's

      **18**    now raising to production of that updated installed base

      **19**    data.  Biosense then produced the updated installed base

11:42   **20**    data.  Dr. Forister relied upon it, and that brings us to

      **21**    where we are today.

      **22**           His 2021 report opines -- and forgive me, Your

      **23**    Honor, at this point, I need to reference something that has

      **24**    been deemed confidential in this case, but it's important to

11:42   **25**    the argument.  I'm going to be speaking at a high level of

11:42   1   generality.  This is information that's going to have to
        2   come out at trial.  We would submit --
        3              THE COURT:  If you want me to seal this portion, I
        4   will, but if we don't need to --
11:42   5              MS. SCHIFFMAN:  It's Biosense's data.
        6              MR. CAVANAUGH:  I don't know what counsel is going
        7   to reference, Your Honor, so it's hard for me to say.
        8              THE COURT:  Well, then for starters, everybody is
        9   covered by the Protective Order?
11:42  10              MR. CAVANAUGH:  Yes.
       11              THE COURT:  So if we need to seal this portion --
       12              MR. CAVANAUGH:  I think we can deal with it after
       13   counsel addresses it.
       14              THE COURT:  Good.
11:43  15              MS. SCHIFFMAN:  Thank you.
       16              So just to say that Dr. Forister's 2021 report
       17   contained the opinion that a majority of operating CARTO 3
       18   machines were installed prior to April 2016, and he puts
       19   forward that exact same opinion in his 2024 report, just
11:43  20   updated using the new installed base data.  So by no means
       21   is there any new theory with regard to installed base data.
       22              In terms of market power, I've gone -- you know,
       23   our response goes through in detail and cites to the various
       24   parts of his 2021 report that talk about a foremarket for
11:43  25   cardiac mapping machines where it's well understood that

11:43   1   that contains the four key competitors; Boston Scientific,
        2   Abbott, Biosense, and Medtronic.  And he further provides
        3   ample evidence of Biosense's dominance of that market.  I'm
        4   happy to go through those cites specifically.
11:44   5           His new report from 2024 and 2025, they build on
        6   that, but the foundation was there in the 2021 report.  And
        7   they build on it using the new data that was produced by
        8   Biosense, as well as developments in the market, for
        9   example, the exit of a key competitor, Acuitus, from the
11:44   10  marketplace, which goes to showing barriers for entry, and
        11  also in light of new binding authoritative law from Epic v.
        12  Apple.  So there have been many intervening events that
        13  bolster Dr. Forister's case for market power in the
        14  foremarket, but all it is doing is bolstering.  It's always
11:44   15  been there as part of his analysis.
        16          In terms of the relationship between market power
        17  and the foremarket and the Eastman Kodak lock-in factors, I
        18  think it's really important to understand here that Dr.
        19  Forister is an economist.  He's not a lawyer.  He's not
11:45   20  opining on what's legally necessary to show to establish an
        21  aftermarket.  That's a dispute the parties have been having
        22  in preparing the jury instructions that Your Honor will
        23  receive today.
        24          He's an economist, and to an economist, all the
11:45   25  circumstances are relevant.  And in analyzing whether

11:45    1    Biosense has been able to profitably impose its, you know,

2    case coverage policy, the tying arrangement, he's considered

3    an array of factors, including both market power in the

4    foremarket and the presence of information and switching

11:45    5    costs that lead to lock-in.  They all factor into his

6    analysis as an explanation for why Biosense has been able to

7    profitability impose its tie.

8          And I can point you precisely to the spot where he

9    runs that analysis in his 2021 report, and show you that is

11:46    10    no different than the analysis he is running in his 2024 and

11    2025 reports if that would be helpful to Your Honor.

12          THE COURT:  Why don't you do that.

13          MS. SCHIFFMAN:  Okay.  I would direct the Court

14    to -- give me one second -- paragraph 172 to 176 of his 2021

11:46    15    report.  The header of that section is:  "Competitive

16    pressure when selling CARTO 3 systems would not have

17    prevented Biosense from charging supercompetitive catheter

18    prices."

19          What he says in that first paragraph there --

11:46    20    well, first of all, he references a primary market.  That's

21    the cardiac mapping machines foremarket.  There's that

22    reference.  It's there already in 2021.

23          He then highlights that he takes the key economic

24    question here to be whether competitive pressures in that

11:47    25    primary market will materially constrain pricing in the

11:47    1    aftermarket.  That's that key question I was mentioning

2    about whether Biosense can profitability impose the tie, or

3    whether there will be enough backlash from consumers in

4    relation to the aftermarket to discipline that and make it

11:47    5    unprofitable.  So that's his driving -- that's his North

6    Star.  That's his question that he's analyzing.

7        If you then look at paragraph 176, he notes in

8    relation to that a really critical fact, that the data

9    simply shows that Biosense has been able to profitability

11:47    10    impose the tie.  It imposed the tie in April of 2016, and

11    there was no drop in its sale of CARTO 3 machines.  In fact,

12    the usage share of CARTO 3 machines, the number of

13    procedures done using CARTO 3 machines, continued to

14    increase showing that customers weren't able to push back

11:48    15    against this tie.

16        He then offers various factors that could explain

17    why there hasn't been this disciplining effect or this

18    pushback effect.  He lists in paragraph 173 and also in

19    paragraph 176 elements going to Biosense's market power in

11:48    20    the cardiac mapping machines market.  For example, in

21    paragraph 173, he talks about how Biosense is the clear

22    market leader in terms of usage share of cardiac mapping

23    machines, but he also offers as an explanation for this fact

24    in paragraph 174, that there are life cycle pricing issues

11:48    25    here, and that there are information and switching cost

11:49    1    issues here, the standard Eastman Kodak factors.  So he's

2    looking at all of these as an explanation for why Biosense

3    has been able to profitably impose its tie.

4         Now, shifting to his 2024 report, we see that

11:49    5    exact same analysis run again.  This time I would direct the

6    Court's attention to paragraph 57 -- actually, let's even

7    start with the heading before that.  It's exactly what I've

8    been talking about.  "Competition in the market for cardiac

9    mapping machines is unable to discipline the tie."  It's

11:49   10    that North Star again, right.  That's what he's talking

11    about here.

12         And he then starts with this key fact, right.  He

13    says in paragraph 47:  "If competition in the foremarket for

14    cardiac mapping machines were able to constrain Biosense's

11:50   15    anticompetitive conduct, then implementing the tie would

16    have decreased the share of cardiac mapping procedures used

17    by the CARTO 3, but that has not happened."  So he's

18    pointing out the facts just show us that they've been able

19    to profitability do this.  There hasn't been enough consumer

11:50   20    pushback to make it unprofitable to impose the tie.

21         And once again, in the following paragraph, he

22    says, you know:  "There's multiple reasons for this in my

23    opinion.  Part of the explanation is Biosense's market power

24    in the foremarket, and part of the explanation is the

11:50   25    lock-in information and switching costs that are standard to

11:50    1    Eastman Kodak."  So he has this analysis that looks at all

2    these factors as an economist would, and he's done it

3    consistently across reports.

4            THE COURT:  Thank you.

11:50    5            Mr. Cavanaugh, briefly.

6            MR. CAVANAUGH:  Your Honor, counsel can't point to

7    a single instance in which Dr. Forister opined prior to 2024

8    that there was -- that Biosense had market power in the

9    foremarket for cardiac mapping systems.  All they can refer

11:51    10   to is he said pricing in the foremarket didn't materially

11   constrain pricing in the aftermarket.  That's a

12   fundamentally different opinion.  That's why it's a new

13   opinion, which this Court did not permit in its order.

14            Your Honor, as to the -- and I would note also in

11:51    15   the Motion for Summary Judgment briefing never once did

16   plaintiff argue that, well, Biosense has market power in the

17   foremarket, and they certainly didn't argue that that would

18   prevent application of the Kodak four-factor test.

19            On the installed base, Your Honor, in 2021, we had

11:52    20   produced subsequent sales data.  However, the question is

21   their new reliance on installed base data from 2009 to 2014.

22   The Ninth Circuit made it clear that -- they noted there

23   were no sales relied on before 2014.  It's classic trying to

24   fill a hole that they saw, Your Honor.  They concede they

11:52    25   had the data.  They say they were -- someone on their side

11:52   1   was confused as to whether they actually had it, but they

2   acknowledge they had it.  They say Dr. Forister relied upon

3   a list of sales of cardiac mapping machines that was undated

4   when they had another list that had all the dates.  They're

11:53   5   simply trying to fill the hole, Your Honor.

6            Now, the question of what's the prejudice from

7   this?  Certainly, on the point of this -- the market power

8   opinion, Your Honor, if they were arguing that, Your Honor

9   would have dealt with that issue in the Motion for Summary

11:53   10  Judgment.  That issue would have gone up to the Ninth

11  Circuit, and the Ninth Circuit or Your Honor could have

12  dealt with that very issue.  They didn't offer that opinion,

13  and now they want to introduce it at trial.  That's

14  improper.

11:53   15           Thank you, Your Honor.

16           THE COURT:  Thank you.

17           Okay, this motion will stand submitted.

18           MS. SCHIFFMAN:  Your Honor, may I just briefly

19  respond on a couple of points?

11:53   20           THE COURT:  No.  On his motion, he gets the last

21  word.

22           Okay, let's address the Daubert motions.

23           MR. DAVIS:  So on plaintiff's Daubert motion --

24           THE COURT:  Yes.

11:54   25           MR. DAVIS:  -- we are not arguing it.  We're

|  |  |  |
|---|---|---|
| 11:54 | 1 | accepting the tentative.  We do have one point we would like |
|  | 2 | to make in response to the ruling on defendant's Daubert |
|  | 3 | motion, as well as respond to any issues they plan to raise. |
|  | 4 | THE COURT:  Okay. |
| 11:54 | 5 | Who is going to address this?  Mr. Cavanaugh. |
|  | 6 | MR. CAVANAUGH:  Thank you, Your Honor. |
|  | 7 | We appreciate the Court's tentative.  Let me just |
|  | 8 | raise two points as to the Court's opinion with respect to |
|  | 9 | zero cost for past services in the but-for world.  And Your |
| 11:55 | 10 | Honor addressed this issue of unexercised market power. |
|  | 11 | Your Honor, Exhibit 10 to my declaration has page 100 from |
|  | 12 | Dr. Forister's deposition.  Dr. Forister assumed that |
|  | 13 | Biosense is a rational, profit-maximizing firm.  He |
|  | 14 | testified on that same page that's a standard economic |
| 11:55 | 15 | assumption. |
|  | 16 | Consistent with that, if you look at paragraph 508 |
|  | 17 | of Areeda, which the Court noted in its tentative, Dr. |
|  | 18 | Forister's assumption of Biosense being a rational |
|  | 19 | profit-maximizing firm if it had market power -- that that's |
| 11:55 | 20 | consistent with what antitrust authorities should always |
|  | 21 | assume, as economists do; that firms exploit such market |
|  | 22 | power, as they have; but then in the end, Areeda notes the |
|  | 23 | problem if you don't accept and apply that assumption, |
|  | 24 | because you can't distinguish between unexercised market |
| 11:56 | 25 | power from whether there is a competitive price compelled by |

11:56  1    market forces.  You can't tell the difference.  That's why
       2    you have to assume that Biosense is a profit-maximizing firm
       3    that will exercise its market power.  And according to the
       4    plaintiffs, what they did with the alleged tie was they --
11:56  5    the tie led to supercompetitive pricing with catheters.
       6    That's their actual-world claim.

       7           Dr. Forister's but-for world is, well, now there's
       8    no tie, so Biosense can't indirectly use its alleged market
       9    power for clinical support services.  It has to do it
11:57  10   directly.  And if Biosense is a profit-maximizing firm, it
       11   will charge a price for that, and that's based on his -- Dr.
       12   Forister's own assumption that Biosense is a
       13   profit-maximizing firm.

       14          And if you simply say, well, there's the
11:57  15   possibility of unexercised market power, you run directly
       16   into the problem that Areeda notes in paragraph 508, which
       17   is that you can't distinguish between is this unexercised
       18   market power, or is it just this is a -- these are prices
       19   that are set by market forces?

11:57  20          So for that reason, Your Honor, plaintiff can't
       21   have it both ways.  If they demonstrate that we had market
       22   power in the real world, then in the but-for world, we have
       23   market power.  We're going to exercise it by raising price
       24   directly on clinical support services.  The reason that they
11:58  25   don't want to go down that road is that wipes out their

|         |     |                                                                    |
|---------|-----|--------------------------------------------------------------------|
| 11:58   | 1   | damage claim, so they want it both ways.  They want market         |
|         | 2   | power for -- to establish liability, but we want unexercised       |
|         | 3   | market power over here so that we can have damages.                |
|         | 4   | Your Honor, that's a fundamental contradiction,                    |
| 11:58   | 5   | and under Daubert, that's an inappropriate methodology and         |
|         | 6   | certainly a fundamentally flawed principle.                        |
|         | 7   | Thank you, Your Honor.                                             |
|         | 8   | THE COURT:  Thank you.                                             |
|         | 9   | MR. DAVIS:  I think I have two more minutes where                  |
| 11:58   | 10  | I can say good morning, Your Honor.                                |
|         | 11  | THE COURT:  Okay.                                                  |
|         | 12  | MR. DAVIS:  Good morning, Your Honor.  I will try                  |
|         | 13  | also to be brief.                                                  |
|         | 14  | So there's two issues I want to address.  I want                  |
| 11:59   | 15  | to address the argument that opposing counsel just made, and       |
|         | 16  | then I also do want to raise the issue of competitive              |
|         | 17  | benchmarks.                                                        |
|         | 18  | So on the first issue, to be clear, what you just                 |
|         | 19  | heard was a frontal assault on tying doctrine.  Why tying          |
| 11:59   | 20  | can be anticompetitive -- the standard theory is in fact           |
|         | 21  | that there's unexercised market power in a tying market, and       |
|         | 22  | that can be extended and converted into anticompetitive harm       |
|         | 23  | in a second market precisely because defendants are not able       |
|         | 24  | to fully exploit their market power in the tying market.           |
| 11:59   | 25  | That is the theory that we cite to some of the                    |

11:59    1    sources in our opposition.  Michael Winston -- there's an
         2    article by Michael Winston at MIT, by Einer Elhauge at
         3    Harvard.  What we need is an explanation.  And as Your
         4    Honor -- what we need is why would it be that in the but-for
12:00    5    world Biosense might not charge for its clinical support,
         6    even though it has this excess market power?  Dr. Forister
         7    has given a reasoned explanation for that, and Your Honor
         8    recognized those reasons, that the clinical support tech
         9    people act as sales people, that they collect information
12:00   10    firsthand about usage and trends, that they can encourage
        11    brand loyalty.
        12            This theoretical argument that opposing counsel
        13    made in fact has been rejected repeatedly by courts.
        14    Indeed, the very Siegel versus Chicken Delight opinion that
12:00   15    they cite rejected the very argument that opposing counsel
        16    just made, and it was prescient because economic theory has
        17    caught up to what the Ninth Circuit has consistently held
        18    since then.
        19            To go into the facts there very briefly, the
12:00   20    defendant in Chicken Delight was a chicken franchise.  They
        21    did in-store pickup and delivery.  And the plaintiffs were
        22    franchisees.  And we had a tying product, which fortunately
        23    was zero dollars.  They gave away a trademark license to the
        24    franchisees, and they had tied products where the
12:01   25    franchisees had to purchase certain items from the

12:01    1    defendant:  ingredients, equipment, packaging materials.

2    And the defendant made the very same argument that opposing

3    counsel is making here.

4            What the defendant said was not only shouldn't the

12:01    5    plaintiff -- shouldn't we assume that there's any damage,

6    but there can't be any damage as a matter of law because if

7    we have market power in the tying market as the plaintiffs

8    say, then if you took away the tie, we would just charge an

9    offsetting amount for trademark, and therefore, there would

12:01    10    be no damages.

11            And that's exactly what opposing counsel just

12    said.  He made an argument that was rejected over 50 years

13    ago.  He said because our damages would be wiped out.  That

14    was exactly the Chicken Delight argument.  What the Ninth

12:02    15    Circuit said was, plaintiffs, you don't win on summary

16    judgment.  Defendant, you don't win on summary judgment.  We

17    actually need to look at the evidence.  The evidence

18    determines whether or not we can have harm from a tie, and

19    tying doctrine has been that way ever since.

12:02    20            They are basically arguing through Daubert a

21    summary judgment.  You can't have any damages if you say

22    that there's market power in the tying market.  Now, that's

23    never been the case.  There have always been reasons why a

24    tie can amplify market power, can extend it, unused market

12:02    25    power from one market to another, and therefore increase

12:02    1    damages.  That's the premise.

2            If that argument is right, there should be no

3    tying doctrine based on any -- in any case based on power in

4    the foremarket, so it can't be right.  The Ninth Circuit has

12:02    5    said it isn't right, and this Court's tentative ruling is in

6    fact exactly right, is exactly right.

7            The one other issue I wanted to raise, if I may,

8    Your Honor, is on the ruling about competitive benchmarks --

9    and I do think it's particularly appropriate to revisit that

12:03    10   issue here because it was raised for the first time on

11   reply.  On reply -- on page 8 of the reply, for the first

12   time -- not in the opening briefing on Daubert -- Biosense

13   raises this argument that the competitive benchmarks that

14   Dr. Forister offers are inappropriate because he doesn't

12:03    15   have a sufficient basis for them.

16           And this Court understandably not having the

17   benefit of briefing on both sides, says, well, because it's

18   based -- his analysis seems to be based on a single footnote

19   in paragraph 70 of his last report, then I think that's not

12:03    20   quite enough.

21           Well, that's totally virtual unfair surprise that

22   this Court was given that misimpression.  There's the waiver

23   argument, but even more importantly, there's tons of support

24   in the various reports that Dr. Forister had submitted.  And

12:04    25   I would just like to give some of the examples, but I think

12:04 1    one of the more compelling examples is one that he relied on

2    -- Dr. Forister relied on in his 2024 report, and it is

3    evidence -- state a position in evidence taken at summary

4    judgment, where it was actually Biosense that asserted as an

12:04 5    undisputed fact that nobody charges for clinical support

6    in -- well, in any market like this one, but particularly in

7    this market.  And also -- and therefore establishing that

8    zero dollar clinical support is an appropriate benchmark.

9        And if I might just because -- not having been

12:04 10   given the opportunity for briefing on this, if I might

11   approach the bench and offer just this one document, which

12   is a portion of the plaintiff's response to the asserted

13   undisputed facts at summary judgment from Biosense.

14       THE COURT:  Please.

12:04 15       (Document handed to the Court)

16       MR. DAVIS:  So I included just to make sure

17   that -- you know, help orient, the cover page of what this

18   is.  On page 119, paragraph 131, this is Biosense's

19   assertion of an undisputed fact.  Innovative quibbled at the

12:05 20   margins but not in relevant part:  "It is industry standard

21   for OEMs to provide free support in the medical device

22   industry, including in the EP" -- the electrophysiology --

23   "industry."

24       For that proposition, Biosense goes on to cite

12:05 25   various sources, including Mr. Bodner, who was

12:06　　1　Vice-President of U.S. Sales.  And according to -- this is

　　　　2　Biosense's explanation.  He explained when asked why

　　　　3　Biosense provides clinical support for free, quote:  "[I]t's

　　　　4　the standard.  No one charges for coverage in

12:06　　5　electrophysiology or in any other medical device capacity

　　　　6　that I'm aware of across orthopedics, surgical,

　　　　7　interventional cardiology, ocular.  I'm not aware of any med

　　　　8　device situation where service or case coverage is charged

　　　　9　in this country."  Dr. Forister cited to that as part of his

12:06　　10　backup in support of his 2024 opinion.

　　　　11　　　　　　　There are additional -- I don't want to take up

　　　　12　too much of this Court's time, but walking through the

　　　　13　additional evidence that Biosense puts forward establishes

　　　　14　that both U.S. and foreign manufacturers' charging of zero

12:06　　15　clinical prices in this industry is absolutely standard, and

　　　　16　therefore is an appropriate competitive benchmark.  There's

　　　　17　no qualification.  There's no limit in terms of

　　　　18　circumstances.

　　　　19　　　　　　　I will just -- I have many more citations, but I

12:07　　20　realize it's -- we're imposing on your time, so I just want

　　　　21　to point to two other, among many, that I think are quite

　　　　22　important.

　　　　23　　　　　　　One is Dr. Wu's own opinion.  This is from his

　　　　24　October 22, 2021, report.  He at paragraphs 136 and 137 in

12:07　　25　particular -- I'll take the shorter one, but in 136, he

12:07    1    quotes from Mr. Bodner for these very propositions, and Dr.

2    Forister relies on Dr. Wu's reports, including in his 2025

3    rebuttal report, the second rebuttal report.  And then at

4    paragraph 137, Dr. Wu, their own expert, says:  "The fact

12:07    5    that free clinical support is a standard across all OEM

6    manufacturers of cardiac mapping systems and catheters, and

7    is likewise recognized by reprocessors as a necessary

8    component of a competitive product offering, demonstrates

9    that there is no separate demand for catheters without

12:08    10    clinical support."

11    So what's important about that?  We disagree about

12    the separate markets issue.  But what's most important about

13    that is Dr. Wu is agreeing, first of all, nobody charges for

14    clinical support, not under any circumstances.  That makes

12:08    15    it an appropriate competitive benchmark.  And second of all,

16    he's using it to draw insights about Biosense's behavior and

17    the markets as they pertain to Biosense, which means this is

18    a good benchmark.  This is a good comparison.

19    So we feel like between -- there's more.  There's

12:08    20    much more, but it seems to us that gets us way past the

21    Daubert mark.  And the only way that it appeared we weren't

22    way past the Daubert mark is the unfair surprise by raising

23    this issue for the very first time on reply.

24    I do want to anticipate one last piece, the

12:08    25    deposition excerpts in regard -- well, two pieces -- one --

12:08  1    I'm sorry, but I'll just direct you to the 2025 rebuttal

2    report of Dr. Forister.  At paragraph 58, Note 74, Dr.

3    Forister relies on the deposition testimony of Mr. Ramos.

4    He was the Senior Director for Sustainability and

12:09  5    Commercialization at J&J and was involved actively in

6    Biosense.  He was the one who said we don't charge in any

7    foreign country, and he identified various countries:

8    France, Germany, Spain, Italy, Netherlands, Israel, Japan.

9         So there is a solid basis for all of these

12:09  10   competitive benchmarks in these sections and other sections

11   of Dr. Forister's report.  The misimpression was only a

12   product of unfair surprise.

13        They do cite to deposition excerpts from Dr.

14   Forister.  Again, if we had had the chance to respond, we

12:09  15   would have been able to say those are wildly misleading.

16   They say that Dr. Forister didn't have a basic understanding

17   of his competitive benchmarks.  That was -- I hate to call

18   it this, but it was basically a lawyer trick.  They asked

19   him what companies are comparators.  He said Abbott.  He

12:10  20   said Boston Scientific.  Those are the two main competitive

21   benchmarks.  Neither one charges for clinical support

22   services.  Both provide cardiac mapping machines.  They are

23   the principal competitors, as Dr. Forister explained in his

24   report of Biosense.

12:10  25        And then they asked him a bunch of very precise

12:10    1    questions, questions like, all right, for Abbott, what
         2    percentage of the procedures using the Abbott machine used
         3    clinical support from Abbott as opposed to hospitals?  And
         4    Dr. Forister very reasonably responded I don't know that
12:10    5    from memory.  If I can look at my report, I think I may be
         6    able to answer that question.  And they just said please
         7    answer from memory.  They did the same with Boston
         8    Scientific.  And he just said I don't have that all
         9    memorized by rote.
12:10   10            That is not him not understanding the basics of
        11    the comparison.  That is them asking a deliberately very
        12    challenging trivia question about exact percentages.  They
        13    very carefully didn't say what roughly is the percentage?
        14    Is it significant?  Any of that sort of stuff.
12:11   15            So we would submit on both of these arguments --
        16    as to the first one, they are trying to unwrite tying law,
        17    and as to the second one, the competitive benchmarks are
        18    appropriate, and there is more than ample support in
        19    Dr. Forister's report and the documents on which he relied
12:11   20    to support those competitive benchmarks.
        21            Thank you, Your Honor.
        22            THE COURT:  Thank you.
        23            Mr. Cavanaugh.
        24            MR. CAVANAUGH:  Yes, Your Honor.
12:11   25            Your Honor, your tentative notes -- challenges the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

12:11  1  methodology that Dr. Forister used.  We don't dispute the
       2  fact that Abbott and Boston Scientific may not charge for
       3  clinical support services, but what Your Honor said was
       4  there's no methodology underlying his reliance on these
12:12  5  benchmarks.  He never looked at what the market conditions
       6  were when these things were introduced.  He did no analysis.
       7  He simply said, well, I know there's this fact out there.
       8  That's a no.  That's not an appropriate benchmark.

       9          What's particularly concerning is trying to rely
12:12  10  on what happens outside the United States.  There is no
       11  analysis of what regulatory regimes are there, no analysis
       12  of whether there's any reprocessing.  What are the market
       13  conditions there?  No analysis.

       14          Your Honor, I've done enough antitrust cases to
12:12  15  know how reluctant a Court should be to accept what's
       16  happening in markets outside the United States without some
       17  firm understanding of what are the market conditions, what
       18  are the regulatory conditions, in order to make that an
       19  appropriate benchmark.  None of that analysis was done here.

12:12  20          Your Honor, as to the Chicken case, the Ninth
       21  Circuit case, this Court simply found it was a question of
       22  fact as to harm.  There is no dispute here, as Areeda notes,
       23  that if you possess market power in an alleged tying
       24  arrangement, you can exercise that market power not in the
12:13  25  tying market but in the tied market.  That's what they

12:13  1    alleged happened here.

2          We're simply pointing out that there has to be

3    some consistency and not a fundamental contradiction which

4    they seek in order to attempt to establish liability, but at

12:13  5    the same time, have it both ways to recover damages.

6          Thank you, Your Honor.

7          THE COURT:  Okay.  Thank you.

8          Well, those will stand submitted.

9          I think we can go briefly through the --

12:13  10         MR. CAVANAUGH:  Your Honor, can I raise one point

11   as to lock-in?

12         THE COURT:  Sure.

13         MR. CAVANAUGH:  I understand the Court's tentative

14   on this, but as the Court noted, the Kodak factors are

12:14  15   necessary to determine the scope of liability.  Newcal made

16   clear that if -- now, choose a hospital here -- knowingly

17   and voluntarily gives market power to BWI, as the Ninth

18   Circuit said in this case, that does not offend the

19   antitrust laws.  There is no liability that can flow from

12:14  20   Biosense's sales to those -- catheter sales to those

21   hospitals that are not locked in.  And if no liability can

22   flow from that, then no damages can flow from it.

23         Their theory is that there is a hospital that

24   knowingly and voluntarily was aware of the policy and bought

12:14  25   catheters.  They say, well, but for the tie, they would have

12:15    1    gotten profits -- sales and profits from that hospital that
         2    wasn't locked in.
         3           There has to be a relationship between the harm,
         4    the anticompetitive conduct, and the alleged damage here.
12:15    5    And Dr. Forister didn't do that.  He's doing simply a
         6    market-wide basis.
         7           Now, Your Honor, there can be the antitrust cases
         8    where market-wide damages are appropriate, but not in the
         9    case of the tying claim involving an aftermarket where Kodak
12:15   10    applies.  There you have -- there's locked-in hospitals, and
        11    there's hospitals that are not locked in.  The sales to the
        12    locked in may be an appropriate basis for damages.  The
        13    sales that were made for which there is no anticompetitive
        14    conduct because they weren't locked in -- if there's no
12:16   15    anticompetitive conduct, they're not entitled to damages for
        16    sales that were made to those hospitals.  They're saying,
        17    well, we would have made 15 to 20 percent of those sales,
        18    but there's no harm associated with that because it doesn't
        19    flow from the alleged anticompetitive conduct.
12:16   20           Thank you, Your Honor.
        21           THE COURT:  Thank you.
        22           MR. DAVIS:  Your Honor --
        23           THE COURT:  No.  Thank you.
        24           MR. DAVIS:  Okay.  Thank you.
12:17   25           THE COURT:  All right.  Let's talk about the

| | |
|---|---|
| 12:17 | 1 |  trial.  We're scheduled to start the 29th.  I'm also |
| | 2 |  starting a trial the 22nd, but I expect we'll run into the |
| | 3 |  end of the week of the 29th.  At this point, I think that |
| | 4 |  case will go to the jury probably the 30th.  I don't have |
| 12:17 | 5 |  any problem having a jury out and starting a new trial.  I |
| | 6 |  actually had three of them at one time. |
| | 7 |          If we start May 1, we will have only half a day on |
| | 8 |  May 2.  And it could be that the jury still has it on -- or |
| | 9 |  it hasn't been submitted to the jury until May 1.  If you |
| 12:17 | 10 |  can live with that certainty, so can I., but if you want a |
| | 11 |  date certain and put it over to the following Tuesday, we |
| | 12 |  can do that, too. |
| | 13 |          What would you like to do? |
| | 14 |          MR. CAVANAUGH:  I think our preference would be to |
| 12:18 | 15 |  start May 1. |
| | 16 |          THE COURT:  Okay. |
| | 17 |          MR. HO:  Same with plaintiffs, Your Honor. |
| | 18 |          THE COURT:  Okay, we'll do that.  We'll keep you |
| | 19 |  posted, but I'm -- well, we'll keep you posted on the |
| 12:18 | 20 |  progress of that other trial so that you can plan |
| | 21 |  accordingly. |
| | 22 |          MR. CAVANAUGH:  Your Honor, could I ask a related |
| | 23 |  question? |
| | 24 |          THE COURT:  Yeah, sure. |
| 12:18 | 25 |          MR. CAVANAUGH:  Will we be sitting on Monday, |

12:18    1    May 5?

2              THE COURT:  No.  We're dark Mondays.

3              MR. CAVANAUGH:  Okay.

4              THE COURT:  Yeah, the usual trial week is Tuesday

12:18    5    through Friday, 9:00 to 12:00, 1:30 to 4:30.  I figure we

6    get five-and-a-quarter hours out of a day with the jury, and

7    I think this case can be tried in six days of evidence.

8    Each side would have rounded up 16 hours for all

9    examinations.  I'm not counting voir dire.  I'm not counting

12:19    10    openings.  I'm not counting closings.  When I say you have

11    16 hours each for six days, I guarantee you the hours,

12    regardless of the number of days that it trails over, and

13    I'll keep you posted at the end of each day.

14              A jury of eight, I think that's enough.  This case

12:19    15    isn't so protracted as to warrant a larger jury.  In that

16    case, you'll each have three peremptories.

17              I seat 14 in the box.  If you exercise all the

18    peremptories, we're down to eight, and that's our jury.  If

19    you stop short, we'll just take the first eight in the box.

12:19    20    You don't lose a challenge by passing, but if we get two

21    passes in a row, we stop.  So you may or may not be familiar

22    with the way I do it, but if you have any questions, please

23    just ask.

24              Except for the first day where we start at 8:30,

12:20    25    the usual day, 9:00 to 12:00, break for about 15 minutes at

12:20   1   10:30.  I try and time those so that it makes sense in terms
        2   of the flow of the witnesses.  In the afternoon, 1:30 to
        3   4:30.
        4           Voir dire, I usually allow 30 minutes for each
12:20   5   side for voir dire.  I'll make it 45.  I'm not really too
        6   concerned about what you ask as long as you're not
        7   conditioning the jury.  If you're conditioning the jury or I
        8   think you are, I'll simply ask you to move on.  Some people
        9   use the time to bond with the jury, and some people use it
12:21  10   to mine for prejudice.  If you're on that track, I'm not
       11   going to cut you off, but I think 45 minutes will be enough,
       12   and I'll look for your proposed questions as well.
       13           As far as jury instructions go, I'll prepare an
       14   initial set of instructions and get those out to you.  I ask
12:21  15   you to prepare a joint statement of the case that I can use
       16   to read as a preface to voir dire, and I'll also plug it in
       17   the initial jury instructions.
       18           In terms of the final instructions, I'm sure
       19   you've seen my order re jury trial.  I ask for the jury
12:21  20   instructions to be prepared in a very precise way.  Namely,
       21   one set, joint set, in the order you think the Court ought
       22   to read them.  If there are alternates, it will be right
       23   there.  If there's -- Jury Instruction No. 1, objections,
       24   alternate, objections.  We're going to have for each
12:22  25   instruction a complete packet right there.  I think it's

12:22    1    laid out pretty clearly in the order for jury trial.

2    I received your deposition markups at 155. I'll

3    start to turn those around as soon as I can.

4    As far as opening statements, I ask you to make

12:22    5    the openings, closings, and examinations all from the

6    lectern. You get one arm's grace. I just don't think it's

7    appropriate for people to be wandering around.

8    In terms of opening statements, I think you're

9    entitled to use anything you reasonably believe will come

12:22    10    into evidence. If you're going to use a PowerPoint, that's

11    fine, but you need to share it with the other side in

12    advance so you have worked out or tender very promptly on

13    the day of trial whatever objections there are to

14    PowerPoints or particular slides.

12:23    15    MR. CAVANAUGH: Your Honor, there's one

16    disagreement as to disclose time for demonstratives for

17    opening. We asked for the morning of. They asked for the

18    night before. I don't think the night before is appropriate

19    because I'm basically telling them what my opening is.

12:23    20    THE COURT: Well, they're going to tell you what

21    theirs is, too. Night before.

22    MR. CAVANAUGH: Okay. Thank you, Your Honor.

23    THE COURT: If people roll in with 50 pages of a

24    disputed PowerPoint, you're unlikely to use the

12:23    25    PowerPoint -- or to be able to use the PowerPoint.

12:23  1            Okay, as far as depositions go, if you're going to

2  impeach a witness, you need to have a copy in front of the

3  witness, recite the page and line you want to read so the

4  other side can look at it, read it.  If you want to move on,

12:24  5  that's your choice.  If you want to ask for a response,

6  that's your choice.

7            MR. CAVANAUGH:  Your Honor, do you have a

8  preference as to -- because these are all video recorded

9  depositions --

12:24  10            THE COURT:  Right.

11            MR. CAVANAUGH:  Is it permissible to play the

12  impeachment -- the impeaching deposition testimony?

13            THE COURT:  Sure.

14            Okay, I think that covers my list of things for

12:24  15  the pretrial conference.  Anything else you would like to

16  take up?

17            Mr. Ho.

18            MR. HO:  Your Honor, one question about rebuttal.

19  I think there may be a disagreement about whether we're

12:24  20  entitled to a rebuttal case.  We think we are.  Biosense

21  indicated they think we aren't.

22            THE COURT:  You know the best point to make that

23  decision?  When would you make the decision?

24            MR. HO:  Well, we would like to make that decision

12:25  25  after the close of our case, but we would also like to be

55

| | |
|---|---|
| 12:25 | 1 |

able to know whether we have a rebuttal case so that we can

plan the time frame, Your Honor.

THE COURT:  Well, I think like everybody -- I

think you have to listen to the evidence as it comes in and

conclude whether something said in the defense case warrants

a rebuttal.  I mean, I'm not going to make that decision

sight unseen.

MR. CAVANAUGH:  That's fine with us, Your Honor.

MR. HO:  Will that come out of our time, Your

Honor?

THE COURT:  Yes.

MR. HO:  Okay.  So we will reserve some time in

case we do get a rebuttal.

THE COURT:  Yeah.

MR. HO:  Thank you.

Any other thoughts?

MR. CAVANAUGH:  Your Honor, we have one witness

who is leaving the country the night of May 5 for a

long-planned European vacation with friends and family.  We

had proposed to the plaintiff that could we call her in

their case.  She's -- it's about a 30-minute direct

examination.  They've objected to that.

THE COURT:  She'll be allowed to testify out of

order.  I mean, it's a common courtesy extended.  I don't

think it's going to disrupt your case if it's 30 minutes

12:26    1    direct.

         2            MR. GOLDSMITH:  Your Honor, may I be heard?

         3            THE COURT:  Sure.

         4            MR. GOLDSMITH:  Andrew Goldsmith for Innovative.

12:26    5            This is the witness who --

         6            THE COURT:  On the mic, please.  On the mic.

         7            MR. GOLDSMITH:  Andrew Goldsmith for Innovative,

         8    Your Honor.

         9            This is the witness who Biosense identified for

12:26   10    the first time in February, just two months ago, and we had

        11    the whole motion practice over whether she would be

        12    permitted to testify.  Documents were produced.  We deposed

        13    her and so forth.  This long-planned vacation, Biosense

        14    never said anything to us about it.  It seems to me, Your

12:26   15    Honor, if they're going to add a new witness at the last

        16    minute, which the Court permitted, it's their responsibility

        17    to choose a witness who's actually available for the trial.

        18            This was previously expected to be a nine-day jury

        19    trial starting on a Tuesday.  It was fairly clear that their

12:27   20    case would most likely start the following week, or at least

        21    that should have been an assumption that they should have

        22    made.  We don't think that our case should be impacted by

        23    their gamble with Ms. Tam's vacation plans.

        24            THE COURT:  Well, if we'd started on the

12:27   25    anticipated date, we may well have gotten to this witness

12:27　1　because they would be in their case-in-chief, but that's not

2　the way it's breaking at least at the moment.

3　　　　MR. GOLDSMITH:  We may or may not have, Your

4　Honor, but it certainly is not clear enough that they could

12:27　5　count on starting their own case during that first week.

6　It's a possibility I agree, but again, that's not our

7　responsibility.

8　　　　THE COURT:  Sir, I'm going to allow it.

9　　　　MR. GOLDSMITH:  Thank you, Your Honor.

12:27　10　　　　THE COURT:  Okay.

11　　　　MR. CAVANAUGH:  Your Honor, just a couple more

12　questions.

13　　　　THE COURT:  Sure.

14　　　　MR. CAVANAUGH:  Sponsoring witnesses, does Your

12:27　15　Honor require a sponsoring witness for exhibits?

16　　　　THE COURT:  Yes.

17　　　　MR. CAVANAUGH:  Okay.

18　　　　THE COURT:  I mean, if you want to stipulate to an

19　exhibit coming in, but I think that there ought to be a

12:28　20　testimonial sponsor rather than just loading up the record

21　with things that the jury never saw or heard.

22　　　　MR. CAVANAUGH:  That's fine, Your Honor.  Okay.  I

23　just -- I've had different judges take different approaches

24　to it, so --

12:28　25　　　　THE COURT:  Then it's good to ask.

| | |
|---|---|
| 12:28 | 1 |

12:28    1          MR. CAVANAUGH:  I'm trying to think of -- Your

2    Honor, will the Court keep track of time, or should we be

3    keeping track of it?

4          THE COURT:  I'll keep track.

12:28    5          MR. CAVANAUGH:  Okay.

6          THE COURT:  There's a time stamp on the

7    transcripts I receive, so I should be fairly accurate.

8          MR. CAVANAUGH:  One other issue, there are a

9    number of Biosense witnesses on the plaintiff's witness list

12:29   10    that are presently may call witnesses.  There are two that

11    are not on our list as will call witnesses.  We've asked --

12    these are busy people with jobs trying to plan their

13    personal and professional lives.  I've asked them to tell us

14    this week are they actually calling any of the Biosense

12:29   15    witnesses in their case, and we haven't gotten a response,

16    but I'd like them to be directed to tell us this week.

17          THE COURT:  If there is somebody who is going to

18    be a no-cut player, I think you need to tell him.

19          MR. GOLDSMITH:  Understood, Your Honor, and

12:29   20    presumably it will go the other way as well.

21          THE COURT:  Absolutely.

22          MR. GOLDSMITH:  Thank you, Your Honor.

23          THE COURT:  And you'll be required at the end of

24    each court day if you're going forward to advise the other

12:29   25    side by 5:00 who the witnesses are for the next day, what

12:30    1    your estimate is, and what the estimate for cross is, so

2    that we make sure up we fill up the days and nobody gets

3    pulled up short.

4                MR. CAVANAUGH:  We've actually worked out an

12:30    5    agreement on that, Your Honor.

6                THE COURT:  Okay.

7                MR. CAVANAUGH:  We're doing it two days before so

8    the parties have time.

9                THE COURT:  Okay.  Good.

12:30   10                MR. HO:  Can I raise two other issues?

11                THE COURT:  Sure.

12                MR. HO:  I believe there is a brewing dispute

13    between the parties about the redaction of certain

14    documents, and obviously, in order to have redacted

12:30   15    documents available for trial, it's something that needs to

16    be worked out before trial.  If the parties are unable to

17    work that out, is there a process by which we could raise

18    that for the Court?

19                THE COURT:  I would advise the magistrate right

12:30   20    now that you have a potential dispute.

21                MR. HO:  Okay.

22                THE COURT:  And in the first instance, your

23    existing papers should go to the magistrate judge, and

24    arrange time with the magistrate judge, Judge Scott, to get

12:31   25    it on her calendar.

12:31    1              MR. HO:  Thank you, Your Honor.

         2              The second issue is there were some exhibits that

         3      were disclosed by Biosense after the parties briefed motions

         4      in-limine.  Again, some of those exhibits may raise issues

12:31    5      that we think are appropriate to resolve before trial.  And

         6      so the same question, is there a process by which we could

         7      raise those issues for the Court?

         8              THE COURT:  I think you should raise them with me.

         9              MR. HO:  Okay.

12:31   10              THE COURT:  What volume are we talking about?

        11              MR. HO:  A handful of exhibits I believe.

        12              THE COURT:  Okay.  Let's take it up the first day

        13      of trial.

        14              MR. HO:  Thank you, Your Honor.

12:31   15              THE COURT:  Have your briefs in in advance, so I

        16      can be prepared to take up the issue.

        17              MR. HO:  We will.  Thank you.

        18              THE COURT:  Mr. Cavanaugh, do you have something?

        19              MR. CAVANAUGH:  Your Honor, will we actually be

12:31   20      starting on May 1?  Is that -- let's assume the jury comes

        21      in before -- earlier.

        22              THE COURT:  Yes.  You've told me you want to

        23      start.  If we can start May 1, we'll start then.

        24              MR. CAVANAUGH:  Fine.

12:32   25              THE COURT:  If we're going to start on May 2, it

12:32   1    doesn't make sense for half a day.

        2            MR. CAVANAUGH:  I understand.  Thank you, Your

        3    Honor.

        4            THE COURT:  And we'll keep you posted.

12:32   5            MR. CAVANAUGH:  Thank you.

        6            MR. GOLDSMITH:  Your Honor, we actually have one

        7    more issue after all.  I think the parties are in agreement

        8    in general that live witnesses will only be called once

        9    instead of being recalled in the defense case.

12:32  10            THE COURT:  Right.

       11            MR. GOLDSMITH:  The question arises, though, as to

       12    deposition designations.  Our view is that if a live witness

       13    is called in our case, Biosense should not be allowed to

       14    present that witness again in its case by deposition either.

12:32  15    If they want to use the deposition, they're free to do that

       16    during cross of course.

       17            THE COURT:  If you've got a person here, take all

       18    the testimony from that person live.

       19            MR. GOLDSMITH:  Thank you, Your Honor.

12:33  20            THE COURT:  All right.  As you're getting closer

       21    to the trial, if you have any issues you want to take up

       22    with the Court, please just contact Ms. Vargas, and we'll

       23    set up a conference call.

       24            Okay, then, anything else?

12:33  25            MR. HO:  Not from plaintiffs, Your Honor.  Thank

62

12:33    1    you.

         2            MR. CAVANAUGH:  Not for defendants, Your Honor.

         3            THE COURT:  Very good.  Thanks for putting in a

         4    long morning.

12:38    5            (Whereupon, the proceedings were concluded.)

         6                        *    *    *

         7

         8

         9

12:38   10

        11

        12

        13

        14

12:38   15

        16

        17

        18

        19

12:38   20

        21

        22

        23

        24

12:38   25

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

12:38    1

2

3

4                          **CERTIFICATE**

12:38    5

6            I hereby certify that pursuant to Section 753,

7    Title 28, United States Code, the foregoing is a true and

8    correct transcript of the stenographically reported

9    proceedings held in the above-entitled matter and that the

12:38   10   transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13   Date:  April 18, 2025

14

12:38   15                        /s/   Sharon A. Seffens  4/18/25

16                        _____
                         **SHARON A. SEFFENS, U.S. COURT REPORTER**

17

18

19

20

21

22

23

24

25

MR. BERHOLD: **[1]** 4/19
MR. CAVANAUGH: **[37]** 5/6 6/6 17/3 25/16 25/23 29/6 29/10 29/12 34/6 36/6 46/24 48/10 48/13 50/14 50/22 50/25 51/3 53/15 53/22 54/7 54/11 55/8 55/17 57/11 57/14 57/17 57/22 58/1 58/5 58/8 59/4 59/7 60/19 60/24 61/2 61/5 62/2
MR. CRUZ: **[12]** 5/12 17/6 17/24 18/13 18/15 19/3 19/6 19/22 20/17 21/13 23/24 24/8
MR. DAVIS: **[8]** 4/16 35/23 35/25 38/9 38/12 42/16 49/22 49/24
MR. FARIDI: **[13]** 5/15 6/12 7/2 9/15 9/18 13/9 13/13 13/18 13/23 14/15 14/24 15/2 16/11
MR. GOLDSMITH: **[11]** 4/10 56/2 56/4 56/7 57/3 57/9 58/19 58/22 61/6 61/11 61/19
MR. HO: **[28]** 4/6 5/23 6/2 10/25 11/8 11/13 11/17 12/7 12/9 12/15 12/24 13/8 27/25 50/17 54/18 54/24 55/9 55/12 55/15 59/10 59/12 59/21 60/1 60/9 60/11 60/14 60/17 61/25
MR. READE: **[2]** 4/13 16/23
MR. SUMMERS: **[6]** 4/25 21/16 21/18 23/6 23/22 25/19
MS. ABDOLLAHI: **[1]** 4/22
MS. KRAFT: **[1]** 5/9
MS. SCHIFFMAN: **[6]** 5/3 28/2 29/5 29/15 31/13 35/18
THE CLERK: **[1]** 4/2
THE COURT: **[120]**

## $

**$30 [4]** 6/15 7/14 10/2 10/19
**$30 million [4]** 6/15 7/14 10/2 10/19
**$9,416 [1]** 15/9
**$90 [3]** 6/16 10/4 10/20
**$90 million [3]** 6/16 10/4 10/20
**$914 [1]** 15/17

## /

**/s [1]** 63/15

## 0

**0684 [1]** 2/10

## 1

**1-1053 [1]** 1/20
**10 [1]** 36/11
**100 [1]** 36/11
**10036 [1]** 2/2
**10104 [1]** 3/2
**1050 [1]** 2/12
**1053 [1]** 1/20
**10:30 [1]** 52/1
**1133 [1]** 2/19
**119 [1]** 42/18
**11:07 [1]** 4/1
**12,000 [1]** 12/2
**1230 [1]** 2/12
**1290 [1]** 3/2
**12:00 [2]** 51/5 51/25
**131 [1]** 42/18
**136 [2]** 43/24 43/25
**137 [2]** 43/24 44/4
**14 [4]** 1/17 4/1 11/25 51/17
**15 [2]** 49/17 51/25
**155 [1]** 53/2
**16 [2]** 51/8 51/11
**1600 [1]** 2/22
**1615 [1]** 2/5
**172 [1]** 31/14
**173 [2]** 32/18 32/21
**174 [1]** 32/24
**176 [3]** 31/14 32/7 32/19
**18 [1]** 63/13
**19 [1]** 6/22
**1:30 [2]** 51/5 52/2

## 2

**20 percent [1]** 49/17
**2000 [1]** 2/0
**20036 [1]** 2/6
**2009 [1]** 34/21
**2014 [2]** 34/21 34/23
**2016 [2]** 29/18 32/10
**202 [1]** 2/6
**2020 [2]** 19/15 19/22
**2021 [12]** 10/11 15/11 28/14 28/22 29/16 29/24 30/6 31/9 31/14 31/22 34/19 43/24
**2024 [15]** 6/22 7/17 8/7 8/14 9/1 14/1 16/4 28/16 29/19 30/5 31/10 33/4 34/7 42/2 43/10
**2025 [15]** 1/17 4/1 7/9 7/11 7/20 7/23 8/5 8/9 8/15 9/2 30/5 31/11 44/2 45/1 63/13
**212 [2]** 2/20 3/3
**22 [1]** 43/24
**22nd [1]** 50/2
**25 [1]** 63/15
**28 [1]** 63/7
**29th [2]** 50/1 50/3

## 3

**30 [2]** 52/4 55/25
**30-minute [1]** 55/21
**30309 [1]** 2/12
**30th [1]** 50/4
**30th of [1]** 15/15
**326-7900 [1]** 2/6
**336-2000 [1]** 2/20
**37 [1]** 9/23
**3800 [1]** 2/13

## 4

**4/18/25 [1]** 63/15
**400 [1]** 2/5
**4000 [1]** 2/23
**404 [1]** 2/13
**411 [1]** 1/20
**415 [1]** 2/10
**45 [2]** 52/5 52/11
**47 [1]** 33/13
**4:30 [2]** 51/5 52/3
**4th [1]** 1/20

## 5

**50 [2]** 40/12 53/23
**505 [1]** 2/9
**508 [2]** 36/16 37/16
**535 [1]** 2/15
**549-6200 [1]** 2/16
**57 [1]** 33/6
**58 [1]** 45/2
**5:00 [1]** 58/25

## 6

**612 [1]** 1/21
**6200 [1]** 2/16
**625 [1]** 2/9
**6422 [1]** 2/23
**660 [1]** 2/22

## 7

**70 [1]** 41/19
**7109 [1]** 2/6
**714 [1]** 2/16
**725-4000 [1]** 2/23
**74 [1]** 45/2
**753 [1]** 63/6
**7900 [1]** 2/6

## 8

**8-French [1]** 15/5
**804-8655 [1]** 1/21
**8655 [1]** 1/21
**872-3800 [1]** 2/13
**8:30 [1]** 51/24

## 9

**903-9314 [1]** 3/3
**906-0684 [1]** 2/10
**92626-7109 [1]** 2/15
**92660-6422 [1]** 2/23
**92701 [1]** 1/20
**9314 [1]** 3/3
**94111 [1]** 2/9
**949 [1]** 2/23
**9:00 [2]** 51/5 51/25

## A

**A.M [1]** 4/1
**Abbott [6]** 30/2 45/19 46/1 46/2 46/3 47/2
**ABDOLLAHI [2]** 2/14 4/23
**ability [1]** 9/25
**able [18]** 10/2 10/20 10/22 11/6 13/24 19/25 31/1 31/6 32/9 32/14 33/3 33/14 33/18 38/23 45/15 46/6 53/25 55/1
**about [34]** 8/4 8/12 9/14 11/18 16/2 16/4 16/5 17/13 18/2 19/13 20/11 24/4 24/10 29/24 32/2 32/21 33/8 33/11 39/10 41/8 44/11 44/11 44/12 44/16 46/12 49/25 51/25 52/6 54/18 54/19 55/21 56/14 59/13 60/10
**above [1]** 63/9
**above-entitled [1]** 63/9
**absolutely [7]** 6/20 7/7 9/5 9/15 14/15 43/15 58/21
**absorb [2]** 10/22 11/6
**academic [1]** 22/1
**accept [3]** 10/14 36/23 47/15
**accepting [1]** 36/1
**according [2]** 37/3 43/1
**accordingly [1]** 50/21
**accuracy [2]** 11/12 11/16
**accurate [3]** 11/10 12/3 58/7
**acknowledge [2]** 20/15 35/2
**acknowledges [1]** 20/14
**across [6]** 17/17 23/8 23/16 34/3 43/6 44/5
**act [1]** 39/9
**actively [1]** 45/5
**actual [4]** 8/19 8/20 20/2 37/6
**actual-world [1]** 37/6
**actually [22]** 8/24 15/22 16/8 16/9 18/21 18/23 18/24 18/25 19/19 20/5 24/20 26/22 33/6 35/1 40/17 42/4 50/6 56/17 58/14 59/4 60/19 61/6
**Acuitus [1]** 30/9
**add [1]** 56/15
**addition [1]** 13/5
**additional [5]** 12/20 12/20 24/22 43/11 43/13
**address [11]** 9/20 10/6 21/15 22/9 25/18 27/8 27/24 35/22 36/5 38/14 38/15
**addressed [4]** 10/11 27/12 27/18 36/10
**addresses [1]** 29/13
**adequately [1]** 25/13
**advance [2]** 53/12 60/15
**adverse [9]** 17/16 17/17 18/19 19/10 22/22 23/9 23/19 24/14 25/7
**advice [1]** 5/25 6/7
**advise [2]** 58/24 59/19
**Advocate [1]** 15/11
**affected [1]** 6/15
**after [7]** 13/2 14/5 25/25 29/12 54/25 60/3 61/7
**aftermarket [9]** 26/7 26/17 27/15 27/20 30/21 32/1 32/14 34/11 49/9
**afternoon [1]** 52/2
**again [8]** 12/24 33/5 33/10 33/21 45/14 57/6 60/4 61/14
**against [1]** 32/15
**aggregate [2]** 24/1 24/9
**ago [2]** 28/5 40/13 56/10
**agree [3]** 16/15 27/2 57/6
**agreeing [1]** 44/13
**agreement [2]** 59/5 61/7
**ahead [1]** 12/8
**ALEJANDRO [2]** 2/18 5/12
**all [31]** 7/2 9/10 12/1 12/24 14/5 17/10 26/17

**A**

**all... [24]** 26/20 27/1 30/14 30/24 31/5 31/20 33/2 34/1 34/9 35/4 44/5 44/13 44/15 45/9 46/1 46/8 49/25 51/8 51/17 53/5 54/8 61/7 61/17 61/20
**alleged [6]** 37/4 37/8 47/23 48/1 49/4 49/19
**allow [2]** 52/4 57/8
**allowed [3]** 28/7 55/23 61/13
**already [2]** 7/12 31/22
**also [18]** 4/11 4/13 4/17 9/3 12/21 12/25 24/4 25/19 30/11 32/18 32/23 34/14 38/13 38/16 42/7 50/1 52/16 54/25
**alternate [1]** 52/24
**alternates [1]** 52/22
**although [1]** 16/17
**always [3]** 30/14 36/20 40/23
**am [1]** 25/11
**Americas [2]** 2/19 3/2
**among [1]** 43/21
**amount [1]** 40/9
**ample [2]** 30/3 46/18
**amplify [1]** 40/24
**Ana [3]** 1/16 1/20 4/1
**analysis [16]** 9/8 26/24 28/14 30/15 31/6 31/9 31/10 33/5 34/1 41/18 47/6 47/11 47/11 47/13 47/19
**analyze [1]** 19/8
**analyzed [1]** 26/23
**analyzing [3]** 25/1 30/25 32/6
**ANDREW [4]** 2/3 4/10 56/4 56/7
**another [4]** 8/12 13/15 35/4 40/25
**answer [2]** 46/6 46/7
**answered [1]** 16/3
**answers [1]** 13/4
**anticipate [1]** 44/24
**anticipated [1]** 56/25
**anticompetitive [7]** 33/15 38/20 38/22 49/4 49/13 49/15 49/19
**antitrust [4]** 36/20 47/14 48/19 49/7
**Anton [1]** 2/15
**any [28]** 10/6 13/3 17/19 18/4 19/18 23/12 23/13 28/9 28/17 29/21 36/3 40/5 40/6 40/21 41/3 41/3 42/6 43/5 43/7 44/14 45/6 46/14 47/12 50/5 51/22 55/16 58/14 61/21
**anything [4]** 53/9 54/15 56/14 61/24
**anytime [1]** 7/23
**apparently [1]** 27/3
**appearances [2]** 2/1 4/5
**appeared [1]** 44/21
**appearing [1]** 22/14
**Apple [1]** 30/12
**application [2]** 10/16 34/18
**applied [1]** 10/15
**applies [1]** 49/10
**apply [1]** 46/23
**appreciate [1]** 36/7
**appreciated [1]** 17/8
**appreciates [1]** 20/13
**approach [2]** 14/21 42/11
**approaches [1]** 57/23
**appropriate [14]** 9/20 20/15 41/9 42/8 43/16 44/15 46/18 47/8 47/19 49/8 49/12 53/7 53/18 60/5
**April [8]** 1/17 4/1 11/25 15/10 15/10 29/18 32/10 63/13
**April 14 [1]** 11/25
**April 2016 [1]** 29/18
**April of [2]** 15/10 32/10
**are [74]**
**are considered [1]** 9/24
**Areeda [4]** 36/17 36/22 37/16 47/22
**aren't [1]** 54/21
**argue [6]** 6/3 6/8 6/16 7/14 34/16 34/17
**arguing [4]** 9/10 35/8 35/25 40/20
**argument [13]** 9/16 12/10 26/5 28/25 38/15 39/12 39/15 40/2 40/12 40/14 41/2 41/13 41/23
**arguments [1]** 46/15
**arises [1]** 61/11

**arm's [1]** 53/6
**around [2]** 55/14 58/17
**arrange [1]** 59/2
**arrangement [2]** 31/2 47/24
**array [1]** 31/3
**article [1]** 39/2
**articulate [1]** 13/25
**as [70]**
**ask [10]** 17/3 50/22 51/23 52/6 52/8 52/14 52/19 53/4 54/5 57/23
**asked [9]** 16/4 28/15 43/2 45/18 45/25 53/17 53/17 58/11 58/13
**asking [1]** 16/2 46/11
**assault [1]** 38/19
**asserted [2]** 42/4 42/12
**assertion [2]** 11/1 42/19
**associated [5]** 9/22 15/20 18/18 23/19 49/18
**assume [10]** 18/6 19/9 19/9 24/11 24/12 24/15 36/21 37/2 40/5 60/20
**assumed [1]** 36/12
**assuming [1]** 20/18
**assumption [1]** 11/9 36/15 36/18 36/23 37/12 56/21
**Atlanta [1]** 2/12
**attached [1]** 14/19
**attempt [1]** 48/4
**attention [1]** 33/6
**authoritative [1]** 30/11
**authorities [1]** 36/20
**available [5]** 14/11 14/12 16/7 56/17 59/15
**Avenue [2]** 2/19 3/2
**avoid [2]** 26/6 26/8
**award [3]** 6/15 9/19 9/21
**awarded [1]** 9/23
**aware [5]** 43/6 43/7 48/24
**away [3]** 14/7 39/23 40/8

**B**

**back [6]** 11/2 16/15 20/11 28/4 28/16 32/14
**backed [1]** 22/1
**backfilling [1]** 13/5
**backlash [1]** 32/3
**backup [1]** 43/10
**bad [1]** 7/4
**baked [1]** 7/10
**balanced [1]** 25/6
**bang [1]** 12/6
**barn [1]** 20/25
**barriers [1]** 30/10
**base [10]** 28/11 28/13 28/14 28/15 28/18 28/19 29/20 29/21 34/19 34/21
**based [13]** 9/6 18/7 20/22 21/1 22/21 22/24 25/7 26/5 37/11 41/3 41/3 41/18 41/18
**basic [1]** 45/16
**basically [3]** 40/20 45/18 53/19
**basics [1]** 46/10
**basis [4]** 41/15 45/9 49/6 49/12
**be [76]**
**Beach [1]** 2/23
**bearing [1]** 8/17 9/8
**because [37]** 7/8 8/11 8/21 10/13 15/22 17/18 18/1 18/6 19/7 20/3 20/17 20/18 20/19 21/9 22/9 23/7 23/14 24/6 24/14 24/21 25/3 26/5 27/1 36/24 38/23 39/16 40/6 40/13 41/10 41/14 41/17 42/9 49/14 49/18 53/9 54/8 57/1
**become [1]** 12/19
**becomes [1]** 20/18
**been [24]** 19/18 24/18 25/6 27/13 28/24 30/12 30/15 30/21 31/1 31/6 32/9 32/17 33/3 33/8 33/18 33/19 39/13 40/19 40/23 40/23 42/9 45/15 50/9 56/21
**before [14]** 14/17 19/15 26/4 26/13 33/7 34/23 53/18 53/18 53/21 59/7 59/16 60/5 60/21
**beginning [1]** 6/19
**behalf [6]** 5/1 5/4 5/7 5/10 5/13 5/16
**behavior [1]** 44/11
**being [6]** 12/10 19/4 21/7 22/8 36/18 61/9
**belabor [1]** 17/9

**believe [3]** 53/9 59/12 60/11
**BELKNAP [3]** 2/9 5/15 5/15
**below [1]** 15/16
**bench [1]** 14/21 42/11
**benchmark [6]** 42/8 43/16 44/15 44/18 47/8 47/19
**benchmarks [9]** 38/17 41/8 41/13 45/10 45/17 45/21 46/17 46/20 47/5
**benefit [1]** 41/17
**BERGER [3]** 2/8 4/17 5/1
**BERHOLD [3]** 2/11 2/11 4/20
**best [1]** 54/22
**between [12]** 7/23 19/10 19/16 19/20 19/23 22/20 30/16 36/24 37/17 44/19 49/3 59/13
**beyond [1]** 7/1
**Bill [1]** 5/6
**binding [1]** 30/11
**BIOSENSE [49]** 1/11 4/3 9/4 11/18 12/11 19/18 20/3 21/22 22/6 22/9 22/25 23/12 26/16 28/17 28/19 30/2 30/8 31/1 31/6 31/17 32/2 32/9 32/21 33/2 34/8 34/16 36/13 36/18 37/2 37/8 37/10 37/12 39/5 41/12 42/4 42/13 42/24 43/3 43/13 44/17 45/6 45/24 54/20 56/9 56/13 58/9 58/14 60/3 61/13
**Biosense's [13]** 17/1 23/20 25/1 25/3 29/5 30/3 32/19 33/14 33/23 42/18 43/2 44/16 48/20
**bit [1]** 6/25
**Bodner [2]** 42/25 44/1
**bolster [1]** 30/13
**bolstering [1]** 30/14
**bond [1]** 52/9
**Boston [6]** 30/1 45/20 46/7 47/2
**both [12]** 10/16 21/24 27/13 28/11 31/3 37/21 38/1 41/17 43/14 45/22 46/15 48/5
**bought [1]** 48/24
**Boulevard [1]** 2/15
**bounds [1]** 7/1
**box [2]** 51/17 51/19
**brand [2]** 26/7 39/11
**break [1]** 51/25
**breaking [1]** 57/2
**brewing [1]** 59/12
**brief [6]** 7/18 7/22 8/16 8/25 25/24 38/13
**briefed [1]** 60/3
**briefing [7]** 11/24 17/10 24/25 34/15 41/12 41/17 42/10
**briefly [6]** 13/9 17/4 23/23 23/24 23/25 34/5 35/18 39/19 48/9
**briefs [6]** 60/15
**brings [2]** 24/21 28/20
**build [2]** 30/5 30/7
**bunch [1]** 45/25
**busy [1]** 58/12
**BWI [1]** 48/17

**C**

**CA [4]** 1/20 2/9 2/15 2/23
**calculation [6]** 7/13 7/14 7/15 8/18 8/22 9/6
**calculations [1]** 9/6
**calendar [1]** 59/25
**CALIFORNIA [3]** 1/5 1/16 4/1
**call [7]** 12/4 12/9 45/17 55/20 58/10 58/11 61/23
**called [2]** 61/8 61/13
**calling [2]** 4/2 58/14
**can [41]** 13/14 13/16 13/19 13/20 14/20 19/11 25/13 26/6 26/7 29/12 31/8 32/2 34/9 38/3 38/10 38/20 38/22 39/10 40/18 40/24 40/24 46/5 47/24 48/9 48/10 48/19 48/21 48/22 49/7 50/10 50/10 50/12 50/20 51/7 52/15 53/3 54/4 55/1 59/10 60/16 60/23
**can't [12]** 16/14 24/15 25/8 34/6 36/24 37/1 37/8 37/17 37/20 40/6 40/21 41/4
**cannot [2]** 18/20 18/21
**capacity [1]** 43/5
**cardiac [3]** 26/3 26/15 29/25 31/21 32/20 32/22 33/8 33/14 33/16 34/9 35/3 44/6 45/22
**cardiology [1]** 43/7

**C**

carefully [1] 6/14 46/13
CARLSON [1] 2/22
CARTO [6] 29/17 31/16 32/11 32/12 32/13 33/17
case [44] 10/10 10/12 18/18 19/15 20/7 20/10 21/7 22/4 22/18 26/6 27/15 27/16 27/16 27/20 28/24 30/13 31/2 40/23 41/3 43/8 47/20 47/21 48/18 49/9 50/4 51/7 51/14 51/16 52/15 54/20 54/25 55/1 55/5 55/13 55/21 55/25 56/20 56/22 57/1 57/5 58/15 61/9 61/13 61/14
cases [3] 20/23 47/14 49/7
catheter [14] 15/4 15/5 15/10 15/17 19/10 20/4 20/5 22/20 23/13 23/15 24/13 25/15 31/17 48/20
catheter's [1] 18/19
catheters [29] 8/19 9/1 9/7 18/7 18/21 18/24 19/17 19/17 19/23 19/23 21/21 21/22 22/2 22/5 22/6 22/9 22/11 22/13 23/7 23/22 23/8 23/10 23/12 23/19 23/20 37/5 44/6 44/9 48/25
caught [1] 39/17
causation [19] 18/2 18/6 18/6 18/12 18/14 18/25 19/8 19/9 19/10 20/4 20/15 20/18 20/20 20/24 21/10 22/20 23/2 23/5 24/6
caused [1] 12/24 18/21 24/14
causing [2] 13/5 23/13
CAVANAUGH [8] 2/18 5/7 6/5 25/22 34/5 36/5 46/23 60/18
caveat [1] 19/24
Center [1] 2/22
CENTRAL [1] 1/5
certain [3] 39/25 50/11 59/13
certainly [7] 7/2 7/4 7/17 34/17 35/7 38/6 57/4
certainty [1] 50/10
CERTIFICATE [1] 63/4
CERTIFIED [1] 1/9
certify [1] 63/6
challenge [2] 22/11 51/20
challenges [1] 46/25
challenging [2] 10/8 46/12
chance [1] 45/14
change [8] 8/11 8/20 8/21 27/8
changed [3] 8/21 11/20 11/21
changes [2] 8/5 28/9
changing [1] 27/10
characterize [1] 19/4
charge [5] 37/11 39/5 40/8 45/6 47/2
charged [1] 43/8
charges [4] 42/5 43/4 44/13 45/21
charging [2] 31/17 43/14
check [1] 13/18
chicken [5] 39/14 39/20 39/20 40/14 47/20
chief [1] 57/1
choice [2] 54/5 54/6
choose [2] 48/16 56/17
Circuit [9] 9/24 26/10 26/14 27/9 27/12 27/19 34/22 35/11 35/11 39/17 40/15 41/4 47/21 48/18
circumstance [1] 20/6
circumstances [4] 19/14 30/25 43/18 44/14
citations [1] 43/19
cite [5] 27/16 38/25 39/15 42/24 45/13
cited [1] 43/9
cites [2] 29/23 30/4
claim [3] 37/6 38/1 49/9
clarified [1] 28/6
classic [1] 34/23
clear [9] 18/3 24/3 26/11 32/21 34/22 38/18 48/16 56/19 57/4
clearly [1] 53/1
client [1] 13/18
clinical [14] 37/9 37/24 39/5 39/8 42/5 42/8 43/3 43/15 44/5 44/10 44/14 45/21 46/3 47/3
close [2] 25/11 54/25
closer [1] 61/20
closings [2] 51/10 53/5
co [1] 16/21
co-founders [1] 16/21
code [2] 13/25 63/7

colleagues [1] 4/7
collected [1] 25/14
collected [1] 25/15
collections [1] 25/15
column [1] 15/14
come [7] 16/15 22/24 25/12 27/6 29/2 53/9 55/9
comes [4] 18/4 21/24 55/4 60/20
coming [2] 7/12 57/19
commented [1] 21/20
commenting [1] 24/18
Commercialization [1] 45/5
common [1] 55/24
companies [1] 45/19
company [1] 14/3
comparators [1] 45/19
compare [1] 17/16
comparison [2] 44/18 46/11
compelled [2] 6/16 36/23
compelling [1] 42/1
competition [3] 26/25 33/8 33/13
competitive [15] 26/16 31/15 31/24 36/25 38/16 41/8 41/13 41/16 44/8 44/15 45/10 45/17 45/20 46/17 46/20
competitor [1] 30/9
competitors [2] 30/1 45/23
complain [1] 8/3
complaint [3] 21/23 22/4 25/4
complete [2] 13/1 52/25
component [1] 44/8
concede [1] 34/24
conceded [1] 24/6
concern [1] 17/12
concerned [1] 52/6
concerning [1] 47/9
conclude [1] 55/5
concluded [2] 26/25 62/5
conclusion [1] 24/16
conditioning [2] 52/7 52/7
conditions [6] 26/24 28/10 47/5 47/13 47/17 47/18
conduct [5] 33/15 49/4 49/14 49/15 49/19
confer [1] 16/14
conference [5] 5/18 11/25 54/15 61/23 63/11
confidential [1] 28/24
confirm [2] 13/15 13/19
confused [1] 35/1
considered [2] 9/24 31/2
consistency [2] 24/9 48/3
consistent [3] 24/2 36/16 36/20
consistently [2] 34/3 39/17
constrain [4] 26/17 31/25 33/14 34/11
consumer [1] 33/19
consumers [1] 32/3
contact [1] 61/22
contain [1] 17/20
contained [1] 29/17
contains [1] 30/1
contesting [1] 7/3
context [1] 28/4
continued [1] 32/13
contradiction [2] 38/4 48/3
contrast [1] 22/8
controlling [1] 27/8 27/9
convenience [1] 14/11
converted [1] 38/22
copy [1] 54/2
core [1] 10/10
correct [3] 7/13 10/17 11/4 12/12 63/8
corrected [4] 6/25 7/9 7/10 7/14
correlated [1] 22/4
correlation [3] 18/2 18/22 20/20 24/12 24/13
cost [5] 15/13 15/16 15/20 32/25 36/9
Costa [1] 2/15
costs [8] 8/25 9/4 9/4 9/8 9/8 9/21 31/5 33/25
could [3] 4/4 11/8 16/1 20/22 27/8 32/16 35/11 50/8 50/22 55/20 57/4 59/17 60/6
counsel [13] 2/1 4/4 5/25 6/7 11/1 29/6 29/13

34/6 38/15 39/12 39/15 40/3 40/11
count [1] 51/8
counting [1] 51/9 51/9 51/10
countries [1] 45/7
country [3] 43/9 45/7 55/18
couple [3] 8/2 35/19 57/11
course [1] 11/23 61/16
court [30] 1/4 15/1 18/1 19/25 21/5 25/25 26/6 26/8 27/16 27/17 28/5 28/6 28/16 31/13 34/13 36/17 41/16 41/22 42/15 47/15 47/21 48/14 52/21 56/16 58/2 58/24 59/18 60/7 61/22 63/16
Court's [10] 4/8 18/10 21/6 26/13 33/6 36/7 36/8 41/5 43/12 48/13
courtesy [1] 55/24
Courthouse [1] 1/19
courts [2] 20/14 39/13
cover [1] 42/17
coverage [1] 31/2 43/4 43/8
covered [1] 29/9
covers [1] 54/14
credit [1] 14/3
critical [2] 7/7 32/8
cross [6] 17/23 17/25 20/12 20/23 59/1 61/16
cross-examination [4] 17/23 17/25 20/12 20/23
CRUZ [2] 2/18 5/13 12/16 13/12 13/13 14/11 16/6 16/13
cure [1] 17/25
customers [1] 32/14
cut [2] 52/11 58/18
cycle [1] 32/24

**D**

D.C [1] 2/6
damage [4] 38/1 40/5 40/6 49/4
damages [23] 6/15 7/13 7/13 7/15 8/17 8/22 9/5 9/6 9/8 10/1 10/2 10/3 27/6 38/3 40/10 40/13 40/21 41/1 48/5 48/22 49/8 49/12 49/15
dangerous [2] 19/13 20/19
dark [1] 51/2
data [98]
dataset [1] 11/10
date [4] 15/23 50/11 56/25 63/13
dates [1] 35/4
Daubert [9] 10/7 35/22 35/23 36/2 38/5 40/20 41/12 44/21 44/22
DAVIS [2] 2/7 4/16
day [11] 50/7 51/6 51/13 51/24 51/25 53/13 56/18 58/24 58/25 60/12 61/1
days [7] 14/14 16/13 51/7 51/11 51/12 59/2 59/7
deal [1] 29/12
dealing [1] 5/20
dealt [3] 26/22 35/9 35/12
decision [6] 26/14 27/9 54/23 54/23 54/24 55/6
declaration [1] 14/20 20/2 36/11
decreased [1] 33/16
deemed [1] 28/24
defect [1] 23/4
defendant [11] 1/12 2/17 5/10 5/13 5/16 6/3 39/20 40/1 40/2 40/4 40/16
defendant's [1] 36/2
defendants [3] 5/7 38/23 62/2
defense [2] 55/5 61/9
definition [1] 9/10 10/12
degree [1] 27/1
Dela [6] 12/16 13/12 13/13 14/11 16/6 16/13
deliberately [1] 46/11
Delight [3] 39/14 39/20 40/14
delivery [1] 39/21
demand [1] 44/9
demonstrate [1] 37/21
demonstrates [1] 44/8
demonstratives [1] 53/16
denied [2] 16/18 24/7
deny [2] 16/12 25/11
depose [4] 12/14 13/12 13/14 13/16

**D**

deposed [1] 56/12
deposition [16] 9/21 9/22 12/13 12/14 13/1 14/11 16/13 36/12 44/25 45/3 45/13 53/2 54/12 61/12 61/14 61/15
depositions [4] 11/17 12/21 54/1 54/9
DEREK [2] 2/3 4/6
designations [1] 61/12
detail [1] 29/23
determine [2] 22/20 48/15
determines [1] 40/18
developments [2] 28/9 30/8
device [3] 42/21 43/5 43/8
devices [2] 17/17 18/18
did [13] 8/20 19/22 25/21 26/19 27/7 28/10 28/17 34/13 34/15 37/4 39/21 46/7 47/6
didn't [14] 14/2 34/10 34/17 35/12 45/16 46/13 49/5
difference [1] 37/1
different [8] 8/14 9/1 22/23 23/8 31/10 34/12 57/23 57/23
dimensions [1] 11/20
dire [4] 51/9 52/4 52/5 52/16
direct [5] 31/13 33/5 45/1 55/21 56/1
directed [1] 58/16
directly [3] 37/10 37/15 37/24
Director [1] 45/4
disagree [1] 44/11
disagreement [2] 53/16 54/19
disagrees [2] 21/2 21/3
discipline [2] 32/4 33/9
disciplining [1] 32/17
disclaimer [1] 17/13
disclose [1] 53/16
disclosed [4] 8/13 9/13 26/4 60/3
disclosure [2] 6/9 9/20
disclosures [1] 10/23
discrepancies [3] 11/19 12/4 12/9
dispute [8] 6/20 11/4 26/18 30/21 47/1 47/22 59/12 59/20
disputed [1] 53/24
disrupt [1] 55/25
dissatisfied [1] 27/3
distinction [1] 19/16
distinguish [4] 19/20 19/23 36/24 37/17
distinguished [1] 22/24
district [5] 1/4 1/5 26/5 27/16 27/17
DIVISION [1] 1/6
do [24] 7/18 7/25 16/22 17/10 19/9 23/18 31/12 33/19 36/1 36/21 37/12 37/22 41/9 44/24 45/13 49/5 50/12 50/13 50/18 51/22 54/7 55/13 60/18 61/15
doctrine [3] 38/19 40/19 41/3
document [3] 15/1 42/11 42/15
documents [5] 12/20 46/19 56/12 59/14 59/15
does [8] 18/11 18/14 19/20 24/19 25/3 28/13 48/18 57/14
doesn't [7] 19/7 19/7 23/12 24/20 41/14 49/18 61/1
doing [3] 30/14 49/5 59/7
dollar [1] 42/8
dollars [1] 39/23
dominance [1] 30/3
don't [30] 6/24 11/25 12/6 12/16 12/17 12/21 13/3 17/9 21/2 21/2 23/6 24/15 29/4 29/6 31/12 36/23 37/25 40/15 40/16 43/11 45/6 46/4 46/8 47/1 50/4 51/20 53/8 53/18 55/24 56/22
done [6] 16/16 16/18 32/13 34/2 47/14 47/19
down [6] 10/6 19/24 20/4 37/25 51/18
Dr [34] 7/10 10/8 18/4 19/8 20/20 21/20 22/13 24/18 25/2 28/10 29/16 30/13 30/18 34/7 35/2 36/12 36/12 36/17 37/7 37/11 39/6 41/14 41/24 42/2 43/9 44/1 45/2 45/2 45/13 45/16 45/23 46/4 47/1 49/5
Dr. [13] 13/1 13/3 13/5 13/24 14/1 15/24 28/20 43/23 44/2 44/4 44/13 45/11 46/19
Dr. Forister [1] 28/20

Dr. Forister's [2] 45/11 46/19
Dr. Wu's [3] 13/23 14/1 45/24 45/24 44/4 44/18
Dr. Wu's [2] 43/23 44/2
draw [1] 44/16
dribbled [1] 11/23
Drive [1] 2/22
driving [1] 32/11
drop [1] 32/11
duplicated [2] 15/12 15/19
duplicative [1] 12/3
during [1] 57/5 61/16

**E**

each [8] 6/19 51/8 51/11 51/13 51/16 52/4 52/24 58/24
earlier [1] 60/21
Eastman [3] 30/17 33/1 34/1
Eco [1] 15/5
economic [2] 31/23 36/14 39/16
economist [5] 22/13 30/19 30/24 30/24 34/2
economists [1] 36/21
effect [2] 32/17 32/18
eight [3] 51/14 51/18 51/19
Einer [1] 39/2
either [5] 7/4 12/18 17/15 24/10 61/14
electrophysiology [2] 42/22 43/5
element [2] 23/2 23/5
elements [3] 26/6 26/8 32/19
elevated [1] 23/9
eleventh [1] 10/9
eleventh-hour [1] 10/9
Elhauge [1] 39/2
else [4] 12/16 13/17 54/15 61/24
encourage [1] 39/10
end [5] 10/11 36/22 50/3 51/13 58/23
enough [7] 32/3 33/19 41/20 47/14 51/14 52/11 57/4
entire [1] 12/10
entitled [4] 49/15 53/9 54/20 63/9
entry [1] 15/13 15/13 30/10
EP [3] 20/9 21/3 42/22
Epic [3] 26/10 27/13 30/11
equal [1] 21/21
equally [2] 22/5
equipment [1] 40/1
erroneously [1] 10/1
error [4] 6/21 6/23 6/24 14/7
especially [2] 19/13 19/14
Essentially [1] 26/7
establish [7] 10/3 10/20 26/7 26/10 30/20 38/2 48/4
established [1] 27/21
establishes [1] 43/13
establishing [1] 42/7
estimate [2] 59/1 59/1
European [1] 55/19
evaluate [1] 17/16
even [8] 12/17 12/22 20/10 24/11 24/23 33/6 39/6 41/23
event [7] 17/16 18/22 19/11 19/18 22/21 24/14 25/7
events [7] 17/16 18/17 18/19 22/23 23/10 23/19 30/12
ever [1] 40/19
everybody [2] 29/8 55/3
evidence [10] 11/2 30/3 40/17 40/17 42/3 42/3 43/13 51/7 53/10 55/4
ex [1] 16/15
exact [5] 15/13 29/19 33/5 46/12
exactly [7] 21/10 28/10 33/7 40/11 40/14 41/6 41/6
examination [5] 17/23 17/25 20/12 20/23 55/22
examinations [2] 51/9 53/5
example [10] 8/6 8/12 8/23 11/13 19/15 19/19 19/25 20/22 30/9 30/22
examples [3] 8/3 41/25 42/1
Except [1] 51/24

exception [1] 27/10
excerpts [2] 61/9 61/13
excerpts in [1] 44/25
excess [1] 39/6
exclusion [1] 21/7
exercise [5] 12/19 37/3 37/23 47/24 51/17
exhibit [4] 14/19 20/1 36/11 57/19
Exhibit 5 [1] 20/1
exhibits [4] 57/15 60/2 60/4 60/11
exist [1] 11/19
existing [2] 28/7 59/23
exit [1] 30/9
expect [3] 22/14 23/17 50/2
expected [1] 56/18
expert [14] 7/9 7/12 10/10 10/22 11/6 11/8 13/24 14/1 16/1 22/13 26/2 28/6 28/11 44/4
expert's [2] 10/8 27/4
explain [1] 32/16
explained [4] 21/8 21/10 43/2 45/23
explanation [10] 11/22 13/3 31/6 32/23 33/2 33/23 33/24 39/3 39/7 43/2
explanations [4] 11/2 11/13 11/23 11/24
exploit [2] 36/21 38/24
explore [2] 12/1 12/1
expressed [1] 17/12
extend [1] 40/24
extended [2] 38/22 55/24
extent [3] 16/13 24/19 27/7
extract [1] 13/25

**F**

fact [21] 14/3 18/4 23/18 25/6 26/14 26/23 26/25 27/19 32/8 32/11 32/23 33/12 38/20 39/13 41/6 42/5 42/19 44/4 47/2 47/7 47/22
factor [2] 31/5 34/18
factors [8] 27/14 27/20 30/17 31/3 32/16 33/1 34/2 48/14
facts [4] 26/18 33/18 39/19 42/13
failed [2] 8/16 9/3
fairly [2] 56/19 58/7
faith [1] 7/4
fall [2] 18/11 18/14
familiar [1] 51/21
family [1] 55/19
far [3] 52/13 53/4 54/1
FARIDI [2] 3/1 5/16
favor [1] 24/21
favors [1] 21/7
FDA [7] 17/14 17/19 18/19 19/16 20/8 21/2 22/9 25/4 37/5
FDA's [1] 17/13
February [2] 7/11 56/10
feel [1] 44/19
fees [1] 9/22
felt [1] 6/16
few [2] 7/19 8/5
fewer [1] 23/19
fictitious [1] 15/19
FIGEL [1] 2/5
figure [1] 51/5
filed [1] 7/23
fill [3] 34/24 35/5 59/2
final [1] 11/25 25/20 52/18
finding [1] 23/11
finds [1] 22/3
fine [5] 10/14 53/11 55/8 57/22 60/24
firm [6] 36/13 36/19 37/2 37/10 37/13 47/17
firms [1] 36/21
first [31] 5/19 5/20 6/20 6/24 8/3 11/3 11/24 13/24 14/8 15/3 15/7 15/13 15/19 15/23 17/12 21/20 23/25 31/10 31/20 38/18 41/10 41/11 44/13 44/23 46/16 51/19 51/24 56/10 57/5 59/22 60/12
firsthand [1] 39/10
five [1] 51/6
flatly [1] 24/7
flavor [2] 14/18 16/8
flawed [1] 38/6
flaws [5] 7/19 7/21 7/23 7/25 9/11

**F**

**Floor [1]** 2/15
**flow [5]** 48/19 48/22 48/22 49/19 52/2
**focus [1]** 25/5
**following [4]** 28/6 33/21 50/11 56/20
**footnote [1]** 41/18
**forced [1]** 10/18
**forces [2]** 37/1 37/19
**foregoing [1]** 63/7
**foreign [2]** 43/14 45/7
**foremarket [17]** 10/9 26/3 26/21 26/24 27/11 28/12 29/24 30/14 30/17 31/4 31/21 33/13 33/24 34/9 34/10 34/17 41/4
**forgive [1]** 28/22
**Forister [27]** 7/10 18/4 19/8 20/20 22/13 24/18 25/2 28/10 28/20 30/19 34/7 35/2 36/12 39/6 41/14 41/24 42/2 43/9 44/2 45/2 45/3 45/14 45/16 45/23 46/4 47/1 49/5
**Forister's [10]** 10/8 21/20 29/16 30/13 36/12 36/18 37/7 37/12 45/11 46/19
**format [1]** 63/10
**forth [1]** 56/13
**fortunately [1]** 39/22
**forward [3]** 29/19 43/13 58/24
**found [3]** 22/16 25/2 47/21
**foundation [1]** 30/6
**founders [1]** 16/21
**four [5]** 6/18 15/7 15/8 30/1 34/18
**four-factor [1]** 34/18
**fourth [1]** 16/20
**fraction [2]** 15/14 15/21
**frame [1]** 55/2
**France [1]** 45/8
**franchise [1]** 39/20
**franchisees [3]** 39/22 39/24 39/25
**FRANCIS [1]** 2/18
**Francisco [1]** 2/9
**frankly [1]** 15/25
**FREDERICK [1]** 2/5
**free [4]** 42/21 43/3 44/5 61/15
**French [1]** 15/5
**Friday [2]** 26/9 51/5
**friends [1]** 55/19
**front [1]** 54/2
**frontal [1]** 38/19
**full [1]** 8/24
**fully [1]** 38/24
**fundamental [2]** 38/4 48/3
**fundamentally [3]** 10/4 34/12 38/6
**further [2]** 26/19 30/2

**G**

**GA [1]** 2/12
**gamble [1]** 56/23
**game [1]** 27/10
**gamesmanship [1]** 7/5
**gave [6]** 8/4 8/7 9/11 14/3 16/3 39/23
**general [2]** 23/11 61/8
**generality [1]** 29/1
**Germany [1]** 45/8
**get [16]** 14/18 16/8 16/15 16/17 17/8 18/6 18/16 20/21 21/1 24/15 51/6 51/20 52/14 53/6 55/13 59/24
**gets [3]** 35/20 44/20 59/2
**getting [2]** 11/23 61/20
**give [7]** 8/2 8/6 8/12 8/23 10/19 31/14 41/25
**given [6]** 6/14 17/13 19/14 39/7 41/22 42/10
**gives [1]** 48/17
**go [11]** 6/19 12/8 30/4 37/25 39/19 48/9 50/4 52/13 54/1 58/20 59/23
**goes [5]** 18/9 18/23 29/23 30/10 42/24
**going [32]** 16/12 18/2 18/5 18/5 19/9 19/9 20/11 20/17 20/20 22/15 24/6 25/11 25/18 27/24 28/25 29/1 29/6 32/19 36/5 37/23 52/11 52/24 53/10 53/20 54/1 55/6 55/25 56/15 57/8 58/17 58/24 60/25
**GOLDSMITH [4]** 2/3 4/11 56/4 56/7
**gone [2]** 29/22 35/10
**good [35]** 4/6 4/9 4/10 4/12 4/15 4/16 4/18

**H**

4/19 4/21 4/22 4/24 4/25 5/2 5/5 5/6 5/8 5/9 5/9 5/11 5/13 5/17 6/12 8/20 10/4 10/24 13/22 17/22 22/9 24/7 24/14 44/18 44/18 57/25 59/9 62/3
**got [1]** 61/17
**gotten [3]** 49/1 56/25 58/15
**grace [1]** 53/6
**granted [1]** 28/16
**great [1]** 13/5
**grouped [1]** 19/18
**guarantee [1]** 51/11

**H**

**had [26]** 7/20 7/22 10/13 11/10 14/8 26/15 27/18 34/8 34/19 34/25 35/1 35/2 35/4 35/4 36/19 37/21 39/22 39/24 39/25 41/24 45/14 45/14 50/6 55/20 56/10 57/23
**hadn't [1]** 26/23
**half [3]** 26/15 50/7 61/1
**handed [2]** 15/1 42/15
**handful [1]** 60/11
**HANSEN [5]** 2/5 4/7 4/11 4/13 5/4
**happen [2]** 22/23 23/14
**happened [4]** 15/18 16/8 33/17 48/1
**happening [2]** 23/10 47/16
**happens [1]** 47/10
**happily [1]** 14/10
**happy [2]** 10/6 30/4
**hard [1]** 29/7
**harm [7]** 9/17 9/18 38/22 40/18 47/22 49/3 49/18
**Harvard [1]** 39/3
**has [36]** 7/12 8/17 8/21 9/11 18/6 20/24 21/20 22/10 22/15 24/12 24/18 25/5 25/6 27/13 27/19 27/19 28/23 31/1 31/6 32/9 33/3 33/17 34/1 34/16 36/11 37/9 39/6 39/7 39/13 39/16 39/17 40/19 41/4 48/2 49/3 50/8
**hasn't [3]** 32/17 33/19 50/9
**hate [1]** 45/17
**have [70]**
**haven't [3]** 54/15
**having [4]** 30/21 41/16 42/9 50/5
**he [57]** 7/11 10/12 11/10 13/19 14/2 14/2 14/3 14/4 14/4 14/8 16/9 19/11 21/20 22/3 22/14 24/7 24/19 26/2 26/18 26/19 28/13 29/18 30/2 31/8 31/10 31/19 31/20 31/23 31/23 32/7 32/16 32/18 32/21 32/23 33/12 33/12 33/21 34/1 34/10 35/20 36/13 40/12 40/13 41/14 42/1 43/2 43/24 43/25 45/4 45/6 45/7 45/19 45/19 46/8 46/19 47/6 47/7
**he's [13]** 19/9 21/22 30/19 30/19 30/24 31/2 32/6 33/1 33/10 33/17 34/2 44/16 49/5
**header [1]** 31/15
**heading [1]** 33/7
**HEALTH [2]** 1/9 4/3
**hear [1]** 16/6
**heard [9]** 5/22 6/1 9/12 11/14 16/22 22/8 38/19 56/2 57/21
**hearing [1]** 11/3
**held [2]** 39/17 63/9
**help [1]** 42/17
**helpful [1]** 31/11
**her [3]** 55/20 56/13 59/25
**here [32]** 5/18 6/20 9/20 9/21 10/16 14/19 15/4 15/4 15/8 15/18 16/9 16/9 17/9 18/3 20/2 20/15 24/4 24/19 30/18 31/24 32/25 33/1 33/11 38/3 40/3 41/10 47/19 47/22 48/1 48/16 49/4 61/17
**hereby [1]** 63/6
**high [2]** 27/1 28/25
**higher [1]** 18/8
**highlight [1]** 6/18
**highlights [1]** 31/23
**him [5]** 16/7 45/19 45/25 46/10 58/18
**himself [1]** 13/3
**his [35]** 10/24 11/7 13/1 14/3 14/4 14/5 15/25 26/12 28/10 28/14 28/15 28/18 30/15 31/5 31/9 31/10 31/14 32/5 32/5 32/6 33/4 35/20 37/11 41/18 41/19 42/2 43/9 43/10

**I**

43/13 44/2 45/17 45/23 47/4
**head [4]** 17/14 30/22 34/17
**hole [2]** 34/24 35/5
**holes [1]** 26/1
**hone [1]** 17/10
**Honor [138]**
**Honor's [4]** 14/20 17/7 20/11 27/5
**HONORABLE [1]** 1/8
**horse [1]** 20/25
**hospital [9]** 8/8 8/10 8/11 8/19 15/11 15/11 48/16 48/23 49/1
**hospitals [8]** 8/5 8/6 26/15 46/3 48/21 49/10 49/11 49/16
**hour [1]** 10/9
**hours [4]** 51/6 51/8 51/11 51/11
**how [5]** 11/18 18/16 24/2 32/21 47/15
**However [1]** 34/20

**I**

**I'd [3]** 17/25 24/8 58/16
**I'll [18]** 8/2 8/6 8/12 8/23 10/5 10/5 16/18 25/24 43/25 45/1 51/13 52/5 52/8 52/12 52/13 52/16 53/2 58/4
**I'm [25]** 10/6 12/7 14/16 14/24 16/12 18/13 20/1 25/23 28/25 30/3 43/6 43/7 45/1 50/1 50/19 51/9 51/9 51/10 52/5 52/10 52/18 53/19 55/6 57/8 58/1
**I've [7]** 21/8 21/10 29/22 33/7 47/14 57/23 58/13
**i.e [1]** 27/9
**idea [1]** 12/2
**identified [4]** 14/5 14/7 45/7 56/9
**identity [1]** 12/21
**immediately [2]** 14/14 15/16
**impact [2]** 8/21 9/5
**impacted [1]** 56/22
**impeach [1]** 54/12
**impeaching [1]** 54/12
**impeachment [1]** 54/12
**implementing [2]** 33/15
**important [8]** 14/18 18/16 21/5 28/24 30/18 43/22 44/11 44/12
**importantly [2]** 17/21 41/23
**impose [6]** 31/1 31/7 32/2 32/10 33/3 33/20
**imposed [2]** 32/10
**imposing [1]** 43/20
**improper [1]** 35/14
**impugned [1]** 22/10
**inability [1]** 13/1
**inadvertent [1]** 6/22
**inappropriate [2]** 38/5 41/14
**INC [2]** 1/11 4/3
**inclined [3]** 9/13 9/19 20/1
**include [1]** 24/22
**included [1]** 42/16
**including [6]** 21/23 22/25 31/3 42/22 42/25 44/2
**incorrect [3]** 7/16 10/18 14/1
**increase [2]** 32/14 40/25
**Indeed [1]** 39/14
**indicated [1]** 54/21
**indirectly [1]** 37/8
**industry [4]** 42/20 42/22 42/23 43/15
**inferring [1]** 23/3
**inflates [1]** 10/1
**information [6]** 21/23 29/1 31/4 32/25 33/25 39/9
**ingredients [1]** 40/1
**initial [2]** 52/14 52/17
**injury [3]** 22/19 22/21 23/13
**INNOVATIVE [15]** 1/9 4/3 13/6 18/3 18/7 18/24 21/11 21/21 22/9 23/1 23/10 23/11 42/19 56/6 56/7
**Innovative's [7]** 17/13 20/9 22/11 22/12 22/17 23/18 24/25
**insights [1]** 44/16
**installed [11]** 28/11 28/13 28/14 28/15 28/18 28/19 29/18 29/20 29/21 34/19 34/21
**instance [5]** 8/2 20/12 23/13 34/7 59/22

**I**

instance where [1] 20/12
instead [1] 61/9
instruction [2] 52/23 52/25
instructions [6] 30/22 52/13 52/14 52/17
  52/18 52/20
intended [1] 17/15
interchangeability [1] 27/1
intervening [1] 30/12
interventional [1] 43/7
introduce [2] 4/8 35/13
introduced [1] 47/6
involved [3] 12/16 12/17 45/5
involving [1] 49/9
irregularities [2] 17/20 18/1
is [200]
isn't [3] 17/22 41/5 51/15
Israel [1] 45/8
issue [28] 6/9 6/14 7/24 10/10 10/11 12/2
  14/5 21/10 24/2 24/6 24/10 24/14 25/21 27/12
  35/9 35/10 35/12 36/10 38/14 38/18 41/7
  41/10 44/12 44/23 58/8 60/2 60/16 61/7
issued [1] 26/1
issues [10] 18/2 24/19 32/24 33/1 36/3 38/14
  59/10 60/4 60/7 61/21
it [100]
it on [1] 50/8
it's [44] 6/16 8/19 15/5 15/14 15/15 18/5
  18/15 18/22 19/2 19/3 19/6 20/5 22/3 22/25
  23/14 24/2 24/4 25/11 28/17 28/24 29/5 29/7
  29/25 30/14 30/18 31/22 33/7 33/9 34/12
  34/23 41/9 41/17 43/20 52/25 53/6 55/21
  55/24 55/25 55/25 56/16 57/2 57/6 57/25
  59/15
Italy [1] 45/8
Item [1] 4/2
items [1] 39/25
its [11] 26/9 31/1 31/7 32/11 33/3 34/13 36/17
  37/3 37/8 39/5 61/14
itself [1] 24/13

**J**

JAMES [1] 1/8
January [10] 7/9 7/20 7/23 8/5 8/9 8/15 9/2
  10/23 10/23 11/7
January 2025 [5] 7/9 7/23 8/9 8/15 9/2
January of [2] 7/20 8/5
Japan [1] 4/19
Jeff [1] 4/19
JEFFREY [2] 2/11 2/11
jobs [1] 58/12
joint [2] 52/15 52/21
Josh [1] 4/16
JOSHUA [1] 2/7
JR [1] 2/18
judge [1] 1/8 59/23 59/24 59/24
judges [1] 57/23
judgment [8] 26/22 34/15 35/10 40/16 40/16
  40/21 42/4 42/13
Judicial [1] 63/11
jump [1] 24/9
jury [24] 18/24 19/11 20/19 30/22 50/4 50/5
  50/8 50/9 51/6 51/14 51/15 51/16 52/4 52/7
  52/9 52/13 52/17 52/19 52/19 52/23 53/1
  56/18 57/21 60/20
just [45] 6/18 8/2 10/4 11/14 12/2 12/3 13/23
  14/16 16/7 17/14 19/7 21/5 21/9 22/8 24/15
  24/21 28/4 29/16 29/19 33/18 35/18 36/7
  37/18 38/15 38/18 39/16 40/8 40/11 41/25
  42/9 42/11 42/16 43/19 43/20 45/1 46/6 46/8
  51/19 51/23 53/6 56/10 57/11 57/20 57/23
  61/22
just because [1] 42/9
justifications [1] 25/2
JVS [2] 1/11 4/2

**K**

KARLA [2] 2/21 5/9
keep [8] 21/5 25/24 50/18 50/19 51/13 58/2

58/4 61/4
keeping [1] 58/3
KELLEY [1] 2/4 2/13
KELLOGG [5] 2/5 4/7 4/11 4/13 5/3
key [5] 30/1 30/9 31/23 32/1 33/12
kind [1] 20/25
know [30] 9/22 9/25 9/25 10/13 10/17 12/15
  12/16 12/22 13/20 13/21 15/22 15/24 19/15
  20/7 21/2 21/6 23/9 24/17 24/23 25/1 29/6
  29/22 31/1 33/22 42/17 46/4 47/7 47/15 54/22
  55/1
knowingly [2] 48/16 48/24
known [3] 15/11 17/20 24/22
knows [1] 13/3 20/8 20/9
Kodak [12] 26/8 27/11 27/11 27/14 27/18
  27/20 30/17 33/1 34/1 34/18 48/14 49/9
KRAFT [2] 2/21 5/9

**L**

label [2] 20/3 20/3
laid [1] 53/1
large [1] 24/5
larger [1] 51/15
last [7] 10/5 25/14 25/14 35/20 41/19 44/24
  56/15
late [5] 6/8 6/25 9/12 9/20 10/11
law [8] 21/7 27/8 27/9 27/13 28/9 30/11 40/6
  46/16
laws [1] 48/19
lawyer [2] 30/19 45/18
lead [1] 31/5
leader [1] 32/22
leads [1] 16/14
leans [1] 18/3
least [2] 56/20 57/2
leaving [1] 55/18
lectern [2] 12/6 53/6
led [1] 37/5
legally [1] 30/20
let [2] 13/20 36/7
let's [9] 5/19 6/10 17/1 25/14 33/6 35/22
  49/25 60/12 60/20
level [1] 28/25
liability [9] 1/13 10/20 22/18 26/10 38/2 48/4
  48/15 48/19 48/21
license [1] 39/23
life [1] 32/24
light [1] 30/11
like [14] 5/22 6/1 22/13 36/1 41/25 42/6 44/19
  46/1 50/13 54/15 54/24 54/25 55/3 58/16
likely [1] 56/20
likewise [1] 47/4
limine [3] 5/19 7/24 60/4
limit [1] 43/17
line [1] 54/3
LINKLATERS [2] 3/1 5/16
list [11] 8/13 8/14 8/16 8/18 8/18 8/20 35/3
  35/4 54/14 58/9 58/11
listed [1] 15/21
listen [1] 51/13
lists [1] 32/18
litigation [1] 22/10
little [3] 6/25 9/9 21/9
live [4] 50/10 61/8 61/12 61/18
lives [1] 58/13
LLC [2] 1/9 4/3
LLP [2] 2/19 2/22 3/1
loading [1] 57/20
lock [4] 30/17 31/5 33/25 48/11
lock-in [4] 30/17 31/5 33/25 48/11
locked [2] 48/21 49/2 49/10 49/11 49/12
  49/14
locked-in [1] 49/10
long [6] 24/18 27/14 52/6 55/19 56/13 62/4
long-planned [2] 55/19 56/13
look [12] 15/3 15/7 20/1 22/19 23/7 23/16
  32/7 36/16 40/17 44/6 45/5 52/12 54/4
looked [2] 20/24 47/5
looking [4] 22/22 23/3 24/25 33/2

looks [1] 34/1
lose [1] 59/8
lot [2] 12/1 13/4 16/2
lots [1] 12/4
lower [1] 7/15
loyalty [1] 39/11

**M**

machine [1] 46/2
machines [14] 26/3 26/15 29/18 29/25 31/21
  32/11 32/12 32/13 32/20 32/23 33/9 33/14
  35/3 45/22
made [15] 12/10 19/16 24/3 26/11 34/22
  38/15 39/13 39/16 40/2 40/12 48/15 49/13
  49/16 49/17 56/22
magistrate [3] 59/19 59/23 59/24
main [1] 45/20
majority [1] 29/17
make [21] 9/9 14/10 16/6 16/16 24/6 24/9
  26/4 26/19 32/4 33/20 36/2 42/16 47/18 52/5
  53/4 54/22 54/23 54/24 55/6 59/2 61/1
makes [5] 17/17 20/7 20/9 44/14 52/1
making [1] 40/3
manufactured [2] 18/9 19/17
manufacturer [1] 22/24
manufacturers [2] 21/25 44/6
manufacturers' [1] 43/14
many [7] 11/24 12/9 23/8 23/8 30/12 43/19
  43/21
mapping [13] 26/3 26/15 29/25 31/21 32/20
  32/22 33/9 33/14 33/16 34/9 35/3 44/6 45/22
margins [1] 42/20
mark [2] 44/21 44/22
market [60] 26/2 26/20 27/11 28/9 28/12
  29/22 30/3 30/8 30/13 30/16 31/3 31/20 32/16
  32/19 32/20 32/22 33/8 33/23 34/8 34/16 35/7
  36/10 36/19 36/21 36/24 37/7 37/3 37/8 37/15
  37/18 37/19 37/21 37/23 38/1 38/3 38/21
  38/21 38/23 38/24 38/24 39/6 40/7 40/7 40/22
  40/22 40/24 40/24 40/25 42/6 42/7 47/12
  47/17 47/23 47/24 47/25 47/25 48/17 49/6
  48/8
market-wide [2] 49/6 49/8
marketplace [1] 30/10
markets [3] 44/12 44/17 47/16
markups [1] 53/2
material [1] 17/23
materially [1] 26/17 31/25 34/10
materials [1] 40/1
Matt [2] 4/25 21/18
matter [4] 5/18 11/4 40/6 63/9
MATTHEW [3] 2/4 2/8 4/13
MAUDE [13] 17/2 17/15 17/18 18/16 18/17
  18/20 19/22 21/24 22/3 22/16 22/21 22/22
  23/3
maximizing [5] 36/13 36/19 37/2 37/10 37/13
may [27] 6/15 10/7 13/9 17/25 35/18 41/7
  46/5 47/2 49/12 50/7 50/8 50/9 50/15 51/1
  51/21 51/21 54/19 55/18 56/2 56/25 57/3 57/3
  60/4 60/20 60/23 60/23 60/25
May 1 [4] 50/7 50/9 60/20 60/23
May 2 [2] 50/8 60/25
May 5 [1] 51/1
MDR [1] 24/13
MDRs [1] 17/18
me [8] 28/22 29/3 29/7 31/14 36/7 56/14 60/8
  60/22
mean [4] 9/16 55/6 55/24 57/18
meaning [1] 24/12
meaningful [1] 17/20
means [4] 24/13 26/20 29/20 44/17
measure [1] 9/19
med [1] 43/7
medical [3] 18/18 42/21 43/5
Medtronic [1] 30/2
meet [1] 16/14
memorized [1] 46/9
memory [2] 46/5 46/7
mentioning [1] 32/1

**M**

**Mesa [1]** 2/15
**methodology [3]** 38/5 47/1 47/4
**mic [2]** 56/6 56/6
**Michael [2]** 39/1 39/2
**might [3]** 39/5 42/9 42/10
**MIL [1]** 11/23
**million [7]** 6/15 6/16 7/14 10/2 10/4 10/19 10/20
**mind [1]** 21/5
**mindful [1]** 25/24
**mine [1]** 52/10
**minimum [1]** 19/5
**minute [2]** 55/21 56/16
**minutes [5]** 38/9 51/25 52/4 52/11 55/25
**misimpression [2]** 41/22 45/11
**misleading [1]** 45/15
**MIT [1]** 39/2
**mod [1]** 18/7
**model [1]** 11/9
**modify [1]** 16/18
**molehills [2]** 9/10 9/10
**moment [1]** 57/2
**MONDAY [2]** 4/1 50/25
**Mondays [1]** 51/2
**MONTAGUE [3]** 2/8 4/17 5/1
**Montgomery [1]** 2/2
**months [2]** 13/2 56/10
**more [14]** 12/13 20/10 20/18 22/6 26/15 38/9 41/23 42/1 43/19 44/19 44/20 46/18 57/11 61/7
**morning [29]** 4/6 4/9 4/10 4/12 4/15 4/16 4/18 4/19 4/21 4/22 4/24 4/25 5/2 5/5 5/6 5/8 5/9 5/11 5/12 5/14 5/15 5/17 6/12 6/17 17/6 38/10 38/12 53/17 62/4
**most [3]** 17/21 44/12 56/20
**motion [14]** 5/25 7/24 10/8 16/12 16/18 17/1 25/11 34/15 35/9 35/17 35/20 35/23 36/3 56/11
**motions [4]** 5/19 9/24 35/22 60/3
**mountains [1]** 9/9
**move [3]** 25/14 52/8 54/4
**Mr [6]** 5/14/10 44/1
**Mr. [17]** 10/22 12/16 13/12 13/13 16/6 24/1 24/5 24/10 24/17 25/22 34/5 36/5 42/25 45/3 46/23 54/17 60/18
**Mr. Bodner [1]** 42/25
**Mr. Cavanaugh [5]** 25/22 34/5 36/5 46/23 60/18
**Mr. Dela [4]** 12/16 13/12 13/13 16/6
**Mr. Ho [2]** 10/22 54/17
**Mr. Ramos [1]** 45/3
**Mr. Summers [4]** 24/1 24/5 24/10 24/17
**Ms [3]** 27/25 56/23 61/22
**much [2]** 43/12 44/20
**MUHAMMAD [2]** 3/1 5/15
**multiple [3]** 23/17 24/20 33/22
**must [3]** 27/14 27/15 27/21
**my [7]** 4/7 33/22 36/11 46/5 52/19 53/19 54/14

**N**

**N.W [1]** 2/5
**name [6]** 8/5 8/8 8/9 8/10 8/11 19/19
**Namely [1]** 52/20
**nature [1]** 24/1
**necessary [4]** 26/9 30/20 44/7 48/15
**need [14]** 11/11 11/15 11/17 12/20 13/18 28/23 29/4 29/11 39/3 39/4 40/17 53/11 54/2 58/18
**needs [2]** 15/3 59/15
**neither [2]** 10/17 45/21
**Netherlands [1]** 45/8
**never [9]** 10/10 15/19 26/4 27/12 34/15 40/23 47/5 56/14 57/21
**new [32]** 2/20 3/2 8/4 8/9 8/10 9/11 10/12 11/3 11/8 11/9 11/10 11/21 12/5 12/11 12/18 14/8 19/20 19/23 25/21 26/1 27/6 28/8 28/8 29/20 29/21 30/5 30/7 30/11 34/12 34/21 50/5
56/15
56/15

**Newcall [3]** 36/10 47/13 48/15
**Newport [2]** 2/2 2/2
**next [2]** 6/11 58/25
**night [4]** 53/18 53/18 53/21 55/18
**nine [1]** 56/18
**nine-day [1]** 56/18
**Ninety [2]** 11/20 11/21
**Ninety percent [2]** 11/20 11/21
**Ninth [14]** 2/15 26/10 26/13 27/9 27/12 27/18 34/22 35/10 35/11 39/17 40/14 41/4 47/20 48/17
**no [51]** 4/2 6/20 7/3 7/4 7/7 7/8 7/17 8/17 8/21 9/5 9/8 9/14 9/18 11/5 11/12 11/22 19/16 24/7 26/1 26/1 26/18 29/20 31/10 32/11 34/23 35/20 37/8 40/10 41/2 43/4 43/17 43/17 44/9 47/4 47/6 47/8 47/10 47/11 47/13 47/22 48/19 48/21 48/22 49/13 49/14 49/18 49/23 51/2 52/23 58/18
**no-cut [1]** 58/18
**nobody [3]** 42/5 44/13 59/2
**None [1]** 47/19
**North [2]** 32/5 33/10
**not [70]**
**note [3]** 27/7 34/14 45/2
**noted [4]** 26/9 34/22 36/17 48/14
**notes [5]** 32/7 36/22 37/16 46/25 47/7
**notion [1]** 13/24
**now [5]** 1/12 11/24 26/4 26/12 27/3 27/7 28/18 33/4 35/6 35/13 37/7 40/22 48/16 49/7 59/20
**number [10]** 9/7 9/7 11/19 12/3 21/23 24/3 24/24 32/12 51/12 58/9
**numerous [1]** 22/15
**NY [2]** 2/20 3/2

**O**

**objected [1]** 55/22
**objections [4]** 28/17 52/23 52/24 53/13
**observable [1]** 22/16
**obviously [2]** 12/11 59/14
**occurrences [1]** 17/17
**October [1]** 43/24
**October 22 [1]** 43/24
**ocular [1]** 43/7
**OEM [1]** 44/5
**OEMs [1]** 42/21
**off [1]** 52/11
**offend [1]** 48/18
**offer [4]** 17/25 18/5 35/12 42/11
**offering [1]** 44/8
**offers [3]** 32/16 32/23 41/14
**offsetting [1]** 40/9
**Oh [1]** 12/7
**okay [46]** 5/24 6/4 6/10 8/6 9/2 10/21 12/23 13/7 13/22 15/3 15/11 15/15 15/17 16/10 16/25 21/12 23/21 25/10 25/20 25/22 28/1 28/5 31/13 35/17 35/22 36/4 38/11 48/7 49/24 50/16 50/18 51/3 53/22 54/1 54/14 55/12 57/10 57/17 57/22 58/5 59/6 59/9 59/21 60/9 60/12 61/24
**old [4]** 8/7 11/20 12/18 14/25
**omit [1]** 8/10
**once [6]** 20/21 21/1 21/6 33/21 34/15 61/8
**one [49]** 6/10 6/19 6/19 8/6 8/23 10/5 12/14 12/15 13/19 15/23 16/8 22/25 29/1 19/24 20/6 20/6 22/15 24/3 24/16 24/19 25/20 26/9 31/14 36/1 40/25 41/7 42/1 42/1 42/6 42/13 44/3 43/23 43/25 44/24 44/25 45/6 45/21 46/16 46/17 48/10 50/6 52/21 53/6 53/15 54/18 55/13 58/8 59/9
**ones [1]** 18/9
**only [11]** 12/15 12/20 13/14 13/19 15/3 27/16 40/4 44/21 45/11 50/7 61/8
**opening [7]** 7/21 11/1 41/12 53/4 53/8 53/17 53/19
**openings [1]** 51/10 53/5
**operating [1]** 29/17
**opine [1]** 20/20

**opined [1]** 34/7
**opines [1]** 36/6
**opining [1]** 30/20
**opinion [20]** 18/6 18/7 18/17 18/23 20/14 26/2 26/4 26/5 27/4 29/17 29/19 33/23 34/12 34/13 35/8 35/12 36/8 39/14 43/10 43/23
**opinions [3]** 20/21 21/1 27/4
**opportunity [4]** 10/14 11/10 17/8 42/10
**opposed [1]** 46/3
**opposing [5]** 38/15 39/12 39/15 40/2 40/11
**opposite [1]** 27/20
**opposition [1]** 39/1
**order [13]** 5/20 16/12 26/1 26/13 29/9 34/13 47/18 48/4 52/19 52/21 53/1 55/24 59/14
**ordered [2]** 14/13 28/5
**orders [1]** 16/7
**orient [1]** 42/17
**original [1]** 18/8
**originally [1]** 19/17
**ORINGHER [1]** 2/14
**orthopedics [1]** 43/6
**other [18]** 13/12 13/20 16/14 18/4 21/25 23/14 41/7 43/5 43/21 45/10 50/20 53/11 54/4 55/16 58/8 58/20 58/24 59/10
**ought [2]** 52/21 57/19
**our [22]** 6/23 7/5 7/22 9/3 9/8 10/7 11/8 13/18 13/24 17/10 29/23 39/1 40/13 50/14 51/18 54/25 55/9 56/22 57/6 58/11 61/12 61/13
**out [30]** 7/19 7/20 7/22 8/1 8/16 9/3 18/23 16/16 20/5 20/22 20/25 21/1 26/18 29/2 33/18 37/25 40/13 47/8 47/8 50/5 51/6 52/14 53/1 53/12 55/9 55/23 59/4 59/16 59/17
**outside [2]** 47/10 47/16
**over [6]** 11/23 38/3 40/12 50/11 51/12 56/11
**overall [2]** 22/22 23/7
**own [4]** 37/12 43/23 44/4 57/5

**P**

**packaging [1]** 40/1
**packet [1]** 52/25
**page [10]** 8/24 20/1 25/1 36/11 36/14 41/11 42/17 42/18 54/3 63/10
**page 100 [1]** 36/11
**page 5 [1]** 25/1
**page 8 [1]** 41/11
**pages [1]** 53/23
**paid [1]** 8/19
**PANTEHA [2]** 2/14 4/22
**papers [6]** 5/23 6/2 7/21 8/1 24/3 59/23
**paragraph [16]** 31/14 31/19 32/7 32/18 32/19 32/21 32/24 33/6 33/13 33/21 36/16 37/16 41/19 42/18 44/4 45/2
**paragraphs [1]** 43/24
**part [9]** 6/23 7/5 7/13 7/17 30/15 33/23 33/24 42/20 43/9
**parte [1]** 16/15
**particular [6]** 18/18 22/19 23/13 28/8 43/25 53/14
**particularly [3]** 41/9 42/6 47/9
**parties [8]** 21/24 28/7 30/21 59/8 59/13 59/16 60/3 61/7
**parts [1]** 29/24
**pass [1]** 14/17
**passes [1]** 51/21
**passing [1]** 51/20
**passively [1]** 17/19
**past [3]** 36/9 44/20 44/22
**patient's [1]** 22/19
**PATTERSON [3]** 2/19 5/7 5/13
**PAUL [1]** 2/7
**pay [1]** 9/21
**PC [3]** 2/8 2/11 2/14
**Peachtree [1]** 2/12
**penny [1]** 15/15 15/15 15/21
**people [10]** 12/21 14/6 16/14 39/9 39/9 52/8 52/9 53/7 53/23 58/12
**percent [3]** 11/20 11/21 49/17
**percentage [2]** 46/2 46/13
**percentages [1]** 46/12

**P**

peremptories [2] 51/16 51/18
perhaps [1] 10/19
permissible [1] 54/11
permission [2] 4/8 14/20
permit [1] 34/13
permitted [2] 56/12 56/16
permitting [1] 27/5
person [3] 12/15 61/17 61/18
personal [3] 6/8 16/20 58/13
pertain [1] 44/17
Ph.Ds [1] 14/6
PHI [2] 8/8 8/11
physician [1] 21/3
picked [2] 15/24 16/1
pickup [1] 39/21
piece [1] 44/24
pieces [1] 44/25
place [2] 15/20 15/22
plaintiff [20] 1/10 2/2 4/7 4/11 4/14 4/17 4/20
4/23 5/1 5/4 6/21 7/3 25/19 26/12 27/15 28/3
34/16 37/20 40/5 55/20
plaintiff's [4] 5/20 35/23 42/12 58/9
plaintiffs [6] 37/4 39/21 40/7 40/15 50/17
61/25
plan [4] 36/3 50/20 55/2 58/12
planned [2] 55/19 56/13
plans [1] 56/23
play [2] 24/21 54/11
player [1] 58/18
please [10] 4/4 12/6 13/10 14/22 17/5 42/14
46/6 51/22 56/6 61/22
PLLC [1] 2/5
plug [1] 52/16
plugging [1] 26/1
point [20] 7/6 7/19 8/16 9/3 12/22 17/9 18/23
20/21 21/6 24/16 24/17 28/23 31/8 34/6 35/7
36/1 43/21 48/10 50/3 54/22
pointed [2] 7/20 7/22
pointing [3] 8/1 33/18 48/2
points [5] 17/11 21/4 23/25 35/19 36/8
policy [2] 31/2 48/24
portion [3] 29/3 29/11 42/12
posited [1] 26/2
position [1] 42/3
possess [1] 47/23
possibility [2] 37/15 57/6
post [1] 22/2
post-remand [1] 22/2
posted [4] 50/19 50/19 51/13 61/4
potential [2] 17/13 20/24 59/20
potentially [1] 27/17
power [36] 26/3 26/20 27/11 28/12 29/22
30/13 30/16 31/3 32/19 33/23 34/8 34/16 35/7
36/10 36/19 36/22 36/25 37/3 37/9 37/15
37/18 37/22 37/23 38/2 38/3 38/21 38/24 39/6
40/7 40/22 40/24 40/25 41/3 47/23 47/24
48/17
PowerPoint [4] 53/10 53/24 53/25 53/25
PowerPoints [1] 53/14
practice [1] 56/11
precise [2] 45/25 52/20
precisely [2] 31/8 38/23
preface [1] 52/16
preference [2] 50/14 54/8
prejudice [10] 7/7 7/8 7/17 10/13 10/24 10/25
13/6 20/25 35/6 52/10
premise [3] 12/5 12/10 41/1
prepare [2] 52/13 52/15
prepared [2] 52/20 60/16
preparing [2] 14/4 30/22
prescient [1] 39/16
presence [1] 31/4
present [1] 61/14
presently [1] 58/10
President [1] 43/1
PRESIDING [1] 1/8
pressure [2] 16/17 31/16
pressures [2] 26/16 31/24

presumably [1] 58/20
pretrial [3] 54/14 54/15
pretty [2] 10/16 34/18
prevent [2] 10/16 34/18
prevented [1] 31/17
preview [1] 17/8
previously [1] 56/18
price [11] 8/13 8/14 8/17 8/18 8/19 8/20 8/20
15/8 36/25 37/11 37/23
prices [5] 5/21 6/7 31/18 37/18 43/15
pricing [2] 26/17 31/25 32/24 34/10 34/11
37/5
primary [2] 31/20 31/25
principal [1] 45/23
principle [2] 10/15 38/6
prior [4] 19/22 26/12 29/18 34/7
probably [2] 13/13 50/4
problem [6] 6/25 22/12 22/17 36/23 37/16
50/5
procedure [2] 23/15
procedures [4] 23/16 32/13 33/16 46/2
proceedings [3] 1/15 62/5 63/9
process [2] 59/17 60/6
procompetitive [1] 25/2
produced [4] 28/19 30/7 34/20 56/12
product [2] 39/22 44/8 45/12
production [3] 12/25 13/2 28/18
products [4] 8/25 19/11 22/18 39/24
professional [1] 58/13
profit [5] 36/13 36/19 37/2 37/10 37/13
profit-maximizing [5] 36/13 36/19 37/2 37/10
37/13
profitability [4] 31/7 32/2 32/9 33/19
profitably [2] 31/1 33/3
profits [2] 49/1 49/1
progress [1] 50/20
promote [1] 25/3
promptly [2] 16/15 53/12
proof [1] 5/20
proposed [2] 52/12 55/20
proposition [1] 42/24
propositions [1] 44/1
Protective [1] 29/9
protracted [1] 51/15
prove [2] 27/11 27/15
provide [3] 13/2 42/21 45/22
provided [6] 6/21 7/8 7/11 7/16 7/20 8/15
provides [2] 30/2 43/3
pull [2] 12/18 14/2
pulled [2] 11/18 59/3
purchase [1] 39/25
pure [2] 18/22 18/25
purported [1] 7/19
purportedly [1] 8/1
purpose [2] 21/8 25/8
purposes [2] 18/22 27/6
pursuant [1] 63/6
push [2] 21/9 32/14
pushback [2] 32/18 33/20
put [3] 20/2 26/18 50/11
puts [2] 29/18 43/13
putting [1] 62/3

**Q**

qualification [1] 43/17
quality [13] 18/8 21/21 22/9 22/10 22/12
22/17 24/2 24/5 24/11 24/18 24/24 25/3 25/5
quants [1] 14/5
quarter [1] 51/6
question [21] 9/14 12/4 12/10 16/4 19/8
20/11 23/7 24/22 25/12 31/24 32/1 32/6 34/20
35/6 46/6 46/12 47/21 50/23 54/18 60/6 61/11
question the [1] 12/4
questions [9] 10/6 13/4 16/2 16/3 46/1 46/1
51/22 52/12 57/12
quibbled [1] 42/19
quite [2] 41/20 43/21
quote [1] 43/3
quotes [1] 44/1

raise [11] 28/17 36/3 36/8 38/16 41/7 48/10
59/10 59/17 60/4 60/7 60/8
raised [1] 41/10
raises [1] 41/13
raising [3] 28/18 37/23 44/22
Ramos [1] 45/3
range [1] 11/17
rate [3] 22/4 23/9 25/4
rates [3] 17/16 17/17 22/22
rather [1] 57/20
rational [2] 36/13 36/18
RAUTH [1] 2/22
re [1] 52/19
read [7] 6/13 19/24 20/4 52/16 52/22 54/3
54/4
READE [2] 2/4 4/13
real [1] 37/22
realize [1] 43/20
really [9] 7/6 12/22 13/4 21/4 24/21 25/5
30/18 32/8 52/5
reason [3] 20/23 37/20 37/24
reasonably [2] 46/4 53/9
reasoned [1] 39/7
reasoning [1] 17/9
reasons [6] 13/25 21/8 21/10 33/22 39/8
40/23
rebuttal [7] 6/3 7/10 44/3 44/3 45/1 54/18
54/20 55/1 55/6 55/13
recalled [1] 61/9
receive [2] 30/23 58/7
received [1] 53/2
recite [1] 54/3
recognized [2] 39/8 44/7
record [3] 4/5 21/17 57/20
recorded [1] 54/8
recover [1] 48/5
redacted [1] 59/14
redaction [1] 59/13
refer [1] 34/9
reference [3] 28/23 29/7 31/22
references [2] 26/14 31/20
reflect [3] 10/23 11/7 28/8
reflecting [1] 24/1
reflects [3] 8/9 15/13 18/17
regard [5] 5/21 25/21 28/11 28/12 29/21
44/25
regarding [1] 25/7
regardless [1] 51/12
regimes [1] 47/11
regulations [1] 63/11
regulatory [2] 47/11 47/18
rehash [1] 17/10
rejected [3] 39/13 39/15 40/12
related [1] 50/22
relates [2] 5/25 16/20
relation [2] 32/4 32/8
relationship [2] 30/16 49/3
relative [2] 9/2 25/7
relevant [2] 30/25 42/20
reliability [1] 23/11
reliance [2] 34/21 47/4
relied [8] 14/2 21/22 28/20 34/23 35/2 42/1
42/2 46/19
relies [2] 44/2 45/3
reluctant [2] 14/16 47/15
rely [3] 9/25 24/19 47/9
relying [1] 10/16
remand [2] 22/2 28/6
reminder [1] 17/14
removed [5] 18/25 19/1 19/2 19/4 19/6
repeatedly [1] 39/13
reply [7] 7/18 8/16 8/24 41/11 41/11 41/11
44/23
report [31] 7/11 10/24 11/7 14/9 17/18 21/20
23/3 23/3 23/5 24/13 24/14 28/14 28/22 29/16
29/19 29/24 30/5 30/6 31/9 31/15 33/4 41/19
42/2 43/24 44/3 44/3 45/2 45/11 45/24 46/5
46/19

**R**

reported [1] 22/1 23/4 63/8
REPORTER [1] 63/16
REPORTER'S [1] 1/15
reports [10] 22/3 25/25 26/13 27/5 28/6 28/11
  31/11 34/3 41/24 44/2
reprocessed [4] 19/16 20/5 22/2 22/5
reprocessing [1] 47/12
reprocessors [1] 44/7
request [1] 28/16
require [1] 57/10
required [3] 26/6 26/11 58/23
rerun [1] 11/9
research [1] 22/1
reserve [1] 55/12
resolve [1] 60/5
respect [4] 17/1 24/24 25/15 36/8
responded [3] 7/21 7/24 46/4
response [6] 7/22 29/23 36/2 42/12 54/5
  58/15
responses [1] 7/25
responsibility [2] 56/16 57/7
responsive [1] 14/4
rest [5] 5/23 6/2 6/6 25/16 25/19
rests [2] 9/16 26/12
result [1] 7/14
reviewed [2] 17/7 22/15
revisit [1] 41/9
right [22] 7/2 14/7 15/14 17/18 18/3 18/9
  20/16 33/10 33/12 41/2 41/4 41/5 41/6 41/6
  46/1 49/25 52/22 52/25 54/10 59/19 61/10
  61/20
road [1] 37/25
robust [1] 26/25
roll [1] 53/23
rote [1] 46/9
roughly [2] 28/5 46/13
rounded [1] 51/8
row [6] 15/6 15/7 15/12 15/15 15/16 51/21
rows [3] 12/3 15/3 15/12
RPR [1] 1/19
Rule [1] 9/23
rules [1] 27/10
ruling [6] 6/13 10/7 10/14 36/2 41/5 41/8
run [1] 33/5 37/15 50/2
running [1] 31/10
runs [1] 31/9

**S**

SACV [2] 1/11 4/2
SACV-19-01984-JVS [2] 1/11 4/2
safe [2] 22/2 22/5
safer [3] 18/8 18/24 19/12
safety [6] 18/23 24/4 24/5 24/11 25/3 25/7
said [25] 10/12 11/1 24/1 24/17 26/1 27/12
  27/17 27/19 27/19 34/10 40/4 40/12 40/13
  40/15 41/5 45/6 45/19 45/20 46/6 46/8 47/3
  47/7 48/18 55/5 56/14
sale [9] 15/17 15/18 15/19 15/19 15/21 15/21
  15/22 15/23 32/11
sales [14] 15/8 27/5 34/20 34/23 35/3 39/9
  43/1 48/20 48/20 49/1 49/11 49/13 49/16
  49/17
sales to [1] 48/20
Samaritan [2] 8/8 8/10
same [15] 8/9 10/15 15/12 15/12 15/18 15/23
  20/23 29/19 33/5 36/14 40/2 46/7 48/5 50/17
  60/6
San [1] 2/9
sanction [1] 9/23
Santa [3] 1/16 1/20 4/1
satisfying [1] 26/8
saw [3] 14/3 34/24 57/21
say [21] 8/25 10/5 12/25 13/16 13/23 20/24
  24/8 26/20 29/7 29/16 34/25 35/2 37/14 38/10
  40/8 40/21 45/15 45/16 46/13 48/25 51/10
saying [1] 49/16
says [5] 31/19 33/13 33/22 41/17 44/4

scheduled [1] 50/1
SCHIFFMAN [4] 1/24 4/5 27/25 62/1
Scientific [4] 30/18 46/8 47/2
scope [1] 48/15
Scott [1] 59/24
Script [1] 12/17
seal [2] 29/3 29/11
seat [1] 51/11
second [11] 5/25 14/10 15/6 15/15 15/21
  31/14 38/23 44/3 44/15 44/15 46/17 60/2
section [2] 31/15 63/6
sections [2] 45/10 45/10
see [7] 15/4 15/6 19/25 22/14 23/17 23/18
  33/4
seek [1] 48/4
seems [3] 41/18 44/20 56/14
seen [1] 52/19
SEFFENS [3] 1/19 63/15 63/16
selling [1] 31/16
SELNA [1] 1/8
Senior [1] 45/4
sense [3] 17/18 52/1 61/1
separate [3] 21/24 44/9 44/12
September [7] 6/22 7/17 8/7 8/14 9/1 16/4
  28/16
September 19 [1] 6/22
September 2024 [1] 9/1
September of [3] 7/17 8/14 16/4
service [1] 43/8
services [5] 36/9 37/9 37/24 45/22 47/3
set [6] 28/4 37/19 52/14 52/21 52/21 61/23
seven [2] 14/14 16/13
several [1] 31/1
share [4] 32/12 32/22 33/16 53/11
SHARON [3] 1/19 63/15 63/16
she [1] 56/11
She'll [1] 55/23
She's [1] 55/21
Sherman [1] 15/11
shifting [1] 33/4
short [2] 51/19 59/3
shorter [1] 43/25
should [16] 10/15 10/17 13/11 25/12 28/7
  36/20 41/2 47/15 56/21 56/21 56/22 58/2 58/7
  59/23 60/8 61/13
shouldn't [2] 40/4 40/5
show [5] 18/21 27/14 30/20 31/9 33/18
showing [2] 22/5 30/10 32/14
shows [3] 15/16 22/1 32/9
side [3] 10/17 13/20 34/25 51/8 52/5 53/11
  54/4 58/25
sides [2] 10/17 41/17
Siegel [1] 39/14
sight [1] 55/7
significance [1] 6/14
significant [3] 12/19 26/19 46/14
similarly [1] 25/1
simple [1] 12/2
simply [8] 32/9 35/5 37/14 47/7 47/21 48/2
  49/5 52/8
since [2] 39/18 40/19
single [4] 16/4 26/7 34/7 41/18
sir [3] 14/23 14/23 57/8
sit [1] 10/6
sitting [1] 50/25
situation [1] 43/8
six [2] 51/7 51/11
skipped [1] 26/24
slides [1] 53/14
snuck [1] 10/12
so [60] 7/11 7/17 8/2 8/21 9/9 13/4 15/2 15/24
  16/6 16/18 19/11 19/17 20/6 21/4 22/7 22/14
  23/6 24/16 25/5 25/24 28/7 29/11 29/16
  29/20 30/12 32/5 33/1 33/17 34/1 35/23 37/8
  37/20 38/1 38/3 38/14 38/18 41/4 42/16 44/20
  44/11 44/19 45/9 46/15 50/10 50/20 51/15
  51/21 52/1 53/12 54/3 55/1 55/12 56/13 57/24
  58/7 59/1 59/7 60/6 60/15
sold [4] 9/7 15/7 15/8 15/10

solid [1] 45/9
some [18] 4/8 9/9 9/17 25/11 27/25 40/9 49/24
  22/14 23/4 23/17 38/25 41/25 47/16 48/3 52/8
  52/9 55/12 60/2 60/4
somebody [2] 13/16 58/17
someone [1] 34/25
something [6] 10/9 15/24 28/23 55/5 59/15
  60/18
soon [3] 14/12 16/7 53/3
sorry [5] 12/7 14/24 18/13 20/1 45/1
sort [6] 9/19 17/8 20/6 23/4 24/1 46/14
SOUNDSTAR [1] 15/5
source [2] 22/14 24/23
sources [5] 21/23 22/15 24/20 39/1 42/25
SOUTHERN [1] 1/6
Spain [1] 45/8
speaking [1] 28/25
speaks [1] 23/11
specific [1] 20/7
specifically [1] 30/4
spent [1] 8/24
sponsor [1] 57/20
sponsoring [2] 57/14 57/15
spot [1] 31/8
spreadsheet [2] 14/6 15/25
SQL [1] 12/17
stamp [1] 58/6
stand [2] 35/17 48/8
standard [13] 8/25 9/4 9/4 15/13 15/16 33/1
  33/25 36/14 38/20 42/20 43/4 43/15 44/5
Star [2] 32/6 33/10
start [12] 28/13 33/7 50/1 50/7 50/15 51/24
  53/3 56/20 60/23 60/23 60/23 60/25
started [2] 20/4 56/24
starters [1] 29/8
starting [5] 50/2 50/5 56/19 57/5 60/20
starts [1] 33/12
state [3] 4/4 27/3 42/3
statement [1] 52/15
statements [2] 53/4 53/8
STATES [5] 1/4 1/19 47/10 47/16 63/7 63/11
stenographically [1] 63/8
step [4] 18/25 19/1 26/19 26/20
still [1] 50/8
stipulate [1] 57/18
stop [2] 51/19 51/21
store [1] 39/21
STRADLING [2] 2/22 5/10
Street [4] 1/20 2/5 2/9 2/12
Stryker [1] 20/5
stuff [2] 16/5 46/14
submit [4] 16/23 22/7 29/2 46/15
submitted [4] 35/17 41/24 48/8 50/9
subsequent [3] 25/25 27/4 34/20
subsequently [1] 28/15
such [1] 36/21
sufficient [2] 16/17 41/15
sufficiently [1] 16/25
suggest [1] 23/12
Suite [5] 1/20 2/5 2/9 2/12 2/22
summary [8] 26/22 34/15 35/9 40/15 40/16
  40/21 42/3 42/13
SUMMERS [7] 2/8 5/1 21/18 24/1 24/5 24/10
  24/17
supercompetitive [4] 5/21 6/7 31/17 37/5
superior [1] 21/22
supplemental [3] 27/5 28/5 28/7
supplemented [1] 22/3
support [18] 37/9 37/24 39/5 39/8 41/23 42/5
  42/8 42/21 43/3 43/10 44/5 44/10 44/14 45/21
  46/3 46/18 46/20 47/3
sure [10] 16/16 42/16 48/12 50/24 52/18
  54/13 56/3 57/13 59/2 59/11
surgical [1] 43/6
surprise [3] 41/21 44/22 45/12
Sustainability [1] 45/4
switching [3] 31/4 32/25 33/25
systems [3] 31/16 34/9 44/6

**T**
take [13] 5/19 6/10 11/8 15/3 43/11 43/25 51/19 54/16 57/23 60/12 60/16 61/17 61/21
taken [1] 42/3
takes [1] 31/23
talk [3] 8/12 29/24 49/25
talking [4] 24/10 33/8 33/10 60/10
talks [1] 32/21
Tam's [1] 56/23
team [1] 14/5
tech [1] 39/8
tell [7] 18/20 19/11 37/1 53/20 58/13 58/16 58/18
telling [1] 53/19
tells [4] 17/14 18/19 18/24 25/8
tender [1] 53/12
tentative [17] 6/7 6/13 10/7 16/19 16/23 17/7 17/11 20/13 21/6 25/17 25/21 36/1 36/7 36/17 41/5 46/25 48/13
tentatives [1] 26/9
terms [7] 29/22 30/16 32/22 43/17 52/1 52/18 53/8
test [4] 11/11 11/15 13/11 34/18
tested [1] 25/13
testified [1] 36/14
testify [2] 55/23 56/12
testimonial [1] 57/20
testimony [5] 24/3 25/7 45/3 54/12 61/18
text [2] 19/25 20/4
than [11] 7/15 8/14 12/13 13/12 18/8 22/6 23/19 26/15 31/10 46/18 57/20
Thank [41] 10/21 13/7 13/8 16/11 16/25 21/13 21/14 21/18 23/21 23/22 25/9 25/10 25/23 27/22 27/23 29/15 34/4 35/15 35/16 36/6 38/7 38/8 46/21 46/22 48/6 48/7 49/20 49/21 49/23 49/24 53/22 55/15 57/9 59/8 59/22 60/1 60/14 60/17 61/2 61/5 61/19 61/25
Thanks [1] 62/3
that [365]
that's [51] 8/18 11/4 12/16 15/4 15/6 15/18 19/13 20/3 20/6 20/6 20/7 21/24 22/1 23/10 24/16 28/10 29/1 30/21 31/20 32/1 32/5 32/5 32/6 33/10 34/11 34/12 35/13 36/14 36/19 37/1 37/6 37/11 38/4 38/5 40/1 40/22 41/1 41/19 41/21 47/8 47/8 47/25 51/14 51/18 53/10 54/5 54/6 55/8 57/1 57/6 57/22
their [42] 7/9 7/11 7/13 7/17 7/21 7/23 8/1 8/16 8/17 8/22 8/24 9/5 9/6 9/7 9/8 10/1 10/8 10/10 10/15 14/11 16/1 21/3 24/21 24/23 25/25 27/4 27/4 34/21 34/25 37/6 37/25 38/24 44/4 48/23 55/21 56/16 56/19 56/23 57/1 57/5 58/12 58/15
their subsequent [1] 25/25
theirs [1] 53/21
them [25] 6/19 7/7 7/9 7/16 7/20 7/22 7/25 8/4 8/7 8/13 8/15 9/11 9/21 10/19 14/7 16/3 24/15 41/15 46/11 50/6 52/22 53/19 58/13 58/16 60/8
themselves [1] 4/8
then [26] 6/19 23/15 24/15 24/17 25/20 28/6 28/14 28/19 29/8 31/23 32/7 32/16 33/12 33/15 36/22 37/22 38/16 39/18 40/8 41/19 44/3 45/25 48/22 57/25 60/23 61/24
THEODORA [1] 2/14
theoretical [1] 39/12
theories [3] 25/21 26/2 28/8
theory [7] 27/6 27/18 29/21 38/20 38/25 39/16 48/23
there [83]
there's [36] 9/14 9/17 9/18 10/13 15/8 15/12 16/16 16/17 19/19 25/20 26/8 28/11 33/22 37/7 37/14 38/14 38/21 39/1 40/5 40/22 41/22 41/23 43/16 43/17 44/19 44/19 47/4 47/7 47/12 49/10 49/11 49/14 49/18 52/23 53/15 58/6
therefore [5] 15/20 40/9 40/25 42/7 43/16
these [14] 13/4 19/11 21/1 33/2 34/2 37/18 44/1 45/9 45/10 46/15 47/4 47/6 54/8 58/12
they [90]

**T (continued)**
they're [9] 10/2 10/20 17/19 35/4 49/15 49/16 49/20 54/19 61/1
they've [5] 8/23 8/5 9/14 24/6
thing [6] 8/3 10/5 11/1 14/8 14/10 14/16
things [6] 6/18 13/23 23/14 47/6 54/14 57/21
think [68]
third [7] 7/6 8/23 14/16 15/14
this [118]
this either [1] 7/4
those [26] 7/21 7/22 10/2 10/3 10/23 16/3 18/21 20/21 20/23 21/4 26/18 30/4 39/8 45/15 45/20 46/20 48/8 48/20 48/20 49/16 49/17 52/1 52/14 53/3 60/4 60/7
though [2] 39/6 61/11
thoughts [1] 55/16
thousands [1] 23/16
three [5] 13/23 23/25 24/24 50/6 51/16
through [10] 6/19 8/11 14/6 18/16 29/23 30/4 40/20 43/12 48/9 51/5
throughout [1] 22/10
tie [15] 25/3 31/7 32/2 32/10 32/10 32/15 33/3 33/9 33/15 33/20 37/4 37/5 37/8 40/8 40/18 40/24 48/25
tied [2] 39/24 47/25
time [27] 11/3 11/24 12/1 16/17 25/24 26/19 27/14 28/17 33/5 41/10 41/12 43/12 43/20 44/23 48/5 50/6 52/1 52/9 53/16 55/2 55/9 55/12 56/10 58/2 58/6 59/8 59/24
titled [1] 63/7
title [1] 15/4
today [2] 28/21 30/23
TODD [1] 2/5
told [2] 14/7 60/22
tons [1] 41/23
too [4] 43/12 50/12 52/5 53/21
took [4] 12/13 15/20 15/22 40/8
total [1] 15/8
totally [1] 41/21
track [4] 52/10 58/2 58/3 58/4
trademark [2] 39/23 40/9
tradition [1] 14/25
trails [1] 51/12
transcript [4] 1/9 1/15 63/8 63/10
transcripts [1] 58/7
trebled [2] 6/16 10/3
trends [1] 39/10
trial [18] 10/18 29/2 35/13 50/1 50/2 50/5 50/20 51/4 52/9 53/13 56/17 56/19 59/15 59/16 60/5 60/13 61/21
trick [1] 45/18
tried [1] 51/7
trivia [1] 46/12
true [3] 19/5 23/14 63/7
try [2] 38/12 52/1
trying [7] 22/19 34/23 35/5 46/16 47/9 58/1 58/12
Tuesday [3] 50/11 51/4 56/19
turn [2] 17/1 53/3
turns [1] 20/5
two [16] 15/3 15/12 17/11 21/4 24/17 36/8 38/9 38/14 43/21 44/25 45/20 51/20 56/10 58/10 59/7 59/10
tying [14] 31/2 38/19 38/19 38/21 38/24 39/22 40/7 40/19 40/22 41/3 46/16 47/23 47/25 49/9
TYLER [1] 2/19
type [2] 9/23 16/5
types [1] 22/23

**U**
U.S [3] 43/1 43/14 63/16
Ultrasound [1] 15/5
unable [2] 33/9 59/16
undated [1] 35/3
under [7] 16/17 18/11 18/14 19/18 19/19 38/5 44/14
underlying [1] 19/10 20/19 47/4
understand [3] 30/18 48/13 61/2
understandably [1] 41/16
understanding [3] 45/16 46/10 47/17

**U (continued)**
understood [2] 29/25 58/19
undisputed [1] 42/5 42/16 52/15
undisputedly [1] 12/25
unexercised [6] 36/10 36/24 37/15 37/17 38/2 38/21
unfair [5] 10/4 20/25 41/21 44/22 45/12
UNITED [6] 1/4 1/19 47/10 47/16 63/7 63/11
units [2] 15/7 15/8
unlikely [1] 53/24
unprofitable [2] 32/5 33/20
unreliable [7] 20/8 20/8 20/9 20/10 21/3 24/22 24/23
unseen [1] 55/7
until [1] 50/9
untimely [1] 12/25
unused [1] 40/24
unwrite [1] 46/16
up [24] 5/19 6/10 7/12 8/21 11/2 14/17 15/25 16/1 22/1 24/22 28/4 35/10 39/17 43/11 51/8 54/16 57/20 59/2 59/2 59/3 60/12 60/16 61/21 61/23
upcoming [1] 10/18
updated [6] 27/5 28/9 28/15 28/18 28/19 29/20
upon [5] 9/25 10/16 14/2 28/20 35/2
us [17] 8/20 10/13 10/16 13/2 16/2 17/14 18/19 18/21 25/8 28/20 33/18 44/20 44/20 55/8 56/14 58/13 58/16
usage [3] 32/12 32/22 39/10
use [12] 7/16 10/18 17/13 37/8 52/9 52/9 52/15 53/9 53/10 53/24 53/25 61/15
used [14] 12/18 13/25 17/15 19/17 19/21 19/23 21/7 22/8 23/15 23/16 25/8 33/16 46/2 47/1
uses [1] 23/8
using [6] 21/11 29/20 30/7 32/13 44/16 46/2
USMAN [1] 3/1
usual [2] 51/4 51/25
usually [1] 52/4
utilized [1] 7/12

**V**
vacation [3] 55/19 56/13 56/23
values [1] 11/21
Vargas [1] 61/22
variation [2] 23/17 23/18
various [6] 7/25 29/23 32/16 41/24 42/25 45/7
versus [2] 4/3 39/14
very [19] 6/14 10/25 12/19 23/24 23/25 35/12 39/14 39/15 39/19 40/2 44/1 44/23 45/25 46/4 46/11 46/13 52/20 53/12 62/3
vetted [1] 17/19
viable [1] 27/18
Vice [1] 43/1
Vice-President [1] 43/1
video [1] 54/8
view [1] 61/12
virtual [1] 41/21
voir [4] 51/9 52/4 52/5 52/16
volume [1] 60/10
voluntarily [2] 48/17 48/24
vs [1] 1/10

**W**
waiver [1] 41/22
walk [1] 18/16
walking [1] 43/12
wandering [1] 53/7
want [50] 6/18 13/23 16/15 16/16 16/22 17/9 17/10 17/10 21/9 24/16 29/3 35/13 37/25 38/1 38/1 38/2 38/14 38/14 38/16 38/16 43/11 43/20 44/24 50/10 54/3 54/4 54/5 57/18 60/22 61/15 61/21
wanted [3] 13/11 16/8 41/7
warrant [1] 51/15
warrants [1] 55/5
was [60] 6/21 6/22 7/2 7/4 7/16 8/8 9/12 10/22 11/6 11/22 12/15 12/17 12/17 13/15 13/25 14/1 14/4 14/8 14/16 15/18 15/25 19/16 23/4

**W**

**was... [37]** 24/4 26/25 27/8 27/10 27/17 30/6 30/7 32/1 32/11 34/8 35/1 35/3 37/4 38/19 39/16 39/20 39/23 40/4 40/12 40/14 40/15 41/10 41/22 42/4 42/25 45/4 45/5 45/6 45/11 45/17 45/18 47/3 47/19 47/21 48/24 56/18 56/19

**Washington [1]** 2/6

**wasn't [2]** 13/24 49/2

**way [12]** 17/20 19/7 23/12 24/5 40/19 44/20 44/21 44/22 51/22 52/20 57/2 58/20

**ways [3]** 37/21 38/1 48/5

**we [124]**

**we'd [1]** 56/24

**we'll [16]** 5/23 6/2 6/6 9/21 14/10 16/6 16/23 25/19 50/2 50/18 50/18 50/19 51/19 60/23 61/4 61/22

**we're [15]** 11/3 11/22 20/18 22/18 35/25 37/23 43/20 48/2 50/1 51/2 51/18 52/24 54/19 59/7 60/25

**We've [2]** 58/11 59/4

**wealth [2]** 6/8 16/20

**WEBB [1]** 2/19

**WEBSTER [2]** 1/11 4/3

**Webster's [1]** 9/4

**week [7]** 14/8 50/3 51/4 56/20 57/5 58/14 58/16

**Weingram [2]** 14/19 20/2

**well [36]** 6/8 6/10 9/14 11/6 11/13 12/15 13/21 17/24 18/15 19/3 24/8 25/14 29/8 29/25 30/8 31/20 34/16 36/3 37/7 37/14 41/17 41/21 42/6 44/25 47/7 48/8 48/25 49/17 50/19 52/12 53/20 54/24 55/3 56/24 56/25 58/20

**went [7]** 8/11 8/21 14/6 14/18 15/2 16/2 16/9

**were [21]** 7/15 11/10 11/18 16/1 22/11 22/12 26/14 29/18 33/14 34/23 34/25 35/8 39/21 47/6 47/6 49/13 49/16 56/12 60/2 60/3 62/5

**weren't [3]** 32/14 44/21 49/14

**West [1]** 1/20

**what [60]** 7/18 8/15 9/2 9/3 9/20 10/16 11/11 11/15 13/4 14/18 15/2 15/18 16/8 16/9 17/25 18/4 18/19 18/20 18/20 19/8 21/11 22/7 22/8 23/25 24/8 26/12 27/12 28/10 29/6 31/19 33/7 33/10 36/20 37/4 38/18 39/3 39/4 39/17 40/4 40/11 40/14 42/17 45/19 46/1 46/13 47/3 47/5 47/10 47/11 47/12 47/17 47/17 47/25 50/13 52/6 53/19 53/20 58/25 59/1 60/10

**what's [8]** 19/13 20/17 30/20 35/6 44/11 44/12 47/9 47/15

**whatever [1]** 53/13

**whatsoever [4]** 7/8 8/17 8/22 9/5

**when [14]** 7/23 14/3 14/4 16/2 16/3 18/4 23/15 23/15 31/16 35/4 43/2 47/6 51/10 54/23

**where [16]** 10/24 20/3 20/12 20/21 21/6 22/18 28/21 29/25 31/8 38/9 39/24 42/4 43/8 49/8 49/9 51/24

**Whereupon [1]** 62/5

**whether [18]** 9/16 18/21 22/25 23/7 23/9 24/4 30/25 31/24 32/2 32/3 35/1 36/25 40/18 47/12 54/19 55/1 55/5 56/11

**which [28]** 7/6 10/10 11/1 12/11 21/21 22/3 22/15 22/23 26/8 26/18 26/19 27/1 27/13 27/17 30/10 34/7 34/13 36/17 37/16 39/22 42/11 44/17 46/19 48/3 49/13 56/16 59/17 60/6

**who [17]** 12/14 12/15 12/16 13/11 13/14 14/5 21/15 25/18 27/24 36/5 42/25 45/6 55/18 56/5 56/9 58/17 58/25

**who's [1]** 56/17

**whole [1]** 56/11

**whose [1]** 12/21

**why [17]** 7/8 11/18 11/22 13/25 18/11 18/14 24/22 31/6 31/12 32/17 33/2 34/12 37/1 38/19 39/4 40/23 43/2

**wide [2]** 49/6 49/8

**widgets [1]** 9/7

**wildly [1]** 45/15

**will [32]** 4/7 6/2 16/18 21/16 25/6 25/16 26/16 27/25 29/4 30/22 31/25 32/3 35/17 37/3 37/11

**will... [37]** 38/12 43/19 48/8 50/4 50/7 50/25 52/11 52/22 53/5 55/16 55/25 56/23 58/1 58/20 59/14 60/11 61/8

**WILLIAM [1]** 2/18

**win [2]** 40/15 40/16

**windfall [1]** 10/19

**Winston [2]** 39/1 39/2

**wiped [1]** 40/13

**wipes [1]** 37/25

**wishes [1]** 6/3

**within [4]** 9/24 14/7 14/14 16/13

**without [3]** 11/2 44/9 47/16

**witness [18]** 13/14 13/15 14/2 14/12 18/5 20/9 54/2 54/3 55/17 56/5 56/9 56/15 56/17 56/25 57/15 58/9 61/12 61/14

**witnesses [10]** 11/18 24/23 52/2 57/14 58/9 58/10 58/11 58/15 58/25 61/8

**word [1]** 35/21

**work [2]** 16/16 59/17

**worked [3]** 53/12 59/4 59/16

**world [6]** 36/9 37/6 37/7 37/22 37/22 39/5

**worse [1]** 24/11

**worst [1]** 19/6

**would [57]** 5/22 6/1 6/8 7/15 7/21 7/24 9/20 10/19 11/11 11/15 11/17 12/14 12/19 12/19 12/25 13/15 13/18 14/13 17/3 19/18 21/5 21/11 22/7 22/13 23/17 29/2 31/11 31/13 31/16 33/5 33/15 34/2 34/14 34/17 35/9 35/10 36/1 39/4 40/8 40/9 40/13 41/25 45/15 46/15 48/25 49/17 50/13 50/14 51/8 54/15 54/23 54/24 54/25 56/11 56/20 57/1 59/19

**wrong [4]** 10/1 14/18 15/2 16/9

**Wu [8]** 13/1 13/3 13/5 13/24 14/1 15/24 44/4 44/13

**Wu's [2]** 43/23 44/2

---

**Y**

**Yeah [3]** 50/24 51/4 55/14

**year [1]** 28/5

**years [2]** 23/17 40/12

**yes [9]** 9/15 15/24 20/22 29/10 35/24 46/24 55/11 57/16 60/22

**YOCCA [1]** 2/22

**York [2]** 2/20 3/2

**you [150]**

**you'll [2]** 51/16 58/23

**you're [10]** 19/25 52/6 52/7 52/10 53/8 53/10 53/24 54/1 58/24 61/20

**you've [3]** 52/19 60/22 61/17

**your [158]**

---

**Z**

**zero [4]** 36/9 39/23 42/8 43/14