Panteha Abdollahi, Esq.
State Bar No. 230002
pabdollahi@tocounsel.com
THEODORA ORINGHER PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, California 92626-7109
Telephone: (714) 549-6200
Facsimile: (714) 549-6201

Jeffrey L. Berhold, Esq.
Admitted *Pro Hac Vice*
jeff@berhold.com
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, Georgia 30309
Telephone: (404) 872-3800
Facsimile: (678) 868-2021

Joshua P. Davis, Esq.
State Bar No. 193254
jdavis@bm.net
BERGER MONTAGUE PC
505 Montgomery St., Suite 625
San Francisco, California 94111
Telephone:  (415) 906-0684

Derek T. Ho, Esq.*
Andrew E. Goldsmith, Esq.*
Matthew D. Reade, Esq.*
Kelley C. Schiffman, Esq.
State Bar No. 325023
Rachel T. Anderson, Esq.*
Annamaria M. Morales-Kimball, Esq.*
Sean P. Quirk, Esq.*
*Admitted *Pro Hac Vice*
dho@kellogghansen.com
agoldsmith@kellogghansen.com
mreade@kellogghansen.com
kschiffman@kellogghansen.com
randerson@kellogghansen.com
amoraleskimball@kellogghansen.com
squirk@kellogghansen.com
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK. P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
Telephone: (202) 367-7900
Facsimile: (202) 326-7999

Attorneys for Plaintiff
INNOVATIVE HEALTH LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| INNOVATIVE HEALTH LLC, <br><br> Plaintiff, <br><br> vs. <br><br> BIOSENSE WEBSTER, INC., <br><br> Defendant. | Case No. 8:19-cv-1984 JVS (KES) <br> Assigned for all purposes to: <br> Honorable James V. Selna <br><br> **PLAINTIFF INNOVATIVE HEALTH LLC'S L.R. 16-10 TRIAL BRIEF** <br><br> Date:    April 14, 2025 <br> Time:    11:00 a.m. <br> Crtrm:  10C <br> Action Filed:  October 18, 2019 <br> Trial Date:  May 1, 2025 |

# TABLE OF CONTENTS

A.   INTERVENING LAW SUPPORTS INNOVATIVE'S ALLEGATIONS ......6

B.   PENDING LEGAL DISPUTES.........................................................................6

C.   BIOSENSE MISSTATES INNOVATIVE'S CLAIMS AND THE RULE
     OF REASON AND ADVANCES IRRELEVANT DEFENSES ....................6

  1.   Biosense Mischaracterizes Innovative's Claims.................................7

       i.    Biosense inaccurately describes the alleged tie............................7

       ii.   Innovative will prove a CARTO 3 clinical support market..........7

       iii.  Innovative alleges a sensor-enabled ultrasound catheters
             market ......................................................................................9

  2.   Innovative Is Entitled To Present Its Cartwright Act Claims...............10

       i.    The Cartwright Act allows for nationwide damages ..................10

       ii.   Innovative correctly articulates the Cartwright Act elements ....12

  3.   Biosense Mischaracterizes the Rule of Reason Analysis ....................13

       i.    The Ninth Circuit has a four-step rule of reason analysis ..........13

       ii.   Biosense misdescribes the rule of reason analysis ....................14

  4.   Biosense Mischaracterizes Innovative's Aftermarket Analysis ..........16

  5.   Biosense's Asserted Defenses Are Contrary to Law ...........................18

       i.    There is no "business justification" defense..............................18

       ii.   Unilateral duty to deal doctrine does not apply to this case.......21

       iii.  There is no "duty to aid" defense in this case ...........................24

  6.   Biosense Incorrectly Asserts that Innovative Cannot Prove Antitrust
       Injury or Damages.................................................................................25

*PLAINTIFF'S TRIAL BRIEF*

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) ............22

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*,
    592 F.3d 991 (9th Cir. 2010)................................................................25

*Aryeh v. Canon Business Solutions, Inc.*, 55 Cal. 4th 1185 (2013)........................14

*Cellular Plus, Inc. v. Superior Ct.*, 14 Cal. App. 4th 1224 (1993).........................13

*Cianci v. Superior Court*, 40 Cal.3d 903 (1985) ..............................................13

*Clothsrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605 (1997)..............................12

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148 (9th Cir. 2001)............19

*Corwin v. Los Angeles Newspaper Serv. Bureau, Inc.*, 4 Cal. 3d 842 (1971) ........14

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992)...........*passim*

*Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121 (N.D. Cal. 2014) .........................12

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023).......................*passim*

*Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495 (1969)..............................20

*FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1 (D.D.C. 2021) ...................................23

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986).....................................9, 19

*FTC v. Qualcomm*, 969 F.3d 974 (9th Cir. 2020) ................................10, 15, 16, 22

*High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987 (9th Cir. 1993)......16

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997)..............................................................21

*In re California Gasoline Spot Mkt. Antitrust Litig.*,
    2022 WL 3215002 (N.D. Cal. Aug. 9, 2022)..........................................13

*In re Cipro Cases I & II*, 61 Cal. 4th 116 (2015) ...............................................13

*In re Da Vinci Surgical Robot Antitrust Litig.*,
    2025 WL 964879 (N.D. Cal. Mar. 31, 2025)...........................................27

*In re Google Play Store Antitrust Litig.*,
    2024 WL 3302068 (N.D. Cal. July 3, 2024) ...........................................10

*In re HIV Antitrust Litig.*, 656 F. Supp. 3d 963 (N.D. Cal. 2023).............................9

*PLAINTIFF'S TRIAL BRIEF*

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019) ................................................26

*In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239 (9th Cir. 2020) 15, 16

*In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948 (N.D. Cal. 2017).........12, 13

*Innovative Health LLC v. Biosense Webster, Inc.*,
  2024 WL 62948 (9th Cir. Jan. 5, 2024)..........................................20

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000).........13, 14

*Lambrix v. Tesla*, 737 F. Supp. 3d 822 (N.D. Cal. 2024).................................17, 18

*Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534 (1998).........................................13

*Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342 (9th Cir. 1987).......20

*N. Pac. Ry. Co. v. United States*, 356 U.S. 1 (1958) ................................................14

*NCAA v. Alston*, 594 U.S. 69 (2021) ......................................................................15

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ......26

*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) .......................................................15

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009).....................22

*Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580 (C.D. Cal. 2008) ....................12

*People v. Ashford Univ., LLC*, 100 Cal. App. 5th 485 (2024) ...............................12

*PLS.com, LLC v. National Ass'n of Realtors*, 32 F.4th 824 (9th Cir. 2022)............9

*Samsung Elec. Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199 (9th Cir. 2014) ........13

*Shields v. World Aquatics*, 2024 WL 4211477 (9th Cir. Sept. 17, 2024) ................9

*Sidibe v. Sutter Health*, 103 F.4th 675 (9th Cir. 2024)....................................13, 14

*Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971) .................................26

*Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191 (2011)..................................................12

*Teradata Corp. v. SAP SE*, 124 F.4th 555 (9th Cir. 2024)......................................19

*U.S. Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610 (1977).......................26

*UAS Mgmt. v. Mater Misericordiae Hosp.*, 169 Cal. App. 4th 357 (2008) ............14

*United States v. Google LLC*, 2025 WL 1132012 (E.D. Va. Apr. 17, 2025)...*passim*

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ...............15, 16, 21

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ..........................................................................22

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020) .....................16, 24

*Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224 (2001) ...........................12

*Younger v. Jensen*, 26 Cal. 3d 397 (1980)..................................................13

*PLAINTIFF'S TRIAL BRIEF*

Pursuant to Local Rule 16-10, Innovative respectfully submits the following Trial Brief for the trial scheduled to commence on May 1, 2025. A Trial Brief should: "(a) Update the Memorandum of Contentions . . . by citing newly decided cases; (b) Brief such issues as directed by the Court; and (c) Reply to the Memorandum of Contentions . . . of any other party." L.R. 16-10.

### A.    INTERVENING LAW SUPPORTS INNOVATIVE'S ALLEGATIONS

The trial brief affords an opportunity to address "newly decided cases." L.R. 16-10(a). On April 17, 2025, Judge Leonie Brinkema of the Eastern District of Virginia, following a three-week bench trial and extensive post-trial filings, issued a decision in DOJ's suit against Google. *See United States v. Google*, 2025 WL 1132012, at *1 (E.D. Va. Apr. 17, 2025). That decision further supports Innovative's allegations in multiple regards and is addressed herein as relevant.

### B.    PENDING LEGAL DISPUTES

Both parties flagged (without argument) certain key legal disputes in their memorandum of contentions. *See* Dkt. 423 (Innovative's Mem. of Contentions at 16-17); Dkt. 425 (Biosense's Mem. of Contentions at 25-26). Many of those disputes are addressed in the parties' Proposed Post-Trial Jury Instructions. *See* Dkt. 441. Because the Court has not "directed" the parties to brief any issues in their trial briefs, L.R. 16-10, Innovative's trial brief is confined to responding to only those issues affirmatively argued or misrepresented in Biosense's memorandum of contentions. Innovative would be happy, however, to provide further briefing on any additional legal issue the Court might find helpful.

### C.    BIOSENSE MISSTATES INNOVATIVE'S CLAIMS AND THE RULE OF REASON AND ADVANCES IRRELEVANT DEFENSES

Biosense's memorandum of contentions misdescribes Innovative's claims in several regards, incorrectly asserts that Innovative should not be allowed to present its Cartwright Act claims to the jury, mischaracterizes the rule of reason analysis, and advances several purported defenses that do not exist or do not apply here.

1.    **Biosense Mischaracterizes Innovative's Claims**

    i.    **Biosense inaccurately describes the alleged tie**

Biosense's memorandum of contentions mischaracterizes the nature of the alleged tying arrangement. Biosense states that it is alleged to have "t[ied] the sale of each of its CARTO 3 sensor-enabled catheters at issue to its clinical support" because the "clinical support policy effectively forced customers to purchase the CARTO 3 sensor-enabled catheters at issue to obtain clinical support provided by [Biosense's clinical support technicians]." Dkt. 425 (Biosense's Mem. of Contentions at 6). This language incorrectly suggests that Biosense's clinical support policy requires hospitals to buy *all* at-issue CARTO 3 sensor-enabled catheters (Lasso Nav, Pentaray, Octaray, SoundStar) to access Biosense's clinical support. Instead, the policy requires that hospitals purchase *whichever* CARTO 3 sensor-enabled catheters they use from either Biosense or Sterilmed to access Biosense's clinical support. Thus, for example, a hospital need not purchase Lasso Navs *and* Pentarays *and* Octarays. What the policy requires is that the hospital purchase from Biosense/Sterilmed whichever of those sensor-enabled diagnostic catheters it uses if it wants to continue to have access to Biosense's clinical support.

    ii.    **Innovative will prove a CARTO 3 clinical support market**

Biosense asserts, without context, that "[Innovative] claims that it does not need to prove a clinical support market for its tying claims." Dkt. 425 (Biosense's Mem. of Contentions at 5 n.1). To be clear: Innovative intends to prove that there is a CARTO 3 clinical support market. What Innovative and Biosense disagree over is whether it is strictly necessary to define a market where there is direct evidence of market power. Ninth Circuit law favors Innovative's position that direct evidence of market power can obviate the need for a precise market definition.

The elements Innovative cites for its Sherman Act tying claim come directly from the ABA's instructions for tying claims. Those instructions make clear that market power with respect to the tying product "may be proved either directly

1    through proof of defendant's ability to control prices or reduce output, or through

2    circumstantial evidence such as high share of the relevant market."  ABA Model

3    Jury Instructions in Civil Antitrust Cases § 2.E.8; *see also Epic Games, Inc. v.*

4    *Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023) (describing difference between direct

5    and indirect evidence).  The relevant instruction for Innovative's Cartwright Act is

6    similar in this regard.  *See* CACI No. 3420.

7         This distinction matters because direct evidence of market power can obviate

8    the need for precise market definition.  "A plaintiff is not required to define a

9    particular market for . . . a rule of reason claim based on evidence of the actual

10   anticompetitive impact of the challenged practice," *PLS.com, LLC v. National Ass'n*

11   *of Realtors*, 32 F.4th 824, 838 (9th Cir. 2022), "such as reduced output, increased

12   prices, or decreased quality in the relevant market," *id.* at 834.  Indeed, the Ninth

13   Circuit recently reaffirmed that a market definition is not required where there is

14   direct evidence of anticompetitive effects.  *See Shields v. World Aquatics*, 2024 WL

15   4211477, at *3 (9th Cir. Sept. 17, 2024) ("Even without a viable market definition,

16   however, Plaintiffs have raised a triable dispute under the rule of reason through

17   direct evidence of anticompetitive effects."); *see also FTC v. Indiana Fed'n of*

18   *Dentists*, 476 U.S. 447, 460-61 (1986) ("Since the purpose of the inquiries into

19   market definition and market power is to determine whether an arrangement has the

20   potential for genuine adverse effects on competition, 'proof of actual detrimental

21   effects, such as a reduction of output,' *can obviate the need for an inquiry into*

22   *market power*, which is but a 'surrogate for detrimental effects.'") (emphasis

23   added); *In re HIV Antitrust Litig.*, 656 F. Supp. 3d 963, 983 (N.D. Cal. 2023)

24   ("product market definition matters where *indirect* evidence of market power is

25   being considered; at this juncture the focus is on *direct* evidence") (emphasis

26   added).  "Despite dicta in *Qualcomm* suggesting the contrary, [the Ninth Circuit]

27   ha[s] never held that a precise market definition is an absolute requirement 'in any

28

1    antitrust case.'" *Epic Games*, 67 F.4th at 974 n.6 (quoting *FTC v. Qualcomm*, 969

2    F.3d 974, 992 (9th Cir. 2020)).

3              iii.    **Innovative alleges a sensor-enabled ultrasound catheters**

4                    **market**

5         In the Final Pretrial Conference Order, Innovative alleges a market for

6    "[s]ensor-enabled ultrasound catheters (Soundstar)."  Dkt. 443 at 3.  Consistent with

7    that allegation, Innovative describes the market containing the SoundStar catheter as

8    a market for "sensor-enabled ultrasound catheters" in its memorandum of

9    contentions.  *See* Dkt. 423 (Innovative's Mem. of Contentions at 3).  In describing

10   this market, Biosense departs from Innovative's phrasing to insert the qualifier

11   "sensor-enabled ultrasound catheters *for use with the CARTO 3*."  Dkt. 425

12   (Biosense's Mem. of Contentions at 6) (emphasis added).  That qualifier is not

13   necessary because the SoundStar is the only sensor-enabled ultrasound catheter.

14        As such, while Innovative will show all aftermarket lock-in factors for this

15   market, such a showing is not strictly necessary because the switching

16   considerations underlying *Eastman Kodak* do not apply where there is a unique

17   product; a doctor wishing to use a sensor-enabled ultrasound catheter can only use a

18   CARTO 3 machine, as no other cardiac mapping machine offers a sensor-enabled

19   ultrasound catheter.  The fact that SoundStars are disposable goods used with the

20   CARTO 3 is not to the contrary.  Not all cases involving a secondary product used

21   with a primary durable good involve a single-brand aftermarket.  *See In re Google*

22   *Play Store Antitrust Litig.*, 2024 WL 3302068, at *4-5 (N.D. Cal. July 3, 2024).

23        Biosense also incorrectly asserts that this market definition is "a brand new

24   theory advanced only in [Innovative's] jury instructions."  Dkt. 425 (Biosense's

25   Mem. of Contentions at 25).  Innovative has always noted the uniqueness of the

26

27

28

SoundStar in relation to its market definition.[1]  *See* Dkt. 59 (Corrected Second Am. Compl. at 8) (describing market for "3D navigational ultrasound catheters"); *id.* ("In lieu of the SOUNDSTAR, the physician can only use a *non-navigational* ultrasound catheter that connects separately to an ultrasound system") (emphasis added); Dkt. 146 (Opp'n to Mot. for Summ. J. at 19) ("Biosense, Sterilmed, Stryker, and Biosense sell SOUNDSTAR catheters, which are the only navigational ultrasound catheters for use with any cardiac mapping system."); Dkt. 341-1 (Forister 2021 Report ¶ 125 ) ("the unique feature of integrating the ultrasound display into the 3D map of the heart is only available with SOUNDSTAR"); *id.* ¶ 42 ("the CARTO family had the . . . first navigational ultrasound catheter (SOUNDSTAR)"); Dkt. 341-4 (Forister 2024 Report ¶ 74) ("[T]he Soundstar is the only navigational ultrasound catheter.  There is no rival system to which a customer could switch in order to use a navigational ultrasound catheter from a different OEM.  As such, there is no foremarket competition that could constrain Biosense's market power in an aftermarket for navigational ultrasound catheters.").

### 2.  Innovative Is Entitled To Present Its Cartwright Act Claims

Biosense inappropriately argues that "[Innovative] should not be permitted to present the Cartwright Act claim to the jury."  Dkt. 425 (Biosense's Mem. of Contentions at 5).  Innovative pleaded Cartwright Act claims and preserved those claims on appeal, so Innovative should be able to present them at trial.

### i.  The Cartwright Act allows for nationwide damages

Biosense's sole argument for why Innovative should not be allowed to present Cartwright Act claims to the jury is that "[Innovative] cannot prove any relevant damages under the Cartwright Act."  Dkt. 425 (Biosense's Mem. of Contentions at 5).  However, the Cartwright Act claims concern Biosense's alleged tying

---

[1] "3D navigational" and "navigational" are alternative ways to refer to the same "sensor-enabled" functionality that renders the SoundStar unique.

*PLAINTIFF'S TRIAL BRIEF*

1  arrangement, and Dr. Forister has calculated damages resulting from that tying

2  arrangement.  *See also In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948, 977

3  (N.D. Cal. 2017) ("the Court rejects [Defendant's] contention that Plaintiffs cannot

4  plead both a Sherman Act § 2 claim and a Cartwright Act claim").  Biosense does

5  not substantiate its damages argument in its memorandum of contentions.  However,

6  Biosense's objection appears to rest on the mistaken view that nationwide damages

7  are not available under the Cartwright Act, even where, as here, the alleged unlawful

8  conduct emanated from California.

9          While California recognizes a general "presumption against extraterritorial

10  application of [California] law," that presumption does not prevent California law

11  from "reach[ing] any unlawful business act of practice committed in California."

12  *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1208 (2011).  Accordingly, California

13  courts have allowed nationwide class actions over unfair business practices to move

14  forward under California law where the underlying conduct "emanated from

15  California."  *Clothsrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 613 (1997); *see*

16  *also Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 242 (2001) (certifying

17  nationwide class where "the core decision at issue here, namely the change of policy

18  made in October of 1997, was made at Apple's headquarters in California");

19  *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598-99 (C.D. Cal. 2008)

20  (nationwide class action under California's CLRA and UCL); *Ehret v. Uber Techs.,*

21  *Inc.*, 68 F. Supp. 3d 1121, 1130-31 (N.D. Cal. 2014) ("Multiple courts . . . have

22  permitted the [extraterritorial] application of California law where the plaintiffs'

23  claims were based on alleged misrepresentations that were disseminated from

24  California.").  This application includes recovery of nationwide damages.  *See*

25  *People v. Ashford Univ., LLC*, 100 Cal. App. 5th 485, 518-24 (2024) (misconduct

26  that "emanated" from California entitles out-of-state plaintiffs to recover under

27  California law).

28

1    The same is true for the Cartwright Act because "California has an interest

2 in . . . addressing [defendant's] unlawful business activities in California and

3 deter[ing] such anticompetitive conduct perpetuated by a resident California

4 corporation." *In re Qualcomm*, 292 F. Supp. 3d at 979.  Thus, the Cartwright Act

5 can apply nationally even when conduct only partly applies in California.  *See*

6 *Knevelbaard Dairies v. Kraft Foods, Inc*., 232 F.3d 979, 993-94 (9th Cir. 2000).

7 "Neither the Sherman Act nor the federal prohibition of undue burdens on interstate

8 commerce prevents [the Cartwright Act] from reaching transactions that have

9 interstate aspects but significantly affect state interests." *Younger v. Jensen*, 26 Cal.

10 3d 397, 405 (1980).

11         **ii.    Innovative correctly articulates the Cartwright Act elements**

12    Biosense mistakenly asserts that the Cartwright Act does not allow per se

13 tying claims.  *See* Dkt. 425 (Biosense's Mem. of Contentions at 15).  Biosense cites

14 only one California case in support, but that very case indicates that the elements

15 Innovative intends to meet constitute "a per se tying arrangement violative of

16 section 16720." *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 541 (1998).

17    The only other cases Biosense cites are federal antitrust cases.  But "the

18 California Supreme Court has consistently held that '[t]he Cartwright Act is broader

19 in range and deeper in reach than the Sherman Act[.]'" *In re California Gasoline*

20 *Spot Mkt. Antitrust Litig.*, 2022 WL 3215002, at *2 (N.D. Cal. Aug. 9, 2022) (citing

21 *In re Cipro Cases I & II*, 61 Cal. 4th 116, 160 (2015)); *see also Cellular Plus, Inc. v.*

22 *Superior Ct.*, 14 Cal. App. 4th 1224, 1242 (1993); *Cianci v. Superior Court*, 40

23 Cal.3d 903, 920 (1985)).  Indeed, the Ninth Circuit recently reaffirmed that

24 California courts do not treat the Cartwright Act as "coextensive with the Sherman

25 Act." *Sidibe v. Sutter Health*, 103 F.4th 675, 685 (9th Cir. 2024) (quoting *Samsung*

26 *Elec. Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014)).  Thus,

27 "[i]nterpretations of federal antitrust law are at most instructive, not conclusive,

28 when construing the Cartwright Act, given that the Cartwright Act was modeled not

on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century." *Aryeh v. Canon Business Solutions, Inc.*, 55 Cal. 4th 1185, 1195 (2013). The role of the federal antitrust laws "is limited: they are 'often helpful' but not necessarily decisive." *Knevelbaard*, 232 F.3d at 985.

Accordingly, Biosense is mistaken in arguing that Innovative's Cartwright Act instructions must include a rule of reason analysis. In *Sidibe*, the Ninth Circuit recently underscored that, under the Cartwright Act, "tying arrangements are per se illegal." 103 F.4th at 693. The court described the application of the per se rule in the context of Cartwright Act tying claims: "alleged conduct is 'conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" *Id.* (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)). The court further explained that defendant's justifications are "irrelevant to per se violations." *Id.* at 693 (citing *UAS Mgmt. v. Mater Misericordiae Hosp.*, 169 Cal. App. 4th 357, 369 (2008)).

The California Supreme Court has held: "Tying arrangements are illegal per se 'whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product' and when 'a total amount of business, substantial enough in terms of dollar-volume so as not to be merely De minimis, is fore closed to competitors by the tie." *Corwin v. Los Angeles Newspaper Serv. Bureau, Inc.*, 4 Cal. 3d 842, 856-57 (1971).

### 3. Biosense Mischaracterizes the Rule of Reason Analysis

The parties agree that Innovative's Sherman Act claims are subject to the rule of reason, but they disagree as to certain aspects of the rule of reason.

### i. The Ninth Circuit has a four-step rule of reason analysis

The Ninth Circuit has articulated four steps in the rule of reason analysis:

(1) *Step 1*: *Anticompetitive Effects*. Innovative bears an initial burden to prove that Biosense's alleged conduct has anticompetitive effects. *See Epic Games*, 67 F.4th at 971.

1    (2) *Step 2*:  *Procompetitive Rationale*.  The burden then shifts to Biosense "to

2        show a procompetitive rationale."  *Id.* at 986-87 (cleaned up).  This

3        justification must be "a nonpretextual claim that [defendant's] conduct is

4        indeed a form of competition on the merits because it involves, for example,

5        greater efficiency or enhanced consumer appeal—then the burden shifts back

6        to the plaintiff to rebut that claim."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991

7        (9th Cir. 2020) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 59

8        (D.C. Cir. 2001)).

9    (3) *Step 3*:  *Rebuttal of Procompetitive Rationale*.  Innovative then has an

10        opportunity to rebut Biosense's purported procompetitive justifications, either

11        by showing they are pretextual, or by showing "substantially less restrictive

12        alternatives."  *Epic Games*, 67 F.4th at 990; *see also id.* ("At step three of the

13        Rule of Reason, 'the burden shifts back to the plaintiff to demonstrate that the

14        procompetitive efficiencies could be reasonably achieved through less

15        anticompetitive means.'" (quoting *NCAA v. Alston*, 594 U.S. 69, 97 (2021)).

16    (4) *Step 4*:  *Balancing*.  If a procompetitive benefit remains unrebutted, then the

17        ultimate question is whether "the anticompetitive harm of the conduct

18        outweighs the procompetitive benefit."  *Qualcomm*, 969 F.3d at 991.

19            **ii.    Biosense misdescribes the rule of reason analysis**

20        Biosense's memorandum of contentions mischaracterizes the rule of reason

21    analysis in at least three regards.

22        First, Biosense misstates the requirements of step two.  Biosense incorrectly

23    claims that to meet its burden of showing a procompetitive justification, Biosense

24    need only "assert" such a justification.  *See* Dkt. 425 (Biosense's Mem. of

25    Contentions at 11).  In fact, Biosense needs to "*show* a procompetitive rationale for

26    the restraint."  *Epic Games*, 67 F.4th at 985; *Ohio v. Am. Express Co.*, 585 U.S. 529,

27    541 (2018) ("the burden shifts to the defendant to *show* a procompetitive rationale

28    for the restraint") (emphasis added); *In re NCAA Grant-in-Aid Cap Antitrust Litig.*,

14

958 F.3d 1239, 1256 (9th Cir. 2020) (defendant "must come forward with evidence of the restraint's procompetitive effects"); *id.* at 1258 (defendant failed to show "concrete procompetitive effect"); *see also* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 1502 ("the burden passes to the defendant to offer evidence that a legitimate objective is served by the challenged behavior."); *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 992 (9th Cir. 1993) ("the issue at trial" for evaluating a justification is whether the defendant "can prove its assertion"); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 488 (7th Cir. 2020) (Brennan, J., concurring) ("[The] "defendant bears the burden" of "proving procompetitive justification on the facts.").  Biosense plucks the "asserts" language from *Qualcomm*, which in turn quoted *Microsoft*.  *See Qualcomm*, 969 F.3d at 991 ("If the monopolist asserts a procompetitive justification . . . ." (quoting *Microsoft*, 253 F.3d at 59)).  But *Microsoft* makes clear that the defendant must present "*evidence demonstrating that* the [alleged restrictions] have some such procompetitive justification."  *Microsoft*, 253 F.3d at 72 (emphasis added).

Second, and relatedly, Biosense ignores that it must provide a "non-pretextual" justification.  *See Epic Games*, 67 F.4th at 985.  Thus, Innovative can refute Biosense's justifications either by showing that there is a less restrictive alternative *or* by showing that the justifications are pretextual or unsubstantiated.  *See United States v. Google*, 2025 WL 1132012, at *44 ("pretextual and unsubstantiated justifications are not 'valid.'").  Given this rule, courts (and jurors) may give "greater weight to the contemporaneous statements contained in the company's internal records, than to later trial testimony in which its employees declined to ratify those statements."  *Id.* (cleaned up).

Lastly, Biosense incorrectly portrays the fourth balancing step as perfunctory.  *See* Dkt 425 (Biosense's Mem. of Contentions at 12).  The rule of reason's fourth step can have real teeth and "courts frequently balance the restriction's

anticompetitive harms against its procompetitive benefits" in assessing the validity of proffered justifications. *Id.* (citing cases including *Epic Games* and *Qualcomm*). Indeed, Judge Brinkema recently rejected procompetitive justifications advanced by Google in part because "any procompetitive benefits of [Google's] conduct were far outweighed by its anticompetitive effects." *Id.*

### 4.    Biosense Mischaracterizes Innovative's Aftermarket Analysis

Biosense has repeatedly mischaracterized Innovative's position on *Eastman Kodak* aftermarket analysis. Biosense has fixated on Innovative's occasional references to *Lambrix v. Tesla*, 737 F. Supp. 3d 822 (N.D. Cal. 2024), while also misconstruing the aspect of *Lambrix* to which Innovative has cited. Innovative's proposed aftermarket jury instructions, not Biosense's caricature of *Lambrix*, are the proper measure of Innovative's position on *Eastman Kodak* aftermarket analysis. As those instructions reflect, Innovative properly treats Biosense's foremarket market power as relevant to (and not a replacement for) an *Eastman Kodak* analysis.

The definitive case on single-brand aftermarkets is *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992). The question presented was "whether a defendant's *lack of market power in the primary equipment market* precludes—as a matter of law—the possibility of market power in derivative markets." *Id.* at 451. This question arose because Kodak, which was accused of unlawful tying and monopolization of the aftermarket for Kodak repair services, lacked market power in the relevant copier foremarket. *See id.* at 466 n.10. Kodak argued that "because competition exists in the equipment market," it necessarily lacked the requisite market power in the aftermarket. The Supreme Court rejected that bright-line rule and held that what mattered was whether competition in "the equipment [fore]market . . . discipline[s] the aftermarkets so that all [products] are priced competitively overall." *Id.* at 486. The Court made clear that this is a holistic "factor"-based inquiry based on "actual market realities." *Id.* at 466-76. The Court further articulated several market imperfections, including "significant

1  information and switching costs," that could allow Kodak to have market power in

2  the aftermarket even absent foremarket power.

3      The Ninth Circuit, in *Epic Games*, summarized the four "single-brand

4  aftermarket" factors from *Eastman Kodak*. *See* 67 F.4th at 977. But the Ninth

5  Circuit also noted that *Eastman Kodak* addressed a situation where the foremarket

6  purchase was made in an "initial (competitive) market." *Id.* at 978. Citing that

7  language, the district court in *Lambrix* observed that "[f]rom a practical perspective,

8  the relevance of information costs, switching costs, and general knowledge of

9  restrictions is reduced where a defendant has market power in the foremarket." 737

10  F. Supp. 3d at 841. The court in *Lambrix*, however, also considered the four

11  *Eastman Kodak* factors as well in assessing the plaintiff's alleged single-brand

12  aftermarket claims.

13      Innovative's position is that both foremarket market power and the *Eastman

14  Kodak* factors are relevant to an aftermarket analysis. *Eastman Kodak* leaves no

15  doubt that market power in the foremarket is relevant to assessing whether "the

16  equipment [fore]market … discipline[s] the aftermarkets so that all [products] are

17  priced competitively overall." 504 U.S. 451 at 486. After all, a defendant's market

18  power in the foremarket affects the degree of foremarket competition. However, the

19  *Eastman Kodak* factors also remain highly relevant to that assessment regardless of

20  whether the defendant has foremarket market power. Thus, Innovative's proposed

21  aftermarket jury instruction directs jurors to consider both factors in assessing the

22  central *Eastman Kodak* question: whether "Biosense is able to force customers to

23  pay prices above competitive levels in the alleged CARTO 3 catheter aftermarkets

24  without causing a substantial number of customers to switch to or choose competing

25  cardiac mapping machines." Dkt 441 (Proposed Jury Instructions at 157).

26

27

28

**5.    Biosense's Asserted Defenses Are Contrary to Law**

**i.    There is no "business justification" defense**

Biosense incorrectly asserts a "business justification" defense that it treats as distinct from the rule of reason's "procompetitive justifications" inquiry, and that it claims requires only two elements:  (1) "a legitimate business purpose," for which (2) "[t]here is no substantially less restrictive alternative."  Dkt. 425 (Biosense's Mem. of Contentions at 19-20).  Biosense does not include any requirement that the justification be "procompetitive" and "non-pretextual," or that the factfinder "balance the harms and the benefits" of the challenged conduct.  *Epic Games*, 67 F.4th at 971, 993.

The Ninth Circuit does not recognize such a "business justifications" defense. The Ninth Circuit acknowledges two strands of tying law under the Sherman Act: per se tying claims and rule of reason tying claims.  *See Epic Games*, 67 F.4th at 974, 997; *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1157 (9th Cir. 2001).  Innovative's Sherman Act claim falls within the second.  For such claims, the Ninth Circuit law does not recognize a "business justification" defense in addition to the analysis of procompetitive justifications.  *See Epic Games*, 67 F.4th at 973, 987-88 (analyzing Apple's justifications as "procompetitive justifications" only); *Tuolomne*, 236 F.3d at 1158-59 (assessing defendant's justifications under the rule of reason framework only); *Teradata Corp. v. SAP SE*, 124 F.4th 555, 565, 571 (9th Cir. 2024) (analyzing only "procompetitive justifications" under four-step rule of reason analysis); *see also United States v. Google*, 2025 WL 1132012, at *44 (equating "valid business reasons" with "procompetitive justifications" under rule of reason).

Indeed, *Epic Games* emphasized that there is no "exemption from the Rule of Reason."  *Epic Games*, 67 F.4th at 988 (citing *Indiana Fed'n of Dentists*, 476 U.S. at 465).  An exemption is exactly what Biosense is requesting with its business justification defense.  That defense, as Biosense describes it, requires neither that the

justification be procompetitive (i.e., that it benefit competition), nor that any procompetitive benefits be weighed against the tying arrangement's anticompetitive effects, as required under the rule of reason.

Further, the Ninth Circuit has already made clear that Biosense's justifications should be analyzed under the rule of reason. Biosense raised its "business justification defense" in its briefing before the Ninth Circuit on appeal. *See* Appellee's Answering Br., *Innovative Health LLC v. Biosense Webster, Inc.*, No. 22-55413, 2022 WL 17476831, at *3 (9th Cir. Nov. 3, 2022). The Ninth Circuit, however, in accordance with Ninth Circuit law, construed that as a request to present "procompetitive justifications" and explained the requirements for offering procompetitive justification, which differ from those Biosense now advances in connection with its purported business justifications defense. *See Innovative Health LLC v. Biosense Webster, Inc.,* 2024 WL 62948, at *3-4 (9th Cir. Jan. 5, 2024).

Biosense gets its business justifications defense from the ABA Model Jury Instructions in Civil Antitrust Cases. *See* Dkt. 441 (Proposed Jury Instructions at 101-104). But the ABA itself recognizes that "[t]he Supreme Court has not expressly accepted the validity of the business justification defense." Comment to ABA Model Jury Instructions in Civil Antitrust Cases § 2.E.11. Instead, both the ABA and Biosense cite to an older Ninth Circuit case: *Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342 (9th Cir. 1987). However, *Mozart* concerned only a per se tying claim under Section 1. *See id.* at 1348 ("We have recognized that antitrust defendants may demonstrate a business justification for an otherwise *per se* illegal tying arrangement.") (emphasis added).

Moreover, the court decided *Mozart* during a period of rapid evolution in tying doctrine as scholars and courts began to reconsider the view, undergirding then-existing per se tying law, that "tying arrangements generally served no legitimate business purpose[.]" *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S.

495, 503 (1969); *see also Microsoft*, 253 F.3d at 84-90 (recounting some of this history).  The eventual outcome of this evolution in the Ninth Circuit was a preference for handling Sherman Act tying claims under the rule of reason—*not* the implementation of a "business justification" defense.  Thus, while *Mozart* and older Ninth Circuit caselaw may reference "business justifications" as part of this doctrinal evolution, that does not reflect current black letter law in the Ninth Circuit. In fact, neither *Tuolumne*, nor *Epic Games*, nor *Teradata* even cite *Mozart* on this issue.

Biosense also cites to language about "business justifications" in *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997).  *See* Dkt. 441 (Proposed Jury Instructions at 154).  But that language is inapposite.  Unlike this case, the plaintiff there proceeded to verdict on remand on a Section 2 refusal to deal claim rather than a tying claim under Section 1 or Section 2.  Kodak had rescinded its policy of selling parts directly to independent service organizations.  *Image Tech. Servs.*, 125 F.3d at 1201.  The discussion of "business justifications" in *Eastman Kodak* occurs only in relation to the Section 2 refusal to deal claim, which represents a different body of law.  *See id.* at 1212.  Moreover, even as to that other body of law, the Ninth Circuit held that the justification had to be procompetitive. *See id.* ("A plaintiff may rebut an asserted business justification by demonstrating . . . that the justification does not legitimately promote competition[.]").

Finally, Biosense has also cited the fact that a "business justification" instruction was given in *Epic Games, Inc. v. Google LLC*, 3:20-cv-05671-JD (N.D. Cal. Dec. 6, 2023), Dkt. 592 and *Surgical Instrument Serv. Co. v. Intuitive Surgical, Inc.*, No. 3:21-03496-AMO (N.D. Cal. January 27, 2025) Dkt. 435-1.  *See* Dkt. 441 (Proposed Jury Instructions at 104).  But that is unsurprising given the weight that the model ABA instructions carry for many practitioners and judges.  *See, e.g.*, Tr., *Surgical Instrument Serv. Co. v. Intuitive Surgical, Inc.*, No. 3:21-03496-AMO (N.D. Cal. Jan. 27, 2025), Dkt. 458 (denying a request to omit the instruction for the

1  sole reason that the "ABA instructions are clear" about including it).  That does not
2  change the fact, however, that the ABA instructions clearly conflict with Ninth
3  Circuit law.

4                  ii.       **Unilateral duty to deal doctrine does not apply to this case**

5        Biosense advances a "no duty to deal" defense, *see* Dkt. 425 (Biosense's
6  Mem. of Contentions at 21), but that defense is inapplicable here. Biosense
7  improperly conflates the alleged tying arrangement imposed on hospitals with an
8  antitrust duty to deal with Innovative.  A no-duty-to-deal defense applies only where
9  alleged antitrust liability turns on "a firm's unilateral refusal to deal with its rivals."
10 *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) (discussing
11 *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)).
12 Innovative's tying allegations do not fit that mold because they challenge Biosense's
13 affirmative coercion of hospitals, not a refusal to deal with Innovative.

14       Unilateral duty to deal doctrine applies when a competitor plaintiff seeks to
15 trade directly with the defendant.  *See, e.g.*, *Qualcomm*, 969 F.3d at 995 (Qualcomm
16 had no "antitrust duty to license rival chip manufacturers").  Innovative does not
17 seek to trade with Biosense or enter any agreement to deal with Biosense. Instead,
18 Innovative challenges the tie that Biosense imposes on *hospitals* requiring *hospitals*
19 to use its catheters if the *hospitals* want Biosense's clinical support for the CARTO
20 3 machine.  This distinction between a refusal to deal with a rival and a genuine
21 tying claim affecting third-party customers is well recognized in the Ninth Circuit.
22 *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016)
23 (distinguishing Aerotec's refusal to deal claim, based on Honeywell's refusal to sell
24 Aerotec parts, from the actual tying arrangement in *Eastman Kodak Co. v. Image
25 Tech. Servs., Inc.*, 504 U.S. 451, 463 (1992) where Kodak "would sell parts *to third
26 parties* only if they agreed not to buy service from independent service operators."
27 (emphasis added)).  In short, unilateral refusal to deal doctrine does not apply here
28 because the challenged conduct is not a unilateral refusal to do business with

Innovative, but a bilateral tying arrangement forcing hospitals not to do business with Innovative.

Indeed, it is well-established that the no-duty-to-deal defense does not apply to tying arrangements (whether raised as part of a Section 1 or Section 2 claim). The defendant in *Eastman Kodak* tried to press a no-duty-to-deal argument, but the Court rejected it, citing the fact that plaintiffs brought a tying claim: "Assuming, *arguendo,* that Kodak's refusal to sell parts to any company providing service can be characterized as a unilateral refusal to deal, *its alleged sale of parts to third parties on condition that they buy service from Kodak is not*." *Eastman Kodak*, 504 U.S. at 463 n.8 (emphasis added). Thus, *Eastman Kodak* leaves no doubt that tying arrangements are not refusals to deal. There is no reason to think that *Trinko*— which mentioned neither tying nor *Eastman Kodak*—changed this black letter law. Tying does not involve an unconditional refusal to deal with a rival. Instead, it involves a conditional sale to customers to "interfere[] with the relationship" between those customers and rivals. *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 28 (D.D.C. 2021). "Conditional dealing schemes are thus categorically different from unilateral conduct that involves only the monopolist's competitors, such as its refusal to deal with them." *Id.*

Judge Brinkema recently rejected Google's request for a "no duty to deal" defense to both Section 1 and Section 2 claims in DOJ's suit against Google for these very reasons:

> The refusal to deal doctrine in Trinko does not apply to Google's conduct at issue. Courts have declined to "extend[ ] a refusal-to-deal-with-rivals analysis" to anticompetitive restraints that a monopolist places on its customers, as opposed to its competitors. *Chase Mfg.*, 84 F.4th at 1173; *see also Kodak*, 504 U.S. at 463 n.8; *Lorain Journal*, 342 U.S. at 152–53. Courts have also "contrast[ed]" the "[r]efusal to deal doctrine" from "a monopolist's more direct interference with rivals,"

such as "limit[ing] the abilities of third parties to deal with rivals (exclusive dealing)" or "requir[ing] third parties to purchase a bundle of goods rather than just the ones they really want (tying)." *Novell*, 731 F.3d at 1072, 1076. Here, Google has engaged in tying that … had the anticompetitive effect of limiting Google's publisher customers' choice of publisher ad server for reasons other than competition on the merits. … Although such tying, like other anticompetitive and restrictive conditions on customers, can be conceptualized as a "conditional refusal[ ] to deal," that does not mean it should be assessed as a "simple refusal to deal" with rivals, which was the alleged harm in Trinko. *Viamedia*, 951 F.3d at 453. Rather, as the Supreme Court reasoned in *Kodak*, even if the refusal to sell a product to rivals could "be characterized as a unilateral refusal to deal," the sale of a tying product to "third parties" on the "condition that they buy" a tied product does not fit within the ambit of the refusal to deal exception to antitrust liability. 504 U.S. at 463 n.8. That is why a tying claim "does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary." *Viamedia*, 951 F.3d at 472.

*United States v .Google*, 2025 WL 1132012, at *43.

Biosense points to the no-duty-to-deal instruction in *Epic Games v. Google*. *See* Dkt. 441 (Proposed Jury Instructions at 103-104). However, there is no need for a similar cautionary instruction here because the jury will not hear evidence that Biosense refuses to sell Innovative's catheters. In *Epic Games v. Google*, the Court—citing *Trinko*—granted summary judgment to Google on plaintiffs' allegation that "Google unlawfully prohibits the distribution of other app stores on Google Play" through its Developer Distribution Agreement ("DDA"). *See* Pretrial Order at 1, *Epic Games, Inc. v. Google LLC*, No. 3:21-md-02981-JD, Dkt. 700. The Court issued the no-duty-to-deal instruction because counsel nonetheless introduced

at trial "evidence that Google's [DDA] prohibits the distribution of other app stores through the Google Play Store."  Dkt. 850 (Final Jury Instructions at 33).  There is no similar evidence here.

Moreover, subsequent developments cast doubt on the appropriateness of the *Epic Games v. Google* instruction.  Apple raised similar no-duty-to-deal arguments in *Epic Games v. Apple* by arguing that its Developer Program Licensing Agreement ("DPLA") was a lawful refusal to deal.  *See* Appellee/Cross-Appellant Principal & Resp Br., Nos. 21-16506 & 21-16695, Dkt. 93 at 62-66.  The Ninth Circuit disregarded those arguments and emphasized that the DPLA is a bilateral restraint.  *See Epic Games*, 67 F.4th at 982; *see also id.* at 984 n.14; *cf.* Def.'s Mot. for Partial Summ. J. at 8, *Epic Games, Inc. v. Google LLC*, No. 3:21-md-02981-JD, Dkt. 483 ("The DDA is unilateral conduct and cannot give rise to a Section 1 claim").

### iii.    There is no "duty to aid" defense in this case

Biosense also references a "no duty to aid" defense.  *See* Dkt 425 (Biosense's Mem. of Contentions at 21).  To the extent Biosense derives this defense from *Trinko*, it is no different than the "no duty to deal" just discussed.  To the extent Biosense derives this defense from *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991 (9th Cir. 2010), and means for it to apply to Innovative's allegations regarding Biosense's blocking technology, Biosense omits half of the relevant law.  The other half makes clear that "changes in product design are not immune from antitrust scrutiny and in certain cases may constitute an unlawful means of maintaining a monopoly under Section 2."  *Id.* at 998; *see also NCAA*, 594 U.S. at 101 (stating a defendant is not permitted to "relabel a restraint [on trade] as a product feature and declare it immune from" antitrust scrutiny).  Specifically, a Section 2 violation may occur where—as is alleged here—a product design does not "provid[e] a new benefit to consumers" and there is "associated anticompetitive conduct."  *Allied Orthopedic Appliances*, 592 F.3d at 999.

The court in *United States v. Google* reiterated this principle just last week in rejecting Google's argument that Google was "shielded from antitrust liability because [its product and policy changes] involved product design choices." 2025 WL 1132012, at *46. The Court held that "'product redesign is anticompetitive when it coerces consumers and impedes competition,' which Google's actions did here." *Id.* (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015)). Similarly, Biosense's product design and "associated conduct," including "tying agreements" and "product disparagement," is exclusionary because its "overall effect" is "to coerce consumers to purchase [its products] over [Innovative's products], rather than to compete on the merits." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 230 (S.D.N.Y. 2019); *see also United States v. Google LLC*, 2025 WL 1132012 at *46 (quoting same). The Court should thus reject Biosense's contention that there is a general "no-duty-to-aid-competitors" defense.

### 6. Biosense Incorrectly Asserts that Innovative Cannot Prove Antitrust Injury or Damages

Biosense has suggested that, without the tie, Biosense necessarily would charge customers for clinical support, decreasing or eliminating customers' savings from buying reprocessed catheters rather than new ones. *See*, *e.g.*, Dkt. 341 (Biosense *Daubert* Mot. at 36-38) (same). Biosense has claimed that *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 52 (9th Cir. 1971) adopted this principle. *See*, *e.g.*, Dkt. 341 (Biosense *Daubert* Mot. at 10). Biosense also asserts that Dr. Forister fails to analyze the effect of Biosense's tie on the combined price customers pay for clinical support and catheters. Biosense is incorrect on all points.

The very cases that Biosense cites hold that it is an issue of fact—one that depends on the evidence—whether an antitrust defendant would increase prices for its tying product if forced to eliminate a tie and, if so, by how much. *See U.S. Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 618 (1977); *Chicken Delight*, 448

F.2d at 52.  Indeed, a district court just last month rejected an antitrust defendant's misinterpretation of Chicken Delight just like Biosense's.  *See In re Da Vinci Surgical Robot Antitrust Litig.*, 2025 WL 964879, at *10 (N.D. Cal. Mar. 31, 2025).  Da Vinci also rejected the economic theory that any decreases in tying product prices necessarily are offset by increases in tied product prices.  *See id.*

Dr. Forister presents economic evidence and analyses demonstrating that, without Biosense's tie, Biosense would not charge for clinical support while at the same time many customers would pay less for catheters because of reprocessing.  *See*, *e.g.*, Dkt. 341-3 (Forister 2025 Rebuttal ¶ 70 n.103).  And Dr. Forister explains why Biosense would not charge for clinical support without the tie: Biosense wants its clinical support specialists in as many hospitals and other medical settings as possible so they can increase catheter sales, obtain firsthand market information, and enhance brand loyalty.  *See id.* at ¶¶ 71, 257; Dkt. 341-1 (Forister 2021 Report ¶ 155).

*PLAINTIFF'S TRIAL BRIEF*

1  DATED:  April 24, 2025              THEODORA ORINGHER PC

2

3

4                                     By:      /s/ Panteha Abdollahi
                                              Panteha Abdollahi
5

6                                     JEFFREY L. BERHOLD, P.C.

7

8

9                                     By:      /s/ Jeffrey L. Berhold
                                              Jeffrey L. Berhold
10                                    BERGER MONTAGUE PC

11

12

13                                    By:      /s/ Joshua P. Davis
                                              Joshua P. Davis
14                                            Matthew Summers

15

16                                    KELLOGG, HANSEN, TODD, FIGEL & FREDERICK,
                                      P.L.L.C.
17

18

19                                    By:      /s/ Andrew E. Goldsmith
20                                            Derek T. Ho
                                              Andrew E. Goldsmith
21                                            Matthew D. Reade
                                              Kelley C. Schiffman
22                                            Rachel T. Anderson
                                              Annamaria M. Morales-Kimball
23                                            Sean P. Quirk
24

25

26                                    Attorneys for Plaintiff
                                      INNOVATIVE HEALTH LLC
27

28

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Plaintiff Innovative Health LLC, certifies that this brief contains 6,582 words, which complies with the word limit of Central District of California Local Rule 11-6.1.


DATED:  April 24, 2025           KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.


                                 By:  ___/s/ Andrew E. Goldsmith___
                                     Andrew E. Goldsmith