**F I L E D**
CLERK, U.S. DISTRICT COURT

5/16/25

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ eva _____ DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| INNOVATIVE HEALTH LLC, <br><br> Plaintiff, <br><br> vs. <br><br> BIOSENSE WEBSTER, INC., <br><br> Defendant. | Case No. 8:19-cv-1984 JVS (KESx) <br><br> Assigned for all purposes to: <br> Honorable James V. Selna <br><br> JURY INSTRUCTIONS |

Dated: May 16, 2025

Hon. James V. Selna, U.S. District Judge

F

# JURY INSTRUCTION NO. 1

Members of the Jury: Now that you have heard all of the evidence and the arguments of the attorneys, it is my duty to instruct you on the law that applies to this case.

Each of you has received a copy of these instructions that you may take with you to the jury room to consult during your deliberations.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

Please do not read into these instructions or anything that I may say or do or have said or done that I have an opinion regarding the evidence or what your verdict should be.

JURY INSTRUCTION NO. 2

I will give you a brief summary of the positions of the parties.

The plaintiff is Innovative Health LLC ("Innovative").

The defendant is Biosense Webster, Inc. ("Biosense").

Innovative contends that Biosense violated the antitrust laws by adopting a policy that forces hospitals to buy certain cardiac catheters from Biosense or its affiliate Sterilmed instead of from Innovative. Innovative argues that Biosense dominates the markets for cardiac mapping machines and for the personnel who are needed to support those machines. Innovative also argues that Biosense abuses that power by not allowing Biosense personnel to support patients' heart procedures if they involve certain catheters sold by Innovative or by other companies like Innovative. Innovative says that it has lost money because it would have sold more catheters to hospitals without Biosense's policy. Innovative also argues that Biosense improperly monopolized the markets for certain kinds of cardiac catheters by instituting the policy, by putting technology in its catheters to make it difficult for companies like Innovative from reprocessing and reselling them, and by hoarding used catheters to prevent Innovative from obtaining them.

Biosense denies Innovative's claims. Biosense contends that there is vigorous competition in the market for integrated cardiac mapping systems, which consist of the cardiac mapping machine, the software for the machine, catheters, and clinical support services. Biosense competes in that market with other providers of integrated cardiac mapping systems. Biosense contends that it does not have an obligation to support procedures using competitors' products. Biosense also contends that its conduct promotes, rather than harms, competition by preventing competitors from free-riding on its services thereby insuring that Biosense has sufficient resources to provide the high quality clinical support that hospitals

1  demand.  Biosense further contends that its conduct is justified for legitimate

2  business reasons.  Biosense also contends that Innovative has failed to show any

3  antitrust injury or damages resulting from Biosense's conduct.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

### JURY INSTRUCTION NO. 3

3

4          When a party has the burden of proving any claim or affirmative defense by a

5   preponderance of the evidence, it means you must be persuaded by the evidence that

6   the claim or affirmative defense is more probably true than not true.

7          You should base your decision on all of the evidence, regardless of which

8   party presented it.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY INSTRUCTION NO. 4

The evidence you are to consider in deciding what the facts are consists of:

1.    the sworn testimony of any witness;

2.    the exhibits which are received into evidence; and

3.    any facts to which the lawyers have agreed.

JURY INSTRUCTION NO. 5

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night.  However, other evidence, such as a turned on garden hose, may provide a different explanation for the presence of water on the sidewalk.  Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

JURY INSTRUCTION NO. 6


Some evidence was admitted for a limited purpose only.

If I instructed you that an item of evidence is admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

JURY INSTRUCTION NO. 7

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

1.    Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they say in their opening statements and closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

2.    Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

3.    Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered. In addition sometimes testimony and exhibits are received only for a limited purpose; when I give a limiting instruction, you must follow it.

4.    Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

8

## JURY INSTRUCTION NO. 8

There are rules of evidence that control what can be received into evidence. When a lawyer asked a question or offered an exhibit into evidence and a lawyer on the other side thought that it was not permitted by the rules of evidence, that lawyer objected. If I overruled the objection, the question was answered or the exhibit received. If I sustained the objection, the question was not answered, and the exhibit was not received. If I sustained an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I ordered that evidence be stricken from the record and that you disregard or ignore the evidence. That means that when you are deciding the case, you must not consider the evidence that I told you to disregard.

# JURY INSTRUCTION NO. 9

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. The questions and answers are recorded. When a person is unavailable to testify at trial, the deposition of that person may be used at the trial. Insofar as possible, you should consider deposition testimony, presented to you in court in lieu of live testimony, in the same way as if the witness had been present to testify.

JURY INSTRUCTION NO. 10

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1) the opportunity and ability of the witness to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case, if any;

(5) the witness's bias or prejudice, if any;

(6) whether other evidence contradicted the witness's testimony;

(7) the reasonableness of the witness's testimony in light of all the evidence; and

(8) any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.  What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it

11

differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

JURY INSTRUCTION NO. 11

You have heard testimony from Dr. Eric Forister and Dr. Lawrence Wu who testified to opinions and the reasons for their opinions. This opinion testimony was allowed because of the education or experience of the expert witness.

Such opinion testimony should be judged like any other testimony. You may accept it, reject it, or give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

1

2

### JURY INSTRUCTION NO. 12

3

4    Certain charts, diagrams, and summaries not admitted into evidence have been

5    shown to you in order to help explain the contents of records, documents, or other

6    evidence in the case. They are not themselves evidence or proof of any facts. If they

7    do not correctly reflect the facts or figures shown by the evidence in the case, you

8    should disregard these charts, diagrams, and summaries and determine the facts from

9    the underlying evidence.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT JURY INSTRUCTION NO. 13

Certain charts, diagrams, and summaries were received into evidence to illustrate information brought out in the trial. Charts, diagrams, and summaries are only as good as the testimony or other admissible evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

JURY INSTRUCTION NO. 14

The parties have agreed to certain facts that will be read to you. You must treat these facts as having been proved.

The parties have agreed to the following facts:

1. Biosense is a California corporation.

2. Biosense introduced its current cardiac mapping machine, the CARTO 3, to the U.S. market in 2009.

3. Innovative is an Arizona company.

## JURY INSTRUCTION NO. 15

I will now give you instructions about the substantive law that applies to the case. The case is about a federal antitrust statute called the Sherman Act and a California antitrust act called the Cartwright Act.

The purpose of these antitrust laws is to preserve free and unfettered competition in the marketplace. These laws rest on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

Innovative brings three types of claims under the Sherman Act: a Section 1 tying claim, a Section 2 unlawful monopolization claim, and a Section 2 attempted monopolization claim. I will explain all three, starting with the Section 1 claim.

Innovative also brings a tying claim under Section 16720 of the Cartwright Act. I will instruct you on that claim toward the end of the instructions.

17

JURY INSTRUCTION NO. 16

Under Section 1 of the Sherman Act, a restraint of trade is illegal only if it is found to be unreasonable. You must determine, therefore, whether the restraint challenged here is unreasonable.

In making this determination, you must first determine whether Innovative has proven that the challenged restraint has resulted in a substantial harm to competition in a relevant product and geographic market. If you find that Innovative has proven that the challenged restraint results in a substantial harm to competition in a relevant market, then you must consider whether the restraint produces countervailing competitive benefits. If you find that it does, then you must balance the competitive harm against the competitive benefit. The challenged restraint is illegal under Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs the competitive benefit.

I will now review each step of the analysis in more detail.

JURY INSTRUCTION NO. 17

As I mentioned, to prove that the challenged restraint is unreasonable, Innovative first must demonstrate that the restraint has resulted in a substantial harm to competition. Although it may be relevant to the inquiry, harm that occurs merely to the individual business of Innovative is not sufficient, by itself, to demonstrate harm to competition generally. That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition.

Furthermore, Innovative must show that the harm to competition occurred in an identified market, known as a relevant market.

If you find that Innovative has proven the existence of a relevant market, then you must determine whether Innovative also has proven that the challenged restraint has a substantial harmful effect on competition in that market. A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality. If the challenged conduct has not resulted in higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraint has produced competitive harm, you may look at the following factors:

- the effect of the restraint on prices, output, product quality, and service;
- the purpose and nature of the restraint;
- the nature and structure of the relevant market;
- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and
- whether Biosense possesses market power.

19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2

## JURY INSTRUCTION NO. 18

3
4
5
6
7
8
9
10
11

If you find that Innovative has proven that the challenged restraint resulted in substantial harm to competition in a relevant market, then you next must determine whether the restraint also benefits competition in other ways.  If you find that the challenged restraint does result in competitive benefits, then you also must consider whether the restraint was reasonably necessary to achieve the benefits. If Innovative proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraint.

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

21

JURY INSTRUCTION NO. 19

If you find that the challenged restraint was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same restraint.

If the competitive harm substantially outweighs the competitive benefits, then the challenged restraint is unreasonable. If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraint is not unreasonable. In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors. Innovative bears the burden of proving that the anticompetitive effect of the conduct substantially outweighs its benefits.

1
2
3

JURY INSTRUCTION NO. 20

4

Innovative claims that Biosense engaged in an unlawful tying arrangement in

5

violation of Section 1 of the Sherman Act. A tying arrangement is one in which the

6

seller will sell or provide one product or service (referred to as the tying product)

7

only on the condition that buyers also purchase a different product (referred to as the

8

tied product), or at least agree that they will not purchase the tied product from any

9

other supplier. In this case, Innovative claims that CARTO 3 clinical support is the

10

tying product and CARTO 3 sensor-enabled catheters are the tied products.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JURY INSTRUCTION NO. 21

Not all tying arrangements are unlawful. The essential characteristic of an invalid tying arrangement is a seller's exploitation of its market power over the tying product (CARTO 3 clinical support) to force buyers to purchase a tied product (CARTO 3 sensor-enabled catheters) that buyers either did not want at all or might have preferred to purchase elsewhere. I will now instruct you regarding how to determine whether there is an unlawful tying arrangement.

# JURY INSTRUCTION NO. 22

To prevail on its tying claim, Innovative must prove each of the following elements by a preponderance of the evidence:

(1) CARTO 3 clinical support and CARTO 3 sensor-enabled catheters are separate and distinct products;

(2) Biosense will provide CARTO 3 clinical support only on the condition that the hospital uses CARTO 3 sensor-enabled catheters that it purchased from Biosense/Sterilmed, or that the hospital not use CARTO 3 sensor-enabled catheters it purchased from any other supplier;

(3) Biosense has sufficient market power with respect to CARTO 3 clinical support to enable it to restrain competition as to CARTO 3 sensor-enabled catheters;

(4) the alleged tying arrangement has foreclosed a substantial volume of commerce as to CARTO 3 sensor-enabled catheters;

(5) the tying arrangement has unreasonably restrained trade in that it had a substantial adverse effect on competition with respect to CARTO 3 sensor-enabled catheters; and

(6) Innovative was injured in its business or property because of the tying arrangement.

If you find that the evidence is sufficient to prove all six of these elements, then you must find for Innovative and against Biosense on Innovative's tying claim. If you find that the evidence is insufficient to prove any one of these elements, then you must find for Biosense and against Innovative on Innovative's tying claim.

JURY INSTRUCTION NO. 23

To determine whether CARTO 3 clinical support and CARTO 3 sensor-enabled catheters are separate and distinct products, you should consider whether they are sold or provided separately, or whether there would be demand for each of them if they were offered separately.

If you find that CARTO 3 clinical support and CARTO 3 sensor-enabled catheters are offered separately, that is evidence that they are separate products. Even if they are not offered separately, CARTO 3 clinical support and CARTO 3 sensor-enabled catheters are separate products if enough customers would want them to be offered separately, and that it is efficient for a company to offer them separately. On the other hand, if there is very little demand for one of the products by itself (that is, without the other product), then CARTO 3 clinical support and CARTO 3 sensor-enabled catheters are not two separate products.

Products may be separate products even if one of them is useless without the other. The relevant issue is whether there is sufficient demand from customers to induce sellers to provide them separately.

JURY INSTRUCTION NO. 24


You may find that a tying arrangement exists between CARTO 3 clinical support and CARTO 3 sensor-enabled catheters if Biosense either refused to provide CARTO 3 clinical support unless hospitals also agreed to use CARTO 3 sensor-enabled catheters purchased from Biosense/Sterilmed (or not use CARTO 3 sensor-enabled catheters purchased from another supplier), or effectively coerced hospitals into using CARTO 3 sensor-enabled catheters purchased from Biosense/Sterilmed in order to use Biosense's CARTO 3 clinical support. To prove coercion, Innovative must prove by a preponderance of the evidence that Biosense exploited its control over CARTO 3 clinical support to force hospitals into purchasing from Biosense/Sterilmed CARTO 3 sensor-enabled catheters, which the hospitals either did not want at all, or might have preferred to purchase from another company on different terms, and that any appearance of choice was illusory. Mere sales pressure or persuasion is not coercion.

JURY INSTRUCTION NO. 25

You may find that Biosense has market power with respect to CARTO 3 clinical support if, by reason of some advantage, Biosense has the power to either:

(a) make customers pay more for the tied package (CARTO 3 clinical support + CARTO 3 sensor-enabled catheters) than they would pay for those components in a competitive market, or

(b) otherwise force customers that use CARTO 3 clinical support to do something that the hospitals would not do in a more competitive market.

In the alternative, you may determine whether Biosense has market power with respect to CARTO 3 clinical support by considering whether Biosense has a high share of that market for CARTO 3 clinical support such that hospitals do not have reasonable alternative sources of CARTO 3 clinical support or a reasonably interchangeable substitute readily available. If Biosense's market share of the market for CARTO 3 clinical support is below 30 percent, Biosense does not have market power. But if Biosense's market share of the market for CARTO 3 clinical support is above 30 percent, you may consider that in determining whether defendant has market power.

Whether a high market share is an indicator of Biosense's market power is a function of numerous market conditions, including the uniqueness of the product, the ability of existing competitors to expand production, and the ease (or difficulty) with which new competitors can enter the market. If you find that hospitals needing CARTO 3 clinical support do not have readily available alternative sources of supply and are forced as a practical matter to use Biosense's CARTO 3 clinical support, you may find that Biosense has market power. You may also consider in your market power determination the presence of any unique features or costs associated with CARTO 3 clinical support that effectively prevent others from

1   offering a comparable product.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

JURY INSTRUCTION NO. 26

2

3

4          If you determine that CARTO 3 clinical support and CARTO 3 sensor-

5     enabled catheters are separate products that have been tied to one another and that

6     Biosense has market power for CARTO 3 clinical support, then you must determine

7     whether Innovative has proven that the tying arrangement has affected a substantial

      amount of commerce with respect to each of the CARTO 3 sensor-enabled catheters.

8          This requirement is met if the tying arrangement has affected more than a *de

9     minimis* amount of commerce with respect to each of the CARTO 3 sensor-enabled

10    catheters. An amount of commerce is more than *de minimis* if it is more than a trivial

11    amount of commerce. If you find that the tying arrangement affected only a trivial

12    amount of commerce with respect to each of the CARTO 3 sensor-enabled catheters,

13    then you must find in favor of Biosense on the tying claim. However, if you find that

14    the tying arrangement affected more than a trivial amount of commerce with respect

15    to each of the CARTO 3 sensor-enabled catheters, then you must find that

16    Innovative has satisfied this element of its Section 1 tying claim.

17

18

19

20

21

22

23

24

25

26

27

28

JURY INSTRUCTION NO. 27

If you find that Innovative has proven that the tying arrangement affected a substantial amount of commerce with respect to CARTO 3 sensor-enabled catheters, then you next must determine whether the tying arrangement also benefits competition in other ways. If you find that the tying arrangement does result in competitive benefits, then you also must consider whether the tying arrangement was reasonably necessary to achieve the benefits. If Innovative proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the tying arrangement.

If you find that the tying arrangement was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same restraint.

If the competitive harm substantially outweighs the competitive benefits, then the tying arrangement is unreasonable. If the competitive harm does not substantially outweigh the competitive benefits, then the tying arrangement is not unreasonable. In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors. Innovative bears the burden of proving that the anticompetitive effect of the conduct substantially outweighs its benefits.

1
2                          JURY INSTRUCTION NO. 28
3
4
        I will now instruct you on Innovative's Section 2 Sherman Act claim.
5
Innovative alleges that this claim concerns all of Biosense's alleged anticompetitive
6
conduct, including the alleged tying arrangements. If you find for Innovative on
7
Innovative's tying claim under Section 1 of the Sherman Act, you may consider the
8
facts relating to the clinical support policy under this claim as well. However, if you
9
find for Biosense on Innovative's tying claim, you must not consider facts relating to
10
the clinical support policy under this claim.
11
        Innovative alleges that it was injured by defendant Biosense's unlawful
12
13   monopolization of each of the alleged catheter markets.
14      To prevail on this claim for a given single-brand aftermarket, Innovative must
15   prove, as to one or more of the alleged catheter markets, each of the following
16   elements by a preponderance of the evidence:
17      (1) the alleged single-brand aftermarkets are valid antitrust markets;
18      (2) Biosense possessed monopoly power in that market;
19      (3) Biosense willfully acquired or maintained monopoly by engaging in
20      anticompetitive conduct ; and
21      (4) Innovative was injured in its business or property because of Biosense's
22      anticompetitive conduct.
23
24      If you find that Innovative has failed to prove any of these elements for any of
25   the three alleged single-brand aftermarkets, then as to that market, you must find for
26   Biosense and against Innovative on this claim. If you find that Innovative has proved
27   each of these elements by a preponderance of the evidence as to an alleged single-
28   brand aftermarket, then, as to that market, you must find for Innovative and against

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Biosense on this claim.

JURY INSTRUCTION NO. 29

To prove its monopolization claim as to each relevant antitrust market, Innovative must prove that Biosense has monopoly power in that market. Monopoly power is the power to profitably raise prices substantially above the competitive level for a significant period of time, restrict the availability of a particular good or service, or exclude competition in a relevant market.  However, possession of monopoly power, in and of itself, is not unlawful.

I will now provide further instructions about how you may determine whether Innovative has met its burden of proving monopoly power in each relevant catheter market.

JURY INSTRUCTION NO. 30

For each of Innovative's antitrust claims under Sherman Act Section 1 and 2, Innovative must prove by a preponderance of the evidence that the relevant markets it alleges are valid antitrust markets.

Defining the relevant market is essential because you will be required to make a judgment about whether Biosense has market power or monopoly power in a properly defined economic market. To make this judgment, you must be able to determine what, if any, economic forces restrain Biosense's freedom to set prices for or to restrict the production level of the products or services in question.

The most likely and most important restraining force will be actual and potential competition from other firms and their products. This includes all firms and products that act or likely could act as restraints on Biosense's power to set prices as it pleases because customers could switch to them if Biosense sets its own prices too high. All the firms and products that exert such restraining force are within what is called the relevant market.

There are two aspects you must consider in determining whether Innovative has met its burden to prove the relevant market by a preponderance of the evidence. The first is the relevant product market. The second is the relevant geographic market. In this case, the parties agree that the relevant geographic market is the United States.

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view. The relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers. Products need not be identical or precisely interchangeable as long as they are reasonable

substitutes. For example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material—such as aluminum foil, cellophane, or even plastic containers—to be reasonable alternatives, then all those products may be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, you must consider whether a small but significant and non-transitory increase in the price of one product would result in enough customers switching from that product to another product such that the price increase would not be profitable. In other words, will customers accept the price increase or will so many switch to alternative products that the price increase will be withdrawn? Generally speaking, a small but significant and non-transitory increase in price is approximately a 5 percent increase in price not due to cost factors. If you find that customers would switch and that the price increase would not be profitable, then you may conclude that the products are in the product market. If, on the other hand, you find that customers would not switch, then you may conclude that the products are not in the product market.

In evaluating whether various products are reasonably interchangeable or reasonable substitutes for each other under the price increase test I have just given you, you may also consider:

- Consumers' views on whether the products are interchangeable;
- the relationship between the price of one product and sales of another;
- the presence or absence of specialized vendors;
- the perceptions of either industry or the public as to whether the products are in separate markets;
- the views of Innovative and Biosense Webster regarding who their respective competitors are; and
- the existence or absence of different customer groups or distribution channels.

36

In this case, Innovative alleges that there is a foremarket, or primary market, for a durable good and then several distinct single-brand aftermarkets where demand for a good or service is entirely dependent on the prior purchase of a particular brand of durable good in the foremarket. Innovative alleges that there is a foremarket for cardiac mapping machines, such as the CARTO 3 machine, and that there are single-brand aftermarkets for goods and services related to the CARTO 3 machine. Specifically, Innovative alleges four separate single-brand aftermarkets: (1) sensor-enabled circular mapping catheters for use with the CARTO 3 (Lasso Nav); (2) sensor-enabled high-density mapping catheters for use with the CARTO 3 (Pentaray, Octaray); (3) sensor-enabled ultrasound catheters (Soundstar); and (4) CARTO 3 clinical support service.

Single-brand aftermarkets may occur where a subset of customers were locked in by their purchase of a durable good. Innovative must prove each of the following elements by a preponderance of the evidence by showing that a significant number customers are locked in:

(1) Biosense's allegedly anticompetitive practices were not generally known when hospitals made therir purchases of CARTO 3 machines;

(2) hospitals lack information to accurately determine the life-cycle costs of the CARTO 3;

(3) the monetary and non-monetary costs for hospitals to switch to a competing brand of the integrated cardiac mapping system are significant; and

(4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market. In other words, the competition in the foremarket (the cardiac mapping machine market) is insufficient to discipline anticompetitive behavior in the aftermarket.

Biosense disputes Innovative's definition of the alleged relevant markets.

37

Biosense contends that competition takes place at the integrated cardiac mapping system level, and that the cardiac mapping machine, the software for the machine, catheters, and clinical support services are all integral parts of Biosense's integrated cardiac mapping system that competes with other competitors' integrated cardiac mapping systems.

If you find that Innovative has proven the existence of one or more single-brand aftermarket(s) and that all four elements for lock in are met, then you should continue to evaluate the remainder of Innovative's claim. However, if you find that Innovative has failed to prove any of these elements for any of its alleged aftermarket(s), then you must find for Biosense and against Innovative on all of Innovative's claims for that aftermarket(s).

This definition of relevant market applies to all of Innovative's claims

1

2                         JURY INSTRUCTION NO. 31

3

4          For each alleged catheter market, if you find that Innovative has proven that

5   the relevant market exists, then you should determine whether Biosense has

6   monopoly power in that market.

7          You can consider two kinds of proof to determine whether Biosense has a

8   monopoly: (1) direct proof, and (2) indirect proof. In the following instructions, I

9   will explain to you these two kinds of proof that you can consider.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JURY INSTRUCTION NO. 32

There are two ways to provide direct proof of monopoly power, which I will now explain.

<u>Raising or Maintaining Prices Above Competitive Levels</u>

In order to provide direct proof of monopoly power, Innovative has the burden of proving that Biosense has the ability to raise or maintain the prices that consumers pay for catheters in the relevant market above competitive levels, or to reduce or maintain the quality of catheters in the relevant market below competitive levels. Innovative must prove that Biosense has the power to do so.  Innovative also has the burden of proving that Biosense has the power to maintain prices above a competitive level, or quality below the competitive level, for a significant period of time. If Biosense attempted to maintain prices above competitive levels, or reduce quality below competitive levels, but would lose so much business to other competitors that the price increase or quality reduction would become unprofitable and would have to be withdrawn, then Biosense does not have monopoly power.

<u>Power to Exclude Competition</u>

In the alternative, in order to provide direct proof of monopoly power, Innovative must prove that Biosense has the ability to exclude competition in the relevant antitrust market.

The ability to earn high profit margins or a high rate of return does not necessarily mean that Biosense has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing. However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that

Biosense would lose a substantial amount of sales if it raised prices or reduced quality substantially, or that Biosense's profit margins were low compared to its competitors, or that Biosense's margins go up and down or are steadily decreasing, might be evidence that Biosense does not have monopoly power.

If you find that Biosense has monopoly power in one or more of the relevant antitrust markets, then you must consider the remaining elements of this claim as to that market. If you find that Biosense does not have monopoly power, then you must find for Biosense and against Innovative on this claim.

JURY INSTRUCTION NO. 33

Innovative may prove Biosense's monopoly power indirectly. As I instructed you earlier, monopoly power is the power to control prices or exclude competition in a relevant market. Innovative has introduced evidence of the structure of the alleged catheter markets to show that Biosense has monopoly power. The evidence of market structure presented by the parties includes evidence of Biosense's market share, market share trends, barriers to entry, entry and exit by other companies, and the number and size of other competitors. If this evidence establishes that Biosense has the power to control prices or exclude competition in a relevant antitrust market, then you may conclude that Biosense has monopoly power in that market.

<u>Market Share</u>

The first factor that you should consider is Biosense's share of the relevant market. Biosense must have a significant share of the market in order to possess monopoly power.

In evaluating whether the percentage of market share supports a finding of monopoly power, you also should consider other aspects of the relevant market, such as market share trends, the existence of barriers to entry (that is, how difficult it is for other producers to enter the market and begin competing with Biosense for sales), the entry and exit by other companies, and the number and size of competitors. Along with Biosense's market share, these factors should inform you as to whether Biosense has monopoly power. The higher the company's share, the higher the likelihood that a company has monopoly power.

<u>Market Share Trends</u>

You may also consider trends in Biosense's market share in the alleged catheter markets. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market

share, while a decreasing share might show that a company does not have monopoly power.

Barriers to Entry

You may also consider whether there are barriers to entry into the relevant market. Barriers to entry make it difficult for new competitors to enter a market in a meaningful and timely way. Barriers to entry might include intellectual property rights (such as patents or trade secrets), the large financial investment required to build a plant or satisfy governmental regulations, specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).

Evidence of low or no entry barriers may be evidence that Biosense does not have monopoly power, regardless of Biosense's market share, because new competitors could enter easily if Biosense attempted to raise prices for a substantial period of time. By contrast, evidence of high barriers to entry along with high market share may support an inference that Biosense has monopoly power.

Entry and Exit by Other Companies

The history of entry and exit in the relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that Biosense lacks monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that Biosense has monopoly power.

Number and Size of Competitors

You may consider whether Biosense's competitors are capable of effectively competing. In other words, you should consider whether the financial strength, market share, and number of competitors act as a check on Biosense's ability to price its products. If Biosense's competitors are vigorous or have large or increasing

43

market shares, this may be evidence that Biosense lacks monopoly power. On the other hand, if you determine that Biosense's competitors are weak, or have small or declining market shares, this may support an inference that Biosense has monopoly power.

If you find that Biosense has monopoly power in any of the relevant markets, then you must consider the remaining elements of Innovative's claim for monopolizing that market. If you find that Biosense does not have monopoly power in a relevant market, then you must find for Biosense and against Innovative on the claim for monopolizing that market.

JURY INSTRUCTION NO. 34

The next element Innovative must prove is that Biosense willfully acquired or maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the alleged catheter markets.

Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals--or the achievement of these goals--unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether Biosense's conduct was anticompetitive or was

45

legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

The acts or practices that result in the acquisition or maintenance of monopoly power must represent something more than the conduct of business that is part of the normal competitive process or commercial success. They must represent conduct that has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason. You may not find that a company willfully acquired or maintained monopoly power through anticompetitive means if it has acquired or maintained that power solely through the exercise of superior foresight and skill; or because of natural advantages such as unique geographic access to raw materials or markets; or because of economic or technological efficiency, including efficiency resulting from scientific research; or by obtaining a lawful patent; or because changes in cost or consumer preference have driven out all but one supplier.

If you find that Innovative has proven by a preponderance of the evidence that Biosense willfully acquired or maintained monopoly power through anticompetitive acts, then you must consider whether Innovative has proved the remaining elements of this claim. If, however, you find that Innovative did not prove this element by a preponderance of the evidence, then you must find for Biosense and against Innovative on this claim.

46

JURY INSTRUCTION NO. 35

Section 2 of the Sherman Act prohibits not just unlawful monopolization, but also attempts at unlawful monopolization. Innovative further claims that it was injured by Biosense's unlawful attempt to monopolize three markets: (1) sensor-enabled circular mapping catheters for use with the CARTO 3 (Lasso Nav); (2) sensor-enabled high-density mapping catheters for use with the CARTO 3 (Pentaray, Octaray); and (3) sensor-enabled ultrasound catheters (SoundStar). These are the same alleged markets involved in Innovative's unlawful monopolization claim.

To prevail on its claim of attempted monopolization, Innovative must prove each of the following elements:

(1) Biosense engaged in anticompetitive conduct;

(2) Biosense had a specific intent to achieve monopoly power in the relevant market;

(3) there was a dangerous probability that Biosense would achieve its goal of monopoly power in the relevant market;

(4) Innovative's business was injured by Biosense's anticompetitive conduct.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Biosense and against Innovative on Innovative's claim of attempted monopolization. If you find that the evidence is sufficient to prove all four elements, then you must find for Innovative and against Biosense on Innovative's claim of attempted monopolization.

1

### JURY INSTRUCTION NO. 36

2        To prove its attempted monopolization claim, it is not sufficient for Innovative

3   to prove that Biosense intended to monopolize the relevant market.  Innovative must

4   also show that Biosense engaged in anticompetitive conduct, coupled with an intent

5   to monopolize and a dangerous probability that defendant would succeed.

6        Generally, a firm engages in anticompetitive conduct when it attempts to

7   exclude rivals without an efficiency-enhancing justification for its conduct.

8        If you find for Innovative on Innovative's tying claim under Section 1 of the

9   Sherman Act, you may consider facts relating to the clinical support policy under

10  this claim as well. However, if you find for Biosense on Innovative's tying claim,

11  you must not consider facts relating to the clinical support policy under this claim.

12       I previously explained the concept of anticompetitive conduct. Please use

13  those instructions in considering whether Biosense engaged in anticompetitive

14  conduct as required to prove Innovative's attempted monopolization claim.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JURY INSTRUCTION NO. 38

The second element that Innovative must prove is that Biosense had a specific intent to monopolize a relevant market. To do so, Innovative must first prove that the alleged catheter markets are relevant markets for antitrust purposes. Innovative must then prove that Biosense had a specific intent to monopolize that market.

I have already instructed you on how to define a relevant. If you previously determined that one or more relevant catheter markets exist, you do not need to repeat that analysis here.

If you previously found that Innovative has proven a relevant market or multiple relevant markets, you must then decide whether Biosense had the specific intent to monopolize those markets. In other words, you must decide if the evidence shows that Biosense acted with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the relevant market.

There are several ways in which Innovative may prove that Biosense had the specific intent to monopolize. There may be evidence of direct statements of Biosense's intent to obtain a monopoly in the relevant market. Such proof of specific intent may be established by documents prepared by responsible officers or employees of Biosense at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Biosense. You must be careful, however, to distinguish between a lawful intent to compete aggressively, which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that Biosense actually intended to obtain a monopoly, specific intent may be inferred from what Biosense did. For example, if the evidence shows that Biosense lacked a legitimate **business** justification and the natural and probable consequence of Biosense's

49

conduct in the relevant market was to give Biosense control over prices and to exclude or destroy competition, and that this was plainly foreseeable by Biosense, then you may (but are not required to) infer that Biosense specifically intended to acquire monopoly power.

JURY INSTRUCTION NO. 39

If you find that Biosense had the specific intent to achieve a monopoly and engaged in significant anticompetitive conduct, you also must determine if the evidence shows the next element of attempt to monopolize: namely, that there was a dangerous probability that Biosense would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.

I have already instructed you what monopoly power means. Those same instructions should be applied in considering whether Biosense had a dangerous probability of success in achieving monopoly power in the markets for high-density mapping catheters and ultrasound catheters, as Innovative alleges.

In determining whether there was a dangerous probability that Biosense would acquire monopoly power in the market, you should consider such factors as:

- Biosense's market share;
- the trend in Biosense's market share;
- whether the barriers to entry into the market made it difficult for competitors to enter the market; and
- the likely effect of any anticompetitive conduct on Biosense's share of the market.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that  Biosense would ultimately acquire monopoly power. A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Biosense would ultimately acquire monopoly power.

JURY INSTRUCTION NO. 40

If you find that Biosense has violated the antitrust laws as alleged by Innovative's Section 1 tying claim, Section 2 unlawful monopolization claim, or Section 2 attempted monopolization claim, then you must decide if Innovative is entitled to recover damages from Biosense.

Innovative is entitled to recover damages for an injury to its business if it can establish these elements of injury and causation:

1. Innovative was in fact injured as a result of Biosense's alleged violation of the antitrust laws;

2. Biosense's alleged illegal conduct was a material cause of Innovative's injury; and

3. Innovative's injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For Innovative to establish injury in fact or fact of damage, it must prove that it was injured as a result of Biosense's alleged violations of the antitrust laws. Proving the fact of damage does not require Innovative to prove the dollar value of its injury. It requires only that Innovative proves that it was in fact injured by Biosense's antitrust violations.

Second, Innovative must offer evidence that establishes by a preponderance of the evidence that Biosense's alleged illegal conduct was a material cause of Innovative's injury. This means that Innovative must have proved that some damage occurred to it as a result of Biosense's alleged antitrust violation, and not some other cause. Innovative is not required to prove that Biosense's alleged antitrust violation was the sole cause of its injury; nor need Innovative eliminate all other possible causes of injury. It is enough if Innovative has proved that the alleged antitrust

violation was a material cause of its injury. You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against—such as where a competitor offers better products or services, or where a competitor is more efficient and can charge lower prices and still earn a profit.

Finally, Innovative must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If Innovative's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then its injuries are antitrust injuries. On the other hand, if Innovative's injuries were caused by heightened competition, the competitive process itself, or acts that would benefit consumers, then its injuries are not antitrust injuries and Innovative may not recover damages for those injuries under the antitrust laws.

You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against—such as where a competitor offers better products or services or where a competitor is more efficient and can charge lower prices and still earn a profit—and the antitrust laws do not permit a plaintiff to recover damages for losses that were caused by the competitive process or conduct that benefits consumers. Even if Biosense's conduct is wrongful under some other theory, that alone is insufficient. Innovative must prove antitrust injury as well.

In summary, if Innovative can establish that it was in fact injured by Biosense's conduct, that Biosense's conduct was a material cause of Innovative's injury, and that Innovative's injury was the type that the antitrust laws were intended to prevent, then Innovative is entitled to recover damages for the injury to its business.

# JURY INSTRUCTION NO. 41

If you find that Biosense violated the antitrust laws and that this violation caused injury to Innovative, then you must determine the amount of damages, if any, Innovative is entitled to recover.

The fact that I am giving you instructions concerning the issue of Innovative's damages does not mean that I believe Innovative should, or should not, prevail in this case. If you reach a verdict for Biosense on the issue of liability, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

Instructions as to the measure of damages are given for your guidance in the event you should find in favor of Innovative based on a preponderance of evidence in accordance with the other instructions I have given you. You should only consider calculating damages for an antitrust claim if you first find that Biosense violated the antitrust law and that such violation directly caused injury to Innovative.

JURY INSTRUCTION NO. 42

If you find that Biosense violated the antitrust laws and that this violation directly caused injury to Innovative, then you must determine the amount of damages, if any, that Innovative is entitled to recover. The law provides that Innovative should be fairly compensated for all damages to its business that were a direct result or likely consequence of the conduct you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put an injured plaintiff as near as possible to the position in which it would have been if the alleged antitrust violation had not occurred. The law does not permit you to award damages to punish a wrongdoer – what we sometimes refer to as punitive damages – or to deter a defendant from particular conduct in the future, or to provide a windfall to a plaintiff. Furthermore, you are not permitted to award to plaintiff an amount for attorneys' fees or the costs of maintaining this lawsuit.

JURY INSTRUCTION NO. 43

Innovative claims that it was harmed because it lost profits as a result of Biosense's alleged antitrust violation. If you find that Biosense violated Section 1 and/or Section 2 of the Sherman Act and that the violation(s) caused injury to Innovative, you may calculate the profits, if any, that Innovative lost as a result of Biosense's antitrust violation.

You are permitted to make just and reasonable estimates in calculating Innovative's damages. You are not required to calculate damages with mathematical certainty or precision. However, the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. Damages may not be based on guesswork or speculation. Innovative must prove the reasonableness of each of the assumptions upon which the damages calculation is based.

If you find that Innovative has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

If you find that Innovative has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages.

JURY INSTRUCTION NO. 44

Innovative also claims that Biosense's alleged tying arrangement violates Section 16720 of the California Cartwright Act. This claim is similar to Biosense's Section 1 Sherman Act tying claim, but you should follow the below California jury instructions in assessing Innovative's Cartwright Act tying claim.

Innovative claims that there is an unlawful tying arrangement in which CARTO 3 clinical support is the tying product and CARTO 3 sensor-enabled catheters are the tied product. In a "tying arrangement" to access one product, called the "tying product," the buyer is required or coerced to purchase a different, separate product, called the "tied product."

To establish this claim against Biosense, Innovative must prove all of the following:

1. That CARTO 3 clinical support and CARTO 3 sensor enabled catheters are separate and distinct;

2. That Biosense will provide CARTO 3 clinical support only if the hospital also uses CARTO 3 sensor-enabled catheters purchased from Biosense/Sterilmed, or that Biosense provided CARTO clinical support and required or otherwise coerced hospitals to not use CARTO 3 sensor-enabled catheters purchased from any other supplier.

3. That Biosense has sufficient economic power in the market for CARTO 3 clinical support to coerce at least some users of CARTO 3 clinical support into using CARTO 3 sensor-enabled catheters purchased from Biosense/Sterilmed or not using CARTO 3 sensor-enabled catheters purchased from a competitor of Biosense;

4. That the conduct involves a substantial amount of sales, in terms of the total dollar value of CARTO 3 sensor-enabled catheters;

5. That Innovative was harmed; and

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6. That Biosense's conduct was a substantial factor in causing Innovative's harm.

JURY INSTRUCTION NO. 45

In deciding whether CARTO 3 clinical support and CARTO 3 sensor-enabled catheters are separate and distinct, you should consider, among other factors, the following:

(a) Whether competitors offer to provide clinical support separately from sensor-enabled catheters or only as a unit;

(b) Whether the combined product is composed of varying assortments of component parts;

(c) Whether buyers are or can be charged separately for the products; and

(d) Whether Biosense ever provides or provided clinical support separate from hospitals using sensor-enabled catheters purchased from Biosense/Sterilmed.

Not all of these factors need be present in order for you to conclude that CARTO 3 clinical support and CARTO 3 sensor-enabled catheters are separate and distinct products.

JURY INSTRUCTION NO. 46

    In determining whether Biosense has sufficient economic power in the market for CARTO 3 clinical support, you may consider whether Biosense has such a large share of the market for CARTO 3 clinical support that hospitals do not have reasonable alternate sources of CARTO 3 clinical support or a reasonably available substitute. If Biosense has economic power, it may be established even though it exists with respect to some, but not all, hospitals.

    You may also consider whether a hospital would be unable to easily locate a similar or equally desirable product in the marketplace. If hospitals do not generally consider other products to be substitutes, this fact may give Biosense economic power over its CARTO 3 clinical support. The fact that Biosense can provide CARTO 3 clinical support in an efficient manner or at a high level of quality does not, by itself, mean that competitors do not offer a similar product.

JURY INSTRUCTION NO. 47

If you decide that Innovative has proved its Cartwright Act tying claim against Biosense, you also must decide how much money will reasonably compensate Innovative for the harm.

This compensation is called "damages."

The amount of damages must include an award for all harm that was caused by Biosense, even if the particular harm could not have been anticipated.

Innovative must prove the amount of its damages. However, Innovative does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages.

The following are the specific items of damages claimed by Innovative:

1. Loss of reasonably anticipated sales and profits;

2. An increase in Innovative's expenses.

61

JURY INSTRUCTION NO. 48

Before you begin your deliberations, elect one member of the jury as your presiding juror. The presiding juror will preside over the deliberations and serve as the spokesperson for the jury in court.

You shall diligently strive to reach agreement with all of the other jurors if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to their views.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not be unwilling to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

1
2

# JURY INSTRUCTION NO. 49

3
4
5
6

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves. Except for discussing the case with your fellow jurors during your deliberations:

7
8
9
10
11
12
13
14

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via email, text messaging, or any social media. This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

15
16
17
18
19
20

Because you will receive all the evidence and legal instruction you properly may consider to return a verdict: do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own

21
22
23
24
25

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of these proceedings. If any juror is exposed to any outside information, please notify the court immediately.

26
27
28

# JURY INSTRUCTION NO. 50

Some of you have taken notes during the trial. Whether or not you took notes, you should rely on your own memory of what was said. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors

1
2   JURY INSTRUCTION NO. 51
3
4       If it becomes necessary during your deliberations to communicate with me,
5   you may send a note through the bailiff, signed by your presiding juror or by one or
6   more members of the jury. No member of the jury should ever attempt to
7   communicate with me except by a signed writing; I will communicate with any
8   member of the jury on anything concerning the case only in writing, or here in open
9   court. If you send out a question, I will consult with the parties before answering it,
10  which may take some time. You may continue your deliberations while waiting for
11  the answer to any question. Remember that you are not to tell anyone—including
12  me—how the jury stands, numerically or otherwise, until after you have reached a
13  unanimous verdict or have been discharged. Do not disclose any vote count in any
14  note to the court.
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2

### JURY INSTRUCTION NO. 52

3
4
5
6
7
8

A verdict form has been prepared for you. You will need to reach a unanimous decision on each of the questions you are asked to answer in the jury verdict form. After you have reached unanimous agreement on a verdict, your presiding juror should complete the verdict form according to your deliberations, sign and date it, and advise the court that you are ready to return to the courtroom.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28