Panteha Abdollahi, Esq.
State Bar No. 230002
pabdollahi@tocounsel.com
THEODORA ORINGHER PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, California 92626-7109
Telephone: (714) 549-6200
Facsimile: (714) 549-6201

Jeffrey L. Berhold, Esq.
Admitted *Pro Hac Vice*
jeff@berhold.com
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, Georgia 30309
Telephone: (404) 872-3800
Facsimile: (678) 868-2021

Joshua P. Davis, Esq.
State Bar No. 193254
jdavis@bm.net
BERGER MONTAGUE PC
505 Montgomery St., Suite 625
San Francisco, California 94111
Telephone:  (415) 906-0684

Derek T. Ho, Esq.*
Andrew E. Goldsmith, Esq.*
Matthew D. Reade, Esq.*
Kelley C. Schiffman, Esq.
State Bar No. 325023
Rachel T. Anderson, Esq.*
Annamaria M. Morales-Kimball, Esq.*
Sean P. Quirk, Esq.*
*Admitted *Pro Hac Vice*
dho@kellogghansen.com
agoldsmith@kellogghansen.com
mreade@kellogghansen.com
kschiffman@kellogghansen.com
randerson@kellogghansen.com
amoraleskimball@kellogghansen.com
squirk@kellogghansen.com
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK. P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
Telephone: (202) 367-7900
Facsimile: (202) 326-7999

Attorneys for Plaintiff
INNOVATIVE HEALTH LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| INNOVATIVE HEALTH LLC,<br><br>Plaintiff,<br><br>vs.<br><br>BIOSENSE WEBSTER, INC.,<br><br>Defendant. | Case No. 8:19-cv-1984 JVS (KES)<br><br>**PLAINTIFF INNOVATIVE HEALTH LLC'S NOTICE OF MOTION AND MOTION FOR PERMANENT INJUNCTION**<br><br>Date:    July 21, 2025<br>Time:    1:30 p.m.<br>Crtrm:   10C<br><br>Action Filed:  October 18, 2019<br>Trial Date:  May 6, 2025 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on July 21, 2025, at 1:30 PM or as soon after as the matter may be heard, before the Honorable James V. Selna, Courtroom 10C, located at 411 West Fourth Street, Room 1053, Santa Ana, California 92701, Plaintiff Innovative Health LLC will and does submit this Motion for Permanent Injunction.  This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities, the trial record, the jury verdict for Plaintiff on all counts, and all other papers and pleadings on file here or that may be presented to the Court.

This Motion is made after conferences of counsel on May 27, May 30, and June 4, 2025.  *See* Local Rule 7-3.  Over the course of the parties' discussions, Innovative narrowed its proposed injunction.  But Defendant Biosense Webster, Inc. would not agree to the relief sought and, despite repeated invitations, refused to provide redlines or a narrowing proposal to address its remaining purported concerns with the injunction.  *See* Declaration of Matthew D. Reade (Jun. 12, 2025) ("Reade Decl."), Ex. 1.  So Innovative now submits this motion.

DATED:  June 12, 2025                    THEODORA ORINGHER PC

By:      */s/ Panteha Abdollahi*
         Panteha Abdollahi

JEFFREY L. BERHOLD, P.C.

By:      */s/ Jeffrey L. Berhold*
         Jeffrey L. Berhold

1

2    BERGER MONTAGUE PC

3

4    By:    _____/s/ Joshua P. Davis_____
              Joshua P. Davis
5             Matthew Summers

6
      KELLOGG, HANSEN, TODD, FIGEL & FREDERICK,
7     P.L.L.C.

8

9

10   By:    _____/s/ Matthew D. Reade_____
             Derek T. Ho
11           Andrew E. Goldsmith
12           Matthew D. Reade
             Kelley C. Schiffman
13           Rachel T. Anderson
             Annamaria M. Morales-Kimball
14           Sean P. Quirk

15

16           Attorneys for Plaintiff
17           INNOVATIVE HEALTH LLC

18

19

20

21

22

23

24

25

26

27

28

*PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PERMANENT INJUNCTION*

1

# **<u>TABLE OF CONTENTS</u>**

2    I.    INTRODUCTION ................................................................................ 7

3    II.   LEGAL STANDARD ......................................................................... 7

4    III.  THE PROPOSED INJUNCTION ................................................... 10

5         A.    The Injunction Ends Biosense's Illegal Case Coverage Policy............ 10

6         B.    The Injunction Bars Biosense from Implementing New Anti-

7               Reprocessing Technology .................................................................... 11

8         C.    The Injunction Forbids Biosense from Collecting Certain Devices

9               That It Does Not Reprocess ................................................................. 11

10        D.    The Injunction's Ancillary Provisions Ensure That the Injunction

11              Works as Intended To Restore Competition......................................... 12

12   IV.   ARGUMENT ................................................................................... 13

13        A.    The Proposed Injunction Stops a Significant Threat of Injury from

14              Antitrust Violations That Are Likely To Continue or Recur................ 13

15        B.    The Injunction Is a Reasonable Way To Eliminate the

16              Consequences of Biosense's Illegal Conduct ..................................... 18

17        C.    Innovative Easily Satisfies Every *eBay* Factor ................................... 25

18   V.    CONCLUSION ................................................................................ 29

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

*Active Sports Lifestyle USA, LLC v. Old Navy, LLC*,
    2014 WL 1246497 (C.D. Cal.) ................................................................ 10

*Allergan Inc. v. Cayman Chem. Co.*, 2009 U.S. Dist. LEXIS 135228 (C.D. Cal.) ... 26

*Anhing Corp. v. Thuan Phong Co.*, 2015 WL 4517846 (C.D. Cal.) .................. 26-27

*Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943 (N.D. Cal. 2009) ............... 8

*Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959) ........................... 7

*BMW of N. Am., LLC v. Rocco*, 2020 WL 7047318 (C.D. Cal.),
    *aff'd*, 2021 WL 5401709 (9th Cir.) ..................................................... 26-27

*Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011 (9th Cir. 2016) .......... 7, 8, 26, 27

*California v. American Stores Co.*, 495 U.S. 271 (1990) ........................... 8, 9

*Corporate Express Office Prods. v. Martinez*,
    2002 U.S. Dist. LEXIS 21310 (C.D. Cal.) ............................................ 27

*Daimler AG v. A-Z Wheels LLC*, 498 F. Supp. 3d 1282 (S.D. Cal. 2020),
    *rev'd on other grounds*, 2023 WL 4758454 (9th Cir.) .......................... 28

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ......................... 7, 26

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) .................. 27

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972) .......................... 9, 20, 23

*Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1971) ............................... 23

*Hope Med. Enters. Inc. v. Fagron Compounding Servs., LLC*,
    2021 WL 4963516 (C.D. Cal.) ....................................................... 28

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,

    1996 WL 101173 (N.D. Cal.), *aff'd in part*, *rev'd in part*,
    125 F.3d 1195 (9th Cir. 1997) ...................................................... 13, 25

    F.3d 1195 (9th Cir. 1997) ........................................................ 19, 21, 23, 24

*Google Play Store Antitrust Litig., In re*, 2024 WL 4438249 (N.D. Cal.),
    *appeal docketed*, No. 24-6256 (9th Cir. Oct. 15, 2024) .................... 8, 14, 19,
                                                                            25, 27, 28

*International Salt Co. v. United States*, 332 U.S. 392 (1947),
    *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006) ...................................................................................9, 21, 22

*Keracell, Inc. v. Aesthetically Correct, LLC*, 2018 WL 7348852 (C.D. Cal.) ..........26

*L.A. Int'l Corp. v. Prestige Brands Holdings, Inc.*,
    2024 WL 2272384 (C.D. Cal.) ................................................................ 24, 26-27

*Los Angeles Police Prot. League v. Gates*, 995 F.2d 1469 (9th Cir. 1993) ..............10

*MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993) ....................26

*National Soc'y of Prof'l Eng'rs v. United States*,
    435 U.S. 679 (1978) .............................................................8, 9, 13, 18, 25

*NLRB v. Express Publ'g Co.*, 312 U.S. 426 (1941)....................................................21

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    20 F.4th 466 (9th Cir. 2021)........................................8, 9, 18, 19, 23, 25

*Regents of Univ. of Cal. v. American Broadcasting Cos.*,
    747 F.2d 511 (9th Cir. 1984) .........................................................................8, 28

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) .......................................................7, 23, 26, 27

*United States v. E. I. Du Pont De Nemours & Co.*, 366 U.S. 316 (1961)............9, 20

*United States v. Glaxo Grp. Ltd.*, 410 U.S. 52 (1973) ..............................................19

*United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972) ......................................28

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    395 U.S. 100 (1969) ........................................................................8, 9, 13, 14,
                                                                                19, 21, 22, 25

**CODE AND STATUTES**

15 U.S.C. § 1..............................................................................................................7

15 U.S.C. § 26........................................................................................................7, 21

Cal. Bus. & Prof. Code § 16720 ................................................................................6

Cal. Bus. & Prof. Code § 16750(a).............................................................................7

*PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PERMANENT INJUNCTION*

## I.    **INTRODUCTION**

The jury found that Defendant Biosense Webster, Inc. violated Sections 1 and 2 of the Sherman Act and Section 16720 of the Cartwright Act, causing Plaintiff Innovative Health LLC more than $147 million in lost profits. *See* Dkt. 526. Since the jury's verdict, Biosense has made clear that it "disagrees" with the verdict and will not voluntarily cease its anticompetitive behavior. Innovative thus seeks a permanent injunction under the Clayton and Cartwright Acts to prevent Biosense from continuing to engage in its anticompetitive conduct.

## II.    **LEGAL STANDARD**

A successful antitrust plaintiff may obtain "injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26; *see also* Cal. Bus. & Prof. Code § 16750(a) (authorizing injunctive relief under California law). Traditional equitable principles apply to determine whether a plaintiff is entitled to such an injunction. *See id.*; *see also*, *e.g.*, *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959) (consulting equitable principles in assessing "injunctive relief"). Outside the antitrust context, the Supreme Court has described those principles with a four-factor test. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Those factors are (1) "irreparable injury" (2) that "monetary damages[] are inadequate to compensate," (3) a "balance of hardships" favoring the plaintiff, and (4) whether an injunction serves the "public interest." *Id.*

Generally, a successful antitrust plaintiff can readily satisfy those factors. "A lessening of competition constitutes an irreparable injury" that money damages alone cannot fix. *Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (loss of "prospective customers," "goodwill," and "opportunity to expand business" justified injunction). A violator of the antitrust laws can assert no valid hardship from an injunction that requires it to obey the laws and redresses the harm it causes to competition. *See Regents of Univ. of Cal. v. American*

*Broadcasting Cos.*, 747 F.2d 511, 520-21 (9th Cir. 1984) (finding "little, if any" hardship to antitrust defendant because the injunction's effect would be "removing the fetters" of a contract that appeared to violate the antitrust laws).  In other words, a defendant "cannot" claim any "***legitimate*** hardships as a result of being enjoined from committing unlawful activities." *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 950 (N.D. Cal. 2009).  And because "the central purpose of the antitrust laws . . . is to preserve competition," which the antitrust "statutes recognize as ***vital to the public interest***," injunctions to remediate antitrust violations are unquestionably in the public interest.  *Boardman*, 822 F.3d at 1024 (cleaned up; emphasis original).

Accordingly, when assessing a permanent injunction under the antitrust laws, the Ninth Circuit and the Supreme Court focus on (1) the threat of continued injury and (2) the scope of the proposed injunction.  *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 129-33 (1969); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 485-87 (9th Cir. 2021).

As to the first, a successful antitrust plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith*, 395 U.S. at 130.  A finding of liability for violating the antitrust laws "empower[s]" a district court "to fashion appropriate restraints on the [defendant's] future activities both to avoid a recurrence of the violation and to eliminate its consequences." *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978); *see also California v. American Stores Co.*, 495 U.S. 271, 283 (1990) (findings of antitrust liability and threat of consumer harm are "plainly sufficient to authorize injunctive relief . . . that will prohibit" the anticompetitive "conduct from causing that harm").  These standards apply equally to requests for injunctive relief under California's Cartwright Act.  *See In re Google Play Store Antitrust Litig.*, 2024 WL 4438249, at *3 & n.4 (N.D. Cal.), *appeal docketed*, No. 24-6256 (9th Cir. Oct. 15, 2024).

Second, as to scope, injunctive relief "must be 'effective to redress the violations' and 'to restore competition.'" *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (emphasis added) (quoting *United States v. E. I. Du Pont De Nemours & Co.*, 366 U.S. 316, 326 (1961)). "Antitrust relief should unfetter a market from anticompetitive conduct and 'pry open to competition a market that has been closed by defendant['s] illegal restraints.'" *Id.* at 577-78 (citation omitted). Courts have leeway in fashioning a remedy to achieve that goal. After a finding of antitrust liability, a permanent injunction is valid if it "represents a reasonable method of eliminating the consequences of the illegal conduct." *Prof'l Eng'rs*, 435 U.S. at 698. Where, as here, "the jury finds that monopolization or attempted monopolization has occurred, the available injunctive relief is broad, including to 'terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.'" *Optronic*, 20 F.4th at 486 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001)).

Courts may deploy both "prohibitory" and "mandatory" injunctions, *Am. Stores*, 495 U.S. at 283, and may enjoin more than just "the precise conduct previously pursued.'" *Optronic*, 20 F.4th at 486 (quoting *Prof'l Eng'rs*, 435 U.S. at 698). "When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed." *International Salt Co. v. United States*, 332 U.S. 392, 400 (1947), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). To the contrary, the court may "restrain acts which are of the same type or class as [the defendant's] unlawful acts," *Zenith*, 395 U.S. at 132, and "practices connected with acts actually found to be illegal," *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88 (1950), such as efforts to repeat the same illegal conduct in other markets, *see Zenith*, 395 U.S. at 132.

"[A]ny factual findings made by the jury during trial bind this Court in its consideration of equitable remedies." *Active Sports Lifestyle USA, LLC v. Old Navy, LLC*, 2014 WL 1246497, at *1 (C.D. Cal.) (Selna, J.); *see also Los Angeles Police Prot. League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993) (stating that courts "deciding . . . equitable claims" must follow the jury's "implicit or explicit factual determinations" on legal claims "based on the same facts"). The Court may also make further factual findings that are not "inconsistent with the jury's verdict." *Gates*, 995 F.2d at 1472.

## III.   THE PROPOSED INJUNCTION

The proposed permanent injunction prohibits the continuation of each of the practices Biosense used in its coordinated strategy to foreclose reprocessing competition—(A) the case coverage policy, (B) anti-reprocessing technology, and (C) device collections—and takes reasonable measures to ensure compliance. *See* Proposed Order ("PO").

### A.    The Injunction Ends Biosense's Illegal Case Coverage Policy

The jury found that Biosense's case coverage policy illegally conditioned clinical support for Biosense's CARTO 3 cardiac mapping machine on customers' using only CARTO-compatible sensor-enabled catheters bought from Biosense or its affiliate Sterilmed. *See infra* Part IV.A.1. The proposed injunction forbids that illegal tie and any similar effort to condition the availability of CARTO on using CARTO-compatible products sold by Biosense or its affiliates.

While the jury trial focused on three sensor-enabled catheter markets, the trial record shows that the case coverage policy applies more broadly. In fact, Biosense has strategically expanded the policy over time to foreclose competition in other CARTO device aftermarkets. *See infra* Part IV.B.2. So the proposed injunction bars Biosense from conditioning access to CARTO on customers' buying or using ***Consumables*** sold by Biosense, PO § 2.1—with "Consumable" meaning "a device . . . originally manufactured by Biosense for use with" its cardiac mapping system.

PO § 1.3.  To prevent evasion, the injunction also forbids Biosense from discriminating in how it provides clinical support or how it otherwise makes CARTO available to a customer because that customer buys, uses, or intends to use Consumables from someone like Innovative.  *See* PO § 2.2.  For example, Biosense cannot deprioritize clinical support for a customer or force a customer to pay more for a CARTO machine because that customer chooses to buy Consumables from someone other than Biosense.  *See id.*

### B.    The Injunction Bars Biosense from Implementing New Anti-Reprocessing Technology

The jury also found that Biosense's use of anti-reprocessing technology on its devices was anticompetitive conduct that contributed to its illegal monopolization. *See infra* Part IV.A.2.  So the proposed injunction forbids Biosense from implementing any new technology that prevents customers from using Biosense's cardiac mapping machine with Consumables sold by someone other than Biosense, *see* PO § 3.2, or that otherwise conditions customers' ability to use the machine on their buying their Consumables from Biosense, *see* PO § 3.1.

### C.    The Injunction Forbids Biosense from Collecting Certain Devices That It Does Not Reprocess

The trial record also shows that Biosense collects used Consumables to deprive its rivals of inputs they need to compete.  *See infra* Part IV.A.3.  To redress that anticompetitive conduct while ensuring that Biosense can compete on the merits with its own reprocessed offerings, the proposed injunction prevents Biosense from collecting used Consumables which neither it nor SterilMed has FDA approval, or a pending application for FDA approval, to reprocess.  *See* PO § 4.1.

The proposed injunction allows two exceptions to that limitation, designed to authorize procompetitive collection practices.  ***First***, Biosense may collect a Consumable that it does not reprocess to the extent necessary to support its own application for approval to reprocess that device.  *See* PO § 4.2.1.  ***Second***, Biosense

1  may collect a Consumable that it does not reprocess to the extent necessary to

2  investigate and remediate a defect in that device.  *See* PO § 4.2.2.

3     **D.    The Injunction's Ancillary Provisions Ensure That the Injunction**

4          **Works as Intended To Restore Competition**

5        The proposed injunction's ancillary provisions, such as its notice

6  requirements and ten-year term, are intended to ensure that the injunction

7  successfully restores competition and remediates the consequences of Biosense's

8  unlawful conduct.

9        The proposed injunction requires Biosense to tell its customers and

10  employees about its terms.  Specifically:

11     • *Notice to customers.*  The proposed injunction requires Biosense to notify

12         users and new purchasers of its cardiac mapping system of the injunction's

13         terms, including Biosense's duty to provide clinical support to all users on

14         nondiscriminatory terms, even when reprocessed devices from someone

15         like Innovative are used.  *See* PO § 6.1.

16     • *Notice to sales employees.*  The proposed injunction also requires

17         Biosense to inform its sales employees, including clinical account

18         specialists, of their and Biosense's obligations under the injunction.  *See*

19         PO § 6.3.

20     • *Notice of hotline to report potential noncompliance.*  Should Innovative

21         establish (at its own expense) a hotline for reporting potential

22         noncompliance with the injunction, Biosense must inform its staff and

23         customers of that hotline and its purpose.  *See* PO § 6.2.

24        Every six months, Biosense must also submit to the Court a report describing

25  the steps Biosense is taking to ensure compliance with the injunction and certifying

26  continued compliance with its terms.  PO § 5.

27        To fully remediate the consequences of illegal policies that Biosense started

28  implementing as early as 2014, the injunction has an initial term of ten years.  *See*

PO § 7; *see also*, *e.g.*, *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 1996 WL
101173, at *2 (N.D. Cal.) ("10 years is an appropriate period for the Injunction to
offset the 10 years that Kodak's illegal parts policy has been in effect."), *aff'd in
part, rev'd in part*, 125 F.3d 1195 (9th Cir. 1997).  But either party may ask to
extend, modify, or terminate the injunction for good cause.  *See* PO § 8.

## IV.    ARGUMENT

The jury found that Biosense's conduct was illegal and anticompetitive.  So
that conduct must end.  Eliminating the barriers that unfairly excluded Innovative
and other independent reprocessors from competing—and telling consumers that
those barriers no longer exist—will "eliminate [the] consequences" of Biosense's
illegal monopolization and protect choice for physicians and hospitals across the
country.  *Prof'l Eng'rs*, 435 U.S. at 697.  The proposed injunction accomplishes
those goals without engaging this Court as a central planner or preventing Biosense
from competing on the merits, should it choose to do so.

This Court should grant the proposed injunction.

### A.    The Proposed Injunction Stops a Significant Threat of Injury from Antitrust Violations That Are Likely To Continue or Recur

To obtain an injunction, Innovative "need only demonstrate a significant
threat of injury from an impending violation of the antitrust laws or from a
contemporary violation likely to continue or recur." *Zenith*, 395 U.S. at 130.  After
the jury's unanimous verdict for Innovative on all claims, Biosense did not offer to
end the behavior the jury found unlawful.  Instead, Biosense told the public that it
"disagree[d] with the jury's decision" and that its "actions are pro-competitive."
Amanda Pedersen, *J&J Faces $147M Antitrust Verdict in Catheter Case*, Medical
Device & Diagnostic Industry (May 20, 2025) (quoting statement of Johnson &
Johnson), https://www.mddionline.com/business/jj-subsidiary-ordered-to-pay-
147m-for-antitrust-violations-in-catheter-dispute.  Though Biosense has every right
to that belief, it only underscores the need to enjoin Biosense from threatening

competition and consumers in the future.  "Injunctive relief is 'wholly proper' when there is "nothing indicating that" a clear violation of the antitrust laws that has already been found 'had terminated or that the threat to [plaintiff] inherent in the conduct would cease in the foreseeable future.' "  *Google Play*, 2024 WL 4438249, at *3 (quoting *Zenith*, 395 U.S. at 131-32) (alteration in original).  So here.

### 1.    Injury from Biosense's Illegal Clinical-Support Tie

The jury condemned Biosense's case coverage policy as an illegal tie under California's Cartwright Act and Section 1 of the Sherman Act.  In so doing, the jury found that (1) the case coverage policy is an unlawful tying arrangement that (2) injured Innovative, *see* Dkt. 521 at 53 (J.I. No. 40).  *See* Dkt. 526.

Biosense will maintain that illegal tie unless it is enjoined.  Biosense has maintained the tie nationwide for nearly a decade, *see* Reade Decl., Ex. 3 (Day 5, Tr. 60:1-15) (Forister), and the tie continues to block competition.  Meredith Snider, Innovative's senior director of sales operations, testified that Biosense's clinical-support tie comes up "[p]retty much with each potential customer" and that "[a]lmost all" of Innovative's customers "will not purchase" tied products from Innovative "because of Biosense's policy."  Reade Decl. Ex. 4 (Tr. 6:20, 40:21-41:19).  Rick Ferreira, Innovative's CEO, stated that Innovative's business would be "double the size" if it could sell the tied products.  Reade Decl., Ex. 5 (Tr. 86:15-16).  And both Mr. Ferreira and Dave Distel, Innovative's VP of Business Development, testified that Biosense's tying policy has been "devastating" to Innovative's business.  *Id.* at 91:16-19; Reade Decl., Ex. 6 (Tr. 31:22, 56:10-14) (Distel).  Mr. Distel described "swimming in SOUNDSTARs," one of the tied catheters, but "not really being able to sell them" to anyone "because of the Biosense Webster case coverage policy."  Reade Decl., Ex. 6 (Tr. 55:18-56:7).

Multiple customers confirmed that testimony.  Dr. Rahul Doshi confirmed that HonorHealth would reprocess tied products with Innovative "if Biosense did not condition CARTO 3 support on using its own new or reprocessed versions" of

14

those products.  Reade Decl., Ex. 7 (Tr. 42:8-12).  And Mary Roberts, who oversees the reprocessing program at Providence St. Joseph Health, testified that Providence would reprocess "*all*" its catheters with Innovative if not for Biosense's tying policy.  Reade Decl., Ex. 8 (Tr. 78:23-24, 88:3-5) (emphasis added).  If the tie persists, those customers will have no recourse; Innovative will continue to lose the chance to expand its business; and competition will continue to suffer.  *See* Reade Decl., Ex. 3 (Day 5, Tr. 117:2-120:15) (Forister) (showing that Biosense's case coverage policy virtually eliminated independent reprocessing competition in the tied product markets, giving Biosense 99 percent or more of some relevant catheter markets).

### 2.    Injury from Biosense's Anti-Reprocessing Technology

The jury also found Biosense liable under Section 2 of the Sherman Act, and awarded Innovative damages, because the anti-reprocessing technology that Biosense installed in its devices unlawfully delayed Innovative's market entry. *Compare* Reade Decl., Ex. 3 (Day 5, Tr. 84:15-25, 90:19-91:17) (Forister), *with* Dkt. 526 (awarding all $147 million that Innovative sought, including $8 million in damages from anti-reprocessing technology); *see also* Dkt. 521 at 2 (J.I. No. 2) (explaining Innovative's claims about blocking technology).  In so finding, the jury necessarily concluded that Biosense's anti-reprocessing technology amounted to "anticompetitive conduct," reflected a "specific intent to achieve monopoly power," and injured Innovative's business.  Dkt. 521 at 47 (J.I. No. 35).

The trial record supports the jury's findings.  Biosense's anti-reprocessing technology delayed Innovative's market entry between six months and more than three years, depending on the device.  *See* Reade Decl., Ex. 9 (Tr. 112:11-113:10) (Joseph).  In delaying Innovative's ability to compete, the technology worked as Biosense intended.  *See, e.g.*, JX-220 at 2 (internal Biosense email discussing the "Falcon security chip feature that prevents [Stryker] reprocessing" and describing as "anti-reprocessing technology"); JX-3099 at 4 (internal Biosense email; "the main

1  driver of implementing the Falcon EEPROM is preventing our competitors to

2  reprocess"); Reade Decl., Ex. 10 (Tr. 42:11-16) (Shalgi) ("[W]e knew from the very

3  beginning that [Falcon] would stop a non-authorized, non-certified reprocessor from

4  reprocessing our catheter.").

5       The proposed injunction enjoins Biosense from adding new anti-reprocessing

6  technologies to its devices to deprive consumers of the ability to choose reprocessed

7  Consumables from Biosense's competitors.  The injunction also ensures that

8  Biosense cannot evade relief from its unlawful case coverage policy by instead tying

9  its products technologically, such as by updating CARTO's software to reject

10  reprocessed Consumables sold by third parties.

11      The trial record underscores the need for those provisions.  Biosense

12  continues to expand its anti-reprocessing technology to new products.  *See*, *e.g.*, JX-

13  3099 at 4 (discussing "implementing the Falcon EEPROM" in "the Vizigo Sheath"

14  to "prevent[] our competitors to reprocess"); Reade Decl., Ex. 3 (Day 5, Tr. 35:24-

15  36:3) (Forister) (noting Biosense's plan to add the Falcon anti-reprocessing chip to

16  the Octaray catheter).  Biosense also upgrades its anti-reprocessing measures when a

17  rival reprocessor overcomes them.  *See* JX-219 at 1 (internal Biosense email; "the

18  team was working on a new version [of the Falcon anti-reprocessing technology]

19  because the previous version was defeated by [Stryker]").  The proposed injunction

20  appropriately restrains Biosense's future activities to prevent another similar

21  violation of the antitrust laws that would delay or prevent Innovative's market entry

22  and deprive consumers of choice.

23           **3.     Injury from Biosense's Anticompetitive Device Collections**

24      The third element of Biosense's plan to foreclose reprocessing competition is

25  device collections.  *See* Reade Decl., Ex. 13 (Tr. 89:6-90:16 (summarizing the

26  evidence of "Biosense using collections to prevent competition," including from

27  Innovative). The trial record shows why the injunction should limit those collection

28

practices, consistent with the jury's finding that Biosense monopolized and attempted to monopolize in violation of Section 2 of the Sherman Act.

Biosense has leveraged its near-universal presence in electrophysiology labs across the country, *see* Reade Decl., Ex. 5 (Tr. 80:18-21) (Ferreira), to collect devices, including devices that it could not reprocess or did not even ***plan*** to reprocess, for the express purpose of denying Innovative and other reprocessing rivals the inputs they need to compete.  *See*, *e.g.*, Reade Decl., Ex. 3 (Day 5, Tr. 44:17-46:12) (Forister) (discussing JX-3114 and JX-3270, internal Biosense documents showing Biosense plotting to "expand the collections policy . . . to the DECANAV and PENTARAY business," even though Biosense did not reprocess those devices, in order to "collect and divert" supply from Innovative); JX-221 at 3-4 (internal Biosense document: "[i]f we control supply, we can greatly minimize competitive activity"); JX-3673 at 2 (internal Biosense email stating that goal of collections is to "prevent the competition from getting access to our catheters").

Biosense made its intentions clear.  It urged its employees to "Maximize collections" so Biosense could "drive Stryker," one of its reprocessing competitors, "out of the RPO EP [reprocessed electrophysiology] business altogether."  JX-298 at 28-29; *see also* Reade Decl., Ex. 3 (Day 5, Tr. 41:20-42:12) (Forister).  Biosense's own data shows that it collected but did not reprocess tens of thousands of AcuNav ultrasound catheters so its rivals could not reprocess them instead.  *See* Reade Decl., Ex. 3 (Day 5, Tr. 42:22-43:7) (Forister).  And according to Biosense's own documents and witnesses, the collection program successfully foreclosed reprocessing competition.  *See* Reade Decl., Ex. 11 (Tr. 62:15-63:7) (Zare) (discussing JX-3207; confirming that Stryker "stopped selling ACUNAV 10F due to supply constraints (caused by BWI collections)"); Reade Decl., Ex. 2 (Koenig Tr. 85:18-24, 86:1-4, 89:25-90:4) (admitting that depriving competitors of necessary inputs was a "benefit" of Biosense's collection practices).

*PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PERMANENT INJUNCTION*

Biosense's device collection practices thus pose a significant and ongoing threat of market foreclosure to Innovative and other independent reprocessors. That threat will loom larger if Biosense's illegal case coverage policy is dismantled. Device collections are the natural lever for Biosense to pull to maintain its ill-gotten monopoly if it cannot abuse its clinical-support monopoly to force consumers to buy its own products. As Innovative's Mr. Distel explained, the case coverage policy has suppressed Innovative's sales of tied devices so much that the collection program has not meaningfully affected Innovative's sales of those devices. *See* Reade Decl., Ex. 6 (Tr. 55:18-56:7). But the collection program "has greatly impacted" Innovative's ability to sell devices that have generally ***not*** been subject to the clinical-support tie. *Id.* Unless the Court limits Biosense's collection program, it will threaten this Court's ability to "terminate [Biosense's] illegal monopoly, deny to [Biosense] the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future." *Optronic*, 20 F.4th at 486 (cleaned up). The proposed injunction thus includes a carefully crafted limit on collections that ensures the effectiveness of any equitable relief while preserving Biosense's ability to compete fairly for reprocessing business. *See supra* Part III.C.

## B.     The Injunction Is a Reasonable Way To Eliminate the Consequences of Biosense's Illegal Conduct

The proposed injunction is "a reasonable method of eliminating the consequences of [Biosense's] illegal conduct." *Prof'l Eng'rs*, 435 U.S. at 698. Indeed, the proposed injunction is narrowly tailored to the jury's verdict. It addresses all three prongs of Biosense's plan to eliminate reprocessing competition and contains modest ancillary provisions to prevent Biosense from evading the injunction by shifting its illegal tactics to new devices or markets.

### 1. Directly Enjoining the Anticompetitive Conduct Is a Reasonable Way To Eliminate It

The solution to an illegal antitrust tie is to "break[ ]" it—that is, to forbid the illegal condition. *Google Play Store*, 2024 WL 4438249, at *9. Thus, it should be uncontroversial that it is appropriate for the Court to prohibit Biosense from continuing to enforce its case coverage policy, which the jury found to be an illegal tie. And given the jury's finding that CARTO customers are "locked in" despite competition in the foremarket for cardiac mapping machines, it is also appropriate to prevent Biosense from accomplishing the same illegal ends by conditioning the availability of CARTO in some new way to stop customers from buying Consumables from other companies. *See* PO § 2; *Zenith*, 395 U.S. at 132 (court has "broad power to restrain acts which . . . may fairly be anticipated from the defendant's conduct in the past").

The proposed injunction also prohibits Biosense from discriminating in providing clinical support or in making CARTO available based on whether its customers buy Consumables from an independent reprocessor like Innovative. Such a non-discrimination provision is a "recognized antitrust remed[y]," *United States v. Glaxo Grp. Ltd.*, 410 U.S. 52, 64 (1973), that this circuit has repeatedly affirmed. *See, e.g., Kodak*, 125 F.3d at 1225-26 ("requiring nondiscriminatory pricing" and terms to "end Kodak's service monopoly"); *Optronic*, 20 F.4th at 486 (affirming injunction that required the defendant "to supply [its rival] on non-discriminatory terms"); *see also Glaxo*, 410 U.S. at 64 (collecting Supreme Court cases authorizing district courts to require "selling on specified terms" and "licensing at reasonable charges" in antitrust injunctions).

It is likewise reasonable to enjoin Biosense from implementing new blocking technologies that prevent use of CARTO with Consumables reprocessed by third parties. *See* PO § 3. The jury found that the anti-reprocessing technology that Biosense installed in its devices illegally delayed Innovative's market entry and

harmed competition without "a legitimate business justification." Dkt. 521 at 49-50 (J.I. No. 38). Prohibiting Biosense from implementing new versions of that illegal technology falls well within the Court's power to restrain Biosense's future activities "to avoid a recurrence of [its] violation" of the antitrust laws. *Prof'l Eng'rs*, 435 U.S. at 697.

The injunction's narrow limit on Biosense's device-collection practices is reasonable too. Biosense used the exact tactic the injunction forbids—collecting used devices that it does not reprocess—with the intent to prevent Innovative from reprocessing those products to compete against Biosense's inferior and more expensive "new" versions. *See supra* Part IV.A.3; *see also* Reade Decl., Ex. 3 (Day 5, Tr. 78:13-19) (Forister) (noting that Innovative's device complaint rates "are significantly lower than the complaint rates for Biosense or Sterilmed"). Directly enjoining that illegal conduct, while allowing procompetitive collections, *see* PO § 4.2, will "redress [Biosense's] violations" and "restore competition" for the sales of affected devices. *Ford Motor*, 405 U.S. at 573 (quoting *E. I. du Pont*, 366 U.S. at 326).

## 2. Enjoining Biosense's Anticompetitive Conduct for All Aftermarket Products Avoids Evasion and Protects the Efficacy of the Court's Injunctive Remedy

The proposed injunction addresses "any past, present, or future cardiac mapping machine made by or for Biosense" during the injunction's term and any aftermarket device originally manufactured by Biosense for use with those machines. PO §§ 1.2-1.3. That language mirrors the permanent injunction that the Ninth Circuit approved in *Kodak*. That injunction defined the capital equipment ("Kodak equipment") to include "all past, present, and future micrographic equipment," not just the particular models at issue at the time, and likewise defined the aftermarket products ("Parts") to include "all parts or supply items that are field

replaceable by Kodak technicians" and "all tools or devices essential to servicing Kodak equipment." *Kodak*, 125 F.3d at 1226.

That scope of relief is reasonable here, as it was in *Kodak*. This Court has ample authority not just to prevent Biosense from continuing to illegally monopolize the specific markets for devices compatible with the CARTO 3 but also to prevent Biosense from replicating its illegal conduct for new or different devices to dominate related aftermarkets. Invoking that very principle, the Supreme Court in *Zenith* reinstated an injunction that "broadly barred" the antitrust defendant from replicating its illegal practices "to restrict or prevent" the claimant "from entering any other foreign market," even though the plaintiff had not proved that it "intended or was prepared to enter" those markets. 395 U.S. at 129-32. "We see no reason," the Court explained, "that the federal courts, in exercising the traditional equitable powers extended to them by [15 U.S.C. § 26], should not respond to the 'salutary principle that when one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful acts.'" *Id.* at 133 (quoting *NLRB v. Express Publ'g Co.*, 312 U.S. 426, 436 (1941)).

Barring Biosense from deploying the same illegal tactics with respect to any CARTO aftermarket device applies that salutary principle. That prohibition is both reasonable and necessary to "cure the ill effects of the illegal conduct." *Gypsum*, 340 U.S. at 88. It will prevent Biosense from evading the injunction by shifting its illegal tactics to new, different, or rebranded devices, *see Zenith*, 395 U.S. at 132-33, or by pursuing other, yet "untraveled" avenues "to restrain trade." *Int'l Salt*, 332 U.S. at 400.

Such evasion is not hypothetical. The trial record shows that Biosense expanded and changed its anticompetitive tactics, and devised new pretexts for them, to choke competition wherever it appeared. That is exactly what happened with the Vizigo sheath. The Vizigo is a steerable "straw" through which physicians run catheters to the heart. Reade Decl., Ex. 6 (Tr. 45:15-22) (Distel). Just three

months after Innovative received FDA clearance to reprocess the Vizigo sheath, Biosense added it to its case coverage policy and "shut down" Innovative's sales— even though the Vizigo was neither a catheter nor "sensor-enabled," the reason Biosense usually used to justify the tie. *Id.* (Tr. 45:12-49:23) (Distel). Biosense also proactively discussed "implementing the Falcon" anti-reprocessing chip "to prevent[] [its] competitors to reprocess . . . the VIZIGO sheath." Reade Decl., Ex. 3 (Day 5, Tr. 40:1-18) (Forister) (quoting JX-3099). It is "contrary to" both the trial record and "common experience" to expect that Biosense, a proven "violator of the antitrust laws," will "relinquish the fruits of [its] violation more completely than the court requires [it] to do." *Int'l Salt*, 332 U.S. at 400. To effectively protect competition, the proposed injunction must extend beyond the specific Consumables at issue in this case to other CARTO-compatible devices—which the record shows are vulnerable to the same anticompetitive tactics. *See Zenith*, 395 U.S. at 133 ("[W]hen one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful acts.") (cleaned up).

Moreover, Innovative's ability to compete for many customers in the markets for sensor-enabled catheters depends on whether those customers can buy and use a full complement of reprocessed CARTO-compatible devices from Innovative. For example, some customers prefer to buy all their reprocessed electrophysiology devices from just one vendor. *See* Reade Decl., Ex. 7 (Tr. 38:23-39:8) (Doshi) (observing that "adding another vendor to do reprocessing might increase th[e] cost" to HonorHealth); Reade Decl., Ex. 12 (Tr. 19:15-20:23) (Ramos) (acknowledging practice of entering "sole source" agreements with one reprocessing vendor to provide all reprocessed EP products for a hospital); JX-3912 at 1 (hospital expressing reluctance to use Innovative because accounting for its inability to buy products subject to Biosense's case coverage policy "only leaves a couple other items and the usage on those [by the hospital historically] was minimal"). If Biosense could freely replicate its anticompetitive tactics for other CARTO-

1  compatible devices, Innovative could not contract with many of those customers.

2  *See Stulhbarg*, 240 F.3d at 841 (lost "opportunity to expand business" justified

3  injunction).

4       Hospitals already struggle "to accurately engage in lifecycle pricing"—that is,

5  to understand the lifetime cost of the CARTO machine plus all the CARTO-

6  compatible devices they will buy while they own it.  Reade Decl., Ex. 3 (Day 5,

7  Tr. 105:17-106:20) (Forister).  The jury found that fact through its verdict.  *See*

8  Dkt. 521 at 37 (J.I. No. 30).  Creating more doubt as to hospitals' ability to depend

9  on independent reprocessors like Innovative to reprocess a full portfolio of CARTO-

10  compatible products would only exacerbate the customer "lock-in" that enabled

11  Biosense's illegal conduct to work.  This Court's injunction must instead be broad

12  enough to "be effective to redress the violations and restore competition."  *Ford*,

13  405 U.S. at 573 (cleaned up).

### 3. An Injunction Benefiting All Independent Reprocessors Is Necessary To Restore Competitive Conditions

16       It is appropriate also for the injunction to benefit all independent reprocessors

17  of CARTO-compatible products.  Were Innovative the injunction's only beneficiary,

18  Innovative would have a uniquely favorable market position.  "Relief in favor of all

19  [independent reprocessors] prevents entrenching" Innovative as an "oligopolist[ ]"

20  and ensures that the injunction protects competition as broadly as the antitrust laws

21  intend, not just for one lucky rival.  *Kodak*, 125 F.3d at 1226; *see also*, *e.g.*,

22  *Optronic Techs.*, 20 F.4th at 486 ("injunctive relief covering nonparties is proper to

23  prevent future Sherman Act violations" (cleaned up)); *Hawaii v. Standard Oil Co.*,

24  405 U.S. 251, 261 (1971) ("While . . . any individual threatened with injury by an

25  antitrust violation may . . . sue for injunctive relief against violations of the antitrust

26  laws, . . . the fact is that one injunction is as effective as 100.").

27

28

### 4.    The Injunction's Notice and Compliance Provisions Are Reasonable

The injunction requires Biosense to tell users and new purchasers of its cardiac mapping machine about the injunction, including Biosense's duty not to discriminate in providing clinical support for procedures using the machine.  *See* PO § 6.1.  Such notice provisions are common in antitrust injunctions; the Ninth Circuit affirmed one in *Kodak*.  *See* 125 F.3d at 1227 (requiring Kodak to inform its customers "that Kodak has been ordered to sell Kodak parts to ISOs for the repair and maintenance of Kodak equipment").  Those provisions are especially important here, because the jury found that Biosense's "anticompetitive practices were not generally known when hospitals made the[ir] purchases of CARTO 3 machines" and that "hospitals lack information to accurately determine the life-cycle costs of the CARTO 3."  Dkt. 521 at 37 (J.I. No. 30).  Those notices, and the requirement that Biosense inform its sales employees of the injunction, will ensure that customers know that they can buy Consumables from other companies like Innovative without losing the ability to use their CARTO machines.

The injunction also requires Biosense to submit a report every six months regarding its compliance with the injunction and to tell its employees and customers about a hotline for reporting potential noncompliance with the injunction, should Innovative choose to create one.  *See* PO §§ 5, 6.1.  "[C]ourts regularly impose similar types of provisions to ensure compliance with other provisions of the injunctions."  *L.A. Int'l Corp. v. Prestige Brands Holdings, Inc.*, 2024 WL 2272384, at *15 (C.D. Cal.) (collecting cases affirming "reporting," "recordkeeping," and "monitoring" requirements in injunctions; and affirming provision of injunction requiring defendants to submit "a semi-annual report" directly to plaintiffs "to ensure compliance with the [antitrust] injunction").  Such provisions are appropriate here, too.  They will encourage Biosense to fully adhere to the injunction and to ensure its employees do the same.

24

### 5.    The Injunction's Ten-Year Duration Is Appropriate

The ten-year duration of the injunction is appropriate.  Biosense has engaged in its illegal conduct for years.  It first tested the clinical-support tie more than eleven years ago, in 2014, with the Ascension hospital system.  *See* Reade Decl., Ex. 3 (Day 5, Tr. 55:13-60:4) (Forister) (discussing origins of Biosense's case coverage policy); Reade Decl., Ex. 9 (Tr. 103:15-109:6) (Joseph) (recounting the blocking technologies that Innovative encountered in the Lasso, Pentaray, Soundstar 3D, and Soundstar Eco catheters, as early as 2015); Reade Decl., Ex. 3 (Day 5, Tr. 42:22-43:19) (Forister) (discussing Biosense's collections of Acunav catheters from 2015, which "denied" customers "the choice of an Innovative reprocessed ACUNAV").  With more than ten years of runway, Biosense has managed to stamp out almost all competition from independent reprocessors and build an impregnable monopoly.  *See* Reade Decl., Ex. 3 (Day 5, Tr. 117:2-120:15) (Forister) (showing that Biosense's case coverage policy virtually eliminated independent reprocessing competition in the tied product markets).  It will take time to dismantle Biosense's anticompetitive scheme and correct all its consequences.  *See Kodak*, 1996 WL 101173, at *2 ("10 years is an appropriate period for the Injunction to offset the 10 years that Kodak's illegal parts policy has been in effect.").  If market conditions change so significantly as to obviate the need for the injunction, Biosense may ask to modify or terminate it early.  PO § 8.

### C.    Innovative Easily Satisfies Every *eBay* Factor

Traditional equitable principles show that the Court should grant the proposed injunction.  Innovative faces a significant threat of ongoing harm from Biosense's anticompetitive conduct, *see Zenith*, 395 U.S. at 130, and the proposed injunction is a reasonable way to eliminate the consequences of that illegal conduct.  *See Prof'l Eng'rs*, 435 U.S. at 697-98; *see also Optronic*, 20 F.4th at 485-87 (applying those factors); *Google Play*, 2024 WL 4438249, at *3 (same).

The answer is the same under the four-factor test used to evaluate permanent injunctions more generally. *See eBay*, 547 U.S. at 391. Innovative easily satisfies every factor of that "sliding scale" test. *Allergan Inc. v. Cayman Chem. Co.*, 2009 U.S. Dist. LEXIS 135228, at *2-3 (C.D. Cal.) (Selna, J.).

**First**, Innovative is suffering irreparable harm. "A lessening of competition constitutes an irreparable injury" in this circuit, *Boardman*, 822 F.3d at 1023, and the jury necessarily found that Biosense's conduct lessened competition to Innovative's detriment.[1] The trial record also is replete with evidence that Biosense's anticompetitive conduct continues to cause Innovative to lose "prospective customers," "goodwill," and opportunities "to expand [its] business"; all those harms are irreparable under Ninth Circuit law. *Stuhlbarg*, 240 F.3d at 841; *see also BMW of N. Am., LLC v. Rocco*, 2020 WL 7047318, at *11 (C.D. Cal.) ("Plaintiffs have established irreparable harm based upon the threat of future lost sales." (cleaned up)), *aff'd*, 2021 WL 5401709 (9th Cir.); *Keracell, Inc. v. Aesthetically Correct, LLC*, 2018 WL 7348852, at *2 (C.D. Cal.) (damages to plaintiff's "current and future business relationships, goodwill, and reputation" were irreparable harms justifying injunctive relief); *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir. 1993) ("As a general rule, a permanent injunction will be granted when . . . there is a threat of continuing violations.").

**Second**, for the same reasons, monetary damages are inadequate to compensate for those injuries. "If the harm being suffered by plaintiff . . . is 'irreparable,'" as it is here, "then the remedy at law (monetary damages) is

---

[1] *See*, *e.g.*, Dkt. 521 at 18-19 (J.I. Nos. 16-17) (for tying claim, requiring jury to find that "the challenged restraint results in a substantial harm to competition," defined as "higher prices, decreased output, lower quality, or the loss of some other competitive benefit"), 45 (J.I. No. 34) (for Section 2 claims, requiring the jury to find "harm to competition"), 53 (J.I. No. 40) (requiring jury to find antitrust injury).

*PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PERMANENT INJUNCTION*

1  'inadequate.'" *L.A. Int'l*, 2024 WL 2272384, at *12 (quoting *Anhing Corp. v.*
2  *Thuan Phong Co.*, 2015 WL 4517846, at *23 (C.D. Cal.)).

3      Biosense's "anticompetitive conduct" has "illegally and unfairly foreclosed"
4  Innovative "from competing." *Google Play Store*, 2024 WL 4438249, at *4. The
5  harms from that foreclosure "are ongoing and cannot be made right simply by
6  [Biosense] writing [Innovative] a large check." *Id.*; *see also Stulhbarg*, 240 F.3d at
7  841 (threatened loss of customers, goodwill, future revenues, and "opportunity to
8  expand business" justified injunction); JX-3969 at 3 (customer asking to return
9  "reprocessed Vizigo sheaths" to Innovative because of the case coverage policy).
10  Biosense's illegal policies will continue to cripple its rivals' ability to innovate and
11  compete unless they are enjoined. *See* Reade Decl., Ex. 3 (Day 5, Tr. 82:20-83:1)
12  (Forister) ("[Biosense's] Case Coverage Policy . . . convinced companies like
13  Innovative and Stryker not to reprocess the OCTARAY because they knew they
14  would be excluded from the market.").

15      Innovative's ongoing injuries from Biosense's anticompetitive conduct are
16  difficult to reduce to "calculable money damages." *Epic Games, Inc. v. Apple, Inc.*,
17  67 F.4th 946, 1003 (9th Cir. 2023); *see also Corporate Express Office Prods. v.*
18  *Martinez*, 2002 U.S. Dist. LEXIS 21310, at *13 (C.D. Cal.) (awarding injunction
19  because damages from "continued customer losses" and lost "future sales" would be
20  "difficult to quantify"). Dr. Forister's calculation of Innovative's ***past*** damages was
21  an "underestimate" because it did not account for, among other things, the damages
22  from Biosense's "collections policy" and from lost sales of other devices, including
23  Consumables like the AcuNav that Biosense inconsistently subjected to its illegal
24  clinical-support tie. Reade Decl., Ex. 3 (Day 5, Tr. 91:3-17); *see also id.* (Day 7,
25  Tr. 81:24-83:1) (explaining that the AcuNav, "at times during the damage period,"
26  "was subject to the case coverage policy"). Innovative cannot collect or estimate its
27  future lost profits from Biosense continuing its illegal conduct. That is why courts
28  recognize that "'continuous' unlawful conduct 'leaves no other adequate remedy for

27

1  the plaintiff aside from injunctive relief.'" *Hope Med. Enters. Inc. v. Fagron*

2  *Compounding Servs., LLC*, 2021 WL 4963516 (C.D. Cal.) (quoting *Daimler AG v.*

3  *A-Z Wheels LLC*, 498 F. Supp. 3d 1282, 1294 (S.D. Cal. 2020)), *rev'd on other*

4  *grounds*, 2023 WL 4758454 (9th Cir.).

5      **Third**, the balance of harms favors Innovative.  In finding Biosense liable, the

6  jury necessarily found that "the competitive harm" from Biosense's conduct

7  "substantially outweigh[ed]" any "competitive benefit" and that Biosense's conduct

8  had no "efficiency-enhancing justification."  Dkt. 521 at 18 (J.I. No. 16), 48 (J.I.

9  No. 36).  Any interest Biosense may have in continuing its anticompetitive conduct

10  cannot outweigh Innovative's interest in restoring its own ability to compete.  *See*

11  *Regents*, 747 F.2d at 520-21.

12      **Fourth**, the public interest favors the injunction.  Enjoining illegal conduct to

13  restore "free and unfettered competition" benefits the public.  *Google*, 2024 WL

14  4438249, at *4.  "The central purpose of the antitrust laws, state and federal, is to

15  preserve competition.  It is competition that these statutes recognize as **vital to the**

16  **public interest**."  *Boardman*, 822 F.3d at 1024 (cleaned up; emphasis original).

17  "Antitrust laws . . . are the Magna Carta of free enterprise.  They are as important to

18  the preservation of economic freedom and our free-enterprise system as the Bill of

19  Rights is to the protection of our fundamental personal freedoms."  *United States v.*

20  *Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972).

21      An injunction protecting choice for physicians and hospitals will also serve

22  the public interest in sustainable, high-quality healthcare.  Biosense's conduct forced

23  hospitals to forgo devices that were higher quality and less expensive than the ones

24  they were forced to buy from Biosense.  *See* Reade Decl., Ex. 3 (Day 5, Tr. 79:9-25)

25  (Forister) (pointing to multiple data sources showing that "Innovative has higher

26  quality than Biosense or Sterilmed" and concluding that "excluding Innovative from

27  the market, preventing customers from choosing them, reduced the quality that was

28  available" to consumers); *id.* (Day 5, Tr. 75:18-22) (explaining that "both the

individual and the average prices" for catheters "were inflated by [Biosense's] Case Coverage Policy").  The trial record also shows that Biosense's ongoing conduct "affect[s]" hospitals' "ability to support patient care."  Reade Decl., Ex. 7 (Tr. 30:14-31:17) (Doshi).  Without the "cost savings" from reprocessing, Dr. Doshi testified, "we simply can't do other things.  We can't support certain types of procedures.  We can't get new technology.  We can't advance patient care." *Id*.  Ms. Roberts's hospital system, Providence St. Joseph, would spend "millions of dollars" more to support "community services," "retain staff," and "make healthcare more affordable."  Reade Decl., Ex. 8 (Tr. 81:5-9, 82:17-24, 86:2-14).  But Biosense's illegal conduct stands in the way.  It should not.

## V.    CONCLUSION

The Court should issue the proposed injunction.


DATED:  June 12, 2025          THEODORA ORINGHER PC


By:    *   /s/ Panteha Abdollahi*
        Panteha Abdollahi

JEFFREY L. BERHOLD, P.C.


By:    *   /s/ Jeffrey L. Berhold*
        Jeffrey L. Berhold

BERGER MONTAGUE PC


By:    *   /s/ Joshua P. Davis*
        Joshua P. Davis
        Matthew Summers

*PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PERMANENT INJUNCTION*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.


By:    /s/ Matthew D. Reade
           Derek T. Ho
           Andrew E. Goldsmith
           Matthew D. Reade
           Kelley C. Schiffman
           Rachel T. Anderson
           Annamaria M. Morales-Kimball
           Sean P. Quirk


           Attorneys for Plaintiff
           INNOVATIVE HEALTH LLC

*PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PERMANENT INJUNCTION*

**<u>CERTIFICATE OF COMPLIANCE</u>**

The undersigned, counsel of record for Plaintiff Innovative Health LLC, certifies that this brief contains 6,983 words, which complies with the word limit of Central District of California Local Rule 11-6.1.

DATED: June 12, 2025

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

By:  ___/s/ Matthew D. Reade___

Matthew D. Reade

31