KARLA KRAFT
State Bar No. 205530
kkraft@stradlinglaw.com
STRADLING YOCCA CARLSON &
RAUTH LLP
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660-6422
Telephone:  (949) 725-4000

WILLIAM F. CAVANAUGH, JR.
State Bar No. 133461
wfcavanaugh@pbwt.com
PATTERSON BELKNAP WEBB
AND TYLER LLP
1133 Avenue of the Americas
New York, NY  10036
Telephone: (212) 336-2000

MUHAMMAD U. FARIDI
(Admitted *Pro Hac Vice*)
LINKLATERS LLP
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 903-9000

Attorneys for Defendant
BIOSENSE WEBSTER, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INNOVATIVE HEALTH LLC,<br><br>Plaintiff,<br><br>vs.<br><br>BIOSENSE WEBSTER, INC.,<br><br>Defendant. | CASE NO. 8:19-cv-01984-JVS-KES<br><br>Hon. James V. Selna<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION**<br><br>Date:  July 21, 2025<br>Time:  9:00 a.m.<br>Judge: Hon. James V. Selna<br>Courtroom: 10C<br><br>Complaint Filed:  October 18, 2019<br>Trial Date:  May 6, 2025 |

- 1 -

# **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................5

II.    LEGAL STANDARD ...............................................................................6

III.    ARGUMENT ............................................................................................7

    A.    IH is not entitled to any injunctive relief related to clinical
support, let alone the vague, overbroad, and burdensome relief
it seeks. ..........................................................................................7

        1.    IH has not demonstrated irreparable harm or the
inadequacy of legal remedies. ...........................................7

        2.    The scope of the proposed provisions regarding clinical
support are vague, overbroad, unnecessarily
burdensome, and anticompetitive. ...................................11

    B.    IH is not entitled to injunctive relief for the Falcon chip. ........17

        1.    IH is not entitled to injunctive relief for past conduct....17

        2.    The balance of the hardships and public interest weigh
against issuing an injunction related to so-called
blocking technology. .......................................................19

    C.    IH is not entitled to injunctive relief for catheter collections. ..22

        1.    IH has not demonstrated harm from catheter
collections. .....................................................................22

        2.    The balance of hardships and public interest weigh
against granting injunctive relief related to catheter
collections. .....................................................................24

    D.    There is no basis to require semiannual reports........................25

    E.    There is no reason for IH's proposed hotline provision. ..........26

    F.    There is no basis for the proposed term of the permanent
injunction. ...................................................................................27

IV.    CONCLUSION ......................................................................................28

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
  750 F.2d 1470 (9th Cir. 1985)......................................................8

*Avaya Inc. v. Telecom Labs, Inc.*,
  No. 06-cv-2490, 2014 WL 2940455 (D.N.J. June 30, 2014)...............25, 26

*Cascade Health Sols. v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008)....................................................15

*Columbia Pictures Indus., Inc. v. Fung*,
  710 F.3d 1020 (9th Cir. 2013)...................................................12

*E. Bay Sanctuary Covenant v. Garland*,
  994 F.3d 962 (9th Cir. 2020).....................................................9

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ..............................................................7

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023)...............................................*passim*

*Fed. Trade Comm'n v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020)....................................................18

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
  703 F.2d 534 (9th Cir. 1983)....................................................22

*In re Google Play Store Antitrust Litig.*,
  No. 20-CV-05671-JD,
  2024 WL 4438249 (N.D. Cal. Oct. 7, 2024)........................................9, 28

*Greg Young Publ'g, Inc. v. Zazzle, Inc.*,
  No. 2:16-CV-04587-SVW-KS, 2018 WL 836276 (C.D. Cal.
  Feb. 8, 2018), *aff'd,* 785 F. App'x 417 (9th Cir. 2019).......................9, 17

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997)...............................................14, 15, 16, 20

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION

*L.A. Int'l Corp. v. Prestige Brands Holdings, Inc.*,
    No. 18-6809-MWF, 2024 WL 2272384 (C.D. Cal. May 20, 2024) ........26

*Malaney v. UAL Corp.*,
    No. 10-cv-02858, 2010 WL 3790296 (N.D. Cal. Sept. 27, 2010) ...........24

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    518 F. Supp. 2d 1197 (C.D. Cal. 2007)......................................................23

*MGA Ent. Inc v. Harris*,
    No. 2:20-CV-11548-JVS-AGR, 2025 WL 1416045 (C.D. Cal.
    Apr. 15, 2025).....................................................................................7, 11

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    594 U.S. 69 (2021) ..........................................................................7, 26

*New York v. Microsoft Corp.*,
    224 F. Supp. 2d 76 (D.D.C. 2002), *aff'd*, 373 F.3d 1199
    (D.C. Cir. 2004).................................................................................*passim*

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    20 F.4th 466 (9th Cir. 2021)......................................................................16

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    No. 5:16-CV-06370-EJD, 2020 WL 1812257 (N.D. Cal.
    Apr. 9, 2020)..................................................................................8, 16

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
    782 F. Supp. 2d 1059 (E.D. Cal. 2011)......................................................24

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
    546 F.3d 991 (9th Cir. 2008)......................................................................12

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .................................................................8, 22

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .......................................................................................7

**Statutes**

15 U.S.C. § 26 ..............................................................................................18

-4-

# I.    INTRODUCTION

The facts in this private antitrust action do not warrant the injunctive relief Innovative Health LLC ("IH") seeks here.  If the jury verdict is affirmed following post-trial motions and any appeal, IH will receive three times the *full* damages it sought at trial.  These damages will have adequately compensated IH for the harm it asserts it suffered from Defendant Biosense Webster, Inc.'s ("Biosense") conduct, and these types of damages would be available for any alleged future harm.  Accordingly, there is no irreparable injury or an inadequate legal remedy—both requirements for granting a permanent injunction.

As for the Proposed Injunction (Dkt. 535-2), IH seeks to enjoin conduct where the balance of hardships favor Biosense, and the proposed restrictions run counter to the public interest.  For example, with respect to the clinical support policy, IH's proposal is overbroad, vague, and goes far beyond the jury's finding of liability.  On its face, it is not clear the extent to which the Proposed Injunction limits Biosense's ability to competitively price its products and services.  And as part of clinical support, IH seemingly would impose on Biosense the obligation to answer questions and make representations about IH's products when Biosense does not have access to IH's confidential information required to do so.

Regarding, the Falcon chip, IH circumvented this technology nearly eight years ago and has not alleged that Biosense subsequently adopted any other so-called blocking technology.  Moreover, IH's vague and ambiguous definition of "blocking technology" would hamstring Biosense's ability to innovate and create new technology that would directly benefit patients.

On the issue of catheter collections, even though IH presented no evidence that those practices caused any past damages, let alone have any ongoing effects, IH would marginalize SterilMed as a competitor by preventing

1  SterilMed from following collection practices that are industry standard and that

2  hospitals request.  These restrictions also would require SterilMed to renegotiate

3  hundreds of hospital contracts.

4      In short, there is a legal remedy for IH's injuries, and there is no basis for

5  prospective relief.  Further, because the provisions in IH's Proposed Injunction

6  would hinder rather than promote competition, the balance of hardships and

7  public interest weigh against granting an injunction.

8      The Court should deny IH's motion.

9  **II.  LEGAL STANDARD**

10     To issue a permanent injunction, the Court must find: "(1) that [the

11 plaintiff] has suffered an irreparable injury; (2) that remedies available at law,

12 such as monetary damages, are inadequate to compensate for that injury; (3)

13 that, considering the balance of hardships between the plaintiff and defendant, a

14 remedy in equity is warranted; and (4) that the public interest would not be

15 disserved by a permanent injunction."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th

16 946, 1002 (9th Cir. 2023).  The party seeking the permanent injunction bears the

17 burden of "satisfy[ing] [this] four-factor test before [the] court may grant such

18 relief."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).[1]  At

19 bottom, "[a]n injunction is a matter of equitable discretion; it does not follow

20 from success on the merits as a matter of course."  *Winter v. Nat. Res. Def.*

21 *Council, Inc.*, 555 U.S. 7, 32 (2008).

22     Where a court decides to grant injunctive relief, the injunction "must be

23 no more burdensome to the defendant than necessary to provide complete relief

24 to the plaintiff."  *Epic Games*, 67 F.4th at 1002 (cleaned up).  "When it comes to

25 fashioning an antitrust remedy,… caution is key."  *Nat'l Collegiate Athletic*

26
───────────────
27 [1] The "four-factor test" applies to any request for a permanent injunction.  *See,*
   *e.g.*, *MGA Ent. Inc v. Harris*, No. 2:20-CV-11548-JVS-AGR, 2025 WL
28 1416045, at *3 (C.D. Cal. Apr. 15, 2025) (Selna, J.).

*Ass'n v. Alston*, 594 U.S. 69, 106 (2021).  The remedy "should be tailored to fit the wrong creating the occasion for the remedy."  *United States v. Microsoft Corp.*, 253 F.3d 34, 107 (D.C. Cir. 2001).  It should neither "embody harsh measures when less severe ones will do" nor "adopt overly regulatory requirements which involve the judiciary in the intricacies of business management…."  *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 100 (D.D.C. 2002), *aff'd*, 373 F.3d 1199 (D.C. Cir. 2004).

## III.  ARGUMENT

### A.    IH is not entitled to any injunctive relief related to clinical support, let alone the vague, overbroad, and burdensome relief it seeks.

#### 1.    IH has not demonstrated irreparable harm or the inadequacy of legal remedies.

For injunctive relief, IH must prove (but cannot) that it has or will suffer an irreparable injury related to the clinical support policy that cannot be remedied by monetary damages.  *See Epic Games*, 67 F.4th at 1002.  "[E]conomic injury is generally not considered irreparable" for the purposes of issuing a permanent injunction unless "the underlying injury does not readily lend itself to calculable money damages."  *Id.* at 1003; *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473-74 (9th Cir. 1985).  Although courts will sometimes consider lost business to be an irreparable harm, those cases involve "evidence that [plaintiff's] business would be threatened with extinction in the absence of injunctive relief."  *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-CV-06370-EJD, 2020 WL 1812257, at *3 (N.D. Cal. Apr. 9, 2020); *see also Am. Passage*, 750 F.2d at 1473-74.  No such evidence exists in this case, and IH's injury readily lends itself to an adequate

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION

monetary remedy, which is why IH asked for and received 100% of its monetary damages that were then trebled to well beyond the actual damages claimed.[2]

*First*, IH's damages from the clinical support policy are readily calculable.  IH has already sought a jury verdict for monetary damages related to the policy.  Dkts. 526, 528-1.  Those damages were based on a straightforward, replicable benchmark analysis.  IH's expert has already identified what he believes are relevant benchmarks and the model relies on simple arithmetic.  Ex. 1,[3] 2025.05.13 AM Tr. 85:18-90:14.  This is not a case like *In re Google Play Store Antitrust Litigation* where the harms "cannot be made right simply by … writing … a large check."  No. 20-CV-05671-JD, 2024 WL 4438249, at *4 (N.D. Cal. Oct. 7, 2024).  Should an issue recur, IH could repeat the analysis with updated numbers and demand treble damages.

Although IH's expert, Eric Forister, suggested that his damages underestimate IH's injury, that testimony does not alter the conclusion that monetary damages are calculable and adequate.  To begin, IH's damages have been trebled, ameliorating any underestimation concern.  *Cf. Greg Young Publ'g, Inc. v. Zazzle, Inc.*, No. 2:16-CV-04587-SVW-KS, 2018 WL 836276, at *5 (C.D. Cal. Feb. 8, 2018) (denying motion for injunction because "statutory damages" were sufficient and available in the future "to compensate Plaintiff" for further injury), *aff'd,* 785 F. App'x 417 (9th Cir. 2019).  Further, the three reasons offered by Forister for the underestimate are irrelevant to the clinical support policy or the markets IH defined.  Ex. 1, 2025.05.13 AM Tr. 91:6-17.

---

[2] IH's suggestion that it can get broad relief for harm to the market (Motion at 20-23, 26) is at odds with the current state of the law on the scope of equitable powers. *See E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 991 (9th Cir. 2020) (Miller, J. concurring in part).

[3] "Ex. __" are exhibits to the accompanying Cavanaugh Declaration.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION

Forister first claimed that he underestimated damages because he excluded damages for AcuNav catheters, DecaNav catheters, and the Vizigo sheath. But the markets that IH alleged were (1) sensor-enabled circular mapping catheters for use with the CARTO 3, (2) sensor-enabled high-density mapping catheters for use with the CARTO 3, and (3) sensor-enabled ultrasound catheters. Ex. 1, 2025.05.13 AM Tr. 110:24-111:19; Ex. 2, 2024.12.02 Forister Report ¶¶ 176, 178, 180-81; Ex. 3 (Forister demonstrative 38); *see also* Dkt. 521 at 38 (Jury Instruction No. 30). AcuNav, DecaNav, and Vizigo sheath fit into none of these categories. *See, e.g.*, Ex. 4, 2025.05.13 PM Tr. 5:25-6:2 (admitting that "ACUNAV isn't even in any of the markets as" Forister "defined them"). IH simply did not present a liability case for these devices. There is no finding that they fall within a relevant antitrust market; no finding that Biosense had market power in those undefined markets; no finding of competitive harm in those undefined markets; no finding that IH was injured in those undefined markets.[4] Consequently, IH cannot rely on these devices for injunctive relief.

The other two reasons that IH's expert offered—(a) that he did not compute damages for catheter collections and (b) that he chose not to compute costs IH incurred to overcome the "blocking" technology—have no bearing on whether damages from the clinical support policy are calculable. Ex. 1, 2025.05.13 AM Tr. 91:6-17. In short, the trial record cannot support a

---

[4] IH suggests these products fall within other undefined aftermarkets. Dkt. 535 ("Motion") at 21. No such evidence was presented at trial. In fact, the record suggests there is no injury related to those devices. For example, Forister admitted that IH "had a similar share of sales of AcuNav and ViewFlex" catheters—a Forister benchmark catheter that was unaffected by the clinical support policy. Ex. 4, 2025.05.13 PM Tr. 23:19-21; Ex. 1, 2025.05.13 AM Tr. 86:20-87:1. Further, these products would not satisfy the test for a single-brand aftermarket. The Vizigo sheath, for example, competes against sheaths from other manufactures, including Abbott's Agilis sheath, which is compatible with the CARTO. Ramos Decl. ¶¶ 18-20.

-9-

conclusion that IH has an inadequate legal remedy with respect to the clinical support policy.

*Second*, and independently, IH suffered no irreparable harm because there is no threat to IH as an ongoing business.  The trial record demonstrates that IH has operated for over a decade with the clinical support policy in place.  Ex. 5, 2025.05.07 PM Tr. 59:15-17.  No witness testified that there was any risk of IH failing as a business.  And IH submitted no such evidence in support of the Motion.

Because lost business by itself is not irreparable harm, IH references cases where lost sales coupled with a loss of goodwill or reputation are grounds for injunctive relief.  *See* Motion at 26-27.  But IH proffered zero evidence about loss of goodwill or reputational harm from the clinical support policy.[5]  No trial witness testified that it thought poorly of IH in light of Biosense's policy.  The "lack of evidence of present and future injury to business reputation or goodwill" bars such harms from being used as a basis for IH's injunctive relief. *MGA Ent. Inc*, 2025 WL 1416045, at *7.  To the contrary, IH's witness testified that customers wanted to buy more devices from IH, evidence that is antithetical to a reduction in goodwill or reputational harm.  *See, e.g.*, Ex. 6, 2025.05.09 PM Tr. 38:9-13.

Accordingly, IH failed to carry its burdens of showing it has suffered irreparable harm or that it has an inadequate legal remedy concerning the clinical support policy.

---

[5] The only evidence IH cites is an email (JX-3969) where a customer asked to return a product.  *See* Motion at 27.  At most, that is a lost sale that could be remedied with damages.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION

**2.    The scope of the proposed provisions regarding clinical support are vague, overbroad, unnecessarily burdensome, and anticompetitive.**

The scope of what IH demands for clinical support reflects a fundamental overreach producing overbroad, ambiguous, unworkable, and anticompetitive requirements.  An injunction "must be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff," *Epic Games*, 67 F.4th at 1002 (cleaned up), and it is legally deficient if it does not permit "an ordinary person…to ascertain from the document itself what conduct is proscribed." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1047-48 (9th Cir. 2013). Further, "where the injunction would hinder, rather tha[n] promote, competition in the market," a court may deny injunctive relief.  *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1009 (9th Cir. 2008).  IH's proposed injunction violates these precepts.

*First*, IH's "Duty Not to Discriminate" provision is vague, may require Biosense to provide information to hospitals and doctors that it does not possess, and would prevent procompetitive conduct.

In relevant part, Proposed Injunction § 2.2 states that:

> Biosense is … enjoined from discriminating in the provision
> of Clinical Support….  [B]y way of example only, Biosense
> may not … degrade the availability of Clinical Support … or
> charge a higher price for Clinical Support or for the sale,
> lease, or use of CARTO, because a hospital or doctor has
> used, is using, will use, or may use a Consumable of
> someone other than Biosense.

IH defines "Clinical Support" to include "interpreting maps and providing insight on the images generated by the CARTO…."  Proposed Injunction § 1.4.

-11-

1   To begin, IH is vague in what it means by not "discriminating in"
2   providing clinical support or "degrad[ing]" it.  The language gives no guideposts
3   to what differences are permissible and what differences are discriminatory or
4   degrading.  For example, Biosense Clinical Account Specialists ("CAS") have
5   the knowledge base to answer manufacturing and technical questions about
6   Biosense and SterilMed catheters. Ex. 7, 2025.05.07 AM Tr. 31:8-22, 53:11-22.
7   Biosense CAS do not, however, have access to IH's confidential information
8   sufficient to answer manufacturing and technical questions about IH catheters.
9   Ex. 8, 2025.05.08 AM Tr. 30:21-25, 33:4-10; Ex. 11 2025.05.14 PM Tr. 47:8-
10  24.  As drafted, it is unclear whether the Proposed Injunction would require
11  Biosense CAS to answer such questions, including questions about how those
12  specifications bear on the accuracy of the maps IH's catheters produced.
13  Specifically, IH's inclusion of "interpreting maps and providing insight on the
14  images generated by the CARTO" (Proposed Injunction § 1.4) coupled with the
15  non-discrimination requirement could be read to mean that if Biosense CAS are
16  providing assurances of accuracy about maps generated by Biosense catheters,
17  then they also must do so for maps generated by IH catheters.

18  To be clear, in raising this ambiguity and knowledge gap, Biosense is not
19  relitigating through this motion the relative safety or performance of Biosense
20  and IH catheters.  Nor does Biosense dispute that IH has FDA clearances that
21  find IH devices are substantially equivalent to predicate Biosense devices.  The
22  point is that Biosense does not have the knowledge to make representations
23  about the accuracy of the maps generated with IH or any other third-party
24  reprocessor's devices.

25  It is undisputed that (a) catheter calibration is important for the accuracy
26  of cardiac maps, Ex 8, 2025.05.08 AM Tr. 58:23-59:8; (b) that Biosense does
27  not know what testing IH performs to ensure the accuracy of the catheter
28

-12-

calibration, Ex. 11 2025.05.14 PM Tr. 47:8-24; and (c) that, by contrast, Biosense knows that its catheters and SterilMed's catheters are accurate within 1mm. Ex. 11, 2025.05.14 PM Tr. 31:16-32:1. Further, IH itself considered whether it could make a similar accuracy claim but has not done so. Ex. 10, 2025.05.08 PM 63:3-21; Ex. 16, JX-3858.

Biosense CAS are, therefore, in a position to answer questions about the accuracy of maps created using Biosense and SterilMed catheters, but they simply do not have the information to answer those same questions about IH or other third-party reprocessed catheters. Answering questions about catheter specifications and accuracy should properly fall to the manufacturer, which for reprocessed catheters is the reprocessor. While IH catheters may have the same level of accuracy as Biosense and SterilMed catheters, Biosense cannot represent that to be true. And Biosense cannot make unverified claims about IH products just as Biosense cannot make unverified claims about its own products. To the extent IH would claim that such differential treatment would constitute "discrimination," it highlights the burden of the Proposed Injunction on Biosense, doctors, and patients. Biosense either has to degrade service across the board by refusing to answer questions about maps generated by any manufacturer's catheters, including its own, or Biosense has to make representations about third-party catheters for which it has no factual basis. Neither approach makes sense.

Further, as IH contended at trial, Biosense CAS have two roles that they undertake simultaneously: (a) they provide clinical support and (b) they provide sales and marketing services for Biosense products. Ex. 1, 2025.05.13 AM Tr. 92:16-21; Ex. 7, 2025.05.07 AM Tr. 27:2-25, 28:23-29:18. Making representations or answering questions about devices properly falls into the second category, and requiring Biosense CAS to perform these functions for

-13-

third-party reprocessed devices would, therefore, transform Biosense CAS into marketers for third-party products. Notably, in *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1225 (9th Cir. 1997), the Ninth Circuit considered an injunction provision that would have required Kodak to maintain an inventory of parts for use by independent services organizations ("ISOs"). The Ninth Circuit observed that such a provision would force Kodak to provide a free service for ISOs and modified the injunction to eliminate that requirement. *Id.* Here too, it is inappropriate to include any provision that would require Biosense to act as a marketing service for the benefit of third-party reprocessors.

The non-discrimination provision also may restrict Biosense's ability to price its products on competitive terms. Presently, Biosense does not charge directly for clinical support. As IH's expert acknowledged, Biosense covers the cost of clinical support through the sale of its catheters and other disposable devices. Ex. 9, 2025.05.15 PM Tr. 96:7-18. Supporting reprocessed catheters necessarily increases Biosense's cost without any offsetting revenue. Even if clinical support were priced as a stand-alone service, there are different economics behind a procedure that uses primarily third-party reprocessed catheters and a procedure that primarily uses Biosense catheters. Under the Proposed Injunction, however, Biosense might have to ignore these differences. If Biosense charges nothing when its catheters are used, Biosense would be required to charge nothing when IH reprocessed catheters are used. On the other hand, if Biosense were to charge a fee when IH catheters are used, Biosense must charge the exact same fee when Biosense catheters are used. Under the guise of non-discrimination, IH's Proposed Injunction might, therefore, prohibit Biosense from offering a discount for clinical support if customers purchase more Biosense catheters. But such "[b]undled discounts generally benefit

-14-

1   buyers because the discounts allow the buyer to get more for less." *Cascade*

2   *Health Sols. v. PeaceHealth*, 515 F.3d 883, 895 (9th Cir. 2008).

3        Compounding these issues, the non-discrimination provision is unclear as

4   to how Biosense can allocate current clinical support resources and how it can

5   manage the availability of future resources.  In terms of the allocation of current

6   resources, if a Biosense CAS, for example, is asked to support two cases in her

7   region on the same day—one where the electrophysiologist exclusively uses

8   third-party reprocessed sensor-enabled catheters, and one where at least some

9   Biosense sensor-enabled catheters are used—the proposed injunction provides

10   no practical guidance as to how Biosense should proceed.  To take another

11   example, under IH's theory, if the jury verdict stands and the proposed

12   injunction is ordered, third-party reprocessing share will materially increase.

13   Ex. 4, 2025.05.13 PM Tr. 43:7-44:3.  Under those circumstances, is Biosense

14   required to maintain CAS staffing to support all cases (or, alternatively, support

15   no cases at all)?

16        Although IH cites *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20

17   F.4th 466, 486 (9th Cir. 2021) and *Kodak*, 125 F.3d at 1225-26 to support the

18   non-discrimination language in the Proposed Injunction, those cases are

19   inapposite as they involved the sale of goods, rather than a service.  In such

20   cases, a non-discrimination provision may make sense because the good—

21   telescopes in *Optronic* and spare parts in *Kodak*—will be the same regardless of

22   the circumstances of the sale.  Clinical support, however, will vary based on the

23   catheters used in a procedure, the arrythmias being treated, and the information

24   provided by the catheters.  Ex. 7, 2025.05.07 AM Tr. 27:2-25.  It is not clear

25   what non-discrimination means in such bespoke circumstances, and the non-

26   discrimination term, therefore, risks enmeshing the Court in the "intricacies of

27   business management…." *New York*, 224 F. Supp. 2d at 100.

28

-15-

*Second*, the clinical support provisions in the Proposed Injunction are overbroad and burdensome for Biosense and hospitals.  In an attempt to improperly sweep beyond the conduct at issue, IH seeks an injunction that does not simply enjoin Biosense from continuing its clinical support policy, but broadly prohibits Biosense from "conditioning the availability of CARTO … on the purchase or use of Consumables sold by or for Biosense" with "Consumable" defined as any device "originally manufactured by Biosense for use with CARTO."  Proposed Injunction §§ 1.3, 2.1.

For example, this provision would prevent customers from financing their purchase of a CARTO through a commitment to purchase a set number of Biosense catheters.[6]  This is a common practice to defray the capital expense of acquiring a mapping system from the competing system manufacturers.  Ex. 5, 2025.05.07 PM Tr. 29:10-15; Ex. 10, 2025.05.08 PM Tr. 95:9-14.  IH was aware of this practice but did not challenge it at trial.  Yet such financing arrangements would be covered by the Proposed Injunction because they "condition[] the availability of CARTO … on the purchase … of Consumables sold by or for Biosense."  As a result, hospitals would be restricted in their ability to acquire a CARTO machine, but not a competing machine sold by Abbott or others.  Rather than enhancing competition, this provision would competitively disadvantage Biosense against its competitors and reduce the choices available to hospitals for purchasing a cardiac mapping machine.

At base, given the overbreadth and vagueness of the Proposed Injunction provisions related to clinical support, no injunctive relief is warranted.  *See Greg*

---

[6] Further highlighting its overbreadth, the non-discrimination provision also appears to prohibit such arrangements as it not only includes supposed discrimination in providing clinical support, but also in "the sale, lease, or use of CARTO…."  Proposed Injunction § 2.2.

-16-

*Young*, 2018 WL 836276, at *6 (denying "permanent injunction [that] was ambiguous and went beyond the issues at trial").

**B.    IH is not entitled to injunctive relief for the Falcon chip.**

**1.    IH is not entitled to injunctive relief for past conduct.**

IH would use the Falcon chip as a springboard for a broad injunction. According to both IH and Biosense's witnesses at trial, the Falcon chip was introduced nearly a decade ago, and for the past seven years, IH has reprocessed Biosense catheters notwithstanding this technology. The challenged conduct is stale, and there was no testimony at trial to the contrary. "[A]s a general rule, past wrongs are not enough for the grant of an injunction; instead, an injunction will only issue if the wrongs are ongoing or likely to recur." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 1005 (9th Cir. 2020). Here, IH submitted no proof that Biosense has or intends to implement new blocking technology. The evidence IH relies upon are chips that have been in Biosense's catheters since the inception of the CARTO system and were updated over a decade ago. IH and others have long since found ways to reprocess catheters with those technologies. Ex. 8, 2025.05.08 AM Tr. 109:4-11. In other words, IH identifies no ongoing or "threatened loss" from blocking technology that would entitle it to injunctive relief. 15 U.S.C. § 26.

IH identified two blocking technologies at trial—both overcome by IH years ago. One technology is electronically erasable programmable read-only memory chips ("EEPROM"), Ex. 8, 2025.05.08 AM Tr. 103:21-106:8, and the other is the Falcon chip, a specific type of EEPROM. *Id.* at 108:15-109:3. Biosense has used EEPROMs from the introduction of the CARTO in 1995 even on catheters that cannot be reprocessed, Ex. 11, 2025.05.14 PM Tr. 36:7-37:14, and the Falcon chip was first used in the SoundStar Eco catheter in late 2014. Ex. 11, 2025.05.14 PM Tr. 43:19-44:18. By no later than the end of 2017, IH

-17-

1  had found ways to reprocess catheters with EEPROMs and with the Falcon

2  Chip.  Ex. 8, 2025.05.08 AM Tr. 109:4-6; *see also* Ex. 12, B. Joseph

3  Demonstrative at 5 (indicating technology had been overcome before 2018).

4  That is, IH found ways around this technology over seven and a half years ago.

5  IH identified no other such technology at trial.  And IH sought and received a

6  damages award of $8 million (trebled to $24 million) for purported delays

7  caused by this technology (coupled with the clinical support policy).

8      IH, nonetheless, points to Biosense's consideration of using the Falcon

9  chip in devices other than the SoundStar Eco.  *See* Motion at 16.  But the

10  inclusion of the Falcon chip in new catheters does not change the technology or

11  obstruct IH's ability to reprocess those catheters.  The technology is the same,

12  IH has already overcome it, and it poses no impediment to IH's reprocessing.  In

13  fact, IH's own expert, Forister, admitted as much.[7]

14      IH's only other evidence regarding a threatened loss from new technology

15  is Biosense's consideration nearly ***seven years ago*** of creating a "new version"

16  of the Falcon chip.  *See* Motion at 16 (citing JX-219).  The referenced email

17  from December 2018 does not evince implementation of any such chip.  In fact,

18  Biosense did not develop a new version of the Falcon chip.  Shalgi Decl. ¶¶ 6-8

19  The Falcon chip that Biosense uses in new devices is the exact same technology

20  developed for the SoundStar Eco over a decade ago.  *Id*.  And it could be

21  "defeated" in the same way.  *Id.* ¶¶ 9-10.

22      Because IH relies on technology that is a ***decade old*** and that IH worked

23  around years ago, IH has not carried its burden of demonstrating that it would

24  suffer irreparable harm or lacks a legal remedy absent an injunction.

25

26  [7] Discussing the Octaray catheter, Forister observed that IH "had already

27  defeated [the technology]" in Octaray because it was the same as earlier
    catheters, so the technology "therefore would not cause further delays."  Ex. 2,
    2024.12.02 Forister Report ¶ 178(b).

28

-18-

### 2. The balance of the hardships and public interest weigh against issuing an injunction related to so-called blocking technology.

Beyond IH's failure to identify likely future harm, IH proposes an expansive definition of so-called blocking technology that would stifle innovation to the determinant of patients and, potentially, disrupt the market and inappropriately burden Biosense by requiring a redesign of existing products and products in development (including products unrelated to the challenged conduct). In short, the breadth and ambiguity of the Proposed Injunction would, "in contravention of the goals of antitrust law, stifle … innovation and investment" because they create uncertainty about permissible software and hardware upgrades. *New York*, 224 F. Supp. 2d at 191; *see Kodak*, 125 F.3d at 1225.

IH defines "Technology" to mean any "hardware or software supporting the operation of CARTO or of any Consumable…or on a Consumable." Proposed Injunction § 3.1. Using that broad definition, IH seeks to prohibit the use of "any Technology … that [(a)] conditions the availability or use of CARTO on the purchase or use of Consumables sold by or for Biosense" or "[(b)] prevents the use of the CARTO with Consumables sold by or for someone other than Biosense."[8] *Id.* § 3.2.

In its motion, IH concedes that it only seeks an injunction for "new technology." Motion at 11. At minimum then, the language of the Proposed Injunction must be limited because it does not specify only "new technology"

---

[8] "Consumable" is defined as a "device … originally manufactured by Biosense for use with CARTO." Proposed Injunction § 1.3. Based on that definition, presumably, IH does not intend to enjoin CARTO's closed-system architecture, which requires the use of devices originally manufactured by Biosense, including reprocessed versions of those devices.

and could therefore be read as requiring Biosense to redesign any catheters in development that have an EEPROM or Falcon chip.  But those chips cannot simply be removed.  As IH acknowledged, the chips contain information that allows the CARTO to identify what catheter has been connected and provides the catheter calibration information.  *See* Ex. 8, 2025.05.08 AM Tr. 111:6-10; Ex. 11, 2025.05.14 PM Tr. 36:7-23.  This information is necessary for the operation of the CARTO.  Biosense would likely need to make hardware and software modifications to the catheters with EEPROMs and Falcon chips to store the data in a new way, and Biosense may need to update the software on all CARTO machines in operation so that the redesigned catheters would be recognized by the system.  This redesign would likely take 12-18 months.  Shalgi Decl. ¶ 11.  In the meantime, this would disrupt the availability of these catheters for hospitals (and the availability of used catheters for IH to reprocess).

Accepting IH's limitation of the proposed injunction to future technology, the restriction would have significant implications for innovations related to the CARTO.  The Proposed Injunction is ambiguous regarding what is meant by technology that "conditions the availability or use of CARTO" or "prevents the use of CARTO."  For example, certain features of Biosense catheters are critical to their functioning but make reprocessing more challenging.  As described at trial, Pentaray catheters have a center lumen, Ex. 8, 2025.05.08 AM Tr.  40:14-18, which is a piece of hardware.  Shalgi Decl. ¶ 14.  It prevents blood coagulation and was designed to be the maximum diameter that can fit with the other catheter components.  *Id*.  This design allowed the Pentaray to have more electrodes than previous catheters, providing for faster and more accurate mapping.  *Id*.  IH's witness at trial acknowledged that it faced a lengthy development delay caused by the center lumen because IH had to show FDA

that it could clean the lumen during reprocessing.  Ex 10, 2025.05.08 PM Tr. 22:20-23:17.  The delay was "two years."  *Id.*

At trial, IH did not contend that the center lumen in Pentaray constituted "blocking technology."  Presumably, then the Proposed Injunction would cover something like the EEPROM for which IH contended there was a six-month delay (Ex. 8, 2025.05.08 AM Tr 113:3-5), but not like the center lumen on the Pentaray, which produced a better product for doctors and patients while slowing down reprocessing approval.  But, on its face, the Proposed Injunction does not differentiate the EEPROM and the center lumen.  Both delayed the entry of reprocessors and both are functional components of the catheter.  Accordingly, the Proposed Injunction would create substantial uncertainty for Biosense as it considers developing new products like the Pentaray or upgrades to existing products.  That uncertainty would unnecessarily entangle the Court in business decisions, as Biosense would frequently need to return to the Court seeking clarification about whether particular product features violate the injunction.

Ultimately, courts are "properly very skeptical" about granting relief that would limit a company's ability to make "product design changes" because "firms routinely innovate in the hope of appealing to consumers, sometimes in the process making their products incompatible with those of rivals."  *Microsoft Corp.*, 253 F.3d at 65 (citing *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 544-45 (9th Cir. 1983)).  Preventing even "a monopolist" from "do[ing] the same thing will inevitably deter a certain amount of innovation."  *Microsoft Corp.*, 253 F.3d at 65.  The loss of such innovation is a harm to competition, a harm to the market, and, in the end, a harm to consumers.  By contrast, IH has identified no ongoing or threatened injury from alleged blocking technology.

-21-

1    Accordingly, the balance of hardship and public interest weigh against

2    issuing an injunction related to "blocking technology."

3    **C.    IH is not entitled to injunctive relief for catheter collections.**

4        **1.    IH has not demonstrated harm from catheter collections.**

5    At trial, IH produced no evidence that it suffered harm from Biosense's

6    catheter collection practices, let alone "irreparable injury" in the markets at issue.

7    *Epic Games*, 67 F.4th at 1002.  IH's expert conceded that his damages model did

8    not include Biosense's collections practices (and he provided no basis to believe

9    he was unable to do so).  *See* Ex. 1, 2025.05.13 AM Tr. 91:7-17; Ex. 4, 2025.05.13

10   PM Tr. 6:19-21.  Further, IH employees confirmed that IH had a sufficient supply

11   of catheters at issue to meet consumer demand.  *See* Ex. 1, 2025.05.13 AM Tr.

12   19:1-17 (agreeing that IH has sufficient reprocessed "Biosense sensor-enabled

13   catheters to sell to its customers"); Dkt. 513 at 2; Ex. 13, Cormier Tr. 131:17-21

14   (testifying that IH "could fill any order").  Critically, as this Court observed in

15   denying Biosense's motion *in limine* to exclude evidence on catheter collections,

16   because none of IH's damages were "predicated on the catheter [collection] issue

17   in isolation," evidence regarding catheter collection was relevant only to "the

18   overall intent of Biosense" and "whether barriers to entry exist."  Dkt. 489 at 8 &

19   n.6.   The evidence, then, does not support injunctive relief as to catheter

20   collections.

21   The jury made no finding related to Biosense's catheter collection

22   practices, *see* Dkt. 526 (Verdict Form), and there is no basis to infer an implicit

23   finding of an injury related to catheter collections.  "[A] district court should only

24   include injunctive terms that have a common sense relationship to … conduct for

25   which a defendant has been held liable."  *Metro-Goldwyn-Mayer Studios, Inc. v.*

26   *Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007).  Here, that means

27   the conduct is limited to the catheter "markets" in which IH contended Biosense

28

-22-

1  undertook anticompetitive conduct and there is no basis to consider conduct
2  related to catheters not at issue.  Further, any jury finding of injury would have
3  gone beyond the limited purpose for which this information was introduced.

4      Because there were no findings on the catheters at issue, IH instead focuses
5  on AcuNav.  Motion at 18.  Even as to sales of AcuNav catheters, the record does
6  not support injunctive relief.  IH points to the conclusory statement of David
7  Distel, who stated—without any specific examples or data—that Biosense's
8  collection practice "has greatly impacted" IH  for AcuNav.  *Id.*  But IH neither
9  defined a relevant market encompassing AcuNav nor calculated damages for
10  AcuNav.  Ex. 4, 2025.05.13 PM Tr. 5:19-6:8.  Accordingly, IH cannot rely on
11  AcuNav to demonstrate irreparable harm.  *See, e.g.*, *Malaney v. UAL Corp.*, No.
12  10-cv-02858, 2010 WL 3790296, at *12 (N.D. Cal. Sept. 27, 2010); *Stanislaus*
13  *Food Prods. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1069 (E.D. Cal.
14  2011).

15      Distel's statement also was flatly contradicted by IH's expert, who admitted
16  that IH "had a similar share of sales of AcuNav and ViewFlex catheters." Ex. 4,
17  2025.05.13 PM Tr. 23:19-21.   Both AcuNav and ViewFlex are ultrasound
18  catheters, *id.* at 22:9-21, but ViewFlex is an Abbott catheter that is not subject to
19  Biosense's practices.  Ex. 1, 2025.05.13 AM Tr. 86:20-87:1.  The similarity in
20  sales between AcuNav and ViewFlex is actual evidence that IH's AcuNav sales
21  were unaffected by Biosense's conduct.

22      The undisputed lack of evidence of injury for relevant (and even irrelevant)
23  catheters underscores IH's inability to show irreparable harm in connection with
24  catheter collections.

25
26
27
28

-23-

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION

### 2.    The balance of hardships and public interest weigh against granting injunctive relief related to catheter collections.

The "balance of hardships" between the parties and the "public interest" warrant denial of the proposed provision of the injunction related to catheter collections. *Epic Games*, 67 F.4th at 1002. The Proposed Injunction would disrupt the very interest behind IH's trial strategy: cost savings for hospitals.

Because IH has not shown any injury, the hardship imposed on Biosense by the Proposed Injunction would outweigh any harm to IH. This is particularly true because there is no implicit or explicit finding from the jury related to Biosense's collection practices. For that reason, IH seeks to enjoin conduct that remains lawful. *See Avaya Inc. v. Telecom Labs, Inc.*, No. 06-cv-2490, 2014 WL 2940455, at *8 & n.9 (D.N.J. June 30, 2014).

Regardless, the Proposed Injunction is also unduly burdensome to Biosense, and contrary to the public interest. IH seeks to bar SterilMed and Biosense (but not IH) from collecting hospitals' used catheters that they do not reprocess. But there is demand from hospitals for a third party to collect catheters that are not reprocessed so that the hospitals can recover salvage value and not deal with disposal. Ramos Decl. ¶ 13. In particular, third-party service provider EPRewards purchases used catheters to recover platinum contained in the tip. Ramos Decl. ¶¶ 10-12. When requested by customers, Biosense administers this program for hospitals, and Biosense currently has 360 such contracts. Ramos Decl. ¶¶ 13-14. The injunction would therefore require Biosense to terminate these existing customer contracts, depriving those customers of this service.[9] To be clear, generally, Biosense only collects used catheters that it does not reprocess subject to a contract with customers. Ramos Decl. ¶ 5. Where, as here, an

---

[9] In fact, the overwhelming majority of catheters that Biosense sends to EPRewards are ablation catheters for which no company has reprocessing approval. Ramos Decl. ¶ 16.

-24-

injunction would cancel existing contracts and impose costs and disruption on those customers, it is against the public interest. *See Avaya Inc.*, 2014 WL 2940455, at *8-9. Further, although IH seeks to impose this burden on Biosense, IH itself currently has in place contracts with customers under the EPRewards program. *See* Ex. 14, Chudzik Tr. at 275:8-25, 276:5-15, 279:1-13; Ex. 13, Cormier Tr. at 73:11-24; Ex. 15, Distel Tr. at 216:2-21, 218:6-219:4. Accordingly, rather than leveling the playing field, this provision would provide IH a competitive advantage that does not now exist to compete for customers by offering legitimate services that Biosense would be enjoined from providing.

### D.    There is no basis to require semiannual reports.

Without justification, IH proposes compliance reporting as a means of policing Biosense's conduct. Absent evidence to the contrary, "courts presume that parties will adhere to orders of the Court." *New York*, 224 F. Supp. 2d at 181. Further, "[j]udges must be sensitive to the possibility that the continuing supervision of a highly detailed decree could wind up impairing rather than enhancing competition." *Alston*, 594 U.S. at 102-03 (2021) (cleaned up). Indeed, in this case, there is no basis for requiring compliance reporting because IH, which is in the market, will readily know whether (a) it continues to face difficulty selling its catheters because Biosense is not providing clinical support, (b) whether it has encountered technology that makes reprocessing a catheter difficult, and (c) whether it is facing supply constraints for catheters. The lone precedent IH cites in support of the reporting requirement (Motion at 24) is a price discrimination case, where without reports it would be difficult to ascertain the defendants' compliance because the pricing information would not otherwise be public. *See L.A. Int'l Corp. v. Prestige Brands Holdings, Inc.*, No. 18-6809-MWF (MRWX), 2024 WL 2272384, at *15 (C.D. Cal. May 20, 2024). That is not the case here.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION

### E.    There is no reason for IH's proposed hotline provision.

There is no basis to require that Biosense inform its employees and customers about a hotline that IH wants to create.  Proposed Injunction § 6.2.  IH points to no case in which such a requirement has been imposed as part of a permanent injunction.  *See* Motion at 24.  An order requiring Biosense to notify employees and customers about a IH hotline creates a strong inference that the Court supports IH's hotline.  At the same time, it would undermine Biosense's ability to comply with an injunction, federal and state law, and company policies and values.

J&J already maintains a publicly accessible hotline for "employees, business partners, customers, consumers and others" to report any conduct that violates company "policies or applicable law and regulations" related to Johnson & Johnson or any of its subsidiaries, such as Biosense.  Johnson & Johnson, *Our Credo Integrity Line*, https://www.jnj.com/code-of-business-conduct (last visited June 26, 2025); *see also* Malik Decl. ¶¶ 5-6.  J&J has a rigorous process in place to vet these reports and respond to them.  *Id.* ¶¶ 20-23.  Requiring Biosense to distribute information about another hotline maintained by a third party risks, among other things, that: (a) Biosense will not timely receive and be able to respond to reports submitted to that third party; and (b) employees and customers will be confused about what hotline they should use—potentially leading to issues in which reports about matters unrelated to the Proposed Injunction are mistakenly reported to an IH hotline rather than J&J's Credo Integrity Line.  That would in turn affect J&J's ability to respond to those reports creating unnecessary business, compliance, and legal risk for J&J.

The redundancy, inefficiency, and potential for confusion created by requiring Biosense to disseminate information about a third-party hotline all militate against granting such relief.

-26-

1

2

**F.    There is no basis for the proposed term of the permanent injunction.**

3       The ten-year term that IH seeks for its injunction is inconsistent with

4   recent case law and makes no practical sense given the dynamics of the markets

5   at issue.  "An antitrust decree should endure only so long as necessary to ensure

6   competition."  *New York*, 224 F. Supp. 2d at 184.  Further, an injunction cannot

7   be punitive in nature and must not "embody harsh measures when less severe

8   ones will do."  *Id.* at 100.  Accordingly, the term should be no longer than

9   necessary to further that goal.  *Id.* at 184  In the most recent case in this circuit to

10  enter an injunction in an antitrust case, the court granted only a three-year

11  injunction.  *Google*, 2024 WL 4438249, at *5.  The court reasoned that

12  timeframe was sufficient "to level the playing field for the entry and growth of

13  rivals, without burdening [defendant] excessively."  *Id.*  Notably, that was a case

14  where no monetary remedy was sought and the conduct was ongoing.  *Id.*  Here,

15  while no equitable relief is necessary or should issue, a three-year term would

16  similarly be more than sufficient.  IH, and other reprocessors such as Stryker,

17  are already in the market.  As IH acknowledged, it has sufficient supplies of

18  catheters to meet demand, *see supra* at 23, and it already has reprocessing

19  contracts with 250 hospitals across the country.  Ex. 7, 2025.05.07 AM Tr.

20  57:25-58:3.

21      IH asserts that it will take "time to dismantle Biosense's anticompetitive"

22  conduct but provides no justification.  If, as IH contends, it was the clinical

23  support policy that has hampered use of certain reprocessed catheters,

24  elimination of that policy should promptly address the issues.

25      No injunction is warranted here, but in any case, ten years is unnecessary

26  and punitive, and three years would be more consistent with recent precedent.

27

28

-27-

## IV. CONCLUSION

For the forgoing reasons, IH's motion for a permanent injunction should be denied.

DATED: June 26, 2025                    STRADLING YOCCA CARLSON & RAUTH LLP

By: */s/ Karla Kraft*
    Karla Kraft

PATTERSON BELKNAP WEBB AND TYLER LLP

By: */s/ William F. Cavanaugh, Jr.*
    William F. Cavanaugh, Jr.

LINKLATERS LLP

By: */s/ Muhammad U. Faridi*
    Muhammad U. Faridi

Attorneys for Defendant
BIOSENSE WEBSTER, INC.

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Biosense Webster, Inc., certifies that this brief contains 6,984 words, which:

☒ complies with the word limit of L.R. 11-6.1.

☐ complies with the word limit set by court order dated _____.

Dated: June 26, 2025

*/s/ Karla Kraft*_____
KARLA KRAFT

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION