# EXHIBIT 9

```
                    UNITED STATES DISTRICT COURT

                   CENTRAL DISTRICT OF CALIFORNIA

              HONORABLE JAMES V. SELNA, JUDGE PRESIDING

INNOVATIVE HEALTH, LLC,         )
                                )
                                )
                                )
                Plaintiff,      )
                                )
                                )
                                )
       Vs.                      )   No. SACV-19-01984-JVS
                                )
                                )
                                )
BIOSENSE WEBSTER, INC.,         )
                                )
                                )
                                )
                Defendant.      )
                                )
_____ )



              REPORTER'S TRANSCRIPT OF PROCEEDINGS

                          JURY TRIAL

                       DAY 7, VOLUME II

                     SANTA ANA, CALIFORNIA

                     THURSDAY, MAY 15, 2025



MIRIAM V. BAIRD, CSR 11893, CCRA
OFFICIAL U.S. DISTRICT COURT REPORTER
350 WEST FIRST STREET
FOURTH FLOOR
SANTA ANA, CA 92701
```

1                           **INDEX**

2    **WITNESS:**                                              **PAGE:**

3
     **Lawrence Wu, Defendant's witness, previously**              5
4    **sworn**
     **DIRECT EXAMINATION RESUMED**                                5
5    **CROSS-EXAMINATION**                                        62
     **REDIRECT EXAMINATION**                                     73
6    **Eric Forister, Plaintiff's witness, sworn**                75
     **DIRECT EXAMINATION**                                       76
7    **CROSS-EXAMINATION**                                        95

8                           *****

9
     **EXHIBITS:**
10
     Exhibit 1148 received                                        19
11   Exhibit 949  received                                        22
     Exhibit 953  received                                        28
12   Exhibit 1142 received                                        36
     Exhibit 1143 received
13   Exhibit 1143 received                                        37
     Exhibit 1159 received                                        37
14   Exhibit 1144 received                                        38
     Exhibit 1157 received                                        38
15   Exhibit 1145 received                                        40
     Exhibit 1158 received                                        41
16   Exhibit 1156 received                                        42
     Exhibit 5009 received                                        72
17
                            *****
18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| | 1 | A. So broadly he looks at Innovative Health's sales, |
| | 2 | prices, and profits in the read world. What he has to do is |
| | 3 | to predict what Innovative's profit, sales, and costs would |
| | 4 | be in a world without the clinical support policy. You might |
| 02:13PM | 5 | hear the term but-for world. The but-for world is a world |
| | 6 | where there is no clinical support policy. |
| | 7 | So he has to predict the prices in that world for |
| | 8 | Innovative. He has to predict the costs that Innovative |
| | 9 | would have in that world. He would have to figure out how |
| 02:13PM | 10 | much reprocessing is done in that world. And you have to get |
| | 11 | those right. Then he's going to compare the profits under |
| | 12 | those two scenarios. |
| | 13 | Q. So how did you approach your review of his damages |
| | 14 | model? |
| 02:14PM | 15 | A. So I approached it by trying to figure out does he get |
| | 16 | the prices right; does he get the cost right; does he get the |
| | 17 | amount of reprocessing right in the but-for world -- that is, |
| | 18 | the world without clinical support. |
| | 19 | When I looked at it, I found that there were three |
| 02:14PM | 20 | main flaws in the methodology he used to get there. |
| | 21 | Q. So let's walk through those. |
| | 22 | A. The first flaw is in order to figure out how much |
| | 23 | reprocessing would be done and the prices that Innovative |
| | 24 | would have, he has to have the right benchmarks. |
| 02:14PM | 25 | What's the benchmark that you want to look at to |

1  figure out how much reprocessing, for example, would be done
2  in the but-for world.  He has to have benchmarks, and he has
3  chosen the wrong benchmarks.
4  Q.   What's the second?
5  A.   The second is that there were issues in how he treated
6  the distribution costs.  So he did not fully account for
7  distribution costs in the but-for world.  In the real world
8  Innovative had a distribution relationship with a company
9  called Medline, and there were sales made by IH to Medline
10 that never made it into the hands of a hospital or doctor.
11        So that's overstating the sales, so I made
12 corrections for that.  That shows up in the orange.  That's
13 the next -- that's the second block.
14 Q.   And let's go to -- what's the third?
15 A.   The third flaw has to do with free-riding.  He is
16 assuming that in a world without a clinical support policy,
17 every time an Innovative Health catheter is used, it's going
18 to get supported by Biosense.
19        So that's not right because it's assumed that it's
20 a world where Innovative is not bearing any cost of clinical
21 support.
22 Q.   And if you make those deductions, what happens to his
23 $139 million in lost-profit damages.
24 A.   So if you make those calculations, then all of his
25 damages go away.

```
02:16PM
```

1  Q.  Okay.  So let's talk about the first one, benchmark.
2  Again, what is -- what's the purpose of the benchmark?
3  A.  So the purpose of a benchmark is you want to find a
4  catheter that is most similar or comparable, okay, but not
5  affected by the clinical support policy.  So very similar,
6  not affected.  That's what you want to do.
7           MR. CAVANAUGH:  Go to the next slide.
8  BY MR. CAVANAUGH:
9  Q.  So what benchmark -- for calculating damages relating to
10 the Biosense SOUNDSTAR, what benchmark catheter did
11 Dr. Forister use?
12 A.  Okay.  So this is the Biosense SOUNDSTAR.  That's the
13 catheter on the left.  Dr. Forister is using the benchmark,
14 the Abbott ViewFlex, which is the one on the right.  The one
15 that I think is a better benchmark is the one in the middle,
16 which is a Biosense ACUNAV.
17 Q.  Why do you think that's better?
18 A.  The SOUNDSTAR is a mapping catheter.  It also is an
19 ultrasound catheter.  Okay.  Now, the reason the Biosense
20 ACUNAV is the most similar is the Biosense ACUNAV is made by
21 the same manufacturer that makes the SOUNDSTAR.  Siemens.
22           It's -- it's also very similar because the ACUNAV
23 also can be plugged into the same Siemens ultrasound machine,
24 which is what the SOUNDSTAR gets plugged into.  It's just
25 very similar in that way.

|       |    |                                                                       |
|-------|----|-----------------------------------------------------------------------|
|       | 1  | rebuttal is supposed to be addressed to whatever                      |
|       | 2  | pro-competitive justifications we put forward.  That is what          |
|       | 3  | counsel indicated.                                                    |
|       | 4  |       MR. HO:  Safety is one of their biggest |
| 03:25PM | 5 | pro-competitive justifications.                                      |
|       | 6  |       THE COURT:  Overruled.            |
|       | 7  | BY MR. HO:                                                            |
|       | 8  | Q.   Were there other studies that you relied on as well?             |
|       | 9  | A.   Yes, several other studies.                                      |
| 03:26PM | 10 | Q.   Could you explain, please.                                      |
|       | 11 | A.   Well, there's studies generally about different types of         |
|       | 12 | medical devices that included catheters, comparing                    |
|       | 13 | reprocessed and new.  That included electrophysiology                 |
|       | 14 | catheters like the kinds at issue here.                               |
| 03:26PM | 15 |       The academic studies have consistently found that |
|       | 16 | reprocessed medical devices are as safe as or safer than new          |
|       | 17 | devices, which was consistent with the complaint data and the         |
|       | 18 | MAUDE data on deaths and injuries.                                    |
|       | 19 | Q.   Now, in your opinion as an economist, even assuming that         |
| 03:26PM | 20 | there were a concern or a debate about the safety of                 |
|       | 21 | reprocessed catheters, would it be appropriate in your view           |
|       | 22 | for Biosense to implement the case coverage policy as a               |
|       | 23 | solution to that?                                                     |
|       | 24 | A.   No, it would not.                                                |
| 03:27PM | 25 | Q.   Why not?                                                        |

    1    A.    Well, once the FDA has approved for reprocessing a catheter, then the doctors and the hospitals are best suited to choose what's best for the patient.  If there was free and fair competition, they would be able to make that choice, and what we would expect to see in economics is that the best and safest catheters would be the ones with the largest sales volume.

    Q.    Now, Dr. Forister, you heard Dr. Wu offer the opinion that the case coverage policy is a solution to a free-riding problem.  Do you recall that?

    A.    Yes.

    Q.    Does that make sense to you?

    A.    No, it does not.

    Q.    Could you explain why, please.

    A.    In particular the mappers, the clinical account specialists, are profit center for Biosense.  They're not a cost center, not a net cost center.  I spoke earlier about the evidence that each of the mappers every year is bringing in 1.5 to 2 million dollars of revenue.  That more than covers their cost.

        Biosense thinks in two months of work, they've covered their year's payroll.  That's why Biosense wants to get its mappers into the hospitals, so it can make more money.  That's why Biosense and all other manufacturers provide their mappers for free, because of the revenue that

| | | |
|---|---|---|
| | 1 | they're able to gain from doing so. |
| | 2 | Q.   Do you recall Dr. Wu testifying that in his view |
| | 3 | interbrand competition -- in other words, competition between |
| | 4 | Biosense and Abbott and Medtronic -- is sufficient to protect |
| 03:28PM | 5 | hospitals against anti-competitive effects? |
| | 6 | A.   I heard him say that. |
| | 7 | Q.   Do you agree with that? |
| | 8 | A.   No, I do not. |
| | 9 | Q.   Why not? |
| 03:28PM | 10 | A.   Well, because the evidence in this case shows that even |
| | 11 | with competition between the mapping machines, Biosense was |
| | 12 | still able to force hospitals to pay more for its catheters |
| | 13 | and receive lower quality. |
| | 14 |         So this competition between the machines did not |
| 03:29PM | 15 | protect the hospitals from having to pay inflated prices for |
| | 16 | lower quality catheters. |
| | 17 | Q.   Do you recall Dr. Wu saying that switching from one |
| | 18 | brand of machine to another is easy? |
| | 19 | A.   Yes. |
| 03:29PM | 20 | Q.   And do you recall he put up a slide about Sutter Health? |
| | 21 | A.   I wasn't here, but I understand that that was the slide. |
| | 22 | Q.   And do you have -- do you find that compelling? |
| | 23 | A.   No. |
| | 24 | Q.   Can you explain why. |
| 03:29PM | 25 | A.   Again, this gets back to the facts in this case.  Sutter |

|  |  |
|---|---|
|  | 1 | **CROSS-EXAMINATION** |
|  | 2 | BY MR. CAVANAUGH: |
|  | 3 | Q.   Dr. Forister, you gave some testimony regarding Biosense |
|  | 4 | declining to train mappers at hospitals.  Were you here this |
| 03:41PM | 5 | morning for Cheryl Saxby's testimony? |
|  | 6 | A.   No. |
|  | 7 | Q.   She testified:  And what were the results of that |
|  | 8 | conversation?  A, Biosense Webster offered to train our staff |
|  | 9 | for mapping. |
| 03:42PM | 10 |        And just so it's clear, Cheryl Saxby is at |
|  | 11 | Providence St. Joseph's Hospital, the associate vice |
|  | 12 | president of specialty sourcing. |
|  | 13 |        MR. HO:  Objection, Your Honor.  There's no |
|  | 14 | question. |
| 03:42PM | 15 | BY MR. CAVANAUGH: |
|  | 16 | Q.   So you were unfamiliar with that testimony? |
|  | 17 | A.   Correct.  I was not here. |
|  | 18 | Q.   So now that you've heard it, do you have any reason to |
|  | 19 | believe Ms. Saxby is lying? |
| 03:42PM | 20 | A.   No. |
|  | 21 | Q.   So, in fact, Biosense did offer to train the staff at |
|  | 22 | Providence St. Joseph's hospital? |
|  | 23 | A.   According to what you've said. |
|  | 24 | Q.   Okay.  And you're also aware that Biosense trained |
| 03:42PM | 25 | Mr. DeTate, right? |

|        |    |                                                                            |
|--------|----|----------------------------------------------------------------------------|
|        | 1  | A.   Yes.                                                                  |
|        | 2  | Q.   And he was not an employee of Biosense, correct?                      |
|        | 3  | A.   He was in the past an employee of Biosense.                           |
|        | 4  | Q.   But he was doing work and he was also trained by                      |
| 03:43PM| 5  | Biosense, correct?                                                         |
|        | 6  | A.   He was trained by Biosense.                                           |
|        | 7  | Q.   You also talked about clinical account specialists                    |
|        | 8  | continuing to provide support for procedures when Innovative               |
|        | 9  | Health or Stryker reprocessed catheters were being used,                   |
| 03:43PM| 10 | correct?                                                                   |
|        | 11 | A.   Yes.                                                                  |
|        | 12 | Q.   Okay.  And you talked about how the CASs generate                     |
|        | 13 | revenue for Biosense, correct?                                             |
|        | 14 | A.   Yes.                                                                  |
| 03:43PM| 15 | Q.   And that revenue is from the sale of Biosense catheters,              |
|        | 16 | not Innovative catheters, correct?                                         |
|        | 17 | A.   Correct.  The catheters at issue, the ablation catheters              |
|        | 18 | and other disposables like the reference patches.                          |
|        | 19 | Q.   Thank you.                                                            |
| 03:44PM| 20 |          MR. CAVANAUGH:  Nothing further, Your Honor.                      |
|        | 21 |          MR. HO:  Nothing further, Your Honor.                             |
|        | 22 |          THE COURT:  Okay.                                                 |
|        | 23 |          Ladies and gentlemen, you've now heard all the                    |
|        | 24 | evidence in the case.  I'm going to ask you to come back at                |
| 03:44PM| 25 | 8:30 tomorrow, at which time I'll instruct you on the law,                 |

|  |  |  |
|---|---|---|
|  | 1 | we'll hear the closing arguments, and then the case will be |
|  | 2 | given to you. |
|  | 3 | You indicated in your note yesterday that you only |
|  | 4 | wanted to go tomorrow to 3:30.  Is there a conflict? |
| 03:44PM | 5 | THE JUROR:  I don't know how compelling it's going |
|  | 6 | to be, a long-standing wedding that's happening of a best |
|  | 7 | friend of mine.  I want to go to the rehearsal and the |
|  | 8 | dinner.  The big event starts at 5:00 o'clock.  It's in Del |
|  | 9 | Mar.  You know, that thought was that if we were going to |
| 03:45PM | 10 | have to go to Tuesday anyway, then -- |
|  | 11 | THE COURT:  Well, let's -- if that's the case, |
|  | 12 | we'll quit at 3:30.  Okay. |
|  | 13 | Okay.  Ladies and gentlemen, I'm going to excuse |
|  | 14 | you at this time.  Please remember the admonition not to |
| 03:45PM | 15 | discuss the case with anyone and not to form any opinions on |
|  | 16 | the issues in the case until it's submitted to you. |
|  | 17 | So we'll see you tomorrow at 8:30. |
|  | 18 | (Open court - jury not present) |
|  | 19 | THE COURT:  Sir, you may step down. |
| 03:46PM | 20 | When do you want to formally address your 50(a) |
|  | 21 | motions?  You want to get yours on file, right? |
|  | 22 | I'll ask you to come in at 7:30 tomorrow.  We'll |
|  | 23 | take a last pass on the instructions and the form of the |
|  | 24 | verdict.  We'll deal with the 50(a) motions.  At this point |
| 03:46PM | 25 | I'm not likely to grant either, but I remind you that if it |