# EXHIBIT 10

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3       HONORABLE JAMES V. SELNA, JUDGE PRESIDING

4   INNOVATIVE HEALTH, LLC,            )
                                       )
5                                      )
                                       )
6                      Plaintiff,      )
                                       )
7                                      )
                                       )
8           Vs.                        )   No. SACV-19-01984-JVS
                                       )
9                                      )
                                       )
10  BIOSENSE WEBSTER, INC.,            )
                                       )
11                                     )
                                       )
12                     Defendant.      )
                                       )
13  _____   )

14

15

16        REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                  JURY TRIAL

18               DAY 3, VOLUME II

19             SANTA ANA, CALIFORNIA

20           THURSDAY, MAY 8, 2025

21  MIRIAM V. BAIRD, CSR 11893, CCRA
    OFFICIAL U.S. DISTRICT COURT REPORTER
22  350 WEST FIRST STREET
    FOURTH FLOOR
23  SANTA ANA, CA 92701

24

25

 1                              **INDEX**

 2     **WITNESS:**                                        **PAGE:**

 3       **Blessan Joseph, Plaintiff's witness, previously sworn**
         **CROSS-EXAMINATION**                              **6**
 4       **REDIRECT EXAMINATION**                           **23**
         **RECROSS-EXAMINATION**                             30
 5       **Dave Distel, plaintiff's witness, sworn**         31
         **DIRECT EXAMINATION**                              31
 6       **CROSS-EXAMINATION**                               57
         **REDIRECT EXAMINATION**                            74
 7       **Mary Roberts, Plaintiff witness, sworn**          77
         **DIRECT EXAMINATION**                              77
 8       **CROSS-EXAMINATION**                               93
         **REDIRECT EXAMINATION**                           103
 9       **RECROSS-EXAMINATION**                            103

10                              * * * * *

11

       **EXHIBITS:**
12
         Exhibit 109 received                                7
13       Exhibit 110 received                                9
         Exhibit 112 received                                9
14       Exhibit JX875 received                             13
         Exhibits 875.1 and 875.2 received                  13
15       Exhibit 4056 received                              15
         Exhibit 4057 received                              15
16       Exhibit 505.8 received                             18
         Exhibit JX120 received                             19
17       Exhibit 4070 received                              19
         Exhibit 4069 will be received                      20
18       Exhibit 3957 received                              46
         Exhibit 3969 received                              49
19       Exhibit 4352 received                              51
         Exhibit 3929 received                              54
20       Exhibit 1391 received                              59
         Exhibit 3858 received                              61
21       Exhibit 136 received                               64
         Exhibit 5046, first e-mail, received               72
22       Exhibits 204, 207, and 209 received               105

23                              * * * * *

24

25


                    **UNITED STATES DISTRICT COURT**

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 01:34PM | 5 |

Q.   All right.  And then failed -- I thought there was

another one.  Failed -- memory read failure.  Do you see

that?

A.   Yes.

Q.   What is memory read failure?

A.   This is when our system is not able to read the

information from the memory chip.

Q.   If we could turn to JX110.  This relates to the PENTARAY

catheter, correct?

A.   Yes.

        MR. CAVANAUGH:  Your Honor, we'd move 110 into

evidence.

        MR. QUIRK:  No objection, Your Honor.

        THE COURT:  110 will be received.

        **(Exhibit 110 received)**

BY MR. CAVANAUGH:

Q.   And here at login, 14.5 percent.  And at the second --

at the floor stage, again 43 percent?

A.   Correct.

Q.   If we go to JX112.

        MR. CAVANAUGH:  Your Honor, we'd move JX112 into

evidence.

        MR. QUIRK:  No objection, Your Honor.

        THE COURT:  112 will be received.

        **(Exhibit 112 received)**

| | |
|---|---|
| | 1 |

```
                    MR. CAVANAUGH:  If we can go to the first page.
```

1                MR. CAVANAUGH:  If we can go to the first page.

2    BY MR. CAVANAUGH:

3    Q.    This is for the SOUNDSTAR eco?

4    A.    That is correct.

01:35PM  5    Q.    23 percent at login and 25 percent on the floor?

6    A.    Correct.

7    Q.    Now, you gave some testimony regarding testing that you

8    do.  You don't test your reprocessed catheters against the

9    calibration data that was in the original OEM catheter,

01:36PM  10    correct?

11    A.    That is correct.  We're not testing against the

12    calibration data that is in the chip already, no.

13    Q.    What you're doing is you're testing the strength of the

14    signal?  Is that -- is that a fair statement?

01:36PM  15    A.    We are testing the response of the coil from the

16    magnetic field that it would be detecting.

17    Q.    Just that it was -- just that it would be detectable?

18    A.    If you want to go into the -- if you want me to go into

19    the details, we are testing at multiple frequencies and

01:36PM  20    energies to see what the response of that coil would be at

21    all of those frequencies.

22    Q.    Let me turn to a different subject.  You were talking

23    about the timestamp that's in the E prompt, correct?  Now,

24    that information about when the catheter was used, when the

01:37PM  25    original OEM catheter was used, that's contained in the

microchip, right?

A.    That information is written onto the microchip by the CARTO system when it's plugged in for the first time.

Q.    So when a doctor actually -- when he or she uses it, that's recorded there on the microchip?

A.    At the time of use, yes.

Q.    Okay.  And the chip prevents reuse of that after a 24-hour period, correct?

A.    The chip prevents the reuse of that catheter once that is separated from that procedure.

Q.    For 24 -- it can be used within a 24-hour period, correct?

A.    As I understand it, that catheter -- that timestamp will allow to use in a procedure with a patient.  And if that patient is on the table for 24 hours, that catheter can be used for that long.

Q.    Now, the inclusion of a timestamp in a catheter goes back to the 1990s; doesn't it?

A.    I'm not aware of that.

Q.    Okay.  It predates the FDA even approving the idea of reprocessed catheters; doesn't it?

A.    I'm not aware of that.

Q.    You weren't in the business in the 1990s, correct?

A.    I was not in the business.

Q.    Now, the restriction on reusing a catheter based on a

1  coming from for these projects.

2  Q.   If we go back to the document which you referred to

3  earlier in preparation for your deposition, the summary.

4  A.   In the summary that I created for the dates for these

01:56PM  5  projects, especially when we attempted the EEPROM efforts,

6  are much earlier than this versus the project initiated at

7  Innovative with a project number and a system.  That might be

8  what this date is referring.

9        But if you are talking about EEPROM-related

01:56PM  10  efforts, we were doing those in parallel and connecting the

11  dots here.  ACUNAV being the same device as SOUNDSTAR without

12  the location sensor and the EEPROM, we had to get the

13  clearance for the ACUNAV first to show we can clean that

14  device.

01:57PM  15        That's the baseline that we stood on when we

16  submitted for SOUNDSTAR 3D.  It's always an evolution of one

17  over the other.

18  Q.   And does this refresh your recollection that the

19  document that was utilized at your deposition and created by

01:57PM  20  your company for purposes of this deposition listed a project

21  initiated date of May 5, 2017?

22  A.   As I clarified, that project initiation is the specific

23  project number, project documentation that we initiated

24  internally.  But research and development department, in

01:57PM  25  order to attempt for the EEPROM-related efforts, we had

```
          1   started much earlier.

          2           When a project is initiated internally, once it's

          3   official, that's when I am pulling in resources from other

          4   departments so that everybody can join in and combine the

01:58PM   5   efforts to get that to the 510(k) effort.  Initially the

          6   EEPROM-related efforts are being done by research and

          7   development.

          8   Q.   And by July of 2017 you had dealt with whatever issues

          9   were being raised by the EEPROM chip, correct?

01:58PM  10   A.   For which product line are you referring to here?

         11   Q.   For the PENTARAY.

         12   A.   Right.  For PENTARAY, EEPROM effort was resolved, yeah.

         13   Q.   July of 2017?

         14   A.   July of 2017.  Project initiated on July of 2017.

01:59PM  15   510(k) was submitted on November 29, 2017.  Somewhere in

         16   that, right before the 510(k) was submitted, would have been

         17   sometime where we had the EEPROM resolution done.  But I will

         18   have to look at that detailed Excel sheet to know exactly

         19   when.

01:59PM  20   Q.   Now, that 510(k) that you -- for PENTARAY that you filed

         21   in November of 2017, that was rejected by the FDA, correct?

         22   A.   That was rejected for the lumen-specific clearance.

         23   They needed to see that we are showing safety.  That was the

         24   aspect.  They didn't see the full results.

02:00PM  25   Q.   So you couldn't begin selling a PENTARAY in November of
```

| | |
|---|---|
| 1 | 2017 because you had to address a lumen issue, correct? |
| 2 | A.   Yes.  We had to resolve the lumen and get the clearance |
| 3 | in order to be able to sell the device in the market. |
| 4 | Q.   And it took your company another two years to resolve |
| 02:00PM  5 | the lumen issue, correct? |
| 6 | A.   Well, that's when we worked on that patent that I |
| 7 | discussed earlier to get that resolved and submitted to -- |
| 8 | Q.   Could you just answer my question, which is:  It took |
| 9 | you two years to resolve the lumen issue, right? |
| 02:00PM 10 | A.   It took us two years to complete that testing. |
| 11 | Q.   All right. |
| 12 | So you couldn't sell a PENTARAY until the lumen |
| 13 | issue was resolved, correct? |
| 14 | A.   Correct. |
| 02:01PM 15 | Q.   And the lumen issue has absolutely nothing to do with |
| 16 | the EEPROM chip, correct? |
| 17 | A.   No, it has nothing to do with the EEPROM chip. |
| 18 | Q.   Thank you. |
| 19 | MR. CAVANAUGH:  Nothing further, Your Honor. |
| 02:01PM 20 | THE COURT:  Redirect? |
| 21 | MR. QUIRK:  Briefly, Your Honor. |
| 22 | **REDIRECT EXAMINATION** |
| 23 | BY MR. QUIRK: |
| 24 | Q.   Mr. Joseph, the document that counsel handed to you and |
| 02:01PM 25 | which wasn't shown to the jury, document 114, did you create |

1    that spreadsheet?

2    A.   No, not this spreadsheet.  This looks like a modified

3    version of that.

4    Q.   Does that spreadsheet include all the dates for

02:02PM  5    initiation and completion of projects that you had on your

6    original spreadsheet?

7    A.   No, it doesn't.

8    Q.   Biosense's counsel asked you the effect of the EEPROMs

9    on the different catheters.  Do you recall that?

02:02PM  10    A.   Yes.

11    Q.   How effective was Biosense's blocking chip for the

12    SOUNDSTAR 3D?

13    A.   It had -- the chip was -- the details were encrypted, so

14    we had to resolve that, but that chip was not locked.  As in

02:02PM  15    when the device is used with the CARTO, a timestamp is

16    recorded but the chip was not locked, which means that once

17    we understood the methodology, once we understood where the

18    timestamp was, we had the freedom to remove that and bring

19    the chip back to the original state as it was made by

02:03PM  20    Biosense Webster.

21         So that, yeah, in comparison to eco, it had one

22    less challenge in comparison.

23    Q.   Can you explain the additional technicality of the

24    SOUNDSTAR eco.

02:03PM  25    A.   Yes.  SOUNDSTAR eco in this scenario going to a much

|     |     |
| --- | --- |
| 1 | reject that up front. |
| 2 | Q.   Biosense's counsel asked you about calibration as well, |
| 3 | correct? |
| 4 | A.   Yes. |
| 02:09PM 5 | Q.   If a -- if we can leave that exhibit up. |
| 6 |       If a catheter fails a calibration test, is that |
| 7 | reflected on the reject rate report? |
| 8 | A.   If it fails on the location sensor testing, then, yeah, |
| 9 | it would be listed as well. |
| 02:09PM 10 | Q.   Where is that? |
| 11 | A.   That would be the location sensor failure listed under |
| 12 | memory write failure. |
| 13 | Q.   If the calibration data is no longer accurate, that |
| 14 | would be reflected on that line, correct? |
| 02:09PM 15 | A.   Yes.  Any -- well, any device that has a coil location |
| 16 | sensor that is not functioning correctly will be rejected, |
| 17 | and that number reflects that. |
| 18 | Q.   How many catheters are rejected for that reason in this |
| 19 | report? |
| 02:10PM 20 | A.   It looks like 59. |
| 21 | Q.   How many are rejected total for the entire report? |
| 22 | A.   For that particular line or the total? |
| 23 | Q.   The total. |
| 24 | A.   Grand total is 3,991. |
| 02:10PM 25 | Q.   Can we go to the right, please. |

| | |
|---|---|
| 1 | A.    Oh, quality rejected total is 5,544. |
| 2 | Q.    They say never to do public math, but 59 divided by |
| 3 | 5,500 is approximately what rate? |
| 4 | A.    One percent. |
| 02:10PM 5 | Q.    That means one percent are failing for location sensor |
| 6 | testing? |
| 7 | A.    Approximately.  Here it looks like we are rejecting |
| 8 | about one percent of our devices that we are testing for |
| 9 | failed location sensors. |
| 02:11PM 10 | MR. QUIRK:  No further questions, Your Honor. |
| 11 | THE COURT:  Recross? |
| 12 | **RECROSS-EXAMINATION** |
| 13 | BY MR. CAVANAUGH: |
| 14 | Q.    The location sensor testing you're referring to, that's |
| 02:11PM 15 | using your test, correct? |
| 16 | A.    That is our testing where we establish baseline using |
| 17 | brand-new devices from Biosense Webster.  And what we are |
| 18 | doing is we are comparing our device's performance of the |
| 19 | coil after it's reprocessed to a new device. |
| 02:11PM 20 | Q.    It's not based on calibration? |
| 21 | A.    It is not based on calibration.  It's purely the coil |
| 22 | performance. |
| 23 | Q.    Thank you. |
| 24 | THE COURT:  Sir, you may step down.  Thank you. |
| 02:11PM 25 | Would you call your next witness, please. |

| | |
|---|---|
| 1 | MR. GOLDSMITH:  Your Honor, Innovative calls Dave |
| 2 | Distel.  We're getting him now. |
| 3 | THE COURT:  Good. |
| 4 | MR. GOLDSMITH:  Your Honor, Ms. Schiffman will |
| 02:12PM  5 | inquire. |
| 6 | MS. SCHIFFMAN:  Your Honor, may I approach with the |
| 7 | binders? |
| 8 | THE COURT:  You may. |
| 9 | **Dave Distel, plaintiff's witness, sworn** |
| 02:12PM 10 | THE CLERK:  Would you please state your full name, |
| 11 | spelling your last name for the record. |
| 12 | THE WITNESS:  Name is Dave Distel, D-i-s-t-e-l. |
| 13 | **DIRECT EXAMINATION** |
| 14 | BY MS. SCHIFFMAN: |
| 02:13PM 15 | Q.  Good afternoon, Mr. Distel. |
| 16 | A.  Good afternoon. |
| 17 | Q.  Please tell the jury where you work. |
| 18 | A.  I work at Innovative Health. |
| 19 | Q.  How long have you worked at Innovative? |
| 02:13PM 20 | A.  A little over eight years. |
| 21 | Q.  What do you do there? |
| 22 | A.  I'm the vice president of business development. |
| 23 | Q.  What degrees do you hold? |
| 24 | A.  I have a bachelor's in nursing from Duquesne University. |
| 02:13PM 25 | I have a master's in nursing with an emphasis in anesthesia |

1    Q.    Are all of those relationships ongoing?

2    A.    The first two are.  The Medline relationship is winding

3    down.

4    Q.    Are you familiar with the sales of Innovative catheters

02:17PM  5    through those channels?

6    A.    I am.

7    Q.    How are you familiar with that?

8    A.    One, from the sales data, but all of the inventories are

9    stored at our warehouse in Scottsdale.  So if somebody is

02:17PM 10    placing an order through Premier or through Medline, the

11    customer places a purchase order that goes to that entity,

12    and those orders are then sent to us.  So we have to package,

13    ship everything, so we have visibility to it.

14    Q.    Now, focusing on those other channels, how do their

02:18PM 15    sales of reprocessed CARTO 3 sensor-enabled catheters compare

16    to the sales of Innovative's other reprocessed catheters?

17    A.    They, too, do well with the regular diagnostic

18    catheters, but their performance on the sensor-enabled

19    catheters mirrors what we see with very little sales.

02:18PM 20    Q.    Are you familiar with the types of catheters needed to

21    conduct an electrophysiology procedure?

22    A.    I am.

23    Q.    What are they?

24    A.    Generally if it's a mapping procedure, it's going to be

02:18PM 25    diagnostic catheters, the mapping catheters and ablation

          1   catheters, and the ultrasound catheters.

          2   Q.    Are all of those catheters reprocessable?

          3   A.    They are not.

          4   Q.    Which one is not?

02:18PM   5   A.    Certainly the ablation catheter is not.

          6   Q.    What are ablation catheters?

          7   A.    Ablation catheters are used to deliver energy.  So when

          8   the physician is treating the arrhythmia in the heart, if you

          9   will, like a short circuit, it either delivers heat or

02:19PM  10   another form of energy, radio frequency to cause a disruption

         11   or to stop that electrical signal.

         12   Q.    What are hospitals' options for purchasing ablation

         13   catheters?

         14   A.    They can only purchase them brand-new from the

02:19PM  15   manufacturer.

         16   Q.    Are you familiar with how much a new ablation catheter

         17   costs?

         18   A.    In the area of $3,200.

         19   Q.    Is there anything else hospitals must always buy new

02:19PM  20   from Biosense?

         21   A.    The reference patches that are used that are put on the

         22   patient's chest to generate the signals needed for the

         23   catheters, they must buy them.

         24   Q.    Are you familiar with how much those patches cost?

02:19PM  25   A.    Approximately $500 a set.

1    Q.    Are you aware of anything else hospitals must buy from

2    Biosense to do an electrophysiology procedure?

3    A.    Well, in buying the console -- the computer, if you

4    will -- there's also occasional upgrades called modules that

02:20PM  5    they would have to buy, service contracts which essentially

6    are a warranty.

7    Q.    Okay.  Now let's talk about devices that can be

8    reprocessed.  Can you give me an example of one.

9    A.    There are quadripolar catheters, for instance.

02:20PM 10    Q.    Okay.  If a hospital wanted to buy all of its

11    quadripolar catheters reprocessed, could it?

12    A.    Not likely.  The reason is because different devices can

13    be reprocessed a different number of times.  Some devices are

14    more fragile than other devices, and some devices may be able

02:20PM 15    to be done one time and some may be able to be done up to

16    three times.

17          We take a conservative approach, as maintaining

18    clinicians that are happy with the performance of the device

19    is more important than trying to get an additional sale.  So

02:21PM 20    the client always has to be buying new product to replace

21    that deficit.

22    Q.    Shifting gears a bit, did Innovative look into setting

23    up a mapper training program?

24    A.    We did.

02:21PM 25    Q.    What prompted that?

|       |                                                                  |
|-------|------------------------------------------------------------------|
| 1     | Q.   The fourth step.                                             |
| 2     | A.   Again, it's placed in a cart in a separate drawer to       |
| 3     | protect it.                                                       |
| 4     | Q.   Why is it important to store used ultrasound catheters      |
| 5     | in this way?                                                      |
| 6     | A.   The handles of the ultrasound catheters are actually        |
| 7     | fairly heavy.  We also collect cables and reprocess them for     |
| 8     | many hospitals, and cables are heavy.  When you have heavy       |
| 9     | items on top of these not only in the drawer but when you're    |
| 10    | shipping, that's what will damage the catheters.                |
| 11    | Q.   Have you seen Sterilmed collection bins?                    |
| 12    | A.   I have.                                                      |
| 13    | Q.   Can you please look in your binder at Exhibit 3929.         |
| 14    | A.   (Witness complies.)  I'm there now.                          |
| 15    | Q.   What is this?                                                |
| 16    | A.   This is an e-mail chain with the top e-mail being from     |
| 17    | Hayden McLean to myself and Conor Daly of Medline, dated         |
| 18    | March 3rd of 2020, subject, forward EP collections.             |
| 19    |        MS. SCHIFFMAN:  Your Honor, we'd move to admit           |
| 20    | Exhibit 3929.                                                     |
| 21    |        MR. FARIDI:  No objection, Your Honor.                    |
| 22    |        THE COURT:  3929 will be received.                        |
| 23    |        **(Exhibit 3929 received).**                              |
| 24    | BY MS. SCHIFFMAN:                                                 |
| 25    | Q.   What is this e-mail about?                                   |

Time stamps in left margin: 02:44PM (line 5), 02:44PM (line 10), 02:44PM (line 15), 02:45PM (line 20), 02:45PM (line 25)

1    A.    This e-mail is about Sterilmed had been actually

2    collecting at Lakeland, and this was an account that Medline

3    and I were now bringing on board.  They were contacted and

4    saw that the catheters were not being collected in a very

02:45PM    5    good way.

6    Q.    Is there a picture included in the e-mail?

7    A.    There is.

8    Q.    What does this show?

9    A.    It shows a trash can being used for collections, and

02:45PM    10    it's overflowing with both EP catheters and ultrasound

11    catheters.

12    Q.    What does this picture tell you?

13    A.    It's not a very serious reprocessing program because,

14    one, you would never let anything like this overflow for many

02:46PM    15    reasons, but this is setting all the catheters up to be

16    damaged.  Then you would have a low yield rate of what you

17    could send back to the client.

18    Q.    Have Biosense's collection practices impacted

19    Innovative?

02:46PM    20    A.    That depends on which catheters and products you're

21    talking about.

22    Q.    How about with the ACUNAV?

23    A.    The ACUNAV, it has greatly impacted us because they

24    require many clients to collect the ACUNAV, many of which are

02:46PM    25    not even buying it back.  And that's a very high-in-demand

```
 1    catheter with clients.
 2    Q.    What about the SOUNDSTAR?
 3    A.    The SOUNDSTAR, while they're collecting it, many of
 4    their clients, there are still enough SOUNDSTARs that come in
 5    to me.  And because of the Biosense Webster case coverage
 6    policy and not really being able to sell them back, I'm
 7    swimming in SOUNDSTARs.
 8    Q.    You just mentioned the case coverage policy?
 9    A.    Yes.
10    Q.    At a high level, from your perspective how has the case
11    coverage policy impacted Innovative Health?
12    A.    It's really been devastating to both Innovative and our
13    clients that had views that they wanted to have substantial
14    savings.
15          We as a company, when we started, we didn't want to
16    be a me, too, reprocessor.  We wanted to do the high-end
17    items that would bring the most value to the client because
18    there's always new technologies that are coming to the
19    marketplace which continue to drive the costs in healthcare.
20          So we've pursued those, like the mapping catheters,
21    the SOUNDSTARs.  We got the clearances, and we fully expected
22    to be able to sell them.  And not only are they the products
23    that would generate the absolute most savings for the
24    hospital, but they also would have generated the most revenue
25    for us.
```

|   |   |
|---|---|
| | 1 |

Q.   Thank you, Mr. Distel.

                MS. SCHIFFMAN:  I pass the witness.

                MR. FARIDI:  Your Honor, may I approach with the
cross-examination binders?

02:48PM          THE COURT:  You may.

                MR. FARIDI:  Thank you.

                        **CROSS-EXAMINATION**

BY MR. FARIDI:

Q.   Good afternoon, Mr. Distel.  My name is Muhammad Faridi.

02:49PM   Very nice to meet you.

A.   You, too, sir.

Q.   I want to just pick up from the conversation that you
were having on direct examination with your counsel about the
e-mail exchange that you had with Megan McCabe that's at

02:49PM   JX4352.  Do you recall that e-mail exchange?

A.   I do, sir.

Q.   And that's the occasion where Ms. McCabe noted that she
was in dire need of SOUNDSTARs because of a backorder issue
at Biosense Webster.  Do you recall that?

02:49PM   A.   I do.

Q.   And you had SOUNDSTARs to sell to the hospital, correct?

A.   I did.

Q.   And your testimony was that you weren't able to sell
those SOUNDSTARs to this hospital that was in dire need of

02:50PM   them because of Biosense's case coverage policy.  Do you

1    This is in an e-mail that you sent to Rick Ferreira, among

2    others.  You say there that:  Biosense Webster claims

3    correctly that they are the only ones that can calibrate

4    their catheters.  True statement, correct?  Yes?

02:57PM  5    A.   Based on what Noah told me, that they are the only ones

6    with that machine, yes.

7    Q.   Did you put the word correctly there in that e-mail?

8    A.   I did.

9    Q.   And then you go on to say:  And there are only three

02:57PM  10   machines in the world that can perform this function, and

11   they own all of them.  Your statement?

12   A.   That's what I was told and what I wrote.

13   Q.   Right.  And then actually look at next bullet point, and

14   there you say fact, correct?  You use the word fact?

02:57PM  15   A.   You'll have to blow it up a little bit.  I'm sorry.

16   Thank you.

17   Q.   Do you see that statement beginning with the word fact?

18   A.   Yes, I do.

19   Q.   Let's take a look at the fact that you wrote down there:

02:57PM  20   When a sensor-enabled catheter is manufactured, it is

21   calibrated, and the calibration information unique to that

22   chip is written into the catheter chip, correct?

23   A.   Correct.

24   Q.   And then let's take a look at the next bullet.  We'll

02:58PM  25   blow up the full bullet point.  You say there:  When a

1    sensor-enabled catheter is reprocessed, the chip calibration

2    information for each catheter is not altered.

3         And then you go on to say:  Instead, the catheter

4    is tested in a magnetic field to verify the actual accuracy

02:58PM  5    versus the calibration data, question mark.  And in red you

6    say:  Biosense Webster kept citing one millimeter accuracy

7    standard.  The BSW reprocessed SOUNDSTAR eco marketing piece

8    is attached.

9         Then in underline you state:  We must in my opinion

02:58PM 10    be able to replicate the claims made on page 4.  And page 4

11    is from the Biosense marketing materials, correct?

12    A.   It is.

13    Q.   Okay.  And your company has not been able to make this

14    one millimeter accuracy claim made by Biosense Webster,

02:59PM 15    correct?  Yes or no, please.

16    A.   I don't know that -- the exact engineering data.  We've

17    not made that claim because I haven't had a need.

18    Q.   Let me reask that question.  Yes or no, sir?  Your

19    company has not been able to make a claim of one millimeter

02:59PM 20    accuracy, correct?

21    A.   We have not made that claim.

22    Q.   Thank you.  And -- but you claimed earlier, did you not,

23    sir, that you weren't able to sell catheters to Trinity

24    because of Biosense's clinical account policy, correct?

02:59PM 25    A.   I did.

1    Q.   You talked about the supply chain for catheters during

2    direct examination.  Do you recall that?

3    A.   Yes.

4    Q.   And you are aware, sir, that the number of catheters

02:59PM  5    collected by your company has increased over time, correct?

6    A.   As our customer base has grown, yes.

7    Q.   Let's actually take a look at Exhibit 136, which we

8    offer.

9    A.   (Witness complies.)  I'm there.

03:00PM  10   Q.   These are materials prepared for your board of directors

11   meeting, correct?

12   A.   I'm reviewing.

13            MR. FARIDI:  We offer 136, Your Honor.

14            MS. SCHIFFMAN:  No objection, Your Honor.

03:00PM  15            THE COURT:  The exhibit will be received.

16            **(Exhibit 136 received)**

17   BY MR. FARIDI:

18   Q.   Let's go to 136.  I want to go over to page 9 of the

19   exhibit.  This is slide seven from the October 2019 meeting

03:00PM  20   materials.  You'll see here, sir, that this shows a steady

21   increase in collections of catheters from 2018 to 2019,

22   correct?

23   A.   I agree.

24   Q.   Sir, is it true that Innovative Health, your company,

03:01PM  25   never actually performed any financial modeling to determine

```
          1    Q.   I want to touch on a couple of issues there.  Just as an

          2    initial matter, Ms. Roberts, it's true, right, that

          3    Providence uses multiple different cardiac mapping systems in

          4    its EP labs?

03:58PM   5    A.   Yes.

          6    Q.   And their systems include the CARTO 3, right?

          7    A.   Yes.

          8    Q.   And those systems include Abbott's cardiac mapping

          9    system?

03:58PM  10    A.   Yes.

         11    Q.   Boston Scientific?

         12    A.   Yes.

         13    Q.   Ms. Roberts, when it comes down to individual EP labs at

         14    Providence, many of those individual labs also have more than

03:59PM  15    one mapping system, right?

         16    A.   Yes.

         17    Q.   In fact, I think you mentioned St. Jude's just up in

         18    Fullerton.  It's true that St. Jude's, Providence St. Jude

         19    has both a CARTO and an Abbott system in the lab, correct?

03:59PM  20    A.   Yes.

         21    Q.   You testified earlier that Providence relies on Biosense

         22    to support cases, correct?

         23    A.   Yes.

         24    Q.   It's also true, though, that Providence doesn't rely

03:59PM  25    only on Biosense's CARTO 3 system for cardiac mapping
```

UNITED STATES DISTRICT COURT

procedures, correct?

A.   Not that I'm aware of.

Q.   And you'd agree that, for example, if Providence has a
mapping system from Abbott, for example, in addition to the
03:59PM  CARTO 3, then Providence has the choice to move some mapping
procedures to Abbott if Providence is unhappy with Biosense's
prices or policies, right?

A.   Yes.

Q.   Again, just in terms of choices that you were testifying
04:00PM  about, Ms. Roberts, with respect to the initial purchase of
cardiac mapping systems, you also understand that the cost of
the mapping system can be financed through the purchase of
disposables like catheters, right?

A.   Yes.

04:00PM  Q.   That means to purchase a mapping system, hospitals like
Providence don't have to invest significant money up front,
correct?

A.   Not that I'm aware of.

Q.   Ms. Roberts, in June of 2020 you gave a presentation to
04:00PM  a group at Providence called the cardiovascular council,
correct?

A.   Possible.

Q.   You recall giving a presentation to the cardiovascular
council at Providence, correct?

04:00PM  A.   Yes.

| | |
|---|---|
| 1 | Q.   And the cardiovascular council at Providence, of course, |
| 2 | is a group from across the Providence health system that |
| 3 | considers best practices in electrophysiology, correct? |
| 4 | A.   Yes. |
| 04:01PM  5 | Q.   Ms. Roberts, in that presentation in June of 2020, you |
| 6 | proposed to the cardiovascular council at Providence that |
| 7 | Providence increase its use of mapping systems other than |
| 8 | Biosense's mapping system, correct? |
| 9 | A.   I don't recall. |
| 04:01PM 10 | Q.   So it's your testimony today that you don't recall ever |
| 11 | recommending to the cardiovascular council that Providence |
| 12 | increase its use of mapping systems other than the CARTO 3? |
| 13 | A.   I don't recall. |
| 14 | Q.   Ms. Roberts, why don't you open up your binder.  You |
| 04:01PM 15 | remember being deposed in this case, correct? |
| 16 | A.   Yes. |
| 17 | Q.   And you remember you swore to tell the truth -- |
| 18 | A.   I did, yes. |
| 19 | Q.   -- just like you did today? |
| 04:01PM 20 | I direct you, Ms. Roberts, in your binder to your |
| 21 | deposition at page 63, lines 2 through 6.  I'm just going to |
| 22 | read this into the record: |
| 23 | "Question:  So you were proposing in this |
| 24 | presentation to utilize other mapping systems more often in |
| 04:02PM 25 | lieu of the Biosense mapping system; isn't that true?" |