KARLA KRAFT
State Bar No. 205530
kkraft@stradlinglaw.com
STRADLING YOCCA CARLSON &
RAUTH LLP
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660-6422
Telephone: (949) 725-4000

WILLIAM F. CAVANAUGH, JR.
State Bar No. 133461
wfcavanaugh@pbwt.com
PATTERSON BELKNAP WEBB
AND TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2000

MUHAMMAD U. FARIDI
(Admitted *Pro Hac Vice*)
LINKLATERS LLP
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 903-9000

Attorneys for Defendant
BIOSENSE WEBSTER, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INNOVATIVE HEALTH LLC, | CASE NO. 8:19-cv-01984-JVS-KES |
| Plaintiff, | Hon. James V. Selna |
| vs. | **DEFENDANT'S NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV P. 50(B)** |
| BIOSENSE WEBSTER, INC., | |
| Defendant. | **Complaint Filed**: October 18, 2019 |
| | **Hearing Date**: August 11, 2025<br>**Time**: 1:30pm<br>**Courtroom**: 10C |

- 1 -

STRADLIN
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
15799374

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Defendant Biosense Webster, Inc. ("Biosense") hereby moves the Court, pursuant to Federal Rule of Civil Procedure 50(b), for a renewed motion for judgment as a matter of law in Biosense's favor on all claims brought by Plaintiff Innovative Health, LLC ("IH").

This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities in support thereof, the Court's record, and on such oral and documentary evidence as the Court may consider.

DATED: July 3, 2025

STRADLING YOCCA CARLSON & RAUTH LLP

By: */s/ Karla Kraft*
    Karla Kraft

PATTERSON BELKNAP WEBB AND TYLER LLP

By: */s/ William F. Cavanaugh, Jr.*
    William F. Cavanaugh, Jr.

LINKLATERS LLP

By: */s/ Muhammad U. Faridi*
    Muhammad U. Faridi

Attorneys for Defendant
BIOSENSE WEBSTER, INC.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-2-
DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
15799374

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................8

LEGAL STANDARD.......................................................................10

ARGUMENT ...............................................................................11

I.   IH FAILED TO PROVE THAT BIOSENSE HAD MARKET
     POWER ...............................................................................11

     A.   No Evidence of Supracompetitive Prices ...................................11

     B.   No Evidence That Biosense Increased Prices for Its Catheters 13

     C.   No Evidence That Biosense Restricted Output..........................13

     D.   No Evidence That Biosense Decreased the Quality of Its
          Products..........................................................................14

     E.   IH Cannot Prove Competitive Harm Under the Rule of Reason
          Analysis Due to Its Failure to Prove Market Power.................16

II.  IH FAILED TO PROVE A SEPARATE MARKET FOR CLINICAL
     SUPPORT .............................................................................16

III. IH FAILED TO PROVE THE ALLEGED SINGLE-BRAND
     AFTERMARKETS ....................................................................19

     A.   Customers Calculate Lifecycle Prices of Biosense's Cardiac
          Mapping System .............................................................19

     B.   No Significant Switching Costs Exist.....................................20

     C.   Evidence of Cross-Elasticity of Demand Contradicts IH's
          Proposed Single-Brand Market.............................................21

     D.   The Clinical Support Policy Was Generally Known.................23

IV.  IH FAILED TO PROVE ANTITRUST INJURY ...............................24

V.   IH'S CLAIMS UNDER SECTION 2 OF SHERMAN ACT FAIL AS
     A MATTER OF LAW .................................................................26

     A.   IH's Section 2 Claims Fail for the Same Reasons As Those
          Under Section 1...............................................................26

     B.   Evidence Regarding the Alleged Blocking Technology and
          Catheter Collection Is Insufficient to Support IH's Section 2
          Claims or the Alleged Damages .............................................27

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-3-

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

15799374

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

VI.   IH'S CARTWRIGHT ACT CLAIMS FAIL AS A MATTER OF LAW ................................................................................28

    A.    The Cartwright Act Does Not Apply Extraterritorially............28

    B.    The *Per Se* Rule Is Inapplicable to the Alleged Tie Under the Cartwright Act..........................................................29

CONCLUSION .........................................................................30

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
15799374

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahn v. Stewart Title Guar. Co.*,
  93 Cal. App. 5th 168 (2023).........................................................................28

*In re Air Passenger Comput. Rsrvs. Sys. Antitrust Litig.*,
  694 F. Supp. 1443 (C.D. Cal. 1988), *aff'd sub nom. Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991) ......................................15

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ....................................................................................24

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ....................................................................................25

*In re Capacitors Antitrust Litig.*,
  No. 17-md-02801, 2020 WL 6462393 (N.D. Cal. Nov. 3, 2020)...............29

*Cascade Health Sols. v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008) ......................................................................24

*In re Cipro Cases I & II*,
  61 Cal. 4th 116 (2015).................................................................................29

*In re Citric Acid Antitrust Litig.*,
  No. C-95-4578, 1996 WL 116827 (N.D. Cal. Mar. 12, 1996)....................29

*Corwin v. L.A. Newspaper Serv. Bureau, Inc.*,
  4 Cal. 3d 842 (1971)....................................................................................30

*Dreamstime.com, LLC v. Google LLC*,
  54 F.4th 1130 (9th Cir. 2022)......................................................................21

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ................................................................................9, 17

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023)................................................................ *passim*

*Fed. Trade Comm'n v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020).......................................................................26

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

15799374

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

*Fontana Pipe & Fabrication, Inc. v. Ameron, Inc.*,
  921 F.2d 279 (9th Cir. 1990) ........................................................................29

*In re HIV Antitrust Litig.*,
  No. 19-CV-02573, 2022 WL 22609107 (N.D. Cal. Sept. 27, 2022) ...........28

*Lakeside-Scott v. Multnomah Cnty.*,
  556 F.3d 797 (9th Cir. 2009) ...............................................................10, 13

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) .....................................................................................24

*Morrison v. Viacom, Inc.*,
  66 Cal. App. 4th 534 (1998) .........................................................................24

*N. Pac. Ry. Co. v. United States*,
  356 U.S. 1 (1958) .........................................................................................30

*Newcal Indus., Inc. v. Ikon Off. Sols., Inc.*,
  No. C04-2776 FMS, 2004 WL 3017002 (N.D. Cal. Dec. 23, 2004) ...........27

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018) .....................................................................................11

*Paladin Assocs., Inc. v. Montana Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) ......................................................................24

*Photovest Corp. v. Fotomat Corp.*,
  606 F.2d 704 (7th Cir. 1979) ........................................................................22

*Pool Water Prods. v. Olin Corp.*,
  258 F.3d 1024 (9th Cir. 2001) ......................................................................24

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ........................................................................13

*Siegel v. Chicken Delight, Inc.*,
  448 F.2d 43 (9th Cir. 1971) .................................................................. 25, 26

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) ........................................................................26

*Sullivan v. Oracle Corp.*,
  51 Cal. 4th 1191 (2011) ................................................................................29

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
15799374

*Tan Lam v. City of Los Banos*,
    976 F.3d 986 (9th Cir. 2020) ........................................................15

*U.S. Steel Corp. v. Fortner Enters., Inc.*,
    429 U.S. 610 (1977) ....................................................................25

*WarnerNo v. Tinder Inc.*,
    105 F. Supp. 3d 1083 (C.D. Cal. 2015).......................................29

*WhitServe, LLC v. Comput. Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) ......................................................11

*Yammine v. Toolbox for HR Spolka Z Ograniczona Odpowiedzialnoscia
    Spolka Komandytowa*,
    No. 24-1390, 2025 WL 957825 (9th Cir. Mar. 31, 2025)..............8

**Other Authorities**

Fed. R. Evid. 103(b) .........................................................................15

Fed. R. Civ. P. 50(b) .................................................................8, 10, 30

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
15799374

Pursuant to Fed. R. Civ. P. 50(b), Defendant Biosense Webster, Inc. ("Biosense") respectfully renews its Motion for Judgment as a Matter of Law because the evidence at trial permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.

## PRELIMINARY STATEMENT

The fundamental premise of IH's tying theory was that Biosense possessed market power in a distinct market for clinical support services (a market that, as described below, was not shown). Biosense provided that service for free. This left IH to hang its case on the claim that Biosense used its market power to charge supracompetitive prices for its Original Equipment Manufacturer ("OEM") catheters in separate alleged single-brand catheter markets, thereby barring competition rather than simply *competing with a competitor*. But at trial, IH presented no evidence that Biosense was charging supracompetitive prices. As such, IH failed to demonstrate—because it cannot do so—market power and the exercise of such power to harm competition.

In fact, the evidence showed that Biosense charged competitive prices and the quality of these products continuously improved. IH's expert, Dr. Forister, further conceded in his testimony that Biosense increased the output for both clinical support and the relevant catheters.[1] IH's failure to show market

---

[1] For the avoidance of doubt, Biosense continues to object to Dr. Forister's opinions regarding market power, causation, his damages model, and his market definition methodology as set forth in Biosense's Daubert Motion (Dkt. 341). All such objections are preserved for appeal and need not be renewed here. *Yammine v. Toolbox for HR Spolka Z Ograniczona Odpowiedzialnoscia Spolka Komandytowa*, No. 24-1390, 2025, WL 957825, at *1 (9th Cir. Mar. 31, 2025) (stating that a party's "evidentiary ruling challenges are not forfeited by [its] failure to make a Rule 50(b) motion, because [its] evidentiary claims are not predicated on insufficiency of the evidence"). But as discussed herein, even with Dr. Forister's inadmissible testimony, IH has not made a legally sufficient claim.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-8-

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
15799374

1    power is fatal to all of its claims, and the judgment should be entered for

2    Biosense on all claims for this reason alone.

3          Beyond market power, Biosense is entitled to judgment as matter of law

4    for five additional reasons.  *First*, IH failed to prove a separate and distinct

5    clinical support market, a threshold element of IH's tying claims under both the

6    Sherman Act and the Cartwright Act.  It is settled law that "to be considered two

7    distinct products, there must be sufficient consumer demand so that it is efficient

8    for a firm to provide" the products separately.  *Eastman Kodak Co. v. Image*

9    *Tech. Servs.*, 504 U.S. 451, 462 (1992) (citation omitted).  There is no dispute

10   that all cardiac mapping system manufacturers provide clinical support for free

11   as part of their system offerings.  While some hospitals may have once self-

12   supported, the growing competition among different system competitors and

13   complexity of the technology made self-support inefficient.

14          *Second*, IH failed to prove the single-brand aftermarkets it alleged.  IH

15   was required to prove *each of* the four *Epic Games* factors, including (1) lack of

16   general knowledge of the challenged restrictions, (2) significant information

17   costs preventing accurate life-cycle pricing; (3) significant switching costs, and

18   (4) that principles regarding cross-elasticity of demand do not undermine the

19   proposed single-brand market.  *Epic Games v. Apple*, 67 F.4th 946, 977 (9th Cir.

20   2023).  Evidence at trial made clear that cross-elasticity of demand *obviated* the

21   existence of IH's proposed aftermarkets because customers do switch between

22   mapping systems in response to a price change.  IH also failed to prove the other

23   three factors.

24          *Third*, IH also failed to prove an antitrust injury.  At trial, IH claimed lost

25   profits due to lower prices for its own products caused by Biosense's clinical

26   support policy.  But a competitor's inability to increase prices and take more

27   market share is not the type of injury that the antitrust laws were intended to

28

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-9-

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
15799374

1  prevent.  Furthermore, IH's expert did not disentangle the prices of clinical

2  support and catheters to show that the price for the two together is

3  supracompetitive, which dooms both IH's allegations of market power and

4  antitrust injury.

5      *Fourth*, IH's Section 2 monopolization claims fail for the same reasons as

6  those under Section 1 of the Sherman Act.  While IH introduced evidence of

7  "blocking technology" and SterilMed's catheter collection practices, IH did not

8  plead any claims relating to either set of conduct separate from the alleged tie,

9  and IH's entire damage claim was premised on the tie.  From the beginning of

10  this case to the end, all roads lead back to Biosense's clinical support policy.

11      *Finally*, IH's Cartwright Act claims fail as a matter of law because

12  California's Cartwright Act does not apply extraterritorially (*i.e.*, outside

13  California).  IH cannot rely only on its nationwide damages model to prove

14  California-specific damages.  Furthermore, the *per se* rule is inapplicable here.

15      For each of the foregoing reasons, judgement should be entered as a

16  matter of law in Biosense's favor and against IH.

17                    **LEGAL STANDARD**

18      Federal Rule of Civil Procedure 50(b) authorizes a party to renew a Rule

19  50(a) motion for judgment as a matter of law.  In ruling on the renewed motion,

20  a court may: "order a new trial" or "direct the entry of judgment as a matter of

21  law."  Fed. R. Civ. P. 50(b).

22      "Judgment as a matter of law is proper when the evidence permits only

23  one reasonable conclusion and the conclusion is contrary to that reached by the

24  jury."  *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009)

25  (citation omitted).  "[A] reasonable inference cannot be supported by only

26  threadbare conclusory statements instead of significant probative evidence."  *Id*.

27  "[G]eneral and conclusory testimony" by experts "is not enough to be …

28

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-10-

15799374

1  substantial evidence in support of a verdict." *WhitServe, LLC v. Comput.*

2  *Packages, Inc.*, 694 F.3d 10, 24 (Fed. Cir. 2012).

3  <u>ARGUMENT</u>

## I.  IH FAILED TO PROVE THAT BIOSENSE HAD MARKET POWER

All of IH's claims were contingent on IH showing that Biosense had market power in the alleged relevant markets.  IH failed to make that showing.

In determining market power, IH must show that Biosense priced its clinical support and catheters "above a competitive level" and that Biosense had "the ability to raise price profitably by restricting output." *Ohio v. Am. Express Co.*, 585 U.S. 529, 549 (2018) (citation modified).  IH failed to put forth any evidence that Biosense priced its clinical support or its catheters above a competitive level.  Nor did IH prove that Biosense increased prices, reduced output, or lowered the quality of its products.

### A.  No Evidence of Supracompetitive Prices

As an initial matter, the parties agreed that Biosense charged zero dollars for its clinical support.  *See, e.g.,* Ex. 1 at 58:1-4; [2]  Ex. 2 at 127:9-24.  Biosense and other OEMs who compete with Biosense offer free clinical support for their systems.  *See* Ex. 3 at 39:8-15, 101:11-24.  Biosense did not charge ***any*** price above a competitive level for its clinical support and, in fact, charged exactly what all of its competitors charge: $0.

Recognizing that these facts demonstrated the absence of market power, IH contended that Biosense used its alleged market power to charge supracompetitive prices for its catheters.  But the evidence presented to the jury showed the opposite as to each of the catheters at issue:

---

[2] "Ex. __" are exhibits to the accompanying Cavanaugh Declaration.  "JX-__" are trial exhibits.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

15799374

- Biosense's Pentaray catheters were priced lower than the average prices of comparable catheters from Boston Scientific and Abbott. Ex. 4 at 41:11-14.

- The prices for Lasso Nav catheters were competitive relative to comparable catheters.  Ex. 5 at 37:25-38:6; JX-1144.

- And Dr. Forister admitted that between 2013 and 2024, the average price of a SoundStar catheter was comparable or lower than the average price of an AcuNav catheter—a nearly identical product except that AcuNav does not have a magnetic sensor and is not affected by the clinical support policy.  Ex. 4 at 40:21-41:3.

Furthermore, Dr. Forister admitted that IH's profit margin for its catheters was higher than Biosense's.  Ex. 4 at 18:16-20:8.  Despite this evidence, IH contended that the price of SoundStar catheters somehow became supracompetitive between 2017 and 2023 when the cost of making SoundStar catheters (due to increased demand) went down.  Ex. 6 at 68:25-69:9.  However, this argument does not work because an analysis of supracompetitive pricing must be based on SoundStar's *price* relative to competitive products, not SoundStar's *costs*.  And IH has no answer to SoundStar's pre-2017 pricing, let alone the pricing pre-policy.

IH's supracompetitive pricing argument focused on the fact that Biosense's *new* catheters are priced higher than IH's *reprocessed* catheters. *See* Ex. 6 at 68:15-21.  Comparing prices of new catheters with used catheters, however, says nothing about competitive pricing levels because it is an apple to orange comparison (*e.g.*, nobody would compare the prices of new cars with used version of the same vehicles to conclude that the new car dealer's prices are high).  The appropriate, apples-to-apples comparison should have been either (1) between prices of new catheters, or (2) between prices of SterilMed's and

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

15799374

IH's reprocessed catheters. As Dr. Wu's testimony and other evidence showed, SterilMed's reprocessed catheters are priced similarly to IH's and Stryker's reprocessed catheters. *See* Ex. 5 at 38:24-39:11; *see also* JX-1157; JX-1158. IH produced no evidence that prior to the implementation of Biosense's clinical support policy, OEM and reprocessed catheters were similarly priced. The simple undisputed fact is that reprocessed catheters have always been priced lower than new OEM catheters, regardless of the implementation of the clinical support policy. *Id.*

### B.    No Evidence That Biosense Increased Prices for Its Catheters

IH also presented no evidence, other than Dr. Forister's conclusory opinions, that prices for the catheters at issue increased because of the policy. *See* Ex. 6 at 75:9-22. Unsupported conclusions by experts are insufficient to support a verdict, especially where probative fact evidence adduced to the jury is to the contrary. *Lakeside-Scott*, 556 F.3d at 802. The evidence actually showed that the average price of the catheters at issue did not increase in the three years after the full implementation of the policy. *See* Ex. 5 at 33:12-34:22; JX-1142; JX-1143; JX-1144. And even looking at a longer period, between 2013 and 2023, the average price of a Pentaray catheter only increased 2.91 percent. Ex. 4 at 41:15-19. Similarly, the average price of a SoundStar catheter only increased 5.39 percent over the same ten-year period. *See* Ex. 4 at 41:4-10. This means that Biosense's catheter prices (adjusted for inflation) have either ***remained stable or decreased over the last decade***. *See* Ex. 4 at 41:4-42:6.

### C.    No Evidence That Biosense Restricted Output

"[T]he essence of market power" is "[t]he ability to control output and prices." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995) (citation omitted). At trial, evidence showed that far from restricting output, Biosense actually ***increased*** the supply of its clinical support and catheters to

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

15799374

-13-

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

meet growing demand.  Ex. 4 at 44:24-46:2.  Since 2010, the volume of U.S. ablation procedures increased significantly, in part, because of Biosense's continuous technology enhancements.  JX-3725 at 15; Ex. 7 at 43:2-23.  Both Dr. Forister and Dr. Wu agreed that Biosense did not restrict the output of clinical support or any catheters at issue in response to the increased demand. According to Dr. Wu, Biosense increased the output of the catheters at issue significantly in the last decade, and the number of electrophysiology cases covered by Biosense clinical account specialists ("CAS") continuously grew over the same period.  *See* Ex. 5 at 39:21-40:23; 94:17-24; JX-1145; JX-1140. Dr. Forister, moreover, conceded that, from 2015 to 2020, the number of cardiac mapping procedures using the CARTO 3 increased at a faster rate than the overall number of cardiac mapping procedures.  *See* Ex. 4 at 44:24-45:9.  That is, Biosense increased its supply of catheters faster than the market demand for mapping procedures.  Similarly, Dr. Forister agreed that the number of mapping procedures covered by Biosense's clinical support grew at a faster rate than the demand for CARTO 3 mapping procedures.

**D.    No Evidence That Biosense Decreased the Quality of Its Products**

IH failed to show that Biosense decreased the quality of clinical support or the catheters at issue.

With respect to clinical support, there was no evidence of any decline in the quality of services provided by Biosense's CASs.  Quite to the contrary, IH argued it wanted Biosense's services to help IH sell its catheters ***because of the high quality of those services***.  Indeed, as IH's own physician witness Dr. Doshi acknowledged, Biosense "do[es] an amazing job at training their own folks to support [procedures]."  Ex. 1 at 25:20-25.

IH, on the other hand, focused on the supposed inferiority of Biosense/Sterilmed catheters relative to IH's catheters.  But IH's only evidence

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-14-

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
15799374

on this point was Dr. Forister's testimony based on a limited sample of unvetted customer complaints and using MAUDE data in an unintended manner.  Ex. 6 at 79:17-25.  The parties' physician witnesses *agreed* that Biosense has been continuously improving the quality and accuracy of the catheters at issue and upgrading its technology.  Indeed, Dr. Doshi testified that Biosense's system is "amazing" and its products become more "sophisticated as time has gone by." *See* Ex. 1 at 25:20-25.  Drs. Doshi and Osorio further testified that Biosense's continuous technology upgrades transformed "everything" by improving the speed and accuracy of electrophysiology procedures and the physician's ability to treat patients.  Ex. 8 at 28:22-29:11; 39:21-40:12.  As an economist, Dr. Forister is neither qualified nor knowledgeable to testify about the comparative quality of IH's and Biosense's catheters.[3]

In another attempt to prove market power, IH presented evidence of Biosense's CARTO 3 market share.  *See* Ex. 6 at 66:25-67:2; 114:21-24.  But market share is, in itself, an "insufficient indicator of market power."  *In re Air Passenger Comput. Rsrvs. Sys. Antitrust Litig.*, 694 F. Supp. 1443, 1456 (C.D. Cal. 1988), *aff'd sub nom. Alaska Airlines v. United Airlines,* 948 F.2d 536 (9th Cir. 1991).  Evidence showed, moreover, that Biosense's competitors have a dominant market share at many hospitals.  *See, e.g.,* Ex. 9 at 30:23-31:1 (Abbott

---

[3] Biosense continues to object to the Court permitting Dr. Forister to rely on the MAUDE data, as set forth in Biosense's motion *in limine*.  *See* Dkt. 342.  Because the district court has definitively ruled on Biosense's *in limine* objections, *see* Dkt. 489, they are preserved for appeal and Biosense need not renew them here.  *Tan Lam v. City of Los Banos,* 976 F.3d 986, 1005 (9th Cir. 2020) ("A party may preserve an objection for appeal by raising the objection solely in a motion *in limine* where the substance of the objection has been thoroughly explored during the hearing on the motion *in limine*, and the trial court's ruling permitting introduction of evidence was explicit and definitive." (citation modified)); *see* Fed. R. Evid. 103(b).  But even with the MAUDE data, as discussed above, IH cannot show that Biosense decreased the quality of catheters at issue.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-15-
DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
15799374

had dominant share at UCLA); Ex. 10 at 30:5-17 (Boston Scientific had 60 percent market share at Torrance whereas Biosense only had 20 percent).

In sum, evidence at trial showed Biosense does not have market power in any of the alleged relevant markets. This is fatal to all of IH's claims.

### E.    IH Cannot Prove Competitive Harm Under the Rule of Reason Analysis Due to Its Failure to Prove Market Power

Absent a showing of either market power, or direct evidence of anticompetitive effect such as reduced output, increased prices, or decreased quality in the relevant market, IH cannot meet its burden to prove competitive harm under the Rule of Reason analysis, which dooms IH's Section 1 and Section 2 claims. *Epic Games*, 67 F.4th at 983 (quoting *Am. Express*, 585 U.S. at 542).

As described in the preceding sections, at trial, IH presented no evidence that Biosense had market power or that it used such market power to reduce output, increase prices, or decrease the quality of the products at issue. Furthermore, ample evidence at trial, such as the number of competitors for cardiac mapping systems, the level of competition among them, and the growing market and innovation in the electrophysiology space, further shows a lack of competitive harm. *See, e.g., supra* Section I.C; Ex. 10 at 106:17-107:9. Accordingly, no reasonable jury could find in IH's favor on the issue of competitive harm under the Rule of Reason analysis.

## II.    IH FAILED TO PROVE A SEPARATE MARKET FOR CLINICAL SUPPORT

Separate from market power, to prove the existence of a tie, IH was required to prove that the products at issue are, in fact, separate and distinct. *Epic Games*, 67 F.4th at 995. IH failed to do so. In fact, multiple witnesses— including IH's witnesses and third-party witnesses—testified that clinical support is not a separate and distinct product from the cardiac mapping system.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-16-

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
15799374

For example, Dr. Doshi admitted that clinical support "is part of a broader system offering," Ex. 1 at 59:15-19. Mr. Coldiron agreed that clinical support "is a service that's provided as part of the overall product offering for the system itself." Ex. 2 at 129:18-130:8. Ms. Tam also testified that clinical support and Biosense's catheters are part of "the whole mapping system." *See* Ex. 9 at 20:7-12. Providing free clinical support was an "industry standard." Ex. 6 at 73:20-25.

Under *Kodak*, products are separate for purposes of a tying claim only if "[a]t least some consumers would purchase service without parts . . . and some consumers, those who self-service for example, would purchase parts without service." *Kodak*, 504 U.S. at 463. Here, that would require evidence of both (a) instances where hospitals purchased catheters without requesting clinical support and (b) instances where hospitals requested clinical support without a purchase of catheters. But there was no evidence whatsoever of circumstances in which a hospital demanded clinical support in the absence of having purchased a catheter. And there was, at best, limited evidence of hospitals providing self-service clinical support during the relevant period. *See infra.*

Furthermore, "to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide" the products separately. *Kodak* , 504 U.S. at 462 (citation omitted). This is commonly referred to as the "consumer-demand test," which requires "(1) that it is possible to separate the products, and (2) that it is efficient to do so, as inferred from circumstantial evidence." *Epic Games*, 67 F.4th at 995.

IH also failed to meet the consumer-demand test. ***First,*** no evidence showed that in the relevant time period it was possible to separate catheters and clinical support. Biosense and other OEMs of mapping systems provided free clinical support as "part of the overall system offering by the manufacturer," not

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-17-

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

15799374

as a separate product.  *See* Ex. 8 at 37:1-3.  All of this occurred before IH began to sell reprocessed Biosense catheters in 2016, *see* Ex. 10 at 70:20-71:17, and IH itself also was unwilling to sell clinical support service separately.  Ex. 10 at 85:20-86:1; JX-31.

**Second,** evidence showed that it is not efficient to separate catheters and clinical support.  By 2015, Biosense CASs were supporting over 87 percent of procedures using the CARTO 3 system; this number increased to 95 percent by 2018.  Ex. 6 at 48:6-16.  The fact that some hospitals ***used to*** self-support mapping procedures is not evidence that clinical support was a separate market by 2016.  In fact, the evidence showed that due to significant evolution in the industry, hospitals moved away from self-support because it was no longer efficient to do so.  As Dr. Doshi and Mary Roberts admitted, due to the level of specialized expertise required in electrophysiology, high turnover, and the complexity of the mapping systems, it is no longer efficient for hospitals to provide mapping support in-house.  *See* Ex. 1 at 24:10-25:25, 38:9-22; Ex. 12 at 90:8-23.  Mr. Idio also testified that while hospitals "could invest the time and resources to hire an additional full-time person to provide mapping support," it was inefficient for hospitals to do so when they "can do the same job by getting support from the company."  Ex. 11 at 122:9-21   On the other hand, it is "very efficient" for system manufacturers to provide clinical support so "[hospitals] don't have to train or hire someone to do that job."  Ex. 8 at 37:20-24.  Consequently, Biosense invested heavily in clinical support services, with its payroll expenses for clinical support alone increasing four-fold over the last decade, to meet customer demand.  JX-1141.

Accordingly, no reasonable jury could conclude that it is possible for Biosense to sell clinical support separately when its competitors are providing

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

such service for free.  With no evidence of separate markets, IH's tying claims under both the Sherman Act and the Cartwright Act fail.

## III.  IH FAILED TO PROVE THE ALLEGED SINGLE-BRAND AFTERMARKETS

For each of IH's claims, it must prove a relevant market.  In this case, IH alleged four separate single-brand aftermarkets, including a separate market for clinical support and separate markets for each of the catheters at issue.  To establish a single-brand aftermarket, a Plaintiff must prove ***each of*** the following elements: "(1) the challenged aftermarket restrictions are not generally known when consumers make their foremarket purchase; (2) significant information costs prevent accurate life-cycle pricing; (3) significant monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Epic Games*, 67 F.4th at 977.  IH failed to prove any of them.

### A.    Customers Calculate Lifecycle Prices of Biosense's Cardiac Mapping System

IH failed to prove that significant information costs prevent accurate lifecycle pricing.  In fact, the trial evidence was overwhelmingly to the contrary.

IH offered nothing but conclusory statements from Dr. Forister that "it's challenging to do [lifecycle pricing] accurately" because CARTO 3 is a "long-lived device."  Ex. 6 at 105:23-106:20.  But multiple third-party witnesses testified that their hospitals project the lifecycle cost of a mapping system when deciding which system to purchase.  *See, e.g.,* Ex. 2 at 80:14-81:24 (Mayo Clinic analyzes a cardiac mapping system's lifecycle costs, taking into account the cost of the disposables, maintenance, utilization and caseload); Ex. 11 at 80:17-81:5 (same for Stanford); Ex. 3 at 14:25-15:9 (same for Allegheny General Hospital); Ex. 13 at 107:8-107:20 (same for Providence St. Joseph's).  In fact, IH's own witnesses, Mr. DeTate and Dr. Doshi, admitted that hospitals

-19-

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
15799374

compare pricing among different mapping systems and consider the pricing of disposables over time when deciding which system to purchase. *See* Ex. 10 at 27:11-28:20; Ex. 1 at 51:12-52:6, 95:20-96:25.

Accordingly, no reasonable jury could have reached a conclusion that customers were unable to calculate lifecycle prices of Biosense's mapping system, despite Dr. Forister's *ipse dixit* to the contrary.

## B.    No Significant Switching Costs Exist

IH also failed to prove significant monetary or non-monetary switching costs. IH relied entirely on Dr. Forister's conclusory opinions that customers face financial impediments (*i.e.*, "the cost to buy a new machine") and non-monetary impediments (*i.e.*, lack of training on another system) when switching between systems. *See* Ex. 6 at 104:17-105:16. But again, the actual evidence told a different story.

With respect to ***monetary*** switching costs, evidence showed that ***66 percent*** of hospitals already had a competing mapping system on site, making it easy for physicians to switch procedures from CARTO 3 to a competing system at no additional cost. *See* Ex. 5 at 20:16-21:6. Indeed, ***all*** hospital witnesses confirmed at trial that their hospitals had competing systems. Ex. 16 at 32:1-9; Ex. 2 at 16:25-17:8; Ex. 11 at 61:1-4; Ex.13 at 54:21-55:5; Ex. 3 at 68:21-69:9; Ex. 12 at 94:1-12. The parties' physician and CAS witnesses also testified to the same. *See* Ex. 1 at 49:3-14; Ex. 9 at 29:24-30:15.

Furthermore, multiple witnesses testified that the capital outlay for acquiring cardiac mapping machines is low due to discounts and incentives offered by OEMs. Even Mr. DeTate, IH's own witness and corporate representative, testified that hospitals can buy mapping systems without substantial upfront cost because it is common for hospitals to offset the cost of the capital equipment through the purchase of catheters. *See* Ex. 10 at 29:10-19.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-20-

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

15799374

*See also* Ex. 13 at 109:4-9; Ex. 2 at 82:7-20; Ex. 3 at 85:2-22; Ex. 14 at 20:23-21:19; 24:18-25:8 (Boston Scientific offers catheter purchase programs to help hospitals acquire capital equipment without significant upfront expenses). Indeed, IH repeatedly made the point that catheters costs exceed machine costs by a factor of at least nine to one. *See* Ex. 15 at 33:3-18; Ex. 6 at 72:7:13.

As for IH's alleged ***non-monetary*** switching costs, both parties' physician witnesses, Dr. Doshi and Dr. Osorio, testified that they are trained on multiple systems and that it is important for electrophysiologists to be familiar with multiple systems. *See* Ex. 1 at 49:3-14; Ex. 8 at 29:14-30:14.

And while there was also evidence that some hospitals did not like Biosense's policy and chose not to switch to another system, *see, e.g.,* Ex. 6 at 59:4-17, that testimony had nothing to do with high switching costs. Hospitals decided not to switch because Biosense has a better product and physicians preferred it. *See* Ex. 3 at 21:9-12; 34:21-35:8, 56:10-23, 68:21-69:3 (physicians prefer the CARTO 3 system because they believe it is "the best thing for [Allegheny's] patients."); Ex. 12 at 103:19-25. Market share gained or maintained "as a consequence of a superior product" is not anticompetitive. *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137–38 (9th Cir. 2022) (citation omitted). It is similarly not anticompetitive when a hospital administrator chose to satisfy the preferences of physicians to attract physicians to perform electrophysiology procedures at their hospitals. *See* Ex. 12 at 103:19-25; Ex. 3 at 34:21-35:8, 68:21-69:3.

C.    **Evidence of Cross-Elasticity of Demand Contradicts IH's Proposed Single-Brand Market**

Evidence also showed that cross-elasticity of demand contradicts—rather than supports—IH's proposed single-brand markets. Cross-elasticity of demand refers to "the extent to which consumers will change their consumption of one product [in response] to a price change in another." *Epic Games*, 67 F.4th at

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

976 (citation omitted).  Furthermore, differential prices are an important factor in considering whether there is cross-elasticity of demand.  *See Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 713 (7th Cir. 1979).

As an initial matter, evidence at trial showed that robust competition exists at the cardiac mapping system level.  *See, e.g.,* Ex. 10 at 53:19-54:4 (cardiac mapping systems compete with one another); Ex. 3 at 69:10-12 (same); Ex. 2 at 88:20-23 (same); Ex. 1 at 50:3-13 (Dr. Doshi admitting that competition between Abbott and Biosense is "very good").  IH's own CEO, Mr. Ferreira, also admitted that there is competition across catheter offerings from Biosense, Abbott, Boston Scientific, and Medtronic.  *See* Ex. 10 at 106:17-107:9.

Given this robust competition, customers can switch to competitive systems and catheters in response to a price change, and evidence at trial confirmed this.  Dr. Wu testified that when Abbott dropped the prices for its mapping machine, it saw an uptick in sales relative to Biosense's CARTO 3 machine.  Ex. 5 at 19:4-17, 20:2-15; JX-1148.  Witnesses testified that if hospitals were unsatisfied with Biosense's prices or policy for any reason, they could switch to another system for electrophysiology procedures.  Ex. 3 at 69:22-70:2; Ex. 10 at 32:25-33:22.  The fact that Biosense's products are priced similarly as comparable products from other OEMs confirms that these products are not distinct markets and cross-elasticity of demand contradicts IH's proposed single-brand aftermarkets.  *See supra* at I.A.

Indeed, multiple witnesses testified that their hospitals have switched between systems.  For example, Ms. Tam testified that most doctors at UCLA freely switch between the CARTO and the Abbott system.  *See* Ex. 9 at 31:2-5.  Third-party witnesses from Providence St. Joseph's and Mayo Clinic also testified that their hospitals had shifted procedures away from the CARTO 3.  *See* Ex. 13 at 20:23-21:4; Ex. 16 at 32:1-9.  Even IH's Senior Director of Sales

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-22-

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
15799374

Operations, Ms. Snider, testified that ECU Health successfully shifted procedures from Biosense's system to Abbott's system, and usage of Abbott's catheters went up by as much as 180 percent while usage of Biosense's catheters went down by 40 percent. Ex. 17 at 56:17-57:22.

**D.    The Clinical Support Policy Was Generally Known**

IH failed to meet its burden to show that Biosense's policy was "not generally known when consumers make their foremarket purchase." *Epic Games*, 67 F.4th at 977.

As Mr. Ramos testified, Biosense made every effort to fully implement the policy by April 1, 2016. *See* Ex. 18 at 105:6-15; JX-5027. Evidence showed that Biosense started sending the written policy statement to large accounts such as Ascension and HealthTrust Partner Group as early as November 2014. *See* JX-156; JX-5031. Multiple hospital witnesses also testified at trial that Biosense notified them about the clinical support policy by 2016. *See, e.g.,* Ex. 12 at 84:19-23, 99:19-21; Ex. 3 at 22:12-22; JX-224. Furthermore, competitors of Biosense, including IH, knew about the policy by March 2016, *See* Ex. 10 at 72:5-13; 116:13-21; JX-545. Competitors reached out to hospitals to refute Biosense's policy statement, making Biosense's policy known to customers to the extent they had not already been notified by Biosense. *See* Ex. 18 at 90:5-19.

Given this evidence, IH sought to prove that not every individual at a hospital in years after the policy was announced may have been aware of the policy. *See*, *e.g*., Ex. 1 at 29:22-23. But that is not the standard articulated in *Epic Games*. Here, the evidence was clear that the clinical support policy was "generally known" to the market no later than April 2016. *Epic Games*, 67 F.4th at 977 (citation modified).

1   For the foregoing reasons, no reasonable jury could find that IH has

2   proven any of the four necessary elements for the alleged single-brand catheter

3   aftermarkets.

4   **IV.    IH FAILED TO PROVE ANTITRUST INJURY**

5   Antitrust injury is an essential element of both IH's Sherman Act and

6   Cartwright Act claims.  *See Morrison v. Viacom.*, 66 Cal. App. 4th 534, 548

7   (1998).  Antitrust injury requires a Plaintiff to prove that it is "adversely affected

8   by an anticompetitive aspect of the defendant's conduct."  *Atl. Richfield Co. v.*

9   *USA Petroleum Co.*, 495 U.S. 328, 339 (1990) (citation omitted).  "Injury that

10  flows from aspects of a defendant's conduct that are beneficial or neutral to

11  competition is not antitrust injury."  *Paladin Assocs. v. Montana Power Co.*, 328

12  F.3d 1145, 1158 (9th Cir. 2003) (citation modified).  Here, IH failed to prove an

13  antitrust injury for two reasons.

14  ***First***, the injury that IH is claiming—lost profits from lower prices and

15  lower market share—is not an antirust injury.  The Ninth Circuit has made clear

16  that "reduced profits from lower prices and decreased market share is not the

17  type of harm" the antitrust laws were "meant to protect against."  *Pool Water*

18  *Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001).  This is because the

19  antitrust laws' "focus on protecting the competitive process and not on the

20  success or failure of individual competitors."  *Cascade Health Sols. v.*

21  *PeaceHealth*, 515 F.3d 883, 902 (9th Cir. 2008) (citation omitted).  Moreover,

22  "antitrust laws primarily are designed to protect interbrand competition from

23  which lower prices can later result."  *Leegin Creative Leather Prods. v. PSKS,*

24  *Inc.*, 551 U.S. 877, 879 (2007).

25  Here, IH, as a competitor of Biosense, complains that Biosense's policy

26  led to IH charging lower prices and losing market share.  Under Dr. Forister's

27  damages model, ***IH's prices and market share for reprocessed catheters would***

28

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-24-

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

15799374

1    ***increase without Biosense's competitive clinical support policy***, and hospitals

2    would be paying ***more*** money to IH for reprocessed catheters.  *See* Ex. 4 at 13:3-

3    16:2, 17:2-18:15).  Essentially, what IH seeks is to deprive consumers of the

4    benefits of lower prices while increasing its own profit by charging higher

5    prices.  But "depriving consumers of the benefits of lower prices . . . does not

6    constitute sound antitrust policy."  *Brooke Grp. Ltd. v. Brown & Williamson*

7    *Tobacco Corp.*, 509 U.S. 209, 224 (1993) (citation omitted).

8        ***Second***, controlling Ninth Circuit precedent makes clear that, "[t]o

9    ascertain whether an unlawful arrangement for the sale of products has caused

10   injury to the purchaser, the cost or value of the products involved, free from the

11   unlawful arrangement, must first be ascertained."  *Siegel v. Chicken Delight*, 448

12   F.2d 43, 52 (9th Cir. 1971) (citation omitted).  Absent such a showing, IH cannot

13   demonstrate antitrust injury as the court cannot exclude the possibility that "the

14   price for the entire package was equal to, or below, a competitive price."  *U.S.*

15   *Steel Corp. v. Fortner Enters.*, 429 U.S. 610, 618 (1977).

16       In *Chicken Delight*, the franchisor licensed its name, trademarks, and

17   method of operations to franchisees for free but required those franchisees to

18   purchase certain equipment and products from the franchisor.  448 F.2d at 47.

19   The franchisees asserted that the equipment and products were sold at

20   supracompetitive prices and prevailed on that issue at summary judgment.  *Id.* at

21   52.  On appeal, the Ninth Circuit reversed, rejecting the district court's finding

22   that the franchisees could prevail by showing that the price for the equipment

23   and products combined was supracompetitive.  Instead, the Ninth Circuit

24   observed that the price paid for the equipment and products was "full

25   compensation . . . for both those items and the franchise licenses," and required

26   the franchisees to show "the value of both tying and tied products, free from the

27   tying arrangement" to prove an antitrust injury flowing from supracompetitive

28

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-25-

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

15799374

1    prices on remand.  *Id.* at 53.  Following *Chicken Delight*, the Supreme Court

2    endorsed the same requirement in a separate case involving an alleged tie

3    between prefabricated homes and financing arrangements: an antitrust Plaintiff

4    must prove the separate prices of the tying and tied products to show an antitrust

5    injury flowing from supracompetitive prices.  *See Fortner*, 429 U.S. at 618.

6        At trial, IH proffered no evidence showing what the separate prices of

7    catheters and clinical support would be without the policy.  As in *Chicken*

8    *Delight*, the only "reasonable" reading of Biosense's provision of free clinical

9    support is that the price is included in the prices of the disposables—principally

10   catheters—that Biosense sells.  448 F.2d at 53.  To demonstrate an antitrust

11   injury, IH was required to distinguish the price of clinical support from the price

12   of catheters "free from" the clinical support policy.  *Id.* at 53.  IH did not even

13   try to do that at trial.  Failure to do so dooms IH's antitrust injury claim and

14   further undermines IH's showing of supracompetitive pricing to prove market

15   power.  *See supra* at I.A.

16       Instead, throughout the trial, IH proffered testimony regarding supposed

17   limits on customer choice.  *See, e.g.,* Ex. 1 at 42:12-15; Ex. 6 at 121:1-8.  But

18   "limitation of consumer choice, in itself, does not amount to antitrust injury."

19   *Somers v. Apple*, 729 F.3d 953, 966 (9th Cir. 2013) (citation modified).  IH

20   cannot escape its failure to prove antitrust injury, which is fatal to all its claims.

21  **V.  IH'S CLAIMS UNDER SECTION 2 OF SHERMAN ACT FAIL AS A**

22      **MATTER OF LAW**

23      **A.    IH's Section 2 Claims Fail for the Same Reasons As Those**

24          **Under Section 1**

        Where plaintiff's Section 2 claim is based on the same predicate as its

25   Section 1 tying claim, and the conduct in question is not anticompetitive under

26   Section 1, then the same conduct need not be analyzed separately under Section

27   2.  *Fed. Trade Comm'n v. Qualcomm*, 969 F.3d 974, 991 (9th Cir. 2020).

28

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-26-

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

15799374

1    Furthermore, for the reason detailed *supra*, IH failed to show that

2    Biosense had market power in a clinical support market or that such a distinct

3    market exists.  Absent a showing that Biosense had market power, IH's section

4    2 claims also cannot stand.  *See Newcal Indus. v. Ikon Off. Sols.,* No. C04-2776

5    FMS, 2004 WL 3017002, at *2 (N.D. Cal. Dec. 23, 2004).

6       **B.    Evidence Regarding the Alleged Blocking Technology and**
         **Catheter Collection Is Insufficient to Support IH's Section 2**
7        **Claims or the Alleged Damages**

8       IH argued that Biosense willfully monopolized or attempted to

9    monopolize the relevant markets by "collecting and withholding catheters," and

10   by deploying a custom-encrypted chip to make it difficult for IH to reprocess

11   Biosense's catheters.  *See* Ex. 6 at 40:19-41:6; Ex. 19 at 103:8-104:6, 112:11-

12   112:13.  IH, however, never pleaded any claims based on these allegations

13   *separate from the alleged tie*.  Moreover, trial evidence on these issues is

14   insufficient to support IH's Section 2 claims.

15      With respect to catheter collections, over Biosense's objection,[4] IH

16   introduced evidence that SterilMed sought to collect more AcuNav and

17   DecaNav catheters than it needed.  Ex. 6 at 44:10-45:9.  But neither catheter is

18   in the alleged antitrust markets.  In those markets, IH's witnesses admitted that

19   IH had more than enough catheters to reprocess.  Ex. 12 at 56:2-7.  As this Court

20   made clear, allegations relating to catheter collections are only relevant to "the

21   overall intent of Biosense" and barriers on competition.  Dkt. 489 at 8 (Order re:

22   Motions *in Limine*).  Evidence at trial showed that SterilMed's collection

23   practices are not for anticompetitive purposes; rather, they were for the purpose

24   of its own reprocessing business.  *See* Ex. 18 at 113:1-21 (SterilMed often does

25   _____

26   [4] Biosense's *in limine* objections to IH's introduction of catheter collection
     evidence are preserved for appeal and Biosense need not renew them here for
27   the same reason stated *supra* footnote 3.  But even with evidence of catheter
     collection, IH has not made a legally sufficient claim.

28

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
15799374

1    not have enough used catheters to reprocess, leading to constant backorders and

2    insufficient safety stock).

3         With respect to the so-called "blocking technology," IH's only claim is

4    that the microchips delayed its release of relevant catheters to the market for a

5    limited period of time.  Yet, at trial, evidence showed that the delay was caused

6    by other issues not attributable to Biosense.  *See* Ex. 12 at 22:20-23:14 (IH's

7    marketing of Pentaray was delayed because IH took two years to resolve a

8    lumen issue to obtain FDA's clearance); 14:23-16:13.  Furthermore, Biosense

9    had put microchips in its mapping catheters to protect their integrity since the

10   1990s, well before reprocessing companies, including IH, were cleared by the

11   FDA to market reprocessed Biosense catheters.  Ex. 19 at 105:11-105:20; Ex. 12

12   at 8:9-8:17.  Hence, it cannot be that the microchip at issue was installed for

13   anticompetitive purposes.  Furthermore, the blocking technology allegations are

14   insufficient to support IH's damages claim because even the $7.9 million

15   damages allegedly caused by the delayed entry was based, in part, on the tie

16   (which IH failed to prove).

17   **VI.  IH'S CARTWRIGHT ACT CLAIMS FAIL AS A MATTER OF LAW**

18        **A.    The Cartwright Act Does Not Apply Extraterritorially**

19        This Court should enter judgment for Biosense on IH's Cartwright Act

20   claims because the Cartwright Act does not apply extraterritorially, and IH

21   presented no calculation of damages for California alone.

22        Damages is one of the "essential elements of an antitrust claim under the

23   Cartwright Act."  *Ahn v. Stewart Title Guar. Co*., 93 Cal. App. 5th 168, 179

24   (2023).  IH's Cartwright Act claims fail because the Cartwright Act does not

25   entitle a Plaintiff to recover nationwide damages.  *See In re HIV Antitrust Litig*.,

26   No. 19-CV-02573, 2022 WL 22609107, at *9 (N.D. Cal. Sept. 27, 2022)

27

28

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-28-

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

15799374

1    (denying multi-state class certification under the Cartwright Act, in part, because

2    the Act cannot extraterritorially cover damages incurred in other states).

3    "[T]here is a strong presumption against the extra-territorial application of

4    California law." *WarnerNo v. Tinder*, 105 F. Supp. 3d 1083, 1096 (C.D. Cal.

5    2015) (citation omitted)).  The California Supreme Court has made clear that the

6    "presumption against extraterritoriality applies to the UCL in full force."

7    *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011) (citation omitted).  This

8    presumption applies equally to the Cartwright Act because, as courts have

9    recognized, "there is a degree of equivalency between the Cartwright Act and

10   the UCL."  *In re Capacitors Antitrust Litig.*, No. 17-md-02801, 2020 WL

11   6462393, at *7 (N.D. Cal. Nov. 3, 2020) (citation omitted).  Furthermore, courts

12   are reluctant to apply California's anticompetition laws extraterritorially because

13   state antitrust laws differ from each other, including with respect to damages.

14   *See, e.g., In re Citric Acid Antitrust Litig.*, No. C-95-4578, 1996 WL 116827, at

15   *2 (N.D. Cal. Mar. 12, 1996).

16   It is undisputed that IH never presented a California-specific damages

17   model.  Hence, the jury had no basis for calculating California-specific damages

18   beyond mere speculation or guesswork, which is prohibited as a matter of law.

19   *Fontana Pipe & Fabrication v. Ameron*, *Inc*. 921 F.2d 279 (9th Cir. 1990).

20   **B.    The *Per Se* Rule Is Inapplicable to the Alleged Tie Under the
            Cartwright Act**

22   The Supreme Court of California has made clear that "although the

23   prohibitions of the Cartwright Act are framed in superficially absolute

24   language," "the Cartwright Act and Sherman Act carry forward the common law

25   understanding that 'only unreasonable restraints of trade are prohibited.'"  *In re*

26   *Cipro Cases I & II*, 61 Cal. 4th 116, 145–46 (2015) (citation modified).  Only

27   when the tying restraints are "plainly anticompetitive," *Epic Games*, 67 F.4th at

28

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-29-

15799374

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

997, and "lack redeeming virtue"—will "tying constitute[] . . . a *per se* illegal practice." *Morrison*, 66 Cal. App. 4th at 540.

As detailed *supra*, Biosense's clinical support policy is not a tie, but regardless, it is a policy that had procompetitive effects in the market, which included lowering prices for IH's reprocessed catheters, preventing free-riding, and providing customers with free clinical support. *See supra* Section I. Accordingly, there was no basis for a jury to find that Biosense's policy was subject to *per se* treatment.

Furthermore, under the Cartwright Act, tying arrangements are illegal *per se* only when "a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product." *Corwin v. L.A. Newspaper Serv. Bureau*, 4 Cal. 3d 842, 856–57 (1971) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 (1958)).  As discussed above, IH failed to prove that Biosense has market power. *See supra* Section I.  Accordingly, IH's Cartwright Act claims under the *per se* rule fail as a matter of law.

## **CONCLUSION**

For the foregoing reasons, Biosense respectfully requests that the Court vacate the judgment on the verdict (Dkt. 528) and enter judgment as a matter of law in favor of Biosense on all of IH's claims pursuant to Federal Rule of Civil Procedure 50(b).

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-30-
DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
15799374

DATED: July 3, 2025

STRADLING YOCCA CARLSON & RAUTH LLP

By: */s/ Karla Kraft*
　　　Karla Kraft

PATTERSON BELKNAP WEBB AND TYLER LLP

By: */s/ William F. Cavanaugh, Jr.*
　　　William F. Cavanaugh, Jr.

LINKLATERS LLP

By: */s/ Muhammad U. Faridi*
　　　Muhammad U. Faridi

Attorneys for Defendant
BIOSENSE WEBSTER, INC.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-31-
DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
15799374

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Biosense Webster, Inc., certifies that this brief contains 6,990 words, which:

☒ complies with the word limit of L.R. 11-6.1.

☐ complies with the word limit set by court order dated _____.

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

15799374