# Exhibit 6

1

1

2

3

4                    UNITED STATES DISTRICT COURT

5                   CENTRAL DISTRICT OF CALIFORNIA

6                          SOUTHERN DIVISION

7                              - - -

8         THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

9

10    INNOVATIVE HEALTH, LLC,      ) CERTIFIED TRANSCRIPT
                     Plaintiff,    )
11        vs.                      )
                                   )  SACV-19-01984-JVS
12    BIOSENSE WEBSTER, INC.,      )
                     Defendant.    ) TRIAL DAY 5, VOL. I
13    ---------------------------)

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  Santa Ana, California

17                    May 13, 2025

18

19                    SHARON A. SEFFENS, RPR
                      United States Courthouse
20                    411 West 4th Street, Suite 1-1053
                      Santa Ana, CA  92701
21                    (612) 804-8655

22

23

24

25

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:36    1    That second line, "The status of the Falcon chip

2    anti-reprocessing technology."

3    Q    And what is the significance of that phrase to you,

4    "anti-reprocessing technology"?

09:36    5    A    So Biosense is describing in its own correspondence

6    that the technology is anti-reprocessing.  It's to stop

7    independent reprocessors.

8    Q    Now, if I could ask you to look at JX3099 in your

9    binder.

09:36   10    A    Okay.

11    Q    Is this one of the documents you relied on?

12    A    Yes, it is.

13            MR. HO:  We move 3099 into evidence.

14            MR. CAVANAUGH:  No objection.

09:37   15            THE COURT:  3099 will be received.

16            (Exhibit 3099 received in evidence)

17    BY MR. HO:

18    Q    Dr. Forister, what is Exhibit 3099?

19    A    This is an e-mail chain, the latest e-mail being from

09:37   20    Mario Garcia at Biosense to Avi Shalgi and others at

21    Biosense sent April 11, 2018.

22    Q    Okay.  And how does this document relate to your

23    opinion?

24    A    This again gives us an example of Biosense's employees

09:37   25    describing the purpose of the technology.

09:37    1    Q    Could you point us to the language that reflects that,
         2    please?
         3    A    Yes.  If we go to page 4 of the exhibit, the second
         4    e-mail on the page from Mario Garcia.
09:37    5          In the first line of that e-mail, he writes:
         6    "Last time we met, I clarified the main driver of
         7    implementing the Falcon EEPROM" -- which is just another
         8    word for a chip -- "is preventing our competitors to
         9    reprocess."
09:38   10    Q    Can you actually read on a little bit further?
        11    A    Sure.  "To reprocess the VIZIGO sheath and not, as
        12    previously understood, as to reprocess them ourselves."
        13    Q    Okay.  And what is the significance of that to your
        14    opinion?
09:38   15    A    So this is in their own words.  The main driver of the
        16    Falcon chip for the anti -- or the blocking technology is to
        17    prevent reprocessing, and even for a device they didn't plan
        18    to reprocess.
        19    Q    If we could go back to Slide 2, I want to move on now
09:38   20    to catheter collections, the second form of conduct that you
        21    describe as anticompetitive.
        22          Can you please summarize why Biosense's collection
        23    practices were anticompetitive and not competition on the
        24    merits?
09:38   25    A    Yes.  And to be clear, it's not just that they were

09:39  1    collecting catheters.  It was that they were collecting and
       2    withholding catheters.  And as you may have gathered, in
       3    order to reprocess catheters, the reprocessors need to get
       4    used catheters.  And so if a company is able to withhold
09:39  5    those used catheters, they can restrict the supply available
       6    to the rivals and to the market.
       7  Q    Okay.  Could I ask you to turn to JX298, please?
       8         Is this a document you relied in forming your
       9  opinions?
09:39 10  A    It is.
      11         MR. HO:  We move the admission of JX298.
      12         THE COURT:  Any objection?
      13         MR. CAVANAUGH:  No objection.
      14         THE COURT:  298 will be received.
09:39 15         (Exhibit 298 received in evidence)
      16  BY MR. HO:
      17  Q    Dr. Forister, what is Exhibit 298?
      18  A    This is a Biosense 2019 kickoff meeting and internal
      19  presentation.
09:40 20  Q    And could you refer us to the portion of the
      21  presentation that's significant for your opinion?
      22  A    Yes.  If we go to page 28 of that and we start at the
      23  bottom, there is some text that straddles the two pages if
      24  we start at the bottom line of that first text box.
09:40 25  "Maximize collections.  The RPO, the reprocessed market, is

09:40   1    unique in the way that there is a finite amount of raw

2    materials.  If we control ACUNAV collections, we control the

3    market.  In fact, it's not far-fetched to believe that if we

4    were able to collect back 75 percent of the OEM that is new

09:40   5    ACUNAV we sell, we could drive Stryker out of the

6    reprocessed electrophysiology business altogether."

7    Q    And could you explain what that means and why it's

8    significant to your opinion?

9    A    Yes.  This is Biosense's internal discussion confirming

09:41  10    what we just discussed, that if a company is able to collect

11    back enough catheters, it can drive its rivals out of the

12    business.

13    Q    Now, this is relating to ACUNAV collections.

14         Were you here in the courtroom when Mr. Dave

09:41  15    Distel testified about -- I'm sorry, I skipped one thing.

16         Did you consider data about Sterilmed's

17    reprocessing of ACUNAV catheters?

18    A    Yes, I did.

19    Q    Okay.

09:41  20         MR. HO:  Could we put up Slide 7, please.

21    BY MR. HO:

22    Q    What does Slide 7 show?

23    A    So this shows Sterilmed's collection and sales of the

24    ACUNAV catheter from 2015 to 2020.  And it's significant

09:41  25    that we start on the left.  They collected about 156,000

09:41   1   catheters.  They discarded, starting at the top on the

        2   right, about 42,000 as not fit for reprocessing.  They sold

        3   59,000.  But then they ended up with 54,000 catheters in

        4   excess, and they just withheld those from the market.  And

09:42   5   that's anticompetitive because customers wanted those

        6   reprocessed catheters, and so Biosense/Sterilmed is

        7   restricting the supply and restricting their choice.

        8   Q    And were you here in the courtroom when Mr. Dave Distel

        9   testified about Innovative facing shortages of ACUNAV

09:42  10   catheters?

       11   A    Yes.

       12   Q    And how is that relevant to your opinion?

       13   A    So that's relevant because it tells us that this

       14   withholding of catheters had an effect on a rival, and it

09:42  15   had an effect that there were customers who wanted the

       16   choice of an Innovative reprocessed ACUNAV, and they were

       17   denied that choice because all of those catheters that they

       18   would have liked to buy were sitting at Sterilmed, not being

       19   sold.

09:43  20   Q    Just to be clear, I think you said "an effect on a

       21   rival."

       22        In antitrust economics, what does a "rival" refer

       23   to?

       24   A    So it refers to a company that's competing with it, so

09:43  25   it's an effect on competition more broadly.

09:43    1    Q    Could I now ask you to turn to Exhibit 3114?

2    A    Okay.

3    Q    Did you rely on Exhibit 3114?

4    A    Yes, I did.

09:43    5         MR. HO:  Move to admit Exhibit 3114.

6         MR. CAVANAUGH:  No objection.

7         THE COURT:  3114 will be received.

8         (Exhibit 3114 received in evidence)

9    BY MR. HO:

09:43    10   Q    Dr. Forister, what is Exhibit 3114?

11   A    This is an e-mail with an attachment from Joseph

12   Koenig, the Product Director of Sustainability at Biosense,

13   sent to Andrew Landers on June 27, 2018, with the Subject:

14   "Expand ULS" -- that is ultrasound, which would include the

09:44    15   ACUNAV -- "buy-back program" -- which is their collections

16   -- "to DECANAV and PENTARAY."

17   Q    Okay.  And how does this document relate to your

18   opinion?

19   A    Well, bear with me because I need to introduce a few

09:44    20   other facts.  So this is 2018, a time when Innovative has

21   clearance to reprocess the DECANAV and the PENTARAY.  At

22   that same time, Sterilmed does not have that clearance, so

23   Sterilmed and Biosense cannot reprocess these catheters.

24         So they are suggesting to expand the collections

09:44    25   policy, which we saw restricted supply in the ACUNAV

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:44   1   business to the DECANAV and PENTARAY business.  And because
        2   Sterilmed wasn't going to be reprocessing these catheters at
        3   that time, this simply eliminated the choice of those
        4   reprocessed catheters from customers.
09:45   5   Q    So given that Biosense/Sterilmed didn't reprocess the
        6   DECANAV, was there any purpose in terms of competition on
        7   the merits for them to collect those catheters?
        8   A    No, there is no evidence that it was competition on the
        9   merits.
09:45  10   Q    Now, if we could turn, please, to Exhibit 3270, is this
       11   another document you relied on?
       12   A    It is.
       13           MR. HO:  We move the admission of Exhibit 3270.
       14           MR. CAVANAUGH:  No objection.
09:45  15           THE COURT:  3270 will be received.
       16           (Exhibit 3270 received in evidence)
       17   BY MR. HO:
       18   Q    Dr. Forister, what is Exhibit 3270?
       19   A    It's an e-mail with an attachment from Joseph Koenig
09:45  20   again at Biosense to Nathan Summers and others at Biosense
       21   sent July 10, 2018, with the Subject field "Intel requested
       22   - DECANAV collections."
       23   Q    So we're still on the topic of DECANAV collections.
       24           How is this e-mail relevant to your opinion?
09:46  25   A    We can see how Biosense is describing these efforts if

09:46  1   we go to the second sentence starting with:  "In an effort

2   to better understand how Innovative Health will source the

3   supply for their reprocess iteration, could you please reply

4   if you are aware of any collections in the electrophysiology

09:46  5   lab besides us or Stryker?  Based on your feedback, we may

6   consider proposing programs that could divert these

7   collections to us."

8   Q    Why is that significant?

9   A    It's significant because it tells you in Biosense's own

09:47  10  words what they're doing.  And it's -- they're looking to

11  collect and divert supply from a competitor and thereby harm

12  or eliminate competition.

13  Q    If we could go back to Slide 2, please, the third form

14  of conduct that you address here is the Case Coverage

09:47  15  Policy.

16        Did you prepare slides to explain why the Case

17  Coverage Policy is anticompetitive?

18  A    Yes.

19  Q    Okay, let's start with this one.

09:47  20        Could you please explain to the jury what a tying

21  arrangement is?

22  A    Yes, and we're going to start with the definition from

23  economics.  What is tying or a tying arrangement?  And

24  economists use that to describe a situation like this.  A

09:47  25  company, on one hand, has a must-have product, a product

09:47  1    that people want to buy from them.  On the other hand, it

2    has another product, one that customers would like to buy

3    from someone else.

4              Now, if a company has a dominance of a must-have

09:48  5    product, it can force customers to source that product --

6    sorry, it can force customers to buy the second product that

7    they didn't want to in order to get access to the first

8    product.  And we call that situation a tie.

9    Q    When does a tying arrangement become anticompetitive?

09:48  10   A    It becomes anticompetitive when the company with the

11   must-have product has market power or dominance, that they

12   are controlling the market for that product, the must-have

13   product.

14   Q    Okay.  And if we can move on to the next slide, could

09:48  15   you explain why in your opinion the Case Coverage Policy is

16   an anticompetitive tie?

17   A    Yes.  It's because Biosense had the CARTO 3 mappers.

18   That's the must-have product.  If you want to do a CARTO 3

19   procedure, you must have a mapper.  And they had other

09:49  20   products that some customers wanted to buy from independent

21   reprocessors.  And instead of competing in those markets,

22   they implemented the Case Coverage Policy, which tied access

23   to their mappers to the purchase of these sensor-enabled

24   catheters.

09:49  25   Q    Now, in 2009 when the CARTO 3 was first released, did

09:49    1    Biosense have a Case Coverage Policy?

2    A    No.

3    Q    Did reprocessed catheters exist in 2009?

4    A    Yes, they did.  As you may have heard last week, the

09:49    5    FDA has been regulating reprocessing since 2002.

6    Q    What portion of EP procedures did Biosense mappers

7    cover in 2009?

8    A    So back in 2009, Biosense's mappers covered about half

9    of the procedures, and the hospitals provided the other half

09:49    10    of the mappers.

11    Q    Okay.  What about by 2015?

12    A    By 2015, Biosense had increased its share to

13    87 percent.

14    Q    And what about by 2018?

09:50    15    A    By 2018, it had increased it even further to a dominant

16    95 percent.

17    Q    Could you please turn in your binder to Exhibit 3329?

18    A    Okay.

19    Q    Did you rely on Exhibit 3329?

09:50    20    A    I did.

21         MR. HO:  We move 3329 into evidence.

22         MR. CAVANAUGH:  No objection.

23         THE COURT:  3329 will be received.

24         (Exhibit 3329 received in evidence)

09:50    25    BY MR. HO:

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

49

| | | |
|---|---|---|
| 09:50 | 1 | Q    If you can turn to page 9 of 3329, what does page 9 of |
| | 2 | this slide presentation show? |
| | 3 | A    So this shows what we had just discussed.  Back in 2009 |
| | 4 | when the CARTO 3 was introduced, the Biosense mappers |
| 09:50 | 5 | covered about half of the cases.  And by 2018, Biosense had |
| | 6 | increased that to 95 percent of cases. |
| | 7 | Q    And why is that important to your economic analysis of |
| | 8 | whether the Case Coverage Policy is an anticompetitive tie? |
| | 9 | A    It's relevant because Biosense realizes that they have |
| 09:51 | 10 | a dominant position, and that dominant position would give |
| | 11 | them leverage over the hospitals. |
| | 12 | Q    Did you analyze how Biosense came to have that dominant |
| | 13 | position in the CARTO 3 clinical support market? |
| | 14 | A    Yes. |
| 09:51 | 15 |      MR. HO:  If we could turn to Slide 10, please. |
| | 16 | BY MR. HO: |
| | 17 | Q    So you have four factors listed here. |
| | 18 |      Could you please explain how Biosense took over |
| | 19 | control of the market for CARTO 3 clinical support? |
| 09:51 | 20 | A    Yes.  So these are four of the activities that Biosense |
| | 21 | undertook to take over the market for mappers.  The first |
| | 22 | being poaching mappers.  That is, when there is a mapper at |
| | 23 | a hospital, they would go and give that mapper big financial |
| | 24 | incentives to hire them away from the hospital. |
| 09:52 | 25 | Q    What was the next? |

10:02  1    A    Sure.  In May, Biosense promised that its mappers would

       2    support cases even if independently reprocessed

       3    sensor-enabled catheters were used.

       4    Q    What happened after that?

10:03  5    A    Well, this was in the context of a contract

       6    renegotiation.  And so after receiving that promise,

       7    Ascension in July signed a three-year contract to buy

       8    catheters and other disposables from Biosense.

       9    Q    After the contract was signed, did Biosense follow

10:03  10   through on its assurance to Ascension?

       11   A    No.  Almost immediately, Ascension noticed Biosense's

       12   mappers were back to walking out or refusing to map on cases

       13   involving independently reprocessed catheters.

       14   Q    What happened then?

10:03  15   A    So then a few months later in October, the first Case

       16   Coverage Policy letter was written and sent to Ascension.

       17           MR. HO:  Your Honor, we move the admission of

       18   JX173.

       19           THE COURT:  Any objection?

10:04  20           MR. CAVANAUGH:  No objection.

       21           THE COURT:  173 will be received.

       22           (Exhibit 173 received in evidence)

       23           MR. HO:  I would like to play a portion of the

       24   audio clip that's now been admitted as Exhibit 143.  In

10:04  25   particular, 58:37 to 59:30.  And we have slides that

59

10:04    1  transcribe the words in the audio recording.

         2           (Video clip played)

         3  BY MR. HO:

         4  Q    So, Dr. Forister, could you explain what we just heard?

10:05    5  A    Yes.  So this is Conrad -- can we have the slide back

         6  up?

         7           So this is Conrad Ramos, the Corporate Account

         8  Director at Biosense, describing what happened at Ascension

         9  when they imposed the Case Coverage Policy.  And if we go

10:05   10  back one slide, they see Ascension didn't like it, and they

        11  spent the next six to nine months trying to drive the

        12  business away from us.

        13           So Ascension didn't like it.  They tried to move

        14  their business elsewhere, but they couldn't.  Ultimately

10:06   15  what happened, even though Ascension didn't like it, was

        16  Ascension spent another $4 million with Biosense because of

        17  the Case Coverage Policy.

        18  Q    And how was that significant to you in terms of whether

        19  the Case Coverage Policy is anticompetitive?

10:06   20  A    So circling back, was this something the customers

        21  liked?  And the answer from Biosense is, no, they didn't

        22  like it.  They didn't want it.  They wanted to buy from

        23  independent reprocessors.  And so this wasn't competition on

        24  the merits.  This was about eliminating choice and reducing

10:06   25  or harming competition.

10:07   1    Q    Now, after the Ascension episode, did Biosense expand

        2    the implementation of the Case Coverage Policy?

        3    A    They did.  Ultimately, in April of 2016, they began

        4    enforcing the policy nationwide.

10:07   5    Q    Now, when you say "enforcing the policy nationwide,"

        6    did Biosense tell all of its customers about the policy in

        7    April 2016?

        8    A    No, and this is an important distinction.  Biosense is

        9    not announcing to the world, to the market, that we have

10:07   10   this policy.  Evidence shows that they are waiting until a

        11   hospital wants to use an independently reprocessed catheter,

        12   and then they tell them, hey, you have a CARTO 3.  You've

        13   been using it for a while, but now you want to do this new

        14   thing, buy independently reprocessed catheters.  No, you

10:07   15   don't have that choice.

        16   Q    Did you see documents showing that Biosense was

        17   concerned about Innovative Health in particular as a

        18   competitor?

        19   A    Yes.

10:08   20   Q    Could you please turn to Exhibit 3193 in your binder?

        21        Did you rely on Exhibit 3193?

        22   A    I did.

        23        MR. HO:  We move that in evidence.

        24        MR. CAVANAUGH:  No objection.

10:08   25        THE COURT:  3193 will be received.

| | | |
|---|---|---|
| 10:14 | 1 | A    Yes. |
| | 2 | Q    And do you recall Biosense's counsel saying that this |
| | 3 | analysis shows that doctors prefer new catheters over |
| | 4 | reprocessed catheters? |
| 10:14 | 5 | A    That's what he told you. |
| | 6 | Q    What is your reaction to that assertion? |
| | 7 | A    That claim is absolute nonsense.  From an economic |
| | 8 | perspective, we know that the PENTARAY catheter market has |
| | 9 | competition being foreclosed by the Case Coverage Policy, |
| 10:14 | 10 | and we've seen that Sterilmed is not a true competitor of |
| | 11 | Biosense.  So the orange line they showed you, and they said |
| | 12 | only six percent of the time do physicians prefer these |
| | 13 | catheters, that's not telling you what physician's prefer |
| | 14 | because Biosense can influence and withhold or hold back |
| 10:15 | 15 | Sterilmed from offering these catheters.  So this is not an |
| | 16 | indication of what physicians prefer when there is free and |
| | 17 | fair competition. |
| | 18 | Q    Now, if we could go to Slide 15, please. |
| | 19 | Did you prepare Slide 15? |
| 10:15 | 20 | A    I did. |
| | 21 | Q    And what does it show? |
| | 22 | A    So this shows you what happens in a market without the |
| | 23 | Case Coverage Policy.  Back in 2013 when reprocessing of the |
| | 24 | SOUNDSTAR was being done by Stryker -- it had been done for |
| 10:15 | 25 | a few years already -- we see 27 percent of the time a |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:15    1    reprocessed SOUNDSTAR is being chosen by the doctors and

2    hospitals.  And this is as I mentioned relatively early, and

3    interest in reprocessing has grown over time.

4    Q    And that's -- 27 percent is far higher that the

10:16    5    5.9 percent that we saw on the previous slide?

6    A    Yes.

7    Q    If we could go to Slide 16, please.

8         So what does this show?

9    A    So this shows what happens when doctors and hospitals

10:16    10    get to choose among catheters not covered by the Case

11    Coverage Policy.  This is the Webster CS, not included in

12    the Case Coverage Policy, and it's the share of reprocessed

13    from 2020 to 2023, a more mature market than the SOUNDSTAR

14    market.  It's about ten years later.  And we can see -- I

10:16    15    don't know if -- maybe you can't read the numbers.  Let's

16    see, 47 percent in 2020, 45 percent in 2021, and then

17    growing to 55 percent of the time in reprocessed catheters

18    chosen in 2023.  And that's why I said the previous slide

19    from the opposing attorney over there was nonsense.  This is

10:17    20    ten times the amount that doctors choose when there's not a

21    Case Coverage Policy in place.

22    Q    Now, Dr. Forister, did you analyze the effect of

23    Biosense's anticompetitive conduct on hospitals and doctors?

24    A    I did.

10:17    25    Q    What percentage of hospitals with an EP lab have a

10:17   1    CARTO 3 machine?

        2    A    Of those hospitals, 72 percent.

        3    Q    Did you prepare a slide to explain the harm to

        4    competition in this case?

10:17   5    A    I did.

        6    Q    Could we put up Slide 17.

        7          So could you explain generally what these four

        8    factors relate to?

        9    A    Yes.  Looking from an economic perspective at these

10:17  10    markets and at the consumers and what happened to them

       11    because of Biosense's conduct, there's four types of

       12    economic harm.  First, prices were inflated.  The hospitals

       13    had to pay more.

       14          Quality was decreased, and we'll talk about what

10:18  15    the data show about the relative quality of Innovative's

       16    catheters and Biosense and Sterilmed's catheters.

       17          Third, there would be a decrease in innovation.

       18    There were innovations that were excluded from the market by

       19    the Case Coverage Policy, and there were also innovations

10:18  20    that were entirely foregone because of that policy.

       21          And finally, a harm to the consumers.  An economic

       22    harm was decreased choice.  They took away the choice from

       23    doctors and hospitals.

       24    Q    Let's start with the first of those, inflated prices,

10:18  25    and if we could turn to the next slide.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

68

10:18  1        Could you explain the two ways in which prices

2  were inflated?

3  A    Yes.  From an economic perspective, we can see two ways

4  that prices were inflated.  First, the hospitals that wanted

10:18  5  to use reprocessed catheters were forced instead to buy much

6  more expensive new catheters, and so the price they faced

7  went way up.  Second, Biosense, by excluding competition,

8  was able to continue to inflate its own prices for new

9  catheters.

10:19  10  Q    So let's start with the first of the two, forced

11  switching.

12        Could we turn to the next slide, please.

13        And could you explain with reference to this slide

14  the effect of that forced switching?

10:19  15  A    So when I say a hospital that wanted a reprocessed

16  catheter had to pay about twice as much if they switched to

17  a new Biosense catheter -- and this is using 2023 numbers --

18  the SOUNDSTAR, a new one, $2,500.  A reprocessed one, a

19  little under $1,300.  So it's two times as expensive.  For

10:19  20  the PENTARAY, 1.5 times as expensive.  And for the LASSO

21  NAV, about three times as expensive.

22  Q    Okay.  And the second point was that they were inflated

23  Biosense prices.

24        Let's turn to Slide 20 if we could.

25        Could you explain what Slide 20 shows, please?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:20    1    A    Yes.  This shows the change in SOUNDSTAR price from

2    2017 to 2023.  So this is the change relative to 2017.  This

3    shows that the price went up $187 while the costs fell by

4    $125.

10:20    5            And to give you -- you know, what's the economic

6    background?  Well, in a competitive market, economics tells

7    us that if costs are going down, prices would go down.  But

8    that's not what we see in what Biosense did.  When its costs

9    went down, its prices went up.

10:20   10    Q    If we could turn to Slide 21.

11            Do we see that in another way in this slide?

12    A    So this shows the same information in a different way.

13    So you can see its costs went down -- the cost is the blue

14    section -- but its price, which is the top of where the red

10:21   15    bar is, went up.  And that means that red bar, which is the

16    profit, went up.  And that would be in absolute dollar

17    terms.  You see the several hundred dollars more they earn

18    in profit per catheter but also in percentage terms.

19    Q    And do you see a similar trend for the PENTARAY

10:21   20    catheter?

21    A    Yes.  So similarly for the PENTARAY, their costs went

22    down.  Their price went up.  Their margins went up in terms

23    of both dollars and in percentage terms.

24    Q    And do you see the same trend for the LASSO NAV?

10:21   25    A    Yes, a slight nuance that their costs went up slightly,

10:21  1   but their price went up far more than their costs, and so

2   their margins went way up both in percentage and in dollar

3   terms.

4   Q    And so again, what is the significance of these last

10:21  5   four graphs where you see the price going up even though the

6   costs are going down?

7   A    It ties back to the economics.  If this was a

8   competitive market, we would expect when the costs go down,

9   the prices would go down.  We would expect the increased

10:22  10   competition that would have occurred from Innovative

11   entering the market -- if the Case Coverage Policy hadn't

12   excluded them, we would expect the margins to go down with

13   increased competition, but we see the opposite.

14   Q    And have you prepared a slide showing Biosense's profit

10:22  15   margins?

16   A    Yes, I have.

17   Q    Could we put up Slide 24, please.  Thank you.

18        What is the economic significance of these profit

19   margins?

10:22  20   A    So these are high profit margins, 76 percent to

21   87 percent.  To put that in concrete terms, that means for

22   each dollar that a hospital pays for, say, the PENTARAY, it

23   only costs 13 cents to make the catheter.  So these are high

24   profit margins.  And the significance is that Biosense was

10:22  25   able to earn or get these profit margins without losing a

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:23  1    significant number of customers.

2    Q    And why is that significant?

3    A    Well, it's significant because if there was intense

4    competition, if a company was charging 87 percent markup,

10:23  5    you would expect some customers to switch, a significant

6    number, but we don't see that.  Instead, the customers are

7    continuing to buy from Biosense, and Biosense is achieving

8    market shares of more than 90 percent, sometimes 99,

9    99.9 percent for some of these catheters.

10:23  10   Q    Now, is it economically sensible to compare Biosense's

11   profit margins to Innovative Health's profit margins?

12   A    No.

13   Q    Why not?

14   A    So economists would be concerned about high profit

10:23  15   margins if a company had dominance in a market.  If they

16   were achieving those high profit margins and a high market

17   share, then you might be worried that there was abuse of

18   market power.  Innovative is not in that situation.

19   Q    Now, Dr. Forister, did you ask whether Biosense might

10:24  20   have offset the inflated catheter prices by lowering its

21   prices for cardiac mapping machines?

22   A    Yes.

23   Q    And what did you conclude?

24   A    I concluded that they would not have.  The evidence

10:24  25   that I've seen on the pricing indicates that -- a variety of

10:24   1    pieces of evidence on pricing indicates that they would not

       2    have raised machine prices in response to removing the Case

       3    Coverage Policy.

       4    Q    Did you prepare a slide showing Biosense's revenues

10:24   5    related to the CARTO 3 in 2023?

       6    A    I did.

       7    Q    Would you put up Slide 25, please.

       8          How much revenue did Biosense earn on catheters

       9    and disposables in 2023?

10:24  10    A    About a billion dollars in the U.S. alone.

     11    Q    And what about from the sale of the CARTO 3 machine

     12    itself?

     13    A    $19 million.

     14    Q    And why is that significant to your opinion?

10:25  15    A    So that's significant because if we think about if

     16    Biosense were to raise the price of machines to offset any

     17    decrease in price of catheters, the amount that customers

     18    are spending on machines is so low that it wouldn't make

     19    economic sense that they'd offset the additional price that

10:25  20    they're charging for catheters with higher CARTO 3 prices.

     21    Q    Did you analyze whether Biosense might have offset the

     22    inflated catheter prices with lower prices for CARTO 3

     23    clinical support?

     24    A    Actually, I'd continue my answer on the previous one,

10:25  25    if I may.

10:25    1    Q    Please.

2    A    There's a few other reasons why the evidence shows they

3    wouldn't have raised CARTO 3 prices if they took away the

4    Case Coverage Policy.  The first is that when they

10:25    5    implemented the Case Coverage Policy, they didn't lower

6    machine prices.  So if we roll things back and we think

7    about, well, if we take out the Case Coverage Policy and we

8    go back in time, does that mean prices were higher?  The

9    answer is no.

10:26    10           The other factor to consider in that offset is a

11    lot of the customers already bought the machine, and there's

12    no way that a change in the machine price later would

13    compensate them for the fact they're paying more for

14    catheters right now.

10:26    15    Q    Now, did you do any analysis of whether Biosense might

16    have offset those inflated catheter prices with lower prices

17    for CARTO 3 clinical support?

18    A    Yes.

19    Q    Could we put up Slide 26, please.

10:26    20           And could you explain how this relates to your

21    conclusion?

22    A    So it's industry standard to offer clinical support for

23    free.  And so consistent with that, we would -- as an

24    economic matter, one would expect that absent the Case

10:26    25    Coverage Policy, clinical support would still be free.  And

10:26    1    here's a few scenarios or situations in which we see that

         2    occurring.  For example, the first one, all other mapping

         3    machine manufacturers offer free clinical support and no

         4    Case Coverage Policy.  Biosense for the approximately seven

10:27    5    years before the tie offered free clinical support without a

         6    Case Coverage Policy.

         7            Even today, on cases involving non-sensor-enabled

         8    independently reprocessed catheters, they still have free

         9    clinical support for those procedures.  And in Alaska -- you

10:27   10    heard last week from Ms. Roberts at Ascension Health that in

        11    Alaska, Biosense made an exception, and they continued to

        12    offer free clinical support even while allowing them to use

        13    independently reprocessed SOUNDSTARs.

        14            And so all these real-world examples of these

10:28   15    situations where there's free clinical support without a

        16    Case Coverage Policy provide a basis to conclude that

        17    Biosense would have continued to offer free clinical support

        18    even if there were no Case Coverage Policy.

        19    Q    Now, Dr. Forister, does Biosense make money or lose

10:28   20    money by providing clinical account specialists to

        21    hospitals?

        22    A    This is a good question.  You might think the case

        23    coverage is a cost center, but it's not.  Biosense

        24    recognizes that having its mappers in the hospital earns it

10:28   25    a lot of money.

10:28    1    Q    How much?

2    A    Biosense itself estimates that each mapper earns

3    Biosense $1.5 to $2 million each year.

4    Q    And how does that compare to the cost of providing a

10:28    5    mapper?

6    A    So that's much higher than the cost of providing a

7    mapper.  Biosense's internal calculations are that a mapper

8    pays for their full year of cost in just two months of work.

9    Q    Dr. Forister, did you reach any conclusions about the

10:29    10    effect of the Case Coverage Policy on the combined prices

11    that hospitals paid for mapping machines, mappers, and

12    catheters?

13    A    Yes.

14    Q    And what was your conclusion?

10:29    15    A    My conclusion was that the Case Coverage Policy had the

16    effect of raising the total price or total cost to hospitals

17    of the machine, the clinical support, and the catheters.

18    Q    And what, if any, is your opinion about the effect of

19    the tying arrangement on the individual and average prices

10:29    20    hospitals pay for catheters?

21    A    So both the individual and the average prices were

22    inflated by the Case Coverage Policy.

23    Q    If we could turn back to Slide 17, please.

24         THE COURT:  Before we do that, why don't we take

10:29    25    the mid-morning break here.

10:29    1              Ladies and gentleman, I was so eager to get going,

         2    I was remiss this morning in not saying good morning to you.

         3              Today, we're only going to take an hour for lunch,

         4    and we're going to stop at 3:00.  I've spoken with counsel.

10:30    5    For the rest of the way along, we'd like to start at 8:30 if

         6    that's doable, and we'll only take one hour for lunch so it

         7    will speed us along.

         8              Very good.  We'll be in recess for 15 minutes.

         9    Please remember the admonition not to discuss the case with

10:30   10    anyone.  You're not to form any opinions on the issues in

        11    the case until it's submitted to you.

        12              (Jury not present)

        13              (Recess)

        14              THE COURT:  Let's bring the jury in, please.

10:45   15              (Jury present)

        16              THE COURT:  Mr. Ho.

        17              MR. HO:  Thank you, Your Honor.

        18    BY MR. HO:

        19    Q    Dr. Forister, could we turn back to your Slide 17.

10:46   20              Before the break, we talked about the inflated

        21    prices caused by Biosense's anticompetitive conduct.  I'd

        22    like to turn now to the decrease in quality.

        23              Could you explain how Biosense's anticompetitive

        24    conduct reduced quality in the market?

10:47   25    A    Okay, so looking at the data on catheter complaint

```
10:49     1    A     Okay.

          2    Q     Did you create Exhibit 4419?

          3    A     I did.

          4              MR. HO:  We move Exhibit 4419 in evidence.

10:50     5              MR. CAVANAUGH:  No objection, Your Honor.

          6              THE COURT:  4419 will be received.

          7              (Exhibit 4419 received in evidence)

          8    BY MR. HO:

          9    Q     What does Exhibit 4419 show?

10:50    10    A     So this shows the complaint rates for the SOUNDSTAR,

         11    PENTARAY, and LASSO NAV separately for Innovative, Biosense,

         12    and Sterilmed.

         13    Q     And how do the complaint rates for Innovative compare

         14    to the complaint rates for Biosense and Sterilmed?

10:50    15    A     You can see that the complaint rates for Innovative on

         16    that top line are significantly lower than the complaint

         17    rates for Biosense or Sterilmed.  And you may recall these

         18    complaint rate numbers from the testimony of Innovative's

         19    representative last week.

10:51    20    Q     I'll ask you now to turn to JX4421.

         21              Did you also create Exhibit 4421?

         22    A     Yes.

         23              MR. HO:  We move 4421 in evidence.

         24              MR. CAVANAUGH:  No objection.

10:51    25              THE COURT:  4421 will be received.
```

10:51    1                 (Exhibit 4421 received in evidence)

2    BY MR. HO:

3    Q    Could you explain what Exhibit 4421 is?

4    A    Yes.  So this shows the adverse events, the injury and

10:51    5    death rates, recorded in the FDA's database for the

6    catheters and manufacturers at issue.  So you can see

7    Biosense SOUNDSTAR, 116 injuries, ten deaths, from 2013 to

8    2023.

9    Q    And how do the adverse events, the injuries and deaths,

10:51    10    compare for Biosense and Sterilmed versus Innovative?

11    A    So Biosense and Sterilmed's rates are higher than

12    Innovative's both in terms of the total number in that

13    column with the green highlighting, and then if we go over

14    to the number of events per 10,000 catheters that were sold,

10:52    15    Innovative's rate of zero is lower than that of Biosense or

16    Sterilmed -- or lower or equal to.

17    Q    How do the two tables that you just showed about the

18    complaint rates and about the FDA MAUDE data relate to your

19    opinion as to whether the Biosense conduct in this case

10:52    20    decreased quality in the market?

21    A    So both of those data sources indicate that Innovative

22    has higher quality than Biosense or Sterilmed.  And so

23    excluding Innovative from the market, preventing customers

24    from choosing them, reduced the quality that was available

10:52    25    to their customers.

10:52   1    Q    In preparing this exhibit in particular, did you
        2    consider the FDA's guidance as to how the MAUDE data should
        3    be used?
        4    A    Yes, I did.
10:52   5    Q    And is the analysis in your table consistent with that
        6    guidance?
        7    A    Yes.  The FDA on their website indicates that this
        8    dataset alone, the adverse event data alone, should not be
        9    used to evaluate the adverse event rate.  And so what I did
10:53  10    was I included additional data, the sales.  I corroborated
       11    it against the complaint data, and then I looked at the
       12    academic research to see are there any findings that are
       13    contrary to this?  And there's no academic studies contrary
       14    to what I'm showing you here.
10:53  15    Q    Now, could you explain why it might well be that
       16    Innovative's reprocessed catheters are higher quality,
       17    safer, more effective than new catheters?  In other words,
       18    why does your empirical analysis make sense?
       19    A    Well, there's a few reasons, and one is this.  The
10:53  20    catheters that are getting to customers that are
       21    reprocessed --
       22            MR. CAVANAUGH:  Your Honor, I'm going to object.
       23    This is not an expert on quality of catheters.  He's done an
       24    analysis based on some data.  That's fine, but I don't think
10:54  25    he's qualified to give his opinion.

11:25    1   CARTO 3.

         2   Q    Have you reviewed CARTO 3 contracts to see whether the

         3   Case Coverage Policy is in the contract?

         4   A    I've reviewed those contracts and haven't seen evidence

11:25    5   of disclosure of the policy in the contracts.

         6   Q    And based on your review of the evidence, is the policy

         7   disclosed at the time of purchase in any other way?

         8   A    No.

         9   Q    Could you please turn to Exhibit 3963.

11:26   10        Did you rely on Exhibit 3963?

        11   A    I did.

        12        MR. HO:  We move to admit Exhibit 3963.

        13        MR. CAVANAUGH:  No objection.

        14        THE COURT:  3963 will be received.

11:26   15        (Exhibit 3963 received in evidence)

        16   BY MR. HO:

        17   Q    Now, Dr. Forister, what is Exhibit 3963?

        18   A    So this is an e-mail from Pamela Krnavek at PeaceHealth

        19   sent January 9, 2024, to Rick Ferreira.  You saw him last

11:26   20   week.  He is the CEO of Innovative Health.

        21   Q    All right.  And how is this document relevant to your

        22   opinion as to lock-in for customers who bought after April

        23   2016?

        24   A    So this is a hospital system communicating with

11:26   25   Innovative, and three dates are significant here.  The date

11:26　　1　of this communication if you can see is from January of

　　　　2　2024, and this e-mail chain is a discussion of the hospital

　　　　3　having been surprised that the Case Coverage Policy exists.

　　　　4　They wanted to buy independently reprocessed catheters from

11:27　　5　Innovative.  This is in 2024.  They then internally asked,

　　　　6　well, when did we sign the contract for the CARTO 3?  And

　　　　7　that was back in 2018 and 2021.  And yet, these if I do the

　　　　8　math right six or three years later after they bought the

　　　　9　machine, now they're finding out a Case Coverage Policy

11:27　　10　exists.

　　　　11　　　　　　I suppose a fourth date is also important.  The

　　　　12　nationwide rollout of the policy was in 2016.  So you had

　　　　13　the policy's been rolled out nationwide.  Customers are

　　　　14　buying it many years later and not finding out about it

11:27　　15　until several years after that point.

　　　　16　Q　　Okay.  Could we please turn back to Slide 36.

　　　　17　　　　　　The second factor on your list is significant

　　　　18　switching costs.  What are switching costs?

　　　　19　A　　Switching costs are the economic term for the cost that

11:28　　20　someone incurs from trying to switch to something new.

　　　　21　Q　　And do hospitals face significant switching costs

　　　　22　between systems?

　　　　23　A　　They do.  And that consists of both financial and other

　　　　24　impediments or costs.

11:28　　25　Q　　Okay.  And what are the financial impediments?

11:28    1    A     So the financial part of the switching cost is the cost

2    to buy a new machine.  If you don't have that other machine,

3    you have to buy it.  They cost hundreds of thousands of

4    dollars.

11:28    5    Q     And what the non-financial switching costs?

6    A     So these are particularly challenging to deal with, and

7    you heard from Dr. Doshi on Friday describing them.  The

8    hospital, or the situation, would have to convince the

9    doctor to switch away from the machine they were planning to

11:28    10    use to a new machine.  And the doctors are comfortable with

11    one machine.  They might not have training on another

12    machine, which is another barrier or cost to switching.

13    They may want to stick with the mapper on the CARTO 3 and

14    not switch to a new mapper on, say, an Abbott machine.  So

11:29    15    these are all costs to switching that indicate that lock-in

16    is happening.

17    Q     Okay.  The third item on your list is the difficulty of

18    lifecycle pricing.

19         Before we get to the difficulty part, what is

11:29    20    lifecycle pricing?

21    A     So that's just predicting the total cost over the life

22    of a CARTO 3.

23    Q     And why in your opinion is it difficult for hospitals

24    to accurately engage in lifecycle pricing?

11:29    25    A     Well, there's a few factors.  The first is that the

11:29   1  CARTO 3 is a long-lived device.  It has a lifespan of ten or
        2  more years.  And you can imagine it's difficult to predict
        3  ten years in the future, particularly in light of the fact
        4  that the hospital would need to predict when new and more
11:30   5  expensive catheters are coming online, when reprocessors
        6  might enter at lower prices.  They need to figure out what
        7  patient demand is going to be, what reimbursements are going
        8  to be, so a host of challenges to predicting a ten-year or
        9  more lifecycle price.
11:30  10  Q    You heard some testimony in court during the trial that
       11  hospitals tried to engage in lifecycle pricing.  Did that
       12  affect your opinion?
       13  A    No.
       14  Q    Why not?
11:30  15  A    Well, one would expect the purchaser of a product to
       16  make some attempts to do lifecycle pricing, but for all the
       17  reasons I mentioned, it's challenging to do that accurately.
       18  And if it's -- if you can't accurately predict those things,
       19  you may not be able to avoid the choice of buying the CARTO
11:30  20  3 and getting locked in.
       21  Q    Now, the last factor on your list is cross-elasticity
       22  of demand.  Could you explain what that means?
       23  A    Yeah.  So that's just a fancy economic way of saying if
       24  the price of one product goes up, do customers switch to
11:31  25  another product?

11:31  1    Q    Okay.  And did we see cross-elasticity of demand
       2    between sensor-enabled catheters for different kinds of
       3    cardiac mapping machines?
       4    A    So I looked at whether we could see that substitution,
11:31  5    say, between the mapping catheters on the CARTO and mapping
       6    catheters on the Abbott machine.  And the evidence in this
       7    case indicates that there is not significant switching going
       8    on between those in response to price or other changes.
       9    Q    Now, what proportion of CARTO 3 machines in operation
11:31  10   today in your opinion are subject to the single-brand
       11   aftermarket lock-in factors that you see on this slide?
       12   A    Essentially, all of them would be.  And particularly
       13   relevant is whether they knew about the policy at the time
       14   they first bought into the CARTO 3.
11:32  15   Q    I'd like to shift gears a little bit and ask you to
       16   help the jury understand what is a relevant antitrust
       17   market?
       18   A    So a relevant antitrust market consists of the products
       19   and services that are reasonably interchangeable or
11:32  20   reasonably substitutable.
       21   Q    Did you evaluate what relevant antitrust markets exist
       22   in this case?
       23   A    I did.
       24   Q    And do you have a slide to help explain your opinions?
11:32  25   A    Yes.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:39  1   characteristics of aftermarket lock-in that you described

2   earlier in your testimony?

3   A    Yes.

4   Q    And do the sensor-enabled catheter markets that you

11:40  5   identified also have the characteristics of lock-in that you

6   described?

7   A    Yes.

8   Q    Dr. Forister, just so the record is clear, what is the

9   geographic scope of these markets?

11:40  10  A    The geographic scope of these markets is the United

11  States.

12  Q    I would like to turn from the question of relevant

13  antitrust markets to another term, "market power."  What is

14  market power?

11:40  15  A    So market power refers to the ability of a company to

16  force customers to do something they wouldn't do in a

17  competitive market.

18  Q    What is monopoly power?

19  A    Monopoly power is significant and sustained market

11:40  20  power.  And to give some examples of what market power would

21  look like, it would be forcing customers to pay inflated

22  prices or taking away choices from customers by excluding

23  competition.

24  Q    Have you analyzed whether Biosense has market power or

11:41  25  monopoly power in the relevant antitrust markets in this

11:41    1    case?

2    A    Yes.

3    Q    Have you prepared a slide to illustrate your opinions?

4    A    Yes.

11:41    5    Q    Okay.  Now, you have again two factors.  The first is

6    high market share and barriers to entry.  What does that

7    mean?

8    A    One way economists evaluate market power is whether a

9    company has a dominant share and whether there's high

11:41    10    barriers to entry.  If a company has a dominant share, it

11    would appear that competition is not knocking it out of its

12    position in the market.  And if there's high barriers to

13    entry, it indicates that it wouldn't be easy for a new

14    company to come in and provide that competition and

11:41    15    discipline or restrain the behavior of a dominant firm.

16    Q    And then could you explain what you mean by inflated

17    price or excluded competition?

18    A    Inflated prices or excluded competition are direct

19    evidence that a company has abused its market power, and

11:42    20    that tells us that the company has market power.

21    Q    Okay.  So again, let's start with the cardiac mapping

22    machine market.

23         What is Biosense's market share in that market?

24    A    We have a slide for this.  It's currently 66 percent.

11:42    25    Q    And how do you measure that?

11:42    1    A    We measure that on the share of usage, the share of

2    procedures that use the CARTO 3.

3    Q    Why is that the appropriate measure?

4    A    That's appropriate, because to have dominance in a

11:42    5    market, a machine manufacturer would have to not just sell

6    the machine to a hospital but also convince the doctors to

7    use it.  If the doctors aren't using it, the machine company

8    is not going to have much power in the market.

9    Q    And what barriers to entry are there in the cardiac

11:43    10    mapping machines market?

11    A    A variety of barriers.  This is a high-tech product, so

12    there's technical barriers.  It's regulated by the FDA, so

13    there's regulatory barriers.  And there's a huge financial

14    and time commitment to getting into this market.  Some

11:43    15    companies have spent hundreds of millions of dollars trying

16    to enter and still failed.

17    Q    What evidence is there that Biosense can inflate prices

18    or exclude competition in this market?

19    A    For example, in the years following the imposition of

11:43    20    the Case Coverage Policy, Biosense was able to raise its

21    price without losing sales even while its competitor was

22    slashing prices.

23    Q    Do you have a slide to demonstrate that?

24    A    Yes.

11:43    25    Q    What does this show?

11:49    1    significantly.

2    Q    Did you do a second quantitative analysis?

3    A    Yes.

4    Q    Could we please put up Slide 45.

11:49    5         What does Slide 45 show?

6    A    So this compares independent reprocessors' share for

7    catheters that were unaffected -- CARTO 3 catheters that

8    were unaffected by the policy.  So one might have been

9    concerned in that previous slide that we see this decline,

11:49    10    but what if it's due to something else?  What if people are

11    just becoming less interested in reprocessing?  And this

12    answers that question.  The share of independent

13    reprocessing went up between 2013 to 2014 and 2022 to 2023

14    for the catheters on the CARTO 3 that weren't covered by the

11:50    15    Case Coverage Policy.

16    Q    Dr. Forister, to summarize, in your opinion, was

17    Biosense's Case Coverage Policy anticompetitive or

18    competition on the merits?

19    A    It was anticompetitive.

11:50    20    Q    And what about Biosense's Project Falcon, the blocking

21    technology?

22    A    The blocking technology was anticompetitive.

23    Q    What about Biosense's catheter collections practices?

24    A    The catheter collection and withholding was

11:50    25    anticompetitive.

11:50    1   Q   What impact did that anticompetitive conduct have on

2   hospitals' choices to buy CARTO 3 sensor-enabled catheters

3   from Innovative Health?

4   A   It eliminated the choices that hospitals would have

11:50    5   made in a competitive market.

6   Q   And how much money did Innovative Health lose as a

7   result?

8   A   At least $147 million.

9         MR. HO:  Pass the witness.

11:51   10         THE COURT:  Why don't we take the lunch break

11   here.  We'll come back at ten to 1:00, ladies and gentleman.

12   Please remember the admonition.

13         (Jury not present)

14         THE COURT:  Anything for the record before we take

11:51   15   the noon break?

16         MR. HO:  Just one ministerial thing.  I know Dr.

17   Wu isn't testifying for some time, but if we could make the

18   standing objection something that both sides could have, we

19   would appreciate that.

11:52   20         MR. CAVANAUGH:  No objection, Your Honor.

21         THE COURT:  Fine.

22         (Recess)

23         (Miriam Baird reported Vol. II)

24             *   *   *

25