# Exhibit 10



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE JAMES V. SELNA, JUDGE PRESIDING

INNOVATIVE HEALTH, LLC, )
Plaintiff, )
Vs. ) No. SACV-19-01984-JVS
BIOSENSE WEBSTER, INC., )
Defendant. )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

DAY 2, VOLUME II

SANTA ANA, CALIFORNIA

WEDNESDAY, MAY 7, 2025

MIRIAM V. BAIRD, CSR 11893, CCRA
OFFICIAL U.S. DISTRICT COURT REPORTER
350 WEST FIRST STREET
FOURTH FLOOR
SANTA ANA, CA 92701

name of the customer, correct?
A. It appears the name of the customer, correct.
Q. So let's just go through a few of the complaints. Row 175, let's scroll over to column R. Here's a complaint made by Torrance. Do you see that?
01:49PM
A. I see. It's dated 6/12/2023.
Q. Right. And the complaint was that the device did not initialize and was not recognized by the ultrasound console, correct?
01:49PM
A. Sorry. She keeps jumping around. Thank you. I see that.
Q. Let's go to row 191. You see there's another complaint made by Torrance?
A. I see that here, yes.
01:49PM
Q. Row 206, another complaint made by Torrance?
A. I see that, yeah.
Q. Row 207, another complaint made by Torrance?
A. What devices are these for?
Q. Well, I'm not asking you about the devices, sir. I'm
01:49PM
just asking whether Torrance made those complaints. Do you see those?
A. I see what you're showing me on the screen, yeah. I was just curious about what --
Q. We'll skip the others.
01:50PM
Now, you were in the courtroom yesterday, sir, when

your counsel said during his opening statement that this case is about choices. Do you recall that?

A. I recall that.

Q. Right. So let's talk about the -- let's talk about how hospitals choose cardiac mapping systems, okay? You would agree with me, Mr. DeTate, that generally speaking hospitals evaluate the competitive landscape in the cardiac mapping system market before purchasing a new system, correct?

A. It would be hard for me to talk about all hospitals. I can talk about my experience at Torrance.

Q. Right. My question simply was: Generally speaking you would agree that hospitals evaluate the competitive landscape before they make decisions, correct?

A. I believe at Torrance Memorial Medical Center, we evaluated the competitive landscape. Again, I can't talk for all hospitals.

Q. You testified on direct, sir, that you visited hundreds of hospitals, correct?

A. I've visited hundreds of hospitals, correct.

Q. You talked about what you observed at those other hospitals other than Torrance, correct?

A. I'm not involved in their decisions about buying a cardiac mapping system.

Q. That's not my question as to whether or not you were involved with decisionmaking at the hospitals.

A. I'm not sure I could answer that question.
Q. My question simply was: You spoke during direct examination about what you saw at those hospitals, correct?
A. Yes.
01:51PM Q. Okay. And one of the things, for instance, that Torrance does or did is to compare the pricing of the different cardiac mapping systems, correct?
A. That's correct. At Torrance we did that.
Q. At Torrance you also looked at each system from a 01:51PM clinical standpoint whether it can perform the type of procedure that the hospital wanted it to perform, correct?
A. That's correct.
Q. And one of the things that Torrance also looked at is the pricing of the consumables, disposables such as 01:52PM catheters, correct?
A. Torrance evaluated the consumables that were available at the time of the contracts. That's correct.
Q. And Torrance also evaluated the price of the sensor-enabled catheters, correct?
01:52PM A. For the catheters that were available, they did.
Q. And you're certainly familiar with the Biosense Webster, the Abbott, the Boston Scientific, and the Medtronic systems, correct?
A. The Medtronic system is fairly new. I'm not that 01:52PM familiar with it. The other three I do have some experience

with, yeah.

Q. So let's focus on those three. You would agree with me that those three systems compete against one another?

A. Those systems perform the same function of generating a 3D map.

01:52PM

Q. You would agree with me that those three systems compete against one another?

A. They're operating in the same space, so I would say they're competitive. That's correct.

01:52PM

Q. And I want to talk about how easy it is for hospitals to switch between systems that choose to do so, an issue that you spoke about on direct examination. Okay. You would agree that a hospital can buy a CARTO 3 system without any capital outlay by making a commitment to purchase catheters?

01:53PM

A. I'm familiar with that.

Q. In fact, it's not uncommon in the hospital setting to offset the cost of the capital equipment through the purchase of catheters, correct?

A. That's correct.

01:53PM

Q. And hospitals can also purchase the GE or Siemens ultrasound machine through Biosense Webster, correct?

A. I know that depending on the timing, Biosense Webster offers one or the other to be purchased with catheter deals. That's correct.

01:53PM

Q. And at the time that you gave your deposition in this

case in 2021, the hospital that you worked at, Torrance, used all three cardiac mapping system -- Biosense Webster, Abbott, and Boston Scientific -- correct?

A. That's correct.

Q. And you spoke about market share of procedures during your direct examination, but I want to talk about what actually happened at Torrance, okay? Boston Scientific had a 60 percent market share of the procedures at Torrance, correct?

A. At the time of the deposition --

Q. Yes.

A. -- I believe that's correct.

Q. CARTO, Biosense Webster's system, had just 20 percent of the market share, correct?

A. I believe at that time that was correct.

Q. And Abbott, the third competitor, had the remaining market share, the 20 percent that's left, correct?

A. Yeah. That seems about right.

Q. By the way, you also spoke on direct examination about how Abbott and Boston Scientific don't have the same type of clinical account support policy that Biosense Webster has. Do you recall that?

A. I do.

Q. Sir, you would agree with me that the Abbott system is an open system, correct?

A.    It depends on what mode you're mapping in, but it's

partially open, partially closed.

Q.    Right.  You can visualize any company's catheter on the

Abbott system, correct?

01:55PM  A.    You can't visualize a PENTARAY on the Abbott system.

Q.    Leaving PENTARAY aside, you can visualize other

sensor-enabled catheters on the Abbott system, correct?

A.    I'm not sure that they plug into the Abbott system that

way.

01:55PM  Q.    Can you visualize a OCTARAY on the Abbott system?

A.    No.

Q.    Okay.  Biosense Webster's system in contrast with

Abbott's system is a closed system, correct?

A.    Biosense Webster is a closed system.  That's correct.

01:56PM  Q.    And Abbott, by the way, doesn't have a corporate

affiliate that sells reprocessed catheters, correct?

A.    I believe they have just recently started reprocessing

ViewFlex catheters.

Q.    Very recently, correct?

01:56PM  A.    That's correct.

Q.    And you know that some of the Abbott clinical account

specialists are having difficulty when being asked to provide

clinical account support for third-party reprocessed Abbott

catheters that are used in the new Abbott system, correct?

01:56PM  A.    We've heard some feedback from some of our customers

that's starting to circulate. That's correct.

Q. Now, focusing on this issue of choice, one of the things that you have recommended to hospitals over the years to control cost is to shift electrophysiology procedures from one cardiac mapping system to another, correct?

A. I'm sorry. Can you rephrase that.

Q. So one of the things that you have recommended to hospitals to control the cost associated with EP procedures is to shift EP procedures from one cardiac mapping system to another system, correct?

A. That's one method for controlling cost.

Q. That's a choice the hospitals have, right?

A. If the physicians are willing to move the market, then, yeah.

Q. That's a choice the physicians have, correct?

A. That's correct.

Q. So, for instance, if you're a hospital that does 80 percent of its cases on the CARTO 3 and 20 percent, let's say, on another system, you can shift the cases from CARTO to the other system if that's cheaper for the hospital if the physicians want that, correct?

A. Well, first they'd have to have the second system. So if they had the second system, then potentially if the physicians were willing to move market share, you could.

Q. Right. If Biosense Webster raised prices on catheters

and a hospital or a physician is not happy about it, one option the hospital has is to move the share of cases being done on the CARTO system to another system, correct?
A. Again, assuming that the hospital had that system and 01:58PM the physicians were willing to move the market, they could move it.
Q. Hospitals can choose to move patients to the other cardiac mapping system to save costs if they have that second cardiac mapping system, correct?
01:59PM A. Assuming the doctor was willing to move those patients to that system, that's correct.
Q. Another strategy that hospitals can use that you have recommended is that if they are dissatisfied with Biosense's clinical support policy, they can shift their share of cases, 01:59PM patients, on the CARTO system to another system, correct?
A. I'm not really sure. That seems like the same question.
Q. No. This question relates to the clinical support policy. Let me reask --
A. Okay. So this isn't about cost. The question is if a 01:59PM hospital is unhappy with the Biosense case coverage policy?
Q. Yes.
A. They could move it.
Q. Yes. They can move that case, the patient, over to a competitor's system, correct, if the physician --
02:00PM A. Again, if they have the computer -- if they have the

mapping system and the physician was willing to do that, then, yeah, that seems reasonable.

Q. Okay. I want to talk a little bit more about the mapping support at Torrance.

02:00PM A. Okay.

Q. For the many years that you worked at Torrance, you and others I think you spoke about on direct examination, you mapped cases on the CARTO system, correct?

A. We did, as well as other systems.

02:00PM Q. Biosense Webster helped train the hospital staff at Torrance when you were being trained there to map electrophysiology cases on the CARTO 3 system, correct?

A. Yeah. When they installed the CARTO 3 system, they trained us to map.

02:00PM Q. They trained Torrance staff without any additional charge, correct?

A. Not that I'm aware of.

Q. Well, sir, why don't we -- if you can take a look at your deposition to see if it helps refresh your recollection

02:01PM on this issue. Go to page 92.

Let me do it another way. You remember testifying at your deposition, correct?

A. I do.

Q. Okay. And let's take a look at page 92, lines 18

02:01PM through 20.

be successful. That means that it was too large for the hospital to provide self support through their own mappers, correct?

A. There were a couple factors related to the size of the hospital that I was speaking to here, but one of the them was -- was that.

Q. Okay. And then you go on to say that -- you say unable to retain staff. The lab function in a state of being propped up by contract labor, correct?

A. That's correct.

Q. And that's a challenge because contract labor, when it's used at a hospital, it's not permanent or stable, correct?

A. That's correct.

Q. It's a challenge because contract laborers don't take ownership in the hospital environment, correct?

A. I -- that's been my experience in the hospital setting. They're there for short periods of time, so they're usually not going to be even there long enough to train on something like this.

Q. And it's the hospital's choice to use contract staff as opposed to hiring and compensating full-time employees, correct?

A. From my experience contract staff is kind of a last-ditch effort to staff a department when you can't hire in full-time people.

Q. And that's a decision the hospitals make, correct?
A. It's the only decision they have generally when they're turning in that direction.
Q. Right. They make that decision, correct?
02:25PM A. I don't know who else would make that decision.
Q. And in the memo you go on to say that physician group is too large to move in one uniform direction. Even though Dr. Eldadah voiced his support, he could not push this agenda to the other members of the group. Do you see that?
02:25PM A. I see that.
Q. And Dr. Eldadah was the head of electrophysiology?
A. He was the medical director.
Q. And then you say: The institution is a teaching hospital where fellows are doing many of the actual cases. 02:25PM This puts a tremendous amount of responsibility on staff to teach and train these physicians during procedures.
Do you see that?
A. I do.
Q. And you say too many mapping systems in the facility, 02:26PM correct?
A. Yeah.
Q. And that shows that cardiac mapping systems are competing against each other there, correct?
A. The rest of this line states that they had two systems 02:26PM there on evaluation, so they were evaluating them. So it

seems like they like their technology at MedStar.

Q. But the systems that they had were competing against each other, correct?

A. Yeah.

02:26PM Q. And then in the section that's titled things learned for future sites, you write non-academic institution, eliminate the fellows. Do you see that?

A. I do.

Q. And what that means is that academic institutions have

02:26PM fellows who are in a training program and typically one or two years out of medical school, correct?

A. That's correct.

Q. And they are generally speaking relatively inexperienced electrophysiologists who are still learning how to manipulate

02:26PM the catheter, correct?

A. That's correct.

Q. And they have increased anxiety when you ask them to use reprocessed catheters, correct?

A. I'm not sure I can answer that statement.

02:27PM Q. Okay. Well, why don't we take a look at your deposition, sir. This is page 263, lines 4 to 20. We'll play the clip 8030.1.

(Videotaped deposition clip played)

BY MR. FARIDI:

02:28PM Q. Sir, one of the other things that you learned was that

physicians didn't feel that reprocessed devices functioned the way they were supposed to, correct?

A. I'm not seeing that highlighted on here.

Q. It's not in the document. I'm just asking you what you experienced at MedStar.

02:28PM

A. That the reprocessed devices didn't function as they were supposed to?

Q. Yes.

A. I don't remember that.

02:28PM

Q. Why don't we take a look at your deposition. This is page 231, lines 11 through 22. Let's play the clip 8031.1.

(Videotaped deposition clip played)

BY MR. FARIDI:

Q. And, sir, one last question. At this facility, the MedStar facility, the IH catheters that you used, the IH catheters that you used, they were not recalibrated, correct?

02:29PM

A. Again, Innovative Health does not recalibrate any reprocessed devices.

MR. FARIDI: No further questions.

02:29PM

THE COURT: Redirect.

MR. GOLDSMITH: Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MR. GOLDSMITH:

Q. Mr. DeTate, on cross-examination you were asked about the concept of offsetting the cost of a new mapping machine

02:30PM

country as well, and our partnership with them is very similar. We test product in there. We get product from them, kind of see what's going on in the marketplace. They're one of those leading-edge providers.

02:46PM Q. Okay. And is that important to Innovative Health?

A. Yes, it is.

Q. How so?

A. Well, it helps keep us current. As I said earlier, one of our things that make us innovative is we're bringing a lot

02:46PM of new products to market for our customers so their savings can continue to grow.

The relationship with both the Mayo Clinic and Stanford University hospitals are the exact same.

Q. At some point in time did Innovative Health sell its

02:46PM products through a partnership with a company called Medline?

A. Yes, we did.

Q. What is Medline?

A. Medline is one of the country's largest distribution companies to hospitals.

02:47PM Q. What kind of relationship did Innovative Health have with Medline?

A. We did a private label program for them, so we would reprocess catheters and they would be able to sell it under their private-label brand called ReNewal.

02:47PM Q. Does Innovative continue to have that relationship with

Medline today?

A. We don't. We're just finishing off a tail on the agreement that ends in the month of July.

Q. Why did you -- why is that relationship coming to an end?

A. For how we sell it, our sales is really a physician preference item, and their sales force really just wasn't suited to be able to sell in that environment.

Q. Mr. Ferreira, you have a binder of exhibits in front of you. Could I ask you to turn to the one that's marked JX10.

A. Yes. I have it here.

Q. Do you recognize JX10?

A. Yes, I do.

MR. HO: Your Honor, we'd move to admit JX10.

THE COURT: Any objection?

MR. CAVANAUGH: No objection.

THE COURT: JX10 will be received.

**(Exhibit JX10 received)**

BY MR. HO:

Q. What is JX10, Mr. Ferreira?

A. It is a clearance letter from the Department of Health and Human Services granting us a 510(k) to sell a reprocessed ACUNAV catheter.

Q. And could you tell the jury the date of the 510(k) approval for the ACUNAV catheter.

A. March the 10th, 2016.

MR. HO: Can we please bring up JX11, which has already been admitted in evidence.

BY MR. HO:

02:48PM Q. Do you recognize JX11?

A. Yes. It's a similar letter from the Department of Health and Human Services dated March the 14th granting us the right to be able to sell reprocessed LASSO NAV catheters.

Q. Okay. So these two 510(k) approvals from March 10th and 02:48PM March 14th for the ACUNAV and the LASSO NAV catheters, were they the first 510(k) approvals that Innovative Health obtained?

A. Yes. They were our first two clearances.

Q. And how did you feel when Innovative Health got those 02:49PM first two clearances?

A. Excited. These were our first two products that we were able to sell.

MR. HO: Now, if we could please bring up JX545, which has also been admitted.

02:49PM BY MR. HO:

Q. Mr. Ferreira, do you recognize JX545?

A. Yes, I do.

Q. What is JX545?

A. This is an e-mail communication between Dave Distel, 02:49PM myself, Tim Einwechter, Liz Stoneman, dated March the 30th,

2016.

Q. Okay -- and so about two weeks after you got the 510(k) approvals that we just saw?

A. Yes. That is correct.

02:49PM Q. What is attached to this e-mail?

A. It is an attachment we received from Douglas Beinborn at Mayo Clinic, which is dated October 31st, 2014. Case coverage position on clinical account specialist support of reprocessed SUD catheters.

02:50PM Q. And what did you understand that letter to be?

A. It's a letter that was being circulated to Mayo facilities telling them they would no longer support the cases if a reprocessed catheter was used in that case.

Q. Do you recall getting this e-mail at the time?

02:50PM A. Yes, I do.

Q. If you look at the e-mail on the first page, Mr. Beinborn is the author of the e-mail. Who is Mr. Beinborn, Douglas Beinborn?

A. Mr. Beinborn ran the lab at Mayo Clinic. He was the

02:50PM operations manager for their EP lab.

Q. He says: Please see the attached letter Biosense Webster is sending to sites. Do you see that?

A. Yes, I do.

Q. What did you understand that to mean?

02:51PM A. That Biosense Webster was using this letter in front of

customers within both the Mayo setup themselves as well as Mayo affiliates.

Q. Mr. Ferreira, was this the first time that you heard of the Biosense Webster case coverage policy?

02:51PM A. Yes, it was.

Q. What was your reaction to it?

A. We were a little taken aback by it, especially after we went from the euphoria of having our first clearances and then two weeks later we see this letter that's being

02:51PM circulated.

Q. Mr. Ferreira, I'd like you to look in your binder for JX3912.

A. (Witness complies.) Yes. I have that.

Q. What is this document?

02:51PM A. This is an e-mail from Lynn Sadler dated August the 15th, 2017, to my daughter Amy Ferreira. And the subject is Methodist device usage.

Q. Did you receive this e-mail in the ordinary course of your business at Innovative Health?

02:52PM A. Yes, I did.

Q. Was this created by Ms. Ferreira at or near the time of the events in question?

A. Yes, it was.

Q. And does Innovative Health keep e-mails in the course of

02:52PM its regularly conducted activity?

and then they could pay us back out of their savings. But we were not able to get that cleared through their compliance department, so that didn't work either.

Q. Did you have any discussions with any other hospital customers about this potential approach?

03:19PM

A. Kaiser Permanente. On Kaiser we talked about doing a cost share with them where we would pay part of it and they could pay part of it out of their savings, but we never got that off the ground either.

03:19PM

Q. How many in total would you say?

A. A handful. Five, maybe six systems.

Q. Why did you not have discussions with all of your customers about this possibility?

A. Because it really wasn't scalable for us to be able to do it. We were actually doing it as a result of the hospitals trying to engage us to figure out a solution to it. So it wasn't something that we could take nationally across the country.

03:19PM

Q. Mr. Ferreira, why can't Innovative Health provide its own mappers to hospitals?

03:19PM

A. Well, really two reasons. One, we don't make the machine. Biosense Webster makes the machine, and the mapper is actually running the machine. He's -- they're running the machine.

03:20PM

Q. What do you mean when you say that the mapper is running

the machine?

A. Well, the catheters all plug into what we call the box but into a -- it's the CARTO system. And the mapper is there and he's running the machine. He's operating the machine.

03:20PM Q. So does the mapper run or operate the catheters?

A. No. The catheters are in the hands of the physician.

Q. So does the mapper support the catheters?

A. No. He supports the machine.

Q. Does Innovative Health provide clinical support to

03:20PM doctors if they have issues with the catheters?

A. Yes. We have a clinical support team that will go out a few different times. One, they'll go out when we launch a brand-new account to the physicians. If they've got any questions, we can answer them.

03:21PM When we launch new products, they're in the accounts. Our large accounts, like Stanford, we would be in there on a quarterly basis. And if the physicians have any questions or about how we do, one of our clinical folks will be on site. Yes.

03:21PM Q. Okay. Is there a second reason why Innovative Health can't provide its own mappers to hospitals?

A. Well, it's not economically feasible for us to do so. I mean, in a case we're only reprocessing about 25 percent of the catheters. The rest of the catheters are the brand-new

03:21PM catheters. And the expensive catheters are still being sold

by Biosense Webster.

Q. Give us a sense in a given case of how much, if you're able to sell reprocessed catheters, what percentage of the equipment in a given case are you providing?

03:21PM A. About 25 percent.

Q. Okay. And can you explain why that makes it economically infeasible for you to provide a map for the entire case?

A. We're not selling the rest of the catheters. We're

03:22PM selling a small sliver of the catheters that are to be used.

Q. Mr. Ferreira, is Biosense's case coverage policy still affecting Innovative Health's business today?

A. Yes, it is.

Q. Give us a sense of what the magnitude of that impact is.

03:22PM A. I think our business could be double the size as it is today if I was able to sell these sensor-enabled catheters. Again, remember, each dollar of sales for me is a dollar of savings for the hospital because they're not having to buy brand-new catheters. So it's pretty impactful.

03:22PM Q. If you could look in your binder and find JX3887.

A. (Witness complies.) Yes. I have it here.

Q. Do you recognize JX3887?

A. Yes. This is an e-mail from Ken Blenis at MarinHealth dated March the 6th, 2020, to Jay Farris.

03:23PM MR. HO: Your Honor, we move to admit 3887.

THE COURT: Any objection?

MR. CAVANAUGH: No. No objection.

THE COURT: 3887 will be received.

**(Exhibit 3887 received)**

03:23PM BY MR. HO:

Q. Mr. Ferreira, who Ken Blenis?

A. Ken Blenis is the supply director in charge of materials at Marin County. He does all the contracting and the purchasing.

03:23PM Q. And just for the record, what is MarinHealth?

A. Marin -- it's a hospital in Marin County.

Q. What is this e-mail exchange about, Mr. Ferreira?

A. It starts off -- it's an e-mail from Ken to Joan Burns at Marin. Joan ran the lab at Marin, so she was the business 03:23PM manager, operations manager for that lab.

Q. And what did Mr. Blenis say to Ms. Burns?

A. So again, like we saw in the e-mail with IU Health, he's highlighting the fact from a business review that they're not saving as much money as they thought they would because 03:24PM they're not being able to reprocess the PENTARAY. He says here: One item that stood out as an additional opportunity is the PENTARAY cath.

Q. And then could you describe what happens in the rest of the e-mail chain.

03:24PM A. So he's asking Joan why she's not reprocessing that or

 THE COURT: Sir --

THE WITNESS: Yes, sir.

THE COURT: -- please listen to the question and answer the question asked of you.

03:50PM THE WITNESS: I would say they're not supporting the procedure. They're supporting the machine.

BY MR. CAVANAUGH:

Q. Now, Stryker also sells reprocessed sensor-enabled catheters, correct?

03:50PM A. Yes, they do.

Q. And in your view the Biosense CAS would have to support that procedure where a Stryker reprocessed catheter was used, correct?

A. I think I said they're not supporting the procedure on 03:50PM your last question. That's my answer.

Q. So let me phrase it this way. In your view a Biosense CAS would have to be at that procedure. Can we agree on that?

A. That they would be at the procedure, yes.

03:50PM Q. Okay. And so if a Stryker reprocessed catheter was going to be used, in your view a Biosense CAS would have to be at that procedure, right?

A. Correct.

Q. And if I started the Cavanaugh Reprocessing Company and 03:51PM got FDA approval to sell a reprocessed Biosense catheter, I

could tell Biosense to have a CAS at that procedure?

A. I think you're taking it out of context, though. You're not acknowledging that --

THE COURT: Sir. Sir.

03:51PM THE WITNESS: Yes, sir.

THE COURT: You don't get to comment at this time. Your job, your duty is to answer that question.

THE WITNESS: Sorry. Yes, you could have the Cavanaugh Reprocessing Business. Absolutely.

03:51PM BY MR. CAVANAUGH:

Q. All right. Now, you certainly view Biosense and Sterilmed as your competitors, correct?

A. Correct.

Q. You would also view Abbott and Boston Scientific and 03:51PM Stryker as your competitors?

A. Yes, I would.

Q. And in terms of ultrasound catheters, do you agree with me that the Abbott and Boston Scientific ultrasound catheters compete with the Biosense ultrasound catheters?

03:52PM A. Yes, they do.

Q. We've heard the term high-density mapping catheters like the Abbott HD Grid and the Boston Scientific, the Telemet Orion. You're familiar with those?

A. Yes.

03:52PM Q. And those high-density mapping catheters, they compete

with the Biosense high-density mapping catheters like the PENTARAY and OCTARAY and Optrell, correct?
A. That is correct.
Q. And in terms of circular mapping catheters like the Biosense LASSO, they compete with the Abbott circular mapping catheters, the Advisor, the Boston Scientific --
A. Correct.
Q. -- and the Medtronic Achieve?
A. Yes.
Q. Now, let me change topics for a moment. Private equity companies are investors in Innovative Health, correct?
A. Yes. That's correct.
Q. 1315 Capital is a private investment company, private equity investment company?
A. Yes. That's correct.
Q. And they invest in many healthcare, medi-tech companies?
A. Yes, they do.
Q. They have over a billion dollars under management?
A. Yes.
Q. 1315 owns a portion of Innovative?
A. Yes, they do.
Q. A little less than 20 percent?
A. Around there.
Q. Okay. A company called G-Bar Ventures has invested in Innovative?

A. Yes.
Q. How much of Innovative do they own?
A. I don't know the exact number, sir. Five percent maybe.
Q. And they're an investment advisor to a family office?
03:54PM A. They are the family office.
Q. Thank you. And your total ownership of Innovative either personally or through 1315 Capital is about 14 percent?
A. Roughly, correct. Yes, sir.
03:54PM Q. Now, you established Innovative with Mr. Einwechter in 2015?
A. Yes.
Q. Now, at the time that you started Innovative, your goal was to start the company, build it into a company that would 03:55PM be advertising to potential acquirers and then sell it, correct?
A. Yes.
Q. And your plan was to hold onto the company for five to seven years and then sell it, correct?
03:55PM A. Well, not my plan. Private equity funds, as you know, change over every seven years, so I'd have to be in a position to either recap the business or sell it in that time frame. So you are correct.
Q. Because when you look at an investment from a private 03:55PM equity standpoint, you're typically looking at a five- to

the end of June of 2025.

Q. And Medline made revenue projections to Innovative and missed those targets frequently, correct?

A. As did we. Correct.

04:07PM Q. If Medline missed their targets, that would mean you would miss your targets?

A. Yeah. I think we're talking about our own sales account, but, correct.

Q. If we could go to JX1293.

04:08PM A. (Witness complies.) I have it, sir.

MR. CAVANAUGH: Your counsel needs to decide whether they have an objection to it.

MR. HO: No objection.

THE COURT: It will be received.

04:08PM **(Exhibit JX1293 received)**

BY MR. CAVANAUGH:

Q. Now, in February of 2019 your company was looking at sending out social media blasts in the marketing campaign regarding the Biosense case coverage policy, correct?

04:08PM A. We used social media a lot. So if you have a post you want to show me, go ahead.

Q. The e-mail reflects --

A. Excuse me. Is that e-mail supposed to be in this booklet? I don't have it in here. All I have is the position statement from Biosense.

04:09PM

Q. Look at what's up on the screen, then.
A. Give me a chance to read it, please.
Q. If you go to the top ...
A. Just keep scrolling up for me real quick.
04:09PM Q. So in February of 2019, there was going to be a social media post: Biosense Webster threatens to stop technical support to hospitals, correct?
A. Correct.
Q. All right. And there was going to be a link to a blog
04:10PM post you had done?
A. Yes. I don't recall the blog post, though. If you've got it, you can show it to me.
Q. But at this point the language, Biosense Webster threatens to stop technical support to hospitals, you had
04:10PM been aware of the case coverage policy going back to March of 2016, correct?
A. Correct.
Q. And the case coverage policy document that was sent to you by someone at the Mayo Clinic was actually dated October
04:10PM of 2014; is that right?
A. That's correct.
Q. And this was a blast that was sent out to -- you would be sending this out to hospitals; wouldn't you?
A. It would go out on our LinkedIn profile.
04:10PM Q. You were also aware that the Veterans Administration

doesn't allow its facilities to use any reprocessed catheters, correct?

A. 25-year-old policy. But, yes, I'm aware of it.

Q. Well, that 25-year-old policy is still in place today; is it not?

A. Yeah, but for the DOD that looks after our veterans, that looks after our Army while they're in war, they reprocess. But the Veterans Affairs that look after them when they're out of service doesn't reprocess.

Q. Turn to JX -- you gave us some testimony about reimbursement. Am I correct that what Medicare and private insurance companies do is they provide a reimbursement amount for a procedure, correct?

A. That's correct.

Q. And they pay that amount regardless of whether a new catheter is used or a reprocessed catheter is used, right?

A. Correct, but the hospital has to file a cost report, so it's reflected in the cost report they file.

Q. But the -- but the answer to my question is that the insurance company pays the same amount regardless of whether it's a new catheter or a used, reprocessed catheter?

A. Yes.

Q. And so if I have to pay a co-insurance amount based on what my insurance carrier is paying the hospital, I'm going to pay the same amount regardless of whether a new or a