# Exhibit 12



1  UNITED STATES DISTRICT COURT

2  CENTRAL DISTRICT OF CALIFORNIA

3  HONORABLE JAMES V. SELNA, JUDGE PRESIDING

4  INNOVATIVE HEALTH, LLC,                )
                                          )
5                                         )
                                          )
6                  Plaintiff,             )
                                          )
7                                         )
                                          )
8       Vs.                               )   No. SACV-19-01984-JVS
                                          )
9                                         )
                                          )
10  BIOSENSE WEBSTER, INC.,               )
                                          )
11                                        )
                                          )
12                 Defendant.             )
                                          )
13  _____      )

14

15

16  REPORTER'S TRANSCRIPT OF PROCEEDINGS

17  JURY TRIAL

18  DAY 3, VOLUME II

19  SANTA ANA, CALIFORNIA

20  THURSDAY, MAY 8, 2025

21  MIRIAM V. BAIRD, CSR 11893, CCRA
    OFFICIAL U.S. DISTRICT COURT REPORTER
22  350 WEST FIRST STREET
    FOURTH FLOOR
23  SANTA ANA, CA 92701

24

25

1    Q.    Up to four.  Okay.  That means they don't work, those

2    four crystals?

3    A.    Yes.

4    Q.    Now, not every catheter that your company collects can

01:31PM  5    be reprocessed, correct?

6    A.    That is correct.

7    Q.    If we could -- if you could turn -- it's going to go up

8    on the screen, JX109.  If you look to your right, I put a

9    binder up there.

01:32PM  10    A.    Okay.

11    Q.    Now, in connection with the deposition you gave in this

12    case, you put together information about reject rates.  Do

13    you recall that?

14    A.    Yes.

01:32PM  15            MR. CAVANAUGH:  Your Honor, we'd move JX109 into

16    evidence.

17            THE COURT:  Any objection?

18            MR. QUIRK:  No objection, Your Honor.

19            THE COURT:  109 will be received.

01:32PM  20            **(Exhibit 109 received).**

21    BY MR. CAVANAUGH:

22    Q.    If we can go to -- this is for the LASSO reprocessed

23    catheters, correct?

24    A.    That is correct.

01:32PM  25    Q.    All right.  And this shows that at the -- when they're

|        |    |                                                                |
|--------|----|----------------------------------------------------------------|
|        | 1  | logged in by your company, right at the outset 24 percent of   |
|        | 2  | them are rejected?                                             |
|        | 3  | A.    This is the stage where the devices are coming in from   |
|        | 4  | the hospital to the login --                                   |
| 01:32PM| 5  | Q.    Yes.                                                     |
|        | 6  | A.    -- where we're logging in to our system.  And, yeah,    |
|        | 7  | approximately 24 percent is being rejected for not meeting     |
|        | 8  | the standards.                                                 |
|        | 9  | Q.    And then those that survive that go on to the           |
| 01:33PM| 10 | reprocessing floor, correct?                                   |
|        | 11 | A.    That is correct.                                         |
|        | 12 | Q.    All right.  And there, according to the documents you   |
|        | 13 | provided to us, 43 percent of those are rejected, correct?     |
|        | 14 | A.    On the floor, yes.  The testing that we do and all of   |
| 01:33PM| 15 | the testing that I define collectively have rejected almost    |
|        | 16 | 48.8 percent.                                                  |
|        | 17 | Q.    And if you turn to page 4 of that document, this lists  |
|        | 18 | all of the reasons why, correct?                               |
|        | 19 | A.    Correct.                                                 |
| 01:33PM| 20 | Q.    All right.  So, for example, if it's kinked, 915 were   |
|        | 21 | rejected because they were kinked?                             |
|        | 22 | A.    Correct.                                                 |
|        | 23 | Q.    And memory write failure, 90 were rejected at the second|
|        | 24 | stage, correct?                                                |
| 01:34PM| 25 | A.    Yes.                                                     |

|       |     |                                                              |
|-------|-----|--------------------------------------------------------------|
|       | 1   | Q.   All right.  And then failed -- I thought there was      |
|       | 2   | another one.  Failed -- memory read failure.  Do you see     |
|       | 3   | that?                                                        |
|       | 4   | A.   Yes.                                                    |
| 01:34PM | 5 | Q.   What is memory read failure?                            |
|       | 6   | A.   This is when our system is not able to read the         |
|       | 7   | information from the memory chip.                            |
|       | 8   | Q.   If we could turn to JX110.  This relates to the PENTARAY |
|       | 9   | catheter, correct?                                           |
| 01:34PM | 10 | A.   Yes.                                                   |
|       | 11  | MR. CAVANAUGH:  Your Honor, we'd move 110 into               |
|       | 12  | evidence.                                                    |
|       | 13  | MR. QUIRK:  No objection, Your Honor.                        |
|       | 14  | THE COURT:  110 will be received.                            |
| 01:35PM | 15 | **(Exhibit 110 received)**                                  |
|       | 16  | BY MR. CAVANAUGH:                                            |
|       | 17  | Q.   And here at login, 14.5 percent.  And at the second --  |
|       | 18  | at the floor stage, again 43 percent?                        |
|       | 19  | A.   Correct.                                                |
| 01:35PM | 20 | Q.   If we go to JX112.                                      |
|       | 21  | MR. CAVANAUGH:  Your Honor, we'd move JX112 into             |
|       | 22  | evidence.                                                    |
|       | 23  | MR. QUIRK:  No objection, Your Honor.                        |
|       | 24  | THE COURT:  112 will be received.                            |
| 01:35PM | 25 | **(Exhibit 112 received)**                                  |

```
 1              THE COURT:  JX875 will be received.

 2              (Exhibit JX875 received)

 3    BY MR. CAVANAUGH:

 4    Q.   Now, this is an e-mail from you to Matt Casiraro,

 5    correct?

 6    A.   This is an e-mail from Matt Casiraro to me.

 7    Q.   Okay.  So you were there by December 29, 2014?

 8    A.   Yes.

 9    Q.   The subject line is FDA -- 510(k) FDA clearance for EP

10    catheters, correct?

11    A.   Yes.

12    Q.   And there's two attachment.

13              MR. CAVANAUGH:  Your Honor, we've marked that as

14    JX875.1 and 875.2.  We'd move those into evidence.

15              THE COURT:  Any objection?

16              MR. QUIRK:  No objection, Your Honor.

17              THE COURT:  875.1 and 875.2 will be received.

18              (Exhibits 875.1 and 875.2 received)

19    BY MR. CAVANAUGH:

20    Q.   Let's turn to JX875.2.

21              MR. CAVANAUGH:  If we can blow that up a little

22    bit.

23    BY MR. CAVANAUGH:

24    Q.   Now, these were the various catheters and other devices

25    that you were considering seeking approval to reprocess,
```

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       |  1 | correct?                                                     |
|       |  2 | A.    It looks like this is the set of projects that are in  |
|       |  3 | the idea phase of our portfolio funnel.                      |
|       |  4 | Q.    And some were at the idea assessment project plan stage? |
| 01:42PM |  5 | A.    The wave 1 product lines are.                          |
|       |  6 | Q.    So you had wave 1, 2, and 3?                           |
|       |  7 | A.    As I see it here, yes.                                 |
|       |  8 | Q.    And the LASSO and ACUNAV were both at -- in wave 1?    |
|       |  9 | A.    Yes.                                                   |
| 01:43PM | 10 | Q.    And those projects were started in the fourth quarter of |
|       | 11 | 2014?                                                        |
|       | 12 | A.    Well, I would say based on the e-mail, you can see these |
|       | 13 | are all projects that were initiated at that time, and it was |
|       | 14 | sent to me on December 29th.  So it seems like these are    |
| 01:43PM | 15 | projects that are still in the idea assessment phase.       |
|       | 16 | Q.    If we go to the prior page and pull that up.  And if we |
|       | 17 | could -- you see under ultrasound catheters?               |
|       | 18 | A.    I see it.                                              |
|       | 19 | Q.    Is there's a reference to Q4 2014 for the LASSO?      |
| 01:44PM | 20 | A.    I see it.                                              |
|       | 21 | Q.    And for the ACUNAV there's also a reference to Q4 2014? |
|       | 22 | A.    I see that.                                            |
|       | 23 | Q.    Now, the LASSO NAV has an EEPROM, correct?            |
|       | 24 | A.    That is correct.                                       |
| 01:44PM | 25 | Q.    Okay.  The ACUNAV did not have an EEPROM; is that right? |

|  |  |  |
|--|--|--|
|  | 1 | A.    That is correct. |
|  | 2 | Q.    And your company received FDA clearance to sell |
|  | 3 | reprocessed ACUNAVs on March 10, 2016, correct? |
|  | 4 | A.    Okay. |
| 01:45PM | 5 | Q.    Why don't we look at JX4056. |
|  | 6 | MR. CAVANAUGH:  Your Honor, we'd move JX4056 into |
|  | 7 | evidence. |
|  | 8 | THE COURT:  Any objection? |
|  | 9 | MR. GOLDSMITH:  No objection, Your Honor. |
| 01:45PM | 10 | THE COURT:  4056 will be received. |
|  | 11 | **(Exhibit 4056 received)** |
|  | 12 | BY MR. CAVANAUGH: |
|  | 13 | Q.    The date of that is March 10, 2016, for the reprocessed |
|  | 14 | ACUNAV, right? |
| 01:45PM | 15 | A.    Yes. |
|  | 16 | Q.    And your company received FDA clearance to sell a |
|  | 17 | reprocessed LASSO NAV, the one with the EEPROM chip, four |
|  | 18 | days later, correct? |
|  | 19 | A.    I would have to check the date. |
| 01:46PM | 20 | Q.    Let's go to JX4057. |
|  | 21 | MR. CAVANAUGH:  We'd move that into evidence. |
|  | 22 | MR. QUIRK:  No objection, Your Honor. |
|  | 23 | THE COURT:  4057 will be received. |
|  | 24 | **(Exhibit 4057 received)** |
|  | 25 |  |

BY MR. CAVANAUGH:

Q.   And you see that we're showing the letter from the FDA. It's dated March 14, 2016, correct?

A.   I see that.

01:46PM  Q.   And that's for the LASSO NAV?

A.   Yes.

Q.   So the difference in approval is four days, correct?

A.   The day we got the clearance from FDA looks like it was four days apart.

01:46PM  Q.   And so that's for the LASSO which had an EEPROM chip and the ACUNAV which did not have an EEPROM chip four days, right?

A.   Okay.  Correct.

         MR. CAVANAUGH:  If we can go back to JX875.2, which
01:47PM  is already in evidence.  If we can go to the third page, and if we could blow that up.

BY MR. CAVANAUGH:

Q.   Now, that lists the Biosense Webster CS catheter and the SOUNDSTAR as just being in the idea phase, right?

01:47PM  A.   I see that.

Q.   And that's wave 2.  And your company delayed its development work on reprocessing the SOUNDSTAR until February of 2016, correct?

A.   That is not correct.

01:48PM  Q.   Do you recall giving a deposition?

```
          1    A.   Yes, I do.

          2    Q.   Okay.  And did you prepare a document in connection with

          3    that deposition?

          4    A.   When I was deposed the second time, I did prepare a

01:48PM   5    timeline just to make sure I had the numbers and dates

          6    correct.

          7    Q.   And if you would turn to -- in your folder there should

          8    be a document --

          9         MR. CAVANAUGH:  Your Honor, we're not moving this

01:48PM  10    into evidence.  I'm using it to refresh the witness's

         11    recollection.

         12    BY MR. CAVANAUGH:

         13    Q.   You'll see a document like this (indicating).  It should

         14    be in the front folder.  Do you have that?

01:49PM  15    A.   Yes.

         16    Q.   And is that the document you prepared?

         17    A.   Not this document.  My document was much longer, an

         18    Excel sheet with all the nuances in there.  This seems to be

         19    a condensed version.

01:49PM  20    Q.   Okay.  And looking at this condensed version, does this

         21    refresh your recollection that it lists the project initiated

         22    for the SOUNDSTAR as February 16, 2017?

         23    A.   I see that.

         24    Q.   If we could -- if we could turn to JX505.8.

01:50PM  25         MR. CAVANAUGH:  Your Honor, we'd move 505.8 into
```

UNITED STATES DISTRICT COURT

```
 1   coming from for these projects.
 2   Q.   If we go back to the document which you referred to
 3   earlier in preparation for your deposition, the summary.
 4   A.   In the summary that I created for the dates for these
 5   projects, especially when we attempted the EEPROM efforts,
 6   are much earlier than this versus the project initiated at
 7   Innovative with a project number and a system.  That might be
 8   what this date is referring.
 9         But if you are talking about EEPROM-related
10   efforts, we were doing those in parallel and connecting the
11   dots here.  ACUNAV being the same device as SOUNDSTAR without
12   the location sensor and the EEPROM, we had to get the
13   clearance for the ACUNAV first to show we can clean that
14   device.
15         That's the baseline that we stood on when we
16   submitted for SOUNDSTAR 3D.  It's always an evolution of one
17   over the other.
18   Q.   And does this refresh your recollection that the
19   document that was utilized at your deposition and created by
20   your company for purposes of this deposition listed a project
21   initiated date of May 5, 2017?
22   A.   As I clarified, that project initiation is the specific
23   project number, project documentation that we initiated
24   internally.  But research and development department, in
25   order to attempt for the EEPROM-related efforts, we had
```

01:56PM (line 5)
01:56PM (line 10)
01:57PM (line 15)
01:57PM (line 20)
01:57PM (line 25)

```
        1   started much earlier.

        2           When a project is initiated internally, once it's

        3   official, that's when I am pulling in resources from other

        4   departments so that everybody can join in and combine the

01:58PM 5   efforts to get that to the 510(k) effort.  Initially the

        6   EEPROM-related efforts are being done by research and

        7   development.

        8   Q.   And by July of 2017 you had dealt with whatever issues

        9   were being raised by the EEPROM chip, correct?

01:58PM 10  A.   For which product line are you referring to here?

        11  Q.   For the PENTARAY.

        12  A.   Right.  For PENTARAY, EEPROM effort was resolved, yeah.

        13  Q.   July of 2017?

        14  A.   July of 2017.  Project initiated on July of 2017.

01:59PM 15  510(k) was submitted on November 29, 2017.  Somewhere in

        16  that, right before the 510(k) was submitted, would have been

        17  sometime where we had the EEPROM resolution done.  But I will

        18  have to look at that detailed Excel sheet to know exactly

        19  when.

01:59PM 20  Q.   Now, that 510(k) that you -- for PENTARAY that you filed

        21  in November of 2017, that was rejected by the FDA, correct?

        22  A.   That was rejected for the lumen-specific clearance.

        23  They needed to see that we are showing safety.  That was the

        24  aspect.  They didn't see the full results.

02:00PM 25  Q.   So you couldn't begin selling a PENTARAY in November of
```

| | |
|---|---|
| 1 | 2017 because you had to address a lumen issue, correct? |
| 2 | A.   Yes.  We had to resolve the lumen and get the clearance |
| 3 | in order to be able to sell the device in the market. |
| 4 | Q.   And it took your company another two years to resolve |
| 02:00PM 5 | the lumen issue, correct? |
| 6 | A.   Well, that's when we worked on that patent that I |
| 7 | discussed earlier to get that resolved and submitted to -- |
| 8 | Q.   Could you just answer my question, which is:  It took |
| 9 | you two years to resolve the lumen issue, right? |
| 02:00PM 10 | A.   It took us two years to complete that testing. |
| 11 | Q.   All right. |
| 12 | So you couldn't sell a PENTARAY until the lumen |
| 13 | issue was resolved, correct? |
| 14 | A.   Correct. |
| 02:01PM 15 | Q.   And the lumen issue has absolutely nothing to do with |
| 16 | the EEPROM chip, correct? |
| 17 | A.   No, it has nothing to do with the EEPROM chip. |
| 18 | Q.   Thank you. |
| 19 | MR. CAVANAUGH:  Nothing further, Your Honor. |
| 02:01PM 20 | THE COURT:  Redirect? |
| 21 | MR. QUIRK:  Briefly, Your Honor. |
| 22 | **REDIRECT EXAMINATION** |
| 23 | BY MR. QUIRK: |
| 24 | Q.   Mr. Joseph, the document that counsel handed to you and |
| 02:01PM 25 | which wasn't shown to the jury, document 114, did you create |

1    that spreadsheet?

2    A.    No, not this spreadsheet.  This looks like a modified

3    version of that.

4    Q.    Does that spreadsheet include all the dates for

02:02PM    5    initiation and completion of projects that you had on your

6    original spreadsheet?

7    A.    No, it doesn't.

8    Q.    Biosense's counsel asked you the effect of the EEPROMs

9    on the different catheters.  Do you recall that?

02:02PM    10    A.    Yes.

11    Q.    How effective was Biosense's blocking chip for the

12    SOUNDSTAR 3D?

13    A.    It had -- the chip was -- the details were encrypted, so

14    we had to resolve that, but that chip was not locked.  As in

02:02PM    15    when the device is used with the CARTO, a timestamp is

16    recorded but the chip was not locked, which means that once

17    we understood the methodology, once we understood where the

18    timestamp was, we had the freedom to remove that and bring

19    the chip back to the original state as it was made by

02:03PM    20    Biosense Webster.

21          So that, yeah, in comparison to eco, it had one

22    less challenge in comparison.

23    Q.    Can you explain the additional technicality of the

24    SOUNDSTAR eco.

02:03PM    25    A.    Yes.  SOUNDSTAR eco in this scenario going to a much

1    A.    This e-mail is about Sterilmed had been actually

2    collecting at Lakeland, and this was an account that Medline

3    and I were now bringing on board.  They were contacted and

4    saw that the catheters were not being collected in a very

02:45PM    5    good way.

6    Q.    Is there a picture included in the e-mail?

7    A.    There is.

8    Q.    What does this show?

9    A.    It shows a trash can being used for collections, and

02:45PM    10    it's overflowing with both EP catheters and ultrasound

11    catheters.

12    Q.    What does this picture tell you?

13    A.    It's not a very serious reprocessing program because,

14    one, you would never let anything like this overflow for many

02:46PM    15    reasons, but this is setting all the catheters up to be

16    damaged.  Then you would have a low yield rate of what you

17    could send back to the client.

18    Q.    Have Biosense's collection practices impacted

19    Innovative?

02:46PM    20    A.    That depends on which catheters and products you're

21    talking about.

22    Q.    How about with the ACUNAV?

23    A.    The ACUNAV, it has greatly impacted us because they

24    require many clients to collect the ACUNAV, many of which are

02:46PM    25    not even buying it back.  And that's a very high-in-demand

```
 1    catheter with clients.
 2    Q.    What about the SOUNDSTAR?
 3    A.    The SOUNDSTAR, while they're collecting it, many of
 4    their clients, there are still enough SOUNDSTARs that come in
 5    to me.  And because of the Biosense Webster case coverage
 6    policy and not really being able to sell them back, I'm
 7    swimming in SOUNDSTARs.
 8    Q.    You just mentioned the case coverage policy?
 9    A.    Yes.
10    Q.    At a high level, from your perspective how has the case
11    coverage policy impacted Innovative Health?
12    A.    It's really been devastating to both Innovative and our
13    clients that had views that they wanted to have substantial
14    savings.
15          We as a company, when we started, we didn't want to
16    be a me, too, reprocessor.  We wanted to do the high-end
17    items that would bring the most value to the client because
18    there's always new technologies that are coming to the
19    marketplace which continue to drive the costs in healthcare.
20          So we've pursued those, like the mapping catheters,
21    the SOUNDSTARs.  We got the clearances, and we fully expected
22    to be able to sell them.  And not only are they the products
23    that would generate the absolute most savings for the
24    hospital, but they also would have generated the most revenue
25    for us.
```

|          | 1  | Q.   Thank you, Mr. Distel. |
|----------|----|----------|
|          | 2  | MS. SCHIFFMAN:  I pass the witness. |
|          | 3  | MR. FARIDI:  Your Honor, may I approach with the |
|          | 4  | cross-examination binders? |
| 02:48PM  | 5  | THE COURT:  You may. |
|          | 6  | MR. FARIDI:  Thank you. |
|          | 7  | **CROSS-EXAMINATION** |
|          | 8  | BY MR. FARIDI: |
|          | 9  | Q.   Good afternoon, Mr. Distel.  My name is Muhammad Faridi. |
| 02:49PM  | 10 | Very nice to meet you. |
|          | 11 | A.   You, too, sir. |
|          | 12 | Q.   I want to just pick up from the conversation that you |
|          | 13 | were having on direct examination with your counsel about the |
|          | 14 | e-mail exchange that you had with Megan McCabe that's at |
| 02:49PM  | 15 | JX4352.  Do you recall that e-mail exchange? |
|          | 16 | A.   I do, sir. |
|          | 17 | Q.   And that's the occasion where Ms. McCabe noted that she |
|          | 18 | was in dire need of SOUNDSTARs because of a backorder issue |
|          | 19 | at Biosense Webster.  Do you recall that? |
| 02:49PM  | 20 | A.   I do. |
|          | 21 | Q.   And you had SOUNDSTARs to sell to the hospital, correct? |
|          | 22 | A.   I did. |
|          | 23 | Q.   And your testimony was that you weren't able to sell |
|          | 24 | those SOUNDSTARs to this hospital that was in dire need of |
| 02:50PM  | 25 | them because of Biosense's case coverage policy.  Do you |

          1    reprocessing program at the ministries?

          2    A.    Yes.

          3    Q.    How many companies have reprocessing contracts with

          4    Providence?

03:43PM   5    A.    One.

          6    Q.    Who is that?

          7    A.    Medline.

          8    Q.    How long has Providence had a reprocessing contract with

          9    Medline?

03:43PM  10    A.    Since 2018.

         11    Q.    What kinds of products are covered under the contract

         12    with Medline?

         13    A.    Patient care, surgical items, and electrophysiology.

         14    Q.    Is it basically all the items that you mentioned

03:44PM  15    earlier?

         16    A.    Correct.

         17    Q.    What company currently supplies the reprocessed EP

         18    catheters that Providence buys under the Medline contract?

         19    A.    Innovative Health.

03:44PM  20    Q.    How long has Innovative been supplying reprocessed EP

         21    catheters to Providence?

         22    A.    Since 2018.

         23    Q.    And who actually negotiated the Medline contract with

         24    Providence?

03:44PM  25    A.    Our sourcing department.

```
          1    Q.   What is your role in relation to the contract?

          2    A.   Once a contract is signed, it comes over to my

          3    department for oversight and implementation.

          4    Q.   Who decides which cardiac mapping machine to use in a

03:44PM   5    case at Providence?

          6    A.   The doctor.

          7    Q.   Does the cardiac mapping machine require someone to

          8    operate the work station while the physician is doing the EP

          9    procedure?

03:45PM  10    A.   Yes.

         11    Q.   Who typically operates the cardiac mapping machines

         12    during EP procedures at Providence?

         13    A.   The manufacturer's technician or representative.

         14    Q.   Do you know who pays them?

03:45PM  15    A.   The manufacturer.

         16    Q.   Are they provided by the manufacturer under a contract

         17    with Providence?

         18    A.   No, not that I'm aware of.

         19    Q.   You testified earlier that Biosense has a case coverage

03:45PM  20    policy?

         21    A.   Yes.

         22    Q.   When did you first learn of this policy?

         23    A.   2016.

         24    Q.   To your knowledge do other manufacturers have a case

03:45PM  25    coverage policy for their cardiac mapping machines?
```

UNITED STATES DISTRICT COURT

1    A.    No.

2    Q.    How exactly has Biosense's policy affected your ability

3    to implement reprocessing contracts at the ministries?

4    A.    We're not able to use those reprocessed items during the

03:46PM  5    cases where the CARTO 3 is used.

6    Q.    You testified earlier about the SOUNDSTAR catheter.  Do

7    you remember that?

8    A.    Yes.

9    Q.    What is the difference in price for Providence between a

03:46PM  10   reprocessed SOUNDSTAR from Innovative and a new SOUNDSTAR

11   from Biosense?

12   A.    Over a thousand dollars.

13   Q.    Per catheter?

14   A.    Yes.

03:46PM  15   Q.    You also testified earlier that the policy is that

16   Biosense will not cover a case on their machines if the

17   doctor uses a sensor-enabled catheter reprocessed by anyone

18   else?

19   A.    Yes.

03:47PM  20   Q.    Does Providence generally rely on Biosense to run the

21   work station on the CARTO?

22   A.    Yes.

23   Q.    Why does Providence rely on the manufacturer's

24   representative to operate Biosense's machine?

03:47PM  25   A.    We don't have the staff with that knowledge.  We don't

1    A.    Yes.

2    Q.    Are you still able to buy all the Innovative

3    sensor-enabled catheters you want in Alaska?

4    A.    No.

03:51PM  5    Q.    What Innovative catheters did you have to stop buying in

6    Alaska?

7    A.    The PENTARAY.

8    Q.    Why did you stop buying Innovative's PENTARAY from

9    Alaska?

03:52PM  10    A.    We lost our mapping technician up there.  So there was

11    an agreement with the Biosense Webster that if we purchased

12    all PENTARAY new through Biosense Webster, that he would

13    assist with the SOUNDSTAR.

14    Q.    Oh.  What kind of SOUNDSTAR?

03:52PM  15    A.    Reprocessed SOUNDSTAR.

16    Q.    Reprocessed SOUNDSTAR from which company?

17    A.    Innovative Health.

18    Q.    Are the doctors in Alaska still using Innovative's

19    SOUNDSTARs?

03:52PM  20    A.    Yes.

21    Q.    Has Biosense changed the scope of the policy at any

22    other Providence ministries?

23    A.    No.

24    Q.    What do you understand would happen at those ministries

03:52PM  25    if the doctor tried to use reprocessed sensor-enabled

```
  1   catheters on cases with the CARTO?
  2   A.   The Biosense Webster would not assist in the procedure.
  3   Q.   And what happens if there is no support for the machine?
  4   A.   We're not able to do the procedure.
  5   Q.   Is Biosense still the only manufacturer with such a case
  6   coverage policy to your knowledge?
  7   A.   Yes.
  8   Q.   Do you have any understanding whether Innovative was
  9   willing to help Providence train its own staff to combat
 10   Biosense's case coverage policy?
 11   A.   Yes.
 12   Q.   And did you explore it at all with Innovative?
 13   A.   We had to drop it because we didn't have the staff, the
 14   timing, or the resources to be able to follow up on that.
 15   Q.   Did you ever get to the point of discussing cost with
 16   Innovative?
 17   A.   No.
 18   Q.   So you don't know the -- well, do you know the cost
 19   of --
 20   A.   I do not.
 21   Q.   What about sending your own staff to train with that
 22   mapper in Alaska?
 23   A.   It's just way too expensive.
 24   Q.   Have any of your ministries actually launched their own
 25   clinical support for the CARTO in response to the case
```

03:53PM (lines 5, 10, 15, 20)
03:54PM (line 25)

```
 1   coverage policy?

 2   A.    No.

 3   Q.    You mentioned another hospital strategy was to switch

 4   from the CARTO to another mapping machine.  Did you try that

 5   strategy at all?

 6   A.    No --

 7   Q.    Why not?

 8   A.    -- not that I'm aware of.  That's not my -- that's not

 9   my area.  That would have been sourcing.

10   Q.    Did Biosense or Sterilmed ever offer to sell you

11   reprocessed sensor-enabled catheters?

12   A.    Yes.

13   Q.    Are you aware of any reason why Providence has not done

14   so?

15   A.    We're sole-source agreement with Medline.

16   Q.    What has been Providence's experience buying

17   Innovative's catheters?

18   A.    Very satisfied.

19   Q.    What has been Providence's experience with Innovative's

20   service?

21   A.    Reliable.  Satisfied.

22   Q.    You said earlier that Providence Alaska had been able --

23   well, you said earlier that Providence Alaska is able to buy

24   Innovative SOUNDSTARs; is that right?

25   A.    That is correct.
```

03:54PM — lines 5, 10, 15
03:55PM — lines 20, 25

|  | 1 | THE COURT:  Cross? |
|--|---|--|
|  | 2 | MR. CRUZ:  Yes, Your Honor. |
|  | 3 | Your Honor, may I approach the bench with -- |
|  | 4 | THE COURT:  You may. |
| 03:57PM | 5 | MR. CRUZ:  Thank you. |
|  | 6 | **CROSS-EXAMINATION** |
|  | 7 | BY MR. CRUZ: |
|  | 8 | Q.  Good afternoon, Ms. Roberts. |
|  | 9 | A.  Good afternoon. |
| 03:57PM | 10 | Q.  I'm Alejandro Cruz.  I just have a couple of follow-up |
|  | 11 | questions for you. |
|  | 12 | Ms. Roberts, you testified today that Providence |
|  | 13 | operates at a loss, correct, sometimes? |
|  | 14 | A.  Yes. |
| 03:57PM | 15 | Q.  Do you know who Rodney Hochman is? |
|  | 16 | A.  Rod Hochman, yes. |
|  | 17 | Q.  Who is he? |
|  | 18 | A.  He's the past president hierarchy of Providence. |
|  | 19 | Q.  And you're aware that in 2023 Mr. Hochman earned |
| 03:58PM | 20 | $14.8 million in compensation, correct? |
|  | 21 | A.  No, I'm not aware of that. |
|  | 22 | Q.  You testified about your views of the case coverage |
|  | 23 | policy.  I think you said it prohibits some things that |
|  | 24 | Providence wants to do, correct? |
| 03:58PM | 25 | A.  Yes. |

1   Q.   I want to touch on a couple of issues there.  Just as an

2   initial matter, Ms. Roberts, it's true, right, that

3   Providence uses multiple different cardiac mapping systems in

4   its EP labs?

03:58PM   5   A.   Yes.

6   Q.   And their systems include the CARTO 3, right?

7   A.   Yes.

8   Q.   And those systems include Abbott's cardiac mapping

9   system?

03:58PM   10   A.   Yes.

11   Q.   Boston Scientific?

12   A.   Yes.

13   Q.   Ms. Roberts, when it comes down to individual EP labs at

14   Providence, many of those individual labs also have more than

03:59PM   15   one mapping system, right?

16   A.   Yes.

17   Q.   In fact, I think you mentioned St. Jude's just up in

18   Fullerton.  It's true that St. Jude's, Providence St. Jude

19   has both a CARTO and an Abbott system in the lab, correct?

03:59PM   20   A.   Yes.

21   Q.   You testified earlier that Providence relies on Biosense

22   to support cases, correct?

23   A.   Yes.

24   Q.   It's also true, though, that Providence doesn't rely

03:59PM   25   only on Biosense's CARTO 3 system for cardiac mapping

|  |  |
|---|---|
| | 1 | procedures, correct? |
| | 2 | A.   Not that I'm aware of. |
| | 3 | Q.   And you'd agree that, for example, if Providence has a |
| | 4 | mapping system from Abbott, for example, in addition to the |
| 03:59PM | 5 | CARTO 3, then Providence has the choice to move some mapping |
| | 6 | procedures to Abbott if Providence is unhappy with Biosense's |
| | 7 | prices or policies, right? |
| | 8 | A.   Yes. |
| | 9 | Q.   Again, just in terms of choices that you were testifying |
| 04:00PM | 10 | about, Ms. Roberts, with respect to the initial purchase of |
| | 11 | cardiac mapping systems, you also understand that the cost of |
| | 12 | the mapping system can be financed through the purchase of |
| | 13 | disposables like catheters, right? |
| | 14 | A.   Yes. |
| 04:00PM | 15 | Q.   That means to purchase a mapping system, hospitals like |
| | 16 | Providence don't have to invest significant money up front, |
| | 17 | correct? |
| | 18 | A.   Not that I'm aware of. |
| | 19 | Q.   Ms. Roberts, in June of 2020 you gave a presentation to |
| 04:00PM | 20 | a group at Providence called the cardiovascular council, |
| | 21 | correct? |
| | 22 | A.   Possible. |
| | 23 | Q.   You recall giving a presentation to the cardiovascular |
| | 24 | council at Providence, correct? |
| 04:00PM | 25 | A.   Yes. |

|  | 1 | sure what page you're referring to. |
|--|---|
|  | 2 | Q.   Ma'am, let me see if I can get you a better binder. |
|  | 3 | A.   A better binder? |
|  | 4 | MR. CRUZ:  May I approach the witness, Your Honor? |
| 04:03PM | 5 | THE COURT:  You may. |
|  | 6 | MR. CRUZ:  Thank you. |
|  | 7 | (Document handed to the witness). |
|  | 8 | BY MR. CRUZ: |
|  | 9 | Q.   Ms. Roberts, in your binder do you see page 63? |
| 04:03PM | 10 | A.   I do. |
|  | 11 | Q.   And do you see line 2 through line 6? |
|  | 12 | A.   Yes. |
|  | 13 | Q.   Does that refresh your recollection about the proposal |
|  | 14 | you made in June of 2020 to the cardiovascular council? |
| 04:04PM | 15 | A.   Yes. |
|  | 16 | Q.   Thank you, ma'am.  So let me just ask my question one |
|  | 17 | more time. |
|  | 18 | In that presentation in June of 2020 to the |
|  | 19 | cardiovascular council at Providence, you proposed to the |
| 04:04PM | 20 | cardiovascular council that Providence increase its use of |
|  | 21 | mapping systems other than Biosense's, correct? |
|  | 22 | A.   Yes. |
|  | 23 | Q.   In making that proposal, you recognized that there are |
|  | 24 | alternative mapping systems that Providence could use more |
| 04:04PM | 25 | often, correct? |

1    A.    Yes.

2    Q.    In fact, Ms. Roberts, Providence has a choice to use

3    alternative mapping support systems other than Biosense's

4    system if it wants to, correct?

04:05PM  5    A.    Yes.

6    Q.    Ms. Roberts, you are aware that Sterilmed sells

7    reprocessed catheters, correct?

8    A.    Yes.

9    Q.    And I think you testified earlier that Providence, for

04:05PM  10   example, would like to buy or it does buy reprocessed

11   SOUNDSTARs?

12   A.    Yes.

13   Q.    And you're aware that Sterilmed sells that product for a

14   price below the OEM price, correct?

04:05PM  15   A.    Yes.

16   Q.    But you choose or Providence chooses not to buy that

17   catheter, that reprocessed catheter from Sterilmed, correct?

18   A.    Yes.

19   Q.    Ms. Roberts, you have known about Biosense's clinical

04:06PM  20   support policy since at least 2016, correct?

21   A.    Yes.

22   Q.    And you're aware, Ms. Roberts, that in December, just

23   this past December 2024, Providence St. Joe's right up in

24   Orange bought a brand-new CARTO 3 system, correct?

04:06PM  25   A.    No, I'm not aware of that.

1    Q.   You mentioned Providence Alaska, ma'am?

2    A.   Uh-huh.

3    Q.   You believe, Ms. Roberts, that it would be helpful for

4    Providence's EP lab to support their own cardiac mapping

04:06PM    5    cases on the CARTO 3 mapping system rather than relying on

6    Biosense, correct?

7    A.   Yes.

8    Q.   And you believe that with proper training, Providence's

9    EP labs could develop that ability to self support, right?

04:06PM    10    A.   Yes.

11    Q.   In fact, Ms. Roberts, let me -- your understanding was

12    that the electrophysiology techs at the time at Providence

13    Alaska supported mapping cases on the CARTO 3, correct, on

14    their own?

04:07PM    15    A.   Yes.

16    Q.   And you believed at the time that Providence Alaska

17    didn't rely on clinical support from OEM mappers, correct?

18    A.   Yes.

19    Q.   But your testimony today, Ms. Roberts, is that

04:07PM    20    Providence Alaska stopped self supporting mapping procedures

21    to the CARTO 3, right?

22    A.   Yes.

23    Q.   And just to be clear, Ms. Roberts, you've never spoken

24    to a Biosense CAS at Providence Alaska in Anchorage, correct?

04:07PM    25    A.   No.

1    A.    Correct.

2    Q.    And you're aware, Ms. Roberts, that in fact Innovative

3    Health told Medline not to develop that mapping training

4    program, correct?

04:09PM 5    A.    Not aware.

6    Q.    Ms. Roberts, you testified that it's too expensive to

7    hire your own mappers, correct?

8    A.    That is correct.

9    Q.    So, Ms. Roberts, just going back a second.  You

04:09PM 10   testified earlier that it's too expensive to hire your own

11   mappers?

12   A.    Yes.

13   Q.    You also testified, though, that Providence would save

14   millions each year if you purchased reprocessed catheters

04:10PM 15   from IH, correct?

16   A.    Yes.

17   Q.    The fact is that today Providence still chooses to use

18   Biosense's CASs to create maps on the CARTO 3, correct?

19   A.    Yes.

04:10PM 20   Q.    That's a choice Providence has, right?

21   A.    Would you repeat that, please.

22   Q.    That's Providence's choice, correct?

23   A.    Yes.

24   Q.    Thank you, ma'am.

04:10PM 25          THE COURT:  Mr. Berhold?

UNITED STATES DISTRICT COURT

|   | |
|---|---|
| 1 | MR. BERHOLD:  Briefly, Your Honor. |
| 2 | **REDIRECT EXAMINATION** |
| 3 | BY MR. BERHOLD: |
| 4 | Q.   Ms. Roberts, who chooses which machine is used on a case |
04:10PM 5 | at Providence? |
| 6 | A.   The doctor. |
| 7 | Q.   Who chooses whether to switch machines on cases at |
| 8 | Providence? |
| 9 | A.   The doctor. |
04:10PM 10 | Q.   Has Providence been able to achieve the reprocessing |
| 11 | savings that it wants by shifting procedures to other brands |
| 12 | of mapping machines? |
| 13 | A.   No. |
| 14 | MR. BERHOLD:  Nothing further, Your Honor. |
04:11PM 15 | MR. CRUZ:  Two brief questions. |
| 16 | THE COURT:  That's fine. |
| 17 | **RECROSS-EXAMINATION** |
| 18 | BY MR. CRUZ: |
| 19 | Q.   Ms. Roberts, you testified that the doctor chooses which |
04:11PM 20 | system to use, correct? |
| 21 | A.   Yes. |
| 22 | Q.   You would agree, Ms. Roberts, that doctors at Providence |
| 23 | Health have their patients in mind when they make decisions |
| 24 | for patient healthcare, correct? |
04:11PM 25 | A.   Yes. |

```
 1   Q.   We'll leave it there for today.  Thank you very much,
 2   Ms. Roberts.
 3            THE COURT:  You may step down.  Thank you.
 4            THE WITNESS:  Thank you.
 5            THE COURT:  All right.  Your next witness, please.
 6            MR. HO:  Your Honor, the next witness is being
 7   called by videotape, and it will take us somewhat past 4:30.
 8   So would you like to continue or --
 9            THE COURT:  What's the length of the --
10            MR. HO:  About 20-plus minutes, a little bit over
11   20.
12            THE COURT:  You want to get that done?  Is
13   everybody comfortable?  Do we need a break?
14            Okay.  Let's play it.
15            MR. HO:  Innovative Health calls Nick Demczuk by
16   video and moves the admission of the following exhibits
17   sponsored by his testimony:  JX204, JX207, JX208, and JX209.
18            THE COURT:  Any objections?
19            MR. FARIDI:  Your Honor, as to 208, I think that
20   was excluded earlier.
21            MR. HO:  Let me just look.
22            Okay.  I apologize.  Not 208.
23            THE COURT:  Okay.
24            MR. FARIDI:  No objections as to the others,
25   Your Honor.
```

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | THE COURT:  204, 207, and 209 will be received.                      |
|       | 2  | **(Exhibits 204, 207, and 209 received)**                            |
|       | 3  | (Videotaped deposition played)                                       |
|       | 4  | THE COURT:  Is that it?                                               |
| 04:33PM | 5 | MR. HO:  Yes, Your Honor.                                            |
|       | 6  | THE COURT:  Okay.                                                     |
|       | 7  | Ladies and gentlemen, we're going to conclude here                   |
|       | 8  | for the day.  Tomorrow we'll start at the regular time, but          |
|       | 9  | we're going to cut short a little bit at the end of the day.         |
| 04:34PM | 10 | So we're just going to take one hour for lunch tomorrow.           |
|       | 11 | I'm going to excuse you at this time.  Please                        |
|       | 12 | remember the admonition not to discuss the case with anyone          |
|       | 13 | and not to form any opinions on the issues in the case until         |
|       | 14 | it's submitted to you.  So we'll see you tomorrow.                    |
| 04:34PM | 15 | THE CLERK:  All rise.                                              |
|       | 16 | (Open court - jury not present)                                      |
|       | 17 | THE COURT:  Anything for the record before we                        |
|       | 18 | conclude?  Mr. Cavanaugh?                                            |
|       | 19 | MR. CAVANAUGH:  Your Honor, one small housekeeping                   |
| 04:34PM | 20 | matter.  Yesterday during my cross-examination of                 |
|       | 21 | Mr. Ferreira, I moved into evidence 1440 and 1293.  Both            |
|       | 22 | documents had attachments which I questioned him about.  I           |
|       | 23 | didn't realize we had marked the attachments as JX1440.1 and         |
|       | 24 | JX1293.1.                                                            |
| 04:35PM | 25 | THE COURT:  Well, it was my intent to receive the                 |