Panteha Abdollahi, Esq.
State Bar No. 230002
pabdollahi@tocounsel.com
THEODORA ORINGHER PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, California 92626-7109
Telephone: (714) 549-6200
Facsimile: (714) 549-6201

Jeffrey L. Berhold, Esq.
Admitted *Pro Hac Vice*
jeff@berhold.com
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, Georgia 30309
Telephone: (404) 872-3800
Facsimile: (678) 868-2021

Joshua P. Davis, Esq.
State Bar No. 193254
jdavis@bm.net
BERGER MONTAGUE PC
505 Montgomery St., Suite 625
San Francisco, California 94111
Telephone:  (415) 906-0684

Derek T. Ho, Esq.*
Andrew E. Goldsmith, Esq.*
Matthew D. Reade, Esq.*
Kelley C. Schiffman, Esq.
State Bar No. 325023
Rachel T. Anderson, Esq.*
Annamaria M. Morales-Kimball, Esq.*
Sean P. Quirk, Esq.*
*Admitted *Pro Hac Vice*
dho@kellogghansen.com
agoldsmith@kellogghansen.com
mreade@kellogghansen.com
kschiffman@kellogghansen.com
randerson@kellogghansen.com
amoraleskimball@kellogghansen.com
squirk@kellogghansen.com
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999

Attorneys for Plaintiff
INNOVATIVE HEALTH LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

INNOVATIVE HEALTH LLC,

Plaintiff,

vs.

BIOSENSE WEBSTER, INC.,

Defendant.

Case No. 8:19-cv-1984 JVS (KES)

**PLAINTIFF INNOVATIVE HEALTH LLC'S REPLY IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION**

Date:     July 21, 2025
Time:     1:30 p.m.
Crtrm:   10C

Action Filed:  October 18, 2019
Trial Date:  May 6, 2025

*PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION*

1

# TABLE OF CONTENTS

I.    Introduction ...................................................................................... 6

II.   A Permanent Injunction Is Appropriate To Prevent Biosense From Continuing To Violate the Antitrust Laws ........................................ 8

    A.    The Injunction Stops a Significant Threat of Injury from Antitrust Violations That Are Likely To Continue or Recur .................. 8

    B.    Biosense's Irreparable-Harm Arguments Are Baseless ....................... 10

III.  Biosense's Objections to the Injunction's Scope Lack Merit ........................ 13

    A.    The Case Coverage Provisions Are Not Vague or Overbroad ............ 13

    B.    Biosense's Overbreadth Arguments As to Blocking Technology Are Unfounded or Addressed by the Modified Proposed Order .......... 19

    C.    Biosense's Challenges to the Collections Provisions Are Unpersuasive ......................................................................... 20

    D.    The Injunction Appropriately Extends to All Consumables ................. 22

    E.    Biosense's Objections to the Injunction's Ancillary Provisions Are Baseless ............................................................................ 23

IV.   Conclusion ..................................................................................... 27

*PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION*

# TABLE OF AUTHORITIES

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
   750 F.2d 1470 (9th Cir. 1985) ............................................................. 12

*Boardman v. Pacific Seafood Grp.*,
   822 F.3d 1011 (9th Cir. 2016) ....................................................... 7, 12

*Broadcom Corp. v. Emulex Corp.*,
   2012 WL 13036855 (C.D. Cal.) ......................................................... 11

*California v. American Stores Co.*,
   492 U.S. 1301 (1989) .................................................................. 7, 11

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008) ............................................................ 17

*Epic Games, Inc. v. Apple Inc.*,
   No. 4:20-cv-5640 (N.D. Cal. Sept. 10, 2021), Dkt. 813 .................................... 27
   559 F. Supp. 3d 898 (N.D. Cal. 2021) ...................................................... 27

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) ....................................................... 12, 27

*Ford Motor Co. v. United States*,
   405 U.S. 562 (1972) ................................................................ 9, 18, 21

*Fortyune v. AMC, Inc.*,
   364 F.3d 1075 (9th Cir. 2004) ............................................................ 13

*FTC v. Mortgage Relief Advocates LLC*,
   No. 2:14-cv-5434 (C.D. Cal. July 23, 2015), Dkt. 73 ...................................... 24

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ........................................................... 6, 9

*GTE Sylvania Inc. v. Cont'l T.V., Inc.*,
   537 F.2d 980 (9th Cir. 1976) ............................................................ 15

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   1996 WL 101173 (N.D. Cal.), *aff'd in part, rev'd in part*, ........................... 11, 25
   125 F.3d 1195 (9th Cir. 1997) ................................................. 14, 16, 22, 25

*In re Data General Corp. Antitrust Litig.*,
   1986 WL 10899 (N.D. Cal.) ............................................................... 27

*In re Google Play Store Antitrust Litig.*,
   2024 WL 4438249 (N.D. Cal) ......................................... 11, 14, 23, 25, 26

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
   803 F.3d 389 (9th Cir. 2015) ............................................................ 11

3

*Knutson v. Daily Rev., Inc.*,
    548 F.2d 795 (9th Cir. 1976) ...............................................................23

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951) ...............................................................14

*MGM Studios, Inc. v. Grokster, Ltd.*,
    518 F. Supp. 2d 1197 (C.D. Cal. 2007) ...............................................................12

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*,
    473 U.S. 614 (1985) ...............................................................12

*Nat'l Soc'y of Prof'l Eng'rs v. United States*
    435 U.S 679 (1978). ...............................................................17, 24, 25, 27

*New York v. Microsoft Corp.*,
    224 F. Supp. 2d 76 (D.D.C. 2002) ...............................................................24

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    2020 WL 1812257 (N.D. Cal.) ...............................................................14
    20 F.4th 466 (9th Cir. 2021) ...............................................................*passim*

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir. 1996) ...............................................................7, 12
    217 F.3d 8 (1st Cir. 2000) ...............................................................27

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ...............................................................7, 12

*United States v. E. I. du Pont de Nemours & Co.*,
    366 U.S. 316 (1961) ...............................................................9, 13, 14, 20

*United States v. Glaxo Grp. Ltd.*,
    410 U.S. 52 (1973) ...............................................................7, 9, 13

*United States v. Nat'l Soc'y of Prof'l Eng'rs*,
    1978 WL 1395 (D.D.C.) ...............................................................27

*United States v. United States Gypsum Co.*,
    340 U.S. 76 (1950) ...............................................................16, 17, 21, 22

*Wilk v. Am. Med. Ass'n*,
    671 F. Supp. 1465 (N.D. Ill. 1987) ...............................................................27

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969) ...............................................................11, 16, 22

*PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION*

## CODE AND STATUTES

Clayton Act, 15 U.S.C. § 12 *et seq.*........................................................................7, 11

Sherman Act, 15 U.S.C. § 1 *et seq.*.............................................................6, 21, 27

*PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION*

# I.    <u>Introduction</u>

Biosense stands before this Court a proven monopolist.  Yet it asks the Court to let it continue the conduct the jury found unlawful, and to require Biosense's victims—not only reprocessors like Innovative but also consumers like Providence St. Joseph's and other hospitals around the country—to file new damages lawsuits to obtain compensation after additional harm is done.  If its position is adopted, Biosense will maintain its monopoly, keep charging supracompetitive prices, and avoid compensating many of its victims—or at least delay compensation far into the future.  That is not how the law works, for good reasons.  Requiring Innovative to play litigation Whack-a-Mole against Biosense would thwart the Sherman Act's purpose to ***protect*** market competition.

Instead, it is well established that an injunction should issue to prevent ongoing or threatened violations of the antitrust laws.  Here, the jury found that Biosense's case coverage policy and blocking technology were anticompetitive, violating Section 2 of the Sherman Act.  Despite the jury's verdict, Biosense has openly and publicly refused to cease those practices.  Such ongoing or recurrent conduct warrants an injunction, as even Biosense concedes.  *See* Opp. at 17 (acknowledging injunction will issue "if the wrongs are ongoing or likely to recur") (quoting *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1005 (9th Cir. 2020)); *see also* Mot. at 8, 13-14 (citing other authorities).  The proposed injunction's ancillary provisions are also reasonable and appropriate.  Its notice and compliance provisions track, or are even more tailored than, those approved in other antitrust cases.  The ten-year term tracks Biosense's ten-year course of unlawful conduct and the ample evidence that ten years or more are needed to undo the harm Biosense has caused.

Biosense's specific complaints about the proposed injunction are unpersuasive.  Many of its objections are based on linguistic quibbles or hypothetical applications of the proposed injunction that Biosense could have addressed with Innovative during the meet-and-confer process; instead, Biosense

1  refused to propose revisions to address any complaints.

2      With respect to the case coverage policy, Biosense claims Innovative cannot

3  obtain any injunctive relief unless it shows that it will go out of business or suffer

4  incalculable lost profits.  That is legally wrong, as courts repeatedly have explained.

5  Mot. at 26-27.  Biosense fails even to acknowledge the Ninth Circuit's holding that

6  "[a] lessening of competition constitutes an irreparable injury."  *Boardman v.*

7  *Pacific Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016); *accord California v.*

8  *American Stores Co.*, 492 U.S. 1301, 1304 (1989) (cleaned up) ("lessening of

9  competition is precisely the kind of irreparable injury that injunctive relief under

10  section 16 of the Clayton Act was intended to prevent").  And Biosense ignores or

11  mischaracterizes the record showing many other reasons why money damages

12  cannot redress Innovative's injuries—from how Biosense's policies block

13  Innovative from offering a full line of electrophysiology products to customers, *see*

14  *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996), to

15  the incalculable lost sales from customers who did not contract with Innovative *at*

16  *all* (not even for unaffected devices) because of Biosense's illegal conduct, *see id.*;

17  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)

18  ("threatened loss of prospective customers or goodwill" is "irreparable harm").

19      There is also nothing "vague" or "unworkable," Opp. at 11, about the

20  proposed injunction.  It directly enjoins Biosense from continuing to enforce the

21  case coverage policy and from evading that prohibition through discriminatory

22  practices.  The injunction's clinical-support provisions adopt the very words that

23  Biosense itself used to describe the case coverage policy, which gives the lie to the

24  complaint that Biosense does not understand what the injunction forbids.  And

25  Biosense's protest that the injunction's nondiscrimination clause is too vague cannot

26  be squared with the long line of precedents establishing it as a "recognized antitrust

27  remed[y]."  *United States v. Glaxo Grp. Ltd.*, 410 U.S. 52, 64 (1973).

28      As for blocking technology, Biosense's principal argument that the Falcon

7

chip is ten years old misses the point.  The trial evidence showed that Biosense is likely to implement ***new*** blocking technology to thwart competition.  As with the case coverage policy, the proposed injunction enjoins proven anticompetitive conduct.  Biosense's claim that the policy could incidentally limit beneficial design changes, like a lumen, is based on a contrived reading of the proposed injunction, which is appropriately tailored to ***blocking*** technology that the jury found to be anticompetitive.

Lastly, contrary to Biosense's protestations, it is reasonable to enjoin Biosense from collecting catheters its sister company, SterilMed, does not reprocess. The trial record supports the conclusion that Biosense engaged in that conduct, and Biosense does not explain how that conduct would be procompetitive.  Biosense's argument that it causes no irreparable harm also contradicts the record, which shows that Innovative suffered shortages of used AcuNav catheters because Biosense hoarded them.  The proposed injunction is reasonably tailored to prevent recurrence of that conduct while imposing no restrictions on Biosense's collection of Consumables (devices "originally manufactured by Biosense for use with CARTO") that Biosense actually reprocesses.

Biosense should not be allowed to keep violating the law.  The Court should issue the proposed injunction to prevent just that.

## II.   A Permanent Injunction Is Appropriate To Prevent Biosense From Continuing To Violate the Antitrust Laws

### A.   The Injunction Stops a Significant Threat of Injury from Antitrust Violations That Are Likely To Continue or Recur

A permanent antitrust injunction is valid if it "is a reasonable method of eliminating the consequences of the illegal conduct."  *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) (cleaned up).  Although the district court has "responsibility initially to fashion the remedy," *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 323 (1961), its injunction "must

1   restore competition." *Optronic*, 20 F.4th at 486 (citing *Ford Motor Co. v. United*

2   *States*, 405 U.S. 562, 573 (1972)); *see also du Pont*, 366 U.S. at 326-35 (vacating

3   injunction that did not use "measures effective to restore competition" and

4   instructing district court to order full divestiture on remand); *Glaxo*, 410 U.S. at 64

5   (reversing because "the District Court should have ordered [stronger] remedies").

6       To obtain "injunctive relief," Innovative "need only demonstrate a significant

7   threat of injury from an impending violation of the antitrust laws or from a

8   contemporary violation likely to continue or recur." *Zenith Radio Corp. v.*

9   *Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969).  Biosense does not and cannot

10  dispute that well-established standard.  Indeed, it grudgingly admits that an

11  injunction is warranted "if the wrongs are ongoing or likely to recur."  Opp. at 17

12  (quoting *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1005 (9th Cir. 2020)).

13      Innovative has made that showing.  The jury found that Biosense is violating

14  the antitrust laws and that those violations harm Innovative.  *See* Mot. at 26 & n.1.

15  The jury specifically found injury from Biosense's case coverage policy and

16  blocking technology; it awarded all the damages Innovative sought for those

17  anticompetitive practices.  Mot. at 15.  Despite that verdict, Biosense will not cease

18  its case coverage policy, its blocking technology, or its practice of collecting devices

19  to "control supply" and thereby "greatly minimize competitive activity."  Dkt. 535-1

20  at 14-15 (JX-221).  To the contrary, Biosense insists that all its tactics are legal and

21  procompetitive.  Mot. at 13-14.

22      The record also shows that, absent an injunction, every part of Biosense's

23  plan to block reprocessing competition—the case coverage policy, blocking

24  technology, and device collection practices—will continue to threaten Innovative,

25  consumers, and competition.  Biosense has enforced its illegal case coverage policy

26  for a decade.  It will not stop unless enjoined.  Mot. at 13-14.

27      Biosense still installs anti-reprocessing technology in its devices.  Dkt. 546-

28  18, ¶ 11 (Shalgi Decl.).  Though Biosense claims (at 18) that it has not (yet) updated

9

its Falcon anti-reprocessing chip, it does not deny that it is "working on a new version because the previous version was defeated" by third-party reprocessors or that Biosense is creating more sophisticated blocking technologies so it can again exclude competitors that overcome Falcon.  Dkt. 535-1 at 8 (JX-219).

Biosense also collects used catheters, including ones it cannot reprocess, to "collect and divert" supply from Innovative and other rivals, Dkt. 535-1 at 165 (Tr. 46:8-12) (Forister), to "drive" them "out of the RPO EP [reprocessed electrophysiology] business."  Dkt. 535-1 at 44 (JX-298).  Those collections harm competition just as Biosense intended.  They restrict supply of used catheters, hurting Innovative and consumers.  Mot. at 17-18; *see also* Dkt. 546-14 at 7 (Cormier Dep. Tr. 131:12-24) (distinguishing Soundstar and Pentaray, for which Innovative had the supply to "fill any order," from the AcuNav, of which Innovative "would be able to fill more orders" with greater supply); Dkt. 535-1 at 161-62 (Tr. 42:13-44:19) (Forister) (showing that Biosense withheld from the market more than 50,000 reprocessable AcuNavs).  Even without the clinical-support tie or new blocking technology, Biosense's collections, if not limited, will impede Innovative's ability to compete to sell the sensor-enabled catheters at the heart of this case.

The antitrust laws call for complete, marketwide relief.  That's why injunctive relief is appropriate.  It will stop Biosense from continuing to harm Innovative, competition, and the public, and "ensure that there remain no practices likely to result in monopolization in the future."  *Optronic*, 20 F.4th at 486 (citation omitted).

**B.    Biosense's Irreparable-Harm Arguments Are Baseless**

**1.    Treble Damages Do Not Foreclose Injunctive Relief**

Biosense claims (at 5) that winning treble damages shows that Innovative lacks "irreparable injury or an inadequate legal remedy."  That is wrong.  A proven monopolist is subject to damages for past acts proven at trial ***and*** prospective relief to "restore competition" and end practices "likely to result in monopolization in the future."  *Optronic*, 20 F.4th at 486 (cleaned up); *see also Image Tech. Servs., Inc. v.*

1  *Eastman Kodak Co.*, 1996 WL 101173, at *1 (N.D. Cal.) (granting permanent

2  injunction after jury award of damages for violation of Section 2).

3      A "lessening of competition is precisely the kind of irreparable injury that

4  injunctive relief under section 16 of the Clayton Act was intended to prevent."

5  *California v. American Stores Co.*, 492 U.S. 1301, 1304 (1989) (cleaned up).[1]

6  Innovative seeks an injunction under that section, *see* Mot. at 7, and the jury found

7  that Biosense is harming Innovative by unreasonably restraining competition.  Mot.

8  at 14, 26 & n.1; *see also* Dkt. 535-1 at 182 (Tr. 117:2-20) (Forister) (showing

9  Biosense captured 92 percent or more of the monopolized markets).  Biosense's

10 illegal foreclosure of competition "establish[es] . . . irreparable injury" because it

11 "cannot be made right simply by . . . writing [the plaintiff] a large check."  *In re*

12 *Google Play Store Antitrust Litig.*, 2024 WL 4438249, at *4 (N.D. Cal).  Even if

13 Biosense pays all the damages it owes, that will not restore Innovative's proper

14 market position or oust Biosense from its unlawful one.  Innovative still cannot

15 compete, and consumers still must face higher prices and lower quality than they

16 would if competition reigned.  Mot. at 15, 28-29.

17      So committed is Biosense to continuing its conduct that it would rather pay

18 treble damages again than be enjoined.  Opp. at 8.  But Biosense cannot buy a

19 license to violate the antitrust laws.  "[T]he purpose of giving private parties treble-

20 damage ***and*** injunctive remedies was not merely to provide private relief, but was to

21 serve as well the high purpose of enforcing the antitrust laws."  *Zenith*, 395 U.S. at

22 130-31 (emphasis added); *see also Mitsubishi Motors Corp. v. Soler Chrysler-*

23 *Plymouth*, 473 U.S. 614, 635 (1985) ("A claim under the antitrust laws is not merely

24

25      [1] *See also, e.g.*, *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389,

26 411 (9th Cir. 2015) ("competitive disadvantage" is irreparable harm); *Broadcom*
   *Corp. v. Emulex Corp.*, 2012 WL 13036855, at *3 (C.D. Cal.) (Selna, J.) (finding

27 irreparable harm from competitive exclusion and lost market share, and rejecting

28 that monetary damages could compensate for exclusionary effects).

a private matter.") (cleaned up).  And by inviting a parade of lawsuits for damages, Biosense highlights yet another reason to issue the injunction:  that "a legal remedy is inadequate if it would require a multiplicity of suits."  *MGM Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1220 (C.D. Cal. 2007) (cleaned up).

### 2.    "Extinction" Is Not Required To Obtain Injunctive Relief

Nor must Innovative show that it will go extinct without an injunction to be entitled to one.  *Contra* Opp. at 7.  "The threat of being driven out of business is ***sufficient*** to establish irreparable harm," *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473-74 (9th Cir. 1985) (emphasis added), but it is not necessary, as many recent injunctions show, *see, e.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1002-03 (9th Cir. 2023) (affirming permanent injunction in favor of Epic Games, a multibillion-dollar company).

Besides, Innovative did not just lose its rightful market position (though that alone shows irreparable harm).  *See Boardman*, 822 F.3d at 1023.  Because of Biosense's illegal conduct, Innovative could not fulfill its promise to customers to "offer[] a complete line" of electrophysiology products.  *Ross-Simons*, 102 F.3d at 19; *see also* Mot. at 22-23; Reade Decl. Ex. 14 (Tr. 89:23-91:4) (Ferreira) (explaining that "when [Innovative] provide[s] a savings analysis to customers," it "break[s] . . . out" the "potential savings from reprocessing devices that are subject to the case coverage policy" because the hospitals cannot "realize" those savings with Innovative).  That "customers wanted to buy more devices" from Innovative but could not, Opp. at 10, is thus another reason to grant an injunction.  It shows that Biosense has harmed Innovative's business, reputation, and goodwill in ways that cannot "be measured accurately." *Ross-Simons*, 102 F.3d at 20.  A "finding of irreparable harm is sustainable on this basis alone." *Id.* at 20 n.7; *see also Stuhlbarg*, 240 F.3d at 841 ("threatened loss" of "customers or goodwill" warrants injunction).

### III.    Biosense's Objections to the Injunction's Scope Lack Merit

Much of Biosense's opposition brief attempts to avoid *any* injunction by complaining that the proposed injunction is vague or overbroad.  Innovative tried to confer with Biosense on the language of the proposed injunction so it could address such complaints.  Biosense refused to offer redline comments on the proposed injunction during meet-and-confer and does not offer any in its opposition brief either.  It now argues (at 16) that "no injunctive relief is warranted" because of the "overbreadth and vagueness of the Proposed Injunction."

The Court should reject that gambit.  Courts "will not set aside injunctions" on vagueness grounds "unless they are so vague that they have no reasonably specific meaning."  *Fortyune v. AMC, Inc.*, 364 F.3d 1075, 1087 (9th Cir. 2004) (cleaned up).  Biosense's vagueness and overbreadth arguments either lack merit or are cured with the modest changes in the modified proposed order ("MPO") submitted herewith.  *See* Reade Decl. Ex. 15 (redline comparing MPO to original at Dkt. 535-2).[2]  And because Innovative has "successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor."  *du Pont*, 366 U.S. at 334.

### A.    The Case Coverage Provisions Are Not Vague or Overbroad

#### 1.    The Non-Discrimination Provision Is Reasonable Under Well-Established Law

Biosense's main vagueness challenge (at 12-15) is to the nondiscrimination provision relating to the case coverage policy.  But nondiscrimination requirements are a "recognized antitrust remed[y]," *Glaxo*, 410 U.S. at 64, that the Ninth Circuit has repeatedly affirmed.  *E.g.*, *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1225-26 (9th Cir. 1997); *Optronic*, 20 F.4th at 486.  In fact, the district

---

[2] Besides the changes discussed below, the MPO also removes a duplicative reference to the injunction's term from the definition of "CARTO."

court's decision in *Optronic*, which Biosense invokes in its opposition, rejected a vagueness objection.  *See* 2020 WL 1812257, at *7 (N.D. Cal.) (citing *Kodak*, 125 F.3d at 1225).  The Ninth Circuit then endorsed the injunction's nondiscrimination provisions on appeal.  *Optronic*, 20 F.4th at 486-87.

Biosense's complaint rings especially hollow here.  Far from lacking "guideposts," the injunction defines "Clinical Support," and thus the scope of Biosense's duty not to discriminate, using ***the same words that Biosense itself used*** to explain the services it would deny customers under its case coverage policy.  *Compare* MPO § 1.4 (defining "Clinical Support" to include "assisting with reconstructing cardiac anatomy using CARTO," "interpreting maps and providing insight on the images generated by CARTO," and "providing technical support for CARTO"), *with* Dkt. 535-1 at 62 (JX-535) (listing identical services).  Biosense knows what its own words mean.

Biosense contends (at 15) that *Kodak*'s and *Optronic*'s approvals of nondiscrimination requirements are "inapposite" because those cases "involved the sale of goods, rather than a service."  Biosense cites nothing to support that distinction.  And in fact, courts have long required antitrust defendants not to discriminate or otherwise condition how they provide "bespoke" services.  *See, e.g.*, *Google Play*, 2024 WL 4438249, at *7 (ordering permanent injunction, relying on nondiscrimination language in *Optronic*, after recounting "Google's conditioning of access by OEMs to Google's Android services"); *Lorain Journal Co. v. United States*, 342 U.S. 143, 157 (1951) (affirming injunction that prohibited advertising service from "discriminating" against "any advertisement" as to "price, space, arrangement, . . . or any other terms or conditions of publication" based on submitter's choice to also advertise in "any other advertising medium").

Biosense's other objections are likewise unpersuasive.

***First***, Biosense complains (at 12) that the injunction cannot require its clinical account specialists to "interpret[] maps and provid[e] insight on the images

14

generated by the CARTO" on nondiscriminatory terms, MPO §§ 1.4, 2.2, because they lack the "knowledge" to interpret CARTO maps or assess their accuracy when Innovative's devices are used.  But the jury rejected that justification as bogus.  It was required to, and did, find that Biosense imposed its case coverage policy "for no legitimate business reason" and "without an efficiency-enhancing justification." Dkt. 521 at 46 (J.I. No. 34); *see also id.* at 48 (J.I. No. 36).[3]

Those findings bind this Court, *GTE Sylvania Inc. v. Cont'l T.V., Inc.*, 537 F.2d 980, 986 n.7 (9th Cir. 1976), and rest on a mountain of evidence, including the "substantial equivalence" of reprocessed devices to their originally manufactured predicates,[4] Biosense's failure to train its CAS any differently on using CARTO with SterilMed catheters, *see* Dkt. 538 (Tr. 52:7-16) (Tam), and Biosense's agreement to support CARTO when Providence Alaska used Innovative's reprocessed Soundstars—so long as Providence bought Pentaray catheters from Biosense instead of reprocessing them with Innovative.  Dkt. 535-1 at 220-21 (Tr. 81:21-82:5) (Roberts); *see also* Dkt. 544 (Tr. 100:8-10) (closing) ("Biosense still maps cases using reprocessed catheters when there's some risk that they'll lose business, like at Providence St. Joe's in Alaska.").  Biosense may not relitigate the jury's verdict in opposing an injunction.

***Second***, Biosense contends (at 13-14) that the injunction's nondiscrimination provision would force Biosense's CAS to "provide sales and marketing services" for Innovative's products.  It likens the provision to *Kodak*, where the Ninth Circuit

---

[3] The jury also considered and rejected the possibilities that the clinical-support tie "benefits" consumers or makes any "business sense apart from any effect it has" on competition.  Dkt. 521 at 45 (J.I. No. 34).

[4] *See, e.g.*, Dkt. 539 (Tr. 34:17-35:2, 46:21-25) (Chudzik) (explaining Food and Drug Administration's substantial-equivalence standard); Dkt. 539 (Tr. 96:12-14) (Joseph) (testifying that Innovative's R&D process ensures reprocessed catheters are "just as good" as new ones).

1    trimmed a requirement that Kodak "inventory parts" for its rivals.  125 F.3d at 1225.

2    But the proposed injunction requires nothing of the sort, and *Kodak* endorsed

3    a nondiscrimination clause just like the one Innovative has proposed.  *Compare id.*

4    at 1227 ("Kodak shall not discriminate against any customer or other party on the

5    basis that such customer or other party has used the parts or services of someone

6    other than Kodak in connection with Kodak equipment."), *with* MPO § 2.2

7    ("Biosense is further enjoined from discriminating in the provision of Clinical

8    Support or the availability of CARTO because of the purchase or use of (or the

9    intention to use) a Consumable of someone other than Biosense.").

10   Innovative has never asked Biosense to sell Innovative's products and does

11   not seek that now.  It asks that Biosense support *Biosense's* CARTO machine no

12   matter which Consumables the doctor decides to use.  *See* Dkt. 543 (Tr. 38:17-39:3)

13   (Ramos) ("**Q.** 'The burden of product support should rest with the supplier that

14   provides them with the product,' right?  **A.** Yes, that's correct. . . .  **Q.** The supplier

15   that provides the CARTO 3 to hospitals, Mr. Ramos, is Biosense Webster, right?

16   **A.** Yes, the hardware, that's correct.  **Q.** In every case, right?  **A.** Yes.").

17   ***Third***, Biosense complains (at 14-15) that the nondiscrimination clause would

18   prevent Biosense from charging customers who use non-Biosense catheters for

19   clinical support—in essence, a discriminatory clinical-support *tax* applied only to

20   customers who reprocess Consumables with third parties.  The injunction

21   appropriately enjoins that conduct, which would be an obvious way to evade the

22   prohibition on the clinical-support tie.  *See Zenith*, 395 U.S. at 132 (court may

23   "restrain acts which are of the same type or class as [defendant's] unlawful acts");

24   *United States v. United States Gypsum Co.*, 340 U.S. 76, 88 (1950) (reversing and

25   remanding injunction for broadening to bar "practices connected with acts actually

26   found to be illegal" to "den[y]" the antitrust violators "future benefits from their

27   forbidden conduct").

28   There is no merit to Biosense's assertion that a clinical-support tax would

16

"benefit buyers." Opp. at 14-15 (quoting *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 895 (9th Cir. 2008)). A monopolist can exploit such a policy to "exclude an equally or more efficient competitor and thereby reduce consumer welfare"—just like what happened with Biosense's clinical-support tie. *Cascade*, 515 F.3d at 896. The "burden is upon" Biosense, "the proved transgressor" of the antitrust laws, to show that discriminating against customers for using third-party reprocessed Consumables would not harm competition, and Biosense has offered nothing to meet its burden. *Prof'l Eng'rs*, 435 U.S. at 698; *see also Gypsum*, 340 U.S. at 89 (court must "give weight" to fact of antitrust liability when "resolving doubts as to the desirability of including provisions designed to restore future freedom of trade," and may forbid "[a]cts entirely proper when viewed alone" to restore competition).

Moreover, the trial record refutes Biosense's claim (at 14) that it needs a discriminatory clinical-support tax to "price its products on competitive terms." Every other mapping system maker provides clinical support to its machines on equal terms even when third-party reprocessed versions of their consumables are used. *See* Reade Decl. Ex. 16 (Tr. 84:24-85:1) (Roberts) (other manufacturers don't have a case coverage policy); Reade Decl. Ex. 17 (Tr. 84:24-85:1) (Forister) ("Biosense and all other manufacturers provide their mappers for free because of the revenue that they're able to gain from doing so."). Biosense used to do the same. *See* Reade Decl. Ex. 18 (Tr. 69:16-19) (Wu) (before the case coverage policy, "Biosense provided case coverage for CARTO 3 procedures regardless of which manufacturer['s] catheters were used in the procedure").

**Finally**, Biosense argues (at 15) that the injunction "is unclear" how Biosense should proceed if one of its clinical account specialists is asked to support two cases on the same day—one involving an Innovative reprocessed catheter, and another where only Biosense products are used. Not so. Biosense can assign the CAS any other way it would like—such as based on who asked first, which procedure would minimize same-day travel, or which procedure is more clinically complex. It just

1  cannot allocate clinical support, or provide inferior clinical support, "because a

2  hospital or doctor has used, is using, will use, or may use a Consumable of someone

3  other than Biosense."  MPO § 2.2.

### 2.    The Injunction Against the Case Coverage Policy Is Not Vague

6      Biosense also objects (at 16 & n.6) that the core provision proscribing the

7  case coverage policy is vague because it could be applied to restrict it from

8  competing effectively for customers who need financing to buy cardiac mapping

9  machines.  The trial record disproves that claim.  Biosense's own expert testified

10  that "there are many ways to finance" a CARTO system, as well as "lease" or

11  "rent[al]" arrangements that also reduce upfront costs.  Reade Decl. Ex. 18

12  (Tr. 28:24-29:5) (Wu); *see also* Dkt. 543 (Tr. 50:8-16) (Zare) (extolling the "flexible

13  pathways" Biosense offers for acquiring CARTO).  If customers wish to acquire a

14  CARTO at minimal upfront cost, Biosense can offer them any option—from loans

15  and payment plans to rental agreements—that does not condition access to CARTO

16  on terms that entrench its monopolies in the consumables markets.

17      Allowing Biosense to condition CARTO access on buying its Consumables

18  would leave a giant loophole for it to reduce consumer choice for CARTO access,

19  pulling the lever of financing instead of clinical support to force unwilling

20  consumers to bundle devices that they would prefer to buy separately from a

21  reprocessor like Innovative.  Prohibiting such conditioning is an appropriate way to

22  "pry open to competition" the markets that Biosense has monopolized.  *Ford*, 405

23  U.S. at 577-78 (cleaned up).  Without its clinical-support tie, Biosense has every

24  reason to block access to competitive reprocessing options that help hospitals save

25  money and "advance patient care."  Dkt. 535-1 at 212 (Tr. 30:14-31:17) (Doshi).

26  And the jury's verdict shows that Biosense could profitably condition CARTO

27  access to protect its aftermarket monopolies.  *See* Dkt. 521 at 37 (J.I. No. 30) (as to

28  mapping-machine foremarket, requiring finding that switching costs are high and

18

that competition cannot "discipline anticompetitive behavior in the aftermarket"). If Biosense cannot force alternative tying arrangements on its customers, it will have to compete on the merits by offering better prices, higher quality, and more choices to customers that want the CARTO and compatible Consumables.

### B.    Biosense's Overbreadth Arguments As to Blocking Technology Are Unfounded or Addressed by the Modified Proposed Order

#### 1.    Innovative Does Not Seek To Enjoin Past Conduct

The Court can easily dispense with Biosense's protest (at 17-18) that Innovative is not entitled to an injunction for ***already developed*** blocking technology: Innovative does not seek to enjoin those technologies. The MPO makes that clear. *See* MPO § 3.

#### 2.    Prohibiting Blocking Technology Does Not Condemn Benign Product Innovations

The MPO's provision barring "Blocking Technology" extends only to hardware or software "that conditions the availability or use of CARTO on the purchase or use of Consumables sold by or for Biosense" or that "prevents use of CARTO with Consumables sold by or for someone other than Biosense." MPO § 3.2. In other words, it prohibits future versions of the blocking technology that the jury condemned as contributing to Biosense's illegal monopolization. Biosense asserts (at 20-21) that this provision could be read to forbid product features that incidentally "make reprocessing more challenging," like the "lumen" on the Pentaray catheter, which delivers anticoagulants while the catheter is inside the heart. But as Biosense itself suggests (at 21), that is not a natural reading of the words "condition" and "prevent."

Biosense created its Falcon chip so it would "know it's our catheter" rather than a third-party reprocessor's, so that when "you plug a used reprocessed catheter without the Biosense signature on it" into CARTO, Biosense would know to cause CARTO to "not work" with that device if someone else reprocessed it. Reade Decl.

---

19

Ex. 19 (Tr. 44:7-14, 39:9-11) (Shalgi). Indeed, Biosense told only its own affiliate SterilMed how to code Falcon-enabled catheters to work with CARTO after being reprocessed. *Id.* at 56:3-7. Biosense knew its Falcon chip would "prevent[] use of CARTO with Consumables sold by or for someone other than Biosense," MPO § 3.2; it even described that chip internally as "anti-reprocessing technology." Dkt. 535-1 at 9 (JX-219).[5]

The "prevent" clause blocks future efforts to inhibit reprocessing competition through technological blocks like the Falcon chip, and the "condition" clause ensures that Biosense cannot tie its products technologically—such as with a forced software pairing—to protect its unlawful catheter monopolies. Technology like the Pentaray lumen is different. It is hard to clean no matter who reprocesses the catheter, and it does not prevent or condition the use of a Pentaray based on proving that Biosense, not a third party, reprocessed the device.

Biosense saw the same trial. It knows what the blocking provisions mean and what conduct the jury condemned; it proposed nothing to address the ambiguities it asserts here. And because Innovative proved antitrust liability, "all doubts as to the remedy are to be resolved in its favor." *du Pont*, 366 U.S. at 334. To the extent Biosense is unsure in the future whether particular conduct conforms to the injunction, it may seek clarification from Innovative or the Court. MPO § 8.

## C. Biosense's Challenges to the Collections Provisions Are Unpersuasive

### 1. A Narrow Prohibition on Collecting Devices That Biosense Does Not Reprocess Is Reasonable

Innovative presented evidence that Biosense had launched a three-pronged

---

[5] *See also* Reade Decl. Ex. 20 (Tr. 24:23-25:13) (Joseph) (explaining that Biosense's chip "completely locked us out" of CARTO when trying to use reprocessed Innovative Soundstars).

attack against third parties reprocessing catheters. Although the jury was not required to make findings specifically about collections, it did find that Biosense illegally monopolized and attempted to monopolize catheter markets in violation of the Sherman Act. Thus, contrary to Biosense's objection (at 22-23), the injunction reasonably forbids an anticompetitive tactic that the trial record shows Biosense used to protect that illegal monopoly: hoarding devices that it cannot reprocess and does not seek to reprocess "to deprive its rival[s] of essential inputs." Dkt. 489 at 8; *see also* Mot. at 16-18 (collecting evidence of anticompetitive intent and effect of Biosense's collections).

Even Biosense's own documents describe the tactic as anticompetitive. When Biosense plotted to collect DecaNav and Pentaray catheters that it had no plans to reprocess, it framed its plan as a response to "Innovative Health['s]" regulatory "approval to reprocess" the DecaNav and to expected Pentaray approvals from "multiple competitive . . . [r]eprocessors." Dkt. 535-1 at 73 (JX-3114). And it justified the plan as follows: "Mitigate immediate risk of negative impact to $100M combined OEM business from competitive reprocessed devices" and "restrict supply from competitors." Dkt. 535-1 at 73-74 (JX-3114). This Court may and should bar that tactic—whether as "the precise conduct" that violated the antitrust laws, *Optronic*, 20 F.4th at 486 (cleaned up); as "connected with acts actually found to be illegal," *Gypsum*, 340 U.S. at 88, 89;[6] or to ensure its decree is effective. *Ford*, 405 U.S. at 573.

### 2.    The Modified Proposed Order Further Limits the Collection Provision to Exclude Non-Reprocessable Ablation Catheters

Preventing Biosense from collecting any used Consumables that it does not

---

[6] *See also* Dkt. 535-1 at 1-2 (JX-3673) (internal Biosense discussion of sending collections guidance to "prevent the competition from getting access to our catheters" to "all my CAS given the full implementation of the case coverage policy").

*PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION*

reprocess or plan to reprocess would prevent it from collecting ablation catheters

that no one can reprocess.  Given Biosense's assertion (at 24 n.9) that nearly all the

catheters it collects fall into that category, Innovative proposes modifying the

injunction to permit Biosense to collect, without limit, ablation catheters that no one

reprocesses.  If a rival begins marketing or selling a reprocessed version of such

devices, however, they will become subject to the bar.  *See* MPO § 4.2.3.

### D.    The Injunction Appropriately Extends to All Consumables

The injunction appropriately extends to all Consumables—devices "originally

manufactured by Biosense for use with CARTO," MPO § 1.3—rather than just

sensor-enabled catheters.  Mot. at 20-23.

Biosense deployed the same tactics and pretexts to limit consumers' ability to

choose reprocessed versions of devices that it had made for use with CARTO

whether those devices were sensor-enabled or not.  An injunction that "broadly

bar[s]" Biosense from replicating its illegal conduct as to other CARTO-compatible

devices that are vulnerable to the same tactics is well within this Court's authority to

"restrain acts which are of the same type or class as [the defendant's] unlawful

acts."  *Zenith*, 395 U.S. at 132; *see also Gypsum*, 340 U.S. at 88, 89 (court may

enjoin "practices connected with acts actually found to be illegal"); *Kodak*, 125 F.3d

at 1226 (affirming permanent injunction extending to "all past, present, and future

micrographic equipment" and "all parts or supply items").

That relief is also needed to ensure Innovative can compete fully in the

sensor-enabled catheter markets. Many consumers prefer to buy a full line of

electrophysiology products from just one vendor.  If Biosense could simply shift its

illegal tactics to new products, Innovative could not compete for many of those

customers.  Mot. at 22-23; *infra* at 12.

Biosense suggests (at 9) that Innovative has shown no threat of harm from its

illegal practices to Innovative's ability to sell other devices—like the DecaNav,

Vizigo, and AcuNav—that Biosense subjects to its unlawful policies.  The record

proves otherwise.  Biosense applied its case coverage policy to the AcuNav and DecaNav catheters, as well as to the Vizigo sheath.  *See* JX-3957 at 5; *see also* Mot. at 27 (showing that Biosense inconsistently subjected the AcuNav to the coverage policy).  And Biosense's practices damaged Innovative's ability to compete for sales of those devices, despite the inter-brand competition that Biosense claims (at 9 & n.4) would discipline its conduct.  *See, e.g.*, Dkt. 535-1 at 206 (Tr. 48:4-12) (Distel) (Biosense "shut down" Innovative's Vizigo sales in "three months"); Dkt. 535-1 at 208-09 (Tr. 55:22-56:1) (Distel) (Biosense's practices have "greatly impacted" Innovative's ability to sell AcuNavs); JX-3437 at 1 (internal Biosense email noting Innovative's clearance to sell DecaNav but stating that Biosense's "field teams" are "prepared to address any potential users/customers" of Innovative's DecaNav "by leveraging our current case coverage policy"); *see also* Dkt. 535-1 at 81 (JX-3207) (Biosense internal deck stating that reprocessing competitor "ha[d] stopped selling ACUNAV 10F due to supply constraints (caused by BWI collections)").  Especially given the jury's verdict that Biosense's conduct lacked any valid procompetitive justification and substantially affected Innovative's ability to sell covered devices, injunctive relief should end that conduct altogether.  *See Google Play*, 2024 WL4438249, at *9 (solution to unlawful tie is to "break[]" it).[7]

**E.      Biosense's Objections to the Injunction's Ancillary Provisions Are Baseless**

**1.      The Compliance Provisions Are Appropriate**

Because antitrust violators have an incentive to return for seconds, *see Knutson v. Daily Rev., Inc.*, 548 F.2d 795, 812 (9th Cir. 1976), antitrust injunctions

---

[7] Biosense misstates (at 9 n.4) Dr. Forister's findings about Innovative's AcuNav sales.  Those sales are "broadly" similar to Innovative's sales of Abbott's Viewflex catheter, Dkt. 546-5 (Tr. 23:21) (Forister), but the data shows a "lower market share for Innovative with Acunav compared to Viewflex in many years." Dkt. 341-3, ¶ 314 (Forister Second Rebuttal Report).

include compliance measures.  *See, e.g.*, *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 181-83 (D.D.C. 2002) (cited by Biosense) ("form[ing] a committee to coordinate enforcement of the remedial decree" and granting plaintiffs "reasonable access to Microsoft's source code, . . . other correspondence," and "employees for interview, and the right to request and receive written reports").[8]

Biosense contests only two of the compliance measures Innovative proposed: (1) semi-annual reports regarding Biosense's compliance with the injunction, *see* MPO § 5; and (2) a notice to employees and customers of a hotline, created and paid for by Innovative or a third party it selects, for reporting noncompliance, *see* MPO § 6.1.  Both measures are proper and, as *New York* shows, less burdensome or intrusive than the relief typically ordered in antitrust cases.

Courts do not "assume, contrary to common experience, that a violator of the antitrust laws will relinquish the fruits of his violation more completely than the court requires him to do."  *Prof'l Eng'rs*, 435 U.S. at 698 (cleaned up).  The "proved transgressor," Biosense has not carried its "burden" of explaining what "legitimate" activities are endangered by reporting its compliance or telling others one way to report violations.  *Prof'l Eng'rs*, 435 U.S. at 698.

Start with the hotline.  Biosense says (at 26) that "there is no reason" it should have to tell anyone about the hotline because its parent company, Johnson & Johnson, has its own.  But J&J's hotline did not stop Biosense's illegal conduct, and some of J&J's employees distrust the hotline.  *See, e.g.*, *CREDO Hotline*, CarePharma.com (2024), https://perma.cc/HW9P-GJ44 (J&J employee forum: "At least 20+ people called the Credo hotline on the West Derm RBD, nothing happened."); *id.* ("it's been months since I reported my case. No response. Pretty

---

[8] *See also* Final Judgment, *FTC v. Mortgage Relief Advocates LLC*, No. 2:14-cv-5434 (C.D. Cal. July 23, 2015), Dkt. 73 at 15 (requiring sworn "compliance report[s]").

*PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION*

sad."); *id.* ("I don't want to lose my job but have been advised by immediate leadership to stay quiet."); *id.* (describing hotline as "hoax" and "complete joke" that was "set up to avoid lawsuits").  A third-party hotline provides an alternative for employees and consumers who do not trust Biosense to police its own misconduct.  *See, e.g.*, JX-225 at 2 (customer criticizing Biosense's "shady business practices" and concluding "I do not trust them at all").  The parties can draft the required notices to address Biosense's concern (at 26) about "confusion."

Semiannual reports are appropriate, too.  Biosense will know whether and how it is complying with the injunction.  Innovative will not.  Broadly, Innovative just knows what happens to it and its customers.  Regular reports would enable Innovative to confirm that Biosense is not pursuing anticompetitive "methods more subtle and informed, and more difficult to prove, than those" Innovative proved at trial.  *Prof'l Eng'rs*, 435 U.S. at 698.  For example, Biosense might enforce its case coverage policy against customers it knows are not in contact with Innovative, while feigning compliance elsewhere.  That harm to competition would be invisible to Innovative.  Regular reports would reveal it.

### 2.    At Least a Ten-Year Term Is Necessary To Restore Competition

The injunction's ten-year term is necessary and well-supported.  *Kodak* required the defendant to provide the monopolized product without discriminating for ten years.  125 F.3d at 1201-02.  The district court found that term was needed "to offset the 10 years that Kodak's illegal parts policy ha[d] been in effect."  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 1996 WL 101173, at *2 (N.D. Cal.).  Competitors need time to recover their rightful positions.  So here.  Mot. at 25.

Biosense's proposed three-year term will not suffice.  Biosense has not shown that these markets are like online networks, where courts can blunt network effects with the stroke of a pen, quickly reshaping the competitive landscape.  *See, e.g.*, *Google Play*, 2024 WL 4438249, at *6 (cited by Opp. at 27) (ordering three-year

term because requiring "access to the catalog of Play Store apps" for that period "suffic[ed] to give rival [app] stores a fair opportunity to establish themselves").

Indeed, the trial evidence is to the contrary. Cardiac mapping machines like the CARTO last "ten or more years." Dkt. 541 (Tr. 105:23-106:9) (Forister). Switching machines is hard and rare. *See* Dkt. 521 at 37 (J.I. No. 30); Dkt. 541 (Tr. 114:23-116:6) (Forister) (Biosense raised prices while maintaining its share of cardiac mapping procedures after imposing case coverage policy). Aftermarket innovation and entry take years of research and investment—for both reprocessors and OEMs like Biosense. *Compare* JX-875.2, *with* JX-11; JX-44 (developing reprocessed Lasso and Soundstar took Innovative one-and-a-half to three years); Reade Decl. Ex. 21 Biosense Closing Demonstrative, Slide 70 (showing ten-year gap between releases of Pentaray and next-generation Octaray).[9] And typically, hospitals buy Consumables through long-term contracts. *See* Dkt. 541 (Tr. 58:4-8) (Forister) (discussing Ascension Health's "three-year contract to buy catheters and other disposables from Biosense"); Dkt. 548-3 (Coldiron Dep. Tr. 88:24-89:10) (hospital employee testifying that "most of our contracts are three years for disposables").

No one would invest in the research, technology, and regulatory work required to reprocess Consumables if Biosense could quash their sale so soon after entry. *See, e.g.*, Dkt. 535-1 at 175 (Tr. 82:3-83:1) (Forister) (Innovative and Stryker have not reprocessed Octaray "because they knew they would be excluded from the market"). Indeed, given existing long-term contracts, some hospitals would not contract with Innovative during a three-year term. And even if they could end their

---

[9] *See also* Dkt. 539 (Tr. 112:11-113:10) (Joseph) (overcoming Biosense's blocking technology alone took between six and 37 months, depending on device); *Id*. (Tr. 83:5-7) (Joseph) (Innovative has spent over $35 million on R&D); *Id*. (Tr. 100:5-102:6) (Joseph) (recounting years of research to develop patented method to reprocess Pentaray).

*PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION*

existing contracts or are now uncommitted, many hospitals would spurn contracts with Innovative and other third-party reprocessors after seeing the cliff edge ahead for their ability to use their products.  That is why it "will take time to dismantle Biosense's anticompetitive scheme and correct all its consequences."  Mot. at 25.

Ten years is a reasonable starting point—even conservative.  Other cases order indefinite relief.  In *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021), the court enjoined Apple from continuing its anticompetitive practices nationwide, ***forever***.  *Id.* at 1058; *Epic Games, Inc. v. Apple, Inc.*, No. 4:20-cv-5640 (N.D. Cal. Sept. 10, 2021), Dkt. 813.[10]  The Ninth Circuit blessed "the scope of the injunctive relief."  *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023).  Now, another version of the injunction is on appeal; its duration still troubles no one.  *See generally, e.g.*, Opening Brief of Apple, Inc., *Epic Games, Inc. v. Apple, Inc.*, No. 25-2935 (9th Cir. June 23, 2025).  Other cases approve indefinite antitrust injunctions too.  *See, e.g.*, *Wilk v. Am. Med. Ass'n*, 671 F. Supp. 1465, 1507 (N.D. Ill. 1987) (indefinite Sherman Act injunction), *aff'd*, 895 F.2d 352 (7th Cir. 1990); *In re Data General Corp. Antitrust Litig.*, 1986 WL 10899, at *8 (N.D. Cal.) (same).  So if Biosense disputes how long it will take to restore competition, the Court should order indefinite relief, revising MPO § 7 to say just, "Either party may move to modify or terminate this injunction for good cause."  Once Biosense has ceased its anticompetitive conduct, the conduct cannot recur, and competition has been restored, good cause may exist for dissolving the order.

## IV.    **Conclusion**

The Court should issue the modified proposed injunction.

---

[10] "[A]ntitrust consent decrees," too, "often mandate[] compliance for an indefinite duration."  *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 12 (1st Cir. 2000).

DATED:  July 7, 2025                THEODORA ORINGHER PC


                                    By:     /s/ Panteha Abdollahi
                                            Panteha Abdollahi

                                    JEFFREY L. BERHOLD, P.C.


                                    By:     /s/ Jeffrey L. Berhold
                                            Jeffrey L. Berhold

                                    BERGER MONTAGUE PC


                                    By:     /s/ Joshua P. Davis
                                            Joshua P. Davis
                                            Matthew Summers

                                    KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.


                                    By:     /s/ Matthew D. Reade
                                            Derek T. Ho
                                            Andrew E. Goldsmith
                                            Matthew D. Reade
                                            Kelley C. Schiffman
                                            Rachel T. Anderson
                                            Annamaria M. Morales-Kimball
                                            Sean P. Quirk


                                            Attorneys for Plaintiff
                                            INNOVATIVE HEALTH LLC

*PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION*

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff Innovative Health LLC, certifies that this brief contains 6,999 words, which complies with the word limit of Central District of California Local Rule 11-6.1.


DATED:  July 7, 2025                    KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.


By:    _/s/ Matthew D. Reade_
          Matthew D. Reade

*PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION*