Panteha Abdollahi, Esq.
State Bar No. 230002
pabdollahi@tocounsel.com
THEODORA ORINGHER PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, California 92626-7109
Telephone: (714) 549-6200
Facsimile: (714) 549-6201

Jeffrey L. Berhold, Esq.
Admitted *Pro Hac Vice*
jeff@berhold.com
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, Georgia 30309
Telephone: (404) 872-3800
Facsimile: (678) 868-2021

Joshua P. Davis, Esq.
State Bar No. 193254
jdavis@bm.net
BERGER MONTAGUE PC
505 Montgomery St., Suite 625
San Francisco, California 94111
Telephone:  (415) 906-0684

Derek T. Ho, Esq.*
Andrew E. Goldsmith, Esq.*
Matthew D. Reade, Esq.*
Kelley C. Schiffman, Esq.
State Bar No. 325023
Rachel T. Anderson, Esq.*
Annamaria M. Morales-Kimball, Esq.*
Sean P. Quirk, Esq.*
*Admitted *Pro Hac Vice*
dho@kellogghansen.com
agoldsmith@kellogghansen.com
mreade@kellogghansen.com
kschiffman@kellogghansen.com
randerson@kellogghansen.com
amoraleskimball@kellogghansen.com
squirk@kellogghansen.com
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999

Attorneys for Plaintiff
INNOVATIVE HEALTH LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

INNOVATIVE HEALTH LLC,

Plaintiff,

vs.

BIOSENSE WEBSTER, INC.,

Defendant.

Case No. 8:19-cv-1984 JVS (KES)

**DECLARATION OF MATTHEW D. READE IN SUPPORT OF PLAINTIFF INNOVATIVE HEALTH LLC'S REPLY IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION**

Date:    July 21, 2025
Time:    1:30 p.m.
Crtrm:  10C

Action Filed:  October 18, 2019
Trial Date:  May 6, 2025

1

I, Matthew D. Reade, declare as follows:

1.      I am an attorney admitted to the bars of the State of Texas and the District of Columbia.  I am admitted *pro hac vice* to practice before this Court.  I practice law at Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., and represent the plaintiff, Innovative Health LLC, in this matter.

2.      I make this declaration in support of Plaintiff Innovative Health LLC's Reply in Support of Motion for Permanent Injunction.

3.      The facts I state here are true and correct.  They are based on my own personal knowledge or knowledge I gleaned from reviewing files pertinent to this matter.  If called as a witness to testify, I could and would competently testify to these facts.

4.      **JX-11** is a true and correct copy of the trial exhibit bearing Bates numbers IH00011427 to IH00011433, which was produced by Innovative Health LLC and admitted into evidence in this case.

5.      **JX-44** is a true and correct copy of the trial exhibit bearing Bates numbers IH00011448 to IH00011453, which was produced by Innovative Health LLC and admitted into evidence in this case.

6.      **JX-225** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00014865 to BWI-INN00014868, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

7.      **JX-875.2** is a true and correct copy of the trial exhibit bearing Bates numbers IH00643769 to IH00643771, which was produced by Innovative Health LLC and admitted into evidence in this case.

8.      **JX-3437** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00325476 to BWI-INN00325479, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

*DECLARATION OF MATTHEW D. READE*

9.  **JX-3957** is a true and correct copy of the trial exhibit bearing Bates numbers IH00697133 to IH00697136.001, which was produced by Innovative Health LLC and admitted into evidence in this case.

10.  **Exhibit 14** is a true and correct excerpt of the trial testimony of Rick Ferreira in this matter.

11.  **Exhibit 15** is a true and correct copy of a redline comparing the modified proposed order submitted with this reply brief with the original proposed order on file at Dkt. 535-2.

12.  **Exhibit 16** is a true and correct excerpt of the trial testimony of Mary Roberts in this matter.

13.  **Exhibit 17** is a true and correct excerpt of the trial testimony of Dr. Eric Forister in this matter.

14.  **Exhibit 18** is a true and correct excerpt of the trial testimony of Dr. Lawrence Wu in this matter.

15.  **Exhibit 19** is a true and correct excerpt of the trial testimony of Avi Shalgi in this matter.

16.  **Exhibit 20** is a true and correct excerpt of the trial testimony of Blessan Joseph in this matter.

17.  **Exhibit 21** is a true and correct copy of a slide from the closing demonstrative used at trial by Biosense in this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 7th day of July, 2025, at Arlington, Virginia.

/s/ *Matthew D. Reade*
Matthew D. Reade



**DEPARTMENT OF HEALTH & HUMAN SERVICES**     Public Health Service

_____

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Center - WO66-G609
Silver Spring, MD  20993-0002

March 14, 2016

Innovative Health, LLC
Rafal Chudzik
Director of Engineering
1435 North Hayden Road, Suite 100
Scottsdale, Arizona 85257

Re: K153153
    Trade/Device Name:  Reprocessed LASSO NAV eco and Reprocessed LASSO 2515 NAV
                eco Variable Electrophysiology (EP) Catheter
    Regulation Number:  21 CFR 870.1220
    Regulation Name:  Electrode Recording Catheter or Electrode Recording Probe
    Regulatory Class:  Class II
    Product Code:  NLH
    Dated:  February 5, 2016
    Received:  February 8, 2016

Dear Rafal Chudzik:

We have reviewed your Section 510(k) premarket notification of intent to market the device referenced above and have determined the device is substantially equivalent (for the indications for use stated in the enclosure) to legally marketed predicate devices marketed in interstate commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to devices that have been reclassified in accordance with the provisions of the Federal Food, Drug, and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA). You may, therefore, market the device, subject to the general controls provisions of the Act. The general controls provisions of the Act include requirements for annual registration, listing of devices, good manufacturing practice, labeling, and prohibitions against misbranding and adulteration. Please note:  CDRH does not evaluate information related to contract liability warranties. We remind you, however, that device labeling must be truthful and not misleading.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA), it may be subject to additional controls. Existing major regulations affecting your device can be found in the Code of Federal Regulations, Title 21, Parts 800 to 898. In addition, FDA may publish further announcements concerning your device in the Federal Register.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean that FDA has made a determination that your device complies with other requirements of the Act or any Federal statutes and regulations administered by other Federal agencies. You must comply with all the Act's requirements, including, but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical device-

Innovative v. Biosense
**No. 8:19-cv-01984-JVS**
**JX-11**

IH00011427

Page 2 - Rafal Chudzik

related adverse events) (21 CFR 803); good manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801), please contact the Division of Industry and Consumer Education at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21 CFR Part 807.97). For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part 803), please go to http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm for the CDRH's Office of Surveillance and Biometrics/Division of Postmarket Surveillance.

You may obtain other general information on your responsibilities under the Act from the Division of Industry and Consumer Education at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.

Sincerely yours,

for Bram D. Zuckerman, M.D.
Director
Division of Cardiovascular Devices
Office of Device Evaluation
Center for Devices and Radiological Health

Enclosure

IH00011428

Page 3 - Rafal Chudzik

Reprocessed Single-Use Device Models Included in Clearance:

| Description | Item Number | Number of Electrodes | Electrode Spacing (mm) | Loop Diameter or Curve (mm) | French Size | Length (cm) |
|---|---|---|---|---|---|---|
| Lasso Nav *eco* Fixed Diagnostic EP Catheter | D134901 | 10 | 4.5 | 15 | 7 | 115 |
| | D134902 | 20 | 4.5 pairs | 15 | 7 | 115 |
| | D134903 | 10 | 6.0 | 20 | 7 | 115 |
| | D134904 | 20 | 6.0 pairs | 20 | 7 | 115 |
| | D134905 | 10 | 8.0 | 25 | 7 | 115 |
| | D134906 | 20 | 8.0 pairs | 25 | 7 | 115 |
| Lasso 2515 Nav *eco* Variable Diagnostic EP Catheter | D134301 | 20 | 2-6-2 | 25–15 | 7 | 115 |
| | D134302 | 10 | 8.0 | 25–15 | 7 | 115 |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Food and Drug Administration

## Indications for Use

Form Approved: OMB No. 0910-0120
Expiration Date: January 31, 2017
*See PRA Statement below.*

510(k) Number *(if known)*

K153153

Device Name
Reprocessed LASSO NAV eco and Reprocessed LASSO 2515 NAV eco Variable Electrophysiology (EP) Catheter

Indications for Use *(Describe)*
The Reprocessed LASSO NAV eco and Reprocessed LASSO 2515 NAV eco Variable Catheters are indicated for multiple electrode electrophysiological mapping of the cardiac structures of the heart, i.e. recording or stimulation only. The Reprocessed LASSO NAV eco and Reprocessed LASSO 2515 NAV eco Variable Catheters are designed to obtain electrograms in the atrial regions of the heart.

The Reprocessed LASSO NAV and Reprocessed LASSO 2515 NAV eco Variable Catheters provide location information when used with compatible CARTO 3 EP Navigation Systems. (These catheters are not compatible with CARTO 3 EP Navigation Systems prior to Version 2.3.)

Type of Use *(Select one or both, as applicable)*

☒ Prescription Use (Part 21 CFR 801 Subpart D)          ☐ Over-The-Counter Use (21 CFR 801 Subpart C)

### CONTINUE ON A SEPARATE PAGE IF NEEDED.

This section applies only to requirements of the Paperwork Reduction Act of 1995.

**\*DO NOT SEND YOUR COMPLETED FORM TO THE PRA STAFF EMAIL ADDRESS BELOW.\***

The burden time for this collection of information is estimated to average 79 hours per response, including the time to review instructions, search existing data sources, gather and maintain the data needed and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden, to:

Department of Health and Human Services
Food and Drug Administration
Office of Chief Information Officer
Paperwork Reduction Act (PRA) Staff
*PRAStaff@fda.hhs.gov*

*"An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB number."*

## SECTION 5: 510(k) SUMMARY

As required by 21 CFR 807.92(c)

**Submitter's Name and Address:**
Innovative Health, LLC.
1435 N. Hayden Road, Suite 100
Scottsdale, AZ 85257

**Contact Name and Information:**
Rafal Chudzik
Director of Engineering
(602) 326-7716 (cell)
(480) 525-6006 (office)
(844) 965-9359 (fax)
rchudzik@innovative-health.com

**Date prepared:**
October 30, 2015

**Device Information:**

| | |
|---|---|
| *Trade/Proprietary Name:* | Reprocessed LASSO® NAV eco and LASSO 2515 NAV eco Variable Electrophysiology (EP) Catheter |
| *Common Name:* | Electrophysiological Mapping Catheter |
| *Classification Name:* | Catheter, Recording, Electrode, Reprocessed |
| *Classification Number:* | Class II, 21 CFR 870.1220 |
| *Product Code:* | NLH |

**Predicate Device:**

| 510(k) Number | 510(k) Title | Manufacturer |
|---|---|---|
| K113213 | LASSO® 2515 NAV *eco* Variable Catheter and LASSO® NAV *eco* Catheter | Biosense Webster |
| K093376 | LASSO® NAV Catheter | Biosense Webster |
| K081258 | Variable LASSO® NAV Catheter, Models: D-1290-01, D-1290-2 | Biosense Webster |

**Reference Device:**

| 510(k) Number | 510(k) Title | Reprocessor |
|---|---|---|
| K112292 | Reprocessed 2515 NAV Variable Electrophysiology Catheter | Stryker Sustainability Solutions |

**Device Description:**

**Reprocessed LASSO 2515 NAV *eco* Variable Catheter and Reprocessed LASSO NAV *eco* Catheter**

Innovative Health
Reprocessed Diagnostic EP Catheters

Page 1
Traditional 510(k)
K153153

**JX-11, Page 5 of 7**    IH00011431

The Reprocessed LASSO 2515 NAV *eco* Variable Catheter and Reprocessed LASSO NAV *eco* Catheter have been designed to facilitate electrophysiological mapping of the atria of the heart with the CARTO 3 EP Navigation System and a reference device. Both catheters are deployed in the right or left atrium through an 8F guiding sheath. Both deflectable catheters consists of a 4.5 F (Lasso NAV eco) or 4 F (LASSO NAV eco Variable) circular spine on the distal tip, with platinum/iridium electrodes that can be used for stimulation and recording.

The Reprocessed LASSO 2515 NAV *eco* Variable Catheter features a Nitinol loop design that allows the expansion and contraction of the loop to custom-fit veins with different sizes, ranging from 25mm to 15mm diameter (± 15%).

The Reprocessed LASSO NAV *eco* Catheter is a fixed catheter with three fixed catheter sizes, namely 15, 20, 25 mm loop sizes to accommodate different vein sizes. Each loop size will be available with either 10 or 20 electrodes.

**Indications for Use:**

**Reprocessed LASSO 2515 NAV *eco* Variable Catheter and Reprocessed LASSO NAV *eco* Catheter**

The Reprocessed LASSO 2515 NAV *eco* Variable Catheter and Reprocessed LASSO NAV *eco* Catheter are indicated for multiple electrode electrophysiological mapping of the cardiac structures of the heart, i.e. recording or stimulation only. These catheters are designed to obtain electrograms in the atrial regions of the heart.

The Reprocessed LASSO 2515 NAV *eco* Variable Catheter and Reprocessed LASSO NAV *eco* Catheter provide location information when used with compatible CARTO EP Navigation Systems. (These catheters are not compatible with CARTO 3 EP Navigation Systems prior to Version 2.3).

> **Note:** Only the catheter is the subject of this submission. Any other related equipment is not included in the scope of this submission.

**Technological Characteristics:**

The purpose, design, materials, function, and intended use of the Reprocessed LASSO 2515 NAV *eco* Variable Catheter and Reprocessed LASSO NAV *eco* Catheter are identical to the predicate devices. There are no changes to the claims, clinical applications, patient population, performance specifications, or method of operation.  In addition, Innovative Health's reprocessing of these devices includes removal of visible soil and decontamination. Each device is inspected and function tested prior to packaging and labeling.

**Functional and Safety Testing:**

Bench and laboratory testing was conducted to demonstrate performance (safety and effectiveness) of the Reprocessed LASSO 2515 NAV *eco* Variable Catheter and Reprocessed LASSO NAV *eco* Catheter. This included the following:

- Biocompatibility
- Cleaning Validation
- Sterilization Validation
- Functional Testing
  - Visual Inspection
  - Dimensional Verification
  - Electrical Performance
  - Simulated Use
  - Mechanical Characteristics
- Electrical Safety Testing
  - Dielectric and Current Leakage
- Packaging Validation

The Reprocessed LASSO 2515 NAV *eco* Variable Catheter and Reprocessed LASSO NAV *eco* Catheter are reprocessed no more than one (1) time. Each device is marked and tracked. After the device has reached the maximum number of reprocessing cycles, the device is rejected from further reprocessing. Reprocessing is performed only by Innovative Health. Innovative Health restricts its reprocessing to exclude devices previously reprocessed by other reprocessors.

**Conclusion:**

Innovative Health concludes that the Reprocessed LASSO 2515 NAV *eco* Variable Catheter and Reprocessed LASSO NAV *eco* Catheter are as safe and effective as the predicate devices described herein.

Innovative Health
Reprocessed Diagnostic EP Catheters

Page 3
Traditional 510(k)
K153153

**JX-11, Page 7 of 7**                    IH00011433



**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Center - WO66-G609
Silver Spring, MD  20993-0002

June 16, 2017

Innovative Health, LLC.
Amy Stoklas-Oakes
Sr. Quality and Regulatory Manager
1435 North Hayden Road, Suite 100
Scottsdale, Arizona 85257

Re:  K170474
    Trade/Device Name:  Reprocessed SoundStar 3D Diagnostic Ultrasound Catheter
         *(see list of models enclosed)*
    Regulation Number:  21 CFR 870.1200
    Regulation Name:  Diagnostic Intravascular Catheter
    Regulatory Class:  Class II
    Product Code:  OWQ
    Dated:  May 11, 2017
    Received:  May 12, 2017

Dear Amy Stoklas-Oakes:

We have reviewed your Section 510(k) premarket notification of intent to market the device referenced above and have determined the device is substantially equivalent (for the indications for use stated in the enclosure) to legally marketed predicate devices marketed in interstate commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to devices that have been reclassified in accordance with the provisions of the Federal Food, Drug, and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA). You may, therefore, market the device, subject to the general controls provisions of the Act. The general controls provisions of the Act include requirements for annual registration, listing of devices, good manufacturing practice, labeling, and prohibitions against misbranding and adulteration. Please note:  CDRH does not evaluate information related to contract liability warranties. We remind you, however, that device labeling must be truthful and not misleading.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA), it may be subject to additional controls. Existing major regulations affecting your device can be found in the Code of Federal Regulations, Title 21, Parts 800 to 898. In addition, FDA may publish further announcements concerning your device in the <u>Federal Register</u>.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean that FDA has made a determination that your device complies with other requirements of the Act or any Federal statutes and regulations administered by other Federal agencies. You must comply with all the Act's requirements, including, but not limited to: registration and listing (21 CFR

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-44**

Page 2 - Amy Stoklas-Oakes                                                    K170474

Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical device-related adverse events) (21 CFR 803); good manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801), please contact the Division of Industry and Consumer Education at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21 CFR Part 807.97). For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part 803), please go to http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm for the CDRH's Office of Surveillance and Biometrics/Division of Postmarket Surveillance.

You may obtain other general information on your responsibilities under the Act from the Division of Industry and Consumer Education at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.

Sincerely,

for Bram D. Zuckerman, M.D.
Director
Division of Cardiovascular Devices
Office of Device Evaluation
Center for Devices and Radiological Health

Enclosure

Page 3 - Amy Stoklas-Oakes                                                    K170474

The following device models are included in this 510(k) submission:

| Item Number | Description | Sheath Usable Length (cm) | French Size | System Compatibility |
|---|---|---|---|---|
| SNDSTR10 | SoundStar 3D Diagnostic Ultrasound Catheter | 90 | 10F | Acuson/Siemens |
| SNDSTR10G | SoundStar 3D Diagnostic Ultrasound Catheter | 90 | 10F | GE Vivid-i and Vivid-q Ultrasound System |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Food and Drug Administration

## Indications for Use

Form Approved: OMB No. 0910-0120
Expiration Date: January 31, 2017
*See PRA Statement below.*

---

510(k) Number *(if known)*
K170474

---

Device Name
Reprocessed SoundStar 3D Diagnostic Ultrasound Catheter

---

Indications for Use *(Describe)*
The Reprocessed SoundStar 3D Diagnostic Ultrasound Catheter is indicated for intra-cardiac and intra-luminal visualization of cardiac and great vessel anatomy and physiology as well as visualization of other devices in the heart.

The SoundStar 3D Diagnostic Ultrasound Catheter provides location information when used with the CARTO EP Navigation Systems.

---

Type of Use *(Select one or both, as applicable)*

☒ Prescription Use (Part 21 CFR 801 Subpart D)        ☐ Over-The-Counter Use (21 CFR 801 Subpart C)

---

### CONTINUE ON A SEPARATE PAGE IF NEEDED.

This section applies only to requirements of the Paperwork Reduction Act of 1995.

**\*DO NOT SEND YOUR COMPLETED FORM TO THE PRA STAFF EMAIL ADDRESS BELOW.\***

The burden time for this collection of information is estimated to average 79 hours per response, including the time to review instructions, search existing data sources, gather and maintain the data needed and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden, to:

Department of Health and Human Services
Food and Drug Administration
Office of Chief Information Officer
Paperwork Reduction Act (PRA) Staff
*PRAStaff@fda.hhs.gov*

*"An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB number."*

---

# SECTION 5: 510(k) SUMMARY

As required by 21 CFR 807.92(c)

**Submitter's Name and Address:**
Innovative Health, LLC.
1435 N. Hayden Road, Suite 100
Scottsdale, AZ 85257

**Contact Name and Information:**
Amy Stoklas-Oakes
Senior Quality and Regulatory Manager
Innovative Health, LLC.
(480) 525-5972 (office)
(888) 965-7705 (fax)
astoklas-oakes@innovative-health.com

**Date prepared:**
February 14, 2017

**Device Information:**

| | |
|---|---|
| *Trade/Proprietary Name:* | Reprocessed SoundStar 3D Diagnostic Ultrasound Catheters |
| *Classification Name:* | Reprocessed Intravascular Ultrasound Catheter |
| *Classification Number:* | Class II, 21 CFR 870.1200 |
| *Product Code:* | OWQ |

**Predicate Device:**

| 510(k) Number | 510(k) Title | Manufacturer |
|---|---|---|
| K101138 | SoundStar 3D Diagnostic Ultrasound Catheter | Biosense Webster, Inc. |
| K091352 | SoundStar 3D Diagnostic Ultrasound Catheter | Biosense Webster, Inc. |

**Device Description:**
The Reprocessed SoundStar 3D Diagnostic Ultrasound Catheters (hereinafter Catheter) is an imaging catheter. The distal end of the catheter has an ultrasound transducer providing two-dimensional imaging and a three-dimensional location sensor providing location information to compatible CARTO EP Navigation Systems with ultrasound capability. A steering mechanism controls the image plane orientation by rotating both the catheter tip and the variable direction.

The item numbers in scope of this submission are as follows:

| Item Number | Description | Sheath Usable Length (cm) | French Size | System Compatibility |
|---|---|---|---|---|
| SNDSTR10 | SoundStar 3D Diagnostic Ultrasound Catheter | 90 | 10F | Acuson/Siemens |
| SNDSTR10G | SoundStar 3D Diagnostic Ultrasound Catheter | 90 | 10F | GE Vivid-i and Vivid-q Ultrasound System |

Table 5.1: Device Scope

**Indications for Use:**
The Reprocessed SoundStar 3D Diagnostic Ultrasound Catheter is indicated for intra-cardiac and intra-luminal visualization of cardiac and great vessel anatomy and physiology as well as visualization of other devices in the heart.

The SoundStar 3D Diagnostic Ultrasound Catheter provides location information when used with the CARTO EP Navigation Systems.

**Technological Characteristics:**
The purpose, design, materials, function, and intended use of the Reprocessed Diagnostic Ultrasound Catheters are identical to the predicate devices. There are no changes to the claims, clinical applications, patient populations, performance specifications, or method of operation. In addition, Innovative Health's reprocessing of the Diagnostic Ultrasound Catheter includes removal of visible soil and decontamination. Each device is inspected and function tested prior to packaging and labeling.

**Functional and Safety Testing:**
Bench and laboratory testing was conducted to demonstrate performance (safety and effectiveness) of Reprocessed Diagnostic Ultrasound Catheters. This included the following:
- Biocompatibility
- Cleaning Validation
- Sterilization Validation
- Functional testing
    - Visual Inspection
    - Dimensional Verification
    - Ultrasound Transducer Testing
    - Simulated Use
    - Mechanical Characteristics
- Electrical Safety Testing
    - Dielectric and Current Leakage
- Packaging Validation

The Reprocessed Diagnostic Ultrasound Catheters are reprocessed no more than one (1) time. Each device is marked and tracked. After the device has reached the maximum number of reprocessing cycles, the device is rejected from further reprocessing. Reprocessing is performed only by Innovative Health. Innovative Health restricts its reprocessing to exclude devices previously reprocessed by other reprocessors.

**Conclusion:**
Innovative Health concludes that the Reprocessed Diagnostic Ultrasound Catheter is as safe and effective as the predicate devices described herein.

Innovative Health
Reprocessed Diagnostic Ultrasound Catheters

Page 2
Traditional 510(k)
K170474

**JX-44, Page 6 of 6**                    IH00011453

| From: | Ramos, Conrado [BWIUS] </O=JNJ/OU=CRDUSBA/CN=RECIPIENTS/CN=CRAMOS12> |
|---|---|
| To: | Portia Tranguch; Robert Pezzin - Provider PPI LLC |
| CC: | Rose Lentz; Mary Carmella - Provider PPI LLC; Julia Liang - Provider PPI LLC; Darlene Klacik; Paul Gallagher - Provider PPI LLC |
| BCC: | Ramos, Conrado [BWIUS] |
| Sent: | 3/17/2016 1:59:42 PM |
| Subject: | RE: Biosense Webster-Clinical Support Policy review with AGH |

Bob and Portia,

I can assure you that this is a company policy and not a sales tactic to promote BWI reprocessing program. The BWI reprocessing program known as the Sound Choice Program has been available to our customers for almost three years now. The program has been very well received by the majority of our customers. Hence, there is absolutely no need for us to use "sales tactics" to promote it. We recently discovered that our clinical support practices were inconsistent regarding the building of Carto maps with non-BWI navigational catheters and the support of ultrasound cases with non-BWI ultrasound catheters. This discovery has led to a retraining effort of our field team and an awareness campaign initiative with our customers where the inconsistencies have been discovered.

The basis for our policy regarding clinical support is rooted in three main BWI requirements. BWI personnel must only provide clinical and technical support for products that they have been properly trained to support. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. BWI personnel must promote and support BWI products in a manner that is consistent with our FDA approved Instructions-For-Use.

Healthcare provider facilities such as AGH have always required suppliers to provide support to their own products. Through BWI's investigation, we have discovered that there is a common misconception in the market place that is driving this inconsistency in clinical support practices. That misconception is the belief that because the Stryker reprocessed version of our products still have our BWI markings and logo on them, they are still considered by some of our customers to be BWI products. The FDA has clearly determined that once the OEM product has been reprocessed by a reprocessing company that reprocessing company is now the legal manufacturer of that product. BWI has no information regarding the reprocessing processes that our catheters have been subjected to by Stryker. As a result, our clinical personnel do not have any knowledge of the performance specifications of the Stryker mapping and ultrasound catheters.

I would very much welcome the opportunity to discuss the issue further via conference if you like.

**Conrad Ramos**
Corporate Account Director
M. **404-808-1726**
F. **877-817-8086**
E. **cramos12@its.jnj.com**

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
3333 S. Diamond Canyon Road
Diamond Bar, CA 91765, USA
www.biosensewebster.com
T. 1-909-839-8500
T. 1-800-729-9010
F. 1-909-595-0187



Innovative v. Biosense
No. 8:19-cv-01984-JVS
JX-225

**Confidentiality Notice:** This document is J&J Proprietary. You may forward this document within J&J on a need to know basis. You may not forward this onto the Internet without the author's permission. This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please reply to the sender, so that J&J can arrange for proper delivery, and then please delete the message from your inbox.

---

**From:** Portia Tranguch [mailto:PERVIN@wpahs.org]
**Sent:** Wednesday, March 16, 2016 8:09 PM
**To:** Robert Pezzin - Provider PPI LLC
**Cc:** Ramos, Conrado [BWIUS]; Rose Lentz; Mary Carmella - Provider PPI LLC; Julia Liang - Provider PPI LLC; Darlene Klacik; Paul Gallagher - Provider PPI LLC
**Subject:** Re: Biosense Webster-Clinical Support Policy review with AGH

Paul spoke with dr thosani today. Others are also aware. It certainly does impact us. This is a threat to us on many levels.  We have thousands of dollars tied up in catheters going through the reprocessing with Stryker. If they pull the clinical support our carto system cannot be used since the biosense reps do the mapping with the carto system and our staff do not have this expertise. This company has not been upfront with us from the beginning. As this is just another example of the shady business practices that are normal for them. They have tried at least three different times to get us to go with their reprocessing company, which of course they own. We have always stood by the contract and commitment that we have had in place with Stryker. This is the latest attempt and they know we cannot do cases without their clinical staff. The clinical rep feeds the physicians with nonsense about the reprocessed catheters from Stryker being sub-par, which has been tested and proven not to be the case. I believe they have funded dr thosani to travel to speak about efficiency in ep labs and I am sure about their system and products. They constantly tell us one thing and then when agreements are signed they tell us we misunderstood and it ends up costing us much more. They are not a business partner and I do not trust them at all. I forwarded Rose an email that I received from Stryker where they have attempted this in other organizations and have been unsuccessful. I will send it to you. I suggested a conference call tomorrow to discuss. Let me know what you think.

Sent from my iPhone

On Mar 16, 2016, at 6:58 PM, Pezzin, Robert J <Robert.Pezzin@highmark.com> wrote:

Portia,

Are the M.D.s aware of the new Biosense Webster-Clinical Support Policy and does this impact AGH in any way?

Thank you,
Bob

Robert Pezzin **I Provider Supply Chain Partners I** Director, Supply Chain Operations
East Commons Professional Building I 4 Allegheny Center, 9th Floor I Pittsburgh, PA 15212
P: 412.330.4508 I robert.pezzin@highmark.com

---

**From:** Ramos, Conrado [BWIUS] [mailto:CRamos12@ITS.JNJ.COM]
**Sent:** Tuesday, March 15, 2016 5:30 PM
**To:** Lentz, Rose (WPAHS)
**Cc:** Tranguch, Portia RN (WPAHS); Klacik, Darlene (WPAHS); Pezzin, Robert J; Sfanos, Julie [BWIUS]; Allen, David J. [BWIUS]
**Subject:** [EXTERNAL] FW: Biosense Webster-Clinical Support Policy review with AGH

Rose,

I wanted to follow-up on our meeting and my message below with a reminder of next week's change in our clinical support practices at AGH.  As we discussed, starting on 3/21/2016 Biosense Webster, Inc. (BWI) personnel will not be authorized to provide clinical or technical support at AGH for any products that they have not been trained to support and which are not consistent with the Carto 3 Mapping System's instructions-for-use.  Specifically, BWI personnel will not be able to create Carto 3 maps with non-BWI magnetic sensor enabled navigational catheters nor will BWI personnel interpret images, set-up, troubleshoot, or breakdown any non-BWI ultrasound catheters.  If

AGH still requires supplier support for these non-BWI products, it will be imperative that AGH arrange for this support with the supplier of these products directly before a procedure is scheduled. If AGH still requires BWI personnel support for these procedures, then AGH must ensure that the required BWI products have been ordered and will be available for BWI personnel to utilize before BWI can confirm that Clinical Account Specialist (CAS) resources will be present. As of yesterday, our records indicate that the required BWI navigational and ultrasound catheters have not been ordered to support next week's currently scheduled EP procedures. Please let Dave and Julie know if you have arranged for clinical support from Stryker for these procedures. If not, please let them know when you have ordered the required BWI products so they can confirm the availability of BWI CAS resources to support next week's procedures.

Thanks,

**Conrad Ramos**
Corporate Account Director
M. 404-808-1726
F. 877-817-8086
E. **cramos12@its.jnj.com**

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
3333 S. Diamond Canyon Road
Diamond Bar, CA 91765, USA
www.biosensewebster.com
T. 1-909-839-8500
T. 1-800-729-9010
F. 1-909-595-0187

<image001.png>

**Confidentiality Notice:** This document is J&J Proprietary. You may forward this document within J&J on a need to know basis. You may not forward this onto the Internet without the author's permission. This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please reply to the sender, so that J&J can arrange for proper delivery, and then please delete the message from your inbox.

---

**From:** Ramos, Conrado [BWIUS]
**Sent:** Friday, February 26, 2016 8:31 AM
**To:** Rose Lentz (rlentz5@wpahs.org)
**Cc:** Allen, David J. [BWIUS]; Sfanos, Julie [BWIUS]
**Subject:** Biosense Webster-Clinical Support Policy review with AGH

Rose,

Thanks for taking the time to meet with Dave, Julie and me on Wednesday to review the Biosense Webster, Inc. (BWI) policy statement on Clinical Account Specialist (CAS) Case Support of Reprocessed SUD Catheters. As I mentioned in our meeting, our goal in having these discussions is to address some common misconceptions regarding our clinical support capabilities. By doing so, we want all stakeholders to have a clearer and more accurate understanding of the rules by which BWI has to operate under. ███████████████

███████████████████████████████████████████████████████████████████ We also need to ensure that our support of our products is consistent with our Instructions-For-Use as approved by the FDA.

As you requested, I have attached the page from the Carto 3 Instructions-For-Use document that lists the magnetic sensor enabled navigational catheters that BWI personnel are able to support in the building of Carto maps. I have also attached a PDF copy of the BWI Clinical Support Policy letter for your reference. Please let me know if you need anything else to disseminate this information among your staff.

As a reminder, BWI will no longer schedule Clinical Account Specialists to support cases where they will be asked to either build Carto maps with non-BWI magnetic sensor enabled catheters or interpret ultrasound images from

non-BWI ultrasound catheters as of March 21st.

Again, thanks for your time in allowing us to review this important matter with you.

Respectfully,

**Conrad Ramos**
Corporate Account Director
M. 404-808-1726
F. 877-817-8086
E. **cramos12@its.jnj.com**

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
3333 S. Diamond Canyon Road
Diamond Bar, CA 91765, USA
www.biosensewebster.com
T. 1-909-839-8500
T. 1-800-729-9010
F. 1-909-595-0187

<image002.png>

**Confidentiality Notice:** This document is J&J Proprietary. You may forward this document within J&J on a need to know basis. You may not forward this onto the Internet without the author's permission. This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please reply to the sender, so that J&J can arrange for proper delivery, and then please delete the message from your inbox.

This e-mail and any attachments to it are confidential and are intended solely for use of the individual or entity to whom they are addressed. If you have received this e-mail in error, please notify the sender immediately and then delete it. If you are not the intended recipient, you must not keep, use, disclose, copy or distribute this e-mail without the author's prior permission. The views expressed in this e-mail message do not necessarily represent the views of Highmark, its diversified business, or affiliates.

Confidentiality Notice: This e-mail message and any attachments are intended solely for the individual or individuals designated above. It may contain confidential or proprietary information and may be subject to confidentiality protections and may be legally privileged. If you are not the intended recipient, you are not authorized to read, copy, retain or distribute this message. If you receive this message in error, please immediately notify the sender by reply e-mail and delete this message. The sender does not waive any privilege or right of privacy or confidentiality that may attach to this communication. You are not authorized to read, copy, retain, or distribute this message, or disclose its contents to any other person. Thank you.



# Praxis MedPlus Portfolio Strategy

## 11/20/2014

Confidential Praxis MedPlus Do Not Distribute, 11/20/14

1

Innovative v. Biosense

No. 8:19-cv-01984-JVS

**JX-875.2**

HIGHLY CONFIDENTIAL        JX-875.2, Page 1 of 3        IH00643769



# Portfolio Action Plan

**Steerable Sheath**
- **Initiate SJM Agilis Project Q4 2014 (Wave 1)**
- Conduct additional market research on BSC ZurPaz and Kalila Vado (Wave 3)

**EPs**
- **Initiate BW Lasso Project Q4 2014 (Wave 1)**
- **Initiate SJM Livewire/Response/Supreme Q4 2014 (Wave 1)**
- **Initiate Bard Dynamic Tip/XT/Orbiter/Viking Q4 2014 (Wave 1)**
- **Initiate BSC Blazer DX/Polaris X/DX/Steerocath Q4 2014 (Wave 1)**
- Start Collections SJM Inquiry/Optima/Afocus/Reflexion Q4 2014 (Wave 2)
- Start Collections BW Decanav/CS/HIS Q4 2014 (Wave 2)
- Start Collections Medtronic EPs Q4 2014 (Wave 2)

**Cables**
- **Initiate EP Cable Project Q4 2014 (Wave 1)**
- Conduct additional market research on ablation cables (Wave 3)

**U-Sound Catheters**
- **Initiate Siemans Acunav Project Q4 2014 (Wave 1)**
- Start collections BW Soundstar Q4 2014 (Wave 2)
- Conduct technical assessment of SJM ViewFlex Ice (Wave 3)

**General OR/Ortho**
- Conduct market research and technical assessment of Cold Laps, Harmonic Scalpels and Ortho Devices (Wave 3)

**Praxis Portfolio**

Confidential: Praxis MedPlus - Do Not Distribute, 11/20/14

2



Portfolio Funnel by Project Phase

| From: | Koenig, Joseph [SYNNA] </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=374e1a0355c747ac884d8fa91aa4a811-JKOENIG4> |
|---|---|
| To: | Fine, Marius [SMDUS] |
| CC: | Lee, Karson [MEDCA]; Wilson, Bryan [SMDUS] |
| Sent: | 8/16/2018 9:53:08 PM |
| Subject: | Re: BWI DecaNav reprocessed Cath |
| Attachments: | INFORM - Innovative Health Receives 510(k) Clearance for Reprocessed Biosense Webster DECANAV Catheter |

Marius-

The attached communication went out to field leadership shortly after the 510(k) approval was announced.  I have since spoken to the field teams who cover the majority of the DecaNav business in the US, who are prepared to address with any potential users/customers by leveraging our current coverage policy.  From an OEM perspective, the suggested course of action is to innovate a "next-generation" DecaNav to obsolete the current catheter, we should get more info around a potential OEM replacement in the coming months.  To date, I have not received any reports of customer purchase/usage of the device, but the field is prepared for if/when it pops up.  Hope this helps.

**Joe Koenig**
Product Director, Sustainability
M. (714) 878-1975
E.  jkoenig4@its.jnj.com

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
33 Technology Drive
Irvine, CA 92618, USA
www.biosensewebster.com



---

**From:** "Fine, Marius [SMDUS]" <mfine2@ITS.JNJ.com>
**Date:** Thursday, August 16, 2018 at 2:31 PM
**To:** "Koenig, Joseph [SYNNA]" <JKOENIG4@ITS.JNJ.COM>
**Cc:** "Lee, Karson [MEDCA]" <klee2@its.jnj.com>, Bryan Wilson <BWilso43@its.jnj.com>
**Subject:** BWI DecaNav reprocessed Cath

Joe,

Our J&J Canada partner, Karson Lee, is wondering what customer facing positioning is being used to combat Innovative Health now that IH has recently received a 510(k) for Biosense's DecaNAV catheter.

Can you provide any insights to Karson (cc'd here)?

Karson – My data indicates Stryker Sustainability does not have regulatory clearance to reprocess the BWI DecaNAV either.

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-3437**

Thanks,

Marius Fine
Sr. Reprocessing Marketing Manager

**Johnson & Johnson** MEDICAL DEVICES COMPANIES

Johnson & Johnson Health Care Systems, Inc.
T: +1 763 488 3239
M:+1 952 826 9659
mfine2@its.jnj.com
http://www.jnj.com

Disclaimer: This electronic message may contain information that is Proprietary, Confidential, or legally privileged or protected. It is intended only for the use of the individual(s) and entity named in the message. If you are not an intended recipient of this message, please notify the sender immediately and delete the material from your computer. Do not deliver, distribute or copy this message and do not disclose its contents or take any action in reliance on the information it contains.

**From:** Lee, Karson [MEDCA]
**Sent:** Monday, August 13, 2018 12:32 PM
**To:** Wilson, Bryan [SMDUS] <BWilso43@its.jnj.com>
**Cc:** Fine, Marius [SMDUS] <mfine2@ITS.JNJ.com>
**Subject:** RE: BW Cath's

Seems like IH is building quite the arsenal in their portfolio.

Do you know if Styker can RPO the Decanav's?

What is our positioning with customers

**From:** Wilson, Bryan [SMDUS]
**Sent:** Monday, August 13, 2018 1:30 PM
**To:** Lee, Karson [MEDCA] <klee2@its.jnj.com>
**Cc:** Fine, Marius [SMDUS] <mfine2@ITS.JNJ.com>
**Subject:** RE: BW Cath's

Yes, IH received clearance in June.

BWI has chosen not to pursue the reprocessed version of Decanav. I cc'd Marius on this to help explain the history here as to why it is not in the pipeline.

**Bryan Wilson**
Sr. Marketing Manager, RPO Marketing

**Johnson & Johnson** MEDICAL DEVICES COMPANIES

Johnson & Johnson Health Care Systems, Inc.
T: 760.419.0655
bwilso43@its.jnj.com
http://www.jnj.com

Disclaimer: This electronic message may contain information that is Proprietary, Confidential, or legally privileged or protected. It is intended only for the use of the individual(s) and entity named in the message. If you are not an intended recipient of this message, please notify the sender immediately and delete the material from your computer. Do not deliver, distribute or copy this message and do not disclose its contents or take any action in reliance on the information it contains.

**From:** Lee, Karson [MEDCA]
**Sent:** Monday, August 13, 2018 10:19 AM
**To:** Wilson, Bryan [SMDUS] <BWilso43@its.jnj.com>
**Cc:** Fine, Marius [SMDUS] <mfine2@ITS.JNJ.com>

**Subject:** RE: BW Cath's

Thanks Bryan – it sounded like Innovative Health received approval on this.

http://infoviewer.infodesk.com/infodisplay/item/14e5b0f0-3230-4c1c-b266-8446ab45bded.html?CU=jnj8748&
PROFILE=unv6&APP=3

Am I confusing the products?

Thanks
Karson

**From:** Wilson, Bryan [SMDUS]
**Sent:** Monday, August 13, 2018 1:10 PM
**To:** Lee, Karson [MEDCA] <klee2@its.jnj.com>
**Cc:** Fine, Marius [SMDUS] <mfine2@ITS.JNJ.com>
**Subject:** RE: BW Cath's

Hi Karson-

Decanav is not currently on product development list.

Thanks,

**Bryan Wilson**
Sr. Marketing Manager, RPO Marketing

*Johnson & Johnson*
MEDICAL DEVICES COMPANIES

Johnson & Johnson Health Care Systems, Inc.
T: 760.419.0655
bwilso43@its.jnj.com
http://www.jnj.com

Disclaimer: This electronic message may contain information that is Proprietary, Confidential, or legally privileged or protected. It is intended only for the use of the individual(s) and entity named in the message. If you are not an intended recipient of this message, please notify the sender immediately and delete the material from your computer. Do not deliver, distribute or copy this message and do not disclose its contents or take any action in reliance on the information it contains.

**From:** Lee, Karson [MEDCA]
**Sent:** Monday, August 13, 2018 8:38 AM
**To:** Wilson, Bryan [SMDUS] <BWilso43@its.jnj.com>
**Subject:** BW Cath's

Bryan – hope you are well – can you let me know if Sterilmed can reprocess the BW Decanav's R7D282CT or
R7F282CT?

Thanks
Karson

| From: | Koenig, Joseph [SYNNA] </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=374E1A0355C747AC884D8FA91AA4A811-JKOENIG4> |
|---|---|
| To: | Haydel, David [BWIUS]; Kowalski, John [BWIUS]; Lech, Tom [BWIUS]; Parker, Callie [BWIUS]; Rathod, Sharad [BWIUS]; Young, Megan [BWIUS]; Allen, David J. [BWIUS]; Allen, Brandon [BWIUS]; Barlow, Chris [BWIUS]; Barone, Richard [BWIUS]; BARTLETT, JIM [BWIUS]; Blake, Andrew [BWIUS]; Brady, Richard [BWIUS]; Corcoran, Kevin [BWIUS]; Criner, Joel [BWIUS]; Dalinghaus, Roger [BWIUS]; brentdoehring@gmail.com; Ellis, Randolph [BWIUS]; Emmerich, Matthew [BWIUS]; Fulkus, Rob [BWIUS]; Gibbons, Todd [BWIUS]; Giroir, Jimmy [BWIUS]; Gonzalez, Deidre [BWIUS]; Hudson, David [BWIUS]; Laird, Tim [BWIUS]; Lindholm, Charles [BWIUS]; Lubinsky, Susan [BWIUS]; MacIntosh, Scott [BWIUS]; Maia, Daniel [BWIUS]; Matelski, Jayme [BWIUS]; O'Mera, Tim [BWIUS]; O'Quinn, Derek [BWIUS]; Patel, Amit [BWIUS]; Brady, Emily [BWIUS]; Smith, Justin [BWIUS]; Stilwell, Thomas [BWIUS]; Tucker, Derek [BWIUS]; Walker, Krista [BWIUS]; Wannamaker, Kenneth [BWIUS]; Washington, Marlene [BWIUS]; Weir, Jennifer [BWIUS]; Wells, Kevin [BWIUS]; Williamson, Wade [BWIUS]; Zoe, Chuck [BWIUS]; Krenek, Marcus [BWIUS] |
| CC: | Zare, Fairy [BWIUS]; Sidi, Nikki [BWIUS]; Bodner, Michael [BWIUS]; Martin, Noah [BWIUS] |
| Sent: | 6/29/2018 3:08:31 AM |
| Subject: | INFORM - Innovative Health Receives 510(k) Clearance for Reprocessed Biosense Webster DECANAV Catheter |

ADs and RBDs-

We have learned that Innovative Health received 510(k) clearance for RPO Biosense Webster DECANAV.  Bear in mind that this device falls within our coverage policy, however we are assessing potential impact and if any additional actions are required to address.  Please cascade to your teams and contact me with any questions/field intel.  Thank you.

Best,


**Joe Koenig**
Product Director, Sustainability
M. (714) 878-1975
E.  jkoenig4@its.jnj.com

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
33 Technology Drive
Irvine, CA 92618, USA
www.biosensewebster.com



Message

| | |
|---|---|
| **From:** | Loy, Jeff [Jeff.Loy@erlanger.org] |
| **Sent:** | 7/13/2022 6:22:54 AM |
| **To:** | Dave Distel [ddistel@innovative-health.com] |
| **Subject:** | [EXTERNAL]RE: Innovative Health |
| **Attachments:** | 097317-220518 BWI Coverage Policy Update_2022_revision_final.pdf; Reprocessed products BWI CASs can not provide coverage.xlsx |

Attached is what we received from the Regional Business Director for Birmingham and Chattanooga. Notice it is not signed by anyone...

Do you have some time at 10am EST on Friday to discuss?

Thanks,

Jeff

Ext. 4684

---

**From:** Dave Distel <ddistel@innovative-health.com>
**Sent:** Wednesday, July 13, 2022 8:26 AM
**To:** Loy, Jeff <Jeff.Loy@erlanger.org>
**Subject:** [External Email] Innovative Health

## This message originated outside of Erlanger. Use caution when opening attachments, clicking links, or responding to requests for information.

---

Hi Jeff,

Hope you are well. It has been some time since we talked. I have a note into Sean to get a business review scheduled for the near future as the last one never took place do to schedule conflicts. The purpose of me writing to you is to discuss the Vizigo issue with Biosense Webster refusing case coverage for a reprocessed Vizigo. It has happened at several other facilities also but the "reasons" given are different. It appears to be more local at this point than an organized corporate push as I am still selling them at several places. We assume as they have success they will simply rewrite their case coverage policy further restraining a facilities ability to reprocess.

The attached letter was sent to Biosense Webster's President to put him on notice of the actions of his staff. Don't expect a reply but will continue to monitor the situation. Can I get 15 – 20 minutes on your calendar to catch up on this topic and understand:

- Who informed you of this refusal to cover cases
- Rationale
- How was it communicated
- Other details

Thank you in advance for your time Jeff. We are investing millions into clearances on devices that can yield customers the greatest savings opportunities and can't allow industry to simply block these efforts at the customers expense, literally.

Best Regards,

Dave



Dave Distel
**VP, Business Development**
480.525.5970 (Office)
507.358.5289 (Mobile)



Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-3957**

   

www.innovative-health.com

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. [v.1]

The information contained in this communication is private, confidential, and may include patient information protected by federal and state privacy laws. It is intended solely for use by the intended recipient and others authorized to receive it. If you are not the intended recipient or authorized to receive it, you are hereby notified that any review, disclosure, copying, distribution or taking action in reliance on the relation of the contents of this information is strictly prohibited and may be unlawful. If you have received this transmission in error, please immediately notify Erlanger Health System's Privacy Office immediately at 423-778-7703 or privacy@erlanger.org.

**Biosense Webster, Inc.**
31 Technology Drive,
Suite 200
Irvine, CA 92618 USA
www.biosensewebster.com

Date: 06/08/2022

RE: Position Statement on Clinical Account Specialist Case Support of Reprocessed Single Use Devices (SUD)

Dear Valued Customer,

This letter is to inform you of Biosense Webster, Inc.'s position regarding case support of reprocessed Single-Use-Devices (SUD) distributed by third parties. Biosense Webster's commitment to providing high-quality products and services requires that we properly train all Clinical Account Specialists on the capabilities, limitations, and proper functioning of all our devices and equipment. Electrophysiologists ask Clinical Account Specialists to assist with reconstructing cardiac anatomy using our technology and interpreting maps and providing insight on the images generated by the CARTO® 3 System. It is critical that our personnel possess a competent base of knowledge of the design intent of each device feature and a thorough understanding of how each device is designed to work with our capital equipment to help achieve the best possible outcome for each patient. This base of knowledge is especially important when it comes to providing product technical support for the CARTO® 3 System and troubleshooting the CARTO® 3 System in the midst of a procedure, which requires accurate inputs from diagnostic mapping catheters, ultrasound catheters, and devices that utilize a CARTO-based software pairing. Most hospital facilities also recognize the critical nature of vendor product competency as it relates to patient safety and consequently require vendor representatives to provide documentation attesting to their competency with their company's products as part of the vendor credentialing process. Reprocessing is a manufacturing process regulated by the U.S. Food and Drug Administration, and reprocessed single use devices generally require a new regulatory submission before they can be distributed. The regulatory clearance for reprocessed devices is owned by the reprocessing company that manufactures and distributes the devices, not the original equipment manufacturer. Therefore, once Biosense Webster's single use devices are subjected to the reprocessing process of another company, those devices are no longer our products.

To offer our customers a portfolio of both new and reprocessed devices, Biosense Webster, Inc. has partnered with a reprocessing company that is also a member of the Johnson & Johnson Family of Companies. We have shared our calibration methods and product testing methods with our affiliated reprocessing company, and we distribute those products along with new Biosense Webster devices. We are confident that the reprocessed devices we distribute meet our quality standards. However, we have no knowledge of the manufacturing operations or specifications of reprocessed devices manufactured by third parties with which we are not affiliated. As such, Biosense Webster cannot attest to the safety, effectiveness, and accuracy of these devices.

Accordingly, our Clinical Account Specialists can only provide product technical support in cases that use diagnostic mapping catheters, ultrasound catheters, and devices that utilize a CARTO-based software pairing distributed by Biosense Webster. Our Clinical Account Specialists understand the capabilities, limitations, and proper functioning of these devices and are able to deliver on our commitment of high-quality support for these products.

For any questions related to the information contained in this letter, please contact your local Biosense Webster, Inc. representative.

Thank you for your continued partnership and for choosing the Biosense Webster, Inc.


Sincerely,


Biosense Webster, Inc.


097317-220518

**This Document has been produced in Native Format**

IH00697136

| Reproduced products for which BWI CAS's can not provide case coverage | | |
|---|---|---|
| **Catheter Common Name** | **OEM Catalog #** | **Description** |
| AcuNav™ | 8255790 | IntraCardiac Echo catheter, 10 Fr, Compatible with Siemens Ultrasound systems |
| | 10135936 | IntraCardiac Echo catheter, 8 Fr, Compatible with Siemens Ultrasound systems |
| | 10043342 | IntraCardiac Echo catheter, 10 Fr, Compatible with GE Ultrasound systems |
| | 10135910 | IntraCardiac Echo catheter, 8 Fr, Compatible with GE Ultrasound systems |
| DecaNAV™ | R7D282CT | Advanced Diagnostic Mapping catheter, 10 poles, 2-8-2 mm Spacing, D curve |
| | R7F282CT | Advanced Diagnostic Mapping catheter, 10 poles, 2-8-2 mm Spacing, F curve |
| Lasso™ NAV eco | D134901 | Advanced Diagnostic, Circular Mapping catheter, 15 mm Fixed loop, 10 pole |
| | D134902 | Advanced Diagnostic, Circular Mapping catheter, 15 mm Fixed loop, 20 pole |
| | D134903 | Advanced Diagnostic, Circular Mapping catheter, 20 mm Fixed loop, 10 pole |
| | D134904 | Advanced Diagnostic, Circular Mapping catheter, 20 mm Fixed loop, 20 pole |
| | D134905 | Advanced Diagnostic, Circular Mapping catheter, 25 mm Fixed loop, 10 pole |
| | D134906 | Advanced Diagnostic, Circular Mapping catheter, 25 mm Fixed loop, 20 pole |
| | D134301 | Advanced Diagnostic, 15 -25 mm Variable Loop Circular Mapping catheter, 20 pole |
| | D134302 | Advanced Diagnostic, 15 -25 mm Variable Loop Circular Mapping catheter, 10 pole |
| OCTARAY™ Mapping catheter with TRUEref™ technology | D160901 | Advanced Diagnostic mapping catheter, 8 splines, 1.5mm long splines, D curve, 2-2-2-2-2 mm spacing |
| | D160902 | Advanced Diagnostic mapping catheter, 8 splines, 2.0mm long splines, D curve, 2-5-2-5-2 mm spacing |
| | D160903 | Advanced Diagnostic mapping catheter, 8 splines, 2.0mm long splines, D curve, 3-3-3-3-3 mm spacing |
| | D160904 | Advanced Diagnostic mapping catheter, 8 splines, 1.5mm long splines, F curve, 2-2-2-2-2 mm spacing |
| | D160905 | Advanced Diagnostic mapping catheter, 8 splines, 2.0mm long splines, F curve, 2-5-2-5-2 mm spacing |
| | D160906 | Advanced Diagnostic mapping catheter, 8 splines, 2.0mm long splines, F curve, 3-3-3-3-3 mm spacing |
| PentaRay® NAV eco Catheter | D128207 | Advanced Diagnostic mapping catheter, 5 splines, F curve, 4-4-4 mm spacing |
| | D128208 | Advanced Diagnostic mapping catheter, 5 splines, F curve, 2-6-2 mm spacing |
| | D128210 | Advanced Diagnostic mapping catheter, 5 splines, D curve, 4-4-4 mm spacing |
| | D128211 | Advanced Diagnostic mapping catheter, 5 splines, D curve, 2-6-2 mm spacing |
| SoundStar® eco | 10439011 | 3D IntraCardiac Echo catheter, Carto compatible, 8 Fr, Siemens Ultrasound system Compatible |
| | 10438577 | 3D IntraCardiac Echo catheter, Carto compatible, 10 Fr, Siemens Ultrasound system Compatible |
| | 10439236 | 3D IntraCardiac Echo catheter, Carto compatible, 8 Fr, GE Ultrasound system Compatible |
| | 10439072 | 3D IntraCardiac Echo catheter, Carto compatible, 10 Fr, GE Ultrasound system Compatible |
| Carto Vizigo™ Bi-directional guiding sheath | D138501 | Steerable guiding sheath, visible on mapping systems, 8.5 Fr ID, Small curve |
| | D138502 | Steerable guiding sheath, visible on mapping systems, 8.5 Fr ID, Medium curve |
| | D138503 | Steerable guiding sheath, visible on mapping systems, 8.5 Fr ID, Large curve |

HIGHLY CONFIDENTIAL  IH00697136.001

# EXHIBIT 14

1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3           HONORABLE JAMES V. SELNA, JUDGE PRESIDING

4   INNOVATIVE HEALTH, LLC,              )
                                         )
5                                        )
                                         )
6                       Plaintiff,       )
                                         )
7                                        )
                                         )
8            Vs.                         )   No. SACV-19-01984-JVS
                                         )
9                                        )
                                         )
10  BIOSENSE WEBSTER, INC.,              )
                                         )
11                                       )
                                         )
12                      Defendant.       )
                                         )
13  _____     )

14

15

16           REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                      JURY TRIAL

18                   DAY 2, VOLUME II

19                 SANTA ANA, CALIFORNIA

20               WEDNESDAY, MAY 7, 2025

21

22

23  MIRIAM V. BAIRD, CSR 11893, CCRA
    OFFICIAL U.S. DISTRICT COURT REPORTER
24  350 WEST FIRST STREET
    FOURTH FLOOR
25  SANTA ANA, CA 92701

|  | 1 | why they're not on buying it back.  She says:  We can discuss |

1    why they're not on buying it back.  She says:  We can discuss

2    but I think it's not possible.  I believe they will not care

3    vet cases [sic] if we start using reprocessed PENTARAY.

4    Q.   What do you understand care vet cases to mean?  Is that

03:24PM   5    a typo?

6    A.   Yeah.  I think it's -- they won't be -- they won't

7    support the cases.

8    Q.   Okay.  And so how does Mr. Blenis respond?

9    A.   Should I read it?

03:24PM   10    Q.   Sure.

11    A.   So his reply back to Jay is:  We want to use the

12    reprocessed PENTARAY catheters, but Biosense says they will

13    stop covering our cases if we begin using those.  While I'd

14    like to just tell them to -- it's an expletive -- we are

03:25PM   15    dependent on them.

16    Q.   What did you understand this message to mean from

17    Mr. Blenis?

18    A.   That he wanted -- he wanted to reprocess the PENTARAY

19    catheter for the savings, but they weren't able to because of

03:25PM   20    the case coverage policy.

21    Q.   What did you understand him to mean when he said we are

22    dependent on them?

23    A.   To run the machine, case coverage policy.

24    Q.   Why would a hospital be dependent on Biosense Webster

03:25PM   25    for running the machine?

1    A.    Because they don't have staff to run the machine.

2    They're not trained on it.

3    Q.    Did MarinHealth buy any reprocessed PENTARAYs from

4    Innovative Health?

03:26PM    5    A.    No.

6    Q.    Why not?

7    A.    The case coverage policy.  They weren't able to.

8    Q.    Again, focusing on Innovative Health's business today,

9    do your customers still try to order reprocessed Biosense

03:26PM   10    Webster catheters that are subject to the case coverage

11    policy?

12    A.    Yes, they do.

13    Q.    And what happens when you -- what do you do when you get

14    an order like that from a customer?

03:26PM   15    A.    So it's -- it's usually bought by somebody who is making

16    sure the supplies are at the hospital.  So they don't know

17    about that case coverage policy, so they'll go and they'll

18    order a catheter from us.  We don't ship it to the hospital.

19    We call and say:  Are you aware that there's a case coverage

03:26PM   20    policy and your staff won't be able to use it?

21            The last thing I want to do is send an invoice to

22    the customer and them having to send me back the catheters.

23    Q.    So you've been in situations where you were the one to

24    inform the hospital about the case coverage policy?

03:26PM   25    A.    Yes.

Q.    How recently would you say that that's happened?

A.    So we just had -- a couple weeks ago we had the same issue happen where a new customer went to order actually SOUNDSTAR, and we told them we couldn't ship them to them.

03:27PM Q.    Does Innovative Health provide a savings analysis to potential customers?

A.    Yes, we do.

Q.    And what is a savings analysis?

A.    As I said earlier, we do a savings guarantee.  In order
03:27PM to generate that guarantee, we get a dataset from the hospital that shows what they buy, typically what they pay for it.  We've got a pretty good price book, so we know.

        We know we're going to have a certain amount of catheters that we'll not be able to collect because they
03:27PM won't end up in our collection container.  And then we know how many we can sell back.

        So if I was to buy a hundred catheters, I know I could reprocess back 70, and the delta would be what they would pay us versus what they would pay for a brand-new one.

03:27PM Q.    And when you provide a savings analysis to customers today, how do you treat the potential savings from reprocessing devices that are subject to the case coverage policy?

A.    We break them out.  So when a hospital gives us their
03:27PM dataset, they give us all their spend in that category.

```
         1    We'll then break up the analysis to show here's what's
         2    really -- here's what the total savings opportunity could be,
         3    but in reality here's what you should be able to realize off
         4    the stuff that's not covered by the case coverage policy.
03:28PM   5    Q.   In your experience, when hospitals buy reprocessed
         6    catheters from Innovative Health, who is going to use the
         7    catheters?
         8    A.   The physician.
         9    Q.   And in your experience, if the doctors at the hospital
03:28PM  10    don't want to use Innovative Health's reprocessed catheters,
        11    would a hospital be interested in buying them?
        12    A.   No.
        13    Q.   Why not?
        14    A.   Because they would be spending the money and the
03:28PM  15    catheters wouldn't get utilized.
        16    Q.   Mr. Ferreira, could you summarize, please, for the jury
        17    the impact of Biosense Webster's case coverage policy on
        18    Innovative Health.
        19    A.   It's been devastating to our business.
03:28PM  20              MR. HO:  Pass the witness.
        21              THE COURT:  Very well.
        22              Cross-examination.
        23              MR. CAVANAUGH:  Your Honor, may I approach the
        24    witness?
03:29PM  25              THE COURT:  You may.
```

|        |    |                                                                      |
|--------|----|----------------------------------------------------------------------|
|        | 1  | **CROSS-EXAMINATION**                                                 |
|        | 2  | BY MR. CAVANAUGH:                                                     |
|        | 3  | Q.   Good afternoon, Mr. Ferreira.                                    |
|        | 4  | A.   Good afternoon.                                                  |
| 03:29PM| 5  | Q.   We haven't met before.  My name is Bill Cavanaugh.              |
|        | 6  | A.   Good afternoon, Mr. Cavanaugh.                                   |
|        | 7  | Q.   Let me start with Sterilmed.  In your direct testimony          |
|        | 8  | you were talking about Sterilmed.  Sterilmed is a competitor         |
|        | 9  | of your company?                                                     |
| 03:30PM| 10 | A.   Yes, they are.                                                   |
|        | 11 | Q.   Sterilmed's been selling reprocessed catheters long            |
|        | 12 | before Innovative Health, correct?                                   |
|        | 13 | A.   That's correct.                                                  |
|        | 14 | Q.   For example, Sterilmed got approval for the SOUNDSTAR 10       |
| 03:30PM| 15 | French back in August of 2011, correct?                              |
|        | 16 | A.   I don't know if that's correct.                                 |
|        | 17 | Q.   But you knew that they were selling a SOUNDSTAR before         |
|        | 18 | your company even existed?                                            |
|        | 19 | A.   I knew they had clearance.  I didn't know they were            |
| 03:30PM| 20 | selling it.                                                           |
|        | 21 | Q.   And Sterilmed has contracts with many hospitals, doesn't       |
|        | 22 | it, to sell reprocessed sensor-enabled catheters?                    |
|        | 23 | A.   I don't know what contracts they have, sir.                    |
|        | 24 | Q.   It's not a secret that Sterilmed exists?                        |
| 03:31PM| 25 | A.   No, not at all.                                                  |

# EXHIBIT 15

1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10

INNOVATIVE HEALTH LLC,

11

Plaintiff,

12

vs.

13

BIOSENSE WEBSTER, INC.,

14

Defendant.

Case No. 8:19-cv-1984 JVS (KES)

**[MODIFIED PROPOSED]
PERMANENT INJUNCTION**

JUDGE: HON. JAMES V. SELNA
COURTROOM: 10C

15
16

Action Filed:  October 18, 2019
Trial Date:  May 6, 2025

17
18
19
20
21
22
23
24
25
26
27
28

This Court has considered the materials and arguments submitted by the parties regarding Plaintiff Innovative Health LLC's Motion for Permanent Injunction, as well as the full record in this matter, including the trial record and the jury's verdict for Plaintiff.  Pursuant to 15 U.S.C. § 26, Cal. Bus. & Prof. Code § 16750(a), and this Court's equitable powers, the Court hereby GRANTS Innovative's Motion for Permanent Injunction and ORDERS that Defendant Biosense Webster, Inc. be enjoined as follows:

1. **Definitions**

1.1. "**Biosense**" means Defendant Biosense Webster, Inc. and its officers, agents, servants, employees, attorneys, and all persons who receive actual notice of this injunction and are in active concert or participation with any of them. This definition includes Biosense Webster's parent company Johnson & Johnson, Johnson & Johnson subsidiary SterilMed, Inc., and their respective officers, agents, servants, employees, and attorneys.  This definition is intended to bind all persons within the scope of Fed. R. Civ. P. 65(d)(2).

1.2. "**CARTO**" means any past, present, or future cardiac mapping machine made by or for Biosense ~~during this injunction's term~~, including the CARTO 3 and any new version of it (whether bearing the "CARTO" name or not).

1.3. "**Consumable**" means a device (including, but not limited to, an electrophysiology catheter) originally manufactured by Biosense for use with CARTO.

1.4. "**Clinical Support**" means the services provided to operate the CARTO by Biosense's clinical account specialists, including associate clinical account specialists and ultrasound clinical account specialists.  For the avoidance of doubt, "Clinical Support" includes any service or activity that Biosense has refused to provide, pursuant to its Position Statement on Clinical Account Specialist Case Support of Reprocessed Single-Use Devices, to customers

1    that sought to use Consumables sold by or for someone other than Biosense,

2    such as (i) assisting with reconstructing cardiac anatomy using CARTO,

3    (ii) interpreting maps and providing insight on the images generated by

4    CARTO, and (iii) providing technical support for CARTO and

5    troubleshooting CARTO during a procedure.  *See, e.g.*, JX-535; JX-216.

6  2.  **No Tie.**

7    2.1. ***Tie Forbidden.***  Biosense is enjoined from conditioning the provision of

8       Clinical Support—or otherwise conditioning the availability of CARTO—on

9       the purchase or use of Consumables sold by or for Biosense.

10   2.2. ***Duty Not to Discriminate.***  Biosense is further enjoined from discriminating

11      in the provision of Clinical Support or the availability of CARTO because of

12      the purchase or use of (or the intention to use) a Consumable of someone

13      other than Biosense.  Without limitation, and by way of example only,

14      Biosense may not refuse, withdraw, or degrade the availability of Clinical

15      Support or CARTO, or charge a higher price for Clinical Support or for the

16      sale, lease, or use of CARTO, because a hospital or doctor has used, is using,

17      will use, or may use a Consumable of someone other than Biosense.

18  3.  **No New Blocking Technology.**

19   3.1. ***Definition Definitions.***  "Technology" refers to any technology installed by

20      or for Biosense on CARTO, on hardware or software supporting the

21      operation of CARTO or of any Consumable (*e.g.*, remote server), or on a

22      Consumable.  "New Technology" refers to any Technology that Biosense did

23      not deploy by June 5, 2025, on or in connection with any product marketed

24      or sold to consumers.

25   3.2. ***Blocking Technology Prohibited.***  Biosense is enjoined from implementing

26      any New Technology (whether via hardware or software) that conditions the

27      availability or use of CARTO on the purchase or use of Consumables sold by

28      or for Biosense.  Biosense is further enjoined from implementing any New

3

Technology that prevents use of CARTO with Consumables sold by or for someone other than Biosense. This injunction does not prohibit Biosense from installing any Technology that it had already deployed, by June 5, 2025, on any Consumable marketed or sold to consumers (*e.g.*, the Falcon chip installed on the Soundstar Eco) in other Consumables after that date.

4. **Limits on Collection of Consumables.**

   4.1. ***No Collection of Consumables That Biosense Cannot Reprocess.*** Biosense is enjoined from collecting used Consumables which it does not have (i) regulatory approval to reprocess under section 510(k) of the Food, Drug and Cosmetic Act; or (ii) a pending application for approval to reprocess under section 510(k) of the Food, Drug and Cosmetic Act.

   4.2. ***Exceptions.***

      4.2.1. ***For 510(k) Test Devices.*** Notwithstanding Section 4.1, this injunction does not prohibit collecting a used Consumable to the extent necessary to support a 510(k) application to reprocess that Consumable.

      4.2.2. ***For Investigating Defective Biosense Products.*** Notwithstanding Section 4.1, this injunction does not prohibit collecting a used Consumable that has not already been reprocessed by someone other than Biosense, to the extent necessary to investigate and remediate a defect in that Consumable.

      4.2.3. ***For Ablation Catheters That Are Not Reprocessed.*** Notwithstanding Section 4.1, this injunction does not prohibit Biosense from collecting ablation catheters that no other person reprocesses in the United States. If any person begins to market or sell a reprocessed version of a catheter subject to this Section 4.2.3, Biosense must comply with Section 4.1 with respect to that catheter within 30 days of notice of such marketing or sale, such as (i) the clearance on the FDA's 510(k) database or (ii) the approval listed on the FDA's Premarket Approval (PMA) database.

4

5. **Reports to the Court.** Every six months during this injunction's term, a Biosense executive with relevant knowledge and with responsibility for compliance with this injunction shall submit a report to this Court. The report shall (i) explain the executive's knowledge and responsibility for compliance with this injunction; (ii) detail the steps Biosense has taken to ensure compliance with this injunction; (iii) summarize the instances of potential noncompliance with this injunction of which Biosense is aware; (iv) describe the steps taken to investigate and remediate those instances of potential noncompliance; and (v) certify, under penalty of perjury, that Biosense continues to comply fully with this injunction.

6. **Notice.**

6.1. ***Notice of Injunction.*** Within 21 days of the entry of this injunction, Biosense shall notify all past and current CARTO users of this injunction. The notice shall specify that Biosense must provide Clinical Support to every customer or end user on nondiscriminatory terms and without regard to whether that person uses Consumables of someone other than Biosense.

6.1.1. ***Forms of Notice Required.*** Biosense shall give this required notice in writing, in a form agreed to by Plaintiff or approved by the Court. The notice shall be sent to all persons who Biosense understands have responsibility for contracting or procurement on behalf of past or current customers who have or have had a CARTO. Biosense must also provide this written notice to every electrophysiology physician associated with those customers that currently have a CARTO.

6.1.2. ***New CARTO Purchasers.*** While this injunction is in effect, Biosense shall notify any purchaser of a CARTO of this injunction's terms. Biosense shall provide that notice in writing (i) with any proposed agreement to acquire a CARTO, and (ii) again once any CARTO is sold. Biosense shall give this required notice in a form agreed to by Plaintiff or

5

1    approved by the Court.

2    6.2. ***Notice of Hotline.***    Innovative Health LLC or a third party designated by

3    Innovative may establish, at their expense, a hotline for reporting actual or

4    potential noncompliance with this injunction.  Within 21 days of receiving

5    notice from Innovative that such a hotline has been created, Biosense shall

6    notify (i) its employees and (ii) past and current CARTO users of the hotline

7    and its purpose.  That notice shall include information about when and how

8    reports can be submitted (*e.g.*, 24 hours a day, 7 days per week) and whether

9    submitters can remain anonymous.  Biosense shall also keep, in a prominent

10    location on its internal systems accessible to its employees, the same

11    information about the hotline and its purpose.  The parties shall agree on the

12    form of these notices by Biosense or, otherwise, shall submit competing

13    proposals to the Court.

14    6.3. ***Notice to Sales Employees.***    Within 14 days of the entry of this injunction,

15    Biosense must notify every sales employee, including all clinical account

16    specialists (which in turn includes all associate clinical account specialists

17    and ultrasound clinical account specialists), of their and Biosense's

18    obligations under this injunction.  Biosense shall also notify any new sales

19    employees, including all clinical account specialists, of this injunction within

20    10 days of the commencement of their employment.  Biosense shall re-notify

21    all sales employees of this injunction on an annual basis during the term of

22    the injunction.  The parties shall agree on the form of these notices by

23    Biosense or, otherwise, shall submit competing proposals to the Court.

24    Biosense shall maintain records sufficient to verify that Biosense has

25    provided the notices required by this paragraph.

26    7.  **Term of Injunction.**  This injunction shall remain in effect for ten years from

27    the date of entry.  Either party may move to modify, extend, or terminate this

28    injunction for good cause.

8. **Retention of Jurisdiction.**  This Court retains jurisdiction of this matter and the parties with respect to this injunction, including (i) to address any disputes or requests for direction regarding this injunction's construction, modification, termination, or extension; (ii) to enforce, modify, terminate, or extend this injunction; and (iii) to assess and to punish violations of this injunction.

   **IT IS SO ORDERED.**

DATED: _____, 2025

_____
The Honorable James V. Selna
United States District Judge

| Summary report: Litera Compare for Word 11.7.0.54 Document comparison done on 7/7/2025 7:49:41 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** 2025 06 12 Proposed Order re Permanent Injunction.docx | |
| **Modified filename:** 2025 07 07 FINAL Modified Proposed Order re Permanent Injunction.docx | |
| **Changes:** | |
| Add | 10 |
| Delete | 2 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 12 |

# EXHIBIT 16

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3         HONORABLE JAMES V. SELNA, JUDGE PRESIDING

4    INNOVATIVE HEALTH, LLC,            )
                                        )
5                                       )
                                        )
6                        Plaintiff,     )
                                        )
7                                       )
                                        )
8         Vs.                           )   No. SACV-19-01984-JVS
                                        )
9                                       )
                                        )
10   BIOSENSE WEBSTER, INC.,            )
                                        )
11                                      )
                                        )
12                       Defendant.     )
                                        )
13   _____  )

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                     JURY TRIAL

18                  DAY 3, VOLUME II

19               SANTA ANA, CALIFORNIA

20              THURSDAY, MAY 8, 2025

21   MIRIAM V. BAIRD, CSR 11893, CCRA
     OFFICIAL U.S. DISTRICT COURT REPORTER
22   350 WEST FIRST STREET
     FOURTH FLOOR
23   SANTA ANA, CA 92701

24

25

|      |    |                                                                      |
|------|----|----------------------------------------------------------------------|
|      | 1  | reprocessing program at the ministries?                              |
|      | 2  | A.   Yes.                                                            |
|      | 3  | Q.   How many companies have reprocessing contracts with            |
|      | 4  | Providence?                                                          |
| 03:43PM | 5  | A.   One.                                                          |
|      | 6  | Q.   Who is that?                                                    |
|      | 7  | A.   Medline.                                                        |
|      | 8  | Q.   How long has Providence had a reprocessing contract with       |
|      | 9  | Medline?                                                             |
| 03:43PM | 10 | A.   Since 2018.                                                   |
|      | 11 | Q.   What kinds of products are covered under the contract          |
|      | 12 | with Medline?                                                        |
|      | 13 | A.   Patient care, surgical items, and electrophysiology.           |
|      | 14 | Q.   Is it basically all the items that you mentioned               |
| 03:44PM | 15 | earlier?                                                           |
|      | 16 | A.   Correct.                                                        |
|      | 17 | Q.   What company currently supplies the reprocessed EP             |
|      | 18 | catheters that Providence buys under the Medline contract?          |
|      | 19 | A.   Innovative Health.                                              |
| 03:44PM | 20 | Q.   How long has Innovative been supplying reprocessed EP         |
|      | 21 | catheters to Providence?                                             |
|      | 22 | A.   Since 2018.                                                     |
|      | 23 | Q.   And who actually negotiated the Medline contract with          |
|      | 24 | Providence?                                                          |
| 03:44PM | 25 | A.   Our sourcing department.                                      |

| | | |
|---|---|---|
| | 1 | Q.   What is your role in relation to the contract? |
| | 2 | A.   Once a contract is signed, it comes over to my |
| | 3 | department for oversight and implementation. |
| | 4 | Q.   Who decides which cardiac mapping machine to use in a |
| 03:44PM | 5 | case at Providence? |
| | 6 | A.   The doctor. |
| | 7 | Q.   Does the cardiac mapping machine require someone to |
| | 8 | operate the work station while the physician is doing the EP |
| | 9 | procedure? |
| 03:45PM | 10 | A.   Yes. |
| | 11 | Q.   Who typically operates the cardiac mapping machines |
| | 12 | during EP procedures at Providence? |
| | 13 | A.   The manufacturer's technician or representative. |
| | 14 | Q.   Do you know who pays them? |
| 03:45PM | 15 | A.   The manufacturer. |
| | 16 | Q.   Are they provided by the manufacturer under a contract |
| | 17 | with Providence? |
| | 18 | A.   No, not that I'm aware of. |
| | 19 | Q.   You testified earlier that Biosense has a case coverage |
| 03:45PM | 20 | policy? |
| | 21 | A.   Yes. |
| | 22 | Q.   When did you first learn of this policy? |
| | 23 | A.   2016. |
| | 24 | Q.   To your knowledge do other manufacturers have a case |
| 03:45PM | 25 | coverage policy for their cardiac mapping machines? |

```
 1    A.    No.

 2    Q.    How exactly has Biosense's policy affected your ability

 3    to implement reprocessing contracts at the ministries?

 4    A.    We're not able to use those reprocessed items during the

03:46PM  5    cases where the CARTO 3 is used.

 6    Q.    You testified earlier about the SOUNDSTAR catheter.  Do

 7    you remember that?

 8    A.    Yes.

 9    Q.    What is the difference in price for Providence between a

03:46PM 10    reprocessed SOUNDSTAR from Innovative and a new SOUNDSTAR

11    from Biosense?

12    A.    Over a thousand dollars.

13    Q.    Per catheter?

14    A.    Yes.

03:46PM 15    Q.    You also testified earlier that the policy is that

16    Biosense will not cover a case on their machines if the

17    doctor uses a sensor-enabled catheter reprocessed by anyone

18    else?

19    A.    Yes.

03:47PM 20    Q.    Does Providence generally rely on Biosense to run the

21    work station on the CARTO?

22    A.    Yes.

23    Q.    Why does Providence rely on the manufacturer's

24    representative to operate Biosense's machine?

03:47PM 25    A.    We don't have the staff with that knowledge.  We don't
```

```
 1   have the resources to be able to do it ourselves.
 2   Q.   What is your view of Biosense's case coverage policy?
 3   A.   I'm not a fan.  Don't like it.
 4   Q.   Why not?
 5   A.   It stops us from being able to meet our goal of making
 6   healthcare affordable to everyone.  We're paying full price
 7   for something that we can get at a fraction of the cost in
 8   order to be able to save money.
 9   Q.   And can you describe for the jury how exactly Providence
10   would use those savings.
11   A.   Well, we would divert those savings to other programs.
12   We would retain staff.  We would be able to get products
13   within our ministry, even if it's capital equipment, with
14   that money that we are saving.
15   Q.   You testified earlier that you first learned of the
16   policy in 2016; is that right?
17   A.   Yes.
18   Q.   What were the circumstances?
19   A.   Well, in 2016 we merged.  St. Joseph's Health and
20   Providence merged.  So we were collaborating to see how we
21   may be able to reach our goal in being financially stable,
22   and this was an area that we identified.
23        The physicians were on board, and it was something
24   that we were going to move forward to.  At that time Biosense
25   was made aware of what we were planning on doing, and they
```

03:47PM (line 5)
03:48PM (line 10)
03:48PM (line 15)
03:48PM (line 20)
03:49PM (line 25)

# EXHIBIT 17

1                 UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3             HONORABLE JAMES V. SELNA, JUDGE PRESIDING

4    INNOVATIVE HEALTH, LLC,            )
                                        )
5                                       )
                                        )
6                         Plaintiff,    )
                                        )
7                                       )
                                        )
8              Vs.                      )   No. SACV-19-01984-JVS
                                        )
9                                       )
                                        )
10   BIOSENSE WEBSTER, INC.,            )
                                        )
11                                      )
                                        )
12                        Defendant.    )
                                        )
13   _____  )

14

15

16             REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                        JURY TRIAL

18                     DAY 7, VOLUME II

19                   SANTA ANA, CALIFORNIA

20                 THURSDAY, MAY 15, 2025

21

22

23   MIRIAM V. BAIRD, CSR 11893, CCRA
     OFFICIAL U.S. DISTRICT COURT REPORTER
24   350 WEST FIRST STREET
     FOURTH FLOOR
25   SANTA ANA, CA 92701

|  | 1 | rebuttal is supposed to be addressed to whatever |
|---|---|---|
|  | 2 | pro-competitive justifications we put forward.  That is what |
|  | 3 | counsel indicated. |
|  | 4 | MR. HO:  Safety is one of their biggest |
| 03:25PM | 5 | pro-competitive justifications. |
|  | 6 | THE COURT:  Overruled. |
|  | 7 | BY MR. HO: |
|  | 8 | Q.   Were there other studies that you relied on as well? |
|  | 9 | A.   Yes, several other studies. |
| 03:26PM | 10 | Q.   Could you explain, please. |
|  | 11 | A.   Well, there's studies generally about different types of |
|  | 12 | medical devices that included catheters, comparing |
|  | 13 | reprocessed and new.  That included electrophysiology |
|  | 14 | catheters like the kinds at issue here. |
| 03:26PM | 15 | The academic studies have consistently found that |
|  | 16 | reprocessed medical devices are as safe as or safer than new |
|  | 17 | devices, which was consistent with the complaint data and the |
|  | 18 | MAUDE data on deaths and injuries. |
|  | 19 | Q.   Now, in your opinion as an economist, even assuming that |
| 03:26PM | 20 | there were a concern or a debate about the safety of |
|  | 21 | reprocessed catheters, would it be appropriate in your view |
|  | 22 | for Biosense to implement the case coverage policy as a |
|  | 23 | solution to that? |
|  | 24 | A.   No, it would not. |
| 03:27PM | 25 | Q.   Why not? |

A.    Well, once the FDA has approved for reprocessing a

catheter, then the doctors and the hospitals are best suited

to choose what's best for the patient.  If there was free and

fair competition, they would be able to make that choice, and

03:27PM    what we would expect to see in economics is that the best and

safest catheters would be the ones with the largest sales

volume.

Q.    Now, Dr. Forister, you heard Dr. Wu offer the opinion

that the case coverage policy is a solution to a free-riding

03:27PM    problem.  Do you recall that?

A.    Yes.

Q.    Does that make sense to you?

A.    No, it does not.

Q.    Could you explain why, please.

03:27PM    A.    In particular the mappers, the clinical account

specialists, are profit center for Biosense.  They're not a

cost center, not a net cost center.  I spoke earlier about

the evidence that each of the mappers every year is bringing

in 1.5 to 2 million dollars of revenue.  That more than

03:28PM    covers their cost.

        Biosense thinks in two months of work, they've

covered their year's payroll.  That's why Biosense wants to

get its mappers into the hospitals, so it can make more

money.  That's why Biosense and all other manufacturers

03:28PM    provide their mappers for free, because of the revenue that

# EXHIBIT 18

1             UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3       HONORABLE JAMES V. SELNA, JUDGE PRESIDING

4    INNOVATIVE HEALTH, LLC,          )
                                      )
5                                     )
                                      )
6                     Plaintiff,      )
                                      )
7                                     )
                                      )
8          Vs.                        )   No. SACV-19-01984-JVS
                                      )
9                                     )
                                      )
10   BIOSENSE WEBSTER, INC.,          )
                                      )
11                                    )
                                      )
12                    Defendant.      )
                                      )
13   _____)

14

15

16        REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                   JURY TRIAL

18                DAY 7, VOLUME II

19              SANTA ANA, CALIFORNIA

20            THURSDAY, MAY 15, 2025

21

22

23   MIRIAM V. BAIRD, CSR 11893, CCRA
     OFFICIAL U.S. DISTRICT COURT REPORTER
24   350 WEST FIRST STREET
     FOURTH FLOOR
25   SANTA ANA, CA 92701

                    hospital.

                    Q.    Let's go to JX953.

                    A.    (Witness complies.)

                    Q.    What are we looking at?

01:40PM             MR. CAVANAUGH:  Your Honor, we'd move JX953 into

                    evidence.

                          MR. HO:  No objection.

                          THE COURT:   953 will be received.

                          **(Exhibit 953 received)**

01:40PM             BY MR. CAVANAUGH:

                    Q.    What's depicted on JX953?

                    A.    So this was my analysis of trying to understand how

                    competition takes place and what I was looking at to see is

                    when hospitals are buying a system, how many times do they

01:41PM             actually have to pay for the machine and how many times do

                    they just actually get the machine for free -- because that's

                    how competitors want to lower the switching cost.

                          What I found was that overall 25 percent of the

                    time, the systems were sold where the machine had a price of

01:41PM             zero.

                    Q.    Now, are there ways that hospitals can gain access to

                    cardiac mapping machines without an initial outlay of money?

                    A.    Yes.  So this would be an example of that.

                    Q.    But are there other methods?  Can they be leased?  Are

01:42PM             there other things that can be done?

A.    So there are many ways to finance a system purchase.
And for some hospitals, in order to make it easier, you could
try to negotiate a zero price or you could lease or rent a
machine.  So, there are many ways to make a purchase so that
you don't have to have the entire upfront cost.

Q.    Do doctors choose -- based on your analysis, what is the
evidence regarding why doctors choose the Biosense cardiac
mapping system?

A.    When I looked through the different documents and, of
course, the testimony, there are a couple of factors that
stand out.  One is doctors are focused on quality, and the
OEM quality and the Biosense quality is something that
matters to them.

        There was testimony, for example, that doctors do
care about patient outcomes, and that's why Biosense is high.
I do remember there was some testimony that some doctors
mentioned concerns when they used a reprocessed catheter.

        So that's why, number one, I just think quality
matters so much to doctors.  For Biosense, that is what
Biosense does with its quality guarantee.  It's competing on
quality.

Q.    Now, the question of physician preference for the
Biosense system perhaps versus other systems, is that
relevant to the question of switching?

A.    It is.

```
 1   Q.    Innovative Health also sells catheters that are

 2   compatible with the Abbott EnSite cardiac mapping machine,

 3   correct?

 4   A.    Yes.

 5   Q.    And it does not sell or provide clinical support,

 6   correct?

 7   A.    By it, you mean Innovative?

 8   Q.    Correct.

 9   A.    Yes.  Innovative does not provide clinical support.

10   Q.    And the same would be true of Stryker?

11   A.    Yes.

12   Q.    And in 2009 approximately 50 percent of cases using the

13   CARTO 3 were covered by clinical support specialists, not

14   provided by Biosense, correct?

15   A.    Yes.

16   Q.    At that time Biosense provided case coverage for CARTO 3

17   procedures regardless of which manufacturer's catheters were

18   used in the procedure, correct?

19   A.    Yes, at that time.

20   Q.    At that time.

21          Now, Dr. Wu, who owns the training materials needed

22   to become a Biosense Webster CAS?

23   A.    Who owns the training materials?

24   Q.    Yes.

25   A.    I don't know.
```

# EXHIBIT 19

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3              HONORABLE JAMES V. SELNA, JUDGE PRESIDING

4    INNOVATIVE HEALTH, LLC,              )
                                          )
5                                         )
                                          )
6                         Plaintiff,      )
                                          )
7                                         )
                                          )
8              Vs.                        )   No. SACV-19-01984-JVS
                                          )
9                                         )
                                          )
10   BIOSENSE WEBSTER, INC.,              )
                                          )
11                                        )
                                          )
12                        Defendant.      )
                                          )
13   _____ )

14

15

16              REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                         JURY TRIAL

18                       DAY 6, VOLUME II

19                    SANTA ANA, CALIFORNIA

20                  WEDNESDAY, MAY 14, 2025

21

22

23   MIRIAM V. BAIRD, CSR 11893, CCRA
     OFFICIAL U.S. DISTRICT COURT REPORTER
24   350 WEST FIRST STREET
     FOURTH FLOOR
25   SANTA ANA, CA 92701

1    Q.   Let me ask you if you would look in your binder to

2    Exhibit 3752.

3    A.   (Witness complies.)   Uh-huh.

4           MR. CAVANAUGH:   Your Honor, we will only use this

01:53PM   5    as a demonstrative, consistent with our discussion before.

6           THE COURT:   Very good.

7    BY MR. CAVANAUGH:

8    Q.   What is this document?

9    A.   This is an alignment e-mail with a few attachments that

01:53PM   10   we prepared before the global management board meeting.

11   Q.   Let me ask you to turn to page 3752.   This PowerPoint

12   that we're looking at, what -- what's the subject?

13   A.   This one, these are the purpose -- what you are

14   presenting now?

01:54PM   15   Q.   Go to the first page.

16   A.   Oh, the first page?

17   Q.   Go to the first page.

18   A.   Falcon creates secure EEPROM system for --

19   Q.   It's entitled Falcon strategy alignment, October 17,

01:54PM   20   2014.

21          MR. BERHOLD:   Your Honor, I just want to make sure

22   we're using this only as a demonstrative and not creating an

23   impression it's anything more to the witness.

24          THE COURT:   Ladies and gentlemen, when I receive a

01:54PM   25   document in evidence, you may consider that document as

1    evidence for facts.  When an exhibit is used as a

2    demonstrative, it's not evidence, but it's used to illustrate

3    the witness's testimony.  These slides are demonstratives.

4              MR. CAVANAUGH:  Thank you, Your Honor.  If we just

01:55PM  5    go back to page 3752.

6    BY MR. CAVANAUGH:

7    Q.    What are the three points here?  What are these points?

8    A.    That's exactly the purpose that I mentioned before why

9    we introduced the Falcon chip, in order to keep the brand and

01:55PM 10    secure the quality of our accuracy, quality, traceability,

11    and know it's our catheter.

12              We license it to only licensed certified

13    reprocessors, and we can track the number of reprocessing

14    cycles that this catheter has done.

01:55PM 15    Q.    At the time of this presentation, what was Biosense

16    evaluating?

17    A.    We were evaluating how we are going to put Falcon in all

18    our catheter portfolio.

19    Q.    Now, did you ultimately put it on the LASSO NAV?

01:56PM 20    A.    No.  At the end we didn't put it on LASSO NAV.

21    Q.    Okay.  If we can turn to page 65.  Now, as part of this

22    project, did Biosense look at Stryker, analyze any Stryker

23    reprocessed LASSO navigation --

24    A.    Yes.

01:56PM 25    Q.    -- catheters?

```
 1   A.   Yes.

 2   Q.   And what -- what were the results?

 3   A.   Okay.  So as you can see here, the R&D department

 4   evaluated 30 off-the-shelf reprocessed, brand-new Stryker

 5   LASSO NAV eco reprocessed catheters.  The bottom line is that

 6   only 50 percent of these catheters were fully functional and

 7   met the calibration check that I talked about before.

 8   Q.   So is this consistent with your recollection of this

 9   work that was done back in 2014?

10   A.   Yes.

11   Q.   Did you also look at Sterilmed reprocessed LASSO NAV

12   catheters?

13   A.   Yes, we did.  Once we were evaluating if to do it

14   internally, we did the same with the Sterilmed.  So we did a

15   full cycle of reprocessed LASSO NAV eco, and we sent it to

16   Haifa, Israel, to our engineers to test them.  And a hundred

17   percent of them passed.

18   Q.   If you can turn to 3236, Exhibit 3236.

19   A.   (Witness complies.)  Yes.

20        MR. CAVANAUGH:  This is already in evidence,

21   Your Honor.

22   BY MR. CAVANAUGH:

23   Q.   There's a video.  If we can go to the video.  It says:

24   Calibration.  If can you see it, you can trust it.  If we

25   just go to the video as part of this.  What is this showing?
```

Timestamps:
01:56PM — line 5
01:57PM — line 10
01:57PM — line 15
01:58PM — line 20
01:58PM — line 25

|   |   |
|---|---|
| 1 | correct? |
| 2 | A.    No. |
| 3 | Q.    Falcon chip blocks reprocessing, correct? |
| 4 | A.    It can stop reprocessing. |
| 02:14PM 5 | Q.    Has Biosense ever certified an authorized reprocessor |
| 6 | aside from its own company, Sterilmed? |
| 7 | A.    Not as far as I know. |
| 8 | Q.    Tell, one more housekeeping matter.  We're not going |
| 9 | to -- we're going to cover one more exhibit but not publish |
| 02:15PM 10 | it to the jury.  Let's take a look at JX3717. |
| 11 | Do you see it in your binder? |
| 12 | A.    Yes. |
| 13 | Q.    This is an e-mail string -- |
| 14 | A.    Yes. |
| 02:15PM 15 | Q.    -- between you and Yochai Parchak? |
| 16 | A.    Yes.  Correct. |
| 17 | Q.    You worked at Biosense at that time; is that right? |
| 18 | A.    Correct. |
| 19 | Q.    And Mr. Parchak worked at Biosense at that time; is that |
| 02:15PM 20 | right? |
| 21 | A.    Correct. |
| 22 | MR. BERHOLD:  Your Honor, I move to admit |
| 23 | Exhibit 3717. |
| 24 | MR. CAVANAUGH:  No objection. |
| 02:16PM 25 | THE COURT:  3717 will be received. |

# EXHIBIT 20

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3        HONORABLE JAMES V. SELNA, JUDGE PRESIDING

4   INNOVATIVE HEALTH, LLC,          )
                                     )
5                                    )
                                     )
6                   Plaintiff,       )
                                     )
7                                    )
                                     )
8        Vs.                         )   No. SACV-19-01984-JVS
                                     )
9                                    )
                                     )
10  BIOSENSE WEBSTER, INC.,          )
                                     )
11                                   )
                                     )
12                  Defendant.       )
                                     )
13  _____ )

14

15

16         REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                    JURY TRIAL

18                 DAY 3, VOLUME II

19              SANTA ANA, CALIFORNIA

20             THURSDAY, MAY 8, 2025

21  MIRIAM V. BAIRD, CSR 11893, CCRA
    OFFICIAL U.S. DISTRICT COURT REPORTER
22  350 WEST FIRST STREET
    FOURTH FLOOR
23  SANTA ANA, CA 92701

24

25

 1   that spreadsheet?

 2   A.   No, not this spreadsheet.  This looks like a modified

 3   version of that.

 4   Q.   Does that spreadsheet include all the dates for

 5   initiation and completion of projects that you had on your

 6   original spreadsheet?

 7   A.   No, it doesn't.

 8   Q.   Biosense's counsel asked you the effect of the EEPROMs

 9   on the different catheters.  Do you recall that?

10   A.   Yes.

11   Q.   How effective was Biosense's blocking chip for the

12   SOUNDSTAR 3D?

13   A.   It had -- the chip was -- the details were encrypted, so

14   we had to resolve that, but that chip was not locked.  As in

15   when the device is used with the CARTO, a timestamp is

16   recorded but the chip was not locked, which means that once

17   we understood the methodology, once we understood where the

18   timestamp was, we had the freedom to remove that and bring

19   the chip back to the original state as it was made by

20   Biosense Webster.

21          So that, yeah, in comparison to eco, it had one

22   less challenge in comparison.

23   Q.   Can you explain the additional technicality of the

24   SOUNDSTAR eco.

25   A.   Yes.  SOUNDSTAR eco in this scenario going to a much

|     |     |
| --- | --- |
| 1 | more complex chip required significant effort from our end to |
| 2 | understand as well as decrypt.  On top of that, that chip was |
| 3 | locked, as in write protected once it was used by the system, |
| 4 | which means again given that it was an advanced chip, once |
| 02:03PM 5 | it's write protected and now we are locked out of the supply |
| 6 | chain where we cannot buy a new chip that was mandated by the |
| 7 | manufacturer of that, we needed to get that from Biosense. |
| 8 | So that completely locked us out, and we had to now |
| 9 | go and seek entirely new expertise in cryptography and |
| 02:04PM 10 | understand how -- and not just cryptography but even |
| 11 | electronic EEPROM expertise to understand this advanced chip |
| 12 | as well as how to now unlock that chip so that we can remove |
| 13 | that timestamp. |
| 14 | Q.   Biosense's counsel showed you the FDA approval letters |
| 02:04PM 15 | for the ACUNAV and LASSO NAV.  Do you recall that? |
| 16 | A.   Yes. |
| 17 | Q.   And those were four days apart.  Do you recall that? |
| 18 | A.   Yes. |
| 19 | Q.   In light of that, how can you say that the EEPROM chip |
| 02:04PM 20 | and the LASSO NAV delayed its launch? |
| 21 | A.   Well, in that scenario it was comparing ACUNAV to LASSO |
| 22 | where one is an ultrasound catheter and one is a mapping |
| 23 | catheter, where, if I were to compare the ACUNAV to the |
| 24 | SOUNDSTAR, now SOUNDSTAR is basically an ACUNAV with a |
| 02:05PM 25 | location sensor and an EEPROM added. |

# EXHIBIT 21










**1995**
**CARTO®**
System

**2000**
**LASSO®**
Catheter

**2005**
**CARTOMERGE®**
Module

**2006**
**CARTOSOUND®**
Module

**2009**
**CARTO® 3**
System

**2011**
**THERMOCOOL® SF**
Catheter

**2011**
**CARTO® 3 System**
MEM Version

**2012**
**PENTARAY™**
Mapping Catheter











**2018**
**VISITAG SURPOINT™**
Module

**2017**
**CARTO VIZIGO™**
**Bi-Directional Guiding** Sheath

**2016**
**CONFIDENSE™**
Module with Ripple Mapping

**2016**
**THERMOCOOL SMARTTOUCH® SF**
Catheter

**2015**
**CONFIDENSE™**
Module

**2013**
**CARTO VISITAG™**
Module/**PASO™**
Module

**2012**
**CARTOUNIVU®**
Module

**2011**
**THERMOCOOL SMARTTOUCH®**
Catheter










**2018**
**CONFIDENSE™**
Module with Pattern Matching and HD Coloring

**2020**
**CARTO PRIME™**
Module

**2021**
**NUVISION™**
Ultrasound Catheter

**2022**
**OCTARAY™**
Mapping Catheter

**2023**
**OPTRELL™**
Mapping Catheter

**2023**
**QDOT MICRO™**
Catheter

**2024**
**CARTO ELEVATE™**
Module

**2024**
**CARTOSOUND™**
**FAM Module**

70