Panteha Abdollahi, Esq.
State Bar No. 230002
pabdollahi@tocounsel.com
THEODORA ORINGHER PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, California 92626-7109
Telephone: (714) 549-6200
Facsimile: (714) 549-6201

Jeffrey L. Berhold, Esq.
Admitted *Pro Hac Vice*
jeff@berhold.com
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, Georgia 30309
Telephone: (404) 872-3800
Facsimile: (678) 868-2021

Joshua P. Davis, Esq.
State Bar No. 193254
jdavis@bm.net
BERGER MONTAGUE PC
505 Montgomery St., Suite 625
San Francisco, California 94111
Telephone:  (415) 906-0684

Derek T. Ho, Esq.*
Andrew E. Goldsmith, Esq.*
Matthew D. Reade, Esq.*
Kelley C. Schiffman, Esq.
State Bar No. 325023
Rachel T. Anderson, Esq.*
Annamaria M. Morales-Kimball, Esq.*
Sean P. Quirk, Esq.*
*Admitted *Pro Hac Vice*
dho@kellogghansen.com
agoldsmith@kellogghansen.com
mreade@kellogghansen.com
kschiffman@kellogghansen.com
randerson@kellogghansen.com
amoraleskimball@kellogghansen.com
squirk@kellogghansen.com
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999

Attorneys for Plaintiff
INNOVATIVE HEALTH LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| INNOVATIVE HEALTH LLC,<br><br>Plaintiff,<br><br>vs.<br><br>BIOSENSE WEBSTER, INC.,<br><br>Defendant. | Case No. 8:19-cv-1984 JVS (KES)<br><br>**DECLARATION OF DEREK T. HO IN SUPPORT OF PLAINTIFF INNOVATIVE HEALTH LLC'S RESPONSE TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(B)**<br><br>Date:    August 11, 2025<br>Time:    1:30 p.m.<br>Crtrm:  10C<br><br>Action Filed:  October 18, 2019<br>Trial Date:  May 6, 2025 |

I, Derek T. Ho, declare as follows:

1.    I am an attorney admitted to the bars of the State of New York, Massachusetts, and the District of Columbia. I am admitted *pro hac vice* to practice before this Court. I practice law at Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., and represent the plaintiff, Innovative Health LLC, in this matter.

2.    I make this declaration in support of Plaintiff Innovative Health LLC's Response to Defendant's Renewed Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b).

3.    The facts I state here are true and correct. They are based on my own personal knowledge or knowledge I gleaned from reviewing files pertinent to this matter. If called as a witness to testify, I could and would competently testify to these facts.

4.    **JX-2** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00197818 to BWI-INN00197821, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

5.    **JX-155** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00387384 to BWI-INN00387388, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

6.    **JX-173** is an audio file trial exhibit bearing Bates numbers BWI-INN00611896 to BWI-INN00611896, which was produced by Biosense Webster, Inc. and admitted into evidence in this case. A true and correct copy of the relevant excerpted portion of the trial exhibit will be lodged with the Court shortly.

7.    **JX-219** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00060483 to BWI-INN00060484, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

8.    **JX-221** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00105448 to BWI-INN00105451, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

9.    **JX-222** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00073719 to BWI-INN00073723, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

10.    **JX-223** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00339133 to BWI-INN00339133, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

11.    **JX-225** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00014865 to BWI-INN00014868, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

12.    **JX-228** is a true and correct copy of the trial exhibit bearing Bates numbers IH00152664 to IH00152665, which was produced by Innovative Health LLC and admitted into evidence in this case.

13.    **JX-298** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00044794 to BWI-INN00044794, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

14.    **JX-511** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00068040 to BWI-INN00068040, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

15.    **JX-545** is a true and correct copy of the trial exhibit bearing Bates numbers IH00287096 to IH00287097, which was produced by Innovative Health LLC and admitted into evidence in this case.

16.    **JX-1262** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00015538 to BWI-INN00015540, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

17.    **JX-3099** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00047565 to BWI-INN00047571, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

*DECLARATION OF DEREK T. HO*

18.    **JX-3108** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00051418 to BWI-INN00051422, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

19.    **JX-3114** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00057216 to BWI-INN00057217, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

20.    **JX-3193** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00074426 to BWI-INN00074428, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

21.    **JX-3207** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00075788 to BWI-INN00075788, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

22.    **JX-3270** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00105170 to BWI-INN00105171, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

23.    **JX-3325** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00113433 to BWI-INN00113435, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

24.    **JX-3329** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00114083 to BWI-INN00114083, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

25.    **JX-3415** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00320111 to BWI-INN00320114, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

26.    **JX-3437** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00325476 to BWI-INN00325479, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

27.     **JX-3673** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00468482 to BWI-INN00468486, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

28.     **JX-3710** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00517898 to BWI-INN00517898, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

29.     **JX-3887** is a true and correct copy of the trial exhibit bearing Bates numbers IH00352645 to IH00352646, which was produced by Innovative Health LLC and admitted into evidence in this case.

30.     **JX-3912** is a true and correct copy of the trial exhibit bearing Bates numbers IH00568087 to IH00568088, which was produced by Innovative Health LLC and admitted into evidence in this case.

31.     **JX-3957** is a true and correct copy of the trial exhibit bearing Bates numbers IH00697133 to IH00697136, which was produced by Innovative Health LLC and admitted into evidence in this case.

32.     **JX-3963** is a true and correct copy of the trial exhibit bearing Bates numbers IH00697169 to IH00697172, which was produced by Innovative Health LLC and admitted into evidence in this case.

33.     **JX-3969** is a true and correct copy of the trial exhibit bearing Bates numbers IH00697211 to IH00697214, which was produced by Innovative Health LLC and admitted into evidence in this case.

34.     **JX-3972** is a true and correct copy of the trial exhibit bearing Bates numbers IH00697222 to IH00697225, which was produced by Innovative Health LLC and admitted into evidence in this case.

35.     **JX-3981** is a true and correct copy of the trial exhibit bearing Bates numbers STRYKER00000018 to STRYKER00000027, which was admitted into evidence in this case.

36.    **JX-4316** is a true and correct copy of the trial exhibit bearing Bates numbers BWI-INN00572169 to BWI-INN00572176, which was produced by Biosense Webster, Inc. and admitted into evidence in this case.

37.    **JX-4352** is a true and correct copy of the trial exhibit bearing Bates numbers IH00698897 to IH00698901, which was produced by Innovative Health LLC and admitted into evidence in this case.

38.    **JX-4392** is a true and correct copy of the trial exhibit titled "Figure 7 Biosense CARTO 3 Usage Share," which was admitted into evidence in this case.

39.    **JX-4419** is a true and correct copy of the trial exhibit titled "Table 12 Average Complaint Rates for Innovative vs Biosense and Sterilmed," which was admitted into evidence in this case.

40.    **JX-4457** is a true and correct copy of the trial exhibit titled " Figure 23 Comparative Third Party Reprocessor Share of Unit Sales," which was admitted into evidence in this case.

41.    **Exhibit 1A** is a true and correct copy of excerpts from Volume I of the May 7, 2025 trial transcript in this matter.

42.    **Exhibit 1B** is a true and correct copy of excerpts from Volume II of the May 7, 2025 trial transcript in this matter.

43.    **Exhibit 2A** is a true and correct copy of excerpts from Volume I of the May 8, 2025 trial transcript in this matter.

44.    **Exhibit 2B** is a true and correct copy of excerpts from Volume II of the May 8, 2025 trial transcript in this matter.

45.    **Exhibit 3A** is a true and correct copy of excerpts from Volume I of the May 9, 2025 trial transcript in this matter.

46.    **Exhibit 3B** is a true and correct copy of excerpts from Volume II of the May 9, 2025 trial transcript in this matter.

47.    **Exhibit 4A** is a true and correct copy of excerpts from Volume I of the May 13, 2025 trial transcript in this matter.

*DECLARATION OF DEREK T. HO*

48.    **Exhibit 4B** is a true and correct copy of excerpts from Volume II of the May 13, 2025 trial transcript in this matter.

49.    **Exhibit 5** is a true and correct copy of excerpts from Volume I of the May 14, 2025 trial transcript in this matter.

50.    **Exhibit 6A** is a true and correct copy of excerpts from Volume I of the May 15, 2025 trial transcript in this matter.

51.    **Exhibit 6B** is a true and correct copy of excerpts from Volume II of the May 15, 2025 trial transcript in this matter.

52.    **Exhibit 7** is a true and correct copy of excerpts from Volume I of the May 16, 2025 trial transcript in this matter.

53.    **Exhibit 8** is a true and correct copy of excerpts used at trial from the deposition of Portia Tranguch dated August 23, 2021 in this matter.

54.    **Exhibit 9** is a true and correct copy of excerpts used at trial from the deposition of Michael Idio dated September 20, 2021 in this matter.

55.    **Exhibit 10** is a true and correct copy of excerpts used at trial from the deposition of Vincent Thomas dated September 9, 2021 in this matter.

56.    **Exhibit 11** is a true and correct copy of excerpts used at trial from the deposition of Donald Coldiron dated September 3, 2021 in this matter.

57.    **Exhibit 12** is a true and correct copy of excerpts used at trial from the deposition of Cheryl Saxby dated August 30, 2021 in this matter.

58.    **Exhibit 13** is a true and correct copy of a slide from the closing demonstrative used at trial by Innovative Health LLC in this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day of July, 2025, at Mountain Village, CO.

/s/ *Derek T. Ho*

Derek T. Ho

| | |
|---|---|
| **From:** | Bodner, Michael [BWIUS] </O=JNJ/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MBODNER1A5> |
| **To:** | Zare, Fairy [BWIUS] |
| **CC:** | Sidi, Nikki [BWIUS] |
| **Sent:** | 6/12/2017 9:08:57 PM |
| **Subject:** | RE: Unified 1MD RPO Strategy Notes & AI |

Sounds good

**From:** Zare, Fairy [BWIUS]
**Sent:** Friday, June 09, 2017 10:21 PM
**To:** Bodner, Michael [BWIUS] <mbodner@ITS.JNJ.com>
**Cc:** Sidi, Nikki [BWIUS] <nsidi1@ITS.JNJ.com>
**Subject:** Re: Unified 1MD RPO Strategy Notes & AI

I think we should have Sterilmed do a feasibility on Pentaray and tell us what it takes for them to reprocess it (cost, time, personnel). We can then decide if that's an investment worth making.

We've heard Stryker is working on reprocessing Pentaray, even though it's unlikely they would be successful since 1-it's very tough to reprocess and 2-we wouldn't map those cases so they would need to train the hospital staff to map and we know that's not sustainable (unless they somehow join forces with St. Jude or come up with a different business model).

So we can have Sterilmed work on Pentaray but not submit it to the FDA, unless Stryker rolls it out.

In the meantime, we really need Sterilmed to fix their manufacturing and quality issues for the existing Certified Performance products before expanding to other products.

Happy to discuss further next week and would love to hear your thoughts on this.

Have a terrific weekend,
Fairy

On Jun 9, 2017, at 6:09 PM, Bodner, Michael [BWIUS] <mbodner@ITS.JNJ.com> wrote:

Thanks, just reviewed all the slides, what's the plan for PRN?

M

---

**From:** Zare, Fairy [BWIUS]
**Sent:** Thursday, June 08, 2017 5:51 PM
**To:** Bodner, Michael [BWIUS] <mbodner@ITS.JNJ.com>
**Cc:** Sidi, Nikki [BWIUS] <nsidi1@ITS.JNJ.com>
**Subject:** FW: Unified 1MD RPO Strategy Notes & AI
**Importance:** High

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-2**

Hi Michael,

Sterilmed is facilitating an exercise between the 1MD operating companies to **outline a high level strategy around sustainability** and reprocessing with the intention of presenting the vision to Sandi Peterson, at the end of

This was prompted because Ethicon has recently faced challenges with Stryker launching the reprocessed version of one of their products which is projected to impact their revenues negatively.
Biosense Webster is included because of our RPO business and mutual competitor, Stryker and involvement with Sterilmed.

Sterilmed is arguing that their 'capabilities' are not leveraged to the fullest by the big OEM businesses (Ethicon and Deputy mostly).
The Op-Co's have clearly communicated that the reason they're exploring RPO as part of their competitive strategy is to help them protect/gain market share. RPO is only one tool (one of many) they may use to compete.

From Biosense's stand point, we've outlined our strategy as such: **Leverage RPO to drive market leadership and increase our share of procedure.**
We've also shared that aside from our current Certified Performance products, we'll be evaluating other products for reprocessing and possibly add to our pipeline, pending assessment and sourcing of all the necessary resources to launch and sustain and financial justification.

I just wanted you to be aware of all this first and would like to brief David also ahead of upcoming calls with Sterilmed and CSS/1MD leadership.

Thanks,
Fairy

<< File: One MD Summary .pptx >>

---

**From:** Ewalt, Jerry [SMDUS]
**Sent:** Tuesday, June 06, 2017 6:25 PM
**To:** Buchan-Sipe, Jen [SMDUS]; Hummell, David [SMDUS]; Hall IV, Harry [SYNNA]; Reed, Timothy [SYNNA]; Ekdahl, Andrew [ETHUS]; Sidi, Nikki [BWIUS]; Flexner, Geoffrey [SYNNA]; Chung, Grace [ETHUS]; Loveless, Trent [SMDUS]; Neichin, Jeffrey [SMDUS]; Wiltshire, Anthony [ETHUS]; Drummond, Kelley [ETHUS]; Zare, Fairy [BWIUS]; Wiltshire, Anthony [ETHUS]; Drummond, Kelley [ETHUS]
**Subject:** RE: Unified 1MD RPO Strategy Notes & AI


All,

Here is the latest deck (8 slides), 1 page summary and collections summary for your review. Please make every attempt to review the material prior to the call tomorrow to make it as productive as possible. This is the last call before the group call with the GCC on June 12th.
<< File: OneMD Sustainability Strategy 1-Pager .docx >>  << File: One MD Collections 1 Pager.pptx >>  << File: One MD Summary Story Deck.pptx >>
Talk to everyone tomorrow.

Jerry
949-525-0462

---

**From:** Ewalt, Jerry [SMDUS]
**Sent:** Wednesday, May 31, 2017 9:28 PM
**To:** Buchan-Sipe, Jen [SMDUS] <jbuchan@ITS.jnj.com>; Hummell, David [SMDUS] <dhumm@its.jnj.com>; Hall IV, Harry [SYNNA] <HHALLIV@ITS.JNJ.COM>; Reed, Timothy [SYNNA] <TREED3@ITS.JNJ.COM>; Ekdahl, Andrew [ETHUS] <AEkdahl@its.jnj.com>; Sidi, Nikki [BWIUS] <nsidi1@ITS.JNJ.com>; Flexner, Geoffrey [SYNNA] <GFLEXNER@ITS.JNJ.COM>; Chung, Grace [ETHUS] <GCHUNG@ITS.JNJ.com>; Loveless, Trent [SMDUS] <tloveles@ITS.JNJ.com>; Neichin, Jeffrey [SMDUS] <jneichi@ITS.JNJ.com>; Wiltshire, Anthony

[ETHUS] <AWiltsh4@its.jnj.com>; Drummond, Kelley [ETHUS] <kdrummo@its.jnj.com>; Zare, Fairy [BWIUS] <fzare@ITS.JNJ.com>; Wiltshire, Anthony [ETHUS] <AWiltsh4@its.jnj.com>; Drummond, Kelley [ETHUS] <kdrummo@its.jnj.com>
**Subject:** Unified 1MD RPO Strategy Notes & AI


All,

Attached are the notes from today's meeting.  Note the owners in bold…

Sandi Peterson expectations
1 pager word document (Background Situation, Objective, Recommendation, Approach, Impact, etc) – **Dave Hummel**
Limit to 8-12 slides

Notes from review of the deck
Slide 2/3: Discuss how we can be more competitive and deliver 1MD value
Slide 4: Market sizing, ensure it is linked with insights group opinion linked to franchise portfolio team's belief of the reprocess-able threat
Slide 5: Focus on the customer need, use customer research insights and proof points – **Jen Buchan**
Opco summary slides:  can we put all 3 on one slide or do they need to be separate to tell individual stories (include collections strategy to the Opco summary slide) – **Jen is trying to unify to 1 slide / OpCo, will need OpCo lead input.**
Discuss reprocessing and reclaim of devices as part of collections capability – **Jeff Neichin to pull together summary and send to team.**
What investments does SM need to support this expanded capability (R&D catch up, advancing next gen collections, reliability of supply chain) - **Jerry**
Where do we demonstrate the cost of offering to the Opcos and provide the financial info – **Trent to work with OpCo leads**

Potential way to clarify the focus further?
Situation: Experiencing OEM Erosion due to RPO while SM is an underutilized asset available to JNJ
Objective: To be more competitive against both OEM & RPO
Recommendation: Deliver 1MD Value through an integrated RPO offering
Approach: Take control and shape the market
Opco led commercial strategy (Product, Channel Incentives, Collections/Supply Requirements)
SM capability of RPO R&D, Collections and Supply/Inventory
1MD leverage of sustainability solution
Impact
Benefit  - lift of x% on OEM biz?
Cost – investing in capability and tolerance of lower GP on RPO units

Please have updates to the deck complete by EOD Monday so that we can distribute to the team prior to next Weds call.

Thanks for everyone's involvement we made great progress today.

Jerry
949-525-0462


-----Original Appointment-----
**From:** Ewalt, Jerry [SMDUS]
**Sent:** Friday, May 19, 2017 2:18 PM
**To:** Ewalt, Jerry [SMDUS]; Buchan-Sipe, Jen [SMDUS]; Hummell, David [SMDUS]; Hall IV, Harry [SYNNA]; Reed, Timothy [SYNNA]; Ekdahl, Andrew [ETHUS]; Sidi, Nikki [BWIUS]; Flexner, Geoffrey [SYNNA]; Chung, Grace [ETHUS]; Loveless, Trent [SMDUS]; Neichin, Jeffrey [SMDUS]; Wiltshire, Anthony [ETHUS]; Drummond,

Kelley [ETHUS]; Zare, Fairy [BWIUS]; Wiltshire, Anthony [ETHUS]; Drummond, Kelley [ETHUS]
**Subject:** Unified 1MD RPO Strategy
**When:** Wednesday, May 31, 2017 3:00 PM-4:00 PM (UTC-06:00) Central Time (US & Canada).
**Where:** **REDACTION: OTHER**

-- Do not delete or change any of the following text. --

Join WebEx meeting

Meeting number: REDACTION: OTHER

Join by phone

Call-in toll-free number: REDACTION: OTHER (US)

Call-in number: REDACTION: OTHER (US)

Show global numbers

Attendee access code: REDACTION: OTHER

Global Access Numbers   **REDACTION: OTHER**
Brazil Toll Free REDACTION: OTHER
Brazil Toll: REDACTION: OTHER
Philippines Toll Free REDACTION: OTHER
Philippines Toll Free
Can't join the meeting? Contact support.

IMPORTANT NOTICE: Please note that this WebEx service allows audio and other information sent during the session to be recorded, which may be discoverable in a
legal matter. By joining this session, you automatically consent to such recordings. If you do not consent to being recorded, discuss your concerns with the host or do not
join the session..

HIGHLY CONFIDENTIAL     **JX-2, Page 4 of 4**     BWI-INN00197821

Innovative v. Biosense

No. 8:19-cv-01984-JVS

JX-155

| From: | Warman, Neil [BWIUS] </O=JNJ/OU=HCSUSP/CN=RECIPIENTS/CN=NWAR |
| To: | Braga, Sam; Campbell, Kevin; Keeter, Joshua; Wray, Michael |
| CC: | Martin, Noah [BWIUS]; Palfi, Sandor [BWIUS] |
| Sent: | 5/6/2014 10:02:28 PM |
| Subject: | RE: Written Assurance that the use of a reprocessed device during a case will still receive rep coverage. |

Sam,

By way of this email please consider this our assurance that our clinical organization will cover scheduled cases as they do today.  They will cover cases where a reprocessed catheter is being used when they are in the room.

If a Clinical Account Specialist is scheduled to be in the EP the CAS will not excuse themselves or exit the room because a reprocessed catheter is being used.  We will hold our people/organization accountable if this type of behavior happens in the future.

Sam, I hope you find this statement clear and concise.  A CAS will cover a scheduled case and will not exit the room due to a reprocessed catheter being used.

Thanks,

*Neil Warman*
Corporate Account Director
Biosense Webster
PART OF THE *Johnson & Johnson* FAMILY OF COMPANIES
Cell 612-804-0496
nwarman@its.jnj.com
3333 Diamond Canyon Road, Diamond Bar, CA 91765

**Confidentiality Notice:** This e-mail transmission may contain information that is confidential and is intended only for the individual or entity named in the e-mail address. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please reply to the sender, so that Johnson & Johnson Health Care Systems Inc. can arrange for proper delivery, and then please delete the message

**From:** Braga, Sam [mailto:Samuel.Braga@ascension.org]
**Sent:** Saturday, May 03, 2014 5:36 AM
**To:** Warman, Neil [BWIUS]; Campbell, Kevin; Keeter, Joshua; Wray, Michael
**Cc:** Martin, Noah [BWIUS]; Palfi, Sandor [BWIUS]; Braga, Sam
**Subject:** Written Assurance that the use of a reprocessed device during a case will still receive rep coverage.

## RE: Written Assurance
NEIL
I appreciate you taking time to discuss the ongoing topic of "rep case coverage". I regrouped briefly with Kevin after you and I spoke. *I suggest you continue down the path of finalizing contract terms and conditions, required for contractual coverage throughout Ascension.*
In thinking through where we are as a system, in lieu of delaying our requirements by addressing local sites as incidents are reported, I believe it is best to receive from JNJ – BWI the following:
**Written Assurance that the use of a reprocessed device during a case will still receive rep coverage.**
As I mentioned to you via phone, the topic of "rep case coverage" has received much visibility, and our end-users are seeking assurances that JNJ - BWI will not interrupt the flow of a procedure by "exiting the case" because a remanufactured device is presented. Due to the sensitive and high profile nature of this topic and the related incidents, I would like to respond back to both Decision Team and Affinity Group with a positive report. Therefore, please provide a "Written Assurance" to Ascension – The

Resource Group on or before Thursday, May 8th. I would also remind you and hope you take into consideration the significant spend throughout Ascension related to JNJ – BWI "non-reprocessed" catheters.
Thank you, in advance.


Sincerely,
*Sam*

Sam Braga, MSM-PM
Director, Critical Products Management
The Resource Group, LLC

*Integrating Excellence and Stewardship*
**An Ascension Subsidiary**
Office:  314.733.6735
Customer Care Representative: 314.733.8500

---

**From:** Warman, Neil [BWIUS] [mailto:NWarman@its.jnj.com]
**Sent:** Thursday, May 01, 2014 9:36 AM
**To:** Braga, Sam; Campbell, Kevin; Keeter, Joshua; Wray, Michael
**Cc:** Martin, Noah [BWIUS]; Palfi, Sandor [BWIUS]
**Subject:** RE: BWI Biosense - Rep Behavior at Ascension Ministries

Sam,

Thank you for taking my call today and discussing the matter of BWI clinical case coverage when reprocessed products are used.

I wanted to give you an assurance that this type of thing will not happen in Evansville again.  Both Sandor and I talked with the local BWI team on this matter.

Please send me the details where this happened in Alabama and Michigan.  I will follow up with the local teams in these accounts and will assure you this matter will be discussed with them.

As discussed, Sandor, Noah and I will keep our May 14th meeting on schedule with the understanding you may cancel after talking with your internal stakeholders.

Thanks,

*Neil Warman*
Corporate Account Director
Biosense Webster
PART OF THE *Johnson & Johnson* FAMILY OF COMPANIES
Cell 612-804-0496
nwarman@its.jnj.com
3333 Diamond Canyon Road, Diamond Bar, CA 91765

---

**Confidentiality Notice:** This e-mail transmission may contain information that is confidential and is intended only for the individual or entity named in the e-mail address. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please reply to the sender, so that Johnson & Johnson Health Care Systems Inc. can arrange for proper delivery, and then please delete the message

---

**From:** Braga, Sam [mailto:Samuel.Braga@ascension.org]
**Sent:** Tuesday, April 29, 2014 6:28 AM
**To:** Warman, Neil [BWIUS]; Campbell, Kevin; Keeter, Joshua; Wray, Michael

Cc: Martin, Noah [BWIUS]; Palfi, Sandor [BWIUS]; Braga, Sam
**Subject:** RE: BWI Biosense - Rep Behavior at Ascension Ministries

___

### RE: BWI Biosense - Rep Behavior at Ascension Ministries

NEIL

This incident has received much attention. As I shared with you last Wednesday morning, it was covered in our regularly scheduled Cardiology Decision Team later that day.

Know that upon gauging the Committee Members, it is was shared that this <u>JNJ Biosense rep behavior has occurred elsewhere within Ascension Ministries</u>.

Thank you for the in depth explanation below of the Lasso catheter function and attributes, however, that is not in question. Your response related to "concerns" raises more questions for me: I would hope that the "concerns" raised were not "rep concerns". As I mentioned in our meeting this rep response and behavior is **very disappointing**, and as a responsibility to our end users, we continue to include this topic as an Agenda item for discussion on all future CV Team Meetings.


Sincerely,

*Sam*

Sam Braga, MSM-PM
Director, Critical Products Management
The Resource Group, LLC

*Integrating Excellence and Stewardship*
**An Ascension Subsidiary**
Office:  314.733.6735
Customer Care Representative: 314.733.8500

___

**From:** Warman, Neil [BWIUS] [mailto:NWarman@its.jnj.com]
**Sent:** Monday, April 28, 2014 7:10 PM
**To:** Campbell, Kevin
**Cc:** Braga, Sam; Martin, Noah [BWIUS]; Palfi, Sandor [BWIUS]
**Subject:** RE: BWI Contract

Kevin,

Thank you for your message and please let me respond.

1.    There is no specific corporate policy that prohibits our people from supporting cases where reprocessed catheters are used.
    a.    This is part of our Johnson & Johnson Credo which every employee takes very seriously.
    b.    Please, let me and Sandor know if you see this happening and we will manage it the local level immediately.
        i.    We would ask for details so we can manage it appropriately.
2.    Sandor and I both talked with our local Region Business Director on this regarding Evansville.  Our local Clinical Account Specialist reports directly to her.
    a.    This is what we learned:
        i.    The reprocessed catheter that was pulled was a LASSO Nav catheter.
        ii.    This catheter is used to create the 3D image of the heart and needs to be highly accurate because it determines where the Electrophysiologist will make point by point ablations in the heart tissue.
        iii.    This was the first time our CAS and the EP were asked to use a reprocessed LASSO Nav catheter.  Neither has ever created an image with one.
        iv.    This created some concerns so a new catheter was pulled.  Now that both the CAS and EP know they will see this catheter in the future they can discuss case strategy before it starts so the best outcomes can be achieved.
3.    During our meeting with you and Sam, Sandor and I committed that no CAS will be allowed to exit a room

because a reprocessed catheter is being used.

Thanks,

*Neil Warman*

Corporate Account Director
Biosense Webster
PART OF THE *Johnson & Johnson* FAMILY OF COMPANIES
Cell 612-804-0496
nwarman@its.jnj.com
3333 Diamond Canyon Road, Diamond Bar, CA 91765

---

**Confidentiality Notice:** This e-mail transmission may contain information that is confidential and is intended only for the individual or entity named in the e-mail address. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please reply to the sender, so that Johnson & Johnson Health Care Systems Inc. can arrange for proper delivery, and then please delete the message

---

**From:** Campbell, Kevin [mailto:Kevin.Campbell@ascension.org]
**Sent:** Monday, April 28, 2014 3:59 PM
**To:** Warman, Neil [BWIUS]
**Cc:** Braga, Sam; Campbell, Kevin
**Subject:** RE: BWI Contract
**Importance:** High

Neil:

I believe Sam and I are still looking for some "written assurance" that the situation that recently occurred with your person "stepping out of a case" will not reoccur. I thought our position was pretty transparent that until this situation was reconciled, such that we and our executive leadership were "comfortable" it would not reoccur, then and only then would be continue to move towards a final document for signature.

Sam, feel free to chime in here, however that is my recollection. Am I misstating this?

Regards,

*Kevin*

Kevin Campbell
Manager, Sourcing and Supplier Management
The Resource Group, LLC
*Integrating Excellence and Stewardship*

**An Ascension Subsidiary**

Office:  314.733.8755

Customer Care Representatives
314.733.8500

---

**From:** Warman, Neil [BWIUS] [mailto:NWarman@its.jnj.com]
**Sent:** Monday, April 28, 2014 5:49 PM
**To:** Campbell, Kevin
**Subject:** BWI Contract

Kevin,

When will your legal shake the contract loose?

---

Thanks,

*Neil Warman*
Corporate Account Director
Biosense Webster
PART OF THE *Johnson & Johnson* FAMILY OF COMPANIES
Cell 612-804-0496
nwarman@its.jnj.com
3333 Diamond Canyon Road, Diamond Bar, CA 91765

**Confidentiality Notice:** This e-mail transmission may contain information that is confidential and is intended only for the individual or entity named in the e-mail address. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please reply to the sender, so that Johnson & Johnson Health Care Systems Inc. can arrange for proper delivery, and then please delete the message

CONFIDENTIALITY NOTICE:

This email message and any accompanying data or files is confidential and may contain privileged information intended only for the named recipient(s). If you are not the intended recipient(s), you are hereby notified that the dissemination, distribution, and or copying of this message is strictly prohibited. If you receive this message in error, or are not the named recipient(s), please notify the sender at the email address above, delete this email from your computer, and destroy any copies in any form immediately. Receipt by anyone other than the named recipient(s) is not a waiver of any attorney-client, work product, or other applicable privilege.

CONFIDENTIALITY NOTICE:

This email message and any accompanying data or files is confidential and may contain privileged information intended only for the named recipient(s). If you are not the intended recipient(s), you are hereby notified that the dissemination, distribution, and or copying of this message is strictly prohibited. If you receive this message in error, or are not the named recipient(s), please notify the sender at the email address above, delete this email from your computer, and destroy any copies in any form immediately. Receipt by anyone other than the named recipient(s) is not a waiver of any attorney-client, work product, or other applicable privilege.

CONFIDENTIALITY NOTICE:

This email message and any accompanying data or files is confidential and may contain privileged information intended only for the named recipient(s). If you are not the intended recipient(s), you are hereby notified that the dissemination, distribution, and or copying of this message is strictly prohibited. If you receive this message in error, or are not the named recipient(s), please notify the sender at the email address above, delete this email from your computer, and destroy any copies in any form immediately. Receipt by anyone other than the named recipient(s) is not a waiver of any attorney-client, work product, or other applicable privilege.

# This Document has been produced in Native Format

Innovative v. Biosense

No. 8:19-cv-01984-JVS

**JX-173**

| From: | Fine, Marius [SMDUS] </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6ED86FEC476C4A5485E37D984434DA87-MFINE2> |
|---|---|
| To: | Koenig, Joseph [SYNNA] |
| Sent: | 12/3/2018 4:41:24 PM |
| Subject: | RE: Request: Soundstar reprocessing by Stryker & status of Falcon chip |

Thanks.  I thought I heard that the team was working on a new version because the previous version was defeated by S3

Marius Fine
Sr. Reprocessing Marketing Manager



Johnson & Johnson Health Care Systems, Inc.
T: +1 763 488 3239
M:+1 952 826 9659
mfine2@its.jnj.com
http://www.jnj.com

Disclaimer: This electronic message may contain information that is Proprietary, Confidential, or legally privileged or protected. It is intended only for the use of the individual(s) and entity named in the message. If you are not an intended recipient of this message, please notify the sender immediately and delete the material from your computer. Do not deliver, distribute or copy this message and do not disclose its contents or take any action in reliance on the information it contains.

**From:** Koenig, Joseph [SYNNA]
**Sent:** Monday, December 03, 2018 10:40 AM
**To:** Fine, Marius [SMDUS] <mfine2@ITS.JNJ.com>
**Subject:** RE: Request: Soundstar reprocessing by Stryker & status of Falcon chip

S3 is reprocessing SS 8F and 10F.  Let me see if I can get more details around Falcon.

**Joe Koenig**
Product Director, Sustainability
M. (714) 878-1975
E.  jkoenig4@its.jnj.com

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
33 Technology Drive
Irvine, CA 92618, USA
www.biosensewebster.com

**From:** Fine, Marius [SMDUS]
**Sent:** Monday, December 3, 2018 7:45 AM
**To:** Koenig, Joseph [SYNNA] <JKOENIG4@its.jnj.com>
**Subject:** Request: Soundstar reprocessing by Stryker & status of Falcon chip

Joe,

HIGHLY CONFIDENTIAL

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-219**

BWI-INN00060483

Please confirm that the SS 8Fr & 10Fr are still being reprocessed by Stryker S3 & the status of the Falcon chip anti-reprocessing technology?

Thanks,

Marius Fine
Sr. Reprocessing Marketing Manager

*Johnson & Johnson*     MEDICAL DEVICES COMPANIES

Johnson & Johnson Health Care Systems, Inc.
T: +1 763 488 3239
M:+1 952 826 9659
mfine2@its.jnj.com
http://www.jnj.com

Disclaimer: This electronic message may contain information that is Proprietary, Confidential, or legally privileged or protected. It is intended only for the use of the individual(s) and entity named in the message. If you are not an intended recipient of this message, please notify the sender immediately and delete the material from your computer. Do not deliver, distribute or copy this message and do not disclose its contents or take any action in reliance on the information it contains.

**From:** Galdonik, Jason [SMDUS]
**Sent:** Monday, December 03, 2018 9:32 AM
**To:** Fine, Marius [SMDUS] <mfine2@ITS.JNJ.com>
**Subject:** Soundstar

Hi Marius –
Question for you -  Is Stryker still reprocessing 8F and 10F Soundstar catheters?  Do you know if BWI ever modified the Falcon security chip feature that prevents S3 reprocessing?

I am getting questions from Heather Rodriquez and HTC on this.

Thanks
Jason

**Jason A. Galdonik**
Sr. Engineering Manager

**Johnson & Johnson**
Medical Devices Companies

Sterilmed, Inc
5010 Cheshire Parkway N, Ste. 2
Plymouth, MN 55446 - USA
T: +1 763 488 3218
jgaldoni@its.jnj.com

Disclaimer: This electronic message may contain information that is Proprietary, Confidential, or legally privileged or protected. It is intended only for the use of the individual(s) and entity named in the message. If you are not an intended recipient of this message, please notify the sender immediately and delete the material from your computer. Do not deliver, distribute or copy this message and do not disclose its contents or take any action in reliance on the information it contains.

| | |
|---|---|
| **From:** | Koenig, Joseph [BWIUS] </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=374E1A0355C747AC884D8FA91AA4A811-JKOENIG4> |
| **To:** | Fanger, Jonathan [BWIUS] |
| **Sent:** | 4/20/2020 8:35:06 PM |
| **Subject:** | Re: Certified Performance Dashboard through March, 2020 - and other topics! |
| **Attachments:** | image002.png; image004.png; image006.jpg; image008.png |

Haha!  For sure.

Joe Koenig
Product Director
US Commercial Marketing
M. (714) 878-1975
E.  jkoenig4@its.jnj.com


Biosense Webster, Inc.
Part of the Johnson & Johnson Family of Companies
33 Technology Drive
Irvine, CA 92618, USA
www.biosensewebster.com


On Apr 20, 2020, at 1:32 PM, Fanger, Jonathan [BWIUS] <JFanger@its.jnj.com> wrote:


Thanks Joe, I appreciate it.  This took off fast.  This quarantine has only created more work!

**From:** Koenig, Joseph [BWIUS] <JKOENIG4@ITS.JNJ.COM>
**Sent:** Monday, April 20, 2020 1:27 PM
**To:** Fanger, Jonathan [BWIUS] <JFanger@its.jnj.com>
**Subject:** RE: Certified Performance Dashboard through March, 2020 - and other topics!

Looks awesome!  Nice work, man!  6/4 should provide enough time to get something ready.  I'll be checking in with Kim and Tracy a week from today, will likely setup regular touchpoints thereafter to make sure content is ready.  Let me know if you need any other support with the curriculum.

**Joe Koenig**
Product Director
US Commercial Marketing
M. (714) 878-1975
E.  jkoenig4@its.jnj.com

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
33 Technology Drive
Irvine, CA 92618, USA
www.biosensewebster.com


<image002.png>


**From:** Fanger, Jonathan [BWIUS] <JFanger@its.jnj.com>
**Sent:** Monday, April 20, 2020 1:15 PM

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-221**

**To:** Koenig, Joseph [BWIUS] <JKOENIG4@ITS.JNJ.COM>
**Subject:** RE: Certified Performance Dashboard through March, 2020 - and other topics!

Hi Joe,

Yes, I'm aligned. We have to put together 8 weeks of training curriculum for UCASs now that we aren't having the June training. One of the days is best practice sharing. There will be 2-3 topics. The UCASs are asking about LAAO specifically, so we thought to include it. I reviewed the overall plan with Fairy and Sarita last week. Today I shared it with Michael and the ADs. It was approved. We will be moving very fast and want to get session leaders locked in for each weekly call. Attached is a first draft of the schedule. I'll be setting up some meetings to push this forward once it's finalized.

Thanks,
Jon

**From:** Koenig, Joseph [BWIUS] <JKOENIG4@ITS.JNJ.COM>
**Sent:** Monday, April 20, 2020 10:06 AM
**To:** Fanger, Jonathan [BWIUS] <JFanger@its.jnj.com>
**Subject:** FW: Certified Performance Dashboard through March, 2020 - and other topics!

I have a call with Kim and Tracy today regarding status of our LAA training. Just double checking that you're aligned to a UCAS specific internal LAAO training call/meeting?

**Joe Koenig**
Product Director
US Commercial Marketing
M. (714) 878-1975
E. jkoenig4@its.jnj.com

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
33 Technology Drive
Irvine, CA 92618, USA
www.biosensewebster.com

<image004.png>

**From:** Bradshaw, Gillian [BWIUS] <gbradsh2@ITS.JNJ.com>
**Sent:** Friday, April 10, 2020 2:51 PM
**To:** Koenig, Joseph [BWIUS] <JKOENIG4@ITS.JNJ.COM>
**Subject:** RE: Certified Performance Dashboard through March, 2020 - and other topics!

Hi Joe,
WOW on the return rate, the highest ever, I think – maybe the EP CASs had them lined up in their garages and found the time due to COVID vs. case coverage?!

Thanks for letting me know you couldn't get on the UCAS call yesterday and I hope whoever had the dental visit is fine?! We had 50 participants on the call – the most ever, again thanks to COVID!

Do you happen to know which of our accounts buy Stryker or Innovative Health AcuNavs? The question came up with regard to providing a target list of accounts that purchase AcuNav, to switch out legacy systems before Philips arrives in our space – we want to be sure they are targeting those systems too, and I know some accounts only buy competitive RPO ULS catheters.

Also, FYI, during a discussion with Siemens about branding the new AcuNav Crystal catheter, they stated that we cannot create a logo using the product name (like we do with SOUNDSTAR and our other products, i.e. the orange

CAPS).  This will be updated in our guidelines but I'm giving you a heads up for future literature any of us develop – hopefully this is something we can negotiate with them as it will be difficult to promote it otherwise.

Hmmmm, I've just seen how they do it for AcuNav Volume … in orange as well (but I know that's a color they use)!  They don't have anything for 2D AcuNav (and I'm pretty sure it's only us that sell it) (but it would be good if we could even present it this way for the 2D one that we sell):

<image006.jpg>

Finally, we were thinking of having a UCAS call for LAA, with Tracy going through her presentation – I learned from Kim that it's not copy approved and that she is working with Dr. Gidney to gather more images (I think you are involved in this too?).  However, I imagine that could take a while – what do you think about us trying to get her current version copy approved, at least to present to the UCAS team, then updating it later for broader use?

Thanks,
Gillian

**From:** Koenig, Joseph [BWIUS] <JKOENIG4@ITS.JNJ.COM>
**Sent:** Friday, April 10, 2020 2:19 PM
**To:** Haydel, David [BWIUS] <DHaydel@its.jnj.com>; Rathod, Sharad [BWIUS] <SRathod@its.jnj.com>; Gonzalez, Deidre [BWIUS] <dgonza55@its.jnj.com>; Lech, Tom [BWIUS] <TLech@its.jnj.com>; Patel, Amit [BWIUS] <APatel7@its.jnj.com>; Lubinsky, Susan [BWIUS] <SLubinsk@its.jnj.com>; DL-BWIUS Regional Business Directors <DL-ASPUS-BWIUS-Regional-Business-Directors@ITS.JNJ.COM>
**Cc:** Bodner, Michael [BWIUS] <mbodner@ITS.JNJ.COM>; Zare, Fairy [BWIUS] <fzare@ITS.JNJ.COM>; Martin, Noah [BWIUS] <NMarti12@its.jnj.com>; Geer, Dawn [BWIUS] <DGeer1@its.jnj.com>; Zambrano, Juan [BWIUS] <JZambra2@its.jnj.com>; Quipones, Janet [BWIUS] <jquipone@ITS.JNJ.COM>; Davis, Jordan [BWIUS] <jdavi124@ITS.JNJ.COM>; Balabaeva, Marina [BWIUS] <MBalabae@its.jnj.com>; Dela Cruz Jr, Romeo [BWIUS] <RDelac10@ITS.JNJ.COM>; Berkowick, Ben [BWIUS] <BBerkowi@ITS.JNJ.COM>; Huang, Shan [BWIUS] <yhuang89@ITS.JNJ.COM>; Miller, Jeanne [BWIUS] <JMiller7@ITS.JNJ.COM>; Den, Dan [BWIUS] <DDen@its.jnj.com>; Hashimoto, Lance [BWIUS] <lhashimo@ITS.JNJ.COM>; Vargas, Ana [BWIUS] <Avarga22@ITS.JNJ.COM>; Espinoza, Alexander [MNTUS] <aespin26@ITS.JNJ.COM>; Slechta, Timothy [BWIUS] <tslechta@ITS.JNJ.COM>; Williams, Ray [ETHUS] <RWillia@its.jnj.com>; Bradshaw, Gillian [BWIUS] <gbradsh2@ITS.JNJ.COM>; Zambrano, Juan [BWIUS] <JZambra2@its.jnj.com>; Trejo, Daniel [BWIUS] <DTrejo8@its.jnj.com>; Balabaeva, Marina [BWIUS] <MBalabae@its.jnj.com>; Sobotka, Christopher [JJCUS] <csobot1@ITS.JNJ.com>; Calvert, Christopher [BWIUS Non-J&J] <CCalver1@its.jnj.com>; Miller, Jeanne [BWIUS] <JMiller7@ITS.JNJ.com>; Guadeloupe, Judy [HCS] <JGuadelo@its.jnj.com>; Monico, Sarita [BWIUS] <SMonico@its.jnj.com>; Koenig, Joseph [BWIUS] <JKOENIG4@ITS.JNJ.COM>
**Subject:** Certified Performance Dashboard through March, 2020

AVPs and RBDs,

Please find attached Certified Performance Dashboard for **March, 2020**.

### HIGHLIGHTS
- **91%** of ULS catheters were returned in **March** by Certified Performance customers.  Rolling 6 months is at **71%** which is short of our **80%** goal**,** so it is important to stay on top of collections/regular returns and ensure the CASs keep the "Bag & Bin" training up with their EP lab staff (training materials are on Connect and OneBWI).
- March: **74%** AcuNav, **92%** SOUNDSTAR; Rolling 6 months: **64%** AcuNav, **71%** SOUNDSTAR
- **95 Customers have <u>fully transitioned</u> (BWI purchases shut off) to Quoting since January, 2019.**
- **3 Buy Back Program** agreements have been executed YTD, **7** are pending.

### CHALLENGES/OPPORTUNITIES
1. **Please stay focused on collections.  If we control supply, we can greatly minimize**

competitive activity.  Let's shoot to keep the number north of 70%!

2.   Non-compliance - Please monitor/manage the ratio, **37 accounts** did not meet the minimum purchase requirement of (at least) 1 new: 2 reprocessed ULS catheters in January, it other words they are buying too much RPO– **THESE ACCOUNTS MUST BE ADDRESSED TO PREVENT BO's/manage our overall supply of ULS – transitioning these accounts to quoting also resolves this issue.**

3.   **Quoting Transition: Please transition your remaining accounts who are still purchasing RPO direct from BWI to Sterilmed quoting NOW, connect with you Sustainability Specialist for support.  The transition to quoting is NOT optional.**

## ACTIONS

1. **Drive collections**, ensuring the CAS/ EP staff "Bag & Bin" their catheters (training materials on Connect and OneBWI).
2. **Drive transition to quoting ASAP.**
3. Ensure remaining ratio customers purchase at least one new for every two reprocessed ultrasound catheters.
4. Address any discrepancies in the returns data with Sterilmed Customer Service (sterilmedcs@its.jnj.com; 1-877-541-0078). Note: Shipments made after the 20th of the month typically go on the following month's Dashboard.
5. **Promote RPO and Buy Back Programs! In the past 6 months, over 25,000 ULS catheters have NOT been returned – we need these in our pipeline and not someone else's!**

**Joe Koenig**
Product Director
US Commercial Marketing
M. (714) 878-1975
E. jkoenig4@its.jnj.com

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
33 Technology Drive
Irvine, CA 92618, USA
www.biosensewebster.com

| **From:** | Lindholm, Charles [BWIUS] </O=JNJ/OU=EXTERNAL (FYDIBOHF25SPDLT)/CN=RECIPIENTS/CN=8D8E4C215E2B4089950D25E417E74C03> |
|---|---|
| **To:** | Zare, Fairy [BWIUS]; Bradshaw, Gillian [BWIUS] |
| **Sent:** | 8/17/2017 1:59:51 PM |
| **Subject:** | FW: US COMM NEWSLETTER ǁ FREEDOM ǁ JULY 17, 2017 |

All … any way to get the Fixed deals and cash packages reworked to include the CART?

On line item simplicity.  One line item thinking.

**From:** BWI US COMMERCIAL
**Sent:** Monday, July 17, 2017 4:01 PM
**Subject:** US COMM NEWSLETTER ǁ FREEDOM ǁ JULY 17, 2017










## NEW FREEDOM ANIMATION

This summer, many of us seek protection from the sun's radiation with sunglasses, sunscreen and other methods of reducing exposure to UV rays. Let's continue to reduce another significant source of radiation exposure by helping our EPs to decrease their reliance on fluoroscopy. Fluoroscopy reduction, in addition to mitigating radiation exposure, also has the added benefit of diminishing the orthopedic burden of wearing lead.



**What are YOU doing this summer to drive the benefits of the CARTO®3 system for fluoroscopy reduction in the EP labs?** We are excited to introduce a short new animation to you about the importance of reducing radiation exposure and the associated

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-222**

orthopedic burden of lead. Please share this with your customers and continue to drive FREEDOM and optimized CARTO®3 workflows with your physicians.

This is on Connect - Media Library - Optimized Carto Experience Page Materials - FREEDOM_MASTER_v12.mp4. Link to animation

♡ LIKE ▣

## CERTIFIED PERFORMANCE UPDATE - HPG ON BOARD



As you probably know, **292 HPG hospitals** can now participate in the **Certified Performance program!** Here's how to get them started:

- **Former Sound Choice** (106 hospitals): Continue with collections; can start ordering reprocessed LASSO® and WEBSTER® CS (and 8F SOUNDSTAR® when it's available in late August). If inventory levels are low they will be prioritized according to program compliance (80% returns, purchase at least 1 new to 2 reprocessed ULS/CS [1:1 for Lasso]).

- **New to Certified Performance**: TM emails Customer Support letting them know an HPG hospital is becoming active (provide hospital name and Master Ship To Number). They will notify Sterilmed who will determine the collector/shipper (Stericycle or CAS); if CAS, TM/CAS submits the Certified Performance Collections Setup Form to Sterilmed (as with all Certified Performance Accounts). They can start ordering reprocessed LASSO® and WEBSTER® CS (and 8F SOUNDSTAR® when available); if

HIGHLY CONFIDENTIAL    **JX-222, Page 2 of 5**    BWI-INN00073720

inventory levels are low, they will be prioritized as above, so please have them start returning catheters as soon as possible!



## CERTIFIED PERFORMANCE COLLECTIONS - JUNE DASHBOARD



Collections are up! **78% for the month of June and 6 months rolling**, thanks to tremendous teamwork!

Congrats to the CASs who "Bagged, Binned, and Shipped" the most catheters during the 2Q payment period (March - May):

- **Ross Hoogenstyn** (TM) [RBD Joel Criner] **417**
- **Josh Vick** [TM Angela Urso, RBD Marlene Washington] **299**
- **Natalie Scoville** [TM Jason Motes, RBD Kevin Wells] **279**
- **Benjamin Tweddale** [TM Jonathan Nussbaum, RBD Scott MacIntosh] **278**
- **Hemming Atterbom** [TMs Dan Hackley/Rick Williams, RBD Krista Walker] **221**

That's almost **1500 catheters** between the 5 of them! Let's get all our **ULS, LASSO® and WEBSTER® CS** catheters back so someone else doesn't grab them!

Here is the **June Dashboard** (representing Jan - June). Please use this to monitor your customers' compliance with the Certified Performance program (return at least 80%, buy at least 1 new for every 2 reprocessed ULS/CS [1:1 for Lasso]), so they can be prioritized if our inventory levels run low. Also, please monitor your returns, addressing any discrepancies with **Sterilmed Customer Service** (sterilmedcs@its.jnj.com;

1-888-541-0078).

Here is the link to the Dashboard.

 ♡ LIKE

## ULTRASOUND SYSTEM UPDATE - VIVID iq



We are getting very close to the Distribution Agreement being signed for the Vivid iq. In the meantime you can **provide quotes** and **add customers to the list for a demo**.

Once these are available, a **patch must be installed on the customer's CARTO® 3** which must meet these minimum requirements:

- v4.3.5
- CARTOSOUND®
- Solios frame grabber

The patch must stay with the CARTO® 3 and so more are being expedited from HTC. Please contact Gillian Bradshaw to be added to the list for one.

This patch only works with v4.3.5 so if your account plans to upgrade to v6, you may want to delay installing a Vivid iq, as a different patch is required and these won't be available for another two months.

There is a lot of interest in this new system and it has received high accolades from our Ultrasound CAS team. The image is excellent - and only with CARTOSOUND® can we bring FREEDOM to EP labs by helping lower their use of fluoroscopy.

♡ LIKE

## ULTRASOUND COMMERCIAL AND TECHNICAL TRAINING A GREAT SUCCESS!

On June 22-23, the Ultrasound CAS team participated in our first Commercial and Technical training with the objective of expanding their role in helping to protect and grow our business in the fastest growing segment of the EP market!

The training incorporated workshops on Integrity Selling skills (AIDINC) and ultrasound systems (including the Vivid iq), an overview of the Ultrasound Academy where the EP CASs will become proficient in ultrasound, so the Ultrasound CASs can focus on upgrades, competitive conversions, and expanded ACUNAV™ usage in the interventional lab, and an overview of our extensive CEE course offering. The highlight of the training was Dr. Tom Forbes' interactive session on ICE in the interventional lab.

Watch this space for success stories, incorporating the AIDINC process ...



**This Document has been produced in Native Format**

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-223**

# CPC Proposal:

# 2018 Collections Rebate Program in Single Use Accounts

# Background:
# 2017 Collections Rebate in Single Use Accounts

- **Program Objective:** Maximize raw materials/ supply availability; competitive strategy

- Current customer pay-out per catheter: **ULS:** $75;   **LASSO:** $25;   **CS:** $15;   **PENTARAY:** $15

- Current CAS pay-out: $15/ catheter

- 16 accounts enrolled

- Rebate is processed within 90 days from the each of the four measurement periods:
  - Quarterly measurement periods: March 31, June 30, Sept 31, Dec 31

- Annualized collections and customer pay-out:

| Catheter | # Collected Q1-Q3 '17 | Customer Pay-out Q1-Q3 '17 | Annualized Collections '17 | Annualized Customer Pay-out '17 |
|---|---|---|---|---|
| ACUNAV | 476 | $35,700 | 635 | $47,600 |
| SOUNDSTAR | 895 | $67,125 | 1193 | $89,500 |
| LASSO | 359 | $8,975 | 479 | $11,967 |
| CS | 489 | $7,335 | 652 | $9,780 |
| PENTARAY | 350 | $5,250 | 467 | $7,000 |
| TOTAL | 2569 | $124,385 | 3425 | $165,847 |

JX-231, Page 3 of 7

# Background (contd.)

**Challenges with 2017 Collections Rebate Program:**

- Limited success (low account enrollment) in program due to low account incentive to return

- Competitors (Stryker) collecting in larger accounts and paying over $100 per ULS catheter collected

# The Request: 2018 Collections in Single Use Accounts

- **Program Objective:** Maximize ULS collections in high volume accounts that are currently single use or returning to competitive reprocessors

- **Changes from 2017 Collections Rebate Program for the following:**

  - Pay $100 per ULS catheter returned in single use accounts.

  - Allow one full year (12 calendar months) for contract duration.

  - Pay customers for ULS catheter returns only; discontinue payments for LASSO, CS and PENTARAY

  - Pay CASs for ULS catheter returns only ($15/ catheter); discontinue payments for LASSO, CS and PENTARAY

- Projected # of new accounts that would participate: 10 new accounts

- Maintain four collections periods; quarterly payment for catheters returned

- 12-month contract duration from date of enrollment. Accounts can begin enrollment through Dec 31, 2018.

- Change program name to "ULS Catheter Buyback Program"

**Estimated Max Pay-out**

| Catheter | Projected 2018 Collections: 26 accounts | Projected 2018 Customer Pay-out: 26 accounts |
|---|---|---|
| ACUNAV | 1031 | $103,133 |
| SOUNDSTAR | 1939 | $193,917 |
| TOTAL | 2971 | **$297,050** |

# Catheter Buyback Program:
# Collections in Single Use Accounts

| Duration | Jan 1 – Dec 31, 2018<br>Contract will be active for 12 months from date of execution |
|---|---|
| **Products Included** | • SOUNDSTAR® eco Catheter<br>• ACUNAV® Siemens |
| **Customer Pay-out** | Pay-out directly to the customer; NOT JJHCS Credit |
| **Products Included & Payment Amount** | $100 / ULS |
| **Field Incentive** | • TM: $500 at account sign-up/ contract execution<br>• CAS collecting at account: $15/ catheter collected*<br>• $1000 for TM at the end of the 12-month period, provided the customer has returned at least 100 catheters |

*CAS will be paid $15 per unit to collect in any accounts where Stericycle doesn't pick up.

**JX-223, Page 6 of 7**

# THANK YOU!

| | |
|---|---|
| **From:** | Ramos, Conrado [BWIUS] </O=JNJ/OU=CRDUSBA/CN=RECIPIENTS/CN=CRAMOS12> |
| **To:** | Portia Tranguch; Robert Pezzin - Provider PPI LLC |
| **CC:** | Rose Lentz; Mary Carmella - Provider PPI LLC; Julia Liang - Provider PPI LLC; Darlene Klacik; Paul Gallagher - Provider PPI LLC |
| **BCC:** | Ramos, Conrado [BWIUS] |
| **Sent:** | 3/17/2016 1:59:42 PM |
| **Subject:** | RE: Biosense Webster-Clinical Support Policy review with AGH |

Bob and Portia,

I can assure you that this is a company policy and not a sales tactic to promote BWI reprocessing program. The BWI reprocessing program known as the Sound Choice Program has been available to our customers for almost three years now. The program has been very well received by the majority of our customers. Hence, there is absolutely no need for us to use "sales tactics" to promote it. We recently discovered that our clinical support practices were inconsistent regarding the building of Carto maps with non-BWI navigational catheters and the support of ultrasound cases with non-BWI ultrasound catheters. This discovery has led to a retraining effort of our field team and an awareness campaign initiative with our customers where the inconsistencies have been discovered.

The basis for our policy regarding clinical support is rooted in three main BWI requirements. BWI personnel must only provide clinical and technical support for products that they have been properly trained to support. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. BWI personnel must promote and support BWI products in a manner that is consistent with our FDA approved Instructions-For-Use.

Healthcare provider facilities such as AGH have always required suppliers to provide support to their own products. Through BWI's investigation, we have discovered that there is a common misconception in the market place that is driving this inconsistency in clinical support practices. That misconception is the belief that because the Stryker reprocessed version of our products still have our BWI markings and logo on them, they are still considered by some of our customers to be BWI products. The FDA has clearly determined that once the OEM product has been reprocessed by a reprocessing company that reprocessing company is now the legal manufacturer of that product. BWI has no information regarding the reprocessing processes that our catheters have been subjected to by Stryker. As a result, our clinical personnel do not have any knowledge of the performance specifications of the Stryker mapping and ultrasound catheters.

I would very much welcome the opportunity to discuss the issue further via conference if you like.

**Conrad Ramos**
Corporate Account Director
M. **404-808-1726**
F.  **877-817-8086**
E.  **cramos12@its.jnj.com**

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
3333 S. Diamond Canyon Road
Diamond Bar, CA 91765, USA
www.biosensewebster.com
T. 1-909-839-8500
T. 1-800-729-9010
F. 1-909-595-0187



Innovative v. Biosense

No. 8:19-cv-01984-JVS

**JX-225**

Confidentiality Notice: This document is J&J Proprietary. You may forward this document within J&J on a need to know basis. You may not forward this onto the Internet without the author's permission. This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please reply to the sender, so that J&J can arrange for proper delivery, and then please delete the message from your inbox.

**From:** Portia Tranguch [mailto:PERVIN@wpahs.org]
**Sent:** Wednesday, March 16, 2016 8:09 PM
**To:** Robert Pezzin - Provider PPI LLC
**Cc:** Ramos, Conrado [BWIUS]; Rose Lentz; Mary Carmella - Provider PPI LLC; Julia Liang - Provider PPI LLC; Darlene Klacik; Paul Gallagher - Provider PPI LLC
**Subject:** Re: Biosense Webster-Clinical Support Policy review with AGH

Paul spoke with dr thosani today. Others are also aware. It certainly does impact us. This is a threat to us on many levels. We have thousands of dollars tied up in catheters going through the reprocessing with Stryker. If they pull the clinical support our carto system cannot be used since the biosense reps do the mapping with the carto system and our staff do not have this expertise. This company has not been upfront with us from the beginning. As this is just another example of the shady business practices that are normal for them. They have tried at least three different times to get us to go with their reprocessing company, which of course they own. We have always stood by the contract and commitment that we have had in place with Stryker. This is the latest attempt and they know we cannot do cases without their clinical staff. The clinical rep feeds the physicians with nonsense about the reprocessed catheters from Stryker being sub-par, which has been tested and proven not to be the case. I believe they have funded dr thosani to travel to speak about efficiency in ep labs and I am sure about their system and products. They constantly tell us one thing and then when agreements are signed they tell us we misunderstood and it ends up costing us much more. They are not a business partner and I do not trust them at all. I forwarded Rose an email that I received from Stryker where they have attempted this in other organizations and have been unsuccessful. I will send it to you. I suggested a conference call tomorrow to discuss. Let me know what you think.

Sent from my iPhone

On Mar 16, 2016, at 6:58 PM, Pezzin, Robert J <Robert.Pezzin@highmark.com> wrote:

Portia,

Are the M.D.s aware of the new Biosense Webster-Clinical Support Policy and does this impact AGH in any way?

Thank you,
Bob

Robert Pezzin **I Provider Supply Chain Partners I** Director, Supply Chain Operations
East Commons Professional Building I 4 Allegheny Center, 9th Floor I Pittsburgh, PA 15212
P: 412.330.4508 I robert.pezzin@highmark.com

**From:** Ramos, Conrado [BWIUS] [mailto:CRamos12@ITS.JNJ.COM]
**Sent:** Tuesday, March 15, 2016 5:30 PM
**To:** Lentz, Rose (WPAHS)
**Cc:** Tranguch, Portia RN (WPAHS); Klacik, Darlene (WPAHS); Pezzin, Robert J; Sfanos, Julie [BWIUS]; Allen, David J. [BWIUS]
**Subject:** [EXTERNAL] FW: Biosense Webster-Clinical Support Policy review with AGH

Rose,

I wanted to follow-up on our meeting and my message below with a reminder of next week's change in our clinical support practices at AGH. As we discussed, starting on 3/21/2016 Biosense Webster, Inc. (BWI) personnel will not be authorized to provide clinical or technical support at AGH for any products that they have not been trained to support and which are not consistent with the Carto 3 Mapping System's instructions-for-use. Specifically, BWI personnel will not be able to create Carto 3 maps with non-BWI magnetic sensor enabled navigational catheters nor will BWI personnel interpret images, set-up, troubleshoot, or breakdown any non-BWI ultrasound catheters. If

AGH still requires supplier support for these non-BWI products, it will be imperative that AGH arrange for this support with the supplier of these products directly before a procedure is scheduled. If AGH still requires BWI personnel support for these procedures, then AGH must ensure that the required BWI products have been ordered and will be available for BWI personnel to utilize before BWI can confirm that Clinical Account Specialist (CAS) resources will be present. As of yesterday, our records indicate that the required BWI navigational and ultrasound catheters have not been ordered to support next week's currently scheduled EP procedures. Please let Dave and Julie know if you have arranged for clinical support from Stryker for these procedures. If not, please let them know when you have ordered the required BWI products so they can confirm the availability of BWI CAS resources to support next week's procedures.

Thanks,

**Conrad Ramos**
Corporate Account Director
M. 404-808-1726
F. 877-817-8086
E. **cramos12@its.jnj.com**

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
3333 S. Diamond Canyon Road
Diamond Bar, CA 91765, USA
www.biosensewebster.com
T. 1-909-839-8500
T. 1-800-729-9010
F. 1-909-595-0187

<image001.png>

**Confidentiality Notice:** This document is J&J Proprietary. You may forward this document within J&J on a need to know basis. You may not forward this onto the Internet without the author's permission. This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please reply to the sender, so that J&J can arrange for proper delivery, and then please delete the message from your inbox.

---

**From:** Ramos, Conrado [BWIUS]
**Sent:** Friday, February 26, 2016 8:31 AM
**To:** Rose Lentz (rlentz5@wpahs.org)
**Cc:** Allen, David J. [BWIUS]; Sfanos, Julie [BWIUS]
**Subject:** Biosense Webster-Clinical Support Policy review with AGH

Rose,

Thanks for taking the time to meet with Dave, Julie and me on Wednesday to review the Biosense Webster, Inc. (BWI) policy statement on Clinical Account Specialist (CAS) Case Support of Reprocessed SUD Catheters. As I mentioned in our meeting, our goal in having these discussions is to address some common misconceptions regarding our clinical support capabilities. By doing so, we want all stakeholders to have a clearer and more accurate understanding of the rules by which BWI has to operate under. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ We also need to ensure that our support of our products is consistent with our Instructions-For-Use as approved by the FDA.

As you requested, I have attached the page from the Carto 3 Instructions-For-Use document that lists the magnetic sensor enabled navigational catheters that BWI personnel are able to support in the building of Carto maps. I have also attached a PDF copy of the BWI Clinical Support Policy letter for your reference. Please let me know if you need anything else to disseminate this information among your staff.

As a reminder, BWI will no longer schedule Clinical Account Specialists to support cases where they will be asked to either build Carto maps with non-BWI magnetic sensor enabled catheters or interpret ultrasound images from

Again, thanks for your time in allowing us to review this important matter with you.

Respectfully,

**Conrad Ramos**
Corporate Account Director
M. 404-808-1726
F. 877-817-8086
E. **cramos12@its.jnj.com**

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
3333 S. Diamond Canyon Road
Diamond Bar, CA 91765, USA
www.biosensewebster.com
T. 1-909-839-8500
T. 1-800-729-9010
F. 1-909-595-0187

<image002.png>

**Confidentiality Notice:** This document is J&J Proprietary. You may forward this document within J&J on a need to know basis. You may not forward this onto the Internet without the author's permission. This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please reply to the sender, so that J&J can arrange for proper delivery, and then please delete the message from your inbox.

This e-mail and any attachments to it are confidential and are intended solely for use of the individual or entity to whom they are addressed. If you have received this e-mail in error, please notify the sender immediately and then delete it. If you are not the intended recipient, you must not keep, use, disclose, copy or distribute this e-mail without the author's prior permission. The views expressed in this e-mail message do not necessarily represent the views of Highmark, its diversified business, or affiliates.

Confidentiality Notice: This e-mail message and any attachments are intended solely for the individual or individuals designated above. It may contain confidential or proprietary information and may be subject to confidentiality protections and may be legally privileged. If you are not the intended recipient, you are not authorized to read, copy, retain or distribute this message. If you receive this message in error, please immediately notify the sender by reply e-mail and delete this message. The sender does not waive any privilege or right of privacy or confidentiality that may attach to this communication. You are not authorized to read, copy, retain, or distribute this message, or disclose its contents to any other person. Thank you.

Message

| | |
|---|---|
| **From:** | Reyes, Kara [Kara_Reyes@s2s-global.com] |
| **Sent:** | 3/3/2020 12:14:36 PM |
| **To:** | Dave Distel [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=baf8a914e9fd46dba546c328f4b357cd-ddistel] |
| **Subject:** | Fwd: EP Reprocessing 2019 Savings Review - follow up |

FYI. Let's discuss before I respond.
Kara Reyes
Director, PremierPro Reprocessing Services
S2S Global
281.838.2503 (Mobile)
kara.reyes@s2s-global.com

---

**From:** Portia Tranguch <Portia.TRANGUCH@ahn.org>
**Sent:** Tuesday, March 3, 2020 11:42:08 AM
**To:** Reyes, Kara <Kara_Reyes@s2s-global.com>
**Cc:** Jennifer Thomas <Jennifer.Thomas@AHN.ORG>
**Subject:** RE: EP Reprocessing 2019 Savings Review - follow up

****This email did not originate from the Premier, Inc. network. Use caution when opening attachments or clicking on URLs.*****

.
Kara:  We are running into the anticipated push back from Biosense about the Pentaray catheters.  Can you send me the information you from other hospitals that have faced this same issue?  Thanks.

Portia Tranguch, BSN, RN
Director Cardiac Services
Allegheny General Hospital
Tel  412-359-4888
Cell 412-651-6972
FAX 412-359-4779
portia.tranguch@ahn.org

---

**From:** Reyes, Kara [mailto:Kara_Reyes@s2s-global.com]
**Sent:** Thursday, February 20, 2020 6:08 PM
**To:** Portia Tranguch
**Cc:** Rob Pavlik; Dave Distel
**Subject:** [EXTERNAL] EP Reprocessing 2019 Savings Review - follow up

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-228**

Hi Portia,

Nice seeing you this week and thank you for meeting with Rob and I.  I'm glad Don was able to make the meeting to see all of the great effort, Jennifer and staff have put forth to deliver close to **$385,000** in savings!  What a great accomplishment it is with even more to be had to "go for the GOLD".   It was a pleasure meeting the staff as well and I am sure they enjoyed being recognized at the luncheon. &#128522;

Attached are the savings trends we reviewed.  During our meeting, we talked about the additional savings potential with the PentaRay as the physicians are using a very high volume of them.  Below is a savings potential based on what Rob collected last year and continues to collect. (I also added the DecaNav which is another item collected and not being

purchased back).  The "Potential Savings" column factors in reject and product rates.  There is close to **$265,000** additional savings by purchasing these 2 item numbers.

| Reprocessable EP Devices | | | | Collected | Device Cost | | Savings |
| Facility | Device | Family | Manufacturer | Total | OEM (Est) | S2S Ascend | Potential |
|---|---|---|---|---|---|---|---|
| Allegheny General Hosp | D128208 | PentaRay | Biosense Webster | 410 | $1,900 | $1,150 | $249,000 |
| Allegheny General Hosp | R7F282CT | Webster DecaNav | Biosense Webster | 34 | $1,050 | $475 | $15,525 |

I have copied Dave Distel, who was unable to attend our meeting on Tues, but who you have met at previous meetings.  I have asked Dave to provide an update to you about his experience with other hospitals pushing back on Biosense Webster's tactics that "restrict" the reprocessing of these devices.

Portia, if AGH purchases from S2S even half of what is listed above, along with the devices being purchased today, the savings will be over **$500,000**!  As always, thank you for your continued support of the program.

Best,
Kara


**Kara Reyes**
Director, EP  Reprocessing Services
281.838.2503 (Mobile)
kara.reyes@s2s-global.com



Premier, Inc. (NASDAQ: PINC)
www.s2s-global.com

Confidentiality Notice: This e-mail message and any attachments are intended solely for the individual or individuals designated above. It may contain confidential or proprietary information and may be subject to confidentiality protections and may be legally privileged. If you are not the intended recipient, you are not authorized to read, copy, retain or distribute this message. If you receive this message in error, please immediately notify the sender by reply e-mail and delete this message. The sender does not waive any privilege or right of privacy or confidentiality that may attach to this communication. You are not authorized to read, copy, retain, or distribute this message, or disclose its contents to any other person. Thank you.

# This Document has been produced in Native Format

Innovative v. Biosense
No. 8:19-cv-01984-JVS
JX-298



**BWI 2019 Kickoff Meeting**

HIGHLY CONFIDENTIAL

BWI-INN00044794.001



# 2018 YEAR IN REVIEW
Michael Bodner



## Strong 2018 Quota Achievement



CONFIDENTIAL.FOR INTERNAL USE ONLY.    © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting



**2018 Year in Review**















CONFIDENTIAL FOR INTERNAL USE ONLY.    © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting.

# OVER $0.5 BILLION Growth in 4 Years



**SALES GROWTH TREND** 2014-2018

$162MM
incremental
revenue in 2018!

CONFIDENTIAL FOR INTERNAL USE ONLY.    © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting

## 2018 Key Successes





## Unstoppable!

| | Q1 GROWTH | Q2 GROWTH | Q3 GROWTH | Q4 GROWTH | FY GROWTH |
|---|---|---|---|---|---|
| Biosense Webster | 14% | 18% | 21% | 13% | 16% |
| Abbott | 12% | 10% | 13% | 12% | 12% |
| Medtronic | 14% | 17% | 18% | TBD | TBD |
| Boston Scientific | 10% | 14% | 9% | 8% | 11% |

CONFIDENTIAL FOR INTERNAL USE ONLY.

HIGHLY CONFIDENTIAL

BWI-INN00044794.009

## 2018 Growth



- $6MM: Contract Compliance

- $38MM: OCE/ "Own the Case"

- $118MM: Case Coverage, competitive conversions

- 16% top line sales growth, 19% growth on bottom line

CONFIDENTIAL.FOR INTERNAL USE ONLY.    © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting.

HIGHLY CONFIDENTIAL                    BWI-INN00044794.010

# Organizational Enhancements



**Career Levelling →**
Grade Pathway

## 85%

**New 85% RBD**
variable compensation
threshold



## CAS
## LTI

**Eligibility**
12 → 170



New roles to upskill organization, enhance career progression,
improve span of control
**RTS • NTM • KAM • Executive TM • ATM**

Expanding resources to drive growth
**104+ CAS, 1 UCAS/Region, 1 MD/Area**

CONFIDENTIAL FOR INTERNAL USE ONLY.     © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting.

## KEY ACCOUNTS ENHANCEMENTS



- Fellow's Bounty: $3,000
- Career acceleration
- Separate ranking
- Haifa Award Trip
- KAMs

CONFIDENTIAL:FOR INTERNAL USE ONLY.

# REWARD AND RECOGNITION



- Credo Award
- Quarterly Spotlight
- Winning Spirit Award
- Case Buster
- OCE Contest
- Competitive Conversion Contest
- Trade Out Bounty

CONFIDENTIAL FOR INTERNAL USE ONLY.    © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting.

# PEOPLE



## 189 New Hires



## 218 Promotions

| New Leaders | |
| --- | --- |
| Kent MacKay– **KAM to RBD** | Callie Parker– **AD to CSS** |
| Jason Motes – **MDM to RBD** | Stephenie Orsini– **DPY to GES** |
| Wade Williamson– **RBD to ACL** | Deidre Gonzalez **– CEM to West AD** |
| Navarro Jordan – **TM to GES** | Amit Patel **– RBD to NE AD** |
| John Shields **– ETM to RBD** | |

©Biosense Webster, Inc. 2019 | Q1 Town Hall

172, 20, 69, 261

HIGHLY CONFIDENTIAL

BWI-INN00044794.014

## 2018 Our Credo Survey Results



**93%**
PARTICIPATION RATE

= compared to 2016



**88%**
OVERALL SCORE

Up by 2% points compared to 2016



**74%**
IMPROVEMENT IN ALL CATEGORIES

Improvement in 25 out of 34 categories from 2016

*Top Areas:*

We are delivering in are our **commitment to patients, doctors and nurses,** as well as our stockholders. Another area clearly called out as a strength was in **launching new products.**

*Improvement Areas:*

Providing **compensation that is fair** and our commitment to **helping you fulfill your family responsibilities**.

*Action Planning:*

- We are partnering with Total Rewards and Sales Compensation for external benchmarking insights.

- We will also focus on helping you fulfill your family responsibilities, which will ultimately drive further employee engagement.



CONFIDENTIAL.FOR INTERNAL USE ONLY.    © Biosense Webster, Inc. 2019 | Q1 Town Hall

HIGHLY CONFIDENTIAL    BWI-INN00044794.015

JX-298, Page 16 of 44

## Our Credo



We raised **$60,000** providing **252 smiles** to children in the world's most marginalized areas.

CONFIDENTIAL.FOR INTERNAL USE ONLY.





**175,000**
**Patients Treated**

CONFIDENTIAL FOR INTERNAL USE ONLY.     © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting.





**WE HAVE A VERY BRIGHT FUTURE…**

CONFIDENTIAL FOR INTERNAL USE ONLY.     © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting.

HIGHLY CONFIDENTIAL

BWI-INN00044794.019

## 2019 Goals

Continuing Momentum of Double Digit Growth and Share Gain



## 2019 Commercial Objectives



CONFIDENTIAL FOR INTERNAL USE ONLY.    © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting.



# Daily Requirements



**Average Daily Sales**

- 2018: +$1.1MM (Jan $4, Dec $5.10)
- 2019: **+$1.35MM** (Jan $4.65, Dec $6)

**$/Case**

- 2018: +$254 (Jan $6,096, Dec $6,350)
- 2019: **+$150** (Jan $6,350, Dec $6,500)

**Case per Day**

- 2018: +147 (Jan 656, Dec 803)
- 2019: **+191** (Jan 732, Dec 923)

| CAS | | Mindset | CAE | SURPOINT™ | VIZIGO™ |
|-----|-----|---------|-----|-----------|---------|
| **+220 2018/19** | **Upskilling** | **1 more Case** | **Conversions** | | |

Scheduling App

CONFIDENTIAL.FOR INTERNAL USE ONLY.

## Squeezing the Juice to Drive Growth

OCE Strategy Fueled Significant Growth for Past Two Years



|  | 2016 EXIT | 2018 EXIT | 2019 BP |
|---|---|---|---|
| **THERMOCOOL® SMARTTOUCH® SF** Catheter | 37% Penetration of Total TC Nav | 80% | 85% |
| **CARTO® PENTARAY®** Catheter | 51% Penetration vs Lasso Nav | 70% | 75% |
| **CARTO® SOUNDSTAR®** Catheter | 57% Penetration in Total AF proc. | 75% | 80% |
| OCE Mix | 15% | 55% | 65% |
| $/CASE | $5,851 | $6,350 | $6,500 |

CONFIDENTIAL.FOR INTERNAL USE ONLY.    © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting.

# Key Tactics



## ⬆ Cases/Day in C3 Loyal Accounts

- SURPOINT™ Module
- Lab Efficiency
- Case Scheduling App
- Fellows Programs
- GSAAF physician locator
- Market Development
- Facebook live
- ER EP Pathway



## ⬆ Share in Splitter/Competitive

- RCAE
- SURPOINT™ Module
- OCE w/ Low Fluoro
- V6 w/ HD Color
- V7 w/ Coherent
- SC2000 AI upgrade
- VIZIGO™ Sheath
- FamDx w/ DECANAV
- Competitive conversion contest
- Afterburners




## ⬆ $/Case +$150

- Drive OCE to 60% penetration in PAF (+10pts)
- Own the procedure: CS/Quad
- Expand OCE to VIZIGO™ Sheath

CONFIDENTIAL.FOR INTERNAL USE ONLY.    © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting.

## New Product Introductions – OCE 2.0!



**Mindshare = market share!**
- *Workflow efficiency*
- *Treat like a therapeutic launch e.g. STSF*



**Confidence to know where you are!**
- *Fluoro reduction tool*
- *Increased efficiency*
- *Competitive share gain*
- *Drive $/case*
- *Gain 10 case commitment*

CONFIDENTIAL.FOR INTERNAL USE ONLY.



CONFIDENTIAL.FOR INTERNAL USE ONLY.    © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting

**1 – Don't put your head in the sand**

**2 - Transition to quoting**
o   Industry standard in Reprocessing, including S3 customers.  Efficient for customers, they don't like buying RPO from two different sources.
o   Eliminates backorders – customer can buy everything off the quote.
o   Competitors have been using the 'ratio' model against us – saying we control what they buy;
o   The onus is on the customer – they have control over what they want to order off their quote

**3- Pull through the entire EP RPO portfolio**
o   Shift in mindset, don't just think about ULS, you now have a portfolio of 250+ SKUs to leverage and offer savings to your customers.  So as you transition your customers to quoting, don't stop at ULS, sell it all!

**4- Go after the competition**
o   We've had two different distribution models from different sources with different compliance metrics.  This all changes in 2019!  You now have all products under one roof with the simple to understand, industry standard distribution model (Quoting).  Leverage this with an attractive new RPO customer incentive (the RPO accelerator) and go after the big fish! And Maximize collections The RPO market is unique in the way that there is a

HIGHLY CONFIDENTIAL                                    BWI-INN00044794.027

finite amount of raw materials.  If we control AcuNav collections, we control the market.  In fact, it's not far fetched to believe that if we were able to collect back 75% of the OEM AcuNav we sell, we could drive Stryker out of the RPO EP business altogether.

## Market Acceleration:

Increase # Patients Treated with CARTO
Increase # Procedures/EP

| Develop Compelling Case for EP Program Expansion | Create Lab Efficiency TEC sites | Invest in Fellows & Referring HCP Education |
|---|---|---|
| Empower EPs with demographic, financial, and OCE procedural data to engage hospital admin to increase investment in EP program | Leverage physician consultants to improve peri-operative efficiency at OCE labs and increase cases/month | • Create robust fellows program<br>• Increase procedure volume via targeted grass roots education of referring HCPs (cardiologist, ER, etc.) |

CONFIDENTIAL. FOR INTERNAL USE ONLY.    © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting.

HIGHLY CONFIDENTIAL

BWI-INN00044794.029



## METRICS: WHAT YOU MEASURE GETS DONE

### Drive OCE
- **OCE penetration:** +10pp vs 18 exit (65%)
- **V6 penetration:** 75%
- **Vizigo:** $15MM
- **$/case:** +$150
- **Surpoint Penetration:** 500 installs, 30% exit PAF penetration

### Gain Competitive Share
- **Gain Revenue Share:** 0.5pts
- **Vizigo:** 35% exit share in CARTO **FAM/DX w/ Decanav:** $5MM
- **Competitive Mapping Trade-Outs:** 12
- **Competitive account growth:** 15%+, $15MM+
- **Total RPO growth of 20%. ULS RPO** growth of **20%**
- **90 C3** installs, **80 ULS** installs
- Hire 18 Afterburners

### Accelerate Procedure Growth
- **CEE:** 200+ physicians/fellows trained
- **Market Dev:** Procedure growth exceeds national average, 1 FB live event/month
- **ULS Pilot:** Hire 3 ULS I/C focused

### Enhance Sales Force Effectiveness
- **116+ CAS** expansion
- Cases/CAS/Mo **+1,** Cases/POD/mo >market (**8%+**)
- 1 **RTS/region**
- 1 **CAE/region** (hunter CAS)(pilot)
- 1 **ATM per Area**
- **Regrettable loss<5%**

CONFIDENTIAL FOR INTERNAL USE ONLY.    © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting.

HIGHLY CONFIDENTIAL

BWI-INN00044794.030

## 2019 Contest Pillar #1



| OCE Penetration Contest | SURPOINT Contest |
|---|---|
| • **STSF+PRN+SS in PAF:**<br>• **Exit Sept '19 +12pts vs Dec '18, maintain avg. in Q4**<br>  • If Dec '18 >=70% +6pts (11 pods)<br>    If Dec '18 >=80% +3pts (9 pods)<br>    If Dec '18 >=90% maintain (7 pods)<br><br>  • $1,000 / POD member | • **SURPOINT:** 40% penetration in AFIB Dec '19 Exit<br><br>  • $1,000 / POD member |
| **Eligible:**<br>**AD/NTM/RBD/RTS/TM/CAS/UCAS** | **Eligible:**<br>**AD/NTM/RBD/RTS/TM/CAS** |

CONFIDENTIAL:FOR INTERNAL USE ONLY.     © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting.

## 2019 Contest Pillar #2



### Competitive Conversion Contest

- **2 Accounts** (+$350K YoY & 15% growth each), **or Docs in KA** (+60 Cases YoY max 2 docs)

  - If 2019 Account - $5,000 per POD (Q4 run rate + 15%)

  - If new Account - $10,000 per POD

**Eligible:**
**RBD/TM/CAS**

### Competitive Hardware Bounty



| | TM | Lead CAS | UCAS |
|---|---|---|---|
| C3 - swapout | $2,000 | $1,000 | n/a |
| Bonus: Precision | $3,000 | $1,500 | n/a |
| Bonus: Rhythmia/CRYO | $4,000 | $2,000 | n/a |
| VividIQ/SC2000/P500 – purchase / upgrade | n/a | n/a | $500 |
| Bonus - VividIQ/SC2000/ P500 trade out for Zonare | n/a | n/a | $1,000 |

**Eligible:**
**TM/CAS/UCAS**

CONFIDENTIAL.FOR INTERNAL USE ONLY.     © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting.

## 2019 Organizational Enhancements

Expanding resources to drive growth

| Compensation Plan |
|---|

- No FAB for Sales: $10K moved to HSS
- Capital +2% TM (4%), +1% RBD (2%), +0.4% AD (0.8%), paid as earned
- CAS FAB: drive case volume vs PY faster than market
- KA CAS $10K vs $5K MBO, paid quarterly
- No UCAS FAB, $2K moved into ULS disposable pool

| Spotlight Trip |
|---|

- 2 per Area per quarter

**116+ CAS, 1 RTS/Region, Regional CAE, Promotions 2x per year**

CONFIDENTIAL.FOR INTERNAL USE ONLY.     © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting

HIGHLY CONFIDENTIAL

BWI-INN00044794.033

## Regional CAE

**Goal:** Gain competitive share, incremental $1MM/160 cases per year
**Objective:** Provide dedicated resources for competitive conversions
**Tactics:** Win cases from Splitters/Competitive: TM Tags, CAE Bags the target: *tagging and bagging*



CONFIDENTIAL:FOR INTERNAL USE ONLY.

# Mindset - Unicorn



**Unbeatable**



**Juggernaut**



**Fully Resourced**



**Partner of Choice**

CONFIDENTIAL.FOR INTERNAL USE ONLY.     © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting.

• **I** am personally committed to …

• I want **YOU** and each BWI employee to be personally committed to …

• **We** have resources to …



LEAD
&
WIN
*with*
INTEGRITY

CONFIDENTIAL-FOR INTERNAL USE ONLY.

Talking Points:

- We are market leaders and we want to be seen as leaders also in the way we conduct our business – which is, at the highest ethical standards. We cannot afford to lose trust of the patients, our customers and the general public by doing things that would undermine our Integrity.
- I am personally committed to – and I want each of YOU and each of your people to be personally committed – to Lead & Win with Integrity.
- Regulatory and compliance environment is very complex but we have resources to ensure that we do the right thing. Rest assured that every BWI program – be it sales, marketing or professional education-related – is thoroughly vetted by the relevant internal functions (HCC, Legal, Medical Affairs, Regulatory Affairs, etc.). And, we need to make sure that we execute all those programs within the approved parameters.
- As I said, the environment can be very challenging, and so, it is important that if you have any questions or concerns, you reach out to our HCCO or Legal counterparts for guidance. They are there to help you be successful and Win with Integrity!

HIGHLY CONFIDENTIAL

BWI-INN00044794.036

## Leadership Philosophies

*__Leadership__ is about making others better as a result of your presence and making sure that impact lasts in your absence.*

CONFIDENTIAL FOR INTERNAL USE ONLY.    © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting.

MICHAEL BODNER:

- Quick overview of agenda/purpose
- Why leadership is critical during times of change
- Why everyone in this room must lead their respective teams to success
- Today is the first day of your leadership path going forward

# 3 Requirements of Leadership



1. Do you care about me?
2. Can I trust you?
3. Are you committed to excellence?

**Lou Holtz**, football coach, University of Notre Dame

CONFIDENTIAL.FOR INTERNAL USE ONLY.    © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting

## Can I Trust You?



$$T = \frac{C + R + I}{S}$$

**T =** Trust

**C =** Credibility

**R =** Reliability

**I =** Intimacy

**S =** Self Orientation

CONFIDENTIAL.FOR INTERNAL USE ONLY.    © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting

JAMI MILLER
[This is from the AMA article about Lou Holtz, " 3 Requirements of Leadership" specifically about TRUST]

**Can I Trust You? (10-15 minutes)**
Once your direct reports are sure that you are committed to personal and professional excellence, they will need to determine whether or not they can trust you. This particular question is especially important, since to a large extent, their livelihood, job satisfaction and future depend on the answer, which obviously needs to be, "yes." What you're telling them is, "You can trust me to be:
• open when I can be
• honest and ethical all the time
• predictable when I can be and to admit my mistakes."

Nobody is perfect, and nobody gets it right every time. Your direct reports know you aren't perfect; they just don't tell you that they know. If you try to cover your mistakes, pretend they didn't happen or, worse yet, blame them on someone else, you can forget about building trust for a long, long time. **Winston Churchill** said it best: "Success is the ability to go from failure to failure without losing your enthusiasm." Churchill's name lives on because of his successes, but those who know history understand that he was not without his critics. You won't be either; it's just one of the realities of being in

HIGHLY CONFIDENTIAL                                              BWI-INN00044794.039

charge.

HIGHLY CONFIDENTIAL                                    BWI-INN00044794.040

# The Steps To Accountability



CONFIDENTIAL FOR INTERNAL USE ONLY.    © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting.



It doesn't make sense to hire smart people and then tell them what to do; we hire smart people so they can tell us what to do."

**- Steve Jobs**

**LEADERSHIP AND EMPOWERMENT**

Leaders empower others to act.

CONFIDENTIAL.FOR INTERNAL USE ONLY.     © Biosense Webster, Inc. 2019 | 2019 Kickoff Meeting.



HIGHLY CONFIDENTIAL

BWI-INN00044794.043

# This Document has been produced in Native Format

Innovative v. Biosense
No. 8:19-cv-01984-JVS
JX-511

*Biosense Webster, Inc.*

# Business Review *2015*



**Third Party trademarks used herein are trademarks of their respective owners**
**©Biosense Webster, Inc. 2015**

**Confidential- Biosense Webster, Inc. - 7257-2014 04USEXT**



Space Holder….. Page for listing information specific to the hospital that you are meeting with. Their Logo, Mission Statement, Etc. Etc.

Confidential- Biosense Webster, Inc.

BWI-INN00068040.002

# Agenda

- Item #1

- Item #2

- Item #3

- Item #4

- Item #5

Confidential- Biosense Webster, Inc.

# US Procedure Demand is Growing Rapidly



| CAGR ('11-'21) | |
|---|---|
| **AF** | 15.5% |
| **VT** | 6.2% |
| **SVT** | 3.0% |
| **Flutter** | 4.4% |
| **TOTAL** | 9.6% |

*Source: Millennium Research Group, "US MARKETS FOR ELECTROPHYSIOLOGY MAPPING AND ABLATION DEVICES 2013", June 2013.*

**Confidential- Biosense Webster, Inc.**

# Engagement with CMS regarding Hospital Outpatient Reimbursement

In response to the unexpected 2013 2% payment decrease, Biosense Webster, Inc. analyzed the CMS data and sent a comment letter to CMS recommending a revised method for calculating cost data for EP ablations.
**This resulted in a $1,969 (17.67%) increase for APC 8000.**

| APC 8000 | |
|---|---|
| 2013 Payment | $11,146 |
| 2014 Payment | $13,155 |
| Payment Increase | $1,969 |
| % Increase | 17.67% |



APC 8000 Medicare national average unadjusted reimbursement

Sources:
- CMS-1589-FC Final Changes to the Hospital Outpatient Prospective Payment System and CY 2013 Payment Rates
- CMS-1601-FC Final Changes to the Hospital Outpatient Prospective Payment System and CY 2014 Payment Rates

Confidential- Biosense Webster, Inc.

# Electrophysiology Global Market

| 2013 SALES CHANGE* | 2014 WW MARKET POSITION** | WW MARKET 2013 - 2018 CAGR** | TOTAL WW MARKET REVENUE 2018** |
|---|---|---|---|
| 13.0% | #1 | 12% | $4.8B |

- **$2.8B market, growing at 12%****
  - Penetration of ablation to treat atrial fibrillation remains under 5%*

- **Biosense Webster, Inc. is #1 worldwide**** **and growing market share globally**
  - >10 new product launches anticipated in next 18-24 months



In the US, THERMOCOOL® Navigation Catheters are approved for drug refractory recurrent symptomatic paroxysmal atrial fibrillation, when used with CARTO® Systems (excluding NAVISTAR® RMT THERMOCOOL® Catheter).

*Operational
**Internal estimates

**Confidential- Biosense Webster, Inc.**
©Biosense Webster, Inc. 2014

EOS#: 021027-140908

# Additional Financial Value

## Annual Price Increase Avoidance = $495,000

- Medical Component of the Consumer Price Index Results for 2009 was **3.3%** (US Bureau of Labor Statics)
- Net effect year-over-year
- No list price increases for last 3 years

| Year | Net Sales | CPI Average | Price Increase Avoided |
|------|-----------|-------------|------------------------|
| 2012 | $5,000,000 | 3.3% | $165,000 |
| 2013 | $5,000,000 | 3.3% | $165,000 |
| 2014 | $5,000,000 | 3.3% | $165,000 |
| | | **TOTAL** | **$495,000** |

**Confidential- Biosense Webster, Inc.**

# Review of Partnership



**Name of Hospital**                    **Biosense Webster**

- Item #1
  - Item #1

- Item #2
  - Item #2

- Item #3
  - Item #3

- Item #4
  - Item #4

- Item #5
  - Item #5

- Item #6
  - Item #6

- Item #7
  - Item #7

- Item #8
  - Item #8

**Confidential- Biosense Webster, Inc.**

ONE TRUSTED SOURCE

# Comprehensive EP Portfolio

## Comprehensive Hardware Portfolio



## Market-Leading Disposables




## Best-In-Class Programs

My fast heartbeat

AFIB ALLIANCE

Cardiology Connect

B R E A D T H   O F   P O R T F O L I O  |  O N E   T R U S T E D   S O U R C E

Confidential- Biosense Webster, Inc.

HIGHLY CONFIDENTIAL

BWI-INN00068040.009

# Value of Biosense Webster's "On Site" Clinical Support Team



Physician Satisfaction

Procedure Efficiency

Product Expertise

Technical Support and Troubleshooting

Training and Education for EP Lab staff

Confidential- Biosense Webster, Inc.

# Expansion to Accommodate Growing Market



**2009**
~120 CAS*
>50% of NAV cases covered

**2015**
~425 CAS*
~87% of NAV cases covered

## Clinical Account Specialist (CAS) Team:

- Clinical support is a cornerstone of our service and value-add proposition
- As the electrophysiology business has grown, we've added resources to support our customers

Confidential- Biosense Webster, Inc.

# Key Contacts

| **Area Director** | Name:<br>Phone #:<br>E-Mail: |
|---|---|

| **Regional Business Director** | Name:<br>Phone #:<br>E-Mail: |
|---|---|

| **Territory Manager** | Name:<br>Phone #:<br>E-Mail: |
|---|---|

| **Ultrasound Account Specialist** | Name:<br>Phone #:<br>E-Mail: |
|---|---|

| **Clinical Account Specialist** | Name:<br>Phone #:<br>E-Mail: |
|---|---|

| **Clinical Account Specialist** | Name:<br>Phone #:<br>E-Mail: |
|---|---|

| **Clinical Account Specialist** | Name:<br>Phone #:<br>E-Mail: |
|---|---|

| **Clinical Account Specialist** | Name:<br>Phone #:<br>E-Mail: |
|---|---|

Confidential- Biosense Webster, Inc.

HIGHLY CONFIDENTIAL

BWI-INN00068040.012

# *BUSINESS REVIEW / CONTRACTING*

Confidential- Biosense Webster, Inc.

# Current Contracts with Biosense Webster

**DISPOSABLE CATHETER PORTFOLIO**

| | |
|---|---|
| Contract Term: | 1 Year |
| Start Date: | XX/XX/XX |
| Expiration Date: | XX/XX/XX |
| Minimum Spend Criteria: | $X,XXX,XXX |
| Market Share Criteria: | XX% |

**PERFORMANCE UPDATE**

| | |
|---|---|
| # of Months Remaining: | X Months |
| Rolling 12 month Spend: | $X,XXX,XXX |
| Estimated Market Share: | XX% |
| Dollars +/- to achieve 80%: | $XXX,XXX |

Confidential- Biosense Webster, Inc.

14

# System Annual Sales with Biosense Webster



Confidential- Biosense Webster, Inc.

HIGHLY CONFIDENTIAL

BWI-INN00068040.015

# System Spend by Facility

| Account Name | 2012 Sales | 2013 Sales | 2014 Sales | 2014 +/- |
|---|---|---|---|---|
| | $10,000,000 | $10,000,000 | $10,000,000 | $10,000,000 |
| | $ | $ | $ | $ |
| | $ | $ | $ | $ |
| | $ | $ | $ | $ |
| | $ | $ | $ | $ |
| | $ | $ | $ | $ |
| | $ | $ | $ | $ |
| System Total | $ | $ | $ | $ |

**Total Spend**

Contributing factors to 2014 +/-  in total spend
1) XXXXX
2) XXXXX
3) XXXXX

**Confidential- Biosense Webster, Inc.**

BWI-INN00068040.016

# Ultrasound Sales Summary

## Annual Sales 2012 – 2015

| Hospital | 2012 Sales | 2013 Sales | 2014 Sales | 2014 + / - | 2015 Sales |
|---|---|---|---|---|---|
| Hospital #1 | $10,000,000 | $10,000,000 | $10,000,000 | $10,000,000 | $10,000,000 |
| Hospital #2 | $ | $ | $ | $ | $ |
| Hospital #3 | $ | $ | $ | $ | $ |
| Hospital #4 | $ | $ | $ | $ | $ |
| Hospital #5 | $ | $ | $ | $ | $ |
| System Total | $ | $ | $ | $ | $ |

**Analysis**

Average Monthly Spend on Ultrasound:
2012:  $XX,XXX
2013:  $XX,XXX
2014:  $XX,XXX
2015:  $XX,XXX

**Confidential- Biosense Webster, Inc.**

# LASSO® Catheter Sales Summary
## Annual Sales 2012- 2015

| Hospital | 2012 Sales | 2013 Sales | 2014 Sales | 2014 + / - | 2015 Sales |
|---|---|---|---|---|---|
| Hospital #1 | $10,000,000 | $10,000,000 | $10,000,000 | $10,000,000 | $10,000,000 |
| Hospital #2 | $ | $ | $ | $ | $ |
| Hospital #3 | $ | $ | $ | $ | $ |
| Hospital #4 | $ | $ | $ | $ | $ |
| Hospital #5 | $ | $ | $ | $ | $ |
| System Total | $ | $ | $ | $ | $ |

**Analysis**

Average Monthly Spend on LASSO® Catheter
2012: $XX,XXX
2013: $XX,XXX
2014: $XX,XXX
2015: $XX,XXX

Confidential- Biosense Webster, Inc.

# Sales Summary – System Spend by Category



| Vendor | 2014 $ Volume | % of Total Spend |
|---|---|---|
| Ablation | $ | % |
| Access / Other | $ | % |
| Accessories | $ | % |
| Diagnostics | $ | % |
| Cables | $ | % |
| Hardware / Software | $ | % |
| Ultrasound | $ | % |
| TOTAL SPEND | $ | |

Confidential- Biosense Webster, Inc.

# Sales Summary

## Annual Sales Trend by Major Product Category 2012 – 2015

| Product Category | 2012 Sales | 2013 Sales | 2014 Sales | 2015 Sales |
|---|---|---|---|---|
| Ablation | $10,000,000 | $10,000,000 | $10,000,000 | $10,000,000 |
| Access / Other | | $ | $ | $ |
| Accessories | | $ | $ | $ |
| Diagnostics | | $ | $ | $ |
| EP Cables | | $ | $ | $ |
| Hardware / Software | | $ | $ | $ |
| Ultrasound | | $ | $ | $ |
| System Total | | $ | $ | $ |

Confidential- Biosense Webster, Inc.

# MONTHLY SALES TRENDS



| Sales (June - March) | $1,760,842 |
|---|---|
| Average Monthly | $176,084 |
| Trend vs. Annual Commitment: | +$113,008 |

**Sales Trends**

|  | JUNE | JULY | AUG | SEPT | OCT | NOV | DEC | JAN | FEB | MAR |
|---|---|---|---|---|---|---|---|---|---|---|
| Series 1 | $301,570 | $81,098 | $97,120 | $205,854 | $190,140 | $133,208 | $445,711 | $90,284 | $56,479 | $159,378 |

Confidential- Biosense Webster, Inc.

# Review of System Market Share



| Vendor | Estimated $ Volume | Estimated Market Share |
|---|---|---|
| Biosense | $ | XX% |
| St. Jude | $ | XX% |
| Boston Sci | $ | XX% |
| MedTronic | $ | XX% |
| Stryker | $ | XX% |
| **TOTAL MARKET** | $ | |

| | | | |
|---|---|---|---|
| **60% Tier** | Estimate on spend that represents 60% of Total Market? | **$X,XXX,XXX** | Additional Dollars / Market Share needed to achieve 60% |
| **80% Tier** | Estimate on spend that represents 80% of Total Market | **$X,XXX,XXX** | Additional Dollars / Market Share needed to achieve 80% |

| | | | | |
|---|---|---|---|---|
| **60% Tier** | Estimate on spend that represents 60% of Total Market? | **$X,XXX,XXX** | Additional Dollars / Market Share needed to achieve 60% | **$XXX,XXX** |
| **80% Tier** | Estimate on spend that represents 80% of Total Market | **$X,XXX,XXX** | Additional Dollars / Market Share needed to achieve 80% | **$XXX,XXX** |

Confidential- Biosense Webster, Inc.

# 2015- Estimated Market Overview

## ESTIMATED Competitive

### EP Market Share = XX%

| Facility | Est. Spend |
|----------|-----------|
| Hospital #1 | $ |
| Hospital #2 | $ |
| Hospital #3 | $ |
| Hospital #4 | $ |
| Hospital #5 | $ |
| Hospital #6 | $ |
| Hospital #7 | $ |
| Total | $ |

## ESTIMATED Biosense Webster

### EP Market Share = XX%

| Facility | Est. Spend |
|----------|-----------|
| Hospital #1 | $ |
| Hospital #2 | $ |
| Hospital #3 | $ |
| Hospital #4 | $ |
| Hospital #5 | $ |
| Hospital #6 | $ |
| Hospital #7 | $ |
| Total | $ |

### Estimated TOTAL EP MARKET = $X,XXX,XXX

HIGHLY CONFIDENTIAL

BWI-INN00068040.023

# 2015- Estimated Market Overview

| | | Description | Estimated Usage | Estimated Cost (Ea) | Estimated Spend |
|---|---|---|---|---|---|
| 1 | *Competitive Vendor* | Description of the product being used at the hospital | X,XXX (Ea) | $X,XXX | *$X,XXX,XXX* |
| 2 | *Competitive Vendor* | Description of the product being used at the hospital | X,XXX (Ea) | $X,XXX | *$X,XXX,XXX* |
| 3 | *Competitive Vendor* | Description of the product being used at the hospital | XXXX (Ea) | $X,XXX | *$X,XXX,XXX* |
| 4 | *Competitive Vendor* | Description of the product being used at the hospital | XXXX (Ea) | $X,XXX | *$X,XXX,XXX* |
| | | | **Estimated Total** | | **$X,XXX,XXX** |

**Confidential- Biosense Webster, Inc.**

# Options for Contract Structure

### DOLLAR VOLUME COMMITMENT

**Option**

# A

 

Discounts are available to customers that choose to make an Annual Purchase Commitment.

---

### DOLLAR VOLUME & MARKET SHARE COMMITMENT

**Option**

# B

 

Higher discounts are available to customers that choose to make a commitment that includes Annual Purchase Commitment and Market Share commitment

Confidential- Biosense Webster, Inc.

HIGHLY CONFIDENTIAL

BWI-INN00068040.025

# Options for Future Contract Structure

## Option #1 — **STATUS QUO – NO CHANGES**

| Volume Commitment | Market share Commitment | $ Impact to Annual Spend | % Impact to Annual Spend |
|---|---|---|---|
| $X,XXX,XXX | NA | $XXX,XXX | XX% |

**How do you get there?**
1. Option does not require a market share commitment or disclosure of competitive usage data
2. XXXXXXXXXX
3. XXXXXXXXXX

## Option #2 — **INCREASE DOLLAR VOLUME COMMITMENT**

| Volume Commitment | Market share Commitment | $ Impact to Annual Spend | % Impact to Annual Spend |
|---|---|---|---|
| $X,XXX,XXX | NA | $XXX,XXX | XX% |

**How do you get there?**
1. Option does not require a market share commitment or disclosure of competitive usage data
2. XXXXXXXXXX
3. XXXXXXXXXX

Confidential- Biosense Webster, Inc.

# Options for Future Contract Structure

## Option #3 — AGREE TO MARKET SHARE COMMITMENT

| Volume Commitment | Market share Commitment | $ Impact to Annual Spend | % Impact to Annual Spend |
|---|---|---|---|
| $X,XXX,XXX | NA | $XXX,XXX | XX% |

**How do you get there?**
1. Option requires a signed market share commitment and disclosure of competitive usage data
2. XXXXXXXXXX
3. XXXXXXXXXX

## Option #4 — INCREASE DOLLAR & MARKET SHARE COMMITMENT

| Volume Commitment | Market share Commitment | $ Impact to Annual Spend | % Impact to Annual Spend |
|---|---|---|---|
| $X,XXX,XXX | NA | $XXX,XXX | XX% |

**How do you get there?**
1. Option requires a signed market share commitment and disclosure of competitive usage data
2. XXXXXXXXXX
3. XXXXXXXXXX

Confidential- Biosense Webster, Inc.

HIGHLY CONFIDENTIAL

BWI-INN00068040.027



# THERMOCOOL® SMARTTOUCH® Catheter

Confidential- Biosense Webster, Inc.

# What is CARTO® SMARTTOUCH™ Technology?



CARTO® SMARTTOUCH™ Technology allows you to monitor the stability, consistency, and amount of contact force on the tissue while mapping and ablating

Confidential- Biosense Webster, Inc.

# What's the importance of Contact Force Technology?



The SMART-AF Trial demonstrated for the first time that….

Stable application of contact force leads to improved patient outcomes

Confidential- Biosense Webster, Inc.

# The THERMOCOOL® SMARTTOUCH® Catheter delivers a new measure of success

In the multicenter SMART-AF clinical study, the THERMOCOOL® SMARTTOUCH® Catheter:

- Demonstrated an **overall success rate of 74%**

- When physicians stayed within a targeted contact force range ≥ 85% of the time, **success rates increased to 88%**



Success Rate After One Year

# What Makes CARTO® SMARTTOUCH™ Technology Unique?



THERMOCOOL® SMARTTOUCH® Catheter is the first device of its kind approved in the U.S. to feature direct contact force technology for the treatment of paroxysmal atrial fibrillation (AFib).

# How Does Carto® SmartTouch® Technology Work?



**Poor tissue contact**
May result in incomplete lesion formation

**Too much contact force**
May result in tissue injury

Heart Wall →

We've combined our catheter technology with a graphic user interface displayed on the Carto® 3 System monitor.

This integration allows the physician to select, visualize, and manage ablation parameters

Confidential- Biosense Webster, Inc.

# Pricing: THERMOCOOL® SMARTTOUCH® Catheter

## PROPOSED – THERMOCOOL® SMARTTOUCH® Catheter

| Product Description | Family Code | Product Code | List Price | Extended Price |
|---|---|---|---|---|
| Uni-Directional | K18 | | $4,200 | $4,000.00 |
| Bi-Directional | K19 | | $4,400 | $4,000.00 |

Confidential- Biosense Webster, Inc.

# CARTO SMARTTOUCH™
## TECHNOLOGY

### BI-DIRECTIONAL WITH CURVE VISUALIZATION

| ORDERING# | CURVE TYPE | FRENCH SIZE | # OF ELECTRODES | ELECTRODE SPACING (mm) | ELECTRODE TIP (mm) | TEMPERATURE SENSOR | LENGTH (cm) |
|---|---|---|---|---|---|---|---|
| D132701 | DD | 8 | 4 | 1-6-2 | 3.5 | Thermocouple | 115 |
| D132702 | FF | 8 | 4 | 1-6-2 | 3.5 | Thermocouple | 115 |
| D132703 | JJ | 8 | 4 | 1-6-2 | 3.5 | Thermocouple | 115 |
| D132704 | FJ | 8 | 4 | 1-6-2 | 3.5 | Thermocouple | 115 |
| D132705 | DF | 8 | 4 | 1-6-2 | 3.5 | Thermocouple | 115 |

### UNI-DIRECTIONAL WITH CURVE VISUALIZATION

| ORDERING# | CURVE TYPE | FRENCH SIZE | # OF ELECTRODES | ELECTRODE SPACING (mm) | ELECTRODE TIP (mm) | TEMPERATURE SENSOR | LENGTH (cm) |
|---|---|---|---|---|---|---|---|
| D133601 | D | 8 | 4 | 1-6-2 | 3.5 | Thermocouple | 115 |
| D133602 | F | 8 | 4 | 1-6-2 | 3.5 | Thermocouple | 115 |
| D133603 | J | 8 | 4 | 1-6-2 | 3.5 | Thermocouple | 115 |

### CABLE

| ORDERING# | DESCRIPTION | LENGTH |
|---|---|---|
| CR3434CT | Cable from Catheter to CARTO®3 System Patient Interface Unit | 3m/10ft |

Confidential- Biosense Webster, Inc.

HIGHLY CONFIDENTIAL

BWI-INN00068040.035



# CAPITAL
# EQUIPMENT
## INSTALLATION BASE

Confidential- Biosense Webster, Inc.

# Facility Hardware Portfolio Review



**CARTO® 3 Mapping System**



**Stockert and COOLFLOW® Pump**



| Capital Item | List Price | Acquired (Yes / No) | Quantity Installed |
|---|---|---|---|
| CARTO® 3 System | $250,000 | ✓ | XX |
| Stockert | $35,000 | ✓ | XX |
| COOLFLOW® Pump | $12,000 | ✓ | XX |

Confidential- Biosense Webster, Inc.

BWI-INN00068040.037

# CARTO® 3 System Software License Review











| System | List Price | Acquired (Yes / No) | Quantity Installed |
|---|---|---|---|
| CARTOMERGE® Module | $75,000 | ✓ | 2 |
| CARTOSOUND® Module | $75,000 | ✓ | 2 |
| CFAE Module | $15,000 | ✗ | 0 |
| VISITAG™ Module | $25,000 | ✓ | 1 |
| PASO™ Module | $25,000 | ✗ | 0 |
| CARTOUNIVU™ Module | $150,000 | ✗ | 0 |
| CARTO® SMARTTOUCH™ 3D Module | $25,000 | ✗ | 0 |

*Confidential- Biosense Webster, Inc.*

# Disposable Catheter Utilization Review

| Category | Product | Using |
|----------|---------|-------|
| **DIAGNOSTIC** | General DX | ✔ |
| | WEBSTER® HIS Catheter | ✔ |
| | WEBSTER® CS Catheter | ✗ |
| | PENTARAY® Catheter | ✔ |
| | LASSO® Catheter | ✔ |
| **SHEATHS** | MOBICATH™ Sheath | ✗ |
| **ABLATION** | CELSIUS® FLTR™ Catheter | ✗ |
| | THERMOCOOL® SF Catheter | ✔ |
| | THERMOCOOL® SMARTTOUCH® Catheter | ✗ |
| **ULTRASOUND** | ACUNAV™ AND SOUNDSTAR® Catheters | ✔ |
| | SOUND CHOICE™ ACUNAV™ & SOUNDSTAR® | ✗ |

Confidential- Biosense Webster, Inc.



# *Capital Equipment*
## *Service & Warranty Update*

Confidential- Biosense Webster, Inc.

# Warranties & Service Agreements Defined

| CARTO® 3 System | Description of Warranty | Cost |
|---|---|---|
| **Manufacturer Warranty** | 3-year warranty included with purchase of CARTO® 3 System | **Included in Purchase** |
| **Extended Manufacturer Warranty** | 1 or 2 year warranty that can be purchased to cover CARTO® 3 System when the original Manufacturer Warranty has expired | $25,000 (1 year)<br><br>$45,000 (2 year) |
| **Premium Service Warranty** | Additional coverage that can be purchased to offer enhanced protection and service for the CARTO® 3 System<br>• Covers cost of accidental breakage<br>• Offers "Priority" Service | $30,000 (1 year)<br><br>$55,000 (2 year) |

| Equipment | Serial # | Warranty Type | Start Date | Expiration Date | Status |
|---|---|---|---|---|---|
| CARTO® 3 System | 13340 | Manufacturer Warranty | 3/1/13 | 2/29/16 | VALID |
| CARTO® 3 System | 11173 | Manufacturer Warranty | 12/4/09 | 12/3/12 | Expired |
| CARTO® RMT System | 11223 | Manufacturer Warranty | 9/21/13 | 9/20/16 | VALID |
| CARTO® XP System | 4761 | Manufacturer Warranty | 5/10/11 | 5/9/12 | Expired |

**Confidential- Biosense Webster, Inc.**

# Warranties & Service Agreements Defined



| Stockert 70 | Description of Warranty | Cost |
|---|---|---|
| **Manufacturer Warranty** | 1-year warranty included with purchase of **STOCKERT** | |
| **Extended Manufacturer Warranty** | 1 or 2 year warranty that can be purchased when the original Manufacturer Warranty has expired | $3,500  (1 year)  $6,650  (2 year) |

| Equipment | Serial # | Warranty Type | Start Date | Expiration Date | Status |
|---|---|---|---|---|---|
| Stockert | ST-3573 | Manufacturer Warranty | 6/28/10 | 6/28/11 | Expired |
| Stockert | ST-2395 | Manufacturer Warranty | 10/14/08 | 10/13/09 | Expired |
| Stockert | ST-1545 | Extended Warranty | 3/9/06 | 3/8/07 | Expired |
| Stockert | ST-1129 | Extended Warranty | 3/9/06 | 3/8/07 | Expired |

Confidential- Biosense Webster, Inc.

# Warranties & Service Agreements Defined



| COOLFLOW® Pump | Description of Warranty | Cost |
|---|---|---|
| **Manufacturer Warranty** | 1-year warranty included with purchase of COOLFLOW® Pump | **Included in Purchase** |
| **Extended Manufacturer Warranty** | Not available | N/A |

| Equipment | Serial # | Warranty Type | Start Date | Expiration Date | Status |
|---|---|---|---|---|---|
| COOLFLOW® Pump | 01961 | Manufacturer Warranty | 11/23/05 | 11/22/08 | Expired |
| COOLFLOW® Pump | 02987 | Manufacturer Warranty | 1/18/07 | 1/17/10 | Expired |
| COOLFLOW® Pump | 03717 | Manufacturer Warranty | 9/26/08 | 9/25/11 | Expired |
| COOLFLOW® Pump | 04608 | Manufacturer Warranty | 6/28/10 | 6/27/13 | Expired |

**Confidential- Biosense Webster, Inc.**



# PRODUCT PIPELINE

## 12-18 MONTH

Confidential- Biosense Webster, Inc.

BWI-INN00068040.044

# The Long Tradition of Biosense Webster Innovation


**FIRST**

*Deflectable Diagnostic Catheter*

*Deflectable Ablation Catheter:* **CELSIUS® Catheter**

*Tricuspid Valve Mapping Catheter:* **HALO® Catheter**

*3D Anatomical Mapping and Ablation System:* **CARTO® System**

*Circular Mapping Catheter:* **LASSO® Catheter**

*Dual Sensor 8mm Tip Ablation Catheter:* **CELSIUS® DS Catheter**

*Image Integration Software:* **CARTOMERGE® Software Module**

*Open Irrigation Ablation Catheter:* **THERMOCOOL® Catheter**

*Ultrasound Imaging Software:* **CARTOSOUND® Software Module**

*Intracardiac Injection Catheter:* **MYOSTAR™ Catheter**

*Intracardiac 3-D Navigation System:* **NOGA® System**

*Ablation Device Approved for AFib Treatment:*

**NAVISTAR® THERMOCOOL® Catheter with CARTO® System**

Confidential- Biosense Webster, Inc.

# Building on the Powerful CARTO® 3 System Platform



**2009**  ACL, CONNECTION OF CHOICE® ✓

**2011**  AccuRESP™ Module ✓

**2012**  CARTO® 3 MEM Version ✓

**2013**  VISITAG™ | PASO™ | CARTOUNIVU™ Modules

Wide choice of catheters, and lab integration
• Vast choice of therapeutic tools
• Less ionizing radiation for patient and staff(*)
• Efficient data sharing

(*) Always verify catheter tip location using fluoroscopy or IC signals and consult the CARTO® System User Guide regarding recommendations for fluoroscopy use.
Sporton S, Earley M, Nathan A, and Schilling R, Electroanatomic versus fluoroscopic mapping for catheter ablation procedures: A prospective randomized study. Journal of Cardiovascular Electrophysiology 2004;15,3:310-315

Confidential- Biosense Webster, Inc.

# SMARTABLATE™ System





### Intuitive user interface:
- Ensures all staff can operate with ease

### Connection Screen:
- Facilitates trouble shooting and reduces down time

### Auto adjust flow rate:
- Ensures accurate flow rate and eliminates need for manual intervention

### Easy to load tubing:
- Reduces down time

---

**96% of physicians reported SMARTABLATE™ System is easier to use than their current system**

---

Confidential- Biosense Webster, Inc.

# CARTOUNIVU™ Module



## May help to lower fluoroscopy exposure time

**Seamlessly combine a fluoro image and CARTO® 3 System maps into a single, accurate 3D view:**

Always verify catheter tip location using fluoroscopy or IC signals and consult the CARTO® System User Guide regarding recommendations for fluoroscopy use.
Sporton S, Earley M, Nathan A, and Schilling R, Electroanatomic versus fluoroscopic mapping for catheter ablation procedures: A prospective randomized study. Journal of Cardiovascular Electrophysiology 2004;15,3:310-315
(*) Data on file, Biosense Webster, Inc

Confidential- Biosense Webster, Inc.

# 6 Months: CARTOUNIVU™ Module Additions



## Expanded features

**Intuitive navigation by**

- Continuous visualization of sensor enabled catheter motion on fluoro background

- Synchronization of catheter image to respiration and cardiac motion on the cine loop

Always verify catheter tip location using fluoroscopy or IC signals and consult the CARTO® System User Guide regarding recommendations for fluoroscopy use.
Sporton S, Earley M, Nathan A, and Schilling R, Electroanatomic versus fluoroscopic mapping for catheter ablation procedures: A prospective randomized study. Journal of Cardiovascular Electrophysiology 2004;15,3:310-315
(*) Data on file, Biosense Webster, Inc

**Confidential- Biosense Webster, Inc.**

# 6 Months: CONFIDENSE™ Mapping Module

## Continuous Point Acquisition



Tissue Proximity indicator for diagnostic Navigation catheters



Signal origination based annotation algorithms



**Sophisticated automation, designed for greater efficiency**



Map Consistency

Products under development and are not approved or available for sale or use in any market.

Confidential- Biosense Webster, Inc.

HIGHLY CONFIDENTIAL

BWI-INN00068040.050

# 12 Months: Robust Analysis of AF Signals



High density catheters

Spatial and Temporal organization of AF signals **

# 4D map of atrium designed to help
- Identify AF mechanisms    • Allow therapy planning

Products under development and are not approved or available for sale or use in any market. CONFIDENTIAL.
** Gray et al, Spatial and Temporal Organization during Cardiac Fibrillation, Nature, vol 392, page 76.

Confidential- Biosense Webster, Inc.





*S*OUND *C*HOICE™

*U*LTRASOUND *R*EPROCESSING *S*OLUTION

# SOUND CHOICE™ Reprocessed Ultrasound Catheter Solutions







**OEM**

**Reprocessor**

**Historically, the OEM and the reprocessing company compete against each other**

**Biosense Webster has changed the paradigm to bring unique capabilities and synergies to reprocessing**

Confidential- Biosense Webster, Inc.

# SOUND CHOICE™ Program– Product Superiority



| Parameter | Biosense Webster Ultrasound Catheter | Biosense Webster Certified Reprocessed Ultrasound Catheter | Other Reprocessed Ultrasound Catheter |
|-----------|--------------------------------------|-----------------------------------------------------------|--------------------------------------|
| Navigational Accuracy | <1mm | <1.5mm | Unknown |
| Image Quality | Original Fidelity | >94% Fidelity | Unknown |

Confidential- Biosense Webster, Inc.

# SOUND CHOICE™ Program– Business Model

- Biosense Webster will sell and distribute new and reprocessed ultrasound catheters
    - ACUNAV™ Catheter
    - SOUNDSTAR® Catheter

- To ensure continuity of supply, customers are eligible to purchase *2 reprocessed* ultrasound catheters for every *1 new* ultrasound catheter

Confidential- Biosense Webster, Inc.

# SOUND CHOICE™ – Program Support

- The Biosense Webster clinical team will provide product support for new (OEM) and reprocessed (Sound Choice)  ultrasound catheters

  – Clinical and Technical support and troubleshooting

  – Drive increased utilization of reprocessing

  – Facilitate product complaints and credits



Confidential- Biosense Webster, Inc.

# SOUND CHOICE ™ Program – Pricing Proposal

| OEM Ultrasound | Cost Per Unit |
|---|---|
| Ultrasound – SOUNDSTAR® Catheter | $X,XXX |
| Ultrasound – ACUNAV™ Catheter | $X,XXX |

| Reprocessed Ultrasound | Cost Per Unit |
|---|---|
| Certified Performance Ultrasound – SOUNDSTAR® Catheter | $X,XXX |
| Certified Performance Ultrasound – ACUNAV™ Catheter | $XXX |

*Proposed Price*



Confidential- Biosense Webster, Inc.

# SOUND CHOICE™ – Cost Savings

## CURRENT
### SPEND ANALYSIS

| Product | Annual Usage | Annual Spend |
|---|---|---|
| OEM (Biosense Webster) | XXX | $5,000,000 |
| Reprocessed (Stryker) | XXX | $ |
| Total Spend | XXX | $ |

## PROPOSED
### SPEND ANALYSIS

| Product | Annual Usage | Annual Spend |
|---|---|---|
| OEM (Biosense Webster) | XXX | $5,000,000 |
| Reprocessed (SterilMed) | XXX | $ |
| Total Spend | XXX | $ |

*Projected Annual Savings with SOUND CHOICE™ :*



**$XXX,XXX**

Confidential- Biosense Webster, Inc.



BWI-INN00068040.058

# *Biosense Webster, Inc.*
# *Customer Support Programs*

Confidential- Biosense Webster, Inc.

# Reimbursement Resources



Reimbursement and Coding Guide
for facilities and physicians



Electrophysiology Services
Coding Checklist



EP Coding and Reimbursement
Frequently Asked Questions



EP Procedure Documentation
Best Practices



Online C-code Finder



Coding and Reimbursement Webinars



Email your Coding Questions

## www.biosensewebster.com/reimbursement

Confidential- Biosense Webster, Inc.

# Referring Network - Education

## Cardiology Connect Educational Programs



## Local Market Analysis



## Afib Alliance Website



# Marketing/PR

## Patient Outreach Resources:

- Patient Videos

- Patient Brochures

- Press Releases/B-Roll

- Heart Anatomy Tear Pads

- Patient Website: www.myfastheartbeat.com



Confidential- Biosense Webster, Inc.

# Clinical Support

## Clinical Account Specialists

- Provide clinical support on the use of Biosense Webster's portfolio of products.

- Streamline workflows to help reduce procedure time

## Technical Services

- Work with hospital to ensure equipment is installed properly and runs smoothly



Confidential- Biosense Webster, Inc.

BWI-INN00068040.063

Message
_____

| | |
|---|---|
| **From:** | ddistel@alliancehcpartners.com [ddistel@alliancehcpartners.com] |
| **Sent:** | 3/30/2016 12:07:54 PM |
| **To:** | teinwechter@alliancehcpartners.com; Liz Stoneman [/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Lstoneman37426ec]; Lars Thording [/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Lthording4848e0b]; Rafal Chudzik [/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Rchudzik2ff] |
| **CC:** | rferreira@alliancehcpartners.com |
| **Subject:** | FW: Biosense Webster |
| **Attachments:** | BWI Customer Letter on Non-BWI Product Support-10-31-2014-Final.pdf |

FYI,

**David Distel**

507.358.5289 *(m)*
ddistel@alliancehcpartners.com
www.alliancehcpartners.com



_____

**From:** "Beinborn, Douglas S." <beinborn.douglas@mayo.edu>
**Date:** Wednesday, March 30, 2016 at 1:39 PM
**To:** David Distel <ddistel@alliancehcpartners.com>, "rferreira@alliancehcpartners.com" <rferreira@alliancehcpartners.com>
**Subject:** Biosense Webster

Hello

David and I have been discussing this and appropriate next steps.  Please see the attached letter Biosense Webster is sending to sites.

Happy to discuss further.

Douglas Beinborn
Operations Manager: Heart Rhythm Services and Heart Rhythm & Physiological Monitoring Lab
Assistant Professor of Medicine
Phone: 507-255-5508
e-mail: Beinborn.douglas@mayo.edu

Innovative v. Biosense
No. 8:19-cv-01984-JVS
JX-545



October 31, 2014

RE: Position Statement on Clinical Account Specialist Case Support of Reprocessed SUD Catheters

Dear Valued Customer,

This letter is to inform you of Biosense Webster, Inc.'s position regarding clinical support of reprocessed Single-Use-Devices (SUD). Biosense Webster's commitment to providing high quality products and services requires that we properly train all clinical account specialists on the capabilities, limitations, and proper functioning of all our devices and equipment. It is critical that our personnel possess a competent base of knowledge of the design intent of each device feature and a thorough understanding of how each disposable product is designed to work with our capital equipment to ensure the best possible outcome for each procedure that we support. This base of knowledge is especially important when it comes to troubleshooting the CARTO® System in the midst of a procedure. In fact, most hospital facilities also recognize the critical nature of vendor product competency as it relates to patient safety and consequently require vendor representatives to provide documentation attesting to their competency with their company's products as part of the vendor credentialing process.

Accordingly, Biosense Webster's clinical account specialists can only provide clinical support for cases that use catheters they have been trained to support. Biosense Webster's portfolio of products includes a combination of both new and reprocessed devices. Biosense Webster's clinical account specialists have been trained to understand the capabilities, limitations, and proper functioning of these devices and hence, are able to deliver on our commitment of high quality support. However, this support by Biosense Webster's clinical account specialists does not extend to products manufactured or reprocessed by another company.

Electrophysiology catheters provided by another original equipment manufacturer or reprocessing company are not Biosense Webster products. Reprocessing is a manufacturing process (reference the FDA guidance documents on reprocessing of SUDs). Therefore, once Biosense Webster's products are subjected to the reprocessing operations of another company, these devices are no longer Biosense Webster's products. The 510(k) clearance for reprocessed devices is owned by the reprocessing company that manufactures and distributes the devices. Biosense Webster has no knowledge of the third party's manufacturing operations, nor of the product specifications of its devices and as such, Biosense Webster cannot attest to the safety or efficacy of these devices.

For any questions related to the information contained in this letter, please contact your local Biosense Webster representative.

Thank you for your continued partnership and for choosing the Biosense Webster, Inc. Family of Products.

Sincerely,


……………
Biosense Webster, Inc.
3333 Diamond Canyon Rd.
Diamond Bar, CA 91765

CONFIDENTIAL                    **JX-545, Page 2 of 2**                    IH00287097

| From: | Ramos, Conrado [BWIUS] </O=JNJ/OU=CRDUSBA/cn=Recipients/cn=CRamos12> |
| To: | Orsini, Stephenie [BWIUS] |
| Sent: | 6/2/2016 3:05:02 AM |
| Subject: | RE: SoundChoice and WHC |

Stephenie,

I am pretty booked up with travel over the month of June but will do my best to help out with Medstar.  If I can't get on site, perhaps I can do a conference call with them.  I actually have gotten pretty effective with customers over the phone regarding this topic and price increases as well.

I'll reach out to Chad on Friday morning before I get on my flight to coordinate some times.

**Conrad Ramos**
Corporate Account Director
M.  404-808-1726
F.  877-817-8086
E.  **cramos12@its.jnj.com**

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
3333 S. Diamond Canyon Road
Diamond Bar, CA 91765, USA
www.biosensewebster.com
T.  1-909-839-8500
T.  1-800-729-9010
F.  1-909-595-0187



**Confidentiality Notice:** This document is J&J Proprietary. You may forward this document within J&J on a need to know basis. You may not forward this onto the Internet without the author's permission. This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited.  If you have received this e-mail transmission in error, please reply to the sender, so that J&J can arrange for proper delivery, and then please delete the message from your inbox.

**From:** Orsini, Stephenie [BWIUS]
**Sent:** Wednesday, June 01, 2016 5:45 PM
**To:** Ramos, Conrado [BWIUS]
**Subject:** FW: SoundChoice and WHC

Conrad,  I would like to ask if you have the capacity to help with Medstar Sound Choice negotiations.  I believe we are going to receive negative feedback regarding our clinical support policy.  Stryker has quoted them over 500K in savings which I am sure includes SoundStar.

We are in a great position from a pricing standpoint.

Chad is going to reach out to the Director of Cardiology and VP of Materials Management to try to get meetings established.

Let me know if this may be a possibility.

Thanks

Innovative v. Biosense
**No. 8:19-cv-01984-JVS**
**JX-1262**

**From:** Hovis, Chad [BWIUS]
**Sent:** Tuesday, May 31, 2016 9:28 AM
**To:** Orsini, Stephenie [BWIUS]; JENKINS, JOEL [BWIUS]
**Subject:** RE: SoundChoice and WHC

Hey Stephenie,
Here are the numbers you asked for:

- · 12 month rolling spend is 6.2 million
- · Feb 2, 2015 the pricing agreement was executed (attached) 6 million
- · 163K loss if we move Acunav only 2:1 reprocessing (this represents $616 reprocessed Acunav price)
- · 210K loss if we move Soundstar/Acunav to 2:1 reprocessing (this represents $942 reprocessed Soundstar price and anticipated Q4 approval)

Below are some scenarios I went through to see how we can save them money, custom scenario includes ST discounts which we will get back when STSF comes out.  It took us 8 months to get regular smarttouch in the door but I'm hoping the premium isn't as high on STSF.
Acunav from 2460.00 to 2445.00.

When I bring soundstar to $2360 it pushes the savings to  $275K.

My proposal is I find out how much savings he is getting from stryker on ultrasound only and meet that savings, then I ask for the halo catheter to be brought in to replace boston scientific 20 pole blazer.

Thoughts?



Chad Hovis, BS
Key Account Manager Baltimore/DC
Biosense-Webster  *a Johnson & Johnson company*
Email: chovis@its.jnj.com
Cell: (443) 510-1156

HIGHLY CONFIDENTIAL     **JX-1262, Page 2 of 3**     BWI-INN00015539

**From:** Orsini, Stephenie [BWIUS]
**Sent:** Friday, May 27, 2016 12:34 PM
**To:** JENKINS, JOEL [BWIUS]
**Cc:** Hovis, Chad [BWIUS]
**Subject:** RE: SoundChoice and WHC

Experience tells me we need to start talking to them about our coverage policy/and Sound Choice reprocessing. If they start reprocessing with Stryker it will be very hard to get back.

Chad, can you work look into the following and then we can set up a call to discuss?
- Current 12 month rolling spend
- Current contract expiration date and performance metric
- 12 month risk moving them to 2:1 ratio of reprocessing Sound and Acunav

Thanks
Stephenie

---

**From:** JENKINS, JOEL [BWIUS]
**Sent:** Thursday, May 26, 2016 10:11 AM
**To:** Orsini, Stephenie [BWIUS]
**Cc:** Hovis, Chad [BWIUS]
**Subject:** SoundChoice and WHC

Hi Steph.

Chad and I were talking about our strategy at WHC and U/S. I truly believe we need this to be our #1 priority at this account. It is a gigantic single use account for us but the hospital is trying to change this. Chad is moving forward with discussions with the physicians… 1.) solidify their support for single use 2.) Support his teams value added service to them versus what Stryker offers to them. They deserve the business not Stryker.

We have a lot of room in pricing to offer them savings on U/S. I would like to do so because it would be valuable in solidify single use. We also need to prepare ourselves for the move towards reprocessed catheters. If we don't we will definitely lose to Stryker and that loss of business would be huge. This is a very large account for us so I would to ask you if you know anyone that has had a key success story saving the business from Stryker. SoundChoice is not a strong area for me so I would like to gain some expertise from teams that have been successful. You have any suggestions?

Joel P. Jenkins
Regional Business Director – Baltimore/DC and South Central PA
Biosense Webster - *a J&J company*
**Mobile: 734-347-3444**
email: jjenki24@its.jnj.com



| From: | Garcia, Mario [BWIUS] </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=D6F2C5D2CB3843AF8D523179A70B7EFC-MGARCI59> |
| To: | Shalgi, Avi [BWIIL] |
| CC: | Giles, Cruz [BWIUS]; Hsueh, Hugh [BWIUS]; Tang, Raymond [BWIUS]; O'Sullivan, Martin [BWIUS]; Stanley, Mark [BWIUS]; Kuhns, Jesse [BWIUS]; Kelly, Christopher [BWIUS]; Bruce, Doug [BWIUS]; Atias, Meiron [BWIUS] |
| Sent: | 4/11/2018 6:11:18 AM |
| Subject: | RE: Ad-Hoc PIB for Vizigo Gate 3 & 5 |
| Attachments: | RE: Vizigo EEPROM |

Hello Avi,

Attached an email that helps as a follow up to your question in regards to the decision of not implementing the Falcon EEPROM (secured EEPROM) into Vizigo that came up during the meeting this Monday, please take into account that this assessment was done at the end of May last year so a new assessment would be required for current system capabilities and implementation timelines should that be the path that the team elects to take.

Thank you in advance for your time and help.

Best Regards

Mario Garcia

-----Original Appointment-----
**From:** PIB [BWIUS]
**Sent:** Monday, April 9, 2018 10:18 AM
**To:** PIB [BWIUS]; Giles, Cruz [BWIUS]; Hsueh, Hugh [BWIUS]; Tang, Raymond [BWIUS]; Garcia, Mario [BWIUS]; O'Sullivan, Martin [BWIUS]; Stanley, Mark [BWIUS]; Kuhns, Jesse [BWIUS]; Kastin, Vadim [BWIUS]; Kelly, Christopher [BWIUS]; Bordley, Diana [BWIUS]; Bishara, Moe [BWIUS]; Rabbitt, Margot [BWIUS]; Darling, Stacey [ASPUS]; Soto, Nathan [ASPUS]; Bruce, Doug [BWIUS]; Shalgi, Avi [BWIIL]; Dickinson, Mark [BWIUS]; McInnis, Kendra [BWIUS]
**Subject:** FW: Ad-Hoc PIB for Vizigo Gate 3 & 5
**When:** Monday, April 9, 2018 4:00 PM-5:00 PM (UTC-08:00) Pacific Time (US & Canada).
**Where:** CR-GC-USIrwindale, Bldg 15815, Rm 712 (15); Bldg 25B1, Rm 1030 (12)


-----Original Appointment-----
**From:** PIB [BWIUS]
**Sent:** Wednesday, April 4, 2018 1:36 PM
**To:** PIB [BWIUS]; O'Sullivan, Martin [BWIUS]; Stanley, Mark [BWIUS]; Kuhns, Jesse [BWIUS]; Kastin, Vadim [BWIUS]; Kelly, Christopher [BWIUS]; Bordley, Diana [BWIUS]; Bishara, Moe [BWIUS]; Rabbitt, Margot [BWIUS]; Darling, Stacey [ASPUS]; Soto, Nathan [ASPUS]; Bruce, Doug [BWIUS]; Shalgi, Avi [BWIIL]; Dickinson, Mark [BWIUS]; McInnis, Kendra [BWIUS]
**Subject:** Ad-Hoc PIB for Vizigo Gate 3 & 5
**When:** Monday, April 9, 2018 4:00 PM-5:00 PM (UTC-08:00) Pacific Time (US & Canada).
**Where:** CR-GC-USIrwindale, Bldg 15815, Rm 712 (15); Bldg 25B1, Rm 1030 (12)


All – Your attendance is requested to review the Stage Gate 3 & 5 presentations for the Vizigo project. I have only invited the team presenting as well as the required PIB Quorum. Please forward to an additional attendees are required.

-- Do not delete or change any of the following text. --

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-3099**

Ad-Hoc PIB Meeting
Monday, April 09, 2018, 3:30 PM | 2 hr
(UTC-08:00) Pacific Time (US & Canada)

---

JOIN USING ONLINE MEETING

Go to:

**REDACTION: OTHER**

Meeting number REDACTION: OTHER

---

JOIN USING TELEPRESENCE

Video address:
**REDACTION: OTHER**

GLOBAL CONNECT ROOMS INVITED
CR-GC-USIrvine, Bldg 25B1, Rm 1030 (12)
CR-GC-USIrwindale, Bldg 15815, Rm 712 (15)

---

AUDIO CONNECTION

Toll -----
Toll-free **REDACTION: OTHER**

Access code: REDACTION: OTHER

Global call-in numbers:
**REDACTION: OTHER**

---

IMPORTANT NOTICE: This online meeting service includes a feature that allows audio and any documents and other materials exchanged or viewed during the session to be recorded. By joining this session, you automatically consent to such recordings. If you do not consent to the recording, discuss your concerns with the meeting host prior to the start of the recording or do not join the session. Please note that any such recordings may be subject to discovery in the event of litigation.

HIGHLY CONFIDENTIAL

JX-3099, Page 2 of 7

BWI-INN00047566

| From: | Goldstein, Avichai [BWIIL] </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=D7AB2057E2BE497DB0301795EF759E85-AGOLDSTE> |
|---|---|
| To: | Garcia, Mario [BWIUS] |
| CC: | Tang, Raymond [BWIUS]; Atias, Meiron [BWIUS]; Goldenberg, Ilan [BWIIL]; Hen, Tomer [BWIIL] |
| Sent: | 6/13/2017 2:09:06 PM |
| Subject: | RE: Vizigo EEPROM |

Hi Mario,
Last time I had an AI to verify if we need to change the CARTO version for supporting your requirement!
I am afraid things are not easy as we think; releasing another SW branch is complicated especially when we handle US and non US V6 revisions.

I have received an answer form SW management that we do need to make a CARTO change for supporting your below requirement. I have discussed also with Pesach and we are not planning to add such a support.
(version is closed and the new coming version is about to close as well)

At this point changing the EEPROM burner station is at risk in timelines if we open it and add support; please note that there are the possible additional risks that we did not think of.
Regarding working with a non-locking EEPROM means repeating V&V and PODs; we do not have any resources for performing it.

Regards,
Avichai


**From:** Garcia, Mario [BWIUS]
**Sent:** Tuesday, June 13, 2017 1:36 AM
**To:** Goldstein, Avichai [BWIIL] <agoldste@its.jnj.com>
**Cc:** Tang, Raymond [BWIUS] <rtang10@ITS.JNJ.com>; Atias, Meiron [BWIUS] <matias29@ITS.JNJ.COM>
**Subject:** RE: Vizigo EEPROM

Hello Avichai,

I do not understand how one thing relates to the other, last time we spoke, you indicated that Carto can work with the locking EEPROM even if used as a "normal" (non-lockable) EEPROM, with that being the case, we discussed it was just a timeline issue. The criticality of introducing the Falcon EEPROM into the Vizigo platform is so it is part of the design ASAP and then just wait for the Carto version to handle the locking mechanism to be released and implement the locking later on.

Thank you in advanced for your time and help.


Best Regards

**Mario Garcia**
Sr. Engineer, New Process Development
T. 1-909-839-8830
E. mgarci59@its.jnj.com


**From:** Goldstein, Avichai [BWIIL]
**Sent:** Sunday, May 28, 2017 4:02 AM
**To:** Garcia, Mario [BWIUS] <MGarci59@ITS.JNJ.COM>; Pressman , Assaf [BWIIL] <apressm1@ITS.JNJ.COM>
**Cc:** Stanley, Mark [BWIUS] <MStanley@ITS.JNJ.COM>; Susel, Pesach [BWIIL] <psusel@its.jnj.com>; Tang, Raymond [BWIUS] <rtang10@ITS.JNJ.com>; Edrei, Yinon [BWIIL] <yedrei@ITS.JNJ.COM>; Atias, Meiron [BWIUS] <matias29@ITS.JNJ.COM>; Goldenberg, Ilan [BWIIL] <igoldenb@its.jnj.com>; Noam Shapira

(noam@smart-solutions.co.il) <noam@smart-solutions.co.il>;
**Subject:** RE: Vizigo EEPROM

Hi Mario,
I was OOO on vacation for a long time.
Please note that I have clarified with the team and the CARTO® does not support the locking meaning that even if we develop a new EEPROM Burner then the CARTO will not stamp the EEPROM; doing this is opening a CARTO application version which is not planned as the version is released.
I do not think there is a point to continue with the below due to the above,
Avichai

**From:** Garcia, Mario [BWIUS]
**Sent:** Wednesday, May 17, 2017 6:14 PM
**To:** Goldstein, Avichai [BWIIL] <agoldste@its.jnj.com>; Pressman , Assaf [BWIIL] <apressm1@ITS.JNJ.COM>
**Cc:** Stanley, Mark [BWIUS] <MStanley@ITS.JNJ.COM>; Susel, Pesach [BWIIL] <psusel@its.jnj.com>; Tang, Raymond [BWIUS] <rtang10@ITS.JNJ.com>; Edrei, Yinon [BWIIL] <yedrei@ITS.JNJ.COM>; Atias, Meiron [BWIUS] <matias29@ITS.JNJ.COM>; Goldenberg, Ilan [BWIIL] <igoldenb@its.jnj.com>; Noam Shapira (noam@smart-solutions.co.il) <noam@smart-solutions.co.il>
**Subject:** RE: Vizigo EEPROM

Hello Avichai,

Last time we met I clarified the main driver of implementing the Falcon EEPROM is preventing our competitors to reprocess the Vizigo Sheath and not as previously understood as to reprocess them ourselves, and you requested a couple of weeks to follow up with the HTC team to assess the different scenarios we discussed, since those couple of weeks have gone by could you please provide an update those items and their timelines?

Quick reminder of the three situations you were going to review with the team:
1. Replace current EEPROM with Falcon EEPROM ASAP without the locking process in place since they both behave the same when not locked, allowing us to in parallel develop the locking mechanism in the EEPROM burner, which as discussed <u>should be</u> easy and quick from the technical point of view plus whatever is the average process time for such ECO revising the EEPROM burner software.
2. Replace current EEPROM and if the timeline of the software revision allows it, implement before launch or ASAP after launch.
3. Do not replace current EEPROM and launch without it while in parallel working on the development of the EEPROM software, implementing the Falcon EEPROM as soon as the timelines allow.

As discussed in the meeting each scenario has its own risks and timelines that would either allow their execution or not within the project timelines, and for all of them we would need to present them to the rest of the team to see what other impacts the "chosen" scenario will bring, looking forward to your response.

Assaf,

I just saw a note that Avichai is on vacation so could you please let us know who from the HTC team can follow up with this matter?

Thank you in advanced for your time and help.

Best Regards

**Mario Garcia**
Sr. Engineer, New Process Development
T. 1-909-839-8830
E. mgarci59@its.jnj.com

**From:** Goldstein, Avichai [BWIIL]

**Sent:** Wednesday, April 19, 2017 11:47 PM
**To:** Garcia, Mario [BWIUS]
**Cc:** Stanley, Mark [BWIUS]; Susel, Pesach [BWIIL]; Tang, Raymond [BWIUS]; Edrei, Yinon [BWIIL]; Atias, Meiron [BWIUS]; Goldenberg, Ilan [BWIIL]; Noam Shapira (noam@smart-solutions.co.il)
**Subject:** RE: Vizigo EEPROM

Mario,

I'll try to make order as perhaps I was not so clear; our reprocessing unit is the CCS so we have no choice but using it for the sheath reprocessing even if it is not a magnetic catheter; meaning we shall need to add its PN to the reprocessing process.
CCS as part of the PN also locks the EEPROM; as the sheath is burnt using the EERPOM burner and it does not have any SW for locking the EEPROM, **the risk** that one can take the unlocked VIZIGO chip and install it on a used catheter and as this EEPROM is not unlocked, the catheter can be reused in CARTO for unlimited times ,**is still valid**.
The decision back at the time was to continue with **not** supporting the falcon chip. If we change the decision now, my personal recommendation is to perform business risk analysis and understand the timelines as DHF for the EEPROM burner will take moths as mentioned below.

Having the fact that the falcon chip was tested as a standalone or on a catheter and not testing it in VIZIGO is not something I recommend to count on. Out of my experience over the years we have learned that what is not tested is not working.
There is a huge process for the supporting of the VIZIGO which will definitely shall include verification; please note we shall need also to perform repression tests.

**Ilan** and **Noam** I appreciate your comments as well

BR,
Avichai

**From:** Garcia, Mario [BWIUS]
**Sent:** Wednesday, April 19, 2017 7:00 PM
**To:** Goldstein, Avichai [BWIIL] <agoldste@its.jnj.com>
**Cc:** Stanley, Mark [BWIUS] <MStanley@ITS.JNJ.COM>; Susel, Pesach [BWIIL] <psusel@its.jnj.com>; Tang, Raymond [BWIUS] <rtang10@ITS.JNJ.com>; Edrei, Yinon [BWIIL] <yedrei@ITS.JNJ.COM>; Atias, Meiron [BWIUS] <matias29@ITS.JNJ.COM>
**Subject:** RE: Vizigo EEPROM

Attached the files for ease of access, and a screenshot of the description of the ECO that contains all this info below, keep in mind this was done for the falcon project in which it is being implemented in the Penta Ray NAV catheter family, and I am suggesting we use the same strategy for Vizigo, from all the topics touched in the previous e-mail, the only one I do not have any documentation on is the EEPROM burner.

Note: DM-2824-92F in Agile will be M-5836-02 in cPDM.

## ECO-0032635: Properties

 

| | |
|---|---|
| **Owner** | ARMENTA, MARY (marment1) |
| **Originator** | GARCIA, MARIO (mgarci59) |
| **State** | Approve |
| **ECO Description** | 1) Create Part M-5836-02 and release it to Rev. A.<br>2) Create Material specification M-5836-00 and release it to Rev. A.<br>3) Obsolete M-5836-01 material specification document only.<br>4) Include M-5836-01 part number on M-5836-00. |
| **Change Type** | Design |
| **Approval Type** | General |
| **Affected Site** | All |
| **Affected Product Family** | PentaRay NAV 7FR Catheter (D-1282) |
| **Reason For Change** | Other |
| **Describe Reason for Change** | 1) Part needs to be setup in our system before it can be used and for its part qualification.<br>2) Keep the same part numbers within one document in case they required revisions in the f<br>3/4)Obsolescing M-5836-01 document only. The part will remain active and will be included i |
| | 1,2,3,4) Catheter specific EEPROM's register serialization, Enhances OEM identification, and a |
| **Justification for Change** | V&V documents are under the "Attached Files" of this ECO, altogether with documentation pr<br>02.<br>A)EEPROMs drawing<br>B)CCS release notes (UG-9900-040).<br>C)"Falcon" EEPROM testing at HTC(REP8001).<br>D)Vendors letter.<br>E)Change assessment with signatures<br><br>Protocols under "Related Protocols" section are the IQ,OQ and PQ performed in one of the CO<br><br>*As part of the requirements per FORM-0960 a full text search was performed using the exis<br>ECO that is impacted by such changes. this full text search is attached to this ECO under "At |
| **Verified or Validated** | Yes (Attach data or application test report no) |
| **Priority** | Normal |
| **Priority Justification** | |
| **Comments** | All action tasks associated with obsolescing a M-Spec are not applicable as the document for |
| **Affected Regions** | Not Applicable |
| **PMA Annual Reports** | Not Reportable |
| **Regulatory Comments** | This ECO is to take a new raw material part to production level. This part is not being added<br>impact any device specifications, device functionality, manufacturing flow diagrams, manufac<br>not a response to serious adverse event, product malfunction, or recall. As such, no regulato |

Best Regards

**Mario Garcia**
Sr. Engineer, New Process Development
T. 1-909-839-8830
E. mgarci59@its.jnj.com

---

**From:** Garcia, Mario [BWIUS]
**Sent:** Wednesday, April 19, 2017 6:56 AM
**To:** Goldstein, Avichai [BWIIL]
**Cc:** Stanley, Mark [BWIUS]; Susel, Pesach [BWIIL]; Tang, Raymond [BWIUS]; Edrei, Yinon [BWIIL]; Atias, Meiron [BWIUS]
**Subject:** Re: Vizigo EEPROM

Thank you for your quick response Avichai,


I believe we need a meeting to discuss further, first of all we already have a POD for the "Falcon" EEPROM I am suggesting to be used (you can reference REP attached and specifications of M-5826-02 in cPDM inside ECO-0032635 for the details), this EEPROM is already setup in the CCS ( validations attached to ECO-00032635), although I do not understand why would it matter for Vizigo since CCS is not needed for the Vizigo sheath, and last but not least from what I recall from a previous conversation with Noam and you about the EEPROM Burner was that it was ready to communicate with the "Falcon" EEPROM so maybe after reviewing the specification for what I am referring to as the Falcon EEPROM we can reassess accordingly.

Mario G.

On Apr 19, 2017, at 3:04 AM, Goldstein, Avichai [BWIIL] <agoldste@its.jnj.com> wrote:

Guys,
There is a risk doing it as one can take the unlocked VIZIGO chip and install it on a used catheter and as this EEPROM is not unlocked, now the catheter can be reused in CARTO for unlimited times!!
Part of the development is to add to the EEPROM burner the code for locking the EEPROMS. According to the latter, until development is not finished this risk applies!
Let's assume we take the risk and install it then, we will need to repeat some POD tests and some functional tests as the EEPROM was replaced.
In addition supporting the falcon chip would require a new EEPROM Burning station SW and there is plenty of code to write (as this is not a minor change).
In addition we will need the CCS supporting the locking the EEPROM.
Releasing a new EEPROM burner will take lots of months as we would need to develop a new DHF for it.
For CARTO it is transparent as long as we keep the same D-specs thought we will need to test the recognition is well.

We have discussed it I think a year ago or more; now to my opinion is too late going this direction

FYI,
Avichai


**From:** Stanley, Mark [BWIUS]
**Sent:** Monday, April 17, 2017 10:52 PM
**To:** Goldstein, Avichai [BWIIL] <agoldste@its.jnj.com>; Susel, Pesach [BWIIL] <psusel@its.jnj.com>
**Cc:** Tang, Raymond [BWIUS] <rtang10@ITS.JNJ.com>; Garcia, Mario [BWIUS] <MGarci59@ITS.JNJ.COM>
**Subject:** Vizigo EEPROM

Avichai,
If we were to switch to the Falcon EEPROM for Vizigo, will that require a software update for CARTO?
-Mark

| From: | Cho, Chris [ETHUS] </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=B5592E9DF3E647F7A89EDF3DB08855DD-CCHO2> |
| To: | Ramos, Conrado [DPYUS]; Koenig, Joseph [BWIUS] |
| Sent: | 7/22/2020 9:35:52 PM |
| Subject: | RE: BWI_JULY_REVIEW_2020v12.pptx |

This will be fun!

Best regards,
Chris Cho
Senior Manager, Sustainability Pipeline Management & Innovation
Health System Value Transformation

**From:** Ramos, Conrado [DPYUS] <CRamos12@ITS.JNJ.COM>
**Sent:** Wednesday, July 22, 2020 3:20 PM
**To:** Koenig, Joseph [BWIUS] <JKOENIG4@ITS.JNJ.COM>; Cho, Chris [ETHUS] <CCho2@its.jnj.com>
**Subject:** RE: BWI_JULY_REVIEW_2020v12.pptx

I agree. If we went all in and offered unrestricted access to strategically essential accounts in exchange for a high OEM market share commitment and sole source on EP RPO (only SMD bins in the EP Lab) , we could cut off S3's supply and crush them.   Boo ha-ha-ha-ha-haahh.



**Conrad Ramos**
Senior Director, JJMDC Sustainability
Health System Value Transformation

Johnson & Johnson  MEDICAL DEVICES COMPANIES

Mobile: 404-808-1726
cramos12@its.jnj.com

Innovative v. Biosense
No. 8:19-cv-01984-JVS
JX-3108

**From:** Koenig, Joseph [BWIUS] <JKOENIG4@ITS.JNJ.COM>
**Sent:** Wednesday, July 22, 2020 1:58 PM
**To:** Ramos, Conrado [DPYUS] <CRamos12@ITS.JNJ.COM>; Cho, Chris [ETHUS] <CCho2@its.jnj.com>
**Subject:** RE: BWI_JULY_REVIEW_2020v12.pptx

This discussion has been happening all over the place.  This has always been Uri's challenge to us (knocking S3 out of EP) and I believe it just came up at a BWI US review.  I think we should schedule a 1 hr (per Michael's

suggestion business update/strategy session.  I actually just spoke to Noah about this today.  I don't think the scenario is overly complex, we just need to align on how much RPO we want to allow the customers to access, if they could get more, they wouldn't need S3, but that obviously needs to be balanced with the OEM business.

**Joe Koenig**
Product Director
US Commercial Marketing
**M.** (714) 878-1975
**E.**  jkoenig4@its.jnj.com

Biosense Webster

31 Technology Drive, Suite 200
Irvine, CA 92618, USA
www.biosensewebster.com

**From:** Ramos, Conrado [DPYUS] <CRamos12@ITS.JNJ.COM>
**Sent:** Wednesday, July 22, 2020 10:32 AM
**To:** Koenig, Joseph [BWIUS] <JKOENIG4@ITS.JNJ.COM>; Cho, Chris [ETHUS] <CCho2@its.jnj.com>
**Subject:** FW: BWI_JULY_REVIEW_2020v12.pptx

Joe and Chris,

Well, this one got away from me quickly.  I'll apologize now for not keeping you both in the loop on this topic from the beginning....The beginning being yesterday when I received the initial message from Melinda asking about what S3 was doing to hold onto to their 25% RPO EP market share.  I figured this would be a quick exchange to bring Melinda up to date on what was going on in the market.  I didn't realize that my message would be forwarded on to Michael.   See the message trail below.

Joe,  do you want to brief Fairy and Ben on the topic and set up a time for us to connect next week, or do you want me to do so?  I can go either way.  Let me know your preference.

**Conrad Ramos**
Senior Director, JJMDC Sustainability
Health System Value Transformation

Johnson & Johnson    MEDICAL
                     DEVICES
                     COMPANIES

Mobile: 404-808-1726
cramos12@its.jnj.com

**From:** Thiel, Melinda [ETHUS] <MThiel4@its.jnj.com>
**Sent:** Wednesday, July 22, 2020 11:52 AM
**To:** Ramos, Conrado [DPYUS] <CRamos12@ITS.JNJ.COM>
**Subject:** FW: BWI_JULY_REVIEW_2020v12.pptx

Let's get this set up?  Should be a good discussion.

**From:** Bodner, Michael [BWIUS] <mbodner@ITS.JNJ.com>
**Sent:** Wednesday, July 22, 2020 11:49 AM
**To:** Thiel, Melinda [ETHUS] <MThiel4@its.jnj.com>
**Subject:** RE: BWI_JULY_REVIEW_2020v12.pptx

Yes, let's do that, maybe 1 hour with your team, me, Fairy, Ben Berkowick and Joe Koenig…looking forward to it…and specifically seeing where we think Stryker maintains 25% RPO ULS share and what we think the right

strategies/tactics are to get his down to <5%...

M

**Michael Bodner**
*Vice President,*
*US Sales, Marketing WW Technical Service*

Biosense Webster
31 Technology Drive,
Suite #200
Irvine, CA 92618 USA

M: +949 526 4695
mbodner@its.jnj.com
http://www.biosensewebster.com

**From:** Thiel, Melinda [ETHUS] <MThiel4@its.jnj.com>
**Sent:** Wednesday, July 22, 2020 7:12 AM
**To:** Bodner, Michael [BWIUS] <mbodner@ITS.JNJ.com>
**Subject:** FW: BWI_JULY_REVIEW_2020v12.pptx

Some good insight from Conrad and the team.  Let me know if you would like to discuss with him and the advisors?  Could be a good strategy session...

**From:** Ramos, Conrado [DPYUS] <CRamos12@ITS.JNJ.COM>
**Sent:** Wednesday, July 22, 2020 7:39 AM
**To:** Thiel, Melinda [ETHUS] <MThiel4@its.jnj.com>
**Subject:** RE: BWI_JULY_REVIEW_2020v12.pptx

Melinda,

You are correct.  We are vulnerable (but not helpless) to both tactics.  Being linked to our OEM counterparts ensures the highest quality product, providing for an RPO end-user experience that is indiscernible from the J&J OEM product experience.  But the hard truth is that our OEM counterparts want to deploy our RPO capabilities as a last resort only (DPS and ETH) and in the most restrictive manner possible (ETH and BWI).  In general, I am attempting to help our team make a "Blue Ocean" shift by employing "David vs. Goliath (Malcolm Gladwell tactics)."  We will not take market share from S3 by playing their game of holistic offerings and unconstrained access to RPO products.  Our core strategies will be Differentiation and Focus, while optimizing the Sterilmed experience (making it easy to do business with us via flexibility and speed of response).  To respond to your question more directly, here is what we are doing against each specific S3 tactic:

1. S3 leveraging the holistic offering, which includes significant rebate related penalties should the facility choose to carve-out the EP Lab.
    - We are positioning ourselves as a holistic RPO supplier that specializes in High Requirement Products (HRP).  By HRP, we mean products that have high technical support, high precision (tight performance specifications), and high calibration (needing to work with our capital equipment without voiding the capital equipment warranty) requirements.
    - We are capitalizing on our brand.  The market recognizes the J&J Brand as being the highest quality possible.  The outcome stakes are the highest in procedures where HRP's are utilized (Cardiac Navigation Catheters, Harmonic Scalpel Devices, Robotic Lung Biopsy Probes).
    - We are getting better at communicating the value of utilizing "specialty reprocessors" to maximize real savings with minimal disruption to clinical operations.  Customers are having to accept the validity and legitimacy of the BWI case coverage policy.  They realize that EP is a growing market that has a positive contribution margin now and in the foreseeable future.  They cannot achieve the targeted savings without "essential" BWI mapping support.  Customers are getting better at holding S3 and Innovative Health accountable for their lack of investment in EP RPO product support capabilities.
    - Our Value Prop rework project is part of our counteroffensive effort against this S3 tactic.

2. S3 offering 100% RPO access for mid-high high volume/tier customers, meaning they are moving away from quoting based on collections and instead are allowing these select customers to order as much RPO product as they want without any restrictions. This would be similar to the former ETH Energy Gold Program.

- For obvious reasons, this one is going to be a lot tougher to address. We have about 30-35 ETH Gold (unlimited access to RPO) Energy Program customers for which we are deploying a new IT Solution. We will have to see how this goes and see if ETH desires to expand the program in 2021. ETH offered this to customers that committed to 85% MS across Advanced and Core Energy products.
- We are developing a Harmonic Sustainability Kit capability for Advent Health system, if successful, we can expand the offering to other accounts that ETH targets. The kits are the equivalent of a Gold Program as there are no restrictions because the kits automatically restrict the blend of OEM and RPO product usage through a built-in ratio.
- BWI has indicated an interest in developing a BWI Gold Program capability. Once we complete the successful deployment of the new IT solution for the ETH Gold customers, we will conduct further due diligence for BWI.

Hope this helps,

**Conrad Ramos**
Senior Director, JJMDC Sustainability
Health System Value Transformation

Johnson & Johnson    MEDICAL
DEVICES
COMPANIES

Mobile: 404-808-1726
cramos12@its.jnj.com

**From:** Thiel, Melinda [ETHUS] <MThiel4@its.jnj.com>
**Sent:** Tuesday, July 21, 2020 11:02 AM
**To:** Ramos, Conrado [DPYUS] <CRamos12@ITS.JNJ.COM>
**Subject:** RE: BWI_JULY_REVIEW_2020v12.pptx

Got it (and what I suspected)– do we have any strategies to defend against these specifically?

**From:** Ramos, Conrado [DPYUS] <CRamos12@ITS.JNJ.COM>
**Sent:** Tuesday, July 21, 2020 10:20 AM
**To:** Thiel, Melinda [ETHUS] <MThiel4@its.jnj.com>
**Subject:** RE: BWI_JULY_REVIEW_2020v12.pptx

Yes. There are two key tactics that S3 is currently deploying against us:

1. Leveraging the holistic offering, which includes significant rebate related penalties should the facility choose to carve-out the EP Lab.
2. Offering 100% RPO access for mid-high high volume/tier customers, meaning they are moving away from quoting based on collections and instead are allowing these select customers to order as much RPO product as they want without any restrictions. This would be similar to the former ETH Energy Gold Program.

Let me know if you would like to discuss further.

**Conrad Ramos**
Senior Director, JJMDC Sustainability
Health System Value Transformation
.

Johnson & Johnson
MEDICAL DEVICES COMPANIES

Mobile: 404-808-1726
cramos12@its.jnj.com

**From:** Thiel, Melinda [ETHUS] <MThiel4@its.jnj.com>
**Sent:** Tuesday, July 21, 2020 10:08 AM
**To:** Ramos, Conrado [DPYUS] <CRamos12@ITS.JNJ.COM>
**Subject:** FW: BWI_JULY_REVIEW_2020v12.pptx

Hi Conrad – I had a 1:1 with Michael yesterday and he asked if we would dig into something.  He showed me some data over the past 12-18 months that shows how we are winning share from Stryker.  I think we are at the point where we are now 65%, Stryker is 25% and others are 10% (in the EP space).  It's been holding at 25% for a while now.  His question was if we had a better sense of what Stryker is doing (contractually?) to maintain that 25% share.  He suspects, and I agree, that those are holistic contracts but wonders if the team has any additional insight.
Thanks

**From:** Bodner, Michael [BWIUS] <mbodner@ITS.JNJ.com>
**Sent:** Monday, July 20, 2020 4:36 PM
**To:** Thiel, Melinda [ETHUS] <MThiel4@its.jnj.com>
**Subject:** BWI_JULY_REVIEW_2020v12.pptx

Thanks for the time today.

Here is the deck

M

| From: | Koenig, Joseph [SYNNA] </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=374e1a0355c747ac884d8fa91aa4a811-JKOENIG4> |
|---|---|
| To: | Landers, Andrew [ETHUS] |
| Sent: | 6/27/2018 11:13:15 PM |
| Subject: | CPC Request - Expand ULS Buyback program to Decanav and Pentaray |
| Attachments: | CPC - Add DecaNav and Pentaray to Buyback Program.pptx |

Andrew-

Could you give me your thoughts on this request?  Would love your thoughts/support prior to submitting to the full committee.  Any feedback would be greatly appreciated.

**Joe Koenig**
Product Director, Sustainability
M. (714) 878-1975
E.  jkoenig4@its.jnj.com

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
33 Technology Drive
Irvine, CA 92618, USA
www.biosensewebster.com



Innovative v. Biosense
**No. 8:19-cv-01984-JVS**
**JX-3114**

JX-3114, Page 1 of 7     BWI-INN00057216

# This Document has been produced in Native Format

HIGHLY CONFIDENTIAL

**JX-3114, Page 2 of 7**

BWI-INN00057217

# CPC – Expand ULS Buyback program to include DecaNav & Pentaray

June 27, 2018



©Biosense Webster, Inc. 2014 | Meeting Name | Date    1

HIGHLY CONFIDENTIAL

# Current Situation

## Current Situation

- Innovative Health, an independent SUD (single use device) Reprocessor, has just received 510k approval to reprocess BWI DecaNav Catheter
- We suspect that multiple competitive SUD Reprocessors are actively working to submit Pentaray 510k's within the next 12 months
- Current Rolling 12 sales of DecaNav are $9.5M, growing at 33% over PY
- Current Rolling 12 Sales of Pentaray are $90.2M, growing at 39% over PY
- Typical RPO device ASP is 50% of OEM ASP
- Today we have a ULS buyback program available to single use accounts
  - In place to bolster RPO supply and limit supply from competitors
  - Buy back for $100/catheter
  - Pay CAS $15/catheter



©Biosense Webster, Inc. 2014 | Meeting Name | Date    2

# Request, Impact & Justification

## Request

- Expand ULS Buyback program to include DecaNav and Pentaray
- Buy from Pentaray and DecaNav from account for $75/unit
- Pay CAS $15/unit for collections

## Impact

- Projected annual financial impact @$75/unit to account and 15$/unit to CAS :
  - Pentaray: $133,052
  - DecaNav: $24,598
    - Based on analysis of proportion of ULS customers/units to total

## Justification

- Incentivizing customers for collections will increase BWI supply and restrict supply from competitors
- Mitigate immediate risk of negative impact to $100M combined OEM business from competitive reprocessed devices



©Biosense Webster, Inc. 2014 | Meeting Name | Date     3

# **Backup Data**



©Biosense Webster, Inc. 2014 | Meeting Name | Date     4

HIGHLY CONFIDENTIAL

BWI-INN00057217.004

# Impact Assessment Comparing to ULS

| ULS Buyback Customers | Total SUD ULS Customers | Buyback customers percentage of total | | | |
|---|---|---|---|---|---|
| 16 | 672 | 2.4% | | | |

| Total Rolling 12 ULS units bought back | Total Rolling 12 OEM ULS Units sold | Percentage of total ULS SUD bought back | Annual $ Impact @$100/catheter | CAS Payment $15/catheter | Total Annual $ Impact |
|---|---|---|---|---|---|
| 2630 | 92802 | 2.8% | $263,000.00 | $39,450.00 | $302,450.00 |

| Total SUD DecaNav Customers | Potential Decanav Buyback Customers | | | | |
|---|---|---|---|---|---|
| 269 | 6 | | | | |

| Total Rolling 12 OEM DecaNav Units sold | Potential DecaNav Buyback units | Potential Annual $ Impact @ $75/Catheter | Potential Annual Impact CAS Payment @ $15/catheter | Total Potential Annual $ Impact | |
|---|---|---|---|---|---|
| 9644 | 273 | $20,498 | $4,100 | $24,598 | |

| Total SUD Pentaray Customers | Potential Pentaray Buyback Customers | | | | |
|---|---|---|---|---|---|
| 495 | 12 | | | | |

| Total Rolling 12 OEM Pentaray Units Sold | Potential Pentaray Buyback Units | Potential Annual $ Impact @ $75/Catheter | Potential Annual Impact CAS Payment @ $15/catheter | Total Potential Annual $ Impact | |
|---|---|---|---|---|---|
| 52165 | 1478 | $110,876 | $22,175 | $133,052 | |

| Total Projected Annual Impact | $157,650 | | | | |
|---|---|---|---|---|---|


Biosense Webster
PART OF THE Johnson & Johnson FAMILY OF COMPANIES

©Biosense Webster, Inc. 2014 | Meeting Name | Date      5

| From: | Zare, Fairy [BWIUS] </O=JNJ/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=FZARE643> |
|---|---|
| To: | Kowalski, John [BWIUS] |
| Sent: | 2/9/2017 2:34:13 AM |
| Subject: | Re: Medline Reprocessing |

Any time. Thank YOU for staying so engaged and on top of this issue.

On Feb 8, 2017, at 6:46 PM, Kowalski, John [BWIUS] <JKowals1@its.jnj.com> wrote:

Thanks Fairy.
Very helpful info which we can use to target Acu to SS transition accounts with our teams.
John

Sent from my iPhone

On Feb 8, 2017, at 6:49 PM, Zare, Fairy [BWIUS] <fzare@ITS.JNJ.com> wrote:

Hi John,

Absolutely, accelerated transition to Sound Star and helping those physicians fully realize all the benefits of relying on Cartosound in their ablation workflow should be top of mind for us.
Attached are the AcuNav accounts sorted by Area for your review and distribution to your teams.

Best,
Fairy

---

**From:** Kowalski, John [BWIUS]
**Sent:** Wednesday, February 08, 2017 11:40 AM
**To:** Young, Megan [BWIUS]
**Cc:** Orsini, Stephenie [BWIUS]; Lech, Tom [BWIUS]; Crouch, Michael [BWIUS]; Parker, Mary [BWIUS]; Bodner, Michael [BWIUS]; Sidi, Nikki [BWIUS]; Ramos, Conrado [BWIUS]; Zare, Fairy [BWIUS]
**Subject:** Re: Medline Reprocessing

Fairy,
As step one, can you please send us a report of the top 100 highest volume AccuNav accounts sorted by Area? Perhaps one strategy would be to transition as many of these accounts to SoundStar as possible, and offer incentives if needed to do so.
Thanks
John

Sent from my iPhone

On Feb 8, 2017, at 9:30 AM, Young, Megan [BWIUS] <MYoung38@ITS.JNJ.COM> wrote:

Hi All,

Just another update regarding Innovative Solutions/Medline reprocessing. Northwestern (KA) informed us yesterday they will be moving all AcuNav business over to Medline effective immediately. They placed an order for 24 new and 24 reprocessed before telling us this news. The Director of the lab, Brad Knight, told the CAS this decision was made without his input and he was also unaware until yesterday. We have an appointment with purchasing on Friday to discuss the impact this switch will have to their current pricing agreement in an effort to maintain this part of the business.

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-3193**

Obviously, I am concerned about this competitor. They are negotiating directly with the c-suite and our teams are unaware until after a decision is made and the contract is signed. This has already happened in 2 major accounts in the GL's (Mayo and Northwestern) and in 2 accounts in the MA. They are strategically picking off our AcuNav business and telling customers to continue buying SS 8FR from us until they receive FDA approval. I think we need to discuss our strategy for this competitive threat on the next leadership call.

Meg

---

**From:** Young, Megan [BWIUS]
**Sent:** Wednesday, January 18, 2017 11:48 AM
**To:** Orsini, Stephenie [BWIUS]; Lech, Tom [BWIUS]; Crouch, Michael [BWIUS]; Kowalski, John [BWIUS]; Parker, Mary [BWIUS]
**Cc:** Bodner, Michael [BWIUS]; Sidi, Nikki [BWIUS]; Ramos, Conrado [BWIUS]
**Subject:** RE: Medline Reprocessing

Thanks Steph.

The Mayo is telling us that their relationship with Innovative Solutions (distributed by Medline) will be implemented "enterprise wide" meaning across all of UMCSC. I am attaching the list of accounts that are part of UMCSC for your reference. 32/67 members have EP programs.

Meg

**From:** Orsini, Stephenie [BWIUS]
**Sent:** Wednesday, January 18, 2017 9:19 AM
**To:** Young, Megan [BWIUS]; Lech, Tom [BWIUS]; Crouch, Michael [BWIUS]; Kowalski, John [BWIUS]; Parker, Mary [BWIUS]
**Cc:** Bodner, Michael [BWIUS]; Sidi, Nikki [BWIUS]; Ramos, Conrado [BWIUS]
**Subject:** Medline Reprocessing

I wanted to update you regarding the competitive activity we have been seeing in the Mid Atlantic.  Several months ago Megan updated us regarding Medline, a third player in reprocessing.  We are now seeing them in the Mid Atlantic.  They seem to be targeting Sterilmed accounts first and have converted several accounts that have been Sterilmed customers since J&J acquired the company.

From what I could find on their website, their program is called "ReNewal".  They advertise many aspects of the reprocessing strategy that have been obstacles to our program.

On-Demand Access
Our real-time web portal provides the ability to manage and assess your reprocessing program's performance 24/7. Customers find our OnDemand system an extremely efficient way to track their shipments, packing lists and financial results online.

This translates to more cost-effective and productive operations. Email alerts are also sent at different stages of your order to help you stay on top of where your devices are and when you can expect a new shipment.

The coverage policy will be key to us protecting our Lasson NAV and Soundstar business.  This will be an additional threat to our Acunav business.

Stephenie

Stephenie Orsini
Area Director Mid-Atlantic
Cell 614-395-8130
sorsini@its.jnj.com

**Biosense Webster, Inc.**

---

JX-3193, Page 2 of 3 BWI-INN00074427

Part of the Johnson & Johnson Family of Companies
3333 S. Diamond Canyon Road
Diamond Bar, CA 91765, USA
www.biosensewebster.com

<image001.png>

**Confidentiality Notice:** This document is J&J Proprietary. You may forward this document within J&J on a need to know basis. You may not forward this onto the Internet without the author's permission. This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited.  If you have received this e-mail transmission in error, please reply to the sender, so that J&J can arrange for proper delivery, and then please delete the message from your inbox.


<AcuNav Units 2016_Central.xlsx>
<AcuNav Units 2016_Great Lakes.xlsx>
<AcuNav Units 2016_MidAtlantic.xlsx>
<AcuNav Units 2016_Northeast.xlsx>
<AcuNav Units 2016_Southeast.xlsx>
<AcuNav Units 2016_West.xlsx>

# This Document has been produced in Native Format

Innovative v. Biosense
No. 8:19-cv-01984-JVS
JX-3207



HIGHLY CONFIDENTIAL

BWI-INN00075788.001



Patients: By providing quality ultrasound catheters that have passed our performance criteria we ensure patient safety

Customers: Hospitals need to consider costs as we know reprocessing is here to stay.

Communities:  Customers looking for sustainable solutions

Shareholders: Every reprocessed catheter sold contributes to bottom line



At launch ULS was growing 2-3% each year

We wanted to offer customers a simple solution for all their EP lab needs by providing a way to purchase a portfolio of new and reprocessed EP lab products.

*The goal of this program is to increase customer loyalty to BWI products, and thereby increase BWI share and revenue*

Demonstrate the Impact of the Program

- Success taking share from Stryker
    - Ex: Stryker has stopped selling Acunav 10F due to supply constraints (caused by BWI collections)

HIGHLY CONFIDENTIAL

BWI-INN00075788.004

4



HIGHLY CONFIDENTIAL

BWI-INN00075788.005

## Additional Share Info

| Share of Reprocessed Market | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|
| Stryker | | 95% | 75% | 67% |
| SMD/BWI | | 5% | 25% | 33% |

| Share of OEM Market | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|
| BWI | 76% | 71% | 66% | 68% |
| SJM | 8% | 15% | 19% | 18% |
| BSX | 16% | 13% | 15% | 15% |



©Biosense Webster, Inc. 2014 | Meeting Name | Date     6



HIGHLY CONFIDENTIAL

BWI-INN00075788.007



- Adding CAS Collections

- Collections turnaround time for bins, supplies

- Reports & Dashboard accuracy (reports will now be automated and have 1 week delay in collections rather than 1 month)

- Customers blocked from ordering ULS in SMD system to reduce confusion and competition between field forces


- In 2016 Stericycle will take over collections for SMD's ASR's.  Customers have been notified.  No action required from BWI team.

- We are working to improve reporting and metrics to improve dashboard accuracy

HIGHLY CONFIDENTIAL

BWI-INN00075788.008

8



Reprocessing isn't going away



Understand how products were selected

- VOC research journey and highlights
  - In total, 10 Electrophysiologists and 28 Administrator types participated
  - Program Interest & Opinions: Introduction of the program was supported by strong positive reactions from respondents
    - For many participation was dependent on overall cost savings, Physician buy-in & how it would impact other reprocessing efforts in hospital
  - Unprompted, customers named quality, cost, support and guarantee as the reason they were most interested in the program
  - The majority of respondents would like the Full EP Portfolio discount; this was the highest rated option. Other options included savings off new catheters, annual rebates, and blended pricing

In summary – we are providing customers what they asked for. Anticipating customer excitement around the expanded offering

HIGHLY CONFIDENTIAL

BWI-INN00075788.011

10

## Program Requirements Refresh

- **2:1 ratio**
  *Customer must purchase a minimum of 1 new catheter for every 2 reprocessed catheters they purchase*

- **80% returns requirement**
  *Customers must return 80% of the new products they purchase*


Biosense Webster.
PART OF THE *Johnson-Johnson* FAMILY OF COMPANIES

©Biosense Webster, Inc. 2014 | Meeting Name | Date    11

HIGHLY CONFIDENTIAL



Clarify rebate target

Over 250 Soundchoice customers also purchase Lasso and/or CS

Key Segments:

1. Current Sound Choice Customers that currently purchase Lasso and/or CS catheters from Stryker

2. Current Stryker customers that have not converted ULS business to BWI

Single use customers are not a target. However, when a single use customer initiates a discussion on reprocessing we want to serve them as well









HIGHLY CONFIDENTIAL

BWI-INN00075788.018

## Details of Collections Rebate

| | |
|---|---|
| **Timing** | March 1 – June 1 |
| **ULS Target Customers** | **Single use** customers who purchase new ULS from BWI. *Current Sound Choice customers are not eligible for a Collections Rebate on ULS products* |
| **LASSO Target Customers** | **Single Use** LASSO® customers, or purchase LASSO from Stryker |
| **Rebate Amount** | $25 / LASSO *(list of all product families in backup)* $75 / ULS *(list of all product families in backup)* |

**Biosense Webster**
PART OF THE *Johnson&Johnson* FAMILY OF COMPANIES

©Biosense Webster, Inc. 2014 | Meeting Name | Date    18

Specify LASSO vs ULS target customer

## Rebate Payout

- Customer must sign rebate agreement in order to be eligible for the program

- Rebate will be processed within 90 days from the end of measurement period

- SMD and BWI Marketing will reconcile and provide collection report necessary to validate rebate amount

- HCS will process rebate payment and send check to the account

 Biosense Webster®
PART OF THE Johnson&Johnson FAMILY OF COMPANIES

©Biosense Webster, Inc. 2014 | Meeting Name | Date    19



Send reminder end of June to remind you to send all catheters by June 1; postmarked

Remove Cas training


This program will run from March 1 – June 1

The rebate will be a cash payment to customers at the end of the three months

$25/Lasso & $75/ULS


We have made sure this will be easy for you.  Here is what you need to do:

- First, Identify the accounts that would be the right targets.  Do this right away and make sure this is completed by the end of Feb.
- Second, Request the contract through the contracts mailbox on March 1, which is the start date of this program
- Third, return the signed contract to the contracts mailbox


At this point your account the account will be setup internally following the same process we use to setup Sound Choice accounts.  Sterilmed will assign someone to collections and

will ship supplies.

If you sign up a single use account that does not have a SMD ASR then a CAS will be assigned.









HIGHLY CONFIDENTIAL                                                   BWI-INN00075788.026

24



15 min break

HIGHLY CONFIDENTIAL     BWI-INN00075788.027



Corporate accounts participating in program

HIGHLY CONFIDENTIAL

BWI-INN00075788.028

## Corporate Accounts

**21 Sterilmed Certified Performance Accounts:**

- Premier GPO (8):  Focus on:
    - Simplified ordering process
    - Competitive pricing
    - BWI contract performance leverage
    - Efficient collections

- Catholic Healthcare Initiative IDN (13): Focus on all the above plus:
    - Fact of 40% IDN wide standardization to BWI Certified Performance
    - Ease of program implementation under HPG #4467
    - HPG Standardization Incentive Program (SIP)

 Biosense Webster.
PART OF THE Johnson&Johnson FAMILY OF COMPANIES

©Biosense Webster, Inc. 2014 | Meeting Name | Date    27

# Corporate Accounts

**SIP Details:**

- Announced to HPG membership on 11/21/2014 via HPG Response Newsletter
- $60 rebate paid per unit of <u>**new**</u> ultrasound catheter
- Available to eLOC HPG members only
- Requires signature of four (4) page HPG SIP acknowledgment document
  - 2:1 ratio requirement
  - 80% new ULS catheter collections
- Rebate paid out to member every 6 months
- Available to single use members as well



©Biosense Webster, Inc. 2014 | Meeting Name | Date     28

## Corporate Accounts

**Tenet Healthcare Transition to HPG:**

- Effective 2/1/2016
- Tenet version vs. HPG version of Sound Choice
  - 2:1 ratio requirement
  - 80% new ULS catheter collections
- BWI Action Plan (Drive Value):
  1. Transition accounts to HPG pricing (eLOC/S-2)
  2. Secure No Charge PO's for ASA Eligible Accounts & install **Carto® 3 ConfiDENSE™ /Carto® 3 Replay™** (90 day spread)
  3. Conduct HPG overall Sound Choice compliance review after 5/1/2016
  4. Address non-compliance at HPG corporate level before local level



©Biosense Webster, Inc. 2014 | Meeting Name | Date    29



Brochure



HIGHLY CONFIDENTIAL

BWI-INN00075788.033



Images coming

## Sales Tools

- Describes Dx catheters offered by Sterilmed.
  - Fixed
  - Steerable

- Current users of RPO Dx EP catheters

- Customer initiated requests to start reprocessing Dx EP catheters



*Final version coming soon!*



©Biosense Webster, Inc. 2014 | Meeting Name | Date    33

HIGHLY CONFIDENTIAL                                                    BWI-INN00075788.035



•Contact info shared with SMD so there are no excuses for lack of communication between teams

HIGHLY CONFIDENTIAL
BWI-INN00075788.036



HIGHLY CONFIDENTIAL

BWI-INN00075788.037

## Certified Performance Simulation

- **Select a real account sales opportunity**
- **Who are your "5.4"?**
  - Identify the various stakeholders, as well as their "Customer Stakeholder Profile"
    - Target a "Mobilizer"
      - Facilitates group discussions
      - Helps others realized shared needs/goals
      - Teaches colleagues something new that we address
      - Resolves disagreements between colleagues
  - **Create your Commercial Teaching**

 Biosense Webster.
PART OF THE Johnson&Johnson FAMILY OF COMPANIES

©Biosense Webster, Inc. 2014 | Meeting Name | Date    36



HIGHLY CONFIDENTIAL

BWI-INN00075788.039



HIGHLY CONFIDENTIAL

BWI-INN00075788.040



HIGHLY CONFIDENTIAL

BWI-INN00075788.041

## Reframing Your Customers' Thinking

- Reframe: An idea that **changes** how your customer views their situation or problem
- Reframes answers questions around:
  - What mistakes does the Customer make today
  - What should the Customer be doing differently?
  - What incorrect assumptions has your customer made?
  - What might the Customer be underestimating?
  - What needs might the Customer not realize they have?
- Reframes have the following components:
  - Links together FACTS and CUSTOMER NEEDS

 Biosense Webster.
PART OF THE Johnson&Johnson FAMILY OF COMPANIES

©Biosense Webster, Inc. 2014 | Meeting Name | Date     40

HIGHLY CONFIDENTIAL     BWI-INN00075788.042

## Reframing Your Customers' Thinking, cont.

- Reframes should be:
  - Focused on getting from "A" to ""B
    - Know the "A" and what is causing it
  - New and different for the customer
  - Rooted in persuasive facts or information
  - Linked to a customer need
  - Creative
  - Something that creates Constructive Tension
    - The three "Ohs"



©Biosense Webster, Inc. 2014 | Meeting Name | Date    41

4

HIGHLY CONFIDENTIAL                                                    BWI-INN00075788.043

HIGHLY CONFIDENTIAL

BWI-INN00075788.044



HIGHLY CONFIDENTIAL

BWI-INN00075788.045

43

## Certified Performance Simulation

- • Preparation (10 min.):
  - • Review account's business goals, complete a SWOT analysis
  - • Review sales history
- • Simulation (10 min.)
  - • Review
    - • Identify the customer you are simulating the call for
      - • Provide account's buyer style (if known)
    - • SWOT analysis
- • Feedback (5 min.)
  - • Quality of Challenger Insights
  - • Tailoring to account's styles and business
  - • Overall effectiveness

Biosense Webster.
PART OF THE Johnson&Johnson FAMILY OF COMPANIES

©Biosense Webster, Inc. 2014 | Meeting Name | Date    44

4

HIGHLY CONFIDENTIAL                                                      BWI-INN00075788.046

44



HIGHLY CONFIDENTIAL

BWI-INN00075788.047

45





HIGHLY CONFIDENTIAL

BWI-INN00075788.049

| From: | Koenig, Joseph [SYNNA] </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=374e1a0355c747ac884d8fa91aa4a811-JKOENIG4> |
|---|---|
| To: | Somers, Nathan [BWIUS]; Richey, Mark [BWIUS]; Lee, Travis [BWIUS]; Munoz, Amy [BWIUS]; Dawes, Courtney [BWIUS]; Mahaffey, Nathanael [BWIUS]; Gaughan, Terence [BWIUS]; Terrazas, Katie [BWIUS]; Burnham, Paul [BWIUS]; Junaid, Shoaib [BWIUS]; Krivor, Simon [BWIUS]; Shellaberger, Howard [BWIUS]; Iorio, Joseph [BWIUS]; Conlon, Melissa [BWIUS]; Pinkey, Joshua [BWIUS]; Lee, Michael [BWIUS]; Leventis III, Andrew P. [BWIUS]; Malone, Michael [BWIUS]; Karka, Michael [BWIUS]; Scoville, Natalie [BWIUS]; Bennett, Jeffrey [ACCUS]; Parker, James [BWIUS]; Young, Molly [BWIUS]; Nussbaum, Jonathan [BWIUS]; Hoogenstyn, Ross [BWIUS]; Okazaki, Lonnie [BWIUS]; Vetrano, Robert [BWIUS]; Goff, Benjamin [BWIUS]; Osberg, James [BWIUS] |
| CC: | Matelski, Jayme [BWIUS]; Barlow, Chris [BWIUS]; Krenek, Marcus [BWIUS]; Weir, Jennifer [BWIUS]; Patel, Amit [BWIUS]; Zoe, Chuck [BWIUS]; Hudson, David [BWIUS]; O'Quinn, Derek [BWIUS]; Barone, Richard [BWIUS]; Stilwell, Thomas [BWIUS]; Gonzalez, Deidre [BWIUS]; Emmerich, Matthew [BWIUS]; Wannamaker, Kenneth [BWIUS]; Lubinsky, Susan [BWIUS]; Brady, Emily [BWIUS]; Wells, Kevin [BWIUS]; Allen, Brandon [BWIUS]; Walker, Krista [BWIUS]; Tucker, Derek [BWIUS]; MacIntosh, Scott [BWIUS] |
| Sent: | 7/10/2018 12:07:38 AM |
| Subject: | Field Intel Requested - DecaNav Collections |
| Attachments: | Copy of DecaNav Account Level Sales_$50K+ - EDIT.xlsx |

Field Sales Leaders-

If you are receiving this, it means that you have an account in your geography that purchases $50K+ in BWI DecaNav annually (see attached file).  In an effort to better understand how Innovative Health will source the supply for their RPO iteration, could you please reply if you are aware of any collections in the EP lab besides us or Stryker?  Based on your feedback, we may consider proposing programs that could divert these collections to us. Any information would be greatly appreciated.  Thank you.

Best,

**Joe Koenig**
Product Director, Sustainability
M. (714) 878-1975
E. jkoenig4@its.jnj.com

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
33 Technology Drive
Irvine, CA 92618, USA
www.biosensewebster.com



Innovative v. Biosense
No. 8:19-cv-01984-JVS
JX-3270

**This Document has been produced in Native Format**

HIGHLY CONFIDENTIAL    **JX-3270, Page 2 of 3**    BWI-INN00105171

| | UCN | RBD | TM | Account | Prior Rolling 12 Months | Rolling 12 Months | Change | Growth | Rolling 12 Months & Prior |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 78872 | Jayme Matelski | Nathan Somers | ABBOTT NORTHWESTERN HOSP | $693,360 | $831,786 | $138,426 | 19.96% | **$1,525,146** |
| 2 | 4186 | Chris Barlow | Mark Richey | SAINT DAVIDS MEDCL CTR | $595,764 | $627,380 | $31,616 | 5.31% | **$1,223,144** |
| 3 | 3692 | Mark Krenek | Travis Lee | CHI BYLR ST LUKES HOSP | $511,494 | $582,888 | $71,394 | 13.96% | **$1,094,382** |
| 4 | 3682 | Jennifer Weir | Amy Munoz | BAYLOR ALL STS MEDCL CTR | $241,200 | $480,765 | $239,565 | 99.32% | **$721,965** |
| 5 | 26974 | Mark Krenek | Courtney Dawes | MEML HERMANN TX MEDCL CTR | $296,759 | $333,180 | $36,421 | 12.27% | **$629,939** |
| 6 | 1092357 | Amit Patel | Nathanael Mahaffey | NEW YORK - PRESBY HOSP | $308,568 | $271,343 | ($37,225) | -12.06% | **$579,911** |
| 7 | 3693 | Mark Krenek | Travis Lee | HOUSTON METHODIST HOSP | $321,762 | $266,994 | ($54,768) | -17.02% | **$588,756** |
| 8 | 3834 | Chuck Zoe | Terry Gaughan | SCRIPPS MEML HOSP | $233,148 | $249,390 | $16,242 | 6.97% | **$482,538** |
| 9 | 72371 | David Hudson | Katie Terrazas | SAINT VINCENT HOSP CATH | $196,641 | $232,162 | $35,521 | 18.06% | **$428,803** |
| 10 | 13951 | Derek O'Quinn | Paul Burnham | PRVDNCE ALASKA MEDCL CTR | $250,536 | $211,387 | ($39,149) | -15.63% | **$461,923** |
| 11 | 62587 | Rick Barone | Shoaib Junaid | THE COOPER HLTH SYST | $17,025 | $209,975 | $192,950 | 1,133.33% | **$227,000** |
| 12 | 2514 | Amit Patel | Simon Krivor | MONTEFIORE MEDCL CTR | $48,177 | $141,804 | $93,627 | 194.34% | **$189,981** |
| 13 | 1007180 | Conor Stilwell | Howard Shellaberger | CHANDLER REGL HOSP | $98,879 | $132,007 | $33,128 | 33.50% | **$230,886** |
| 14 | 1113974 | Conor Stilwell | Joseph Iorio | ARIZONA HEART HOSP | $25,144 | $131,108 | $105,964 | 421.43% | **$156,252** |
| 15 | 2530 | Deidre Gonzalez | Melissa Bergold | LONG ISLE JWSH MEDCL CTR | $52,116 | $128,451 | $76,335 | 146.47% | **$180,567** |
| 16 | 6261 | Matt Emmerich | Josh Pinkey | MERCY HOSP ANDERSON | $93,200 | $118,980 | $25,780 | 27.66% | **$212,180** |
| 17 | 1326478 | Mark Krenek | Travis Lee | BAY AREA REGL MEDCL CTR | $128,192 | $110,550 | ($17,642) | -13.76% | **$238,742** |
| 18 | 2434 | Deidre Gonzalez | Michael Lee | HACKENSACK UNIV MEDCL CTR | $100,395 | $110,526 | $10,131 | 10.09% | **$210,921** |
| 19 | 3766 | Conor Stilwell | Howard Shellaberger | TUCSON MEDICAL CTR | $59,400 | $109,728 | $50,328 | 84.73% | **$169,128** |
| 20 | 52320 | Mark Krenek | Courtney Dawes | KINGWOOD MED CTR | $67,712 | $105,225 | $37,513 | 55.40% | **$172,937** |
| 21 | 7088 | Mark Krenek | Travis Lee | CLEAR LK REGL MEDCL CTR | $42,826 | $93,863 | $51,037 | 119.17% | **$136,689** |
| 22 | 1116 | Conor Stilwell | Howard Shellaberger | BANNER GOOD SAMARITAN | $24,896 | $91,872 | $66,976 | 269.02% | **$116,768** |
| 23 | 426629 | Ken Wannamaker | Andrew Leventis | GREENVILLE HLTH SYST | $14,400 | $91,800 | $77,400 | 537.50% | **$106,200** |
| 24 | 72501 | Matt Emmerich | Josh Pinkey | UNIVERSITY OF CINCINNATI | $5,844 | $91,556 | $85,712 | 1,466.67% | **$97,400** |
| 25 | 1030173 | Susan Lubinsky | Michael Malone | NWN MEML HOSP | $89,930 | $76,898 | ($13,032) | -14.49% | **$166,828** |
| 26 | 4879 | Emily Simmons | Michael Karka | MUNROE REGL MEDCL CTR | $4,140 | $76,590 | $72,450 | 1,750.00% | **$80,730** |
| 27 | 3647 | Kevin Wells | Nataile Scoville | HILLCREST MEDCL CTR | $0 | $75,150 | $75,150 | /0 | **$75,150** |
| 28 | 7038 | Brandon Allen | Jeff Bennett | FAWCETT MEML HOSP | $39,312 | $72,892 | $33,580 | 85.42% | **$112,204** |
| 29 | 381667 | Brandon Allen | Jeff Bennett | VA HOSP TAMPA SSF | $78,602 | $72,737 | ($5,866) | -7.46% | **$151,339** |
| 30 | 44570 | Krista Walker | Molly Young | UCHEALTH UNIV OF CO HOSP | $23,276 | $71,944 | $48,668 | 209.09% | **$95,220** |
| 31 | 6690 | Jennifer Weir | Amy Munoz | PLZ MEDCL CTR OF FT WORTH | $48,900 | $70,587 | $21,687 | 44.35% | **$119,487** |
| 32 | 16509 | Mark Krenek | Courtney Dawes | TX CHLDS HOSP | $111,735 | $68,760 | ($42,975) | -38.46% | **$180,495** |
| 33 | 57774 | Rick Barone | Shoaib Junaid | PROSPECT CCM LLC | $44,640 | $66,960 | $22,320 | 50.00% | **$111,600** |
| 34 | 6680 | Derek Tucker | James Parker | MEDICAL CITY DALLAS HOSP | $46,345 | $64,350 | $18,005 | 38.85% | **$110,695** |
| 35 | 2685 | Scott Macintosh | Jonathat Nussbaum | THE HOSP OF THE UNV OF PA | $58,995 | $63,971 | $4,976 | 8.43% | **$122,966** |
| 36 | 410762 | Joel Criner | Ross Hoogenstyn | MERCY GEN HLTH PARTNERS | $0 | $63,889 | $63,889 | /0 | **$63,889** |
| 37 | 1072988 | Jennifer Weir | Amy Munoz | AM HOSP CATH LABS LLP | $0 | $57,408 | $57,408 | /0 | **$57,408** |
| 38 | 3947 | Derek O'Quinn | Lonnie Okazaki | THE QUEEN'S MEDCL CTR | $43,200 | $55,946 | $12,746 | 29.50% | **$99,146** |
| 39 | 7163 | Rick Barone | Robert Vetrano | SAINT BARNABAS MEDCL CTR | $15,648 | $52,812 | $37,164 | 237.50% | **$68,460** |
| 40 | 4205 | Marlene Washington | Ben Goff | SANTA BARBARA COTGE | $27,508 | $52,688 | $25,180 | 91.54% | **$80,196** |
| 41 | 4152 | Jayme Matelski | James Osberg | CENTRACARE ST CLOUD HOSP | $33,396 | $50,600 | $17,204 | 51.52% | **$83,996** |

HIGHLY CONFIDENTIAL

BWI-INN001051.001

| From: | Palfi, Sandor [BWIUS] </O=JNJ/OU=CRDUSBA/CN=RECIPIENTS/CN=SPALFI2> |
|---|---|
| To: | Zare, Fairy [BWIUS] |
| CC: | Hummell, David [BWIUS]; Ewalt, Jerry [BWIUS]; Sidi, Nikki [BWIUS]; Bartee, Alanna [BWIUS] |
| Sent: | 10/6/2016 4:56:18 PM |
| Subject: | Re: Sterilmed cannabalization of our single use DX |
| Attachments: | image001.jpg |

Dave,

In the past these we exactly the situations that undermined the collaboration between individuals. Can we get a clear message out to SMD sales force on this?

Thanks,
sp

Sent from my iPad

On Oct 6, 2016, at 11:38 AM, Zare, Fairy [BWIUS] <fzare@ITS.JNJ.com> wrote:

Hi David and Jerry,

The below came up yesterday. Will you please look into it? I think we all agree that we should not be approaching single use BWI accounts – and definitely not without the partnership of the BWI TM so I'd like to understand the circumstances for this situation so we can assure the BWI sales organization that we're aligned with the SMD team – specially as we're getting ready to launch CS/Lasso.

Thank you,
Fairy

---

**From:** Criner, Joel [BWIUS]
**Sent:** Wednesday, October 05, 2016 2:28 PM
**To:** Zare, Fairy [BWIUS]; Young, Megan [BWIUS]
**Cc:** Sidi, Nikki [BWIUS]; Phillips, Robert [BWIUS]
**Subject:** RE: Sterilmed cannabilization of our single use DX

Fairy,

The two accounts affected are Lakeland Regional in St. Joseph, MI, and Sparrow Health in Lansing, MI.  There is no Stryker presence in either account.

Best Regards,

Joel Criner
Regional Business Director
612.308.6560

<image001.jpg>

---

**From:** Zare, Fairy [BWIUS]
**Sent:** Wednesday, October 05, 2016 4:22 PM
**To:** Criner, Joel [BWIUS]; Young, Megan [BWIUS]
**Cc:** Sidi, Nikki [BWIUS]; Phillips, Robert [BWIUS]

Innovative v. Biosense
No. 8:19-cv-01984-JVS
JX-3325

**Subject:** RE: Sterilmed cannabilization of our single use DX

Joel and team,

Thanks for bringing this to our attention. I'll speak with David Hummel about this.

Fairy

---

**From:** Criner, Joel [BWIUS]
**Sent:** Wednesday, October 05, 2016 5:53 AM
**To:** Young, Megan [BWIUS]
**Cc:** Sidi, Nikki [BWIUS]; Zare, Fairy [BWIUS]; Phillips, Robert [BWIUS]
**Subject:** Re: Sterilmed cannabilization of our single use DX

It's just a blatant cannibilizing in accounts that aren't using Stryker.

It appears we just lost 300k in single use DX business at Lakeland Health in MI.

The TM is Ted Zeigler

Sent from my iPhone

Joel Criner
Regional Business Director
Biosense Webster
612-308-6560

On Oct 5, 2016, at 7:10 AM, Young, Megan [BWIUS] <MYoung38@ITS.JNJ.COM> wrote:

Nikki and Fairy,

We know this should not be happening. How would you recommend I handle this? This is the second time this year we have had an issue with Sterilmed reps trying to convert our single use customers.

Should I reach out to Dave Hummel directly?

Meg

---

**From:** Criner, Joel [BWIUS]
**Sent:** Tuesday, October 04, 2016 12:12 PM
**To:** Young, Megan [BWIUS]
**Cc:** Phillips, Robert [BWIUS]
**Subject:** Sterilmed cannabilization of our single use DX

Meg,

So what's the line at this point in time with Sterilmed rep calling on single use DX customers, and pitching re-use of our DX catheters to them.  Our Sterilmed is just directly working to convert our single use DX business.  This only erodes J&J Asp and profits.  What is our action in response to this?

Best Regards,

Joel Criner
Regional Business Director
612.308.6560

<image001.jpg>

**JX-3325, Page 2 of 3**

Biosense Webster
a Johnson & Johnson company

JX-3325, Page 3 of 3

BWI-INN00113435

# This Document has been produced in Native Format

Innovative v. Biosense
No. 8:19-cv-01984-JVS
JX-3329

BWI-INN00114083



Biosense Webster, Inc.

# Business Review 2018

Caution:  US law restricts this device to sale by or on the order of a physician.
Important information: Prior to use, refer to the instructions for use supplied with this device for indications, contraindications,
side effects, warnings and precautions.

Third Party trademarks used herein are trademarks of their respective owners.

047282-180131
1
©Biosense Webster, Inc. 2018 | Business Review

HIGHLY CONFIDENTIAL



Slide customizable by field sales rep



## Review of Partnership

**Loma Linda University** **Biosense Webster, Inc.**

- Additional Clinical Resources - Clinical Account Executives
  ○ Lynn Ho
  ○ Mike Houck

- Limited Market Release Site
  ○ New products showcase hospital

- Carto Version 6

- HD Coloring

- Investigator Initiated Studies

- Partnership with Biosense Webster R&D

- Market Development for EP physicians

- Strategies to Optimize Reimbursement

- Physician locator tool for prospective patients



Slide customizable by field sales rep

# Afib Has Significant Medical, Economic and Quality of Life Impacts

 Atrial fibrillation (Afib) is the **most common heart rhythm disorder** in the U.S.[1]

 More than **50% of patients don't respond** to or cannot tolerate drug therapy[2]

 Afib increases a person's risk for stroke **five-fold**[3]

 Condition can have a **significant negative impact** on quality of life[4]

 In the U.S. alone, Afib puts an **estimated $16 billion burden** on the health care system each year[5]

 **3 million in the U.S. and 20 million worldwide affected** by Afib; prevalence projected to increase significantly as population ages[6]

1. https://www.hrsonline.org/Patient-Resources/Heart-Diseases-Disorders/Atrial-Fibrillation-AFib
2. Calkins et al. Circ Arrhythm Electrophysiol 2009;2:349-361.
3. Wolf et al. Stroke 1991;22:982-988.
6. Chugh et al. Circulation 2014;129:837-847.

THERMOCOOL® Navigation Catheters are indicated for the treatment of drug refractory recurrent symptomatic paroxysmal atrial fibrillation, when used with CARTO® Systems (excluding NAVISTAR® RMT THERMOCOOL® Catheter).

4. Deaton et al. Heart Lung 2003;32:291-9.
5. Kim et al. Circ Cardiovasc Qual Outcomes. 2012;5:85-93.

Biosense Webster
PART OF THE Johnson&Johnson FAMILY OF COMPANIES

## U.S. Electrophysiology Market

| 2016 U.S. MARKET SIZE * | U.S. MARKET 2013 - 2023 CAGR* | PROJECTED U.S. MARKET 2023* |
|---|---|---|
| $1.9B | 10.1% | $3.6B |



**$1.9B U.S. EP market growing at 10%**
- Penetration of ablation to treat atrial fibrillation remains under 10%**





**Biosense Webster, Inc. currently holds #1 market position in the U.S. ***

*Estimates as per Decisions Research Group, Electrophysiology Mapping and Ablation Devices U.S. 2017, June 2017. All rights reserved. Reproduction, distribution, transmission or publication is prohibited. Reprinted with permission. As these estimates are from a third party source, Biosense Webster, Inc. does not make and hereby disclaims any and all representations or warranties relating to the sufficiency and/or accuracy of the information provided by Millennium Research Group and shall not in any way be liable for the same.

**Internal Estimates

***Based on Q2 2017 DRG PriceTrack unit and revenue share data. ©2017 Millenium Research Group. All Rights Reserved.



## U.S. Ablation Procedure Volume





| CAGR<br>2010 – 2020 | |
|---|---|
| AF | 16.6% |
| VT | 5.8% |
| AFL | 3.9% |
| SVT | 2.7% |
| ALL | 9.8% |

**Catheter ablations are projected to continue increasing over the next five years**

THERMOCOOL® Navigation Catheters are approved for drug refractory recurrent symptomatic atrial fibrillation, when used with CARTO® Systems (excluding NAVISTAR® RMT THERMOCOOL® Catheter).
©2015 Millennium Research Group, Inc. All rights reserved. Reproduction, distribution, transmission or publication is prohibited. Reprinted with permission.
As these estimates are from a third party source, Biosense Webster, Inc. does not make and hereby disclaims any and all representations or warranties relating to the sufficiency
and/or accuracy of the information provided by Millennium Research Group and shall not in any way be liable for the same.



HIGHLY CONFIDENTIAL

## Expansion to Accommodate Growing Market



**2009**
~120 CAS*
>50% of NAV cases covered

**2018**
~800 CAS*
~95% of NAV cases covered

**Clinical Account Specialist (CAS) Team:**
- Clinical support is a cornerstone of our service and value-add proposition
- As the electrophysiology business has grown, we've added resources to support our customers



Biosense Webster, Inc. Advocated on Behalf of Customers for Appropriate OUTPATIENT Coding and Payment

In response to the unexpected 2013 payment decrease, Biosense Webster, Inc. analyzed the CMS data and sent a comment letter to CMS recommending a revised method for calculating cost data for outpatient EP ablations.



$1,661 (10.6%) increase for Medicare outpatient ablations in 2018

CMS-1589-FC Hospital Outpatient Prospective Payment System and CY 2013 Payment Rates
CMS-1601-FC Hospital Outpatient Prospective Payment System and CY 2014 Payment Rates
CMS-1613-FC Hospital Outpatient Prospective Payment System CY 2015 Payment Rates
CMS-1633-FC Hospital Outpatient Prospective Payment System CY 2016 Payment Rates
CMS-1656-FC Hospital Outpatient Prospective Payment System CY 2017 Payment Rates
CMS-1678-FC Hospital Outpatient Prospective Payment System CY 2018 Payment Rates





The CARTO® 3 System

Many Arrhythmias, One Solution™

# A Long Legacy of Innovation


**1995**
**CARTO®** System
The innovation and ground-breaking real-time 3D electroanatomical mapping system goes global


**1996**
**NAVISTAR®** Catheter
Approved in Europe for ablation, this milestone signaled an important advance: the first combination diagnostic and ablation catheter


**1997**
**THERMOCOOL®** Catheter
The world's first irrigated-tip catheter is launched in Europe


**1997**
**LASSO®** Catheter
The approval of the world's first circular mapping catheter enables clinicians capture recording from the pulmonary veins


**2005**
**CARTOMERGE®** Module
First module combining precision CARTO® XP System maps with pre-acquired 3D CT or MRI images


**2006**
**CARTOSOUND®** Module
The CARTOSOUND® Module integrates real-time 3D imaging with intracardiac echo


**2009**
**CARTO®** System
The CARTO® System revolutionizes 3D mapping technology by increasing the accuracy, speed and efficiency of the procedure


**2009**
**CARTO®** CFAE Module
Efficiently identify complex fractionated atrial electrograms (CFAE) Find key areas of interest and automatically detects CFAE signals on a 3D map



# A Long Legacy of Innovation


**2010**
**CARTO® Express**
The CartoXPress® Module for the Carto® XP System provides fast mapping and enhanced visualization of the Lasso® NAV Catheter toop to help you see the target chamber and your primary catheters clearly and accurately


**2010**
**CARTO® FAM Module**
FAM allows you to quickly build a map with Carto® system accuracy by using a sensor-based catheter, such as the NaviStar® Catheter or Fixed Lasso® NAV Catheter


**2011**
**THERMOCOOL® SF Catheter**
Featuring advanced irrigation technology, this catheter maximizes cooling of the catheter tip and optimizes fluid delivery with half the flow rate of earlier Biosense Webster, Inc. generation of catheter without porous tip technology


**2011**
**CARTO® 3 System MEM Version**
The approval of the world's first circular mapping catheter enables clinicians capture recording from the pulmonary veins


**2011**
**CARTO® AccuRESP® Module**
The new AccuRESP® Module reduces effects of respiration motion for a new level of mapping


**2012**
**CARTOUNVU® Module**
Enabling clinicians to seamlessly merge a static fluoro image with real-time cardiac maps into a single, accurate 3D view


**2013**
**CARTO VISITAG™ Module**
The first technology to incorporate parameters of lesion formation that can be indexed by the user according to their ablation strategy


**2013**
**PASO™ Module**
The first technology to integrate pace mapping with three-dimensional mapping the PASO™ Module streamlines VT pace mapping and facilities fast identification of the VT target site


**2014**
**THERMOCOOLSMARTTOUCH®**
**Catheter**
A therapeutic catheter to enable the direct and real time measurement of contract force during catheter ablation procedures



# A Long Legacy of Innovation



**2014**
**CONFIDENSE® Module**
Continuous Mapping designed to expedite map creation based on filtered data points



**2017**
**RIPPLE MAPPING**
Enables simultaneous dynamic visualization of propagation, activation and voltage



**2014**
**CARTOREPLAY™ Module**
Continuous Mapping designed to expedite map creation based on filtered data points



**2017**
**CARTO® 3 SYSTEM:**
**VERSION 6 SOFTWARE**
Enables "Glass Mode" to reduce visual clutter while preserving the map's anatomical shell and 3D appearance. Enables pattern matching filter. Compares each real time 12-lead Body Surface morphology to a pre-selected user defined morphology template



**2016**
**THERMOCOOL SMARTTOUCH®**
**SF Catheter**
Enables both the precise and stable application of contact force technology while enhancing cooling efficiency and optimizes fluid delivery with half the flow rate of earlier Biosense Webster, Inc. generation catheters



**2017**
**CARTOSEG™ CT**
**SEGMENTATION MODULE**
Automates the CT segmentation process of all four chambers and enables visualization of the esophagus, coronary sinus, pulmonary veins, esophagus, left atrial appendage, papillary muscles and trabeculation, coronary arteries, and myocardium segmentation for wall thickness





Certified Performance
Ultrasound Reprocessing Solution

# Certified Performance- Reprocessing Solutions

  

**OEM**   **Reprocessor**

Historically, the OEM
and the reprocessing company
compete against each other

Biosense Webster, Inc. has
changed the paradigm to bring
unique capabilities and
synergies to reprocessing



# Certified Performance Offers Customers:

| **Performance** | **Support** | **Value** |







We certify the performance of our reprocessed ultrasound catheters by offering a **performance warranty** that assures:

- Image quality is greater than 94% original fidelity

- Location accuracy is less than 1.0mm

Our clinical account specialists have been trained to understand the capabilities, limitations, and proper function of these devices.

- Biosense Webster, Inc. cannot attest to the safety or efficacy of devices manufactured or reprocessed by another company.

We are the first and only **OEM supported** reprocessing program to offer:

- Warranty on every ultrasound catheter

- Sustainable supply



## Certified Performance



| Parameter | Biosense Webster, Inc. Ultrasound Catheter | Biosense Webster, Inc. Certified Reprocessed Ultrasound Catheter | Other Reprocessed Ultrasound Catheter |
|---|---|---|---|
| Navigational Accuracy | <1mm | <1.5mm | Unknown |
| Image Quality | Original Fidelity | >94% Fidelity | Unknown |





## Product Offering and Competitive Differentiation:
## Certified Location Accuracy and OEM Quality Standards

| | OEM | Certified Performance | Stryker, Medline, Innovative Health |
|---|---|---|---|
| ULS Catheters | | Certified Performance ULS Catheters | Other Reprocessed ULS Catheters |
| Image Quality | 100% Fidelity | 94% of original fidelity | unknown |
| Location Accuracy | < 1 mm | < 1.5 mm | unknown |
| LASSO® Catheter | | Certified Performance LASSO® Catheters | Other Reprocessed LASSO® Catheters |
| Location Accuracy | < 1 mm | < 1.5 mm | unknown |
| Electrodes | Biosense Webster, Inc. | 100% quality inspection | unknown |
| Deflection | Quality Standards | Tested for same range as OEM device | unknown |
| WEBSTER® CS Catheter | | Certified Performance WEBSTER® CS Catheters | Other Reprocessed CS Catheters |
| Electrodes | | 100% quality inspection | unknown |
| Deflection | Biosense Webster, Inc. | Tested for same range as | Unknown |
| CARTO® System | Quality Standards | OEM device | |
| Registration | | Auto ID Validation | unknown |





BUSINESS REVIEW / CONTRACTING

BWI-INN00114083.019

## Current Contracts with Biosense Webster, Inc.



Slide customizable by field sales rep

BWI-INN00114083.020

## Annual Sales Trend with Biosense Webster, Inc.





## Options for Contract Structure

**DOLLAR VOLUME COMMITMENT**



Discounts are available to customers that choose to make an Annual Purchase Commitment.

**DOLLAR VOLUME & MARKET SHARE COMMITMENT**



Higher discounts are available to customers that choose to make a commitment that includes Annual Purchase Commitment and Market Share commitment



## Options for Future Contract Structure

**Option #1**    STATUS QUO – NO CHANGES

| Volume Commitment | Market share Commitment | $ Impact to Annual Spend | % Impact to Annual Spend |
|---|---|---|---|
| $2,000,000 | NA | $294,550 | 15% |

**How do you get there?**
1. Option does not require a market share commitment or disclosure of competitive usage data
2. XXXXXXXXXX
3. XXXXXXXXXX

**Option #2**    INCREASE DOLLAR VOLUME COMMITMENT

| Volume Commitment | Market share Commitment | $ Impact to Annual Spend | % Impact to Annual Spend |
|---|---|---|---|
| $2,000,000 | 70% | $0 | 0% |

**How do you get there?**
1. Option does not require a market share commitment or disclosure of competitive usage data
2. XXXXXXXXXX



Slide customizable by field sales rep

HIGHLY CONFIDENTIAL

| From: | Fanger, Jonathan [BWIUS] </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6544285793184905ACC91012F4BCE285-JFANGER> |
|---|---|
| To: | Jeser, Andrew [BWIUS] |
| Sent: | 5/9/2018 1:47:09 PM |
| Subject: | Re: Stryker CARTO Education |

Hi Andy,

   Feel free to upgrade any accounts necessary to protect your business.  I'll give you a call shortly to discuss and give you a bit more detail.

   Thanks,
Jonathan

Sent from my iPhone

On May 9, 2018, at 9:06 AM, Jeser, Andrew [BWIUS] <ajeser@its.jnj.com> wrote:

Can we move forward on this?   Stryker was there this week.

Thank You,

Andy Jeser
Biosense Webster
708.334.7915

Begin forwarded message:

**From:** ajeser@its.jnj.com
**Date:** May 7, 2018 at 12:04:24 CDT
**To:** SUSAN LUBINSKY <SLubinsk@its.jnj.com>
**Subject: Fwd: Stryker CARTO Education**

Stryker is leveraging their corporate relationships.     This is coming from the top down.     Maybe it's because Advocate has a new person in charge of reprocessing.

Thank You,

Andy Jeser
Biosense Webster
708.334.7915

Begin forwarded message:

**From:** "Young, Megan [BWIUS]" <MYoung38@ITS.JNJ.COM>
**Date:** May 7, 2018 at 11:56:04 CDT
**To:** "Jeser, Andrew  [BWIUS]" <ajeser@its.jnj.com>
**Cc:** "Lubinsky, Susan [BWIUS]" <SLubinsk@its.jnj.com>
**Subject: RE: Stryker CARTO Education**

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-3415**

Maybe we should hire the Stryker rep… he must be good if he can sell this to people…

**From:** Jeser, Andrew [BWIUS]
**Sent:** Monday, May 07, 2018 11:21 AM
**To:** Fanger, Jonathan [BWIUS] <JFanger@its.jnj.com>; Chmiel, Yoram [BWIIL] <Ychmiel@its.jnj.com>
**Cc:** Smith, Mitchell [BWIUS] <MSmith34@ITS.JNJ.COM>; Lubinsky, Susan [BWIUS] <SLubinsk@its.jnj.com>;
Young, Megan [BWIUS] <MYoung38@ITS.JNJ.COM>
**Subject:** RE: Stryker CARTO Education

Yoram and Jonathan,
I have a 2nd account that is looking at Stryker education support cases.    This is in the same healthcare system
and Sherman.

Can this account please be upgraded to V6 immediately?        Is the FMR V6 compatible with RMT and the VIVID
IQ?

If yes, this is for:
ADVOCATE CHRIST MEDICAL CENTER

Thank You,

Andy

**From:** Fanger, Jonathan [BWIUS]
**Sent:** Thursday, May 3, 2018 11:04 AM
**To:** Smith, Mitchell [BWIUS] <MSmith34@ITS.JNJ.COM>; Jeser, Andrew [BWIUS] <ajeser@its.jnj.com>
**Subject:** FW: Stryker CARTO Education

Andrew and Mitch,
    Looks like we will need to upgrade one of your accounts as a blocking tactic.  We just need to get the Site
Inspection form for each system and a no charge PO for the systems.  After the training and install, an upgrade
form must be returned for each system.

    Please let me know if you need anything else from me.
Thanks,
Jonathan

**From:** Chmiel, Yoram [BWIIL]
**Sent:** Thursday, May 03, 2018 7:14 AM
**To:** Bodner, Michael [BWIUS] <mbodner@ITS.JNJ.com>; Sidi, Nikki [BWIUS] <nsidi1@ITS.JNJ.com>
**Cc:** Fanger, Jonathan [BWIUS] <JFanger@its.jnj.com>; Young, Megan [BWIUS] <MYoung38@ITS.JNJ.COM>
**Subject:** Fwd: Stryker CARTO Education

Michel, Nikki

Another strategic target for V6 placements, accounts Stryker planning to conduct CARTO training.

I suggest to move forward with this unless you see an issue.

Y

Yoram Chmiel
Senior Marketing Manager - US Commercial Marketing

Biosense Webster Inc.
Mobile: 909-345-4208

Begin forwarded message:

**From:** "Young, Megan [BWIUS]" <<u>MYoung38@ITS.JNJ.COM</u>>
**Date:** May 3, 2018 at 7:07:18 AM PDT
**To:** "Chmiel, Yoram [BWIIL]" <<u>Ychmiel@its.jnj.com</u>>
**Cc:** "Zare, Fairy [BWIUS]" <<u>fzare@ITS.JNJ.com</u>>, "Salahuddin, Afrah [BWIUS]" <<u>ASalahud@ITS.JNJ.COM</u>>
**Subject: Re: Stryker CARTO Education**

A few months back - thats a great idea. Can we do this?

Sent from my iPhone

On May 3, 2018, at 9:55 AM, Chmiel, Yoram [BWIIL] <<u>Ychmiel@its.jnj.com</u>> wrote:

When did she leave BWI?

Let's upgrade this account to V6 prior to her training

Yoram Chmiel
Senior Marketing Manager - US Commercial Marketing
Biosense Webster Inc.
Mobile: 909-345-4208

On May 3, 2018, at 6:32 AM, Zare, Fairy [BWIUS] <<u>fzare@ITS.JNJ.com</u>> wrote:

FYI

Begin forwarded message:

**From:** "Young, Megan [BWIUS]" <<u>MYoung38@ITS.JNJ.COM</u>>
**To:** "Zare, Fairy [BWIUS]" <<u>fzare@ITS.JNJ.com</u>>, "Bradshaw, Gillian [BWIUS]" <<u>gbradsh2@ITS.JNJ.com</u>>, "Koenig, Joseph [SYNNA]" <<u>JKOENIG4@ITS.JNJ.COM</u>>
**Subject: FW: Stryker CARTO Education**

All,

Please see the attached and read what Ashley is planning to do as part of her course. She recently left BWI.

Both leadership and legal are following up.

Meg

**From:** Jeser, Andrew [BWIUS]
**Sent:** Wednesday, May 02, 2018 9:47 PM
**To:** Young, Megan [BWIUS] <<u>MYoung38@ITS.JNJ.COM</u>>
**Cc:** Criner, Joel [BWIUS] <<u>JCriner@ITS.JNJ.COM</u>>; Lubinsky, Susan [BWIUS] <<u>SLubinsk@its.jnj.com</u>>
**Subject:** Stryker CARTO Education

Meg,
Attached is a Stryker support presentation that was given to Advocate Sherman Hospital.  Stryker's proposal is to train the hospital staff to run CARTO for a fee.  Stryker would train the lab staff for 10-15 procedures. The goal is

**JX-3415, Page 3 of 4**                BWI-INN00320113

for the EP staff can run CARTO and use Stryker SoundStar and LASSO NAV catheters.

Stryker highlights Ashley Toussant and another former clinical.

I will keep you posted as things develop.

Andy
<STYKER SUPPORT.PDF>

| From: | Koenig, Joseph [SYNNA] </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=374e1a0355c747ac884d8fa91aa4a811-JKOENIG4> |
|---|---|
| To: | Fine, Marius [SMDUS] |
| CC: | Lee, Karson [MEDCA]; Wilson, Bryan [SMDUS] |
| Sent: | 8/16/2018 9:53:08 PM |
| Subject: | Re: BWI DecaNav reprocessed Cath |
| Attachments: | INFORM - Innovative Health Receives 510(k) Clearance for Reprocessed Biosense Webster DECANAV Catheter |

Marius-

The attached communication went out to field leadership shortly after the 510(k) approval was announced.  I have since spoken to the field teams who cover the majority of the DecaNav business in the US, who are prepared to address with any potential users/customers by leveraging our current coverage policy.  From an OEM perspective, the suggested course of action is to innovate a "next-generation" DecaNav to obsolete the current catheter, we should get more info around a potential OEM replacement in the coming months.  To date, I have not received any reports of customer purchase/usage of the device, but the field is prepared for if/when it pops up.  Hope this helps.

**Joe Koenig**
Product Director, Sustainability
M. (714) 878-1975
E. jkoenig4@its.jnj.com

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
33 Technology Drive
Irvine, CA 92618, USA
www.biosensewebster.com



**From:** "Fine, Marius [SMDUS]" <mfine2@ITS.JNJ.com>
**Date:** Thursday, August 16, 2018 at 2:31 PM
**To:** "Koenig, Joseph [SYNNA]" <JKOENIG4@ITS.JNJ.COM>
**Cc:** "Lee, Karson [MEDCA]" <klee2@its.jnj.com>, Bryan Wilson <BWilso43@its.jnj.com>
**Subject:** BWI DecaNav reprocessed Cath

Joe,

Our J&J Canada partner, Karson Lee, is wondering what customer facing positioning is being used to combat Innovative Health now that IH has recently received a 510(k) for Biosense's DecaNAV catheter.

Can you provide any insights to Karson (cc'd here)?

Karson – My data indicates Stryker Sustainability does not have regulatory clearance to reprocess the BWI DecaNAV either.

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-3437**

Thanks,

Marius Fine
Sr. Reprocessing Marketing Manager

Johnson & Johnson MEDICAL DEVICES COMPANIES

Johnson & Johnson Health Care Systems, Inc.
T: +1 763 488 3239
M:+1 952 826 9659
mfine2@its.jnj.com
http://www.jnj.com

Disclaimer: This electronic message may contain information that is Proprietary, Confidential, or legally privileged or protected. It is intended only for the use of the individual(s) and entity named in the message. If you are not an intended recipient of this message, please notify the sender immediately and delete the material from your computer. Do not deliver, distribute or copy this message and do not disclose its contents or take any action in reliance on the information it contains.

**From:** Lee, Karson [MEDCA]
**Sent:** Monday, August 13, 2018 12:32 PM
**To:** Wilson, Bryan [SMDUS] <BWilso43@its.jnj.com>
**Cc:** Fine, Marius [SMDUS] <mfine2@ITS.JNJ.com>
**Subject:** RE: BW Cath's

Seems like IH is building quite the arsenal in their portfolio.

Do you know if Styker can RPO the Decanav's?

What is our positioning with customers

**From:** Wilson, Bryan [SMDUS]
**Sent:** Monday, August 13, 2018 1:30 PM
**To:** Lee, Karson [MEDCA] <klee2@its.jnj.com>
**Cc:** Fine, Marius [SMDUS] <mfine2@ITS.JNJ.com>
**Subject:** RE: BW Cath's

Yes, IH received clearance in June.

BWI has chosen not to pursue the reprocessed version of Decanav. I cc'd Marius on this to help explain the history here as to why it is not in the pipeline.

**Bryan Wilson**
Sr. Marketing Manager, RPO Marketing

Johnson & Johnson MEDICAL DEVICES COMPANIES

Johnson & Johnson Health Care Systems, Inc.
T: 760.419.0655
bwilso43@its.jnj.com
http://www.jnj.com

Disclaimer: This electronic message may contain information that is Proprietary, Confidential, or legally privileged or protected. It is intended only for the use of the individual(s) and entity named in the message. If you are not an intended recipient of this message, please notify the sender immediately and delete the material from your computer. Do not deliver, distribute or copy this message and do not disclose its contents or take any action in reliance on the information it contains.

**From:** Lee, Karson [MEDCA]
**Sent:** Monday, August 13, 2018 10:19 AM
**To:** Wilson, Bryan [SMDUS] <BWilso43@its.jnj.com>
**Cc:** Fine, Marius [SMDUS] <mfine2@ITS.JNJ.com>

**Subject:** RE: BW Cath's

Thanks Bryan – it sounded like Innovative Health received approval on this.

http://infoviewer.infodesk.com/infodisplay/item/14e5b0f0-3230-4c1c-b266-8446ab45bded.html?CU=jnj8748&
PROFILE=unv6&APP=3

Am I confusing the products?

Thanks
Karson

**From:** Wilson, Bryan [SMDUS]
**Sent:** Monday, August 13, 2018 1:10 PM
**To:** Lee, Karson [MEDCA] <klee2@its.jnj.com>
**Cc:** Fine, Marius [SMDUS] <mfine2@ITS.JNJ.com>
**Subject:** RE: BW Cath's

Hi Karson-

Decanav is not currently on product development list.

Thanks,

**Bryan Wilson**
Sr. Marketing Manager, RPO Marketing

*Johnson & Johnson*
MEDICAL DEVICES COMPANIES

Johnson & Johnson Health Care Systems, Inc.
T: 760.419.0655
bwilso43@its.jnj.com
http://www.jnj.com

Disclaimer: This electronic message may contain information that is Proprietary, Confidential, or legally privileged or protected. It is intended only for the use of the individual(s) and entity named in the message. If you are not an intended recipient of this message, please notify the sender immediately and delete the material from your computer. Do not deliver, distribute or copy this message and do not disclose its contents or take any action in reliance on the information it contains.

**From:** Lee, Karson [MEDCA]
**Sent:** Monday, August 13, 2018 8:38 AM
**To:** Wilson, Bryan [SMDUS] <BWilso43@its.jnj.com>
**Subject:** BW Cath's

Bryan – hope you are well – can you let me know if Sterilmed can reprocess the BW Decanav's R7D282CT or R7F282CT?

Thanks
Karson

| From: | Koenig, Joseph [SYNNA] </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=374E1A0355C747AC884D8FA91AA4A811-JKOENIG4> |
|---|---|
| To: | Haydel, David [BWIUS]; Kowalski, John [BWIUS]; Lech, Tom [BWIUS]; Parker, Callie [BWIUS]; Rathod, Sharad [BWIUS]; Young, Megan [BWIUS]; Allen, David J. [BWIUS]; Allen, Brandon [BWIUS]; Barlow, Chris [BWIUS]; Barone, Richard [BWIUS]; BARTLETT, JIM [BWIUS]; Blake, Andrew [BWIUS]; Brady, Richard [BWIUS]; Corcoran, Kevin [BWIUS]; Criner, Joel [BWIUS]; Dalinghaus, Roger [BWIUS]; brentdoehring@gmail.com; Ellis, Randolph [BWIUS]; Emmerich, Matthew [BWIUS]; Fulkus, Rob [BWIUS]; Gibbons, Todd [BWIUS]; Giroir, Jimmy [BWIUS]; Gonzalez, Deidre [BWIUS]; Hudson, David [BWIUS]; Laird, Tim [BWIUS]; Lindholm, Charles [BWIUS]; Lubinsky, Susan [BWIUS]; MacIntosh, Scott [BWIUS]; Maia, Daniel [BWIUS]; Matelski, Jayme [BWIUS]; O'Mera, Tim [BWIUS]; O'Quinn, Derek [BWIUS]; Patel, Amit [BWIUS]; Brady, Emily [BWIUS]; Smith, Justin [BWIUS]; Stilwell, Thomas [BWIUS]; Tucker, Derek [BWIUS]; Walker, Krista [BWIUS]; Wannamaker, Kenneth [BWIUS]; Washington, Marlene [BWIUS]; Weir, Jennifer [BWIUS]; Wells, Kevin [BWIUS]; Williamson, Wade [BWIUS]; Zoe, Chuck [BWIUS]; Krenek, Marcus [BWIUS] |
| CC: | Zare, Fairy [BWIUS]; Sidi, Nikki [BWIUS]; Bodner, Michael [BWIUS]; Martin, Noah [BWIUS] |
| Sent: | 6/29/2018 3:08:31 AM |
| Subject: | INFORM - Innovative Health Receives 510(k) Clearance for Reprocessed Biosense Webster DECANAV Catheter |

ADs and RBDs-

We have learned that Innovative Health received 510(k) clearance for RPO Biosense Webster DECANAV. Bear in mind that this device falls within our coverage policy, however we are assessing potential impact and if any additional actions are required to address. Please cascade to your teams and contact me with any questions/field intel. Thank you.

Best,


**Joe Koenig**
Product Director, Sustainability
M. (714) 878-1975
E. jkoenig4@its.jnj.com

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
33 Technology Drive
Irvine, CA 92618, USA
www.biosensewebster.com



| From: | Haydel, David [BWIUS] </O=JNJ/OU=EESUSCI/CN=RECIPIENTS/CN=DHAYDEL> |
|---|---|
| To: | Zare, Fairy [BWIUS] |
| Sent: | 3/18/2016 1:34:57 AM |
| Subject: | Re: BWI to take over collections in this sound choice account |
| Attachments: | image001.png |

Let's talk in 5 min?

David Haydel
Sent from iPhone

On Mar 17, 2016, at 6:10 PM, Zare, Fairy [BWIUS] <fzare@ITS.JNJ.com> wrote:

Hi Dave,
I just saw your note; I'll call you in  a few minutes (if too late, I can chat as early as you can talk tomorrow morning)
Looking forward to it,
Fairy

**From:** Haydel, David [BWIUS]
**Sent:** Thursday, March 17, 2016 1:41 PM
**To:** Zare, Fairy [BWIUS]
**Subject:** RE: BWI to take over collections in this sound choice account

Fairy,

Can you call me when you have a minute?
Planning to send this to all my CAS given the full implementation of the case coverage policy, the new performance certified user accounts, and the lack of SterilMed access to these accounts.
Thanks,

**David Haydel**
Regional Business Director
Biosense Webster, Inc.
**M.** 985.789.3717

**From:** Zare, Fairy [BWIUS]
**Sent:** Monday, February 15, 2016 5:25 PM
**To:** Urwiler, Kelly [BWIUS]
**Cc:** Haydel, David [BWIUS]; Crouch, Michael [BWIUS]
**Subject:** BWI to take over collections in this sound choice account

Innovative v. Biosense
**No. 8:19-cv-01984-JVS**
**JX-3673**

Hello Kelly,

Thank you for making the Certified Performance product line a success by ensuring our catheters are collected regularly so we have a steady supply of reprocessed catheters back to the customers and as importantly, prevent the competition from getting access to our catheters.

Please review the training on this link – where instructions on collections are outlined.
https://connect.biosensewebster.com/Connect/MediaLib?path=
%3D%3DL1VsdHJhc291bmQgQ2F0aGV0ZXJzIFByb2R1Y3QgUGFnZSBNYXRlcmlhbHMvQ0FTIENvbGxlY3Rpb24gUHJvZ3JhbS8%3D

The forms you'll need to request the packaging/labels for the catheters are attached – use the excel or pdf – whichever is easier;

Remember when you send in your request to SterilMed for packaging/labels, it'll take up to 7-10 business days for the goods to arrive – so order as much as you need so you don't have to wait too long for the boxes. Please keep tabs on how many catheters you've shipped to Sterilmed in case we need to refer to your log; you'll be reimbursed $15/catheter for what you ship back to Sterilmed. For the time being, the payments will be processed bi-annually.

Any questions, please let me know.
Thank you,


**Fairy Zare**
**Group Product Director, Ultrasound & Diagnostics**
**M.** 949-557-7246
**T.** 909-839-7384
**E.** fzare@its.jnj.com

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
3333 S. Diamond Canyon Road
Diamond Bar, CA 91765, USA
www.biosensewebster.com

<image001.png>

**Confidentiality Notice:** This document is J&J Proprietary. You may forward this document within J&J on a need to know basis. You may not forward this onto the Internet without the author's permission. This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please reply to the sender, so that J&J can arrange for proper delivery, and then please delete the message from your inbox.


**From:** Stilwell, Thomas [BWIUS]

**Sent:** Monday, February 15, 2016 4:01 PM
**To:** Zare, Fairy [BWIUS]
**Cc:** Haydel, David [BWIUS]; Crouch, Michael [BWIUS]; Urwiler, Kelly [BWIUS]
**Subject:** Re: BWI to take over collections in this sound choice account

Hello Fairy,

The CAS will be Kelly Urwiler
(480) 433-3244
KUrwiler@ITS.jnj.com

Thank you.

    Best Regards,
    **Conor Stilwell**
    Territory Manager
    **M.** 713-823-5304
    **E.** tstilwel@its.jnj.com

On Feb 15, 2016, at 4:40 PM, Zare, Fairy [BWIUS] <fzare@ITS.JNJ.com> wrote:

Hello,

BWI will be taking over the catheter collection in accounts that are ONLY Sound Choice (i.e. SterilMed doesn't sell any products into). Therefore the following account will no longer be serviced by Sterilmed.

|  | UCN |
|---|---|
| 6967 Mayo Clinic (Phoenix, AZ) | 68506 |

We need your help to get a CAS assigned to collect in this account. The CAS will be compensated a rate of $15/catheter for each unit returned to SterilMed.
Please provide me with the name of the CAS who will be taking over so I can direct them to the training and forms needed to order product box/labels and get them set up.

Thank you,
Fairy


**Fairy Zare**
**Group Product Director, Ultrasound & Diagnostics**
**M.** 949-557-7246
**T.** 909-839-7384
**E.** fzare@its.jnj.com

**Biosense Webster, Inc.**
Part of the Johnson & Johnson Family of Companies
3333 S. Diamond Canyon Road
Diamond Bar, CA 91765, USA
www.biosensewebster.com

<image003.png>

**Confidentiality Notice:** This document is J&J Proprietary. You may forward this document within J&J on a need to know basis. You may not forward this onto the Internet without the author's permission. This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please reply to the sender, so that J&J can arrange for proper delivery, and then please delete the message from your inbox.

BWI-INN00468486

| From: | Bodner, Michael [BWIUS] </O=JNJ/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MBODNER1A5> |
|---|---|
| To: | Crouch, Michael [BWIUS]; Lech, Tom [BWIUS] |
| CC: | Hitch, Adam [BWIUS] |
| Sent: | 6/29/2017 6:59:50 PM |
| Subject: | RE: Jennifer Attebury/ Rhythmia and Jose Osorio |

Agree, thanks

Michael

**From:** Crouch, Michael [BWIUS]
**Sent:** Thursday, June 29, 2017 10:11 AM
**To:** Lech, Tom [BWIUS] <TLech@its.jnj.com>
**Cc:** Bodner, Michael [BWIUS] <mbodner@ITS.JNJ.com>; Hitch, Adam [BWIUS] <AHitch8@ITS.JNJ.COM>
**Subject:** Jennifer Attebury/ Rhythmia and Jose Osorio

Tom,

I was speaking with Adam Hitch this morning and we were going over business in his market. He recently had a CAS leave the Memphis POD to go to work for Boston. She will be working with their Rhythmia system and plans to move to Birmingham. ███████████████████████████████████████████████████████████████ She never formally covered any cases at this account with BWI. I do want it noted that she visited the account on many occasions with customers for TEC site visits and that is how she formed her relationship with Osorio. I wanted to bring this to everyone's attention to see if we should explore the legal ramifications and if we can somehow block her from covering cases at this account?

# REDACTION: PRIVILEGE

Best,

## Michael Crouch
Area Director – Central
BioSense Webster
Cell Phone: 210-382-7443
Office : 210-957-0028
Fax: 210-855-1902
MCrouch8@its.jnj.com



Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-3710**

**Confidentiality Notice:** This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please reply to the sender, so Johnson & Johnson can arrange for proper delivery, then delete the message from your inbox.

Message
_____

**From:**      Blenis, Ken [Ken.Blenis@mymarinhealth.org]
**Sent:**      3/6/2020 12:51:46 PM
**To:**        Jay Farris [/o=ExchangeLabs/ou=Exchange Administrative Group
               (FYDIBOHF23SPDLT)/cn=Recipients/cn=123cb4df138445e69f0d3bda640ecc37-jfarris]; Rick Ferreira
               [/o=ExchangeLabs/ou=Exchange Administrative Group
               (FYDIBOHF23SPDLT)/cn=Recipients/cn=3f712852aa394a6ebcf4076d9b89f341-rferreira11]
**Subject:**   FW: EP Cath reprocessing

We want to use the reprocessed Pentaray catheters, but Biosense says that they will stop covering our cases if we begin using those…

While I'd like to just tell them to (^&% off, we are dependent on them.

Ken

**Ken Blenis**
Director Supply Chain
**O:** 1-415-925-7508   |   **M:** 1-707-481-9851   |   **F:** 1-415-925-7896


                              MarinHealth Medical Center
                              Materials Management
                              250 Bon Air Road
                              Greenbrae, CA 94904
                              www.mymarinhealth.org

CONFIDENTIALITY NOTICE: This email message, including any attachments,
is for the sole use of the intended recipient(s) and may contain confidential and
privileged information. Any unauthorized review, use, disclosure or distribution
is prohibited. If you are not the intended recipient, please contact the sender by
reply email and destroy all copies of the original message.

_____

**From:** Byrnes, Joan
**Sent:** Friday, March 06, 2020 11:31 AM
**To:** Blenis, Ken <Ken.Blenis@mymarinhealth.org>
**Subject:** Re: EP Cath reprocessing

We can discuss. But I think it's not possible.
I believe they will not care vet cases if we start using reprocessed pentaray

Get Outlook for iOS

_____

**From:** Blenis, Ken <Ken.Blenis@mymarinhealth.org>
**Sent:** Friday, March 6, 2020 10:16:36 AM
**To:** Byrnes, Joan <Joan.Byrnes@mymarinhealth.org>
**Subject:** EP Cath reprocessing

Joan,

I had a business review meeting with Innovative Health last week and am happy to see how much we are saving with the reprocessing program.  Thanks for your help in the cost savings efforts!

One item that stood out as an additional opportunity is the Penta Ray cath.  We are turning them in but not buying back.  I asked if we could get further incentive to purchase them and they reduced the price to $850.  I know we need to be careful not to reduce our Biosense spend too much, but we can still purchase reprocessed on occasion.  Have you tried the reprocessed PentaRay from Innovative?

Innovative v. Biosense
No. 8:19-cv-01984-JVS
JX-3887

| Account Name | Item # | Family Detail | Manufacturer | Type | Usage Qty | Collections | Buyback | OEM Price | Contracted Price | Unrealized Opportunity |
|---|---|---|---|---|---|---|---|---|---|---|
| Marin General Hosp | D128211 | PentaRay | Biosense Webster | EP | | 107 | 0 | $1,800 | $850 | $81,700 |

Let me know what you think.

Thank you,

Ken

**Ken Blenis**
Director Supply Chain
**O:** 1-415-925-7508  |  **M:** 1-707-481-9851  |  **F:** 1-415-925-7896



MarinHealth Medical Center
Materials Management
250 Bon Air Road
Greenbrae, CA 94904
www.mymarinhealth.org

CONFIDENTIALITY NOTICE: This email message, including any attachments,
is for the sole use of the intended recipient(s) and may contain confidential and
privileged information. Any unauthorized review, use, disclosure or distribution
is prohibited. If you are not the intended recipient, please contact the sender by
reply email and destroy all copies of the original message.

Message

| | |
|---|---|
| **From:** | Sadler, Lynn [LSadler@IUHealth.org] |
| **Sent:** | 8/15/2017 8:40:06 AM |
| **To:** | Amy Ferreira [/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Alferreiraee2] |
| **CC:** | Berardi, Kimberly [kberardi@IUHealth.org] |
| **Subject:** | RE: Methodist Device Usage |

I'm not sure what products you are talking about.  If it is a Biosense Webster product and it has a sensor we cannot use reprocess items...well we can but Biosense will not support the case.  We are not the Mayo Clinic our physicians are not ready to take the stand against Biosense and say support the case "or else".  The Cables on the list are reprocessed in house.  We can do it more economically then sending them to a reprocessor.  That only leaves a couple other items and the usage on those was minimal.  If there are other items I am missing please let me know I will be happy to look at anything you have.  Have you received any word on the Halo catheters?  Currently we are OK but that will change by the end of the month.

Lynn

---

**From:** Amy Ferreira [mailto:alferreira@innovative-health.com]
**Sent:** Tuesday, August 15, 2017 11:18 AM
**To:** Sadler, Lynn
**Subject:** Re: Methodist Device Usage

**** EXTERNAL Message From alferreira@innovative-health.com. DO NOT open attachments or click links from unknown senders or unexpected emails. ****

Thank you Lynn, I appreciate you getting back to me so quickly!

Are you able to share with me the reasoning behind why Methodist does not purchase reprocessed product on all devices used? Physician preference, issues in the past, etc?

Thanks,
Amy

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. [v.1]

---

**From:** "Sadler, Lynn" <LSadler@IUHealth.org>
**Date:** Tuesday, August 15, 2017 at 10:08 AM
**To:** Amy Ferreira <alferreira@innovative-health.com>
**Subject:** FW: Methodist Device Usage

Amy,
The items highlighted in green are pretty much what we currently reprocess.  I added one item at the bottom.  The usage is minimal but we do use a few a year.

Lynn

---

**From:** Amy Ferreira [mailto:alferreira@innovative-health.com]
**Sent:** Tuesday, August 15, 2017 10:05 AM
**To:** Sadler, Lynn
**Subject:** Methodist Device Usage

Innovative v. Biosense
No. 8:19-cv-01984-JVS
JX-3912

**** EXTERNAL Message From alferreira@innovative-health.com. DO NOT open attachments or click links from unknown senders or unexpected emails. ****

Hi Lynn,

Hope your week is off to a great start!

I am hoping you can help me to gather some information prior to the meeting in Phoenix next week. I was reviewing the device usage data that IU supply chain provided to me, and I want to verify with you whether or not Methodist uses all 27 of these product codes, attached. Can you please verify that this information is accurate? If I am missing any products, or have some listed that you might not use anymore, please let me know.

I have highlighted in green the items that Methodist currently reprocesses. Are you able to provide me with any background information on why Methodist currently only reprocesses 11 products out of the 27 listed? I want to make sure that we look at all possible opportunities to increase your savings.

Any information you can provide would be greatly appreciated! Thank you in advance for your help, Lynn!

Amy



Amy Ferreira
Director, Business Development
www.innovative-health.com
 (Office)
602.549.6400 (Mobile)

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. [v.1]

Message
| | |
|---|---|
| **From:** | Loy, Jeff [Jeff.Loy@erlanger.org] |
| **Sent:** | 7/13/2022 6:22:54 AM |
| **To:** | Dave Distel [ddistel@innovative-health.com] |
| **Subject:** | [EXTERNAL]RE: Innovative Health |
| **Attachments:** | 097317-220518 BWI Coverage Policy Update_2022_revision_final.pdf; Reprocessed products BWI CASs can not provide coverage.xlsx |

Attached is what we received from the Regional Business Director for Birmingham and Chattanooga. Notice it is not signed by anyone...

Do you have some time at 10am EST on Friday to discuss?

Thanks,

Jeff

Ext. 4684

---

**From:** Dave Distel <ddistel@innovative-health.com>
**Sent:** Wednesday, July 13, 2022 8:26 AM
**To:** Loy, Jeff <Jeff.Loy@erlanger.org>
**Subject:** [External Email] Innovative Health

## This message originated outside of Erlanger. Use caution when opening attachments, clicking links, or responding to requests for information.

---

Hi Jeff,

Hope you are well. It has been some time since we talked. I have a note into Sean to get a business review scheduled for the near future as the last one never took place do to schedule conflicts. The purpose of me writing to you is to discuss the Vizigo issue with Biosense Webster refusing case coverage for a reprocessed Vizigo. It has happened at several other facilities also but the "reasons" given are different. It appears to be more local at this point than an organized corporate push as I am still selling them at several places. We assume as they have success they will simply rewrite their case coverage policy further restraining a facilities ability to reprocess.

The attached letter was sent to Biosense Webster's President to put him on notice of the actions of his staff. Don't expect a reply but will continue to monitor the situation. Can I get 15 – 20 minutes on your calendar to catch up on this topic and understand:

- Who informed you of this refusal to cover cases
- Rationale
- How was it communicated
- Other details

Thank you in advance for your time Jeff. We are investing millions into clearances on devices that can yield customers the greatest savings opportunities and can't allow industry to simply block these efforts at the customers expense, literally.

Best Regards,

Dave



Dave Distel
**VP, Business Development**
480.525.5970 (Office)
507.358.5289 (Mobile)



Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-3957**

www.innovative-health.com

   

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. [v.1]

The information contained in this communication is private, confidential, and may include patient information protected by federal and state privacy laws. It is intended solely for use by the intended recipient and others authorized to receive it. If you are not the intended recipient or authorized to receive it, you are hereby notified that any review, disclosure, copying, distribution or taking action in reliance on the relation of the contents of this information is strictly prohibited and may be unlawful. If you have received this transmission in error, please immediately notify Erlanger Health System's Privacy Office immediately at 423-778-7703 or privacy@erlanger.org.

Biosense Webster, Inc.
31 Technology Drive,
Suite 200
Irvine, CA 92618 USA
www.biosensewebster.com

Date: 06/08/2022

RE: Position Statement on Clinical Account Specialist Case Support of Reprocessed Single Use Devices (SUD)

Dear Valued Customer,

This letter is to inform you of Biosense Webster, Inc.'s position regarding case support of reprocessed Single-Use-Devices (SUD) distributed by third parties. Biosense Webster's commitment to providing high-quality products and services requires that we properly train all Clinical Account Specialists on the capabilities, limitations, and proper functioning of all our devices and equipment. Electrophysiologists ask Clinical Account Specialists to assist with reconstructing cardiac anatomy using our technology and interpreting maps and providing insight on the images generated by the CARTO® 3 System.  It is critical that our personnel possess a competent base of knowledge of the design intent of each device feature and a thorough understanding of how each device is designed to work with our capital equipment to help achieve the best possible outcome for each patient.  This base of knowledge is especially important when it comes to providing product technical support for the CARTO® 3 System and troubleshooting the CARTO® 3 System in the midst of a procedure, which requires accurate inputs from diagnostic mapping catheters, ultrasound catheters, and devices that utilize a CARTO-based software pairing.  Most hospital facilities also recognize the  critical nature of vendor product competency as it relates to patient safety and consequently require vendor  representatives to provide documentation attesting to their competency with their company's products as part of  the vendor credentialing process. Reprocessing is a manufacturing process regulated by the U.S. Food and Drug  Administration, and reprocessed single use devices generally require a new regulatory submission before they  can be distributed. The regulatory clearance for reprocessed devices is owned by the reprocessing company that  manufactures and distributes the devices, not the original equipment manufacturer. Therefore, once Biosense  Webster's single use devices are subjected to the reprocessing process of another company, those devices are  no longer our products.

To offer our customers a portfolio of both new and reprocessed devices, Biosense Webster, Inc. has partnered with a  reprocessing company that is also a member of the Johnson & Johnson Family of Companies. We have shared  our calibration methods and product testing methods with our affiliated reprocessing company, and we distribute  those products along with new Biosense Webster devices. We are confident that the reprocessed devices we  distribute meet our quality standards.  However, we have no knowledge of the manufacturing operations or  specifications of reprocessed devices manufactured by third parties with which we are not affiliated. As such,  Biosense Webster cannot attest to the safety, effectiveness, and accuracy of these devices.

Accordingly, our Clinical Account Specialists can only provide product technical support in cases that use diagnostic mapping catheters, ultrasound catheters, and devices that utilize a CARTO-based software pairing distributed by Biosense Webster. Our Clinical Account Specialists  understand the capabilities, limitations, and proper functioning of these devices and are able to deliver on our  commitment of high-quality support for these products.

For any questions related to the information contained in this letter, please contact your local Biosense Webster, Inc. representative.

Thank you for your continued partnership and for choosing the Biosense Webster, Inc.


Sincerely,


Biosense Webster, Inc.

097317-220518

**This Document has been produced in Native Format**

IH00697136

| Reprocessed products for which BWI CAS's can not provide case coverage | | |
|---|---|---|
| **Catheter Common Name** | **OEM Catalog #** | **Description** |
| AcuNav™ | 8255790 | IntraCardiac Echo catheter, 10 Fr, Compatible with Siemens Ultrasound systems |
| | 10135936 | IntraCardiac Echo catheter, 8 Fr, Compatible with Siemens Ultrasound systems |
| | 10043342 | IntraCardiac Echo catheter, 10 Fr, Compatible with GE Ultrasound systems |
| | 10135910 | IntraCardiac Echo catheter, 8 Fr, Compatible with GE Ultrasound systems |
| DecaNAV™ | R7D282CT | Advanced Diagnostic Mapping catheter, 10 poles, 2-8-2 mm Spacing, D curve |
| | R7F282CT | Advanced Diagnostic Mapping catheter, 10 poles, 2-8-2 mm Spacing, F curve |
| Lasso™ NAV eco | D134901 | Advanced Diagnostic, Circular Mapping catheter, 15 mm Fixed loop, 10 pole |
| | D134902 | Advanced Diagnostic, Circular Mapping catheter, 15 mm Fixed loop, 20 pole |
| | D134903 | Advanced Diagnostic, Circular Mapping catheter, 20 mm Fixed loop, 10 pole |
| | D134904 | Advanced Diagnostic, Circular Mapping catheter, 20 mm Fixed loop, 20 pole |
| | D134905 | Advanced Diagnostic, Circular Mapping catheter, 25 mm Fixed loop, 10 pole |
| | D134906 | Advanced Diagnostic, Circular Mapping catheter, 25 mm Fixed loop, 20 pole |
| | D134301 | Advanced Diagnostic, 15 -25 mm Variable Loop Circular Mapping catheter, 20 pole |
| | D134302 | Advanced Diagnostic, 15 -25 mm Variable Loop Circular Mapping catheter, 10 pole |
| OCTARAY™ Mapping catheter with TRUEref™ technology | D160901 | Advanced Diagnostic mapping catheter, 8 splines, 1.5mm long splines, D curve, 2-2-2-2-2 mm spacing |
| | D160902 | Advanced Diagnostic mapping catheter, 8 splines, 2.0mm long splines, D curve, 2-5-2-5-2 mm spacing |
| | D160903 | Advanced Diagnostic mapping catheter, 8 splines, 2.0mm long splines, D curve, 3-3-3-3-3 mm spacing |
| | D160904 | Advanced Diagnostic mapping catheter, 8 splines, 1.5mm long splines, F curve, 2-2-2-2-2 mm spacing |
| | D160905 | Advanced Diagnostic mapping catheter, 8 splines, 2.0mm long splines, F curve, 2-5-2-5-2 mm spacing |
| | D160906 | Advanced Diagnostic mapping catheter, 8 splines, 2.0mm long splines, F curve, 3-3-3-3-3 mm spacing |
| PentaRay® NAV eco Catheter | D128207 | Advanced Diagnostic mapping catheter, 5 splines, F curve, 4-4-4 mm spacing |
| | D128208 | Advanced Diagnostic mapping catheter, 5 splines, F curve, 2-6-2 mm spacing |
| | D128210 | Advanced Diagnostic mapping catheter, 5 splines, D curve, 4-4-4 mm spacing |
| | D128211 | Advanced Diagnostic mapping catheter, 5 splines, D curve, 2-6-2 mm spacing |
| SoundStar® eco | 10439011 | 3D IntraCardiac Echo catheter, Carto compatible, 8 Fr, Siemens Ultrasound system Compatible |
| | 10438577 | 3D IntraCardiac Echo catheter, Carto compatible, 10 Fr, Siemens Ultrasound system Compatible |
| | 10439236 | 3D IntraCardiac Echo catheter, Carto compatible, 8 Fr, GE Ultrasound system Compatible |
| | 10439072 | 3D IntraCardiac Echo catheter, Carto compatible, 10 Fr, GE Ultrasound system Compatible |
| Carto Vizigo™ Bi-directional guiding sheath | D138501 | Steerable guiding sheath, visible on mapping systems, 8.5 Fr ID, Small curve |
| | D138502 | Steerable guiding sheath, visible on mapping systems, 8.5 Fr ID, Medium curve |
| | D138503 | Steerable guiding sheath, visible on mapping systems, 8.5 Fr ID, Large curve |

HIGHLY CONFIDENTIAL                                                                    IH00697136.001

Message

| | |
|---|---|
| **From:** | Krnavek, Pamela [PKrnavek@peacehealth.org] |
| **Sent:** | 1/9/2024 9:02:32 AM |
| **To:** | Rick Ferreira [rferreira@innovative-health.com]; Jay Farris [jfarris@innovative-health.com] |
| **Subject:** | [EXTERNAL]RE: [EXTERNAL]RE: [EXTERNAL]RE: J&J Unit Faces Revived Antitrust Claims Over Cardiac Catheters |

2018 and 2021

**Kind regards,**

**Pamela Krnavek, RN, CVAHP** | **Supply Chain**
*Manager, Value Analysis*
1115 SE 164th Ave, Vancouver, WA 98683
peacehealth.org | 360-729-1000 OFFICE

Whatsoever I thankfully receive, as a token of God's love
to me, I part with contentedly as a token of my love to Him.
-Theophilus Gale



Sensitivity: General Business Use. This document contains proprietary information and is intended for business use only.

**From:** Rick Ferreira <rferreira@innovative-health.com>
**Sent:** Tuesday, January 9, 2024 3:39 AM
**To:** Krnavek, Pamela <PKrnavek@peacehealth.org>; Jay Farris <jfarris@innovative-health.com>
**Subject:** Re: [EXTERNAL]RE: [EXTERNAL]RE: J&J Unit Faces Revived Antitrust Claims Over Cardiac Catheters

**WARNING - UNVERIFIED EXTERNAL EMAIL:** This email came from a sender outside of PeaceHealth. Do not open any attachments, click on any links, or provide information unless you recognize the email address it came from and were expecting this message.

Thanks Pam
Do you know when the contract when the system was purchased and contract signed?
Rick



Rick Ferreira
**CEO**
480.525.5910 (Office)
480.467.8517 (Mobile)
www.innovative-health.com

  

This message contains confidential information and is intended only for the individual named. If you are
not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-3963**

sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. [v.1]

Sensitivity: General Business Use. This document contains proprietary information and is intended for business use only.

**From:** Krnavek, Pamela <<u>PKrnavek@peacehealth.org</u>>
**Date:** Monday, January 8, 2024 at 9:51 PM
**To:** Jay Farris <<u>jfarris@innovative-health.com</u>>, Rick Ferreira <<u>rferreira@innovative-health.com</u>>
**Subject:** [EXTERNAL]RE: [EXTERNAL]RE: J&J Unit Faces Revived Antitrust Claims Over Cardiac Catheters

When Troy negotiated the purchase of the Carto system, I surmise the 2016 Biosense policy was not disclosed.  I will research to see if it's in the contract.  When they came in and said they would not support cases, AFTER we purchased the system, I was taken aback and Troy seemed surprised, as well.

**Kind regards,**

**Pamela Krnavek, RN, CVAHP  |  Supply Chain**
*Manager, Value Analysis*
1115 SE 164th Ave, Vancouver, WA 98683
peacehealth.org  |  360-729-1000 OFFICE

Whatsoever I thankfully receive, as a token of God's love
to me, I part with contentedly as a token of my love to Him.
                                    -Theophilus Gale



Sensitivity: General Business Use. This document contains proprietary information and is intended for business use only.

**From:** Jay Farris <<u>jfarris@innovative-health.com</u>>
**Sent:** Monday, January 8, 2024 5:50 PM
**To:** Krnavek, Pamela <<u>PKrnavek@peacehealth.org</u>>; Combs, Mark <<u>mcombs3@peacehealth.org</u>>
**Cc:** Rick Ferreira <<u>rferreira@innovative-health.com</u>>
**Subject:** RE: [EXTERNAL]RE: J&J Unit Faces Revived Antitrust Claims Over Cardiac Catheters

**WARNING - UNVERIFIED EXTERNAL EMAIL:** This email came from a sender outside of PeaceHealth. Do not open any attachments, click on any links, or provide information unless you recognize the email address it came from and were expecting this message.

Here's the document. Not too long of a read....



Jay Farris
**Regional Sales Director – Central and Western US**
480.525.5910 (Office)
480.235.8736 (Mobile)



www.innovative-health.com

   

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. [v.1]

Sensitivity: General Business Use. This document contains proprietary information and is intended for business use only.

**From:** Jay Farris
**Sent:** Monday, January 8, 2024 10:07 AM
**To:** Krnavek, Pamela <PKrnavek@peacehealth.org>; Combs, Mark <mcombs3@peacehealth.org>
**Subject:** RE: [EXTERNAL]RE: J&J Unit Faces Revived Antitrust Claims Over Cardiac Catheters

I am not signed up but working on getting us a login…

**From:** Krnavek, Pamela <PKrnavek@peacehealth.org>
**Sent:** Monday, January 8, 2024 9:59 AM
**To:** Jay Farris <jfarris@innovative-health.com>; Combs, Mark <mcombs3@peacehealth.org>
**Subject:** [EXTERNAL]RE: J&J Unit Faces Revived Antitrust Claims Over Cardiac Catheters

Would you share your login? I can't read the whole thing and for some reason can't create an account, thanks

Kind regards,

**Pamela Krnavek, RN, CVAHP** | **Supply Chain**
*Manager, Value Analysis*
1115 SE 164ᵗʰ Ave, Vancouver, WA 98683
peacehealth.org | 360-729-1000 OFFICE

Whatsoever I thankfully receive, as a token of God's love
to me, I part with contentedly as a token of my love to Him.
                          -Theophilus Gale



Sensitivity: General Business Use. This document contains proprietary information and is intended for business use only.

**From:** Jay Farris <jfarris@innovative-health.com>
**Sent:** Saturday, January 6, 2024 7:34 AM
**To:** Combs, Mark <mcombs3@peacehealth.org>; Krnavek, Pamela <PKrnavek@peacehealth.org>
**Subject:** J&J Unit Faces Revived Antitrust Claims Over Cardiac Catheters

**WARNING - UNVERIFIED EXTERNAL EMAIL:** This email came from a sender outside of PeaceHealth. Do not open any attachments, click on any links, or provide information unless you recognize the email address it came from and were expecting this message.

Some good news happened yesterday !!

https://news.bloomberglaw.com/antitrust/j-j-unit-faces-revived-antitrust-claims-over-cardiac-catheters

Sent from my iPhone



Jay Farris
**Regional Sales Director – Central and Western US**
480.525.5910 (Office)
480.235.8736 (Mobile)
www.innovative-health.com

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. [v.1]

This message is intended solely for the use of the individual and entity to whom it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable state and federal laws. If you are not the addressee, or are not authorized to receive for the intended addressee, you are hereby notified that you may not use, copy, distribute, or disclose to anyone this message or the information contained herein. If you have received this message in error, immediately advise the sender by reply email and destroy this message.

Message

| | |
|---|---|
| **From:** | Rick Ferreira [rferreira@innovative-health.com] |
| on behalf of | Rick Ferreira <rferreira@innovative-health.com> [rferreira@innovative-health.com] |
| **Sent:** | 6/20/2022 4:58:16 AM |
| **To:** | Amy Ferreira [alferreira@innovative-health.com]; Jay Farris [jfarris@innovative-health.com]; Michael Ferreira [mferreira@innovative-health.com]; Meredith Snider [msnider@innovative-health.com] |
| **CC:** | Dave Distel [ddistel@innovative-health.com]; Lars Thording [lthording@innovative-health.com] |
| **Subject:** | FW: [EXTERNAL]Query |
| **Attachments:** | BWI Letter on Reporcessed Catheter Support.docx |

Great note from Dave to one of his customers!
I would keep this in your "cut & paste" file as you will undoubtedly have this come up at one or more of your accounts.

Have a great day guys!

Rick



Rick Ferreira
**CEO**
480.525.5910 (Office)
480.467.8517 (Mobile)
www.innovative-health.com

    



**From:** Dave Distel <ddistel@innovative-health.com>
**Date:** Monday, June 20, 2022 at 4:22 AM

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-3969**

**To:** "Meder, Risa" <MederR@centracare.com>, "Manning, Nate" <ManningN@centracare.com>
**Cc:** "Coldiron, Donald R. (Don), M.B.A." <Coldiron.Donald@mayo.edu>, "Ali, Barket" <Ali.Barket@mayo.edu>
**Subject:** RE: [EXTERNAL]Query

Hi Risa,

Thanks for the note and very unfortunate Biosense Webster is putting their profit motivation in front of your hospitals ability to control costs while preserving clinician satisfaction and patient outcomes. I will certainly credit you for the Vizigo as you are a valued client and I respect your hospitals need to maximize profitability to offset negative margin service lines that must be offered to be a full service acute care provider to the community. Returning stuff through Medline is a challenge. Just let me know what you can use of approximate equal value to the 3 Vizigo and will get it to you no charge. No need to return the Vizigo as I can't resell them out of the packaging.

That said, please allow me to set the facts straight in regards to Biosense's position:

- Biosense launched their case coverage policy in October 2014. It addresses sensor enabled products which the Vizigo is not.
- Ascent reprocessing which was sold to Stryker in 2009 received FDA clearance to reprocess the SoundStar 3D in 2009. Between that event and the implementation of the case coverage policy, <u>Biosense covered tens of thousands of reprocessed 3D SoundStar's without any issues.</u> For if there were issues they would have presented the data to the FDA and shut down the practice vs using a case coverage policy that says the mapping techs can only provide coverage for products they are "trained on". When the FDA grants a 510K to a reprocessor they have validated through the 510K process that the product is "substantially equivalent", i.e: same performance and specifications. The sensor enabled products perform fine reprocessed because the sensors (3 magnetic coils) are in the extruded shaft of the catheter. Not only can they not move but they are not exposed to O2 or electrolytes to oxidize. The calibration information for the catheter is not changed. The reprocessor just verifies its accuracy to specified tolerances.
- **The Vizigo is not sensor enabled!** All it has in it is an auto ID chip that is the same as in all the Webster CS and like catheters. There is no EPROM like in the SoundStar or Pentaray. An EPROM by the way is only for device security to lock the device 24 hours after being plugged in and encryption to make it more difficult for the reprocessor to reset. **The Vizigo is simply a steerable sheath and a Quad catheter combined. No fascinating technology here.**

**I know they will not back down. But please know they have no basis for their claims and are simply lying to make more money**. Biosense has covered hundreds of thousands of reprocessed Agilis and reprocessed quads. Put the two together and OMG, we can't cover this! Please let us know what products you can use and Tracy will get them to you.

I am in the St. Cloud area Thursday afternoon and Friday if Nate and yourself have time to meet to review program progress and additional opportunities for increased savings?

I have cc'd Don Coldiron and Barket Ali who manage the cardiology portfolio for Captis so they are aware of Biosense Webster's new unfounded position.

Thanks,

Dave





Dave Distel
**VP, Business Development**
480.525.5970 (Office)
507.358.5289 (Mobile)
www.innovative-health.com

  

**From:** Meder, Risa <MederR@centracare.com>
**Sent:** Thursday, June 16, 2022 3:03 PM
**To:** Dave Distel <ddistel@innovative-health.com>
**Subject:** [EXTERNAL]Query

Good afternoon Dave,

I have a question for you.  I was so excited about saving money by ordering the reprocessed Vizigo sheaths that I forgot that Carto won't back up our cases if we use a reprocessed product that has a chip.   I have 3 of them. ☹  Is there any way we can return them?  They are out of their box but the packaging is still intact.  I totally understand if we can't but thought I'd ask.  Thanks so much for your consideration.

Risa Meder
Electrophysiology
320-251-2700 ext 59958
Confidentiality Notice: This e-mail and any attachment may contain confidential information that is legally privileged. This information is intended only for the use of the individual or entity named above. The authorized recipient of this information is prohibited from disclosing this information to any other party unless required to do so by law or regulation. If you are not the intended recipient, you are hereby notified any disclosure, copying, distribution or action taken in reliance on the contents of these documents is strictly prohibited. If you have received this transmission in error, please notify the sender immediately, reply to this transmission, or contact the CentraCare Information Systems Network Security staff by calling the IS Help Desk for assistance at 320-251-2700, ext. 54540, and delete these documents.

**BIOSENSE Webster.**
PART OF THE *Johnson&Johnson* FAMILY OF COMPANIES

Date: XX/XX/XXXX

RE: Position Statement on Clinical Account Specialist Case Support of Reprocessed SUD Catheters

Dear Valued Customer,

This letter is to inform you of Biosense Webster, Inc.'s position regarding clinical support of reprocessed Single-Use-Devices (SUD). Biosense Webster's commitment to providing high quality products and services requires that we properly train all clinical account specialists on the capabilities, limitations, and proper functioning of all our devices and equipment. It is critical that our personnel possess a competent base of knowledge of the design intent of each device feature and a thorough understanding of how each disposable product is designed to work with our capital equipment to ensure the best possible outcome for each procedure that we support. This base of knowledge is especially important when it comes to troubleshooting the CARTO® System in the midst of a procedure. In fact, most hospital facilities also recognize the critical nature of vendor product competency as it relates to patient safety and consequently require vendor representatives to provide documentation attesting to their competency with their company's products as part of the vendor credentialing process.

Accordingly, Biosense Webster's clinical account specialists can only provide clinical support for cases that use catheters they have been trained to support. Biosense Webster's portfolio of products includes a combination of both new and reprocessed devices. Biosense Webster's clinical account specialists have been trained to understand the capabilities, limitations, and proper functioning of these devices and hence, are able to deliver on our commitment of high quality support. However, this support by Biosense Webster's clinical account specialists does not extend to products manufactured or reprocessed by another company.

Electrophysiology catheters provided by another original equipment manufacturer or reprocessing company are not Biosense Webster products. Reprocessing is a manufacturing process (reference the FDA guidance documents on reprocessing of SUDs). Therefore, once Biosense Webster's products are subjected to the reprocessing operations of another company, these devices are no longer Biosense Webster's products. The 510(k) clearance for reprocessed devices is owned by the reprocessing company that manufactures and distributes the devices. Biosense Webster has no knowledge of the third party's manufacturing operations, nor of the product specifications of its devices and as such, Biosense Webster cannot attest to the safety or efficacy of these devices.

For any questions related to the information contained in this letter, please contact your local Biosense Webster representative.

Thank you for your continued partnership and for choosing the Biosense Webster, Inc. Family of Products.

Sincerely,

……………
Biosense Webster, Inc.
3333 Diamond Canyon Rd.
Diamond Bar, CA 91765

**Biosense Webster, Inc.** | 3333 Diamond Canyon Road, Diamond Bar, CA 91765 USA
**Tel:** 909-839-8500 | **Tel:** 800-729-9010 | **Fax:** 909-468-2905
**www.biosensewebster.com**

CONFIDENTIAL                    JX-3969, Page 4 of 4                    IH00697214

Message
_____

| | |
|---|---|
| **From:** | Reyes, Kara [Kara_Reyes@s2s-global.com] |
| **on behalf of** | Reyes, Kara <Kara_Reyes@s2s-global.com> [Kara_Reyes@s2s-global.com] |
| **Sent**: | 1/3/2023 7:32:42 AM |
| **To:** | Meredith Snider [msnider@innovative-health.com] |
| **CC:** | Dave Distel [ddistel@innovative-health.com]; Rick Ferreira [rferreira@innovative-health.com] |
| **Subject:** | [EXTERNAL]FW: SterilMed Potential Cost Savings for 2022 |
| **Attachments:** | University SterilMed Analysis Jan 2022 thru Jun 2022.xlsx; BWI Coverage Policy.pdf |

*CONFIDENTIAL* :  Happy New Year.  See below and attached.   Mer – let's get together this afternoon to put together a response.  Not surprised.  I copied in Dave and Rick to keep them in the loop on the BSW stuff.

Thanks,
kr

_____

**From:** Cardenas, Miguel <Miguel_Cardenas@PremierInc.com>
**Sent:** Monday, January 2, 2023 9:07 AM
**To:** Reyes, Kara <Kara_Reyes@s2s-global.com>
**Subject:** FW: SterilMed Potential Cost Savings for 2022

Good Morning Kara,
Hope you had a happy holidays.
This is the letter BW sent to UH for review in attempts to keep their reprocessing contract.  What is yalls take on the highlighted OEM products below not being reprocessed by another company?  By removing those items the savings reduces from 600K to 315K, obviously not ideal but we need to do whats right by UH regardless.

**Miguel Cardenas**
Region Director- UH/Southwest
Member Field Services | Premier Inc.

M: (210) 316-6716

Upcoming PTO – December 24- January 2

premierinc.com

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-3972**

_____

**From:** Lunday, Phillip [BWIUS] <plunday@its.jnj.com>
**Sent:** Tuesday, December 27, 2022 1:39 PM
**To:** Cardenas, Miguel <Miguel_Cardenas@PremierInc.com>; Alexandria Garcia <Alexandria.Garcia2@uhs-sa.com>; Jody Eastland <Jody.Eastland@uhs-sa.com>; Michael Llanas <MichaelA.Llanas@uhs-sa.com>; Horacio Vasquez <Horacio.Vasquez@uhs-sa.com>; Wesley Waymer <Wesley.Waymer@uhs-sa.com>; Alex Cisneros <Alex.Cisneros@uhs-sa.com>; May, Louis [SMDUS] <LMay@its.jnj.com>
**Cc:** Amaya, Vanessa [BWIUS] <VAmaya@ITS.JNJ.com>
**Subject:** SterilMed Potential Cost Savings for 2022

****This email did not originate from the Premier, Inc. network. Use caution when opening attachments or clicking on URLs.*****

.
All, please see the attached SterilMed analysis of potential cost savings for 2022 with your current SterilMed contract. This analysis is based on the total collections, total OEM purchased and total SterilMed quoted back to University. The

first tab has the total for each of the categories previously mentioned as well as the catalog and item description. The second tab shows the missed savings over the year. Cables and diagnostic items were calculated at 85% reprocessed use vs OEM. Acunav and SoundStar were calculated at a 2:1 margin (2 reprocessed and 1 OEM). The items highlighted in light pink color on tab 1 are competitive items that were quoted back and collected. I do not have access to the total OEM purchased in the competitive categories to provide a complete picture of total missed savings.

Just based on Biosense Webster products alone there was an estimated total of $195,000.00 in missed savings this year. Couple that with the competitive OEM products ordered that could have been purchased through SterilMed and you are getting close to $250,000.00 in missed savings this year.

As you are looking to move to a different vendor for reprocessing please note that all of the ULSD (Acunav and SoundStar) will need to be OEM as well as any navigational catheter (Pentaray, Lasso, DecaNav and Esophastar). Please see attached coverage policy letter.

I am asking that after review of the information and current contract in place that the EP/Cath and IR be carved out and remain SterilMed. This will provide you the most savings, clinical expertise on site for all procedures to troubleshoot catheters and cables and a trusted vendor with Biosense Webster / SterilMed – Johnson & Johnson companies.

I look forward to hearing your response.

Thank you

Phil Lunday
**Executive Territory Manager**
BioSense Webster
Cell Phone: 210-262-2731
Plunday@its.jnj.com



This message and its contents are PROPRIETARY AND CONFIDENTIAL to Premier, Inc. inclusive of its affiliates and subsidiaries. This message and all attachments are a private communication and are only for the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system.

**This Document has been produced in Native Format**

**JX-3972, Page 4 of 7**

University Jan- Dec 2022

University Jan- Sept 2022

| Item # | Item Description | EA Collected | EA Quoted | JJMDC RPO Purchased (EA) | RPO Buyer Efficiency | OEM Purchased (EA) | AVG Monthy Use OEM + RPO |
|---|---|---|---|---|---|---|---|
| **Cables** | | | | | | | |
| BIOCB3410CT | CABLE DECA LIGHT BLUE 34-PIN DARK BLUE 10-PIN CARTO 3 | 3 | 3 | | 0% | 2 | 0 |
| BIOCB3412CT | CABLE DECA LIGHT BLUE 34-PIN DARK BLUE 12-PIN CARTO 3 | 1 | 7 | | 0% | | 0 |
| BIOCB3434CT | CABLE 20 POLE A/20 POLE B LIGHT BLUE 34-PIN DARK BLUE 34-PIN CARTO 3 | 21 | 16 | | 0% | 28 | 5 |
| BIOCR3425CT | CABLE MAP RED 34-PIN RED 25-PIN CARTO 3 | 3 | 3 | | 0% | 3 | 1 |
| BIOCR3434CT | CABLE INTERFACE CARTO 3 | 110 | 117 | | 0% | 99 | 17 |
| BIOCY1210CT | CABLE DECA YELLOW 12-PIN BLACK 10-PIN CARTO 3 | 14 | 13 | | 0% | 20 | 3 |
| BIOCY1212CT | CABLE QUAD-A QUAD-B DECA YELLOW 12-PIN DARK BLUE 12-PIN CARTO 3 | 28 | 26 | | 0% | 24 | 4 |
| BIOD134401 | CABLE INTERFACE CARTO 3 SYSTEM SPLIT HANDLE | 80 | 88 | | 0% | 73 | 12 |
| DAI401984 | EP CABLE DIAGNOSTIC EXTENSION BLACK | 22 | 24 | | 0% | | |
| IRV85953 | EP CABLE EXTENSION 4 PIN GREY | 26 | 34 | | 0% | | 0 |
| IRV85954 | EP CABLE EXTENSION 10 PIN | 129 | 130 | | 0% | | 0 |
| | Sub Total | 437 | 461 | 0 | 0% | 249 | |
| | | | | | | | |
| **Diagnostic Catheters** | | | | | | | |
| BIOBD710DF282CT | CATHETER EZ STEER BI-DIRECTIONAL CS DEFLECTABLE CURVE TYPE: D-F NON AUTO ID | 1 | 1 | | 0% | | 0 |
| BIOBD710FJ282CT | CATHETER EZ STEER BI-DIRECTIONAL CS DEFLECTABLE CURVE TYPE: D-F 12 PIN AUTO ID | 1 | 5 | | 0% | 1 | 0 |
| BIOD6DR252CT-TB | EP DIAGNOSTIC CATHETER WITH AUTO ID DEFLECTABLE QUADRIPOLAR D CURVE | 20 | 18 | | 0% | 15 | 3 |
| BIOD6-DR-252-RT | EP DIAGNOSTIC CATHETER QUADRIPOLAR D-TYPE/BLUE | 13 | 11 | | 0% | 15 | 3 |
| BIOF5-QA-252-RT | EP DIAGNOSTIC CATHETER FIXED CURVE QUADRIPOLAR A/YELLOW | 1 | 1 | | 0% | 2 | 0 |
| DAI402004 | EP DIAGNOSTIC CATHETER FIXED CURVE QUAD SUPREME CRD-2 | 5 | 5 | | 0% | | 0 |
| DAI402010 | EP CATHETER SUPREME HEXA CRD-2 | 12 | 5 | | 0% | | 0 |
| IRV81104 | EP DIAGNOSTIC INQUIRY STEERABLE DECAPOLAR LARGE CURVE | 120 | 138 | | 0% | | 0 |
| IRV81404 | EP DIAGNOSTIC INQUIRY QUADRAPOLAR LARGE CURVE | 19 | 18 | | 0% | | 0 |
| IRV81418 | EP CATHETER INQUIRY STEERABLE QUADRAPOLAR X-LARGE CURVE | 1 | | | 0% | | 0 |
| | Sub Total | 193 | 202 | 0 | 0% | 33 | |
| | | | | | | | |
| **Ultrasound** | | | | | | | |
| BIO10439072 | CATHETER SOUNDSTAR ECO 3D DIAGNOSTIC ULTRASOUND FOR USE ON GE IMAGING SYSTEM 10FR | 41 | 29 | | | 52 | 9 |
| R10439236 | SOUNDSTAR ECO 8F DIAGNOSTIC ULTRASOUND CATHETER FOR USE ON GE IMAGING SYSTEM | 16 | 14 | | 0% | 22 | 4 |
| RD087031 | ViewFlex ICE Catheter | 3 | | | | | 0 |
| ACU10135910 | CATHETER ACUNAV DIAGNOSTIC ULTRASOUND 8FR GE | 6 | 7 | | 0% | 51 | 9 |
| ACU10043342 | CATHETER ACUNAV DIAGNOSTIC ULTRASOUND 10FR GE | 1 | 3 | | 0% | 12 | 2 |
| | Sub Total | 67 | | 0 | 0% | 137 | |

CONFIDENTIAL

IH00697224.001

**SterileMed Savings**          2022

| Savings with SterileMed | Cables | DX Catheters | Acunav | Soundstar |
|---|---|---|---|---|
| Total RPO Purchased | 0 | 0 | 0 | 0 |
| AVG RPO Price | $34.42 | $118.36 | $849.68 | $1,392.56 |
| Total RPO Spend | $0.00 | $0.00 | $0.00 | $0.00 |
| Total OEM Purchased | 249 | 33 | 68 | 74 |
| AVG OEM Price | $236.00 | $358.72 | $2,708.00 | $2,612.00 |
| Total OEM Spend | $58,764.00 | $11,837.76 | $184,144.00 | $193,288.00 |
| | | | | |
| Current Savings | $0.00 | $0.00 | $0.00 | $0.00 |
| Total Potential Spend at 85% | $12,961.04 | $5,107.68 | $100,519.60 | $133,535.44 |
| Actual Spend | $58,764.00 | $11,837.76 | $184,144.00 | $193,288.00 |
| Missed Savings | -$45,802.96 | -$6,730.08 | -$83,624.40 | -$59,752.56 |

**** Cost Savings for Ulsd Catheters are Calculated at 2:1 margin
2 Reporcessed 1 new

| Total SterileMed Savings | $0.00 |
|---|---|
| Potential Additional Savings | -$195,910.00 |

CONFIDENTIAL                                                        IH00697224.002

**JX-3972, Page 6 of 7**

**Biosense Webster, Inc.**
31 Technology Drive,
Suite 200
Irvine, CA 92618 USA
www.biosensewebster.com

Date: XX/XX/XXXX

RE: Position Statement on Clinical Account Specialist Case Support of Reprocessed Single Use Devices (SUD)

Dear Valued Customer,

This letter is to inform you of Biosense Webster, Inc.'s position regarding case support of reprocessed Single-Use-Devices (SUD) distributed by third parties. Biosense Webster's commitment to providing high-quality products and services requires that we properly train all Clinical Account Specialists on the capabilities, limitations, and proper functioning of all our devices and equipment. Electrophysiologists ask Clinical Account Specialists to assist with reconstructing cardiac anatomy using our technology and interpreting maps and providing insight on the images generated by the CARTO® 3 System. It is critical that our personnel possess a competent base of knowledge of the design intent of each device feature and a thorough understanding of how each device is designed to work with our capital equipment to help achieve the best possible outcome for each patient. This base of knowledge is especially important when it comes **to providing product technical support for the CARTO**® 3 System, and troubleshooting the CARTO® 3 System in the midst of a procedure, which requires accurate inputs from diagnostic mapping and ultrasound catheters.. Most hospital facilities also recognize the critical nature of vendor product competency as it relates to patient safety and consequently require vendor representatives to provide documentation attesting to their competency with their company's products as part of the vendor credentialing process.Reprocessing is a manufacturing process regulated by the U.S. Food and Drug Administration, and reprocessed single use devices generally require a new regulatory submission before they can be distributed. The regulatory clearance for reprocessed devices is owned by the reprocessing company that manufactures and distributes the devices, not the original equipment manufacturer. Therefore, once Biosense Webster's single use devices are subjected to the reprocessing process of another company, those devices are no longer our products.

To offer our customers a portfolio of both new and reprocessed devices, Biosense Webster has partnered with a reprocessing company that is also a member of the Johnson & Johnson Family of Companies. We have shared our calibration methods and product testing methods with our affiliated reprocessing company, and we distribute those products along with new Biosense Webster devices. We are confident that the reprocessed devices we distribute meet our quality standards. However, we have no knowledge of the manufacturing operations or specifications of reprocessed devices manufactured by third parties with which we are not affiliated. As such, Biosense Webster cannot attest to the safety, **effectiveness, and accuracy** of these devices.

Accordingly, our Clinical Account Specialists can only provide product technical support in cases that use diagnostic mapping and ultrasound catheters distributed by Biosense Webster. Our Clinical Account Specialists understand the capabilities, limitations, and proper functioning of these devices and are able to deliver on our commitment of high-quality support for these products.

For any questions related to the information contained in this letter, please contact your local Biosense Webster, Inc. representative.

Thank you for your continued partnership and for choosing the Biosense Webster, Inc.

Sincerely,

Biosense Webster, Inc.

097317-180821

# STEARNS WEAVER MILLER
# WEISSLER ALHADEFF & SITTERSON, P.A.

Eric S. Roth
150 West Flagler Street, Suite 2200
Miami, FL 33130
Direct: (305) 789-3351
Fax: (305) 789-3395
Email: eroth@stearnsweaver.com

February 23, 2018

*Via FedEx*

Re:    Biosense Webster Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement ("NCA")

Dear

Our Firm represents Biosense Webster, Inc. ("BWI"), and we are writing as a follow up to the January 29 letter BWI sent you regarding the NCA. We understand that you are or soon will be working for Stryker Corporation, a BWI competitor. BWI expects you to comply with your continuing obligations under the NCA and has some specific concerns regarding your employment with Stryker as it relates to the NCA, as explained below.

BWI has invested time, energy and resources in developing and maintaining the secrecy of its Confidential Information. BWI values its Confidential Information and has a legitimate business interest in protecting it. Thus, we remind you of your obligation, under paragraph 5 of the NCA, not to use or disclose, either directly or indirectly, to or for the benefit of any third party, any of BWI's Confidential Information. Please note that the NCA defines Confidential Information to include, among other things, BWI's business information not known to the public and information the company keeps confidential from competitors including, information regarding company software and hardware, sales, selling, and business strategies as well as BWI's customer lists, the names or significance of BWI's customers, and BWI's customers' preferences, needs, requirements, purchasing histories, likes, dislikes, habits and other customer-specific information.

Additionally, BWI invested significant time and resources to train you to become a clinical account specialist including but not limited to providing you with extraordinary and specialized training on BWI's three-dimensional cardiac mapping and navigation technology and the catheters which electrophysiologists use in conjunction with that technology. Such technology contains proprietary hardware and employs proprietary software to create a state of the art platform which physicians use to treat patients. As you know, the company undertakes significant effort to ensure that its clinical account specialists are highly proficient in the

#6338804 v1

MIAMI  ·  FORT LAUDERDALE  ·  TAMPA  ·  TALLAHASSEE

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-3981**

CONFIDENTIAL                                    STRYKER00000018

**JX-3981, Page 1 of 10**



February 23, 2018
Page 2

technology and can service the needs of the physician customers who use the products to treat patients.

As a further means of protecting BWI's Confidential Information, the company's investment in the extraordinary and specialized training it provided you and the company's customer relationships, paragraph 6 of the NCA also provides that for 18 months following the end of your BWI employment (e.g., until August 2, 2019), you may not work for a competitor in any capacity in which you could disadvantage BWI or advantage the competitor by your use or disclosure of BWI's Confidential Information. Paragraph 7 of the NCA also restricts your ability to contact, call upon, solicit business from, sell to or render services to (or assist others to contact, call upon solicit business from, sell to or render services to) any BWI customers in connection with the sale, support, service or use of any product that resembles or competes with a BWI product. As used in the NCA, the term "customers" refers to the hospitals (including the administrators, nurses and lab staff) and physicians with whom you worked or with whom you had contact during the last 12 months of your BWI employment. For the sake of clarity, those customers include the facilities and physicians identified on Exhibit A to this letter.

BWI expects that over the next 18 months (e.g., until August 2, 2019), you will not, directly or indirectly, contact, communicate with, call on, provide services to, solicit business from, sell to, or otherwise work with any of the hospitals or physicians with whom you had contact on behalf of BWI. These restrictions apply to the physicians whether they are performing services at one of the hospitals identified above or at any other facility (even if you did not work at such facility during the last twelve months of your employment with BWI).

We understand that your role with Stryker may require you to promote the use of reprocessed products to customers and to educate customers and Stryker personnel on the use of equipment such as that manufactured and marketed by BWI or one of its competitors. The NCA prohibits you from competing against BWI by promoting, for Stryker, the use of reprocessed BWI products. Additionally, the NCA prohibits you from using the training and Confidential Information BWI provided you on its products in order to attempt to train or otherwise educate any person, including Stryker employees and representatives, customers or others, on the use of any BWI products, reprocessed or otherwise. BWI expects that you will refrain from such activities and that you will limit your efforts on behalf of Stryker to products other than those manufactured and/or marketed by BWI and to customers other than those with whom you worked for BWI (as noted above).

Additionally, in order to enable BWI to monitor your compliance with the terms of the NCA, you agreed to notify BWI, in writing, during the 18 month term of the NCA, when you begin working for a new employer. That notification must include the name of your employer, your title and a description of the responsibilities you will have in that position. If you change employment during the 18 month term of the NCA, you are required to provide us with the same information with regard to any subsequent employer. BWI has not received such notification from you, and we expect you to comply with this obligation by providing us with the information required by paragraph 9 of the NCA.

MIAMI • FORT LAUDERDALE • TAMPA • TALLAHASSEE

CONFIDENTIAL                                                    STRYKER00000019

██████████████

February 23, 2018
Page 3

Please contact me if you have any questions regarding your continuing obligations to BWI or if you disagree with the list of restricted customers we have currently identified on Exhibit A. Nothing herein is intended to, and nothing herein does, waive or release any of BWI's rights under the NCA, all of which are expressly reserved.

Sincerely,

████████████████████████

Eric S. Roth

Enclosure

cc:

██████████████

Senior Legal Counsel, Employment,
Stryker Corporation
*Via email to*: ████████@stryker.com

MIAMI · FORT LAUDERDALE · TAMPA · TALLAHASSEE

CONFIDENTIAL                                        STRYKER00000020

JX-3981, Page 3 of 10

# EXHIBIT A

**Hospitals**

Allegiance Health-Jackson
Beaumont-Dearborn
Beaumont-Troy
Bronson Methodist-Kalamazoo
McLaren Macomb-Mount Clemens
McLaren-Port Huron
Providence Health-Southfield
Sparrow Health-Lansing
St. John Macomb Oakland-Warrend
St. John Medical Center-Detroit
St. Joseph Mercy-Ann Arbor
St. Mary's Hospital-Saginaw
Covenant-Saginaw
McLaren Bay Region-Bay City
Henry Ford-Detroit
University of Michigan Hospitals & Clinics-
  Ann Arbor
VA Medical Center-Ann Arbor
Genesys Medical Center – Grand Blanc

**Physicians**

Ilana Kutinsky
Brian Williamson
Salim Ahmed
Hazim Al-ameri
Asim yunus
Liaqat Zaman
Rehan Mahmud
Abhijeet Singh
Claudio Schuger
Arfaat Khan
Gurjit Singh
Marc Lahiri
Waddah Maskoun
Karl Ilg
Matt Ebinger
Eric Good
Madar Abed
Hakan Oral
Fred Morady
Frank Bogun
Frank Pelosi
Aman Chugh
Eugene Chung
Thomas Crawford
Rakesh Latchamsetty
Hamid Ghanbari
Mo Saeed
Ryan Cunnane
Krit Jorgnashian
Jihn Han
Bipin Ravindran
Shrinivas Hebsur
Edwin Zishiri
Tim Shinn
Alanna Greenstein
Ajay Krishen
Ali Shakir
Cameron Willoughby
Christian Machado
David Rhine
Dipak Shah
Douglas Moore
Joel Reinoehl
Luis Pires
Nour Juratli
Shadi Idris
Sohail Hassan
Utkarsh Kohli

CONFIDENTIAL

STRYKER00000021

## EMPLOYEE SECRECY, INTELLECTUAL PROPERTY, NON-COMPETITION
## AND NON-SOLICITATION AGREEMENT

Name of Employee: ████████████

TO BE PROVIDED BY H.R.

Employee WWID:   1032928

### A. Introduction

     **Biosense Webster Inc** is one of numerous entities within the Johnson & Johnson Family of Companies. The businesses in which these entities are engaged are extremely competitive. During your employment, you will be given access to CONFIDENTIAL INFORMATION (as defined below) and training relating to the business of **Biosense Webster Inc** and may have access to CONFIDENTIAL INFORMATION relating to the business of other entities within the Johnson & Johnson Family of Companies. This Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (this "Agreement") also applies to any employment you may subsequently have with any other Johnson & Johnson company.

     Because your receipt of CONFIDENTIAL INFORMATION will assist you in performing your work effectively and because the secrecy of CONFIDENTIAL INFORMATION is very important for competitive and other reasons, you are expected to preserve its confidentiality, to refrain from competing with Johnson & Johnson companies while employed by **Biosense Webster Inc** or any other Johnson & Johnson company, and, with certain limitations, to refrain for eighteen (18) months after your employment ends from competing with any Johnson & Johnson company whose CONFIDENTIAL INFORMATION you had access to during your employment. To formalize these expectations, this Agreement sets forth certain confidentiality, non-competition and non-solicitation obligations you have to **Biosense Webster Inc** and to any other Johnson & Johnson company by which you may be employed at a later date or to whose CONFIDENTIAL INFORMATION you are given access while employed by **Biosense Webster Inc** or any other Johnson & Johnson company. This Agreement also defines certain rights and obligations concerning intellectual property, non-solicitation-of-business, non-solicitation of employees and publicity.

### B. Definitions

     As used in this Agreement:

     **COMPANIES** means, collectively **Biosense Webster Inc**, Johnson & Johnson, and all other entities that are at least 50 percent owned by Johnson & Johnson, either directly or indirectly, and their respective successors and assigns.

     **COMPANY** means any of the COMPANIES.

     **EMPLOYER** means **Biosense Webster Inc** or, if applicable, any other entity within the COMPANIES by which you are (or were) employed at any time. For purposes of Paragraphs 9, 10, and 11 of this Agreement that concern your rights and obligations after you are no longer employed by any COMPANY, EMPLOYER means the COMPANY by which you were last employed.

     **INVENTIONS** means discoveries, improvements and ideas, whether or not patentable, that relate to any work assigned to or performed by you for or on behalf of any COMPANY or to the actual or anticipated research or development or other business activities of any COMPANY.

11/11/13                          October 2011

**CONFIDENTIAL INFORMATION** means information about the business of any COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to you or known by you as a result of your employment by any COMPANY. CONFIDENTIAL INFORMATION includes, but is not limited to, (a) information that the COMPANY keeps confidential from competitors concerning such things as inventions, research, development, strategies, operations, logistics, manufacturing, distribution, purchasing, licensing, business planning and development, finance, computer software or hardware, automated systems, engineering, marketing, merchandising, selling, sales, personnel, customers or clients, including, but not limited to, sales volumes or strategies, number or location of sales representatives, names or significance of a COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, or other customer or client-specific information; and (b) personal or business information about any COMPANY's employees, customers, vendors, consultants and agents which is not publicly known and is disclosed to you or known by you in connection with your employment by any COMPANY.

**COMPETITOR** means any person or entity outside the COMPANIES (a) that is engaged in or preparing to become engaged in research, development, production, marketing, selling of, or consulting on a product, process, technology, machine, invention or service in existence or under development that resembles or competes with an existing or potential product, process, technology, machine, invention, or service of any COMPANY or (b) that could benefit from CONFIDENTIAL INFORMATION.

### C. Rights and Obligations

In consideration of your receipt of CONFIDENTIAL INFORMATION and company-specific training, your employment or the continuation of your employment with any EMPLOYER, and other benefits being provided to you in connection with this Agreement, you agree as follows:

1. You will disclose promptly in writing to your EMPLOYER or its designee all INVENTIONS conceived or made by you during your employment whether or not during your hours of employment or with the use of any COMPANY's facilities, materials or personnel, either solely or jointly with another or with others, and related to the actual or anticipated business or activities of any COMPANY, or related to their actual or anticipated research and development or suggested by or resulting from any task assigned by you or work performed by you for, or on behalf of, any COMPANY. Except as otherwise provided in Paragraphs 19, 20 and 21 of this Agreement, you assign and agree to assign your entire right, title and interest in all INVENTIONS to your EMPLOYER or its designee. You will not assert any rights to any INVENTIONS as having been made or acquired by you prior to your being employed by your EMPLOYER unless such INVENTIONS are identified on a sheet attached hereto and signed by you and your EMPLOYER as of the date of this Agreement.

2. All works, including, but not limited to, reports, computer programs, drawings, documentation and publications, that you create or prepare during and within the scope of your employment with your EMPLOYER shall be considered works made for hire, and the worldwide copyrights therein shall be the sole and exclusive property of your EMPLOYER. If any such copyrightable work or portion thereof shall not legally qualify as a work made for hire, or shall subsequently be held not to be a work made for hire, you assign and hereby agree to assign to your EMPLOYER or its designee all your right, title and interest therein. You agree to promptly disclose all such works to your EMPLOYER.

3. You will execute any applications, assignments or other instruments that your EMPLOYER considers necessary to apply for and obtain Letters Patent or trademark or copyright registrations to protect the interests of any COMPANY with respect to INVENTIONS, trademarks and

4/11/13 - 2 -

copyrightable works conceived, created, authorized or made by you during your employment. These obligations shall continue beyond the termination of your employment and shall be binding upon your executors, administrators and other legal representatives.

4. You will not use or disclose to any COMPANY any confidential information belonging to others, including your former employers, if any. You represent there is no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would prohibit or restrict your ability to perform your job-related duties that you have not disclosed and provided to your EMPLOYER.

5. Except as required by your duties for your EMPLOYER, you will not use, disclose, disseminate, lecture upon or publish any CONFIDENTIAL INFORMATION, either during your employment with your EMPLOYER or thereafter, unless you first obtain the prior written consent of any COMPANY to which the CONFIDENTIAL INFORMATION relates.

6. Except as provided in the next sentence or to any extent prohibited by applicable law, during your employment with any COMPANY and for a period of eighteen (18) months after your last date of employment within the COMPANIES, you will not, directly or indirectly, perform work for any COMPETITOR in any position and in any location in which you could disadvantage any COMPANY or advantage the COMPETITOR by your disclosure or use of CONFIDENTIAL INFORMATION to which you had access. Following the termination of your employment, you will be permitted to work for an entity or person if (a) the COMPANY with a competitive interest determines that the entity or person for which you wish to work has a diversified business and no portion of the business for which you have indicated that you would render services is a COMPETITOR, and (b) prior to your commencing any work, such entity or person and you each provides written assurance satisfactory to the COMPANY with a competitive interest that you will not render any services for the portion of the business that is a COMPETITOR for a period of eighteen (18) months after your last date of employment within the COMPANIES. The restrictions of this paragraph will not apply with respect to services you render in California after termination of your employment within the COMPANIES.

7. To avoid disadvantaging your EMPLOYER or any other COMPANY through your use of relationships you gained, maintained, or enhanced through your employment with any COMPANY, you will not, during your employment with any COMPANY or for eighteen (18) months after your last date of employment within the COMPANIES, directly or indirectly, solicit any business from, sell to, or render any service to any accounts, customers or clients with which you have had contact during the last twelve (12) months of your employment within the COMPANIES in connection with the sale of any product or service that resembles or competes with one that is being (or is being prepared to be) sold, developed or acquired by any COMPANY for which you worked during the last twelve (12) months of your employment. The restrictions of this paragraph will not apply to limit your activities for any COMPANY while you are employed within the COMPANIES or to services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

8. Except to any extent prohibited by applicable law, you agree that for a period of twelve (12) months after your last date of employment within the COMPANIES, you will not, directly or indirectly, solicit or hire on your own behalf, or on behalf of others, any individual employed by any COMPANY with whom you have worked or who became known to you as a result of your employment within the COMPANIES. The restrictions of this paragraph will not apply to limit your activities for any COMPANY while you are employed within the COMPANIES or to services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

11/11/13   - 3 -

CONFIDENTIAL

STRYKER00000024

9. For purposes of enabling your EMPLOYER and any other COMPANY with a competitive interest to monitor your compliance with your obligations under this Agreement, you will notify your EMPLOYER in writing, both at the time you give notice that you will be terminating your employment within the COMPANIES and whenever within the eighteen (18)-month period following the termination of such employment you plan to commence work with a new entity or person of: the identity of each entity or person for which you will be working, your new title, and the responsibilities of the position. During this time period you will also provide such notice as to any planned changes in your work responsibilities. You will provide the notices required under this paragraph to the highest-ranking employee in the Human Resources organization of your EMPLOYER and will do so promptly, and, in any event, at least two (2) weeks prior to commencing any new position or (if applicable) new responsibilities. You will promptly provide any additional information requested by your EMPLOYER that is reasonably related to the purposes of this paragraph. The information you provide pursuant to this paragraph should not include any confidential information belonging to anyone outside the COMPANIES and will not be used except to evaluate your compliance with your obligations under this Agreement, to enforce those obligations, and to seek remedies for your breach or another party's interference with your obligations under this Agreement.

10. If, after the termination of your employment within the COMPANIES, you are unable to obtain employment consistent with your education and experience in a position in which your Gross Monthly Pay (as defined below, "GMP") is at least equal to your GMP at the time of such termination solely because the restrictions set forth in Paragraphs 6 or 7 of this Agreement, then any such restriction that caused you to be unable to obtain such employment shall bind you only as long as your EMPLOYER, commencing after you provide written notice pursuant to Paragraph 9, makes monthly payment to you equal to the lesser of (a) the amount you last received from your EMPLOYER as GMP or (b) the difference between your last GMP at your EMPLOYER and your GMP in any subsequent position. Gross Monthly Pay shall consist of the sum of the following applicable amounts, prorated to a monthly basis: your annual base pay, annual commissions, year-end cash bonus, and the monetary value of your year-end stock award (but not any stock option grants, restricted stock units, Certificates of Extra Compensation or other extra compensation, long-term compensation or benefits). Your GMP at your EMPLOYER will be based on the amounts you actually received during the last twelve (12) calendar months you were employed. Your GMP in any subsequent work will be based on your EMPLOYER's reasonable projection of the amounts to be received by you during the first twelve (12) months in that employment.

11. To qualify for the payments provided for in Paragraph 10 above for each month that you claim payment is due, you must represent in writing to the Vice President of Human Resources of your EMPLOYER, within fifteen (15) days following the end of the month, that although you diligently sought work consistent with your education and experience, you were unable to attain such employment in a position in which your GMP equaled the GMP you last received from your EMPLOYER, solely because of a restriction set forth in Paragraphs 6 or 7 above. You must also promptly submit such further information as your EMPLOYER may request to verify the accuracy of your representation.

12. If your EMPLOYER gives you a written release from the restriction of Paragraphs 6 or 7 above that has been the sole cause of your inability to obtain employment consistent with your education and experience in which your GMP equals at least the GMP you last received from your EMPLOYER, then your EMPLOYER will no longer be obligated to make the payments contemplated by Paragraph 10 above.

13. Upon termination of your employment with your EMPLOYER, you will turn over to an individual designated by your EMPLOYER all property in your possession or custody belonging to your EMPLOYER or any other COMPANY, including any computer equipment. You shall not retain



14/11/13    - 4 -

CONFIDENTIAL

STRYKER00000025

copies of any correspondence, memoranda, reports, notebooks, drawings, photograph, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk) relating in any way to the affairs of your EMPLOYER or any other COMPANY that were entrusted to or obtained by you at any time during your employment with any COMPANY.

14. You acknowledge that if you violate or are about to violate this Agreement by disclosing or using information prohibited by Paragraph 5 above, by engaging in conduct prohibited by Paragraphs 6, 7 or 8 above, or by failing to turn over property as required by Paragraph 13 above, immediate irreparable injury to one or more of the COMPANIES will result, warranting (in addition to any other relief) the imposition of injunctive relief against you.

15. Your EMPLOYER may assign this Agreement and all of its rights and obligations.   Each COMPANY is an express third-party beneficiary of this Agreement.

16. Nothing in this Agreement shall affect any common law duties you have to any COMPANY, including, but not limited to, your duty of loyalty.

17. This Agreement will be governed by and interpreted according to the laws of the State of New Jersey, without regard to its conflict of law rules. Any action relating to or arising out of this Agreement may be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. You consent to personal jurisdiction and venue in both such courts and to service of process by United States mail or express courier service in any such action.

18. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

19. The following applies only to a Minnesota employee:   Paragraph 1 does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used to conceive or reduce to practice such INVENTION and which was developed entirely by you on your own time, and (a) which does not relate at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by you for your EMPLOYER.

20. The following applies only to a California, Delaware, Illinois, Kansas, or North Carolina employee: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) the INVENTION results from any work performed by you for your EMPLOYER. For California employees, the requirement to assign your rights in an invention to your EMPLOYER does not apply to an invention which qualifies fully under the provisions of California Labor Code Section 2870.

21. The following applies only to a State of Washington employee: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) directly to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, and (b) the INVENTION results from any work performed by you for your EMPLOYER.



- 5 -

CONFIDENTIAL

STRYKER00000026

22. Nothing contained in this Agreement shall be deemed to confer on you any rights with respect to the duration of your employment. YOUR EMPLOYMENT IS TERMINABLE AT WILL BY EITHER YOUR EMPLOYER OR YOU, WITH OR WITHOUT CAUSE, EXCEPT THAT IF YOU INITIATE THE TERMINATION, THERE SHALL BE, AT YOUR EMPLOYER'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER YOU GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If your EMPLOYER elects to continue your employment during the notice period, it shall advise you of that fact and of the duration of the notice period. During any notice period, you will provide such transitional services as your EMPLOYER may request. Your EMPLOYER will be obligated to continue your pay during the notice period, and your duty of loyalty to your EMPLOYER will continue through such period.

This Agreement sets forth the entire agreement between the parties relating to its subject matter and supersedes all prior agreements, written or oral, between them. No modification of or amendment to this Agreement will be effective unless it is in writing and signed by you and an authorized representative of your EMPLOYER. You represent that you have not relied on any representations by any representative of any COMPANY concerning the subject matter of this Agreement that are not expressly stated in this Agreement.

YOU ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, AND YOU AGREE TO THE TERMS ABOVE.

DATE: __11-11-13__

EMPLOYEE SIGNATURE

Print Employee Name

Address

City/State

**Biosense Webster Inc**

- 6 -

CONFIDENTIAL

STRYKER00000027

| From: | Kandev, Ilia [SLCUS] </O=JNJ/OU=CSCUSNO/CN=RECIPIENTS/CN=IKANDEV> |
| --- | --- |
| To: | Bartee, Alanna [BWIUS]; Zare, Fairy [BWIUS]; Lessek, Tim [ETHUS] |
| Sent: | 4/29/2016 6:46:56 PM |
| Subject: | Fwd: Can workplace wellness help the environment? |
| Attachments: | ATT00001.htm; med_009_04_044501.pdf |

Team -

Just an FYI. We have clinical objections regarding quality of OEM vs RPO and we are looking to bolster our quality claim. Not sure if you want to use the below for Sound Choice or PCH RPO Quality since you already have the OEM credibility but I am passing on in case you want to use.

Sent from my iPad

Begin forwarded message:

**From:** "Kandev, Ilia [SLCUS]" <IKandev@its.jnj.com>
**Date:** April 29, 2016 at 11:43:41 AM MST
**To:** Randall Marker <rmarker@sterilmed.com>
**Cc:** Ilia Kandev <ikandev@sterilmed.com>, Jeffrey Neichin <jneichin@sterilmed.com>, "Ayer, Jonathan" <jayer1@sterilmed.com>, "Cleary, Kevin [ETHUS]" <KCleary@sterilmed.com>, "Stojanovski, Dragi [ETHUS]" <DStojanovski@sterilmed.com>, "Burger, Scott" <SBurger@sterilmed.com>, "Montgomery, Chance" <cmontgom@sterilmed.com>, "Dufur, Brian [ETHUS]" <BDufur@sterilmed.com>
**Subject: Re: Can workplace wellness help the environment?**

Good article Randy. The mention of the RPO device quality study was interesting. We have the reference of our devices being higher quality than S3 in our acquisition deck, but having a general study on the RPO device quality is something we should add ass well. I will work on that as I am updating the acquisition deck with the CSDs.

Here is the conclusion of the study and the study itself attached.

OEM single-use bipolar and ultrasound diathermy devices were found to be defective 4.9 times more frequently than RP devices based on surgical team reporting. The overall defect rate for OEM bipolar and ultrasound diathermy devices was 2.0% and was not significantly different based on manufacturer.

Innovative v. Biosense
**No. 8:19-cv-01984-JVS**

**JX-4316**

# A Comparison of the Defect Rate Between Original Equipment Manufacturer and Reprocessed Single-Use Bipolar and Ultrasound Diathermy Devices

**Terrence J. Loftus**

Medical Director Surgical Services and Clinical Resources,
Division of Care Management,
Banner Health,
1441 N. 12th Street,
Phoenix, AZ 85006
e-mail: Terry.Loftus@BannerHealth.com

*Reprocessing has emerged as an attempt to control the cost of single-use bipolar and ultrasound diathermy devices despite limited data on defect rates. This study compares the defect rates, as reported by surgical teams, between original equipment manufacturer (OEM) single-use bipolar and ultrasound diathermy devices and reprocessed (RP) devices. Data were retrospectively collected on 3112 devices over a 7-month period for two types of bipolar and ultrasound diathermy devices. There is a significant difference ($p < 0.001$) in reported bipolar and ultrasound diathermy device defects between OEM and RP. OEM single-use bipolar and ultrasound diathermy devices were reported to be defective more frequently than RP devices based on reports from the surgical team.* [DOI: 10.1115/1.4030858]

## Introduction

Reprocessing has emerged as an attempt to control the cost of single-use bipolar and ultrasound diathermy devices. Data on the defect rates of these medical devices remain limited [1]. OEMs claim lower defect rates compared to RP devices; however, the Food and Drug Administration (FDA) has reported that RP single-use devices do not present an elevated health risk [2]. It has been noted that errors in processing can lead to increased cost and may result in worse patient outcomes [3]. In addition to patient safety issues, reprocessing can also have legal implications [4].

Understanding the defect rates of these devices as reported by the surgical teams, working under real world conditions, will help clarify the true risk for each type of bipolar and ultrasound diathermy device. The purpose of this study is to compare the reported defect rates between the OEM single-use bipolar and ultrasound diathermy devices to RP energy devices in a single, large healthcare system.

## Materials and Methods

This is a retrospective study of data collected over a 7-month period (Jan. 1, 2013–July 31, 2013) for two types of bipolar and ultrasound diathermy devices used, for vessel sealing and dividing, in both open and laparoscopic surgical procedures. One of the OEMs produces ultrasonic (US) diathermy single-use devices. The other OEM produces bipolar diathermy (BD) single-use devices. A total of 680 OEM (US) devices and 713 OEM (BD) devices were used in the comparison along with 1036 RP (US) devices and 683 RP (BD) devices. Any device that was reported as defective by the surgeon, scrub tech, first assistant, or circulating nurse at any time during the course of an operation on a patient was counted as a defect and reported to supply chain services for

tracking purposes. The number of devices purchased during this time period was also tracked by supply chain services through purchase orders. This count was used to determine the overall defect rate during the study period. Rates were calculated based on the reported defective devices divided by the number of devices purchased during the reporting period. Comparisons were made between OEM and RP for all bipolar and ultrasound diathermy devices and broken out based on manufacturer type. Devices to be RP were collected from the operating rooms of 19 acute care facilities across seven states and RP through an external vendor who has FDA 510(k) approval to reprocess the single-use bipolar and ultrasound diathermy devices included in this study. RP devices were, therefore, the same model as the OEM device, which the FDA 510(k) approval was based.

This study was determined to be exempt by the healthcare system's Institutional Review Board (Project No. 01-14-0069, Reference No. 014742). Patient data were not used. Only the reported defect rates of the bipolar and ultrasound diathermy devices used during the study period were tracked. Statistical analyses were performed using a two-tailed Z-test for two population proportions. A $p$ value $< 0.05$ was considered statistically significant.

## Results

A total of 3112 devices were purchased and included in the reporting period (OEM: 1393 and RP: 1719). There is a significant difference ($p < 0.001$) in reported bipolar and ultrasound diathermy device defects between OEM and RP, with a higher percentage of defects (2.0% versus 0.41%) reported with the OEM devices (see Table 1). OEM devices were reported as defective 4.9 times more frequently than RP devices. This difference was maintained for both types of bipolar and ultrasound diathermy devices studied, US (OEM versus RP: $p = 0.0013$) and BD (OEM versus RP: $p = 0.009$).

When comparing the OEM US to the OEM BD device, there was no significant difference in the reported defect rates ($p = 0.522$) (see Table 2). This held true for RP devices as well. There was no significant difference in the defect rates between the RP US and the RP BD devices ($p = 0.3472$).

## Discussion

In this study, the reported defect rates were compared between OEM and RP single-use bipolar and ultrasound diathermy devices. Over a 7-month period in our healthcare system, it was found that, contrary to popular opinion [5], OEM bipolar and ultrasound diathermy devices were reported as defective more frequently than comparable devices that underwent reprocessing. Previously, Weld et al. [6] demonstrated better performance for a RP ultrasound diathermy device compared to a RP device based on visual inspection of the device, mechanical testing, and in vivo testing in an animal model. Our study focused on surgical team reporting during operative cases involving patients under real world conditions. It may be that the difference in outcomes may have more to do with how performance is defined.

**Table 1  Comparison of OEM versus RP devices**

| All devices | Defects | Purchases | Defect rate (%) | Z-score | p-value |
| --- | --- | --- | --- | --- | --- |
| OEM | 28 | 1393 | 2.01 | — | — |
| RP | 7 | 1719 | 0.41 | — | — |
| OEM versus RP | — | — | — | 4.216 | <0.001 |
| US | — | — | — | — | — |
| US OEM | 12 | 680 | 1.76 | — | — |
| US RP | 3 | 1036 | 0.29 | — | — |
| OEM versus RP | — | — | — | 3.211 | 0.0013 |
| BD | — | — | — | — | — |
| BD OEM | 16 | 713 | 2.24 | — | — |
| BD RP | 4 | 683 | 0.59 | — | — |
| OEM versus RP | — | — | — | 2.607 | 0.009 |

Manuscript received July 16, 2014; final manuscript received June 8, 2015; published online August 6, 2015. Assoc. Editor: Rosaire Mongrain.

Downloaded From: http://medicaldevices.asmedigitalcollection.asme.org/ on 04/29/2016 Terms of Use: http://www.asme.org/about-asme/terms-of-use
CONFIDENTIAL    JX-4316, Page 2 of 8    BWI-INN00572170

**Table 2   Comparison of device based on manufacturer**

| OEM | Defects | Purchases | Defect rate (%) | Z-score | p-value |
|---|---|---|---|---|---|
| US OEM | 12 | 680 | 1.76 | — | — |
| BD OEM | 16 | 713 | 2.24 | — | — |
| US OEM versus BD OEM | — | — | — | −0.637 | 0.5222 |
| RP | — | — | — | — | — |
| US RP | 3 | 1036 | 0.29 | — | — |
| BD RP | 4 | 683 | 0.59 | — | — |
| US RP versus BD RP | — | — | — | −0.943 | 0.3472 |

For the purposes of this study, "defective" was defined as any time a member of the surgical team (surgeon, scrub tech, first assistant, or circulating nurse) determined that the bipolar and ultrasound diathermy device was not functioning in a manner consistent with the devices intended purpose. Most commonly, this was either the surgeon or scrub tech that made this determination. When it comes to the OEM and RP manufacturers, testing is performed under laboratory conditions, whereas this study was designed to evaluate these devices under real world operating conditions with the people who work first-hand with the equipment. This is, no doubt, a much more rigorous condition which explains the relatively higher defect rate. What is not apparent is why OEM devices were reported as defective more frequently than RP devices.

The U.S. FDA's Code of Federal Regulations (CFR) states "each manufacturer shall establish and maintain procedures for finished device acceptance to ensure that each production run, lot, or batch of finished devices meets acceptance criteria" [7]. The FDA allows for medical device testing to be performed by sampling as long as the manufacturer uses valid statistical techniques. Sampling allows a manufacturer to ensure a predictable level of confidence that the defect rate is acceptable [8]. A defect rate can be seen as being derived from in vitro testing whereas, in this study, the defect rate is derived from in vivo testing. Furthermore, when an OEM device is reported to be defective it is removed from the potential supply source for a RP device. Only those OEM devices that passed in vivo testing in the operating room are deemed suitable for reprocessing. In addition, the reprocessing manufacturer in this study does not use a sampling method for testing. All of their RP devices are tested before being distributed for use in the operating room. RP devices should have a lower defect rate since OEM devices reported as defective are removed from the RP supply chain and each is tested prior to distribution.

Limitations of this study include lack of confirmation data on why devices were reported as defective. It is unknown exactly, why each device was reported to be defective by the surgical team. Confirming this information could change the number of devices reported as defective. For example, if a device was reported to be defective and the issue was really operator error, then this would erroneously classify the device as defective. Similarly, a device in which sterility was compromised by one of the operators prior to use could be reported as defective when, in fact, the device would have functioned as intended. Lacking true causation for the device being reported as defective limits our understanding of the differences noted in the results. The difference between types of defects, such as mechanical (faulty circuit), operational (device's sterility compromised), or system (education on proper use of device), is critical for correcting the issue responsible for the defect. Unfortunately, a breakdown of the type and cause of the reported defect was not available for this analysis. A more robust data collection process is essential for this type of process improvement.

An additional limitation is that it is possible that a device reported as defective was purchased before the reporting period and left unused for more time, or a purchased device, counted in the denominator, was reported as defective after the reporting period. While inventory is screened for expiration dates, it may be that OEM devices remained on the shelf longer before being used and are at risk for device malfunction compared to RP devices which may have a more rapid turnover in our system. Without the ability to track individual devices in our system, this possibility cannot be excluded. Another limitation of this study is that patient outcomes were not included in the analysis. Since bipolar and ultrasound diathermy devices that are reported to be defective are replaced with devices that are used successfully, patient care may not be impacted, regardless of whether an OEM or RP device is used. Unfortunately, encounter level detail on clinical outcomes was not available for this analysis. Having a mechanism to track a device throughout its life-cycle may assist in this endeavor.

Recently, the FDA approved the final rule for implementing the unique device identification (UDI) system for medical devices in 2013 [9]. UDI was designed to identify a device from distribution to use. A UDI could allow for more accurate reporting of defects, tracking of specific reasons for the defect, comparing like models, and correlating this information with patient outcomes. In addition, knowing if a device passed a sampling test but became defective during the course of an operation would assist manufacturers in producing devices with greater real world reliability and value. In the era of value-based purchasing, medical devices that cost twice as much [10] and are reported to be defective more frequently challenge conventional definitions of reliability and value.

## Conclusions

OEM single-use bipolar and ultrasound diathermy devices were found to be defective 4.9 times more frequently than RP devices based on surgical team reporting. The overall defect rate for OEM bipolar and ultrasound diathermy devices was 2.0% and was not significantly different based on manufacturer.

## Acknowledgment

The author wishes to acknowledge the support of the Division of Care Management and Supply Chain Services of Banner Health in the development of this manuscript.

## References

[1] Committee on Gynecologic Practice, The American College of Obstetricians and Gynecologists, 2012, "Committee Opinion No. 537: Reprocessed Single-Use Devices," Obstet. Gynecol., 120(4), pp. 974–976.

[2] U.S. GAO, 2008, "Reprocessed Single-Use Medical Devices: FDA Oversight Has Increased, and Available Information Does Not Indicate That Use Presents an Elevated Health Risk," U.S. Government Accountability Office, Washington, DC, accessed May 1, 2014, http://www.gao.gov/new.items/d08147.pdf

[3] Blackmore, C. C., Bishop, R., Luker, S., and Williams, B. L., 2013, "Applying Lean Methods to Improve Quality and Safety in Surgical Sterile Instrument Processing," Jt. Comm. J. Qual. Patient Saf., 39(3), pp. 99–105.

[4] Larosz, E., 2013, "Legal Implications of Single-Use Medical Device Reprocessing," Healthcare Q., 16(3), pp. 48–52.

[5] Pyrek, K. M., 2003, "Reprocessing of Medical Devices: Government Intensifies Its Scrutiny as Clinicians Debate Patient-Safety Issues. SurgiStrategies," Last accessed May 16, 2014, http://www.surgistrategies.com/articles/2003/02/reprocessing-of-medical-devices-116124.aspx

[6] Weld, K. J., Dryer, S., Hruby, G., Ames, C. J., Venkatesh, R., Matthews, B. D., and Landman, J., 2006, "Comparison of Mechanical and In Vivo Performance of New and Reprocessed Harmonic Scalpels," Urology, 67(5), pp. 898–903.

[7] FDA, Quality System Regulation, 2014, "Title 21 Part 820 of the Code of Federal Regulations," U.S. Food and Drug Administration, Washington, DC, accessed May 15, 2014, http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm

[8] Veselov, V., Roytman, H., and Alquier, L., 2012, "Medical Device Regulations for Process Validation: Review of FDA, GHTF, and GAMP Requirements," J. Validation Technol., 18(2), pp. 82–91.

[9] Federal Register, Unique Device Identification System, 2013, "A Rule by the Food and Drug Administration on 09/24/2013," U.S. Food and Drug Administration, Washington, DC, accessed May 15, 2014, https://www.federalregister.gov/articles/2013/09/24/2013-23059/unique-device-identification-system

[10] Lee, J., 2013, "Repositioning Reprocessing: Hospitals See Big Potential for Savings, But Safety Remains an Issue for Some," Modern Healthcare, accessed June 4, 2014, http://www.modernhealthcare.com/article/20130706/MAGAZINE/307069957

Downloaded From: http://medicaldevices.asmedigitalcollection.asme.org/ on 04/29/2016 Terms of Use: http://www.asme.org/about-asme/terms-of-use
CONFIDENTIAL

JX-4316, Page 3 of 8
BWI-INN00572171

Sent from my iPad

On Apr 29, 2016, at 10:54 AM, Randall Marker <rmarker@sterilmed.com> wrote:

Interesting article below from Practice Greenhealth about reprocessing. Take note of the growth projections and the comment about reduced savings with an OEM reprocessing program in EP.

**Randy Marker**
Director of Corporate Sales
<image001.jpg>
5010 Cheshire Parkway
Suite 2
Plymouth, MN  55446
P 513.325.3145
F 763.488.4552
rmarker@sterilmed.com
www.sterilmed.com

CONFIDENTIALITY NOTE: This e-mail message, including any attachments, may contain information that is confidential, proprietary or legally privileged. If you are not an intended recipient of this message or an authorized assistant to an intended recipient, please notify the sender by replying to this message and then delete it from your system. Use, dissemination, distribution, or reproduction of this message and/or its attachments (if any) by unintended recipients is not authorized and may be unlawful.

**From:** Practice Greenhealth [mailto:green@multibriefs.com]
**Sent:** Friday, April 29, 2016 1:37 PM
**To:** Marker, Randy
**Subject:** Can workplace wellness help the environment?

---

This message was sent to rmarker@sterilmed.com



April 29, 2016



Home  |  About  |  Membership  |  Tools & Resources  |          Subscribe  |  Archive  |
Greenhealth Academy  |                                                    Advertise

Search Archive | View Web Version | Advertise

Search Past Issues
View Web Version
Advertise



## Can workplace wellness help the environment?



Share on



T.

Share on

E-mail

**The Huffington Post**

Healthcare in America is some of the best you can receive in the world, but the healthcare system is not without its costs. One such cost that has begun to receive added attention in recent years is the environmental footprint of the estimated 5,000 hospitals in the United States. According to the Journal of the American Medical Association, these facilities produce huge volumes of waste (as much as 7,000 tons per day), and account for 8 percent of America's carbon emissions. Given the rising pressure in America to make businesses more sustainable, many in the healthcare industry are looking for creative ways to operate more efficiently.  <u>READ MORE</u>

## Go green, save green: Sustainable laundry operations



Share on



T.

Share on

E-mail

**Facility Executive**

According to the Environmental Protection Agency, businesses and other institutions account for 17 percent of water taken from public water supplies in the United States. They also generate 45 percent of the U.S. green house gas emissions. Nevertheless, healthcare, hospitality, and other industries have done a great deal to reduce their energy and water usage — that's clear from the proliferation of Energy Star ratings and low-flow toilets in these environments. But there are more resource and financial savings to be had. Finding them requires a close look at laundry operations.  <u>READ MORE</u>

**PRODUCT SHOWCASE**



### circuitGuard™ - Free Evaluation Available

FDA cleared as a hygienic alternative to decontamination of anesthesia equipment. **circuitGuard™** filter's exclusive Unitized Construction protects anesthesia circuits and equipment (ET CO2, etc.) from contamination and protects patients from contaminated circuits and equipment. Available on contract at HCA Surgery Centers nationwide. OPS – top ten ways to reduce costs. Save Time – Money - Space. *ORDER NOW:* **1-800-950-ARC1**

## Savings war: The pros and cons of SUD reprocessing growth



Share on



T.

Share on

E-mail

**DOTmed.com**

For nearly two decades, single-use device (SUD) reprocessing has steadily gained favor among U.S. health

systems looking to better control costs and reduce their environmental footprint. In fact, SUD reprocessing is projected to grow globally at a compound annual growth rate of 19.3 percent until 2020, according to a 2015 report from Transparency Market Research. This rate of growth is considerably strong, estimated to be two to three times faster than the med tech market overall. The tangible financial and environmental savings SUD reprocessing offers hospitals have helped it grow and earn a spot as one of the top healthcare supply chain strategies used to reduce costs and optimize resources. **READ MORE**

## USDA invests in nanotechnology to increase food safety, combat waste

 Share on
 T.
 Share on
E-mail

By Bambi Majumdar

 Food insecurity around the world has meant that millions of people are unsure of where their next meals are coming from. Yet in America, 40 percent of food that is bought is thrown away and 26 percent of the produce doesn't even reach grocery stores. To address these issues, the U.S. Department of Agriculture recently announced a $5.2 million investment toward nanotechnology research to increase sustainability, improve food safety and combat food waste. **READ MORE**

### Biohazardous & Medical Waste Management

Cost Effective, Easily Implemented and Environmentally Sustainable
Learn How-Visit Booth 111

## Laundry, recycling should be a breeze at new Sanford hospital in Minnesota

 Share on
 T.
 Share on
E-mail

Inforum

Staff at the new Sanford Medical Center Fargo can say "goodbye" to carting laundry and recyclables through hospital hallways. A pneumatic tube system hidden from sight will whisk those items away in minutes. **READ MORE**

## 7 ways going green can save you lots of money

 Share on
 T.
 Share on
 E-mail

CNBC

Let's be honest: If you run a business, reducing your carbon footprint might not be your top priority. But going green can actually save money for you and your business — and improve your workplace culture in the meantime. For example, one report from 2012 found that hospitals that reduce energy consumption and waste produced could save $15 billion over a decade. **READ MORE**

**PRODUCT SHOWCASE**




### Try Environmentally Preferred Instrument Solutions!

Sustainable, cost-effective and safer outcomes. Case Medical instrument solutions are labeled Safer Choice by the U.S. Environmental Protection Agency making them safer for staff, patients and the environment. Case Solutions are proven to be effective and up to 40-50% lower cost than competitor products.

For more information, please contact: 888-227-CASE, (888-227-2273).

### Cerner Ambulatory Practice Management

Specialty Practice Management is a complete front- and back-office solution that offers a rapid return on your investment and improved satisfaction among your staff. Practices with 10 or fewer providers turn to this comprehensive solution to manage self-pay accounts and eliminate the common mistakes that prevent or delay insurance reimbursement.
**Read more**

## Why water management will take smart buildings to the next level






Environmental Leader

Global investment in water management technologies and services is expected to grow from US$2 billion in 2016 to US$2.8 billion in 2025 as water management becomes more integrated into smart buildings, a new report from Navigant Research notes. As corporate sustainability initiatives and energy efficiency become more important, smart building technology vendors are beginning to showcase more comprehensive tools, including some created especially for water conservation and management. **READ MORE**

PRODUCT SHOWCASE



### Safer, Greener Breathing Circuit Kits

WilMarc Medical specializes in creating high quality PVC-Free, Phthalate-Free including DEHP, anesthesia products designed to exceed expectations of technical and economic performance. Our products are free of any plasticizers linked to health concerns and are environmentally safe when disposed. Products manufactured and assembled in the U.S.

Contact us at info@wilmarcmedical.com or 800-685-6706

## Massive solar-powered garden towers to spring up in Tokyo



T.



Share on

E-mail

Inhabitat

Tokyo's urban jungle is about to become a whole lot greener. Dutch firm ingenhoven architects unveiled designs for the Toranomon Project, a mixed-use development draped with greenery that, once complete, will boast the city's highest residential building at approximately 220 meters tall. Designed to flank the existing Toranomon Hills Mori Tower on two sides, the green-roofed buildings will include a variety of environmentally friendly technologies, from solar panels to gray water recycling. **READ MORE**

## TRENDING ARTICLES

Missed last week's issue? See which articles your colleagues read most.

- How to prevent food waste: 27 tips for community leaders (Sustainable Cities Collective)
- The power of visioning and goal setting (Practice Greenhealth)
- ACP urges physicians to step up climate change fight (Medscape)

Don't be left behind. Click here to see what else you missed.

**Practice Greenhealth thanks the following contract advertisers in Greenhealth Magazine:**

## Greenhealth eNews

**Connect with Practice Greenhealth**

Recent Issues | Subscribe | Unsubscribe | Advertise | Web Version

Colby Horton, Vice President of Publishing, 469-420-2601 | Download media kit
Ashley Whipple, Senior Content Editor, 469-420-2642 | Contribute news

**Practice Greenhealth**
12355 Sunrise Valley Drive Suite 680 | Reston, VA 20191 | 888-688-3332 |
Contact Us

Learn how to add us to your safe sender list so our emails get to your inbox.

7701 Las Colinas Ridge, Ste. 800, Irving, TX 75063

Message

| | |
|---|---|
| **From:** | Dave Distel [ddistel@innovative-health.com] |
| **on behalf of** | Dave Distel <ddistel@innovative-health.com> [ddistel@innovative-health.com] |
| **Sent:** | 3/8/2023 12:13:03 PM |
| **To:** | Megan Mccabe [MeganMcCabe@crouse.org] |
| **CC:** | Reyes, Kara [Kara_Reyes@s2s-global.com] |
| **Subject:** | RE: [EXTERNAL]RE: [EXTERNAL]RE: [EXTERNAL]soundstar catheters |

Thanks Megan,

Do you have any time this Friday after 11am EST or Monday the 13th after 11am EST to briefly catch up on next steps via phone?   If so, what is the best number to call you at?

Thank you,

Dave



Dave Distel
**VP, Business Development**
480.525.5970 (Office)
507.358.5289 (Mobile)
www.innovative-health.com



Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-4352**



**From:** Megan Mccabe <MeganMcCabe@crouse.org>
**Sent:** Wednesday, March 8, 2023 12:39 PM
**To:** Dave Distel <ddistel@innovative-health.com>
**Cc:** Chris Scribner <ChrisScribner@crouse.org>
**Subject:** [EXTERNAL]RE: [EXTERNAL]RE: [EXTERNAL]soundstar catheters

Ok so I had them come in and meet with me. No budging on the soundstars but the language does not speak to the Acunav catheters so I am happy to send those your way and buy back.

---

**From:** Dave Distel [mailto:ddistel@innovative-health.com]
**Sent:** Wednesday, March 8, 2023 11:40 AM
**To:** Megan Mccabe <MeganMcCabe@crouse.org>
**Cc:** Chris Scribner <ChrisScribner@crouse.org>
**Subject:** FW: [EXTERNAL]RE: [EXTERNAL]soundstar catheters

Hi Megan,


I am free this afternoon if you have a few minutes to catch up.   I have more accounts purchasing SoundStars but uniformly, if they have not addressed the case coverage issue upfront with Biosense Webster they are refusing to cover the cases.  Look forward to hearing if they will cover cases at your facility and discuss getting the reprocessing program restarted.


Dave






Dave Distel
**VP, Business Development**
480.525.5970 (Office)
507.358.5289 (Mobile)
www.innovative-health.com



This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. [v.1]

**From:** Dave Distel <ddistel@innovative-health.com>
**Sent:** Thursday, March 2, 2023 8:23 PM
**To:** Megan Mccabe <MeganMcCabe@crouse.org>; Chris Scribner <ChrisScribner@crouse.org>

**Cc:** Meredith Snider <msnider@innovative-health.com>; Aaron Detate <adetate@innovative-health.com>
**Subject:** RE: [EXTERNAL]RE: [EXTERNAL]soundstar catheters

Megan,

Thank you for the note and would be very interested in moving forward with some products.   That said, let's discuss how we properly launch a successful program which would include meeting with your team and educating them on modern reprocessing processes and quality controls.  Want to make sure we have any questions answered and alignment before putting reprocessed products in their hands.  I could accommodate getting a member of our Clinical Integration team to meet with your team and you in the not to distant future.   Attached are the bio's of two of the individuals I would use to support Crouse.

Soundstar's are a hot topic for everyone right now.  First, I have hundreds of each code ready to sell and thousands, I can reprocess.  I want to be very upfront with you on my experience and position on dealing with Biosense Webster (BWI) and there sensor enabled products.  I do not mean to sound disrespectful or arrogant, but I want to clearly lay out the scenario as BWI has been brutal with clients over the use of reprocessed sensor enable products, under the guise of their attached case coverage policy.

Background:
- Prior to October, 2014, BWI covered cases with thousands of reprocessed 3D Soundstar's from Stryker.  There were no clinical issues and usage was rapidly growing.  This was presumably problematic to their budget.  So the first "BWI Case Coverage Policy" was issued, stating they would not covered reprocessed sensor enable catheters from anyone but them.  No clinical data to support the decision, just an iron clad policy.
- They have enforced this policy broadly but on occasions that might benefit them, (sale of new capital equipment)  cover cases with reprocessed competitive products, then stop the practice when they no longer have reason to support it.
- Innovative Health sells reprocessed sensor enabled BWI products to clients that map their own cases with outstanding product quality statistics.

Current Situation:
- BWI has had rolling backorders of Soundstar's, albeit it seems from our clients it has acutely worsened.
- I have been contacted by many clients seeking reprocessed Soundstar's so they can continue to provide needed care to patients.
- Some hospitals the BWI mapper covered the cases without incident.   Others if 8fr's were on backorder, they told the hospital they had 10fr and move to them.   Others steered towards Acunav.  Most outright refused to allow the product to be used.  In all cases, as soon as they had product available they refused to allow the hospital to use the reprocessed Soundstar's, leaving them to come to us to return them with me eating shipping and associated costs.

I can overnight you all the product you need.  But first please go to your BWI mapper, sales rep and Region Manager and ask the following as I do not want you in an undesirable position:
1. Do they acknowledge they have a backorder that will not be resolving in the near term?
2. Do they acknowledge that the needs of the patients and clinicians supersedes a sales policy?
3. Acknowledge that they will provide case coverage with no interference or counter detailing of the Innovative Health reprocessed products.
4. That when their supply of product resumes, they will cover cases and allow you to use current inventories of purchased Innovative Health Soundstar's, without incident?

I am available all day tomorrow to connect and address any questions.  Look forward to working with your team and always believe the needs of the patient come first.

Best Regards,

Dave



**Dave Distel**
**VP, Business Development**
480.525.5970 (Office)
507.358.5289 (Mobile)
www.innovative-health.com



  

**From:** Megan Mccabe <MeganMcCabe@crouse.org>
**Sent:** Thursday, March 2, 2023 12:31 PM
**To:** Dave Distel <ddistel@innovative-health.com>; Chris Scribner <ChrisScribner@crouse.org>
**Cc:** Meredith Snider <msnider@innovative-health.com>
**Subject:** [EXTERNAL]RE: [EXTERNAL]soundstar catheters

Before we end this, I would like to trial some products to buy back. I apologize, I have been out of the office for the last 2 weeks.

Can we do an auto buy of products? Is it possible to set something like that up? Like every week we get X of catheter XX on a continual basis?

For starters, let's do the following:

402004= 20
401443 =30

I am in dire need of soundstars. Can you have Danielle send them in so we can buy them back?

| Account Name | Manufacturer | Item # | Family Detail | 16wk Collections | 16wk Buyback | 16wk Buyback Rate | Available Stock |
|---|---|---|---|---|---|---|---|
| Crouse Health Hosp | Abbott / St Jude | 402004 | Supreme | 16 | 0 | 0.0% | 28 |
| | | 401443 | Supreme | 37 | 0 | 0.0% | 59 |
| | Biosense Webster | 10135936 | AcuNav 8F | 0 | 2 | | 0 |
| | | PentaRay | PentaRay | 45 | 0 | 0.0% | 100 |
| | | DecaNav | Webster DecaNav | 27 | 0 | 0.0% | 100 |
| | | D135304 | Webster CS Uni-Dir. | 83 | 0 | 0.0% | 0 |
| **Grand Total** | | | | 208 | 2 | 1.0% | |

**From:** Dave Distel [mailto:ddistel@innovative-health.com]
**Sent:** Thursday, February 16, 2023 9:49 AM
**To:** Megan Mccabe <MeganMcCabe@crouse.org>; Chris Scribner <ChrisScribner@crouse.org>
**Cc:** Meredith Snider <msnider@innovative-health.com>
**Subject:** RE: [EXTERNAL]soundstar catheters

Hi Megan,

I had Danielle not return the SoundStars as while we can reprocess them, most hospitals can't purchase them back due to the Biosense Webster case coverage policy.   I sell them to hospitals that map their own cases but they are few and far between.  I am simply swimming in them and don't need anymore.

Chris and I spoke two weeks ago and we will be **ceasing the collections of product** since you can not purchase any products back.   I will coordinate with Danielle on removing the bins and stopping the program.  Should circumstances change in the future, I am always available to discuss reestablishing the program.


Best Regards,

Dave






Dave Distel
**VP, Business Development**
480.525.5970 (Office)
507.358.5289 (Mobile)
www.innovative-health.com

          

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. [v.1]

**From:** Megan Mccabe <MeganMcCabe@crouse.org>
**Sent:** Wednesday, February 8, 2023 11:07 AM
**To:** Chris Scribner <ChrisScribner@crouse.org>
**Cc:** Dave Distel <ddistel@innovative-health.com>
**Subject:** [EXTERNAL]soundstar catheters

Danielle mentioned something about not being able to return the soundstar catheters because of a biosense contract?

Megan McCabe RN BSN | Nurse Manager Cardiac Services
Crouse Health
736 Irving Ave. | Syracuse, NY 13210
o 315/470-2957 | f 315/470-2717
meganmccabe@crouse.org | crouse.org

---

CROUSE HEALTH CONFIDENTIALITY NOTICE:
The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.


CH_DIS10_a

**Figure 7**
**Biosense CARTO 3 Usage Share**



Source: BWI-INN00722100.

Innovative v. Biosense
No. 8:19-cv-01984-JVS
JX-4392

| Table 12 Average Complaint Rates for Innovative vs Biosense and Sterilmed | | | |
|---|---|---|---|
| Company | Soundstar | Pentaray | Lasso Nav |
| Innovative | 0.69% | 0.28% | 0.67% |
| Biosense | 2.34% | 1.43% | 1.63% |
| Sterilmed | 2.59% | 2.09% | 2.51% |

Note: Averages calculated from 2017 - 2023 when available.

Sources: BWI-INN00722083; BWI-INN00722118; BWI-INN00722123; IH00697210.

Innovative v. Biosense
No. 8:19-cv-01984-JVS
JX-4419



Innovative v. Biosense
No. 8:19-cv-01984-JVS
JX-4457

# EXHIBIT 1A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

INNOVATIVE HEALTH, LLC,          )  CERTIFIED TRANSCRIPT
                   Plaintiff,   )
     vs.                        )
                                )   SACV-19-01984-JVS
BIOSENSE WEBSTER, INC.,         )
                   Defendant.   )  TRIAL DAY 2, VOL. I
-----------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

May 7, 2025

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

09:35    1   Q    Switching gears just a little bit, Ms. Tam, I want to
         2   talk for just a minute about how you're compensated for your
         3   work.
         4           Can you estimate -- best estimate -- what your
09:35    5   annual compensation is from Biosense over the last couple of
         6   years?
         7   A    Yeah.  So I recently looked into this, and it was
         8   around 190 to 210-K.
         9   Q    And how is that compensation structured?
09:35   10   A    There is a base component, and then there is also a
        11   variable.  The variable consists of sales commissions,
        12   bonuses, field training, contests.
        13   Q    So do you receive any type of commission when
        14   physicians agree to purchase Biosense catheters for use in
09:35   15   procedures?
        16   A    Yes.
        17   Q    And is that commission based on your sales
        18   individually?
        19   A    No.  So how it works is that on my team, there is an
09:36   20   overall quota, and our team as a whole needs to meet that
        21   quota.  So if I'm doing really well at UCLA and another
        22   hospital is not, it balances each other out, so --
        23   Q    Can you tell us, Ms. Tam, your own personal approach to
        24   that aspect of your job for which you're earning those sales
09:36   25   commissions?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:36    1    A     Yeah.  So when I look at the sales aspect of this role,

         2    it's really me trying to have conversations with physicians

         3    to see if there's any gaps or needs that they have in which

         4    Biosense can help them in better treating their patients.

09:36    5    Q     And in terms of just going back to the compensation

         6    that you told us about, Ms. Tam, what proportion of that

         7    annual compensation would you say is comprised of the

         8    variable bucket that you talked about?

         9    A     Recently also I found this.  It was around 30 to

09:36   10    50 percent.

        11    Q     And that 30 to 50 percent comprises all of the little

        12    categories you talked about from sales and bonuses and all

        13    of that?

        14    A     Yes.

09:37   15    Q     And in terms of the sales commissions that you

        16    mentioned, do you know what portion of that 30 to 50 percent

        17    is made of up of sales commissions?

        18    A     I do not know, but it is substantial.

        19    Q     So going back to your day-to-day work, you mentioned

09:37   20    you primarily work at UCLA, right?

        21    A     Yes.

        22    Q     Does UCLA have any EP labs?

        23    A     Yes, they have a couple.

        24    Q     And what cardiac mapping systems do the EP labs at UCLA

09:37   25    have?

09:37    1   A     They have two CARTOs, three to four Abbott mapping

         2   systems, and one Boston Scientific.

         3   Q     And have you worked at UCLA for your whole time at

         4   Biosense?

09:37    5   A     Yeah, I have around seven years now.

         6   Q     And when you were working at UCLA, would you say you

         7   were generally aware of how frequently physicians mapped

         8   with systems other than the CARTO system?

         9   A     Being at UCLA for seven years and still going there,

09:38   10   yeah, I have a pretty good understanding of the lay of the

        11   land there.

        12   Q     So based on that seven years of day-to-day experience,

        13   what proportion of EP procedures do you estimate is

        14   currently mapped at UCLA using the Abbott system?

09:38   15   A     I would estimate around 50 to 55 percent.

        16   Q     Ms. Tam, in the time you've been at UCLA, has the

        17   proportion of EP procedures mapped using the Abbott system

        18   changed at all?

        19   A     Yes, it has.

09:38   20   Q     And can you tell me about that change?

        21   A     When I first really got integrated, it was like, I

        22   don't know, 65 to 75 percent Abbott.

        23   Q     And during your time as a CAS, has it always been the

        24   case that UCLA has been a majority Abbott mapping

09:39   25   institution?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:06   1   finish her answer.

2           MS. ANDERSON:  The witness answered yes or no.  If

3   she wants to elaborate, Mr. Cruz can allow her to do so on

4   redirect.

10:06   5           THE COURT:  Proceed.

6   BY MS. ANDERSON:

7   Q   So just to be clear, Ms. Tam, clinical account

8   specialists do not receive any different training for when a

9   Sterilmed reprocessed catheter is being used by the doctor,

10:07   10  correct?

11  A   We do not.

12  Q   And the CAS's mapping skills are the same when the

13  doctor is using a Sterilmed reprocessed catheter or a

14  Biosense originally manufactured version of that same

10:07   15  catheter, right?

16  A   Yes.

17          MS. ANDERSON:  No further questions.

18          THE COURT:  Mr. Cruz.

19                  REDIRECT EXAMINATION

10:07   20  BY MR. CRUZ:

21  Q   Ms. Tam, I just have a couple of questions for you.  I

22  think Ms. Anderson talked with you just a bit about it.  She

23  asked you some questions about training hospital staff.

24          So I would just like to ask you has anyone from

10:08   25  UCLA's staff ever asked you to train hospital staff to map?

| 10:08 | 1 | A     No, but I've trained them on EP but not mapping. |
| | 2 | Q     I guess can you tell me about any other training that |
| | 3 | you may have given to hospital staff aside from mapping? |
| | 4 | A     Yeah.  So in-services are something that I do.  So when |
| 10:08 | 5 | we launch new products, I will in-service them on how to |
| | 6 | optimally use them or just some features of those new |
| | 7 | products, but also, I set aside time to also teach them EP |
| | 8 | so they can understand what's happening in the cases as |
| | 9 | well, so understanding those electrical signals and what all |
| 10:08 | 10 | those maneuvers that the physicians do are. |
| | 11 | Q     Going back to your mention of a plus or minus one |
| | 12 | millimeter of accuracy in the questions that Ms. Anderson |
| | 13 | asked you about, we talked on your direct about the training |
| | 14 | in the ten months that you were learning to become a CAS. |
| 10:09 | 15 | Do you remember that? |
| | 16 | A     I do. |
| | 17 | Q     And has there been additional training since you were |
| | 18 | certified as a CAS between then and today? |
| | 19 | A     Yeah, there's a lot.  And since we launch new products, |
| 10:09 | 20 | there's always software modules that they roll out to us, so |
| | 21 | we're able to learn with that.  And then we usually meet up |
| | 22 | for dinners and stuff to also receive more training. |
| | 23 | Q     And does that training to your recollection generally |
| | 24 | also include policy changes or administrative issues for the |
| 10:09 | 25 | company that may change? |

10:09    1    A    Those are usually calls, yeah.

         2    Q    And with respect to that training that you received

         3    continuously over the last seven years, do you recall all of

         4    the documents that you have received as to all of that

10:09    5    training?

         6    A    No.  It's a lot to remember.

         7    Q    With respect to the training that you have received,

         8    though, do you say that you retain the training itself and

         9    its contents generally?

10:10   10    A    Yeah, yeah.

        11    Q    And in terms of the questions from Ms. Anderson,

        12    Ms. Anderson's questions regarding Sterilmed training, I

        13    think there was a question about whether you had received

        14    specific training on Sterilmed.

10:10   15              Can you tell us a bit about your idea as to why

        16    you did not receive specific -- or you said you did not

        17    receive specific training on Sterilmed catheters?

        18    A    Yeah.  So my understanding is that I wouldn't think we

        19    would need additional training because J&J basically gave it

10:10   20    a seal of approval that's very similar to a new catheter, so

        21    it should functionally work the same.  So that would be my

        22    understanding as to why, or my guess as to why, we didn't

        23    receive additional training.

        24    Q    And when you say "your guess," just to be clear,

10:10   25    Ms. Tam, when you're talking about your guess, is that based

11:16   1   A     So there's a mechanism on the handle that you can

        2   maneuver, and it causes the tip to curve down, so you can

        3   adjust the deflection on the catheter.  It helps with

        4   directing it into specific locations in the heart.

11:17   5   Q     All right.  And I interrupted.  Keep telling us about

        6   the DECANAV, please.

        7   A     The DECANAV catheter also has a sensor in it that

        8   allows it to be visualized and tracked on the mapping system

        9   as soon as it's inserted into the body.

11:17   10  Q     In what procedure would that be desirable?

        11  A     This catheter -- sometime ago doctors wanted to reduce

        12  the amount of x-ray that they were using in procedures.

        13  This particular catheter solves some of that problem.  It

        14  allows you to instantly see it as soon as you're advancing

11:17   15  it into the body, and you don't have to use x-ray to see the

        16  location of the catheters.

        17          MR. GOLDSMITH:  Your Honor, one more for now.  May

        18  I approach the witness with JX4163?

        19          THE COURT:  You may.

11:18   20  BY MR. GOLDSMITH:

        21  Q     What is that, sir?

        22  A     This is an OCTARAY catheter.

        23  Q     Who manufactured it?

        24  A     This catheter, JX4163, was manufactured by Biosense

11:18   25  Webster.

11:18    1        MR. GOLDSMITH:  Plaintiff offers JX4163 into

2   evidence.

3        MR. FARIDI:  No objection.

4        THE COURT:  4163 will be received.

11:18    5        (Exhibit 4163 received in evidence)

6   BY MR. GOLDSMITH:

7   Q    Tell us about the OCTARAY, Mr. DeTate.

8   A    The OCTARAY catheter has a similar design to the

9   PENTARAY catheter.  It has splines around the tip.  These

11:18   10   soft splines have electrodes on them.  It has more splines

11   and more electrodes than the PENTARAY catheter did.  It

12   allows you to collect more data and more geometry in an even

13   faster amount of time.

14   Q    Is the OCTARAY a high-density mapping catheter?

11:19   15   A    It is.

16   Q    Does Innovative reprocess the OCTARAY?

17   A    Innovative Health does not reprocess the OCTARAY

18   catheter.

19   Q    Why not?

11:19   20   A    This catheter was introduced after the Case Coverage

21   Policy, and due to the case coverage policy, Innovative did

22   not pursue 510(k) clearance on this catheter.

23   Q    What is 510(k) clearance?

24   A    That is the number of the clearance or submission to

11:19   25   the FDA that manufacturing companies, both Innovative Health

Case 8:19-cv-01984-VS-KES   Document 371-1   Filed 06/25/25   Page 312 of 676   Page ID #:26145

| | |
|---|---|
| 11:19 | 1 reprocessing companies or OEM manufacturers, have to submit |
| | 2 in order to get approval to sell devices. |
| | 3 Q    You said OEM.  What does that mean? |
| | 4 A    Original Equipment Manufacturer. |
| 11:19 | 5 Q    After any of these catheters are inserted into a |
| | 6 patient's heart, how does the doctor know where they are? |
| | 7 A    There's three ways that they can see where these |
| | 8 catheters are located in the heart.  The first way is by |
| | 9 using the x-ray machine that's in the room.  They can |
| 11:20 | 10 activate the x-ray, and they can see where the catheters are |
| | 11 located in relation to the heart.  The second way is using |
| | 12 the ultrasound machine that's in the room.  You can direct |
| | 13 the ultrasound catheter to locate the different locations of |
| | 14 the catheters that are placed in the heart.  And then the |
| 11:20 | 15 third way is on the mapping system. |
| | 16 Q    Can we see the next slide, please. |
| | 17          What is this, Mr. DeTate? |
| | 18 A    This picture is an example of a map, a CARTO 3 map, of |
| | 19 the left atrium. |
| 11:20 | 20 Q    How does this image compare to what the image would |
| | 21 look like during a procedure on the CARTO machine? |
| | 22 A    Well, this is two-dimensional picture of a |
| | 23 three-dimensional object.  In the mapping system, you would |
| | 24 be able to rotate the map to get a better view of the |
| 11:21 | 25 different structures that are present in the left atrium as |

```
11:30    1    A      The term "sensor-enabled catheter' refers to a location
         2    sensor that's embedded in the catheter.  It interfaces with
         3    the different mapping systems to allow accurate
         4    visualization and location of the catheter.
11:30    5    Q      Of the catheters that you've shown the jury here today,
         6    which of those are sensor enabled?
         7    A      All of them are.
         8    Q      You showed us both new and reprocessed catheters.
         9            During your time running the electrophysiology lab
11:30   10    at Torrance Memorial Medical Center, which type did that
        11    hospital use?
        12    A      In my time at Torrance Memorial Medical Center, we used
        13    reprocessed versions of all the catheters except one.
        14    Q      Which one?
11:31   15    A      The OCTARAY catheter.
        16    Q      And why not that one?
        17    A      Because it's not being reprocessed by anyone.
        18    Q      Why did the hospital use reprocessed catheters?
        19    A      The hospital used reprocessed catheters to control
11:31   20    costs associated with the procedures.
        21    Q      How significant were the cost savings?
        22    A      The costs are generally about half of what a new device
        23    costs.
        24    Q      Why did that matter to Torrance Memorial Medical
11:31   25    Center?
```

11:31    1    A    For Torrance Memorial Medical Center, it was important

2    to control costs mainly because the margins associated with

3    the procedures are pretty narrow, pretty tight.

4    Reimbursement remains kind of flat or goes down slightly

11:31    5    over time, and as a new technology is introduced into the

6    procedure area, those margins shrink even more.

7    Q    You mentioned reimbursement. What's that?

8    A    Reimbursement is the amount of money a hospital is paid

9    for doing the entire procedure.

11:32    10    Q    Paid by whom?

11    A    Paid by insurance companies mostly, yeah.

12    Q    In the 4,500 some procedures that you've been a part

13    of, do you know about how many used reprocessed catheters?

14    A    It's been a long time, but I would say in those

11:32    15    procedures, almost all of them have used at least one, if

16    not more, reprocessed catheters.

17    Q    During your time at Torrance Memorial Medical Center,

18    did you ever notice a difference in quality between new and

19    reprocessed catheters?

11:32    20    A    I did not.

21    Q    Did you ever try to figure out whether there was a

22    difference?

23    A    I did.

24    Q    Why did you do that?

11:32    25    A    When we were trying to -- at Torrance Memorial Medical

11:32    1    Center when we were trying to maximize reprocessing, we

        2    needed to get the support of the physicians.

        3    Q      Why is that?

        4    A      Because the physicians are the ones using the devices.

11:32    5    They're the ones that make the decisions on whether they're

        6    going to use new or reprocessed, and without their support,

        7    we wouldn't have been able to use all the reprocessed

        8    devices we did.

        9    Q      So what did you do?

11:33   10    A      We performed a trial while we were there at Torrance.

      11    Q      When was that?

      12    A      Probably sometime between 2012 and 2013.

      13    Q      Did you have any involvement with Innovative Health at

      14    that time?

11:33   15    A      I did not.

      16    Q      So what was your interest in the trial?

      17    A      My interest was in controlling the costs associated

      18    with the procedure.

      19    Q      What was the trial?

11:33   20    A      The trial, with the physicians buy-in, involved -- at

      21    the start of the case, we would not tell them what catheters

      22    we were going to open.  They would either be a new or a

      23    reprocessed device.  We would then hand them to them.  They

      24    would use them during the procedure.  At the end of the

11:33   25    procedure, we would ask them to identify which devices were

11:37  1  Q     Had Mr. Escolero ever expressed concerns about the

2  quality of reprocessed catheters before?

3  A     Not before that.

4  Q     In your experience, do manufacturers other than

11:38  5  Biosense have policies prohibiting their mappers from

6  working on procedures using sensor-enabled catheters?

7  A     Not to my knowledge.

8  Q     While you were at Torrance Memorial Medical Center, how

9  did Biosense enforce this policy?

11:38  10  A     It was sporadic, not really enforced early on following

11  that conversation, and then over time, it became

12  aggressively enforced.

13  Q     During the time that it was not so enforced at

14  Torrance, did you get any insight into what Biosense was

11:38  15  doing at other hospitals?

16  A     I did.

17  Q     How was that?

18  A     Through my consulting work.

19  Q     What consulting work?

11:38  20  A     In 2018, I started consulting for Innovative Health.

21  Q     Doing what briefly?

22  A     It was mostly implementing with current or new

23  customers.  I would visit other hospitals.  I would interact

24  with lab staff and management and physicians from other

11:38  25  facilities.

11:38   1   Q    What did you see with respect to the policy at other
        2   hospitals?
        3   A    I saw that in many locations across the country they
        4   had a very well-defined and strict Case Coverage Policy
11:39   5   where they would not support or map the procedure if a
        6   reprocessed sensor-enabled device was used.
        7   Q    Now, did you ever talk to Biosense personnel about
        8   training more Torrance Memorial Medical Center staff on how
        9   to map using the CARTO 3?
11:39  10   A    I did.
       11   Q    How did that come about?
       12   A    Well, over the, you know, 15 years that I was at
       13   Torrance, I asked Biosense to participate in training with
       14   my staff a lot of times.  Early on, that's how I learned.
11:39  15   They trained me.  They trained a couple of my other
       16   employees that were working with me at the time, and they
       17   were pretty engaged in that initially.
       18   Q    Then what happened?
       19   A    Over time they started to withdraw from that.  They
11:39  20   weren't really doing much training on the mapping system.
       21   And eventually, the statement that was made to me was that
       22   that was not their responsibility.
       23   Q    Did Biosense's enforcement of the policy, the case
       24   coverage policy, at Torrance Memorial Hospital change?
11:40  25   A    It did.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

|       |    |                                                                |
|-------|----|----------------------------------------------------------------|
| 11:40 | 1  | Q    When?                                                     |
|       | 2  | A    I would say probably around 2021.  I don't know the       |
|       | 3  | exact date, but that's a pretty relative time there.           |
|       | 4  | Q    What happened?                                            |
| 11:40 | 5  | A    They started aggressively enforcing the Case Coverage     |
|       | 6  | Policy if we wanted to use a reprocessed PENTARAY.             |
|       | 7  | Q    Can you recall a particular incident of that occurring?   |
|       | 8  | A    I can.  There was one case in particular where we were    |
|       | 9  | reprocessing -- going to use a reprocessed PENTARAY catheter   |
| 11:40 | 10 | as well as some other reprocessed devices, and the CAS or      |
|       | 11 | mapper approached me and asked me what devices we were going   |
|       | 12 | to use in the case.                                            |
|       | 13 | Q    What did you say?                                         |
|       | 14 | A    I told him that we were going to use a reprocessed        |
| 11:41 | 15 | PENTARAY, a reprocessed SOUNDSTAR, and some other             |
|       | 16 | reprocessed diagnostic catheters.                             |
|       | 17 | Q    Who was the mapper?                                       |
|       | 18 | A    Again, it was Jose Escolero.                              |
|       | 19 | Q    What he did he say?                                       |
| 11:41 | 20 | A    He told me that if we used the reprocessed PENTARAY he    |
|       | 21 | would not be able to support the case.                         |
|       | 22 | Q    Then what happened?                                       |
|       | 23 | A    He left.                                                  |
|       | 24 | Q    So what did you do?                                       |
| 11:41 | 25 | A    We started the case.  I was mapping the procedure, and    |

| 11:42 | 1 | Honor.  That's a party admission.  Do you mean the doctor? |
| | 2 | THE COURT:  Just a minute. |
| | 3 | Overruled. |
| | 4 | BY MR. GOLDSMITH: |
| 11:42 | 5 | Q     What happened next, Mr. DeTate? |
| | 6 | A     Jose came back to the procedure room, the control room. |
| | 7 | Q     Then what happened? |
| | 8 | A     The doctor and Jose had a discussion in the control |
| | 9 | room.  He asked -- the doctor asked Jose -- |
| 11:43 | 10 | MR. FARIDI:  Objection, not a party admission. |
| | 11 | Hearsay. |
| | 12 | MR. GOLDSMITH:  Your Honor, the question is not |
| | 13 | hearsay.  It's not an assertion of fact. |
| | 14 | THE COURT:  Overruled. |
| 11:43 | 15 | THE WITNESS:  The doctor asked Jose why he left |
| | 16 | the procedure, and Jose told him it was because we were |
| | 17 | using a reprocessed PENTARAY catheter, and it wasn't his |
| | 18 | choice.  It was company policy, and he had to go. |
| | 19 | BY MR. GOLDSMITH: |
| 11:43 | 20 | Q     What happened then? |
| | 21 | A     Jose left. |
| | 22 | Q     How did you finish the procedure? |
| | 23 | A     I finished mapping the procedure with the doctor. |
| | 24 | Everything went well.  The patient was fine, and the case |
| 11:43 | 25 | was over. |

| | | |
|---|---|---|
| 11:43 | 1 | Q    During your time at Torrance Memorial Medical Center, |
| | 2 | were you ever involved in the purchase of a new mapping |
| | 3 | machine? |
| | 4 | A    I was. |
| 11:43 | 5 | Q    What was your role in that? |
| | 6 | A    I was the clinical resource for the supply chain team |
| | 7 | that was looking at purchasing a new mapping system. |
| | 8 | Q    What does that mean? |
| | 9 | A    I provided feedback to the supply chain team around the |
| 11:44 | 10 | doctor's choices or desires, helped them understand the |
| | 11 | catheters that were comparable between the two systems and |
| | 12 | the technology that was comparable between the two systems. |
| | 13 | Q    When was this? |
| | 14 | A    This would have been probably in 2012, 2013 maybe. |
| 11:44 | 15 | Q    What did the hospital do? |
| | 16 | A    The hospital decided to purchase an EnSite mapping |
| | 17 | system. |
| | 18 | Q    Who manufactures that one? |
| | 19 | A    That's manufactured by Abbott. |
| 11:44 | 20 | Q    What happened next? |
| | 21 | A    After the purchase of the mapping system, there was a |
| | 22 | discussion that we had with the doctors around moving cases |
| | 23 | to the new system. |
| | 24 | Q    Did the doctors move the cases to the new system? |
| 11:44 | 25 | A    Initially, they did move cases. |

| 11:44 | 1 | Q How many doctors were there? |
| | 2 | A There were four. |
| | 3 | Q You say initially. Then what happened? |
| | 4 | A About six months into the first year of using that |
| 11:45 | 5 | system, two of the doctors started moving cases back to the |
| | 6 | CARTO 3 system. |
| | 7 | Q Did you do anything else to encourage those doctors to |
| | 8 | move to the Abbott machine? |
| | 9 | A There was some other contracting that was done. There |
| 11:45 | 10 | was a shared savings incentive for the physicians. |
| | 11 | Q Can you explain that? |
| | 12 | A Yeah. Based on the pricing on the EnSite system of the |
| | 13 | consumables as well as the overall system and case mix, the |
| | 14 | EnSite system saved money for the hospital. And if the |
| 11:45 | 15 | doctors were willing to participate and use the EnSite |
| | 16 | system more, then a portion of that savings could then be |
| | 17 | shared with them based on the relationship they had with the |
| | 18 | hospital. |
| | 19 | Q After that was implemented, did the two doctors who had |
| 11:46 | 20 | gone back to the CARTO switch over to the Abbott machine? |
| | 21 | A They did not. |
| | 22 | Q You mentioned earlier that you started consulting at |
| | 23 | some point for Innovative Health. |
| | 24 | A That's correct. |
| 11:46 | 25 | Q Tell us again when that was. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:46   1   A    It would have been in 2018.

        2   Q    How long were you a consultant?

        3   A    From 2018 until 2021.

        4   Q    What did you do then?

11:46   5   A    I became a full-time employee for Innovative Health.

        6   Q    Doing what?

        7   A    As the Senior Director of Clinical Integration.

        8   Q    You can have a sip of water if you want.

        9   A    Thank you.  I haven't been talking much today.

11:46  10   Q    What did you do in that role?

       11   A    In that role, I was responsible for managing the

       12   clinical team, again, a group of individuals with a similar

       13   background to myself.  They worked in the hospital.  They

       14   were nurses and technologists who supported the use of

11:47  15   Innovative reprocessed devices.

       16   Q    Since you've been at Innovative, Mr. DeTate, has

       17   Innovative considered helping train mappers at hospitals?

       18   A    It's been discussed.

       19   Q    Were you involved in those discussions?

11:47  20   A    I was.

       21   Q    Were you involved in any efforts to train doctors at

       22   hospitals?

       23   A    I was.

       24   Q    What did you do?

11:47  25   A    There was kind of a pilot program that we did at one

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 11:57    | 1  | permanent basis?                                             |
|          | 2  | A     I'm not aware of any.                                  |
|          | 3  | Q     Have you ever introduced Biosense's Case Coverage      |
|          | 4  | Policy to a hospital that was already using a CARTO 3?       |
| 11:57    | 5  | A     I have.                                                |
|          | 6  | Q     When was that?                                         |
|          | 7  | A     The instance I'm thinking of was I believe maybe in    |
|          | 8  | 2023.                                                        |
|          | 9  | Q     What hospital do you have in mind?                     |
| 11:57    | 10 | A     The University of Cincinnati Hospital.                 |
|          | 11 | Q     Who did you work with there?                           |
|          | 12 | A     There were two folks.  It was a supply chain manager,  |
|          | 13 | and I think it was a lab manager or director.  Her name was  |
|          | 14 | Trisha I believe.                                            |
| 11:57    | 15 | Q     Trisha Stahl?                                          |
|          | 16 | A     That sounds right.                                     |
|          | 17 | Q     Did Ms. Stahl tell you what she wanted to do?          |
|          | 18 | A     At that time --                                        |
|          | 19 |         MR. FARIDI:  Objection, hearsay.                     |
| 11:57    | 20 |         MR. GOLDSMITH:  Your Honor, statement of intent.     |
|          | 21 | It's not hearsay.                                            |
|          | 22 |         MR. FARIDI:  It's for the proof they're putting it   |
|          | 23 | in for.                                                      |
|          | 24 |         THE COURT:  Sustained.                               |
| 11:58    | 25 | BY MR. GOLDSMITH:                                            |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
11:58   1    Q     Did Ms. Stahl buy any products from Innovative Health?

        2    A     Ms. Stahl wanted to but did not.

        3    Q     Did she tell you why not?

        4              MR. FARIDI:  Objection.

11:58   5              MR. GOLDSMITH:  For the effect on Mr. DeTate and

        6    Innovative, Your Honor.

        7              MR. FARIDI:  Irrelevant.

        8              THE COURT:  Sustained.

        9    BY MR. GOLDSMITH:

11:58  10    Q     Mr. DeTate, in your experience, what effect does

       11    Biosense's Case Coverage Policy have on the choices

       12    available to doctors in hospitals?

       13              MR. FARIDI:  Objection, opinion testimony.

       14              MR. GOLDSMITH:  Based on his experience, Your

11:59  15    Honor.  That's permissible.

       16              THE COURT:  Overruled.

       17              THE WITNESS:  From my experience, the Case

       18    Coverage Policy has had a profound effect on Innovative

       19    Health.

11:59  20    BY MR. GOLDSMITH:

       21    Q     How so?

       22    A     The Case Coverage Policy prevents Innovative Health

       23    from performing its core mission and goal, which is to

       24    provide high quality reprocessed devices to a hospital and

11:59  25    increased access to care.
```

| | | |
|---|---|---|
| 11:59 | 1 | MR. GOLDSMITH:  No further questions, Your Honor. |
| | 2 | THE COURT:  Ladies and gentlemen, we'll take the |
| | 3 | lunch break here.  We'll resume at 1:30.  Please remember |
| | 4 | the admonition not to discuss the case with anyone.  You're |
| 11:59 | 5 | not to form any opinions on the issues in the case until |
| | 6 | it's submitted to you.  So we'll see you at 1:30, please. |
| | 7 | (Jury not present) |
| | 8 | THE COURT:  Anything before we take the lunch |
| | 9 | break? |
| 12:00 | 10 | MR. HO:  Your Honor, I believe there are some |
| | 11 | objections to the exhibits that we have disclosed for |
| | 12 | Mr. Ferreira who's going to be called this afternoon, and I |
| | 13 | believe both sides would appreciate it if we could be heard |
| | 14 | on that sometime before the jury returns. |
| 12:00 | 15 | THE COURT:  Is he the next witness? |
| | 16 | MR. HO:  Yes, after Mr. DeTate. |
| | 17 | THE COURT:  Okay.  Why don't we take that up at |
| | 18 | 1:15. |
| | 19 | MR. HO:  Thank you.  Your Honor. |
| 12:00 | 20 | THE COURT:  Okay. |
| | 21 | (Recess) |
| | 22 | (Miriam Baird reported Vol. II) |
| | 23 | *   *   * |
| | 24 | |
| 12:00 | 25 | |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

# EXHIBIT 1B

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3      HONORABLE JAMES V. SELNA, JUDGE PRESIDING

4   INNOVATIVE HEALTH, LLC,          )
                                     )
5                                    )
                                     )
6                   Plaintiff,       )
                                     )
7                                    )
                                     )
8        Vs.                         )   No. SACV-19-01984-JVS
                                     )
9                                    )
                                     )
10  BIOSENSE WEBSTER, INC.,          )
                                     )
11                                   )
                                     )
12                  Defendant.       )
                                     )
13  _____ )

14

15

16       REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                  JURY TRIAL

18               DAY 2, VOLUME II

19            SANTA ANA, CALIFORNIA

20          WEDNESDAY, MAY 7, 2025

21

22

23  MIRIAM V. BAIRD, CSR 11893, CCRA
    OFFICIAL U.S. DISTRICT COURT REPORTER
24  350 WEST FIRST STREET
    FOURTH FLOOR
25  SANTA ANA, CA 92701

1    have been used after we clean them and sterilize them to show

2    that they're going to perform the exact same as the original

3    equipment device.

4    Q.    Mr. Ferreira, were you involved in deciding to call your

02:40PM    5    company Innovative Health?

6    A.    Yes.  Yes, I was.

7    Q.    What does the word innovative mean to you?

8    A.    I think in our case it's really four key things.  One,

9    we're innovative in our approach to be able to -- some of the

02:41PM    10    devices that we can clean, the function test.  We hold about

11    a dozen patents currently today from some of that innovation

12    we've developed.

13         Another thing that's innovative for us is we

14    provide our hospitals a savings guarantee.  So if they

02:41PM    15    reprocess devices with us, we will guarantee them a certain

16    amount of savings.  And if we don't hit that savings number

17    for them, we'll write them a check for the difference.

18         Another innovative piece would be really our field

19    model.  We focus a lot on transparency with the hospitals,

02:41PM    20    showing them back data as to how many devices they're using,

21    how many we're collecting, how many they're turning back, and

22    what that savings number looks like.

23         Lastly, because we're narrowly focused on the EP

24    arena, we're bringing out a lot of new devices.  So our

02:41PM    25    hospital clients continue to see their savings grow by about

```
 1    20 percent a year as we add new 510(k)s.
 2    Q.   Mr. Ferreira, does Innovative Health reprocess Biosense
 3    Webster EP mapping catheters?
 4    A.   Yes, we do.
 5    Q.   Can you give some examples.
 6    A.   ACUNAV, SOUNDSTAR.
 7    Q.   And what cardiac mapping machine are those used with?
 8    A.   On the CARTO mapping system.
 9    Q.   Can they be used with any other make of cardiac mapping
10    machine?
11    A.   No.
12    Q.   So let's talk about the SOUNDSTAR.  Is that one of the
13    catheters that you reprocess?
14    A.   Yes, it is.
15    Q.   How does a SOUNDSTAR catheter reprocessed by Innovative
16    Health compare to a new SOUNDSTAR catheter sold by Biosense?
17    A.   It performs the same as the original equipment
18    manufacturer device.
19    Q.   What about the price?
20    A.   It's half.
21    Q.   What about for the LASSO?
22    A.   The exact same.  It performs as the LASSO does directly
23    from Biosense Webster.
24    Q.   And what about the PENTARAY?
25    A.   The exact same.
```

```
 1    Q.   How do you know that they perform exactly the same?

 2    A.   Well, like I said earlier, we have to do bench testing

 3    that we provide to FDA to show what substantial equivalency

 4    is, and that's what we get our clearance for.

 5           So we show the FDA how the device performs as a new

 6    device, and then we have to be able to take that same

 7    standard and show that it performs the same after we've

 8    reprocessed it.

 9           Those validation studies go to the government, go

10    to FDA, and they come back and say you're either

11    substantially equivalent or you're not.

12    Q.   Give us a sense of how much these catheters are when

13    sold new by Biosense.

14    A.   Anywhere between $2,800 to as much as $3,500.

15    Q.   So when you talk about the cost savings to the hospitals

16    from buying a reprocessed Innovative Health catheter, give us

17    a sense of how much the hospital will save for each catheter.

18    A.   $1,500, $1,700 per catheter.  It's a meaningful number.

19    Q.   Now, you're familiar with Biosense Webster, right?

20    A.   Yes, I am.

21    Q.   And you know that that's a subsidiary of Johnson &

22    Johnson?

23    A.   Yes, I do know that.

24    Q.   And you're also familiar with the Biosense Webster

25    sister company Sterilmed?
```

```
 1   A.   Yes, I am.

 2   Q.   Okay.  Does Sterilmed sell reprocessed Biosense Webster

 3   EP catheters?

 4   A.   Yes, they do.

 5   Q.   Now, when you're out selling to your customers, have you

 6   seen Sterilmed try to convince hospitals to buy reprocessed

 7   Sterilmed catheters rather than new Biosense Webster

 8   catheters?

 9   A.   No.  No.

10   Q.   Why not?

11   A.   Because they would rather sell the new catheter at

12   double the price.

13   Q.   When have you seen Sterilmed offer customers reprocessed

14   Sterilmed catheters instead of new Biosense Webster

15   catheters?

16   A.   Typically as a defensive measure, if we're in the

17   account pitching the account or program, they'll come up and

18   say, oh, we can also do that.  But it's not something they

19   push in the marketplace.

20   Q.   Do you view Sterilmed as one of Innovative Health's

21   competitors?

22   A.   Yes, we do.

23   Q.   And are there any other companies selling reprocessed

24   Biosense EP catheters?

25   A.   Stryker sells catheters as well.  It processes
```

```
 1   catheters.
 2   Q.    Mr. Ferreira, does Innovative Health have a partnership
 3   with the Mayo Clinic?
 4   A.    Yes, we do.
 5   Q.    What is the Mayo Clinic?
 6   A.    The Mayo Clinic is the world's number-one heart
 7   hospital, obviously the biggest heart hospital, most famous
 8   here in the United States, but it also ranked number one in
 9   the world.
10   Q.    Does the Mayo Clinic have a significant EP practice?
11   A.    Yes, they do.
12   Q.    Can you explain what your partnership is with the Mayo
13   Clinic.
14   A.    It really is a development agreement.  Because of who
15   the Mayo Clinic is, a lot of new technology is developed
16   inside of the Mayo Clinic.  So we get a chance early on to
17   see kind of what's coming to market, how it performs.
18            We test product inside of Mayo Clinic.  We receive
19   samples from Mayo Clinic.  So they're an important partner
20   for us.
21   Q.    Does Innovative Health have a partnership with Stanford
22   Health Care?
23   A.    Yes, we do.
24   Q.    And what is Stanford Health Care?
25   A.    Stanford is one of the top heart hospitals in the
```

        the machine?

        A.   Well, the catheters all plug into what we call the box

        but into a -- it's the CARTO system.  And the mapper is there

        and he's running the machine.  He's operating the machine.

03:20PM Q.   So does the mapper run or operate the catheters?

        A.   No.  The catheters are in the hands of the physician.

        Q.   So does the mapper support the catheters?

        A.   No.  He supports the machine.

        Q.   Does Innovative Health provide clinical support to

03:20PM doctors if they have issues with the catheters?

        A.   Yes.  We have a clinical support team that will go out a

        few different times.  One, they'll go out when we launch a

        brand-new account to the physicians.  If they've got any

        questions, we can answer them.

03:21PM          When we launch new products, they're in the

        accounts.  Our large accounts, like Stanford, we would be in

        there on a quarterly basis.  And if the physicians have any

        questions or about how we do, one of our clinical folks will

        be on site.  Yes.

03:21PM Q.   Okay.  Is there a second reason why Innovative Health

        can't provide its own mappers to hospitals?

        A.   Well, it's not economically feasible for us to do so.  I

        mean, in a case we're only reprocessing about 25 percent of

        the catheters.  The rest of the catheters are the brand-new

03:21PM catheters.  And the expensive catheters are still being sold

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 03:21PM | 5 |

1    by Biosense Webster.

2    Q.    Give us a sense in a given case of how much, if you're

3    able to sell reprocessed catheters, what percentage of the

4    equipment in a given case are you providing?

5    A.    About 25 percent.

6    Q.    Okay.  And can you explain why that makes it

7    economically infeasible for you to provide a map for the

8    entire case?

9    A.    We're not selling the rest of the catheters.  We're

10   selling a small sliver of the catheters that are to be used.

11   Q.    Mr. Ferreira, is Biosense's case coverage policy still

12   affecting Innovative Health's business today?

13   A.    Yes, it is.

14   Q.    Give us a sense of what the magnitude of that impact is.

15   A.    I think our business could be double the size as it is

16   today if I was able to sell these sensor-enabled catheters.

17   Again, remember, each dollar of sales for me is a dollar of

18   savings for the hospital because they're not having to buy

19   brand-new catheters.  So it's pretty impactful.

20   Q.    If you could look in your binder and find JX3887.

21   A.    (Witness complies.)  Yes.  I have it here.

22   Q.    Do you recognize JX3887?

23   A.    Yes.  This is an e-mail from Ken Blenis at MarinHealth

24   dated March the 6th, 2020, to Jay Farris.

25         MR. HO:  Your Honor, we move to admit 3887.

```
 1              THE COURT:  Any objection?

 2              MR. CAVANAUGH:  No.  No objection.

 3              THE COURT:  3887 will be received.

 4              (Exhibit 3887 received)

03:23PM  5  BY MR. HO:

 6  Q.   Mr. Ferreira, who Ken Blenis?

 7  A.   Ken Blenis is the supply director in charge of materials

 8  at Marin County.  He does all the contracting and the

 9  purchasing.

03:23PM 10  Q.   And just for the record, what is MarinHealth?

11  A.   Marin -- it's a hospital in Marin County.

12  Q.   What is this e-mail exchange about, Mr. Ferreira?

13  A.   It starts off -- it's an e-mail from Ken to Joan Burns

14  at Marin.  Joan ran the lab at Marin, so she was the business

03:23PM 15  manager, operations manager for that lab.

16  Q.   And what did Mr. Blenis say to Ms. Burns?

17  A.   So again, like we saw in the e-mail with IU Health, he's

18  highlighting the fact from a business review that they're not

19  saving as much money as they thought they would because

03:24PM 20  they're not being able to reprocess the PENTARAY.  He says

21  here:  One item that stood out as an additional opportunity

22  is the PENTARAY cath.

23  Q.   And then could you describe what happens in the rest of

24  the e-mail chain.

03:24PM 25  A.   So he's asking Joan why she's not reprocessing that or
```

# EXHIBIT 2A

1

2

3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

INNOVATIVE HEALTH, LLC,       ) CERTIFIED TRANSCRIPT
                  Plaintiff,  )
      vs.                     )
                              )  SACV-19-01984-JVS
BIOSENSE WEBSTER, INC.,       )
                  Defendant.  ) TRIAL DAY 3, VOL. I
---------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

May 8, 2025

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

09:42  1   location sensors were not working?

2   A    There would be an error, or somebody in the staff would

3   realize it and see it and not proceed.

4   Q    And keeping with this image, what would happen if an

09:43  5   Innovative catheter showed an abnormality in this step?

6   A    Our software would have a big red thing on the screen

7   that says it's a fail, and that device would get thrown out.

8   It would be considered a bad device, and it would not get

9   reprocessed.

09:43  10        MS. MORALES-KIMBALL:  I would like to publish

11   JX4375.

12   BY MS. MORALES-KIMBALL

13   Q    What does this image depict?

14   A    This is our electrical testing workstation for our

09:43  15   catheters.

16   Q    What happens at this testing station?

17   A    Again, we are testing the electrical performance of the

18   device.  Keep in mind that the device is in the heart.

19   They're measuring signals, so we have to measure those

09:43  20   signals as well and, again, compare them to the

21   specification, the criteria that we have that the FDA

22   cleared for us from the new products.

23   Q    And you said signals.  What type of signals?

24   A    It's a voltage.  It's a very, very small voltage that

09:44  25   we look for.

09:44    1    Q    What happens after the testing step?

         2    A    We will then move to an additional -- the next quality

         3    control station.

         4    Q    And what might happen in that -- what does happen in

09:44    5    that quality control step?

         6    A    It's a redundant quality inspection step.  So again,

         7    every device will have an operator inspector that's been

         8    trained to inspect that device under a magnification,

         9    cameras, very specific tools that they have that are looking

09:44   10    for any kind of damage on that product.

        11    Q    What do you mean by redundant?

        12    A    We do quality control six different times on our floor.

        13    So what that means is that every single device will be

        14    inspected six different times by six different people.  So

09:45   15    the goal there is that you have multiple people looking at

        16    that product.  Every product, every time.

        17    Q    What happens next?

        18    A    We go to our packaging room.

        19               MS. MORALES-KIMBALL:  I would like to publish

09:45   20    JX4831.

        21    BY MS. MORALES-KIMBALL:

        22    Q    What does this image depict?

        23    A    In this room here, we are putting the devices into our

        24    packaging.  So they will go through a process where we put

09:45   25    them into a protective tray.  There is a pouch that we put

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
09:45    1    them into, and then there is a box.  And we use different
         2    types of equipment to inspect that product as well right
         3    before it is actually sealed.  So you take the pouch, and
         4    you seal the end on there.
09:45    5    Q     Then what happens?
         6    A     Then we do a quality control inspection again.  So in
         7    this step here, we are looking at the product in its final
         8    package.  So we have a device that's in a tray.  It's in a
         9    pouch.  We have a seal.  And then we inspect it using a
09:46   10    specific piece of equipment to check for quality control.
        11    Q     Then what happens?
        12    A     Then we sterilize the product.
        13              MS. MORALES-KIMBALL:  Your Honor, permission to
        14    approach the witness with JX4190.
09:46   15              THE COURT:  You may.
        16    BY MS. MORALES-KIMBALL:
        17    Q     Mr. Chudzik, I handed you what has been marked as
        18    JX4190.  Do you recognize this?
        19    A     Yes, I do.
09:47   20    Q     What is it?
        21    A     This is an Innovative packaged reprocessed SOUNDSTAR
        22    Eco catheter.
        23              MS. MORALES-KIMBALL:  I would like to move JX4190
        24    into evidence.
09:47   25              MR. CAVANAUGH:  No objection.
```

09:50   1   Q    Approximately how many devices are in Innovative's

        2   warehouse?

        3   A    We can carry anywhere from 2,000 to 4,000 devices in

        4   our warehouse.

09:50   5   Q    Could Innovative increase that number if the demand was

        6   to increase?

        7   A    Absolutely.

        8   Q    And going back to the full transfer phase, how does

        9   this process differ between products that receive a line

09:50  10   extension versus a 510(k) clearance, if at all?

       11   A    Yeah, the process would be identical.  Everything you

       12   saw today would be identical for both.

       13   Q    And how many of Innovative's catheters that it

       14   reprocesses go through this entire process?

09:51  15   A    We reprocess anywhere from 3,000 to 5,000 devices per

       16   month.

       17   Q    And would every one of those go through this process?

       18   A    Yes.

       19   Q    Going back to the FDA design control, is transferring

09:51  20   to the production floor the final step?

       21   A    No, it's not.

       22   Q    What comes next?

       23   A    We have what we call our post-market surveillance step.

       24   Q    What is that?

09:51  25   A    This is an FDA requirement that after you have products

09:51  1  in the market and they have been used on patients, you are

2  making sure everything is still good.  You're talking to

3  your customers.  You're assessing the quality of the

4  product.  You're making sure that everything you've done is

09:52  5  still working properly.

6          MS. MORALES-KIMBALL:  We can take down the slides.

7  BY MS. MORALES-KIMBALL:

8  Q    You mentioned Biosense's Case Coverage Policy, do you

9  recall?

09:52  10  A    Yes, I do.

11  Q    Have you ever discussed that policy in your meetings

12  with customers?

13  A    Yes.

14  Q    How often?

09:52  15  A    I would say almost every time.

16  Q    Why does it come up?

17  A    The savings potential for customers on sensor-enabled

18  devices is massive, and so they bring it up that they are

19  not able to participate in that part of the savings for

09:52  20  their hospital.

21  Q    Which customers can you specifically recall discussing

22  Biosense's Case Coverage Policy with?

23  A    Torrance Medical, Stanford.  We have the Mayo Clinic as

24  a customer as well.  Kaiser is a big health system.  So

09:53  25  those are just a few recent ones.

09:53   1   Q    Does Biosense's Case Coverage Policy apply to the

        2   SOUNDSTAR Eco?

        3   A    Yes, it does.

        4   Q    The LASSO NAV?

09:53   5   A    Yes.

        6   Q    The PENTARAY?

        7   A    Yes.

        8   Q    What happens when these catheters come into Innovative?

        9   A    Well, as mentioned, we are not able to reprocess them,

09:53  10   so we do put them in our warehouse.

       11   Q    How do you view Biosense's Case Coverage Policy's

       12   impact on Innovative and its customers?

       13   A    It's been very tough.  You know, customers, as you may

       14   know, take a lot of time to gain trust.  It takes a lot of

09:53  15   time to establish relationships, and so we're not able to

       16   provide a big service for them in terms of savings.

       17   Hospitals and customers are angry about the process and the

       18   ability to not be able to save the money.

       19        From an Innovative standpoint, we are a small

09:54  20   company.  We've worked really hard to obtain 510(k)

       21   clearances.  We follow the same exact process as all the big

       22   companies.  We've got 49 clearance in about, you know, 100

       23   months.  It's a very, very aggressive and good

       24   accomplishment.  We've incurred a lot of costs.  A lot of

09:54  25   time in the projects has been delayed as well.  So it's

11:37    1    and we're also able to detect a 50-micron particle anywhere
         2    in that lumen.
         3    Q    Were other reprocessors already using similar
         4    technology to reprocess the PENTARAY?
11:37    5    A    No.  Innovative was the first one to secure this patent
         6    as well as reprocess the PENTARAY.
         7    Q    Let's please publish JX4372 already in evidence to the
         8    jury.  What is depicted in this photograph?
         9    A    This picture is actually showing the practical
11:38   10    application of the patent that I just explained.
        11    Q    What is the machine in front of the technician?
        12    A    This is the microlumen occlusion tester that is a
        13    result of that patent.
        14    Q    When you say "occlusion," what do you mean?
11:38   15    A    Occlusion means a blockage, anything that is stopping
        16    or hindering the flow.
        17    Q    In brief, what do Innovative's other patents cover?
        18    A    We have patents that allow us to reprocess certain
        19    complex medical devices that nobody is attempting to
11:38   20    reprocess at this point.  We have methods that involve
        21    inspecting for patient safety, for example, as the one I
        22    just described, and we also have methods that help us refine
        23    our reprocessing methodologies.
        24    Q    You can take that down.
11:38   25              Moving to another topic, are you familiar with the

LASSO NAV?

11:39     1

A     Yes, I'm very familiar with that catheter.

Q     How did you become familiar with it?

A     This was one of my earlier projects when I joined

11:39     5   Innovative, so I remember it well.

Q     What year was that?

A     This was most of 2015.

Q     How did that project for the LASSO NAV compare to

research on other catheters?

11:39     10   A     Well, LASSO NAV, in comparison to the other

electrophysiology catheters that I worked on had an extra

component in there that gave us a surprise, as well as took

us extra time and effort to figure out in order to bring

that to market as a reprocessed option.

11:39     15   Q     What took extra time and effort?

A     So LASSO devices had an electronic chip that was inside

that device that specifically had what I call a kill switch

methodology that was used that combined software as well as

encryption methodologies to prevent that device from being

11:40     20   reused after it was used the first time.

Q     What did Innovative have to do to address these chips?

A     One, we had to add expertise.  Given that this would

add software components and it was encrypted, we needed --

definitely added individuals and experts from the field.  We

11:40     25   had to seek out experts in cryptography to understand the

11:40    1    data, as well as electronics specific in this electronic

    2    chip.  It's an EEPROM in there, so we needed experts who

    3    understood EEPROM.

    4    Q    What does EEPROM stand for?

11:40    5    A    EEPROM, spelled E-E-P-R-O-M, stands for Electronically

    6    Erasable Programmable Read-Only Memory.

    7            MR. QUIRK:  May I approach the witness, Your Honor

    8    with an exhibit?

    9            THE COURT:  You may.

11:41   10    BY MR. QUIRK:

   11    Q    I've handed you JX4136 already admitted in evidence.

   12    What is that?

   13    A    This is a LASSO catheter.

   14    Q    Is it a new or a reprocessed catheter?

11:41   15    A    This is a reprocessed LASSO catheter.

   16    Q    Can you show the jury on this reprocessed LASSO

   17    catheter where the chip is located?

   18    A    The chip is actually located inside this connector, and

   19    it's inside this housing, and this is the part that gets

11:41   20    plugged into the CARTO system.

   21    Q    Have you worked with counsel to prepare a demonstrative

   22    to assist in describing these chips?

   23    A    Yes, I have.

   24    Q    If we can we go to Slide 5, please, in the

11:42   25    demonstrative, what is this?

11:42    1    A    This is a picture, a representation, of the delay that

         2    was caused by these kill switches for us for the -- in our

         3    projects.

         4    Q    What does the red line represent?

11:42    5    A    The red shows the extra time it took us to complete

         6    that given project.

         7    Q    What does the green line represent?

         8    A    The green represents a standard project that would

         9    have -- a standard project without that electronic component

11:42   10    in there.

        11    Q    How was Biosense using these chips when you first

        12    encountered them?

        13    A    So electronic chips were used in the earlier models of

        14    the Biosense Webster catheter, but it was used as an auto-ID

11:42   15    function, automatic identification function.  Since then, it

        16    evolved to add more details and add more software-based

        17    functions.  That turned into being used as a single use,

        18    where after that use is done, the chip will lock that

        19    device.  When it's being plugged in, it will say that the

11:43   20    device is already used and expired.

        21    Q    You mentioned the chips evolved.  Can you explain how

        22    they evolved.

        23    A    Well, in this case, for LASSO, it's a 3-pin EEPROM that

        24    is being used versus a simple one for auto-ID.  And in this

11:43   25    scenario, it had -- or this chip, the data within the

11:43    1    chip -- first, we had to understand the chip.  We had to

        2    figure out how to read the information within the chip, and

        3    when we read it, it was a whole bunch of jumbled up letters

        4    and numbers, so we needed to understand how to unscramble

11:43    5    that puzzle.  We needed to figure out the decryption

        6    methodology.  Once we understood that, there was -- that's

        7    when we know that there is a time stamp that is being used

        8    as a method to block that device from being reused.

        9    Q    What did you and the Innovative team have to do to

11:44   10    decrypt and resolve the chips?

        11   A    In this case, we had to get the experts externally as

        12   well as internally.  I had my electrical engineer internally

        13   as well as I reached out to external experts -- one would be

        14   Nathan Einwechter -- to get through these software-related

11:44   15   issues to understand how to resolve it.

        16   Q    Who is Nathan Einwechter?

        17   A    Nathan Einwechter is our CFO, Tim Einwechter's son.

        18   Q    How did you get connected with Nathan Einwechter?

        19   A    As I mentioned earlier, when this project was tasked to

11:44   20   me, and when I understood about the software concerns, and

        21   when I provided that update to management, Tim asked me to

        22   reach out to Nathan.  And in his words, he said Nathan does

        23   something with computers.  Later, I learned he's actually a

        24   cryptography expert.  And since then, I've been working with

11:45   25   him.

11:45    1    Q    How did the Innovative overcome the chip on the LASSO

         2    NAV?

         3    A    So once we understood the decryption methodology, and

         4    once we read the information, and once we found out the time

11:45    5    stamp, which was the time at which that device was plugged

         6    in, and we knew the location at where it was, we were able

         7    to remove that time stamp and install a new chip in the

         8    LASSO and put all of the information back into the chip,

         9    minus the time stamp obviously, and then proceed with the

11:45   10    rest of the process to get that device reprocessed.

        11    Q    And if we can advance to the next slide, please.  You

        12    can go all the way.

        13          Are the chips you've been describing on this

        14    slide?

11:45   15    A    Yes.  The picture that is showing next to the device

        16    that is highlighted, that is the electronic chip, what I

        17    call the EEPROM.

        18    Q    What did Innovative have to do for the PENTARAY down in

        19    the bottom right?

11:46   20    A    With PENTARAY, we first attempted to replace the chip

        21    by separating the device and the handle.  The handle design

        22    itself is complex where we saw certain features that were

        23    used to prevent that removal.  But again, understanding the

        24    software was important, we understood the decryption

11:46   25    methodology, given that it's a different model, we had to

11:46 1  use different methodology there.  But it, again, added that

2  time due to the electronic chip.

3  Q     How about for the SOUNDSTAR 3D?

4  A     SOUNDSTAR 3D, similarly, the information in the chip is

11:46 5  encrypted.  But as you see, the chip evolved from the 3-pin

6  EEPROM to now it's an 8-pin EEPROM.  I am emphasizing the

7  numbers here, because the more complex the EEPROM, the more

8  advanced the chip is, and the more effort it takes to

9  understand how that chip works.

11:47 10       So in this case, for SOUNDSTAR 3D, once we

11  understood that chip, we were able to reset the time stamp.

12  In this scenario, the electronic chip used was not locked,

13  so we were able to remove the time stamp and reset that

14  device.

11:47 15  Q     How about for the SOUNDSTAR Eco?

16  A     That was our longest effort and went through a few

17  hurdles.  Similar to SOUNDSTAR 3D, in this case, we figured

18  out the decryption methodology.  And as you see, the chip

19  was even further evolved.  Now, it is 16-pin EEPROM.  And

11:47 20  once we understood the data within it, we were able to

21  secure the chip directly from the manufacturer, Maxim, and

22  we were sourcing it.

23       Once we got as close as figuring out and resolving

24  the issue, we learned that Biosense went to a custom chip,

11:48 25  which cut us out of the supply chain.  We couldn't source

| | | |
|---|---|---|
| 11:48 | 1 | the chip now, and now we were back to square one, and we had |
| | 2 | to figure out additional methods to supplement that to reset |
| | 3 | the time stamp, which added that time for us. |
| | 4 | Q    Were you able to resolve the chip issues in the |
| 11:48 | 5 | SOUNDSTAR Eco? |
| | 6 | A    Yes, eventually we did. |
| | 7 | Q    At the time that Innovative started reprocessing the |
| | 8 | SOUNDSTAR Eco, were other reprocessors already reprocessing |
| | 9 | it? |
| 11:48 | 10 | A    When we started reprocessing SOUNDSTAR Eco, I believe |
| | 11 | Sterilmed already had the clearance for SOUNDSTAR Eco. |
| | 12 | Q    Who is Sterilmed? |
| | 13 | A    Sterilmed is the reprocessing wing for Biosense |
| | 14 | Webster. |
| 11:48 | 15 | Q    Was anyone not affiliated with Biosense reprocessing |
| | 16 | the SOUNDSTAR Eco? |
| | 17 | A    No. |
| | 18 | Q    Would you say that you're hacking the catheters? |
| | 19 | A    No, I won't say I'm hacking the catheters. |
| 11:49 | 20 | Q    Why not? |
| | 21 | A    Because it makes it sound like I'm doing something |
| | 22 | nefarious, and in this scenario, I don't believe I am. |
| | 23 | Q    Where did you get the catheters? |
| | 24 | A    We got the catheters from our hospital partners.  We |
| 11:49 | 25 | bought it from them. |

11:49    1    Q     Why are you trying to resolve the blocking chips?

         2    A     For our partners.  Our hospital partners are reaching

         3    out to us asking about our capability and asking if we would

         4    be able to reprocess this device so they can benefit from

11:49    5    the savings.

         6    Q     Have you talked to hospitals about the decryption and

         7    need to reset the time stamp?

         8    A     Yes.  When I'm onsite talking to the physicians, I do

         9    explain the process.  I do explain the efforts we have to go

11:49   10    through to remove that lock and be able to give that device

        11    one more life, but the hospital staff is already aware of

        12    the time stamp and the kill switch limitations in there.

        13    Q     Did you tell the FDA about the procedures to decrypt

        14    and solve the kill switches for these catheters?

11:50   15    A     Yes, we did.

        16    Q     Where did you tell them?

        17    A     The 510(k) that we discussed earlier.  In that whole

        18    packet when we send the results and the testing that we did

        19    for these devices, we provided all the information,

11:50   20    including the decryption methodology, as well as the chip

        21    replacement when it was done, as well as the resetting.  And

        22    we showed the compatibility afterwards, that the devices

        23    were functional in these hospital settings.

        24    Q     Is the information in the original applications to the

11:50   25    FDA for reprocessing these catheters?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:50    1    A    Yes.  It's in the 510(k) packet that we submitted to

         2    the FDA.

         3    Q    Did the FDA ever raise any concerns about what

         4    Innovative had to do?

11:51    5    A    No, they did not.

         6    Q    What type of data is stored on these chips?

         7    A    The time stamp, the product information as I mentioned

         8    earlier, but also the calibration data.  Given that these

         9    are mapping catheters, there would be location sensor

11:51   10    specific calibration information in there.

        11    Q    What's the purpose of the calibration data?

        12    A    When these devices are being manufactured, the original

        13    manufacturer is adding those calibration data into the chip,

        14    so when it's plugged into the Carto system, the system knows

11:51   15    how to initialize this catheter and how to map and create

        16    that map effectively.

        17    Q    When Innovative deactivates the kill switch, does that

        18    affect the calibration data?

        19    A    No, we don't change anything on the calibration data.

11:51   20    Q    Do the location sensors need to be recalibrated?

        21    A    The devices that are passing our testing -- once it

        22    goes through our scrutiny of testing and passes all of

        23    those, those devices do not need to be recalibrated.

        24    Q    Aside from Biosense catheters, does Innovative

11:52   25    reprocess electrophysiology products from other

| | | |
|---|---|---|
| 11:52 | 1 | manufacturers? |
| | 2 | A     Yes, we do. |
| | 3 | Q     Which manufacturers? |
| | 4 | A     We do reprocess advanced mapping catheters from Abbott, |
| 11:52 | 5 | from Boston Scientific, and from Medtronic to list a few. |
| | 6 | Q     How did Biosense's blocking chips compare to the |
| | 7 | technology for these manufacturers? |
| | 8 | A     Well, Biosense Webster was the first to start using |
| | 9 | this methodology, and as you see, they have evolved heavily. |
| 11:52 | 10 | Other manufacturers have followed suit as well as of now. |
| | 11 | Q     How long did the kill switches delay Innovative in |
| | 12 | taking the LASSO NAV to market? |
| | 13 | A     Six months. |
| | 14 | Q     Did Innovative not move forward on other aspects of |
| 11:53 | 15 | reprocessing the LASSO NAV until your team resolved the kill |
| | 16 | switch issue? |
| | 17 | A     No.  My team was working on efforts in parallel because |
| | 18 | we already know the other efforts we need to complete |
| | 19 | anyway, so this effort for EEPROM was done in parallel. |
| 11:53 | 20 | Q     How can you say then that the chip caused a particular |
| | 21 | delay? |
| | 22 | A     Well, as I mentioned, in comparison to other |
| | 23 | electrophysiology catheters, even ones with the electronic |
| | 24 | chip, these specific catheters had these blocks, and we can |
| 11:53 | 25 | account for the time that it took for these efforts because |

11:53   1   it was done separately and parallel, so we can calculate

    2   that and figure that out.

    3   Q    How long did the chips delay Innovative in taking

    4   PENTARAY to market?

11:53   5   A    For PENTARAY, it added six months.

    6   Q    How about for SOUNDSTAR 3D?

    7   A    SOUNDSTAR 3D was 19 additional months.

    8   Q    And how about for SOUNDSTAR Eco?

    9   A    Like I mentioned earlier, Eco was the longest for us,

11:54   10  37 months in addition.

    11  Q    Let's move on to one final topic.  You mentioned

    12  earlier that you worked at CR Bard.

    13          Did you work in reprocessing there?

    14  A    No.  CR Bard was an original equipment manufacturer.

11:54   15  They did not do reprocessing.

    16  Q    Based on your experience having worked for an original

    17  equipment manufacturer and data reprocessor, how do you

    18  think reprocessing affects industry competition?

    19  A    After putting in the time with the industry, now I

11:54   20  believe it pushes -- it accelerates competition.

    21  Q    How so?

    22  A    Well, while reprocessors like Innovative is working on

    23  adding another life or two on the devices that still can be

    24  effectively used, the original equipment manufacturer could

11:54   25  focus on innovating, on working on the next version of these

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
11:54    1    devices that could benefit the patients.

         2    Q    If it weren't for reprocessing, what would happen to

         3    the original manufacturer's catheters like say a new LASSO

         4    NAV in front of you after the first use?

11:55    5    A    If it wasn't for Innovative or any of the reprocessors,

         6    including this device, this would have been -- since it was

         7    used in a medical setting, this would be burned.  It would

         8    be incinerated, or it will end up in a landfill.

         9              MR. QUIRK:  Pass the witness, Your Honor.

11:55   10              THE COURT:  We'll take the lunch break here,

        11    ladies and gentlemen.  We'll resume at 1:30.  Please

        12    remember the admonition.

        13              (Jury not present)

        14              THE COURT:  Sir, you may step down.

11:55   15              Anything before we take the break?

        16              MR. HO:  Not from the plaintiff, Your Honor.

        17              MR. CAVANAUGH:  Not from the defendant, Your

        18    Honor.

        19              THE COURT:  Okay.  Thank you.  We're in recess.

11:56   20              (Recess)

        21              (Miriam Baird reported Vol. II)

        22                    *    *    *

        23

        24

        25
```

# EXHIBIT 2B

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3          HONORABLE JAMES V. SELNA, JUDGE PRESIDING

4    INNOVATIVE HEALTH, LLC,          )
                                      )
5                                     )
                                      )
6                     Plaintiff,      )
                                      )
7                                     )
                                      )
8         Vs.                         )   No. SACV-19-01984-JVS
                                      )
9                                     )
                                      )
10   BIOSENSE WEBSTER, INC.,          )
                                      )
11                                    )
                                      )
12                    Defendant.      )
                                      )
13   _____ )

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                     JURY TRIAL

18                  DAY 3, VOLUME II

19               SANTA ANA, CALIFORNIA

20              THURSDAY, MAY 8, 2025

21   MIRIAM V. BAIRD, CSR 11893, CCRA
     OFFICIAL U.S. DISTRICT COURT REPORTER
22   350 WEST FIRST STREET
     FOURTH FLOOR
23   SANTA ANA, CA 92701

24

25

1    2017 because you had to address a lumen issue, correct?

2    A.    Yes.  We had to resolve the lumen and get the clearance

3    in order to be able to sell the device in the market.

4    Q.    And it took your company another two years to resolve

5    the lumen issue, correct?

6    A.    Well, that's when we worked on that patent that I

7    discussed earlier to get that resolved and submitted to --

8    Q.    Could you just answer my question, which is:  It took

9    you two years to resolve the lumen issue, right?

10   A.    It took us two years to complete that testing.

11   Q.    All right.

12        So you couldn't sell a PENTARAY until the lumen

13   issue was resolved, correct?

14   A.    Correct.

15   Q.    And the lumen issue has absolutely nothing to do with

16   the EEPROM chip, correct?

17   A.    No, it has nothing to do with the EEPROM chip.

18   Q.    Thank you.

19        MR. CAVANAUGH:  Nothing further, Your Honor.

20        THE COURT:  Redirect?

21        MR. QUIRK:  Briefly, Your Honor.

22                    **REDIRECT EXAMINATION**

23   BY MR. QUIRK:

24   Q.    Mr. Joseph, the document that counsel handed to you and

25   which wasn't shown to the jury, document 114, did you create

```
 1   that spreadsheet?

 2   A.   No, not this spreadsheet.  This looks like a modified

 3   version of that.

 4   Q.   Does that spreadsheet include all the dates for

 5   initiation and completion of projects that you had on your

 6   original spreadsheet?

 7   A.   No, it doesn't.

 8   Q.   Biosense's counsel asked you the effect of the EEPROMs

 9   on the different catheters.  Do you recall that?

10   A.   Yes.

11   Q.   How effective was Biosense's blocking chip for the

12   SOUNDSTAR 3D?

13   A.   It had -- the chip was -- the details were encrypted, so

14   we had to resolve that, but that chip was not locked.  As in

15   when the device is used with the CARTO, a timestamp is

16   recorded but the chip was not locked, which means that once

17   we understood the methodology, once we understood where the

18   timestamp was, we had the freedom to remove that and bring

19   the chip back to the original state as it was made by

20   Biosense Webster.

21        So that, yeah, in comparison to eco, it had one

22   less challenge in comparison.

23   Q.   Can you explain the additional technicality of the

24   SOUNDSTAR eco.

25   A.   Yes.  SOUNDSTAR eco in this scenario going to a much
```

02:02PM (line 5)
02:02PM (line 10)
02:02PM (line 15)
02:03PM (line 20)
02:03PM (line 25)

|   |   |
|---|---|
| 1 | more complex chip required significant effort from our end to |
| 2 | understand as well as decrypt.  On top of that, that chip was |
| 3 | locked, as in write protected once it was used by the system, |
| 4 | which means again given that it was an advanced chip, once |
| 02:03PM 5 | it's write protected and now we are locked out of the supply |
| 6 | chain where we cannot buy a new chip that was mandated by the |
| 7 | manufacturer of that, we needed to get that from Biosense. |
| 8 |     So that completely locked us out, and we had to now |
| 9 | go and seek entirely new expertise in cryptography and |
| 02:04PM 10 | understand how -- and not just cryptography but even |
| 11 | electronic EEPROM expertise to understand this advanced chip |
| 12 | as well as how to now unlock that chip so that we can remove |
| 13 | that timestamp. |
| 14 | Q.   Biosense's counsel showed you the FDA approval letters |
| 02:04PM 15 | for the ACUNAV and LASSO NAV.  Do you recall that? |
| 16 | A.   Yes. |
| 17 | Q.   And those were four days apart.  Do you recall that? |
| 18 | A.   Yes. |
| 19 | Q.   In light of that, how can you say that the EEPROM chip |
| 02:04PM 20 | and the LASSO NAV delayed its launch? |
| 21 | A.   Well, in that scenario it was comparing ACUNAV to LASSO |
| 22 | where one is an ultrasound catheter and one is a mapping |
| 23 | catheter, where, if I were to compare the ACUNAV to the |
| 24 | SOUNDSTAR, now SOUNDSTAR is basically an ACUNAV with a |
| 02:05PM 25 | location sensor and an EEPROM added. |

```
 1            So if I take those two times and I subtract the
 2   time it took us for ACUNAV, then I can easily calculate how
 3   much time extra it took for SOUNDSTAR.  Similarly, I can do
 4   the same for LASSO if I compare that to a standard EP
 5   catheter that did not have the locks.
 6            MR. QUIRK:  Your Honor, under the rule of
 7   completeness, I'd like to refresh the witness's recollection
 8   with the full spreadsheet that was only excerpted by
 9   Biosense's counsel.
10            THE COURT:  Any objection?
11            MR. CAVANAUGH:  No objection, Your Honor.
12            MR. QUIRK:  Can we show --
13            MR. CAVANAUGH:  Well, Your Honor, are we talking
14   about relating to DX114?
15            MR. QUIRK:  Yes, the underlying data.
16            MR. CAVANAUGH:  Your Honor, I don't have an
17   objection if they show it to the witness, but I would object
18   to it going into evidence.  I didn't show it -- I didn't
19   publish it to the jury.
20            MR. QUIRK:  Are we able to put the -- okay.  We're
21   not moving to put that exhibit into evidence, Your Honor.  We
22   can move on.
23            THE COURT:  Is there any objection to receiving the
24   exhibit?
25            MR. QUIRK:  So we're not -- sorry, Your Honor.
```

02:05PM (line 5)
02:05PM (line 10)
02:05PM (line 15)
02:05PM (line 20)
02:06PM (line 25)

|    |                                                                          |
|----|--------------------------------------------------------------------------|
|  1 | We're not moving that exhibit into evidence.                             |
|  2 |         THE COURT:  Oh, all right.  Okay.                                 |
|  3 | BY MR. QUIRK:                                                             |
|  4 | Q.   Mr. Joseph, Biosense's counsel also asked you about                 |
|  5 | EEPROM chips and other manufacturers' catheters.  Do you                 |
|  6 | recall that?                                                             |
|  7 | A.   Yes.                                                                 |
|  8 | Q.   How did the anti-reprocessing efforts that you've seen               |
|  9 | from these other manufacturers compare to what you saw from              |
| 10 | Biosense?                                                                 |
| 11 | A.   Well, I would say the other manufacturers are following             |
| 12 | more Biosense's efforts in this scenario.  For example, I'm              |
| 13 | pointing to SOUNDSTAR eco where the device is already in the             |
| 14 | market and the chip was modified and added, and a custom chip            |
| 15 | was added.                                                               |
| 16 |         So in that scenario I haven't seen other                         |
| 17 | manufacturers making changes to a product that's already                 |
| 18 | released based on what they are seeing in the market.  But,              |
| 19 | like I mentioned earlier, all of these manufacturers have                |
| 20 | also started adding EEPROM chips to these devices.                       |
| 21 | Q.   Biosense's counsel asked you about Innovative's effort              |
| 22 | to decrypt the chips.  Do you recall that?                               |
| 23 | A.   Yes.                                                                 |
| 24 | Q.   Where does Innovative get the catheters that it intends            |
| 25 | to reprocess?                                                            |

The timestamps in the left margin are:
02:06PM (line 5), 02:06PM (line 10), 02:06PM (line 15), 02:07PM (line 20), 02:07PM (line 25).

|     |     |
| --- | --- |
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 02:07PM | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 02:08PM | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 02:08PM | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 02:08PM | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 02:09PM | 25 |

A.    We buy them from our hospital partners or third parties.

Q.    Who owns the catheters before Innovative receives them for reprocessing?

A.    The hospitals or the third-party vendors.

Q.    Who owns the catheters when Innovative unlocks and decrypts the chips?

A.    We do.  Innovative does.

Q.    Then on one other topic, if we can bring up JX109.  This was the reject rate report for the LASSO NAV, correct?

A.    That's correct.

Q.    And then JX110, this was the reject report for the PENTARAY, correct?

A.    Yes.

Q.    If we can go to the slide with the details for the reasons for reject rates.  Biosense's counsel asked you about memory chip failures.  Do you recall that?

A.    Yes.

Q.    Can you explain what that reason for reject means.

A.    The memory write failure is where there might be some electrical connection issue or the chip itself could be having issues.  So this is where we are seeing that either we were not able to write the data back into the chip; or when we read it, we couldn't read the information.

         So in either scenario this would cause delay in the procedure, and we don't want that at the patient end.  So we

|   | |
|---|---|
| 1 | reject that up front. |
| 2 | Q.   Biosense's counsel asked you about calibration as well, |
| 3 | correct? |
| 4 | A.   Yes. |
| 02:09PM  5 | Q.   If a -- if we can leave that exhibit up. |
| 6 | If a catheter fails a calibration test, is that |
| 7 | reflected on the reject rate report? |
| 8 | A.   If it fails on the location sensor testing, then, yeah, |
| 9 | it would be listed as well. |
| 02:09PM  10 | Q.   Where is that? |
| 11 | A.   That would be the location sensor failure listed under |
| 12 | memory write failure. |
| 13 | Q.   If the calibration data is no longer accurate, that |
| 14 | would be reflected on that line, correct? |
| 02:09PM  15 | A.   Yes.  Any -- well, any device that has a coil location |
| 16 | sensor that is not functioning correctly will be rejected, |
| 17 | and that number reflects that. |
| 18 | Q.   How many catheters are rejected for that reason in this |
| 19 | report? |
| 02:10PM  20 | A.   It looks like 59. |
| 21 | Q.   How many are rejected total for the entire report? |
| 22 | A.   For that particular line or the total? |
| 23 | Q.   The total. |
| 24 | A.   Grand total is 3,991. |
| 02:10PM  25 | Q.   Can we go to the right, please. |

```
 1   A.   I worked in the supply chain department.

 2   Q.   What does the supply chain department do?

 3   A.   The supply chain works with the end users -- the

 4   physicians, the nurses -- to understand what products that

 5   they need for patient care.  You then identify the

 6   alternatives, and then you seek to get a product on contract

 7   so that they're able to purchase them.

 8   Q.   When did you leave the Mayo Clinic?

 9   A.   In 2006.

10   Q.   What did you do next?

11   A.   I went to Stryker, a medical device manufacturer.

12   Q.   And what did you do there?

13   A.   I was involved in various sales roles.

14   Q.   And what did you do after Stryker?

15   A.   I went to a small startup called Interline.

16   Q.   And where did you go after that?

17   A.   From there I went to Innovative Health.

18   Q.   Who do you report to at Innovative Health?

19   A.   Rick Ferreira, the CEO.

20   Q.   And what again is your title at Innovative?

21   A.   Vice president of business development.

22   Q.   What are your responsibilities?

23   A.   I work primarily in working with clients in sales,

24   showing them the moneys they can save from reprocessing, and

25   then working with some of our larger accounts to help manage
```

02:15PM  (line 5)
02:15PM  (line 10)
02:15PM  (line 15)
02:15PM  (line 20)
02:16PM  (line 25)

1    their programs.

2    Q.    Do you sell all the catheters that Innovative

3    reprocesses?

4    A.    Yes, I do.

02:16PM   5    Q.    What CARTO 3 sensor-enabled catheters do you sell?

6    A.    That would be the SOUNDSTAR ultrasound catheters, the

7    DECANAV, the NAV LASSO, and the PENTARAY.

8    Q.    Are you familiar with Innovative's sales results?

9    A.    I am.

02:16PM   10    Q.    How do Innovative's sales of the CARTO 3 sensor-enabled

11    catheters compare to the sales of its other reprocessed

12    catheters?

13    A.    We do extremely well selling diagnostic catheters, but

14    we're extremely curtailed in selling the sensor-enabled

02:16PM   15    catheters due to the case coverage policy.

16    Q.    How has Innovative made sales to customers over the

17    years?

18    A.    So we sell both direct to clients, meaning we have a

19    one-on-one relationship, and then we sell through several

02:17PM   20    sales channels.

21    Q.    What are those sales channels?

22    A.    So like Stryker or Vizient and Premier.  They're both

23    group purchasing organizations that hospitals can belong to

24    and purchase from.  And then also Medline medical device

02:17PM   25    manufacturer.

```
 1   Q.   Are all of those relationships ongoing?

 2   A.   The first two are.  The Medline relationship is winding

 3   down.

 4   Q.   Are you familiar with the sales of Innovative catheters

 5   through those channels?

 6   A.   I am.

 7   Q.   How are you familiar with that?

 8   A.   One, from the sales data, but all of the inventories are

 9   stored at our warehouse in Scottsdale.  So if somebody is

10   placing an order through Premier or through Medline, the

11   customer places a purchase order that goes to that entity,

12   and those orders are then sent to us.  So we have to package,

13   ship everything, so we have visibility to it.

14   Q.   Now, focusing on those other channels, how do their

15   sales of reprocessed CARTO 3 sensor-enabled catheters compare

16   to the sales of Innovative's other reprocessed catheters?

17   A.   They, too, do well with the regular diagnostic

18   catheters, but their performance on the sensor-enabled

19   catheters mirrors what we see with very little sales.

20   Q.   Are you familiar with the types of catheters needed to

21   conduct an electrophysiology procedure?

22   A.   I am.

23   Q.   What are they?

24   A.   Generally if it's a mapping procedure, it's going to be

25   diagnostic catheters, the mapping catheters and ablation
```

```
 1   Q.   Why did you do that?

 2   A.   I wanted to see if this was a closed opportunity or if

 3   there was any opportunities to pursue this in the future.

 4   Q.   And what did she tell you?

 5   A.   She told me that she would be unable to move forward

 6   because Biosense was enforcing the case coverage policy.

 7   Q.   Is Mayo Rochester an Innovative client?

 8   A.   Yes, they are.

 9   Q.   Who manages that account?

10   A.   I do.

11   Q.   How often do you visit Mayo Rochester?

12   A.   I'm often there weekly as I live right in the area.

13   Q.   When you visit, what visibility, if any, do you have as

14   to who is mapping the CARTO 3 cases there?

15   A.   So when I am there, I'm often in the clean utility rooms

16   which are attached to all of the EP rooms or O.R.s, if you

17   will.  So I can physically see in and see the personnel that

18   are sitting at the mapping station.

19        At Mayo and many other hospitals, they want to be

20   able to control what access manufacturers' representatives

21   have to ensure it's proper.  So the staff all wear blue hair

22   nets.  Manufacturers have to wear red hair nets.  And

23   everybody sitting at the mapping stations, they all have red

24   hats on.

25   Q.   And can Mayo Rochester -- do they buy CARTO 3
```

02:30PM (line 5)
02:30PM (line 10)
02:30PM (line 15)
02:31PM (line 20)
02:31PM (line 25)

1    sensor-enabled catheters?

2    A.    Not anymore.

3    Q.    Did that used to be different?

4    A.    They were buying them, yes, for several years there

02:31PM    5    before things changed.

6    Q.    Why the difference?

7    A.    In the beginning there were Mayo personnel, so EP techs

8    that were employed by Mayo that knew how to map, they were

9    mapping the cases.  So they were able to use the NAV LASSOs

02:31PM    10    and the SOUNDSTARs, but that changed when they were no longer

11    mapping cases.

12    Q.    Does Innovative Health have FDA clearance to reprocess

13    the VIZIGO steerable sheath?

14    A.    We do.

02:32PM    15    Q.    What is the VIZIGO steerable sheath?

16    A.    The VIZIGO steerable sheath in the simplest term is a

17    long device that you can think of as a straw that's

18    steerable.  The physician inserts it in a blood vessel in the

19    groin, and it will go up to the heart so that the physician

02:32PM    20    can take catheters and go up through the sheath like a

21    channel to get them into the heart and position them in the

22    heart where they need them.

23    Q.    When did Innovative get clearance to reprocess the

24    VIZIGO?

02:32PM    25    A.    March of 2022.

```
          1    Q.    Did you sell VIZIGOs after that?

          2    A.    I did.

          3    Q.    How were those sales?

          4    A.    I had several clients that initially contacted me with

02:32PM   5    great interest, like Erlanger, CentraCare, and several

          6    others.

          7    Q.    What happened after that?

          8    A.    Shortly after I started selling them, the sales stopped.

          9    And then I learned that it was now being included in the

02:33PM  10    Biosense Webster case coverage policy.

         11    Q.    If you could please look in your binder and find

         12    Exhibit 3957.

         13    A.    (Witness complies.)  Yes.

         14    Q.    What is this?

02:33PM  15    A.    This is an e-mail chain with the top e-mail being from

         16    Jeff Loy to myself dated July 13th, 2022, with the subject

         17    matter being, re, Innovative Health.

         18          MS. SCHIFFMAN:  Your Honor, we'd move to admit

         19    Exhibit 3957.

02:33PM  20          MR. FARIDI:  No objection, Your Honor.

         21          THE COURT:  3957 will be received.

         22          **(Exhibit 3957 received)**

         23    BY MS. SCHIFFMAN:

         24    Q.    Who is Mr. Jeff Loy?

02:33PM  25    A.    Jeff Loy is the director of supply chain management for
```

|  |  |
|---|---|
| | 1 | Erlanger Health in Chattanooga, Tennessee. |
| | 2 | Q.    And do you remember receiving this e-mail from him? |
| | 3 | A.    Yes, I do. |
| | 4 | Q.    Is there an attachment to the e-mail? |
| 02:34PM | 5 | A.    Yes.  There were two things attached. |
| | 6 | Q.    Let's look at the second attachment, please. |
| | 7 | A.    (Witness complies.) |
| | 8 | Q.    What is this? |
| | 9 | A.    This is a listing of the catheters that Biosense had |
| 02:34PM | 10 | considered that could not be covered as sensor-enabled |
| | 11 | catheters, but for first time it now had the VIZIGO sheath |
| | 12 | products listed on it. |
| | 13 | Q.    What about the other attachment?  What is that? |
| | 14 | A.    It's a case coverage policy.  There's some new verbiage |
| 02:35PM | 15 | in it that now talks about a term called software pairing. |
| | 16 | Q.    Can you please direct us to that language. |
| | 17 | A.    It would be down in the base right there (indicating). |
| | 18 | Yes, please. |
| | 19 | Q.    What do you remember thinking about that language? |
| 02:35PM | 20 | A.    Well, I'd never heard the term software pairing before, |
| | 21 | nor had any of my friends in the industry.  It felt like it |
| | 22 | was a phrase being used to justify why a client could not use |
| | 23 | the VIZIGO as it was not a sensor-enabled sheath. |
| | 24 | Q.    Is there a date on this version of the letter? |
| 02:35PM | 25 | A.    There is.  It's -- hang on.  It's June 8th of 2022. |

```
 1    Q.    Remind us, please, when did Innovative get FDA clearance
 2    to reprocess the VIZIGO.
 3    A.    That would have been March of 2022.
 4    Q.    How did receiving this version of the case coverage
 5    policy letter make you feel?
 6    A.    Well, I was crushed in that we pursue devices that our
 7    clients want so that they can save more money in their
 8    procedures.  And we spent hundreds of thousands of dollars to
 9    pursue the clearance to get the VIZIGO, thinking that it
10    would sell remarkably well because a competitive product from
11    Abbott sells amazingly well.  And I was shut down in a matter
12    of, like, three months.
13    Q.    After receiving this letter, did Erlanger Hospital
14    purchase VIZIGO sheaths?
15    A.    They did not.
16    Q.    If you could please look in your binder and find
17    Exhibit 3969.
18    A.    (Witness complies.)  Yes.
19    Q.    What is this?
20    A.    This is an e-mail string with the top e-mail being from
21    Rick Ferreira to the members of our sales team on June 20th
22    of 2022.  Subject matter, forward external query.
23              MS. SCHIFFMAN:  Your Honor, we'd move to admit
24    Exhibit 3969.
25              MR. FARIDI:  No objection, Your Honor.
```

1           THE COURT:  3969 will be received.

2           **(Exhibit 3969 received)**

3   BY MS. SCHIFFMAN:

4   Q.    MR. Distel, could you please look at page 3.

02:37PM   5   A.    (Witness complies.)  Yes.

6   Q.    Who is this e-mail from?

7   A.    This is from Risa Meder.

8   Q.    Who is Risa Meder?

9   A.    Risa Meder is one of the EP techs at CentraCare

02:37PM   10  Hospital.  She also does all of the ordering of products for

11  their labs.

12  Q.    I'd like you to read the first four sentences in

13  Ms. Reder's e-mail.

14  A.    I have a question for you.  I was so excited about

02:37PM   15  saving money by ordering the reprocessed VIZIGO sheaths that

16  I forgot that CARTO won't back up cases if we use a

17  reprocessed product that has a chip.  I have three of them.

18  Sad face.  Is there any way we can return them?

19  Q.    What happened after you received this e-mail?

02:38PM   20  A.    Innovative Health did the return and credited them money

21  back.

22  Q.    Has CentraCare bought VIZIGOs from Innovative since?

23  A.    They have not.

24  Q.    Do you recall any other recent notable incidents

02:38PM   25  involving the case coverage policy?

A.    This e-mail is about Sterilmed had been actually

collecting at Lakeland, and this was an account that Medline

and I were now bringing on board.  They were contacted and

saw that the catheters were not being collected in a very

02:45PM  good way.

Q.    Is there a picture included in the e-mail?

A.    There is.

Q.    What does this show?

A.    It shows a trash can being used for collections, and

02:45PM  it's overflowing with both EP catheters and ultrasound

catheters.

Q.    What does this picture tell you?

A.    It's not a very serious reprocessing program because,

one, you would never let anything like this overflow for many

02:46PM  reasons, but this is setting all the catheters up to be

damaged.  Then you would have a low yield rate of what you

could send back to the client.

Q.    Have Biosense's collection practices impacted

Innovative?

02:46PM  A.    That depends on which catheters and products you're

talking about.

Q.    How about with the ACUNAV?

A.    The ACUNAV, it has greatly impacted us because they

require many clients to collect the ACUNAV, many of which are

02:46PM  not even buying it back.  And that's a very high-in-demand

1    catheter with clients.

2    Q.    What about the SOUNDSTAR?

3    A.    The SOUNDSTAR, while they're collecting it, many of

4    their clients, there are still enough SOUNDSTARs that come in

5    to me.  And because of the Biosense Webster case coverage

6    policy and not really being able to sell them back, I'm

7    swimming in SOUNDSTARs.

8    Q.    You just mentioned the case coverage policy?

9    A.    Yes.

10   Q.    At a high level, from your perspective how has the case

11   coverage policy impacted Innovative Health?

12   A.    It's really been devastating to both Innovative and our

13   clients that had views that they wanted to have substantial

14   savings.

15        We as a company, when we started, we didn't want to

16   be a me, too, reprocessor.  We wanted to do the high-end

17   items that would bring the most value to the client because

18   there's always new technologies that are coming to the

19   marketplace which continue to drive the costs in healthcare.

20        So we've pursued those, like the mapping catheters,

21   the SOUNDSTARs.  We got the clearances, and we fully expected

22   to be able to sell them.  And not only are they the products

23   that would generate the absolute most savings for the

24   hospital, but they also would have generated the most revenue

25   for us.

|    |    |
|----|----|
| | 1 |

Q.    Thank you, Mr. Distel.

            MS. SCHIFFMAN:  I pass the witness.

            MR. FARIDI:  Your Honor, may I approach with the

cross-examination binders?

02:48PM  5            THE COURT:  You may.

            MR. FARIDI:  Thank you.

                        **CROSS-EXAMINATION**

BY MR. FARIDI:

Q.    Good afternoon, Mr. Distel.  My name is Muhammad Faridi.

02:49PM  10  Very nice to meet you.

A.    You, too, sir.

Q.    I want to just pick up from the conversation that you

were having on direct examination with your counsel about the

e-mail exchange that you had with Megan McCabe that's at

02:49PM  15  JX4352.  Do you recall that e-mail exchange?

A.    I do, sir.

Q.    And that's the occasion where Ms. McCabe noted that she

was in dire need of SOUNDSTARs because of a backorder issue

at Biosense Webster.  Do you recall that?

02:49PM  20  A.    I do.

Q.    And you had SOUNDSTARs to sell to the hospital, correct?

A.    I did.

Q.    And your testimony was that you weren't able to sell

those SOUNDSTARs to this hospital that was in dire need of

02:50PM  25  them because of Biosense's case coverage policy.  Do you

```
 1  reprocessing program at the ministries?

 2  A.   Yes.

 3  Q.   How many companies have reprocessing contracts with

 4  Providence?

 5  A.   One.

 6  Q.   Who is that?

 7  A.   Medline.

 8  Q.   How long has Providence had a reprocessing contract with

 9  Medline?

10  A.   Since 2018.

11  Q.   What kinds of products are covered under the contract

12  with Medline?

13  A.   Patient care, surgical items, and electrophysiology.

14  Q.   Is it basically all the items that you mentioned

15  earlier?

16  A.   Correct.

17  Q.   What company currently supplies the reprocessed EP

18  catheters that Providence buys under the Medline contract?

19  A.   Innovative Health.

20  Q.   How long has Innovative been supplying reprocessed EP

21  catheters to Providence?

22  A.   Since 2018.

23  Q.   And who actually negotiated the Medline contract with

24  Providence?

25  A.   Our sourcing department.
```

|  | 1 | Q.   What is your role in relation to the contract? |
|--|---|--|

```
          1    Q.   What is your role in relation to the contract?

          2    A.   Once a contract is signed, it comes over to my

          3    department for oversight and implementation.

          4    Q.   Who decides which cardiac mapping machine to use in a

03:44PM   5    case at Providence?

          6    A.   The doctor.

          7    Q.   Does the cardiac mapping machine require someone to

          8    operate the work station while the physician is doing the EP

          9    procedure?

03:45PM   10   A.   Yes.

          11   Q.   Who typically operates the cardiac mapping machines

          12   during EP procedures at Providence?

          13   A.   The manufacturer's technician or representative.

          14   Q.   Do you know who pays them?

03:45PM   15   A.   The manufacturer.

          16   Q.   Are they provided by the manufacturer under a contract

          17   with Providence?

          18   A.   No, not that I'm aware of.

          19   Q.   You testified earlier that Biosense has a case coverage

03:45PM   20   policy?

          21   A.   Yes.

          22   Q.   When did you first learn of this policy?

          23   A.   2016.

          24   Q.   To your knowledge do other manufacturers have a case

03:45PM   25   coverage policy for their cardiac mapping machines?
```

UNITED STATES DISTRICT COURT

```
 1   A.    No.

 2   Q.    How exactly has Biosense's policy affected your ability

 3   to implement reprocessing contracts at the ministries?

 4   A.    We're not able to use those reprocessed items during the

 5   cases where the CARTO 3 is used.

 6   Q.    You testified earlier about the SOUNDSTAR catheter.  Do

 7   you remember that?

 8   A.    Yes.

 9   Q.    What is the difference in price for Providence between a

10   reprocessed SOUNDSTAR from Innovative and a new SOUNDSTAR

11   from Biosense?

12   A.    Over a thousand dollars.

13   Q.    Per catheter?

14   A.    Yes.

15   Q.    You also testified earlier that the policy is that

16   Biosense will not cover a case on their machines if the

17   doctor uses a sensor-enabled catheter reprocessed by anyone

18   else?

19   A.    Yes.

20   Q.    Does Providence generally rely on Biosense to run the

21   work station on the CARTO?

22   A.    Yes.

23   Q.    Why does Providence rely on the manufacturer's

24   representative to operate Biosense's machine?

25   A.    We don't have the staff with that knowledge.  We don't
```

03:46PM (line 5)
03:46PM (line 10)
03:46PM (line 15)
03:47PM (line 20)
03:47PM (line 25)

|        |    |                                                                      |
|--------|----|----------------------------------------------------------------------|
|        | 1  | have the resources to be able to do it ourselves.                    |
|        | 2  | Q.    What is your view of Biosense's case coverage policy?           |
|        | 3  | A.    I'm not a fan.  Don't like it.                                  |
|        | 4  | Q.    Why not?                                                        |
| 03:47PM| 5  | A.    It stops us from being able to meet our goal of making          |
|        | 6  | healthcare affordable to everyone.  We're paying full price          |
|        | 7  | for something that we can get at a fraction of the cost in           |
|        | 8  | order to be able to save money.                                      |
|        | 9  | Q.    And can you describe for the jury how exactly Providence        |
| 03:48PM| 10 | would use those savings.                                             |
|        | 11 | A.    Well, we would divert those savings to other programs.          |
|        | 12 | We would retain staff.  We would be able to get products             |
|        | 13 | within our ministry, even if it's capital equipment, with           |
|        | 14 | that money that we are saving.                                       |
| 03:48PM| 15 | Q.    You testified earlier that you first learned of the            |
|        | 16 | policy in 2016; is that right?                                       |
|        | 17 | A.    Yes.                                                            |
|        | 18 | Q.    What were the circumstances?                                    |
|        | 19 | A.    Well, in 2016 we merged.  St. Joseph's Health and             |
| 03:48PM| 20 | Providence merged.  So we were collaborating to see how we           |
|        | 21 | may be able to reach our goal in being financially stable,           |
|        | 22 | and this was an area that we identified.                             |
|        | 23 |         The physicians were on board, and it was something          |
|        | 24 | that we were going to move forward to.  At that time Biosense        |
| 03:49PM| 25 | was made aware of what we were planning on doing, and they           |

UNITED STATES DISTRICT COURT

|  |  |
|--|--|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 03:49PM | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 03:49PM | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 03:49PM | 15 |

1    presented us with a policy stating that we were not able to

2    do that.

3    Q.    You also testified earlier that you started to buy

4    reprocessed catheters from Innovative in 2018?

5    A.    Correct.

6    Q.    Did you have contact with Innovative to prepare for the

7    start of the contract?

8    A.    Yes.

9    Q.    Did you speak to anyone at Innovative about Biosense's

10   case coverage policy during that on-boarding process?

11   A.    Yes.

12   Q.    Who?

13   A.    Rick Ferreira.

14   Q.    Do you know his position at Innovative?

15   A.    I believe he is the CEO.

16   Q.    Why did you speak with Mr. Ferreira about Biosense's

17   case coverage policy?

18   A.    I wanted to educate myself to see the reasoning behind

19   it and maybe get some advice on how we might be able to move

20   forward with it.

21   Q.    Did Mr. Ferreira have any suggestions for dealing with

22   Biosense's case coverage policy?

23   A.    From what I recall, you know, maybe changing the system

24   that we currently use, training our staff to be able to do

25   our own mapping, or even having Innovative Health have

```
 1    someone common on site and train our staff to be able to do

 2    so.

 3    Q.   At that time, 2018, what catheters did Providence want

 4    to reprocess with Innovative?

 5    A.   All of them.

 6    Q.   Once you on-boarded the contract with Medline, was

 7    Providence able to buy all the Innovative catheters it wanted

 8    to buy?

 9    A.   No.

10    Q.   Which Innovative catheters could Providence not buy?

11    A.   The PENTARAY, the SOUNDSTAR, and the LASSO.

12    Q.   And why could Providence not buy those Innovative

13    catheters?

14    A.   Because of the policy that was in place by Biosense

15    Webster.

16    Q.   Was there any Providence ministry that did not have an

17    issue with Biosense's case coverage policy?

18    A.   Yes.  Alaska.

19    Q.   Why was Alaska different?

20    A.   They had their own mapper who had the knowledge to be

21    able to do it himself.

22    Q.   Did you buy Innovative's reprocessed Biosense

23    sensor-enabled catheters in Alaska?

24    A.   Yes.

25    Q.   Did your doctors use them?
```

03:50PM  5
03:50PM  10
03:51PM  15
03:51PM  20
03:51PM  25

1    A.    Yes.

2    Q.    Are you still able to buy all the Innovative

3    sensor-enabled catheters you want in Alaska?

4    A.    No.

03:51PM    5    Q.    What Innovative catheters did you have to stop buying in

6    Alaska?

7    A.    The PENTARAY.

8    Q.    Why did you stop buying Innovative's PENTARAY from

9    Alaska?

03:52PM    10    A.    We lost our mapping technician up there.  So there was

11    an agreement with the Biosense Webster that if we purchased

12    all PENTARAY new through Biosense Webster, that he would

13    assist with the SOUNDSTAR.

14    Q.    Oh.  What kind of SOUNDSTAR?

03:52PM    15    A.    Reprocessed SOUNDSTAR.

16    Q.    Reprocessed SOUNDSTAR from which company?

17    A.    Innovative Health.

18    Q.    Are the doctors in Alaska still using Innovative's

19    SOUNDSTARs?

03:52PM    20    A.    Yes.

21    Q.    Has Biosense changed the scope of the policy at any

22    other Providence ministries?

23    A.    No.

24    Q.    What do you understand would happen at those ministries

03:52PM    25    if the doctor tried to use reprocessed sensor-enabled

|       |                                                                        |
|-------|------------------------------------------------------------------------|
| 1     | catheters on cases with the CARTO?                                     |
| 2     | A.    The Biosense Webster would not assist in the procedure.          |
| 3     | Q.    And what happens if there is no support for the machine?         |
| 4     | A.    We're not able to do the procedure.                              |
| 5     | Q.    Is Biosense still the only manufacturer with such a case         |
| 6     | coverage policy to your knowledge?                                     |
| 7     | A.    Yes.                                                             |
| 8     | Q.    Do you have any understanding whether Innovative was             |
| 9     | willing to help Providence train its own staff to combat              |
| 10    | Biosense's case coverage policy?                                       |
| 11    | A.    Yes.                                                             |
| 12    | Q.    And did you explore it at all with Innovative?                   |
| 13    | A.    We had to drop it because we didn't have the staff, the          |
| 14    | timing, or the resources to be able to follow up on that.             |
| 15    | Q.    Did you ever get to the point of discussing cost with           |
| 16    | Innovative?                                                            |
| 17    | A.    No.                                                              |
| 18    | Q.    So you don't know the -- well, do you know the cost             |
| 19    | of --                                                                  |
| 20    | A.    I do not.                                                        |
| 21    | Q.    What about sending your own staff to train with that            |
| 22    | mapper in Alaska?                                                      |
| 23    | A.    It's just way too expensive.                                     |
| 24    | Q.    Have any of your ministries actually launched their own         |
| 25    | clinical support for the CARTO in response to the case               |

102

```
         1    A.    Correct.

         2    Q.    And you're aware, Ms. Roberts, that in fact Innovative

         3    Health told Medline not to develop that mapping training

         4    program, correct?

04:09PM  5    A.    Not aware.

         6    Q.    Ms. Roberts, you testified that it's too expensive to

         7    hire your own mappers, correct?

         8    A.    That is correct.

         9    Q.    So, Ms. Roberts, just going back a second.  You

04:09PM  10   testified earlier that it's too expensive to hire your own

         11   mappers?

         12   A.    Yes.

         13   Q.    You also testified, though, that Providence would save

         14   millions each year if you purchased reprocessed catheters

04:10PM  15   from IH, correct?

         16   A.    Yes.

         17   Q.    The fact is that today Providence still chooses to use

         18   Biosense's CASs to create maps on the CARTO 3, correct?

         19   A.    Yes.

04:10PM  20   Q.    That's a choice Providence has, right?

         21   A.    Would you repeat that, please.

         22   Q.    That's Providence's choice, correct?

         23   A.    Yes.

         24   Q.    Thank you, ma'am.

04:10PM  25              THE COURT:  Mr. Berhold?
```

|      |                                                              |
|------|--------------------------------------------------------------|
| 1    | MR. BERHOLD:  Briefly, Your Honor.                           |
| 2    | **REDIRECT EXAMINATION**                                     |
| 3    | BY MR. BERHOLD:                                              |

1          MR. BERHOLD:  Briefly, Your Honor.

2                    **REDIRECT EXAMINATION**

3    BY MR. BERHOLD:

4    Q.   Ms. Roberts, who chooses which machine is used on a case

04:10PM  5    at Providence?

6    A.   The doctor.

7    Q.   Who chooses whether to switch machines on cases at

8    Providence?

9    A.   The doctor.

04:10PM  10   Q.   Has Providence been able to achieve the reprocessing

11   savings that it wants by shifting procedures to other brands

12   of mapping machines?

13   A.   No.

14          MR. BERHOLD:  Nothing further, Your Honor.

04:11PM  15          MR. CRUZ:  Two brief questions.

16          THE COURT:  That's fine.

17                    **RECROSS-EXAMINATION**

18   BY MR. CRUZ:

19   Q.   Ms. Roberts, you testified that the doctor chooses which

04:11PM  20   system to use, correct?

21   A.   Yes.

22   Q.   You would agree, Ms. Roberts, that doctors at Providence

23   Health have their patients in mind when they make decisions

24   for patient healthcare, correct?

04:11PM  25   A.   Yes.

|  | 1 | Q.   We'll leave it there for today.  Thank you very much, |
|--|---|--|
|  | 2 | Ms. Roberts. |
|  | 3 | THE COURT:  You may step down.  Thank you. |
|  | 4 | THE WITNESS:  Thank you. |
| 04:12PM | 5 | THE COURT:  All right.  Your next witness, please. |
|  | 6 | MR. HO:  Your Honor, the next witness is being |
|  | 7 | called by videotape, and it will take us somewhat past 4:30. |
|  | 8 | So would you like to continue or -- |
|  | 9 | THE COURT:  What's the length of the -- |
| 04:12PM | 10 | MR. HO:  About 20-plus minutes, a little bit over |
|  | 11 | 20. |
|  | 12 | THE COURT:  You want to get that done?  Is |
|  | 13 | everybody comfortable?  Do we need a break? |
|  | 14 | Okay.  Let's play it. |
| 04:12PM | 15 | MR. HO:  Innovative Health calls Nick Demczuk by |
|  | 16 | video and moves the admission of the following exhibits |
|  | 17 | sponsored by his testimony:  JX204, JX207, JX208, and JX209. |
|  | 18 | THE COURT:  Any objections? |
|  | 19 | MR. FARIDI:  Your Honor, as to 208, I think that |
| 04:13PM | 20 | was excluded earlier. |
|  | 21 | MR. HO:  Let me just look. |
|  | 22 | Okay.  I apologize.  Not 208. |
|  | 23 | THE COURT:  Okay. |
|  | 24 | MR. FARIDI:  No objections as to the others, |
| 04:13PM | 25 | Your Honor. |

# EXHIBIT 3A

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

| | | |
|---|---|---|
| INNOVATIVE HEALTH, LLC, | ) CERTIFIED TRANSCRIPT | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) SACV-19-01984-JVS | |
| BIOSENSE WEBSTER, INC., | ) | |
| Defendant. | ) TRIAL DAY 4, VOL. I | |
| ---------------------------- | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

May 9, 2025

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

09:18   1    Q    You mentioned that your own staff has to cover

        2    different types of cases.

        3         Can you expand on that a little bit?  Were you

        4    referring specifically to EP cases?

09:18   5    A    Not at all.  In fact, just as an example -- and this

        6    varies of course across the country and certainly across

        7    facilities, but at HonorHealth, we have one hospital out of

        8    our five that do electrophysiology procedures that have some

        9    dedicated folks that focus on electrophysiology, not a

09:18  10    hundred percent, but the majority of the cases that cover

       11    electrophysiology.

       12         Now, within that, it's doing ablations, but it

       13    also could be doing putting in a pacemaker or putting in a

       14    defibrillator.  So there is a wide spectrum of cases even

09:19  15    within electrophysiology that don't include mapping, so it's

       16    not like we have any of these folks sitting and doing one

       17    mapping case after another, after another.  That's only at

       18    one particular facility, and that's for a small subset of

       19    our personnel.

09:19  20         The rest of our facilities and the majority of our

       21    staff, even at our biggest center, actually go across

       22    laboratories and do different things.  So they might be

       23    doing electrophysiology one day.  They might be doing

       24    angioplasty the next day.  They might be doing a structural

09:19  25    case like percutaneous valves or something the next day.  It

| | | |
|---|---|---|
| 09:19 | 1 | varies.  And it's just related to staff manpower and |
| | 2 | coverage of the lapse. |
| | 3 | Q    And is any of your staff at HonorHealth currently |
| | 4 | trained to operate the mapping machines? |
| 09:19 | 5 | A    None. |
| | 6 | Q    Have your hospitals been dependent on manufacturers to |
| | 7 | operate machines? |
| | 8 | A    Yes. |
| | 9 | Q    Has that dependence changed over the last five or six |
| 09:20 | 10 | years at HonorHealth? |
| | 11 | A    No. |
| | 12 | Q    Could you do mapping procedures without that support |
| | 13 | from the manufacturers? |
| | 14 | A    We could not. |
| 09:20 | 15 | Q    I want to change subjects. |
| | 16 |        What is reprocessing generally? |
| | 17 | A    So reprocessing generally is taking something that you |
| | 18 | have used, such as a catheter or a sheath or a cable or what |
| | 19 | have you, and resterilizing it or sterilizing it -- no, |
| 09:20 | 20 | resterilizing it, sorry -- so that you can reuse it for |
| | 21 | another patient. |
| | 22 | Q    In your experience, do hospitals reprocess or reuse |
| | 23 | medical devices? |
| | 24 | A    All the time. |
| 09:21 | 25 | Q    Do hospitals reprocess devices used during |

| 09:21 | 1 | cardiovascular surgery? |
| | 2 | A     Yes, sir. |
| | 3 | Q     What about open-heart surgery? |
| | 4 | A     Yes. |
| 09:21 | 5 | Q     What about valve repair? |
| | 6 | A     Yes. |
| | 7 | Q     Does that include instruments like scissors? |
| | 8 | A     Sure. |
| | 9 | Q     What about devices used in mapping procedures? |
| 09:21 | 10 | A     Yes. |
| | 11 | Q     Which devices? |
| | 12 | A     We do reprocess or resterilize several different types |
| | 13 | of catheters. We do also different types of long sheaths, |
| | 14 | which are basically long tubes that we use to insert |
| 09:21 | 15 | catheters. And we do it with many cables that these |
| | 16 | catheters are connected to. |
| | 17 | Q     Does HonorHealth have a contract with anyone to |
| | 18 | reprocess catheters? |
| | 19 | A     We currently have a contract with Innovative Health. |
| 09:22 | 20 | Q     Is that for EP catheters? |
| | 21 | A     Yes. |
| | 22 | Q     When did HonorHealth start its contract with Innovative |
| | 23 | Health? |
| | 24 | A     I am actually not exactly sure. It has not been a very |
| 09:22 | 25 | long time. I would say approximately a year and a half, but |

09:22   1   I'm not a hundred percent sure when it started formally.

2   Q    Has anything prevented HonorHealth from taking full

3   advantage of its reprocessing contract with Innovative

4   Health?

09:22   5   A    Well, the one thing in particular has been related to

6   being able to resterilize high-density mapping catheters

7   from Biosense Webster because of a policy that they would

8   not cover or support those cases if we did that.  And it's

9   high-density mapping catheters and also a mapping-enabled

09:23   10   sheath that is used for catheter manipulation.

11   Q    How has Biosense's policy affected your ability to make

12   use of your reprocessing contract with Innovative?

13   A    Well, the concern is that we, obviously as mentioned,

14   are dependent on Biosense to help us perform these

09:23   15   procedures by providing somebody to do the mapping portion

16   of the procedure or to run the mapping machine.  So if we

17   don't have case coverage, we can't do the procedure.  It's

18   really as simple as that.  So not being able to reprocess a

19   particular type of catheter because then we're in fear of

09:23   20   losing that coverage does affect our ability to reprocess

21   catheters.

22   Q    When did you first hear about the Case Coverage Policy?

23   A    Sometime last fall I believe.

24   Q    Was that before or after HonorHealth started its

09:24   25   contract with Innovative?

09:24  1   A     It was after.

2   Q     How long have you been practicing EP again?

3   A     25 years.

4   Q     Were you surprised to learn of the policy last year?

09:24  5   A     I was.

6   Q     Why was it a surprise to you?

7   A     It's mostly around the idea of as absolute as it was,

8   right.  If we are being told that we're not going to get

9   coverage to perform a procedure that we feel is in the best

09:24  10  interest, of course, of patient care and sometimes is

11  life-saving, that, of course, creates a great deal of angst.

12  And all of us are in the business of taking care of

13  patients, and so, yeah, I was surprised.

14  Q     What do you think of the Case Coverage Policy,

09:25  15  Dr. Doshi?

16  A     I don't think it's appropriate.

17  Q     Why not?

18  A     Number 1, I do feel that we can use reprocessed

19  catheters safely, effectively.  But importantly, it does

09:25  20  affect our ability to support patient care.  It does

21  represent of course a cost savings as you can imagine, and

22  that is incredibly important for hospitals and hospital

23  systems these days.  So that is something that -- I mean,

24  it's one of the prime reasons why we do reprocessing.

09:25  25          There are several others as well of course.  We do

09:25  1   think about the bigger picture as far as whether this is a

2   reduction of a carbon footprint or a reduction of waste or

3   even supporting our local business.

4          Innovative Health is based in Phoenix, and they

09:26  5   had developed a relationship with some of the folks at

6   HonorHealth when we were initially looking at this, and we

7   were very impressed with their facilities and their work, et

8   cetera.  So obviously, it's nice to think about supporting

9   somebody locally, right.

09:26  10         But the bigger picture here is that we want to be

11  able to take care of patients, but we need to do this in a

12  cost-effective manner.  We're all aware of the high cost of

13  healthcare.  And quite frankly, unless we look at trying to

14  manage that cost-effectiveness as best as possible, we

09:26  15  simply can't do other things.  We can't support certain

16  types of procedures.  We can't get new technology.  We can't

17  advance patient care.  It's really that simple.

18  Q    Are you aware of any other cardiac mapping machine

19  manufacturer that has a policy like this one?

09:27  20  A    I'm not.

21  Q    During your entire time practicing at hospitals and

22  teaching at medical schools, has any other cardiac mapping

23  machine maker that you can think of had a policy like this

24  one?

09:27  25  A    Not that I'm aware of.

09:27  1    Q    As a practical matter, can you perform a mapping

2    procedure without someone besides you running the CARTO-3?

3    A    At this time, no.

4    Q    Does the Biosense manufacturer's representative treat

09:27  5    the patient during your cases?

6    A    They do not.

7    Q    Who does?

8    A    I do, or the physician does.

9    Q    Does the manufacturer's representative diagnose your

09:27  10   patients during cardiac mapping procedures?

11   A    No.

12   Q    Who does?

13   A    I do.

14   Q    Does the Biosense manufacturer's representative handle

09:28  15   the catheters during your cardiac mapping procedures?

16   A    They do not.

17   Q    Who does?

18   A    I do.

19   Q    Where are you positioned physically during the

09:28  20   procedure?

21   A    At the bedside.

22   Q    Where is the manufacturer's representative?

23   A    Typically at a desk or behind a cart where the computer

24   equipment is located.

09:28  25   Q    How many EP procedures would you estimate that you have

09:28   1   performed during the course of your career?

2   A      Tens of thousands.

3   Q      How many with support from a Biosense Webster

4   manufacturer's representative?

09:28   5   A      The vast majority of cases that I have done with CARTO,

6   and that is several thousand, have been done with the

7   support of a CARTO representative.

8   Q      Dr. Doshi, can you think of any clinical reason why

9   Biosense's manufacturer's representative could not operate

09:29  10   the CARTO when you, as a physician, are using an Innovative

11  catheter?

12  A      I cannot.

13  Q      Is there any doubt in your mind about that?

14  A      None whatsoever.

09:29  15   Q      Who interprets the map of the heart that's created by

16  the CARTO 3?

17  A      I do.

18  Q      Do you ever delegate that task to the Biosense

19  manufacturer's representative?

09:29  20   A      No.

21  Q      Who interprets ultrasound images of the heart during

22  your cardiac mapping procedures?

23  A      I do.

24  Q      Would you ever ask the Biosense manufacturer's

09:29  25   representative to do that interpretation for you?

09:32   1   reasons as well, but it's mostly physician preference.  And
        2   they are the predominant mapping system that is used at
        3   HonorHealth.  They are the industry leader for certain.

        4           I also do believe that we should have multiple
09:32   5   mapping systems and multiple types of mapping systems for a
        6   variety of reasons, right.  There are sometimes subtle but
        7   real technology differences between systems.  And also,
        8   we're a teaching institution, and so we want to expose our
        9   trainees to as many different things as possible.  So
09:33  10   regardless, I would want to have, you know, as many
       11   different technology options as possible.
       12   Q    Are there certain features that are only available on
       13   the CARTO 3?
       14   A    There are some.
09:33  15   Q    Can you think of any specific example?
       16   A    One would be the integration with ultrasound imaging to
       17   create an anatomic shell of the chamber that we're working
       18   with.  So a three-dimensional mapping system allows you to
       19   create an anatomic shell of the cardiac chamber that you're
09:33  20   manipulating a catheter in, and so that can be formed by a
       21   variety of different ways.

       22           The way these are typically done is an electrical
       23   catheter moves around that shell and you superimpose that
       24   anatomic location with electrical information.  There are
09:34  25   other ways to also add to that degree of accuracy, and

09:34 | 1 | ultrasound is one example of that where you can superimpose
 | 2 | a realtime ultrasound image to make that map.
 | 3 | Q    Putting on your network director hat, how easy is it to
 | 4 | get physicians to change from their preferred machine?
09:34 | 5 | A    It depends on the physician.  Some physicians, it's
 | 6 | very easy, and that's the minority.  The majority of
 | 7 | physicians, it's very difficult actually.
 | 8 | Q    Why don't you just order your doctors to switch from
 | 9 | the CARTO to a different brand?
09:34 | 10 | A    As much as that might -- and not specifically for CARTO
 | 11 | to a different brand, but in general, as much as that might
 | 12 | be a very attractive thing, it's never the right thing to
 | 13 | do, right.  I would never want to have a physician doing
 | 14 | something that they're not comfortable with.
09:35 | 15 |         So if a physician feels that they can treat the
 | 16 | patient better doing something a certain way, whether it's
 | 17 | just related to comfort or it's experience, we want that
 | 18 | physician to do the best they can for that particular
 | 19 | patient of course.
09:35 | 20 | Q    Have you ever asked the Abbott mapping technicians to
 | 21 | operate the CARTO for you?
 | 22 | A    No.
 | 23 | Q    Why not?
 | 24 | A    They're not trained to do so.
09:35 | 25 | Q    Why don't you ask Innovative to send a mapping

09:35  1  technician to operate Biosense's CARTO?

2  A    I'm not aware they have any such people, and I'm not

3  sure -- well, I don't have any experience with a non-CARTO

4  person or one that has not been appropriately trained by

09:35  5  Johnson & Johnson to operate those machines, so I just don't

6  know how competent they would be.  As I mentioned before, I

7  think all the companies do an incredible job at training

8  their own personnel.

9  Q    What about hiring and training hospital staff at

09:36  10  HonorHealth to operate the machine when the doctor wants to

11  use the CARTO?

12  A    It would be a potential solution for this, but it is

13  virtually impossible, again, for some of the reasons I had

14  outlined previously.  We just don't have the bandwidth

09:36  15  related to the personnel we have, their availability, their

16  ability, to focus that time on a particular procedure and to

17  go through that adequate training.

18        It would, of course, just related to even

19  man-hours but even the appropriateness or the level of

09:36  20  capacity for a particular staff to be able to do this would

21  be very expensive, very difficult, and, quite frankly, right

22  now virtually impossible.

23  Q    Dr. Doshi, why don't you just buy Biosense reprocessed

24  catheters from Sterilmed?

09:37  25  A    It's a great question.  I do not know the details of

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:49 | 1 | Q    And CARTO 3, sir, has also contributed to decreasing

2 | the amount of time that's used to complete an EP procedure,

3 | correct?

4 | A    Correct.

09:49 | 5 | Q    Because in the olden days, it could sometimes take

6 | seven to ten hours to complete an EP procedure, correct?

7 | A    Sure.  That's very long, but, yes, the procedure times

8 | have decreased with this modern technology.

9 | Q    And that saves money for hospitals, correct?

09:49 | 10 | A    Yes.

11 | Q    Because you can complete more procedures, correct?

12 | A    Correct.

13 | Q    And the contributions of Biosense Webster and its

14 | technologies has helped both electrophysiologists like

09:50 | 15 | yourself, and your colleagues, and patients?

16 | A    Absolutely.

17 | Q    And hospitals?

18 | A    Absolutely.

19 | Q    I want to talk a little bit about the competition that

09:50 | 20 | Biosense faces, okay?

21 |        You spoke a lot about during your direct

22 | examination as to how some physicians are not able to

23 | operate more than one cardiac mapping machine.  Do you

24 | recall that?

09:50 | 25 | A    Yes.

09:50    1    Q    Dr. Doshi, you yourself, sir, have evaluated almost

         2    every mapping system in the electrophysiology space,

         3    correct?

         4    A    Correct.

09:50    5    Q    You personally have had obviously hands-on experience

         6    with the CARTO 3, correct?

         7    A    Yes.

         8    Q    In fact, you had access to CARTO 3 at almost every

         9    electrophysiology lab that you worked at?

09:50   10    A    Yes.

        11    Q    You also had access to the Abbott system at almost

        12    every electrophysiology lab that you worked at?

        13    A    Yes.

        14    Q    Just a couple of clarifications on the Abbott system.

09:51   15    The Abbott system is known in the industry as the open

        16    system, correct?

        17    A    Correct.

        18    Q    And that means that you can use that platform to

        19    visualize any catheter based on impedence technology,

09:51   20    correct?

        21    A    Correct.

        22    Q    The Abbott systems is different from the CARTO 3

        23    because the CARTO 3 is a closed system, correct?

        24    A    Correct.

09:51   25    Q    And that means that only Biosense-originated catheters

| | | |
|---|---|---|
| 09:51 | 1 | can be used on it, correct? |
| | 2 | A    Correct. |
| | 3 | Q    And at HonorHealth, you talked about how many CARTO 3s |
| | 4 | you have during your direct examination, correct? |
| 09:51 | 5 | A    Correct. |
| | 6 | Q    You said you had about five to six, correct? |
| | 7 | A    I think we have four or five. |
| | 8 | Q    Okay.  But you also have five Abbott cardiac mapping |
| | 9 | systems, correct? |
| 09:51 | 10 | A    Correct. |
| | 11 | Q    And you would admit, sir, that you are not the only |
| | 12 | electrophysiologist at HonorHealth who knows how to use both |
| | 13 | the Abbott and the CARTO system, correct? |
| | 14 | A    Correct. |
| 09:52 | 15 | Q    In fact, when we spoke during your deposition, |
| | 16 | HonorHealth was in the process at that time of also |
| | 17 | acquiring the OPAL system that's manufactured by Boston |
| | 18 | Scientific, correct? |
| | 19 | A    Correct. |
| 09:52 | 20 | Q    And you would agree, sir, that it's not uncommon for |
| | 21 | electrophysiology labs to have multiple cardiac mapping |
| | 22 | systems, correct? |
| | 23 | A    Correct. |
| | 24 | Q    Dr. Doshi, you also believe, sir, that it's a good |
| 09:52 | 25 | thing for electrophysiologists to have exposure to different |

09:52  1  mapping systems?

2  A    Correct.

3  Q    And the systems that we've been talking about, the

4  Abbott system and the Biosense system, you would agree, sir,

09:52  5  that these systems compete against one another, correct?

6  A    Correct.

7  Q    You believe that they all operate, generally speaking,

8  in the same space, correct?

9  A    Yes.

09:53  10  Q    And in fact, the competition between Biosense Webster

11  and Abbott to use your words in the deposition is very good,

12  correct?

13  A    Yes.

14  Q    You spoke during direct examination, sir, about the

09:53  15  process that hospitals go through in order to acquire

16  capital equipment such as cardiac mapping systems.  Do you

17  recall that?

18  A    Yes.

19  Q    And you referenced the committee system that is used at

09:53  20  HonorHealth, correct?

21  A    Yes.

22  Q    And purchasing decisions related to cardiac mapping

23  systems are made by these committees, correct?

24  A    Correct.

09:53  25  Q    In fact, you talked during direct examination about how

11:24   1   as a response to the Case Coverage Policy?

2   A    So Biosense did a great job of getting early doctors to

3   CARTO.  I mean, they did a great job.  A lot of doctors came

4   out wanting CARTO from their residency and fellowships.  And

11:25   5   so they -- I saw this a lot, especially in academic medical

6   centers.  It was happening I would say 90 percent of the

7   time that I would have that kind of headwind.  And very

8   rarely did I come into a hospital and they had like Abbott

9   and Boston without a CARTO-type nuance to it.

11:25  10   Q    And how frequently did you see hospitals decline to use

11   reprocessed catheters or third-party reprocessed catheters

12   because of the Case Coverage Policy?

13   A    Again, 90 percent of the time if they had CARTO they

14   were saying -- they were saying to us it's not worth it.

11:25  15   It's not worth it.

16   Q    So did you discuss ways that hospitals might work

17   around the Case Coverage Policy?

18   A     I mean, the one I talked about with trying to train

19   your own people up, that was certainly something they would

11:25  20   attempt to do.  Again, it just became a roadblock, and I

21   wish I could give you more color or thoughtful ideas, but

22   they just paused on even trying to push too far.  I mean,

23   that letter was real.

24   Q    Did you ever discuss with hospitals the idea of

11:26  25   switching to a different kind of mapping machine?

| | | |
|---|---|---|
| 11:26 | 1 | A   Yeah, sure.  So mapping machines are expensive, very |
| | 2 | expensive.  It's a lot of money to invest in a capital |
| | 3 | machine when you build a lab.  And to move from that device |
| | 4 | to another one, to change management, the cost, the |
| 11:26 | 5 | training, all of those things that are required to do that |
| | 6 | is huge, right.  So when you run the simple numbers to |
| | 7 | change management to another system versus let's just -- |
| | 8 | let's just get through that and do -- focus on -- let's |
| | 9 | focus on this category instead.  Let's put that horsepower |
| 11:26 | 10 | over here and not even do it.  That's the path of least |
| | 11 | resistance that they would choose. |
| | 12 | So again, change management, very expensive.  And |
| | 13 | then you have the doctors saying I don't want to change. |
| | 14 | I'm used to this.  I've got my lab.  I've got my rhythm. |
| 11:27 | 15 | I've got my people.  This is what I want, right.  So again, |
| | 16 | I think the headwinds to change, just too strong. |
| | 17 | Q   So did you ever see a hospital successfully switch to a |
| | 18 | different mapping machine to get around Biosense's Case |
| | 19 | Coverage Policy? |
| 11:27 | 20 | A   I personally did not. |
| | 21 | Q   Now, you mentioned a moment before the idea of a |
| | 22 | hospital training up their own staff to be able to map on |
| | 23 | the CARTO 3.  Did you ever suggest that to hospitals? |
| | 24 | A   I did.  I did, and it just kind of became the market |
| 11:27 | 25 | understood that that person would just be hired out from the |

11:27   1   lab.

2   Q     Hired by whom?

3   A     Biosense or -- you know, it just became a choice we

4   know what can happen.  We're going to spend all this time,

11:27   5   energy, and commitment to train somebody up, and then now

6   we're at risk.  And this happens -- it just happens in the

7   labs, right.  So again, it's just another market dynamic

8   that was affecting the category.

9   Q     So did you ever see a hospital successfully train their

11:28   10   own staff to map on the CARTO 3 as a way of getting around

11   Biosense's Case Coverage Policy?

12   A     I don't believe so.  Could it have happened?  Yeah,

13   absolutely.  I think it would be just an extreme outlier for

14   it to even -- A, them to do it, and then to be able to

11:28   15   retain.  So I can confidently tell you 99 percent of the

16   hospitals that I worked with did not do that or would not do

17   that.

18   Q     Now, Mr. Tuttle, do you have a sense of how large

19   Biosense's footprint is across all of the EP labs in the

11:28   20   country?

21   A     My understanding at the time was that they were

22   probably 70 to 80 percent of the market.  And then you had

23   Abbott who acquired St. Jude as number two.  Then you had

24   Boston, number three, and then you had some early ones kind

11:29   25   of tiptoeing in at small single digits.  But, yeah, I think

11:29    1    from my engagements and understanding of the market it was,

2    you know, in that 70 to 80 percent.

3    Q    Are you aware as to whether or not all of those other

4    cardiac mapping machine companies, Abbott, Boston

11:29    5    Scientific -- whether they offer mapping support?

6    A    They do.

7    Q    Are you aware as to whether any of these companies,

8    including Biosense, charges for that mapping support?

9    A    No.

11:29    10    Q    Do you know if any other manufacturer has a Case

11    Coverage Policy like Biosense's?

12    A    They do not.

13    Q    So to your knowledge, does Boston Scientific prevent

14    their clinical support personnel from running a mapping

11:30    15    machine if the doctor uses a third-party reprocessed

16    catheter in the procedure?

17    A    They absolutely do not.

18    Q    To your knowledge, does Abbott prevent their clinical

19    support personnel from running its mapping machine if the

11:30    20    doctor uses a third-party reprocessed catheter in their

21    procedures?

22    A    They absolutely do not.

23      MS. ANDERSON:   Thank you, Mr. Tuttle.

24      Pass the witness.

11:30    25      THE COURT:   Mr. Faridi.

11:30　　1　　　　　　MR. FARIDI:  May I approach with some documents

　　　　2　　that may come up during cross-examination?

　　　　3　　　　　　THE COURT:  You may.

　　　　4　　　　　　　　　　CROSS-EXAMINATION

11:30　　5　　BY MR. FARIDI:

　　　　6　　Q　　Mr. Tuttle, you no longer work at Vizient, correct?

　　　　7　　A　　That's correct.

　　　　8　　Q　　And you're at company called Endologix?

　　　　9　　A　　That's accurate.

11:31　　10　　Q　　And how long have you been there?

　　　　11　　A　　I've been here -- started in November '24.

　　　　12　　Q　　November of 2024?

　　　　13　　A　　Yes, sir.

　　　　14　　Q　　And when did you leave Vizient?

11:31　　15　　A　　2020.

　　　　16　　Q　　So about five years ago?

　　　　17　　A　　Yes.

　　　　18　　Q　　Okay.  And is your current company -- I take it that

　　　　19　　it's in the medical device space.

11:31　　20　　A　　That's accurate, yes, sir.

　　　　21　　Q　　Vascular diseases?

　　　　22　　A　　Yes.

　　　　23　　Q　　Does it do any work in the electrophysiology space?

　　　　24　　A　　It does not.

11:31　　25　　Q　　So you're not currently dealing with the

# EXHIBIT 3B

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3              HONORABLE JAMES V. SELNA, JUDGE PRESIDING

4     INNOVATIVE HEALTH, LLC,            )
                                         )
5                                        )
                                         )
6                         Plaintiff,     )
                                         )
7                                        )
                                         )
8              Vs.                       )   No. SACV-19-01984-JVS
                                         )
9                                        )
                                         )
10    BIOSENSE WEBSTER, INC.,            )
                                         )
11                                       )
                                         )
12                        Defendant.     )
                                         )
13    _____   )

14

15

16              REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                         JURY TRIAL

18                       DAY 4, VOLUME II

19                    SANTA ANA, CALIFORNIA

20                     FRIDAY, MAY 9, 2025

21

22    MIRIAM V. BAIRD, CSR 11893, CCRA
      OFFICIAL U.S. DISTRICT COURT REPORTER
23    350 WEST FIRST STREET
      FOURTH FLOOR
24    SANTA ANA, CA 92701

25

Q.    When did you first become familiar with them?

A.    So first in my career I became familiar with them back

when I was with Stryker Sustainability.  But then I became

familiar with them again, started working with them again in

01:45PM    2022.

Q.    Focusing on your work with Innovative, did you have any

presentations to University Hospital?

A.    We did.  We had several.

Q.    Approximately how many?

01:45PM    A.    I would have to go with, I think, around three or four.

Q.    During what time period?

A.    It would've been the beginning of summer, so probably

June, to about the end of November.

Q.    Of which year?

01:46PM    A.    Of 2022.

Q.    Who attended those meetings on behalf of UH?

A.    So it started with their Premier representative, and

Premier is their GPO.  So it started with their Premier

representative, and then also supply chain leadership, and

01:46PM    then also the EP and cath lab leadership and some of the

staff.

        And then, of course, some physicians also join.

And then in this particular case, the president wanted to get

involved with this hospital -- excuse me, with this program.

01:46PM    Q.    And what's the name of the Premier representative?

```
 1   A.   Miguel.
 2   Q.   And who joined from UH's supply chain?
 3   A.   From supply chain that would have been Horacio.  And I
 4   apologize.  I don't know all their last names.  And Jodie.
 5   And then from -- and Alex Garcia.  And then from -- I believe
 6   there's one other person that may have joined.  Wes, I
 7   believe his name was.  He wasn't as much involved, but he
 8   joined.
 9   Q.   And who was the EP or cath lab leadership representative
10   that joined?
11   A.   That would be Virginia.  And then she also had Jimmy
12   Wilkinson and Francisco.
13   Q.   You mentioned that the president of University Hospital
14   joined as well?
15   A.   He did -- Mr. Chris Sandles.
16   Q.   Is that typical?
17   A.   Not usually.
18   Q.   What do you make of Mr. Sandles joining these Innovative
19   presentations?
20   A.   He was really excited about the savings opportunity.
21   The lab really needed it.  It was a great savings opportunity
22   for them.  So he also kind of wanted to make sure that we
23   knew what we were talking about and that we were actually
24   going to be able to capture the savings for him.
25   Q.   I'd like to direct you to what has been marked as JX4454
```

01:47PM   5
01:47PM  10
01:47PM  15
01:48PM  20
01:48PM  25

|  | 1 | in your binder. |
|---|---|---|
|  | 2 | A.    (Witness complies.) |
|  | 3 | Q.    Ms. Snider, do you recognize this document? |
|  | 4 | A.    Yes, I do. |
| 01:49PM | 5 | Q.    What is it? |
|  | 6 | A.    It's an e-mail -- it's an e-mail chain. |
|  | 7 | Q.    Looking at the top level, the most recent e-mail, did |
|  | 8 | you receive this? |
|  | 9 | A.    Yes, I did. |
| 01:49PM | 10 | Q.    When was that? |
|  | 11 | A.    That was on November 2nd of 2022. |
|  | 12 |        MS. MORALES-KIMBALL:  I'd like to move JX4454 into |
|  | 13 | evidence. |
|  | 14 |        MR. CRUZ:  No objection, Your Honor. |
| 01:49PM | 15 |        THE COURT:  4454 will be received. |
|  | 16 |        **(Exhibit 4454 received)** |
|  | 17 | BY MS. MORALES-KIMBALL: |
|  | 18 | Q.    Who sent this e-mail? |
|  | 19 | A.    Mr. Sandles did. |
| 01:49PM | 20 | Q.    Following your meetings with Mr. Sandles, did he |
|  | 21 | indicate whether he intended to purchase reprocessed products |
|  | 22 | from Innovative? |
|  | 23 | A.    Yes, he did. |
|  | 24 | Q.    Do you see that reflected in this document? |
| 01:50PM | 25 | A.    Yes.  You can see that he says:  Thank you, Meredith.  I |

```
            1    A.   Yes, I do.

            2    Q.   You see Mr. Cardenas's highlighting?

            3    A.   Yes, I do.

            4    Q.   Where is that?

02:23PM     5    A.   It's in the paragraph starting with "as you are

            6    looking."

            7    Q.   Who is the original sender of this e-mail?

            8    A.   This is Phil Lunday.

            9    Q.   Who is that?

02:24PM    10    A.   He's the executive territory manager for Biosense

           11    Webster.  Oversees University Hospital San Antonio.

           12    Q.   And focusing on the text that was highlighted by

           13    Mr. Cardenas, what do you understand that to convey?

           14    A.   He's referring to the case coverage policy with the

02:24PM    15    sensor-enabled devices.

           16    Q.   And just because there's some acronyms, what does ULSD

           17    mean?

           18    A.   Ultrasound.

           19    Q.   What does OEM mean?

02:24PM    20    A.   Original equipment manufacturer.

           21    Q.   Do you see Biosense's case coverage policy included in

           22    this document?

           23    A.   Yes.

           24    Q.   Where is that?

02:25PM    25    A.   Page 7.
```

```
 1   Q.   Did you interact with anyone from UH about the policy
 2   after this e-mail was sent?
 3   A.   Yes, I did.
 4   Q.   Who did you interact with?
 5   A.   With Virginia and Jimmy in particular.
 6   Q.   How did they react to Mr. Lunday's e-mail?
 7   A.   They were not pleased.
 8   Q.   What do you mean by that?
 9   A.   They were pretty upset that due to the devices, the
10   catheters that were mentioned in this case coverage policy
11   that they did not know about, their cost savings was pretty
12   much going to be almost cut in half.
13   Q.   When was Mr. Lunday's e-mail sent to UH?
14   A.   It was sent on December 27th.
15   Q.   How many days was that after UH opted out of the
16   Sterilmed contract?
17   A.   It was six days.
18   Q.   Is UH a customer, an Innovative customer, today?
19   A.   They are.
20   Q.   When did they formally become a customer?
21   A.   So that would be February and March of 2023.
22   Q.   Has UH been a customer continuously since that time?
23   A.   Yes, they have.
24   Q.   And since February or March 2023, has UH ever purchased
25   reprocessed LASSO NAV catheters from Innovative?
```

1    A.    No, they have not.

2    Q.    And since becoming a customer in February or March 2023,

3    has University Hospital ever purchased reprocessed PENTARAY

4    catheters from Innovative Health?

02:27PM  5    A.    No, they have not.

6    Q.    And during that same time frame, has UH ever purchased

7    reprocessed SOUNDSTAR catheters from Innovative Health?

8    A.    No, they have not.

9    Q.    Do you have an understanding as to what University

02:27PM  10    Hospital would like to do with respect to these catheters?

11    A.    Oh, they would love to be able to purchase those from

12    us, all the sensor-enabled -- any device that we can provide

13    to them back they will want to purchase.

14    Q.    Do you have an understanding of what University Hospital

02:28PM  15    intended to do with respect to Biosense OEM purchases after

16    receiving this policy?

17    A.    Well, they wanted to look at all options to be able to

18    switch devices so that they could have more devices that

19    weren't in the sensor-enabled in the case coverage policy so

02:28PM  20    that they could reprocess more.

21    Q.    What do you mean?

22    A.    So since the -- due to the case coverage policy, they

23    couldn't, you know, they couldn't reprocess and purchase

24    those devices for Innovative Health.  So they were looking at

02:28PM  25    other catheters from other OEMs to be able to start

|  |  |
|---|---|
| | 1 |
| | 2 |

1    purchasing devices, catheters that we could actually

2    reprocess for them.

3    Q.    And these catheters reprocessed by other OEMs, what

4    mapping device, if any, would they connect to?

02:29PM    5    A.    They were in particular looking at the EnSite X.

6    Q.    Where is that?

7    A.    Abbott St. Jude.

8    Q.    Was UH successful in transitioning to Abbot's mapping

9    catheter?

02:29PM    10    A.    No, not really.

11    Q.    I'm sorry.  Let me rephrase.  Mapping machine?

12    A.    No.

13    Q.    Do you know why?

14    A.    Yeah.  It really came down to physician preference.

02:29PM    15    Q.    Physician preference for what?

16    A.    The physicians wanted to utilize the CARTO 3 system.

17    Q.    In your dealings with Innovative customers, are you

18    aware of any besides UH that have formed an opinion about

19    Sterilmed?

02:30PM    20    A.    Yes.

21    Q.    How did you obtain that understanding?

22    A.    I -- just with my interactions with supply chain cath

23    lab management potential customers.

24    Q.    And generally how do customers view Sterilmed?

02:30PM    25            MR. CRUZ:  Objection, Your Honor, both relevance

|  | 1 | and hearsay.  We're clearly going to get testimony here based |

1    and hearsay.  We're clearly going to get testimony here based

2    on conversations from third parties.

3              THE COURT:  Sustained.

4    BY MS. MORALES-KIMBALL:

02:31PM    5    Q.  Ms. Snider, hospitals have -- have hospitals conveyed

6    their state of mind with respect to Sterilmed?

7              MR. CRUZ:  Objection, Your Honor.  This is not

8    state of mind.  These are opinions of third parties.

9              THE COURT:  Sustained.

02:31PM    10    BY MS. MORALES-KIMBALL:

11    Q.  Are you aware of any other customers beside University

12    Hospital that had made a plan to move product from Biosense

13    Webster to another manufacturer's mapping machine?

14    A.  Yes.

02:32PM    15    Q.  And generally were they successful in doing so?

16    A.  No.

17    Q.  And why is that?

18    A.  The majority of the time it comes down to physician

19    preference.  Other times it's too much of a capital -- too

02:32PM    20    costly for them.

21    Q.  Besides UH, are there any current Innovative customers

22    that will not purchase sensor-enabled catheters from

23    Innovative due to Biosense's policy?

24    A.  Oh, yes.

02:32PM    25    Q.  How would you know that?

1    A.    Well, I work with all of our customers at some sort of

2    level and go through their data.

3    Q.    And approximately how many customers will not purchase

4    sensor-enabled catheters because of Biosense's policy?

02:33PM    5    A.    Almost all of them.

6    Q.    How many would that be?

7    A.    Over 200.

8    Q.    Has that impact been tied to any specific region?

9    A.    No.  It's across the United States.

02:33PM   10    Q.    And are any located in California?

11    A.    Yes.  Several of them are.

12    Q.    Which ones?

13    A.    Kaiser Permanente, Stanford Health, Sharp Health,

14    Torrance Memorial.  Those are the ones that come to mind

02:33PM   15    right now.

16    Q.    Does Biosense's policy come up with potential customers?

17    A.    Oh, yes.

18    Q.    How often?

19    A.    Pretty much with each potential customer.

02:34PM   20    Q.    Let's focus just on 2025 so far.

21    A.    Okay.

22    Q.    So in the last five months, about how many potential

23    customers have you interacted with about Biosense's case

24    coverage policy?

02:34PM   25    A.    I would have to say about probably, like, 10 to 15

UNITED STATES DISTRICT COURT

```
 1   hospitals and health systems.

 2   Q.   Which ones can you recall?

 3   A.   HCA Far West, HCA Mountain, HCA Tri-Star, HCA South

 4   Atlantic, Advent Health, Trinity Health, the Valley Health

 5   system, New York Presbyterian, Ardent Health, and Carolina

 6   East University Health.

 7   Q.   You mentioned health systems.  Are any of those health

 8   systems?

 9   A.   Yes.  Those are all health systems.  Sorry.

10   Q.   So how many EP labs approximately are represented by the

11   list you just provided?

12   A.   So with those particular hospitals, they have hospitals

13   that range from 2 to 25, around there.

14   Q.   And where are those hospitals you just described

15   located?

16   A.   They're across the United States.  You've got -- you

17   know, HCA Far West is in California, Nevada, all the way --

18   Advent is in Florida.  New York Presbyterian is up in

19   New York.  Valley Hospital is in New Jersey.  And you've got

20   a ton of them in central areas.

21   Q.   Ms. Snider, how has the case coverage policy impacted

22   Innovative?

23   A.   I mean, tremendously.  We have these 510(k) clearances

24   and devices that we can sell, but we can't sell them.

25   Q.   How has it impacted the sales that you oversee?
```

02:35PM (5)
02:35PM (10)
02:36PM (15)
02:36PM (20)
02:37PM (25)

```
 1    A.    By millions of dollars.

 2    Q.    How has Biosense's case coverage policy impacted the

 3    hospital customers you work with?

 4    A.    It has really impacted them so much that it's sad.

 5    Q.    What do you mean by that?

 6    A.    Well, in healthcare right now they're, like, desperately

 7    needing to save money.  And, you know, it's great to be able

 8    to walk in with the environmental aspect of it and be able to

 9    divert this from local landfills.  But the cost savings they

10    really need, and there's not a lot of opportunities nowadays

11    to be able to get cost savings in hospitals and especially in

12    specific areas like procedures like the EP lab.

13          Right now there are no choices.  They really don't

14    have control, and it's really preventing them from saving

15    millions of dollars where they need to put that back into

16    innovation.  They need to put that back into their staff.

17          I think I get passionate about it because I -- I

18    talk to these customers on a daily basis about finding ways

19    to save money.

20    Q.    Thank you.

21          MS. MORALES-KIMBALL:  I'll pass the witness.

22          THE COURT:  Mr. Cruz.

23          MR. CRUZ:  Yes, Your Honor.  May I approach to

24    provide the binder to the witness?

25          THE COURT:  You may.
```

# EXHIBIT 4A

1

1

2

3

UNITED STATES DISTRICT COURT

4

CENTRAL DISTRICT OF CALIFORNIA

5

SOUTHERN DIVISION

6

- - -

7

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

8

9

INNOVATIVE HEALTH, LLC,          ) CERTIFIED TRANSCRIPT
                     Plaintiff,  )
10          vs.                  )
                                 )   SACV-19-01984-JVS
11   BIOSENSE WEBSTER, INC.,      )
                     Defendant.  ) TRIAL DAY 5, VOL. I
12   ----------------------------)

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                Santa Ana, California

17                  May 13, 2025

18

19                    SHARON A. SEFFENS, RPR
                      United States Courthouse
20                    411 West 4th Street, Suite 1-1053
                      Santa Ana, CA  92701
21                    (612) 804-8655

22

23

24

25

09:16   1   Q    Now, during your cross-examination on Friday,

2   Biosense's counsel asked whether you had told UH about

3   Biosense's Case Coverage Policy.  Do you recall that?

4   A    Yes.

09:16   5   Q    Do you view it as your responsibility to educate

6   hospitals on Biosense's Case Coverage Policy?

7   A    No.

8   Q    And even though you do not view it as your

9   responsibility, do you provide that education on some

09:16   10   occasions?

11   A    Yes.

12   Q    How often?

13   A    Pretty much every time we provide a savings analysis.

14   Q    Why is that?

09:17   15   A    Because we want to be able to show them all the devices

16   that we can reprocess and then what their true capabilities

17   of savings are.  And then we identify which devices are

18   sensor-enabled and which devices are not sensor-enabled.

19   Q    And what's the importance of it being sensor-enabled

09:17   20   with respect to the savings analysis?

21   A    Because if there is a Case Coverage Policy in there,

22   they won't be able to get that savings.

23           MS. MORALES-KIMBALL:  No further questions.

24           THE COURT:  Anything further?

09:17   25           MR. CRUZ:  No further questions, Your Honor.

| | | |
|---|---|---|
| 09:17 | 1 | THE COURT:  You may step down.  Thank you. |
| | 2 | Would you call your next witness, please? |
| | 3 | MR. HO:  Thank you, Your Honor.  We call Eric |
| | 4 | Forister. |
| 09:18 | 5 | Your Honor, may I approach with exhibit binders? |
| | 6 | THE COURT:  You may. |
| | 7 | ERIC FORISTER, PLAINTIFF'S WITNESS, SWORN |
| | 8 | THE CLERK:  If you could please state your full |
| | 9 | name, spelling your last name for the record. |
| 09:18 | 10 | THE WITNESS:  Eric Forister, F-o-r-i-s-t-e-r. |
| | 11 | THE COURT:  Mr. Ho. |
| | 12 | DIRECT EXAMINATION |
| | 13 | BY MR. HO: |
| | 14 | Q    Good morning.  Could you please introduce yourself to |
| 09:18 | 15 | the jury? |
| | 16 | A    I'm Dr. Eric Forister. |
| | 17 | Q    Dr. Forister, what is your role in this case? |
| | 18 | A    I'm an expert economist for Innovative Health. |
| | 19 | Economists evaluate economic, business, and market issues. |
| 09:19 | 20 | Q    Could you please describe your educational background? |
| | 21 | A    Yes.  I have a Bachelor's of Science In |
| | 22 | Mathematics/Economics from UCLA, magna cum laude.  And I |
| | 23 | have a Ph.D. in Business Administration in the field of |
| | 24 | Economics from Stanford. |
| 09:19 | 25 | Q    What is your current job? |

09:19    1    A    I'm currently a managing director at Econ One Research,

2    Incorporated.

3    Q    And what is that?

4    A    Econ One is an economic research and consulting firm.

09:19    5    We help analyze market issues related to competition or

6    calculating lost profits.

7    Q    Do you specialize in any subfield of economics?

8    A    Yes, in what would be called antitrust or competition

9    economics.

09:19    10    Q    Can you describe your experience in that field?

11    A    Yes.  Over the course of my career, I have analyzed

12    dozens and dozens of industries, starting when I was at

13    Stanford and continuing through my almost 20-year career as

14    a consultant.

09:20    15    Q    Could you maybe pull the microphone a little closer?

16    A    Sure.  Better?

17    Q    Okay.  Have you written on the subject of antitrust or

18    competition economics?

19    A    Yes.  For example, I have written a book chapter on

09:20    20    market power and market definition, which are topics that

21    we'll get into in a little bit, for the American Bar

22    Association.

23    Q    Have you worked as an economic consultant on other

24    cases?

09:20    25    A    Yes, on hundreds of cases over the past 20 years or so.

| | | |
|---|---|---|
| 09:20 | 1 | Q    Have you testified at deposition or at trial in any of |
| | 2 | those cases? |
| | 3 | A    Yes, about ten times. |
| | 4 | Q    In all of the consulting work that you have done in |
| 09:20 | 5 | those cases, approximately how often have you been retained |
| | 6 | by the plaintiff in the case as opposed to the defendant? |
| | 7 | A    Over my career, it's been a fairly even split.  It's |
| | 8 | about 50/50. |
| | 9 | Q    Have you been retained by Innovative Health as an |
| 09:20 | 10 | expert in any case other than this one? |
| | 11 | A    No. |
| | 12 | Q    How about Biosense Webster?  Have you been involved in |
| | 13 | any case other than this one? |
| | 14 | A    No. |
| 09:21 | 15 | MR. HO:  We offer Dr. Eric Forister as an expert |
| | 16 | in antitrust economics. |
| | 17 | MR. CAVANAUGH:  No objection, Your Honor, subject |
| | 18 | to that. |
| | 19 | THE COURT:  Dr. Forister will be received as an |
| 09:21 | 20 | expert in the stated field. |
| | 21 | When I make that finding, it indicates that the |
| | 22 | witness has at least the minimum qualifications to express |
| | 23 | opinions in the particular field.  It is for you to |
| | 24 | determine how much weight to give the evidence. |
| 09:21 | 25 | BY MR. HO: |

09:21    1    Q    Dr. Forister, what was your assignment in this case?

        2    A    Generally speaking, my assignment had three parts.

        3    First, it was to evaluate if Biosense's conduct was

        4    competition on the merits, which we'll explain in a bit, or

09:21    5    anticompetitive conduct.  Second, it was to quantify the

        6    effect, if any, of that anticompetitive conduct.  And third,

        7    it was to evaluate competition in the markets at issue.

        8    Q    What materials did you review to arrive at your

        9    opinions in this case?

09:22   10    A    A lot of materials.  Hundreds and hundreds of

       11    documents, dozens of depositions.  I visited an EP lab to

       12    see a procedure so I could get a better understanding of how

       13    these products are used.  I analyzed over ten years of sales

       14    data, and looking at academic research and studies on

09:22   15    reprocessed medical devices.  All of that culminating in

       16    writing six expert reports.

       17    Q    Did you charge for your work in this case?

       18    A    I did.  I charged my usual hourly rate.

       19    Q    And does your compensation depend in any way on the

09:22   20    outcome of this case?

       21    A    No, not in any way.

       22    Q    Dr. Forister, have you prepared a slide to help

       23    summarize your opinions for the jury?

       24    A    I have.

09:22   25            MR. HO:  Could we please publish Slide 2.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:23   1   BY MR. HO:

2   Q    Dr. Forister, could you please summarize the first of

3   your three opinions?

4   A    So related to the first part of my assignment, I

09:23   5   determined that Biosense has engaged in anticompetitive

6   conduct.  This includes three things:  The blocking

7   technology that was inserted into the catheters, the

8   Catheter Collections and Withholding Policy, and the Case

9   Coverage Policy.

09:23   10           Related to the second part of my assignment, I

11   found that Biosense has harmed competition, and it's harmed

12   Innovative Health at least $147 million in lost profits, and

13   that's spread over about ten years, from 2016 to present.

14           And the third, Biosense has market and monopoly

09:23   15   power in relevant antitrust markets.  And there's a lot of

16   terminology there that I will be unpacking over the next few

17   hours.

18   Q    Dr. Forister, in a competitive marketplace, without the

19   anticompetitive conduct that you list on Slide 2, can you

09:24   20   describe where competition would occur in the CARTO 3

21   environment?

22   A    Yes, I think we have a slide on that.

23   Q    Okay.

24   A    So one of the questions when evaluating competition is

09:24   25   where would it occur?  And the first place would be

09:24   1    hospitals would have a choice over which mapping machine to

  2    get.  They could pick among the CARTO, the Abbott machine,

  3    and so on.

  4         Once a hospital had chosen a machine, they would

09:24   5    then in a competitive world be able to choose where they got

  6    their mappers, the clinical account specialists.  And then

  7    they would also be able to choose where they got their

  8    sensor-enabled catheters and other kinds of catheters.  And

  9    again, this would be a hospital that has a CARTO 3, so they

09:24  10    would be getting CARTO 3-compatible products.

 11    Q    Dr. Forister, were you present in court for the opening

 12    statement of Biosense's counsel?

 13    A    I was.

 14         MR. HO:  If we could put up Slide 4.

09:25  15    BY MR. HO:

 16    Q    Do you recall Biosense's counsel saying that separate

 17    competition for mapping machines, CARTO 3 clinical support,

 18    and CARTO 3 sensor-enabled catheters was, quote, "not the

 19    real world"?

09:25  20    A    I heard him say that.

 21    Q    Do you agree with that?

 22    A    No, not at all, and this is a really important point.

 23    Their attorneys have told you that there is only competition

 24    when the hospital buys a machine, and that makes no sense.

09:25  25    It's completely disconnected from the real world.

09:25  1            In the real world, hospitals have often provided

2      their own mappers, and so we see that there is competition

3      for CARTO 3 mappers.  They have also often purchased

4      sensor-enabled catheters from independent reprocessors, at

09:25  5      least prior to the Case Coverage Policy.

6      Q    Do economists have a method for analyzing whether there

7      would be separate competition for mapping machines, CARTO 3

8      mappers, and CARTO-3 sensor-enabled catheters?

9      A    Yes.  In competition economics, we've come up with a

09:26  10     series of tests to evaluate whether products are separate or

11     whether they're really sold together.

12            MR. HO:  Could we publish Slide 5, please.

13     BY MR. HO:

14     Q    Could you please explain what the factors are that you

09:26  15     list on Slide 5?

16     A    Yes.  So when you're looking at whether products or

17     services are sold together or whether they're separate

18     products, we look to see if they're offered separately.  Is

19     it efficient to supply them separately?  And then we also

09:26  20     look at whether customers want to buy them separately.  Is

21     there demand to obtain them separately?

22     Q    So let's go through the three pairs of products one by

23     one.

24            Is there real-world evidence that there was

09:26  25     separate supply and demand of CARTO 3 machines separate from

09:27    1    CARTO 3 clinical support?

         2    A    Yes, absolutely.  If we go back in time when the CARTO

         3    3 was new, hospitals provided about half of their own

         4    mapping.  And so at that time, we could see a significant

09:27    5    amount of the mapping was provided separately, and we're

         6    talking about the hospitals.  They obviously demanded it.

         7    They wanted it separately.  And so those are two separate

         8    products.

         9    Q    Now, if we go to the next line, is there real-world

09:27   10    evidence that there is separate supply and demand for CARTO

        11    3 clinical support and CARTO 3 sensor-enabled catheters?

        12    A    Yes, in particular, the fact that Biosense is providing

        13    mappers, and the hospitals provide mappers.  And then we can

        14    see that the catheters can sometimes be sold by independent

09:27   15    reprocessors.  So there's a whole mix of ways that a

        16    hospital could be receiving support and catheters

        17    separately, and that's what they choose to do, that sort of

        18    mixing and matching in a competitive market before the Case

        19    Coverage Policy was in place.

09:28   20    Q    And then finally, is there real-world evidence that

        21    there was separate supply and demand for CARTO 3 machines

        22    separate from CARTO 3 sensor-enabled catheters?

        23    A    Yes.  Essentially the presence of independent

        24    reprocessors and the hospital demand or desire to purchase

09:28   25    from them shows us that, because they're being supplied

09:28  1    separately, the catheters from the machines, and then

2    hospitals want them separately.  It's somewhat the main

3    point of this case that hospitals want to get their

4    catheters separately from machines.  And there are companies

09:28  5    that could efficiently supply them in the absence of the

6    anticompetitive conduct.

7    Q    And so how do these factors -- how does this analysis

8    relate to your opinion about what competition would look

9    like absent the anticompetitive conduct?

09:28  10    A    It shows us that there would be separate markets for

11    these different products.  Put another way, those different

12    products and services -- the machines, the clinical support,

13    and the catheters -- are in separate markets.

14    Q    And what would competition in those markets look like

09:29  15    if it were not for Biosense's anticompetitive conduct?

16    A    A significant number of hospitals would purchase, and

17    doctors would choose, independently reprocessed catheters

18    from companies like Innovative and Stryker.

19    Q    Let's talk a little bit about what competition is.

09:29  20            Dr. Forister, what do economists mean by

21    "competition on the merits"?

22    A    So competition on the merits is about competition on

23    the benefits or attractiveness of your company's own

24    products so, for example, improving your products, maybe

09:29  25    better packaging, let's say.

09:29   1          Put it in the context of potato chips.  A potato
        2   chip company comes out with better packaging.  They
        3   advertise.  They come up with better flavors of chips, new
        4   varieties.  All of these things that make you or the
09:30   5   customer want to choose their product, that's competition on
        6   the merits.
        7   Q    And what role does consumer choice play in a
        8   competitive mark?
        9   A    Consumer choice is the bedrock of how free markets
09:30   10  work.  The fact that consumers can choose the best product
        11  is what gives companies an incentive to make better
        12  products, to lower their prices.  Basically, to compete.
        13  Q    Now, Dr. Forister, how does anticompetitive conduct
        14  differ from competition on the merits?
09:30   15  A    So anticompetitive conduct -- instead of a company
        16  focusing on making their product better, they focus on
        17  eliminating consumer choice, so stopping customers from
        18  being able to choose another company's product instead of
        19  making the customer want to choose their product on their
09:30   20  own.
        21  Q    So let's go to your potato chip example.  Let's say a
        22  company disrupted its competitor's supply of potatoes so
        23  that the competitor couldn't make the potato chips.
        24          Would that be anticompetitive conduct or
09:31   25  competition on the merits?

09:31  1    A    That would be anticompetitive conduct.  Nothing would

2    be better about that company's product.  It would just be

3    harming or eliminating the ability or reducing the ability

4    of customers to buy another company's chips.

09:31  5    Q    Now, Dr. Forister, with that distinction in mind, could

6    you please summarize why Biosense's conduct, the three forms

7    of conduct that you have on Slide 2, was anticompetitive and

8    not competition on the merits?

9    A    Yeah.  The short summary would be that none of those

09:31  10   three things -- the blocking technology, the collection and

11   withholding, and the Case Coverage Policy -- none of those

12   things made Biosense's products better.  They just

13   eliminated or restricted the choice of customers to buy

14   their preferred catheters, which happened to be offered by

09:31  15   other companies.

16   Q    So let's start with the blocking technology, which is

17   the first of three on your list.

18         Could you please explain what the blocking

19   technology was?

09:32  20   A    Yes.  The blocking technology consisted of hardware and

21   software elements embedded on a chip that's in the device.

22   And that included some encryption of the information on the

23   chip.

24   Q    On what catheters did Biosense install that blocking

09:32  25   technology?

09:32    1    A    They installed it on the SOUNDSTAR, the LASSO NAV, and

         2    the PENTARAY.  They were intending to put it on the OCTARAY,

         3    so those catheters.

         4    Q    Why in your opinion is that blocking technology

09:32    5    anticompetitive and not competition on the merits?

         6    A    Going back to that fundamental principle, did it do

         7    something that the customers wanted?  Did it enable a new

         8    feature that customers wanted?  And the evidence I've seen

         9    points to the opposite.

09:32   10         MR. HO:  Could we put up Slide 6, please.

        11    BY MR. HO:

        12    Q    Have you prepared a slide to explain the basis for your

        13    opinion?

        14    A    Yes.  This walks through three topics that economists

09:33   15    would look at to evaluate whether the blocking technology

        16    was competition on the merits or anticompetitive.

        17    Q    Okay.  Could you start with the first of three topics?

        18    "Function of the technology," what does that mean, and how

        19    is it relevant?

09:33   20    A    Yes.  It's asking the question what does the technology

        21    do?  Does it provide a function or benefit a feature that

        22    customers want?  And that the answer is simply no.

        23    Q    Moving on to the second topic, it says:  "No positive

        24    consumer feedback."

09:33   25         Can you explain what you mean by that?

09:33   1    A    Yes.  If a company developed a new feature, you would

2    expect that customers react to that with some positive

3    feedback, right.  If you are buying a product and it has

4    something you like, you often would tell other people.  That

09:34   5    possible feedback would be out in the world, but we don't

6    see that here.

7    Q    And then the third topic is "Internal Biosense

8    documents."

9        What documents did you review in connection with

09:34   10   this opinion?

11   A    Economists often review internal documents to see what

12   the company describes its technology as doing, and so I

13   reviewed internal Biosense correspondence and presentations.

14   Q    Okay.  Could you turn in your binder, please, to JX219?

09:34   15       Dr. Forister, is this one of the documents that

16   you reviewed?

17   A    Yes, it was.

18       MR. HO:  We move to admit Exhibit 219.

19       THE COURT:  Any objection?

09:34   20       MR. CAVANAUGH:  No objection.

21       THE COURT:  219 will be received.

22       (Exhibit 219 received in evidence)

23   BY MR. HO:

24   Q    Dr. Forister, what is Exhibit 219?

09:34   25   A    This is an e-mail chain, the latest e-mail being from

09:34    1    Marius Fine to Joseph Koenig, both Marius Fine at Johnson &

2    Johnson and Joseph Koenig at Biosense, sent December 3,

3    2018.  And the Subject is "SOUNDSTAR reprocessing by Stryker

4    and status of the Falcon chip."

09:35    5    Q    Dr. Forister, could you please explain what is the

6    Falcon chip?

7    A    The Falcon chip is the blocking technology, and it was

8    developed as part of Project Falcon.

9    Q    And what was Project Falcon?

09:35    10    A    Project Falcon was a capital P project, a secret

11    project that Biosense used to develop the blocking

12    technology.

13    Q    Now, you said "secret project."

14         What do you mean by "secret project"?

09:35    15    A    Well, they told their employees not to tell anyone that

16    they were doing this.  And there were -- there was internal

17    correspondence where employees were asking about it, and

18    they told them basically go away.  This is none of your

19    business.

09:36    20    Q    Could you please explain how Exhibit 219 relates to

21    your opinion as to whether Project Falcon and the blocking

22    technology were anticompetitive?

23    A    Yes.  So if we go to the top of the second page --

24    okay, there we go.  There's an e-mail that straddles both

09:36    25    pages.  We can see how Biosense's own employees describe it.

09:36  1    That second line, "The status of the Falcon chip

       2    anti-reprocessing technology."

       3    Q    And what is the significance of that phrase to you,

       4    "anti-reprocessing technology"?

09:36  5    A    So Biosense is describing in its own correspondence

       6    that the technology is anti-reprocessing.  It's to stop

       7    independent reprocessors.

       8    Q    Now, if I could ask you to look at JX3099 in your

       9    binder.

09:36  10   A    Okay.

       11   Q    Is this one of the documents you relied on?

       12   A    Yes, it is.

       13        MR. HO:  We move 3099 into evidence.

       14        MR. CAVANAUGH:  No objection.

09:37  15        THE COURT:  3099 will be received.

       16        (Exhibit 3099 received in evidence)

       17   BY MR. HO:

       18   Q    Dr. Forister, what is Exhibit 3099?

       19   A    This is an e-mail chain, the latest e-mail being from

09:37  20   Mario Garcia at Biosense to Avi Shalgi and others at

       21   Biosense sent April 11, 2018.

       22   Q    Okay.  And how does this document relate to your

       23   opinion?

       24   A    This again gives us an example of Biosense's employees

09:37  25   describing the purpose of the technology.

09:37   1   Q    Could you point us to the language that reflects that,
        2   please?
        3   A    Yes.  If we go to page 4 of the exhibit, the second
        4   e-mail on the page from Mario Garcia.
09:37   5        In the first line of that e-mail, he writes:
        6   "Last time we met, I clarified the main driver of
        7   implementing the Falcon EEPROM" -- which is just another
        8   word for a chip -- "is preventing our competitors to
        9   reprocess."
09:38  10   Q    Can you actually read on a little bit further?
       11   A    Sure.  "To reprocess the VIZIGO sheath and not, as
       12   previously understood, as to reprocess them ourselves."
       13   Q    Okay.  And what is the significance of that to your
       14   opinion?
09:38  15   A    So this is in their own words.  The main driver of the
       16   Falcon chip for the anti -- or the blocking technology is to
       17   prevent reprocessing, and even for a device they didn't plan
       18   to reprocess.
       19   Q    If we could go back to Slide 2, I want to move on now
09:38  20   to catheter collections, the second form of conduct that you
       21   describe as anticompetitive.
       22        Can you please summarize why Biosense's collection
       23   practices were anticompetitive and not competition on the
       24   merits?
09:38  25   A    Yes.  And to be clear, it's not just that they were

09:39  1    collecting catheters.  It was that they were collecting and

2    withholding catheters.  And as you may have gathered, in

3    order to reprocess catheters, the reprocessors need to get

4    used catheters.  And so if a company is able to withhold

09:39  5    those used catheters, they can restrict the supply available

6    to the rivals and to the market.

7    Q     Okay.  Could I ask you to turn to JX298, please?

8          Is this a document you relied in forming your

9    opinions?

09:39  10   A     It is.

11         MR. HO:  We move the admission of JX298.

12         THE COURT:  Any objection?

13         MR. CAVANAUGH:  No objection.

14         THE COURT:  298 will be received.

09:39  15         (Exhibit 298 received in evidence)

16   BY MR. HO:

17   Q     Dr. Forister, what is Exhibit 298?

18   A     This is a Biosense 2019 kickoff meeting and internal

19   presentation.

09:40  20   Q     And could you refer us to the portion of the

21   presentation that's significant for your opinion?

22   A     Yes.  If we go to page 28 of that and we start at the

23   bottom, there is some text that straddles the two pages if

24   we start at the bottom line of that first text box.

09:40  25   "Maximize collections.  The RPO, the reprocessed market, is

09:40    1    unique in the way that there is a finite amount of raw

         2    materials.  If we control ACUNAV collections, we control the

         3    market.  In fact, it's not far-fetched to believe that if we

         4    were able to collect back 75 percent of the OEM that is new

09:40    5    ACUNAV we sell, we could drive Stryker out of the

         6    reprocessed electrophysiology business altogether."

         7    Q    And could you explain what that means and why it's

         8    significant to your opinion?

         9    A    Yes.  This is Biosense's internal discussion confirming

09:41   10    what we just discussed, that if a company is able to collect

        11    back enough catheters, it can drive its rivals out of the

        12    business.

        13    Q    Now, this is relating to ACUNAV collections.

        14         Were you here in the courtroom when Mr. Dave

09:41   15    Distel testified about -- I'm sorry, I skipped one thing.

        16         Did you consider data about Sterilmed's

        17    reprocessing of ACUNAV catheters?

        18    A    Yes, I did.

        19    Q    Okay.

09:41   20         MR. HO:  Could we put up Slide 7, please.

        21    BY MR. HO:

        22    Q    What does Slide 7 show?

        23    A    So this shows Sterilmed's collection and sales of the

        24    ACUNAV catheter from 2015 to 2020.  And it's significant

09:41   25    that we start on the left.  They collected about 156,000

09:41   1   catheters.  They discarded, starting at the top on the

2   right, about 42,000 as not fit for reprocessing.  They sold

3   59,000.  But then they ended up with 54,000 catheters in

4   excess, and they just withheld those from the market.  And

09:42   5   that's anticompetitive because customers wanted those

6   reprocessed catheters, and so Biosense/Sterilmed is

7   restricting the supply and restricting their choice.

8   Q    And were you here in the courtroom when Mr. Dave Distel

9   testified about Innovative facing shortages of ACUNAV

09:42   10  catheters?

11  A    Yes.

12  Q    And how is that relevant to your opinion?

13  A    So that's relevant because it tells us that this

14  withholding of catheters had an effect on a rival, and it

09:42   15  had an effect that there were customers who wanted the

16  choice of an Innovative reprocessed ACUNAV, and they were

17  denied that choice because all of those catheters that they

18  would have liked to buy were sitting at Sterilmed, not being

19  sold.

09:43   20  Q    Just to be clear, I think you said "an effect on a

21  rival."

22        In antitrust economics, what does a "rival" refer

23  to?

24  A    So it refers to a company that's competing with it, so

09:43   25  it's an effect on competition more broadly.

| | | |
|---|---|---|
| 09:43 | 1 | Q    Could I now ask you to turn to Exhibit 3114? |
| | 2 | A    Okay. |
| | 3 | Q    Did you rely on Exhibit 3114? |
| | 4 | A    Yes, I did. |
| 09:43 | 5 | MR. HO:  Move to admit Exhibit 3114. |
| | 6 | MR. CAVANAUGH:  No objection. |
| | 7 | THE COURT:  3114 will be received. |
| | 8 | (Exhibit 3114 received in evidence) |
| | 9 | BY MR. HO: |
| 09:43 | 10 | Q    Dr. Forister, what is Exhibit 3114? |
| | 11 | A    This is an e-mail with an attachment from Joseph |
| | 12 | Koenig, the Product Director of Sustainability at Biosense, |
| | 13 | sent to Andrew Landers on June 27, 2018, with the Subject: |
| | 14 | "Expand ULS" -- that is ultrasound, which would include the |
| 09:44 | 15 | ACUNAV -- "buy-back program" -- which is their collections |
| | 16 | -- "to DECANAV and PENTARAY." |
| | 17 | Q    Okay.  And how does this document relate to your |
| | 18 | opinion? |
| | 19 | A    Well, bear with me because I need to introduce a few |
| 09:44 | 20 | other facts.  So this is 2018, a time when Innovative has |
| | 21 | clearance to reprocess the DECANAV and the PENTARAY.  At |
| | 22 | that same time, Sterilmed does not have that clearance, so |
| | 23 | Sterilmed and Biosense cannot reprocess these catheters. |
| | 24 | So they are suggesting to expand the collections |
| 09:44 | 25 | policy, which we saw restricted supply in the ACUNAV |

09:44   1   business to the DECANAV and PENTARAY business.  And because

        2   Sterilmed wasn't going to be reprocessing these catheters at

        3   that time, this simply eliminated the choice of those

        4   reprocessed catheters from customers.

09:45   5   Q    So given that Biosense/Sterilmed didn't reprocess the

        6   DECANAV, was there any purpose in terms of competition on

        7   the merits for them to collect those catheters?

        8   A    No, there is no evidence that it was competition on the

        9   merits.

09:45   10  Q    Now, if we could turn, please, to Exhibit 3270, is this

        11  another document you relied on?

        12  A    It is.

        13         MR. HO:  We move the admission of Exhibit 3270.

        14         MR. CAVANAUGH:  No objection.

09:45   15         THE COURT:  3270 will be received.

        16         (Exhibit 3270 received in evidence)

        17  BY MR. HO:

        18  Q    Dr. Forister, what is Exhibit 3270?

        19  A    It's an e-mail with an attachment from Joseph Koenig

09:45   20  again at Biosense to Nathan Summers and others at Biosense

        21  sent July 10, 2018, with the Subject field "Intel requested

        22  - DECANAV collections."

        23  Q    So we're still on the topic of DECANAV collections.

        24         How is this e-mail relevant to your opinion?

09:46   25  A    We can see how Biosense is describing these efforts if

09:46   1   we go to the second sentence starting with:  "In an effort
        2   to better understand how Innovative Health will source the
        3   supply for their reprocess iteration, could you please reply
        4   if you are aware of any collections in the electrophysiology
09:46   5   lab besides us or Stryker?  Based on your feedback, we may
        6   consider proposing programs that could divert these
        7   collections to us."
        8   Q    Why is that significant?
        9   A    It's significant because it tells you in Biosense's own
09:47  10   words what they're doing.  And it's -- they're looking to
       11   collect and divert supply from a competitor and thereby harm
       12   or eliminate competition.
       13   Q    If we could go back to Slide 2, please, the third form
       14   of conduct that you address here is the Case Coverage
09:47  15   Policy.
       16        Did you prepare slides to explain why the Case
       17   Coverage Policy is anticompetitive?
       18   A    Yes.
       19   Q    Okay, let's start with this one.
09:47  20        Could you please explain to the jury what a tying
       21   arrangement is?
       22   A    Yes, and we're going to start with the definition from
       23   economics.  What is tying or a tying arrangement?  And
       24   economists use that to describe a situation like this.  A
09:47  25   company, on one hand, has a must-have product, a product

09:47  1  that people want to buy from them.  On the other hand, it

2  has another product, one that customers would like to buy

3  from someone else.

4          Now, if a company has a dominance of a must-have

09:48  5  product, it can force customers to source that product --

6  sorry, it can force customers to buy the second product that

7  they didn't want to in order to get access to the first

8  product.  And we call that situation a tie.

9  Q    When does a tying arrangement become anticompetitive?

09:48  10  A    It becomes anticompetitive when the company with the

11  must-have product has market power or dominance, that they

12  are controlling the market for that product, the must-have

13  product.

14  Q    Okay.  And if we can move on to the next slide, could

09:48  15  you explain why in your opinion the Case Coverage Policy is

16  an anticompetitive tie?

17  A    Yes.  It's because Biosense had the CARTO 3 mappers.

18  That's the must-have product.  If you want to do a CARTO 3

19  procedure, you must have a mapper.  And they had other

09:49  20  products that some customers wanted to buy from independent

21  reprocessors.  And instead of competing in those markets,

22  they implemented the Case Coverage Policy, which tied access

23  to their mappers to the purchase of these sensor-enabled

24  catheters.

09:49  25  Q    Now, in 2009 when the CARTO 3 was first released, did

09:49   1   Biosense have a Case Coverage Policy?

2   A    No.

3   Q    Did reprocessed catheters exist in 2009?

4   A    Yes, they did.  As you may have heard last week, the

09:49   5   FDA has been regulating reprocessing since 2002.

6   Q    What portion of EP procedures did Biosense mappers

7   cover in 2009?

8   A    So back in 2009, Biosense's mappers covered about half

9   of the procedures, and the hospitals provided the other half

09:49   10   of the mappers.

11   Q    Okay.  What about by 2015?

12   A    By 2015, Biosense had increased its share to

13   87 percent.

14   Q    And what about by 2018?

09:50   15   A    By 2018, it had increased it even further to a dominant

16   95 percent.

17   Q    Could you please turn in your binder to Exhibit 3329?

18   A    Okay.

19   Q    Did you rely on Exhibit 3329?

09:50   20   A    I did.

21        MR. HO:  We move 3329 into evidence.

22        MR. CAVANAUGH:  No objection.

23        THE COURT:  3329 will be received.

24        (Exhibit 3329 received in evidence)

09:50   25   BY MR. HO:

09:50    1    Q    If you can turn to page 9 of 3329, what does page 9 of

         2    this slide presentation show?

         3    A    So this shows what we had just discussed.  Back in 2009

         4    when the CARTO 3 was introduced, the Biosense mappers

09:50    5    covered about half of the cases.  And by 2018, Biosense had

         6    increased that to 95 percent of cases.

         7    Q    And why is that important to your economic analysis of

         8    whether the Case Coverage Policy is an anticompetitive tie?

         9    A    It's relevant because Biosense realizes that they have

09:51   10    a dominant position, and that dominant position would give

        11    them leverage over the hospitals.

        12    Q    Did you analyze how Biosense came to have that dominant

        13    position in the CARTO 3 clinical support market?

        14    A    Yes.

09:51   15         MR. HO:  If we could turn to Slide 10, please.

        16    BY MR. HO:

        17    Q    So you have four factors listed here.

        18         Could you please explain how Biosense took over

        19    control of the market for CARTO 3 clinical support?

09:51   20    A    Yes.  So these are four of the activities that Biosense

        21    undertook to take over the market for mappers.  The first

        22    being poaching mappers.  That is, when there is a mapper at

        23    a hospital, they would go and give that mapper big financial

        24    incentives to hire them away from the hospital.

09:52   25    Q    What was the next?

09:52   1   A       The next would be withholding of training.  So Biosense

        2   makes the CARTO 3.  They have the training materials for

        3   people who want to learn how to map on it, and they would

        4   withhold that training from hospitals.

09:52   5   Q       Okay.  And what about noncompetes?

        6   A       Noncompetes are agreements that Biosense made its

        7   mappers sign that said after they leave Biosense, they can't

        8   map or train mappers for a rival for 18 months.

        9   Q       Could you please turn in your binder to Exhibit 3981?

09:52  10   A       Okay.

       11   Q       Dr. Forister, did you rely on Exhibit 3981?

       12   A       Yes.

       13           MR. HO:  We move 3981 into evidence.

       14           MR. CAVANAUGH:  No objection.

09:52  15           THE COURT:  3981 will be received.

       16           (Exhibit 3981 received in evidence)

       17   BY MR. HO:

       18   Q       Dr. Forister, could you explain what Exhibit 3981 is?

       19   A       Yes.  This is a letter from attorneys representing

09:53  20   Biosense, writing to a former Biosense mapper who left the

       21   company who was planning to train mappers at a hospital on

       22   how to use the CARTO 3, how to do mapping.  And this is a

       23   letter demanding that this former employee stop that, to not

       24   do it.

09:53  25   Q       And what was the former employee's name?

09:53  1  A      Under that FATEX at the top, you can see it was -- I

2  may mispronounce it -- Ashley Toussaint.

3  Q      And what is the relevance of this attorney letter to

4  your opinion?

09:53  5  A      So this shows us that Biosense was enforcing, or trying

6  to enforce, its noncompetes.  Sometimes you have a situation

7  where there's noncompetes for the employees, but the company

8  doesn't enforce them.  This shows us that they were actively

9  enforcing them.

09:54  10  Q      To go back to Slide 10, please, the last factor you

11  list is software changes.

12           Could you explain what you mean by that?

13  A      Yes.  The CARTO 3 relies on software to perform the

14  mapping, and so the mappers are trained on a particular

09:54  15  version of the software.  If that software version changes,

16  the mappers would need new training in order to continue

17  mapping.  And so one of the blocking tactics that Biosense

18  undertakes is to what it calls upgrade the software and

19  change that software so that existing mappers at hospitals

09:54  20  can no longer do mapping.

21  Q      Okay.  Can you please turn in your binder to

22  Exhibit 3415?  Did you rely on Exhibit 3415?

23  A      I did.

24           MR. HO:  We move Exhibit 3415 into evidence.

09:54  25           THE COURT:  Any objection?

| | | |
|---|---|---|
| 09:54 | 1 | MR. CAVANAUGH:  No objection. |
| | 2 | THE COURT:  3415 will be received. |
| | 3 | (Exhibit 3415 received in evidence) |
| | 4 | BY MR. HO: |
| 09:55 | 5 | Q    Dr. Forister, what is Exhibit 3415? |
| | 6 | A    This is an e-mail chain, the latest e-mail being from |
| | 7 | Jonathan Fanger at Biosense to Andrew Jeser at Biosense.  It |
| | 8 | was sent May 9, 2018, and the Subject is "Stryker CARTO |
| | 9 | education." |
| 09:55 | 10 | Q    And could you please explain to the jury what is going |
| | 11 | on in this e-mail exchange? |
| | 12 | A    So we saw that noncompete, the letter attempting to |
| | 13 | enforce the noncompete with Ashley.  She was going to be |
| | 14 | hired by Stryker to train mappers at a hospital, and this is |
| 09:55 | 15 | Biosense's discussion of what to do about that. |
| | 16 | Q    Okay.  And what do they say they want to do about that? |
| | 17 | A    If we turn to the second page, the second e-mail on |
| | 18 | that page from Jonathan Fanger sent on May 3, Jonathan |
| | 19 | writes:  "Andrew and Mitch, looks like we will need to |
| 09:55 | 20 | upgrade one of your accounts as a blocking tactic." |
| | 21 | Q    And what does that mean? |
| | 22 | A    That means that they were upgrading or changing the |
| | 23 | software on the CARTO in order to block these independent |
| | 24 | mappers from receiving training and conducting the mapping. |
| 09:56 | 25 | Q    Was this a one-off situation? |

09:56    1    A    No, it doesn't appear to be that way.

2    Q    How do you know that?

3    A    If we turn to the first page of the document, that

4    first e-mail, Jonathan writes:  "Hi, Andy.  Feel free to

09:56    5    upgrade any accounts necessary to protect your business."

6    Q    Now, how does the fact that Biosense controls the

7    training for the CARTO 3 and can modify the software at any

8    time affect competition in the market for CARTO 3 clinical

9    support?

09:56   10    A    Well, as a practical matter, it makes it essentially

11    impossible for another company, Innovative, Stryker, or the

12    hospitals themselves to train new mappers to replace a

13    Biosense mapper.

14    Q    Did you see evidence of Biosense itself acknowledging

09:57   15    how difficult it would be for independent reprocessors to

16    have their own training programs?

17    A    Yes, I've seen that.

18    Q    Would you please turn to Exhibit 2 in your binder?

19          Did you rely on Exhibit 2?

09:57   20    A    I did.

21          MR. HO:  Your Honor, we move Exhibit 2 into

22    evidence.

23          MR. CAVANAUGH:  No objection.

24          THE COURT:  2 will be received.

09:57   25          (Exhibit 2 received in evidence)

BY MR. HO:

Q    What is Exhibit 2?

A    This is an e-mail chain, the latest e-mail being from Michael Bodner at Biosense to Fairy Zare at Biosense that was sent June 12, 2017.

Q    And how was this e-mail significant to your opinion?

A    On this particular topic, it's significant, because in the second paragraph of the second e-mail starting with: "We've heard Stryker is working on reprocessing PENTARAY even though it's unlikely they would be successful since (1) it's very tough to reprocess, and (2) we wouldn't map those cases, so they would need to train the hospital staff to map, and we know that's not sustainable."

Q    Dr. Forister, were you here in court for the videotaped deposition of Noah Martin?

A    I was.

Q    And do you recall Mr. Martin testified about what happened at Ascension Health?

A    Yes, I do.

Q    What is Ascension Health just to remind the jury?

A    Ascension Health is a large Catholic nonprofit hospital system with about a hundred hospitals in the U.S.

Q    Did you review Biosense's internal documents about that episode and prepare a timeline of the events?

A    I did.

09:58   1   Q    Can I ask you to turn to Exhibit JX3626?

        2   A    Okay.

        3   Q    Did you rely on that exhibit in reaching your opinions

        4   on this issue?

09:59   5   A    Yes.

        6            MR. HO:  Your Honor, we move 3626 into evidence.

        7            MR. CAVANAUGH:  No objection.

        8            THE COURT:  3626 will be received.

        9            (Exhibit 3626 received in evidence)

09:59   10  BY MR. HO:

        11  Q    Okay, let's go to your timeline on Slide 11, please.

        12  A    Okay.

        13  Q    Could you explain what happened at Ascension Health

        14  beginning with the first event on the timeline from

09:59   15  April 2014?

        16  A    Sure.  So in April 2014, a Biosense mapper walked out

        17  of a procedure because a doctor chose to use an

        18  independently reprocessed sensor-enabled catheter.  In

        19  response, the doctor didn't want to stop the procedure.  He

09:59   20  wanted the mapper to stay, and so they did away with the

        21  independently reprocessed catheter, and they opened and used

        22  a new Biosense catheter.

        23  Q    And do the documents show that that was a single

        24  episode?

10:00   25  A    No.  Ascension had seen this happen several times in or

| | | |
|---|---|---|
| 10:00 | 1 | around April 2014. |
| | 2 | Q    Okay.  What happened next? |
| | 3 | A    So you can imagine Ascension was furious about this, |
| | 4 | and so they e-mailed Biosense to resolve this problem. |
| 10:00 | 5 | Q    Okay.  And if I could ask you to turn to Exhibit 153, |
| | 6 | please. |
| | 7 | MR. HO:  And we can publish this to the jury |
| | 8 | because it's already in evidence. |
| | 9 | BY MR. HO: |
| 10:00 | 10 | Q    Do you recognize Exhibit 153? |
| | 11 | A    I do. |
| | 12 | Q    And does 153 contain Biosense's response to Ascension? |
| | 13 | A    Yes, it does.  We can see at the top an e-mail from |
| | 14 | Neil Warman at Biosense. |
| 10:00 | 15 | Q    Could you please read the underlined sentence in the |
| | 16 | response? |
| | 17 | A    And to be clear, this was underlined by the Biosense |
| | 18 | person, Neil Warman, who is sending the e-mail.  "There is |
| | 19 | no specific corporate policy that prohibits our people from |
| 10:01 | 20 | supporting cases, as we view this as part of our credo |
| | 21 | responsibility to patients." |
| | 22 | Q    And so just to be clear, he is saying that there is no |
| | 23 | such thing as what we now have been referring to in this |
| | 24 | case as the Case Coverage Policy, right? |
| 10:01 | 25 | A    Correct.  He is essentially saying the opposite of |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:01  1    that.

2    Q    And he's saying that the reason is J&J's credo

3    responsibility to patients.

4          Could you explain what the J&J credo is?

10:01  5    A    Yeah.  The credo is a promise or oath to patients to

6    take care of them, to compete fairly for their business by

7    providing better healthcare.

8    Q    How does J&J advertise or disclose the credo?

9    A    For example, it's on their website.

10:01  10   Q    So what is the economic significance of the J&J credo?

11   A    So the economic significance is that they're making a

12   promise to take care of patients, and that's something that

13   patients, doctors, hospitals would find attractive.  And it

14   gets back to is this competition on the merits?  Is it

10:02  15   attracting patients to you because your product is being

16   improved?

17   Q    Now, did Mr. Warman's e-mail satisfy Ascension?

18   A    No, it did not.

19   Q    So then what happened?

10:02  20   A    There was continued back and forth e-mails because

21   Biosense -- not Biosense, Ascension wanted a stronger

22   promise.

23   Q    And did it receive one?

24   A    It did.

10:02  25   Q    Could you please explain?

10:02    1    A    Sure.  In May, Biosense promised that its mappers would

2    support cases even if independently reprocessed

3    sensor-enabled catheters were used.

4    Q    What happened after that?

10:03    5    A    Well, this was in the context of a contract

6    renegotiation.  And so after receiving that promise,

7    Ascension in July signed a three-year contract to buy

8    catheters and other disposables from Biosense.

9    Q    After the contract was signed, did Biosense follow

10:03    10    through on its assurance to Ascension?

11    A    No.  Almost immediately, Ascension noticed Biosense's

12    mappers were back to walking out or refusing to map on cases

13    involving independently reprocessed catheters.

14    Q    What happened then?

10:03    15    A    So then a few months later in October, the first Case

16    Coverage Policy letter was written and sent to Ascension.

17         MR. HO:  Your Honor, we move the admission of

18    JX173.

19         THE COURT:  Any objection?

10:04    20         MR. CAVANAUGH:  No objection.

21         THE COURT:  173 will be received.

22         (Exhibit 173 received in evidence)

23         MR. HO:  I would like to play a portion of the

24    audio clip that's now been admitted as Exhibit 143.  In

10:04    25    particular, 58:37 to 59:30.  And we have slides that

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:04   1   transcribe the words in the audio recording.

        2            (Video clip played)

        3   BY MR. HO:

        4   Q    So, Dr. Forister, could you explain what we just heard?

10:05   5   A    Yes.  So this is Conrad -- can we have the slide back

        6   up?

        7            So this is Conrad Ramos, the Corporate Account

        8   Director at Biosense, describing what happened at Ascension

        9   when they imposed the Case Coverage Policy.  And if we go

10:05  10   back one slide, they see Ascension didn't like it, and they

       11   spent the next six to nine months trying to drive the

       12   business away from us.

       13            So Ascension didn't like it.  They tried to move

       14   their business elsewhere, but they couldn't.  Ultimately

10:06  15   what happened, even though Ascension didn't like it, was

       16   Ascension spent another $4 million with Biosense because of

       17   the Case Coverage Policy.

       18   Q    And how was that significant to you in terms of whether

       19   the Case Coverage Policy is anticompetitive?

10:06  20   A    So circling back, was this something the customers

       21   liked?  And the answer from Biosense is, no, they didn't

       22   like it.  They didn't want it.  They wanted to buy from

       23   independent reprocessors.  And so this wasn't competition on

       24   the merits.  This was about eliminating choice and reducing

10:06  25   or harming competition.

| | | |
|---|---|---|
| 10:07 | 1 | Q    Now, after the Ascension episode, did Biosense expand |
| | 2 | the implementation of the Case Coverage Policy? |
| | 3 | A    They did.  Ultimately, in April of 2016, they began |
| | 4 | enforcing the policy nationwide. |
| 10:07 | 5 | Q    Now, when you say "enforcing the policy nationwide," |
| | 6 | did Biosense tell all of its customers about the policy in |
| | 7 | April 2016? |
| | 8 | A    No, and this is an important distinction.  Biosense is |
| | 9 | not announcing to the world, to the market, that we have |
| 10:07 | 10 | this policy.  Evidence shows that they are waiting until a |
| | 11 | hospital wants to use an independently reprocessed catheter, |
| | 12 | and then they tell them, hey, you have a CARTO 3.  You've |
| | 13 | been using it for a while, but now you want to do this new |
| | 14 | thing, buy independently reprocessed catheters.  No, you |
| 10:07 | 15 | don't have that choice. |
| | 16 | Q    Did you see documents showing that Biosense was |
| | 17 | concerned about Innovative Health in particular as a |
| | 18 | competitor? |
| | 19 | A    Yes. |
| 10:08 | 20 | Q    Could you please turn to Exhibit 3193 in your binder? |
| | 21 |      Did you rely on Exhibit 3193? |
| | 22 | A    I did. |
| | 23 |      MR. HO:  We move that in evidence. |
| | 24 |      MR. CAVANAUGH:  No objection. |
| 10:08 | 25 |      THE COURT:  3193 will be received. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
10:08   1              (Exhibit 3193 received in evidence)
        2   BY MR. HO:
        3   Q     What is Exhibit 3193?
        4   A     This is an e-mail chain from Fairy Zare at Biosense to
10:08   5   John Kowalski at Biosense sent 2/9/2017, and the Subject is
        6   "Medline Reprocessing."
        7   Q     And to remind us, what is Medline?
        8   A     As you heard last week, Medline is a distribution
        9   partner for Innovative Health.  And so in the context of
10:08  10   this e-mail, when they talk about Medline reprocessed, what
       11   they mean is Innovative Health reprocessed catheters.
       12   Q     And where in the e-mail do you see Biosense talking
       13   about Innovative as a competitive threat?
       14   A     If we turn to the second page, the e-mail from
10:09  15   Stephanie Orsini.  So we can zoom in on what will be the
       16   first and last paragraphs.  So the first one:  "I wanted to
       17   update you regarding the competitive activity we have been
       18   seeing in the mid-Atlantic.  Several months ago, Megan
       19   updated us regarding Medline, a third player in
10:09  20   reprocessing."  And, of course, that references Innovative's
       21   reprocessed catheters.  "We are now seeing them in the
       22   mid-Atlantic."
       23   Q     And how did Biosense say it would respond to Innovative
       24   as a competitive threat?
10:09  25   A     So in response to this competitive activity, we can
```

10:09   1   look at the last paragraph.  It reads:  "The Coverage Policy

        2   will be key to us protecting our LASSO NAV and SOUNDSTAR

        3   business."

        4   Q     And why is that significant?

10:09   5   A     It's significant because it gives us an indication of

        6   whether Biosense is meeting competition on the merits or

        7   it's going to prevent competition.  And here, instead of

        8   meeting competition and improving its product, it's using

        9   the Case Coverage Policy to eliminate competition.

10:10  10   Q     Can I ask you to look at Exhibit 3437 in your binder?

       11         Did you rely on Exhibit 3437?

       12   A     I did.

       13         MR. HO:  We move Exhibit 3437 in evidence.

       14         MR. CAVANAUGH:  No objection.

10:10  15         THE COURT:  3437 will be received.

       16         (Exhibit 3437 received in evidence)

       17   BY MR. HO:

       18   Q     Dr. Forister, what is Exhibit 3437?

       19   A     This is an e-mail from Joseph Koenig from Biosense to

10:10  20   Marius Fine that was sent August 16, 2018.

       21   Q     Okay.  And what is the Subject line?

       22   A     The Subject is "DECANAV reprocessed cath."

       23   Q     Okay.  At this time, had Innovative received FDA 510(k)

       24   approval to sell the reprocessed DECANAV catheter?

10:11  25   A     Yes.  Innovative receiving that FDA approval is what

10:11   1   kicks off this e-mail chain.

2   Q    And how does Biosense and Sterilmed respond to

3   Innovative getting that 510(k) approval?

4   A    Well, they considered whether Sterilmed would reprocess

10:11   5   the DECANAV, whether they would meet competition with their

6   own reprocessed version, and Biosense decided that Sterilmed

7   would not do so.

8   Q    Okay.  What did Biosense say it would do instead?

9   A    Then that was one of the questions that its own sales

10:11   10  staff had, and the answer is in the first e-mail, the first

11  sentence that starts with -- sorry, the second sentence,

12  starting with:  "I have since spoken to the field teams who

13  cover the majority of the DECANAV business in the U.S.

14  We're prepared to address with any potential user's

10:12   15  customers by leveraging our current coverage policy."

16  Q    Have you seen evidence that Biosense holds back

17  competition from Sterilmed?

18  A    Yes.  In fact, this e-mail contains that sort of

19  evidence, that there was competition, and Biosense is

10:12   20  talking about -- or saying that Sterilmed will not become a

21  reprocesser of DECANAV.

22  Q    Okay.  If I can ask you to turn to Exhibit 3325.

23       Did you rely on Exhibit 3325?

24  A    Yes.

10:12   25       MR. HO:  Your Honor, we move 3325 into evidence.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:12    1          MR. CAVANAUGH:  No objection.

         2          THE COURT:  3325 will be received.

         3          (Exhibit 3325 received in evidence)

         4  BY MR. HO:

10:12    5  Q    Dr. Forister, what is Exhibit 3325?

         6  A    This is an e-mail chain from Sandor Palfi at Biosense

         7  to Fairy Zare at Biosense sent 10/6/2016, and the Subject

         8  is:  "Sterilmed cannibalization of our single-use DX."

         9  Single-use DX would be new diagnostic catheters.

10:13   10  Q    And could you explain how the discussion in this e-mail

        11  relates to your opinion?

        12  A    Yes.  So there was a situation where a Sterilmed sales

        13  representative convinced a hospital to switch away from

        14  Biosense new diagnostic catheters to Sterilmed reprocessed

10:13   15  catheters.  And in response, Biosense identified that this

        16  was cannibalization because Biosense and Sterilmed are both

        17  owned by Johnson & Johnson.  If Sterilmed takes business

        18  away from Biosense, then J&J's profits go down.  Customers

        19  are spending less.  I mean, they're getting the same amount

10:14   20  of catheters, but they're giving the Johnson & Johnson

        21  family of companies less money.

        22  BY MR. HO:

        23  Q    Could we turn to Slide 14, please.

        24          Do you recall Biosense in its opening statement

10:14   25  presenting this slide?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:14   1    A    Yes.

        2    Q    And do you recall Biosense's counsel saying that this

        3    analysis shows that doctors prefer new catheters over

        4    reprocessed catheters?

10:14   5    A    That's what he told you.

        6    Q    What is your reaction to that assertion?

        7    A    That claim is absolute nonsense.  From an economic

        8    perspective, we know that the PENTARAY catheter market has

        9    competition being foreclosed by the Case Coverage Policy,

10:14  10    and we've seen that Sterilmed is not a true competitor of

       11    Biosense.  So the orange line they showed you, and they said

       12    only six percent of the time do physicians prefer these

       13    catheters, that's not telling you what physician's prefer

       14    because Biosense can influence and withhold or hold back

10:15  15    Sterilmed from offering these catheters.  So this is not an

       16    indication of what physicians prefer when there is free and

       17    fair competition.

       18    Q    Now, if we could go to Slide 15, please.

       19         Did you prepare Slide 15?

10:15  20    A    I did.

       21    Q    And what does it show?

       22    A    So this shows you what happens in a market without the

       23    Case Coverage Policy.  Back in 2013 when reprocessing of the

       24    SOUNDSTAR was being done by Stryker -- it had been done for

10:15  25    a few years already -- we see 27 percent of the time a

10:15   1   reprocessed SOUNDSTAR is being chosen by the doctors and

2   hospitals.  And this is as I mentioned relatively early, and

3   interest in reprocessing has grown over time.

4   Q    And that's -- 27 percent is far higher that the

10:16   5   5.9 percent that we saw on the previous slide?

6   A    Yes.

7   Q    If we could go to Slide 16, please.

8        So what does this show?

9   A    So this shows what happens when doctors and hospitals

10:16   10   get to choose among catheters not covered by the Case

11   Coverage Policy.  This is the Webster CS, not included in

12   the Case Coverage Policy, and it's the share of reprocessed

13   from 2020 to 2023, a more mature market than the SOUNDSTAR

14   market.  It's about ten years later.  And we can see -- I

10:16   15   don't know if -- maybe you can't read the numbers.  Let's

16   see, 47 percent in 2020, 45 percent in 2021, and then

17   growing to 55 percent of the time in reprocessed catheters

18   chosen in 2023.  And that's why I said the previous slide

19   from the opposing attorney over there was nonsense.  This is

10:17   20   ten times the amount that doctors choose when there's not a

21   Case Coverage Policy in place.

22   Q    Now, Dr. Forister, did you analyze the effect of

23   Biosense's anticompetitive conduct on hospitals and doctors?

24   A    I did.

10:17   25   Q    What percentage of hospitals with an EP lab have a

10:17    1    CARTO 3 machine?

         2    A    Of those hospitals, 72 percent.

         3    Q    Did you prepare a slide to explain the harm to

         4    competition in this case?

10:17    5    A    I did.

         6    Q    Could we put up Slide 17.

         7         So could you explain generally what these four

         8    factors relate to?

         9    A    Yes.  Looking from an economic perspective at these

10:17   10    markets and at the consumers and what happened to them

        11    because of Biosense's conduct, there's four types of

        12    economic harm.  First, prices were inflated.  The hospitals

        13    had to pay more.

        14         Quality was decreased, and we'll talk about what

10:18   15    the data show about the relative quality of Innovative's

        16    catheters and Biosense and Sterilmed's catheters.

        17         Third, there would be a decrease in innovation.

        18    There were innovations that were excluded from the market by

        19    the Case Coverage Policy, and there were also innovations

10:18   20    that were entirely foregone because of that policy.

        21         And finally, a harm to the consumers.  An economic

        22    harm was decreased choice.  They took away the choice from

        23    doctors and hospitals.

        24    Q    Let's start with the first of those, inflated prices,

10:18   25    and if we could turn to the next slide.

10:18  1    Could you explain the two ways in which prices

2    were inflated?

3    A    Yes.  From an economic perspective, we can see two ways

4    that prices were inflated.  First, the hospitals that wanted

10:18  5    to use reprocessed catheters were forced instead to buy much

6    more expensive new catheters, and so the price they faced

7    went way up.  Second, Biosense, by excluding competition,

8    was able to continue to inflate its own prices for new

9    catheters.

10:19  10   Q    So let's start with the first of the two, forced

11   switching.

12        Could we turn to the next slide, please.

13        And could you explain with reference to this slide

14   the effect of that forced switching?

10:19  15   A    So when I say a hospital that wanted a reprocessed

16   catheter had to pay about twice as much if they switched to

17   a new Biosense catheter -- and this is using 2023 numbers --

18   the SOUNDSTAR, a new one, $2,500.  A reprocessed one, a

19   little under $1,300.  So it's two times as expensive.  For

10:19  20   the PENTARAY, 1.5 times as expensive.  And for the LASSO

21   NAV, about three times as expensive.

22   Q    Okay.  And the second point was that they were inflated

23   Biosense prices.

24        Let's turn to Slide 20 if we could.

25        Could you explain what Slide 20 shows, please?

10:20   1   A     Yes.  This shows the change in SOUNDSTAR price from
        2   2017 to 2023.  So this is the change relative to 2017.  This
        3   shows that the price went up $187 while the costs fell by
        4   $125.
10:20   5           And to give you -- you know, what's the economic
        6   background?  Well, in a competitive market, economics tells
        7   us that if costs are going down, prices would go down.  But
        8   that's not what we see in what Biosense did.  When its costs
        9   went down, its prices went up.
10:20  10   Q     If we could turn to Slide 21.
       11           Do we see that in another way in this slide?
       12   A     So this shows the same information in a different way.
       13   So you can see its costs went down -- the cost is the blue
       14   section -- but its price, which is the top of where the red
10:21  15   bar is, went up.  And that means that red bar, which is the
       16   profit, went up.  And that would be in absolute dollar
       17   terms.  You see the several hundred dollars more they earn
       18   in profit per catheter but also in percentage terms.
       19   Q     And do you see a similar trend for the PENTARAY
10:21  20   catheter?
       21   A     Yes.  So similarly for the PENTARAY, their costs went
       22   down.  Their price went up.  Their margins went up in terms
       23   of both dollars and in percentage terms.
       24   Q     And do you see the same trend for the LASSO NAV?
10:21  25   A     Yes, a slight nuance that their costs went up slightly,

1    but their price went up far more than their costs, and so

2    their margins went way up both in percentage and in dollar

3    terms.

4    Q    And so again, what is the significance of these last

5    four graphs where you see the price going up even though the

6    costs are going down?

7    A    It ties back to the economics.  If this was a

8    competitive market, we would expect when the costs go down,

9    the prices would go down.  We would expect the increased

10   competition that would have occurred from Innovative

11   entering the market -- if the Case Coverage Policy hadn't

12   excluded them, we would expect the margins to go down with

13   increased competition, but we see the opposite.

14   Q    And have you prepared a slide showing Biosense's profit

15   margins?

16   A    Yes, I have.

17   Q    Could we put up Slide 24, please.  Thank you.

18        What is the economic significance of these profit

19   margins?

20   A    So these are high profit margins, 76 percent to

21   87 percent.  To put that in concrete terms, that means for

22   each dollar that a hospital pays for, say, the PENTARAY, it

23   only costs 13 cents to make the catheter.  So these are high

24   profit margins.  And the significance is that Biosense was

25   able to earn or get these profit margins without losing a

71

10:23 | 1 | significant number of customers.

2 | Q    And why is that significant?

3 | A    Well, it's significant because if there was intense

4 | competition, if a company was charging 87 percent markup,

10:23 | 5 | you would expect some customers to switch, a significant

6 | number, but we don't see that.  Instead, the customers are

7 | continuing to buy from Biosense, and Biosense is achieving

8 | market shares of more than 90 percent, sometimes 99,

9 | 99.9 percent for some of these catheters.

10:23 | 10 | Q    Now, is it economically sensible to compare Biosense's

11 | profit margins to Innovative Health's profit margins?

12 | A    No.

13 | Q    Why not?

14 | A    So economists would be concerned about high profit

10:23 | 15 | margins if a company had dominance in a market.  If they

16 | were achieving those high profit margins and a high market

17 | share, then you might be worried that there was abuse of

18 | market power.  Innovative is not in that situation.

19 | Q    Now, Dr. Forister, did you ask whether Biosense might

10:24 | 20 | have offset the inflated catheter prices by lowering its

21 | prices for cardiac mapping machines?

22 | A    Yes.

23 | Q    And what did you conclude?

24 | A    I concluded that they would not have.  The evidence

10:24 | 25 | that I've seen on the pricing indicates that -- a variety of

10:24 1   pieces of evidence on pricing indicates that they would not

2   have raised machine prices in response to removing the Case

3   Coverage Policy.

4   Q    Did you prepare a slide showing Biosense's revenues

10:24 5   related to the CARTO 3 in 2023?

6   A    I did.

7   Q    Would you put up Slide 25, please.

8        How much revenue did Biosense earn on catheters

9   and disposables in 2023?

10:24 10   A    About a billion dollars in the U.S. alone.

11   Q    And what about from the sale of the CARTO 3 machine

12   itself?

13   A    $19 million.

14   Q    And why is that significant to your opinion?

10:25 15   A    So that's significant because if we think about if

16   Biosense were to raise the price of machines to offset any

17   decrease in price of catheters, the amount that customers

18   are spending on machines is so low that it wouldn't make

19   economic sense that they'd offset the additional price that

10:25 20   they're charging for catheters with higher CARTO 3 prices.

21   Q    Did you analyze whether Biosense might have offset the

22   inflated catheter prices with lower prices for CARTO 3

23   clinical support?

24   A    Actually, I'd continue my answer on the previous one,

10:25 25   if I may.

10:25   1   Q      Please.

        2   A      There's a few other reasons why the evidence shows they

        3          wouldn't have raised CARTO 3 prices if they took away the

        4          Case Coverage Policy.  The first is that when they

10:25   5          implemented the Case Coverage Policy, they didn't lower

        6          machine prices.  So if we roll things back and we think

        7          about, well, if we take out the Case Coverage Policy and we

        8          go back in time, does that mean prices were higher?  The

        9          answer is no.

10:26  10              The other factor to consider in that offset is a

       11          lot of the customers already bought the machine, and there's

       12          no way that a change in the machine price later would

       13          compensate them for the fact they're paying more for

       14          catheters right now.

10:26  15   Q      Now, did you do any analysis of whether Biosense might

       16          have offset those inflated catheter prices with lower prices

       17          for CARTO 3 clinical support?

       18   A      Yes.

       19   Q      Could we put up Slide 26, please.

10:26  20              And could you explain how this relates to your

       21          conclusion?

       22   A      So it's industry standard to offer clinical support for

       23          free.  And so consistent with that, we would -- as an

       24          economic matter, one would expect that absent the Case

10:26  25          Coverage Policy, clinical support would still be free.  And

1    here's a few scenarios or situations in which we see that

2    occurring.  For example, the first one, all other mapping

3    machine manufacturers offer free clinical support and no

4    Case Coverage Policy.  Biosense for the approximately seven

5    years before the tie offered free clinical support without a

6    Case Coverage Policy.

7           Even today, on cases involving non-sensor-enabled

8    independently reprocessed catheters, they still have free

9    clinical support for those procedures.  And in Alaska -- you

10   heard last week from Ms. Roberts at Ascension Health that in

11   Alaska, Biosense made an exception, and they continued to

12   offer free clinical support even while allowing them to use

13   independently reprocessed SOUNDSTARs.

14          And so all these real-world examples of these

15   situations where there's free clinical support without a

16   Case Coverage Policy provide a basis to conclude that

17   Biosense would have continued to offer free clinical support

18   even if there were no Case Coverage Policy.

19   Q    Now, Dr. Forister, does Biosense make money or lose

20   money by providing clinical account specialists to

21   hospitals?

22   A    This is a good question.  You might think the case

23   coverage is a cost center, but it's not.  Biosense

24   recognizes that having its mappers in the hospital earns it

25   a lot of money.

10:28   1    Q    How much?

        2    A    Biosense itself estimates that each mapper earns

        3    Biosense $1.5 to $2 million each year.

        4    Q    And how does that compare to the cost of providing a

10:28   5    mapper?

        6    A    So that's much higher than the cost of providing a

        7    mapper.  Biosense's internal calculations are that a mapper

        8    pays for their full year of cost in just two months of work.

        9    Q    Dr. Forister, did you reach any conclusions about the

10:29   10   effect of the Case Coverage Policy on the combined prices

        11   that hospitals paid for mapping machines, mappers, and

        12   catheters?

        13   A    Yes.

        14   Q    And what was your conclusion?

10:29   15   A    My conclusion was that the Case Coverage Policy had the

        16   effect of raising the total price or total cost to hospitals

        17   of the machine, the clinical support, and the catheters.

        18   Q    And what, if any, is your opinion about the effect of

        19   the tying arrangement on the individual and average prices

10:29   20   hospitals pay for catheters?

        21   A    So both the individual and the average prices were

        22   inflated by the Case Coverage Policy.

        23   Q    If we could turn back to Slide 17, please.

        24        THE COURT:  Before we do that, why don't we take

10:29   25   the mid-morning break here.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
10:29    1              Ladies and gentleman, I was so eager to get going,
         2    I was remiss this morning in not saying good morning to you.
         3              Today, we're only going to take an hour for lunch,
         4    and we're going to stop at 3:00.  I've spoken with counsel.
10:30    5    For the rest of the way along, we'd like to start at 8:30 if
         6    that's doable, and we'll only take one hour for lunch so it
         7    will speed us along.
         8              Very good.  We'll be in recess for 15 minutes.
         9    Please remember the admonition not to discuss the case with
10:30   10    anyone.  You're not to form any opinions on the issues in
        11    the case until it's submitted to you.
        12              (Jury not present)
        13              (Recess)
        14              THE COURT:  Let's bring the jury in, please.
10:45   15              (Jury present)
        16              THE COURT:  Mr. Ho.
        17              MR. HO:  Thank you, Your Honor.
        18    BY MR. HO:
        19    Q    Dr. Forister, could we turn back to your Slide 17.
10:46   20              Before the break, we talked about the inflated
        21    prices caused by Biosense's anticompetitive conduct.  I'd
        22    like to turn now to the decrease in quality.
        23              Could you explain how Biosense's anticompetitive
        24    conduct reduced quality in the market?
10:47   25    A    Okay, so looking at the data on catheter complaint
```

| | | |
|---|---|---|
| 10:47 | 1 | rates, the FDA's own database of adverse events like injury |
| | 2 | and death associated with these catheters, and academic |
| | 3 | studies, all of that indicates that excluding the |
| | 4 | reprocessors in this case has reduced the quality that was |
| 10:47 | 5 | available to hospitals and doctors. |
| | 6 | Q   Okay.  Before we turn to the data, I'd like to play two |
| | 7 | additional segments of the conference call that we heard |
| | 8 | earlier, JX173, in particular, 40:49 through 41:16 and then |
| | 9 | 41:42 through 41:46. |
| 10:48 | 10 | (Video clips played) |
| | 11 | BY MR. HO: |
| | 12 | Q   So Dr. Forister, could you explain what we just heard? |
| | 13 | A   Yes.  So that was a conference call.  It included |
| | 14 | statements by Noah Martin, who you saw deposition testimony |
| 10:49 | 15 | of last week, and Conrad Ramos, both at Biosense. |
| | 16 | Q   And what is the significance of that back and forth |
| | 17 | between the two of them? |
| | 18 | A   So one of the economic harms that we looked at is |
| | 19 | quality, and one of the potential justifications that was |
| 10:49 | 20 | put forward for the Case Coverage Policy was whether it |
| | 21 | ensured hospitals higher quality, and Biosense itself is |
| | 22 | indicating that that's not why they're imposing the policy. |
| | 23 | Q   Okay.  Now, let's turn to the data that you were |
| | 24 | referring to.  I'd like you to turn in your binder to |
| 10:49 | 25 | Exhibit 4419, please. |

| | | |
|---|---|---|
| 10:49 | 1 | A    Okay. |
| | 2 | Q    Did you create Exhibit 4419? |
| | 3 | A    I did. |
| | 4 | MR. HO:  We move Exhibit 4419 in evidence. |
| 10:50 | 5 | MR. CAVANAUGH:  No objection, Your Honor. |
| | 6 | THE COURT:  4419 will be received. |
| | 7 | (Exhibit 4419 received in evidence) |
| | 8 | BY MR. HO: |
| | 9 | Q    What does Exhibit 4419 show? |
| 10:50 | 10 | A    So this shows the complaint rates for the SOUNDSTAR, |
| | 11 | PENTARAY, and LASSO NAV separately for Innovative, Biosense, |
| | 12 | and Sterilmed. |
| | 13 | Q    And how do the complaint rates for Innovative compare |
| | 14 | to the complaint rates for Biosense and Sterilmed? |
| 10:50 | 15 | A    You can see that the complaint rates for Innovative on |
| | 16 | that top line are significantly lower than the complaint |
| | 17 | rates for Biosense or Sterilmed.  And you may recall these |
| | 18 | complaint rate numbers from the testimony of Innovative's |
| | 19 | representative last week. |
| 10:51 | 20 | Q    I'll ask you now to turn to JX4421. |
| | 21 | Did you also create Exhibit 4421? |
| | 22 | A    Yes. |
| | 23 | MR. HO:  We move 4421 in evidence. |
| | 24 | MR. CAVANAUGH:  No objection. |
| 10:51 | 25 | THE COURT:  4421 will be received. |

```
10:51   1              (Exhibit 4421 received in evidence)

        2   BY MR. HO:

        3   Q    Could you explain what Exhibit 4421 is?

        4   A    Yes.  So this shows the adverse events, the injury and

10:51   5   death rates, recorded in the FDA's database for the

        6   catheters and manufacturers at issue.  So you can see

        7   Biosense SOUNDSTAR, 116 injuries, ten deaths, from 2013 to

        8   2023.

        9   Q    And how do the adverse events, the injuries and deaths,

10:51  10   compare for Biosense and Sterilmed versus Innovative?

       11   A    So Biosense and Sterilmed's rates are higher than

       12   Innovative's both in terms of the total number in that

       13   column with the green highlighting, and then if we go over

       14   to the number of events per 10,000 catheters that were sold,

10:52  15   Innovative's rate of zero is lower than that of Biosense or

       16   Sterilmed -- or lower or equal to.

       17   Q    How do the two tables that you just showed about the

       18   complaint rates and about the FDA MAUDE data relate to your

       19   opinion as to whether the Biosense conduct in this case

10:52  20   decreased quality in the market?

       21   A    So both of those data sources indicate that Innovative

       22   has higher quality than Biosense or Sterilmed.  And so

       23   excluding Innovative from the market, preventing customers

       24   from choosing them, reduced the quality that was available

10:52  25   to their customers.
```

10:52   1   Q    In preparing this exhibit in particular, did you

        2   consider the FDA's guidance as to how the MAUDE data should

        3   be used?

        4   A    Yes, I did.

10:52   5   Q    And is the analysis in your table consistent with that

        6   guidance?

        7   A    Yes.  The FDA on their website indicates that this

        8   dataset alone, the adverse event data alone, should not be

        9   used to evaluate the adverse event rate.  And so what I did

10:53  10   was I included additional data, the sales.  I corroborated

       11   it against the complaint data, and then I looked at the

       12   academic research to see are there any findings that are

       13   contrary to this?  And there's no academic studies contrary

       14   to what I'm showing you here.

10:53  15   Q    Now, could you explain why it might well be that

       16   Innovative's reprocessed catheters are higher quality,

       17   safer, more effective than new catheters?  In other words,

       18   why does your empirical analysis make sense?

       19   A    Well, there's a few reasons, and one is this.  The

10:53  20   catheters that are getting to customers that are

       21   reprocessed --

       22        MR. CAVANAUGH:  Your Honor, I'm going to object.

       23   This is not an expert on quality of catheters.  He's done an

       24   analysis based on some data.  That's fine, but I don't think

10:54  25   he's qualified to give his opinion.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
| 10:54 | 1  | THE COURT: Mr. Ho.                                        |
|       | 2  | MR. HO: Your Honor, I think he's allowed to              |
|       | 3  | explain why his empirical findings are consistent with his |
|       | 4  | understanding of the way these markets work.             |
| 10:54 | 5  | THE COURT: Overruled.                                    |
|       | 6  | THE WITNESS: Okay. I'm allowed to answer the             |
|       | 7  | question?                                                |
|       | 8  | THE COURT: Yes.                                          |
|       | 9  | THE WITNESS: Okay. All right, so a reprocessed           |
| 10:54 | 10 | catheter -- sorry, I need to reset. All right, so a new  |
|       | 11 | catheter, Biosense makes it. They do their inspection    |
|       | 12 | process. It goes to the customer. The reprocessed catheter |
|       | 13 | in contrast to that one checkpoint going through the     |
|       | 14 | Biosense process -- sorry, going through the -- yeah, going |
| 10:54 | 15 | through the Biosense process, it has three checkpoints.  |
|       | 16 | It's going to go through that initial process. Then it's |
|       | 17 | going to go and be used in a procedure.                  |
|       | 18 | And for a lot of medical devices, the first time         |
|       | 19 | the device is used is when it's the most likely to have an |
| 10:55 | 20 | issue. And so it goes to the procedure. They see it      |
|       | 21 | doesn't work. The ones that are lemons are taken out, not |
|       | 22 | used, and then the used catheters go through another     |
|       | 23 | checkpoint, which is Innovative's own quality assurance and |
|       | 24 | testing. And you've heard last week that Innovative checks |
| 10:55 | 25 | each catheter six times with six different people to make |

10:55    1    sure that the catheter is good to use.

         2    BY MR. HO:

         3    Q    Now, if we could go back to Slide 17, please, and move

         4    on to decreased innovation.  What do you mean by that?

10:55    5    A    Well, we can start with a fundamental economic

         6    principle, which is competition spurs innovation.  Companies

         7    come out with new and better products because they're facing

         8    competitive pressure to convince customers to buy from them.

         9    So reducing competition on a theoretical basis would reduce

10:55   10    innovation.

        11    Q    And do you see real-world examples of that here?

        12    A    Yes, and real-world experience here confirms that, and

        13    I'll give two examples.  First, you heard testimony last

        14    week about Innovative's patented technology for cleaning the

10:56   15    lumen, this narrow tube that's in the catheter that's really

        16    hard to get clean.  They came up with a way to clean it that

        17    was new, so a new process that made it even cleaner than a

        18    new catheter's lumen.  By excluding Innovative's sales, they

        19    prevented that technology from getting to customers.

10:56   20    Q    Are there other examples?

        21    A    Yes.  A second example would be because of the Case

        22    Coverage Policy, that convinced companies like Innovative

        23    and Stryker not to reprocess the OCTARAY because they knew

        24    they would be excluded from the market.  And so that

10:56   25    innovation of a reprocessed OCTARAY has not occurred, and it

10:56   1   looks like that is due to the Case Coverage Policy.

2   Q   Now, lastly, if we could talk about the fourth bullet

3   point, decreased choice, how did Biosense's conduct decrease

4   choice?

10:57   5   A   Well, the Case Coverage Policy itself is cutting off

6   choice.  The customer that wants to choose independently

7   reprocessed and use Biosense's mappers can't do so, so that

8   choice is removed.

9        And I can give you an example of why that choice

10:57   10   matters.  You heard last week the testimony that there was a

11   shortage at one point of the 8 French SOUNDSTAR, the 8

12   French being the narrow diameter.  And instead of letting

13   doctors go and get their preferred catheter size, the 8

14   French, from an independent reprocessor, doctors were forced

10:57   15   to use a different catheter or the larger diameter catheter.

16        And looking at the medical research, larger

17   diameter catheters are associated with needing to make a

18   larger incision in the patient to put them in.  And so we

19   can see that decrease in the choice can have a direct impact

10:57   20   on customer health and safety.

21   Q   Now, Dr. Forister, what did you calculate to be

22   Innovative's lost profits from Biosense's anticompetitive

23   conduct?

24   A   I calculated that their lost profits were at least

10:58   25   $147 million.

| | | |
|---|---|---|
| 10:58 | 1 | Q    Over what time period? |
| | 2 | A    And that was about a ten-year period from 2016 through |
| | 3 | until now last week. |
| | 4 | Q    Okay.  Could you please put up Slide 29. |
| 10:58 | 5 | Dr. Forister, you prepared Slide 29? |
| | 6 | A    I did. |
| | 7 | Q    What does it show? |
| | 8 | A    So this breaks out the lost profit for these three sets |
| | 9 | of catheters:  the SOUNDSTAR at approximately $95 million, |
| 10:58 | 10 | the PENTARAY and OCTARAY at approximately $43 million, and |
| | 11 | the LASSO NAV at about $9 million. |
| | 12 | Q    Did you prepare a slide to help illustrate your lost |
| | 13 | profits calculation? |
| | 14 | A    I did. |
| 10:58 | 15 | Q    Could we put up Slide 30. |
| | 16 | Could you explain generally what Slide 30 shows? |
| | 17 | A    Yes.  So to get to that $147 million in total lost |
| | 18 | profits, I started by looking at just what was the effect of |
| | 19 | the Case Coverage Policy, and that had $139 million in lost |
| 10:59 | 20 | profits.  I then asked, well, what effect did the blocking |
| | 21 | technology have?  And the blocking technology delayed entry. |
| | 22 | And so if the blocking technology was removed, Innovative |
| | 23 | could have started selling earlier.  It would have had more |
| | 24 | months of sales.  And so I calculated how much that would |
| 10:59 | 25 | be, and it was about $8 million. |

10:59    1    Q    Okay.  Let's start with lost profits from tying on the
         2    left there.
         3            What are the components of lost profits from
         4    tying?
10:59    5    A    So if we want to see what were the lost profits, we
         6    first would need to estimate -- or sorry, I should say
         7    calculate what Innovative's profits would be in the absence
         8    of the Case Coverage Policy, what I'll call Innovative's
         9    competitive profits, and then we subtract off what
11:00   10    Innovative actually had as profits, and that difference is
        11    the lost profits.
        12    Q    So if you could explain what the blue box is,
        13    Innovative's actual profits, how do you calculate that?
        14    A    So that's simply taking their total sales units, how
11:00   15    many catheters did they sell, how much did they charge per
        16    catheter, multiply those two together, and subtract off the
        17    cost of supplying those catheters.
        18    Q    Okay.  Now, turning to the green box, what economic
        19    method did you use to determine Innovative's competitive
11:00   20    profits?
        21    A    So I used what's called a benchmark approach or
        22    benchmark analysis.
        23    Q    What do economists use a benchmark approach for?
        24    A    So in a benchmark analysis, we look at another market
11:00   25    or product, the benchmark, to infer what performance would

```
11:00    1    have been like in the market of issue for these catheters.
         2    Q    Could we put up Slide 31, please.
         3          Could you explain what Slide 31 shows?
         4    A    So we're looking for benchmark, and there's two
11:01    5    important factors to have.  First, that benchmark should be
         6    unaffected by the challenged conduct.  We're looking for an
         7    example to use of where the conduct didn't occur.  The
         8    second is we want a benchmark that's comparable.  So we can
         9    say with those two things, one, it wasn't affected by the
11:01   10    challenged conduct; and, two, it looks like we can use it to
        11    infer what would have happened in the market that we're
        12    interested in.
        13    Q    And so using those criteria, what benchmarks did you
        14    choose?
11:01   15    A    For the SOUNDSTAR ultrasound catheter, I used the
        16    Abbott ViewFlex ultrasound catheter, and for the mapping
        17    diagnostic catheters at issue, I used the Biosense WEBSTER
        18    CS diagnostic catheter.
        19    Q    Okay, let's turn to the next slide.
11:01   20          Could you please explain why you chose the Abbott
        21    ViewFlex as the benchmark catheter for the Biosense
        22    SOUNDSTAR?
        23    A    So going to those two topics we just talked about,
        24    first, was the Abbott ViewFlex unaffected by the challenged
11:01   25    conduct?  Abbott doesn't have a Case Coverage Policy for the
```

11:02  1   ViewFlex, so it's unaffected.  Satisfied.

2          Second, is it similar enough to the affected

3   product that it makes a reliable benchmark?  And we can see

4   a few points of similarity, starting with it's an ultrasound

11:02  5   catheter like the SOUNDSTAR.  It's used in these EP

6   procedures.  It's a catheter that has independent

7   reprocessors.  And it's the closest in sales volume of the

8   unaffected ultrasound catheters to the SOUNDSTAR.  So based

9   on those points of comparison, it looks similar and reliable

11:02  10  to use as a benchmark.

11  Q    Okay.  Could we turn to the next slide, please.

12          And could you explain based on those criteria why

13  you chose the WEBSTER CS as the benchmark catheter for the

14  three affected catheters?

11:02  15  A    So the WEBSTER CS is a Biosense catheter, but it's not

16  covered by the Case Coverage Policy.  So it's unaffected.

17  It satisfies that.  The second, is it similar to the

18  affected products?  Well, it's a diagnostic catheter.  It's

19  used in EP procedures.  It has independent reprocessors, and

11:03  20  it's the closest in volume of unaffected catheters to the

21  LASSO, PENTARAY, and OCTARAY volume.

22  Q    Okay.  So now that you've chosen your two benchmark

23  catheters, what do you do after that?

24  A    So next we calculate the market shares and price

11:03  25  discounts in the benchmark markets so we can apply them to

11:03  1   our markets at issue.

2   Q    Okay.  Could you turn in your binder to Exhibit 4406,

3   please.

4   A    Okay.

11:03  5   Q    Did you create 4406?

6   A    I did.

7        MR. HO:  We move 4406 into evidence.

8        MR. CAVANAUGH:  No objection.

9        THE COURT:  4406 will be received.

11:03 10        (Exhibit 4406 received in evidence)

11   BY MR. HO:

12   Q    Dr. Forister, could you explain what 4406 shows?

13   A    Yes.  So this shows for the Webster CS benchmark on the

14   green line what Innovative's market share was.  You can see

11:04 15   it growing up to eight percent and sort of leveling off

16   towards ten percent.  And we see the dashed lines.  The

17   dashed gray is the LASSO NAV, and the black is the PENTARAY.

18   Q    And did you use the Webster CS as the benchmark for the

19   OCTARAY as well?

11:04 20   A    For the OCTARAY as well, yes.

21   Q    Did you do the same comparison as you see here for the

22   ViewFlex and the SOUNDSTAR?

23   A    I did.

24   Q    Okay.  Could we look at 4405, please.

11:04 25        Did you prepare 4405?

11:04  1    A    I did.

2               MR. HO:  We move 4405 into evidence.

3               MR. CAVANAUGH:  No objection.

4               THE COURT:  4405 will be received.

11:04  5        (Exhibit 4405 received in evidence)

6    BY MR. HO:

7    Q    Could you please explain what 4405 shows?

8    A    So this shows the benchmark for the ultrasound

9    catheter.  The ViewFlex benchmark is the dark blue line.

11:05  10   You can see it growing before leveling off a bit.  And then

11   the dashed gray line is the SOUNDSTAR.

12   Q    Okay.  So now you've done these comparisons of the

13   affected catheters with respect to the benchmark catheters.

14   What did you do next?

11:05  15   A    We go back to our profit formula, quantity times price

16   minus cost.  So for quantity, we look at the market share

17   that they would have earned.  And so we take that path of

18   market share performance, and we line it up with the entry

19   date that Innovative had with the catheters of interest.

11:05  20   For example, if they had entered January 1, 2016, we'd start

21   our market share growth from that point.

22               So then we project what their market share would

23   have been, and we multiply their market share by the actual

24   sales of that catheter to compute what they would have

11:06  25   earned.  So if they would have had, you know, a ten percent

90

11:06  1  market share of catheter sales, and there were a hundred

2  thousand catheters sold, they would have sold 10,000

3  catheters.  So that's how we calculate the quantity they

4  would have sold.

11:06  5          The next question is what price they would have

6  sold it at.  So we again look to the benchmark market.  And

7  for reprocessed devices like this, they're often sold at --

8  the reprocessed is often sold at a discount off the new

9  price.  So we look at what that discount was for the

11:06  10  benchmarks, and we apply that discount in the markets at

11  issue to get our price that they would have sold it.  So

12  then we multiply the quantity they would have sold times the

13  price they would have sold it at, subtract off costs, and we

14  have their profits.

11:06  15  Q    Okay.  So if we could put Slide 30 back up.

16          I think you've now explained how you arrived at

17  the blue box and the green box and, as a result, how you got

18  to lost profits from tying.

19          How did you determine the an additional lost

11:07  20  profits from blocking, the red box in the middle?

21  A    Yes.  So I talked about lining up that market share --

22  the benchmark market share performance with the actual entry

23  date of Innovative for these catheters.  I simply moved that

24  back by however many months the blocking technology was

11:07  25  causing a delay.  So if there was a three-month delay, I

| | |
|---|---|
| 11:07 | 1 |

```
11:07   1   just shifted that back three months, and they made sales for

        2   an additional three months.

        3   Q    Okay.  And I think you said in the summary of your

        4   opinions that the total lost profits that you calculated was

11:07   5   at least $147.4 million.

        6        Could you explain why you said at least?

        7   A    Yes.  There's a variety of factors that make it an

        8   underestimate of what the true lost profit is.  For example,

        9   I didn't include the ACUNAV catheter, the DECANAV catheter,

11:08  10   and the VIZIGO Steerable Sheath.  I didn't calculate damages

       11   due to the collections policy.  And I also didn't include

       12   damages from the additional cost, the monetary cost, of

       13   overcoming the blocking technology.  You heard from

       14   Innovative's engineer last week that it took time and effort

11:08  15   to overcome the blocking technology.  I only accounted for

       16   that time delay.  I didn't account for the cost of

       17   overcoming the blocking delay.

       18   Q    Now, Dr. Forister, I think you've heard since you've

       19   been sitting in this courtroom Biosense's counsel offer a

11:08  20   number of arguments as to why the Case Coverage Policy was

       21   legitimate.  Do you recall those?

       22   A    Yes.

       23   Q    And do you recall Biosense's attorney discussing free

       24   riding in his opening statement?

11:09  25   A    He did.
```

11:09    1    Q    If we could put up Slide 34, please.

2        And do you recall Biosense's counsel making this

3    statement in his opening statement?

4    A    I recall that.

11:09    5    Q    Okay. Now, do you agree with that statement?

6    A    No. From an economic standpoint, there is a lot of

7    error packed into this short sentence.

8    Q    Could you explain why?

9    A    Okay. There's two errors that I'll talk through.

11:09    10    First, Biosense is saying that -- they're claiming that

11    Innovative wants Biosense to provide the mappers, the CAS

12    service, for free. I'll pause there. That is not the

13    economic issue here. Biosense could charge for its mappers.

14    The claim is not that Biosense can't do that. They could if

11:09    15    they wanted to.

16        The second part is that Biosense is claiming that

17    the mappers help sell Innovative's product, and from an

18    economic standpoint, that's very misleading. You heard last

19    week from Biosense's own mapper, Ms. Tam, that she is paid

11:10    20    commissions for making more sales. If we look at Biosense's

21    documents, they categorize these mappers as salespeople.

22    They have a whole host of competitions and rewards for

23    selling more catheters, and Biosense describes all the ways

24    that the mappers can upsell and increase their own product.

11:10    25    So to say that their salesperson is selling Innovative

11:10     1    catheters doesn't make any economic sense.

         2    Q    Just to make one point clear, you said the issue in

         3    this case is not whether Biosense can charge for CAS

         4    services if it wanted to.  What is the issue in this case?

11:10     5    A    Oh, so the issue is that -- or the claim is that

         6    Biosense shouldn't be allowed to withhold that from

         7    customers if they use just one independently reprocessed

         8    catheter.

         9    Q    Dr. Forister, how does Biosense profit from procedures

11:11    10    even if there is a reprocessed catheter used?

        11    A    Well, each procedure uses multiple catheters and

        12    disposables.  You heard from both Biosense and Innovative

        13    witnesses last week to that effect.  In particular, there's

        14    -- for ablation procedures, they use ablation catheters, and

11:11    15    those can cost more than $3,000, and there's no reprocessing

        16    done on those.  So for an ablation procedure, Biosense is

        17    basically guaranteed to make that $3,000 in revenue for a

        18    procedure.

        19            There's other types of products, like the

11:11    20    reference patches that are used for the navigation aspect

        21    that only Biosense sells.  So Biosense is always going to

        22    make a sale for each procedure that's done, regardless of

        23    how many independently reprocessed catheters are used.

        24    Q    Dr. Forister, economically, is it free riding for a

11:12    25    company like Innovative to want to compete in the market for

11:12  1  catheters but not to compete in the market for clinical

2  support?

3  A    No.  From an economic standpoint, from looking at the

4  business world, it's completely normal to expect a company

11:12  5  competes in the market it's best suited for.  All the time

6  you'll see companies that compete in just one market without

7  competing in the market for, say, a related product.

8  Q    Could you give an example?

9  A    Yeah.  So you might want to go for a bike ride, and you

11:12  10  might want a bicycle and a helmet.  There's companies that

11  just make helmets, and there's companies that just make

12  bicycles, even though you use them together.  There's many

13  other examples.  You might think of cereal and milk.  People

14  generally eat cereal with milk, but there's companies that

11:13  15  just provide cereal, and companies that just provide milk,

16  even though those are products used together.

17  Q    In your opinion, Dr. Forister, is free riding the real

18  economic justification for the Case Coverage Policy?

19  A    Based on my economic analysis, no.

11:13  20  Q    And have you prepared a slide to explain why?

21  A    Yes.

22  Q    Could you please put up Slide 35.

23       And could you explain what Slide 35 shows?

24  A    Yes.  So if we want to consider whether a claimed

11:13  25  reason for a policy like this is what they claim, we can use

| | |
|---|---|
| 11:13 | 1 |

1  a variety of economic tools, and one is to see if that claim

2  holds up with the use of that policy or absence of that

3  policy in various situations.

4  Q    So if you could walk us through the four considerations

5  on this slide.

6  A    Sure.  So if free riding was an issue, one would have

7  expected Biosense to have put in place this policy when they

8  first started selling the machines and the catheters because

9  there was reprocessing at that time.  Even today, the policy

10  doesn't cover independently reprocessed non-sensor-enabled

11  catheters.  And the same free-riding issue that they're

12  claiming would apply there, Biosense doesn't apply it.  They

13  only apply it to their most expensive catheters.

14       We can look at other mapping machine

15  manufacturers.  And if free riding was a problem, if they

16  would experience that same problem, we would have expected

17  them to have the same policy, but they don't.

18       And then I'll go back to the example from last

19  week of Ms. Roberts talking about Ascension Hospital in

20  Alaska.  Biosense doesn't apply its policy in Alaska when

21  the Providence Hospital uses independently reprocessed

22  SOUNDSTARs.  So Biosense if there was a real free-riding

23  problem, from an economic standpoint, it's inconsistent that

24  Biosense would do that.

25  Q    I think you also heard Biosense's counsel ask a lot of

11:15   1   questions about recalibration of catheters.

        2          Do these same factors relate to your economic

        3   assessment of whether recalibration is a sound justification

        4   for the Case Coverage Policy?

11:15   5   A      Yes.

        6   Q      Could you please explain?

        7   A      So we take those same -- the same situations.  If

        8   recalibration was a real problem, is the Case Coverage

        9   Policy being applied in a way that's consistent with that?

11:15  10   Well, I wouldn't -- you know, from an economic standpoint,

       11   you wouldn't have expected Biosense to wait six years to

       12   apply it nationwide.  Biosense clinical support staff have

       13   covered cases with tens of thousands of Stryker reprocessed

       14   catheters that would under their theory suffer from this

11:16  15   recalibration issue.

       16          All the other mapping machine manufacturers would

       17   face this same recalibration issue.  Yet, they don't use the

       18   Case Coverage Policy.  And in Alaska, Biosense makes an

       19   exception, and they use what they claim are non-calibrated

11:16  20   catheters -- sorry, they allow mappers to cover cases with

       21   what they claim are non-calibrated catheters.

       22          So if we compare their claimed justification to

       23   how they're actually using the tie and whether other

       24   companies are, those two don't match up from an economic

11:16  25   standpoint.

| | | |
|---|---|---|
| 11:16 | 1 | Q    Dr. Forister, could I ask you to turn to Exhibit 3236 |
| | 2 | in your binder? |
| | 3 | A    Okay. |
| | 4 | Q    Did you rely on 3236? |
| 11:16 | 5 | A    I did. |
| | 6 | MR. HO:  We move to admit Exhibit 3236. |
| | 7 | MR. CAVANAUGH:  No objection. |
| | 8 | THE COURT:  3236 will be received. |
| | 9 | (Exhibit 3236 received in evidence) |
| 11:17 | 10 | BY MR. HO: |
| | 11 | Q    Dr. Forister, what is Exhibit 3236? |
| | 12 | A    This is a Biosense presentation about the CARTO. |
| | 13 | Q    And if we could turn to--I think it's Slide 13 of the |
| | 14 | presentation. |
| 11:17 | 15 | A    Yes. |
| | 16 | Q    How is this relevant to your assessment of the |
| | 17 | recalibration arguments that you've heard in court? |
| | 18 | A    So what economists will do is they'll corroborate an |
| | 19 | economic analysis with facts on the ground.  And so this is |
| 11:17 | 20 | one of the ways that I corroborated the analysis I just |
| | 21 | showed you with case facts.  And here, Biosense is |
| | 22 | describing calibration.  The smaller text, if you can see it |
| | 23 | -- I'll start with the tiny text:  "If you can see your |
| | 24 | catheters, the field is calibrated, and the image is |
| 11:17 | 25 | accurate.  That is, if you can see the catheters displayed |

11:18    1    on the CARTO machine, the system will not display a catheter

         2    with semi-accuracy."

         3    Q     And how is that significant?

         4    A     So this explains from a technical standpoint why we see

11:18    5    that inconsistent -- seemingly inconsistent pattern in the

         6    economics of the recalibration, which is the machine already

         7    has a way to self-correct for any calibration issues.  If

         8    the catheter is not calibrated, it won't be displayed, and

         9    in the operation, you just use a replacement catheter.

11:18   10    Q     Dr. Forister, did you do any analysis weighing the

      11    anticompetitive harms of Biosense's conduct against any

      12    benefit of that conduct to competition?

      13    A     I did.

      14    Q     And what did you conclude?

11:18   15    A     I looked for any benefits to consumers, and across the

      16    variety of claimed benefits, I didn't see any actual

      17    economic value that they were giving to customers.  Against

      18    that, we saw these four types of economic harm.  And so if

      19    we look at the net effect, there was economic harm to

11:19   20    customers, the hospitals, and the doctors.

      21    Q     Dr. Forister, I think you also heard Biosense ask

      22    questions about whether hospitals have a choice just to

      23    switch away from a CARTO 3 machine to another cardiac

      24    mapping machine in order to avoid the Case Coverage Policy.

11:19   25         Did you do an economic empirical analysis of that

11:19   1   question?

2   A    Yes, I did.

3   Q    Would you please turn to Exhibit 4392 in your binder.

4   Q    Did you prepare Exhibit 4392?

11:19   5   A    Yes.

6            MR. HO:  Move to admit Exhibit 4392.

7            MR. CAVANAUGH:  No objection.

8            THE COURT:  4392 will be received.

9            (Exhibit 4392 received in evidence)

11:20  10   BY MR. HO:

11   Q    Dr. Forister, could you explain what Exhibit 4392

12   shows?

13   A    This shows the share of electrophysiology procedures

14   that are being been done using the CARTO 3.

11:20  15   Q    And what does it show?

16   A    Well, it shows -- you can see a somewhat flat share for

17   the first few years after the Case Coverage Policy rolled

18   out nationwide and then increasing share.

19   Q    And so we talked at some length about how Biosense's

11:20  20   conduct caused increased prices and decreased quality.  And

21   yet, based on this chart, we see that their share of

22   procedures went up.

23            What is the economic significance of that?

24   A    The economic significance is this.  If it was easy to

11:20  25   switch, if there were low costs of switching in response to

11:21 1    that increase in prices and the other harms, we would expect
2    hospitals to be switching away from using the CARTO 3 after
3    the policy went nationwide in 2016.  Instead, we don't see
4    significant switching away from the CARTO 3, which indicates
11:21 5    that there are significant switching costs.
6    Q    Now, Dr. Forister, once a hospital buys a CARTO 3
7    mapping machine, do they have a choice to buy non-CARTO 3
8    compatible mapping catheters for their procedures?
9    A    Effectively, they would not have that choice because of
11:21 10   the Case Coverage Policy.
11   Q    Well, do they have the ability to buy non-CARTO 3
12   catheters?
13   A    Oh, sorry, I misheard.  In theory, they do.  But
14   there's a variety of challenges and difficulties they'd face
11:21 15   that economists refer to as switching costs.
16   Q    And so why is it an economic issue that once you buy
17   the CARTO 3 machine you can only use CARTO 3 compatible
18   catheters?
19   A    So that's an issue because once a hospital and a doctor
11:22 20   has chosen to use the CARTO 3, they're locked in to buying
21   the aftermarket products for the CARTO 3.
22   Q    Now, you use the word "aftermarket."
23        Could you explain what an aftermarket is?
24   A    The aftermarket is simply the purchases you make after
11:22 25   that initial equipment purchase.

| | | |
|---|---|---|
| 11:22 | 1 | Q    Okay.  I think you used the phrase "locked in." |
| | 2 | Could you explain what you mean by "locked in"? |
| | 3 | A    Being locked in is what occurs when you buy this |
| | 4 | original equipment, and then you're stuck buying the |
| 11:22 | 5 | compatible equipment in the aftermarket.  For example, you |
| | 6 | get -- you buy an iPhone.  Well, then you're locked into |
| | 7 | buying the apps and accessories for the iPhone. |
| | 8 | Q    And in your opinion, do a substantial number of CARTO 3 |
| | 9 | buyers face substantial lock-in? |
| 11:23 | 10 | A    Yes.  The evidence in this case indicates that they |
| | 11 | have substantial lock-in. |
| | 12 | Q    And have you prepared a slide to help explain that to |
| | 13 | the jury? |
| | 14 | A    Yes. |
| 11:23 | 15 | Q    Would you put up Slide 36. |
| | 16 | Now, the title of the slide is "Single-Brand |
| | 17 | Aftermarket Lock-In Factors," and so a lot of words. |
| | 18 | Could you explain generally what this slide is |
| | 19 | about? |
| 11:23 | 20 | A    So we talked about a customer being locked in in the |
| | 21 | aftermarket for that original equipment, the CARTO 3.  That |
| | 22 | original equipment is the single brand that's being |
| | 23 | referenced there.  And these are four factors that |
| | 24 | economists consider when evaluating the extent to which a |
| 11:23 | 25 | customer is locked in, and they might experience then |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:23  1    anticompetitive effects in the aftermarket.

2    Q    So let's talk about the first of the four factors.  It

3    says:  "Consumers do not generally know about the

4    anticompetitive conduct."

11:24  5            And let's talk about hospitals that bought the

6    CARTO 3 before April of 2016.  Could you explain how that

7    factor would apply to them?

8    A    Yes.  So the policy had not been rolled out nationwide,

9    and so with limited exception, like Ascension, the hospitals

11:24  10   would not have known about the policy.  And so if you don't

11   know the policy exists when you buy the machine, then you're

12   stuck with it.  You're locked in dealing with that policy

13   after the point of initial purchase.

14   Q    Of all the CARTO 3 machines that hospitals operate

11:24  15   today, what percentage were installed prior to April of

16   2016?

17   A    Fifty-eight percent of the machines today were

18   installed prior to April 2016.

19   Q    And now, could you apply that first factor to hospitals

11:24  20   that bought their machines after April 2016?

21   A    Yes.  And an important factor here is that Biosense is

22   not informing the market about this as a broad matter.  And

23   so a lot of customers -- it looks like the customers who

24   were buying the CARTO 3 even after April of 2016 are not

11:25  25   being informed at the time they decided to purchase the

| | 1 | CARTO 3. |
|11:25| 2 | Q    Have you reviewed CARTO 3 contracts to see whether the |
| | 3 | Case Coverage Policy is in the contract? |
| | 4 | A    I've reviewed those contracts and haven't seen evidence |
|11:25| 5 | of disclosure of the policy in the contracts. |
| | 6 | Q    And based on your review of the evidence, is the policy |
| | 7 | disclosed at the time of purchase in any other way? |
| | 8 | A    No. |
| | 9 | Q    Could you please turn to Exhibit 3963. |
|11:26| 10 | Did you rely on Exhibit 3963? |
| | 11 | A    I did. |
| | 12 | MR. HO:  We move to admit Exhibit 3963. |
| | 13 | MR. CAVANAUGH:  No objection. |
| | 14 | THE COURT:  3963 will be received. |
|11:26| 15 | (Exhibit 3963 received in evidence) |
| | 16 | BY MR. HO: |
| | 17 | Q    Now, Dr. Forister, what is Exhibit 3963? |
| | 18 | A    So this is an e-mail from Pamela Krnavek at PeaceHealth |
| | 19 | sent January 9, 2024, to Rick Ferreira.  You saw him last |
|11:26| 20 | week.  He is the CEO of Innovative Health. |
| | 21 | Q    All right.  And how is this document relevant to your |
| | 22 | opinion as to lock-in for customers who bought after April |
| | 23 | 2016? |
| | 24 | A    So this is a hospital system communicating with |
|11:26| 25 | Innovative, and three dates are significant here.  The date |

Case 1:19-cv-01984-VSB-SLC  Document 571  Filed 06/25/25  Page 104 of 676  Page
Page ID #26545372

11:26    1    of this communication if you can see is from January of

2    2024, and this e-mail chain is a discussion of the hospital

3    having been surprised that the Case Coverage Policy exists.

4    They wanted to buy independently reprocessed catheters from

11:27    5    Innovative.  This is in 2024.  They then internally asked,

6    well, when did we sign the contract for the CARTO 3?  And

7    that was back in 2018 and 2021.  And yet, these if I do the

8    math right six or three years later after they bought the

9    machine, now they're finding out a Case Coverage Policy

11:27    10    exists.

11        I suppose a fourth date is also important.  The

12    nationwide rollout of the policy was in 2016.  So you had

13    the policy's been rolled out nationwide.  Customers are

14    buying it many years later and not finding out about it

11:27    15    until several years after that point.

16    Q    Okay.  Could we please turn back to Slide 36.

17        The second factor on your list is significant

18    switching costs.  What are switching costs?

19    A    Switching costs are the economic term for the cost that

11:28    20    someone incurs from trying to switch to something new.

21    Q    And do hospitals face significant switching costs

22    between systems?

23    A    They do.  And that consists of both financial and other

24    impediments or costs.

11:28    25    Q    Okay.  And what are the financial impediments?

11:28  1   A    So the financial part of the switching cost is the cost
2   to buy a new machine.  If you don't have that other machine,
3   you have to buy it.  They cost hundreds of thousands of
4   dollars.
11:28  5   Q    And what the non-financial switching costs?
6   A    So these are particularly challenging to deal with, and
7   you heard from Dr. Doshi on Friday describing them.  The
8   hospital, or the situation, would have to convince the
9   doctor to switch away from the machine they were planning to
11:28  10  use to a new machine.  And the doctors are comfortable with
11  one machine.  They might not have training on another
12  machine, which is another barrier or cost to switching.
13  They may want to stick with the mapper on the CARTO 3 and
14  not switch to a new mapper on, say, an Abbott machine.  So
11:29  15  these are all costs to switching that indicate that lock-in
16  is happening.
17  Q    Okay.  The third item on your list is the difficulty of
18  lifecycle pricing.
19       Before we get to the difficulty part, what is
11:29  20  lifecycle pricing?
21  A    So that's just predicting the total cost over the life
22  of a CARTO 3.
23  Q    And why in your opinion is it difficult for hospitals
24  to accurately engage in lifecycle pricing?
11:29  25  A    Well, there's a few factors.  The first is that the

11:29   1   CARTO 3 is a long-lived device.  It has a lifespan of ten or
2   more years.  And you can imagine it's difficult to predict
3   ten years in the future, particularly in light of the fact
4   that the hospital would need to predict when new and more
11:30   5   expensive catheters are coming online, when reprocessors
6   might enter at lower prices.  They need to figure out what
7   patient demand is going to be, what reimbursements are going
8   to be, so a host of challenges to predicting a ten-year or
9   more lifecycle price.
11:30   10   Q    You heard some testimony in court during the trial that
11   hospitals tried to engage in lifecycle pricing.  Did that
12   affect your opinion?
13   A    No.
14   Q    Why not?
11:30   15   A    Well, one would expect the purchaser of a product to
16   make some attempts to do lifecycle pricing, but for all the
17   reasons I mentioned, it's challenging to do that accurately.
18   And if it's -- if you can't accurately predict those things,
19   you may not be able to avoid the choice of buying the CARTO
11:30   20   3 and getting locked in.
21   Q    Now, the last factor on your list is cross-elasticity
22   of demand.  Could you explain what that means?
23   A    Yeah.  So that's just a fancy economic way of saying if
24   the price of one product goes up, do customers switch to
11:31   25   another product?

11:31    1    Q    Okay.  And did we see cross-elasticity of demand

         2    between sensor-enabled catheters for different kinds of

         3    cardiac mapping machines?

         4    A    So I looked at whether we could see that substitution,

11:31    5    say, between the mapping catheters on the CARTO and mapping

         6    catheters on the Abbott machine.  And the evidence in this

         7    case indicates that there is not significant switching going

         8    on between those in response to price or other changes.

         9    Q    Now, what proportion of CARTO 3 machines in operation

11:31   10    today in your opinion are subject to the single-brand

        11    aftermarket lock-in factors that you see on this slide?

        12    A    Essentially, all of them would be.  And particularly

        13    relevant is whether they knew about the policy at the time

        14    they first bought into the CARTO 3.

11:32   15    Q    I'd like to shift gears a little bit and ask you to

        16    help the jury understand what is a relevant antitrust

        17    market?

        18    A    So a relevant antitrust market consists of the products

        19    and services that are reasonably interchangeable or

11:32   20    reasonably substitutable.

        21    Q    Did you evaluate what relevant antitrust markets exist

        22    in this case?

        23    A    I did.

        24    Q    And do you have a slide to help explain your opinions?

11:32   25    A    Yes.

| | | |
|---|---|---|
| 11:32 | 1 | Q     Okay.  So in the two columns there on the right, you |
| | 2 | have first "Practical Indicators," and then something called |
| | 3 | "SSNIP Test." |
| | 4 |           Could you first explain what you mean by practical |
| 11:32 | 5 | indicators? |
| | 6 | A     Yes.  Practical indicators are common sense things that |
| | 7 | economists look to to define a market.  For example, is |
| | 8 | there a set of products that have unique characteristics |
| | 9 | that put them in their own group?  Are there unique |
| 11:32 | 10 | production facilities to make a set of products?  Are there |
| | 11 | distinct customers for a product?  Are the products at a |
| | 12 | distinct price, or is there industry recognition that |
| | 13 | there's a distinct market? |
| | 14 | Q     Okay.  And then what do you mean by a SSNIP test -- |
| 11:33 | 15 | what does SSNIP stand for? |
| | 16 | A     I apologize for throwing out an acronym.  It stands for |
| | 17 | small but significant non-transitory increase in price. |
| | 18 | Q     And what does that mean in ordinary terms? |
| | 19 | A     Well, I'll try to get it in ordinary terms.  It's if a |
| 11:33 | 20 | company had control of a market, could they impose this |
| | 21 | small and significant let's say five percent non-transitory, |
| | 22 | which just means long-term, one year, increase in price?  So |
| | 23 | could a monopolist of a set of products raise their price |
| | 24 | five percent above -- or sorry, I should say inflate their |
| 11:33 | 25 | price five percent above the competitive level for more than |

11:34  1  a year and do so profitably?  If a monopolist that

2  controlled that set of products could do so, economists say

3  that that is a relevant antitrust market.

4  Q     And did you apply both those tests, the practical

11:34  5  indicators and the SSNIP test, in arriving at your opinions

6  about the three sets of relevant antitrust markets in this

7  case?

8  A     Yes.

9  Q     Okay.  So could we please start with the cardiac

11:34  10  mapping machine market, and explain why in your opinion that

11  is a relevant antitrust market?

12  A     Well, I'll start with practical indicators.  You've

13  heard about these machines.  They do cardiac mapping.

14  That's a unique service.  There's not a close substitute

11:34  15  that you could go to if you wanted to map the heart.

16  There's not really something else you could use that's

17  closely interchangeable.  And from that perspective, then it

18  looks like a relevant market.

19           There's distinct customers.  Electrophysiology

11:35  20  labs are the ones buying mapping machines.  And so we can

21  see for a variety of factors this looks like a relevant

22  market.

23           Then we can turn to this SSNIP Test.  Could a

24  company that controls that market raise the price of them if

11:35  25  they controlled all the machines?  And given how unique they

11:35    1    are and the relative price of machines, the economic answer

         2    is they could.

         3    Q    Dr. Forister, could you now explain why in your opinion

         4    there is a relevant antitrust market for CARTO 3 clinical

11:35    5    support?

         6    A    So again, we turn to these practical indicators.  This

         7    is a unique service.  It's providing the mapping support for

         8    CARTO 3 machines.  You can't do that with an Abbott mapper.

         9    People need a lot of training to do it.  It's specialized.

11:35   10    You have a distinct customer group, these EP labs with Carto

        11    3 machines.  So for those reasons, it looks like for

        12    practical reasons it's a relevant market.

        13            Then we can look at the SSNIP test.  What if a

        14    company controlled all of the market for mappers.  Could

11:36   15    they force customers to pay more?  Well, we have the answer

        16    here with what Biosense did.  They didn't even obtain a

        17    complete monopoly, just 95 percent of the market, and they

        18    were able to force customers to pay more for catheters.  So

        19    we can see that the SSNIP test is also satisfied.

11:36   20    Q    Now, for the CARTO 3 sensor-enabled catheters, the last

        21    set of markets, do you have another slide to help explain

        22    that to the jury?

        23    A    Yes.

        24    Q    Okay.  Could you please explain your opinion as to the

11:36   25    three relevant antitrust markets relating to catheters?

| | |
|---|---|
| 11:36 | 1 |

1    A     So on the one hand, we have the distinct customers, the

2    EP labs with CARTO 3 procedures.  And then we look at are

3    these unique features that put them in their own buckets.

4    In the first place, Biosense puts them in these buckets,

5    categorizing them as LASSO NAV's sensor-enabled circular

6    mapping for the Carto 3, and the PENTARAY, OCTARAY, OPTRELL

7    are sensor-enabled high-density mapping catheters.  You also

8    heard testimony last week from Ms. Tam at Biosense and a

9    representative from Innovative describing the unique

10   features of the LASSO NAV versus the other mapping

11   catheters, and that puts them into separate relevant

12   markets.

13   Q    And then why is there yet a third separate relevant

14   market for sensor-enabled ultrasound catheters?

15   A     Well, this gets to the ultrasound is doing something

16   much different than the mapping catheter.  It's showing that

17   ultrasound picture, as opposed to collecting and displaying

18   the electronic information of the heart, and so that puts it

19   in a separate market.

20   Q    And why is there no for use with the CARTO 3 in your

21   description of the sensor-enabled ultrasound catheter

22   market?

23   A     That's because there's only one sensor-enabled

24   ultrasound catheter.  It's the SOUNDSTAR.  So it's in its

25   own market without the full use of CARTO 3 attached.

| | | |
|---|---|---|
| 11:38 | 1 | Q    If we could go back to Slide 37. |
| | 2 | Do markets consisting of the OEM and reprocessed |
| | 3 | catheters you identified satisfy the SSNIP Test? |
| | 4 | A    Yes, they do. |
| 11:38 | 5 | Q    And what is your basis for that conclusion? |
| | 6 | A    We can see what happens when a company is able to |
| | 7 | achieve a near monopoly in sales of those catheters, and |
| | 8 | that it raises prices. |
| | 9 | Q    Did you do an analysis of average prices? |
| 11:39 | 10 | A    Yes. |
| | 11 | Q    And does that analysis relate to your opinion on this |
| | 12 | point? |
| | 13 | A    It does.  For example, for the SOUNDSTAR, we saw that |
| | 14 | there was significant purchasing of reprocessing prior to |
| 11:39 | 15 | the Case Coverage Policy.  And by implementing the Case |
| | 16 | Coverage Policy, Biosense was able to raise the average |
| | 17 | price of the SOUNDSTAR.  As it achieved that near total |
| | 18 | monopoly position, it raised the average price ten percent. |
| | 19 | Q    Are you aware of any other markets that are similar to |
| 11:39 | 20 | this one in that they include a new device like the Biosense |
| | 21 | OEM catheter as well as reprocessed devices? |
| | 22 | A    Yes.  Each of these catheter markets would include both |
| | 23 | the new and the OEM catheters. |
| | 24 | Q    If we could go back to Slide 36. |
| 11:39 | 25 | Does the CARTO 3 clinical support market have the |

11:39  1  characteristics of aftermarket lock-in that you described

2  earlier in your testimony?

3  A    Yes.

4  Q    And do the sensor-enabled catheter markets that you

11:40  5  identified also have the characteristics of lock-in that you

6  described?

7  A    Yes.

8  Q    Dr. Forister, just so the record is clear, what is the

9  geographic scope of these markets?

11:40  10  A    The geographic scope of these markets is the United

11  States.

12  Q    I would like to turn from the question of relevant

13  antitrust markets to another term, "market power."  What is

14  market power?

11:40  15  A    So market power refers to the ability of a company to

16  force customers to do something they wouldn't do in a

17  competitive market.

18  Q    What is monopoly power?

19  A    Monopoly power is significant and sustained market

11:40  20  power.  And to give some examples of what market power would

21  look like, it would be forcing customers to pay inflated

22  prices or taking away choices from customers by excluding

23  competition.

24  Q    Have you analyzed whether Biosense has market power or

11:41  25  monopoly power in the relevant antitrust markets in this

Case 1:19-cv-01984-JVS-SES Document 571-1 Filed 06/25/25 Page 14 of 53 Page ID #26582
Case 1:19-cv-01984-JVS-SES Document 571-1 Filed 06/25/25 Page 14 of 53 Page ID #26582

114

11:41  1   case?

       2   A     Yes.

       3   Q     Have you prepared a slide to illustrate your opinions?

       4   A     Yes.

11:41  5   Q     Okay.  Now, you have again two factors.  The first is

       6   high market share and barriers to entry.  What does that

       7   mean?

       8   A     One way economists evaluate market power is whether a

       9   company has a dominant share and whether there's high

11:41 10   barriers to entry.  If a company has a dominant share, it

      11   would appear that competition is not knocking it out of its

      12   position in the market.  And if there's high barriers to

      13   entry, it indicates that it wouldn't be easy for a new

      14   company to come in and provide that competition and

11:41 15   discipline or restrain the behavior of a dominant firm.

      16   Q     And then could you explain what you mean by inflated

      17   price or excluded competition?

      18   A     Inflated prices or excluded competition are direct

      19   evidence that a company has abused its market power, and

11:42 20   that tells us that the company has market power.

      21   Q     Okay.  So again, let's start with the cardiac mapping

      22   machine market.

      23         What is Biosense's market share in that market?

      24   A     We have a slide for this.  It's currently 66 percent.

11:42 25   Q     And how do you measure that?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:42 | 1 | A    We measure that on the share of usage, the share of |
| | 2 | procedures that use the CARTO 3. |
| | 3 | Q    Why is that the appropriate measure? |
| | 4 | A    That's appropriate, because to have dominance in a |
| 11:42 | 5 | market, a machine manufacturer would have to not just sell |
| | 6 | the machine to a hospital but also convince the doctors to |
| | 7 | use it.  If the doctors aren't using it, the machine company |
| | 8 | is not going to have much power in the market. |
| | 9 | Q    And what barriers to entry are there in the cardiac |
| 11:43 | 10 | mapping machines market? |
| | 11 | A    A variety of barriers.  This is a high-tech product, so |
| | 12 | there's technical barriers.  It's regulated by the FDA, so |
| | 13 | there's regulatory barriers.  And there's a huge financial |
| | 14 | and time commitment to getting into this market.  Some |
| 11:43 | 15 | companies have spent hundreds of millions of dollars trying |
| | 16 | to enter and still failed. |
| | 17 | Q    What evidence is there that Biosense can inflate prices |
| | 18 | or exclude competition in this market? |
| | 19 | A    For example, in the years following the imposition of |
| 11:43 | 20 | the Case Coverage Policy, Biosense was able to raise its |
| | 21 | price without losing sales even while its competitor was |
| | 22 | slashing prices. |
| | 23 | Q    Do you have a slide to demonstrate that? |
| | 24 | A    Yes. |
| 11:43 | 25 | Q    What does this show? |

11:43   1  A    So this shows -- there's a red line that has the CARTO

2  3 price.  You can see it going up from $203,000 in 2016 to

3  $258,000 in 2023.  At the same time, their unit sales, the

4  blue bar, is essentially flat.  And this contrasts with the

11:44   5  price of the Abbott machine, which was falling during this

6  period.

7  Q    And if we go back to Slide 39.

8        Let's turn to the CARTO 3 clinical support market.

9  What is Biosense's market share in that market?

11:44  10  A    As we saw earlier, 95 percent.

11  Q    And are there barriers to entry in that market?

12  A    Yes.  Beyond simply having to train the mapper, there's

13  all these barriers that Biosense has put up, such as

14  withholding the training materials, upgrading or changing

11:44  15  the software on the machines, so that even if you entered

16  the market, you get knocked out right away.

17  Q    Did you see evidence that Biosense can inflate prices

18  or exclude competition?

19  A    Yes.  So we see that using its market power in clinical

11:44  20  support it's able to force customers to pay more for

21  catheters.  So it's able to inflate prices using market

22  power in clinical support.

23  Q    And then turning lastly to the CARTO 3 sensor-enabled

24  catheter markets, do you have a slide to show Biosense's

11:45  25  market share in those markets?

Case 1:19-cv-01984-VSB-SES Document 541-1 Filed 06/25/25 Page 538 of 676 Page ID #: 26558

11:45  1   A    Yes.

2   Q    What is Biosense's market share in those three catheter

3   markets?

4   A    So for the sensor-enabled circular mapping, 92 percent.

11:45  5   For those high-density mapping catheters, PENTARAY, OPTRELL,

6   OCTARAY, over 99 percent.  And for the SOUNDSTAR, the

7   sensor-enabled ultrasound, 99 percent.

8   Q    Can that share also be calculated in terms of the money

9   spent on these catheters?

11:45  10  A    Yes.  That's another way to look at the economic

11  footprint of the companies.

12  Q    Okay.  Could we please go to the next slide.

13       So what does this slide show?

14  A    So this shows the revenues that Biosense/Sterilmed

11:45  15  earned as opposed to independent reprocessors for these

16  catheters from 2016 to 2023.  And I break out the SOUNDSTAR,

17  the PENTARAY/OCTARAY, and the LASSO NAV.  If we look at just

18  the total Biosense/Sterilmed received, it's $3.6 billion of

19  revenue for these catheters, and the independent

11:46  20  reprocessors less than one percent, just under $26 million.

21  Q    What barriers to entry exist in these markets?

22  A    Well, there is the technical difficulty of entering,

23  and the cost, approximately half a million dollars to get

24  FDA clearance, but the bigger barrier is the Case Coverage

11:46  25  Policy.  Even if you brought your own independently

11:46 1 reprocessed catheter to market, the Case Coverage Policy

2 would exclude you from almost the entire market.

3 Q    Did you see evidence that Biosense can inflate prices

4 and exclude competition in these catheter markets?

11:46 5 A    Yes.

6 Q    What evidence?

7 A    Well, so the Case Coverage Policy and what happened in

8 those markets is one, and the economic analysis that we've

9 been talking about thus far is another.

11:47 10 Q    In your opinion, Dr. Forister, did Biosense's

11 anticompetitive conduct allow Biosense to achieve its

12 monopoly power in these markets?

13 A    Yes.

14 Q    What is the basis for your opinion?

11:47 15 A    Well, the economic analysis we discussed, as well as a

16 few specific quantitative comparisons of shares across

17 different markets and over time.

18 Q    Okay.  Let's go to the first of those quantitative

19 analyses.

11:47 20       Could we put up Slide 44, please.

21       Did you prepare Slide 44?

22 A    Yes.

23 Q    And could you please explain what this shows?

24 A    Okay.  So one point of comparison would be to say what

11:47 25 happened to independently reprocessed market share before

11:47  1    the tie and after the tie?  And here's what it was for

2    sensor-enabled ultrasound, that is, the SOUNDSTAR.  2013 and

3    2014, independent reprocessors had a 23 percent share of

4    that market.  After the tie, 2022-2023, down to one percent.

11:48  5    Q    Did you find similar trends with respect to the other

6    CARTO 3 catheters?

7    A    Yes.  The LASSO NAV, we also see a decrease in the

8    share over time.

9    Q    Would you please find JX4457 in your binder.

11:48  10         Did you prepare 4457?

11    A    I did.

12         MR. HO:  We move 4457 into evidence.

13         MR. CAVANAUGH:  No objection.

14         THE COURT:  4457 will be received.

11:48  15         (Exhibit 4457 received in evidence)

16    BY MR. HO:

17    Q    Could you please explain what 4457 shows?

18    A    Yes.  So we've been talking about several catheters,

19    the SOUNDSTAR, the PENTARAY, and the LASSO NAV.  So if we

11:49  20    roll up those in a bigger group, we can look at third-party

21    or independent reprocessor share in 2013 to 2014,

22    16 percent, and that gets taken down to one percent in 2022

23    to 2023 after the tie.  So we can see a before the tie and

24    after the tie comparison shows independent reprocessors'

11:49  25    share of the navigational catheters going down

Case 1:19-cv-01984-VSB-SES Document 541-1 Filed 06/25/25 Page 120 of 139
Case 1:19-cv-01984-VSB-SES Document 571-1 Filed 06/27/25 Page 541 of 676
Page ID# 26538
Page ID# 26538

| | |
|---|---|
| 11:49 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:49 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 11:49 | 10 |

11:49   1   significantly.

2   Q    Did you do a second quantitative analysis?

3   A    Yes.

4   Q    Could we please put up Slide 45.

11:49   5        What does Slide 45 show?

6   A    So this compares independent reprocessors' share for

7   catheters that were unaffected -- CARTO 3 catheters that

8   were unaffected by the policy.  So one might have been

9   concerned in that previous slide that we see this decline,

11:49   10   but what if it's due to something else?  What if people are

11   just becoming less interested in reprocessing?  And this

12   answers that question.  The share of independent

13   reprocessing went up between 2013 to 2014 and 2022 to 2023

14   for the catheters on the CARTO 3 that weren't covered by the

11:50   15   Case Coverage Policy.

16   Q    Dr. Forister, to summarize, in your opinion, was

17   Biosense's Case Coverage Policy anticompetitive or

18   competition on the merits?

19   A    It was anticompetitive.

11:50   20   Q    And what about Biosense's Project Falcon, the blocking

21   technology?

22   A    The blocking technology was anticompetitive.

23   Q    What about Biosense's catheter collections practices?

24   A    The catheter collection and withholding was

11:50   25   anticompetitive.

11:50    1   Q    What impact did that anticompetitive conduct have on

         2   hospitals' choices to buy CARTO 3 sensor-enabled catheters

         3   from Innovative Health?

         4   A    It eliminated the choices that hospitals would have

11:50    5   made in a competitive market.

         6   Q    And how much money did Innovative Health lose as a

         7   result?

         8   A    At least $147 million.

         9              MR. HO:  Pass the witness.

11:51   10              THE COURT:  Why don't we take the lunch break

        11   here.  We'll come back at ten to 1:00, ladies and gentleman.

        12   Please remember the admonition.

        13              (Jury not present)

        14              THE COURT:  Anything for the record before we take

11:51   15   the noon break?

        16              MR. HO:  Just one ministerial thing.  I know Dr.

        17   Wu isn't testifying for some time, but if we could make the

        18   standing objection something that both sides could have, we

        19   would appreciate that.

11:52   20              MR. CAVANAUGH:  No objection, Your Honor.

        21              THE COURT:  Fine.

        22              (Recess)

        23              (Miriam Baird reported Vol. II)

        24                        *    *    *

        25

1

2

3

4                        CERTIFICATE

5

6          I hereby certify that pursuant to Section 753,

7    Title 28, United States Code, the foregoing is a true and

8    correct transcript of the stenographically reported

9    proceedings held in the above-entitled matter and that the

10   transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13   Date:  May 13, 2025

14

15

16                       /s/   Sharon A. Seffens  5/13/25
                         _____
17                       SHARON A. SEFFENS, U.S. COURT REPORTER

18

19

20

21

22

23

24

25

# EXHIBIT 4B

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3         HONORABLE JAMES V. SELNA, JUDGE PRESIDING

4   INNOVATIVE HEALTH, LLC,            )
                                       )
5                                      )
                                       )
6                        Plaintiff,    )
                                       )
7                                      )
                                       )
8            Vs.                       )   No. SACV-19-01984-JVS
                                       )
9                                      )
                                       )
10  BIOSENSE WEBSTER, INC.,            )
                                       )
11                                     )
                                       )
12                       Defendant.    )
                                       )
13  _____   )

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                     JURY TRIAL

18                  DAY 5, VOLUME II

19               SANTA ANA, CALIFORNIA

20              TUESDAY, MAY 13, 2025

21

22

23   MIRIAM V. BAIRD, CSR 11893, CCRA
     OFFICIAL U.S. DISTRICT COURT REPORTER
24   350 WEST FIRST STREET
     FOURTH FLOOR
25   SANTA ANA, CA 92701

1    questioning Mr. Chudzik regarding a complaint they received

2    from Stanford Hospital in April of 2021?

3    A.    Yes.  I was here.

4    Q.    And you would agree with me that that complaint should

02:32PM    5    have been logged in Innovative Health's complaint system?

6    A.    No.  I spoke with Mr. DeTate at Innovative Health to get

7    some more background on that e-mail you're referring to.

8    Q.    But can we agree that there was no complaint in

9    Innovative Health's system for that complaint that came from

02:33PM    10   Stanford Hospital?

11   A.    That it wasn't what would be categorized as a complaint.

12   I can give you more context.

13   Q.    Can you answer my question.  There was a complaint

14   regarding performance of some ACUNAV catheters that came from

02:33PM    15   -- that were used at Stanford Hospital, correct?

16   A.    No.  I can give some context about that.

17   Q.    Was there a complaint?  Are you saying there was no

18   complaint?

19   A.    Based on my conversation with Mr. DeTate, there was not.

02:33PM    20   Q.    There was -- there was a report regarding some ACUNAV

21   catheters that didn't perform correctly, correct?

22   A.    If we bring up the e-mail, that would refresh my

23   recollection.

24   Q.    Well, we already had the testimony.  We already had the

02:34PM    25   document.  So let me just ask you:  There was no complaint in

|   |   |
|---|---|
| 1 | Innovative Health's system for that incident at Stanford |
| 2 | Hospital, correct? |
| 3 | A.   I think we're -- we're talking past each other.  How |
| 4 | about there was no complaint in the Innovative database for |
| 02:34PM 5 | that date or month. |
| 6 | Q.   Thank you. |
| 7 | MR. CAVANAUGH:  Nothing further, Your Honor. |
| 8 | THE COURT:  Okay. |
| 9 | Redirect? |
| 02:34PM 10 | **REDIRECT EXAMINATION** |
| 11 | BY MR. HO: |
| 12 | Q.   Dr. Forister, could I ask you to turn back to |
| 13 | Exhibit 3981 in the binder that I spoke with you about this |
| 14 | morning. |
| 02:35PM 15 | A.   Yes. |
| 16 | Q.   You remember Mr. Cavanaugh asking you some questions |
| 17 | about this document? |
| 18 | A.   Yes. |
| 19 | MR. HO:  We can publish it. |
| 02:35PM 20 | BY MR. HO: |
| 21 | Q.   This is the letter from the law firm to Ashley |
| 22 | Toussaint.  Now if you could turn to page 2.  You remember |
| 23 | Mr. Cavanaugh was asking you questions about the second |
| 24 | paragraph of that page? |
| 02:35PM 25 | A.   Yes. |

| | |
|---|---|
| 1 | Q.   And he kept on asking you if that was the condition that |
| 2 | Biosense was imposing on Ms. Toussaint? |
| 3 | A.   Correct. |
| 4 | Q.   Okay.  Could I ask you to look at the next paragraph of |
| 5 | the letter that he didn't ask you about. |
| 6 | A.   (Witness complies.)  Okay. |
| 7 | Q.   And read for the record the sentence that begins |
| 8 | additionally. |
| 9 | A.   Additionally, the NCA -- that is, noncompete |
| 10 | agreement -- prohibits you from using the training and |
| 11 | confidential information Biosense provided you on its |
| 12 | products in order to attempt to train or otherwise educate |
| 13 | any person, including Stryker employees and representatives, |
| 14 | customers, or others, on the use of any Biosense products, |
| 15 | reprocessed or otherwise. |
| 16 | Q.   Is that portion of the letter relevant to your opinion? |
| 17 | A.   Yes. |
| 18 | Q.   Could you explain why that portion is the portion that's |
| 19 | relevant to your opinion. |
| 20 | A.   So this is giving a blanket prohibition for customers, |
| 21 | which we defined with the other attorney, or others, which |
| 22 | would include all other hospitals. |
| 23 | Q.   Now, Mr. Cavanaugh asked you about a number of documents |
| 24 | where Innovative witnesses talked about some catheters |
| 25 | competing with other catheters? |

02:35PM (line 5)
02:36PM (line 10)
02:36PM (line 15)
02:36PM (line 20)
02:36PM (line 25)

1    A.    Yes.

2    Q.    And I think you began to give an explanation as to why

3    that was not dispositive to you as an economist.

4    Mr. Cavanaugh said that he would prefer that you do that on

02:37PM    5    my clock, so I would like to give you that opportunity to

6    explain why those documents are not dispositive to you as an

7    economist.

8    A.    Okay.    This often occurs.    When people in the industry

9    are talking about competition between products, they're not

02:37PM    10    doing the sort of economic analysis that is for the relevant

11    markets for a case like this.

12        In particular, they're not considering lock-in.

13    They're not asking if a customer is already locked in to the

14    CARTO 3.    Is the, say, the HD Grid competing against their

02:37PM    15    choice or closely competing against their choice of using the

16    PENTARAY.

17        So those lock-in factors and all the analysis we

18    talk about indicate that these catheters specific to each

19    system are in different markets.

02:37PM    20    Q.    I think Mr. Cavanaugh also asked you some questions

21    about a slide that he put up about what hospitals have what

22    machines.    Do you recall that pie chart?

23    A.    Yes.

24    Q.    And I think you said that there were significant

02:38PM    25    limitations to the data underlying that pie chart?

1    A.    Yes.

2    Q.    Could you explain what those were.

3    A.    Two of the major limitations -- one, they had collected

4    sales data, but one of the other manufacturers -- I think it

02:38PM  5    was Biosense -- they didn't take into account that there is

6    some attrition over time.

7            So they're overstating the number of other systems

8    and hospitals with other systems or with overlapping systems

9    relative to what's actually in the market.

02:38PM  10            The other important caveat is that they're talking

11    about a hospital and not an EP lab.  My understanding from

12    this data is that a hospital could have multiple EP labs.  So

13    they might have a CARTO 3 lab.  They might have an Abbott

14    lab.  In that sense they're not necessarily substituting

02:39PM  15    between the two or not easily substituting between the two.

16    Q.    And Mr. Cavanaugh asked you some questions about your

17    use of the MAUDE data?

18    A.    Correct.

19    Q.    I asked you a question about this on direct.  Just to be

02:39PM  20    very clear, why in your opinion is your use of the MAUDE data

21    consistent with the language that Mr. Cavanaugh highlighted

22    on the slide from the FDA website?

23    A.    Yes.  The key -- the key piece from that FDA description

24    that I addressed is not to rely on that data alone.  If you

02:39PM  25    just see the number of incidents, you literally can't

|   |   |
|---|---|
| | 1 |

          calculate an incident rate because you don't know what the

          denominator is.  You have this many incidents; you divide

          them by the total number of catheters; you figure out the

          incidents rate.

02:39PM           I combined it with that data to overcome that

          limitation.  I also looked at it in the context of the

          complaint data and other medical studies and academic

          research.

     Q.    Thank you.

02:40PM           MR. HO:  No further questions.

               THE COURT:  Okay.

               MR. CAVANAUGH:  Nothing further, Your Honor.

               THE COURT:  Okay.  Thank you.

               Sir, you may step down.  Thank you.

02:40PM           Call your next witness, please.

               MR. HO:  Your Honor, we call Vincent Thomas by

     videotaped deposition.

               THE COURT:  What's the length?

               MR. HO:  Two minutes.

02:40PM           (Videotaped deposition clip played)

               MR. HO:  Your Honor, Innovative Health rests its

     case-in-chief.

               THE COURT:  Okay.

               Ladies and gentlemen, I have to take up some

02:42PM     matters with counsel, so we'll see you tomorrow at 8:30.

```
 1    We'll just take an hour for lunch tomorrow.

 2            So we'll see you in the morning.  Please remember

 3    the admonition.

 4            THE CLERK:  All rise.

 5            (Open court - jury not present)

 6            THE COURT:  Any 50(a) motion you make will be

 7    deemed made as of this time.  What do you want to do?

 8            MR. CAVANAUGH:  Your Honor, we'll file a memorandum

 9    in support of that 50(a) motion.

10            THE COURT:  Okay.

11            MR. CAVANAUGH:  Thank you.

12            THE COURT:  Anything before we recess?

13            MR. CAVANAUGH:  No, not for defendants, Your Honor.

14            MR. HO:  Not for plaintiff.

15            THE COURT:  Okay.  See you in the morning.

16                (Proceedings adjourned at 2:43 p.m.)

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 5

1

1

```
 1

 2

 3

 4              UNITED STATES DISTRICT COURT

 5             CENTRAL DISTRICT OF CALIFORNIA

 6                    SOUTHERN DIVISION

 7                        - - -

 8      THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

 9

10    INNOVATIVE HEALTH, LLC,      ) CERTIFIED TRANSCRIPT
                      Plaintiff,  )
11         vs.                     )
                                   )  SACV-19-01984-JVS
      BIOSENSE WEBSTER, INC.,      )
12                    Defendant.  ) TRIAL DAY 6, VOL. I
      ---------------------------)
13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              Santa Ana, California

17                May 14, 2025

18

19                    SHARON A. SEFFENS, RPR
                      United States Courthouse
20                    411 West 4th Street, Suite 1-1053
                      Santa Ana, CA  92701
21                    (612) 804-8655

22

23

24

25
```

08:44   1   arrhythmias in the top chamber or in the lower chamber of
        2   the heart.
        3           The normal heartbeat is what you see on the left.
        4   You can see -- by listening here, you can see there is a
08:44   5   regularity in the pattern of how the heart beats.  The top
        6   chamber activates first, there is a delay, and then the
        7   lower chamber.  So that's the normal rhythm of the heart.
        8           As we go towards the right, we have a
        9   representation of the heart in atrial fibrillation, which is
08:44  10   the most common arrhythmia we have today.  And what you see
       11   listening is the heart is irregular.  There is no specific
       12   pattern.  We call it irregular, the way it's contracting the
       13   top chamber.  It's not contracting anymore.  It's just
       14   quivering because of chaotic electrical patterns in the top
08:45  15   chamber getting the heart to contract very fast and in an
       16   unpredictable manner.
       17   Q    Let's talk about the role of cardiac mapping systems in
       18   the treatment of arrhythmia.
       19           What role do cardiac mapping systems play in the
08:45  20   treatment of arrhythmia?
       21   A    So "mapping system" is short.  The correct name is an
       22   electroanatomical mapping system.  So what it does is it
       23   looks at the electrical activity of the heart in a given
       24   place, and then it indexes to a 3D reconstruction of the
08:45  25   heart it is doing.

08:45   1        So electroanatomical mapping is a technology that

        2   was invented three decades ago that allows us to essentially

        3   build 3D reconstructions of the heart and understand where

        4   the electricity -- where an arrhythmia, for example, is

08:46   5   coming from.  If there is a source, find it very quickly.  I

        6   can identify where it's coming from and use that map we

        7   built to treat that source.

        8   Q    And let's go to the next slide.

        9        Can you tell the jury about the major cardiac

08:46  10   mapping systems that are available in the marketplace?

       11   A    Yes, sir.  On the left you have Biosense Webster's

       12   CARTO.  The next one is Abbott Precision-X.  Then you have

       13   Boston Scientific OPAL and Medtronic Affera.  So those are

       14   the four main companies in the space of electrophysiology.

08:46  15        Biosense Webster was the first company who

       16   invented this technology.  And it has a specific technology,

       17   which is magnetic-based navigation, which is the most

       18   accurate that they invented.  Other companies have other

       19   types of mapping technologies called impedance-based, which

08:47  20   is less accurate.  And only recently they were able to have

       21   systems that are somewhat similar to Biosense Webster's.

       22   Q    So in addition to these systems that we see on the

       23   slide, is there software associated with cardiac mapping

       24   systems?

08:47  25   A    Yes.  So what you're looking at here is the hardware

08:47   1   where we connect cables from the catheters, for example,

2   that are inside a patient's body into the systems to

3   measure.  And there is a user interface.  How I see that

4   information, it's really ever-evolving.

08:47   5             So maybe once or twice a year, you have new

6   software modules being released that have really transformed

7   how we do these procedures:  the speed of the procedure, the

8   accuracy of the procedure, and the ability to treat

9   patients.  So there is always new modules, new evolution in

08:47   10   the software.  The speed, the cadence, is quite impressive,

11   so ever-changing.

12   Q    And have you used -- let me withdraw that question and

13   ask it another way.

14             Which systems have you used before?

08:48   15   A    I have used all of the ones you are looking at here.

16   Those are the main ones.  In addition to that, I have used

17   probably four others from smaller companies that I have done

18   work with in design of the products.

19   Q    And how did they come to learn how to use these

08:48   20   systems?

21   A    You start using them during your fellowship training.

22   During the fellowship, I had the opportunity to work with

23   CARTO, with Abbott.  And then throughout my career,

24   different hospitals either had or we acquired new

08:48   25   technologies.  And some I also learned from doing work in

08:48    1    animal labs.

         2    Q    Is it important for electrophysiologists to be trained

         3    on multiple systems?

         4    A    Absolutely.  Different systems may have different

08:48    5    strengths.  Up until maybe a few years ago, Biosense's

         6    system, the CARTO system, was significantly better than the

         7    competition because of the spatial and temporal resolution.

         8         Today you have good systems with an almost similar

         9    spatial and temporal resolution, such as the Precision-X.

08:49   10    But you may have a software module, for example, that works

        11    better for a specific disease process.  So for one

        12    arrhythmia, I might do better work for my patient with one

        13    system versus another, and so I think it's very important to

        14    understand all of the systems.

08:49   15    Q    And at the HCA facilities that you manage today, how

        16    many systems are there?

        17    A    We have CARTO 3, Precision-X, and the Rhythmia system.

        18    And we're acquiring now the Affera, so I will soon have all

        19    four.

08:49   20    Q    And over your career, have you preferred one system

        21    over another, generally speaking?

        22    A    Up until two years ago, perhaps, or three, absolutely

        23    CARTO because of spatial and temporal resolution.  This

        24    comes because of their method of mapping, which is

08:50   25    electromagnetic, which is sub-millimeter precision.

# EXHIBIT 6A

1

<pre>
 1

 2

 3

 4                UNITED STATES DISTRICT COURT

 5              CENTRAL DISTRICT OF CALIFORNIA

 6                     SOUTHERN DIVISION

 7                         - - -

 8      THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

 9
          INNOVATIVE HEALTH, LLC,        ) CERTIFIED TRANSCRIPT
10                          Plaintiff,   )
              vs.                        )
11                                       )  SACV-19-01984-JVS
          BIOSENSE WEBSTER, INC.,        )
12                          Defendant.   ) TRIAL DAY 7, VOL. I
          ----------------------------)
13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              Santa Ana, California

17               May 15, 2025

18

19                      SHARON A. SEFFENS, RPR
                        United States Courthouse
20                      411 West 4th Street, Suite 1-1053
                        Santa Ana, CA  92701
21                      (612) 804-8655

22

23

24

25
</pre>

09:11   1   and then other functions were added to my responsibilities,
        2   including communications and pricing and contracting market
        3   development.  And then as of a couple of years ago, I've
        4   been responsible for the sales organization as well.
09:11   5   Q    What's kept you at Biosense?
        6   A    The impact that we make and the people.  It's -- I was
        7   checking before coming in my team's work today.  Today we
        8   will be treating 1,400 patients across this country.  By the
        9   time I go home, 1,400 people will be treated with our
09:12  10   technology.  And my team would be sitting shoulder to
       11   shoulder with that physician giving somebody their life
       12   back.  So what keeps me here is being a small part of an
       13   organization that is made up of amazing, mission-driven,
       14   smart, smart people who wake up every day trying to figure
09:12  15   out how to make somebody's life better.
       16   Q    Have the number of EP procedures changed since you've
       17   joined Biosense?
       18   A    They have increased tremendously, yes.
       19   Q    If you could look at -- and we'll put it up on the
09:12  20   screen -- JX3725.
       21        MR. CAVANAUGH:  And, Your Honor, we would move
       22   this into evidence.  I understand there's no objection.
       23        MR. GOLDSMITH:  No objection, Your Honor.
       24        THE COURT:  3725 will be received.
09:13  25        (Exhibit 3725 received in evidence)

09:13    1    BY MR. CAVANAUGH:

         2    Q    This is an e-mail from you to Ashley Whitten, and there

         3    is an attachment I wanted to ask you about.

         4         What is that attachment?

09:13    5    A    This is a document I put together to speak to --

         6    actually, working with the finance leadership program

         7    person.  So I often talk to new employees or different

         8    people who join the company about who we are, and this is a

         9    document that I created to talk to them about it.

09:13   10         MR. CAVANAUGH:  Can you go to Slide 13?

        11    BY MR. CAVANAUGH:

        12    Q    What are we seeing here?  Just explain to the jury what

        13    we're seeing on this.

        14    A    It's a chart describing the number of U.S. ablation

09:13   15    procedures over the years, and it shows that procedure

        16    volume is rapidly increasing year after year.

        17    Q    So this ends in 2020?

        18    A    Yes.

        19    Q    What's happened since then?

09:14   20    A    This chart if you track it up has continued to move in

        21    the same direction, and it has even picked up speed, meaning

        22    the number of procedures are continuing to grow.  The demand

        23    is high.

        24    Q    What factors have caused this growth?

09:14   25    A    A-fib, which is what we're talking about, atrial

09:14  1    fibrillation.  And this particular disease is on the rise

2    because the underlying conditions that cause it are on the

3    rise, such as diabetes, hypertension, obesity.  And so more

4    prevalence of the disease is a part of it, but also because

09:14  5    the technology that is there to help treat it has gotten so

6    much better.

7         So over the years, now physicians can treat

8    patients earlier and give them their lives back.  So the

9    disease is growing.  The devices, the technology, and

09:15  10   techniques that are used to treat them are getting a lot

11   better, and therefore, more physicians are instead of

12   medically managing sick patients intervening early and

13   treating them.  So, therefore, the volume is growing.

14   Q    What role, if any, has Biosense played in this growth?

09:15  15   A    A significant role.  We are a primary player in an

16   important aspect of this innovation that I talked about.

17        Our founder, Mr. Will Webster, was the first

18   person to invent a device in close collaboration with

19   physicians to map and ablate and treat this disease.  And

09:15  20   since then, 25 years ago, we have been innovating and

21   bringing better technologies to the market and growing the

22   space.

23   Q    We've heard testimony about the CARTO 3 mapping system.

24   A    Yes.

09:15  25   Q    Does Biosense face competition in providing that

09:16   1   offering?

        2   A    Absolutely.  Yes, of course.

        3   Q    How would you describe the level of competition you

        4   face?

09:16   5   A    This is a super dynamic and attractive market, and the

        6   competition is fierce.  And every case is contested.  There

        7   are major players that are competing significantly in the

        8   space.

        9   Q    And who do you see as your major competitors?

09:16  10   A    The big ones are Abbott, Boston Scientific, and

       11   Medtronic.

       12   Q    What type of companies are those?

       13   A    These are highly diversified and massive med tech,

       14   medical technology companies, with a variety of expertise in

09:16  15   different medical fields and, of course, a cardiovascular

       16   portfolio.

       17   Q    Okay.  If we could go to Slide 22.

       18        Now, we've had testimony about innovations that

       19   Biosense has brought to the market.  Have your competitors

09:17  20   brought innovations to the market?

       21   A    Absolutely, yes.  This is a very dynamic market, as I

       22   said, and these are super smart and respectable companies,

       23   and there is new innovation that has come on the market.

       24   This is adorable.  It's an older chart.  It's gotten a lot

09:17  25   more fierce than this actually.  So there is a lot of new

09:17   1   products on the market every year.

2   Q    How does Biosense distinguish its electrophysiology

3   offering from those of your competitors?

4   A    Biosense stands for the best products, the best

09:17   5   innovation, and the best people.  And we compete by offering

6   the most innovative, most accurate, most trusted portfolio

7   hand in hand with a deeply trained and dependable clinical

8   support that together offer a superior product, and that's

9   how we've been competing.

09:18   10   Q    We've had a lot of testimony about Biosense's

11   1-millimeter accuracy guarantee.

12   A    Yes.

13   Q    Do any of your competitors make that claim?

14   A    No.  We stand for our accuracy, and we put our name

09:18   15   behind it, and that's how we compete.

16   Q    In your -- in the nearly ten years you've been with the

17   company, have you interacted with physicians?

18   A    I regularly interact with physicians in my job.

19   Q    Based on those interactions, in your view, how

09:18   20   important is the concept of accuracy to physicians?

21   A    It's foundational.  These physicians are treating a

22   very complex disease while the patient is on a table and

23   their heart is beating.  They're playing video games inside

24   somebody's heart.  So knowing exactly where they are and

09:19   25   what they're seeing being trusted, and being able to deliver

09:19    1    the therapy, burning inside somebody's heart exactly where,

         2    and not an inch, you know, over, means the difference

         3    between that patient going home or not, that patient getting

         4    better or disaster.  So accuracy is foundational to what

09:19    5    they do.

         6    Q    Let's talk about your competitors.

         7         How do you perceive Abbott promotes its EP

         8    offering as against Biosense?

         9    A    Abbott is known or is marketed as a flexible

09:19   10    architecture portfolio.  So they have a mapping and ablation

        11    and the full portfolio, but they're -- compared to us,

        12    they're more flexible, so they're referred to as an open

        13    architecture system.

        14    Q    How does that compare to yours?

09:20   15    A    Biosense or CARTO would be a closed architecture,

        16    meaning everything that we design has to work within that

        17    ecosystem and is validated to work within that ecosystem.

        18    Abbott is more flexible, that they can visualize third-party

        19    products.

09:20   20    Q    Has Abbott made any changes to its catheter mapping

        21    portfolio?

        22    A    They have.  Everybody is innovating, and so since

        23    accuracy is such a big deal and Biosense being the leading

        24    accuracy play, they have over the years also introduced a

09:20   25    system that works with sensor-enabled technology, and they

09:20    1    can toggle back and forth between their old and their new

         2    system.

         3    Q     How does Boston Scientific in your view promote its

         4    electrophysiology offering as against Biosense's system?

09:21    5    A     Boston Scientific is a formidable competitor.  They

         6    also have a mapping and ablation portfolio, a very

         7    attractive one actually right now and leading in that sense.

         8    And there's is also I would say a sensor-enabled system.

         9    Q     How have they -- you said they're a formidable

09:21   10    competitor currently.  For example, what have they done?

        11    A     They have -- last year, they launched the first

        12    therapeutic ablation catheter in the market that can destroy

        13    that bad tissue through a different energy form called PFA,

        14    pulse field ablation.  So instead of using radio frequency,

09:21   15    they can use pulse field ablation, and that's disrupted the

        16    space and currently is the most popular system or ablation

        17    catheter on the market.

        18    Q     Turning to Medtronic, how has Medtronic sought to

        19    compete against Biosense and the other?

09:22   20    A     Medtronic, also a very strong med tech company.  Don't

        21    tell them I'm saying all this.  Hopefully, all of this stays

        22    here.  It's rolled out a new platform that combines both

        23    energy forms.  It's pretty smart.  So you can use RF, radio

        24    frequency, and PFA in the same catheter, and you can map

09:22   25    with the same catheter.  So the whole system works together

09:22  1  seamlessly, and it's a therapeutic dual modality and a

2  mapping capability that they've rolled out.

3  Q    Based on your experience, for a given procedure, who

4  makes the decision about what system to use:  Biosense,

09:23  5  Abbott, Boston Scientific?

6  A    Mainly the physicians, because this is a super

7  complicated procedure as you can imagine, and there is a lot

8  of new technology that needs to be understood.  The

9  physicians are the ones who understand and choose.  And of

09:23  10  course they work for hospitals and with hospitals, so the

11  hospital administration has a voice, but mainly the

12  physician decides.

13  Q    Turning to a different subject, in your present job,

14  are you involved in determining the pricing of Biosense

09:23  15  products?

16  A    Yes, at a strategic level, I am, yes.

17  Q    How do you approach that question?

18  A    How we price a new technology depends on the value it

19  brings.  So what problem is it solving for the physician,

09:23  20  for the hospital, and how competitive is that landscape?

21  What else is on the market?  And so there's a give or take.

22  How much are we adding value, and what choices do they have?

23  And that's how it's priced.

24  Q    How does the price of CARTO 3, the machine, including

09:24  25  the hardware, software, and catheters, compare to the price

09:24    1    of competing systems?

2    A    It's competitively priced.  And so if you're looking

3    for a ballpark, at the moment, the Medtronic system is the

4    most premium system on the market, probably followed by the

09:24    5    Boston Scientific, and then CARTO.  For a CARTO system,

6    approximately probably $250,000 is the average price.  It's

7    hard to price it really.

8    Q    Now, are there ways -- let's just focus on the

9    hardware, the CARTO 3 machine.  Are there ways that

09:24    10    hospitals can obtain those without purchasing the hardware

11    outright?

12    A    Yes.  It's capital equipment.  So obviously, you can

13    buy it outright cash, but we also have a lot of flexible

14    pathways, meaning you could rent, lease, a combination, that

09:25    15    kind of thing.  There's a lot of creative ways of getting

16    the system.

17    Q    And they agree to buy catheters as part of that?

18    A    Correct, yes, they can.

19    Q    And what would the impact of that be?  If you get an

09:25    20    agreement to buy a certain level of catheters, what impact

21    does that have on the cost of the hardware?

22    A    It reduces the cost of the hardware.  So essentially,

23    you're committing a disposable -- it's like a razor blade.

24    You're committing to spend a certain amount of dollars or

09:25    25    usage with disposables, and then you obtain the hardware.

09:25   1   Q    In your experience, do hospitals look at overall cost

        2   when deciding whether to purchase a system from a given

        3   manufacturer?

        4            MR. GOLDSMITH:  Objection, Your Honor.  Foundation

09:26   5   and hearsay.

        6            THE COURT:  Lay the foundation.

        7   BY MR. CAVANAUGH:

        8   Q    In your position, do you interact with hospitals?

        9   A    Of course, yes.

09:26  10   Q    Okay.  And do you discuss with them purchasing

       11   decisions that they're making?

       12   A    Routinely, yes.

       13   Q    Okay.  Based on that experience, in your view, do

       14   hospitals look at overall cost when deciding whether to

09:26  15   purchase a system?

       16            MR. GOLDSMITH:  Objection, Your Honor, still to

       17   the hearsay as to what they're doing separate from her.

       18            THE COURT:  The statements of the hospitals will

       19   be received but not for the truth, simply that hospitals

09:26  20   said what they said to the witness, not for the truth.

       21            Overruled.

       22            THE WITNESS:  Yes.

       23   BY MR. CAVANAUGH:

       24   Q    Okay.  But yet -- and has that been true the entire

09:26  25   period of time when you've been at Biosense?

09:28  1  engineering schools across the country.  We routinely do

2  recruiting and internships and bring them into the pipeline.

3  We have classrooms set every month.  So it's a very

4  well-established process that makes sure we have enough

09:28  5  people to support our customers.

6           And it's a long process, right.  I don't know if

7  you guys have discussed this.  It's a long process to train

8  these people.  So it takes at least nine months, and then

9  they need to learn on the job and do a variety of

09:28  10  procedures.  So we keep hiring so that we have people to

11  support this procedure and the patients next year, for

12  example.

13           MR. CAVANAUGH:  Thank you, Ms. Zare.

14           Your Honor, pass the witness.

09:29  15           THE COURT:  Okay.

16           MR. GOLDSMITH:  May I approach with some binders,

17  Your Honor?

18           THE COURT:  You may.

19           THE WITNESS:  Thank you.

09:29  20                    CROSS-EXAMINATION

21  BY MR. GOLDSMITH:

22  Q    Good morning, Ms. Zare.

23  A    Good morning.

24  Q    You mentioned in your direct examination that you

09:30  25  joined Biosense Webster in 2015?

09:30   1   A    Correct.

2   Q    You work here in Irvine at the headquarters, right?

3   A    That's right.

4   Q    You always have?

09:30   5   A    No, originally when I joined, the headquarters was in

6   Diamond Bar for a few months, and then they moved down.

7   Q    Diamond Bar here in California?

8   A    Yes.

9   Q    Now, you've talked on your direct examination about

09:30  10  Sterilmed's sales of reprocessed catheters versus Biosense

11  Webster's sales of new catheters, right?

12  A    Yes.

13  Q    Sterilmed can't sell reprocessed catheters until it has

14  approval from the FDA to do that, right?

09:30  15  A    Of course, yes.

16  Q    On a catheter-by-catheter basis, right?

17  A    Correct, yes.

18  Q    And you've been involved in that process, right?

19  A    Yes.

09:30  20  Q    Could you turn please to JX2 in that binder, which is

21  already in evidence.

22  A    I guess I can see.  I can look up here and not look for

23  at it in here?

24  Q    You can, yes.

09:31  25  A    Okay.

09:31   1    Q    So we're going to the first page of the second e-mail.

        2         That's an e-mail that you wrote in June 2017,

        3    right?

        4    A    Yes, it looks like it, yes.

09:31   5    Q    Could you please read for us the second and third

        6    paragraphs?

        7    A    "We've heard" -- that one, right?  "We've heard Stryker

        8    is working on reprocessing PENTARAY, even though it's

        9    unlikely they would be successful since 1-it's very tough to

09:31  10    reprocess and 2-we wouldn't map those cases so they would

       11    need to train the hospital staff to map, and we know that's

       12    not sustainable (unless they somehow join forces with St.

       13    Jude or come up with a different business model)."

       14    Q    And then the line after that, too, please.

09:31  15    A    "So we can have Sterilmed work on PENTARAY but not

       16    submit it to the FDA, unless Stryker rolls it out."

       17    Q    Thank you.  And could you read one more sentence?

       18    A    Yes.  "In the meantime, we really need Sterilmed to fix

       19    their manufacturing and quality issues for the existing

09:32  20    Certified Performance products before expanding to other

       21    products."

       22    Q    And now on this same topic, could you turn please to

       23    JX3 in your binder?  This one's not in evidence yet, so you

       24    have to look at the paper copy.

09:32  25    A    JX3 means what?

# EXHIBIT 6B

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3         HONORABLE JAMES V. SELNA, JUDGE PRESIDING

4    INNOVATIVE HEALTH, LLC,          )
                                      )
5                                     )
                                      )
6                      Plaintiff,     )
                                      )
7                                     )
                                      )
8          Vs.                        )   No. SACV-19-01984-JVS
                                      )
9                                     )
                                      )
10   BIOSENSE WEBSTER, INC.,          )
                                      )
11                                    )
                                      )
12                     Defendant.     )
                                      )
13   _____  )

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                    JURY TRIAL

18                 DAY 7, VOLUME II

19              SANTA ANA, CALIFORNIA

20             THURSDAY, MAY 15, 2025

21

22

23   MIRIAM V. BAIRD, CSR 11893, CCRA
     OFFICIAL U.S. DISTRICT COURT REPORTER
24   350 WEST FIRST STREET
     FOURTH FLOOR
25   SANTA ANA, CA 92701

BY MR. HO:

Q.   Is that true, Dr. Wu?

A.   Yes.  There was a class-action matter involving prices

of vitamin C, and I did work on behalf of the defendants in

03:02PM    that case.

Q.   And the jury found for the plaintiffs in that case,

correct?

MR. CAVANAUGH:  Objection, Your Honor.

THE COURT:  Sustained.

03:02PM    MR. HO:  I'll move on.  Thank you.

BY MR. HO:

Q.   Now, Dr. Wu, you said on direct examination that in your

view right shoes and left shoes are an example of products

that are in a single market, not a separate market, correct?

03:02PM    A.   I said a pair of shoes would be the relevant market in

that a left shoe is not in its own separate market and a

right shoe is not in its separate market.

Q.   Are you aware of any company that sells left shoes but

not right shoes?

03:02PM    A.   I am not.

Q.   Or right shoes but not left shoes?

A.   I am not, and there's a good reason for that, because --

THE COURT:  Sir, just answer the question.

MR. HO:  Thank you.

03:03PM    BY MR. HO:

```
 1   Q.   Have you personally ever bought a left shoe but not a
 2   right shoe?
 3   A.   I have not.
 4   Q.   You're familiar with a company called Stryker; are you
03:03PM  5   not?
 6   A.   Yes.
 7   Q.   And Stryker sells reprocessed catheters that are
 8   compatible with the CARTO 3 machine?
 9   A.   Yes.
03:03PM 10   Q.   But Stryker sells those catheters without providing
11   clinical support, correct?
12   A.   Yes.
13   Q.   Sterilmed also sells reprocessed catheters that are
14   compatible with the CARTO 3 machine, correct?
03:03PM 15   A.   Yes, it does.
16   Q.   But Sterilmed, as distinct from Biosense, does not
17   provide clinical support for those catheters, correct?
18   A.   Yes.  Sterilmed itself does not.
19   Q.   And indeed before Sterilmed was acquired by J&J, it sold
03:03PM 20   catheters but not clinical support, correct?
21   A.   Yes.
22   Q.   Innovative Health also sells catheters, correct?
23   A.   Yes.
24   Q.   And it does not sell clinical support, correct?
03:04PM 25   A.   It does not.
```

```
 1   Q.   Innovative Health also sells catheters that are

 2   compatible with the Abbott EnSite cardiac mapping machine,

 3   correct?

 4   A.   Yes.

 5   Q.   And it does not sell or provide clinical support,

 6   correct?

 7   A.   By it, you mean Innovative?

 8   Q.   Correct.

 9   A.   Yes.  Innovative does not provide clinical support.

10   Q.   And the same would be true of Stryker?

11   A.   Yes.

12   Q.   And in 2009 approximately 50 percent of cases using the

13   CARTO 3 were covered by clinical support specialists, not

14   provided by Biosense, correct?

15   A.   Yes.

16   Q.   At that time Biosense provided case coverage for CARTO 3

17   procedures regardless of which manufacturer's catheters were

18   used in the procedure, correct?

19   A.   Yes, at that time.

20   Q.   At that time.

21        Now, Dr. Wu, who owns the training materials needed

22   to become a Biosense Webster CAS?

23   A.   Who owns the training materials?

24   Q.   Yes.

25   A.   I don't know.
```

03:04PM (line 5)
03:04PM (line 10)
03:04PM (line 15)
03:05PM (line 20)
03:05PM (line 25)

|  | 1 | Q.   If you wanted to train to be a CAS, isn't it true that |

1    Q.   If you wanted to train to be a CAS, isn't it true that

2    you have to get Biosense Webster's training materials?

3    A.   Well, Biosense trains its CASs.  So if that's what you

4    means by Biosense owns the training materials, then, yes,

03:05PM    5    Biosense invests in hiring and training its CASs.

6    Q.   And were you aware that Biosense sent legal letters to

7    former Biosense Webster mappers demanding that they not train

8    hospitals in how to map using the CARTO 3 machine?

9    A.   I don't recall anything specifically, but I do recall

03:06PM    10    seeing documents to that effect.

11    Q.   And were you aware that Biosense changed the software on

12    the CARTO 3 system to prevent former Biosense Webster mappers

13    from training others on how to map cases?

14    A.   I don't know one way or another.

03:06PM    15    Q.   Now, you testified on direct examination that in your

16    view there's been no harm to competition based on the

17    evidence that you've seen, correct?

18    A.   Yes.

19    Q.   When I deposed you in March, you recall that I asked you

03:06PM    20    if you had seen documents where specific hospitals decided

21    not to buy reprocessed catheters from Innovative Health,

22    citing the case coverage policy as a reason?  Do you remember

23    me asking you that question?

24    A.   Yes.

03:06PM    25    Q.   And do you recall you said:  Nothing comes to mind?

A.    Well, what was the question to that that led to that
answer?

Q.    The question was:  Dr. Wu.  Have you seen any documents
where specific hospitals decided not to buy reprocessed
catheters from Innovative, citing the case coverage policy as
a reason?  And do you recall your answer being:  Nothing
comes to mind?

A.    Yes, at that -- when I gave that deposition, then, yes.

Q.    But you've reviewed the evidence that has come in, the
documents that have come into evidence in this case, have you
not, in the trial of this case?

A.    I don't know that I've seen every one, but I focused on
the transcripts.

Q.    And would you agree with me that there have been many
documents where specific hospitals decided not to buy
reprocessed catheters from Innovative, citing the case
coverage policy as a reason?

A.    I don't know.  I'll have to take a look at the
documents.  I was focused on the trial transcripts, so I
don't know each and every document you're referring to.

Q.    Could I ask you to turn in your binder to Exhibit 5009,
please.

          MR. HO:  Your Honor, we move 5009 in evidence.

          MR. CAVANAUGH:  No objection.

          THE COURT:  5009 will be received.

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 03:08PM | 5 |

                    MR. HO:  We don't need to put it up right now.

                    **(Exhibit 5009 received)**

BY MR. HO:

Q.   Dr. Wu, do you recognize this document?

03:08PM  A.   Let me take a quick look at it.

Q.   Okay.

A.   (Witness reviewing document)  Okay.

Q.   Do you recognize this document?

A.   I recall seeing it before, yes.

03:09PM  Q.   And do you recall relying on this document?

A.   Not specifically, but if it's in my report, then I did.

Q.   Dr. Wu, I think you testified on direct examination that

you did two corrections to Dr. Forister's damages analysis;

is that correct?

03:09PM  A.   I did three corrections to his --

Q.   You did three corrections, but you did it twice.  In one

case you wound up with negative $10 million; is that right?

A.   Yes.  If you're asking me whether I did it twice, I did

the analysis based on a starting point of $139.5 million.

03:09PM  Then I did the analysis again under a different set of

assumptions, realizing that there is no evidence of antitrust

damage related to the OCTARAY delay and the purchases made

after April 2016.

         So once I got to that number, then I did the --

03:10PM  then I did my three corrections again.

|  |  |
|---|---|
|  | 1 |

```
 1              MR. CAVANAUGH:  Nothing further, Your Honor.

 2              THE COURT:  Anything further?

 3              MR. HO:  Nothing further.

 4              MR. CAVANAUGH:  Your Honor, the defendant Biosense

 5   rests.

 6              THE COURT:  Okay.

 7              Mr. Ho?

 8              MR. HO:  Your Honor, before we move into our

 9   rebuttal case, we'd like to -- we do intend to file a 50(a)

10   motion, and we'd ask that it be being filed as of this time.

11              THE COURT:  It will be.

12              MR. HO:  Thank you, Your Honor.

13              MR. CAVANAUGH:  And, Your Honor, we would renew our

14   50(a) motion.

15              THE COURT:  Received.

16              MR. HO:  Thank you, Your Honor.  Plaintiff

17   Innovative Health calls Dr. Eric Forister.

18              Eric Forister, Plaintiff's witness, sworn

19              MR. HO:  Your Honor, may I approach?

20              THE COURT:  You may.

21              MR. CAVANAUGH:  Your Honor, note my objection.  The

22   parties' agreement was we would get these the night before.

23   There's been no disclosure of any of this.

24              MR. HO:  Your Honor, they are largely slides we've

25   already used and a few slides that quote testimony in the
```

03:14PM (line 5)
03:14PM (line 10)
03:14PM (line 15)
03:15PM (line 20)
03:15PM (line 25)

1    case.

2              THE COURT:  Proceed.

3                    **DIRECT EXAMINATION**

4    BY MR. HO:

03:15PM  5    Q.   Dr. Forister, good afternoon.

6    A.   Good afternoon.

7    Q.   Did you hear Dr. Wu opine that mapping machines,

8    mappers, and catheters are not in separate markets and that

9    there's only a single market for Innovative mapping systems?

03:16PM  10    A.   I did.

11    Q.   Did that cause you to change the opinion that you

12    offered in our case-in-chief?

13    A.   No.

14    Q.   Did you prepare a slide to explain why?

03:16PM  15    A.   Yes.

16              MR. HO:  Can we put that up, please.

17    BY MR. HO:

18    Q.   Is this a slide you prepared and used in your direct

19    examination?

03:16PM  20    A.   It is.

21    Q.   So could you please explain using this slide why you

22    disagree with Dr. Wu.

23    A.   Yes.  So there's an economic test for whether two

24    products or services are separate or whether they're one

03:16PM  25    product.  I talked to you all about that earlier this week.

|       |                                                                          |
|-------|--------------------------------------------------------------------------|
| 1     | The first part is whether it's efficient to supply                       |
| 2     | those products separately, and the answer for all these pairs            |
| 3     | is yes.  We see clinical support being supplied separately               |
| 4     | from catheters in many cases.                                            |

03:17PM  5    Q.   And how does Dr. Wu attempt to support his contention

6    that there's only a single market?

7    A.   Well, I would add one other part, the second column that

8    customers want to obtain the product separately.  We also see

9    that for the clinical support from catheters as well as the

03:17PM  10   machines.

11        But to your question, Dr. Wu's approach, instead of

12   doing an economic test, is to simply say these three products

13   and services are used together; therefore, they must be one

14   product.  That is not a valid economic test.

03:17PM  15        For example, consider coffee beans and coffee

16   machines.  You need both to be useful, but they are not one

17   product.  Companies sell them separately.  People want to buy

18   them separately.  Yet, under Dr. Wu's test for whether two

19   products are one, you would find that coffee beans and coffee

03:18PM  20   machines are actually one product and can't be obtained

21   separately.

22   Q.   Do you recall Dr. Wu using the example of a pair of

23   shoes?

24   A.   Yes.

03:18PM  25   Q.   Why is that not an apt or good analogy in this case?

A.    Because if we go through these economic tests, we can
see the left shoe and right shoe are almost never offered
separately.  And generally speaking, no one wants to buy them
separately.

03:18PM          That's how we know they're one product, and that's
not a good analogy here because we have all these examples of
customers who want to obtain the machine, the clinical
support, and the catheters from separate sources, which is
the right column.  In the left column similarly we have lots
03:18PM  of examples of companies offering them separately.

Q.    So in your opinion if there were not Biosense's
anti-competitive conduct, would there be competition in all
three of these markets?

A.    Yes, there would.  And to clear up any confusion, there
03:19PM  definitely would be competition among the machines.  That's
not at issue here.  It's that there would still would be
competition for provision of clinical support.  A lot of
hospitals want to provide it themselves.  And it would
definitely be competition in all these different catheters.

03:19PM  Q.    Dr. Forister, were you here in the courtroom yesterday
during the testimony of Ms. Orsini?

A.    Yes.

Q.    And do you recall her testifying that she was not aware
of Biosense denying clinical support training for hospitals?

03:19PM  A.    Yes.  I heard her say that.

```
 1    Q.    Why does that issue matter to you?

 2    A.    It matters because the withholding of training from

 3    hospitals is one of the things that Biosense did to obtain

 4    the dominant position in the market for mappers, and it was

 5    its dominant position in the market for mapping that allowed

 6    it to force hospitals to buy its catheters.

 7            MR. HO:  Could we put up the slide that you used in

 8    your prior testimony, please.  Slide three.

 9    BY MR. HO:

10    Q.    Could you please remind us of those strategies.

11    A.    Yes.  So Biosense was poaching mappers from the

12    hospitals, withholding training, instituting non-competes,

13    and making software changes to block hospitals from mapping

14    themselves.

15    Q.    Could you remind the jury how much evidence have you

16    reviewed with respect to the issue of whether or not Biosense

17    provided training to hospitals.

18    A.    Uh-huh.  So I've seen several documents indicating that

19    Biosense was withholding training from the hospitals.

20    Q.    Could you give examples of what you are referring to.

21    A.    Yeah.  So the document that we looked at the last time I

22    was up here where there was a hospital that -- there was a

23    hospital where Stryker was going to hire Ms. Ashley Toussaint

24    to train the mappers at that hospital.  There was a

25    non-compete that Biosense tried to apply against her.
```

03:19PM (line 5)
03:20PM (line 10)
03:20PM (line 15)
03:20PM (line 20)
03:20PM (line 25)

1          Ultimately the hospital changed the software on the

2     machine to block her from providing that training.  So

3     Biosense knew the hospital wanted training, but Biosense did

4     not provide that training.  In fact, they blocked a third

03:21PM   5     party from providing it at their own cost.

6          This isn't an isolated incident.  There's other

7     examples.  More broadly, for example, Allegheny Hospital

8     wanted their own -- wanted to train their own mappers, and

9     Biosense did not train them.

03:21PM  10     Q.   Dr. Forister, do you recall when Dr. Wu questioned the

11     data on which you rely in concluding that reprocessed

12     catheters are just as safe as or safer than new OEM

13     catheters?

14     A.   Yes.

03:21PM  15     Q.   Did his testimony cause you to change your conclusion

16     about that data?

17     A.   No.

18     Q.   Why not?

19     A.   Well, the main limitation -- and you heard him say this

03:21PM  20     as well -- is not to use the FDA's MAUDE data on deaths and

21     injuries alone, that you need to combine it with the sales

22     data, which Dr. Wu also said.

23          That's exactly what I've done.  I combined the

24     MAUDE death and injury data with sales data so that I can

03:22PM  25     compute the rate of deaths and injuries associated with

```
 1    different manufacturers of catheters.
 2    Q.    I think, Dr. Forister, there might have been some
 3    comment made that this data reporting to the FDA is
 4    voluntary.  Is that accurate?
 5    A.    No, it is not.
 6    Q.    Could you please explain.
 7    A.    To the contrary.  The manufacturer and the user -- that
 8    is, the hospitals -- are required to report this data.
 9    Q.    Is it common for economists to rely on data that
10    companies are legally required to report to the government?
11    A.    Yes, it is.
12    Q.    Do you recall when you were cross-examined about the
13    limitations on using the MAUDE data for death and injury?
14    A.    Yes.
15            MR. HO:  Put up the next slide, please.
16    BY MR. HO:
17    Q.    Do you recall this question and this answer?
18    A.    Yes.
19    Q.    And how does this relate to --
20            MR. CAVANAUGH:  Your Honor, objection.  This is not
21    a proper rebuttal.
22            MR. HO:  Your Honor --
23            MR. CAVANAUGH:  He's trying to clean up what
24    happened on direct examination.
25            THE COURT:  Just a minute.
```

03:22PM (line 5)
03:22PM (line 10)
03:23PM (line 15)
03:23PM (line 20)
03:23PM (line 25)

          1          Sustained.

          2    BY MR. HO:

          3    Q.   Turning from the MAUDE data to the complaint data, do

          4    you recall testimony about the possibility that the complaint

03:23PM   5    data was unreliable?

          6          MR. CAVANAUGH:   Your Honor, again, there's no

          7    testimony given by Dr. Wu regarding complaint data.

          8          MR. HO:   Your Honor, he's a rebuttal witness not

          9    just for Dr. Wu but for their case.   There was ample

03:24PM  10    testimony --

         11          THE COURT:   Overruled.

         12          MR. HO:   Thank you.

         13          THE WITNESS:   Yes.  And another way in which I

         14    overcame that limitation of the MAUDE death and injury data,

03:24PM  15    of not relying solely on it, was to confirm those results

         16    using the complaint data.

         17    BY MR. HO:

         18    Q.   And you recall that there was another source of data

         19    that you relied on in addition to the MAUDE data and the

03:24PM  20    complaint data?

         21    A.   Yes.

         22    Q.   Could you explain what that is.

         23    A.   Yeah.  So that was academic research studies on the

         24    reliability or safety of reprocessed medical devices as

03:24PM  25    compared to new OEM medical devices.

UNITED STATES DISTRICT COURT

```
 1   Q.   Now, if I could ask you to look at Exhibit JX4316 in
 2   your binder, please.
 3   A.   (Witness complies.)
 4   Q.   Do you see it?
 5   A.   I do.
 6   Q.   Do you recall Ms. Zare testifying about this document
 7   earlier?
 8   A.   I wasn't in the courtroom, but I heard that she did.
 9   Q.   Now, could I ask you to look at the bottom of the first
10   page.
11   A.   (Witness complies.)  Okay.
12   Q.   Do you see the language starting with OEM?
13   A.   Yes.
14   Q.   Could you just explain to the jury what this means in
15   plain English.
16   A.   Sure.  So this meant that for one of the studies of
17   reprocessed and new medical devices, they found that the
18   reprocessed devices -- sorry.  They found that the OEM
19   devices were defective 4.9 times more frequently than the
20   reprocessed devices.
21            MR. CAVANAUGH:  Your Honor --
22   BY MR. HO:
23   Q.   Were there other studies --
24            THE COURT:  Just a minute.
25            MR. CAVANAUGH:  Objection, Your Honor.  This
```

03:24PM  5
03:25PM 10
03:25PM 15
03:25PM 20
03:25PM 25

|     |     |
| --- | --- |
|     | 1   |

rebuttal is supposed to be addressed to whatever

pro-competitive justifications we put forward.  That is what

counsel indicated.

          MR. HO:  Safety is one of their biggest

pro-competitive justifications.

          THE COURT:  Overruled.

BY MR. HO:

Q.   Were there other studies that you relied on as well?

A.   Yes, several other studies.

Q.   Could you explain, please.

A.   Well, there's studies generally about different types of

medical devices that included catheters, comparing

reprocessed and new.  That included electrophysiology

catheters like the kinds at issue here.

          The academic studies have consistently found that

reprocessed medical devices are as safe as or safer than new

devices, which was consistent with the complaint data and the

MAUDE data on deaths and injuries.

Q.   Now, in your opinion as an economist, even assuming that

there were a concern or a debate about the safety of

reprocessed catheters, would it be appropriate in your view

for Biosense to implement the case coverage policy as a

solution to that?

A.   No, it would not.

Q.   Why not?

A.    Well, once the FDA has approved for reprocessing a

catheter, then the doctors and the hospitals are best suited

to choose what's best for the patient.  If there was free and

fair competition, they would be able to make that choice, and

03:27PM    what we would expect to see in economics is that the best and

safest catheters would be the ones with the largest sales

volume.

Q.    Now, Dr. Forister, you heard Dr. Wu offer the opinion

that the case coverage policy is a solution to a free-riding

03:27PM    problem.  Do you recall that?

A.    Yes.

Q.    Does that make sense to you?

A.    No, it does not.

Q.    Could you explain why, please.

03:27PM    A.    In particular the mappers, the clinical account

specialists, are profit center for Biosense.  They're not a

cost center, not a net cost center.  I spoke earlier about

the evidence that each of the mappers every year is bringing

in 1.5 to 2 million dollars of revenue.  That more than

03:28PM    covers their cost.

        Biosense thinks in two months of work, they've

covered their year's payroll.  That's why Biosense wants to

get its mappers into the hospitals, so it can make more

money.  That's why Biosense and all other manufacturers

03:28PM    provide their mappers for free, because of the revenue that

1      they're able to gain from doing so.

2      Q.    Do you recall Dr. Wu testifying that in his view

3      interbrand competition -- in other words, competition between

4      Biosense and Abbott and Medtronic -- is sufficient to protect

03:28PM  5      hospitals against anti-competitive effects?

6      A.    I heard him say that.

7      Q.    Do you agree with that?

8      A.    No, I do not.

9      Q.    Why not?

03:28PM  10      A.    Well, because the evidence in this case shows that even

11      with competition between the mapping machines, Biosense was

12      still able to force hospitals to pay more for its catheters

13      and receive lower quality.

14            So this competition between the machines did not

03:29PM  15      protect the hospitals from having to pay inflated prices for

16      lower quality catheters.

17      Q.    Do you recall Dr. Wu saying that switching from one

18      brand of machine to another is easy?

19      A.    Yes.

03:29PM  20      Q.    And do you recall he put up a slide about Sutter Health?

21      A.    I wasn't here, but I understand that that was the slide.

22      Q.    And do you have -- do you find that compelling?

23      A.    No.

24      Q.    Can you explain why.

03:29PM  25      A.    Again, this gets back to the facts in this case.  Sutter

03:30PM

1    Health saw that decline in CARTO 3 usage because it lost

2    several doctors.  The doctors left.  New doctors used a

3    different mix of machines.  But replacing doctors is not

4    easy, and so replacing doctors to switch machines is not

5    easy.  That's a large switching cost.

6    Q.   Do you recall him relying on another piece of

7    information for that opinion?

8    A.   Yes.

9    Q.   And what was it?

10   A.   It's my understanding that he's relying on the fact that

11   there's doctors who use more than one machine, or they may

12   switch their procedures from one machine to another.  But

13   that evidence doesn't show that they're switching in response

14   to price.  It's that they have a preference for which machine

15   and which catheters to use to treat a patient, given their

16   diagnosis.

17          And so this doesn't show that there's low switching

18   costs.  To the contrary, the physician preference over what

19   to use is something that's impeding twice base switching.

20   Q.   Now, you recall or you understand that Dr. Wu said that

21   if switching costs -- I'm sorry.  If hospitals or physicians

22   don't want to switch because of physician preference, that

23   that's not really a switching cost?

24   A.   Yes.

25   Q.   Do you agree with that?

1   A.    No, I do not.

2   Q.    Could you explain why.

3   A.    The physician preference is part of the switching cost.

4   Convincing the doctor to change to use a different machine in

03:31PM    5   order to have access to the reprocessed catheters is a cost.

6   It's a difficulty.  So it is a switching cost.

7   Q.    Now, let's talk about lock-in.  You understand that

8   Dr. Wu's opinion is that hospitals are not subject to

9   lock-in?

03:31PM    10   A.    Yes.

11   Q.    Do you agree with that?

12   A.    No, I do not.

13   Q.    Could you explain why.

14   A.    Well, for example, with the case coverage policy, the

03:31PM    15   evidence shows that generally the hospitals were not informed

16   at the time that they purchased their CARTO 3.  The coverage

17   policy is not in the purchase contracts for the CARTO.  It's

18   not on Biosense's website.

19           So hospitals are buying the CARTO 3, becoming

03:32PM    20   dependent on it because they set up their EP lab to run the

21   procedures with that, with their doctors trained and so on.

22   And then if they decide that they want an independently

23   reprocessed catheter, that's when they find out about the

24   case coverage policy, at which point they're already locked

03:32PM    25   in.

```
 1   Q.   Now, I think you heard that there was some testimony

 2   contradicting the idea or trying to contradict the idea that

 3   hospitals didn't know about the policy.  Do you recall that?

 4   A.   Yes.

 5   Q.   Do you recall some testimony by Mr. Ramos that hospitals

 6   were aware of the policy?

 7   A.   I do.

 8   Q.   Now, you've reviewed documents on this issue?

 9   A.   Yes.

10   Q.   And based on your review of those documents, how do you

11   know that hospitals remained unaware of the policy long after

12   April 2016?

13   A.   Because we see examples of hospitals where just that

14   situation occurred.  The last time I was talking with you,

15   there was an example from PeaceHealth where they found out

16   around January 2024 that the machines that they bought in

17   2018 and 2021 had this policy.

18        They didn't know that at the time it was purchased.

19   Even six years later after their first purchase, they were

20   just finding out about it.

21   Q.   How does the fact that the case coverage policy was not

22   disclosed at the time of purchase affect hospitals' ability

23   to engage in lifecycle pricing?

24   A.   It's a key element of that.  If the hospitals don't know

25   about it, they can't incorporate that information into the
```

03:32PM (line 5)
03:32PM (line 10)
03:33PM (line 15)
03:33PM (line 20)
03:33PM (line 25)

| | |
|---|---|
| | 1 |
their lifecycle pricing.  So if they're not aware at the time

2  of their purchasing of the policy, it won't factor into that.

3  Q.   Now, let's turn to your damages analysis.  Did you hear

4  Dr. Wu's criticisms of your benchmarks?

03:34PM  5  A.   I did.

6  Q.   Did you find those criticisms persuasive?

7  A.   No.

8  Q.   Can you explain why.

9  A.   Well, if we can bring up the slide on the -- let's say

03:34PM  10  the first of them.  So for the Biosense SOUNDSTAR, Dr. Wu

11  says that the Biosense ACUNAV is a more appropriate

12  benchmark.  But he and I both agree that finding a catheter

13  that was unaffected by the anti-competitive conduct is one of

14  the two key things to look for.

03:34PM  15       The Biosense ACUNAV, which would otherwise be -- I

16  agree with him it would otherwise be a good benchmark because

17  it's made by Biosense and it works on the CARTO 3.  However,

18  at times during the damages period it was subject to the case

19  coverage policy.  There's Biosense documents that indicate

03:35PM  20  that.  That's why the Biosense ACUNAV is not an appropriate

21  benchmark for the SOUNDSTAR.

22  Q.   Did Dr. Wu offer any other proposed benchmark for the

23  SOUNDSTAR?

24  A.   No, he did not.

03:35PM  25  Q.   Just the ACUNAV?

A.    Just the ACUNAV, which was affected by the

anti-competitive conduct.  Therefore, if we want to know what

the catheter would -- what an experience would look like for

a catheter not affected by the conduct, it would not be a

03:35PM    reliable benchmark.

Q.    Why didn't you use a Biosense catheter as a benchmark

for the SOUNDSTAR?

A.    Well, because all of the Biosense ultrasound

catheters -- and the SOUNDSTAR is an ultrasound catheter --

03:36PM    all of the Biosense ultrasound catheters at some point were

covered or subject to the case coverage policy.

Q.    Is the ViewFlex an ultrasound catheter?

A.    It is.

Q.    What about your use of the Biosense Webster CS as a

03:36PM    benchmark for the LASSO NAV, PENTARAY, and OCTARAY catheters?

A.    So for those catheters Dr. Wu indicated that he would've

used an Abbott catheter instead.  But here, we have a

Biosense catheter that's not subject to the case coverage

policy and therefore would be a more similar comparison.

03:36PM         In addition, the Biosense Webster has the benefit

that it has a more mature experience with reprocessing.  So

it would give us more reliable sense for what prices and

sales would look like for a reprocessed catheter.

Q.    What is the benchmark that Dr. Wu proposes for the

03:37PM    PENTARAY and OCTARAY?

1    A.    He proposes the Abbott HD Grid.

2    Q.    And why in your opinion is that not a good benchmark?

3    A.    For the same reasons.  It's not a Biosense catheter.  It

4    doesn't plug into the CARTO 3.  Therefore, it's not as good a

03:37PM  5    benchmark.

6    Q.    Now, let's discuss your damages calculation.  Have you

7    reviewed Dr. Wu's alternative damages calculations?

8    A.    I have.

9    Q.    Do you find them persuasive?

03:37PM  10   A.    No.

11   Q.    Could you explain why.

12   A.    Well, broadly for three reasons.  The first related to

13   the use of the appropriate benchmark.  He's chosen to use the

14   benchmarks in opposite situations.

03:37PM  15        We both apparently agree that a Biosense catheter

16   used on the CARTO 3 would be the best benchmark to use, but

17   he has a situation where there's an ultrasound catheter

18   covered by the case coverage policy, subject to it, and he

19   uses that inappropriately instead of the Abbott ViewFlex that

03:38PM  20   I suggest.

21        And then he does the opposite.  When there is an

22   appropriate Biosense catheter that works on the CARTO 3, the

23   Webster that he could've used, he doesn't use that and

24   instead switches to the Abbott.  So he gets it backwards.

03:38PM  25   Q.    Now, the second thing you say is that you disagree with

1    the deduction of costs for mappers.  Could you explain.

2    A.    Yes.  Because the mappers are a source of profit for the

3    OEMs, they want to provide those mappers for free.  So

4    there's no reason to think that with or without the tie, that

03:38PM    5    Innovative would have had to pay for those mappers because

6    Biosense wants its mappers in the hospital.  Same as the

7    other OEMs, they would continue to provide it for free.

8    Q.    Remind us if you could how is Biosense able to generate

9    all of that money from having the CAS in the hospital?

03:39PM    10    A.    Well, it boils down to the fact that the CAS also acts

11    as salespeople.  Biosense categorizes them as salespeople.

12    They pay them as salespeople.  And they measure that the CAS

13    being in the room dramatically increases sales.

14    Q.    So in a but-for world without the anti-competitive

03:39PM    15    conduct, would Biosense continue to provide the CAS without a

16    separate charge?

17    A.    Yes.  All the evidence points to that.  Biosense did it

18    before the case coverage policy.  They do it after the case

19    coverage policy for many of the other types of catheters.

03:39PM    20         The other major manufacturers all do it, and

21    Biosense makes that exception that we talked about for

22    Providence Alaska Hospital.

23    Q.    Could you please explain the third item on your slide.

24    A.    Uh-huh.  So I don't know if you caught it, but in

03:40PM    25    Dr. Wu's slide down in the corner, when he was telling you

1    damages were zero, he actually calculated that they were

2    negative.

3            In particular, for the SOUNDSTAR his approach finds

4    that the case coverage policy caused $20 million more in

03:40PM  5    profits for Innovative.  And just to make sure that we

6    understand the direction of that, what he's saying is that

7    the case coverage policy benefited Innovative hugely on the

8    SOUNDSTAR to $20 million.  That's why when he gets to the

9    blocking technology and he says the blocking technology would

03:40PM  10   have moved back entry earlier but that's bad, that's because

11   he said removing the case coverage policy and letting

12   Innovative make more sales would actually cause it to lose

13   even more money, which makes no economic sense.

14   Q.   Could you explain why it makes no economic sense.

03:41PM  15   A.   Because the Biosense documents clearly show that their

16   policy was intended to eliminate competition from independent

17   reprocessors.  Biosense didn't put this in place with any

18   thought that it would benefit Innovative, and I've seen no

19   documents that Innovative thinks that the case coverage

03:41PM  20   policy or the blocking technology were benefits to

21   Innovative.

22   Q.   Thank you.

23           MR. HO:  No further questions.

24           THE COURT:  Mr. Cavanaugh.

03:41PM  25           MR. CAVANAUGH:  Thank you, Your Honor.

|  |  |
|---|---|
| | **CROSS-EXAMINATION** |
| 1 | |
| 2 | BY MR. CAVANAUGH: |
| 3 | Q.   Dr. Forister, you gave some testimony regarding Biosense |
| 4 | declining to train mappers at hospitals.  Were you here this |
| 03:41PM 5 | morning for Cheryl Saxby's testimony? |
| 6 | A.   No. |
| 7 | Q.   She testified:  And what were the results of that |
| 8 | conversation?  A, Biosense Webster offered to train our staff |
| 9 | for mapping. |
| 03:42PM 10 | And just so it's clear, Cheryl Saxby is at |
| 11 | Providence St. Joseph's Hospital, the associate vice |
| 12 | president of specialty sourcing. |
| 13 | MR. HO:  Objection, Your Honor.  There's no |
| 14 | question. |
| 03:42PM 15 | BY MR. CAVANAUGH: |
| 16 | Q.   So you were unfamiliar with that testimony? |
| 17 | A.   Correct.  I was not here. |
| 18 | Q.   So now that you've heard it, do you have any reason to |
| 19 | believe Ms. Saxby is lying? |
| 03:42PM 20 | A.   No. |
| 21 | Q.   So, in fact, Biosense did offer to train the staff at |
| 22 | Providence St. Joseph's hospital? |
| 23 | A.   According to what you've said. |
| 24 | Q.   Okay.  And you're also aware that Biosense trained |
| 03:42PM 25 | Mr. DeTate, right? |

# EXHIBIT 7

1

```
 1
 2
 3
 4                 UNITED STATES DISTRICT COURT
 5               CENTRAL DISTRICT OF CALIFORNIA
 6                      SOUTHERN DIVISION
 7                          - - -
 8        THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING
 9
10    INNOVATIVE HEALTH, LLC,       ) CERTIFIED TRANSCRIPT
                        Plaintiff,  )
11          vs.                     )
                                    )  SACV-19-01984-JVS
12    BIOSENSE WEBSTER, INC.,       )
                        Defendant.  )     TRIAL DAY 8
13    ---------------------------)
14
15         REPORTER'S TRANSCRIPT OF PROCEEDINGS
16              Santa Ana, California
17                 May 16, 2025
18
19                        SHARON A. SEFFENS, RPR
                          United States Courthouse
20                        411 West 4th Street, Suite 1-1053
                          Santa Ana, CA  92701
21                        (612) 804-8655
22
23
24
25
```

07:35    1                    THE COURT:  Okay.

         2                    MS. XU:  It should be "to be offered separately,"

         3      comma, "and."

         4                    THE COURT:  Okay.  "To be offered separately" and

07:35    5      then -- oh, a comma after "separately," is that what you are

         6      saying?

         7                    MS. XU:  Yes, and also "and."

         8                    THE COURT:  Read the sentence in.

         9                    MS. XU:  Yes, sure.  So it should say "to be

07:36   10      offered separately, and that it is efficient" --

        11                    THE COURT:  Insert the word "and"?

        12                    MS. XU:  Yes.

        13                    THE COURT:  Okay.

        14                    MS. XU:  And one last thing, which is really

07:36   15      minor, is on page 18, Instruction No. 16.

        16                    THE COURT:  Okay.

        17                    MS. XU:  So line 15, the word "benefit" should go

        18      with the previous line.

        19                    THE COURT:  Oh, okay.

07:36   20                    MS. XU:  That's it on the errors, Your Honor.

        21      Thank you.

        22                    THE COURT:  Okay.  Let me make these corrections

        23      so that we can start to print.  It seems to take forever to

        24      print.  And then I'll come back, and I'll take any further

07:37   25      objections to the jury instructions.

| | | |
|---|---|---|
| 07:37 | 1 | (Recess) |
| | 2 | THE COURT:  At this time, the parties will have an |
| | 3 | opportunity to make any additional objections to the jury |
| | 4 | instructions given or not given.  Any previous objections |
| 07:45 | 5 | made in writing or on the record will be deemed to have been |
| | 6 | made at this point.  If you wish to ensure that you've |
| | 7 | preserved your record, I'm happy to hear any further |
| | 8 | objections. |
| | 9 | MR. DAVIS:  Your Honor, if I may? |
| 07:46 | 10 | THE COURT:  Mr. Davis. |
| | 11 | MR. DAVIS:  Thank you very much. |
| | 12 | As I mentioned yesterday, I just want to be clear |
| | 13 | because of a pending appeal that's relevant that we -- it is |
| | 14 | our position that power in the foremarket under Eastman |
| 07:46 | 15 | Kodak and Epic Games is sufficient to support a tying claim |
| | 16 | in circumstances like these.  And so given the evidence of |
| | 17 | power in the foremarket, it's our view that this jury |
| | 18 | instruction should make clear that that suffices and that |
| | 19 | the jury need not also find the lock-in factors. |
| 07:46 | 20 | THE COURT:  Okay.  Thank you. |
| | 21 | MR. DAVIS:  Thank you, Your Honor. |
| | 22 | THE COURT:  Ms. Xu. |
| | 23 | MS. XU:  Yes, Your Honor. |
| | 24 | We just want to very briefly walk through some of |
| 07:46 | 25 | the objections. |

07:46   1          Defendant would object to the placement of

        2   Instruction No. 30 relating to the relevant market.

        3          The second objection relates to Jury Instruction

        4   No. 19 relating to the omission of language "interbrand and

07:47   5   intrabrand competition."..

        6          We would also object to all of the tying

        7   instructions to the extent they describe the tied products

        8   not as each of the CARTO sensor-enabled catheters.

        9          We would also object to the omission of the

07:47  10   business justification instruction.

       11          The omission of Instruction No. 42 regarding no

       12   duty to deal.

       13          We would also object to Instruction No. 40

       14   regarding injury and causation.

07:47  15          And finally, we would object to the inclusion of

       16   the Cartwright Act instructions, No. 44 to No. 47.

       17          Thank you, Your Honor.

       18          THE COURT:  Okay.  Are you all satisfied that your

       19   record is preserved as to the instructions?

07:48  20          MR. DAVIS:  Yes, Your Honor, we are.  Thank you.

       21          THE COURT:  All right.

       22          Mr. Cavanaugh?

       23          MR. CAVANAUGH:  Yes, we are, Your Honor.

       24          THE COURT:  Okay, let's turn to the 50(a) motions.

07:48  25          Okay, let's deal with plaintiff's motion.

10:50    1    reprocessed catheters, a competitor "would need to train the

         2    hospital staff to map, and we know that's not sustainable."

         3              Biosense also says that hospitals and doctors

         4    should just switch to a different machine.  If you don't

10:50    5    like the case coverage policy, why not use an Abbott

         6    machine?  But again, that's not fair competition because

         7    Biosense doesn't tell hospitals about the case coverage

         8    policy when the hospitals buy the machine.  It tells

         9    hospitals after they've bought the system, after doctors

10:51   10    have been trained and built their entire practice around the

        11    machine.  That's exactly what happened at Ascension.

        12    Hospitals and doctors are locked in.  They can't easily

        13    switch.

        14              Ladies and gentlemen, the harm of this conduct to

10:51   15    consumers has been enormous.

        16              If we go to Slide 71, please.

        17              In 2013 to 2014, before Biosense created the case

        18    coverage policy, the market for sensor-enabled catheters

        19    looked like this.  16 percent of the market was independent

10:51   20    reprocessors, and this was as independent reprocessing was

        21    just taking off.  Let's look at what happened after the case

        22    coverage policy.  Independent reprocessors' share was driven

        23    down to one percent.

        24              And how do we know that that is because of the

10:52   25    case coverage policy?  Because we know that reprocessing

10:52  1   thrives for catheters that are not covered by the case
       2   coverage policy.
       3       If we go to the next slide, for catheters not
       4   covered by the case coverage policy, before the tie,
10:52  5   27 percent of the market was independent third-party
       6   reprocessors.  After the tie, 30 percent.  Independent
       7   reprocessing grew for those catheters.  But for the
       8   catheters covered by the case coverage policy, it shrank to
       9   one percent.  That's harm to competition in four pie charts.
10:52  10      Now, let's look at Biosense's market shares of the
       11  catheters that are covered by the case coverage policy.
       12  92 percent for the LASSO NAV, almost 100 percent for the
       13  other two.  There is no competition in these markets, and
       14  the case coverage policy is the reason.
10:53  15      Here are all the hospitals that you heard about in
       16  this case either through documents or testimony that had to
       17  pay inflated prices for catheters because of the case
       18  coverage policy.  You heard about Peace Health, Marin
       19  Health, Stanford Health Care, Kaiser, Torrance, Providence,
10:53  20  Sharp, HonorHealth, CHI Health, UH San Antonio, South Texas
       21  Health, the Mayo Clinic, CentraCare, Ascension, Methodist
       22  Hospital, Erlanger, HCA Orange Park, Trinity, MedStar,
       23  Allegheny, and Crouse.  And you heard that hospitals in
       24  GPOs, like Premier and Vizient, want to buy from Innovative
10:54  25  and can't.

10:54   1       And those hospitals who can't buy but would have

2   bought Innovative Health's products, those hospitals

3   represent the lost sales to Innovative from the case

4   coverage policy.  As Dr. Forister calculated, that's

10:54   5   $147 million in lost profits from Biosense's anticompetitive

6   conduct over ten years, and that includes the delays caused

7   by Project Falcon, the antireprocessing technology.

8       Now, ladies and gentlemen, I want to walk through

9   the jury verdict form and the Court's legal instructions,

10:54   10   and explain why you should find that this anticompetitive

11   conduct violated the law.

12       The first law you'll be asked to apply is the

13   Sherman Act, the federal law.  And as Judge Selna explained,

14   the fundamental purpose of the Sherman Act is to protect

10:55   15   competition and protect consumers.  Innovative brings three

16   claims under the Sherman Act and one claim under a

17   California statute called the Cartwright Act, which also

18   protects competition.

19       Let's look at the verdict form together.  You'll

10:55   20   see there are four questions for you to answer on the first

21   page of the verdict form.

22       Question 1 is whether Innovative proved its claim

23   under Section 1 of the Sherman Act through a tying

24   arrangement.  Question 2 is about whether Innovative proved

10:55   25   its claim under Section 2 for monopolization.  Question 3 is

# EXHIBIT 8

Page 1

1          UNITED STATES DISTRICT COURT

           CENTRAL DISTRICT OF CALIFORNIA

2               SOUTHERN DIVISION

3

4    INNOVATIVE HEALTH LLC,

5         Plaintiff,                    CASE NO.

6    vs.                        8:19-cv-01984-JVS-KES

7    BIOSENSE WEBSTER, INC.,

8         Defendant.

9

10

11      VIDEOTAPE DEPOSITION OF PORTIA TRANGUCH

12           APPEARING REMOTE FROM

13         PITTSBURGH, PENNSYLVANIA

14

15               AUGUST 23, 2021

16               9:30 A.M. EST

17

18

19   Reported By:

20   Judith L. Leitz Moran

21   RPR, RSA, CCR-B-2312

22   APPEARING REMOTELY FROM ATLANTA, GEORGIA

23

24

25

Peter Brantsch                                     August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 14

1   usually takes before you have to replace or upgrade

2   your CARTO 3 systems?

3       A    In general, I would say, I don't know,

4   maybe five to eight years.  It just -- it depends

5   on the system.  And we maintain them along the way,

6   so, you know.

7       Q    And does the CARTO 3 also have -- well,

8   let me ask it a little differently.  Does -- oh,

9   yeah.

10          Does the CARTO 3 have modules that can be

11  added to the system as well?

12      A    I believe it does.  I'm not intimately

13  familiar with the working of the system.

14      Q    Okay.

15      A    I don't work in the EP lab.

16      Q    Okay.  Do you -- is it fair to say that

17  you have had substantial experience, though, in

18  managing the cost in the electrophysiology lab?

19      A    Yes.

20      Q    Based on your experience, do you believe

21  it is difficult to project the cost of using a

22  mapping system over the life cycle of the mapping

23  system?

24      A    I'm not exactly sure what you mean.

25      Q    Okay.  In your work, do you try to

800.808.4958                                        770.343.9696

Peter Stasiuk                                          August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 15

1    project the cost of using a CARTO 3 over the five-

2    to eight-year life cycle of the system?

3         A    We project the cost of the system, but

4    then there are additional items that you have to

5    purchase which that's easier to project because

6    that's by case.

7              So we know what our projected cases are,

8    we know what our projected disposable usage is, and

9    then we can apply that.

10        Q    And is it true that the manufacturer

11   sometimes launch new catheters during the life

12   cycle of a mapping system?

13        A    Yes.

14        Q    And is it true that they sometimes launch

15   new modules during the life cycle of the mapping

16   system?

17        A    Yes.

18        Q    And is it true that manufacturers

19   sometimes launch new sheaths for use with the

20   cardiac mapping system?

21        A    New -- new what?

22        Q    Sheaths.  Sheaths.  Are you familiar with

23   the term "sheath"?

24        A    Sheath?  Sheath?

25        Q    Yeah.

Page 16

1      A    Yes.  Yes.

2      Q    And do the manufacturers sometimes

3   introduce new sheaths for use with their cardiac

4   mapping system?

5      A    Yeah.

6      Q    And is it true that sometimes catheters

7   for a mapping system are approved by the FDA to be

8   reprocessed by third parties during the life cycle

9   of the cardiac mapping system?

10     A    Yes.

11     Q    And do all of those introductions of new

12  products and reprocessed products to be used with

13  the cardiac mapping system affect your ability to

14  project the total cost of using the mapping system

15  over the five to eight years of the mapping system?

16     A    It can.

17     Q    And have you ever been in the lab for a

18  electrophysiology procedure?

19     A    Not for an entire procedure, but I've

20  been in and out of the lab.

21     Q    Is it your understanding that the

22  electrophysiologist treats the patient during the

23  procedure?

24     A    The physician?

25     Q    Yes.

Patrick Baasch                                    August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 17

 1       A    Yes.

 2       Q    And is it your understanding the

 3  physician decides which catheters to use during the

 4  procedure?

 5       A    Yes.

 6       Q    Is it your understanding the physician

 7  operates the catheters during the procedure?

 8       A    Yes.

 9       Q    Is it your understanding that the

10  physician makes any ablations during the procedure?

11       A    Yes.

12       Q    And is it your understanding that there

13  is also a technician that will run the cardiac

14  mapping system software?

15       A    Yes.

16       Q    And do the system manufacturers provide

17  free clinical support to Allegheny for running

18  their cardiac mapping systems during procedures?

19       A    Biosense Webster does, yes.

20       Q    Does Allegheny have anyone on staff that

21  is trained to provide the technical support on the

22  CARTO 3 instead of the Biosense employee?

23       A    No.

24       Q    Why not?

25       A    Because the clinical support has always

Peter Branch                                    August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 33

1        A     On the reprocessed?

2        Q     Correct.

3        A     Not if it wasn't reprocessed by their

4    company.

5        Q     Okay.  So let me see if I can break down

6    the question of the SOUNDSTAR versus the AcuNav.

7    Is it accurate to say that Biosense would not

8    provide coverage on cases where the physician used

9    a Biosense SOUNDSTAR eco catheter reprocessed by a

10   third party like Innovative?

11       A     Correct.

12       Q     And your physicians did not want to

13   switch from the SOUNDSTAR eco to the AcuNav?

14       A     I'm not exactly sure it was this

15   particular catheter, but I know that they did have

16   trouble with one reprocessed catheter.  But it was

17   the physician's choice.

18       Q     And do you recall if physicians had a

19   problem with the -- using an AcuNav generally or

20   had a problem specifically with the reprocessed

21   version of the AcuNav?

22       A     I think it was one reprocessed version

23   that they had a problem with.

24       Q     And was it all the physicians or some of

25   the physicians?

Patrick Lynch                                                    August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 34

1        A    I don't think it was all of them, but not
2    all of them do ablation, so it would be the
3    physicians that do those procedures.
4        Q    Let me ask it a little differently.
5             So do you recall -- so -- okay.
6             So you don't recall whether you were able
7    to persuade the physicians to switch specifically
8    to the new AcuNavs?
9        A    I don't remember that conversation, no.
10       Q    Okay.
11       A    With the physicians, no.
12       Q    And you don't recall specifically a
13   conversation with any of the physicians about
14   switching to reprocessed AcuNavs?
15       A    No, we have a lot of reprocessed AcuNavs
16   that we use for many procedures.
17       Q    Okay.  So Mr. Distel also suggests that
18   Allegheny shift to competitive systems such as the
19   EnSite Precision.  And you already testified
20   earlier about the preferences of your physicians.
21            Have you tried to shift procedures to
22   competitive systems like the EnSite Precision?
23       A    No, not specifically.  We -- purchasing
24   these mapping systems is a huge investment on a
25   hospital.  So when you have a system and the

Page 35

1   physicians are happy with the system, we're not

2   going to change a system just to be able to use a

3   reprocessed item.  We're going to do what's best

4   for the patient and what our physicians are

5   comfortable with.  In this case, it was CARTO.

6           So looking at purchasing a brand new

7   system to be able to use a reprocessed catheter is

8   not financially responsible.

9       Q    And is that because you believe that the

10  physicians will continue to use the existing brand

11  of cardiac mapping system?

12      A    Yes.

13          MR. BERHOLD:  Jim, can we pull up 152664

14  as Exhibit 228?

15          CONCIERGE FARMER:  Okay.  The document's

16  available now.

17          (Deposition Exhibit 228 marked.)

18      A    (Witness reviews document.)

19  BY MR. BERHOLD:

20      Q    Other than the -- have you had an

21  opportunity to review Exhibit 228, Mrs. Tranguch?

22      A    I have.

23      Q    Other than the email at the very top from

24  Kara Reyes to Dave Distel, do you recognize Exhibit

25  228?

Page 36

1       A     Yes.

2       Q     And generally what is being discussed in

3   Exhibit 228?

4       A     In 2020 Innovative Health awarded

5   Allegheny General's electrophysiology department

6   with an award for Innovative -- or for savings with

7   reprocessed items.

8             So Kara and her group had been at the

9   hospital, and while they were here, they went over

10  our savings for the year, and one of the items that

11  we potentially could save on was a catheter called

12  a Pentaray which was a Biosense Webster catheter.

13      Q     And did you try to use the Pentaray

14  catheters reprocessed by Innovative in cases at

15  Allegheny?

16      A     We tried to purchase -- well, we

17  purchased a couple after Kara presented the savings

18  hoping that we could use them and, you know, save

19  additional dollars to put towards other items that

20  we needed in the hospital.

21            Those items were purchased, but the

22  Biosense Webster clinician would not allow those to

23  be used during the cases.

24      Q     And so a new Pentaray catheter from

25  Biosense would be pulled for the procedure?

Peter Branch                                    August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 38

 1    Thomas at Allegheny?

 2         A    That's correct.

 3         Q    And Mr. Distel says in the email that

 4    Jennifer had commented that she had asked Biosense

 5    to provide training to the staff and Biosense

 6    refused.  Do you see that?

 7         A    Yes.

 8         Q    Do you recall having any conversations

 9    with Mrs. Thomas along those lines?

10         A    I remember her saying that they weren't

11    going to provide it.  I -- other than that, no.

12         Q    Did Ms. Thomas tell you who at Biosense

13    told you that they weren't going to provide

14    training to your staff?

15         A    I don't remember specifically, but I --

16    my guess would be that it would have been Dave.  I

17    forget his last name.  Dave Allen.  He's

18    responsible for the clinical team.

19         Q    And do you recall if Jennifer told you if

20    Biosense offered any explanation?

21         A    I don't recall.

22         Q    But you do recall that Jennifer told you

23    that it was her understanding that Biosense was not

24    going to provide training to your staff?

25         A    Correct.

Patricia Branch                                    August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 39

1      Q    And you recall that her understanding was
2   based on a conversation with Biosense?
3      A    That's -- yes.  Yes.
4      Q    Does Boston Scientific have a case
5   coverage policy to your knowledge?
6      A    Boston Scientific?  Not that I'm aware
7   of.
8      Q    Does Boston Scientific provide free
9   clinical support for the Rhythmia cardiac mapping
10  system to Allegheny?
11     A    They train our staff when we purchase the
12  system, and then if we need them to come in to
13  support the staff, they'll come in, but they don't
14  just automatically send people in to be here with
15  their system.
16     Q    Does Allegheny prefer to maximize its
17  savings on reprocessed catheters through its
18  contract with Innovative Health?
19     A    Do we prefer to?  Yes.
20     Q    Yes.
21     A    If we can use reprocessed, it's a cost
22  savings for the hospital and allows us to provide
23  the same quality of care at a lower cost.
24     Q    And would that include savings on the
25  SOUNDSTAR?

Peter Brancuch                                    August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 40

1        A     It includes savings on any catheter

2    that's able to be reprocessed.

3        Q     And that would include savings on the

4    Pentaray?

5        A     As long as that's able to be reprocessed.

6        Q     But Allegheny has had to reject savings

7    from Innovative Health on the SOUNDSTAR and the

8    Pentaray to keep their case coverage from Biosense?

9             MS. KOZIKOWSKI:  Objection.

10       A     That's correct.

11   BY MR. BERHOLD:

12       Q     And that continues to this day?

13       A     Yes.

14       Q     And Allegheny has asked Biosense if they

15   would train your staff so Allegheny could cover

16   cases and use Innovative?

17            MS. KOZIKOWSKI:  Objection.

18       A     Yes.

19   BY MR. BERHOLD:

20       Q     And -- and your physicians at Allegheny

21   are not going to switch cardiac mapping systems at

22   your direction?

23       A     At my direction?  No.

24            MR. BERHOLD:  Can we take a short break

25   of 10 minutes now?  It's been about an hour and 20

Case 8:19-cv-01984-JVS-KES    Document 571-1    Filed 07/17/25    Page 624 of 676
Page ID #:31211

Peter Strazuch                                    August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 53

1       Q    Did Innovative ask whether you would
2    support this lawsuit?
3       A    Can you repeat that, please?
4       Q    Did Innovative ask whether you would
5    support this lawsuit?
6       A    They did.
7       Q    And what was your response?
8       A    Yes.
9       Q    And are you -- did they ask you to appear
10   voluntarily for this deposition today?
11      A    No.  I just got the information that I
12   was asked to provide documents in discovery and
13   then told to be -- that I had a deposition.  Wasn't
14   from Innovative, it was through the court process.
15      Q    So who contacted you about this
16   deposition today in letting you know that you had
17   it?
18      A    I don't know.  I'd have to go back
19   through my emails, person specifically.  But it was
20   a notice of a deposition, it wasn't a notice from
21   Innovative, I don't believe.
22      Q    Were you aware of the deposition before
23   you got the deposition notice?
24      A    I was aware that it was possible because
25   we were asked discovery -- to provide documents and

Case 8:19-cv-01984-JVS-KES    Document 571-1    Filed 07/17/25    Page 625 of 676
Page ID #:31922

Pirus Srangach                                      August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 54

1    information.  But prior to that, no.

2         Q    Have you spoken with Mr. Todd Senard

3    about this lawsuit?

4         A    No.

5         Q    Have you spoken with him about your

6    testimony today?

7         A    No.

8         Q    All right, let's take a look at Exhibit

9    229.  This is a document that was already

10   introduced.  It's an email from Mr. Distel to you

11   and Jennifer Thomas.

12            Do you remember talking about this

13   document with Mr. Berhold?

14        A    Yes.

15        Q    Okay.  So I'd just like to ask you a few

16   follow-up questions on it.

17            So Mr. Distel says:  Thank you for the

18   time and details of the attempt to utilize

19   reprocessed sensor-enable catheters to drastically

20   increase your savings potential.

21            Do you see that?

22        A    I do.

23        Q    And what -- what is Mr. Distel referring

24   to when he thanks you for the time and details that

25   you provided?

Pam Branch                          August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 55

1      A    I didn't provide him with anything.  I
2  believe that this email is a response from an email
3  that Jennifer Thomas may have sent to him.  I don't
4  know anything about time and details and an
5  attempt.
6          I know we did try to purchase catheters.
7  We tried to use them in a case and the
8  representative refused to use them, and in fact,
9  pulled them off our shelves.
10     Q    So you understand this to be a response
11  to an email that Jennifer Thomas sent?
12     A    Yes.
13     Q    Do you know if that email was produced in
14  this litigation?
15     A    I have no idea.
16     Q    And you refer generally to -- you tried
17  to purchase catheters and use them in a case and
18  the representative refused to use them and in fact
19  pulled them off our shelves.  What catheters --
20     A    Yes.
21     Q    -- are you referring to there?
22     A    I believe they were the Pentaray
23  catheters.  We use an awful lot of catheters from
24  them.  But I believe they were the Pentaray
25  catheters.

Innovative Health, LLC v. Biosense Webster, Inc.

Page 56

1          We tried to -- we did purchase a couple.

2    We tried to use it during a case and the

3    representative refused to support the case, wanted

4    a new catheter, which they got them because there

5    was a patient involved in this case that needed to

6    be taken care of.

7          And then the representative brought the

8    rest of the reprocessed ones and put them in my

9    office.

10         Q    You initially said that the

11   representative refused to provide support.  This is

12   because of Biosense Webster's --

13         A    With the reprocessed -- with the

14   reprocessed catheter.  He did not -- let me

15   clarify.  He did not refuse to support the patient

16   or the case.  Those clinical representatives are

17   very professional and as focused on patient safety

18   as we are.

19         This is a very good product.  It is a

20   very -- it's the best thing for our patients.  They

21   would never jeopardize the care of a patient.

22         He refused to use the reprocessed

23   catheter.

24         Q    Thank you for the clarification.

25         When you say, "he refused to use the

Portia Branch                                        August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 57

1    reprocessed catheter," that's based on Biosense

2    Webster's clinical support policy, correct?

3         A    Yes.

4         Q    You then mentioned that he took the

5    reprocessed Pentaray catheters off the shelves.

6              Where does that understanding come from?

7    Did you see him take the catheters off the shelves?

8         A    No, I saw him bring them to my office and

9    put them on my table and say, "We can't use these."

10        Q    So when you say he took them off the

11   shelves, what you mean is he brought them to your

12   office and said we can't use these?  Did he --

13        A    Right.

14        Q    What the rest of the conversation?

15        A    That was it.  He turned around and walked

16   out.

17        Q    So he left the catheters with you, he

18   didn't bring them outside the hospital?

19        A    No, he left them on my table.  No, he did

20   not remove them from the facility.

21        Q    Allegheny General, was left with the

22   reprocessed catheters?

23        A    Correct.

24        Q    Okay.  Let's go back to this email.

25        A    Okay.

Page 78

1          MR. BERHOLD:  Objection.

2    BY MS. KOZIKOWSKI:

3          Q    Do you have an understanding of what they

4    don't like about it?

5          A    No.

6          Q    And again, that physician's dislike of a

7    reprocessed AcuNav or their preference to use the

8    SOUNDSTAR, that has nothing to do with Biosense

9    requiring Allegheny to do anything, correct?

10         A    No, physician preference has nothing to

11   do with Biosense at all.

12         Q    The third bullet says:  Shifting to

13   competitive systems such as EnSite Precision.

14              Do you see that?

15         A    I do.

16         Q    And Allegheny has an EnSite system,

17   correct?

18         A    That's correct.

19         Q    But your testimony is that physicians

20   just don't prefer to use the system, they prefer

21   the CARTO system, correct?

22         A    That's correct.

23         Q    You also testified that getting --

24   acquiring new systems is a huge investment for

25   hospitals, correct?

Page 79

```
 1      A    Yes.

 2      Q    But in terms of this specific suggestion

 3   to switch to an EnSite Precision, this is something

 4   that Allegheny already has, this wouldn't be

 5   something they would need to acquire anew, correct?

 6      A    That's correct.

 7      Q    And so they wouldn't need to invest in

 8   anything in order to switch to the EnSite

 9   Precision, they already have it.

10      A    (No response.)

11      Q    Are you at all involved in the decisions

12   about what EP mapping systems Allegheny should

13   acquire?

14      A    No.  The physicians choose what they

15   would like.

16      Q    In terms of acquiring new systems, is

17   this, if you know, something that Allegheny

18   typically finances or is it through a cash

19   purchase?

20      A    For some it depends on the system, it

21   depends on what's available at the time.

22      Q    But generally --

23      A    Generally what happens is they provide us

24   with options, we pass that off to the people at

25   provider supply chain, they negotiate the
```

Paul Strosbech                    August 23, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 80

1   contracts.  We may have, you know, some input into

2   that or tell them, yes or no, we think we can make

3   these recommendations -- or meet these requirements

4   or we can't and they make those decisions.  Then

5   the capital process -- I mean, that's out of my

6   hands.  All I do is gather and answer questions.

7        Q    Do you agree that generally Allegheny is

8   able to finance the purchase of a new system rather

9   than --

10       A    Currently?  Currently we budget for

11  capital as we think we're going to need it.  So

12  they'll be asking me shortly for capital that I may

13  need next year.  That's how we get our capital at

14  this point.

15            Prior to Allegheny Health Network being

16  formed, there was very little capital available for

17  West Penn Allegheny Health System.  So at that time

18  they did use capital -- or catheter purchases to

19  get different pieces of equipment throughout the

20  hospital.  The process is much different now than

21  it was originally.

22       Q    I'm not sure I quite understand your

23  testimony.  Can you explain a little bit more about

24  what the process used to be --

25       A    When I first took this --

# EXHIBIT 9

Page 1

1          UNITED STATES DISTRICT COURT

           CENTRAL DISTRICT OF CALIFORNIA

2              SOUTHERN DIVISION

3

4    INNOVATIVE HEALTH LLC,

5         Plaintiff,                    CASE NO.

6    vs.                     8:19-cv-01984-JVS-KES

7    BIOSENSE WEBSTER, INC.,

8         Defendant.

9

10

11       VIDEOTAPE 30(b)(6) DEPOSITION OF

12            STANFORD HEALTH CARE

13       AND THE INDIVIDUAL DEPOSITION

14         OF WITNESS: MICHAEL IDIO

15            APPEARING REMOTE FROM

16            PALO ALTO, CALIFORNIA

17

18           SEPTEMBER 20, 2021

19              12:33 P.M

20

21   Reported By:

22   Judith L. Leitz Moran

23   RPR, RSA, CCR-B-2312

24   APPEARING REMOTELY FROM ATLANTA, GEORGIA

25

Innovative Health, LLC v. Biosense Webster, Inc.

Page 21

1       Q     And do you have a recollection of

2   Stanford conducting a survey?

3       A     Yes.  It's this -- it's this one.

4       Q     And do you recall that the results were a

5   hundred percent of survey stakeholders recommended

6   using Innovative Health?

7       A     Do I recall?  I don't recall.  I don't

8   know.  I don't know what other people voted, so.

9       Q     And did Kim Watson from Category

10  Management conduct the survey?

11      A     I'm not a hundred percent sure.  Maybe.

12      Q     Do you know why Stanford chose to do a

13  vendor survey?

14      A     Maybe to, I don't know, choose the best

15  company out there maybe.

16      Q     But do you know why?

17      A     I don't.  This is Category Management's.

18  This is their project, so.

19      Q     Do you prefer to maximize savings on

20  reprocessed contract -- catheters through the

21  contract with Innovative Health?

22      A     Do I prefer?

23      Q     Yes.

24      A     I don't know how to answer that question.

25  I -- I want to save money for the department, and I

Page 22

1   have no complaints right now with Innovative Health

2   doing the reprocessing.

3           MS. HEAFEY:  Yeah.  I think Mr. Idio has

4   already testified that this is not his area.  This

5   is not his project.

6   BY MR. BERHOLD:

7       Q    Does Stanford try to use Biosense

8   SOUNDSTARs reprocessed by Innovative Health?

9       A    Current state, no.

10      Q    What was that?

11      A    Current state, no, we don't use

12  reprocessed SOUNDSTAR.

13      Q    Why not?

14      A    We got an information that if we use

15  reprocessed SOUNDSTAR, Biosense Webster will not

16  support the cases.

17      Q    And when did Stanford receive that

18  information, to your knowledge?

19      A    I can't remember.  It's been a while.

20      Q    Has Stanford tried to use Biosense

21  Pentarays reprocessed by Innovative Health?

22      A    I can't remember.  And I will have -- I

23  can find out, but at this point I can't remember

24  for Pentarays.

25      Q    Do you know why Stanford is not currently

30(b)(6) Michael Idio                              September 20, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 23

1   using Biosense Pentarays reprocessed by Innovative

2   Health?

3        A    Do I know why we're not using those?  I

4   don't remember.

5        Q    Is it also related to the Biosense case

6   coverage policy?

7        A    What is the case coverage policy?

8        Q    Do you know whether Biosense will provide

9   the mapping support on cases where Stanford uses a

10  Biosense Pentaray catheter reprocessed by

11  Innovative Health?

12       A    I don't know.  I don't know.  But again,

13  I can find out.  So we have a way to find, see if

14  we use any reprocessed Pentarays.  I have that

15  capability to find out.

16       Q    Has Stanford rejected savings from

17  Innovative on reprocessed SOUNDSTAR catheters to

18  keep your coverage from Biosense?

19            MS. KOZIKOWSKI:  Objection.

20       A    Can you repeat that question?  Sorry.

21  BY MR. BERHOLD:

22       Q    Has Stanford rejected savings from

23  Innovative Health on Biosense SOUNDSTAR catheters

24  reprocessed by Innovative Health to keep your case

25  coverage from Biosense Webster?

Page 24

1             MS. KOZIKOWSKI:  Objection.

2      A     To keep -- sorry, the last -- the last

3   line, I don't understand that one, but we do -- I

4   have --

5   BY MR. BERHOLD:

6      Q     Okay.

7      A     -- rejected an amount of savings if we

8   use SOUNDSTAR.

9      Q     Let me ask -- so let me ask it a little

10  differently.

11            Has Stanford rejected savings from

12  Innovative Health on Biosense SOUNDSTAR catheters

13  reprocessed by Innovative Health to keep the

14  mapping support from the Biosense Webster clinical

15  account specialists?

16     A     See that last line, I don't understand

17  that last line.  Sorry.  They -- they gave us a

18  projected savings if we use reprocessed SOUNDSTARs.

19     Q     But did you testify earlier that Biosense

20  has told Stanford that they won't provide mapping

21  support on the cases if Stanford --

22     A     Correct.

23     Q     -- uses Biosense SOUNDSTARs reprocessed

24  by Innovative Health?

25     A     Correct.  So if we use reprocessed

Case 8:19-cv-01984-JVS-KES    Document 571-1    Filed 07/17/25    Page 638 of 676
Page 638 # Michael Idio    September 20, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 25

1    SOUNDSTAR, we were told that Biosense Webster will

2    not support the case.

3        Q    And has Stanford rejected savings from

4    Innovative Health on reprocessed SOUNDSTAR

5    catheters because you were told that Biosense would

6    not support the case?

7            MS. KOZIKOWSKI:  Objection.

8        A    So we are not using reprocessed SOUNDSTAR

9    because we won't have support.

10   BY MR. BERHOLD:

11       Q    Has Stanford looked at covering -- excuse

12   me.

13           Has Stanford looked at providing mapping

14   support from its own staff on its cases?

15       A    We are open to that idea.  And we just

16   need the approval of the physicians to agree that a

17   representative from Innovative Health can support

18   the case if we use reprocessed SOUNDSTARs from

19   Innovative Health.

20       Q    And does Stanford currently have the

21   headcount to dedicate staff to learning how to map

22   the cases and map the cases?

23       A    I don't have the bandwidth to have my

24   techs cleared how to map.  That would require

25   another body to map which I don't have.  Current

Case 8:19-cv-01984-JVS-KES    Document 571-1    Filed 07/17/25    Page 639 of 676
30(b)(6) Michael Idio                                    September 20, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 26

1    practice is the vendor or the companies, they come

2    over to help us support the case.  That's the

3    current practice.

4            CVTs, my techs, they're not -- it's not

5    practice for them to map.  If they map, it would --

6        Q    And the --

7        A    -- it would -- I would -- it would

8    require me to get approval to hire another person

9    to do the mapping.

10            I don't know, did I answer the question?

11            MS. HEAFEY:  Uh-huh.

12    BY MR. BERHOLD:

13        Q    Yes, thank you.

14            And if there were two procedures

15    happening in two rooms, you would need two

16    additional employees to provide the mapping

17    support?

18        A    If we trained our people to map, then I

19    would require two more if there's two rooms

20    running, correct.

21        Q    And typically, how many -- well, at -- at

22    300 Pasteur Drive does Stanford sometimes have two

23    or three CARTO mapping procedures happening at the

24    same time?

25        A    Three at the same time?  I can't remember

Page 28

1      A     Yes, there's a third location at

2   Emeryville.

3      Q     And so it's --

4      A     I have to send support there if there's a

5   case.

6      Q     Okay.  And so do you have an estimate of

7   how many trained mappers would be required for

8   Stanford to buy mapping support on all of the CARTO

9   3 procedures at all three facilities?

10     A     So if we have three CARTO cases, then we

11  need three mappers.

12     Q     And do you have an understanding of how

13  long it would take to train someone to provide

14  mapping support on the CARTO 3?

15     A     Nope.

16     Q     And do you have an understanding of what

17  kind of training, such as classroom training or

18  online training or clinical training, is required

19  to teach someone to provide mapping support on the

20  CARTO 3?

21     A     Nope.

22     Q     And would Stanford be using Biosense

23  SOUNDSTAR catheters reprocessed by Innovative

24  Health currently if Biosense would provide the

25  mapping support on those cases?

30(b)(6) Michael Idio                                    September 20, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 29

1        A     Let me just open the light.  Sorry.

2              Yes, we would use reprocessed SOUNDSTAR

3     if Biosense Webster would support the cases.

4        Q     And you would be using reprocessed

5     SOUNDSTARs from Innovative Health if Biosense would

6     support the cases?

7        A     We -- yes, if they would support -- if

8     Biosense Webster would support the cases, we would

9     use reprocessed SOUNDSTARs bought from Innovative

10    Health.

11       Q     And turning back to Exhibit 347 on your

12    iPad.  You recall participating in the survey from

13    Ms. Watson in Exhibit 347?

14       A     Yeah.

15             MR. BERHOLD:  Can we go off the record?

16             VIDEO TECHNICIAN:  The time is 1:15.  We

17    are off the record.

18             (Recess taken.)

19             VIDEO TECHNICIAN:  The time is 1:26.

20    We're back on the record.

21             MR. BERHOLD:  Welcome back, Mr. Idio.

22    BY MR. BERHOLD:

23       Q     Do you recall testifying earlier that you

24    were awaiting physician approval on pursuing

25    training your own staff to provide mapping support

30(b)(6) - Michael Idio                          September 20, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 30

1    on the CARTO 3?

2              MS. KOZIKOWSKI:   Objection.

3        A    No, that was not my -- that's not what I

4    said.  We're waiting for --

5    BY MR. BERHOLD:

6        Q    Okay.

7        A    -- physicians to approve that the support

8    would come from Innovative Health, not my staff.

9        Q    Okay.  So is it your understanding that

10   Innovative Health itself would provide the mapping

11   support on CARTO 3 mapping procedures?

12       A    It's my understanding that Innovative

13   Health is open to support cases or if we use

14   reprocessed CARTO Sound from Innovative Health.

15       Q    And is -- is -- well, what exactly is

16   your understanding of the offer from Innovative

17   Health?

18       A    If the physicians are okay that the

19   support is coming from Innovative Health, then we

20   would go ahead and continue using reprocessed CARTO

21   Sound from Innovative Health and use Innovative

22   Health's support for mapping.

23       Q    And is there a written request pending

24   with the physicians for approval?

25       A    No.

Page 47

```
 1      A     Okay.  Yep, I do.

 2      Q     The previous reprocessing company was

 3   Sterilmed, correct?

 4      A     Right.  Correct.

 5      Q     Does this your -- refresh your

 6   recollection as to whether Dr. Viswanathan was in

 7   his role at Stanford --

 8      A     Yes.

 9      Q     -- prior to the switch to Innovative?

10      A     Is probably correct because he wasn't

11   here --

12      Q     Okay.

13      A     -- during -- when we used Sterilmed.

14      Q     And so Dr. Viswanathan wouldn't have an

15   opinion -- an opinion one way or the other on the

16   quality of service of --

17      A     Correct.

18      Q     -- Sterilmed, correct?

19      A     Correct.

20      Q     Okay.  And if you look at the email right

21   above that one which starts in the bottom of 141.

22      A     Okay.

23      Q     Ms. Watson replies to you.  She says:

24   Thanks for the feedback.  You might have a

25   discussion with Dr. Viswanathan to share your
```

Page 48

1    team's experiences with the prior vendor.  The

2    Biosense Rep has had direct contact with

3    Dr. Viswanathan and has attempted to influence him

4    in the direction of Biosense.

5               Do you see that?

6         A    Yep.

7         Q    Did you have this discussion with

8    Dr. Viswanathan about the previous vendor which was

9    Sterilmed?

10        A    Correct.

11        Q    What do you recall about that

12   conversation with Dr. Viswanathan?

13        A    He asked me what was the service like the

14   the previous one, Sterilmed.

15        Q    And what was your experience with

16   Sterilmed that you shared with Dr. Viswanathan?

17        A    Sterilmed, they did a terrible job with

18   reprocessing.  It would pile up in the dirty room

19   all the catheters.  They would not pick up on time.

20               If you opened the pick-up area of the

21   room, it looks like garbage.  There's no -- it's

22   not organized.  We have to call them multiple

23   times.

24               And then when we buy the reprocessed

25   stuff from them, when we open them and use them,

30(b)(6) - Michael Idio                                    September 20, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 49

1     they don't work.

2              That was my experience with Sterilmed.

3        Q     And that is the experience you shared

4     with Dr. Viswanathan?

5        A     Yes.

6        Q     So his participation in the survey was

7     based on experiences you had shared with him about

8     Sterilmed from several years ago, not about any --

9     any of his own personal experience, correct?

10       A     His vote was based on his own decision.

11    I was just sharing what I experienced.  I can't

12    control his vote.

13       Q     But he didn't have any experience with

14    Sterilmed at all, correct, prior to --

15       A     You got to ask him that.  I don't know

16    where he worked before.  So he probably does have,

17    I don't know.

18       Q     He didn't work at Stanford when Stanford

19    was using Sterilmed, correct?

20       A     Yes.

21       Q     And the experiences that you had with

22    Sterilmed all predated 2017, correct?

23       A     Before 2017, sounds about right.

24       Q     So you haven't had any experience one way

25    or the other with Sterilmed since then, correct?

Page 50

1       A     We used Sterilmed before 2017, I think.

2    So I was experiencing the service from Sterilmed.

3       Q     And you haven't experienced Sterilmed's

4    service since then, correct?

5       A     After Innovative Health took over, we

6    haven't had experience with Sterilmed, correct.

7       Q     We can put that document away.

8             Has Stanford discussed in general this

9    lawsuit, not necessarily related to this

10   deposition, with anyone at Innovative Health?  Have

11   you personally?

12      A     No, just --

13      Q     I should have asked you verbally.

14            Has anyone -- has Stanford discussed

15   this -- this lawsuit in general with anyone at

16   Innovative Health?

17      A     No, I found this out from Nancy.

18      Q     So your first knowledge of this lawsuit

19   came when you were subpoenaed to testify at this

20   deposition today; is that correct?

21      A     Yes.  I -- well --

22            MS. HEAFEY:  Yes, it's okay to answer

23   that question, Michael, but please don't --

24      A     I was --

25            MS. HEAFEY:  -- discuss with them any

Page 71

1    BY MS. KOZIKOWSKI:

2         Q    You can still answer the question.

3         A    They compete with each other.  I think

4    so, yeah.

5         Q    The cardiac mapping systems we discussed

6    can be for EP studies and procedures, correct?

7         A    Used by EP procedures, yes.

8         Q    They all generally perform the same

9    function, right?

10        A    I don't know.

11        Q    Do the CARTO 3 and the EnSite mapping

12   systems generally perform the same function?

13        A    I don't know.  I'm not an expert of those

14   equipment.  Sorry.

15        Q    A physician performing an EP study could

16   use any of these mapping systems, correct?

17             MR. BERHOLD:  Objection.

18        A    It's their decision on which one to use.

19   BY MS. KOZIKOWSKI:

20        Q    But they can, subject to their own

21   preference, or what have you, they can use any of

22   these mapping systems that's available to them,

23   correct?

24             MR. BERHOLD:  Objection.

25        A    It's their decision on which mapping

Michael Idio                                    September 20, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 72

1    systems to use.  I don't know.

2            MS. HEAFEY:  Mr. Idio is not an expert on

3    medical procedures and appropriate equipment for

4    those procedures.

5            MS. KOZIKOWSKI:  Understood.

6    BY MS. KOZIKOWSKI:

7       Q    Mr. Idio, if Stanford was unsatisfied

8    with Biosense's prices or policies for whatever

9    reason, they could switch to another system that's

10   available for its EP studies, correct?

11           MR. BERHOLD:  Objection.

12      A    Can you repeat the question, please?

13   BY MS. KOZIKOWSKI:

14      Q    Sure.  If Stanford was unsatisfied with

15   Biosense's prices or policies for whatever reason,

16   they could switch to another system available to it

17   for its EP studies, correct?

18           MR. BERHOLD:  Objection.

19      A    That's a doctor decision.

20   BY MS. KOZIKOWSKI:

21      Q    So if a doctor was dissatisfied with

22   Biosense's prices or policies for whatever reason,

23   that doctor could make the decision to switch to

24   another system available to him or her for his or

25   her EP studies, correct?

Case 8:19-cv-01984-JVS-KES     Document 571-1     Filed 07/17/25     Page 649 of 676
Page 106 # Michael Idio
September 20, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 73

1      A     I don't know what --

2            MR. BERHOLD:  Objection.

3      A     I don't know what their...

4  BY MS. KOZIKOWSKI:

5      Q     You testified that some physicians prefer

6  the CARTO system and some use either the CARTO

7  system or the Abbott system, correct?

8      A     Correct.

9            MR. BERHOLD:  Objection.

10 BY MS. KOZIKOWSKI:

11     Q     Are there physicians that prefer to use

12 the Abbott EnSite mapping system?

13     A     Yes, there is -- there is a physician

14 that prefers the EnSite.

15     Q     And you testified that there are

16 physicians that prefer the CARTO 3 mapping system

17 as well?

18     A     Correct.

19     Q     And I believe you testified that there's

20 some that will use either, correct?

21     A     Correct.

22     Q     And which system a physician prefers to

23 use is not based on anything Biosense Webster is

24 requiring, correct?

25            MR. BERHOLD:  Objection.

Page 76

1   experts.  It would be a better -- it would be a

2   better -- best question to ask the physicians, not

3   me about.

4   BY MS. KOZIKOWSKI:

5        Q    I'll give you a second to get the light.

6        A    Right.  I have an automatic light thing.

7        Q    No problem.

8             And understanding that you don't know,

9   you know, the specific reasons why a physician

10  might prefer one system over another, you know, you

11  agree this could be based on a variety of factors,

12  correct, like, the physician's product -- the view

13  of product quality, right?

14            MR. BERHOLD:  Objection.

15       A    Like, how would I know which one they

16  want?

17  BY MS. KOZIKOWSKI:

18       Q    Just in general, the factors that they --

19  that a physician may consider when they're deciding

20  to use one or the other for their EP procedures.

21       A    I don't -- I don't -- I don't know the

22  reason why they prefer one over the other.

23       Q    Okay.  Understanding you don't know the

24  specific reasons why, would you agree that it could

25  be a variety of reasons?

Innovative Health, LLC v. Biosense Webster, Inc.

Page 77

1      A     I don't know the --

2            MR. BERHOLD:  Objection.

3      A     I don't know the reasons why they -- on

4   how they choose the systems.

5   BY MS. KOZIKOWSKI:

6      Q     And there's nothing stopping a physician

7   at Stanford from switching from CARTO 3 to the

8   Abbott mapping system or vice versa, correct?

9            MR. BERHOLD:  Objection.

10     A     It's the same question that you asked

11  earlier.  It's their decision on which one to use.

12  BY MS. KOZIKOWSKI:

13     Q     So, let's discuss a little bit about how

14  Stanford makes these decisions about what cardiac

15  systems to purchase.

16           I -- I know you testified that the --

17  Dr. Paul Wang requested to trial the KODEX and that

18  was brought to upper management.

19           Is upper management generally the group

20  of individuals that makes decisions about what

21  cardiac mapping system to provide?

22     A     No, that's a big purchase.  It costs a

23  lot of money to add another system.

24           So my understanding is, if they know that

25  there's no need for a new one, that's probably why

Page 78

1    they decline to have a new one.

2        Q    So does -- my question is, does Stanford

3    have a team or a committee that makes, you know,

4    these large purchasing decisions for cardiac

5    mapping systems?

6        A    Yeah, upper management, the people that

7    are --

8        Q    Upper management is the group that makes

9    those decisions?

10       A    Yes.

11       Q    And you're not a member of that group,

12   correct?

13       A    No.  My job is just to present.  My job

14   is just to present the request of the physicians

15   and give it to them.

16       Q    Understood.  And -- and upper management

17   is the same group we talked about a little bit

18   earlier.  I believe there were four individuals we

19   talked about?

20       A    Yeah.

21       Q    Does this person research the purchasing

22   decision before making it?

23       A    Say that again.  Sorry.

24       Q    You testified that purchasing a cardiac

25   mapping system is a large purchase.

Innovative Health, LLC v. Biosense Webster, Inc.

Page 122

1   the scope of the deposition.

2            MR. BERHOLD:  Objection.

3            MS. KOZIKOWSKI:  Okay.  Alissa, can you

4   put up Tab 3.

5            (Deposition Exhibit 351 marked.)

6            MS. KOZIKOWSKI:  Alissa, before we get to

7   that.

8   BY MS. KOZIKOWSKI:

9        Q    Mr. Idio, you testified that if -- it's

10  possible that Stanford could invest the time and

11  resources to hire an additional full-time person to

12  provide mapping support if it was approved.  Do you

13  recall that?

14       A    Yes.

15       Q    Who would need to approve that?

16       A    Upper management.

17       Q    Is that something you've pitched to upper

18  management at any point?

19       A    I wouldn't pitch it because we can do the

20  same job by getting support from the company, so

21  why would we hire someone?

22       Q    So you've never pitched it to upper

23  management to hire someone to -- to provide

24  Stanford --

25       A    Never -- never pitched?  I don't know if

Page 123

1    I -- it was probably discussed, what if we train

2    our own people.  But again, that would require

3    another staff to hire.

4         Q    Okay.  So you said it was probably

5    discussed.  Do you recall specific discussion about

6    this about with --

7         A    I don't recall.  It's probably been

8    discussed in the past.

9         Q    But you don't remember one way or the

10   other?

11        A    Recall, no.

12        Q    And you've never sort of formally

13   requested that Stanford hire an additional person

14   to train them to self-support?

15        A    So just -- just to find a full-time CVT

16   is really hard enough, but to find a CVT that knows

17   how to map is way harder.

18             So during these years, you know, 2018,

19   2019, I have -- I was short staffed with CVTs.

20   That's why I have travelers.  Could not even find a

21   full-time job, like a full-time CVT.

22             So finding -- finding a CVT with mapping

23   experience is really tough.

24        Q    Have you ever looked for a full-time

25   staffing member with mapping experience?

Page 124

1        A    Oh, yeah, we have postings.  We still

2   have postings.  It's been long.

3        Q    And the postings seek --

4        A    We don't -- we don't require it.  It's

5   just a bonus for us if they know how to map.

6        Q    Okay.  And just one reminder, it's hard

7   for the court reporter to take down what we're both

8   saying as we speak over each other.  So if you

9   could just wait for me to get my full question out

10   and I'll try to do the same when you're answering,

11   okay?

12            Okay.  Go ahead and look at Tab 3.

13            And do you recognize this document?

14        A    I've -- it looks like I've -- yeah, it

15   looks like I've seen it.  Because it was sent to

16   me, so, yeah.

17        Q    And just for the record -- oh, sorry --

18   this is Exhibit 351.  It's Bate stamped IH00475914.

19            And it's a February 8th, 2018 email from

20   Sally Tham to you.

21            And we discussed that Sally Tham is a

22   sales representative for Innovative, correct?

23        A    Correct.

24        Q    And Rick Ferreira is also on these

25   emails.  He's Innovative's CEO, correct?

306006 Michael Idio    September 20, 2021
Innovative Health, LLC v. Biosense Webster, Inc.

Page 125

1     A     That's correct.

2     Q     Do you interact with him often?

3     A     Often?  No, not often.

4     Q     How frequently would you say you interact

5   with him?

6     A     When we were -- when we were

7   transitioning to Innovative Health, I've talked to

8   him once or twice.

9     Q     So you've talked to him once or twice in

10   the context of moving over to Innovative Health?

11     A     Of the service that they're providing.

12     Q     Okay.  So go ahead and look at the bottom

13   email in that chain.

14          Ms. Tham says to you:  Jack, Rick and I

15   are meeting on February -- Monday, February 12th at

16   10 a.m. to discuss the situation and please join us

17   if you can because Rick can provide some insights

18   on how to protect yourself from the Biosense

19   Webster threats.

20          Do you see that?

21     A     Yes, I see it.

22     Q     And so, Ms. Tham is inviting you to a

23   meeting to discuss Bio -- Biosense Webster's,

24   quote, "threats," correct?

25     A     Rick and I -- what was the question

# EXHIBIT 10

Page 1

1               UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3                    SOUTHERN DIVISION

4

5    INNOVATIVE HEALTH LLC,        ) Case No.
                                   ) 8:19-cv-01984-JVS-KES
6         Plaintiff,               )
                                   )
7         vs.                      )
                                   )
8    BIOSENSE WEBSTER, INC.,       )
                                   )
9            Defendant.            )
     _____)

10

11

12         RECORDED DEPOSITION OF VINCENT THOMAS, M.D., a

13         witness herein, noticed by Jeffrey L. Berhold,

14         P.C., taken at 535 Anton Boulevard, Costa Mesa,

15         California at 8:55 a.m., on Monday, September 9,

16         2024, before Delia M. Satterlee, CSR 9114.

17

18

19

20

21

22

23         Job Number 6870736

24

25

Vincent Thomas, M.D.                    September 9, 2024
Innovative Health, LLC v. Biosense Webster, Inc.

                                                    Page 10

1      about the case.

2           Q.  And the case involved allegations of a possible

3      product defect from Biosense Webster?

4           A.  I don't recall if there were product

5      allegations.

6           Q.  What is your best recollection of the

7      allegations in the case?

8           A.  As a safety officer, my recollection was driven

9      around what was happening in the case.  I do recall that

10     there was a patient that suffered a -- a medical issue

11     that needed to be resolved and that Biosense Webster

12     products were used in the case.

13          Q.  And the patient had suffered some sort of

14     injury allegedly?

15          A.  Yes.

16          Q.  Was there any allegation that -- that -- Let me

17     start over.

18          Was there -- Was it an issue of injury or death?

19          A.  To my understanding, at the time of the case,

20     it was injury.

21          Q.  Okay.  So you are familiar generally with the

22     ground rules of a deposition?

23          A.  I'm generally familiar with the ground rules of

24     a deposition.

25          Q.  Have you ever given testimony in a trial?

Vincent Thomas, M.D.                         September 9, 2024
Innovative Health, LLC v. Biosense Webster, Inc.

                                                    Page 11

 1         A.   No.

 2         Q.   What have you done to prepare for your

 3    deposition today?

 4         A.   We had preparation sessions, "we" being with

 5    the attorneys representing Biosense Webster.

 6         Q.   Anything else?

 7         A.   No.

 8         Q.   You worked for Biosense Webster from March 2018

 9    to January 2022?

10         A.   That is correct.

11         Q.   You were a medical safety officer?

12         A.   Yes.

13         Q.   United States or worldwide?

14         A.   Biosense Webster is a global company.  I

15    support it as a safety officer for the company, so I

16    believe the answer to your question is "worldwide."

17         Q.   What were your duties?

18         A.   A medical safety officer is intended to support

19    the safety of the -- and assess the safety of products

20    across the product life cycles, so all products

21    developed by the supporting company that we are

22    supporting.

23         Q.   You prepared a declaration for this case

24    previously?

25         A.   I understand that there was a declaration that

Vincent Thomas, M.D.                    September 9, 2024
Innovative Health, LLC v. Biosense Webster, Inc.

Page 12

 1     I had signed.
 2          Q.  Aside from e-mails with counsel, did you
 3     prepare any other documents for this case besides your
 4     declaration?
 5          A.  No.
 6          Q.  Did you ever conduct any studies for this case?
 7          A.  No.
 8          Q.  Did you ever collect any documents for this
 9     case?
10          A.  Could I clarify?
11          Q.  (Nods head in the affirmative.)
12          A.  Did I personally collect any documents for this
13     case?
14          Q.  Yes.  Did you -- Dr. Thomas, did you ever
15     personally collect any documents for this case?
16          A.  I personally did not collect any documents for
17     this case.
18          Q.  Did you personally ever conduct a search for
19     documents relevance [SIC] to this case?
20          A.  I personally did not conduct a search for
21     documents relevant to this case.
22          Q.  Did you personally search your e-mails at any
23     time for any e-mails relevant to this case?
24          A.  I personally did not search my e-mails for any
25     documents relevant to this case.

Vincent Thomas, M.D.                    September 9, 2024
Innovative Health, LLC v. Biosense Webster, Inc.

Page 19

1          A.   Yes.

2          Q.   How do you know her?

3          A.   When I joined Biosense Webster in 2018, Jasmina

4     Brooks was part of the Global Strategic Marketing Group.

5          Q.   Do you know Feri Ziray?

6          A.   Yes.

7          Q.   How do you know her?

8          A.   Feri I first met at a -- a leadership

9     conference supported by the Cardiovascular and Surgical

10    Specialty Solutions Group.

11         Q.   And when you talk about the Cardiovascular

12    Solutions Group, are you referring to a group within

13    Johnson & Johnson?

14         A.   Yes.  So Cardiovascular Surgical Solutions,

15    CSS, had oversight of multiple different companies

16    within Johnson & Johnson, Biosense Webster being one of

17    them.

18         Q.   Do you know Doug Bruce?

19         A.   Yes.

20         Q.   And how do you know Doug Bruce?

21         A.   When I joined Biosense Webster, Johnson &

22    Johnson, in 2018, Doug Bruce, I believe, was head of

23    Research & Development.

24         Q.   Do you know Conrad Ramos?

25         A.   That name is not familiar to me.

Vincent Thomas, M.D.                                    September 9, 2024
Innovative Health, LLC v. Biosense Webster, Inc.

                                                              Page 20

 1          Q.   Do you know Sandor Palfi?

 2          A.   That name is not familiar to me.

 3          Q.   Do you know Noah Martin?

 4          A.   That name is not familiar to me.

 5          Q.   Did you have anyone that reported directly to

 6     you when you were chief safety officer at

 7     Biosense Webster?

 8          A.   To clarify, I was not chief safety officer --

 9          Q.   I'm sorry.

10          A.   -- at Biosense Webster.

11          I'm happy to answer that as medical safety officer

12     supporting Biosense Webster, employed by Johnson &

13     Johnson, as an independent medical safety reviewer, no,

14     I did not have anybody reporting in to me.

15          Q.   So Biosense hired you to be medical safety

16     officer.

17          A.   Johnson & Johnson hired me to support

18     Biosense Webster as their independent medical safety

19     reviewer or medical safety officer.

20          Q.   So who was your employer during that time?  Who

21     paid your paycheck?

22          A.   Johnson & Johnson.

23          Q.   Okay.  And Johnson & Johnson hired you as a

24     subject matter expert?

25          A.   Can I clarify "subject matter expert"?  In

Vincent Thomas, M.D.                                    September 9, 2024
Innovative Health, LLC v. Biosense Webster, Inc.

                                                        Page 21

1      what?

2          Q.   Well, I was going to ask some additional

3      questions, but -- I mean when they hired you as a

4      subject matter expert with respect to certain matters;

5      correct?

6          A.   With respect to medical safety and independent

7      review of medical safety.

8          Q.   With respect to electrophysiology procedures?

9          A.   Yes.

10         Q.   With respect to patient risk management?

11         A.   Yes.

12         Q.   Your expertise was based on your prior

13     education and experience.

14         A.   Yes, I believe so.

15         Q.   As an electrophysiologist and cardiologist.

16         A.   That is correct.

17         Q.   You acquired your knowledge of

18     electrophysiology studies and procedures from your prior

19     education and experience as an electrophysiologist and

20     cardiologist?

21         A.   Yes.  But to clarify, as a pediatric

22     cardiologist and electrophysiologist.

23         Q.   And you acquired your knowledge of the

24     functionality of cardiac mapping systems and diagnostic

25     and mapping catheters from your prior education and

Vincent Thomas, M.D.                    September 9, 2024
Innovative Health, LLC v. Biosense Webster, Inc.

Page 25

1        conditions treated with these types of procedures.

2            Q.  Have you ever heard of the Biosense position

3        statement?

4            A.  No.

5            Q.  Your declaration does not refer to the Biosense

6        position statement; is that right?

7            A.  I believe that to be the case, yes.

8            Q.  And you did not participate in the creation of

9        any Biosense Webster position statement?

10           A.  No.

11           Q.  And you were never consulted on any

12       modifications to any Biosense Webster position

13       statement?

14           A.  Could I clarify "position statement"?  On what?

15           Q.  Sure.

16       Have you ever heard of a Biosense Webster position

17       statement on the use of reprocessed catheters?

18           A.  No.

19           Q.  And you didn't participate in the creation of

20       any Biosense Webster position statement regarding

21       reprocessed catheters.

22           A.  No.

23           Q.  And you've never been consulted on

24       modifications to any Biosense Webster position statement

25       on reprocessed catheters?

Page 26

1          A.  No.

2          Q.  And you are not planning to offer any opinions

3    regarding any Biosense Webster position statement on

4    reprocessed catheters.

5          MR. LOBB:  Objection; vague and ambiguous.

6          THE WITNESS:  I'm here to work off of factual

7    information.  I suppose that based on the factual

8    information, it would be my opinion.

9          MR. BERHOLD:

10          Q.  But at this time, you're not familiar with any

11    Biosense Webster position statement on reprocessed

12    catheters?

13          A.  I am not.

14          Q.  Exhibit 419, your declaration, does not refer

15    to the Biosense Webster clinical support program; is

16    that right?

17          A.  I believe that is correct.

18          Q.  You were not involved on a day-to-day basis

19    with the Biosense Webster clinical support program?

20          A.  I was not involved on a day-to-day basis with

21    the clinical support program.

22          Q.  Dr. Thomas, have you heard of the

23    Falcon Project at Biosense Webster?

24          A.  No.

25          Q.  You never participated in any Falcon Project at

Vincent Thomas, M.D.                         September 9, 2024
Innovative Health, LLC v. Biosense Webster, Inc.

                                                              Page 27

1        Biosense Webster?

2             A.   I don't recall any Falcon Project or my

3        participation in it.

4             Q.   Have you ever heard of a Falcon chip?

5             A.   Can I clarify?   In relation to

6        Biosense Webster?

7             Q.   Well, let me ask it as a couple of ways.

8             Have you ever heard of any Falc- -- things called

9        the Falcon chip?

10            MR. LOBB:   Objection; vague and ambiguous.

11            THE WITNESS:   I've heard of the Millennium Falcon

12       as part of "Star Wars" if that's what you're referring

13       to.   But I doubt that's the case.

14            MR. BERHOLD:   Okay.

15            Q.   And did you ever hear of something called the

16       Falcon chip during your time at Biosense Webster?

17            A.   No.

18            Q.   And you were not involved in the development of

19       any Falcon chip during your time at Biosense Webster?

20            A.   No.

21            Q.   And you were not involved in the implementation

22       of anything called the Falcon chip during your time at

23       Biosense Webster.

24            A.   I was not involved.

25            Q.   And you were not planning to offer any opinions

Vincent Thomas, M.D.                           September 9, 2024
Innovative Health, LLC v. Biosense Webster, Inc.

Page 28

1      in this case on any justifications for using a Falcon

2      chip in Biosense Webster catheters?

3              MR. LOBB:  Objection; vague and ambiguous, calls

4      for speculation.

5              THE WITNESS:  I don't know what "Falcon chip" is

6      related to.  It would be difficult for me to answer that

7      question regarding an opinion.

8              MR. BERHOLD:

9              Q.  But you don't currently have any opinion on any

10     justifications for anything relating to a Falcon chip

11     used by Biosense Webster on its catheters.

12             MR. LOBB:  Same objections.

13             THE WITNESS:  I don't know what the justifications

14     are for a Falcon chip.  I'm not familiar with that

15     program.  There may be opinions that I have, again based

16     on independent safety and factual reviews of the data

17     that I've seen and understand, but I'm not clear if that

18     has any relation to the justification for Falcon chip.

19             MR. BERHOLD:

20             Q.  And you currently don't have any opinions on

21     any Falcon chip at Biosense Webster because you're

22     simply not familiar with the Falcon chip.

23             A.  I do not have any opinions about Falcon chip.

24             Q.  Your declaration, Exhibit 419, does not refer

25     to catheters reprocessed by Innovative Health.

# EXHIBIT 11

CONFIDENTIAL

Page 1

1        UNITED STATES DISTRICT COURT

         CENTRAL DISTRICT OF CALIFORNIA

2              SOUTHERN DIVISION

3    _____

4    INNOVATIVE HEALTH LLC,

5         Plaintiff,              CASE NO.

6    vs.                          8:19-cv-01984-JVS-KES

7    BIOSENSE WEBSTER, INC.,

8         Defendant.

9    _____

10             ** CONFIDENTIAL **

11        VIDEOTAPE 30(B)(6) DEPOSITION

12         OF BIOSENSE WEBSTER, INC.

13        AND IN HIS INDIVIDUAL CAPACITY

14          WITNESS: DONALD COLDIRON

15           APPEARING REMOTE FROM

16           ROCHESTER, MINNESOTA

17

18             SEPTEMBER 3, 2021

19               9:33 A.M CST

20

21   Reported By:

22   Judith L. Leitz Moran

23   RPR, RSA, CCR-B-2312

24   APPEARING REMOTELY FROM ATLANTA, GEORGIA

25

CONFIDENTIAL

Page 146

1   have to rephrase it, but -- unless you want to.

2   I'm just trying to follow.

3        Q    And so how long -- do you have a sense of

4   the life cycle of the CARTO 3 cardiac mapping

5   system?

6        A    You know, I know we have some that are,

7   you know, beyond five years old.  Maybe not CARTO

8   3, maybe it's a prior CARTO, but mapping systems in

9   general.  And then we have some that five -- you

10  know, five or more years old.

11       Q    And during the life cycle of a cardiac

12  mapping system, will OEMs introduce new catheters

13  from time to time for use on the cardiac mapping

14  system?

15       A    Yes.

16       Q    And is it true that some of those new

17  catheters come at a significant price of thousands

18  of dollars?

19       A    Yes.

20       Q    And is it also true that third parties

21  will get clearance to reprocess OEM catheters for

22  use on a cardiac mapping system during the life

23  cycle of the cardiac mapping system?

24            MS. MOSKOWITZ:  Objection.

25       A    Yes.

Page 147

1   BY MR. BERHOLD:

2       Q    And a reprocessed catheter can result in

3   a savings of more than a thousand dollars in a

4   procedure?

5            MS. MOSKOWITZ:  Objection.

6       A    Correct.  And those are often utilized

7   in -- or often taken into account in case cost.

8   BY MR. BERHOLD:

9       Q    And are you -- is Mayo able to take into

10  account future clearances for new or reprocessed

11  devices in calculating case cost?

12      A    No, because suppliers will not -- I mean,

13  this is the primary reason, we don't have access to

14  pricing until it's FDA approved.

15      Q    And that's true of the new or reprocessed

16  catheters?

17      A    Yes.

18           MR. BERHOLD:  I don't have any additional

19  questions, Mr. Coldiron.

20           MS. MOSKOWITZ:  Nothing further from me

21  either.  Thank you again.

22           MR. KARPENKO:  We will read and sign.

23           MR. BERHOLD:  Thank you for your time.

24  Everyone enjoy their --

25           MR. KARPENKO:  I have -- I do have one

CONFIDENTIAL

Page 148

1    thing before we go off the record, and that is,

2    that we will designate the deposition transcript

3    for today as confidential pursuant to the

4    protective order entered in the case.

5            And obviously, there were a couple of

6    lines of testimony that counsel designated as

7    highly confidential pursuant to that same

8    protective order.

9            VIDEO TECHNICIAN:  We are off the record

10   at 1:08 p.m.  And this concludes today's testimony

11   given by Don Coldiron.

12           The total number of media units used was

13   three and will be retained by Veritext New York.

14           (Deposition concluded at 1:08 p.m.)

15           (Signature reserved.)

16

17              *   *   *   *   *

18

19

20

21

22

23

24

25

# EXHIBIT 12

**REDACTED IN FULL
DOCUMENT PROPOSED TO BE
FILED UNDER SEAL IN ITS
ENTIRETY**

# EXHIBIT 13

# U.S. Hospitals That Wanted to Buy Innovative But Couldn't

