KARLA KRAFT
State Bar No. 205530
kkraft@stradlinglaw.com
STRADLING YOCCA CARLSON &
RAUTH LLP
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660-6422
Telephone: (949) 725-4000

WILLIAM F. CAVANAUGH, JR.
State Bar No. 133461
wfcavanaugh@pbwt.com
PATTERSON BELKNAP WEBB
AND TYLER LLP
1133 Avenue of the Americas
New York, NY  10036
Telephone: (212) 336-2000

MUHAMMAD U. FARIDI
(Admitted *Pro Hac Vice*)
LINKLATERS LLP
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 903-9000

Attorneys for Defendant
BIOSENSE WEBSTER, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INNOVATIVE HEALTH LLC,<br><br>Plaintiff,<br><br>vs.<br><br>BIOSENSE WEBSTER, INC.,<br><br>Defendant. | CASE NO. 8:19-cv-01984-JVS-KES<br><br>Hon. James V. Selna<br><br>**DEFENDANT'S REPLY IN SUPPORT OF RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(B)**<br><br>**Complaint Filed**:  October 18, 2019<br><br>**Hearing Date**:  August 11, 2025<br>**Time**:  1:30 p.m.<br>**Courtroom**:  10C |

- 1 -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT...................................................................5

ARGUMENT ..........................................................................................7

I.    IH FAILED TO PROVE THAT BIOSENSE HAD MARKET POWER IN ANY ALLEGED RELEVANT MARKETS ...................7

    A.    No Market Power in the Alleged Market for CARTO 3 Clinical Support ...............................................................................7

    B.    No Market Power in the Relevant Catheter Markets................10

II.   IH FAILED TO PROVE A SEPARATE MARKET FOR CLINICAL SUPPORT ...............................................................13

III.  IH FAILED TO PROVE THE ALLEGED SINGLE-BRAND AFTERMARKETS ................................................................16

    A.    No Information Costs Prevent Accurate Lifecycle Pricing......16

    B.    No Significant Switching Costs Exist.......................................17

    C.    Evidence of Cross-Elasticity of Demand Contradicts IH's Proposed Single-Brand Market.................................................18

    D.    The Clinical Support Policy Was Generally Known................20

IV.   IH FAILED TO PROVE ANTITRUST INJURY .............................20

V.    IH'S CLAIMS UNDER SECTION 2 OF SHERMAN ACT FAIL ...25

VI.   IH'S CARTWRIGHT ACT CLAIMS FAIL ......................................26

    A.    The Cartwright Act Does Not Cover Out-of-State Damages ...26

    B.    The *Per Se* Rule Is Inapplicable to the Alleged Tie Under the Cartwright Act........................................................................26

CONCLUSION .........................................................................27

REPLY ISO RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ................................................................. 22

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ................................................................. 24

*Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986) ................................................................. 23

*Chung v. City of Los Angeles*,
587 F. App'x 428 (9th Cir. 2014)........................................... 6, 15

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ................................................................... 22

*Dupree v. Younger*,
598 U.S. 729 (2023) ................................................................. 15

*Fed. Trade Comm'n v. Qualcomm, Inc.*,
969 F.3d 974 (9th Cir. 2020) ................................................... 26

*Fontana Pipe & Fabrication, Inc. v. Ameron, Inc.*,
921 F.2d 279 (9th Cir. 1990) ................................................... 27

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
423 F.3d 374 (3d Cir. 2005) .................................................... 18

*Indie Caps LLC v. Ackerman*,
No. CV-20-01970, 2023 WL 5206136 (D. Ariz. Aug. 14, 2023).................. 15

*Innovative Health, LLC v. Biosense Webster, Inc.*,
No. 22-55413, 2024 WL 62948 (9th Cir. Jan. 5, 2024) ................. 15

*In re Air Passenger Comput. Rsrvs. Sys. Antitrust Litig.*,
694 F. Supp. 1443 (C.D. Cal. 1988)............................................ 10

*In re Cipro Cases I & II*,
61 Cal. 4th 116 (Cal. 2015) ..................................................... 28

REPLY ISO RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

*In re Citric Acid Antitrust Litig.*,
  No. 95-CV-4578, 1996 WL 116827 (N.D. Cal. Mar. 12, 1996)..................... 27

*In re HIV Antitrust Litig.*,
  No. 19-CV-02573, 2022 WL 22609107
  (N.D. Cal. Sept. 27, 2022) ........................................................................... 27

*In re Xyrem (sodium oxybate) Antitrust Litig.*,
  No. 20-MD-02966, 2024 WL 4023561 (N.D. Cal. Aug. 26, 2024).......... 11, 12

*Kypta v. McDonald's Corp.*,
  671 F.2d 1282 (11th Cir. 1982) .................................................................... 24

*Lakeside-Scott v. Multnomah County*,
  556 F.3d 797 (9th Cir. 2009) ........................................................................ 21

*Linotype Co. v. Varityper, Inc.*,
  No. 89-CV- 4747, 1989 WL 94338 (S.D.N.Y. Aug. 4, 1989) ....................... 13

*Morrison v. Viacom, Inc.*,
  66 Cal. App. 4th 534 (Cal. Ct. App. 1998) ................................................... 28

*Paladin Assocs., Inc.v. Mont. Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) ...................................................................... 21

*Pool Water Prods. v. Olin Corp.*,
  258 F.3d 1024 (9th Cir. 2001) ................................................................ 22, 23

*Shaw v. Lindheim*,
  809 F. Supp. 1393 (C.D. Cal. 1992) .............................................................. 15

*Siegel v. Chicken Delight*,
  448 F.2d 43 (9th Cir. 1971) ..................................................................... 24, 25

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,
  188 F.3d 11 (1st Cir. 1999) ........................................................................... 18

*U.S. Steel Corp. v. Fortner Enters., Inc.*,
  429 U.S. 610 (1977) ...................................................................................... 24

*WhitServe, LLC v. Comput. Packages, Inc.*,
  694 F.3d 10 (Fed. Cir. 2012) ........................................................................ 21

*Williams v. County of Westchester*,
  171 F.3d 98 (2d Cir. 1999) ........................................................................... 15

-4-

# PRELIMINARY STATEMENT

While citing various evidence, Innovative Health LLC ("IH") fails to confront the undisputed evidence on which Biosense Webster, Inc.'s ("Biosense") motion rests—facts that compel judgment in Biosense's favor.

*As a threshold matter*, the Ninth Circuit's decision on this Court's summary judgment ruling is not dispositive. Denial of summary judgment does not preclude a district court from later granting judgment as a matter of law. *See Chung v. City of Los Angeles*, 587 F. App'x 428, 428-30 (9th Cir. 2014). The Ninth Circuit's decision did not relieve IH of its burden to produce evidence at trial to prove each element of its claims, particularly where, as here, there are dispositive issues that neither this Court nor the Ninth Circuit ever addressed.

*Second*, on the critical question of whether Biosense has market power, IH identifies no trial evidence to rebut the following key facts:

- Biosense provides clinical support at no charge as do its competitors;
- Biosense's catheters are priced comparably to similar products offered by other Original Equipment Manufacturers ("OEMs");
- Biosense did not suppress the output of clinical support or any catheters at issue; and
- Biosense continues innovating, releasing new improved catheters and upgrading existing mapping technologies.

There is only one logical explanation for these facts. Biosense provides clinical support at no charge before, during and after the policy (IH's "but for" world) as do its OEM competitors, because of robust competition at the cardiac mapping system level and because this service can most efficiently be provided by those competitors. Free clinical support is not a "tying product" in some aftermarket because Biosense lacked market power in either the alleged clinical support

REPLY ISO RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

market or the catheter markets in order to charge supracompetitive prices,
suppress output, or degrade the quality of either product.

*Third*, with regard to whether clinical support and the relevant catheters
are separate and distinct products, IH concedes that other OEMs of cardiac
mapping systems provide free clinical support as part of their system offerings,
and the only evidence IH cites to satisfy the consumer demand test is that
hospitals used to self-support decades ago when there were not enough clinical
account specialists ("CAS") to support all CARTO 3 procedures. This historical
fact is not evidence that clinical support was a separate market during the
relevant time period. At trial, not a single hospital was identified as supporting
its own procedures today. IH has no meaningful response to the evolution of the
industry in the past decade, which demonstrates that it is inefficient to separate
catheters and clinical support.

*Fourth*, IH claims that Dr. Forister's opinion—despite contradicting IH's
own fact witnesses—satisfied all four *Epic Game*s factors necessary to establish
the alleged single-brand aftermarkets. But IH has no meaningful response to the
overwhelming evidence that robust competition exists at the mapping system
level, and that customers can and do switch to competitive systems. That
evidence shows that no significant switching costs exist, and that cross-elasticity
of demand contradicts IH's purported single-brand aftermarkets. No hospital
witness testified that accurate lifecycle pricing could not be assessed or that the
clinical support policy was not generally known to customers.

*Fifth*, on antitrust injury, IH argues that its near exclusion from sales of
certain catheters is an antitrust injury. However, where, as here, the exclusion
was a result of lawful competition and procompetitive conduct, it is not an
antitrust injury. IH also asserts that, as a competitor, it did not need to
disentangle the price of clinical support from the price of catheters. Instead, IH

-6-

assumes that Biosense would charge $0 in the absence of the policy. But this assumption contradicts IH's own theory that clinical support is a separate aftermarket. If Biosense, as IH alleges, had market power in a separate clinical support aftermarket, it should be able to charge hospitals for providing this service.

*Sixth*, as to IH's Section 2 claims, IH does not dispute that it never pleaded any claims or damages based on so-called "anti-reprocessing technology" or "catheter hoarding" independent of the alleged tie. Absent a proven tie, IH's Section 2 claims cannot survive.

*Finally*, IH incorrectly claims that the presumption against extraterritorial coverage of the Cartwright Act applies only to out-of-state conduct, not out-of-state damages. IH's failure to present a California-specific damages model remains fatal to its Cartwright Act claims. IH further claims that tying arrangements are illegal *per se* under the Cartwright Act, but this view has been expressly rejected by California courts.

## ARGUMENT

## I.    IH FAILED TO PROVE THAT BIOSENSE HAD MARKET POWER IN ANY ALLEGED RELEVANT MARKETS

There is no dispute that all of IH's claims are contingent on a showing that Biosense had market power in the alleged CARTO 3 clinical support market and the catheter markets. IH's opposition confirms that it failed to prove Biosense's market power in any of those markets.

### A.    No Market Power in the Alleged Market for CARTO 3 Clinical Support

#### 1.    No Evidence of Supracompetitive Pricing

IH concedes that Biosense did not charge a price above the competitive level for its clinical support by virtue of charging $0. Opp. at 12. Thus, there was no supracompetitive pricing of CARTO 3 clinical support.

REPLY ISO RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

1    From the outset of this case, IH's theory has been that Biosense used its

2    dominant position in CARTO 3 clinical support to force customers to buy its

3    catheters, thereby causing hospitals to "pay higher prices and forgo a superior

4    product." Opp. at 11. As discussed *infra*, IH's theory is flawed because there is

5    no evidentiary basis for IH to claim that hospitals paid higher prices than they

6    would have paid in a world without the clinical support policy. Nor as discussed

7    *infra* did IH prove that its reprocessed catheters are "superior" to Biosense's

8    new catheters or SterilMed's reprocessed catheters. IH further claims that

9    Biosense—despite having market power—"has not . . . [] used [that power] to

10   extract a monopoly price." Opp. at 12. But if Biosense, as IH alleges, did not

11   take advantage of the alleged market power, then there is no violation of

12   antitrust laws.

13    2.    No Evidence of Decreased Quality

14    IH presented **zero** evidence that Biosense decreased the quality of its

15   clinical support. Recognizing the lack of evidence on this issue, IH grasps at

16   rare incidents of CAS "walkouts." *Id*. at 12. However, evidence at trial showed

17   that the "walkouts" were one-off incidents that occurred in 2014, and there was

18   no evidence they reoccurred. After being made aware of such incidents,

19   Biosense "immediately engaged in retraining the field team" to avoid their

20   recurrence. Ex. 8 at 99:19-101:1. Furthermore, evidence at trial showed that

21   Biosense continued increasing its investment in the CAS program and

22   improving the quality of clinical support. Mot. at 18; Ex. 9 at 93:16-94:24.

23   Indeed, IH's own physician witness, Dr. Doshi, spoke highly of the quality of

24   Biosense's clinical support and CAS training.  Mot. at 14 (Biosense "do[es] an

25   amazing job at training their own folks to support [procedures].").

26    IH also claims that Biosense degraded its CAS quality through

27   enforcement of the clinical support policy. Biosense's policy not to support

28

-8-

procedures involving competitors' reprocessed catheters does nothing to detract from the quality of clinical support. In fact, evidence at trial showed that, if anything, ***the policy enhances, rather than decreases, the quality of clinical support***. Because IH does not recalibrate its reprocessed catheters (which affects accuracy), *see* Ex. 2 at 46:10-15, and because CASs have no knowledge of the specifications of IH's reprocessed catheters, CASs cannot stand behind the performance of IH's catheters. *See* Ex. 8 at 86:22-87:18.

### 3. No Evidence of Suppressed Output

IH argues that Biosense suppressed the "marketwide output" of clinical support by blocking independent reprocessors. Opp. at 12. But IH points to no evidence of this assertion because there is none. As Dr. Forister conceded, Biosense increased the supply of its clinical support faster than the growth of demand for CARTO 3 mapping procedures. Mot. at 13-14. In other words, ***IH's own expert conceded at trial that Biosense increased, rather than suppressed, the output of CARTO 3 clinical support.***

### 4. No Indirect Evidence of Market Power

IH claims that Biosense's high market share, accompanied by a high barrier to enter the alleged CARTO 3 clinical support market, constitutes indirect evidence of market power. Opp. at 11. Howe evidence showed that there was no such barrier to enter the alleged CARTO 3 clinical support market. IH's own CFO, Mr. Einwechter, testified that IH had the financial resources to start a clinical support program; IH simply chose not to do so because it preferred to avoid the capital expense and pocket the cash. Ex. 11 at 127:18-21. Mr. DeTate, IH's corporate representative at trial, is a CAS himself and can train more CASs for IH to provide clinical support. *See* Ex. 1 at 100:16-101:1. Without other evidence, market share is, in itself, an "insufficient indicator of market power." *In re Air Passenger Comput. Rsrvs. Sys. Antitrust Litig.,* 694 F.

REPLY ISO RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

Supp. 1443, 1456 (C.D. Cal. 1988), *aff'd sub nom. Alaska Airlines v. United Airlines,* 948 F.2d 536 (9th Cir. 1991).

**B.    No Market Power in the Relevant Catheter Markets**

IH claims that it adduced evidence of Biosense's market power in the relevant catheter markets.  *See* Opp. at 12-16.  Not so.

1.    <u>No Evidence of Supracompetitive Pricing</u>

*First,* IH has no meaningful response to data showing that, in the years following implementation of the policy, prices for Biosense's new catheters fell slightly.  Mot. at 13; Ex. 14 (Wu Demonstratives 22 & 23). [1]  Because it is uncontroverted that hospitals did not face higher catheter prices with the clinical support policy, IH attempts to conflate the price of its used catheters with the price of new catheters.  Opp. at 25.  IH asserts that Biosense forced hospitals to use more expensive new catheters as opposed to reprocessed catheters and thereby inflated the average price of all catheters.  Opp. at 12-13.  This argument suffers from the same flaws explained in Biosense's Motion: it is meaningless to compare prices of new catheters and used reprocessed catheters.  Mot. at 12-13.  Just as no one would compare the prices of new cars with used versions of the same vehicles to conclude that the new car dealer's prices are above competitive levels, there is no value in comparing the prices of new catheters to used catheters.  As IH acknowledges, reprocessors have a "lower cost structure" than Biosense.  Opp. at 14.  And because Biosense and IH have "fundamentally different cost structures and face different types and dynamics of competition, . . . any analysis of the competitive price must account for those differences."  *In re Xyrem (sodium oxybate) Antitrust Litig.*, No. 20-MD-02966, 2024 WL 4023561, at *20 (N.D. Cal. Aug. 26, 2024).  The appropriate, apples-to-apples comparison

---

[1] Ex. __ are exhibits to the accompanying Cavanaugh Declaration.  "JX-__" are trial exhibits.

REPLY ISO RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

1    should have been between prices of Biosense's products and comparable OEM

2    products.  The evidence showed that Biosense's catheters are priced similarly to

3    comparable OEM products.  Mot. at 13; JX-1159.  SterilMed's reprocessed

4    catheters also had similar prices to other reprocessors, including IH.  Mot. at 13.

5    IH has no meaningful answer to this evidence.

6        Furthermore, Biosense did not inflate the average price of all catheters

7    because Biosense offered SterilMed's catheters—which are priced similarly to

8    IH's catheters—to customers who wanted to buy reprocessed catheters.

9    Contrary to IH's contention that Biosense "throttled SterilMed competition to

10   prevent 'cannibalization' of new catheter sales," Opp. at 13, evidence at trial

11   showed that SterilMed has competed vigorously with other reprocessors to grow

12   its business over the past decade.  As of today, SterilMed has over 500 different

13   product SKUs and sells to about 500 facilities.  Ex. 8 at 106:19-107:1.

14   SterilMed was also the market leader for reprocessed electrophysiology products

15   and had roughly 65 percent of market share in 2020, followed by Stryker (25

16   percent) and others (10 percent).  *See* JX-3108 at 5; Ex. 9 at 15:25-16:12.

17       *Second*, IH seeks to show supracompetitive pricing through Biosense's

18   profit margin and Dr. Forister's testimony that prices for Biosense's catheters

19   went up while production costs went down.  Opp. at 13.  But IH's gross margins

20   are no different than Biosense's, and IH does not contend that it possesses

21   market power.  IH also ignores the fact that the increase in price of Biosense's

22   catheters was minimal (*i.e.*, lower than inflation) over the last decade.  Mot. at

23   13.  IH cites a single out-of-jurisdiction case to allege that price and marginal

24   costs are used to evaluate supracompetitive pricing.  Opp. at 14-15.  However,

25   that is not the law in this Circuit.  *See In re Xyrem Antitrust Litig.*, 2024 WL

26   4023561, at *20 ("[W]hether an entity's gross margins on a product are a

27   dispositive lens through which market power can be assessed is at best a debated

28

REPLY ISO RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

1   proposition."). In any event, production costs do not tell the full story here. As

2   IH recognizes, Biosense provides free clinical support for its catheters. The

3   costs of providing clinical support have increased significantly over time. Mot.

4   at 18. And unlike IH, Biosense invests billions in research and development of

5   new products. Ex. 8 at 18:9-18. IH ignores these costs completely when

6   claiming that Biosense inflated its margin to supracompetitive levels.

7   　　　　　　　2.　　No Evidence of Suppressed Output or Decreased Quality

8   　　　IH argues that Biosense suppressed the output of catheters by excluding

9   reprocessed devices from the market because competition from reprocessed

10  devices would increase output. Opp. at 15. But as explained in the Motion,

11  evidence showed that ***Biosense increased its supply of catheters faster than the***

12  ***market demand for cardiac mapping procedures.*** Mot. at 13-14. Therefore,

13  the output of catheters has not been suppressed in any form.

14  　　　With regard to quality, evidence showed—and IH acknowledges—that

15  Biosense continues to upgrade the technology of its sensor-enabled catheters and

16  software. Ex. 8 at 18:23-20:13, 25:16-26:16; Opp. at 20.

17  　　　IH asserts that Biosense decreased the quality of catheters by excluding

18  IH's superior-quality reprocessed catheters. However, there is no basis for IH to

19  claim that its reprocessed catheters are superior to Biosense's OEM catheters.

20  Mot. at 14-15. IH has never performed any head-to-head testing of Biosense's

21  and IH's catheters to substantiate such a claim. *Linotype Co. v. Varityper, Inc.*,

22  No. 89-CV- 4747, 1989 WL 94338, at *2-3 (S.D.N.Y. Aug. 4, 1989) (finding

23  defendant "falsely and misleadingly compare[d] competing products," in part,

24  due to the lack of any "head-to-head" testing). The complaint and MAUDE data

25  relied upon by IH suffers from multiple flaws such as limited sample size,

26  unvetted data, and unintended use of data. Mot. at 14-15; Ex. 10 at 43:14-45:13.

27  Moreover, reliance on the complaint data is misleading for a number of reasons,

28

-12-

including the fact that while Biosense CASs "lodge complaints when [physicians] have issues," IH "do[es]n't have anyone in the room for the procedure" and physicians "[are] not going to ask someone from another company to make a complaint." Ex. 7 at 48:6-48:17.

### 3.    No Indirect Evidence of Market Power

IH further argues that Biosense has high market share (*i.e.*, above 90 percent) in the alleged catheter markets and that the barrier to entry is high due to Biosense's closed system. Opp. at 16. But Biosense's market share in IH's alleged single-brand catheter aftermarkets is meaningless because these markets are not the relevant markets in the first place. Any market participant can be found to have high market share if the relevant markets are defined narrowly enough. Furthermore, IH takes issue with the fact that Biosense has a "closed system" and the fact that "catheters can only be reprocessed a limited number of times." *Id*. Neither fact constitutes evidence of Biosense's market power. It is no violation of antitrust laws to have a "closed system" design, and Biosense is certainly not to be blamed for the FDA's restrictions on reprocessing.

Absent a showing of market power or any direct evidence of anticompetitive effect, IH cannot prove harm to competition. Mot. at 16. Besides the impact the policy had on its sales, the only other harm IH alleges is reduction of healthcare access. Opp. at 9. But as discussed *supra*, Biosense offers similarly priced reprocessed catheters through SterilMed. Stryker also sells competitively priced reprocessed catheters. Hospitals indisputably had access to lower priced reprocessed catheters.

## II.    IH FAILED TO PROVE A SEPARATE MARKET FOR CLINICAL SUPPORT

To begin, IH incorrectly claims that the Ninth Circuit's decision forecloses Biosense's argument under Rule 50(b) that clinical support and catheters are separate products. Opp. at 16-17. IH is not correct. "The Ninth

-13-

Circuit's decision in [the case at bar] does not constitute 'law of the case' for purposes of this Court's ruling on defendant['s] motion for judgment as a matter of law." *Shaw v. Lindheim*, 809 F. Supp. 1393, 1403 (C.D. Cal. 1992). Indeed, the Ninth Circuit has affirmed district court decisions granting judgment as a matter of law where, on remand, trial records foreclosed possibilities that had led a prior panel to reverse a grant of summary judgment. *See Chung*, 587 F. App'x 428, at 428-30; *see also Williams v. County of Westchester*, 171 F.3d 98, 102 (2d Cir. 1999) (affirming district court's grant of Rule 50(b) judgment as a matter of law in favor of same party for whom summary judgment was earlier denied).

As the Supreme Court explained, while the standard under Rule 50(b) largely mirrors the summary judgment standard, the key "difference" (which IH elides in its papers) is that district courts evaluate a 50(b) motion "in light of the trial record rather than the discovery record." *Dupree v. Younger*, 598 U.S. 729, 731-32 (2023); *see also Indie Caps LLC v. Ackerman*, No. CV-20-01970-PHX-DJH, 2023 WL 5206136, at *2 (D. Ariz. Aug. 14, 2023). Here, the Ninth Circuit merely held that IH produced sufficient evidence, ***for purposes of summary judgment***, for a rational trier of fact to conclude that clinical support and catheters are distinct products; this decision did not relieve IH from its burden to produce evidence ***at trial*** to prove this essential element of its tying claims, or any other material fact. *Innovative Health, LLC v. Biosense Webster, Inc.*, No. 22-55413, 2024 WL 62948, at *2 (9th Cir. Jan. 5, 2024).

And on the merits, IH agrees that it must produce evidence to meet the "consumer-demand test," which requires "(1) that it is possible to separate the products and (2) that it is efficient to do so, as inferred from circumstantial evidence." Opp. at 17. IH has no meaningful response to multiple witnesses' testimony that it is inefficient to sell catheters and clinical support separately.

-14-

1  Mot. at 18.  Nor does IH dispute that there was no evidence whatsoever of

2  circumstances in which a hospital demanded clinical support in the absence of

3  having purchased a catheter, thereby failing to meet the reciprocal requirement

4  under *Kodak*. Mot. at 17.

5        Instead, IH points to three pieces of evidence to claim that CARTO 3

6  clinical support is a separate market.  But these facts—whether considered

7  individually or collectively—are insufficient to support the verdict.

8        *First*, IH offers evidence that hospitals used to buy reprocessed catheters

9  and self-support CARTO 3 procedures prior to the enforcement of the clinical

10  support policy.  Opp. at 17.  But, as discussed in the Motion, the industry has

11  evolved significantly in the past decade, and the fact that some hospitals ***used to***

12  self-support is not evidence that clinical support was a separate market by 2016.

13  Mot. at 18.  IH remains silent as to the industry's evolution, which it cannot

14  dispute.  IH also ignores the fact that hospitals did not want to self-support (*i.e.*,

15  there is no demand for clinical support separately) when hospitals could obtain

16  clinical support from the seller of the catheters as they do today from Biosense

17  and its OEM competitors.  Mot. at 18.

18        *Second*, IH points to the fact that Biosense's competitors, Abbott and

19  Boston Scientific, provide clinical support services while allowing hospitals to

20  purchase catheters from other manufacturers for use on their systems.  Opp. at

21  17.  But according to IH's own market definition, the separate single-brand

22  aftermarket it needs to prove is the ***CARTO 3 clinical support market***, not the

23  ***clinical support market in general***.  Abbott and Boston Scientific do not

24  provide CARTO 3 clinical support.  IH equivocated by re-defining the single-

25  brand aftermarket it alleges in this case.  Furthermore, Abbott allows hospitals to

26  purchase catheters and clinical support separately because it has an open system

27

28

-15-

REPLY ISO RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

allowing for the use of competitors' OEM and reprocessed catheters on it. Ex. 4 at 48:14-17. Biosense, on the other hand, has a closed system. Ex. 9 at 47:7-19.

*Third*, IH's reliance on a 2018 document reflecting that Biosense had 95 percent market share in the alleged CARTO 3 clinical support market is misplaced. That was seven years ago. No evidence at trial showed that ***any*** hospital provides its own clinical support today, and IH cites none. Not a single hospital witness testified at trial that their hospital self-supports CARTO 3 procedures. Even the one example IH points to (Providence Alaska), does not self-support; the testimony was that Biosense supported a limited number of CARTO 3 procedures there on agreed-upon terms. Ex. 3 at 92:6-8. All of this confirms—rather than rebuts— the inefficiency of selling catheters and clinical support separately. If it were efficient to separate the two products, most of the market participants (as opposed to only five percent or less of them) would have done so.

For these reasons, no reasonable jury could conclude that it is possible and efficient for Biosense to sell clinical support separate from its catheters.

## III.  IH FAILED TO PROVE THE ALLEGED SINGLE-BRAND AFTERMARKETS[2]

IH's opposition does not show that all four factors necessary to prove the alleged single-brand aftermarkets are met.

### A.    No Information Costs Prevent Accurate Lifecycle Pricing

IH claims that information costs prevent hospitals from accurately assessing CARTO 3's lifecycle costs because Biosense "frequently launched new products." Opp. at 20. But antitrust laws do not require Biosense—or any

---

[2] As with separate products, the law of the case also does not foreclose Biosense's argument that IH failed to prove single-brand aftermarkets. *See supra* at 14.

-16-

REPLY ISO RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

market participants—to anticipate policy changes or technological developments in the future.  Indeed, "[i]n addressing the question of information deficits between a foremarket and an aftermarket, perfect information about the aftermarket is not required.  Rather, the focus should be on whether the primary market is in possession of information that sufficiently reveals the anticompetitive tendencies of a manufacturer in its aftermarket." *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 19 n.3 (1st Cir. 1999).  In short, "[p]erfect information is not required for the primary market to check the aftermarket." *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 382 (3d Cir. 2005).

IH has no meaningful response to testimony from multiple hospital witnesses, including witnesses from Mayo Clinic, Stanford Health Care, Allegheny General Hospital, and Providence St. Joseph's, stating that their hospitals were not prevented from accurately calculating lifecycle prices of Biosense's mapping system.[3]  Mot. at 19-20.  IH contends that these hospitals "attempted" to calculate lifecycle prices but could not do so "accurately."  Opp. at 21.  But no witness offered that testimony, and IH cites to nothing to support this argument.

### B.    No Significant Switching Costs Exist

IH also failed to prove significant monetary or non-monetary switching costs.  In terms of ***monetary switching costs***, IH focuses on the fact that a mapping machine costs "a quarter-of-a-million dollars."  Opp. at 21.  Yet, IH has no meaningful response to the overwhelming evidence showing that the capital outlay for acquiring a mapping machine is low due to discounts and

---

[3] IH cites Ms. Zare's testimony ("[i]t's hard to price it really") but fails to acknowledge its context.  Ms. Zare was not discussing a ***customer's*** lifecycle pricing of a CARTO 3 system; instead, her testimony addressed how ***Biosense*** prices its own products against the price of competing systems.  Ex. 9 at 49:13-50:6.

REPLY ISO RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

incentives offered by OEMs.  Mot. at 20-21.  Furthermore, IH does not deny—and concedes as much by its silence—that *all* hospital witnesses confirmed that their hospitals had competing mapping systems, making it easy to switch between systems with no additional cost.  *Id.* at 20.

With respect to ***non-monetary switching costs***, IH claims that it is difficult to shift physicians away from the machine on which they were trained and have the most experience.  Opp. at 22.  But IH ignores testimonies from both parties' physician witnesses, Dr. Doshi and Dr. Osorio, that they are trained on multiple systems and it is important for electrophysiologists to be familiar with multiple systems.  Mot. at 21.  IH also ignores the fact that hospitals like UCLA and Torrance have moved to using predominantly alternative systems.  Mot. at 15-16.  IH seizes on thin testimony that certain hospitals did not switch to competing systems, Opp. at 22, but fails to link the lack of switching to what it needs to prove—*i.e.*, significant switching costs.  As explained in the Motion, hospitals and physicians could switch to another system but were unwilling to do so—not because of the alleged switching costs, but because they prefer the CARTO 3 system and believe it is "the best thing for patients."  Mot. at 21.  Customer loyalty engendered by a superior product is not unlawful.

### C.   Evidence of Cross-Elasticity of Demand Contradicts IH's Proposed Single-Brand Market

Relying on the Ninth Circuit's decision, IH first claims that competition in the foremarket is insufficient to discipline anticompetitive behavior in the aftermarket because customers that purchased CARTO 3 machines before April 2016 were "locked in."  Opp. at 22.  But evidence at trial proved the contrary: even hospitals that bought CARTO 3 prior to 2014 were not "locked in."  *First*, hundreds of hospitals that bought CARTO 3 machines before April 2016 purchased at least one additional CARTO 3 machine after April 2016.  For example, Ascension, which IH claims was locked in by Biosense's policy and

-18-

1   unable to switch, willingly purchased additional CARTO 3 machines after it

2   became aware of the policy.  *See* Ex. 8 at 94:6-8; JX-1431.  So did hundreds of

3   other hospitals.  *See* Ex. 7 at 51:23-52:1 ("[E]very hospital" Dr. Osorio worked

4   at purchased additional CARTO 3 machines after becoming aware of the

5   policy); Ex. 12 at 65:5-7 (Providence purchased additional CARTO 3 machines

6   after 2016); JX-1434.1; Ex. 8 at 97:8-11 (HealthTrust Partners Group purchased

7   additional CARTO 3 machines with knowledge of the policy).  This fact alone

8   shows that these customers were not locked in; instead, they willingly purchased

9   additional CARTO 3 machines with full knowledge of the policy.

10          *Second*, most of these hospitals have competing mapping systems onsite

11   and can switch procedures from one to another at no additional cost.  Mot. at 20.

12   Indeed, evidence showed that two-thirds of hospitals surveyed had either no

13   CARTO 3 system or a competing system as well as a CARTO 3 system.  *Id.*

14          IH relies heavily on Dr. Forister's "economic analysis" to conclude that

15   there was limited inter-brand switching, suggesting that competition in the

16   foremarket is insufficient to discipline anticompetitive behavior in the

17   aftermarket.  Opp. at 22-23.  Again, fact evidence presented to the jury is to the

18   contrary.  Multiple witnesses testified that robust competition exists at the

19   mapping system level.  Mot. at 22.  Witnesses, including IH's own witnesses

20   and those from third parties, also testified that hospitals can switch (and have

21   switched) to competitive systems.  Mot. at 22-23.  And contrary to IH's

22   assertions, evidence showed that when Abbott dropped the price for its mapping

23   machine, it saw an uptick in sales relative to Biosense's CARTO 3 machine.

24   Mot. at 22.

25          IH has no meaningful response to the overwhelming evidence on this

26   issue.  Instead, IH dismisses witness testimony, including testimony from its

27   own CEO, Mr. Ferreira, as "casual statements" and claims that fact testimony

28

-19-

REPLY ISO RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

"does not inform [its expert's] 'economic analysis' of demand cross-elasticity." Opp. at 23.  But the law is clear that unsupported conclusions by experts are insufficient to support a verdict, especially where probative fact evidence adduced to the jury is to the contrary.  *See Lakeside-Scott v. Multnomah County*, 556 F.3d 797, 802 (9th Cir. 2009); *WhitServe, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 24 (Fed. Cir. 2012).

### D.    The Clinical Support Policy Was Generally Known

Not surprisingly, IH points to evidence that certain individuals at some hospitals may not have been aware of the clinical support policy in years after the policy was announced.  Opp. at 19.  But the fact that individual physicians or hospital administrators did not know about the policy is insufficient to show that the hospital, as an institution, had no knowledge of the policy, let alone to prove that the policy was not "generally known" in the industry.  IH points to no evidence to bridge these gaps.  In fact, evidence at trial showed that the clinical support policy was communicated to customers as early as November 2014 and became generally known to the market by April 2016.  Mot. at 23.  No reasonable jury could reach a different conclusion based on the trial record.

## IV.  IH FAILED TO PROVE ANTITRUST INJURY

In its Motion, Biosense demonstrated that IH failed to prove antitrust injury for two reasons:  (1) the injury IH presented at trial "flow[ed] from aspects of [Biosense's] conduct that are beneficial or neutral to competition," *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003), as evidenced by the fact that in the world with Biosense's clinical support policy IH charged *lower prices* than it would have in a world without the policy; and (2) IH failed to disentangle the price of clinical support from the price of catheters, making it impossible to glean whether the clinical support policy resulted in supracompetitive prices.

-20-

In response, IH argues that "Biosense tries to confuse matters by citing Dr. Forister's damages model," Opp. at 24, which shows that IH's prices are lower with the clinical support policy than without the policy. There is no confusion here.[4] Dr. Forister admitted that for "every year, in [his] damage model hospitals would be paying Innovative" a higher price. Ex. 6 at 13:18-18:15; *see also* Ex. 13 (Forister Cross Demonstratives showing increased prices for SoundStar and Lasso). That is, IH is claiming damages from having to lower its prices to compete with Biosense. This is not the sort of injury the antitrust laws are designed to protect.[5] *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993); *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001).

The cases that IH cites, moreover, only confirm that IH cannot prove antitrust injury based on evidence that it was forced to charge lower prices to compete. In *Ellis v. Salt River Project Agricultural Improvement & Power District*, the Ninth Circuit found that the challenged conduct resulted in antitrust injury because the exclusionary acts allegedly led to "increased prices," not, as here, decreased prices. 24 F.4th 1262, 1274 (9th Cir. 2022). And in *PLS.com, LLC v. National Association of Realtors*, the Ninth Circuit noted that "injuries due to lower prices are not antitrust injuries unless those lower prices are predatory." 32 F.4th 824, 840 (9th Cir. 2022).

Although IH attempts to assert that its near exclusion from sales of certain

---

[4] If IH is suggesting that its damages model is not modeling its alleged injury, then the Court should grant Biosense's motion on the ground that IH failed in "the translation of [its] *legal theory of the harmful event* into an analysis of the economic impact *of that event*." *Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013) (citation omitted) (emphasis in original).

[5] IH claims that Biosense challenges Dr. Forister's damages analysis on this ground "for the first time post-trial." This is wrong. Biosense made this same argument in its Rule 50(a) motion. Dkt. 517 at 15-16.

catheters is an antitrust injury and harm to competition, Opp. at 9, 24, such exclusion, standing on its own, is not an antitrust injury because it is equally consistent with being driven from the market as a result of lawful competition and procompetitive conduct. *See Pool Water Prods.*, 258 F.3d at 1036 ("A decrease in one competitor's market share, however, affects competitors, not competition."); *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986) ("[C]ompetition for increased market share[], is not activity forbidden by the antitrust laws.").

Here, IH did not show that prices increased with the clinical support policy. In fact, as discussed *supra*, the data showed the contrary. Further, Dr. Forister admitted that, in a world without the policy, IH would "potentially" be "charging higher prices tha[n] SterilMed and Stryker" based on the increase in price that he modeled and admitted that he did not in fact analyze IH's prices relative to other reprocessors. Ex. 6 at 15:5-16:17. At bottom, IH's alleged harm is that it was not able to charge higher prices. That is not an antitrust injury.

Indeed, the reason IH would be able to charge higher prices in a world without the clinical support policy is that IH would be capturing the value of Biosense's clinical support through a free ride. Ex. 9 at 96:12-97:7; Ex. 10 at 5:13-7:21; Ex. 14 (Wu Demonstrative 6). Tellingly, Dr. Forister never rebutted this point or offered any explanation for IH's higher prices in his damages model.

That IH's asserted injury stems not from an antitrust violation but from its inability to capture the benefits of Biosense's clinical support without incurring any cost dovetails with IH's second failure to prove antitrust injury—namely that IH did not disentangle the price of Biosense's catheters and clinical support in a world without the clinical support policy. As Dr. Forister admitted,

-22-

Biosense covers the cost of clinical support through the sale of its catheters. *See* Ex. 10 at 96:12-18. In other words, the appropriate way to view Biosense's catheter prices is that they are "full compensation . . . for both" the catheters and the clinical support. *Siegel v. Chicken Delight*, 448 F.2d 43, 53 (9th Cir. 1971); *see also Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir. 1982) ("Unless the fair market value of both the tied and tying products are determined and an overcharge in the complete price found, no injury can be claimed…."). Accordingly, harm from the clinical support policy can only be shown if the combined price of clinical support and catheters is above what it would be if separate prices were charged for each product in the absence of the policy. *See U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 618 (1977).

IH asserts that it need not perform the analysis in *Chicken Delight* because it is a competitor, not a consumer. Opp. at 25. But this misses the point. The critical holding of *Chicken Delight* is that if a plaintiff fails to establish that the price for both the tied and tying product is higher with the tie than what it would be without the tie, then the plaintiff has not established that the claimed injury flows from anticompetitive conduct as opposed to conduct that is beneficial or neutral to competition.[6]

IH did no such analysis. Instead, Dr. Forister assumes away this problem by asserting that Biosense would not charge a price for clinical support in the absence of the clinical support policy. This is untethered from the trial evidence and contradicts Dr. Forister's other opinions. In asserting that Biosense has market power, Dr. Forister claimed that Biosense "inflate[d] prices using market power in clinical support." Ex. 5 at 116:17-22. Dr. Forister also opined in

---

[6] It also makes little sense that a competitor would have to make a lesser showing than a consumer given the Supreme Court's admonition that antitrust laws exist for "the protection of competition, not competitors…." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).

REPLY ISO RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

purporting to conduct a hypothetical monopolist test that the test was satisfied for clinical support because Biosense "force[d] customers to pay more" through the policy. *Id.* at 110:3-19. If Dr. Forister is correct that Biosense has market power, that opinion simply cannot be squared with his assertion that, in a world without the clinical support policy, Biosense would not charge for clinical support. On the one hand, Dr. Forister wants to assert that Biosense used its market power to increase prices. On the other hand, he wants to assert that Biosense would not use its market power to increase prices. Dr. Forister (and IH) cannot have it both ways. *See* Opp. at 25. And even assuming there would be no charge for clinical support without the policy, Dr. Forister never calculates the prices for Biosense's catheters. There is no basis to assume the prices would be lower or the same, given that Biosense would incur the costs of free clinical support where competitors' reprocessed catheters are used.

Indeed, Dr. Forister never modeled any change in Biosense or SterilMed catheter prices at all. If there is no change in catheter prices or clinical support prices with and without the clinical support policy, that would tend to suggest either the absence of market power or the absence of supracompetitive pricing. Either way, IH failed to adduce sufficient evidence to prove its claims.

IH asserts that Biosense's expert Dr. Wu never contested this point. Opp. at 25. That misrepresents Dr. Wu's opinions. To begin, Dr. Wu fundamentally disagreed with Dr. Forister that Biosense has market power. Dr. Wu opined that Biosense cannot charge for clinical support because it does not have market power. Ex. 10 at 33:12-23. Dr. Wu further opined that if Dr. Forister is correct about his view of the world then his damages model is incorrect because it does not account for the cost of clinical support. Ex. 10 at 48:14-21. That criticism is consistent with *Chicken Delight*. Regardless, IH ultimately bears the burden of proof on this issue, and it failed to provide sufficient evidence of antitrust injury

-24-

REPLY ISO RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

under the *Chicken Delight* framework.

## V.   IH'S CLAIMS UNDER SECTION 2 OF THE SHERMAN ACT FAIL

While Section 1 and Section 2 claims are not always duplicative, there is no dispute that where (1) plaintiff's Section 2 claim is based on the same predicate as its Section 1 tying claim, and (2) the conduct in question is not anticompetitive under Section 1, the same conduct need not be analyzed separately under Section 2. *Fed. Trade Comm'n v. Qualcomm, Inc.*, 969 F.3d 974, 991 (9th Cir. 2020). This is blackletter law and was included in this Court's final jury instructions. *See* Dkt. 521 (Jury Instruction No. 28). For reasons stated *supra*, the alleged tie need not be analyzed again for IH's Section 2 claims.

With respect to "anti-reprocessing technology" and "catheter hoarding," ***IH concedes that it has never pleaded any claims based on these allegations separate from the alleged tie.*** *See* Opp. at 6, 26. For this reason alone, evidence about anti-reprocessing technology and catheter hoarding cannot independently sustain the Section 2 verdict. Biosense also did not waive (and could not have waived) any arguments about these claims because Biosense had no reason to raise them since they were not in IH's complaint.

Furthermore, as this Court acknowledged, IH claimed no damages based on Biosense and SterilMed's catheter collection practices. *See* Dkt. 489 at 8. Even the $7.9 million damages allegedly caused by the "anti-reprocessing technology" is based, in part, on the tie. Absent a proven tie, IH's Section 2 claims cannot survive.

-25-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VII. IH'S CARTWRIGHT ACT CLAIMS FAIL

### A. The Cartwright Act Does Not Cover Out-of-State Damages

IH does not dispute that the Cartwright Act does not apply extraterritorially, instead, it argues that "the anti-extraterritoriality presumption encompasses out-of-state conduct, not out-of-state damages." Opp. at 26. But that is not the law. Recognizing that state antitrust laws differ from each other, including with respect to damages, courts in California have held that, with respect to the Cartwright Act, the presumption against extraterritoriality applied to out-of-state damages. *See, e.g.*, *In re Citric Acid Antitrust Litig*., No. 95-CV-4578, 1996 WL 116827, at *2 (N.D. Cal. Mar. 12, 1996) (refusing to apply Cartwright Act outside California because state antitrust laws differ from each other, including with respect to damages); *In re HIV Antitrust Litig.,* No. 19-CV-02573, 2022 WL 22609107, at *9 (N.D. Cal. Sept. 27, 2022) (denying multi-state class certification under the Cartwright Act, in part, because the Act cannot cover damages incurred in states other than California).

IH's only response is that Biosense's conduct emanated from its headquarters in California. But even if that is true, IH still must present a California-specific damages model. There is no dispute that IH failed to do so at trial. As a result, the jury had no basis for calculating California-specific damages beyond mere speculation or guesswork, which is prohibited as a matter of law. *See Fontana Pipe & Fabrication, Inc. v. Ameron*, *Inc.,* 921 F.2d 279 (9th Cir. 1990).

### B. The *Per Se* Rule Is Inapplicable to the Alleged Tie Under the Cartwright Act

In its Opposition, IH argues that tying arrangements are always illegal *per se* under the Cartwright Act. Opp. at 27. That is not the law. Though "the prohibitions of the Cartwright Act are framed in superficially absolute language," the Supreme Court of California has made clear that "the Cartwright

-26-

Act and Sherman Act carry forward the common law understanding that 'only unreasonable restraints of trade are prohibited.'" *In re Cipro Cases I & II*, 61 Cal. 4th 116, 145-46 (Cal. 2015). California appellate courts have also explicitly held that "[t]ying ***may*** constitute a *per se* violation of the Cartwright Act." *Morrison v. Viacom, Inc*., 66 Cal. App. 4th 534, 540 (Cal. Ct. App. 1998) (emphasis added). And that only "***[u]nder certain conditions***. . . tying constitutes such a *per se* illegal practice." *Id.* (emphasis added). Here, as detailed *supra* and explained in the Motion, the "conditions," including Biosense having market power, are not met. Mot. at 30.

## <u>CONCLUSION</u>

For the foregoing reasons, Biosense respectfully requests that the Court vacate the judgment on the verdict (Dkt. 528) and enter judgment as a matter of law in favor of Biosense on all of IH's claims pursuant to Federal Rule of Civil Procedure 50(b).

DATED: July 28, 2025

STRADLING YOCCA CARLSON & RAUTH LLP

By: */s/ Karla Kraft*
Karla Kraft

PATTERSON BELKNAP WEBB AND TYLER LLP

By: */s/ William F. Cavanaugh, Jr.*
William F. Cavanaugh, Jr.

LINKLATERS LLP

By: */s/ Muhammad U. Faridi*
Muhammad U. Faridi

Attorneys for Defendant
BIOSENSE WEBSTER, INC.

REPLY ISO RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

# **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Biosense Webster, Inc., certifies that this brief contains 6,995 words, which:

☒ complies with the word limit of L.R. 11-6.1.

☐ complies with the word limit set by court order dated _____.

REPLY ISO RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW