**ASCENSION HEALTH**
**RESOURCE AND SUPPLY MANAGEMENT GROUP, LLC**
**3D EP Mapping System Equipment, Accessories, and Service**
**Purchase Agreement**

Product Category:     **Electrophysiology Equipment**

Contract Number:     **ME000003360**

Effective Date:     **February 1, 2016**

Expiration Date:     **January 31, 2019**

<u>**Between**</u>

**Ascension Health**
**Resource and Supply Management Group, LLC**        **Tel. No.: 314-733-8500**

**11775 Borman Drive, Suite 340**        **Fax No.: 314-733-8583**

**St. Louis, Missouri 63146**        **Attn:     Senior Director Strategic Sourcing**

**Referred to as "The Resource Group"**

<u>**And**</u>

**Biosense Webster, Inc.**        **Tel. No.:  909-839-8500**

**3333 Diamond Canyon Road**        **Fax No.:  909-595-0187**

**Diamond Bar, CA 91765**        **Attn:     Senior Manager, Contracting**

**Referred to as "Supplier"**

4818-5212-6250, v. 6

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-1431**

## 3D EP MAPPING SYSTEM EQUIPMENT, ACCESSORIES, AND SERVICE PURCHASE AGREEMENT

This 3D EP Mapping System Equipment, Accessories, and Service Purchase Agreement ("Agreement") is effective as of February 1, 2016 ("Effective Date"), by and between Biosense Webster, Inc., a California corporation ("Supplier"), and Ascension Health Resource and Supply Management Group, LLC, a Missouri limited liability company ("The Resource Group"), (each a "party" to and collectively "parties" to this Agreement), on behalf of itself and its Participants. The parties agree that this Agreement is entered into for the express intended benefit of the Participants to access this Agreement.

Supplier and its affiliates sell medical devices and consumer products. The Resource Group provides shared services and administrative functions on behalf of the Participants.

The federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), prohibits certain activities in connection with referring or arranging for business paid for by a federal healthcare program. Supplier will provide Participants, as permitted by the "discount safe harbor" to the federal anti-kickback statute under 42 C.F.R. § 1001.952(h), with Price Concessions (as defined below) on purchases under this Agreement if certain conditions are met.

The parties agree as follows:

1.    STANDARD TERMS AND CONDITIONS

      This Agreement is subject to The Resource Group Standard Terms and Conditions attached hereto and incorporated herein by reference as <u>Appendix A</u> (the "Standard Terms and Conditions").

2.    DEFINITIONS

      The Definitions are as set forth in the Standard Terms and Conditions.

3.    PRODUCTS AND SERVICES

      3.1    <u>Products and Warranty Services</u>. The pricing (including any discount at the time of sale (a "Discount") and any retrospective payment (a "Rebate"), each, a ("Price Concession") for purchase of a given Product by the Participants is set forth in <u>Appendix B</u>. Only Products covered by <u>Appendix B</u> and purchased under this Agreement are eligible for Price Concessions within the terms of this Agreement. The Resource Group and Participants shall, have the ability to order and purchase the Products set forth in <u>Appendix B</u>. All replacement parts for Products will be available for not less than five (5) years following the last date of manufacture. Clinical Engineering training shall be provided in accordance with Section 3.15 of the Agreement. The provision of Off-Contract Products (as defined in the Standard Terms and Conditions) shall be governed by Section 3.1 of the Standard Terms and Conditions.

      3.2    <u>New Products</u>. In the event Supplier develops any new products ("New Products") during the term of this Agreement, then Supplier shall enter into good faith negotiations with The Resource Group for a new agreement or amendment to this Agreement for such New Products, should The Resource Group desire to have such New Products added to this Agreement.

      3.3    <u>Parts</u>.

             3.3.1    <u>Replacement Parts</u>. Supplier shall ensure that all replacement parts for Equipment are available for not less than five (5) years following the date when Supplier ceases to sell the Equipment. Supplier shall provide The Resource Group, Participants and Clinical Engineering access to an electronic copy of Supplier's parts database with list prices, descriptions, at no additional charge.

The pricing information on parts, as set forth on Appendix B, shall also apply to all parts: (i) purchased by The Resource Group, Participants or Clinical Engineering for installation; (ii) provided by Supplier for installation by Participant or Clinical Engineering; (iii) installed by Supplier during time and materials service as set forth on Appendix B; (iv) purchased by The Resource Group, Participant or Clinical Engineering or provided by Supplier because they fell outside of contractual coverage; (v) purchased by The Resource Group, Participant or Clinical Engineering or provided by Supplier because warranty or contractual coverage was denied; or (vi) core charges assessed because an exchange part was not returned. Supplier agrees to ship all parts pursuant to Section 8.4 of the Agreement for parts, and supplies.

3.4   <u>Software.</u>

3.4.1   <u>License for Software</u>. Supplier grants The Resource Group and any Participant, as applicable, a perpetual, non-transferable license to use the Software. This license for the Software shall be in accordance with the Documentation and shall apply only to the piece of Equipment purchased under this Agreement on which such Software is originally installed. The Participant may not modify or change the Software as installed, nor may the Participant decompile, disassemble or otherwise reverse engineer the Equipment Software. The Participant may not copy the Software or user Documentation.

3.4.2   <u>Software Documentation</u>. Any Documentation furnished with the Equipment hereunder will be in form and substance at least equal to comparable materials generally in use in the industry. If at any time such original Documentation is revised or supplemented by additional Documentation, thereupon Supplier shall deliver to The Resource Group and/or Participant copies of such revised or additional Documentation at no charge in quantity equivalent to the quantity of such original Documentation then in The Resource Group and/or Participant's possession.

3.4.3   <u>Upgrades and Updates</u>. Software Upgrades and Updates, inclusive of hardware, will be provided at no additional cost to The Resource Group or any Participant for Equipment to meet all regulatory requirements to ensure proper performance of the Equipment based on the Documentation, and for no less than five (5) years from the final date of manufacture of such equipment by the Supplier. The installation of all Upgrades and Updates will be coordinated with the Participant or Participant's Clinical Engineering representative. Supplier's duty to provide Upgrades and Updates pursuant to this Section shall (a) not be conditioned on The Resource Group, Clinical Engineering or a Participant purchasing an after-warranty maintenance contract; and (b) survive the expiration or termination of this Agreement regardless of the cause giving rise to termination. Supplier warrants that all Products and Equipment will be installed with the most current Baseline Software Updates and Upgrades to the extent such upgrades are included in the purchase. Supplier support and maintenance on the Software will not be conditioned on any Updates that are not provided free of charge.

3.4.4   <u>Advantage Software Program</u>. The Resource Group and Participants may obtain Software from Supplier pursuant to the Advantage Software Program, the terms of which are set forth in <u>Appendix J</u> (inclusive of any applicable sub-appendices), attached hereto and incorporated herein.

3.5   <u>Regulatory Modifications to Hardware</u>. Intentionally deleted.

3.6   <u>Trade-in</u>. Supplier shall negotiate trade-in allowances for used equipment in connection with The Resource Group's or a Participant's purchase of new Equipment. Supplier shall

HIGHLY CONFIDENTIAL   JX-1431, Page 3 of 61   BWI-INN00067059

make commercially reasonable efforts to provide any quotation involving a trade-in allowance to the Participant and a duplicate copy to Clinical Engineering and The Resource Group. Acceptance of the trade-in offer is at the Participant's discretion.

3.7    <u>Movement of Equipment</u>. Intentionally deleted.

3.8    <u>Tear Down / Disposal of Equipment</u>. Intentionally deleted.

3.9    <u>Supplier Representatives</u>. Representatives of Supplier will make commercially reasonable efforts to call on each Participant and/or Participant's Clinical Engineering, in person and not by telephone or other means, upon request by the Participant and/or Clinical Engineering, during the term of this Agreement. Any meeting may be canceled by either party, in its sole discretion without cause and without penalty. While performing Services or otherwise present at a Participant, representatives of Supplier shall abide by such Participant's facility's rules, policies and procedures for suppliers. In coordination with Clinical Engineering or Participant, Supplier, as requested, will make commercially reasonable efforts to attend a Product fair not less than annually at a location selected by Clinical Engineering or Participant. During the product fair Supplier agrees to share information within regulatory compliance parameters. Each party will pay its own expenses associated with such product fairs during each year of this Agreement (including, without limitation, travel, lodging and meals).

3.10    <u>Semi-Annual Business Review</u>. At The Resource Group's request, Supplier will meet with The Resource Group at least two (2) times during each year of this Agreement to share new product and technology information; to review Product requirements; to provide any best practice studies relating to Products; and to discuss opportunities of mutual interest, savings opportunities, invoice accuracy, fill rate levels, shipping cost, and other Service issues and requirements. The details and schedule of the semi-annual business review will be mutually agreed upon by Supplier and The Resource Group. Each party will pay its own expenses associated with such meetings during each year of this Agreement (including, without limitation, travel, lodging and meals).

3.11    <u>Technology Changes</u>. If, during the term of this Agreement, Supplier determines that new technology becomes available from Supplier, the new technology product may be added to this Agreement subject to mutually agreed upon pricing via an amendment. Supplier will notify The Resource Group of a new technology product following national launch of the product. The Product will be reviewed and may be approved by The Resource Group then, if so desired by The Resource Group, added to <u>Appendix B</u> via an amendment at a mutually agreed upon price.

3.12    <u>In-Service Training</u>. Upon reasonable request and in accordance with applicable law, Supplier will provide all necessary on-site in-service operator training to any and all end users at time of installation and on an as needed basis post-installation. Supplier will make commercially reasonable efforts to provide to all shifts (i.e., days, afternoons, midnights, and weekend shifts) of each Participant, clinical in-service training relating to Products.

Supplier acknowledges that all Participants will have sales representation coverage, whether direct or via distributorship, for the full term of this Agreement. Updated sales rosters (inclusive of contact names, business addresses, phone numbers, and email addresses) for all direct sales representatives shall be provided to The Resource Group and Participants upon request. Meals, travel support, and certain other payments or value transfers to US physicians and US teaching hospitals are reportable under the Open Payments requirements of the Affordable Care Act. The Resource Group will reasonably cooperate with Supplier in providing information necessary to comply with Open Payments, including information about physicians who participate in Supplier-sponsored training programs.

3.13    <u>Samples</u>. Intentionally deleted.

3.14    <u>Products Used in Clinical Trials</u>. Intentionally deleted.

3.15    <u>Clinical Engineering Training</u>. Each calendar quarter during the term of this Agreement, Supplier shall, at no cost, offer the Clinical Engineering staff of each Participant the necessary technical training and technical documentation, for maintenance and repairs to the Equipment. Supplier shall offer training on all updates and improvements to the Equipment, as well as offer any re-certification necessary, at no charge, in order for Clinical Engineering staff to support Equipment.  All of Participant's travel expenses associated with Clinical Engineering training will be paid by Participant (including, without limitation, lodging and meals).   Notwithstanding the foregoing, quarterly Clinical Engineering training requires written confirmation of a minimum of five (5) Clinical Engineering staff members thirty (30) days prior to the start date of training.  In the event a quarterly training does not have five (5) confirmed Clinical Engineering staff members, then Supplier shall have the right to cancel the training course for that quarter. Confirmed Clinical Engineering staff members cannot exceed ten (10) attendees per quarterly training course event.

  3.15.1    <u>End of Warranty Transition</u>. Supplier shall provide each Participant with notice of Clinical Engineering training dates at least three (3) months in advance of such training in order to allow Participant or Clinical Engineering to arrange schedules and attend a training session(s). Supplier reserves the right to reschedule Clinical Engineering Training dates with a minimum of thirty (30) days' notice.

3.16    <u>Service Literature</u>. At no cost to The Resource Group, Clinical Engineering or Participants, Supplier shall provide the end user no later than at the time of delivery with one (1) copy of operator manual covering the applicable Equipment. Supplier must provide all updates to Documentation and (where applicable) final versions of Documentation during the life of the Equipment or the end of this Agreement, whichever comes first.

3.17    <u>Linking to Supplier's Website</u>. The Resource Group and Participants may include Supplier's name and public website address on The Resource Group's or a Participant's Private Homepage for the purpose of providing a link from The Resource Group's or a Participant's website to the homepage of Supplier's website (the "Link"). Supplier hereby grants to The Resource Group and Participants a limited, revocable right and license to use, display and reproduce Supplier's name and public website address in connection with the establishment and maintenance of the Link. For purposes of this Section, the term "Private Homepage" means The Resource Group's or a Participant's homepage and/or a subsection of The Resource Group's or a Participant's homepage available only to The Resource Group's and/or Participants' personnel.

3.18    <u>Time and Materials</u>. Labor, travel and parts provided on a time and materials basis only apply to Services not covered by the Equipment Warranty of Performance. All labor, travel and parts provided on a time and materials basis shall be provided pursuant to the terms and conditions set forth in a service agreement set forth in <u>Appendix C</u> (inclusive of any applicable sub-appendices), attached hereto and incorporated herein.

3.19    <u>Changes in Products</u>. If a Product is discontinued, the regulatory status of a Product changes, or Supplier and its affiliates cease to market or co-market a Product, then Supplier may delete that Product from this Agreement by notice to The Resource Group provided that any such change is market wide.

3.20    <u>Own Use</u>. The Participants must use the Products solely on the Participant's patients, staff, employees, students and their respective dependents. The Resource Group and

HIGHLY CONFIDENTIAL       BWI-INN00067061

the Participants will not resell any Products, including, without limitation, in retail outlets or to any affiliate.

4.    WARRANTIES

4.1    <u>Warranty of Title</u>. Supplier warrants and represents that it has and shall continue to have for the term of this Agreement, good title to the Products delivered to The Resource Group and each Participant and that such Products do not violate the property rights or interests of any third party, inclusive of the intellectual property contained therein, and that there is no actual or threatened suit by any third party based on an alleged violation of such right by Supplier.

4.2    <u>Warranty of Skill</u>. Supplier warrants and represents that Services performed by Supplier or by a permitted subcontractor, employee, or agent of Supplier shall be performed on a professional basis, consistent with the best practices in the industry and in a diligent, workmanlike, and expeditious manner and in compliance with all applicable federal and state laws, rules, ordinances and regulations. Supplier acknowledges that time is of the essence for all Services provided hereunder.

4.3    <u>Warranty of Performance – Non-Equipment Products</u>.    Supplier warrants and represents that each of the Products as delivered to and accepted by The Resource Group and each Participant shall be free from defects in material and workmanship and shall conform to the Documentation for such Product and Supplier's representations regarding the functions and uses for which the Product is marketed throughout the term of this Agreement.

4.4    <u>Warranty of Performance - Equipment</u>. Supplier warrants and represents that Equipment as delivered, installed and accepted by The Resource Group or a Participant shall be free from defects in material and workmanship and shall conform to the Documentation for such Equipment and the Supplier's representations regarding the functions and uses of the Equipment ("Equipment Warranty of Performance") for a period of one (1) year beginning on the date of installation ("Equipment Warranty Period"). The Documentation provided on or before the Effective Date shall represent the minimum functionality of the Equipment. It is acknowledged that updates, upgrades, and subsequent releases of Products may increase the scope of this warranty. The Equipment Warranty of Performance shall not apply to the extent of any misuse or abuse of the Equipment. The Equipment Warranty of Performance is null and void if service is attempted or performed by persons who are not authorized to do so by Supplier.

4.4.1    <u>Corrective Action for Equipment under Warranty of Performance</u>. The Equipment Warranty of Performance shall cover all parts and labor necessary to repair, maintain, and update the Equipment in accordance with the Documentation during the Equipment Warranty Period. The warranty shall cover Service and travel from 7:00 am – 5:00 pm (Participant's local time), Monday through Friday, excluding holidays. If at any time during Equipment Warranty Period, the Equipment ceases to operate in accordance with the Documentation, Supplier shall take action to correct the Equipment.

4.4.2    <u>Flexibility of Warranty of Performance</u>. Intentionally deleted.

4.4.3    <u>Service Escalation and  Replacement of Equipment under Warranty or Full Service Agreement</u>.  Within two (2) covered days after a Supplier field service engineer arrives on site to repair Equipment, if the Equipment has not been successfully repaired it will be automatically escalated by Supplier. If the Equipment is not repaired within ten (10) covered days of escalation, Supplier shall replace the problematic Equipment.  In no circumstance will the replacement of Equipment, following the service escalation process, take longer

than twenty-one (21) calendar days. The Supplier shall bear all expenses of Equipment removal, replacement, and installation under this process. In the event Equipment is being repaired or replaced in accordance with this Section, Supplier will make commercially reasonable efforts to provide loaner equipment to the Participant within twenty-four (24) hours of Participant's, Clinical Engineering's or Authorized Agent's request for Participant's use until Equipment becomes fully operational. All shipping costs relating to such loaner equipment shall be the sole responsibility of Supplier.

4.5    <u>Warranty of Performance for Software</u>. Supplier warrants and represents that Software as delivered to and accepted by The Resource Group and each Participant shall be free from defects in material and workmanship and shall conform to the documentation for such software and Supplier's representations regarding the functions and uses for which the Software is marketed throughout the term of this Agreement.

4.6    <u>Media Defects</u>.  Supplier warrants that all tapes, diskettes or other electronic media provided to The Resource Group and/or Participant hereunder will be free from defects. The Resource Group and/or Participant shall file a complaint with Supplier for such defect and to replace any defective electronic media at no additional cost to The Resource Group and/or Participant.

4.7    <u>Interoperability</u>. Supplier represents and warrants that Baseline Software is compatible with the Equipment being acquired and as specified in the Documentation and in this Agreement. If applicable, Supplier represents and warrants that the Baseline Software is interoperable, is capable of being loaded on the Equipment and is executable on the Equipment with no upgrades or modifications to the Equipment or any Baseline Software (operating system or otherwise) relating to the Equipment.

4.8    <u>Warranty Against Viruses and Time Locks</u>.  Supplier shall use commercially reasonable efforts to provide Firmware that is free of viruses, Trojan horses, worms, time bombs, malicious code, or other computer programming routines that are intended to destroy, detrimentally interfere with, intercept, or expropriate any Participant systems, data, or personal information ("**Illicit Code**"). If any Software contains Illicit Code, Supplier shall, via a document specific to this provision, notify The Resource Group and/or Participant in writing and receive a signed acknowledgement of receipt from The Resource Group and/or Participant. Such notification shall specifically inform The Resource Group and/or Participant of the full extent and nature of the Illicit Code and provide The Resource Group and/or Participant with instructions for overriding such Illicit Code in emergencies.

4.9    <u>Date/Time Warranty</u>. Intentionally deleted.

4.10    <u>Implied and Statutory Warranties</u>. Intentionally deleted.

5.    SUPPORT AND MAINTENANCE

5.1    <u>Support During Equipment Warranty Period</u>. Supplier shall provide flexible maintenance and support Services consistent with the needs of the Participants and/or Clinical Engineering. Supplier shall, at no additional cost, provide telephone support (including technical support) from the hours of 7:00 AM to 8:00 PM Eastern Time Zone, Monday through Friday, excluding all nationally recognized and Supplier holidays. Supplier shall make commercially reasonable efforts to respond to all telephone support service calls and requests by Participants or Clinical Engineering within two (2) hours of a Participant's or Clinical Engineering's initial call from the hours of 7:00 AM to 8:00 PM Eastern Time Zone, Monday through Friday, excluding all nationally recognized and Supplier holidays. The maintenance and support Services shall ensure continued operations of the Equipment in accordance with the Documentation.

5.2   <u>Maintenance During Equipment Warranty Period</u>. Maintenance will include preventative maintenance that will be provided in accordance with Supplier specifications. This will be performed at a time as mutually agreed upon by Supplier and the Participant and/or Clinical Engineering. All preventative maintenance will be conducted in accordance with the manufacture's maintenance schedule set forth in the technical specifications for the Equipment, and includes calibration. Supplier is responsible for scheduling and providing the necessary preventative maintenance. Supplier may be requested to report into Participant's Clinical Engineering services manager or equivalent, and may be supervised at all times while present at the Participant's facility. Supplier will be responsible for providing Participant and/or Clinical Engineering with a copy of the Field Service Report.

5.3   <u>Post-Warranty Services</u>. All post-warranty services provided by Supplier following the Equipment Warranty Period shall be provided pursuant to the terms and conditions set forth in the post-warranty agreement options at the pricing as set forth on <u>Appendix B-3</u>, which shall include, but are not limited to, the service offerings listed in <u>Appendix C</u>.

5.4   <u>Equipment Warranty Period Maintenance</u>. Maintenance, at a minimum, shall include checking mechanical and electrical safety, lubrication, and functional testing, and adjusting for optimum performance as specified in the Documentation, as well as all maintenance and certification required in accordance with regulation or law. Maintenance provided under this Section shall be provided at no cost to The Resource Group, the Participant, and/or Clinical Engineering from 7:00 am – 5:00 pm (Participant's local time), Monday through Friday, excluding holidays.

5.5   <u>On-Site Response Times</u>. On-site support Services shall be provided at no cost to The Resource Group, the Participant, and/or Clinical Engineering during the Equipment Warranty Period from 7:00 am – 5:00 pm (Participant's local time), Monday through Friday, excluding holidays. All on-site support Service provided on a time and materials basis (i.e., after the Equipment Warranty Period) shall be provided pursuant to the terms and conditions set forth in the post-warranty agreement options set forth in <u>Appendix C</u>.

5.6   <u>Subcontractors</u>. The Supplier may subcontract any part of the Services to any third party without the prior written consent of The Resource Group, Clinical Engineering, or Participants. The Supplier shall be responsible to The Resource Group, Clinical Engineering, or Participants for the performance of Services by such third party. The Supplier shall bear the sole responsibility for all compensation and benefits of its subcontractors.

5.7   <u>Equipment Service Documentation</u>. When performing Services pursuant to the warranty or maintenance and support provisions herein, Supplier shall properly and accurately document and provide to the Participant and Clinical Engineering, the documentation at the completion of the service call before leaving the site, or within five (5) business days if Services are provided by Supplier's authorized third party service agent, all Services performed ("Field Service Report"), all labor and parts repaired, replaced, or refurbished in accordance with all federal, state, and local laws and regulations, and reasonable Participant rules. The Field Service Report shall include, at a minimum, detailed information on Participant name, caller name, caller email, caller phone number, Product name, serial Number, parts used, description of work performed, field service engineer name, Service request number, and date.

5.8   <u>Uptime Guarantee</u>. Intentionally deleted.

5.9   <u>Loaner Equipment</u>. Intentionally deleted.

6.    FINANCE / PRICING

HIGHLY CONFIDENTIAL
BWI-INN00067064

6.1 <u>Pricing</u>.

    6.1.1 <u>Pull-up Pricing</u>. Intentionally deleted.

    6.1.2 <u>Market Competitive Pricing</u>. If, after the Effective Date of this Agreement, either party in its reasonable discretion believes that the total delivered value (price, quality, value, service, and technology) of all Products purchased under this Agreement is not market competitive in comparison with or to Supplier's agreements with any other group purchasing organizations with similar terms and commitments, such party must provide written notice to the other party of such and both parties will negotiate in good faith for a period of thirty (30) days towards a resolution. In the event the resolution requires adjustments to total delivered value, such adjustments will become effective at the time the parties mutually agree in writing to a resolution and no retroactive adjustments will be made.

    6.1.3 <u>Pricing Structure – Non Equipment</u>. Intentionally deleted.

    6.1.4 <u>Special Price Provisions</u>. In the event of a market-wide promotion, The Resource Group, Clinical Engineering and Participants will not be precluded from joining in the promotion unless indicated otherwise in <u>Appendix B</u>.

    6.1.5 <u>Firm Pricing</u>. Supplier agrees to hold firm throughout the term of this Agreement the pricing set forth in <u>Appendix B</u>, excluding <u>Appendix B-1</u>, repair parts pricing and <u>Appendix B-3</u>, repair labor pricing. Each party agrees that the pricing structure and any related discount or rebate described herein is commercially reasonable for that party. Notwithstanding the foregoing, the pricing set forth in <u>Appendix B-1</u>, repair parts pricing and <u>Appendix B-3</u>, repair labor pricing, shall (i) remain firm for year one (1) of the Agreement, (ii) not increase by more than ten percent (10%) each subsequent year of the Agreement and (iii) be equal to or less than pricing of similarly-situated customers of Supplier.

    6.1.6 <u>Product and Pricing Information</u>. Supplier will provide to The Resource Group Product and pricing information in <u>Appendix B</u> in electronic-Excel format by the effective date(s) of this Agreement and any amendments thereto.

6.2 <u>Rebates</u>. Intentionally deleted.

6.3 <u>Format of Sales Data</u>. Supplier shall provide sales documentation reports ("Reports") in a mutually agreeable electronic-Excel format ("Sales Documentation Format") within sixty (60) calendar days following the end of each calendar month for the term of this Agreement. Such Reports will include information on all Products purchased by each Participant individually and in the aggregate hereunder and all information reasonably requested by The Resource Group to the extent required from The Resource Group or any Participant to be in compliance with applicable laws. Supplier, if it has such capability, shall report the following on the Reports: GLN, UPN, UNSPSC, and GTIN. Supplier shall provide such Reports to the following address:

        Ascension Health Resource and Supply Management Group, LLC
        Attention: Technical Support Manager
        11775 Borman Drive, Suite 340, St. Louis, Missouri 63146
        MOSTL-MB-DataIntegr@ascensionhealth.org

6.4 <u>Price Quotation Guarantee</u>. Supplier must provide each Participant, upon request, with a written price quotation for Equipment.

HIGHLY CONFIDENTIAL        **JX-1431, Page 9 of 61**        BWI-INN00067065

6.4.1 <u>Price Quote Remedies</u>. If a Supplier representative provides any Participant with a price quotation in which any price term is higher than the price set forth in <u>Appendix B</u>, then:

6.4.1.1 Supplier shall provide the correct price terms to the Participant;

6.4.1.2 If the Participant purchased Equipment at the incorrect pricing, then Supplier shall

6.4.1.2.1 refund any excess amount the Participant paid to Supplier.

In addition to the above, if Supplier willfully and negligently provides any Participant with a price quotation in which any price term is inconsistent with the terms and conditions of this Agreement, then The Resource Group may, in its sole discretion, terminate this Agreement without penalty to The Resource Group or Participants.

6.5 <u>Electronic Transfer of Funds/Electronic Data Interchange</u>. Supplier shall reasonably accommodate requests of Participants with respect to Supplier's use of Electronic Data Interchange ANSI X.12 Transaction Sets, including Transaction Sets 810 (invoice), 820 (payment order/remittance advice), 850 (purchase order), 855 (purchase order acknowledgment), 856 (ship notice/manifest), 844 (product transfer account adjustment), and 849 (response to product transfer account adjustment (or charge back or rebate). Supplier shall ensure that correct coding is used to: (i) identify Products which are on back-order; (ii) to identify accepted Purchase Orders; and (iii) to identify rejected Purchase Orders.

6.6 <u>Payment, Interest and Credit</u>.

6.6.1 <u>Payment Terms</u>. Payment shall be due within thirty (30) days of the date of the invoice. Supplier will accept payment from The Resource Group or a Participant in the following forms: check, credit card (at time of order), and electronic funds transfer.

6.6.2 <u>Late Fees</u>. Supplier shall not charge The Resource Group or any Participant or its paying agent late fees relating to any payments due under this Agreement.

6.6.3 <u>Early Payment Option</u>. Intentionally deleted.

6.6.4 <u>Electronic Funds Transfer</u>. Intentionally deleted.

6.6.5 <u>Participant Liability for Payment</u>. Supplier agrees to invoice all Participants (or their affiliated designated paying agents or other paying agents mutually agreed to by the Participant and Supplier) on a direct basis. Supplier shall communicate directly with the applicable Participant in all matters concerning Purchase Orders, billing, and payment relating to such Participant. Only the Participant that places the Purchase Order shall be liable for the prices, fees, costs and other liabilities relating to that specific Purchase Order. Any breach of this Agreement or other liabilities caused by a Participant shall be borne exclusively by that Participant and Supplier shall have no recourse or rights against Ascension Health Alliance, Ascension Health, The Resource Group or any other Participant for such breach or other liability.

6.6.6 <u>No Set-Off</u>. The Resource Group and each Participant will neither deduct nor set-off, from payments under this Agreement, amounts allegedly owed to The Resource Group or a Participant by Supplier or its affiliates under a separate agreement or cause of action.

6.7     <u>Audit</u>. Upon thirty (30) days' prior written notice, The Resource Group and its designated agents shall have the right to audit Supplier's books and records regarding provision of Products and Services not more than once annually. Supplier shall provide The Resource Group and its designated agents with access to the books and records during normal Supplier business hours sufficient to allow The Resource Group to audit Supplier's compliance with pricing, Contract Administrative Fee payments, and the monetary terms of this Agreement. If, as a result of such audit, The Resource Group determines that Supplier has overcharged any Participant, or if Supplier has failed to abide by the monetary terms of this Agreement, The Resource Group shall notify Supplier of the amount of such overcharge, additional costs or underpayment and Supplier shall promptly pay to The Resource Group or Participant, as applicable, the agreed upon amount of the overcharge, additional costs or underpayment. In the event any such audit reveals an aggregate overcharge to the Participants during any twelve (12) month period of three percent (3%) or greater above their annual aggregate purchases, Supplier shall reimburse The Resource Group for the reasonable, documented cost of such audit not to exceed twenty-five thousand dollars ($25,000).

6.8     <u>Records Retention</u>. Supplier shall maintain its books and records for the longer of the date required by law or its policies; provided that Supplier will maintain copies of this Agreement and all related key financial records for at least six (6) years after the expiration or earlier termination of the Agreement. Supplier shall maintain and, upon request, provide The Resource Group the records, documents and other information required to meet The Resource Group's audit rights under this Agreement.

6.9     <u>Administrative Fees</u>. From the Effective Date through the term of this Agreement, Supplier expressly agrees that it will remit to The Resource Group, within sixty (60) calendar days after each calendar quarter, a Contract Administrative Fee, as defined herein, equal to three percent (3%) of the total net sales for all Products listed in <u>Appendix B-1</u>, Equipment listed in <u>Appendix B-2</u> and service offerings listed in Table 1 of <u>Appendix B-3</u> that Participants purchased under this Agreement during that calendar month, less any credits and returns applied during that period. Supplier shall provide to The Resource Group the Contract Administrative Fee in the form of an electronic funds transfer or check, together with all necessary information and documentation for each Participant's proper accounting of the Contract Administrative Fee. Any Contract Administrative Fee reported or paid after the Effective Date of this Agreement is not subject to future setoff or adjustment for returns of Product purchases made prior to the Effective Date of this Agreement.

Example of payment term: Contract Administrative Fees for sales in January through March are due within sixty (60) days following March 31 (i.e., payment is due by May 30).

6.9.1   <u>Administrative Fee Payment</u>. Supplier must send all administrative fee payments by either electronic funds transfer or by check as follows:

ACH:

Bank of America
Account Name: Ascension Health Alliance d/b/a Ascension – The Resource Group
Account Number: 354010136542
ABA Number: 081000032

Wire Transfers:

Bank of America

DocuSign Envelope ID: 246215FB-8D9D-4638-AC2C-D3E53A095677

Account Name: Ascension Health Alliance d/b/a Ascension – The Resource Group
Account Number: 354010136542
ABA Number: 026009593

Checks:

Ascension Health Alliance d/b/a Ascension – The Resource Group
P.O. Box 505302
St. Louis, Missouri 63150-5302

A remittance advice must accompany each payment and must include the following information:

- The Resource Group Agreement number;

- The amount of the total payment of the Contract Administrative Fee allocated to the Agreement;

- The period for which the Contract Administrative Fee payment is being made; and

- Supplier's name as it appears on the Agreement.

6.9.2    <u>Reporting Sales Data and Pricing Data</u>. Accompanying each Contract Administrative Fee payment, Supplier must provide The Resource Group with a sales data report, which must be submitted electronically via email to MOSTL-MB-DataIntegr@ascensionhealth.org. Each sales data report must be in the electronic format specified in <u>Appendix E</u>, which is subject to revision from time to time by agreement of the parties, and must include all content specified in <u>Appendix E</u>. If Supplier fails to submit the sales data and/or Contract Administrative Fee payment when due, then The Resource Group and Supplier representatives assigned to this Agreement shall meet to attempt to resolve the cause of the delay in accordance with Section 13.1.2.

6.10    <u>Other Purchases</u>. Only Products listed in <u>Appendix B-1</u>, Equipment listed in <u>Appendix B-2</u> and service offerings listed in Table 1 of <u>Appendix B-3</u> purchased under this Agreement, as measured by Supplier, are eligible for payment of Rebates and fees, and for calculation of performance requirements. Supplier will not reverse payments made to or by Supplier for the purchase of Products or Services so that a purchase can be attributed to a different contract.

7.    RISK ALLOCATION

This Agreement is subject to the Risk Allocation Sections set forth in Section 5 of the Standard Terms and Conditions.

8.    ORDERING, DELIVERY, AND ACCEPTANCE

8.1    <u>Ordering</u>.

8.1.1    <u>Ordering</u>. A Participant or Clinical Engineering may place an order for direct Products and/or Services directly with Supplier by telephone or fax at the address set forth below:

If ordering Products:
Johnson & Johnson Health Care Systems Inc.

425 Hoes Lane
Piscataway, New Jersey 08855
Telephone No.:  800-255-2500
Fax No.:  800-225-2905

If ordering Services:
Biosense Webster, Inc., Technical Support Center
Telephone No.: 1-866-473-7823

For telephone or facsimile orders, the Participant or Clinical Engineering must deliver to Supplier a Purchase Order for that Product and/or Service priced in accordance with <u>Appendix B</u>, no later than the end of the business day immediately following the date of such order. Supplier shall accept all orders of Products and/or Services submitted by The Resource Group, Clinical Engineering or Participants and made in accordance with this Section. The Resource Group, Clinical Engineering and Participants may place an order at any time with Supplier for any direct Products and/or Services identified in <u>Appendix B</u>.

8.1.2 <u>Design Modification - Equipment</u>. Subsequent to The Resource Group's or a Participant's Purchase Order for a piece of Equipment, Supplier shall not deliver Equipment that has been functionally modified without the approval of The Resource Group or the Participant.

8.1.3 <u>Order Cancellation</u>. At no cost to The Resource Group, Clinical Engineering or any Participant, The Resource Group, Clinical Engineering or a Participant may cancel an order for any Product or Service at any time before Supplier's shipment of the Product, except for orders of custom-ordered Equipment (i.e., a Participant may not cancel these orders without Supplier's written approval) or Supplier's commencement of Services.

8.1.4 <u>Minimum Order</u>. Supplier shall have no minimum purchase requirement applicable to The Resource Group, Clinical Engineering or any Participant.

8.1.5 <u>Loaner Sets</u>. Intentionally deleted.

8.2 <u>Consignment</u>. Intentionally deleted.

8.3 <u>Authorized Distributors</u>. Intentionally deleted.

8.4 <u>Delivery</u>.

8.4.1 <u>Standard Shipping</u>. A "Regular Order" is the shipment of Product purchased from Supplier directly to the Participant. For Products not identified as Equipment, Regular Orders are F.O.B. Origin with freight and insurance prepaid by Supplier with the exception of special delivery. For Equipment, Regular Orders are F.O.B. Destination with freight and insurance paid by Supplier. "F.O.B. Destination" shall mean that title and risk of loss to the Products shall not pass to the Participant until the Products are delivered to the Participant via a commercial carrier. Supplier shall indemnify the Participant for damage or loss of Product during shipment. Supplier will also be responsible for any insurance and filing claims with the commercial carrier. Except as otherwise set forth herein, Supplier agrees that Participants shall not incur, or otherwise be liable for, transit-related fees, including, but not limited to freight charges and handling fees, unless Supplier receives prior written authorization from The Resource Group or Participant to incur such fees.

HIGHLY CONFIDENTIAL
BWI-INN00067069

8.4.2 <u>Special Delivery</u>. Upon The Resource Group's, Clinical Engineering's, or a Participant's written request for express shipping, Supplier will ship any Product via Supplier's parcel delivery company (e.g., Airborne Express, FedEx, etc.) and charge The Resource Group, Clinical Engineering, or the Participant for the actual shipping and order fees, listed as separate line items on the invoice from Supplier. Overnight and second-day delivery is available for an additional expedited shipping fee.

8.5 <u>Installation - Equipment</u>.

8.5.1 <u>Site Preparation</u>.

8.5.1.1 <u>Site Requirements</u>. Supplier will make reasonably commercial efforts to provide The Resource Group or a Participant with Supplier's site requirements and preparation recommendations ("Site Requirements") including, but not limited to, cooling needs, electrical power, space, lighting, rigging, and grounding requirements no later than fourteen (14) calendar days after The Resource Group's or the Participant's submission of a Purchase Order for Equipment.

8.5.1.2 <u>Participant Site Preparation</u>. Supplier shall work with Participant and/or Clinical Engineering to predefine and agree upon an implementation plan for site preparation and installation. The Resource Group and each Participant, at its expense, shall prepare the sites where each item of Equipment will be installed according to Supplier's Site Requirements, and Supplier shall not be responsible for the quality or adequacy of any work not performed by, or under the direction or authority of, Supplier.

8.5.2 <u>Preparation for Installation of Equipment</u>. At no cost to The Resource Group or any Participant, after delivering any item of Equipment, Supplier must perform all tasks necessary to install the Equipment including, but not limited to, uncrating, unpacking, field assembly, interconnection, calibration, testing, and inspection, in order to ensure that the Equipment conforms to Equipment specifications and is completely ready to perform all procedures and functions for which it is designed and marketed by Supplier. Supplier shall work directly with Clinical Engineering, or Participant's Supply Chain Management and appropriate facility staff on all Equipment acquisitions and installations.

8.6 <u>Acceptance of Equipment</u>.

8.6.1 <u>Equipment Requiring Installation by Supplier</u>. For any Equipment that requires installation by Supplier, The Resource Group or a Participant shall not be deemed to have accepted such Equipment until (a) a technical inspection has been conducted by Participant and/or Clinical Engineering at time of installation, (b) Supplier's field service engineer has installed and approved such Equipment, and (c) all technical documentation usually provided with installation. In the event the Supplier's field service engineer has installed and approved such Equipment and the Participant or Clinical Engineering fails to conduct a technical inspection within five (5) business days of the installation, the Equipment shall be deemed as accepted by The Resource Group or Participant. Prior to acceptance, The Resource Group and the Participant shall bear no cost associated with the rejection of any nonconforming Equipment, including, but not limited to restocking fees, shipping fees, Product costs, etc. Notwithstanding any other provision of this Agreement, or any other writing, installation of Equipment shall not constitute the acceptance of the Equipment until Supplier's field service engineer has certified the Equipment as ready.

8.6.2    <u>Equipment Not Requiring Installation by Supplier</u>. Intentionally deleted.

8.7    <u>Acceptance of Non-Equipment</u>.

8.7.1    <u>Inspection / Rejection of Products</u>. Intentionally deleted.

8.7.2    <u>Inspection / Rejection of Services</u>. Following performance of Services, The Resource Group, Clinical Engineering or the Participant shall, within thirty (30) days after receipt of the Field Service Report, conduct acceptance review, which means to review the work product of the Services to determine whether the Services provided meet the specifications and perform the functions identified in the applicable Purchase Order, statement of work or other document defining the Services to be rendered. In the event the Services fail to fulfill the specifications, Supplier shall re-perform the Services without additional cost to The Resource Group, Clinical Engineering or the Participant.

8.7.3    <u>Acceptance of Products with Expiration Date</u>. Notwithstanding anything to the contrary, The Resource Group or a Participant shall not be deemed to have accepted Products with an expiration date of less than sixty (60) days from the date of delivery. In the event The Resource Group or Participant rejects such product, The Resource Group or Participant shall file a Product compliant with the Supplier.

8.8    <u>Returns</u>.

8.8.1    <u>Return of Products</u>. The Resource Group, Clinical Engineering or Participants may return Products in accordance with Supplier's Return Goods Policy as set forth in <u>Appendix H</u>.

8.8.2    <u>Restocking Fees</u>. Except as permitted by Supplier's Return Goods Policy, The Resource Group, Clinical Engineering and Participants shall not pay fees imposed by Supplier which relate to the restocking of any Products returned or rejected by The Resource Group, Clinical Engineering or a Participant hereunder.

9.    PERFORMANCE MEASURES

9.1    <u>Timely Delivery of Equipment</u>. The delivery date for each piece of Equipment shall be a date mutually agreed upon by Supplier and The Resource Group or the applicable Participant ("Delivery Date"). Supplier or The Resource Group or the Participant, as the case may be, shall use commercially reasonable efforts to provide the other with at least thirty (30) days prior written notice of any delay that will impact Supplier's ability to deliver the Equipment, or The Resource Group's or the Participant's ability take possession of the Equipment, on the Delivery Date ("Delay Notice").

9.1.1    <u>Delivery Performance Measures (Non-Equipment)</u>. Supplier guarantees that all Products, excluding Equipment and upgrades, ordered direct from Supplier shall be delivered to the appropriate Participant within five (5) business days of Supplier's receipt of a Purchase Order.

10.    HEALTH CARE REGULATORY REQUIREMENTS AND THE RESOURCE GROUP REQUIREMENTS

This Agreement is subject to the Regulatory Requirements set forth in Section 6 of the Standard Terms and Conditions.

11.    CONFIDENTIALITY

HIGHLY CONFIDENTIAL
BWI-INN00067071

This Agreement is subject to the Confidentiality Section set forth in Section 7 of the Standard Terms and Conditions.

12. TERM

12.1 <u>Term</u>. This Agreement will remain in effect for a period of three (3) years, commencing February 1, 2016, and shall continue thereafter through January 31, 2019, unless earlier terminated pursuant to the terms of this Agreement. This Agreement may be renewed, upon mutual written agreement of the parties, for one (1) additional one (1) year term. This Agreement is subject to the Termination Section set forth in Section 8 of the Standard Terms and Conditions.

13. DISPUTE RESOLUTION

13.1 <u>Informal Dispute Resolution</u>.

13.1.1 <u>Daily Governance</u>. Daily issues regarding performance of the obligations of this Agreement will be handled directly through negotiations between the Participants (inclusive of Clinical Engineering) and Supplier.

13.1.2 <u>Informal Dispute Resolution Process</u>. The parties shall attempt to resolve disputes through informal dispute resolution utilizing the following procedure. However, either party may pursue litigation at any time pursuant to Section 9.1 of <u>Appendix A</u>.

<u>Level One</u>. The Participant and Supplier representative assigned to the Participant shall attempt to resolve any dispute arising between the parties. The Participant and Supplier shall have ten (10) days from the first date written notice of the dispute is delivered to the other party.

<u>Level Two</u>. If the Level One Representatives are unable to resolve the matter within ten (10) days, the dispute should be referred to the Chief Strategy Officer for The Resource Group and a representative of Supplier. The representatives shall meet in person and have five (5) days or other mutually agreed amount of time to attempt to resolve the dispute after receiving notice from the Level One Representatives that they are unable to resolve the dispute.

<u>Level Three</u>. If the Level Two Representatives are unable to resolve the dispute within five (5) days, the dispute shall be referred to the Chief Executive Officer of The Resource Group and a representative of Supplier with final say over the matter. The representatives shall have five (5) days or other mutually agreed amount of time to attempt to resolve the dispute after receiving notice from the Level Two Representatives that they are unable to resolve the dispute.

Notwithstanding the above, either party, without notice and without using any informal dispute resolution procedure, may initiate a legal action to obtain preliminary injunctive relief to preserve data, prevent or stop the release of information, or compel the other party to act to maintain the status quo. If the dispute is related to the payment of fees, neither party may suspend performance of this Agreement if the disputed fees have been deposited in court pending the resolution of the dispute or as bond for injunctive relief. Further, if the parties are unable to resolve the dispute through the informal process, then either party may avail itself of the Formal Dispute Resolution terms set forth in Section 9 of the Standard Terms and Conditions. All communications by the parties during the Informal Dispute Resolution shall be inadmissible in court as evidence of settlement negotiations.

Attachments:
Appendix A – Standard Terms and Conditions
Appendix B – Pricing Information
Appendix C – Service Offerings
Appendix D – Rebates (Intentionally deleted)
Appendix E – Sales Data Record Layout
Appendix F – Authorized Distributors (Intentionally deleted)
Appendix G – Sample Consignment Inventory Agreement (Intentionally deleted)
Appendix H – Supplier's Return Goods Policy
Appendix I – Training Agreement
Appendix J – Advantage Software Program

*[Signatures on the following page]*

IN WITNESS WHEREOF, the undersigned duly authorized representatives of the parties have executed this Agreement as of the Effective Date.

**"THE RESOURCE GROUP"**                    **"SUPPLIER"**

**ASCENSION HEALTH  RESOURCE AND**          **BIOSENSE WEBSTER, INC.**
**SUPPLY MANAGEMENT GROUP, LLC**

Scott Caldwell                              Lizabeth Randolph
_____                     _____
Name                                        Name

Chief Executive Officer                     Senior Director, CSS Commercial Operations
_____                     _____
Title                                       Title

                                            _Lizabeth Randolph_    1/29/2016
                                            DB811B3CB7E1446...
_____                     _____
Signature                                   Signature

The terms and conditions of this Capital Equipment and Consumables Purchase Agreement are for the exclusive use of Ascension Health Resource and Supply Management Group, LLC.

HIGHLY CONFIDENTIAL          JX-1431, Page 18 of 61          BWI-INN00067074

APPENDIX A
STANDARD TERMS AND CONDITIONS

1.    DEFINITIONS

1.1    "*Agreement*" means this Agreement between the parties together with all exhibits, schedules, appendices, amendments, and addendums.

1.2    "*Ascension Health*" is a Missouri non-profit corporation and a health system comprised of health ministries, hospitals, facilities and affiliates. It is a wholly-owned subsidiary of Ascension Health Alliance.

1.3    "*Ascension Health Alliance*" is a Missouri non-profit corporation.  It is the parent organization of, Ascension Health, a health system consisting primarily of non-profit corporations that own and operate local health care facilities.

1.4    "*Ascension Health Resource and Supply Management Group, LLC*" is a Missouri limited liability company that has operational responsibility for supply chain management of Ascension Health Alliance and the Participants. Its sole member is Ascension Health Alliance.

1.5    "*Clinical Engineering*" means the clinical engineering staff employed by any Participant or any Participant that provides clinical engineering services.

1.6    "*Data*" means all data and information, including but not limited to Confidential Information, whether in written or electronic form, submitted to Supplier by The Resource Group and/or Participants or a user, or obtained, developed or produced by Supplier in connection with the Software including, without limitation, information relating to The Resource Group's and/or Participants' users, vendors, employees, technology, operations, facilities, consumer markets, products, capacities, systems, procedures, security practices, research, development, business affairs and finances, business methodologies, improvements, intellectual property, and patient information (however, in the event of a conflict between the BAA, as defined herein, and the confidentiality obligations set forth in the Agreement, any term more protective with regard to patient data controls), but excluding internal communications of Supplier that relate only to Supplier's administration and management.

1.7    "*Documentation*" means all materials supplied by Supplier or its agents to The Resource Group, affiliates or Participants regarding the provision of Services, Software, or Products. Documentation specifically includes all technical information, specifications, marketing materials and responses prepared by Supplier to any Request for Information or Request for Proposals issued by The Resource Group.

1.8    "*Equipment*" is a subclass of Products and means all Products that are identified as Equipment in Appendix B-2, and is a device that is used in the care of patients. "Equipment" as used herein shall include embedded Software

1.9    "*Participant*" or "*Participants*" means any entity that has entered into a written Participant Agreement with The Resource Group and, at the time of purchase, is an acute-care facility, a hospital, a free-standing walk-in center, or other health care provider located in any state of the United States or the District of Columbia.

1.10    "*Participant Agreement*" means a written agreement between an entity and The Resource Group entered into for the purpose of allowing the entity to participate in this Agreement.

1.11    "*Product*" or "*Products*" means the goods available for purchase as identified in Appendix B, together with any parts available through Supplier and that are necessary to maintain

Ascension Health Resource and Supply Management Group, LLC – Confidential            Page 19 of 61
RSMG-6394                                                                            Appendix A
4818-5212-6250, v. 6

HIGHLY CONFIDENTIAL            JX-1431, Page 19 of 61            BWI-INN00067075

Equipment, purchased directly or indirectly from or through Supplier and related to the goods available for purchase under this Agreement.

1.12  *"Purchase Order"* means a writing executed by Clinical Engineering or a Participant and evidencing an express intent on behalf of the Participant to purchase a specific quantity and type of Products and/or Services, to be delivered or performed by Supplier by a given date.

1.13  *"Service"* or *"Services"* means any services, including, but not limited to, training, maintenance and warranty services, provided by Supplier, which may be in conjunction with Clinical Engineering or Participant, pursuant to the terms of this Agreement or otherwise made available and identified in <u>Appendix B</u> and may be further described in <u>Appendix C</u>.

1.14  *"Software"* means the machine readable forms of computer software programs, interfaces and customizations developed by or provided by Supplier embedded in the Equipment (i) all Updates and Upgrades to the foregoing provided under this Agreement or a software maintenance agreement; and (ii) all Documentation for the foregoing. Software includes Baseline Software and Enhancement Software.

1.15  *"Update"* means an update or revision to Software that corrects an error or incorporates other changes that do not result in material changes to functionality, including, but not limited to, interim releases indicated by changes in the hundredth's (e.g. version X.X.2 would be the interim release after version X.X.1), or changes to the right of the hundredth's digit of the Software version number. If Supplier removes a feature or function from the Software that existed as of the date licensed by The Resource Group or Participant, or which resulted from a Update during the term, and Supplier then distributes the removed feature or function as a separate product, then such new product shall be deemed to be an Update for purposes of this Agreement. If Supplier develops a successor product with incremental improvements to the Software with similar functionality and Supplier then distributes the successor product, then such successor product will be considered an Update.

1.16  *"Upgrade"* means any upgrade or revision to Software that materially improves functionality or that adds functional capabilities to the Software that due to its scope should not be included in an Update, including, but not limited to, interim releases indicated by changes in the tenth's (e.g., version X.2 would be the next interim release after version X.1).

1.17  *"Baseline Software"* means any system software or firmware included with the Equipment by the Supplier necessary to maintain the operation of the Equipment under the terms of the warranty and this Agreement. Baseline Software includes the programs that are dedicated to managing the hardware itself, such as the operating system, file management utilities, and disk operating system. The operating system manages the computer hardware resources in addition to applications and data.

1.18  *"Enhancement Software"* means applications software, other than Upgrades or Updates, that materially upgrades and expands the functional capabilities of the Equipment or Baseline Software. Enhancement Software will be available at an additional charge set forth in <u>Appendix B</u>. Enhancement Software consists of end-user programs designed to enable the end-user to complete specific tasks not embedded in the Baseline Software.

2.  PARTIES

2.1  <u>Participants</u>. Before any entity is eligible to purchase Products or Services pursuant to the terms of this Agreement, the entity must qualify as a Participant. A list of Participants

Ascension Health Resource and Supply Management Group, LLC – Confidential
RSMG-6394
4818-5212-6250, v. 6

Page 20 of 61
Appendix A

HIGHLY CONFIDENTIAL            JX-1431, Page 20 of 61            BWI-INN00067076

is available at: http://www.ascensionhealth.org/ communication/vendorparticipants.xls, as may be updated from time to time. The Resource Group may, at its sole discretion at any time, add entities as Participants. Supplier expressly agrees that Participants have all of the same rights and interests of The Resource Group contained herein, including the right to enforce the terms of this Agreement. The Resource Group may, at any time without cause or penalty, provide written notice of the removal of a Participant from participation in this Agreement. Supplier shall as promptly as practical, and in no event more than five (5) business days, accept and recognize any change The Resource Group makes with regard to removing Participants that complies with the criteria set forth above. Supplier shall have thirty (30) days to accept and recognize any change The Resource Group makes with regard to adding Participants that complies with the criteria set forth above.

2.2     <u>Authorized Agent</u>. Participant may be acting as an authorized agent for another Participant ("Authorized Agent') to administer Clinical Engineering services and/or facility management services, which includes procurement of Products and/or Services hereunder. It is expressly acknowledged that the Authorized Agent may also function as the Participant's paying agent and administrator of this Agreement. In the event that the Authorized Agent's agency relationship with the Participant terminates, Supplier's sole and exclusive recourse shall be against the Participant receiving the Products and/or the benefits of Services and from Purchase Orders received by Supplier after termination of the agency relationship.

2.3     <u>Third-Party Beneficiaries</u>. The Resource Group and Supplier are entering into this Agreement for the express, intended benefit of the Participants, The Resource Group and Supplier. Each Participant is an intended third-party beneficiary of this Agreement. Each Participant may directly enforce its rights against Supplier, including the terms and conditions of this Agreement that affect the Participant. Except as provided in this Section, there are no other third-party beneficiaries of this Agreement. Supplier or The Resource Group may, pursuant to the terms of this Agreement, modify or terminate this Agreement without the consent of any Participant. The Resource Group represents that Ascension Health Alliance, The Resource Group, Ascension Health, each Participant and each subsidiary and affiliate entity thereof are separate legal entities. Except to the extent expressly stated in this Agreement, none of the liabilities of a Participant shall be treated as a joint liability of Ascension Health Alliance, Ascension Health, The Resource Group, any other Participant, or any other affiliate entity of Ascension Health Alliance, Ascension Health, or The Resource Group. Further, none of the liabilities or obligations of Ascension Health Alliance, Ascension Health or The Resource Group shall pass to a Participant or any of its related affiliates.

3.      PRODUCTS

3.1     <u>Off-Contract Products</u>. Supplier acknowledges that, in the interest of patient safety and the provision of high quality medical care, The Resource Group and its Participants require that products be evaluated, vetted and approved by The Resource Group or the applicable Participant before introduction into or use by The Resource Group or any Participant. Supplier acknowledges that, in accordance with the Participant's internal policies, only the Participant may place orders for Products and that individual physicians or clinicians cannot order Products on behalf of the Participant. Enforcement of such policies is solely up to The Resource Group or the Participant.

3.2     <u>Product Notices</u>. If any Product is recalled, whether voluntarily or as required by a governmental entity, then Supplier shall: (i) implement the recall in accordance with applicable laws, regulations and government directives, and notify The Resource Group, Clinical Engineering and the Participants; (ii) reimburse The Resource Group and the Participants for their reasonable costs associated with the Product recall, including costs

Ascension Health Resource and Supply Management Group, LLC – Confidential
RSMG-6394
4818-5212-6250, v. 6

Page 21 of 61
Appendix A

HIGHLY CONFIDENTIAL          JX-1431, Page 21 of 61          BWI-INN00067077

of patient notification, returning or disposing of the recalled Product; and (iii) at The Resource Group's option either provide no-cost replacement Product or credit or reimburse The Resource Group and the Participants at the current contracted price for any recalled Product that is not replaced. Specific details such as the timing and recipients of notices; whether a recall is at the item, lot or other level; return, destruction or other disposition of recalled Products; and similar issues will vary based on the particular recall and be specified in the recall notice.

4.    TAXES

4.1    <u>Tax-Exemption</u>. The Resource Group and most Participants are exempt from most sales and use taxes and will not be responsible for the payment of any such taxes to Supplier if each timely provides Supplier with a valid exemption certificate. In the event such exemption is rejected or a Participant is otherwise subject to taxation, The Resource Group and Participants, as applicable, shall pay for taxes imposed in conjunction with this Agreement, including sales, use and similar taxes based on or measured by charges payable under this Agreement and imposed under authority of federal, state or local taxing jurisdictions. This Participant and The Resource Group obligation specifically excludes foreign, federal, state and local taxes based upon Supplier's revenues, net income, number of employees, or corporate existence.

4.2    <u>Excise Taxes</u>. Supplier agrees that payment of the medical device excise tax, as set forth in Section 4191 of the Internal Revenue Code, is the responsibility of Supplier, and Supplier will not invoice that tax to the Resource Group or Participants.

5.    RISK ALLOCATION

5.1    <u>Indemnity</u>.

5.1.1    The Supplier will indemnify The Resource Group, Ascension Health Alliance, Ascension Health and each Participant for losses arising from any claim made by any person or entity, other than The Resource Group, Ascension Health Alliance, Ascension Health or a Participant, alleging that use of any Product in accordance with Supplier-approved labeling resulted in bodily injury to the extent such claims arise out of defects in Products, or that any Product infringes upon the intellectual property of any other person or entity.

5.1.2    It is a condition to the Supplier's obligations under Section 5.1.1 of <u>Appendix A</u> that The Resource Group, Ascension Health Alliance, Ascension Health or the Participant notify the Company promptly of that claim, permit the Supplier to control the litigation and settlement of that claim, and cooperate with the Supplier, at no expense to The Resource Group, Ascension Health Alliance, Ascension Health, or the Participant, in all matters related thereto, including by making its documents, employees and agents available as reasonably necessary.

5.1.3    The Supplier will not be required to indemnify The Resource Group, Ascension Health Alliance, Ascension Health or a Participant with respect to: any claim to the extent arising out of negligence or willful misconduct by The Resource Group, Ascension Health Alliance, Ascension Health or a Participant; use of a Product by any person or entity other than in accordance with Supplier-approved Product labeling including, without limitation, any restrictions on re-use of products; or breach of its obligations under this Agreement by The Resource Group, Ascension Health Alliance, Ascension Health, or a Participant to the extent that such breach gives rise to the claim.

DocuSign Envelope ID: 246215FB-3D9D-4638-AC2C-53E63A095677

5.1.4   The Supplier may not settle any claim without the consent of The Resource Group, Ascension Health Alliance, Ascension Health or the Participant unless there is no finding or admission that The Resource Group, Ascension Health Alliance, Ascension Health or the Participant has violated any law or the rights of any person or entity and the sole relief provided is monetary damages that the Supplier pays in full.

5.2   Insurance. Through the term of this Agreement and for at least three (3) years thereafter, for any policy written on a claims-made basis Supplier shall maintain the following insurance coverage (all together, the "Required Insurance"):

5.2.1   Commercial General Liability insurance in an amount not less than one million dollars ($1,000,000.00) per occurrence and two million dollars ($2,000,000.00) annual aggregate;

5.2.2   Excess or Umbrella Liability insurance extending over the required Commercial General Liability and Employer's Liability in an amount not less than five million dollars ($5,000,000.00) per occurrence and five million dollars ($5,000,000.00) annual aggregate;

5.2.3   Product Liability Insurance in the amount of ten million dollars ($10,000,000.00) per occurrence, and ten million dollars ($10,000,000.00) annual aggregate;

5.2.4   Worker's Compensation insurance as provided by statute and Employer's Liability insurance of at least one hundred thousand dollars ($100,000.00) per employee;

5.2.5   General Insurance Requirements. Prior to the Effective Date of this Agreement and upon request, such request not to occur more than once per calendar year, Supplier shall provide certificates of insurance to The Resource Group evidencing the Required Insurance, and (a) naming Ascension Health Alliance, Ascension Health, The Resource Group and Participants (which may be named as a general category and does not need to name each individual Participant), each of their respective subsidiaries and each of their respective officers, trustees, directors, members, sponsors and employees as additional insureds under Supplier's Commercial General Liability policy, as such parties' interests may appear with respect to this Agreement (collectively, the "Insureds"); and (b) being primary and non-contributory with respect to any other insurance or self-insurance Ascension Health may maintain to the extent the loss arises from Supplier's negligence. Furthermore, all Required Insurance shall: (y) be provided by reputable and financially responsible insurance carriers with an A.M. Best's Financial Performance Rating ("FPR") of A with the exception of Product Liability Insurance, which is insured via a captive insurance company; and (z) include a waiver of all rights of subrogation against the Insureds. If any of the Required Insurance is cancelled or non-renewed, notice shall be delivered in accordance with policy provisions, and the Company shall promptly deliver such notice to The Resource Group Such cancellation or reduction in coverage shall not relieve Supplier of its continuing obligation to maintain substantially similar insurance coverage.

5.3   Employee Conduct. A Supplier representative visiting the premises of The Resource Group, Ascension Health Alliance, Ascension Health or any Participant shall comply with any applicable policies of which Supplier and/or representative has been provided notice. Nothing contained in any such policy shall create any additional right or obligation hereunder or modify any term of this Agreement. The sole remedy for any failure to comply with The Resource Group's, Ascension Health Alliance's, Ascension Health's or Participant's credentialing policy is exclusion of Supplier representative from the

DocuSign Envelope ID: 246215FB-3D9D-4638-AC2C-53E53A095677

premises of The Resource Group, Ascension Health Alliance, Ascension Health or such Participant. Supplier shall address any issues pertaining to such policies directly with the applicable Participant.

6.    HEALTH CARE REGULATORY REQUIREMENTS AND THE RESOURCE GROUP REQUIREMENTS

6.1    Regulatory Requirements.

6.1.1    Access to Books and Records. To the extent that Section 952 of the Omnibus Reconciliation Act of 1980 (the "Act") and the regulations promulgated thereunder are applicable to this Agreement, Supplier, and any organizations related to it performing any of the duties pursuant to this Agreement valued at Ten Thousand Dollars ($10,000) or more in any twelve (12)-month period, shall until four (4) years after the furnishing of Products or Services pursuant to this Agreement, comply with requests of the Comptroller General, the Secretary of the Department of Health and Human Services, and their duly authorized representatives for access (in accordance with Section 952 of the Act) to any contract or agreement between Supplier and Ascension Health Alliance, The Resource Group, Ascension Health or a Participant for Products or Services and to any contract or agreement between Supplier and such related organizations, as well as the books, documents and records of Supplier and its related organizations, if any, which are necessary to verify the cost of the Products and Services provided.

6.1.2    Regulatory Changes. On its own initiative and at the request of The Resource Group or any Participant, Supplier shall provide The Resource Group and Participants with updates or new versions to make Equipment and Products comply with all generally applicable federally mandated regulatory changes and state mandated changes at no charge to The Resource Group or Participants. Any such updates supplied pursuant to this Section shall be subject to the terms, conditions and obligations of this Agreement.

6.1.3    Anti-Kickback Law.

6.1.3.1    The Resource Group acknowledges that, by law, it and each Participant is required to disclose, in any cost reports or claims for reimbursement submitted to Medicare, Medicaid, or certain other health care programs, the cost (including, but not limited to, Price Concessions or any other price reductions) of any Product purchased under this Agreement and, on request, provide to the U.S. Department of Health and Human Services and any state agencies, any invoices, coupons, statements, and other documentation reflecting such costs for Products. The Resource Group or the Participants may receive subsequent documentation under some programs reflecting adjustments or allocations to the Price Concessions available hereunder.

6.1.3.2    In preparing any documentation referred to in Section 6.1.3.1 of Appendix A, The Resource Group or the Participants may be required to evaluate as a discount, for cost-reporting purposes, the value of any Product listed as $0.00 on any invoice.

6.1.3.3    Neither The Resource Group nor the Participants should include as a discount, for cost-reporting purposes, the value of any item that is designated as a sample, or that The Resource Group or the Participant

HIGHLY CONFIDENTIAL

BWI-INN00067080

knows constitutes a sample, nor should it seek reimbursement for any such items.

6.1.3.4 Supplier recommends that The Resource Group retain a copy of this Agreement and any other documentation provided by Supplier regarding any Price Concessions under this Agreement.

6.1.3.5 The Resource Group and the Participants may request additional information from Supplier to meet its reporting or disclosure obligations by writing to Supplier at the address stated in Section 10.10 of this Appendix A.

6.1.4    Exclusion from Federal Health Care Programs.

6.1.4.1 Supplier represents that it has not been excluded from participating in any "federal health care program," as defined in 42 U.S.C. § 1320a-7b(f), or in any other federal or state government payment program and that it is eligible to participate in the foregoing programs. The Resource Group represents that neither it nor, to the best of its knowledge, any Participant, has been excluded from participating in any "federal health care program," as defined in 42 U.S.C. § 1320a-7b(f), or in any other federal or state government payment program and that each is eligible to participate in the foregoing programs.

6.1.4.2 If either The Resource Group or Supplier is excluded from participating in, or becomes otherwise ineligible to participate in, any such program during the term of this Agreement, then such party will notify the other party of that event within thirty (30) days. Upon occurrence of that event, whether or not such notice is given, either party may terminate this Agreement effective upon written notice to the other party. If a Participant is excluded from participating in, or becomes otherwise ineligible to participate in, any such program during the term of this Agreement, such Participant or The Resource Group will notify Supplier of that event within thirty (30) days. Upon occurrence of that event, whether or not such notice is given, either The Resource Group or Supplier may terminate the applicable Participant's participation in this Agreement effective upon written notice to the other party.

6.1.5    HCPCS Codes. Intentionally deleted.

6.1.6    Compliance with Laws. In performing their obligations under this Agreement, Supplier, The Resource Group and each Participant shall comply with all applicable federal and state laws and regulations, including without limitation the Federal Food, Drug and Cosmetic Act, the Prescription Drug Marketing Act, equal-opportunity laws, and fraud and abuse laws.

6.1.7    Compliance with Health Information. The parties agree that in the provision of Products, Software and/or Services under this Agreement, Supplier does not require and shall not request access to, or attempt to access, any Protected Health Information of The Resource Group or any of its Participants so Supplier is not a Business Associate of The Resource Group as defined in HIPAA. If Supplier inadvertently comes in contact with Protected Health Information, Supplier will keep such information confidential and not further access, use or disclose it. If Supplier or its affiliate does require Protected Health Information then it will sign a mutually agreed upon Business Associate Agreement with The

HIGHLY CONFIDENTIAL                    JX-1431, Page 25 of 61                    BWI-INN00067081

Resource Group. For purposes of this Section, Protected Health Information has the meaning set forth in 45 CFR §160.103.

6.1.8    <u>Environmental Health Information</u>. Supplier will meet with The Resource Group to provide timely updates during the term of this Agreement regarding latex, mercury, polyvinyl chloride (PVC), 2 di-ethyl hexyl phthalate (DEHP) and any other Product that may be determined to be a health and/or environmental hazard. All of Supplier's expenses associated with such meetings will be paid by Supplier (including, without limitation, travel, lodging and meals). Supplier will work with The Resource Group and Participants in developing new Products and exploring opportunities to eliminate such hazards from Supplier's Product offering.

6.1.9    <u>Group Purchasing Organization</u>. The Resource Group represents and warrants that: (i) it is currently in compliance with, and will remain in compliance with, all representations made to the U.S. Department of Health and Human Services Office of Inspector General ("OIG") in obtaining OIG Advisory Opinion 12-01 (the "Advisory Opinion"); (ii) it has in place, and will maintain for the duration of this Agreement, policies and practices necessary to assure its structure and operations comply with the material facts relied upon by the OIG in the Advisory Opinion and implement, train and annually perform an internal audit to ensure continuing compliance; and (iii) with respect to this Agreement, it has evaluated multiple resources, prior to determining that this Agreement provides the best value to its Participants. The Resource Group acknowledges and agrees that Supplier has entered into this Agreement in specific reliance upon the foregoing representations and warranties. The Resource Group will promptly notify Supplier and its affiliates if it breaches any such representations and warranties. From the date of such breach, Supplier's obligation to pay Contract Administrative Fees otherwise due under this Agreement shall be suspended during and until such time as any non-compliance with the Advisory Opinion is resolved to the parties' mutual satisfaction, and The Resource Group shall refund to Supplier any Contract Administrative Fees paid on purchases from and after such breach up to resolution of the non-compliance. The Resource Group shall indemnify and hold harmless Supplier and its affiliates from and against any and all third party liabilities, claims, fines or penalties incurred or suffered by Supplier or its affiliates as a result of the breach or misrepresentation of any of the above representations and warranties.

6.1.10   **Equal Opportunity Clause. The parties shall abide by the requirements of 41 C.F.R. 60-1.4(a), 60-300.5(a) and 60-741.5(a), and the posting requirements of 29 C.F.R. Part 471, appendix A to subpart A, if applicable. These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability or veteran status.**

6.2    <u>Ethical Requirements</u>.

6.2.1    <u>Corporate Compliance</u>. Ascension Health Alliance, Ascension Health and The Resource Group have in place a Corporate Responsibility Program ("Program") which has as its goal to ensure that Ascension Health Alliance, Ascension Health, and The Resource Group comply with federal, state and local laws and regulations. The Program focuses on risk management, the promotion of good

Ascension Health Resource and Supply Management Group, LLC – Confidential
RSMG-6394
4818-5212-6250, v. 6

Page 26 of 61
Appendix A

HIGHLY CONFIDENTIAL                    JX-1431, Page 26 of 61                    BWI-INN00067082

corporate citizenship, including the commitment to uphold a high standard of ethical and legal business practices, and the prevention of misconduct. Supplier acknowledges Ascension Health Alliance's, Ascension Health's, and The Resource Group's commitment to the Program.

6.2.2    <u>Ethical and Religious Directives</u>. The parties acknowledge that the operations of Ascension Health Alliance, Ascension Health, The Resource Group, and their affiliates are in accordance with the Ethical and Religious Directives for Catholic Health Care Services, as promulgated by the United States Conference of Catholic Bishops, Washington, D.C., of the Roman Catholic Church or its successor ("Directives") and the principles and beliefs of the Roman Catholic Church is a matter of conscience to  Ascension Health Alliance, Ascension Health, The Resource Group and their affiliates. The Directives are located at http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf. Supplier acknowledges that it is the intent of The Resource Group that neither this Agreement nor any part hereof shall be construed to require Ascension Health Alliance, Ascension Health, The Resource Group, or their affiliates to violate said Directives in their operations.

7.    CONFIDENTIALITY AND DATA SECURITY

7.1    <u>Treatment of Confidential Information</u>. Each party (for The Resource Group, this includes the Participants, Ascension Health Alliance and Ascension Health) shall hold the following "Confidential Information" in strict confidence and not disclose the same to any other person or entity except as provided herein: all information, pricing and terms relating to or contained in this Agreement; all Product data, trade secrets, financial data, pricing, business plans or any other information received from the other party, Ascension Health Alliance, Ascension Health or Participants, in implementing this Agreement; Ascension Health Alliance's, The Resource Group's, Ascension Health's and Participants' purchasing information and characteristics; and all information derived from the foregoing. Confidential Information shall also be deemed to include any strategic planning initiatives by Ascension Health Alliance or any such additional initiatives that either party designates as being confidential.

7.1.1    Notwithstanding the above:

7.1.1.1 A party may disclose Confidential Information to the personnel within its organization, its physicians that use the Products and/or Software, its legal and accounting advisors, and its temporary employees, contractors and consultants that require the Confidential Information in connection with the party's rights and obligations under this Agreement, provided that the disclosing party requires any such recipient to use the information solely for these purposes and to keep it strictly confidential.

7.1.1.2 A party may disclose Confidential Information as required by law, provided that the disclosing party provides reasonable prior notice to the other party to enable such other party to attempt to prevent or limit the disclosure and the disclosing party assists the other party upon request in seeking relief from or limiting the disclosure.

7.1.1.3 Supplier may disclose this Agreement and Confidential Information related to this Agreement to: any prospective buyer of rights with respect to a Product, provided that such buyer agrees in writing to use the information solely in that capacity and to keep it strictly confidential; to its affiliates; and to any entity that manufactures, markets, co-markets, or

Ascension Health Resource and Supply Management Group, LLC – Confidential
RSMG-6394
4818-5212-6250, v. 6

Page 27 of 61
Appendix A

HIGHLY CONFIDENTIAL          JX-1431, Page 27 of 61          BWI-INN00067083

distributes any Product, provided that any such entity uses the information solely for these purposes and keeps it strictly confidential.

7.1.1.4 Neither party shall be obligated to hold the following information in confidence: information that is or becomes publicly available through no fault of the recipient, information developed by a party without using any Confidential Information, information lawfully possessed by a party before receipt from the disclosing party, and information lawfully disclosed to a party on a non-confidential basis from a person or entity that is not bound by a duty of confidentiality.

7.1.1.5 The Resource Group may disclose the pricing available under this Agreement to a third-party if The Resource Group has entered into a written agreement with such third-party that prohibits the third-party from (i) disclosing the pricing in any way identifiable to The Resource Group or any Participant; (ii) disclosing the pricing linked to The Resource Group's or any Participant's performance or demographics; (iii) disclosing pricing trends with respect to The Resource Group or any Participant whether or not The Resource Group or Participant is named; and (iv) publishing the pricing in the public domain in any form.

7.1.1.6 A party may disclose Confidential Information with the prior written consent of the other party.

7.1.1.7 Ascension Health Alliance, Ascension Health, The Resource Group and Participants may disclose Confidential Information to Ascension Health Alliance, other Participants, The Resource Group, Ascension Health and its health ministries and affiliates provided the Confidential Information may not be further disclosed unless otherwise permitted pursuant to this Section 7.1.1.

7.2   Return of Confidential Information. Each party shall use best efforts to return any Confidential Information to the disclosing party or appropriate Participant upon request. Ascension Health Alliance, The Resource Group, Ascension Health, Participants, and Supplier may freely disclose this Agreement internally within their respective organizations.

7.3   Geographic Limitations on Data; Overseas Outsourcing. Supplier warrants and represents that it will limit the flow of, Supplier's access to and Supplier's use of Protected Health Information and The Resource Group's and/or Participants' Confidential Information to the geographic limits of the United States of America.  The Resource Group and/or Participants may authorize extraterritorial disclosure of such information with the express written permission of the Supplier, which must be specific as to the geographic area and entities by which and/or to which the data will be accessed, used and/or provided.

7.4   Ownership of Data. The Resource Group and the Participants are the sole and exclusive owner of their Data and Supplier acknowledges that it will not acquire any rights in such Data.  Except as provided in Section 7.1 of Appendix A, Supplier acknowledges that it may not, without the prior written consent of The Resource Group and/or each Participant, even if it is in a "cleansed" or de-identified form, (i) use any Data for any purpose other than as necessary in fulfilling its obligations under this Agreement; (ii) disclose, sell, assign, lease or otherwise provide Data to third parties other than disclosures to subcontractors in connection with fulfilling its obligations under this Agreement; (iii) commercially exploit Data whether such exploitation is by or on behalf of Supplier, its employees or agents or (iv) duplicate and/or disclose to others, in whole or in

HIGHLY CONFIDENTIAL

BWI-INN00067084

part, the Data, except and only to the extent that such duplication or disclosure is necessary to fulfill obligations under the Agreement or as necessary to comply with any laws. Supplier shall safeguard Data against loss, disclosure, unauthorized access or alteration under security procedures consistent with best practices in the health and medical industry. If Supplier is legally compelled by law, process or order of any court or governmental agency or otherwise to disclose Data and/or Confidential Information, Supplier shall give The Resource Group and/or Participants prompt notice and permit The Resource Group and/or Participants to seek a protective order or take other appropriate action. Upon The Resource Group's and/or Participants' request, and upon termination or expiration of the Agreement, Supplier shall deliver all Data to The Resource Group and/or Participants, as applicable in a mutually agreed upon, industry standard format. Supplier retains no right to Data and shall not assert or possess any lien or other rights in Data.

7.5 <u>Data Breach</u>. In the event of an unauthorized use or disclosure by Supplier, its employees, agents or subcontractors of individually identifiable information, which is related in any way to this Agreement, ("Personal Information"), Supplier shall take the following action with respect to such unauthorized use or disclosure: (a) promptly communicate the nature of the unauthorized use or disclosure to those persons whose Personal Information was or likely was used or disclosed in an unauthorized fashion ("Affected Individuals") via written correspondence approved in advance by The Resource Group's and/or Participants' General Counsel; (b) comply with any and all laws, regulations, governmental orders or other governmental requirements applicable to such unauthorized use or disclosure of Personal Information; and (c) take all necessary reasonable action to mitigate any damages reasonably anticipated or realized by Affected Individuals, The Resource Group and/or Participants relating to the unauthorized use or disclosure of Personal Information.

7.6 <u>Remote Access</u>. Intentionally deleted.

8. TERMINATION

8.1 <u>Termination</u>.

8.1.1 <u>Termination for Breach</u>. In the event of a material breach of any provision of this Agreement, the non-breaching party shall notify the breaching party in writing of the specific nature of the breach. If the breaching party does not cure such material breach within thirty (30) days of receiving a notice of any material breach, the non-breaching party may immediately terminate this Agreement.

8.1.2 <u>Termination Without Cause</u>. The Resource Group may terminate this Agreement without cause or penalty upon thirty (30) days prior written notice to the Supplier. Supplier may terminate this Agreement without cause or penalty at any time by giving one hundred eighty (180) days advance notice to The Resource Group.

8.1.3 <u>Orders Placed Prior to Termination</u>. Supplier shall fulfill, in accordance with the terms of this Agreement, all Purchase Orders for Products and Services submitted by The Resource Group and Participants and received by Supplier prior to termination or expiration of this Agreement. The Resource Group and/or the applicable Participants shall make payment for such Purchase Orders in accordance with the terms of this Agreement.

8.2 <u>Termination of Existing Contracts</u>. During the term of this Agreement, Supplier covenants that it will not solicit any Participant to enter into or negotiate a separate agreement for the same Product and/or Services offered hereunder without The Resource Group's prior written consent. Any Participant wishing to purchase any Products, Software or Services under this Agreement, may, at its option and without any cost or penalty, terminate any

Ascension Health Resource and Supply Management Group, LLC – Confidential
RSMG-6394
4818-5212-6250, v. 6

Page 29 of 61
Appendix A

HIGHLY CONFIDENTIAL          JX-1431, Page 29 of 61          BWI-INN00067085

existing contract or other arrangement with Supplier for the same Products or Services. Supplier must not directly or indirectly contract with any Participant for the same Products after the Effective Date without The Resource Group's prior written consent, which will not be unreasonably withheld.

8.3 <u>Survival</u>. Any provision by its express term or any provision that by its nature is intended to survive, including the following Sections of this Agreement, shall survive expiration or termination of this Agreement:

- Parts and Software Upgrades – Sections 3.3 and 3.4 of the Agreement;
- Warranties – Section 4 of the Agreement;
- Audit rights – Section 6.7 of the Agreement;
- Parties – Section 2 of the Standard Terms and Conditions;
- Product Notices – Section 3.2 of the Standard Terms and Conditions;
- Taxes – Section 4 of the Standard Terms and Conditions;
- Indemnification and Insurance obligations – Sections 5.1 and 5.2 of the Standard Terms and Conditions;
- Health Care Regulatory Requirements and The Resource Group Requirements – Section 6 of the Standard Terms and Conditions;
- Confidentiality and Data Security – Section 7 of the Standard Terms and Conditions;
- Orders Placed Prior to Termination – Section 8.1.3 of the Standard Terms and Conditions;
- Formal Dispute Resolution – Section 9 of the Standard Terms and Conditions; and
- General Contract Provisions – Sections 10.1 through 10.7 and Sections 10.9 through 10.12 of the Standard Terms and Conditions.

9. FORMAL DISPUTE RESOLUTION

9.1 <u>Formal Dispute Resolution/Exhaust of Informal Process</u>. If the parties are unable to resolve the dispute through the informal process set forth in Section 13.1.2, then either party may initiate litigation in the federal courts located in the Eastern District of Missouri or state courts located in St. Louis County, Missouri. All communications by the parties during the Informal Dispute Resolution Process shall be inadmissible in court as evidence of settlement negotiations. **EACH PARTY HEREBY IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY FEDERAL OR STATE JUDICIAL PROCEEDING. EACH PARTY HEREBY WAIVES ANY RIGHT TO SEEK PUNITIVE, EXEMPLARY, MULTIPLIED, COVER OR CONSEQUENTIAL DAMAGES, PREJUDGMENT INTEREST OR ATTORNEYS' FEES OR COSTS EXCEPT AS MAY BE REQUIRED BY STATUTE.**

10. GENERAL CONTRACT PROVISIONS

10.1 <u>Publicity and Trademarks</u>. Each party agrees (for The Resource Group, this includes the Participants, Ascension Health Alliance and Ascension Health) that it shall not, without prior written consent of the other party in each instance, use in advertising, publicity, or otherwise the name of the other party, or any partner or employee of the party, nor any trade name, trademark, trade device, or simulation thereof owned by the party, including, in the case of Supplier, those of Ascension Health Alliance, Ascension Health or any Participant. For The Resource Group, Ascension Health Alliance, Ascension Health and Participants, written consent is only valid if it comes from Ascension Health's Office of the General Counsel. In addition, Supplier shall not represent, directly or indirectly, that any Product or any Service provided by Supplier has been approved, recommended, certified, or endorsed by any Participant, Ascension Health Alliance, Ascension Health or The Resource Group.

Ascension Health Resource and Supply Management Group, LLC – Confidential
RSMG-6394
4818-5212-6250, v. 6

Page 30 of 61
Appendix A

HIGHLY CONFIDENTIAL                    JX-1431, Page 30 of 61                    BWI-INN00067086

10.2 <u>Priority of Documents</u>. Except for the most current version of the BAA, this Agreement shall take priority over all agreements relating to Products and Services executed prior to the Effective Date between Supplier and The Resource Group except to the extent Supplier and The Resource Group expressly agree otherwise. Except to the extent expressly agreed by The Resource Group and Supplier, the terms of this Agreement shall not be modified or conflicted by subsequent agreements between Supplier and The Resource Group or any Participant. In the event of a conflict between this Agreement and related documents, the terms of this Agreement shall be given effect.  The terms of this Agreement shall supersede the terms and conditions on any purchase orders, invoices, price quotes or other documents or agreements Supplier may utilize with The Resource Group and Participants relating to the Products and/or Services covered under this Agreement and such terms and conditions contained in the aforementioned documents shall have no effect on the relationship of the parties.

10.3 <u>Amendment</u>. This Agreement may only be amended by written agreement of the parties.

10.4 <u>Entire Agreement</u>. This Agreement is limited to Supplier's Products covered in <u>Appendix B</u>.  All exhibits and schedules attached hereto and referenced herein are made a part of this Agreement. This Agreement constitutes the entire agreement between the parties concerning the subject matter of this Agreement and supersedes all prior negotiations and agreements between the parties concerning the subject matter of this Agreement. The terms of any Purchase Order, invoice, or similar document used to implement this Agreement shall be subject to and shall not modify this Agreement.

10.5 <u>Waiver</u>. No provision of this Agreement may be waived except by a writing signed by the party against whom the waiver is sought to be enforced. No failure to enforce any provision of this Agreement constitutes a waiver of future enforcement of that provision or of any other provision of this Agreement.

10.6 <u>Headings</u>. The descriptive headings of the Sections of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any provision hereof.

10.7 <u>Assignment</u>. Except as provided in this Section, neither party may assign, subcontract, delegate, or otherwise transfer, directly or indirectly, this Agreement or any of its rights or obligations under this Agreement, either voluntarily or involuntarily (whether by merger, acquisition, consolidation, dissolution, operation of law, change of control, or otherwise), without the prior written consent of the other party, such consent not to be unreasonably withheld or delayed. If Supplier or any of its affiliates divests itself of any Product, then Supplier may, upon written notice to The Resource Group, such notice to be provided as soon as publicly available, assign to the person or entity acquiring that Product any of Supplier's rights under this Agreement relating to that Product, on the condition that the assignee will also assume Supplier's obligations under this Agreement relating to that Product; provided that in the event of any such assignment, The Resource Group may terminate this Agreement on written notice to Supplier and the assignee within the sixty (60)-day period following notice of the assignment. This provision shall not prevent Supplier's use of its independent distributor network, use of common carriers to deliver product or administrative support of its affiliates. The Resource Group may, upon at least ninety (90) days written notice to Supplier, (i) assign this Agreement to an affiliated entity provided that following the assignment, the representations and warranties set forth in Section 6.1.9 (Group Purchasing Organization) continue to be true upon and following the assignment and such entity assumes The Resource Group's obligations under this Agreement; or (ii) assign this Agreement to an entity if, upon and following the assignment, the entity will be a group purchasing organization organized in accordance with 42 C.F.R. § 1001.952(j) the "Group Purchasing Organization Safe Harbor," satisfy the requirements of the Group Purchasing Organization Safe Harbor, and assume The Resource Group's obligations under this agreement; provided that Supplier may

HIGHLY CONFIDENTIAL

BWI-INN00067087

terminate this Agreement on written notice to The Resource Group and assignee within the sixty (60)-day period following notice of the assignment. Any purported assignment in violation of this Section will be void.

10.8    Change in Ownership. In the event of a sale of all or substantially all of the assets of Supplier or sufficient stock of Supplier to effect a Change in Control of Supplier, The Resource Group may terminate this Agreement on at least ninety (90) days notice to Supplier. For purposes of this Section, a "Change in Control" shall mean the acquisition by an entity of fifty percent (50%) or more of Supplier capital stock ordinarily having voting rights if the acquiring entity actively exercises management control.

10.9    Severability. If any part of this Agreement shall be determined to be invalid, illegal or unenforceable by any valid act of Congress or act of any state legislature or by any regulation duly promulgated by the United States or a state acting in accordance with the law, or declared null and void by any court of competent jurisdiction, then such part shall be reformed, if possible, to conform to the law and, in any event, the remaining parts of this Agreement shall be fully effective and operative insofar as reasonably possible.

10.10    Notices. Notices under this Agreement must be in writing, signed by the sending party, and sent to the address below by one of the following methods: personal delivery; registered or certified mail, in each case return receipt requested and postage prepaid; nationally recognized overnight courier, with all fees prepaid; or facsimile. A notice under this Agreement is effective upon receipt or refusal of delivery by the other party. The address listed below may be changed by notice in accordance with this Section.

If to The Resource Group:
Ascension Health Resource and Supply Management Group, LLC
Attn: Vice President User-Directed Strategic Sourcing
11775 Borman Drive, Suite 340
St. Louis, Missouri 63146
TheResourceGroup@Ascension.org

Copy to:
Ascension Health
Senior Vice President, Legal Services and General Counsel
4600 Edmundson Road
St. Louis, Missouri 63134

If to Supplier:
Biosense Webster, Inc.
Attn: Contracts Department; Commercial Operations
3333 Diamond Canyon Road
Diamond Bar, CA 91765

10.11    Independent Contractors. For purposes of this Agreement, each party is an independent contractor. This Agreement does not create a partnership, association, or other business entity. Neither party has any authority to act for or to bind the other.

10.12    Binding Effect. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

10.13    Force Majeure and Product Shortage. The obligations of either party to perform under this Agreement may be excused during a period of delay caused by acts of God or by shortages of power or materials or government orders which are beyond the reasonable control of the party obligated to perform ("Force Majeure Event"). In the event that either party ceases to perform its obligations under this Agreement due to the occurrence of a Force Majeure Event, such party shall: (1) use commercially reasonable efforts to notify

Ascension Health Resource and Supply Management Group, LLC – Confidential
RSMG-6394
4818-5212-6250, v. 6

Page 32 of 61
Appendix A

HIGHLY CONFIDENTIAL          JX-1431, Page 32 of 61          BWI-INN00067088

the other party in writing of such Force Majeure Event and its expected duration; (2) take all reasonable steps to recommence performance of its obligations under this Agreement as soon as possible. For the term of any Force Majeure event declared by Supplier, The Resource Group and the Participants shall be released from the terms of this Agreement in order that they may procure the Products from any other available source. In the event that any Force Majeure Event delays a party's performance for more than thirty (30) days following notice by such party pursuant to this Agreement, the other party may terminate this Agreement immediately upon written notice to such party. In the event of a Supplier or industry-wide shortage of Product(s), Supplier and its affiliates reserve the right to allocate Products among their customers in any manner that they, in their sole discretion, determine is reasonable. In the event of any such suspension of performance by Supplier pursuant to this Section, the parties agree that The Resource Group and the Participants may suspend its corresponding performance and obligations under this Agreement.

10.14   <u>Other Contractual Obligations</u>. Each party represents that it is not prohibited from entering into, or performing its obligations under, this Agreement by the terms of any other agreement.

10.15   <u>Warranty of Authority</u>. The Resource Group represents and warrants to Supplier that it is duly authorized to execute this Agreement and that it has authority to legally bind The Resource Group and each Participant to the terms of this Agreement (including, without limitation, the damage and jury trial waivers in Section 9.1 of this <u>Appendix A</u>).

APPENDIX B-1
PRODUCT (NON-EQUIPMENT) PRICING INFORMATION

| Manufacturer Catalog # | Description | UOM | Content | Contract Price | List Price |
|---|---|---|---|---|---|
| KT-0001-420 | Green Patch Sensor Cable Kit | EA | 1 | $4,270.15 | $4,270.15 |
| KT-0001-421 | Yellow Patch Sensor Cable Kit | EA | 1 | $4,270.15 | $4,270.15 |
| EM-5400-03F | PIN BOX | EA | 1 | $1,795.61 | $1,795.61 |
| CW-5407-10F | BS CABLES SET,2M TRUNK + LEADS | EA | 1 | $1,750.30 | $1,750.30 |
| MA-5400-501 | 550mm Location Pad Holder (molded) | EA | 1 | $1,497.21 | $1,497.21 |
| CW-4178-32F | F.O CW-4178-31F & Suport Kit HM-4178-31F | EA | 1 | $1,016.76 | $1,016.76 |
| CA-5401-51 | LOCATION PAD EXTENTION CABLE | EA | 1 | $736.37 | $736.37 |
| CA-5400-191 | BW-GE BS-ECG Cable | EA | 1 | $475.81 | $475.81 |
| CA-5400-12 | IC Out Cable | EA | 1 | $1,940.06 | $1,940.06 |
| KT-5400-103 | Optical DVI Detachable Transmiter Receiv | EA | 1 | $3,483.61 | $3,483.61 |
| CW-5400-99F | Fiber Optic Cable 2xLC to 2xLC, Hardened | EA | 1 | $220.35 | $220.35 |
| MP-4703-24 | GUIDING PIN SCREW | EA | 1 | $19.20 | $19.20 |
| CA-5400-06 | Ablation Adaptor Cable | EA | 1 | $665.57 | $665.57 |
| CA-5400-21 | BW-GE ICEG Cable | EA | 1 | $790.18 | $790.18 |
| MA-5407-09 | RMT GUIDING PIN | EA | 1 | $10.20 | $10.20 |
| CW-4163-01N | LAN CABLE DIRECT 35M | EA | 1 | $147.27 | $147.27 |
| CW-3903-30F | T-Type15(F) to DVI-I Video Cable 75ohm 3 | EA | 1 | $719.38 | $719.38 |
| MA-5405-12 | PU TABLE CLAMP | EA | 1 | $1,053.86 | $1,053.86 |
| CW-3902-30F | BNC-to-DVI-I Cable 75ohm 30m W/Shrink-Co | EA | 1 | $345.53 | $345.53 |
| EM-5400-20 | ECG OUT CONNECTION UNIT | EA | 1 | $1,801.05 | $1,801.05 |
| KT-0001-425 | LP Cable Replacment kit | EA | 1 | $987.30 | $987.30 |
| KT-0001-439 | LPH Mounting Kit (for 65 mm height) | EA | 1 | $449.47 | $449.47 |
| EM-5406-00 | P.S UNIT | EA | 1 | $3,622.26 | $3,622.26 |
| CA-0001-42 | BS Service cable | EA | 1 | $600.43 | $600.43 |
| M-4700-60 | JB PACING AUX. | EA | 1 | $147.27 | $147.27 |
| MA-5403-09 | GUIDING PIN | EA | 1 | $56.02 | $56.02 |
| CW-4162-08N | Fiber optic Cable, 30m, 62.5/125MIC ST t | EA | 1 | $167.67 | $167.67 |
| CW-5308-01F | RS232 COMPUTER CABLE DB9 (F) to DB9 (M) | EA | 1 | $47.81 | $47.81 |
| EE-0232-09N | Modem RS-232 to F.O. Port-Powered 11x6x2 | EA | 1 | $805.59 | $805.59 |
| CA-5400-11 | 24V Power CABLE | EA | 1 | $1,056.13 | $1,056.13 |
| CP506410F | Frame Grabber 4-Inputs 64MB-SDRAM | EA | 1 | $6,675.90 | $6,675.90 |
| MA-5400-13 | PIU TABLE ARM | EA | 1 | $3,122.22 | $3,122.22 |
| MP-5400-85 | HOOK 30MM | EA | 1 | $33.99 | $33.99 |
| CA-5400-081 | Map Adaptor CBL | EA | 1 | $1,136.56 | $1,136.56 |
| CW-4000-00N | FIBER OPTIC ROUND CABLE 25M, ONE SIDE PR | EA | 1 | $349.78 | $349.78 |
| EM-5400-04 | Yellow Poles Pin-Box | EA | 1 | $2,749.50 | $2,749.50 |
| EM-5400-15 | Foot Pedal Assy. | EA | 1 | $1,183.86 | $1,183.86 |

Ascension Health Resource and Supply Management Group, LLC – Confidential
ASCENSION-112372-v2-RSMG-6394
4818-5212-6250, v. 6

Page 34 of 61
Appendix B-1

HIGHLY CONFIDENTIAL       BWI-INN00067090

| Manufacturer Catalog # | Description | UOM | Content | Contract Price | List Price |
|---|---|---|---|---|---|
| MA-5400-801 | 750mm Location Pad Holder (molded) | EA | 1 | $1,689.12 | $1,689.12 |
| MA-5400-86 | PIU CABLES SUPPORT | EA | 1 | $373.62 | $373.62 |
| CW-2412-04F | USB TYP B CBL VID.CONV U2412M | EA | 1 | $45.32 | $45.32 |
| MP-5400-123 | RETAINING BELT | EA | 1 | $33.99 | $33.99 |
| EM-5400-201 | Dual ECG Out Connection Unit | EA | 1 | $2,567.31 | $2,567.31 |
| KT-0001-438 | LPH Mounting Kit (for 90 mm height) | EA | 1 | $688.28 | $688.28 |
| KT-5400-003 | PIU Slider Kit | EA | 1 | $168.23 | $168.23 |
| CA-5400-161 | Two Pairs STIM Cable -3m | EA | 1 | $252.07 | $252.07 |
| CA-5400-17 | STIM SPLITTER CARTO - CARDIOLAB | EA | 1 | $215.25 | $215.25 |
| KT-0001-440 | LPH Mounting Kit (for 160 mm width) | EA | 1 | $390.33 | $390.33 |
| CA-5400-162 | TWO PAIRS STIM CABLE - 6M | EA | 1 | $273.59 | $273.59 |
| CW-1210-24F | Power-Cord USA 10Amp 3x18AWG 2.4m Black | EA | 1 | $22.54 | $22.54 |
| CA-4008-11 | GROUNDING CABLE | EA | 1 | $368.19 | $368.19 |
| CA-4041-04 | PACING EXTENTION CABLE | EA | 1 | $122.46 | $122.46 |
| KT-0001-447 | CARTO® 3 System MTRJ-SC Adapter Kit# | EA | 1 | $550.07 | $550.07 |
| 39D03X | EP - FOOT SWITCH | EA | 1 | $452.52 | $452.52 |
| 39D05X | EP - Global Port | EA | 1 | $1,960.76 | $1,960.76 |
| 39D06X15 | PC INTERFACE CABLE (15M) | EA | 1 | $259.53 | $259.53 |
| M-5463-21 | DISPLAY MODULE COMPLETE | EA | 1 | $1,495.20 | $1,495.20 |
| M-5463-24 | MODULE 331(MEASUREMENT MODULE) | EA | 1 | $1,476.72 | $1,476.72 |
| M-5463-25 | ECG MODULE COMPLETE | EA | 1 | $1,722.77 | $1,722.77 |
| M-5463-313 | STOCKERT REMOTE CONTROLPACKAGE | EA | 1 | $4,345.58 | $4,345.58 |
| M-5463-422 | MODULE 324 (CPU) STOCKERT | EA | 1 | $1,043.46 | $1,043.46 |
| M-4900-05 | SMARTABLATE SYSTEM -FOOT PEDAL | EA | 1 | $761.91 | $761.91 |
| M-4900-28 | SMARTABLATE GEN-PUMP CABLE 5M | EA | 1 | $222.72 | $222.72 |
| FG-5400-00 | CARTO 3 SYSTEM RMA | EA | 1 | $33,064.34 | $33,064.34 |
| FG-5600-00 | CARTO 3 RMT SYSTEM RMA | EA | 1 | $33,064.34 | $33,064.34 |
| EM-5401-00 | PATIENT INTERFACE UNIT | EA | 1 | $21,686.46 | $21,686.46 |
| EM-5401-00F | PATIENT INTERFACE UNIT - ROHS | EA | 1 | $21,686.46 | $21,686.46 |
| EA-5401-12 | DC/DC card old (FRU) Rma | EA | 1 | $4,260.89 | $4,260.89 |
| EA-5401-121 | DC/DC card (FRU) Rma | EA | 1 | $4,260.89 | $4,260.89 |
| EA-5401-121F | DC/DC card (FRU) -ROHS | EA | 1 | $4,260.89 | $4,260.89 |
| EA-5401-16 | ECG Card RMA | EA | 1 | $4,937.15 | $4,937.15 |
| EA-5401-162 | ECG card (FRU) RMA | EA | 1 | $4,937.15 | $4,937.15 |
| EA-5401-162F | ECG card (FRU) -ROHS | EA | 1 | $4,937.15 | $4,937.15 |
| EA-5401-27 | Backplane Card RMA | EA | 1 | $4,465.63 | $4,465.63 |
| EA-5401-271 | New Backplane Card RMA | EA | 1 | $4,465.63 | $4,465.63 |
| EA-5401-271F | Backplane Card ROHS | EA | 1 | $4,465.63 | $4,465.63 |
| EA-5401-45 | EP-OUT Card (FRU) | EA | 1 | $1,446.35 | $1,446.35 |
| EA-5401-45F | EP-OUT Card (FRU) | EA | 1 | $1,446.35 | $1,446.35 |

Ascension Health Resource and Supply Management Group, LLC – Confidential
ASCENSION-112372-v2-RSMG-6394
4818-5212-6250, v. 6

Page 35 of 61
Appendix B-1

| Manufacturer Catalog # | Description | UOM | Content | Contract Price | List Price |
|---|---|---|---|---|---|
| EM-5401-20 | Main Module old RMA | EA | 1 | $8,460.00 | $8,460.00 |
| EM-5401-201 | Main Module RMA | EA | 1 | $8,460.00 | $8,460.00 |
| EM-5401-201F | Main Module - ROHS | EA | 1 | $8,460.00 | $8,460.00 |
| EM-5405-20 | Patch Unit Replacement Kit RMA | EA | 1 | $10,685.18 | $10,685.18 |
| KT-0001-422 | Patch Unit Replacement Kit RMA | EA | 1 | $10,685.18 | $10,685.18 |
| EM-5405-20F | CARTO 3 PATCH UNIT - ROHS | EA | 1 | $10,685.18 | $10,685.18 |
| EM-5403-00 | LOCATION PAD | EA | 1 | $10,365.32 | $10,365.32 |
| EM-5403-00F | LOCATION PAD - ROHS | EA | 1 | $10,365.32 | $10,365.32 |
| EM-5407-08 | LP RMT & MARKERS | EA | 1 | $10,592.91 | $10,592.91 |
| EM-5407-08F | LP RMT & MARKERS - ROHS | EA | 1 | $10,592.91 | $10,592.91 |
| KT-5404-00 | CARTO 3 Station Kit RMA | EA | 1 | $4,520.99 | $4,520.99 |
| KT-5404-02 | RMA work station C3 | EA | 1 | $4,520.99 | $4,520.99 |
| KT-5404-04 | CARTO® 3 Station Kit (V1, T3500MT-G3) RMA | EA | 1 | $4,520.99 | $4,520.99 |
| KT-5404-08 | CARTO3 STATION KIT V2 T3600 (RMA) | EA | 1 | $4,520.99 | $4,520.99 |
| REPAIR -CFP | Flat Fee (repair-cfp) | EA | 1 | $750.00 | $750.00 |
| REPAIR -STK | Flat Fee (repair-stk) | EA | 1 | $1,180.00 | $1,180.00 |
| Repair - SMA Gen | Flat Fee (repair-sma gen) | EA | 1 | $1,800.00 | $1,800.00 |
| REPAIR - SMA Pump | Flat Fee (repair-sma pump) | EA | 1 | $1,700.00 | $1,700.00 |
| Loaner STK | Flat Fee (loaner stk) | EA | 1 | $795.00 | $795.00 |
| Loaner CFP | Flat Fee (loaner cfp) | EA | 1 | $125.00 | $125.00 |
| Loaner SMA Gen | Flat Fee (loaner sma gen) | EA | 1 | $650.00 | $650.00 |
| Loaner SMA Pump | Flat Fee (loaner sma pump) | EA | 1 | $450.00 | $450.00 |
| Loaner Late Fee | Flat Fee (loaner late fee) | EA | 1 | $250.00 | $250.00 |
| PM - CFP | Flat Fee (pm-cfp) | EA | 1 | $750.00 | $750.00 |
| PM - STK | Flat Fee (pm-stk) | EA | 1 | $1,180.00 | $1,180.00 |
| PM - SMA Gen | Flat Fee (pm-sma gen) | EA | 1 | $1,600.00 | $1,600.00 |
| PM - SMA Pump | Flat Fee (pm-sma pump) | EA | 1 | $1,200.00 | $1,200.00 |
| PM - SMA | Flat Fee (pm-sma) | EA | 1 | $2,880.00 | $2,880.00 |
| FG-5400-00 | CARTO 3 SYSTEM RMA | EA | 1 | $33,064.34 | $33,064.34 |
| FG-5600-00 | CARTO 3 RMT SYSTEM RMA | EA | 1 | $33,064.34 | $33,064.34 |
| EM-5401-00 | PATIENT INTERFACE UNIT | EA | 1 | $21,686.46 | $21,686.46 |
| EM-5401-00F | PATIENT INTERFACE UNIT - ROHS | EA | 1 | $21,686.46 | $21,686.46 |
| EA-5401-12 | DC/DC card old (FRU) Rma | EA | 1 | $4,260.89 | $4,260.89 |
| EA-5401-121 | DC/DC card (FRU) Rma | EA | 1 | $4,260.89 | $4,260.89 |
| EA-5401-121F | DC/DC card (FRU) -ROHS | EA | 1 | $4,260.89 | $4,260.89 |
| EA-5401-16 | ECG Card RMA | EA | 1 | $4,937.15 | $4,937.15 |
| EA-5401-162 | ECG card (FRU) RMA | EA | 1 | $4,937.15 | $4,937.15 |
| EA-5401-162F | ECG card (FRU) -ROHS | EA | 1 | $4,937.15 | $4,937.15 |
| EA-5401-27 | Backplane Card RMA | EA | 1 | $4,465.63 | $4,465.63 |

Ascension Health Resource and Supply Management Group, LLC – Confidential
ASCENSION-112372-v2-RSMG-6394
4818-5212-6250, v. 6

Page 36 of 61
Appendix B-1

HIGHLY CONFIDENTIAL          JX-1431, Page 36 of 61          BWI-INN00067092

DocuSign Envelope ID: 246215FB-3D5D-4638-AC2C-53E63A095677

| Manufacturer Catalog # | Description | UOM | Content | Contract Price | List Price |
|---|---|---|---|---|---|
| EA-5401-271 | New Backplane Card RMA | EA | 1 | $4,465.63 | $4,465.63 |
| EA-5401-271F | Backplane Card  ROHS | EA | 1 | $4,465.63 | $4,465.63 |
| EA-5401-45 | EP-OUT Card (FRU) | EA | 1 | $1,446.35 | $1,446.35 |
| EA-5401-45F | EP-OUT Card (FRU) | EA | 1 | $1,446.35 | $1,446.35 |
| EM-5401-20 | Main Module old RMA | EA | 1 | $8,460.00 | $8,460.00 |
| EM-5401-201 | Main Module RMA | EA | 1 | $8,460.00 | $8,460.00 |
| EM-5401-201F | Main Module - ROHS | EA | 1 | $8,460.00 | $8,460.00 |
| EM-5405-20 | Patch Unit Replacement Kit RMA | EA | 1 | $10,685.18 | $10,685.18 |
| KT-0001-422 | Patch Unit Replacement Kit RMA | EA | 1 | $10,685.18 | $10,685.18 |
| EM-5405-20F | CARTO 3 PATCH UNIT - ROHS | EA | 1 | $10,685.18 | $10,685.18 |
| EM-5403-00 | LOCATION PAD | EA | 1 | $10,365.32 | $10,365.32 |
| EM-5403-00F | LOCATION PAD - ROHS | EA | 1 | $10,365.32 | $10,365.32 |
| EM-5407-08 | LP RMT & MARKERS | EA | 1 | $10,592.91 | $10,592.91 |
| EM-5407-08F | LP RMT & MARKERS - ROHS | EA | 1 | $10,592.91 | $10,592.91 |
| KT-5404-00 | CARTO 3 Station Kit RMA | EA | 1 | $4,520.99 | $4,520.99 |
| KT-5404-02 | RMA work station C3 | EA | 1 | $4,520.99 | $4,520.99 |
| KT-5404-04 | CARTO® 3 Station Kit (V1, T3500MT-G3) RMA | EA | 1 | $4,520.99 | $4,520.99 |
| KT-5404-08 | CARTO3 STATION KIT V2 T3600 (RMA) | EA | 1 | $4,520.99 | $4,520.99 |

Ascension Health Resource and Supply Management Group, LLC – Confidential
ASCENSION-112372-v2-RSMG-6394
4818-5212-6250, v. 6

Page 37 of 61
Appendix B-1

HIGHLY CONFIDENTIAL          JX-1431, Page 37 of 61          BWI-INN00067093

APPENDIX B-2
EQUIPMENT PRICING INFORMATION

**\*List prices are subject to change at any time**

| Manufacturer Catalog # | Description | UOM | Content | Contract Price | List Price |
|---|---|---|---|---|---|
| C3TRADE | CARTO® 3 Competitive Program (offered as part of competitive equipment trade-in only) :  C3BASE Plus Clinical Module Package, PASO, ConfiDense and CartoReplay™ | EA | 1 | $235,000.00 | $565,000.00 |
| C3COMPLETE | CARTO® 3 Complete Program:  C3BASE Plus Clinical Module Package, PASO, ConfiDense,  CartoReplay™ and CartoUnivu™, 2 YR ASA, SmartAblate System | EA | 1 | $499,000.00 | $1,008,000.00 |
| C3BIGPICTURE | CARTO® 3 Big Picture Program:  C3BASE Plus Clinical Module Package, PASO, ConfiDense,  CartoReplay™ and CartoUnivu™, 2 YR ASA, SmartAblate System, Odyssey Vision One 58" Quad Monitor, Odyssey Service Agreement 2 YR. | EA | 1 | $725,000.00 | $1,366,000.00 |
| C3BASE | CARTO® 3 System Base Package (incl. MEM and C3ST3D Module) | EA | 1 | $165,998.00 | $300,000.00 |
| C3BASECMP | CARTO® 3 System Base Package and Clinical Module Package | EA | 1 | $215,998.00 | $490,000.00 |
| C3BASECMPMMIII | CARTO® 3 System Base Package, Clinical Module Package and MEM Module III | EA | 1 | $373,998.00 | $665,000.00 |
| C3BASERMT | CARTO® 3 System Base Package and RMT Kit | EA | 1 | $203,776.00 | $375,000.00 |
| EM5402010 | System Cart | EA | 1 | $8,000.00 | $15,000.00 |
| EM5402030 | CART 22U 600VA 115V | EA | 1 | $5,000.00 | $5,000.00 |
| MA540013 | Patient Interface Unit (PIU) Arm | EA | 1 | $2,000.00 | $3,081.00 |
| KT5400127 | MEM UPG KIT for CARTO® 3 System with Dell T3500MT Workstation | EA | 1 | $4,999.00 | $10,000.00 |
| KT5400128 | MEM UPG KIT for CARTO® 3 System with Dell T3400 Workstation **without** CARTOSOUND® Module | EA | 1 | $4,999.00 | $10,000.00 |
| KT5400129 | MEM UPG KIT + VIDEO CARD for CARTO® 3 System with Dell T3400 Workstation **with** CARTOSOUND® Module | EA | 1 | $4,999.00 | $10,000.00 |
| C3CONFD | Carto® 3 System ConfiDense™ Mapping Module | EA | 1 | $20,000.00 | $25,000.00 |
| C3REPLAY | Carto® 3  CartoReplay™ Module | EA | 1 | $20,000.00 | $25,000.00 |
| C3CNFDRPLY | Carto® 3 System ConfiDense™ Mapping Module with Carto® 3  CartoReplay™ Module Bundle | EA | 1 | $30,000.00 | $50,000.00 |
| C3REPLAYADD | Carto® 3 CartoReplay™ Module  Add-On - Price only available if purchase within 30 days of ConfiDense™ Module installation | EA | 1 | $10,000.00 | $25,000.00 |
| C3ST3D | CARTO® SmartTouch™ 3D Module (includes C3TOUCH and C3VISIST.  MEM Base not included) | EA | 1 | $9,998.00 | $50,000.00 |
| C3TOUCH | CARTO® 3 System SmartTouch™ Contact Force Module (MEM Base and VISITAG™ Module required, but not included) | EA | 1 | $4,999.00 | $25,000.00 |
| C3VISIST | VISITAG™ Module for CARTO® 3 System (MEM Base required, but not included) | EA | 1 | $4,999.00 | $25,000.00 |
| MMIII | MEM Module III: PASO™and CartoUnivu™ Module Module Bundle for CARTO® 3 System | EA | 1 | $158,000.00 | $175,000.00 |
| C3PASO | PASO™ Module for CARTO® 3 System | EA | 1 | $23,000.00 | $25,000.00 |

| Manufacturer Catalog # | Description | UOM | Content | Contract Price | List Price |
|---|---|---|---|---|---|
| MSP2 | PASO™ Module for CARTO® 3 System - 2 Modules on one PO | EA | 1 | $41,400.00 | $50,000.00 |
| MSP3 | PASO™ Module for CARTO® 3 System - 3 Modules on one PO | EA | 1 | $58,500.00 | $75,000.00 |
| MSP4 | PASO™ Module for CARTO® 3 System - 4 Modules on one PO | EA | 1 | $69,000.00 | $100,000.00 |
| MSP5 | PASO™ Module for CARTO® 3 System - 5 Modules on one PO | EA | 1 | $85,000.00 | $125,000.00 |
| KT5400124 | CartoUnivu™ Module for CARTO® 3 System | EA | 1 | $135,000.00 | $150,000.00 |
| MSCU2 | CartoUnivu™ Module for CARTO® 3 System - 2 Modules on one PO | EA | 1 | $244,000.00 | $300,000.00 |
| MSCU3 | CartoUnivu™ Module for CARTO® 3 System - 3 Modules on one PO | EA | 1 | $345,000.00 | $450,000.00 |
| MSCU4 | CartoUnivu™ Module for CARTO® 3 System - 4 Modules on one PO | EA | 1 | $405,000.00 | $600,000.00 |
| MSCU5 | CartoUnivu™ Module for CARTO® 3 System - 5 Modules on one PO | EA | 1 | $506,250.00 | $750,000.00 |
| C3MERGE | CARTOMERGE® Module for CARTO® 3 System | EA | 1 | $37,778.00 | $75,000.00 |
| C3SOUND | CARTOSOUND® Module for CARTO® 3 System | EA | 1 | $37,778.00 | $75,000.00 |
| C3CFAE | CFAE Software for CARTO® 3 System | EA | 1 | $11,000.00 | $15,000.00 |
| C3RMT | RMT Module Kit | EA | 1 | $37,778.00 | $75,000.00 |
| BWICOMMKIT | BWI Comm. Kit | EA | 1 | $5,070.00 | $5,070.00 |
| CMCSCFC3 | Clinical Software Module Package for CARTO® 3 System Includes: CARTOSOUND® Module, CARTOMERGE® Module, CFAE and 1 year Premium Upgrade | EA | 1 | $50,000.00 | $190,000.00 |
| KT5401110 | Quick Pace Solution Kit ***only for existing C3 Systems with Serial #'s <13000 | EA | 1 | $10,000.00 | $15,000.00 |
| M490006A | SmartAblate System (SuperKit). | EA | 1 | $45,000.00 | $60,000.00 |
| M4902 | SmartAblate™ System (SuperKit) - 2 each on one PO. | EA | 1 | $85,500.00 | $120,000.00 |
| M4903 | SmartAblate™ System (SuperKit) - 3 each on one PO. | EA | 1 | $121,500.00 | $180,000.00 |
| M4904 | SmartAblate™ System (SuperKit) - 4 each on one PO. | EA | 1 | $135,000.00 | $240,000.00 |
| M4905 | SmartAblate™ System (SuperKit) - 5 each on one PO. | EA | 1 | $156,150.00 | $300,000.00 |

Ascension Health Resource and Supply Management Group, LLC – Confidential
RSMG-6394
4818-5212-6250, v. 6

Page 39 of 61
Appendix B-2

HIGHLY CONFIDENTIAL                    JX-1431, Page 39 of 61                    BWI-INN00067095

APPENDIX B-3
SERVICES PRICING INFORMATION

**Table 1: Pricing for Service Offerings:**

| Manufacturer Catalog No. | Description | List Price | Contracted Price |
|---|---|---|---|
| C3PRW1 | CARTO® 3 System Premium Service Agreement - One Year | $60,000.00 | $47,500.00 |
| C3PRWSA1 | CARTO® 3 System Premium Service Agreement and SmartAblate™ System Service Agreement - One Year | $70,000.00 | $57,500.00 |
| C3PRWSA2 | CARTO® 3 System Premium Service Agreement and SmartAblate™ System Service Agreement - Two Year | $125,000.00 | $105,000.00 |
| C3PRWSAOCE2 | CARTO® 3 System Premium Service Agreement and SmartAblate™ System Service Agreement and Optimized Carto Experience Module Package- Two Year | $145,000.00 | $125,000.00 |
| WARRANTYEXT | Stockert Standard Service Agreement - One Year | $3,500.00 | $3,500.00 |
| WARRANTYEXT | Stockert w Remote Control Standard Service Agreement - One Year | $4,000.00 | $4,000.00 |
| SVSA | SmartAblate™ System Service Agreement - One Year | $12,000.00 | $9,000.00 |

**Table 2: Rates for Time and Materials Services:**

| Description | Contract Price | List Price |
|---|---|---|
| Field Service:  Price per hour (4-hour minimum) | $395 (4 hour Minimum) | $395 (4 hour Minimum) |
| In-House Service:  Price per hour (4-hour minimum) | $295 (4 hour Minimum) | $295 (4 hour Minimum) |

Ascension Health Resource and Supply Management Group, LLC – Confidential
RSMG-6394
4818-5212-6250, v. 6

APPENDIX C
SERVICE OFFERINGS

The terms and conditions set forth in this Appendix C ("Services Agreement") are subject to the terms and conditions of the 3D EP Mapping System Equipment, Accessories, and Service Purchase Agreement dated February 1, 2016, between Biosense Webster, Inc. ("Supplier") and Ascension Health Resource and Supply Management Group, LLC ("The Resource Group") ("Purchase Agreement"). In the event of a conflict between the service agreements contained in this Services Agreement and the Purchase Agreement, the Purchase Agreement shall control.

Participant and/or Clinical Engineering may terminate any Purchase Order applicable to this Appendix C without cause upon thirty (30) days prior written notice.  Participant and/or Clinical Engineering may cancel any unperformed Services without cause at any time. In the event of early termination, Supplier shall refund or charge the difference between the amount paid by Participant hereunder and the value of Services provided by Supplier hereunder from the effective date to the date of termination of a Services Agreement.  Supplier shall determine the value of the Services provided as the greater of (A) the amount equal to the value of all parts and labor supplied by Supplier up to the date of termination calculated at the prices prevailing at the dates such parts and labor were supplied, or (B) the remaining, non-discounted amortized value of the Services Agreement. In the event that the term of any Services Agreement exceeds the term of the Purchase Agreement due to expiration or early termination of the Purchase Agreement, Participant and/or Clinical Engineering and Supplier shall continue to operate under the terms and conditions of the Purchase Agreement for any Services purchased that may extend beyond the term of the Purchase Agreement.

A Participant or Clinical Engineering may amend the level of support or maintenance with Supplier upon thirty (30) days written notice at any time following the expiration of the Equipment Warranty Period, and may add Equipment to be supported upon five (5) days' notice without penalty. If the change results in a lower priced level of Support, the Participant or Clinical Engineering will be credited this amount.

HIGHLY CONFIDENTIAL
BWI-INN00067097

APPENDIX C-1

Extended Warranty Service Agreement Terms and Conditions – CARTO® 3 SYSTEM

**Defined Terms.** "Equipment" shall mean the CARTO® 3 System.
"Extended Warranty Service Agreement" period is defined as a warranty period on the Equipment after the Equipment Warranty Period has expired.
**Term.** Pursuant to this service agreement (the "Agreement"), Supplier ("BWI") agrees to maintain and service the Equipment for PARTICIPANT for a period beginning on the date indicated on PARTICIPANT's purchase order and continuing for the period of service purchased by PARTICIPANT.
**Maintenance.** BWI shall provide maintenance for the Equipment not less frequently than annually during the term of this Agreement. Such maintenance shall include, without limitation, those actions BWI considers necessary to ensure proper operation of the Equipment. Annual maintenance will be scheduled, upon BWI's or PARTICIPANT's request, between 7 a.m. and 5 p.m. local time Monday through Friday excluding BWI holidays ("Working Hours"). BWI may perform annual maintenance concurrently with functional maintenance and, in that event, such maintenance may be unscheduled. BWI shall provide all necessary replacement parts for the maintenance of the Equipment during the term of the Agreement at no cost to PARTICIPANT, subject to the Agreement exclusions set forth below. Replacement parts may be new parts or rebuilt parts that are equivalent in the judgment of BWI to new parts when used in connection with the Equipment. Replacement parts will be warranted for the balance of the Agreement. All replaced parts will become the property of BWI. PARTICIPANT shall provide reasonable access to the Equipment for maintenance. Any service not covered by this Agreement will be quoted by separate quotation.
**Service for CARTO® 3System.** Service will be provided at PARTICIPANT's location upon request for the purpose of making necessary repairs and adjustments to maintain the CARTO® 3System. BWI will use commercially reasonable efforts to provide service as quickly as possible and on a priority basis for emergencies. In situations where this response time is neither practical nor warranted, the service call will be scheduled at a time during Working Hours mutually agreed upon by BWI and PARTICIPANT. In addition to the foregoing services, subject to PARTICIPANT contacting the BWI Technical Services Department and obtaining prior approval before returning the items for repair, PARTICIPANT may return components of the CARTO® 3System to BWI for repair. Freight and transportation charges for such components will be the responsibility of BWI. BWI will use commercially reasonable efforts to provide PARTICIPANT with temporary replacement components while the repair is being completed. No C.O.D. shipments will be accepted without prior authorization. The decision to repair or replace any parts of the Equipment will be made by BWI.
**Responsibilities of PARTICIPANT.** PARTICIPANT agrees to make the Equipment available for service at the time of each scheduled maintenance or emergency service call. PARTICIPANT must operate, maintain and care for the Equipment in accordance with the instructions in the Documentation and in this Agreement.

**General Exclusions.** BWI shall not be obligated to provide service under this Agreement for damage to or destruction of the Equipment where such damage or destruction is a result of or caused by fire or explosion of any origin, riot, civil commotion, aircraft, war, or any Act of God including but not limited to lightning, windstorm, hail, flood, or earthquake. This Agreement also specifically excludes:

(a) consumables/ disposables/ expendables;
(b) damage or faulty operation due to unauthorized repair;
(c) use of incorrect power supply;
(d) damage or malfunction due to use of attachments or devices not provided by BWI in connection with the Equipment.
(e) damage or malfunction due to use of consumables/disposables/expendables other than those manufactured and distributed by BWI, if such items caused or contributed to the malfunction;
(f) physical damage due to incorrect use, abuse, or misuse solely and directly attributable to Participant;

(g) damage or malfunction due to modifications of the Equipment not authorized in writing by BWI;
(h) damage or malfunction due to accessories not listed or included in this Agreement;
(i) damage or malfunction due to any action other than the proper use or handling of this machine, as provided by the Documentation;
(j) damage or malfunction due to accident, abuse, misuse, modification, damage during shipment for repair and service solely and directly attributable to Participant; and
(k) damage or malfunction due to service or installation by anyone other than an authorized BWI Service Representative or Clinical Engineering

**Excluded Parts.**
(a) Body Surface ECG cable
(b) IC out cable
(c) RF generator cables
(d) Printer, printer cartridges and paper

(e) EOD/CD/DVD media
(f) Body Surface out cable
(g) Workstation Cart
(h) Hardware enhancements

(i) Consumables/Disposables
(j) Power strips
(k) Isolation Transformer
(l) Fuses

(m) Parallel data cables
(n) Table adaptors
(o) Video cables

**Consumables/Disposables/Expendables:** Include cables or components that require sterilization or that are disposed of upon conclusion of the procedure.
**Wear and Tear:** Defined as loss, damage or depreciation resulting from ordinary use and exposure of Equipment.
**Equipment Location.** This Agreement applies only if the Equipment is located at the location where BWI initially installed the Equipment or at another location of which BWI approved. Any resale, removal, or relocation of the Equipment without the prior approval of BWI will result in automatic cancellation of this Agreement.
**Excluded Labor. All labor not covered by this Agreement will be invoiced door-to-door at the current service rate.** The billable rate for field service is $395 per hour for travel and labor with a 4-hour minimum charge. The billable rate for in-house service is $295 per hour for labor with a 4-hour minimum charge. PARTICIPANT will be advised prior to or during a service call if the service is not covered by this Agreement. Services not covered by this Agreement will be separately invoiced and are payable to BWI within thirty (30) days of invoice.
**Parts Billing.** Parts not covered by this Agreement that are installed by BWI during service or repair will be separately invoiced and are payable to BWI within thirty (30) days of invoice. Parts will be billed at the current list price.

Ascension Health Resource and Supply Management Group, LLC – Confidential
RSMG-6394
4818-5212-6250, v. 6

Page 42 of 61
Appendix C-1

HIGHLY CONFIDENTIAL          JX-1431, Page 42 of 61          BWI-INN00067098

DocuSign Envelope ID: 246215EB-3D9D-4638-AC2C-53E53A095677

**Equipment Modifications.**  BWI reserves the right to make changes to the Equipment built and/or sold at any time without incurring any obligation to make the same or similar changes on Equipment previously built or sold unless the modification is pursuant to a regulatory change under Section 6.1.2 of Appendix A.

**Termination.**  Participant may terminate this Agreement by giving sixty (60) days prior written notice to BWI.  In the event the Agreement is terminated, BWI shall refund or charge the difference between the amount paid by PARTICIPANT hereunder and the value of services provided by BWI hereunder from the effective date to the date of termination of the Agreement.  BWI shall determine the value of the services provided as the greater of (A) the amount equal to the value of all parts and labor supplied by BWI up to the date of termination calculated at the prices prevailing at the dates such parts and labor were supplied, or (B) the remaining, non-discounted amortized value of the Agreement.

**Property Rights.**  Any ideas, concepts, know-how, or techniques that BWI may develop during the performance of this Agreement shall be the sole and exclusive property of BWI.

**Publicity and Trademarks.** Each party shall not, and shall cause its affiliates not to, (1) issue any press release or make any announcement regarding this Agreement or (2) use the name or any trademarks or service marks of the other party or any of its affiliates without the prior written consent of the other party.

APPENDIX C-2
Premium Service Agreement Terms and Conditions – CARTO® 3 SYSTEM

**Defined Terms.**  "Equipment" shall mean the CARTO® 3 System.
" Premium Service Agreement" shall mean a valid service agreement on the "Equipment".
**Term.**  Pursuant to this service agreement (the "Agreement"), Supplier ("BWI") agrees to maintain and service the Equipment for PARTICIPANT for a period beginning on the date indicated on PARTICIPANT's purchase order and continuing for the period of service purchased by PARTICIPANT.
**Maintenance.**  BWI shall provide maintenance for the Equipment not less frequently than annually during the term of this Agreement. Such maintenance shall include, without limitation, those actions BWI considers necessary to ensure proper operation of the Equipment. Annual maintenance will be scheduled, upon BWI's or PARTICIPANT's request, between 7 a.m. and 5 p.m. local time Monday through Friday excluding BWI holidays ("Working Hours"). BWI may perform maintenance concurrently with functional maintenance and, in that event, such maintenance may be unscheduled. BWI shall provide all necessary replacement parts for the maintenance of the Equipment during the term of the Agreement at no cost to PARTICIPANT, subject to the Agreement exclusions set forth below. Replacement parts may be new parts or rebuilt parts that are equivalent in the judgment of BWI to new parts when used in connection with the Equipment. Replacement parts will be warranted for the balance of the Agreement. All replaced parts will become the property of BWI. PARTICIPANT shall provide reasonable access to the Equipment for maintenance. Any service not covered by this Agreement will be quoted by separate quotation.
**Service for CARTO® 3 System.**  Service will be provided at PARTICIPANT's location upon request for the purpose of making necessary repairs and adjustments to maintain the CARTO® 3 System. BWI will use commercially reasonable efforts to provide service as quickly as possible and on a priority basis for emergencies. In situations where this response time is neither practical nor warranted, the service call will be scheduled at a time during Working Hours mutually agreed upon by BWI and PARTICIPANT.  In addition to the foregoing services, subject to PARTICIPANT contacting the BWI Technical Services Department and obtaining prior approval before returning the items for repair, PARTICIPANT may return components of the CARTO® 3 System to BWI for repair. Freight and transportation charges for such components will be the responsibility of BWI. BWI will use commercially reasonable efforts to provide PARTICIPANT with temporary replacement components while the repair is being completed. No C.O.D. shipments will be accepted without prior authorization. The decision to repair or replace any parts of the Equipment will be made by BWI.
**Responsibilities of PARTICIPANT.**  PARTICIPANT agrees to make the Equipment available for service at the time of each scheduled maintenance or emergency service call. PARTICIPANT must operate, maintain and care for the Equipment in accordance with the instructions in the Documentation and in this Agreement

**General Exclusions.**  BWI shall not be obligated to provide service under this Agreement for damage to or destruction of the Equipment where such damage or destruction is a result of or caused by fire or explosion of any origin, riot, civil commotion, aircraft, war, or any Act of God including but not limited to lightning, windstorm, hail, flood, or earthquake.  This Agreement also specifically excludes:

(a) consumables/ disposables/ expendables;
(b) damage or faulty operation due to unauthorized repair;
(c) use of incorrect power supply;
(d) damage or malfunction due to use of attachments or devices not provided by BWI in connection with the Equipment.
(e) damage or malfunction due to use of consumables/disposables/expendables other than those manufactured and distributed by BWI, if such items caused or contributed to the malfunction;
(f) physical damage due to incorrect use, abuse, or misuse solely and directly attributable to Participant;

(g) damage or malfunction due to modifications of the Equipment not authorized in writing by BWI;
(h) damage or malfunction due to accessories not listed or included in this Agreement;
(i) damage or malfunction due to any action other than the proper use or handling of this machine, as provided by the Documentation;
(j) damage or malfunction due to accident, abuse, misuse, modification, damage during shipment for repair and service; and
(k) damage or malfunction due to service or installation by anyone other than an authorized BWI Service Representative or Clinical Engineering.

**Excluded Parts.**
(a) Printer cartridges and paper    (b) CD/DVD media       (c) Power Strip      (d) Fuses

**Accidental Damage Coverage:** Notwithstanding the previous section on "General Exclusions", BWI will cover one (1) occurrence of physical damage caused to the Equipment if such damage occurred in accordance with normal operation of the Equipment as per BWI training on normal operation of the Equipment. To request Accidental Damage coverage, Participant must contact BWI. within twenty-four (24) hours of first knowledge of such damage. By definition, "one occurrence of physical damage" will mean a SINGLE event of damage to the Equipment and NOT damage one (1) time to each piece of Equipment
**Consumables/Disposables/Expendables:** Include cables or components that require sterilization or that are disposed of upon conclusion of the procedure.
**Wear and Tear:** Defined as loss, damage or depreciation resulting from ordinary use and exposure of Equipment.
**Equipment Location.**  This Agreement applies only if the Equipment is located at the location where BWI initially installed the Equipment or at another location of which BWI approved. Any resale, removal, or relocation of the Equipment without the prior approval of BWI will result in automatic cancellation of this Agreement.
**Excluded Labor.**  **All labor not covered by this Agreement will be invoiced door-to-door at the current service rate.** The billable rate for field service is $395 per hour for travel and labor with a 4-hour minimum charge.   The billable rate for in-house service is $295 per hour for labor with a 4-hour minimum charge. PARTICIPANT will be advised prior to or during a service call if the service is not covered by this Agreement.  Services not covered by this Agreement will be separately invoiced and are payable to BWI within thirty (30) days of invoice.
**Parts Billing.**  Parts not covered by this Agreement that are installed by BWI during service or repair will be separately invoiced and are payable to BWI within thirty (30) days of invoice.  Parts will be billed at the current list price.

Ascension Health Resource and Supply Management Group, LLC – Confidential                     Page 44 of 61
RSMG-6394                                                                                       Appendix C-2
4818-5212-6250, v. 6

HIGHLY CONFIDENTIAL                    JX-1431, Page 44 of 61                    BWI-INN00067100

**Equipment Modifications.** BWI reserves the right to make changes to the Equipment built and/or sold at any time without incurring any obligation to make the same or similar changes on Equipment previously built or sold unless the modification is pursuant to a regulatory change under Section 6.1.2 of Appendix A.

**Termination.** Participant may terminate this Agreement by giving sixty (60) days prior written notice to BWI. In the event the Agreement is terminated, BWI shall refund or charge the difference between the amount paid by PARTICIPANT hereunder and the value of services provided by BWI hereunder from the effective date to the date of termination of the Agreement. BWI shall determine the value of the services provided as the greater of (A) the amount equal to the value of all parts and labor supplied by BWI up to the date of termination calculated at the prices prevailing at the dates such parts and labor were supplied, or (B) the remaining, non-discounted amortized value of the Agreement.

**Property Rights.** Any ideas, concepts, know-how, or techniques that BWI may develop during the performance of this Agreement shall be the sole and exclusive property of BWI.

**Publicity and Trademarks.** Each party shall not, and shall cause its affiliates not to, (1) issue any press release or make any announcement regarding this Agreement or (2) use the name or any trademarks or service marks of the other party or any of its affiliates without the prior written consent of the other party.

Ascension Health Resource and Supply Management Group, LLC – Confidential
RSMG-6394
4818-5212-6250, v. 6

Page 45 of 61
Appendix C-2

HIGHLY CONFIDENTIAL          JX-1431, Page 45 of 61          BWI-INN00067101

APPENDIX C-3
Standard Service Agreement Terms and Conditions - STOCKERT 70 GENERATOR

**Defined Terms.** "Equipment" shall mean the Stockert 70 Generator.

**Term.** Pursuant to this service agreement (the "Agreement"), Supplier ("BWI") agrees to maintain and service the Equipment for PARTICIPANT for a period beginning on the date indicated on PARTICIPANT's purchase order and continuing for the period of service purchased by PARTICIPANT.

**Maintenance.** BWI shall provide preventive maintenance for the Equipment not less frequently than annually during the term of this Agreement. Such maintenance shall include without limitation those actions BWI considers necessary to ensure proper operation of the Equipment. Preventive maintenance will be scheduled upon BWI's or PARTICIPANT's request, between 7 a.m. and 5 p.m. local time Monday through Friday excluding BWI holidays ("Working Hours"). BWI may perform preventive maintenance concurrently with functional maintenance and in that event such maintenance may be unscheduled. BWI shall provide all necessary replacement parts for the maintenance of the Equipment during the term of the Agreement at no cost to PARTICIPANT, subject to the Agreement exclusions set forth below. Replacement parts may be new parts or rebuilt parts that are equivalent in the judgment of BWI to new parts when used in connection with the Equipment. Replacement parts will be warranted for the balance of the Agreement. All replaced parts will become the property of BWI. PARTICIPANT shall provide reasonable access to the Equipment for maintenance. Any service not covered by this Agreement will be quoted by separate quotation and undertaken only with written approval from Customer.

**Service for Stockert 70 Generator.** Service on the Stockert 70 Generator is generally done at BWI, not in the field. In most cases, PARTICIPANT will send the Stockert 70 Generator to BWI for service at BWI's expense. In rare circumstances, it may be necessary for BWI to perform field service for the Stockert 70 Generator. BWI will provide PARTICIPANT with a loaner Stockert 70 Generator when it is deemed necessary by BWI. Loaners are subject to availability and must be returned upon receipt of original unit or an additional charge may apply.

**Responsibilities of PARTICIPANT.** PARTICIPANT agrees to make the Equipment available for service at the time of each scheduled preventive maintenance or emergency service call. PARTICIPANT must operate, maintain and care for the Equipment in accordance with the instructions in the Documentation and in this Agreement.

**General Exclusions.** BWI shall not be obligated to provide service under this Agreement for damage to or destruction of the Equipment where such damage or destruction is a result of or caused by fire or explosion of any origin, riot, civil commotion, aircraft, war, or any Act of God including but not limited to lightning, windstorm, hail, flood, or earthquake. This Agreement also specifically excludes:

(a) consumables/ disposables/ expendables;
(b) physical damage due to incorrect use, abuse, or misuse solely and directly attributable to Participant;
(c) damage or faulty operation due to unauthorized repair;
(d) use of incorrect power supply;
(e) damage or malfunction due to use of attachments or devices not provided by BWI in connection with the Equipment.
(f) damage or malfunction due to use of consumables/disposables/expendables other than those manufactured and distributed by BWI, if BWI determines that such items caused or contributed to the malfunction;

(g) damage or malfunction due to modifications of the Equipment not authorized in writing by BWI;
(h) damage or malfunction due to accessories not listed or included in this Agreement;
(i) damage or malfunction due to any action other than the proper use or handling of this machine, as provided by the Documentation;
(j) damage or malfunction due to accident, abuse, misuse, modification, damage during shipment for repair and service solely and directly attributable to Participant; and
(k) damage or malfunction due to service or installation by anyone other than an authorized BWI Service Representative or Clinical Engineering.

**Excluded Parts.**

| | | | |
|---|---|---|---|
| (a) Body Surface ECG cable | (e) EOD media | (i) Consumables/Disposables | (m) Parallel cables |
| (b) IC out cable | (f) DAT tape media | (j) Power strips | (n) Table adaptors |
| (c) RF generator cables | (g) Carts | (k) Isolation Transformer | (o) Video cables |
| (d) Printer, printer cartridges and paper | (h) Hardware enhancements | (l) Fuses | |

**Equipment Location.** This Agreement applies only if the Equipment is located at the location where BWI initially installed or shipped the Equipment or at another location of which BWI approved. Any resale, removal, or relocation of the Equipment without the prior approval of BWI will result in automatic cancellation of this Agreement.

**Excluded Labor.** All labor not covered by this Agreement will be invoiced door-to-door at the current service rate and only with prior approval of Participant. The billable rate for field service is $395 per hour for travel and labor with a 4-hour minimum charge. The billable rate for in-house service is $295 per hour for labor with a 4-hour minimum charge. PARTICIPANT will be advised prior to or during a service call if the service is not covered by this Agreement. Services not covered by this Agreement will be separately invoiced and are payable to BWI within thirty (30) days of invoice.

**Parts Billing.** Parts not covered by this Agreement that are installed by BWI during service or repair will be separately invoiced and are payable to BWI within 30 days of invoice. Parts will be billed at the current list price.

**Equipment Modifications.** BWI reserves the right to make changes to the Equipment built and/or sold at any time without incurring any obligation to make the same or similar changes on Equipment previously built or sold unless the modification is pursuant to a regulatory change under Section 6.1.2 of Appendix A.

**Termination.** Participant may terminate this Agreement by giving sixty (60) days prior written notice to BWI. In the event the Agreement is terminated, BWI shall refund or charge the difference between the amount paid by PARTICIPANT hereunder and the value of services provided by BWI hereunder from the effective date to the date of termination of the Agreement. BWI shall determine the value of the services provided as the greater of (A) the amount equal to the value of all parts and labor supplied by

Ascension Health Resource and Supply Management Group, LLC – Confidential
RSMG-6394
4818-5212-6250, v. 6

Page 46 of 61
Appendix C-3

HIGHLY CONFIDENTIAL          JX-1431, Page 46 of 61          BWI-INN00067102

DocuSign Envelope ID: 246315EB-3D9D-4638-AC2C-53553A095677

BWI up to the date of termination calculated at the prices prevailing at the dates such parts and labor were supplied, or (B) the remaining, non-discounted amortized value of the Agreement.

**Property Rights.**  Any ideas, concepts, know-how, or techniques that BWI may develop during the performance of this Agreement shall be the sole and exclusive property of BWI.

**Publicity and Trademarks.** Each party shall not, and shall cause its affiliates not to, (1) issue any press release or make any announcement regarding this Agreement or (2) use the name or any trademarks or service marks of the other party or any of its affiliates without the prior written consent of the other party.

HIGHLY CONFIDENTIAL                    JX-1431, Page 47 of 61                    BWI-INN00067103

APPENDIX C-4
Standard Service Agreement Terms and Conditions - SMARTABLATE GENERATOR

**Defined Terms.** "Equipment" shall mean the SMARTABLATE™ System (RF Generator, Irrigation Pump & Remote Control)
Term.   Pursuant to this warranty (the "Warranty"), Supplier ("BWI") agrees to maintain and service the Equipment for
PARTICIPANT for a period beginning on the date indicated on PARTICIPANT's purchase order and continuing for the period of one
(1) year.
**Maintenance.**  BWI shall provide preventive maintenance for the Equipment not less frequently than annually during the term of this
Warranty. Such maintenance shall include without limitation those actions BWI considers necessary to ensure proper operation of
the Equipment.  Preventive maintenance will be scheduled upon BWI's or PARTICIPANT's request, between 7 a.m. and 5 p.m.
("Working Hours") local time Monday through Friday excluding BWI holidays.  BWI may perform preventive maintenance
concurrently with functional maintenance and in that event such maintenance may be unscheduled.  BWI shall provide all necessary
replacement parts for the maintenance of the Equipment during the term of the Warranty at no cost to PARTICIPANT, subject to the
Warranty exclusions set forth below.  Replacement parts may be new parts or rebuilt parts that are equivalent in the judgment of
BWI to new parts when used in connection with the Equipment.  Replacement parts will be warranted for the balance of the
warranty. All replaced parts will become the property of BWI.  PARTICIPANT shall provide reasonable access to the Equipment for
maintenance.  Any service not covered by this warranty will be quoted by separate quotation and under taken only with written
approval from Customer.
**Service for SMARTABLATE™ System Service** on the SMARTABLATE™ System is generally done at BWI, not in the field. In most
cases, PARTICIPANT will send their equipment to BWI for service at BWI's expense. In rare circumstances, it may be necessary
for BWI to perform field service for the equipment. BWI will provide PARTICIPANT with a loaner equipment when it is deemed
necessary by BWI.  Loaners are subject to availability and must be returned upon receipt of original unit. A Loaner Rental charge
would be levied if the Loaner is not returned back within three (3) business days of the receipt of the original unit.
**Responsibilities of PARTICIPANT.**  PARTICIPANT agrees to make the Equipment available for service at the time of each
scheduled preventive maintenance or emergency service call. PARTICIPANT must operate, maintain and care for the Equipment in
accordance with the instructions in the Documentation.
**General Exclusions.**   BWI shall not be obligated to provide service under this Warranty for damage to or destruction of the
Equipment where such damage or destruction is a result of or caused by fire or explosion of any origin, riot, civil commotion, aircraft,
war, or any Act of God including but not limited to lightning, windstorm, hail, flood, or earthquake.  This Warranty also specifically
excludes:

(a) consumables/ disposables/ expendables;
(b) physical damage due to incorrect use, abuse, or misuse
solely and directly attributable to Participant;
(c) damage or faulty operation due to unauthorized repair;
(d) use of incorrect power supply;
(e) damage or malfunction due to use of attachments or
devices not provided by BWI in connection with the
Equipment.
(f)   damage   or   malfunction   due   to   use   of
consumables/disposables/expendables other than those
manufactured and distributed by BWI, if such items caused or
contributed to the malfunction;

(g) damage or malfunction due to modifications of the
Equipment not authorized in writing by BWI;
(h) damage or malfunction due to accessories not listed or
included in this Warranty;
(i) damage or malfunction due to any action other than the
proper use or handling of this machine, as provided by the
Documentation;
(j) damage or malfunction due to accident, abuse, misuse,
modification, damage during shipment for repair and service
solely and directly attributable to Participant; and
(k) damage or malfunction due to service or installation by
anyone other than an authorized BWI Service Representative or
Clinical Engineering.

**SMARTABLATE™ System Warranty Included Parts.**
(a) SMARTABLATE™ RF        (b) SMARTABLATE™ Pump              (c) SMARTABLATE™ Remote
Generator
**Excluded Parts.**
(a) Gen-Rem Cable          (e) Hardware Enhancements          (i) Power cords              (m) ablation cables and  tubing
(b) Gen-Pump Cable         (f) Isolation Transformer          (j) Ground Cable
(c)    SCom   Recording   /  (g) Fuses                        (k) Foot Pedal
Carto Cable
(d) Carts and cart shelf    (h) Table Adaptors               (l) Pole clamp
**Equipment Location.**  This Warranty applies only if the Equipment is located at the location where BWI initially installed or shipped
the Equipment or at another location of which BWI approved.  Any resale, removal, or relocation of the Equipment without the prior
approval of BWI will result in automatic cancellation of this Warranty.
**Excluded Labor.**  All labor not covered by this warranty will be invoiced door-to-door at the current service rate and only with prior
approval of Participant. The billable rate for field service is $395 per hour for travel and labor with a 4-hour minimum charge.   The
billable rate for in-house service is $295 per hour for labor with a 4-hour minimum charge.  Participant will be advised prior to or
during a service call if the service is not covered by this warranty. Services not covered by this warranty will be separately invoiced
and are payable to BWI within thirty (30) days of invoice.
**Parts Billing.**  Parts not covered by this warranty that are installed by BWI during service or repair will be separately invoiced and
are payable to BWI within thirty (30) days of invoice.  Parts will be billed at the current list price.
**Equipment Modifications.**  BWI reserves the right to make changes to the Equipment built and/or sold at any time without incurring
any obligation to make the same or similar changes on Equipment previously built or sold unless the modification is pursuant to a
regulatory change under Section 6.1.2 of Appendix A.
**Termination.**  Participant may terminate this Warranty by giving sixty (60) days prior written notice to BWI.  In the event the
Warranty is terminated, BWI shall refund or charge the difference between the amount paid by PARTICIPANT hereunder and the
value of services provided by BWI hereunder from the effective date to the date of termination of the Warranty.  BWI shall determine
the value of the services provided as the greater of (A ) the amount equal to the value of all parts and labor supplied by BWI up to

Ascension Health Resource and Supply Management Group, LLC – Confidential                Page 48 of 61
RSMG-6394                                                                                 Appendix C-4
4818-5212-6250, v. 6

HIGHLY CONFIDENTIAL                    JX-1431, Page 48 of 61                    BWI-INN00067104

DocuSign Envelope ID: 246215FB-3D9D-4638-AC2C-52E53A095677

the date of termination calculated at the prices prevailing at the dates such parts and labor were supplied, or (B) the remaining, non-discounted amortized value of the Warranty.

**Property Rights.** Any ideas, concepts, know-how, or techniques that BWI may develop during the performance of this Warranty shall be the sole and exclusive property of BWI.

**Publicity and Trademarks.** Each party shall not, and shall cause its affiliates not to, (1) issue any press release or make any announcement regarding this Warranty or (2) use the name or any trademarks or service marks of the other party or any of its affiliates without the prior written consent of the other party.

HIGHLY CONFIDENTIAL          JX-1431, Page 49 of 61          BWI-INN00067105

DocuSign Envelope ID: 24621EFB-3D9D-4638-AC2C-53E53A095677

APPENDIX D
REBATES

Intentionally deleted.

HIGHLY CONFIDENTIAL

BWI-INN00067106

APPENDIX E
SALES DATA RECORD LAYOUT

**Instructions**

This document provides the Record Layout for Sales source detail.  Please use an Excel Spreadsheet.
Numeric fields may be zero filled to the left (but it is not required).  All decimal positions are explicit, a
decimal point is required.  Invoices and credits both are to be extracted in this process.  Fields should not
be enclosed by "quotes".

The RSMG Member ID needed in the file can be obtained from our participant roster located at
Participant roster download link: http://www.ascensionhealth.org/communication/vendorparticipants.xls.

Sales data is to be supplied monthly unless otherwise specified in contract.  The files can be sent by
email to MOSTL-MB-DataIntegr@ascensionhealth.org.  Questions can be answered by calling GPO
Vendor Assistance Team at 314.733.6499.

*** For Services related contracts please see notes in descriptions for field to determine proper value. If
you still have questions on what a value should be please contact GPO Vendor Assistance Team at
314.733.6499.
**Sales Data Layout – Line Item Detail**
**Source:** Vendor    **Type:** Excel Spreadsheet
**Description:** Sales detail extract file provided by the vendor.
<u>NOTE – For credits, please provide a negative quantity and a positive transaction unit price</u>

| Field Name | Description |
| --- | --- |
| Ship to Customer # | Customer number of the facility where product is shipped |
| Ship to Name | Name of location receiving product |
| Ship to Street Address | Street address of location receiving product. |
| Ship to City | City of location receiving product. |
| Ship to State | State of location receiving product. |
| Ship to Zip Code | Zip Code of location receiving product. |
| UOM | ANSI unit of measure.  Represents the shipping container.  *** For services related contracts if UOM is not applicable please use 'EA' |
| Content | Content of the smallest UOM, ex. When a CASE contains 12 EACH, then the Content is 12. May be known as "conversion factor." (Numeric value only)  *** For services related contracts if Content is not applicable please use '1'. |
| Basic Unit | Smallest defined unit of measure for this item. (i.e., "EA").  Should be an ANSI unit of measure value.  *** For services related contracts if Basic Unit is not applicable please use 'EA' |
| Quantity | Quantity purchased based on UOM.  Must be negative for credits. (Numeric Value Only)  *** For services related contracts if Quantity is not applicable please use '1'. |
| Unit Price | Cost per Unit of Measure purchased. Include up to 4 decimals places.  Based on US currency. |
| Total Purchase Amount | Total dollar amount of the purchase based on quantity purchased and the unit price. Include up to 4 decimal places. Based on US currency. |
| Total Administrative Fee | Total dollar amount of the admin fee associated with the quantity and/or purchase amount. |
| Admin Fee % | For example, 3% Total Spend |
| Manufacturer Parent | Required field |
| Manufacturer Division | May be the same as Parent.  Required field |
| Manufacturer Catalog Number | Manufacturer Item Number.  *** For services related contracts if Manufacturer Catalog Number is not applicable please use generic value like 'Maintenance', 'Inspection', 'Labor', 'Supplies' etc. followed by' / '(slash) and Invoice number.  Example Labor/123456789 |
| Item Description | Item name and/or description. |
| National Contract Number | Ascension Health assigned contract number. |
| The Resource Group - Member Id | Field is required.  The data value is available from the RSMG Participant List. |
| Purchase Date | (MM/DD/YYYY)  Year and month of Purchase |
| Purchase Order # | |
| Invoice # | |

APPENDIX F
AUTHORIZED DISTRIBUTORS

Intentionally deleted.

Ascension Health Resource and Supply Management Group, LLC – Confidential
RSMG-6394
4818-5212-6250, v. 6

Page 52 of 61
Appendix F

HIGHLY CONFIDENTIAL                    JX-1431, Page 52 of 61                    BWI-INN00067108

APPENDIX G
SAMPLE CONSIGNMENT INVENTORY AGREEMENT

Intentionally deleted.

HIGHLY CONFIDENTIAL

JX-1431, Page 53 of 61

BWI-INN00067109

APPENDIX H-1
SUPPLIER'S RETURN GOODS POLICY (NON-EQUIPMENT)

**Authorization:**
A Return Goods Authorization number must be obtained prior to returning Supplier products. To request return authorization, contact Johnson and Johnson Health Care Systems Customer Service at 800-255-2500 (toll-free in the Continental U.S.). Please be prepared to provide the following information: Catalog number, quantity, lot or serial number and reason for return for each item you wish to return.

Once an authorization number is acquired, products should be returned to Supplier within thirty (30) days, in proper protective packaging, with freight/postage prepaid.

**Return Product Conditions:**
All products must be in their original shipped condition, as determined by Supplier, for return credit consideration. If any of the following conditions exist, the product(s) will not be considered for credit:
- Product is not in the original sealed package or other Supplier standard packaging.
- Markings or stickers have been added on the outside label of the Supplier product packaging.
- Product packaging is defaced in any manner.
- Packaging is opened.
- Product has been used.
- Product has been damaged.
- Product was purchased on a "special order" or "made-to-order" basis.
- Product is returned without a Return Goods Authorization.
- Product was held by the Participant for more than one hundred eighty (180) days.
- Credit will be given only after the product has been received and inspected.

**Credit Policy for Unused Products in their Original Shipped Condition:**

**Full credit:**
Product returned within ninety (90) days from the date of purchase (determined by the invoice date).

**75% credit:**
Product returned between 91-120 days from the date of invoice.

**50% credit:**
Product returned between 121-180 days from the date of invoice.

**No credit will be given for products returned after one hundred eighty (180) days from the date of invoice.**

**Product Complaints:**
This policy does not address product complaints. All product complaints should be handled by calling the Clinical and Technical Support Center at 866-473-7823.

**Hardware-related Returns:**

- This policy does not apply to hardware returns.

Ascension Health Resource and Supply Management Group, LLC – Confidential
RSMG-6394
4818-5212-6250, v. 6

Page 54 of 61
Appendix H-1

HIGHLY CONFIDENTIAL          JX-1431, Page 54 of 61          BWI-INN00067110

APPENDIX H-2
SUPPLIER'S RETURN GOODS POLICY (EQUIPMENT)

If the Participant is not completely satisfied with any of the Equipment listed in <u>Appendix B-2</u>, the Participant may return the Equipment to Supplier for up to thirty (30) days from the date of delivery and receive a complete refund.

Ascension Health Resource and Supply Management Group, LLC – Confidential
RSMG-6394
4818-5212-6250, v. 6

Page 55 of 61
Appendix H-2

HIGHLY CONFIDENTIAL          JX-1431, Page 55 of 61          BWI-INN00067111

APPENDIX I
CLINICAL ENGINEERING TRAINING AGREEMENT

The terms and conditions set forth in this clinical engineering training agreement ("Training Agreement") by and between _____ ("Participant"), _____ ("Trainee") and Biosense Webster, Inc. ("Supplier") are subject to the terms and conditions of the 3D EP Mapping System Equipment, Accessories, and Service Purchase Agreement dated February 1, 2016, between Supplier and Ascension Health Resource and Supply Management Group, LLC ("The Resource Group") ("Purchase Agreement"). In the event of a conflict between this Training Agreement and the Purchase Agreement, the Purchase Agreement shall control.

1.  Trainee. Clinical engineering training shall be offered to Trainee who is an employee of or managed by Participant.

2.  Training. Trainee is receiving training for the following: _____ in accordance with Section 3.15 of the Agreement.

3.  Confidentiality. Participants and Trainee acknowledge that Trainee will be provided with access to information that includes Supplier's technical data and processes ("Training Information"). Trainee and Participant will treat such Training Information as Confidential Information under Section 7.1 of Appendix A of the Purchase Agreement but may use such Training Information without limitation to further Participant's business purposes. Notwithstanding the foregoing, Participant and Trainee agree that for a period of five (5) years from the date of disclosure each will retain in confidence all Training Information disclosed to them or obtained while visiting any Supplier facility or equipment site. This restriction shall not apply to any:

    a.  information which at the time of disclosure is in the public domain;

    b.  information which, after disclosure, becomes part of the public domain by publication or otherwise (through no fault of Trainee or Participant); or

    c.  information that Trainee or Participant lawfully receives from a third party without any obligation to keep such information confidential; or

    d.  information that Trainee or Participant can establish was in its possession prior to the time of disclosure and was not acquired, directly or indirectly, from Supplier (as such prior possession can be properly demonstrated by it); or

    e.  information Trainee or Participant can establish was independently developed by persons in its employ or otherwise who did not use or access Supplier's Training Information;

    f.  information that is required by law to be disclosed, provided that Participant or Trainee gives Supplier advance notice of the requirement for disclosure so that Supplier can take whatever action it deems necessary to protect the disclosure of its Training Information.

4.  Restrictions on Disclosure. If Participant is a clinical engineering services entity, Trainee agrees that Trainee will not disclose any Training Information to Trainee's customers, but Trainee may disclose such Training Information to Participant.

5.  Breach. In the event that Trainee breaches this Training Agreement through no fault of Participant, Supplier's sole and exclusive recourse shall be against Trainee.

6.  Injunctive Relief. Participant and Trainee acknowledge that any unauthorized use, disclosure or misappropriation of any of the Training Information in violation of this Training Agreement may cause harm to Supplier and further agree that, in the event of such a disclosure, Supplier shall be

HIGHLY CONFIDENTIAL

BWI-INN00067112

authorized and entitled to obtain immediate injunctive relief and any other relief or remedies to which Supplier may be entitled.

IN WITNESS WHEREOF, the undersigned duly authorized representatives of the parties have executed this Agreement as of the Effective Date.

PARTICIPANT

_____

By:_____

Name:_____

Title:_____


SUPPLIER

BIOSENSE WEBSTER, INC.

By:_____

Name:_____

Title:_____


TRAINEE

By: _____

Name:_____

Title:_____

HIGHLY CONFIDENTIAL    **JX-1431, Page 57 of 61**    BWI-INN00067113

APPENDIX J
ADVANTAGE SOFTWARE PROGRAM

The terms and conditions set forth in this <u>Appendix J</u> ("Program") are subject to the terms and conditions of the 3D EP Mapping System Equipment, Accessories, and Service Purchase Agreement dated February 1, 2016, between Biosense Webster, Inc. ("Supplier") and Ascension Health Resource and Supply Management Group, LLC ("The Resource Group") ("Purchase Agreement"). In the event of a conflict between the terms and conditions contained in this Program and the Purchase Agreement, the Purchase Agreement shall control.

1.1    <u>Participant Eligibility</u>.    In order to be eligible for this Program, the Participant must have purchased and installed a CARTO® 3 SYSTEM prior to initiating each transaction for New Software Upgrades (as defined below). The Participant will not be entitled to purchase any New Software Upgrades under this Program unless, at the time of purchase, the Participant is an acute-care facility, a hospital, or a free-standing walk-in center; does not purchase Products directly or indirectly under another agreement with Supplier or its affiliates; serves only the Participant's patients; and does not sell Products purchased under the Purchase Agreement at retail to the general public.

1.2    <u>New Software Upgrades</u>.    Subject to the terms and conditions of this Program set forth herein and solely during the term of the Electrophysiology Purchase Agreement (CV000002049), the Participant may acquire at no additional charge a single unit of new Software per CARTO® 3 SYSTEM, as listed in <u>Appendix J-1</u> (the "New Software Upgrades"). New Software Upgrades shall include all updates to Participant's existing software from Supplier as necessary for Supplier to install and Participant to fully utilize the New Software Upgrade, if any, that Supplier makes commercially available for purchase in the United States from the Effective Date and throughout the term of this 3D Mapping System Equipment, Accessories, and Service Purchase Agreement (CV000002049).    For clarity, under this Program only, Supplier shall have the sole discretion to determine what new products, if any, shall be deemed New Software Upgrades that are eligible for purchase..    New Software Upgrades shall not include, without limitation, (i) any item that Supplier deems to be a disposable product including, but not limited to, any form of catheter; or (ii) any item that is a product of a third-party entity that is not affiliated with Supplier or Johnson & Johnson that is first marketed and distributed by Supplier on or up to ninety (90) days prior to the Effective Date, due to an acquisition or license or other similar form of agreement that provides such marketing and distribution rights to Supplier or its affiliates, or (iii) any product that facilitates anatomical orientation, with integration of Fluoro Images or Cene loops as background to CARTO® 3 System maps or (iv) any generator. The parties acknowledge and agree that the Supplier is under no obligation to, and may not launch, any new product that shall be considered New Software Upgrades under this Program. Participant further acknowledges that this Program only requires the Supplier to provide New Software Upgrades approved by the U.S. Food and Drug Administration ("FDA") for marketing and upon full market launch by Supplier, and that Supplier will not accept any order for any New Software Upgrades which has not been so approved for marketing.

The Supplier has determined the Carto® 3 System ConfiDense™ Mapping Module and the Carto® 3 CartoReplay™ Module to be deemed New Software Upgrades that are eligible for acquisition under this Program for all Participants listed in <u>Appendix J-2</u>.  Any Participants not listed in <u>Appendix J-2</u> will not be eligible to receive the Carto® 3 System ConfiDense™ Mapping Module and the Carto® 3 CartoReplay™ Module under this Program.

1.3    <u>Pricing for New Software Upgrades</u>.  Pricing for the New Software Upgrade packages is set forth on <u>Appendix J-1</u> and is available to Participants and select future additional Participants listed on <u>Appendix J-2</u>. Supplier shall not be obligated to offer over forty-five (45) New Software Upgrade Packages.

1.4    <u>Purchases</u>.  The Participant shall issue a no charge Purchase Order to initiate each transaction for New Software Upgrades. Supplier's provision of New Software Upgrades without charge in accordance with such a Purchase Order shall be deemed a "purchase" by a Participant for purposes of the Program.

HIGHLY CONFIDENTIAL
BWI-INN00067114

DocuSign Envelope ID: 246215EB-3D9D-4638-AC2C-53553A095677

(a)  The Participant acknowledges and agrees that in the event of any return of any item of New Software Upgrades that was acquired under this Program, Supplier shall have no obligation to credit or refund any monetary amounts paid by the Participant pursuant to this Program.

(b)  With respect to each piece of New Software Upgrades, unless the Participant notifies Supplier in writing within ten (10) days of delivery, acceptance of the piece of New Software Upgrades will be deemed to have occurred.

(c)  Supplier owns all copyright, trade secret, patent, trademark and other proprietary rights in the Baseline Software included with Equipment purchased by the Participant and Enhancement Software, including all modifications and improvements thereto.  Title to any Baseline Software and Enhancement Software will not pass to the Participant, but will be licensed to the Participant as described in the Purchase Agreement.

HIGHLY CONFIDENTIAL    **JX-1431, Page 59 of 61**    BWI-INN00067115

APPENDIX J-1
NEW SOFTWARE UPGRADES

| TABLE 1 | | | | | |
| --- | --- | --- | --- | --- | --- |
| **Qty.** | **Cat No.** | **Description** | **Product Agreement Term*** | **List Price per Package** | **Amount per Contract Year** |
| Maximum of 45 Packages | ASA2015LT | Advantage Service Program | Available through the term of CV000002049 | $50,000 | $0.00 |
| | | | | **Total per Year** | $ N/A* |
| | | | | **Final Total** | $ N/A* |

Ascension Health Resource and Supply Management Group, LLC – Confidential
ASCENSION-112372-v2-RSMG-6394
4818-5212-6250, v. 6

Page 60 of 61
Appendix J-1

HIGHLY CONFIDENTIAL

JX-1431, Page 60 of 61

BWI-INN00067116

APPENDIX J-2
ELIGIBLE PARTICIPANTS **

**TABLE 2**

| Customer No. | Name | Address | City | State | Zip Code | Packages |
|---|---|---|---|---|---|---|
| 76964 | ALEXIAN BROTHERS MED CTR | 800 BIESTERFIELD RD | ELK GROVE VILLAGE | IL | 60007-3361 | 1 |
| 77016 | SAINT THOMAS MIDTOWN HOSP | 2000 CHURCH ST | NASHVILLE | TN | 37236-0001 | 1 |
| 77027 | BORGESS MEDICAL CENTER | 1521 GULL RD | KALAMAZOO | MI | 49048-1640 | 1 |
| 77192 | GENESYS W FLINT | 4255 BEECHER RD | FLINT | MI | 48532-3608 | 2 |
| 77505 | PROVIDENCE HOSPITAL | 6801 AIRPORT BLVD | MOBILE | AL | 36608-3709 | 2 |
| 77507 | PRVDNCE HLTHCARE NTWRK | 6901 MEDICAL PKWY | WACO | TX | 76712-7910 | 1 |
| 77510 | PROVIDENCE HOSPITAL | 16001 W 9 MILE RD | SOUTHFIELD | MI | 48075-4818 | 1 |
| 77561 | SAINT ANTHONYS MEDCL CTR | 10010 KENNERLY RD | SAINT LOUIS | MO | 63128-2106 | 2 |
| 77595 | VIA CHRISTI HOSPITALS | 929 N SAINT FRANCIS ST | WICHITA | KS | 67214-3821 | 2 |
| 77619 | SACRED HEART HLTH SYST | 5151 N 9TH AVE | PENSACOLA | FL | 32504-8721 | 1 |
| 77637 | ST JOHN HOSP & MEDCL CTR | 22101 MOROSS RD | DETROIT | MI | 48236-2148 | 2 |
| 77655 | ST JOSEPHS HSP OF MRSHFLD | 611 ST JOSEPH AVE | MARSHFIELD | WI | 54449-1832 | 1 |
| 77681 | ST MARYS MEDICAL CENTER | 3700 WASHINGTON AVE | EVANSVILLE | IN | 47714-0541 | 1 |
| 77686 | ST MARYS MICHIGAN | 800 S WASHINGTON AVE | SAGINAW | MI | 48601-2551 | 1 |
| 77695 | SETON MEDICAL CENTER | 1201 W 38TH ST | AUSTIN | TX | 78705-1006 | 2 |
| 77718 | SAINT VINCENTS BIRMINGHAM | 810 SAINT VINCENTS DR | BIRMINGHAM | AL | 35205-1601 | 2 |
| 77721 | ST VINCENTS MED CTR RVRSD | 1 SHIRCLIFF WAY | JACKSONVILLE | FL | 32204-4748 | 1 |
| 77725 | ST VINCENT HOSP CATH LAB | 8333 NAAB RD | INDIANAPOLIS | IN | 46260-5924 | 2 |
| 80446 | SAINT JOHN MEDCL CTR INC | 1900 S WHEELING AVE | TULSA | OK | 74104-5623 | 1 |
| 88742 | SAINT THOMAS W HOSP | 4220 HARDING PIKE | NASHVILLE | TN | 37205-2005 | 1 |
| 111299 | SETON MEDCL CTR | 201 SETON PKWY | ROUND ROCK | TX | 78665-8000 | 1 |
| 111577 | ST JOHN MACOMB OAKLAND | 11800 E 12 MILE RD | WARREN | MI | 48093-3472 | 1 |
| 112428 | ST VINCENTS E | 50 MEDICAL PARK DR E | BIRMINGHAM | AL | 35235-3401 | 1 |
| 128162 | SACRED HEART HOSP | 7800 US HIGHWAY 98 W | MIRAMAR BEACH | FL | 32550-7228 | 1 |

** If any Wheaton Franciscan Healthcare facilities in Southeast Wisconsin become a Participant of The Resource Group within one hundred eighty (180) days of the Effective Date of this Agreement, Supplier shall include those facilities as Eligible Participants under this agreement.

Ascension Health Resource and Supply Management Group, LLC – Confidential
RSMG-6394
4818-5212-6250, v. 6

Page 61 of 61
Appendix J-2

HIGHLY CONFIDENTIAL          JX-1431, Page 61 of 61          BWI-INN00067117