

# PURCHASING AGREEMENT

## Products

| | |
|---|---|
| **Vendor:** | **Johnson & Johnson Health Care Systems Inc.** |
| **Products:** | **ELECTROPHYSIOLOGY** |
| **Effective Date:** | **August 1, 2018** |
| **Agreement Number:** | **HPG-4467** |

Template Version: October 10, 2011 (DocuSign); March 8 2017 Update

Innovative v. Biosense
No. 8:19-cv-01984-JVS
**JX-1434.1**

# TABLE OF CONTENTS

1.0    Definitions ................................................................................................................. 3

2.0    General Purchasing Provisions ................................................................................ 7

3.0    GPO Fees, Rebates, Reporting, Prices, Payments ................................................ 10

4.0    EDI and E-Commerce ............................................................................................ 11

5.0    Price Warranty ........................................................................................................ 12

6.0    Taxes ....................................................................................................................... 12

7.0    Vendor Delivery Performance; Cancellation; Customer Service .......................... 13

8.0    Shipping Terms for Direct Purchases .................................................................... 15

9.0    Warranties and Disclaimer of Liability ................................................................. 16

10.0   Indemnity ............................................................................................................... 22

11.0   Confidentiality ....................................................................................................... 23

12.0   Insurance ................................................................................................................ 25

13.0   Termination of Agreement ..................................................................................... 25

14.0   Compliance Requirement; Books and Records; Physician Ownership Interests and Compensation Arrangements ........................................................................................................ 26

15.0   Merger of Terms ..................................................................................................... 31

16.0   Modifications of Terms. .......................................................................................... 32

17.0   Minority and Women Owned Business Enterprises ............................................... 33

18.0   Contracting for Environmentally Acceptable Products ......................................... 33

19.0   Miscellaneous ......................................................................................................... 33

Exhibits

## PURCHASING AGREEMENT

This Purchasing Agreement is entered into by **HealthTrust Purchasing Group, L.P.**, a Delaware limited partnership, having its principal place of business at 1100 Charlotte Avenue, Nashville, Tennessee 37203 (hereinafter referred to as **"HPG"**), and **Johnson & Johnson Health Care Systems Inc.**, a New Jersey corporation and a wholly owned subsidiary of Johnson & Johnson, a New Jersey corporation having its principal place of business at 425 Hoes Lane-P.O. Box 6800, Piscataway, NJ 08855-6800 (hereinafter referred to as **"Vendor"**), for the primary purpose of establishing the terms and conditions pursuant to which Participants (as hereinafter defined) may purchase certain products and services from Vendor.

**WHEREAS**, HPG is organized as a group purchasing organization with various healthcare providers belonging to HPG as Participants;

**WHEREAS**, Participants have entered into Participation Agreements (as hereinafter defined) with HPG, which permit Participants and their Affiliates (as hereinafter defined) to obtain products and services under purchasing agreements between HPG and its vendors, provided Participants comply with the purchaser obligations stated in the purchasing agreements and Participants' obligations under the Participation Agreements; and

**WHEREAS**, Vendor desires to offer certain of its products and/or services to Participants.

**NOW, THEREFORE**, HPG and Vendor hereby agree that Vendor shall provide the products and/or services described herein to Participants in accordance with the terms and conditions set forth herein:

## 1.0 Definitions

1.1. "**Affiliates**" as applied to any particular entity, is defined as those entities, businesses, facilities, and enterprises, that are controlled by, controlling, or under common control with a stated entity, whether by ownership or contract.

1.2. "**Agreement**" shall be defined as this purchasing agreement, including all exhibits and other attachments expressly incorporated by reference herein, as amended from time to time.

1.3. "**Cause**" shall be defined as any failure to perform or observe any material covenant or obligation contained in this Agreement, including any violation of state or federal laws, rules or regulations which would prohibit a Party or any Purchaser, as applicable, from participating in federal or state healthcare programs.

1.4. "**Compliance**" or "**Compliant**" with respect to any Participant/Group, shall be defined as achieving the performance requirements for the designated tier, as specified in and subject to the terms of Exhibit A. For purposes of clarity, any products in the Product category that are reprocessed or refurbished by a third party shall be excluded from the calculation of Purchaser compliance requirements hereunder.

1.5. "**Confidential Information**" shall be defined as information related to the business of a Party, Purchasers and their Affiliates, clients and patients that may be obtained as the result of performance under this Agreement. Confidential Information shall include, but is not limited to, the list of Participants, the terms of this Agreement, including the prices for Products and Services, and the sales volumes of Products and Services, in the aggregate or by Purchaser. Subject to the HIPAA Requirements (as defined in Section 11.3) and any

HIGHLY CONFIDENTIAL

BWI-INN00052081
BWI-INN00052079

applicable law or regulation, Confidential Information shall not include: (i) information that is publicly known prior to the disclosure or becomes publicly known through no wrongful act of the Receiving Party; (ii) information that was in lawful possession of the Receiving Party prior to the disclosure and was not received as a result of any breach of confidentiality with respect to the Disclosing Party; (iii) de-identified and aggregated transaction data related to purchases of Products and/or Services; or (iv) information that was independently developed by the Receiving Party without use of information received hereunder.

1.6.    "**COID**" shall be defined as an internal identification number assigned by HPG to its Participants.

1.7.    "**Consolidated Service Centers**" or "CSCs" shall be defined as warehouse consolidation centers that are Participants and that service a Group.

1.8.    "**Contract Quarter**" shall be defined as the three-month period commencing on the Effective Date, and each three-month period thereafter during the Term.

1.9.    "**Contract Year**" shall be defined as the twelve-month period commencing on the Effective Date, and each twelve-month period thereafter during the Term.

1.10.    "**Disclosing Party**" shall be defined as the Party, its Affiliate or a Purchaser that provides or discloses Confidential Information to the other Party, its Affiliate or a Purchaser hereunder.

1.11.    "**Discount**" shall be defined as a price reduction at the time of sale.

1.12.    "**Distributor(s)**" shall be defined as any product distributor designated by the Parties in Exhibit B to distribute Products to Purchasers hereunder.

1.13.    "**Dual Source Award**" shall be defined as an agreement by HPG not to contract with more than one alternative supplier from which Participants can purchase products and services comparable to those listed in Exhibit A during the Term.

1.14.    "**EDI**" shall be defined as Electronic Data Interchange.

1.15.    "**Effective Date**" shall be defined as the date designated in Exhibit B.

1.16.    "**EFT**" shall be defined as Electronic Funds Transfer.

1.17.    "**Expiration Date**" shall be defined as the date this Agreement expires, which is designated in Exhibit B.

1.18.    "**FDA**" shall be defined as the United States Food and Drug Administration.

1.19.    "**Fill Rate**" shall be defined as the average of the individual fill rates for all orders of a Product by stock keeping unit (or "**SKU**") by all Purchasers during any calendar month, calculated by dividing the total units delivered undamaged within the delivery schedule requirements of Section 7.0 of this Agreement and/or Exhibit B by the total units ordered for such Product during such calendar month.

1.20.    Intentionally Omitted.

HIGHLY CONFIDENTIAL

BWI-INN00052082
BWI-INN00052079

1.21.   "**GLN**" shall be defined as the Global Location Number assigned to each Purchaser by GS1.

1.22.   "**GPO Fees**" shall have the definition set forth in Section 3.1.

1.23.   **"GPO Affiliation Certificate"** shall be defined as a form executed by a Participant or its Affiliate designating HPG as its sole group purchasing organization.

1.24.   "**GPOID**" shall be defined as the unique identification number assigned by HPG to each Purchaser.

1.25.   "**Group**" shall be defined as an HPG Participant or a division within an HPG Participant, as listed on the Scrubs website, provided that, for purposes of this Agreement, all listed members of a Group must be included in such Group, unless the Parties agree otherwise.

1.26.   **"Market Share"** shall be defined as the ratio of a Participant's/Group's NCP over such Participant's/Group's NCP plus total net dollar purchases of similar units of product (excluding all ddistributor markups, shipping charges, and taxes and net of any returns) from other suppliers calculated at the prices set forth on Exhibit A, during a particular time period, expressed as a percentage (%).

1.27.   "**Multi-Source Award**" shall be defined as Vendor being designated as an approved source of Products and/or Services, with no limitation on HPG contracting with alternative suppliers from which Participants can purchase comparable products and services.

1.28.   **"NCP"** shall be defined as the net dollar value of purchases of Products under this Agreement by a Purchaser during a given period directly from the Vendor or its Affiliates, or as reported by Distributors, excluding all Distributor markups, shipping charges, and taxes and net of any returns.

1.29.   **"Non-Compliant"**, with respect to any Participant/Group, shall be defined as the failure to achieve the performance requirements for the designated tier, as specified in and subject to the terms of Exhibit A.

1.30.   "**Optional Source Award**" shall be defined as Vendor being designated as an approved source of the Products and/or Services, with no limitation on HPG or Participants contracting with alternative suppliers for purchases of comparable products and services, or on Participants purchasing comparable products and services from alternative suppliers on a non-contract basis.

1.31.   **"OSHA"** shall be defined as the Occupational Safety and Health Administration.

1.32.   "**Participant(s)**" shall be defined as member(s) of HPG that have entered into a Participation Agreement, and their Affiliates that have entered into a GPO Affiliation Certificate, and that qualify for the classes of trade listed in Exhibit B.

1.33.   "**Participation Agreement**" shall be defined as a written member agreement between HPG and a Participant that permits the Participant and its Affiliates to purchase products and services from various vendors having purchasing agreements with HPG.

1.34.   "**Party**" and "**Parties**" shall be defined as Vendor and/or HPG, as the context requires.

HIGHLY CONFIDENTIAL

BWI-INN00052083
BWI-INN00052079

1.35.   **"Price Concession"** shall be defined as all Discounts and Rebates collectively.

1.36.   "**Product Support**" shall be defined as those activities performed by Vendor Personnel in connection with any Purchaser's purchase and/or use of Products, including conversion to, support for, and training and education related to, the Products.  Product Support is included in the price of the Products.

1.37.   "**Products**" shall be defined as those goods listed in Exhibit A to this Agreement, and for all purposes except pricing and GPO Fees, any instruments or other items provided by Vendor Personnel in connection with the use of the goods listed in Exhibit A.

1.38.   "**Purchaser**" shall be defined as any Participant or Group obtaining Products and/or Services from Vendor.

1.39.   "**Purchaser Data**" means any or all of the following, and all copies thereof, regardless of the form or media in which such items are held: (a) personally identifiable health or any other information regulated by a governmental authority of Purchaser or any Affiliate or any of their respective patients or customers; or (b) any data and/or information stored, recorded, processed, created, derived or generated by Vendor (utilizing data set forth in (a)).

1.40.   "**Rebate**" shall be defined as any amount paid by Vendor to HPG for allocation to Purchasers, based on purchases of Products and/or Services by Purchasers hereunder during a specified time period.  The Rebate shall be determined as stated in Section 3.2 and any applicable Exhibit.

1.41.   "**Recall**" shall have the definition set forth in Section 9.9.

1.42.   "**Receiving Party**" shall be defined as the Party, its Affiliate or a Purchaser that receives Confidential Information from the other Party, its Affiliate or a Purchaser hereunder

1.43.   "**Semi-Annual Period**" shall be defined as the six-month period commencing on the Effective Date, and each six-month period thereafter during the Term.

1.44.   "**Services**" shall be defined as those services listed in Exhibit A to this Agreement.

1.45.   "**Sole Source Award**" shall be defined as an agreement by HPG not to contract with any alternative supplier from which Participants can purchase products and services comparable to those listed in Exhibit A during the Term.

1.46.   "**Term**" shall be defined, subject to the termination provisions of Section 13, as the period during which this Agreement is in effect, commencing on the Effective Date and expiring on the Expiration Date, or as extended pursuant to a written agreement signed by both Parties.

1.47.   "**Vendor Personnel**" shall be defined as any Vendor employees or Subcontractors (as defined in Section 19.4) responsible for performing Services and/or Product Support under this Agreement.

HIGHLY CONFIDENTIAL

BWI-INN00052084
BWI-INN00052079

## 2.0    General Purchasing Provisions

2.1.    <u>GPO and Discount Laws and Regulations.</u>  HPG represents and Vendor recognizes that HPG is a group purchasing organization as defined in 42 C.F.R. § 1001.952(j).  The Parties acknowledge that it is their intent to establish a business relationship in which Price Concessions offered by Vendor to HPG and Purchasers comply with the exceptions to the Medicare and Medicaid Anti-Kickback statute set forth at 42 U.S.C. § 1320a-7b(b)(3) (A) and (C), the "safe harbor" regulations regarding discounts set forth in 42 C.F.R. §1001.952(h); and any GPO Fees paid by Vendor to HPG comply with the exceptions to the Medicare and Medicaid Anti-Kickback statute set forth in 42 U.S.C. § 1320a-7b(b)(3) (A) and (C), and the "safe harbor" regulations regarding payments to group purchasing organizations set forth in 42 C.F.R. § 1001.952(j) (the **"GPO Safe Harbor"**); and the Parties believe that the relationship contemplated by this Agreement is in compliance with those requirements. Pursuant to 42 C.F.R. § 1001.952(j): (a) HPG has a written agreement with each Participant stating that entities such as Vendor will pay GPO Fees to HPG based upon purchases of Products by Purchasers; (b) HPG will disclose in writing to Purchasers at least annually, and to the Secretary of the United States Department of Health and Human Services (**"HHS"**) upon request, the amount received from Vendor with respect to purchases made by or on behalf of each Purchaser; (c) HPG is authorized to act as a purchasing agent for the Participants; and (d) the Participants are neither wholly owned by HPG nor subsidiaries of a parent corporation that wholly owns HPG (either directly or through another wholly owned entity).

2.2.    <u>Award Basis.</u>  HPG and Vendor agree that they are entering into this Agreement pursuant to the award basis designated in Exhibit B of this Agreement.

2.3.    <u>Eligible Purchasers.</u>  Commencing on the Effective Date, all Participants located in the United States (50 U.S. states and the District of Columbia) shall be eligible to obtain Products and/or Services from Vendor under this Agreement.   Vendor agrees to check HPG's Participant list, located at:

https://scrubs.healthtrustpg.com/Listing.asp?route=Source/vendors/mm_listings

(the **"SCRUBS website"**) on the first and third Tuesday of every month, and to update its list of Participants within fifteen (15) business days thereafter to accurately reflect the name, address, GPOID or GLN, and any other assigned identification code for each Participant. Vendor agrees to permit any new Participants added to the Participant list with access to Products and pricing under this Agreement by the end of such 15-day period.  If a Purchaser ceases to be a Participant of HPG during the Term, Vendor agrees not to allow such entity to purchase Products and/or Services under this Agreement. Purchasers obtaining Products and/or Services from Vendor under this Agreement shall be considered third party beneficiaries hereunder.

2.4.    <u>Termination of Participant-Specific Arrangements.</u>  Any Participant desiring to avail itself of the contractual options, terms and conditions described herein may, at its option and without penalty or liability, except under any equipment lease or financing obligation, terminate any existing contract or other arrangement with Vendor for the sole purpose of participating in the group purchasing arrangement set forth in this Agreement, notwithstanding any provision to the contrary in any such existing contract or arrangement. For purposes of clarity, non-payment to any Participant of any rebate for which the eligibility

HIGHLY CONFIDENTIAL       BWI-INN00052085
BWI-INN00052079

criteria specified under any such existing contract or other arrangement has not been met shall not constitute a penalty.

2.5.   <u>No Local Deals</u>.  During the Term, except as permitted by Exhibit B or any standardization incentive program offered hereunder, Vendor covenants that it will not solicit any Participant to enter into or negotiate a separate agreement for the same Products and/or Services offered hereunder without HPG's prior written consent.

2.6.   <u>Purchaser Obligations</u>.  Payment for purchases made by Purchasers under this Agreement shall be the sole responsibility of the Purchaser; Vendor agrees that HPG shall have no responsibility and no obligation for such payments owed by Purchasers or for any other obligations of Purchasers under this Agreement.

2.7.   <u>Direct Purchases.</u>  If Products and/or Services may be obtained directly from Vendor, as noted in Exhibit B, then upon receipt of an order from Purchaser, Vendor agrees to sell and deliver to Purchaser the Products and/or Services listed in the order at the prices set forth in Exhibit A (including any Discounts), subject to and in accordance with the terms and conditions stated in this Agreement.  No minimum quantity or dollar amount shall apply to any order unless expressly stated in Exhibit B.  If Vendor charges a Purchaser a price higher than that stated in Exhibit A, Vendor shall issue such Purchaser a refund (not a credit), unless an undisputed past due accounts receivable balance is owed by such Purchaser (in which case Vendor may set off the refund against the undisputed balance owed and shall pay the net, if any, to Purchaser), in the amount of such overcharge/overpayment promptly following discovery by Vendor, or discovery by and notice to Vendor thereof by the Purchaser, but in no event later than thirty (30) days following Vendor's discovery or Purchaser's notice.  If Vendor charges a Purchaser a price lower than that stated in Exhibit A, then such Purchaser shall have no obligation to pay the amount of such undercharge to Vendor, nor shall Vendor have the right to set-off the undercharge against any refund due for an overcharge/overpayment, unless the undercharge was an error discovered and re-invoiced within ninety (90) days after the date of the original invoice. Vendor shall provide to Purchasers, at least quarterly, statements listing unapplied credits, and upon request by a Purchaser, shall promptly refund the amount of the unapplied credits.

2.8.   <u>Purchases through Distributors.</u>  If any Product is available through a Distributor, as designated in Exhibit B, then the terms and conditions of this Agreement that apply to shipment directly from Vendor to a Purchaser shall not be applicable to purchases of such Products through a Distributor. Vendor shall provide to HPG and Distributors pricing files to enable Distributor to charge Purchasers the prices in Exhibit A plus any applicable Distributor markup as negotiated between Distributor and Purchaser.  Vendor shall assume total responsibility for obtaining from Distributors purchase information for each Purchaser so that Vendor accurately pays and reports on GPO Fees and Rebates (if any).

2.9.   <u>Effective Date and Firm Pricing.</u>  The obligation of Vendor to make Products, Product Support and/or Services available hereunder shall commence as of the Effective Date. Except as otherwise provided herein, the provisions of this Agreement, including prices, shall be effective from the Effective Date through the Expiration Date.  Prices for Products and/or Services may not be increased except pursuant to a written amendment to this Agreement.

HIGHLY CONFIDENTIAL

BWI-INN00052086
BWI-INN00052079

2.10. <u>Capital Investments.</u>  Each Party assumes the full and complete risk of any capital investment that such Party makes to enable or to enhance its capabilities to perform under this Agreement.  In no event will either Party, any Participant, or any Purchaser assume any financial or other risk associated with capital investments made by any of the others as a result of or related to this Agreement.

2.11. <u>Orders.</u>  The terms set forth in this Agreement shall apply to each order by a Purchaser, whether such order is communicated by Purchaser's purchase order form, EDI, internet e-commerce, facsimile, orally, or any other method, or whether reference is made to this Agreement.

2.12. <u>Product Discontinuation.</u>  Vendor agrees to provide HPG at least ninety (90) days' notice prior to discontinuation of any Product that is equipment and at least sixty (60) days' notice prior to discontinuation of any Product that is a disposable item.  Any replacement products shall have characteristics and specifications substantially comparable to that for the discontinued Product.  Any new product that serves as a replacement for a discontinued Product will be added to this Agreement via amendment at a price to be negotiated.  If the Parties cannot agree on a price for the replacement products, or if HPG does not agree that proposed products are suitable replacements, or that suitable replacements are available on this Agreement, then Purchasers can purchase comparable products from alternate vendors and such purchases shall not count against HPG or Purchaser performance or compliance requirements hereunder.   If a replacement product has new functionalities or other improvements, it shall be handled in accordance with Section 2.13 below.

2.13. <u>New Products.</u> During the Term, if new technology related to Products becomes available from any supplier including Vendor, HPG shall have the right to evaluate and ultimately contract with such supplier so that HPG can offer New Technology Products to Participants. A "**New Technology Product**" shall be defined as a product that, as compared to existing Products and as demonstrated in independent, peer-reviewed publication(s): (i) offers significant technological advancements; (ii) will significantly improve clinical outcomes or patient care; or (iii) will significantly streamline work processes.  Vendor shall provide Participants with an opportunity to purchase, at Price Concessions to be negotiated, New Technology Products offered by Vendor and not referenced in Exhibit A, and shall notify HPG of such at least thirty (30) days prior to New Technology Products being made available for national purchase, but subsequent to FDA approval (if applicable). Before offering any new product in the product category, including a New Technology Product, to Participants for purchase, Vendor shall: (i) complete any product documentation requested by HPG; (ii) meet with HPG to provide required product information to HPG and its clinical committees; (iii) agree with HPG upon a price for such product; and (iv) amend Exhibit A to add such product at the agreed upon price.  If Vendor offers any new product, including a New Technology Product, to Participants for purchase prior to completing (i) – (iv) above, Vendor agrees that Participants will pay the price specified on Exhibit A for the most comparable Product on this Agreement, until such time as the new product is added to Exhibit A at a mutually agreed upon price. HPG shall offer Vendor equal consideration and review for potential supply commitments for New Technology Products. If HPG enters into any national or group agreement for Participants to purchase a New Technology Product from a supplier other than Vendor, neither such agreement nor the purchase of the New Technology Product (by itself) shall constitute a breach of this Agreement or failure by HPG or Purchasers to meet the purchasing requirements under this Agreement or any agreement hereunder between Vendor and a Purchaser.

HPG-4467 - Page **9** of 156

2.14.   <u>Performance Requirements</u>.   For Sole Source Awards only, Vendor agrees that all Products identified in Exhibit A have been included in this Agreement based upon manufacturer requirements and Product specifications agreed upon by the Parties as of the Effective Date. Vendor further agrees that, Vendor will not change either: (i) the manufacturer or source of any Product components; or (ii) the Product specifications, in either (i) or (ii) in a manner that would require resubmission to the FDA.  If Vendor does make any such change, Vendor agrees to the following:

2.14.1   Contracted pricing for the identified Product(s) will not be increased under any circumstances;

2.14.2   For ninety (90) days following such change, each Purchaser shall have the right to procure the identified Product(s) from another source without any penalty and will continue to be deemed in compliance with all terms and conditions of this Agreement and any agreement with Vendor under this Agreement; and

2.14.3   During such ninety (90) days, HPG and Vendor will mutually agree to either remove the identified Product(s) from this Agreement or amend this Agreement.

## 3.0   <u>GPO Fees, Rebates, Reporting, Prices, Payments</u>

3.1.   <u>GPO Fees</u>.   In consideration for the administrative and other services HPG shall perform in connection with purchases of Products and Services under this Agreement by Purchasers, Vendor shall pay administrative fees to HPG ("**GPO Fees**"), as allowed by the GPO Safe Harbor, for all purchases by Purchasers of Products and Services under this Agreement, whether such purchases are made directly from Vendor or through a Distributor, or whether such purchases are made at prices other than those stated in Exhibit A or pursuant to a separate agreement with a Purchaser entered into hereunder.   The GPO Fee shall be determined by multiplying the GPO Fee percentage stated in Exhibit B (if any) by the NCP of Products and Services by Purchasers during the applicable time period. The payment of such GPO Fees is intended to be in compliance with the exception to the Medicare and Medicaid Anti-Kickback Statute set forth at 42 U.S.C. § 1320a-7b(b)(3)(C) and the "safe harbor" regulations set forth in 42 C.F.R. § 1001.952(j). Vendor shall provide an electronic report with each GPO Fee payment that accurately lists purchases upon which GPO Fees are based by each Purchaser for the applicable quarter and any other information that may be required to enable HPG to comply with 42 C.F.R. § 1001.952(j).   As between Vendor and HPG, HPG shall have the sole discretion as to the use and disposition of GPO Fees received hereunder.

3.2.   <u>Rebates</u>.   Vendor shall pay Rebates to HPG based on purchases of Products and/or Services by Purchasers in the amounts stated in Exhibit A, if any are stated therein.   If a percentage is listed in Exhibit A for the Rebate, then the Rebate shall be determined by multiplying the stated percentage by the NCP for Products purchased hereunder.   Rebates shall be paid to HPG for payment by HPG to Purchasers. The payment of Rebates is intended to be in compliance with the exception to the Medicaid and Medicare Anti-Kickback Statute set forth at 42 U.S.C. § 1320a-7b(b)(3)(A) and the "safe harbor" regulations set forth in 42 C.F.R. § 1001.952(h).   Vendor shall provide an electronic report with each Rebate payment that contains sufficient detail to permit HPG to accurately allocate the appropriate amounts to each Purchaser.

HIGHLY CONFIDENTIAL                                                     BWI-INN00052088
BWI-INN00052079

3.3.   Vendor Reports.   The Vendor reports submitted pursuant to Sections 3.1 and 3.2 shall include a listing of each Purchaser by the Purchaser GPOID or GLN number supplied with HPG's list of Participants, even if Vendor uses its own customer identification number.   The Vendor reports shall be sent by email to:

vendorbackup@healthtrustpg.com

If Vendor does not have internet access, then Vendor shall save the required reports on diskettes or compact disks and send them to HPG along with the GPO Fee and Rebate payments to the applicable address listed in Exhibit B, Addresses for Payments. Timely payment without the required reports shall be considered non-payment until reports meeting the above requirements have been delivered to HPG.

3.4.   Prompt Payment Acknowledgement.   Vendor acknowledges that failure to pay Rebates and GPO Fees in accordance with Exhibit B, or to submit accurate reports, will delay HPG's payment and/or reporting of Rebates and/or GPO Fees to Participants and Purchasers, thereby potentially causing Participants and Purchasers to be unable to accurately complete cost reports required under government-reimbursed healthcare programs.

3.5.   Intentionally Omitted.

3.6.   Electronic Reports.   In addition to the Product pricing listed in Exhibit A, on or prior to the Effective Date, and thereafter upon request. Vendor shall provide HPG with electronic copies of: (i) the price list in Exhibit A and (ii) Vendor's list prices.

**4.0   EDI and E-Commerce**

4.1.   Transmission of Orders for Direct Purchases.   Purchase order placement (850), order confirmation (855), and change orders and invoices (810), for Products and Services obtained pursuant to this Agreement shall be sent by use of EDI or by internet based e-commerce system, except where Vendor or a Purchaser does not have such capability, or as otherwise authorized pursuant to Exhibit B.

4.2.   GHX.   Vendor acknowledges that: (i) HPG has entered into an arrangement with Global Health Exchange, LLC (**"GHX"**) pursuant to which GHX shall provide to HPG and Participants e-commerce services associated with the ordering of products and services; (ii) many Participants utilize GHX for EDI, e-commerce ordering systems and electronic marketplace systems for order placement and confirmation; and (iii) if Vendor has not already done so, Vendor will use its best efforts to enter into a user agreement with GHX within sixty (60) days following the Effective Date if Vendor has an existing interface and otherwise within ninety (90) days following the Effective Date (unless mutually agreed upon otherwise by the Parties in writing), which agreement will permit Products and Services to be purchased by Purchasers using the GHX e-commerce system.  Vendor acknowledges that there is a cost associated with access to and use of the GHX system and that Vendor will not have access to the GHX system unless Vendor enters into a user agreement with GHX.  If Vendor is not currently a user of GHX, Vendor agrees to promptly notify HPG and Purchasers of its entry into a user agreement with GHX.  Once a user agreement is in place between Vendor and GHX, Vendor will reasonably cooperate with HPG and GHX in facilitating efficient transactions with Purchasers, and if applicable, any Distributor, through the GHX e-commerce system. Vendor acknowledges that Purchasers will order (850), confirm (855) and invoice (810) with line item detail matching continuously from end-to-

HIGHLY CONFIDENTIAL

BWI-INN00052089
BWI-INN00052079

end of transmission (purchase order, confirmation and invoice) as required by GHX, including reorder number, price and unit of measure.

4.3.   <u>Transaction Data</u>.  Vendor and HPG acknowledge and agree that, as to any transactions for Products and/or Services through the GHX e-commerce system or any other e-commerce system, Vendor and the applicable Purchaser shall own all transaction data, and HPG shall have the right to access such transaction data solely for performance of its group purchasing functions.

4.4.   <u>EDI and EFT Costs</u>. Vendor, HPG and the Participants shall participate in any EDI and/or EFT exchanges at their own cost and expense.

**5.0   <u>Price Warranty</u>**

5.1.   <u>Market Competitiveness Guarantee</u>.  Vendor represents and warrants that the prices set forth in Exhibit A (including any applicable Rebates) and the non-price terms set forth in this Agreement (including quality and technology) are and, during the Term shall remain, market competitive and that such terms, on a total contract basis, shall be at least as favorable as those terms offered by Vendor during the Term to any other group purchasing organization whose members' product category, purchase commitment levels, product purchase mix and volume are, during the corresponding period, substantially similar to those Products purchased by Purchasers (**"Market Competitiveness Guarantee"**).  If HPG receives information from any source that indicates that Vendor is not in compliance with the Market Competitiveness Guarantee, then HPG may provide written notice of such information to Vendor.  Within ten (10) business days following its receipt of such notice, Vendor shall either: (i) advise HPG in writing of all adjustments necessary to ensure its compliance with the Market Competitiveness Guarantee and make all such adjustments within thirty (30) days thereafter, unless another time period is otherwise agreed to by the Parties; or (ii) provide documentation refuting the allegations of Vendor's non-compliance, in which case the Parties shall work in good faith to resolve the dispute.  In the event the resolution requires adjustments to the pricing, such adjustments will become effective at the time the Parties mutually agree to a resolution, and no retroactive adjustments will be made.

5.2.   <u>Price Decreases</u>.  If Vendor offers any general, "across the board" price decreases for Products and/or Services to a substantial number of its customers during the Term, Vendor shall notify HPG of such price decreases and make such decreases available to Purchasers promptly and in like amounts.

5.3.   <u>Invoice Errors</u>.  If an invoice does not match purchase order information, including but not limited to purchase order number, Products, prices set forth in Exhibit A and other required information, then Purchaser shall have the right to reject the invoice and request resubmission by Vendor, and the payment term set forth in Exhibit B shall be tolled until an invoice with the correct purchase order information has been received by Purchaser.

**6.0   <u>Taxes</u>**

6.1.   <u>Tax Collection</u>.

6.1.1   <u>Sales or Use Taxes</u>.  Vendor shall be registered in all taxing jurisdictions where, as a seller of Products and/or Services hereunder, it is legally required to register.  Any federal, state, excise or local sales, use or other similar tax imposed on Vendor by

HIGHLY CONFIDENTIAL                                                                                      BWI-INN00052090
BWI-INN00052079

virtue of this Agreement or the Products and/or Services provided by Vendor hereunder, or any such taxes imposed on a Purchaser, shall be collected from Purchaser by Vendor, and shall be paid to the appropriate taxing jurisdiction by Vendor. Each Vendor invoice to Purchasers shall clearly and separately state the amount of such tax. Vendor shall promptly refund to Purchasers any over-charges of taxes collected by Vendor from Purchasers. Vendor shall pay any penalties or interest assessed by any taxing authority as a result of Vendor's failure to comply with this Section 6.1, provided that Purchaser has complied with Section 6.3.

6.1.2   <u>Medical Device Excise Tax.</u> Vendor agrees that payment of the medical device excise tax, as set forth in Section 4191 of the Internal Revenue Code, is the responsibility of the Vendor, and the Vendor will not invoice that tax to Purchaser.

6.2.    <u>Product Information for Tax Reconciliation</u>. Upon request, Vendor shall provide commercially reasonable assistance to HPG and each Purchaser to provide data and information in Vendor's possession to assist Purchaser's reconciliation of its item files to Vendor's files with regard to tax rates and taxability of Products and/or Services, including the provision of the following information, to the extent Vendor tracks and has actual knowledge of such information:

6.2.1   Is the Product or package <u>labeled</u> in a manner that indicates that it is available only with a physician's prescription (i.e., is it a federal legend item)?

6.2.2   Is the item a kit, pack, or tray? If yes, list all items contained in the kit, pack, or tray and each item's approximate percentage of the cost.

6.2.3   Is the Product intended for single patient use?

6.2.4   Does the Product carry a National Drug Code (**"NDC"**) label or serve as a generic equivalent for a product carrying an NDC label?

6.2.5   Is the Product medicated? If yes, what is the primary active ingredient?

6.3.    <u>Tax Information</u>. Upon request, Vendor shall furnish to HPG and each Purchaser a copy of Vendor's registration certificate and number within each taxing jurisdiction where Vendor is required to register. If a Purchaser is tax-exempt, such Purchaser shall, prior to purchase, furnish Vendor with any documents necessary to demonstrate its tax-exempt status or any changes in its status, and Vendor shall honor such Purchaser's tax-exempt status as appropriate under applicable state law. Vendor shall also provide to each Purchaser Vendor's Federal Tax Identification number upon request.

**7.0   <u>Vendor Delivery Performance; Cancellation; Customer Service</u>**

7.1.    <u>Delivery Performance Warranty for Direct Purchases</u>. For purchases made directly from Vendor, Vendor represents and warrants to HPG and Purchasers that it shall maintain in inventory at appropriate locations sufficient quantities of each Product and shall both choose a transportation mode and carrier and provide said carrier with appropriate instructions to ensure that any Purchaser ordering Products will receive delivery within the delivery schedule stated in Exhibit B.

HIGHLY CONFIDENTIAL

BWI-INN00052091
BWI-INN00052079

7.2.  <u>Delivery Failures for Direct Purchases</u>.  For purchases made directly from Vendor, if Vendor anticipates that it will not be able to deliver any particular Product ordered by any Purchaser within the delivery schedule stated in Exhibit B, Vendor shall promptly notify the Purchaser and work with the Purchaser to resolve the delivery issue to Purchaser's reasonable satisfaction. Such resolution may include acceptance of alternative delivery dates or provision of an acceptable substitute from Vendor at the same or lower pricing as the unavailable Product. Further, in such circumstances and upon a Purchaser's request to Vendor's authorized sales representative for expedited shipping to meet clinical needs, Vendor will pay the additional costs for expedited Product shipment, limited to the time period during which Vendor is unable to meet the delivery schedule in Exhibit B, unless the delay is the result of a Force Majeure Event as defined in Section 19.15. Vendor shall be responsible for paying additional costs for expediting any shipment of Products to meet the delivery obligations stated in this Agreement, including Products subject to backorder.

7.3.  <u>Additional Remedies for Delivery Failures for Direct Purchases</u>. If Vendor and Purchaser are unable to reach resolution regarding a delivery failure pursuant to Section 7.2, Purchaser shall have the right to either cancel the order in whole or in part, or to order a replacement from another supplier, in addition to any other rights of Purchaser arising under this Agreement or by law.

7.4.  <u>No Breach of Award</u>.  Neither Purchaser nor HPG shall be deemed to be in breach of any Sole Source Award or Dual Source Award terms of this Agreement (if any) or any other terms of this Agreement (including any individual Purchaser commitment terms) as a result of: (i) entering into a contract for Product(s) in the Product category that Vendor is unable to provide (or any Distributor is unable to supply due to Vendor supply problems) as required by the terms of this Agreement; or (ii) purchasing replacements for Product(s) that Vendor is unable to provide (or any Distributor is unable to supply due to Vendor supply problems) as required by the terms of this Agreement. Additionally, if this is a Dual Source Award and the other Dual Source Award supplier is unable to supply its product, then neither HPG nor any Purchaser shall be deemed to be in breach of any terms of this Agreement as a result of the purchase from a third party supplier of replacements for product that the other Dual Source Award supplier is unable to provide (or any Distributor of such other supplier is unable to supply due to such supplier's supply problems) until such inability to supply is resolved.

7.5.  <u>Cancellation of Orders</u>. Purchaser may cancel any order arising out of this Agreement in whole or in part, without liability, if (i) Products have not been shipped as of the date of Vendor's receipt of notice of cancellation (unless Products are custom orders); (ii) Product deliveries are not made at the time and in the quantities specified; (iii) Products (or the possession and use thereof) infringe, misappropriate or are alleged to infringe or misappropriate any third party patent, trademark, copyright, trade secret or other intellectual property right; (iv) Products (or the possession and use thereof) fail to comply with the terms of this Agreement or with any applicable law or regulation; or (v) Products are subject to Recall. Also, Purchaser may immediately cancel any order where the Vendor is in breach of the Warranty of Non-exclusion, as set forth in Section 14.5. To cancel, Purchaser shall give notice to Vendor in writing, and to the extent specified therein, Vendor shall immediately terminate deliveries under the order.

7.6.  <u>Fill Rate Requirements</u>. With respect to Products that Vendor ships directly to a Purchaser, Vendor represents and warrants that it shall meet or exceed a ninety-five percent (95%) Fill

HIGHLY CONFIDENTIAL

BWI-INN00052092
BWI-INN00052079

Rate (unless a different Fill Rate is specified in Exhibit B) for each Product during the Term (the **"Required Fill Rate"**).  Any failure by Vendor to maintain the Required Fill Rate for any Product supplied to a Purchaser that is not cured within thirty (30) days following written notice from HPG shall be deemed a breach of this Agreement.  In addition to any other rights or remedies of HPG, if the award basis is Sole Source or Dual Source, upon any such breach, HPG shall have the right, by providing fifteen (15) calendar days' notice to Vendor, to obtain a comparable product from another supplier, and such purchases shall be excluded from the calculation of HPG and Purchaser compliance requirements hereunder.  If Vendor has not achieved the Required Fill Rate with respect to such Product within thirty (30) days following Vendor's receipt of the 15-day notice, HPG shall have the right to convert such Sole Source Award or Dual Source Award designation for such Product to a Multi-Source Award or Optional Source Award designation for such Product, with no change in pricing from the Sole Source Award or Dual Source Award pricing.

7.7.  <u>Product Shortage</u>.  In the event of a shortage of Product, Vendor and its Affiliates reserve the right to allocate Products among their customers in any manner that they, in their sole discretion, determine is reasonable; provided, however, that neither Vendor nor its Affiliates shall be excused from any of their obligations hereunder.  In making such allocation determination, Vendor may consider factors including, but not limited to:  government commitments, medical needs, prior utilization, volumes, uses, and geography.

7.8.  <u>Vendor Customer Service</u>.  Vendor shall provide customer service support staff for receipt of telephone calls, e-mails and facsimiles from Purchasers and HPG for the purpose of resolving issues related to transactions under this Agreement during the hours stated in Exhibit B.  Vendor reserves the right to institute changes to the foregoing.  Vendor will make commercially reasonable efforts to provide thirty (30) days prior notice to HPG of any changes, however, failure to provide such notice does not prohibit Vendor from implementing such changes.

7.9.  <u>Reports</u>.  In addition to the reporting obligations of Section 3.3, Vendor shall also furnish to HPG in an agreed-upon format any additional reports reasonably requested by HPG, related to Products provided to Purchasers hereunder.

## 8.0  <u>Shipping Terms for Direct Purchases</u>

8.1.  <u>Shipment Terms</u>.  For purchases directly from Vendor, terms for shipment of Product and freight payment responsibility shall all be in conformance with the provisions in this Section 8.0 and Exhibit B.  Except as set forth in Exhibit B, no "Handling", "Shipping and Handling" or any other processing or delivery charges may be added to any invoice, and Purchasers shall have no obligation to pay any such charges for purchases under this Agreement.

8.2.  <u>Packing</u>.  Vendor assumes all responsibility for proper packing of Products for safe shipment to Purchaser, in accordance with both the packing and shipping regulations of the transportation service provider, and also, if applicable, the packing, marking, labeling and shipping paper requirements of the United States Department of Transportation's Hazardous Material Regulations.

8.3.  <u>Risk of Loss</u>.  Title and risk of loss or damage for shipment of Products shall be as stated in Exhibit B.  If Products are shipped on an F.O.B. Origin basis, all such Products shall be shipped with title and risk of loss or damage passing to the ordering Purchaser upon Vendor's delivery of the Products to the carrier.  Notwithstanding the foregoing, however, Vendor

HIGHLY CONFIDENTIAL

BWI-INN00052093
BWI-INN00052079

shall procure on behalf of each ordering Purchaser and at Vendor's expense, insurance covering the Products in transit, which insurance shall not impose any financial liability upon any Purchaser, including without limitation, any liability for any deductible. Vendor shall be responsible for submitting any damage-in-transit claims to the carrier on a Purchaser's behalf and shall promptly ship to the applicable Purchaser replacement Products for any Products which are damaged in transit. Vendor shall be entitled to retain the proceeds of any damage-in-transit insurance claim, provided that Vendor has shipped replacement Products to the applicable Purchaser and subject to the Purchaser assigning the claim to Vendor.

8.4.  <u>Inspection</u>.  All Products shall be subject to inspection and approval upon receipt by Purchaser.  Purchasers shall have thirty (30) calendar days from date of delivery in which to inspect the Products and to accept or reject such Products.  Any Products which do not comply with Purchaser's purchase order, including quantities and delivery time; in any way fail to comply with the warranties provided under this Agreement or with applicable law; or are damaged in shipment, whether discovered at time of receipt or at a later time, may be rejected by Purchaser, irrespective of the date of payment.  Purchaser may hold any Product rejected for reasons described herein pending Vendor's instructions, or Purchaser, at Purchaser's option, may return such Products to Vendor in accordance with Vendor's Returned Goods Policy set forth in Exhibit E hereto.

## 9.0  <u>Warranties and Disclaimer of Liability</u>

9.1.  <u>Product Warranties</u>.  Vendor represents and warrants to HPG and Purchasers that the Products when received by Purchaser:

9.1.1  are new, unadulterated and not used, remanufactured or reconditioned (unless specified in the order and pre-approved by Purchaser);

9.1.2  are free from defects, whether patent or latent, in design, materials or workmanship, provided that such representation shall not apply to Vendor Software;

9.1.3  as well as Product packaging, labeling and inserts, conform to the requirements of all applicable industry, nationally recognized accreditation groups and regulatory standards and federal, state and local laws, regulations and ordinances, including FDA, Environmental Protection Agency, Center for Disease Control and Prevention, and Equipment Testing Lab rules, regulations, guidelines and required approvals, any requirements imposed by the Joint Commission on comparable products, Medicare/Medicaid conditions of participation, and any amendments thereto; and that Products will not display or print out any information that contains any abbreviations prohibited by Joint Commission standards;

9.1.4  conform with statements in Vendor's Product inserts, user documentation, specifications, and written warranties for the Products;

9.1.5  are marked with an industry standard barcode for each unit of measure associated with each Product;

9.1.6  Vendor represents and warrants to HPG and Purchasers that (i) when delivered, no Product is a "tracked device" (as defined in 21 CFR 821.1, as such may be amended from time to time), unless Vendor provides the tracking requirements applicable to such Product in Exhibit B; and (ii) if a Product is a "tracked device", the disclosures

HIGHLY CONFIDENTIAL

BWI-INN00052094
BWI-INN00052079

in Exhibit B regarding the applicable tracking requirements for such Product are true and accurate;

9.1.7   carry a safety mark, if required by OSHA, from a National Recognized Testing Laboratory (**"NRTL"**) for use of electrical equipment in a public facility (as specified in the OSHA 29 C.F.R. Standards, Part 1910, Subpart S-Electrical, Sec 1910.399, including any amendments thereto);

9.1.8   are listed with Underwriters Laboratory (**"UL"**) or a nationally recognized testing laboratory as suitable for use in a healthcare facility, if such listing is available for Products; if Products include medical electrical equipment, Products shall meet or exceed the requirements of either UL-544 or UL 60601-1 Medical Electrical Equipment, Part 1: General Requirements for Safety, as amended or superseded, or the then most current UL, National Fire Protection Association (**"NFPA"**) 99, NFPA 70, FDA, or other applicable standard/code that addresses the safety and marking requirements of electrical medical devices (references to UL or NFPA code sections in this Section 9.1 shall also be deemed to apply to any amendments or superseding sections thereto);

9.1.9   if the Products are electrically powered, each Product is provided with a heavy-duty grade power cord that meets the requirements of UL-544, UL 60601-1, or NFPA 99 § 8-4.1 (and subsets) or the then most current UL, NFPA 99, NFPA 70, FDA, or other applicable standard/code that addresses the safety and marking requirements of electrical medical devices; the adapters and extension cords, if needed, for the use of this Product, meet the requirements of NFPA 99 § 8-4.1.2.5 or the then most current UL, NFPA 99, NFPA 70, FDA, or other applicable standard/code that addresses the safety and marking requirements of electrical medical devices; and to the extent other requirements of NFPA apply to any Product, whether or not specifically referenced in this Agreement, Products will comply with such applicable NFPA standards;

9.1.10  to the extent applicable, meet the requirements of NFPA 99 for Health Care Facilities, Chapter 8 or UL 544 or UL 2601-1 or the then most current UL, NFPA 99, NFPA 70, FDA, or other applicable standard/code that addresses the safety and marking requirements of electrical medical devices, with maximum leakage current not to exceed the values set forth in NFPA 99 § 7-5.1.3 or 7-5.2 or the then most current UL, NFPA 99, NFPA 70, FDA, or other applicable standard/code that addresses the safety and marking requirements of electrical medical devices, as applicable. (Actual leakage current test values for Products shall be furnished by Vendor at the request of HPG or any Purchaser);

9.1.11  if the Products are equipment intended for use in an operating room environment or other location with anesthetizing equipment, each Product is labeled in accordance with NFPA 99 § 9-2.1.8.3 or the then most current UL, NFPA 99, NFPA 70, FDA, or other applicable standard/code that addresses the safety and marking requirements of electrical medical devices; each Product label shall indicate whether it is suitable for use in anesthetizing locations under the requirements of NFPA 70 § 13-4.1 and 99 § 7-5.1 or the then most current UL, NFPA 99, NFPA 70, FDA, or other applicable standard/code that addresses the safety and marking requirements of electrical medical devices; if Product is intended to be used in locations where flammable

HIGHLY CONFIDENTIAL

BWI-INN00052095
BWI-INN00052079

anesthetics are used, the Product shall be marked in accordance with NFPA 70 § Article 505-9 or the then most current UL, NFPA 99, NFPA 70, FDA, or other applicable standard/code that addresses the safety and marking requirements of electrical medical devices;

9.1.12 if the Products are equipment, each Product is shipped with an operator or user manual (may be in compact disc form or downloaded from Vendor's website) that includes:

9.1.12.1    Illustrations that show locations of controls;

9.1.12.2    Explanation of the function of each control;

9.1.12.3    Illustrations of proper connection to the patient and other equipment;

9.1.12.4    Step-by-step procedures for proper use of the appliance;

9.1.12.5    Safety precautions (or considerations) in application and in servicing;

9.1.12.6    Effects of probable malfunctions on patient and employee safety;

9.1.12.7    Difficulties that might be encountered, and care to be taken if the Product is used on a patient at the same time as other electric devices;

9.1.12.8    Circuit diagrams for the particular Product shipped;

9.1.12.9    Functional description of the circuits in Product;

9.1.12.10   Power requirements, heat dissipation, weight, dimensions, output current, output voltage and other pertinent data for the Product;

9.1.12.11   All other warnings and instructions necessary to operate the equipment safely, effectively, and efficiently; and

9.1.12.12   Troubleshooting guide.

9.1.13 if the Products are equipment, each Product contains:

9.1.13.1    Condensed operating instructions clearly and permanently displayed on the Product itself;

9.1.13.2    Nameplates, warning signs, condensed operating instructions, labels, etc. that are legible and will remain so for the expected life of the Product under the usual stringent hospital service cleaning conditions;

9.1.13.3    Labeling in compliance with the medical device labeling requirements under the applicable FDA rules, regulations, and guidelines; and

9.1.13.4    Labeling that provides all other warnings and instructions necessary to operate the equipment safely, effectively, and efficiently.

9.1.14 Any warranties in addition to those provided herein with respect to a given Product are as described in the package inserts accompanying units of that Product on purchase. THERE ARE NO PRODUCT WARRANTIES THAT EXTEND BEYOND THOSE INCLUDED IN SECTION 9.0 INCLUDING, BUT NOT LIMITED TO, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

9.2. <u>Hazardous Materials</u>. Vendor represents and warrants to HPG and Purchasers that the Products when delivered do not contain any of the following, unless Vendor indicates otherwise on Exhibit C, and that the disclosures in Exhibit C regarding the presence or absence of such materials in the Products are true and accurate:

HIGHLY CONFIDENTIAL

BWI-INN00052096
BWI-INN00052079

| | | |
|---|---|---|
| (i) | Carcinogens; |
| (ii) | DEHP or 2 di-ethyl hexyl phthalate; |
| (iii) | Halogenated Organic Flame Retardants; |
| (iv) | Latex; |
| (v) | Lead; |
| (vi) | Mercury; |
| (vii) | Persistent Bioaccumulative Toxins; |
| (viii) | PVC (or polyvinyl chloride); |
| (ix) | Reproductive Toxins. |

9.3.    <u>Product Failures</u>.  If any Product purchased hereunder fails to function in accordance with the warranties stated herein within the warranty period stated in Exhibit B, then Vendor shall promptly repair or replace the Product, at Purchaser's option, at no additional cost to Purchaser.

9.4.    <u>Good Title</u>.  Vendor represents and warrants to HPG and Purchasers that Vendor has good title to the Products shipped directly and that the Products are free and clear from all liens, claims and encumbrances.

9.5.    <u>Intellectual Property Rights</u>.

9.5.1    Vendor represents and warrants to HPG and Purchasers that, to the best of its knowledge and belief, the Products and the possession and use thereof by Purchasers in the manner intended by Vendor do not infringe or misappropriate the patent, trade secret, trademark, copyright or other intellectual property rights of any third party. For purposes of clarity, the fact that Vendor may be involved in litigation or other disputes involving intellectual property rights shall not constitute a breach of this Section 9.5.1.

9.5.2    If the Products and the use thereof are covered by any intellectual property rights of Vendor or its Affiliates, provided Purchaser has paid the purchase price for the Products, Purchaser shall have the right to use the Products in the manner intended by Vendor without paying any additional fees to Vendor or Vendor's Affiliates.

9.6.    <u>Services</u>.  If Vendor is required to provide any Services and/or Product Support under this Agreement, Vendor represents and warrants to HPG and Purchasers that:

9.6.1    any Services and/or Product Support provided conform to the requirements of all applicable industry, accreditation and regulatory standards and federal, state and local laws, regulations and ordinances, including FDA, Environmental Protection Agency, Center for Disease Control and Prevention, and Equipment Testing Lab rules, regulations, guidelines and required approvals, requirements imposed by the Joint Commission on manufacturers of comparable products, Medicare/Medicaid conditions of participation, and any amendments thereto;

9.6.2    such Services and/or Product Support shall be performed timely, in a workman-like manner, consistent with industry standards; and otherwise in conformance with any standards provided in any Exhibit to this Agreement;

9.6.3    Vendor shall obtain at its own cost any and all necessary consents, licenses, approvals, and permits required for the provision of Services and/or Product Support;

HIGHLY CONFIDENTIAL

BWI-INN00052097
BWI-INN00052079

9.6.4    Vendor Personnel routinely visiting the premises of any Purchaser shall, upon being provided notice of such Purchaser's credentialing and other applicable policies, either comply with such policies, negotiate such policies with such Purchaser, or be excluded from such Purchaser's premises.  Vendor may address any issues pertaining to such policies directly with the applicable Purchaser; and

9.6.5    Vendor will not employ or use any individual to perform Services or Product Support under this Agreement who is not legally authorized to work in the United States in the capacity required to perform the Services or Product Support.  Vendor represents that all Vendor Personnel and other individuals it assigns to perform Services or Product Support under this Agreement are legally authorized to work in the United States in the capacity required to perform the Services or Product Support and will provide upon request written documentation to support such representation.  Vendor agrees that if the status of any Vendor Personnel so assigned by Vendor changes during the Term such that that person is not legally authorized to work in the United States in the capacity required to perform the Services or Product Support, Vendor shall provide notice thereof to Purchaser and remove such Vendor Personnel from performing any Services or Product Support.  Vendor agrees to defend, indemnify and hold harmless HPG and Purchasers under Section 10.1 of this Agreement if any claim were made against HPG or any Purchaser related to any alleged failure of Vendor to comply with its warranties, representations, and certifications under this Section 9.6.5.

9.7.    <u>Training</u>.  Vendor represents and warrants that if Vendor Personnel provide Product training to Purchaser employees or physicians: (i) the predominant purpose of the training is provide instruction on the FDA approved use of the Products; (ii) the training is not for instruction on how to market the Products or to encourage investment in Vendor; and (iii) the training is not for instruction on how to bill any federal healthcare program.

9.8.    <u>Child Labor and Human Trafficking</u>.  Vendor represents and warrants that Vendor, its Subcontractors and its manufacturers of Products comply with applicable labor and employment laws regarding, and prohibit, any form of child labor or other exploitation of children in the manufacturing and delivery of the Products, consistent with provisions of the International Labor Organization's ("**ILO**") Minimum Age Convention (No. 138), 1973.  In addition, in connection with any International Organization for Standardization ("**ISO**") certification, Vendor represents and warrants that it complies with a Social Accountability Guideline pursuant to which Vendor disqualifies any manufacturing site that uses unacceptable manufacturing practices, such as child labor, forced labor or unsafe or unsanitary working conditions or trafficking in persons as defined by the Trafficking Protocol (United Nations General Assembly, *Protocol to Prevent Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime*, 15 November 2000, available at http://www.unhcr.org/refworld/docid/4720706c0.html).  Upon a reasonable request from HPG, Vendor agrees to promptly investigate a particular Subcontractor or manufacturer to ensure compliance with the foregoing and, subject to confidentiality requirements, to keep HPG informed of the status of such investigation.  In addition to any other rights or remedies of HPG, if an award basis is Sole Source or Dual Source and Vendor does not resolve any such compliance issue to HPG's reasonable satisfaction, HPG shall have the right, by providing fifteen (15) calendar days notice to Vendor, to convert such Sole Source Award or Dual Source Award designation for such Product to a Multi-Source Award or Optional

HIGHLY CONFIDENTIAL

BWI-INN00052098
BWI-INN00052079

Source Award designation for such Product, with no change in pricing from the Sole Source Award or Dual Source Award pricing.

9.9.  Recalls.  If any Product is recalled, whether voluntarily or as required by a governmental entity, then Vendor shall implement the recall in accordance with applicable laws, regulations and government directives, and notify HPG and Purchasers; reimburse Purchasers for their reasonable costs of packing, returning or disposing of the recalled Product; and, at Vendor's option, either provide no-cost replacement Product or credit or reimburse Purchasers for their original costs, including freight, of any recalled Product that is not repaired or replaced.  Specific details such as the timing and recipients of notices; whether a recall is at the item, lot or other level; return, destruction or other disposition of recalled Products; and similar issues will vary based on the particular recall and be specified in the recall notice.  Vendor will notify HPG of any recall within 72 hours via e-mail at the following address:

vendorrecall@healthtrustpg.com

To the extent such recall precludes Vendor from supplying any Products under this Agreement, any Purchaser compliance requirements or purchase requirements under this Agreement or any facility agreement between any Purchaser and Vendor related to such Products shall not be effective for as long as Vendor is unable to supply such Products.  If any Product pricing is dependent upon a Purchaser meeting compliance or purchase requirements for designated Products, a Purchaser's pricing will not change for failure to meet the compliance or purchase requirements during the time period due to Vendor's inability to provide said designated Products.

9.10.  Disaster Recovery Plan.  Vendor represents and warrants to HPG and Purchasers that it has and shall maintain a disaster recovery plan to enable delivery of Products upon the occurrence of any event or circumstance beyond Vendor's reasonable control, including without limitation acts of God, war or terrorist attack, pandemic, riot, strike, labor disturbance, fire, explosion or flood at its primary manufacturing and distribution locations, and agrees to review such plan with HPG upon request.

9.11.  Product Documentation.  Upon request Vendor will supply HPG and Purchasers with written documentation, including certifications, operator manuals, safety marks, and the like for Products on or prior to a purchase or installation.

9.12.  Product Safety Performance Testing Data.  Upon request, Vendor will provide to HPG and Purchasers the safety performance testing data Vendor submitted to the FDA before a Product is purchased and documents demonstrating compliance with IEC 60601-1 + United States deviations (UL2601-1/UL6061-1).  Such data will be limited to public information only.

9.13.  Beneficiaries; Survival.  The representations and warranties provided in this Agreement shall run to HPG, Purchaser or Vendor, as applicable, and their successors and permitted assigns, and their applicability during the Term shall survive the termination or expiration of this Agreement.  Vendor and HPG each acknowledge and agree that the other Party would not execute this Agreement and Purchasers would not purchase the Products and/or Services but for the representations and warranties set forth in this Agreement.

HIGHLY CONFIDENTIAL

BWI-INN00052099
BWI-INN00052079

9.14.  Liability Limitations; Mitigation.  Except as is otherwise provided herein, except as may be covered by a Party's insurance policies, and except as may arise from a Party's or any Purchaser's (i) gross negligence, willful misconduct or confirmed violation of applicable law, or (ii) breaches of Section 11.0 (Confidentiality), or obligations pursuant to Section 9.9 (Recalls) or Section 10.1 (Vendor Indemnification), neither Party nor any Purchaser shall be liable to the other for the other's special, consequential, punitive, incidental or indirect damages, however caused, on any theory of liability, and whether or not they have been advised of the possibility of such damages.  Any reasonable, proximate, and documented costs and expenses incurred by HPG and any Purchasers to mitigate or lessen any damages or harm caused by any failure of Products, Product Support or Services to comply with the warranties referenced in this Agreement shall be considered direct damages. Notwithstanding anything to the contrary in this Agreement, for clarification purposes only, the following costs caused by a breach by Vendor of its confidentiality obligations under Section 11 (Confidentiality) hereunder resulting in the unauthorized disclosure of Purchaser Data shall be deemed direct damages:

(i)  the notification as required by applicable law of any and all individuals whose respective personal data has been disclosed due to a breach by Vendor of its confidentiality obligations under Section 11 (Confidentiality) (a "Personal Data Breach"); and the notification as required by applicable law to any governmental agencies of a Personal Data Breach;

(ii)  reasonable remedies provided to any impacted individuals by a Personal Data Breach including a minimum of twelve (12) months of credit reporting or monitoring;

(iii)  removal and replacement of Vendor Software that caused the Personal Data Breach including installation of new equivalent Vendor Software at no additional charge; and

(iv) expenses incurred either by Purchaser or through Purchaser's retention of an independent third party forensic investigator, legal counsel, or any other third party, to investigate or assess the Personal Data Breach and to comply with applicable law and/or relevant industry standards.

## 10.0  Indemnity

10.1.  Vendor Indemnification.  Vendor shall indemnify, hold harmless and defend HPG, Purchasers and their Affiliates, successors, permitted assigns, directors, officers, medical personnel and employees ("HPG Indemnitees") from and against any third party claims and related demands, losses, awarded damages, amounts paid in settlements (subject to the process set forth in Section 10.2), costs, and expenses, including reasonable attorneys' fees (subject to the process set forth in Section 10.2) (collectively referred to as "Damages"), including claims arising from or relating to the use of a Product, Product Support or Services, or arising from or relating to the breach or alleged breach by Vendor of the representations, warranties or covenants contained in this Agreement or in materials furnished by Vendor, and in either case, resulting in (a) property damage, (b) bodily injury or death, or (c) alleged infringement of any intellectual property right; provided that solely with respect to Vendor Software such Vendor indemnity obligations shall be further subject to Section 6, "Avoidance of Infringement" of the On Premise Software Terms and Conditions Exhibit. If the Injury is caused by the negligence of both Vendor and any of the HPG Indemnitees, the apportionment of said Damages shall be shared between Vendor and such HPG Indemnitees

HIGHLY CONFIDENTIAL

BWI-INN00052100
BWI-INN00052079

based upon the comparative degree of each other's negligence, and each shall be responsible for its own defense and costs, including but not limited to the costs of defense, attorneys' fees, witnesses' fees and expenses incident thereto. Vendor's requirement under this provision to indemnify HPG Indemnitees for claims alleging infringement of any intellectual property right applies regardless of the pendency of any direct litigation between Vendor or its Affiliates and a third party claimant.

10.2. <u>Indemnification Process</u>. If any demand or claim is made or suit is commenced against an HPG Indemnitee for which Vendor has an indemnity obligation under Section 10.1 above, written notice of such shall be provided to Vendor by the HPG Indemnitee, Vendor shall undertake the defense of any such suit, and such HPG Indemnitee shall permit Vendor to control the litigation and/or settlement of such claim and cooperate with Vendor in the defense of the demand, claim or suit to whatever reasonable extent Vendor requires and at Vendor's sole expense. Vendor shall have the right to compromise such claim at Vendor's expense for the benefit of such HPG Indemnitee; provided, however, Vendor shall not have the right to obligate an HPG Indemnitee in any respect in connection with any such compromise without the written consent of such HPG Indemnitee. Notwithstanding the foregoing, if Vendor fails to assume its obligation to defend, an HPG Indemnitee may do so to protect its interest and seek reimbursement from Vendor.

10.3. <u>Reimbursement of Costs for Third Party Litigation</u>. With respect to any litigation involving only one of the Parties or its Affiliates (the **"Litigating Party"**), if any subpoena or other legally binding request related to such litigation is served on the other Party (the **"Subpoenaed Party"**) requesting copies of documents maintained by the Subpoenaed Party, the Litigating Party shall reimburse the Subpoenaed Party for its out-of-pocket costs associated with compliance with such request, including reasonable attorneys' fees.

## 11.0   <u>Confidentiality</u>

11.1. <u>Confidentiality Obligations</u>. During the Term and surviving its expiration or termination, except as set forth in Section 11.2, both Parties will regard and preserve as confidential and not disclose publicly or to any third party (other than their respective Affiliates) the Confidential Information of the other Party, its Affiliates or any Purchaser. Subject to Section 11.2, each Party agrees to use the Confidential Information of the other Party, its Affiliates or any Purchaser solely for purposes of performing its obligations hereunder. All Confidential Information shall remain the property of the Disclosing Party.

11.2. <u>Permitted Uses of Confidential Information</u>. Notwithstanding the definition of Confidential Information or any provision to the contrary contained herein: (i) HPG and Purchasers shall have the right to use Vendor pricing information on Products and Services for their internal analyses (including their materials management and group purchasing organization functions) and to disclose such information to third party consultants solely for performance of such analyses pursuant to a confidentiality agreement; (ii) HPG shall have the right to disclose terms and pricing information and provide copies of this Agreement to potential Participants and any third party consultants of any potential Participants, pursuant to a confidentiality agreement; (iii) HPG shall have the right to disclose terms and pricing information and provide copies of this Agreement to Participants and any third party consultants of Participants, provided such disclosure is made pursuant to the terms of a confidentiality agreement; (iv) HPG shall have the right to provide copies of this Agreement to potential purchasers of any Participant and any third party consultants of any potential

HIGHLY CONFIDENTIAL

BWI-INN00052101
BWI-INN00052079

purchasers of any Participants, provided such disclosure is made pursuant to the terms of a confidentiality agreement; (v) Vendor shall have the right to provide copies of this Agreement to any prospective buyer of rights with respect to the Products, provided such disclosure is made pursuant to the terms of a confidentiality agreement; (vi) HPG, Purchasers and Vendor shall have the right to provide Product pricing information to Distributors and third party e-commerce companies that process orders between Purchasers and Vendor, provided such disclosure is made pursuant to the terms of a confidentiality agreement; (vii) Purchasers shall have the right to disclose de-identified transaction data related to aggregate purchases of Products by product category to entities that aggregate purchasing data from individual facilities; and (viii) a Receiving Party shall be entitled to disclose Confidential Information as requested or required by law, court order, subpoena or regulatory agency request, provided that immediate notice of such request is given to the Disclosing Party to provide an opportunity to oppose such request for disclosure. Any confidentiality agreement required by this Section 11.2 shall have terms that are substantially similar to those contained in Sections 11.1 and 11.2.

11.3.  <u>HIPAA Requirements</u>.  Vendor acknowledges that many Purchasers are "covered entities" as that term is defined at 45 C.F.R. § 160.103.  To the extent applicable to this Agreement, Vendor agrees to comply with the Health Information Technology for Economic and Clinical Health Act of 2009 (the "**HITECH** Act"), the Administrative Simplification Provisions of the Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. § 1320d et seq.  ("**HIPAA**") and any current and future regulations promulgated under either the HITECH Act or HIPAA, including without limitation the federal privacy regulations contained in 45 C.F.R. Parts 160 and 164 (the "**Federal Privacy Regulations**"), the federal security standards contained in 45 C.F.R. Parts 160, 162 and 164 (the "**Federal Security Regulations**"), and the federal standards for electronic transactions contained in 45 C.F.R. Parts 160 and 162 (the "**Federal Electronic Transactions Regulations**"), all as may be amended and/or supplemented from time to time, and all collectively referred to herein as the "**HIPAA Requirements**". Vendor agrees to not use or further disclose any "Protected Health Information", including "Electronic Protected Health Information" (all terms in quotes in this section are as defined in the HIPAA Requirements) other than as permitted by the HIPAA Requirements and the terms of this Agreement. Vendor will make its internal practices, books, and records relating to the use and disclosure of Protected Health Information available to the Secretary of HHS, upon request, for determining compliance with the HIPAA Requirements.  To the extent Vendor is a "**Business Associate**" and any Purchaser is a "**Covered Entity**", Vendor agrees to negotiate and enter into any further agreements that are applicable to the transactions contemplated under this Agreement as necessary to facilitate compliance with the HIPAA Requirements ("**Business Associate Contracts**").  The Business Associate Contracts will govern Vendor's access to "**Protected Health Information**" as defined under HIPAA, and compliance with relevant privacy provisions of HIPAA, including access to Vendor's books and records.

11.4.  <u>Data Use</u>. Vendor and HPG shall not sell, market or commercialize data (whether or not deemed Confidential Information) made available by HPG or Purchasers hereunder or related to purchases by Purchasers hereunder, create derivative products or applications based on such data, or otherwise use such data in any manner not expressly permitted in this Agreement or permitted in writing by the Disclosing Party, except that HPG may use such data to perform its GPO functions, including for benchmarking purposes.

HIGHLY CONFIDENTIAL

BWI-INN00052102
BWI-INN00052079

DocuSign Envelope ID: 61B50B37-E71A-4626-B1F4-2E5EB4BB2670

## 12.0    Insurance

Throughout the Term, Vendor shall maintain at its own expense commercial general liability insurance and product liability insurance (including coverage for completed operations) for bodily injury, death and property damage covering Vendor for claims, lawsuits or damages arising out of its performance under this Agreement, and any negligent or otherwise wrongful acts or omissions by Vendor or any Vendor Personnel, with HPG listed as an additional insured under commercial general liability.  All such policies of insurance will be provided on an occurrence basis, and each such policy shall provide limits of liability in the minimum amounts specified in Exhibit B.  Vendor shall also maintain Automobile Liability insurance with limits of one million dollars ($1,000,000) combined single limit, Worker's Compensation with statutory limits as applicable, and Employer's Liability insurance with limits of one million dollars ($1,000,000).  Upon HPG's written request, Vendor or Vendor's agent shall provide HPG with a copy of all certificates of insurance evidencing the existence of all coverage required hereunder. Vendor shall provide HPG with not less than thirty (30) days prior written notice of a cancellation in the liability policies of Vendor.  For avoidance of doubt, any insufficiency of Vendor's insurance limits or denial of coverage by Vendor's insurance carriers shall in no way limit Vendor's liability for damages under this Agreement.

## 13.0    Termination of Agreement

13.1.    <u>Termination with Cause</u>.  In addition to the termination rights stated in Sections 7.6, 14.5, 14.7, 19.1, 19.9 and 19.15, Vendor and HPG shall each have the right to terminate this Agreement in its entirety or with respect to certain Products or Services for Cause, which is not cured within thirty (30) days following receipt of written notice thereof specifying the Cause.  Vendor and any Purchaser shall each have the right to terminate any of their respective obligations hereunder as to the other for Cause, which is not cured within thirty (30) days following receipt of written notice thereof specifying the Cause.

13.2.    <u>Termination without Cause</u>.

13.2.1  For Sole Source Awards only, HPG shall have the right, at any time during the Term, to terminate this Agreement in its entirety, without Cause, by providing at least sixty (60) days prior written notice, without any liability to Vendor for such termination.

13.2.2  If the award basis is other than Sole Source, (i) HPG shall have the right to terminate this Agreement in its entirety, without Cause, by providing at least sixty (60) days prior written notice, without any liability to Vendor for such termination, and (ii) Vendor shall have the right to terminate this Agreement in its entirety, without Cause, by providing at least ninety (90) days prior written notice, without any liability to HPG for such termination.

13.3.    <u>Change of Control.</u>  HPG shall also have the right to terminate this Agreement in its entirety or with respect to certain Products or Services, upon sixty (60) days' prior written notice, upon the transfer, directly or indirectly, by sale, merger or otherwise, of substantially all of the assets of Vendor or its ultimate parent or any permitted assignee (upon assignment to such assignee) or if more than forty-nine percent (49%) of the ownership interest of Vendor, its ultimate parent or any such permitted assignee, is transferred to an independent third party entity.

HIGHLY CONFIDENTIAL

BWI-INN00052103
BWI-INN00052079

13.4. <u>Remedies</u>.  Subject to the provisions of Section 13.6, any termination by either Party, whether for breach or otherwise, shall be without prejudice to any claims for damages or other rights against the other Party, or between Vendor and any Purchaser, that preceded termination.  No specific remedy set forth in this Agreement shall be in lieu of any other remedy to which a Party or any Purchaser may be entitled pursuant to this Agreement or otherwise at law or equity.

13.5. Intentionally Omitted.

13.6. <u>Survival of Terms</u>.  Any terms in this Agreement which by their nature must survive after the Term to give their intended effect shall be deemed to survive termination or expiration of this Agreement.

## 14.0  **Compliance Requirement; Books and Records; Physician Ownership Interests and Compensation Arrangements**

14.1. <u>Access to Vendor Records</u>.

14.1.1 If Vendor provides Services under this Agreement worth ten thousand dollars ($10,000) or more over a consecutive twelve (12) month period, and to the extent the requirements of 42 C.F.R. § 420.300 *et seq.* are applicable to the transactions contemplated by this Agreement, Vendor shall make available to the Secretary of HHS, the Comptroller General of the Government Accountability Office (**"GAO"**) and their authorized representatives, upon request, all contracts, books, documents and records relating to the nature and extent of charges hereunder until the expiration of four (4) years after Services are furnished under this Agreement if Services are of the type reimbursable under Medicare or any other government healthcare program.

14.1.2 If Vendor subcontracts with an organization "related" to Vendor to fulfill Vendor's obligations under this Agreement, and if said subcontract is worth ten thousand dollars ($10,000) or more over a consecutive twelve (12) month period, Vendor shall ensure that such subcontract contains a clause substantially identical to Section 14.1.1, which permits access by the HHS, GAO and their representatives to the "related" organization's books and records.

14.2. <u>Discount Laws and Regulations</u>.

14.2.1 Vendor agrees to comply with 42 U.S.C. § 1320a-7b(b)(3)(A) and the "safe harbor" regulations regarding discounts or other reductions in price set forth at 42 C.F.R. § 1001.952(h).

14.2.2 Vendor shall include language on its invoices advising the Purchasers that the prices stated may be subject to further reductions and reminding the Purchasers of their cost reporting obligations.

14.2.3 Purchasers may request additional information from Vendor to meet their reporting or disclosure obligations by writing to Vendor at the address stated in Exhibit B.

14.2.4 Vendor shall separately list the prices, shipping fees and taxes applicable to capital cost components (e.g., equipment that must be either capitalized or reported as lease expense) and operating cost components (e.g., services and/or supplies) on an invoice

HIGHLY CONFIDENTIAL

BWI-INN00052104
BWI-INN00052079

or agreement with a Purchaser. The price for all capital component items must be reported on the invoice or agreement at the net price, with no Price Concession to be received separately or at a later point in time.

14.3.  <u>Government Contractor Requirements.</u>  HPG is not a federal government contractor; however, some of the Purchasers that will purchase from Vendor under this Agreement may be federal government contractors or subcontractors.  Vendor acknowledges that purchase orders by any such entities incorporate the contract clauses regarding equal employment opportunity and affirmative action contained in 41 C.F.R. § 60-1.4 (Executive Order 11246), 41 C.F.R. § 60-250.5, 60-300.5 (Vietnam Era Veterans Readjustment and Assistance Act),41 C.F.R. § 60-741.5 (Rehabilitation Act) and 29 C.F.R. § 471 (Executive Order 13496).  The Parties do not intend that inclusion of this Section 14.3 shall confer any rights on any individual or employee of Vendor.

14.4.  <u>Audit Rights.</u>

14.4.1  <u>Right to Audit Vendor</u>.  HPG shall have the right, to review Vendor's books, documents and records (whether in hard copy, electronic or other form) that pertain directly to the Product purchases under this Agreement, the amounts payable to Vendor under this Agreement, and the GPO Fees and Rebates payable by Vendor for the Products provided by Vendor hereunder. HPG shall exercise such right only during normal business hours and with reasonable advance notice to Vendor.  Audits will be limited to one in any 12-month period and, unless in response to a governmental investigation, audits will be limited to the purchases of Products within three (3) years prior to the date of the audit request.  The audit may be conducted by employees of HPG or its Affiliates (including contract employees) or by an external auditing firm selected by HPG.

14.4.2  <u>Methodology</u>.  The methodology for such audit may include sampling and extrapolation in accordance with standard statistical estimations. In connection with any such audit, Vendor shall provide an aging report, as well as a report containing the following data fields:  GPOID or GLN, COID, Customer Number, Facility/Customer Name, Street Address, City, State, Invoice Date, Invoice Number, PO Number, HPG Contract Number, Contract Name and Description, Product/Item Number, Product/Item Description, Unit of Measure, Quantity Shipped, Unit Price, and Extended Price. HPG reserves the right to reasonably request, and Vendor agrees to provide, any additional data pertinent to the audit.  At the request of HPG, the requested records shall be provided to HPG in electronic form.

14.4.3  <u>Costs</u>.  The cost of the audit, including the cost of the auditors, shall be paid by HPG. HPG shall have no obligation to pay any costs incurred by Vendor or Vendor Personnel in cooperating with HPG in such audit.

14.4.4  <u>Audit Executive Summary and Payments</u>.  Upon completion of the audit, Vendor will be notified in writing of the results (an **"Executive Summary"**).  If no response to the Executive Summary is received from Vendor within forty-five (45) days following its issuance, the Executive Summary shall be deemed accepted by Vendor, and HPG will issue an invoice to Vendor for any amounts due.  Vendor shall pay HPG for proper application and allocation, the amount of any overcharges and unapplied credits (as to Purchasers) and underpayments (as to HPG) determined by

HIGHLY CONFIDENTIAL

BWI-INN00052105
BWI-INN00052079

the audit within thirty (30) days from receipt of an invoice from HPG. Payment by Purchasers of mutually negotiated prices for Products that are less than those listed in Exhibit A shall not be considered to be undercharges and shall not be applied to reduce the amount of any overcharges by Vendor. If the result of the audit is that Vendor has overpaid GPO Fees to HPG, such overpayment may be used as a credit against future GPO Fees payable by Vendor to HPG.

14.4.5  <u>Disputes; Settlement Exclusions</u>.  The Parties agree to use good faith efforts to resolve any dispute that may arise from any Executive Summary issued pursuant to Section 14.4.4. If HPG and Vendor enter into any settlement with respect to an audit conducted hereunder, each Purchaser shall have the right to be excluded from such settlement, provided that the pro rata portion of such settlement paid by Vendor that is allocable to such Purchaser is refunded by HPG.

14.4.6  <u>Pricing Validation</u>.  The foregoing provisions for conducting audits shall not be construed to preclude HPG or any Purchaser from conducting limited-in-scope reviews of charges by Vendor for purchases under this Agreement to validate accurate invoicing, and requesting that Vendor correct any inaccurate invoices discovered by such review. For clarification purposes, such reviews will not be conducted at Vendor's premises or offices.

14.4.7  <u>Allegations of Purchaser Non-Compliance</u>.  If Vendor reasonably determines that a Purchaser is not Compliant, Vendor may notify HPG in a writing accompanied by documentation supporting such determination of Purchaser's non-Compliance. HPG will work with such Purchaser to address the issues raised by Vendor, and will respond to Vendor in writing within forty-five (45) days following receipt of Vendor's notice. If HPG fails to respond within such 45-day period, or if HPG validates Vendor's allegations of non-Compliance, such Purchaser shall have thirty (30) days following the expiration of such 45-day period in which to cure the non-Compliance. If such Purchaser fails to cure such non-Compliance by the expiration of such 30-day period, such Purchaser shall be moved to the Access tier.

14.5.  <u>Warranty of Non-exclusion.</u>

14.5.1  Vendor represents and warrants to HPG, Purchasers and their Affiliates that Vendor and its directors, officers, and key employees (i) are not currently excluded, debarred, or otherwise ineligible to participate in the Federal health care programs as defined in 42 U.S.C. § 1320a-7b(f) (the **"Federal Healthcare Programs"**) or any state healthcare program; and (ii) no final adverse action, as defined in 42 USC § 1320a-7(e) and 42 USC § 1320a-7(g), has occurred or is pending against Vendor. These representations and warranties shall be ongoing during the Term, and Vendor shall immediately notify HPG of any change in the status of the representations and warranties set forth in this Section 14.5. Any breach of this Section 14.5 shall give HPG the right to terminate this Agreement immediately.

14.5.2  HPG represents and warrants to Vendor and its Affiliates that HPG and its directors, officers, and key employees (i) are not currently excluded, debarred, or otherwise ineligible to participate in the Federal Healthcare Programs or any state healthcare program; and (ii) no final adverse action, as defined in 42 USC § 1320a-7(e) and 42 USC § 1320a-7(g), has occurred or is pending against HPG. These representations

HIGHLY CONFIDENTIAL

and warranties shall be ongoing during the Term, and HPG shall immediately notify Vendor of any change in the status of the representations and warranties set forth in this Section 14.5.2. Any breach of this Section 14.5.2 shall give Vendor the right to terminate this Agreement immediately.

14.6.  <u>No Remuneration</u>. Vendor represents and warrants to HPG and Purchasers that Vendor has not made, is not obligated to make, and will not make any payment or provide any remuneration or items of intrinsic value to any third party or to HPG, Purchasers or their directors, officers or employees in return for HPG entering into this Agreement or for any business transacted under this Agreement (excluding employee compensation, GPO Fees, Rebates, Distributor payments and GHX payments). HPG represents and warrants to Vendor that HPG has not made, is not obligated to make, and will not make any payment or provide any remuneration or items of intrinsic value to any third party or to Vendor or its directors, officers or employees in return for HPG entering into this Agreement or for any business transacted under this Agreement (excluding employee compensation).

14.7.  <u>Background Checks</u>. Vendor agrees to perform background checks on any Vendor Personnel who have access to, or may have access to, any Purchaser facility for the purpose of delivering, maintaining, servicing, or removing equipment and/or Products, or attending surgical procedures in which the Products are used, to ensure such Vendor Personnel: (i) are not currently excluded, debarred or otherwise ineligible to participate in any Federal Healthcare Program or the healthcare program of any state in which such Vendor Personnel will be providing services for a Purchaser; (ii) have not been convicted of a criminal offense related to the provision of healthcare items or services but have not yet been excluded; (iii) have not been convicted of any felony; (iv) as discovered through any background check or based upon Vendor's knowledge, have not been terminated from employment by any employer or contractor for theft, misappropriation of property, or any other potentially illegal or unethical acts; and (v) have the appropriate I-9 documentation. Vendor agrees not to use any Vendor Personnel failing to meet the above criteria to provide Services or Product Support to any Purchaser under this Agreement. Any breach of this Section 14.7 shall give HPG the right to terminate this Agreement immediately.

14.8.  <u>Vendor Relations Policy</u>. Vendor acknowledges that HPG has a Vendor Relations Policy relating to ethics and compliance issues between suppliers and HPG, and that it can access such policy through the internet at:

http://healthtrustpg.com/ethics-compliance/

If Vendor becomes aware of any action by any HPG employee or representative that is not consistent with the provisions of Section 14.6 or of the Vendor Relations Policy referenced above, Vendor shall so advise HPG's Compliance Officer (either by phone to 615-344-3000, or in writing to HPG's principal place of business) or by calling HPG's Ethics Line at 1-800-345-7419.  If HPG becomes aware of any action by any Vendor Personnel, which is not consistent with the provisions of Section 14.6, HPG shall so advise Vendor at the following address:

Johnson & Johnson Health Care Systems Inc.
425 Hoes Lane
Piscataway, New Jersey 088855-6800
Attention:  Director of Compliance

HPG-4467 - Page **29** of 156

14.9.   <u>Potential Conflicts</u>.  The Johnson & Johnson Policy on Business Conduct, which is available at <u>http://www.investor.jnj.com/governance/conduct.cfm</u>, applies to Vendor and its Affiliates that provide Products under this Agreement.  The referenced policy requires that employees of Vendor and each such Affiliate disclose any actual or potential conflicts of interest, including any potential conflict between an employee and its customers, to Vendor or such Affiliate, as applicable, and HPG.

14.10.   <u>Industry Code of Conduct</u>.  Vendor acknowledges that it subscribes to and follows the Advanced Medical Technology Association ("**AdvaMed**") Code of Conduct, which can be found at <u>http://www.advamed.org</u>.  If Vendor is not a member of AdvaMed, Vendor represents that it is aware of the Code of Conduct for AdvaMed and agrees that Vendor Personnel shall comply with such Code of Conduct.

14.11.   <u>Physician Ownership Interests and Compensation Arrangements</u>.

     14.11.1   <u>Physician Ownership Interests</u>.  Vendor represents and warrants that it is a wholly-owned subsidiary of a publicly traded company with at least $75 million in stockholders' equity at the end of its most recent fiscal year or on average during the previous 3 fiscal years, and that except for public shareholders of Johnson & Johnson, no Physician or Immediate Family Member of a Physician has an Ownership Interest in Vendor unless the identity of such Physician has been previously disclosed in Vendor's Certification (defined in Section 14.11.3 below).  For purposes of this Section 14.11 only, a business that is considered affiliated with Vendor includes, but is not limited to, a parent entity, subsidiary, or other entity controlling, controlled by, or under common control with Vendor, with control meaning the direct or indirect power to govern the management and policies of the entity or the power to approve the entity's transactions through a management agreement or otherwise.

     14.11.2   <u>Physician Compensation Arrangements</u>.  Vendor represents and warrants that, with respect to any and all current and future compensation arrangements in effect during the term of this Agreement between Vendor and a Physician, an Immediate Family Member of a Physician, and any entity in which a Physician or an Immediate Family Member of a Physician has an ownership interest, Vendor is subject to internal policies governing such arrangements, which provide that:

          14.11.2.1   They constitute compensation consistent with fair market value for commercially reasonable and legitimate services under a signed written agreement;

          14.11.2.2   They do not vary with, or otherwise take into account, the volume or value of referrals or other business generated by the Physician for or with any hospital, ASC or health care facility, regardless of whether said compensation otherwise satisfies the special rules set forth in 42 C.F.R § 411.354(d)(2) or (d)(3); and

          14.11.2.3   consulting, product development, royalty agreement or similar arrangements, exclude from the compensation or royalty payment any revenues Vendor receives by virtue of the use of any product, item or

HIGHLY CONFIDENTIAL                               BWI-INN00052108

          BWI-INN00052079

service in question by the following: (i) the Physician or, to the actual knowledge of Vendor's senior management in the absence of willful ignorance ("Knowledge"), any Immediate Family Member of a Physician; (ii) any practice group with which the Physician or, to Vendor's Knowledge, any Immediate Family Member of a Physician is affiliated; (iii) to Vendor's Knowledge, any member, employee or consultant of a practice group of which the Physician or any Immediate Family Member of a Physician is affiliated; (iv) any hospital, ASC or health care facility with which the Physician is employed  or has medical staff privileges; and (v) to Vendor's Knowledge any individual or entity for which the Physician has any actual ability to directly or indirectly control procurement decisions for goods, items or services.

14.11.3    <u>Certification, Notice of Changes and Termination</u>. Vendor has submitted a Physician Ownership & Compensation Certification ("Certification") to HPG and represents and warrants to the continued accuracy of the information provided therein. Vendor will submit a renewed and updated Certification upon request of HPG.  Vendor will also provide HPG with thirty (30) days' advance written notice prior to entering into any transaction inconsistent with the representations and warranties of Sections 14.11.1 and 14.11.2. Upon receipt of any such notice, HPG may immediately terminate this Agreement, without penalty or prejudice, by written notice to Vendor.

14.11.4    For purposes of this Section 14.11, the following terms have the following meanings.  "Physician" means any person who is a doctor of medicine or osteopathy, a doctor of dental surgery or dental medicine, a doctor of podiatric medicine, a doctor of optometry, or chiropractor.  "Immediate Family Member" of a person means that person's husband or wife; birth or adoptive parent, child, or sibling; stepparent, stepchild, stepbrother, or stepsister; father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law; grandparent or grandchild; grandparent's or grandchild's spouse.  "Ownership Interest" means any direct or indirect ownership or investment interest whether through equity, debt or other means, including but not limited to stock, stock options, warrants, partnership shares, limited liability company memberships, as well as loans and bonds.

14.11.5    For the avoidance of any doubt and notwithstanding anything else to the contrary set forth in this Agreement, HPG acknowledges and agrees that its sole remedy upon discovery of any inaccuracy in any representation set forth in this Section 14.11 (Physician Ownership Interests and Compensation Arrangements) HPG may immediately terminate this Agreement, without penalty or prejudice, by written notice to Vendor.

**15.0    <u>Merger of Terms</u>**

15.1.    <u>Entire Agreement; Prior Agreement</u>.  This Agreement constitutes the entire agreement between the Parties and, as of the Effective Date, this Agreement terminates and replaces any existing agreement between HPG and Vendor (the **"Prior Agreement"**) for purchases of products and services comparable to the Products and/or Services by Purchasers.  This

HIGHLY CONFIDENTIAL
BWI-INN00052109
BWI-INN00052079

Agreement shall exclusively govern the purchases of Products and/or Services by Purchasers that occur during the Term.

15.1.1 <u>Other Documents.</u>  The terms of any purchase order issued by a Purchaser shall not apply to purchases of Products and/or Services hereunder, except as necessary to designate specific Products and/or Services, quantities, delivery dates, and other similar terms that may vary from order to order; the terms of this Agreement, to the extent applicable, shall be deemed incorporated into such purchase orders. The terms and conditions contained in any purchase order or other document supplied by a Purchaser or of any invoice, bill of lading, or other documents supplied by Vendor are expressly rejected and superseded by this Agreement and shall not be included in any contract with a Purchaser.

15.1.2 In order to be eligible for committed pricing hereunder, Participants or Groups must complete electronic Letters of Commitment in the form attached as Exhibit D (an **"eLOC"**).  An eLOC is not required for Access pricing.  Any change to the eLOC shall first be approved in writing by HPG.

15.2. <u>Conflicts.</u>  If any conflict arises between the terms herein and the terms of any Exhibit hereto, the priority for control, from first to last priority, shall be Exhibit B, Exhibit A, the terms herein, and then any other Exhibit  The terms of this Agreement shall take priority over any conflicting terms contained in any Vendor Product warranty, whether referenced herein, attached to this Agreement, included with any Product sold by Vendor, or included as part of any facility agreement between Vendor and a Purchaser.  The terms of this Agreement shall take priority over the terms of any facility agreement, commitment form, standardization incentive program acknowledgement, or other similar form signed by a Purchaser and referencing this Agreement, unless such document expressly states otherwise and has been approved in writing by HPG.

**16.0  <u>Modifications of Terms.</u>**

16.1. Amendments.  Subject to Section 16.2, this Agreement, as executed and approved, shall not be modified except by written amendment signed by the Parties hereto expressly stating an intent to modify the terms of this Agreement.

16.2. <u>Exhibit A Revisions</u>.  The following described informal amendment process for revising Exhibit A may be used by the Parties in place of the amendment process specified in Section 16.1 only when revising catalog numbers for Products (**"Exhibit A Revisions"**).  Exhibit A Revisions shall be implemented by transmission or delivery by an authorized representative of one Party of a document expressly stating the desired Exhibit A Revisions and their effective date and a return transmission or delivery by an authorized representative of the other Party of its consent to such Exhibit A Revisions.  The effective date of such Exhibit A Revisions shall be mutually agreed upon by the Parties.  For purposes of clarification, a formal amendment pursuant to Section 16.1 shall be required for any price changes, Product additions and/or deletions, modifications to the Products, changes to Exhibit A other than Exhibit A Revisions, or an extension of the Term, as well as for any modifications to the terms of this Agreement.

HIGHLY CONFIDENTIAL                                                                      BWI-INN00052110
BWI-INN00052079

## 17.0    Minority and Women Owned Business Enterprises

17.1.    Policies. HPG and Vendor acknowledge their respective company policies and practices to not only encourage, but to expand the participation of Minority and Woman Owned Business Enterprises (**"MWBEs"**) in their procurement processes, and their desire to work together to encourage the use of MWBEs in fulfillment of their obligations under this Agreement. As used in this Agreement, MWBEs shall be defined to include any company certified as a minority or woman owned business by the National Minority Supplier Development Council or any local affiliates thereof, or any federal, national, state, municipal, or local agency that certifies minority and/or woman owned businesses in accordance with PL. 95-507.

17.2.    Contracting with MWBEs. Vendor recognizes and acknowledges that, in conjunction with HPG's efforts to involve MWBEs in its contracting process, HPG may enter into purchasing agreements with MWBEs that will enable Participants to purchase supplies and/or equipment comparable to the Products hereunder. In such event, notwithstanding any other terms of this Agreement to the contrary, the Parties agree that if HPG enters into any such agreement with any MWBE, such will not be deemed to be a breach of this Agreement by HPG, nor will any purchases by Participants or their Affiliates from MWBEs be deemed to be a breach of this Agreement or any agreement hereunder between Vendor and a Purchaser.

17.3.    Reporting of MWBE Activity. Upon written request from HPG, Vendor shall identify and report in writing to HPG all MWBE activities in which it participates, specifically identifying such activities and purchases relating to Products and Services obtained under this Agreement (**"MWBE Report"**). Vendor shall identify in such reports any MWBE Subcontractors used during the reporting period. The MWBE contact for Vendor shall be the person listed in Exhibit B. All MWBE Reports shall be sent to:

> Director of Business Diversity
> HealthTrust Purchasing Group, L.P.
> 1100 Charlotte Avenue, Suite 1100
> Nashville, Tennessee 37203

## 18.0    Contracting for Environmentally Acceptable Products

Vendor recognizes and acknowledges that, in conjunction with HPG's efforts to make environmentally acceptable products available to Participants, if the disclosures in Exhibit C indicate that any of the Products contain any of the materials listed in Section 9.2, then HPG may enter into purchasing agreements with suppliers that will enable Participants to purchase alternative products comparable to such Products that do not contain such materials. Notwithstanding any other terms of this Agreement to the contrary, the Parties agree that if HPG enters into any such agreement(s), such will not be deemed to be a breach of this Agreement by HPG, nor will any purchases by Participants or their Affiliates from these alternate sources be deemed to be a breach of this Agreement or any agreement hereunder between Vendor and a Purchaser.

## 19.0    Miscellaneous

19.1.    Publicity. No advertisement or public announcement of the existence of this Agreement or the relationship created hereby may be made by either Party without the consent of the other Party, unless such Party is required by law to do so, or the Parties mutually agree to do so. In such event, the text of any proposed announcement should be first submitted in writing in accordance with Exhibit B (Vendor contact information). Any violation of this provision

HIGHLY CONFIDENTIAL

BWI-INN00052111
BWI-INN00052079

shall confer on the non-breaching Party the right to terminate this Agreement immediately without any right of the breaching Party to cure such breach.

19.2.   <u>Vendor Name and Logos</u>. Vendor hereby authorizes HPG to use Vendor's names and logos, as provided by Vendor to HPG, on the SCRUBS website solely for purposes of providing information about this Agreement to Participants. Any other use of Vendor's names and logos must be pre-approved by Vendor. Upon Vendor's request, HPG will remove any of Vendor's name and logos from the SCRUBS website.

19.3.   <u>Assignment</u>.  Neither Party shall assign this Agreement, in whole or in part, without the prior written consent of the other Party, which consent shall not be unreasonably withheld. Consent by either Party to such assignment in one instance shall not constitute consent by the Party to any other assignment.  Any assignment without such prior written consent shall be void and have no effect.  Notwithstanding the foregoing, consent shall not be required for any of the following: (i) the transfer, in whole or in part, of a Party's rights and obligations under this Agreement to any entity which is an Affiliate of the transferring Party; or (ii) the transfer, in whole or in part, of a Party's rights and obligations under this Agreement in the event of a significant organizational transaction which, in the case of HPG, results in a change in the legal structure of HPG, provided that such new organization meets the necessary requirements as defined in 42 C.F.R. § 1001.952(j). For purposes of this Section 19.3, a "significant organizational transaction" means (a) a transaction such as, without limitation, a spin-off or sale of assets of a business, provided that the entity to which this Agreement is transferred was, in whole or in part, an Affiliate of the transferring Party immediately prior to such significant organizational transaction; or (b) an internal reorganization which results in the transferring Party being organized in one or more different legal entities or any other corporate form(s), whether through conversion, merger, or otherwise. Subject to the foregoing, all terms, conditions, covenants and agreements contained herein shall inure to the benefit of and be binding upon any successor and any permitted assignees of the respective Parties.  If HPG does not consent to any proposed assignment relating to the sale of a Vendor Affiliate or a Vendor Affiliate's rights to any Product, then such sale may proceed, and any affected Products will be removed from this Agreement, effective as of the date of such sale.  If HPG determines, in its sole discretion, that, as a result of such sale, the remainder of this Agreement has been materially changed, then HPG may terminate the entire Agreement upon notice to Vendor.

19.4.   <u>Subcontractors.</u>  Vendor may utilize representatives, agents or other third party entities (each a "**Subcontractor**") in the performance of Vendor's obligations under this Agreement, provided that the following conditions are met: (i) any Subcontractor shall satisfy the background check requirements set forth in Section 14.7; and (ii) any Subcontractor must have signed Vendor's confidentiality agreement and/or business associate agreement (if applicable), in each case with terms at least as restrictive as those contained herein, prior to any involvement in the performance of Vendor's obligations under this Agreement. Vendor hereby guarantees and shall remain responsible for the full compliance by each Subcontractor of all duties and obligations that would otherwise apply to Vendor absent the use of such Subcontractor.  HPG shall not have to assert or exhaust any remedies against any Subcontractor before asserting against Vendor or recovering from Vendor any Damages arising under any Injury or other claim, or exercising any indemnification or other rights under this Agreement.  For purposes of clarity, this Section 19.4 does not apply to Distributors of Product or to commercial delivery services (e.g., FedEx and UPS).

HIGHLY CONFIDENTIAL

BWI-INN00052112
BWI-INN00052079

19.5.   <u>Independent Contractor Relationship.</u>  The Parties are independent contractors and that this Agreement does not create any partnership, agency, employment, or joint venture relationship, or any right of either Party or its agents or employees to bind or obligate the other Party to any legal or financial obligation.

19.6.   <u>Severability.</u>   If any provision of this Agreement should for any reason be held invalid, unenforceable or contrary to public policy, the remainder of the Agreement shall remain in full force and effect notwithstanding.

19.7.   <u>Waivers.</u>  The waiver of any provision of this Agreement or any right, power or remedy hereunder shall not be effective unless made in writing and signed by both Parties.  No failure or delay by either Party in exercising any right, power or remedy with respect to any of its rights hereunder shall operate as a waiver or future waiver thereof.

19.8.   <u>Dispute Resolution.</u>  In the event of any controversy or claim arising out of or relating to this Agreement, the Parties shall first attempt to mediate the dispute using a professional mediator from the American Arbitration Association (**"AAA"**) or a like organization selected by agreement or, absent agreement, through selection procedures administered by the AAA. Within a period of forty-five (45) days after the request for mediation, the Parties shall convene with the mediator, with business representatives present, for at least one session to attempt to resolve the matter. In no event shall mediation delay commencement of arbitration for more than forty-five (45) days, absent agreement of the Parties, or interfere with the availability of emergency relief. Any dispute not settled through mediation shall be resolved by arbitration before a single arbitrator in accordance with the AAA commercial arbitration rules then pertaining (available at www.adr.org), except where those rules conflict with this provision, in which case this provision controls. Any court with jurisdiction shall enforce this clause and enter judgment on any award. The arbitrator shall be selected within twenty (20) business days from commencement of the arbitration from the AAA's national roster of arbitrators pursuant to agreement or through selection procedures administered by the AAA. Within forty-five (45) days of initiation of arbitration, the Parties shall reach agreement upon and thereafter follow procedures, including limits on discovery, assuring that the arbitration shall be concluded and the award rendered within no more than eight (8) months from selection of the arbitrator or, failing agreement, procedures meeting such time limits shall be designed by the AAA and adhered to by the Parties. The arbitration shall be held in Tennessee and the arbitrator shall apply the substantive law of Tennessee, except that the interpretation and enforcement of this arbitration provision shall be governed by the federal arbitration act. **The arbitrator shall not award cover, punitive, exemplary, multiplied or consequential damages, or attorneys' fees or costs, except as may be required by statute, and each entity bound hereby irrevocably waives any right to seek such damages in arbitration or judicial proceedings.  Each Party irrevocably waives its right to trial of any issue by jury.**  Each Party has the right to pursue provisional relief from any court, such as attachment, preliminary injunction, replevin, etc., to avoid irreparable harm, maintain the status quo, or preserve the subject matter of the arbitration, even though mediation has not been commenced or completed.  For the avoidance of doubt, the Parties agree that this Agreement shall be interpreted in accordance with Tennessee law. Notwithstanding the foregoing, reasonable legal fees and costs incurred by a Purchaser in connection with a Personal Data Breach as contemplated by Section 9.14 shall be recoverable.

HIGHLY CONFIDENTIAL

BWI-INN00052113
BWI-INN00052079

19.9.  <u>Change in Law</u>.  If any governmental entity shall enact or amend a law or adopt or amend a regulation, or if any governmental entity or court of competent jurisdiction shall adopt or amend an interpretation of a law or regulation, or if a judgment/award is rendered in litigation/arbitration, that has the effect of (a) prohibiting any right or obligation of a Party under this Agreement, (b) making any such right materially less valuable or any such obligation materially more burdensome to a Party, or (c) changing materially the economic conditions underlying any portion of this Agreement (any of the foregoing, a **"Material Change"**), then either Party may request renegotiation of the affected term or terms of this Agreement, upon written notice to the other Party setting forth the basis for such request, to remedy such condition. In the interim, the Parties shall perform their obligations hereunder in material compliance with law to the extent it is feasible to continue performance. The Parties expressly recognize that upon request for renegotiation following a Material Change, each Party has a duty and obligation to the other only to renegotiate the affected term or terms in good faith and, further, the Parties expressly agree that their consent to proposals submitted by the other Party during renegotiation efforts shall not be unreasonably withheld. The Parties further expressly recognize that in any such renegotiation, the relative economics to each of the Parties shall be preserved, to the extent reasonably possible. Should the Parties be unable to reach a mutually satisfactory resolution with respect to the affected term or terms within sixty (60) days after the date on which written notice of a desired renegotiation is given, then either Party shall be entitled, after the expiration of said 60-day period, to terminate this Agreement upon delivering notice to the other Party.

19.10.  <u>Headings; Interpretations</u>. The descriptive headings of the sections of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any provision hereof.  In this Agreement, unless the context otherwise requires, (i) the term "days" means calendar days; and (ii) the term "including" shall mean, "including, without limitation."

19.11.  <u>Notices</u>. Notices under this Agreement shall all be in writing, shall be effective upon receipt and shall be sent by any of the following methods: (i) facsimile or e-mail with return facsimile or e-mail acknowledging receipt; (ii) United States Postal Service certified or registered mail with return receipt showing receipt; (iii) courier delivery service with proof of delivery; or (iv) personal delivery.  Either Party may change the name and address of any of its designated recipients of notices by giving notice as provided for herein.  Notices to Vendor shall be sent to the person at the address listed in Exhibit B.  Unless stated otherwise in this Agreement, notices to HPG shall be sent as follows:

> Senior Vice President, Strategic Sourcing
> HealthTrust Purchasing Group, L.P.
> 1100 Charlotte Avenue, Suite 1100
> Nashville, Tennessee 37203

19.12.  <u>Counterparts; Execution</u>.  This Agreement and any amendments hereto may be executed by the Parties hereto individually or in any combination, in one or more counterparts, each of which shall be an original and all of which shall together constitute one and the same agreement.  Execution and delivery of this Agreement and any amendments by the Parties shall be legally valid and effective through: (i) executing and delivering the paper copy of the document; (ii) transmitting the executed paper copy of the document by facsimile transmission, or electronic mail in "portable document format" (".pdf") or other electronically scanned format; or (iii) creating, generating, sending, receiving or storing by

HIGHLY CONFIDENTIAL

BWI-INN00052114
BWI-INN00052079

electronic means this Agreement and any amendments, the execution of which is accomplished through use of an electronic process associated with this Agreement, and executed or adopted by a Party with the intent to execute this Agreement (i.e., "electronic signature" through a process such as DocuSign®).

19.13.  Own Use.  All Products sold to Purchasers must be used in the United States by the Purchasers solely on human inpatients, outpatients, home health patients, staff, employees, and students for their own or their dependents' use, and not for resale in retail outlets, veterinary institutions or to third parties.  Notwithstanding the foregoing, Product transfers (i) by Consolidated Services Centers and (ii) between Participants within a Group on an emergency basis, are permitted.

19.14.  No Set-Off. Neither Party nor any Purchaser or any of their Affiliates will deduct or set-off, from payments under this Agreement, amounts allegedly owed to such Party or a Purchaser or any of their Affiliates under a separate agreement or cause of action.

19.15.  Force Majeure.  Noncompliance with any obligation under this Agreement due to events such as acts of God; war, terrorism or civil commotion; destruction of production facilities or materials; fire, earthquake or storm; labor disturbances; failure of public utilities or common carriers; or any other causes beyond the reasonable control of a Party (each, a **"Force Majeure Event"**) will not constitute a breach of this Agreement.  If the Force Majeure Event continues for thirty (30) days or more, the compliant Party may terminate this Agreement upon delivery of notice to the non-compliant Party.

*[Signature Page Follows]*

HIGHLY CONFIDENTIAL

BWI-INN00052115
BWI-INN00052079

**IN WITNESS WHEREOF**, the Parties hereby indicate their acceptance of the terms of this Agreement by the signatures of their duly authorized representatives.

**HealthTrust Purchasing Group, L.P.,**
by HPG Enterprises, LLC, its general partner

HealthTrust Signee: _Michael Berryhill_
79E2ED3B1744443...

HealthTrust Signee Name: Michael Berryhill

HealthTrust Signee Title: COO

HealthTrust Signature Date: 6/18/2018

**Johnson & Johnson Health Care Systems, Inc.**

Vendor Signee: _Anne Johnson_
B1A819198A8340F.

Vendor Signee Name: Anne Johnson

Vendor Signee Title: Enterprise Contracting Director

Vendor Signature Date: 5/24/2018

HIGHLY CONFIDENTIAL

BWI-INN00052116
BWI-INN00052079

## **Exhibits List**

*The following Exhibits are part of the Agreement and are hereby incorporated by reference.*

A. Products, Prices, Rebates and Compliance
  A-1 – Equipment Pricing Grid
  A-2 – Consumable Pricing Grid
  A-3 – Products and Pricing
  A-4 - Advantage Software Agreement Lite (ASA LITE)

B. Specific Purchasing Terms

C. Environmental Disclosure Chart

D. Electronic Letter of Commitment Form

E. Returned Goods Policy

F. On Premises Software Terms and Conditions

HIGHLY CONFIDENTIAL

BWI-INN00052117
BWI-INN00052079

**HealthTrust Purchasing Group, L.P.**
**Purchasing Agreement**
**No.: HPG-4467**
**Vendor: Johnson & Johnson Health Care Systems Inc.**
**Effective Date: August 1, 2018**

Exhibit A

**Products and Services with Prices**

Definitions:

"Contract Quarter" shall be defined as the three-month period commencing on the Effective Date, and each three-month period thereafter during the Term.

"Semi-Annual Period" shall be defined as the six-month period commencing on the Effective Date, and each six-month period thereafter during the Term.

Products and Pricing:
    a.  The Products that Vendor will offer for sale to Participants under this Agreement, together with the applicable prices and performance requirements, are set forth in:
        i.  Exhibit A-1: Equipment
        ii.  Exhibit A-2: Disposables
The tier selected by a Participant on its eLOC will apply to all Disposables.

    b.  Pricing will remain firm for the Term of this Agreement. In the event that the Term is extended beyond the period set forth herein, the Parties will mutually agree upon, and set forth in an amendment hereto, the pricing applicable to any extended period.

    c.  Subject to the terms and conditions of this Agreement, the Vendor shall offer the Products to the Participants at the prices stated in Exhibits A-1 and A-2 applicable to the tier selected by the Participant. The Participant is committing that, in a given Semi-Annual Period, the Participant's' NCP (as defined below) will meet or exceed the requirements set forth for the pricing tier selected by the Participant in the eLOC. The tiers available under this Agreement and the Semi-Annual Period NCP requirements for each are listed below:

| Tier Name | Tier Description |
|---|---|
| Tier 1 | Participant commits to purchase from Vendor at least $1.0MM total Disposables NCP during each Semi-Annual Period |
| Tier 2 | Participant commits to purchase from Vendor at least $500k total Disposables NCP during each Semi-Annual Period |
| Tier 3 | Participant commits to purchase from Vendor at least $250k total Disposables NCP during each Semi-Annual Period |
| Tier 4 | Participant commits to purchase from Vendor at least $125k total Disposables NCP during each Semi-Annual Period |
| Tier 5 | Access Level.  **(eLOC is NOT Required)** |

HIGHLY CONFIDENTIAL

BWI-INN00052118
BWI-INN00052079

DocuSign Envelope ID: 61B50837-E714-4EC6-A131-2E5EB4BB267D

d.  Vendor will review each Participant's purchases of Committed Products within thirty (30) days following the expiration of each Contract Quarter. If the Participant's NCP during any Contract Quarter, calculated on a semi-annualized basis, does not meet its commitment, then such Participant agrees to participate in a utilization business review with Vendor. Vendor shall also review each Participant's compliance to commitments once following each Semi-Annual Period. If a Participant's NCP during any Semi-Annual Period did not meet the purchasing dollar threshold for the selected pricing tier, then Vendor may notify HPG in a writing accompanied by documentation supporting such determination of Non-Compliance, and the Participant shall have thirty (30) days following HPG's receipt of such notice in which to cure the Non-Compliance.  If the Participant fails to cure such Non-Compliance by the expiration of such 30-day period, as Vendor's sole remedy, such Participant shall be moved to the tier of pricing that reflects its actual purchasing pattern.  If, however, a Participant's purchase of Committed Products during a Semi-Annual Period exceeded the purchasing requirements for its tier such that the Participant would have met the Compliance level for a better tier of pricing, Vendor shall notify HPG in a writing accompanied by documentation and such Participant shall be moved to such better tier of pricing that reflects its actual purchasing pattern.

HIGHLY CONFIDENTIAL

BWI-INN00052119
BWI-INN00052079

**Exhibit A-1**

**Equipment Pricing Grid**

| Mfr Catalog Number | Long Description | UOM | UOM Factor | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Access |
|---|---|---|---|---|---|---|---|---|
| C3BASECMP2 | CARTO 3 SYSTEM. INCLUDES (I) BASELINE SOFTWARE LICENSE (II) | EA | 1 | $ 237,700.00 | $ 237,700.00 | $ 237,700.00 | $ 237,700.00 | $ 276,500.00 |
| C3BASERMT2 | CARTO 3 SYSTEM. INCLUDES (I) BASELINE SOFTWARE LICENSE (II) | EA | 1 | $ 224,200.00 | $ 224,200.00 | $ 224,200.00 | $ 224,200.00 | $ 260,900.00 |
| C3BASE2 | CARTO 3 SYSTEM. INCLUDES (I) BASELINE SOFTWARE LICENSE (II) | EA | 1 | $ 182,600.00 | $ 182,600.00 | $ 182,600.00 | $ 182,600.00 | $ 212,500.00 |
| KT5400124 | KIT ABLATION CARTOALARA | EA | 1 | $ 148,500.00 | $ 148,500.00 | $ 148,500.00 | $ 148,500.00 | $ 148,500.00 |
| C3PRWSAOCE2 | CARTO 3 SYSTEM PREMIUM WITH HARDWARE REFRESH SMARTABLATE SER | EA | 1 | $ 125,000.00 | $ 125,000.00 | $ 125,000.00 | $ 125,000.00 | $ 125,000.00 |
| C3PRWSA2 | CARTO 3 SYSTEM PREMIUM WITH HARDWARE REFRESH AND SMARTABLATE | EA | 1 | $ 105,000.00 | $ 105,000.00 | $ 105,000.00 | $ 105,000.00 | $ 105,000.00 |
| C3PR3 | CARTO® 3 System Premium (includes Basic; account has no warranty) - Three Year | EA | 1 | $  90,000.00 | $  90,000.00 | $  90,000.00 | $  90,000.00 | $  90,000.00 |
| 2C3PS3 | CARTO® 3 System Premium (includes Basic; account has no warranty)  for 2 or more systems - Three Year | EA | 1 | $  81,000.00 | $  81,000.00 | $  81,000.00 | $  81,000.00 | $  81,000.00 |
| C3PRW2 | CARTO 3 SYSTEM PREMIUM WITH HARDWARE REFRESH-TWO YEAR | EA | 1 | $  80,000.00 | $  80,000.00 | $  80,000.00 | $  80,000.00 | $  80,000.00 |
| C3TOPPS3 | CARTO® 3 System Time of Purchase Premium | EA | 1 | $  76,500.00 | $  76,500.00 | $  76,500.00 | $  76,500.00 | $  76,500.00 |

HIGHLY CONFIDENTIAL

BWI-INN00052120
BWI-INN00052079

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | (includes Basic; account has no warranty) - Three Year | | | | | | | |
| C3PR2 | CARTO 3 SYSTEM PREMIUM (INCLUDES BA | EA | 1 | $ 64,000.00 | $ 64,000.00 | $ 64,000.00 | $ 64,000.00 | $ 64,000.00 |
| 2C3PS2 | CARTO® 3 System Premium (includes Basic; account has no warranty) for 2 or more systems - Two Year | EA | 1 | $ 57,600.00 | $ 57,600.00 | $ 57,600.00 | $ 57,600.00 | $ 57,600.00 |
| C3PRWSA 1 | CARTO 3 SYSTEM PREMIUM WITH HARDWARE REFRESH AND SMARTABLATE | EA | 1 | $ 57,500.00 | $ 57,500.00 | $ 57,500.00 | $ 57,500.00 | $ 57,500.00 |
| CMCSCFC 3 | SOFTWARE 1 YEAR PREMIUM COMPLEX FRACTIONATED ATRIAL ELECTROGRAM CARTOSOUND MEDICAL | EA | 1 | $ 55,000.00 | $ 55,000.00 | $ 55,000.00 | $ 55,000.00 | $ 55,000.00 |
| C3TOPPS2 | CARTO® 3 System Time of Purchase Premium (includes Basic; account has no warranty) - Two Year | EA | 1 | $ 54,400.00 | $ 54,400.00 | $ 54,400.00 | $ 54,400.00 | $ 54,400.00 |
| M490006A | KIT IRRIGATION SMARTABLATE SUPER | EA | 1 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 |
| C3PRW1 | CARTO 3 SYSTEM PREMIUM WITH HARDWARE REFRESH-ONE YEAR | EA | 1 | $ 47,500.00 | $ 47,500.00 | $ 47,500.00 | $ 47,500.00 | $ 47,500.00 |
| CONRPWS | Carto® 3 System ConfiDense™ Mapping Module with Carto® 3 CartoReplay™ Module Bundle and T5810 Workstation Upgrade **for T3400, T3500, and T3610 workstations | EA | 1 | $ 44,000.00 | $ 44,000.00 | $ 44,000.00 | $ 44,000.00 | $ 44,000.00 |
| C3MERGE | SOFTWARE INTEGRATION CARTOMERGE MEDICAL | EA | 1 | $ 42,000.00 | $ 42,000.00 | $ 42,000.00 | $ 42,000.00 | $ 42,000.00 |
| C3SOUND | SOFTWARE IMAGE | EA | 1 | $ 41,600.00 | $ 41,600.00 | $ 41,600.00 | $ 41,600.00 | $ 41,600.00 |

Page A-4

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | INTERGRATION MODULE CARTO SOUND MEDICAL | | | | | | | |
| C3RMT | SOFTWARE KIT MEDICAL | EA | 1 | $ 41,600.00 | $ 41,600.00 | $ 41,600.00 | $ 41,600.00 | $ 41,600.00 |
| C3PR1 | CARTO 3 SYSTEM PREMIUM (INCLUDES BA | EA | 1 | $ 35,000.00 | $ 35,000.00 | $ 35,000.00 | $ 35,000.00 | $ 35,000.00 |
| KT5401110 F | Quick Pace Solution Kit ***only for existing C3 Systems with Serial #'s <13000 | EA | 1 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 |
| C3CNFDR PLY | Carto® 3 System ConfiDense™ Mapping Module with Carto® 3 CartoReplay™ Module Bundle **for T3610 and T5810 workstations | EA | 1 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 |
| CONFDWS | Carto® 3 System ConfiDense™ Mapping Module including T5810 Workstation Upgrade **for T3400, T3500, and T3610 workstations | EA | 1 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 |
| 2C3PS1 | CARTO® 3 System Premium (includes Basic; account has no warranty) for 2 or more systems - One Year | EA | 1 | $ 31,500.00 | $ 31,500.00 | $ 31,500.00 | $ 31,500.00 | $ 31,500.00 |
| C3TOPPS1 | CARTO® 3 System Time of Purchase Premium (includes Basic; account has no warranty) - One Year | EA | 1 | $ 29,750.00 | $ 29,750.00 | $ 29,750.00 | $ 29,750.00 | $ 29,750.00 |
| M490007 | SmartAblate™ Generator | EA | 1 | $ 27,000.00 | $ 27,000.00 | $ 27,000.00 | $ 27,000.00 | $ 27,000.00 |
| C3PASO | PASO MODULE FOR CARTO 3 | EA | 1 | $ 25,300.00 | $ 25,300.00 | $ 25,300.00 | $ 25,300.00 | $ 25,300.00 |
| C3CONFD | SYSTEM NAVIGATION CARTO 3 CONFIDENSE MAP MODULE UPGRADE KIT | EA | 1 | $ 22,000.00 | $ 22,000.00 | $ 22,000.00 | $ 22,000.00 | $ 22,000.00 |
| C3REPLA Y | MODULE CATHETER CARTO 3 CARTOREPLAY | EA | 1 | $ 22,000.00 | $ 22,000.00 | $ 22,000.00 | $ 22,000.00 | $ 22,000.00 |
| SVSA2 | SmartAblate™ System Premium | EA | 1 | $ 19,000.00 | $ 19,000.00 | $ 19,000.00 | $ 19,000.00 | $ 19,000.00 |

HIGHLY CONFIDENTIAL

BWI-INN00052122
BWI-INN00052079

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Service Agreement - Two Year | | | | | | | |
| 2SASVS2 | SmartAblate™ Multi-System Premium Service Agreement - Two Year | EA | 1 | $ 17,100.00 | $ 17,100.00 | $ 17,100.00 | $ 17,100.00 | $ 17,100.00 |
| SATOPSVS2 | SmartAblate™ System Time of Purchase Premium Service Agreement - Two Year | EA | 1 | $ 16,150.00 | $ 16,150.00 | $ 16,150.00 | $ 16,150.00 | $ 16,150.00 |
| M490008 | SmartAblate™ Irrigation Pump | EA | 1 | $ 16,000.00 | $ 16,000.00 | $ 16,000.00 | $ 16,000.00 | $ 16,000.00 |
| C3CFAE | SOFTWARE CFAE LICENSE MEDICAL | EA | 1 | $ 12,100.00 | $ 12,100.00 | $ 12,100.00 | $ 12,100.00 | $ 12,100.00 |
| KT540458S | DELL T5810 WORKSTATION | EA | 1 | $ 12,000.00 | $ 12,000.00 | $ 12,000.00 | $ 12,000.00 | $ 12,000.00 |
| KT5400160 | CARTOSEG® CT Module for CARTO® 3 System | EA | 1 | $ 12,000.00 | $ 12,000.00 | $ 12,000.00 | $ 12,000.00 | $ 12,000.00 |
| C3ST3D | CATHETER ABLATION 3D SMARTTOUCH CARTO | EA | 1 | $ 11,000.00 | $ 11,000.00 | $ 11,000.00 | $ 11,000.00 | $ 11,000.00 |
| EM5402010 | CART EQUIPMENT 115V 2X TRANSFORMER | EA | 1 | $ 10,300.00 | $ 10,300.00 | $ 10,300.00 | $ 10,300.00 | $ 10,300.00 |
| SVSA1 | SMARTABLATE SYSTEM PREMIUM SERVICE AGREEMENT- ONE YEAR | EA | 1 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 |
| 2SASVS1 | SmartAblate™ Multi-System Premium Service Agreement - One Year | EA | 1 | $ 9,000.00 | $ 9,000.00 | $ 9,000.00 | $ 9,000.00 | $ 9,000.00 |
| KT5400170 | Ripple Mapping Module | EA | 1 | $ 8,500.00 | $ 8,500.00 | $ 8,500.00 | $ 8,500.00 | $ 8,500.00 |
| SATOPSVS1 | SmartAblate™ System Time of Purchase Premium Service Agreement - One Year | EA | 1 | $ 8,500.00 | $ 8,500.00 | $ 8,500.00 | $ 8,500.00 | $ 8,500.00 |
| M490009 | SmartAblate™ Remote Control | EA | 1 | $ 7,000.00 | $ 7,000.00 | $ 7,000.00 | $ 7,000.00 | $ 7,000.00 |
| EM5402030 | CART 22U 600VA 115V | EA | 1 | $ 6,400.00 | $ 6,400.00 | $ 6,400.00 | $ 6,400.00 | $ 6,400.00 |
| C3TOUCH | SOFTWARE MODULE SMARTTOUCH CARTO 3 MEDICAL | EA | 1 | $ 5,500.00 | $ 5,500.00 | $ 5,500.00 | $ 5,500.00 | $ 5,500.00 |
| C3VISIST | MODULE SURGICAL MICROSCOPE | EA | 1 | $ 5,500.00 | $ 5,500.00 | $ 5,500.00 | $ 5,500.00 | $ 5,500.00 |

HIGHLY CONFIDENTIAL

BWI-INN00052123
BWI-INN00052079

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | VISITAG CARTO 3 SYSTEM SMARTTOUCH | | | | | | | | | |
| KT540059 | Topera Compatibility Kit (C3 Ext. CBL for Basket Catheters Kit. Includes Cable, XML File and documentation) | EA | 1 | $ 5,400.00 | $ 5,400.00 | $ 5,400.00 | $ 5,400.00 | $ 5,400.00 | | |
| KT5400127 | KIT UPGRADE CARTO DELL T3500MT V3 C3 | EA | 1 | $ 4,999.00 | $ 4,999.00 | $ 4,999.00 | $ 4,999.00 | $ 4,999.00 | | |
| KT5400128 | KIT UPGRADE CARTO DELL T3400 C3 V3 | EA | 1 | $ 4,999.00 | $ 4,999.00 | $ 4,999.00 | $ 4,999.00 | $ 4,999.00 | | |
| KT5400129 | KIT UPGRADE SOFTWARE MEM VERSION C3 3.2.2 MULTIELECTRODE MAPPING BASE VIDEO CARD C3 | EA | 1 | $ 4,999.00 | $ 4,999.00 | $ 4,999.00 | $ 4,999.00 | $ 4,999.00 | | |

HIGHLY CONFIDENTIAL

BWI-INN00052124

BWI-INN00052079

**Exhibit A-2**

**Consumable Pricing Grid**

| Mfr Catalog Number | Long Description | UOM | UOM Factor | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Access |
|---|---|---|---|---|---|---|---|---|
| D134805 | CATHETER ABLATION D-F CURVE SMARTTOUCH THERMOCOOL SF BIDIRECTIONAL THERMOCOUPLE | EA | 1 | $ 3,340.00 | $ 3,549.00 | $ 3,632.00 | $ 3,758.00 | $ 3,966.00 |
| D134804 | CATHETER ABLATION F-J CURVE SMARTTOUCH THERMOCOOL SF BIDIRECTIONAL THERMOCOUPLE | EA | 1 | $ 3,340.00 | $ 3,549.00 | $ 3,632.00 | $ 3,758.00 | $ 3,966.00 |
| D134802 | CATHETER ABLATION F-F CURVE SMARTTOUCH THERMOCOOL SF BIDIRECTIONAL THERMOCOUPLE | EA | 1 | $ 3,340.00 | $ 3,549.00 | $ 3,632.00 | $ 3,758.00 | $ 3,966.00 |
| D134803 | CATHETER ABLATION J-J CURVE SMARTTOUCH THERMOCOOL SF BIDIRECTIONAL THERMOCOUPLE | EA | 1 | $ 3,340.00 | $ 3,549.00 | $ 3,632.00 | $ 3,758.00 | $ 3,966.00 |
| D134801 | CATHETER ABLATION D-D CURVE SMARTTOUCH THERMOCOOL SF BIDIRECTIONAL THERMOCOUPLE | EA | 1 | $ 3,340.00 | $ 3,549.00 | $ 3,632.00 | $ 3,758.00 | $ 3,966.00 |
| D134702 | CATHETER ABLATION F CURVE SMARTTOUCH THERMOCOOL | EA | 1 | $ 3,160.00 | $ 3,358.00 | $ 3,437.00 | $ 3,555.00 | $ 3,753.00 |

HIGHLY CONFIDENTIAL

BWI-INN00052125
BWI-INN00052079

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | SF UNIDIRECTION AL THERMOCOUPL E | | | | | | | | | |
| D134703 | CATHETER ABLATION J CURVE SMARTTOUCH THERMOCOOL SF UNIDIRECTION AL THERMOCOUPL E | EA | 1 | $ 3,160.00 | $ 3,358.00 | $ 3,437.00 | $ 3,555.00 | $ 3,753.00 |
| D134701 | CATHETER ABLATION D CURVE SMARTTOUCH THERMOCOOL SF UNIDIRECTION THERMOCOUPL E | EA | 1 | $ 3,160.00 | $ 3,358.00 | $ 3,437.00 | $ 3,555.00 | $ 3,753.00 |
| D132705 | CATHETER ABLATION 115CM 8FR 3.5MM DF CURVE SMARTTOUCH THERMOCOOL NAVISTAR BIDIRECTIONA L THERMOCOUPL E | EA | 1 | $ 3,150.00 | $ 3,220.00 | $ 3,325.00 | $ 3,430.00 | $ 3,500.00 |
| D132704 | CATHETER ABLATION 115CM 8FR 3.5MM FJ CURVE SMARTTOUCH THERMOCOOL NAVISTAR BIDIRECTIONA L THERMOCOUPL E | EA | 1 | $ 3,150.00 | $ 3,220.00 | $ 3,325.00 | $ 3,430.00 | $ 3,500.00 |
| D132702 | CATHETER ABLATION 115CM 8FR 3.5MM FF CURVE SMARTTOUCH THERMOCOOL NAVISTAR BIDIRECTIONA L THERMOCOUPL E | EA | 1 | $ 3,150.00 | $ 3,220.00 | $ 3,325.00 | $ 3,430.00 | $ 3,500.00 |
| D132701 | CATHETER ABLATION 115CM 8FR 3.5MM DD CURVE | EA | 1 | $ 3,150.00 | $ 3,220.00 | $ 3,325.00 | $ 3,430.00 | $ 3,500.00 |

HIGHLY CONFIDENTIAL

BWI-INN00052126
BWI-INN00052079

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | SMARTTOUCH THERMOCOOL NAVISTAR BIDIRECTIONAL THERMOCOUPLE | | | | | | | | | |
| D132703 | CATHETER ABLATION 115CM 8FR 3.5MM JJ CURVE SMARTTOUCH THERMOCOOL NAVISTAR BIDIRECTIONAL THERMOCOUPLE | EA | 1 | $ 3,150.00 | $ 3,220.00 | $ 3,325.00 | $ 3,430.00 | $ 3,500.00 | | |
| D133602 | CATHETER ABLATION 115CM 8FR 3.5MM F CURVE SMARTTOUCH THERMOCOOL CARTO 3 UNIDIRECTIONAL THERMOCOUPLE | EA | 1 | $ 2,970.00 | $ 3,036.00 | $ 3,135.00 | $ 3,234.00 | $ 3,300.00 | | |
| D133601 | CATHETER ABLATION 115CM 8FR 3.5MM D CURVE SMARTTOUCH THERMOCOOL CARTO 3 UNIDIRECTIONAL THERMOCOUPLE | EA | 1 | $ 2,970.00 | $ 3,036.00 | $ 3,135.00 | $ 3,234.00 | $ 3,300.00 | | |
| D133603 | CATHETER ABLATION 115CM 8FR 3.5MM J CURVE SMARTTOUCH THERMOCOOL CARTO 3 UNIDIRECTIONAL THERMOCOUPLE | EA | 1 | $ 2,970.00 | $ 3,036.00 | $ 3,135.00 | $ 3,234.00 | $ 3,300.00 | | |
| NR7TCSIY | CATHETER ABLATION 125CM 7FR 1-7-4MM SPACING NAVISTAR RMT THERMOCOOL NAVIGATION QUADRIPOLAR HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE STEERABLE | EA | 1 | $ 2,784.00 | $ 2,950.00 | $ 3,073.00 | $ 3,208.00 | $ 3,319.00 | | |

Page A-10

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| BNI35DFCT | CATHETER ELECTROPHYSIOLOGY 7.5FR CARTO 3 THERMOCOOL SF D-F CURVE BIDIRECTIONAL DEFLECTABLE TIP STEERABLE MULTIELECTRODE STERILE DISPOSABLE | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 | |
| BNI35FJCT | CATHETER ELECTROPHYSIOLOGY 7.5FR CARTO 3 THERMOCOOL SF F-J CURVE BIDIRECTIONAL DEFLECTABLE TIP STEERABLE MULTIELECTRODE STERILE | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 | |
| BNI75TCDFH | CATHETER ABLATION 115CM 7.5FR 3.5MM 2-5-2MM SPACING D-F CURVE EZ STEER THERMOCOOL NAVIGATION THERMOCOUPLE | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 | |
| BNI75TCFJH | CATHETER ABLATION 115CM 7.5FR 8FR 3.5MM 2-5-2MM SPACING F-J CURVE EZ STEER THERMOCOOL NAVIGATION THERMOCOUPLE BIDIRECTIONAL | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 | |
| BNI35BDCT | CATHETER ELECTROPHYSIOLOGY 7.5FR CARTO 3 THERMOCOOL SF B-D CURVE BIDIRECTIONAL DEFLECTABLE TIP STEERABLE MULTIELECTRODE STERILE | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 | |
| BNI35BFCT | CATHETER ELECTROPHYSIOLOGY 7.5FR CARTO 3 | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 | |

HIGHLY CONFIDENTIAL

BWI-INN00052128
BWI-INN00052079

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | THERMOCOOL SF B-F CURVE BIDIRECTIONAL DEFLECTABLE TIP STEERABLE MULTIELECTRODE STERILE | | | | | | | | |
| BNI75TCJJH | CATHETER ABLATION 115CM 7.5FR 3.5MM 2-5-2MM SPACING J-J CURVE EZ STEER THERMOCOOL NAVIGATION THERMOCOUPLE | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 |
| BNI35BBH | CATHETER ELECTROPHYSIOLOGY B-B CURVE 7.5FR BIDIRECTIONAL DEFLECTABLE TIP STEERABLE MULTIELECTRODE STERILE CARTO XP THERMOCOOL SF CARTO XP SYSTEM | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 |
| BNI35BDH | CATHETER ELECTROPHYSIOLOGY B-D CURVE 7.5FR BIDIRECTIONAL DEFLECTABLE TIP STEERABLE MULTIELECTRODE STERILE CARTO XP THERMOCOOL SF CARTO XP SYSTEM | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 |
| BNI35BFH | CATHETER ELECTROPHYSIOLOGY B-F CURVE 7.5FR BIDIRECTIONAL DEFLECTABLE TIP STEERABLE MULTIELECTRODE STERILE CARTO XP THERMOCOOL SF CARTO XP SYSTEM | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 |
| BNI35DDCT | CATHETER ELECTROPHYSIOLOGY 7.5FR CARTO 3 | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 |

HIGHLY CONFIDENTIAL

BWI-INN00052129
BWI-INN00052079

| | THERMOCOOL SF D-D CURVE BIDIRECTIONAL DEFLECTABLE TIP STEERABLE MULTIELECTRODE STERILE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| BNI35DDH | CATHETER ELECTROPHYSIOLOGY DD CURVE 8FR 3.5MM 115CM BIDIRECTIONAL DEFLECTABLE TIP THERMOCOUPLE CARTO XP THERMOCOOL SF CARTO XP SYSTEM | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 |
| BNI35DFH | CATHETER ELECTROPHYSIOLOGY BF CURVE 8FR 3.5MM 115CM BIDIRECTIONAL DEFLECTABLE TIP THERMOCOUPLE CARTO XP THERMOCOOL SF | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 |
| BNI35DJCT | CATHETER ELECTROPHYSIOLOGY 7.5FR CARTO 3 THERMOCOOL SF D-J CURVE BIDIRECTIONAL DEFLECTABLE TIP STEERABLE MULTIELECTRODE STERILE | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 |
| BNI35DJH | CATHETER ELECTROPHYSIOLOGY D-J CURVE 7.5FR BIDIRECTIONAL DEFLECTABLE TIP STEERABLE MULTIELECTRODE STERILE CARTO XP THERMOCOOL SF CARTO XP SYSTEM | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 |
| BNI35FFCT | CATHETER ELECTROPHYSIOLOGY 7.5FR CARTO 3 | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 |

Page A-13

HIGHLY CONFIDENTIAL

BWI-INN00052130

BWI-INN00052079

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | THERMOCOOL SF F-F CURVE BIDIRECTIONAL DEFLECTABLE TIP STEERABLE MULTIELECTRODE STERILE | | | | | | | | | |
| BNI35FFH | CATHETER ELECTROPHYSIOLOGY FF CURVE 8FR 3.5MM 115CM BIDIRECTIONAL DEFLECTABLE TIP THERMOCOUPLE CARTO XP THERMOCOOL SF CARTO XP SYSTEM | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 | | |
| BNI35FJH | CATHETER ELECTROPHYSIOLOGY FJ CURVE 8FR 3.5MM 115CM BIDIRECTIONAL DEFLECTABLE TIP THERMOCOUPLE CARTO XP THERMOCOOL SF | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 | | |
| BNI35JJCT | CATHETER ELECTROPHYSIOLOGY 7.5FR CARTO 3 THERMOCOOL SF J-J CURVE BIDIRECTIONAL DEFLECTABLE TIP STEERABLE MULTIELECTRODE STERILE | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 | | |
| BNI35JJH | CATHETER ELECTROPHYSIOLOGY JJ CURVE 8FR 3.5MM 115CM BIDIRECTIONAL DEFLECTABLE TIP THERMOCOUPLE CARTO XP THERMOCOOL SF CARTO XP SYSTEM | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 | | |
| BNI75TCDDH | CATHETER ABLATION 115CM 7.5FR 3.5MM 2-5-2MM | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 | | |

HIGHLY CONFIDENTIAL

BWI-INN00052131

BWI-INN00052079

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | SPACING D-D CURVE EZ STEER THERMOCOOL NAVIGATION THERMOCOUPLE | | | | | | | | | | |
| BNI75TCFFH | CATHETER ABLATION 115CM 7.5FR 3.5MM 2-5-2MM SPACING F-F CURVE EZ STEER THERMOCOOL NAVIGATION THERMOCOUPLE | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 |
| BNI35BBCT | CATHETER ELECTROPHYSIOLOGY 7.5FR CARTO 3 THERMOCOOL SF B-B CURVE BIDIRECTIONAL DEFLECTABLE TIP STEERABLE MULTIELECTRODE STERILE | EA | 1 | $ 2,695.00 | $ 2,856.00 | $ 2,975.00 | $ 3,106.00 | $ 3,213.00 |
| 10135936 | CATHETER ULTRASOUND 8FR 90CM LATEX FREE ACUNAV X300 CV70 P50 CYPRESS | EA | 1 | $ 2,606.00 | $ 2,762.00 | $ 2,877.00 | $ 3,004.00 | $ 3,107.00 |
| 10135910 | CATHETER ULTRASOUND 8FR 90CM INTRACARDIAC 4 WAY STEERING REAL TIME VISUALIZATION DOPPLER IMAGING MODULAR SYSTEM SETUP ACUNAV ECHOCARDIOGRAPHY | EA | 1 | $ 2,606.00 | $ 2,762.00 | $ 2,877.00 | $ 3,004.00 | $ 3,107.00 |
| 8255790 | CATHETER ULTRASOUND 2D 10FR 90CM INTRACARDIAC 4 WAY STEER REAL TIME VISUALIZATION GRAYSCALE DOPPLER MODE ACUNAV X300 P50 SEQUOIA CYPRESS | EA | 1 | $ 2,606.00 | $ 2,762.00 | $ 2,877.00 | $ 3,004.00 | $ 3,107.00 |

HIGHLY CONFIDENTIAL

BWI-INN00052132
BWI-INN00052079

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | ECHOCARDIOG RAPHY | | | | | | | | |
| 10043342 | CATHETER ULTRASOUND 10FR 90CM INTRACARDIAC 4 WAY STEERING REAL TIME VISUALIZATIO N ACUNAV GE | EA | 1 | $ 2,606.00 | $ 2,762.00 | $ 2,877.00 | $ 3,004.00 | $ 3,107.00 |
| MA540013 | CABLE CATHETER CARTO 3 TABLE ARM PATIENT INTERFACE UNIT | EA | 1 | $ 2,600.00 | $ 2,600.00 | $ 2,600.00 | $ 2,600.00 | $ 2,600.00 |
| 10439011 | CATHETER ULTRASOUND 3D 8FR 90CM TIP OVERLAY SOUNDSTAR GREEN SIEMENS SEQUOIA CYPRESS ACUSON X300 X700 | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 |
| 10438577 | CATHETER ULTRASOUND 10FR 90CM INTRACARDIAC REPROCESSED SOUNDSTAR | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 |
| 10439236 | CATHETER ULTRASOUND 8FR SOUNDSTAR GE | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 |
| 10439072 | CATHETER ULTRASOUND 10FR INTRACARDIAC STEERING HANDLE SOUNDSTAR GE | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 |
| BN7TCFJ8 L | CATHETER ABLATION 115CM 7FR 8MM 1-7-4MM SPACING F-J CURVE EZ STEER DS NAV BIDIRECTIONA L HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPL E 2 SENSOR DEFLECTABLE TIP | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 |
| BN7TCDF 8L | CATHETER ABLATION 115CM 7FR 8MM | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 |

Page A-16

HIGHLY CONFIDENTIAL

BWI-INN00052133

BWI-INN00052079

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1-7-4MM SPACING D-F CURVE EZ STEER DS NAV BIDIRECTIONAL HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE 2 SENSOR DEFLECTABLE TIP | | | | | | | | | |
| D131504 | CATHETER ABLATION 7.5FR J CURVE THERMOCOOL SF UNIDIRECTIONAL THERMOCOUPLE DEFLECTABLE TIP CARTO 3 SYSTEM | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 |
| D131503 | CATHETER ABLATION 7.5FR F CURVE THERMOCOOL SF UNIDIRECTIONAL THERMOCOUPLE DEFLECTABLE TIP CARTO 3 SYSTEM | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 |
| D131803 | CATHETER ABLATION 8FR F CURVE THERMOCOOL SF UNIDIRECTIONAL THERMOCOUPLE CARTO XP SYSTEM | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 |
| NI75TCFH | CATHETER ABLATION 115CM 7.5FR 4MM 2-5-2MM SPACE F CURVE NAVISTAR THERMOCOOL LATEX FREE UNIDIRECTIONAL STEER HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE IRRIGATE ORANGE | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 |
| NI75TCDH | CATHETER ABLATION | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 |

Page A-17

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 115CM 7.5FR 4MM 2-5-2MM SPACING D CURVE NAVISTAR THERMOCOOL NAVIGATION HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE IRRIGATE BLUE | | | | | | | | | | |
| D131502 | CATHETER ABLATION 7.5FR D CURVE THERMOCOOL SF UNIDIRECTIONAL THERMOCOUPLE DEFLECTABLE TIP CARTO 3 SYSTEM | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 | | | |
| NI75TCJH | CATHETER ELECTROPHYSIOLOGY 2-5-2MM SPACING J CURVE 8FR 115CM 3.5MM UNIDIRECTIONAL STEERING HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE IRRIGATED TIP NAVISTAR THERMOCOOL BLACK | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 | | | |
| BN7TCFF8L | CATHETER ABLATION 115CM 7FR 8MM 1-7-4MM SPACING F-F CURVE EZ STEER DS NAV BIDIRECTIONAL HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE 2 SENSOR DEFLECTABLE TIP | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 | | | |
| BN7TCJJ8L | CATHETER ABLATION 115CM 7FR 8MM 1-7-4MM SPACING J-J CURVE EZ STEER DS NAV BIDIRECTIONAL | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 | | | |

HIGHLY CONFIDENTIAL

BWI-INN00052135
BWI-INN00052079

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | L HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE 2 SENSOR DEFLECTABLE TIP | | | | | | | | |
| NI75TCCH | CATHETER ELECTROPHYSIOLOGY 2-5-2MM SPACING C CURVE 7.5FR 115CM 3.5MM NAVIGATION HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE IRRIGATED TIP NAVISTAR THERMOCOOL GREEN | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 | |
| BN7TCDD8L | CATHETER ABLATION 115CM 7FR 8MM 1-7-4MM SPACING D-D CURVE EZ STEER DS NAV BIDIRECTIONAL HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE 2 SENSOR DEFLECTABLE TIP | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 | |
| D131501 | CATHETER ABLATION 115CM 8FR 3.5MM 2-5-2MM SPACE B CURVE CARTO THERMOCOOL SF UNIDIRECTIONAL THERMOCOUPLE DEFLECTABLE TIP CARTO 3 SYSTEM | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 | |
| D131801 | CATHETER ABLATION 3FR B CURVE THERMOCOOL SF UNIDIRECTIONAL THERMOCOUPLE CARTO XP SYSTEM | EA | 1 | $ 2,514.00 | $ 2,664.00 | $ 2,775.00 | $ 2,897.00 | $ 2,997.00 | |

Page A-19

HIGHLY CONFIDENTIAL

BWI-INN00052136
BWI-INN00052079

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D131802 | CATHETER ABLATION 3FR D CURVE THERMOCOOL SF UNIDIRECTIONAL THERMOCOUPLE CARTO XP SYSTEM | EA | 1 | $ | 2,514.00 | $ | 2,664.00 | $ | 2,775.00 | $ | 2,897.00 | $ | 2,997.00 |
| D131804 | CATHETER ABLATION 3FR J CURVE THERMOCOOL SF UNIDIRECTIONAL THERMOCOUPLE CARTO XP SYSTEM | EA | 1 | $ | 2,514.00 | $ | 2,664.00 | $ | 2,775.00 | $ | 2,897.00 | $ | 2,997.00 |
| NI75TCBH | CATHETER ABLATION 115CM 8FR 3.5MM 2-5-2MM SPACE B CURVE CARTO THERMOCOOL NAVIGATION HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE IRRIGATE TIP RED | EA | 1 | $ | 2,514.00 | $ | 2,664.00 | $ | 2,775.00 | $ | 2,897.00 | $ | 2,997.00 |
| SNDSTR10 G | CATHETER ULTRASOUND 3D 10FR 90CM NAVIGATION SENSOR PHASE ARRAY PROBE SOUNDSTAR GE VIVID I ULTRASOUND SYSTEM | EA | 1 | $ | 2,514.00 | $ | 2,664.00 | $ | 2,775.00 | $ | 2,897.00 | $ | 2,997.00 |
| SNDSTR10 | CATHETER ULTRASOUND 3D 10FR 90CM NAVIGATION SENSOR PHASE ARRAY PROBE REPROCESS OUNDSTAR ACUSON SIEMENS | EA | 1 | $ | 2,514.00 | $ | 2,664.00 | $ | 2,775.00 | $ | 2,897.00 | $ | 2,997.00 |
| NS7TCF8L 174HS | CATHETER ABLATION 115CM 7FR 8MM 1-7-4MM SPACING LARGE F CURVE NAVISTAR NAVIGATION QUADRIPOLAR HYPERTRONICS | EA | 1 | $ | 2,337.00 | $ | 2,477.00 | $ | 2,580.00 | $ | 2,693.00 | $ | 2,786.00 |

Page A-20

DocuSign Envelope ID: 61B50937-F714-4506-9131-2E5EB4BB267D

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 25 PIN CONNECTOR THERMOCOUPLE STERILE ORANGE | | | | | | | | | |
| NS7TCJ8L174HS | CATHETER ABLATION 115CM 7FR 8MM 1-7-4MM SPACING J CURVE LARGE NAVISTAR NAVIGATION QUADRIPOLAR HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE STERILE BLACK | EA | 1 | $ 2,337.00 | $ 2,477.00 | $ 2,580.00 | $ 2,693.00 | $ 2,786.00 | | |
| NR7TCS4YU | CATHETER ABLATION 125CM 7FR 4MM 1-7-4MM SPACING NAVISTAR RMT NAVIGATION QUADRIPOLAR HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE STEERABLE SOFT TIP | EA | 1 | $ 2,337.00 | $ 2,477.00 | $ 2,580.00 | $ 2,693.00 | $ 2,786.00 | | |
| NS7TCD8L174HS | CATHETER ABLATION 115CM 7FR 8MM 1-7-4MM SPACING D CURVE NAVISTAR NAVIGATION QUADRIPOLAR HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE STERILE BLUE | EA | 1 | $ 2,337.00 | $ 2,477.00 | $ 2,580.00 | $ 2,693.00 | $ 2,786.00 | | |
| NR7TCS4Y | CATHETER ABLATION 125CM 7FR 4MM 1-7-4MM SPACING NAVISTAR RMT NAVIGATION QUADRIPOLAR HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE STEERABLE SOFT TIP | EA | 1 | $ 2,337.00 | $ 2,477.00 | $ 2,580.00 | $ 2,693.00 | $ 2,786.00 | | |
| NS7TCB8L174HS | CATHETER ABLATION | EA | 1 | $ 2,337.00 | $ 2,477.00 | $ 2,580.00 | $ 2,693.00 | $ 2,786.00 | | |

Page A-21

BWI-INN00052138
BWI-INN00052079

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 115CM 7FR 8MM 1-7-4MM SPACING B CURVE NAVISTAR NAVIGATION QUADRIPOLAR HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE STERILE RED | | | | | | | | |
| NS7TCC8L174HS | CATHETER ABLATION 115CM 7FR 8MM 1-7-4MM SPACING C CURVE NAVISTAR NAVIGATION QUADRIPOLAR HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE STERILE GREEN | EA | 1 | $ 2,337.00 | $ 2,477.00 | $ 2,580.00 | $ 2,693.00 | $ 2,786.00 |
| MA5402201 | Carto® 3 Workstation Cart Dual Monitor Arm | EA | 1 | $ 2,200.00 | $ 2,200.00 | $ 2,200.00 | $ 2,200.00 | $ 2,200.00 |
| BN7TCDF4L | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACING D-F CURVE EZ STEER NAV BIDIRECTIONAL HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE DEFLECTABLE TIP | EA | 1 | $ 2,156.00 | $ 2,285.00 | $ 2,380.00 | $ 2,485.00 | $ 2,570.00 |
| BN7TCFJ4L | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACING F-J CURVE EZ STEER NAV BIDIRECTIONAL HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE DEFLECTABLE TIP | EA | 1 | $ 2,156.00 | $ 2,285.00 | $ 2,380.00 | $ 2,485.00 | $ 2,570.00 |
| CR7TCSIRT | CATHETER ABLATION | EA | 1 | $ 2,156.00 | $ 2,285.00 | $ 2,380.00 | $ 2,485.00 | $ 2,570.00 |

HIGHLY CONFIDENTIAL

BWI-INN00052139
BWI-INN00052079

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 125CM 7FR 4MM 2-5-2MM SPACING CELSIUS RMT QUADRIPOLAR REDEL 10 PIN CONNECTOR THERMOCOUPLE IRRIGATED TIP | | | | | | | | | |
| BN7TCJJ4L | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACING J-J CURVE EZ STEER NAV BIDIRECTIONAL HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE DEFLECTABLE TIP | EA | 1 | $ 2,156.00 | $ 2,285.00 | $ 2,380.00 | $ 2,485.00 | $ 2,570.00 | | |
| BN7TCFF4L | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACING F-F CURVE EZ STEER NAV BIDIRECTIONAL HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE DEFLECTABLE TIP | EA | 1 | $ 2,156.00 | $ 2,285.00 | $ 2,380.00 | $ 2,485.00 | $ 2,570.00 | | |
| BN7TCDD4L | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACING D-D CURVE EZ STEER NAV BIDIRECTIONAL HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE DEFLECTABLE TIP | EA | 1 | $ 2,156.00 | $ 2,285.00 | $ 2,380.00 | $ 2,485.00 | $ 2,570.00 | | |
| NS7TCFL174HS | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACING F CURVE LARGE NAVISTAR | EA | 1 | $ 1,979.00 | $ 2,097.00 | $ 2,185.00 | $ 2,281.00 | $ 2,359.00 | | |

HIGHLY CONFIDENTIAL

BWI-INN00052140
BWI-INN00052079

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | NAVIGATION QUADRIPOLAR HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE STERILE ORANGE | | | | | | | |
| NS7TCDL174HS | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACING D CURVE NAVISTAR NAVIGATION QUADRIPOLAR HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE STERILE BLUE | EA | 1 | $ 1,979.00 | $ 2,097.00 | $ 2,185.00 | $ 2,281.00 | $ 2,359.00 |
| NS7TCJL174HS | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACING J CURVE NAVISTAR NAVIGATION QUADRIPOLAR HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE STERILE BLACK | EA | 1 | $ 1,979.00 | $ 2,097.00 | $ 2,185.00 | $ 2,281.00 | $ 2,359.00 |
| NS7TCEL174HS | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACING E CURVE LARGE NAVISTAR NAVIGATION QUADRIPOLAR HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE STERILE WHITE | EA | 1 | $ 1,979.00 | $ 2,097.00 | $ 2,185.00 | $ 2,281.00 | $ 2,359.00 |
| 118330S | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACE D CURVE NAVISTAR HYPERTRONICS 25 PIN CONNECTOR NAVIGATION QUADRAPOLAR SOFT | EA | 1 | $ 1,979.00 | $ 2,097.00 | $ 2,185.00 | $ 2,281.00 | $ 2,359.00 |

HIGHLY CONFIDENTIAL

BWI-INN00052141
BWI-INN00052079

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | THERMOCOUPLE BLUE | | | | | | | | |
| NS7TCBL174HS | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACING B CURVE NAVISTAR NAVIGATION QUADRIPOLAR HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE STERILE RED | EA | 1 | $ 1,979.00 | $ 2,097.00 | $ 2,185.00 | $ 2,281.00 | $ 2,359.00 |
| NS7TCCL174HS | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACING C CURVE NAVISTAR NAVIGATION QUADRIPOLAR HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE STERILE GREEN | EA | 1 | $ 1,979.00 | $ 2,097.00 | $ 2,185.00 | $ 2,281.00 | $ 2,359.00 |
| 118331S | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACING F CURVE NAVISTAR NAVIGATION QUADRIPOLAR HYPERTRONICS 25 PIN CONNECTOR THERMOCOUPLE SOFT TIP ORANGE | EA | 1 | $ 1,979.00 | $ 2,097.00 | $ 2,185.00 | $ 2,281.00 | $ 2,359.00 |
| 118332S | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACE J CURVE NAVISTAR HYPERTRONICS 25 PIN CONNECTOR NAVIGATION QUADRAPOLAR SOFT THERMOCOUPLE BLACK | EA | 1 | $ 1,979.00 | $ 2,097.00 | $ 2,185.00 | $ 2,281.00 | $ 2,359.00 |
| 118431S | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACING F | EA | 1 | $ 1,979.00 | $ 2,097.00 | $ 2,185.00 | $ 2,281.00 | $ 2,359.00 |

HIGHLY CONFIDENTIAL

BWI-INN00052142
BWI-INN00052079

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | CURVE NAVISTAR NAVIGATION QUADRIPOLAR HYPERTRONICS 25 PIN CONNECTOR THERMISTOR SOFT TIP ORANGE | | | | | | | | | | |
| 118432S | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACING J CURVE NAVISTAR NAVIGATION QUADRIPOLAR HYPERTRONICS 25 PIN CONNECTOR THERMISTOR SOFT TIP BLACK | EA | 1 | $ 1,979.00 | $ 2,097.00 | $ 2,185.00 | $ 2,281.00 | $ 2,359.00 | | | |
| 118435S | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACE B CURVE NAVISTAR HYPERTRONICS 25 PIN CONNECTOR NAVIGATION QUADRAPOLAR SOFT THERMISTOR RED | EA | 1 | $ 1,979.00 | $ 2,097.00 | $ 2,185.00 | $ 2,281.00 | $ 2,359.00 | | | |
| NS7TCDM 174HS | CATHETER ABLATION 115CM 7FR 4MM 1-7-4MM SPACE D CURVE NAVISTAR HYPERTRONIC 25 PIN CONNECTOR NAVIGATION QUADRAPOLAR THERMOCOUPL E MAP BLUE | EA | 1 | $ 1,979.00 | $ 2,097.00 | $ 2,185.00 | $ 2,281.00 | $ 2,359.00 | | | |
| D128209 | PENTARAY NAV, PENTARAY NAV ECO 7FR, F, 1-8-1, D128209 | EA | 1 | $ 1,794.00 | $ 1,901.00 | $ 1,981.00 | $ 2,068.00 | $ 2,139.00 | | | |
| D128212 | PENTARAY NAV, PENTARAY NAV ECO 7FR, D, 1-8-1, D128212 | EA | 1 | $ 1,794.00 | $ 1,901.00 | $ 1,981.00 | $ 2,068.00 | $ 2,139.00 | | | |
| D128208 | CATHETER ELECTROPHYSI OLOGY 2-6- | EA | 1 | $ 1,794.00 | $ 1,901.00 | $ 1,981.00 | $ 2,068.00 | $ 2,139.00 | | | |

HIGHLY CONFIDENTIAL                                                                    BWI-INN00052143

BWI-INN00052079

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2MM F CURVE 7FR NAVIGATION ELECTRODE PENTARAY | | | | | | | | | |
| D128211 | CATHETER ELECTROPHYSI OLOGY 2-6-2MM D CURVE 7FR NAVIGATION ELECTRODE PENTARAY | EA | 1 | $ 1,794.00 | $ 1,901.00 | $ 1,981.00 | $ 2,068.00 | $ 2,139.00 | | |
| D128210 | CATHETER ELECTROPHYSI OLOGY 4-4-4MM D CURVE 7FR NAVIGATION ELECTRODE PENTARAY | EA | 1 | $ 1,794.00 | $ 1,901.00 | $ 1,981.00 | $ 2,068.00 | $ 2,139.00 | | |
| D128207 | CATHETER ELECTROPHYSI OLOGY 4-4-4MM F CURVE 7FR NAVIGATION PENTARAY | EA | 1 | $ 1,794.00 | $ 1,901.00 | $ 1,981.00 | $ 2,068.00 | $ 2,139.00 | | |
| D128201 | CATHETER ELECTROPHYSI OLOGY 1MM 4-4-4MM SPACE F CURVE 7FR 3FR 115CM 5 BRANCH 20 POLE NAVIGATION RECORD SIGNAL LATEX FREE PENTARAY | EA | 1 | $ 1,794.00 | $ 1,901.00 | $ 1,981.00 | $ 2,068.00 | $ 2,139.00 | | |
| D128202 | CATHETER ELECTROPHYSI OLOGY 1MM 2-6-2MM SPACING F CURVE STAR 7FR 3FR 115CM 20 POLE 5 BRANCH NAVIGATION RECORD SIGNAL ELECTRODE PENTARAY | EA | 1 | $ 1,794.00 | $ 1,901.00 | $ 1,981.00 | $ 2,068.00 | $ 2,139.00 | | |
| D128203 | CATHETER ELECTROPHYSI OLOGY 1MM 1-8-1MM SPACING F CURVE STAR 7FR 3FR 115CM 20 POLE 5 BRANCH NAVIGATION RECORD SIGNAL | EA | 1 | $ 1,794.00 | $ 1,901.00 | $ 1,981.00 | $ 2,068.00 | $ 2,139.00 | | |

HIGHLY CONFIDENTIAL

BWI-INN00052144
BWI-INN00052079

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ELECTRODE PENTARAY | | | | | | | | | | | |
| D128204 | CATHETER ELECTROPHYSI OLOGY 1MM 4-4-4MM D CURVE STAR 7FR 3FR 115CM 20 POLE 5 BRANCH NAVIGATION RECORD SIGNAL ELECTRODE PENTARAY | EA | 1 | $ | 1,794.00 | $ | 1,901.00 | $ | 1,981.00 | $ | 2,068.00 | $ | 2,139.00 |
| D128205 | CATHETER ELECTROPHYSI OLOGY 1MM 2-6-2MM SPACING D CURVE STAR 7FR 3FR 115CM 20 POLE 5 BRANCH NAVIGATION RECORD SIGNAL ELECTRODE PENTARAY | EA | 1 | $ | 1,794.00 | $ | 1,901.00 | $ | 1,981.00 | $ | 2,068.00 | $ | 2,139.00 |
| D128206 | CATHETER ELECTROPHYSI OLOGY 1-8-1MM SPACING D CURVE 7FR NAVIGATION PENTARAY | EA | 1 | $ | 1,794.00 | $ | 1,901.00 | $ | 1,981.00 | $ | 2,068.00 | $ | 2,139.00 |
| D134301 | CATHETER ELECTROPHYSI OLOGY 25-15MM LASSO 2515 NAVISTAR CIRCLE 22 POLE SPLIT HANDLE | EA | 1 | $ | 1,617.00 | $ | 1,714.00 | $ | 1,785.00 | $ | 1,864.00 | $ | 1,928.00 |
| D134302 | CATHETER ELECTROPHYSI OLOGY 115CM 7FR 25-15MM LASSO 2515 NAV 8MM SPACING D CURVE 10 POLE VARIABLE HIGH RESOLUTION | EA | 1 | $ | 1,617.00 | $ | 1,714.00 | $ | 1,785.00 | $ | 1,864.00 | $ | 1,928.00 |
| D7L202515 RT | CATHETER ELECTROPHYSI OLOGY 2-6-2MM SPACE D CIRCLE 7FR 25-15MM 115CM 20 POLE DEFLECTION VARIABLE MAP LASSO | EA | 1 | $ | 1,617.00 | $ | 1,714.00 | $ | 1,785.00 | $ | 1,864.00 | $ | 1,928.00 |
| D7L102515 RT | CATHETER ELECTROPHYSI | EA | 1 | $ | 1,617.00 | $ | 1,714.00 | $ | 1,785.00 | $ | 1,864.00 | $ | 1,928.00 |

HIGHLY CONFIDENTIAL

BWI-INN00052145
BWI-INN00052079

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | OLOGY 8MM SPACING 7FR 25-15MM 115CM DEFLECTABLE DECAPOLAR REDEL 10 PIN CONNECTOR VARIABLE CIRCULAR MAPPING LASSO | | | | | | | | | |
| 123703S | CATHETER ELECTROPHYSI OLOGY 7FR 20 PIN 20 POLE DEFLECTABLE VARIABLE LASSO | EA | 1 | $ 1,617.00 | $ 1,714.00 | $ 1,785.00 | $ 1,864.00 | $ 1,928.00 |
| LN122515 CT | CATHETER ELECTROPHYSI OLOGY D CURVE 7FR 25-15MM 12 POLE NAVIGATION VARIABLE CIRCULAR MAPPING LASSO | EA | 1 | $ 1,617.00 | $ 1,714.00 | $ 1,785.00 | $ 1,864.00 | $ 1,928.00 |
| LN222515 CT | CATHETER ELECTROPHYSI OLOGY D CURVE 7FR 25-15MM 22 POLE NAVIGATION VARIABLE CIRCULAR MAPPING LASSO | EA | 1 | $ 1,617.00 | $ 1,714.00 | $ 1,785.00 | $ 1,864.00 | $ 1,928.00 |
| BDI35FJR T | CATHETER ABLATION 115CM 8FR 2-5-2MM SPACING 3.5MM F-J CURVE THERMOCOOL SF 6 ELECTRODE TIP BIDIRECTIONA L NONNAVIGATI ONAL | EA | 1 | $ 1,594.00 | $ 1,689.00 | $ 1,760.00 | $ 1,837.00 | $ 1,900.00 |
| BDI35DFR T | CATHETER ABLATION D-F CURVE THERMOCOOL SF BIDIRECTIONA L NAVIGATION DEFLECTABLE TIP NONBRAIDED | EA | 1 | $ 1,594.00 | $ 1,689.00 | $ 1,760.00 | $ 1,837.00 | $ 1,900.00 |
| BDI35BFR T | CATHETER ABLATION 115CM 8FR B-F CURVE | | | $ 1,594.00 | $ 1,689.00 | $ 1,760.00 | $ 1,837.00 | $ 1,900.00 |

HIGHLY CONFIDENTIAL

BWI-INN00052146
BWI-INN00052079

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | THERMOCOOL SF NONNAVIGATIONAL THERMOCOUPLE | | | | | | | |
| BDI35BDRT | CATHETER ABLATION 115CM 8FR B-D CURVE THERMOCOOL SF NONNAVIGATIONAL THERMOCOUPLE | EA | 1 | $ 1,594.00 | $ 1,689.00 | $ 1,760.00 | $ 1,837.00 | $ 1,900.00 |
| BDI35BBRT | CATHETER ABLATION 115CM 8FR B-B CURVE THERMOCOOL SF NONNAVIGATIONAL THERMOCOUPLE | EA | 1 | $ 1,594.00 | $ 1,689.00 | $ 1,760.00 | $ 1,837.00 | $ 1,900.00 |
| BDI35DDRT | CATHETER ABLATION D-D CURVE THERMOCOOL SF BIDIRECTIONAL NAVIGATION DEFLECTABLE TIP NONBRAIDED | EA | 1 | $ 1,594.00 | $ 1,689.00 | $ 1,760.00 | $ 1,837.00 | $ 1,900.00 |
| BDI35DJRT | CATHETER ABLATION 115CM 8FR D-J CURVE THERMOCOOL SF NONNAVIGATIONAL THERMOCOUPLE | EA | 1 | $ 1,594.00 | $ 1,689.00 | $ 1,760.00 | $ 1,837.00 | $ 1,900.00 |
| BDI35FFRT | CATHETER ABLATION 8FR F-F CURVE THERMOCOOL SF NONNAVIGATIONAL BIDIRECTIONAL THERMOCOUPLE | EA | 1 | $ 1,594.00 | $ 1,689.00 | $ 1,760.00 | $ 1,837.00 | $ 1,900.00 |
| BDI35JJRT | CATHETER ABLATION 115CM 8FR J-J CURVE THERMOCOOL SF NONNAVIGATIONAL | EA | 1 | $ 1,594.00 | $ 1,689.00 | $ 1,760.00 | $ 1,837.00 | $ 1,900.00 |

Page A-30

HIGHLY CONFIDENTIAL

BWI-INN00052147

BWI-INN00052079

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | THERMOCOUPLE | | | | | | | | |
| BDI75TCDFRT | CATHETER ABLATION 115CM 7.5FR 8FR 3.5MM 2-5-2MM SPACE D-F CURVE EZ STEER THERMOCOOL BIDIRECTIONAL NONNAVIGATION THERMOCOUPLE | EA | 1 | $ 1,528.00 | $ 1,620.00 | $ 1,687.00 | $ 1,761.00 | $ 1,822.00 |
| BDI75TCFJRT | CATHETER ABLATION 115CM 7.5FR 3.5MM 2-5-2MM SPACING F-J CURVE EZ STEER THERMOCOOL NONNAVIGATION THERMOCOUPLE | EA | 1 | $ 1,528.00 | $ 1,620.00 | $ 1,687.00 | $ 1,761.00 | $ 1,822.00 |
| BDI75TCFFRT | CATHETER ABLATION 115CM 7.5FR 3.5MM 2-5-2MM SPACING F-F CURVE EZ STEER THERMOCOOL NONNAVIGATION THERMOCOUPLE | EA | 1 | $ 1,528.00 | $ 1,620.00 | $ 1,687.00 | $ 1,761.00 | $ 1,822.00 |
| BDI75TCDDRT | CATHETER ABLATION 115CM 7.5FR 3.5MM 2-5-2MM SPACING D-D CURVE EZ STEER THERMOCOOL BIDIRECTIONAL THERMOCOUPLE | EA | 1 | $ 1,528.00 | $ 1,620.00 | $ 1,687.00 | $ 1,761.00 | $ 1,822.00 |
| BDI75TCJJRT | CATHETER ABLATION 115CM 7.5FR 3.5MM 2-5-2MM SPACING J-J CURVE EZ STEER THERMOCOOL NONNAVIGATION THERMOCOUPLE | EA | 1 | $ 1,528.00 | $ 1,620.00 | $ 1,687.00 | $ 1,761.00 | $ 1,822.00 |

Page A-31

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D134902 | CATHETER ELECTROPHYSIOLOGY 7FR 15MM LASSO NAVISTAR FIXED D CURVE 22 POLE DEFLECTABLE SPLIT HANDLE | EA | 1 | $ | 1,482.00 | $ | 1,571.00 | $ | 1,636.00 | $ | 1,708.00 | $ | 1,767.00 |
| D134904 | CATHETER ELECTROPHYSIOLOGY 7FR 20MM LASSO NAVISTAR FIXED D CURVE 22 POLE DEFLECTABLE SPLIT HANDLE | EA | 1 | $ | 1,482.00 | $ | 1,571.00 | $ | 1,636.00 | $ | 1,708.00 | $ | 1,767.00 |
| D134906 | CATHETER ELECTROPHYSIOLOGY 7FR 25MM LASSO NAVISTAR FIXED D CURVE 22 POLE DEFLECTABLE SPLIT HANDLE | EA | 1 | $ | 1,482.00 | $ | 1,571.00 | $ | 1,636.00 | $ | 1,708.00 | $ | 1,767.00 |
| DLN2215CT | CATHETER ELECTROPHYSIOLOGY 6MM SPACING D CURVE 7FR 15MM 115CM 20 POLE DEFLECTABLE NAVIGATION CARTO XP LASSO | EA | 1 | $ | 1,482.00 | $ | 1,571.00 | $ | 1,636.00 | $ | 1,708.00 | $ | 1,767.00 |
| DLN2220CT | CATHETER ELECTROPHYSIOLOGY 6MM SPACING D CURVE 7FR 20MM 115CM 20 POLE DEFLECTABLE NAVIGATION CARTO XP LASSO | EA | 1 | $ | 1,482.00 | $ | 1,571.00 | $ | 1,636.00 | $ | 1,708.00 | $ | 1,767.00 |
| DLN2225CT | CATHETER ELECTROPHYSIOLOGY 6MM SPACING D CURVE 7FR 25MM 115CM 20 POLE DEFLECTABLE NAVIGATION CARTO XP LASSO | EA | 1 | $ | 1,482.00 | $ | 1,571.00 | $ | 1,636.00 | $ | 1,708.00 | $ | 1,767.00 |
| D131602 | CATHETER ABLATION 115CM 8FR D CURVE THERMOCOOL | EA | 1 | $ | 1,417.00 | $ | 1,501.00 | $ | 1,564.00 | $ | 1,633.00 | $ | 1,689.00 |

HIGHLY CONFIDENTIAL

BWI-INN00052149
BWI-INN00052079

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | SF NONNAVIGATIONAL UNIDIRECTIONAL THERMOCOUPLE | | | | | | | | | |
| D131603 | CATHETER ABLATION 115CM 8FR F CURVE THERMOCOOL SF NONNAVIGATIONAL UNIDIRECTIONAL THERMOCOUPLE | EA | 1 | $ 1,417.00 | $ 1,501.00 | $ 1,564.00 | $ 1,633.00 | $ 1,689.00 | |
| D131601 | CATHETER ABLATION 115CM 8FR B CURVE THERMOCOOL SF NONNAVIGATIONAL UNIDIRECTIONAL THERMOCOUPLE | EA | 1 | $ 1,417.00 | $ 1,501.00 | $ 1,564.00 | $ 1,633.00 | $ 1,689.00 | |
| D131604 | CATHETER ABLATION 115CM 8FR J CURVE THERMOCOOL SF NONNAVIGATIONAL UNIDIRECTIONAL THERMOCOUPLE | EA | 1 | $ 1,417.00 | $ 1,501.00 | $ 1,564.00 | $ 1,633.00 | $ 1,689.00 | |
| DI7TCFLRT | CELSIUS THERMOCOOL TC, DEF TC IR 7FR 4P F LE 2-5-2, DI7TCFLRT | EA | 1 | $ 1,348.00 | $ 1,428.00 | $ 1,488.00 | $ 1,553.00 | $ 1,607.00 | |
| DI7TCDLRT | CELSIUS THERMOCOOL TC, DEF TC IR 7FR 4P D LE 2-5-2 RT, DI7TCDLRT | EA | 1 | $ 1,348.00 | $ 1,428.00 | $ 1,488.00 | $ 1,553.00 | $ 1,607.00 | |
| DI7TCJLRT | CATHETER ABLATION 115CM 7FR 3.5MM 2-5-2MM SPACING J CURVE CELSIUS THERMOCOOL REDEL 10 PIN CONNECTOR IRRIGATED | EA | 1 | $ 1,348.00 | $ 1,428.00 | $ 1,488.00 | $ 1,553.00 | $ 1,607.00 | |

HIGHLY CONFIDENTIAL

BWI-INN00052150
BWI-INN00052079

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | DEFLECTABLE TIP BLACK | | | | | | | | | | |
| DI7TCBLRT | CATHETER ABLATION 115CM 7FR 3.5MM 2-5-2MM SPACING B CURVE CELSIUS THERMOCOOL REDEL 10 PIN CONNECTOR IRRIGATED DEFLECTABLE TIP RED | EA | 1 | $ | 1,348.00 | $ | 1,428.00 | $ | 1,488.00 | $ 1,553.00 | $ 1,607.00 |
| D134909 | LASSO NAV 10 Pole Fixed, 7Fr Def LassoNav SH,12P,20mm,D, D134909 | EA | 1 | $ | 1,305.00 | $ | 1,383.00 | $ | 1,441.00 | $ 1,504.00 | $ 1,556.00 |
| D134901 | CATHETER ELECTROPHYSI OLOGY 7FR 15MM LASSO NAVISTAR FIXED D CURVE 12 POLE DEFLECTABLE SPLIT HANDLE | EA | 1 | $ | 1,305.00 | $ | 1,383.00 | $ | 1,441.00 | $ 1,504.00 | $ 1,556.00 |
| D134903 | CATHETER ELECTROPHYSI OLOGY 7FR 20MM LASSO NAVISTAR FIXED D CURVE 12 POLE DEFLECTABLE SPLIT HANDLE | EA | 1 | $ | 1,305.00 | $ | 1,383.00 | $ | 1,441.00 | $ 1,504.00 | $ 1,556.00 |
| D131209S | CATHETER ELECTROPHYSI OLOGY 6MM SPACING FIXED D CURVE 6MM 20MM 10 POLE LASSO | EA | 1 | $ | 1,305.00 | $ | 1,383.00 | $ | 1,441.00 | $ 1,504.00 | $ 1,556.00 |
| D134905 | CATHETER ABLATION 7FR 25MM D CURVE LASSO NAVISTAR 12 POLE DEFLECTABLE SPLIT HANDLE FIXED | EA | 1 | $ | 1,305.00 | $ | 1,383.00 | $ | 1,441.00 | $ 1,504.00 | $ 1,556.00 |
| D7TCE8L162RT | CATHETER ABLATION 115CM 7FR 8MM 1-6-2MM SPACE E CURVE CELSIUS REDEL 10 PIN CONNECTOR 2 SENSOR DEFLECTABLE QUADRAPOLAR | EA | 1 | $ | 1,305.00 | $ | 1,383.00 | $ | 1,441.00 | $ 1,504.00 | $ 1,556.00 |

Page A-34

HIGHLY CONFIDENTIAL

BWI-INN00052151
BWI-INN00052079

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | THERMOCOUPLE WHITE | | | | | | | | |
| DLN1215CT | CATHETER ELECTROPHYSIOLOGY 6MM SPACING D CURVE 7FR 15MM 115CM DEFLECTABLE DECAPOLAR NAVIGATION CARTO XP LASSO | EA | 1 | $ 1,305.00 | $ 1,383.00 | $ 1,441.00 | $ 1,504.00 | $ 1,556.00 | |
| DLN1220CT | CATHETER ELECTROPHYSIOLOGY 6MM SPACING D CURVE 7FR 20MM 115CM DEFLECTABLE DECAPOLAR NAVIGATION CARTO XP LASSO | EA | 1 | $ 1,305.00 | $ 1,383.00 | $ 1,441.00 | $ 1,504.00 | $ 1,556.00 | |
| DLN1225CT | CATHETER ELECTROPHYSIOLOGY 6MM SPACING D CURVE 7FR 25MM 115CM DEFLECTABLE DECAPOLAR NAVIGATION CARTO XP LASSO | EA | 1 | $ 1,305.00 | $ 1,383.00 | $ 1,441.00 | $ 1,504.00 | $ 1,556.00 | |
| R10439011 | Reprocessed Soundstar eco 8F, REPROCESS SDSTR ECO 8F-90 SMS, R10439011 | EA | 1 | $ 1,268.00 | $ 1,348.00 | $ 1,379.00 | $ 1,427.00 | $ 1,506.00 | |
| R10439236 | Reprocessed Soundstar eco 8F, REPROCESS SDSTR ECO 8F-90 GE, R10439236 | EA | 1 | $ 1,268.00 | $ 1,348.00 | $ 1,379.00 | $ 1,427.00 | $ 1,506.00 | |
| D7L2015RT | CATHETER ELECTROPHYSIOLOGY 4.5MM SPACING 7FR 15MM 115CM 20 POLE DEFLECTABLE REDEL 10 PIN CONNECTOR CIRCULAR MAPPING LASSO | EA | 1 | $ 1,259.00 | $ 1,334.00 | $ 1,390.00 | $ 1,451.00 | $ 1,501.00 | |
| 122071S | CATHETER ELECTROPHYSIOLOGY 11MM SPACING 7FR 5MM 20 POLE DEFLECTABLE | EA | 1 | $ 1,259.00 | $ 1,334.00 | $ 1,390.00 | $ 1,451.00 | $ 1,501.00 | |

Page A-35

HIGHLY CONFIDENTIAL

BWI-INN00052152
BWI-INN00052079

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | POLYURETHAN E LASSO | | | | | | | | | | | |
| 122072S | CATHETER ELECTROPHYSI OLOGY 7FR 35MM 115CM DEFLECTABLE LASSO | EA | 1 | $ | 1,259.00 | $ | 1,334.00 | $ | 1,390.00 | $ | 1,451.00 | $ | 1,501.00 |
| D7L2015C T | CATHETER ELECTROPHYSI OLOGY 3 7FR 15MM DEFLECTABLE CARTO 20P | EA | 1 | $ | 1,259.00 | $ | 1,334.00 | $ | 1,390.00 | $ | 1,451.00 | $ | 1,501.00 |
| D7L2020C T | CATHETER ELECTROPHYSI OLOGY 3 7FR 20MM DEFLECTABLE CARTO 20P | EA | 1 | $ | 1,259.00 | $ | 1,334.00 | $ | 1,390.00 | $ | 1,451.00 | $ | 1,501.00 |
| D7L2020R T | CATHETER ELECTROPHYSI OLOGY 6MM SPACING 7FR 20MM 115CM 20 POLE DEFLECTABLE REDEL 10 PIN CONNECTOR CIRCULAR MAPPING LASSO | EA | 1 | $ | 1,259.00 | $ | 1,334.00 | $ | 1,390.00 | $ | 1,451.00 | $ | 1,501.00 |
| D7L2025R T | CATHETER ELECTROPHYSI OLOGY 8MM SPACING 7FR 25MM 115CM 20 POLE DEFLECTABLE REDEL 10 PIN CONNECTOR CIRCULAR MAPPING LASSO | EA | 1 | $ | 1,259.00 | $ | 1,334.00 | $ | 1,390.00 | $ | 1,451.00 | $ | 1,501.00 |
| D7L2030R T | CATHETER ELECTROPHYSI OLOGY 9.5MM SPACING 7FR 30MM 115CM 20 POLE DEFLECTABLE REDEL 10 PIN CONNECTOR CIRCULAR MAPPING LASSO | EA | 1 | $ | 1,259.00 | $ | 1,334.00 | $ | 1,390.00 | $ | 1,451.00 | $ | 1,501.00 |
| BD7TCFJ8 L | CATHETER ABLATION 115CM 7FR 8MM 1-7-4MM SPACING F-J CURVE EZ STEER DS BIDIRECTIONA L REDEL 10 PIN | EA | 1 | $ | 1,213.00 | $ | 1,285.00 | $ | 1,339.00 | $ | 1,398.00 | $ | 1,446.00 |

Page A-36

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | CONNECTOR THERMOCOUPLE 2 SENSOR DEFLECTABLE TIP | | | | | | | | | | |
| BD7TCDF8L | CATHETER ABLATION 115CM 7FR 8MM 1-7-4MM SPACING D-F CURVE EZ STEER DS BIDIRECTIONAL REDEL 10 PIN CONNECTOR THERMOCOUPLE 2 SENSOR DEFLECTABLE TIP | EA | 1 | $ | 1,213.00 | $ | 1,285.00 | $ | 1,339.00 | $ | 1,398.00 | $ | 1,446.00 |
| BD7TCJJ8L | CATHETER ABLATION 115CM 7FR 8MM 1-7-4MM SPACING J-J CURVE EZ STEER DS BIDIRECTIONAL REDEL 10 PIN CONNECTOR THERMOCOUPLE 2 SENSOR DEFLECTABLE TIP | EA | 1 | $ | 1,213.00 | $ | 1,285.00 | $ | 1,339.00 | $ | 1,398.00 | $ | 1,446.00 |
| BD7TCFF8L | CATHETER ABLATION 115CM 7FR 8MM 1-7-4MM SPACING F-F CURVE EZ STEER DS BIDIRECTIONAL REDEL 10 PIN CONNECTOR THERMOCOUPLE 2 SENSOR DEFLECTABLE TIP | EA | 1 | $ | 1,213.00 | $ | 1,285.00 | $ | 1,339.00 | $ | 1,398.00 | $ | 1,446.00 |
| BD7TCDD8L | CATHETER ABLATION 115CM 7FR 8MM 1-7-4MM SPACING D-D CURVE EZ STEER DS BIDIRECTIONAL REDEL 10 PIN CONNECTOR THERMOCOUPLE 2 SENSOR DEFLECTABLE TIP | EA | 1 | $ | 1,213.00 | $ | 1,285.00 | $ | 1,339.00 | $ | 1,398.00 | $ | 1,446.00 |
| CR7TCS4RTU | CATHETER ABLATION 125CM 7FR 4MM 2-5-2MM | EA | 1 | $ | 1,170.00 | $ | 1,240.00 | $ | 1,292.00 | $ | 1,349.00 | $ | 1,395.00 |

HIGHLY CONFIDENTIAL

BWI-INN00052154
BWI-INN00052079

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SPACING CELSIUS RMT QUADRIPOLAR REDEL 10 PIN CONNECTOR THERMOCOUPLE STEERABLE | | | | | | | | | | | | | |
| CR7TCS4RT | CATHETER ABLATION 125CM 7FR 4MM 2-5-2MM SPACING CELSIUS RMT QUADRIPOLAR REDEL 10 PIN CONNECTOR THERMOCOUPLE | EA | 1 | $ | 1,170.00 | $ | 1,240.00 | $ | 1,292.00 | $ | 1,349.00 | $ | 1,395.00 | |
| D7TCJ8L162RT | CATHETER ABLATION 115CM 7FR 8MM 1-6-2MM SPACING J CURVE CELSIUS DS 2 SENSOR QUADRIPOLAR REDEL 10 PIN CONNECTOR THERMOCOUPLE DEFLECTABLE BLACK | EA | 1 | $ | 1,120.00 | $ | 1,187.00 | $ | 1,237.00 | $ | 1,291.00 | $ | 1,336.00 | |
| D7TCF8L162RT | CATHETER ABLATION 115CM 7FR 8MM 1-6-2MM SPACING F CURVE CELSIUS DS 2 SENSOR QUADRIPOLAR REDEL 10 PIN CONNECTOR THERMOCOUPLE DEFLECTABLE ORANGE | EA | 1 | $ | 1,120.00 | $ | 1,187.00 | $ | 1,237.00 | $ | 1,291.00 | $ | 1,336.00 | |
| D7TCD8L162RT | CATHETER ABLATION 115CM 7FR 8MM 1-6-2MM SPACING D CURVE CELSIUS DS 2 SENSOR QUADRIPOLAR REDEL 10 PIN CONNECTOR THERMOCOUPLE DEFLECTABLE BLUE | EA | 1 | $ | 1,120.00 | $ | 1,187.00 | $ | 1,237.00 | $ | 1,291.00 | $ | 1,336.00 | |
| D7TCB8L162RT | CATHETER ABLATION | EA | 1 | $ | 1,120.00 | $ | 1,187.00 | $ | 1,237.00 | $ | 1,291.00 | $ | 1,336.00 | |

HIGHLY CONFIDENTIAL

BWI-INN00052155
BWI-INN00052079

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 115CM 7FR 8MM 1-6-2MM SPACING B CURVE CELSIUS DS QUADRIPOLAR REDEL 10 PIN CONNECTOR THERMOCOUPLE 2 SENSOR DEFLECTABLE TIP RED | | | | | | | | |
| R10438577 | SoundStar Siemens Reprocessed, REPROCESS SDSTR ECO 10F-90 SMS, R10438577 | EA | 1 | $ 1,095.00 | $ 1,196.00 | $ 1,299.00 | $ 1,400.00 | $ 1,444.00 |
| R10439072 | SoundStar GE Reprocessed, REPROCESS SDSTR ECO 10F-90 GE, R10439072 | EA | 1 | $ 1,095.00 | $ 1,196.00 | $ 1,299.00 | $ 1,400.00 | $ 1,444.00 |
| RSDSTR10 G | SoundStar GE Reprocessed, REPROCESS SDSTR 10F-90 GE, RSDSTR10G | EA | 1 | $ 1,095.00 | $ 1,196.00 | $ 1,299.00 | $ 1,400.00 | $ 1,444.00 |
| RSNDSTR 10 | SoundStar Siemens Reprocessed, REPROCESS SDSTR 10F-90 SMS, RSNDSTR10 | EA | 1 | $ 1,095.00 | $ 1,196.00 | $ 1,299.00 | $ 1,400.00 | $ 1,444.00 |
| D117136 | Dx Defl 20 Pole Duo-Decapolar, 7F DEF,20P,2mm,DUO-DECAPOLAR, D117136 | EA | 1 | $ 1,078.00 | $ 1,142.00 | $ 1,190.00 | $ 1,242.00 | $ 1,285.00 |
| D139801 | Dx Defl 20 Pole Duo-Decapolar, 7FR CS Duo Deca Cath | EA | 1 | $ 1,078.00 | $ 1,142.00 | $ 1,190.00 | $ 1,242.00 | $ 1,285.00 |
| D728260R T | CATHETER ELECTROPHYSIOLOGY 2-8-2MM SPACING 7FR 115CM DEFLECTABLE DUO DECAPOLAR REDEL 10 PIN CONNECTOR | EA | 1 | $ 1,078.00 | $ 1,142.00 | $ 1,190.00 | $ 1,242.00 | $ 1,285.00 |
| D7T20282 CT | CATHETER ELECTROPHYSIOLOGY 2-8-2MM SPACING TRICUSPID CURVE 7FR | EA | 1 | $ 1,078.00 | $ 1,142.00 | $ 1,190.00 | $ 1,242.00 | $ 1,285.00 |

HIGHLY CONFIDENTIAL

BWI-INN00052156

BWI-INN00052079

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 110CM 20 POLE DEFLECTABLE AUTO ID HALO XP BLUE | | | | | | | | | |
| D7R20P14 CT | CATHETER ELECTROPHYSI OLOGY 2-12-2MM SPACING ISMUS CATH CURVE 7FR 115CM 20 POLE DEFLECTABLE AUTO ID | EA | 1 | $ 1,078.00 | $ 1,142.00 | $ 1,190.00 | $ 1,242.00 | $ 1,285.00 | | |
| D7R20P14 RT | CATHETER ELECTROPHYSI OLOGY 2-12-2MM SPACING ISMUS CATH CURVE 7FR 115CM 20 POLE DEFLECTABLE REDEL 10 PIN CONNECTOR | EA | 1 | $ 1,078.00 | $ 1,142.00 | $ 1,190.00 | $ 1,242.00 | $ 1,285.00 | | |
| D7T20282 RT | CATHETER ELECTROPHYSI OLOGY 2-8-2MM SPACE TRICUSPID CURVE 7FR 110CM 20 POLE 10 PIN CONNECTOR DEFLECTABLE REDEL HALO XP BLUE | EA | 1 | $ 1,078.00 | $ 1,142.00 | $ 1,190.00 | $ 1,242.00 | $ 1,285.00 | | |
| D7A20131 RT | CATHETER ELECTROPHYSI OLOGY 1-3-1MM SPACING D/CRISTACATH CURVE 7FR 115CM 3MM 20 POLE DEFLECTABLE REDEL 10 PIN CONNECTOR | EA | 1 | $ 1,078.00 | $ 1,142.00 | $ 1,190.00 | $ 1,242.00 | $ 1,285.00 | | |
| D7T20P15 RT | CATHETER ELECTROPHYSI OLOGY 2-13-2MM SPACING TRICUSPID CURVE 7FR 110CM 20 POLE DEFLECTABLE AUTO ID HALO XP BLUE | EA | 1 | $ 1,078.00 | $ 1,142.00 | $ 1,190.00 | $ 1,242.00 | $ 1,285.00 | | |
| D7L1015C T | CATHETER ELECTROPHYSI OLOGY 4.5MM SPACING 7FR 15MM 115CM DEFLECTABLE DECAPOLAR AUTO ID CIRCULAR | EA | 1 | $ 1,078.00 | $ 1,142.00 | $ 1,190.00 | $ 1,242.00 | $ 1,285.00 | | |

HIGHLY CONFIDENTIAL

BWI-INN00052157

BWI-INN00052079

| | | | | | | |
|---|---|---|---|---|---|---|
| | MAPPING LASSO | | | | | |
| D6R20P12 RT | CATHETER ELECTROPHYSI OLOGY 12MM SPACING ISMUS CATH CURVE 6FR 92CM 1MM DEFLECTABLE DUO DECAPOLAR REDEL 10 PIN CONNECTOR REGULAR TIP | EA | 1 | $ 1,078.00 | $ 1,142.00 | $ 1,190.00 $ 1,242.00 $ 1,285.00 |
| D7L1020R T | CATHETER ELECTROPHYSI OLOGY 6MM SPACING 7FR 20MM 115CM DEFLECTABLE DECAPOLAR REDEL 10 PIN CONNECTOR CIRCULAR MAPPING LASSO | EA | 1 | $ 1,078.00 | $ 1,142.00 | $ 1,190.00 $ 1,242.00 $ 1,285.00 |
| D7L1012R T | CATHETER ELECTROPHYSI OLOGY 4MM SPACING 7FR 12MM 115CM DEFLECTABLE DECAPOLAR REDEL 10 PIN CONNECTOR CIRCULAR MAPPING LASSO | EA | 1 | $ 1,078.00 | $ 1,142.00 | $ 1,190.00 $ 1,242.00 $ 1,285.00 |
| D7L1015R T | CATHETER ELECTROPHYSI OLOGY 4.5MM SPACING 7FR 15MM 115CM DEFLECTABLE DECAPOLAR REDEL 10 PIN CONNECTOR CIRCULAR MAPPING LASSO | EA | 1 | $ 1,078.00 | $ 1,142.00 | $ 1,190.00 $ 1,242.00 $ 1,285.00 |
| D7L1020C T | CATHETER ELECTROPHYSI OLOGY 6MM SPACING 7FR 20MM 115CM DEFLECTABLE DECAPOLAR AUTO ID CIRCULAR MAPPING LASSO | EA | 1 | $ 1,078.00 | $ 1,142.00 | $ 1,190.00 $ 1,242.00 $ 1,285.00 |
| 122073S | CATHETER ELECTROPHYSI OLOGY J CURVE 7FR | EA | 1 | $ 1,078.00 | $ 1,142.00 | $ 1,190.00 $ 1,242.00 $ 1,285.00 |

HIGHLY CONFIDENTIAL

BWI-INN00052158

BWI-INN00052079